# Exhibit "B"

## DECLARATION OF B. GREG CLINE

I, B. Greg Cline, hereby declare as follows:

1.    I have been General Counsel of Pace-O-Matic, Inc. ("POM") since 2016.

2.    POM develops and produces electronic skill games which are sold in Pennsylvania, Virginia and elsewhere.

3.    The outcome of POM's skill games is dependent predominantly upon skill, rather than chance, and therefore POM's games are not gambling devices in predominate skill jurisdictions, including Pennsylvania and Virginia.

4.    Although the skill-based nature of POM's games is readily apparent, POM has over the years faced legal challenges concerning its games and specifically whether the games can be characterized as gambling devices.

5.    To defend against one such possible legal challenge, POM retained the Eckert, Seamans, Cherin & Mellott, LLC firm (hereinafter "Eckert") in 2011 to provide legal services in Pennsylvania relating to its "Palmetto Gold" skill game.

6.    The representation is documented in an engagement letter dated September 13, 2011 which states that Eckert agreed to provide legal services to POM in relation to "distribution of [POM]'s 'Palmetto Gold' skill games or similar

devices within the Commonwealth of Pennsylvania, and any legal issues which may arise from the distribution of any such devices within the Commonwealth of Pennsylvania . . . ." A copy of the engagement letter is attached as Exhibit "A."

7.     POM's records confirm that Eckert billed POM for services in 2011. Eckert never notified POM that Eckert no longer considered itself bound by the 2011 engagement letter.

8.     On December 20, 2016, Eckert and POM executed a second engagement letter pursuant to which Eckert agreed to provide legal services to POM relating to "legal, regulatory and possible legislative matters in Virginia" concerning "sales and marketing of [POM's] electronics and software." A copy of the engagement letter is attached as Exhibit "B."

9.     Eckert's representation of POM and its affiliates pursuant to the December 20, 2016 engagement letter relates to similar software referenced in the September 13, 2011 engagement letter. POM's current skill games utilize newer versions of the software used in 2011 and provide similar game play. In other words, the games function essentially the same.

10.     POM provides administrative, management and other support services for affiliated and related entities and, in this role, retained Eckert to provide legal services for itself and those affiliated and related entities.

11.    In furtherance of the legal services requested from Eckert, POM and affiliated companies provided Eckert with highly sensitive, proprietary, confidential and non-public information concerning POM skill games and related business operations and participated with Eckert in confidential and privileged communications concerning the development and execution of legal strategies to preserve and defend the legality of POM's skill games.

12.    Relying on Eckert's duties of loyalty and confidentiality, POM invited Eckert to participate in regularly scheduled, privileged conferences with POM representatives involving and relating to legal issues affecting POM's short and long-term business objectives, competitive business strategies, litigation matters and legal, regulatory and legislative strategies in Pennsylvania, Virginia and elsewhere.

13.    Given the nature of the legal services provided by Eckert, Eckert was intimately involved in POM's affairs.

14.    POM paid Eckert more than $700,000 for legal services pursuant to the December 16, 2016 engagement letter.

15.    Eckert's representation of POM pursuant to the December 20, 2016 engagement letter included:  representing POM and its affiliates in meetings with law enforcement and government personnel relating to POM's skill games;

representing POM and its affiliates in litigation matters concerning the legality of

POM's skill games; negotiating and drafting agreements between POM and its

affiliates and third parties; and providing advice and counsel relating to legal,

legislative and litigation strategies for marketing and selling POM skill games.

16.    Among other things, on June 28, 2019, Eckert filed a complaint on

behalf of POM's affiliates, Queen of Virginia Skill & Entertainment, LLC and

POM of Virginia, LLC, against the Commonwealth's Attorney for the City of

Charlottesville in the Circuit Court for the City of Charlottesville, Virginia seeking,

*inter alia*, a declaratory judgment that POM's games are not gambling devices.  As

counsel for POM and its affiliates, Eckert secured legal and governmental opinions

attesting that POM's products are games of skill and not gambling devices and,

citing those opinions, Eckert accurately asserted in Paragraph 1 of the Verified

Complaint filed on behalf of POM's affiliates that POM's games "are not illegal

gambling" because "skill is determinative of successful play."  A copy of the

Complaint (with the referenced opinions) is attached as Exhibit "C."

17.    Also on behalf of POM, Eckert secured a written opinion from the

Deputy Chief of the Commonwealth of Virginia Department of Alcoholic

Beverage Control that POM's electronic skill games are not subject to

administrative sanction because they are not gambling devices.  The Deputy Chief

noted that his decision was based, in part, on the determination that POM's skill

games are lawful in Pennsylvania: "As we discussed, this game is currently being widely used in Pennsylvania . . . and has been found to be a game of skill by the Court of Common Pleas of Beaver County, Pennsylvania." The July 7, 2017 opinion letter is attached hereto as Exhibit "D."

18.     Eckert also represented POM and its affiliates in various other litigation matters relating to POM's skill games, including intellectual property disputes, zoning matters, contract actions and arbitrations.

19.     While Eckert advocated for and defended the legality of POM's skill games in Virginia, Eckert simultaneously attacked POM and its skill games in multiple actions filed on behalf of Parx Casino in Pennsylvania against certain selected establishments that offer POM games.  Eckert never disclosed to POM that Eckert had been requested by Parx Casino to attack POM and its skill games.

20.     In one such action, *Greenwood Gaming & Entm't Inc. v. Smoker's Express*, docketed at No. 2019-6832 in the Court of Common Pleas of Bucks County, Eckert argued in a brief filed on December 3, 2019 on behalf of Parx Casino that POM manufactures "illegal slot machine[s]" and "deceptively market[s] these games as 'legal,' when, in fact, they are not."  A copy of the brief is attached as Exhibit "E."

21.    Eckert argued the exact opposite about exactly the same skill games in Virginia.

22.    Eckert attacked POM games on behalf of Parx Casino in more than 20 similar actions filed on behalf of Parx Casino in Bucks County and Montgomery County, Pennsylvania against establishments that offer POM games.  A list of those actions is attached as Exhibit "F."  Eckert selectively targeted establishments in Pennsylvania with POM skill games.

23.    These are not the only instances in which Eckert advanced positions directly adverse to POM while concurrently representing POM and affiliated companies.  While Eckert was representing POM, the co-chair of Eckert's gaming practice authored letters sent on behalf of Parx Casino to hundreds of Pennsylvania municipalities advocating that skill games including those manufactured by POM are "illegal slot machines" and should be outlawed through a local ordinance which Eckert drafted and enclosed with the letter.  A copy of the letter is attached as Exhibit "G."

24.    In addition, while Eckert was representing POM, I observed an Eckert lawyer conferring with Parx Casino's *amicus* counsel at a January 15, 2020 hearing in the Commonwealth Court in opposition to POM's motion to prevent the unlawful seizure of its skill games in the matter captioned *POM of Pennsylvania,*

*LLC v. Pennsylvania State Police, Bureau of Liquor Control Enforcement*, No. 503
M.D. 2018 (Pa. Commw. Ct.). Further, Eckert planned, advertised and hosted a
gaming industry meeting and legislative reception in Harrisburg, Pennsylvania on
February 4, 2020, just after Eckert dropped POM as a client, to promote legislation
banning skill games like POM's.

25.    On January 29, 2020, Eckert abruptly terminated its representation of
POM due to concerns that POM raised over Eckert's conflicting representation of
Parx Casino. A copy of the letter from Eckert terminating the representation is
attached as Exhibit "H."

26.    Eckert's withdrawal on behalf of POM prejudiced POM's legal and
legislative strategies in Virginia. Specifically, Eckert's decision to drop POM as a
client has deprived POM of the valued leadership role that Eckert partner and
former Virginia Attorney General Anthony F. Troy played in developing and
effectuating POM's legal strategies.

27.    It is a source of great distress that Eckert has chosen to continue
advocating on behalf of Parx Casino that POM's skill games should be banned in
Pennsylvania. Eckert's participation in privileged legal strategy discussions with
POM personnel makes Eckert uniquely positioned to inflict irreparable harm on
POM through its continued advocacy on behalf of Parx Casino.

28.     The sensitive business information that Eckert has access to as counsel for POM and the confidential and privileged communications that Eckert participated in with POM personnel relate to the very same games that Eckert is seeking to ban on behalf of Parx Casino.  Such information and communications are immensely beneficial to Eckert in its continuing representation of Parx Casino.  Eckert's withdrawal from the representation of POM and its affiliates does not and cannot purge the knowledge that Eckert acquired through its privileged dealings with POM.

29.     Neither POM nor any of its affiliates ever agreed to waive Eckert's conflict of interest.  Eckert never informed POM that it might represent Parx Casino in matters materially adverse to POM or might seek on behalf of Parx Casino to ban POM's games in Pennsylvania or elsewhere.  POM would never have retained Eckert or entrusted Eckert with its sensitive, proprietary and confidential information and privileged communications if Eckert had disclosed that it might advocate against POM's skill games in the future.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
B. Greg Cline

Date:  March 23, 2020

Sworn to and subscribed before me
on this 23ʳᵈ day of March 2020.

_____
Notary Public

Christine Ann Santelli
NOTARY PUBLIC
Gwinnett County
State of Georgia
My Comm Expires        January 2, 2024

Page 9 of 9

# Exhibit A

# ECKERT SEAMANS

Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

TEL 412 566 6000
FAX 412 566 6099
www.eckertseamans.com

David J. Mayernik
412 566 6126
dmayernik@eckertseamans.com

September 13, 2011

Mark E. Jefferson, Esquire
General Counsel
Pace-O-Matic, Inc.
4150 Blue Ridge Industrial Parkway
Norcross, Georgia 30071

Dear Mr. Jefferson:

We are pleased that you have asked our firm to represent Pace-O-Matic, Inc. in connection with legal advice related to distribution of Pace-O-Matic's "Palmetto Gold" skill games or similar devices within the Commonwealth of Pennsylvania, and any legal issues which may arise from the distribution of any such devices within the Commonwealth of Pennsylvania, including the defense of Pace-O-Matic and its operators or distributors in any actions arising out of and related to such distribution which may be brought in the state or federal courts in the Commonwealth of Pennsylvania (hereinafter referred to as the "Project"). The purpose of this engagement letter is to set forth our mutual understanding of the basis on which we have agreed to undertake such representation. Under the Pennsylvania Rules of Professional Conduct, we are required to inform you in writing of the basis of the fee and expense reimbursement arrangement that will be applicable to our handling of the Project. This letter agreement will become effective upon our receipt of the retainer described below and a copy of this letter signed by you.

The charges for our services will be based upon our regular hourly rates in effect at the time the services are rendered. My rate currently is currently is $370 per hour. Judge Robert Graci's rate currently is $400 per hour. If other members in the firm work on this matter, their time will be billed on the basis of their regular hourly rate. If associate attorneys in the firm work on this matter, their time will be billed on the basis of their regular hourly rate. Associate hourly rates currently range from $155 to $335 per hour depending on their experience. If firm paralegals work on the Project, their time will be billed on the basis of their hourly rate which is in the $100 to $200 range. All of our current rates will be in effect for the calendar year 2011, but are subject to change thereafter, usually on an annual basis.

Any additional services requested to be provided by our firm beyond the scope of the work involved in this Project will be subject to a separate written agreement and billed to you in accordance with our hourly rates in effect at the time those services are rendered. In other words, if you would want us to provide advice and counsel to Pace-O-Matic for products different from "Palmetto Gold," a new, mutually agreed upon engagement letter would be required.

**ECKERT
SEAMANS**

Mark E. Jefferson, Esquire
September 13, 2011
Page 2

It is possible that some of our present or future clients will have matters adverse to you while we are representing you. We understand that you have no objection to our representations of parties with interests adverse to you and that you waive any actual or potential conflict of interest as long as those engagements are not substantially related to our representation of you. We agree that your consent shall not apply in any instance where, as a result of our representation of you, we have obtained confidential information that, if known to such other client, could be used to your material disadvantage.

We are requesting a retainer fee of $5,000, which amount is to be remitted with a copy of this letter executed by you. The retainer will be applied against our monthly charges. Bills will be submitted to you on a monthly basis and will be itemized describing all time expended by each attorney or paralegal involved in the Project. Each bill will also contain a description of all expenditures incurred on your behalf that month.

It is our understanding that all bills rendered to you by us will be paid within thirty days of the date on which such bills are submitted. We reserve the right to terminate our representation of you if such bills are not paid in a timely manner. We also reserve the right to charge interest on the amount of any bill remaining unpaid after expiration of a thirty day period at a rate of one per cent (1%) a month. We will promptly respond to any questions you may have concerning any item on a bill submitted to you.

You will be billed for disbursements and expenses that we incur on your behalf, including, without limitation, electronic research, travel costs, mileage, express mailings and postage, long distance telephone costs, telecopying charges, photocopying charges, and secretarial overtime. Unless you have a written arrangement with the firm which specifies otherwise, our firm policy requires that most expenses, excepting those which are extremely small in amount, incurred on your behalf and which are payable to a third party, will be forwarded to you for direct payment. Please remit such payments within thirty days directly to the third party. The firm will not be responsible for payment of the disbursements and expenses incurred on your behalf and which are payable to a third party.

Some of our clients use electronic mail ("E-Mail") to conduct communications between them and the firm. During 1999 the ethics committee of the American Bar Association issued a Formal Opinion in which it concluded that an attorney could transmit information relating to the representation of a client by use of unencrypted E-Mail sent over the Internet without violating the attorney's responsibilities under the Rules of Professional Conduct because such a mode of information transmission afforded a reasonable expectation of privacy from a technological and legal standpoint. For greater protection of client information, our firm has the capability to encrypt E-Mail. If you would like to request the use of encrypted E-Mail, please contact me so I can notify the appropriate personnel in our Information Systems department. However, no system of encryption provides absolute protection of the confidentiality of information communicated by E-Mail. If you do not want the firm to use E-Mail for some, or all, of its

**ECKERT
SEAMANS**

Mark E. Jefferson, Esquire
September 13, 2011
Page 3

communication with you, please advise us promptly to that effect. We will follow your
instructions as to the manner in which you want to communicate with the firm.

Clients are entitled to request and receive client-owned files unless the Firm asserts a legally
cognizable right to retain all or a portion of the files. No client files can be removed from the
Firm and transmitted to any person or entity without the client's written authorization. After a
legal representation has ended, client-owned files will either be returned to the client or kept in
the possession of the Firm in accordance with its client file retention policy. Under that policy,
client files are retained by the Firm for a fixed time period after which the files may be
destroyed. No client files will be destroyed unless approved by the responsible Firm attorney on
that legal representation or by the Firm's Executive Director. Files released to a client are no
longer subject to the Firm's client file retention policy.

If this engagement letter is consistent with your understanding of our fee and representation
arrangement, please sign the enclosed copy where indicated and return it to me. If you have any
questions concerning any of the matters discussed in this letter, please do not hesitate to let me
know.

We appreciate the opportunity to be of service to you on this Project and look forward to
working with you.

Very truly yours,

ECKERT SEAMANS CHERIN & MELLOTT, LLC

By_____
David J. Mayernik

Enclosure

Accepted and agreed to this _____ day of _____, 20__.

_____
        Mark E. Jefferson

Client: Pace-O-Matic, Inc.
Title: General Counsel

# Exhibit B



Eckert Seamans Cherin & Mellott, LLC
SunTrust Center
919 East Main Street, Suite 1300
Richmond, VA 23219

TEL   804 788 7740
FAX   804 698 2950
www.eckertseamans.com

Thomas A. Lisk
tlisk@eckertseamans.com
804-788-7750

December 20, 2016

Michael Pace, President
Pace-O-Matic, Inc.
4150 Blue Ridge Industrial Parkway
Norcross, GA  30071

Re:   Pace-O-Matic, Inc./
      Engagement of Eckert Seamans Cherin & Mellott, LLC

Dear Mr. Pace:

Eckert Seamans Cherin & Mellott, LLC (hereinafter, "Eckert Seamans") is very pleased that Pace-O-Matic, Inc. (hereinafter "POM") has asked our Firm to represent it concerning certain legal, regulatory and possible legislative matters in Virginia relating to the sales and marketing of your electronics and software (hereinafter, the "Project"). The purpose of this engagement letter is to set forth our mutual understanding of the basis on which we have agreed to undertake such representation. Below you will find the basis of the fee and expense reimbursement arrangement that will be applicable to our handling of the aforementioned representation. This letter agreement will become effective upon our receipt of a copy of this letter signed by an appropriate officer of POM.

The charges for our services will be based upon our regular hourly rates in effect at the time the services are rendered. Alternatively, many clients prefer to establish a fixed-fee monthly or quarterly retainer to provide predictability in billings for our representation. Please let me know if such an arrangement may be of interest to POM. Absent such a fixed-fee arrangement, I am the primary attorney responsible for your representation and I have a current rate of $520 per hour, which will rise to $545 per hour in 2017. If other members in the Firm work on this matter, their time will be billed on the basis of their regular hourly rate in effect at that time. All of our current rates will be in effect for the calendar year 2016, but are subject to change thereafter, usually on an annual basis. Unless otherwise agreed, any additional services requested to be provided by our Firm beyond the scope of the work involved in this Project will be billed to POM in accordance with our hourly rates in effect at the time those services are rendered.

Bills will be submitted to you on a monthly basis and will be itemized describing all time expended by each attorney or paralegal involved in the Project. It is our understanding that all bills rendered to you by us will be paid within thirty days of the date on which such bills are submitted. We reserve the right to terminate our representation of POM if such bills are not paid in a timely manner. We also reserve the right to charge interest on the amount of any unpaid



**ATTORNEYS AT LAW**

bills after the expiration of this thirty-day period at a rate of one percent (1%) per month. Similarly, we will promptly respond to any questions you may have concerning any item on a bill submitted to POM.

POM will be billed for disbursements and expenses that we incur on its behalf, including, without limitation, travel costs, mileage, express mailings and postage, long distance telephone costs, telecopying charges and photocopying charges. To the extent that any expenses incurred are payable to a third party, Eckert Seamans typically will pay such expenses and, thereafter, include the same expense on our monthly invoice to POM. If, however, any expenses to be incurred are in excess of $200 and will be payable to a third party, Eckert Seamans will seek approval from POM before incurring the expense and, thereafter, we will forward the invoice to you for direct payment. Please remit such payments within thirty days directly to the third party.

Some of our clients use electronic mail ("E-Mail") to conduct communications between them and the Firm. During 1999, the ethics committee of the American Bar Association issued a Formal Opinion in which it concluded that an attorney could transmit information relating to the representation of a client by use of unencrypted E-Mail sent over the Internet without violating the attorney's responsibilities under the Rules of Professional Conduct because such a mode of information transmission afforded a reasonable expectation of privacy from a technological and legal standpoint. For greater protection of client information, our Firm has the capability to encrypt E-Mail. If you would like to request the use of encrypted E-Mail, please contact me so I can notify the appropriate personnel in our Information Systems Department. However, no system of encryption provides absolute protection of the confidentiality of information communicated by E-Mail. If you do not want the Firm to use E-Mail for some, or all, of its communications with you, please advise us promptly to that effect. We will follow your instructions as to the manner in which you want to communicate with the Firm.

Clients are entitled to request and receive client-owned files unless the Firm asserts a legally cognizable right to retain all or a portion of the files. No client files can be removed from the Firm and transmitted to any person or entity without the client's written authorization. After a legal representation has ended, client-owned files will either be returned to the client or kept in the possession of the Firm in accordance with its client file retention policy. Under that policy, client files are retained by the Firm for a fixed time period after which the files may be destroyed. No client files will be destroyed unless approved by the responsible Firm attorney on that legal representation or by the Firm's Executive Director. If the client requests that its files be returned, we will strive to do so within ten (10) business days following the client's written request. Files released to a client are no longer subject to the Firm's client file retention policy.

It is possible that some of our present or future clients will have matters adverse to POM while we are representing POM. We understand that POM will have no objection to our representations of parties with interests adverse to it and that POM will waive any actual or potential conflict of interest as long as those engagements are not substantially related to our



Michael Pace, President
Pace-O-Matic, Inc.
December 20, 2016
Page 3

representation of POM. We agree that this consent shall not apply in any instance where, as a result of our representation of POM, we have obtained confidential information that, if known to such other client, could be used to its material disadvantage.

If this engagement letter is consistent with your understanding of our fee and representation arrangement, please have an appropriate officer of POM execute the enclosed copy where indicated and return it to me. If you have any questions concerning any of the matters discussed in this letter, please do not hesitate to let me know.

We appreciate the opportunity to be of service to you and Pace-O-Matic, Inc. on the Project and look forward to working with you.

Very truly yours,

ECKERT SEAMANS CHERIN & MELLOTT, LLC

By: _____
    Thomas A. Lisk

Accepted and agreed to this _____ day of December, 2016

PACE-O-MATIC, INC.

By: _____
Title: _VP Finance + Operation_

# Exhibit C

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF CHARLOTTESVILLE FILED

6-28-19 @ 12:14pm
(Date & Time)

City of Charlottesville
Circuit Court Clerk's Office
Llezelle A. Dugger, Clerk
By _____
Deputy Clerk

QUEEN OF VIRGINIA SKILL &          )
ENTERTAINMENT, LLC,                 )
POM OF VIRGINIA, LLC, and           )
MIELE MANUFACTURING, INC.,          )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )       Case No._____
                                    )
JOSEPH D. PLATANIA, in his official )
capacity as Commonwealth's attorney )
for the City of Charlottesville,    )
                                    )
        Defendant.                  )

## VERIFIED COMPLAINT

Plaintiffs Queen of Virginia Skill & Entertainment, LLC ("Queen of Virginia"), POM of

Virginia, LLC ("POM VA"), and Miele Manufacturing, Inc. ("Miele Manufacturing")

(collectively, "Plaintiffs"), through the undersigned counsel, state as follows for their Verified

Complaint against Defendant Joseph D. Platania ("Defendant"), in his official capacity as

Commonwealth's attorney for the City of Charlottesville:

## INTRODUCTION

1.      For two or more years, Plaintiffs have offered a legal, electronic game of skill in

the Commonwealth without issue. Plaintiffs contract with retail locations that house the game in

Department of Alcoholic Beverage Control ("ABC")-licensed restaurants, bars, and convenience

stores and are subject to a strict standard of conduct. In determining that their game is legal and

not an unlawful gambling device, Plaintiffs had the game examined by an independent laboratory

which determined that its outcome depended predominantly on skill rather than chance and

**EXHIBIT**

**A**

1

therefore could not be an illegal gambling device under Virginia law. Plaintiffs relied on these expert analyses, the design of the software, advice of numerous counsel, Virginia Attorney General opinions, and a common sense understanding of the Virginia gaming statutes that games, where skill is determinative of successful play, are not illegal gambling. Prior to distributing the game in the Commonwealth, Plaintiffs submitted the game to the ABC, which determined, based on information provided by Plaintiffs, and with the advice of the Attorney General's office, that the game was predominantly skill-based. Plaintiffs met with numerous Commonwealth's attorneys throughout the Commonwealth, including the former Commonwealth's attorney for the City of Charlottesville, who stated that he had no problems with the game. Plaintiffs assembled a team of former law enforcement officials to ensure compliance with the relevant laws and regulations before offering the game to retailers at restaurants, bars, and convenience stores in the Commonwealth, including those in Charlottesville.

2.    However, on the afternoon of Friday, June 7 of this year, Defendant issued a press release announcing his intention to prosecute retailers housing Plaintiffs' skill game because he "determined" that the game is an illegal gambling device, despite existing law and government decisions to the contrary. As a direct result of Defendant's actions, games that are located in retail locations in Charlottesville are being unplugged and removed from their premises out of fear that Defendant will prosecute these retail locations. Thus, Plaintiffs' ability to continue doing business is impaired. Defendant's attempt to enforce an inapplicable gambling statute to prevent the distribution of the game in the Commonwealth is improper and threatens Plaintiffs' fundamental property and liberty rights as well as their procedural due process rights. This Court

2

should issue declaratory and/or injunctive relief, and/or a writ of prohibition to suspend Defendant's unconstitutional and *ultra vires* actions.

## THE PARTIES

3.      Queen of Virginia is a Wyoming limited liability company, with offices in Richmond, Virginia and Duluth, Georgia. It is duly authorized to transact business in the Commonwealth of Virginia. Queen of Virginia owns and distributes the terminal and game known as Queen of Virginia Skill & Entertainment (the "Game").

4.      POM VA is a Wyoming limited liability company, with its principal place of business in Duluth, Georgia. It is duly authorized to transact business in the Commonwealth of Virginia. POM VA licenses to Queen of Virginia the software that comprises the Game.

5.      Miele Manufacturing is a Pennsylvania corporation, with a principal place of business in Williamsport, Pennsylvania. Miele Manufacturing manufactures and sells the hardware (game terminal, cabinet, electronics, screen, etc.) that comprise the Game.

6.      Defendant is the Commonwealth's attorney for the City of Charlottesville. He is sued in his official capacity.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this dispute pursuant to Va. Code § 17.1-513 and 42 U.S.C. § 1983.

8.      This Court has personal jurisdiction over Defendant as a citizen and government official of the Commonwealth of Virginia and/or pursuant to Va. Code § 8.01-328.1(A)(1).

9.      Venue is proper in this Court pursuant to Va. Code § 8.01-261(2).

3

## FACTS

10.     Plaintiffs manufacture, distribute, and maintain the Queen of Virginia Skill & Entertainment game ("the Game"), a skill game machine that is available as either a table-top device or standalone cabinet.

11.     The game begins when the player inserts money into a bill acceptor at the front of the game terminal. That generates a tic-tac-toe style puzzle in which the game spins nine reels in a 3x3 grid. When the reels stop spinning, the player has thirty seconds to select which of the nine cells should be changed to a wild symbol to create a chain of three identical symbols, either horizontally, vertically, or diagonally. The goal is to place the wild symbol in a cell to create at least one chain of three like symbols, as in tic-tac-toe.

12.     Whether one spot is more advantageous than another depends on the value of the symbols for which a chain of three was created. There may exist multiple possible solutions in which a chain of three is created, and it is up to the player to select, within thirty seconds, which cell is the most advantageous for the wild symbol.

13.     If the player does not select a wild symbol within thirty seconds, the player will lose.

14.     The game will never generate a puzzle in which the player automatically wins without selecting a wild symbol for the correct spot in the grid.

15.     Upon successfully creating a chain (or chains) of three symbols, the player will be awarded points depending on the symbols that comprise the chain or chains of three created by the successful player.

16.     The player must correctly solve the tic-tac-toe puzzle in order to win and must choose the correct solution in order to maximize his or her awards.

4

17.    By using the "preview" feature, a player can see the next tic-tac-toe puzzle that is available for play before paying the purchase price for the game. If the player changes to a different game theme or increases or decreases his or her play level, then a different tic-tac-toe puzzle will appear in the preview screen. By utilizing the preview feature, a player can toggle back and forth between game themes and purchase levels to choose the most advantages tic-tac-toe puzzle to solve. Moreover, the preview feature eliminates chance altogether because the player can view and study the puzzle (and determine the amount he or she would be awarded for correctly solving the puzzle) prior to paying any money to play the game.

18.    Some of the tic-tac-toe puzzles cannot be solved by placing a wild card in any of the available locations and some of the tic-tac-toe puzzles, when correctly solved, award a player less than the purchase price of the game. If the player fails to recover at least 104% of the purchase price to play the game, the player moves on to a "Follow Me" phase, a "Simon"-style memory game featuring nine colored dots on the screen in a 3x3 grid. The system lights one dot up and makes a sound, which the player must match by touching the corresponding dot. The system then adds additional dots in progressively longer sequences that the player must repeat. Each dot is associated with a distinct sound and color, which the skillful player can use to match the pattern. If the player successfully completes 25 sequences without missing a dot, the player will be assured a total prize of 104% of the purchase price to play the Game. In other words, a skillful player who successfully completes the Simon Says memory game is guaranteed to be awarded more than the purchase price of the game every time. However, if the player is not skillful and misses a dot or touches an incorrect dot, the Follow Me portion of the game will terminate without any award. As a result, if a player shows enough skill, the player can win each and every puzzle. Winning is not left to mere chance.

5

19.     Successful players of the Game will be paid out in credits, with one credit representing one cent. At any point, the player can redeem the credits won by utilizing the ticket printer on the machine and exchanging the ticket for cash at the location.

20.     The Game is always played in the same way, is not connected to the Internet, cannot be altered by the retail locations that host the game, and is not subject to modification by any other operator or third party. There is no factual dispute as to the manner in which the Game is played or the operation of its software.

21.     The Game is decided predominantly on the basis of the skill of the player rather than probability or chance. Skillful players of the Game who can identify correct patterns in the tic-tac-toe puzzle in the limited time allotted and remember the sequence in the Follow Me phase will win more than less-skillful players, and a perfectly skillful player can always win at least 104% or more of the amount of consideration paid to play the Game every time. For this reason, the Game is not an illegal gambling device, and playing it does not constitute illegal gambling under Virginia's gambling statutes, Va. Code § 18.2-325 *et seq.*

22.     Beginning in 2016, Plaintiffs laid the groundwork to introduce the Game into the Commonwealth.

23.     First, Plaintiffs submitted the game to a legal review which concluded that the Game is not an illegal gambling device under Virginia law because skill predominates, following a line of Attorney General opinions finding that, where chance does not predominate in the outcome of the game, it is not gambling under Virginia law. (Exhibit A, Gentry Locke Letter). Plaintiffs also submitted the Game's software for third party review and analysis, which also concluded that it was a skill game in which chance did not predominantly determine the likelihood of success. (Exhibit B, Farley Report).

6

24.     Plaintiffs placed the Games in restaurants and other establishments licensed by the ABC.

25.     Plaintiffs sought assurances that the Game would not be treated as an illegal gambling device by the ABC in order to avoid exposing restaurants, bars, and convenience stores hosting the game from the potential loss of their ABC licenses for mistaken or misguided ABC enforcement. Accordingly, Plaintiffs submitted an inquiry to the ABC in 2017 seeking guidance as to whether the ABC would treat the Game as an illegal gambling device.

26.     On July 7, 2017, with advice from the office of the Attorney General, the ABC issued a letter to Plaintiffs in which the ABC's Deputy Chief, following review of materials provided by Plaintiffs, opined that "we don't think the element of chance is a predominant factor in winning a prize in this game. It is apparent that there is a significant element of skill involved." (Exhibit C, ABC Letter).

27.     The letter went on, describing the tic-tac-toe phase of the Game as depending "on the player's ability to spot the pattern and determine the best place to put the 'wild' to enhance his/her chances of a higher score." *Id.* Moreover, the letter noted that the Follow Me phase "involves memory," and that, taken together, "skill is the predominant factor in the game rather than chance." *Id.*

28.     The letter concluded that the ABC would not "consider these machines, in their current configuration and intended use, to be gambling devices and no administrative charges will be initiated [by the ABC] against any licensee which utilizes the machines on their premises." *Id.*

29.     Following receipt of the letter from the ABC, Plaintiffs introduced the Game into ABC-licensed establishments in Virginia pursuant to contracts with retail locations that contain

7

strict guidelines as to how the Games are to be used and advertised, thus ensuring compliance with the relevant law. By way of example, Plaintiffs will not permit the Game to be used or placed in any establishments that also allow illegal gambling, and further mandate that the retailers take every precaution to prevent the improper or illegal use of skill game terminals. Retailers are also contractually obligated to cooperate with any and all law enforcement inquiries and investigations, and to remove from their premises any game terminals that the ABC determines to be illegal.

30.     Under Plaintiffs' contracts with their retailers, the retailers are also subject to a strict code of conduct that governs the use and advertising of terminals that contain the Game.

31.     Plaintiffs have never permitted the Game to be played in establishments that allow illegal gambling devices or slot machines.

32.     Plaintiffs also hired former ABC officers as dedicated compliance officers to make sure that retail locations with the Game did not also host illegal games or slot machines.

33.     As they began to introduce the Game into the Commonwealth, Plaintiffs arranged meetings with Commonwealth's attorneys throughout the state to demonstrate the Game and ensure that the Commonwealth's attorneys understood how the Game worked and operated as a skill game. Plaintiffs' team—which comprised a former Justice of the Supreme Court of Virginia, former Attorney General of Virginia, former Assistant United States Attorney, former ABC Board Member, former FBI and ABC special agents, and former Deputy Attorneys General of Virginia—met with numerous Commonwealth's attorneys prior to distributing the Game in their jurisdictions. Specifically, Plaintiffs met with former Charlottesville Commonwealth's attorney Dave Chapman ("Chapman"), who said he had no issue with the Game.

8

34.     Having conducted their due diligence and established the legality of the Game, Plaintiffs began distributing Game terminals in retail locations throughout the Commonwealth, including 30 or so locations in the City of Charlottesville.

35.     The Game has been successful, and since its introduction, it has generated significant tax revenue for the Commonwealth. The local retail locations in which Plaintiffs' games are located report increased business and sales and have come to rely on the revenue and increased sales generated from the Game. Moreover, Plaintiffs earmark a share of their revenue for charitable causes, and the Game has generated almost $450,000 in grants to non-profits in Virginia since its introduction into the Commonwealth.

36.     In January 2018, Defendant replaced Chapman as Charlottesville Commonwealth's attorney.

37.     At a May 20, 2019 Charlottesville City Council meeting, a resident asked whether Charlottesville allowed "slot machines."

38.     Around the same time, local news media had reported on the presence of Plaintiffs' games in the Charlottesville area. Various news stories misidentified the Games as "slot machines" that "slipped in the back door" through a "little loophole."

39.     A citizen who saw one of these news stories complained about the Games in an email to City Council and Defendant, in which she misidentified the Game as a "slot machine" and requested that Defendant and/or City "challenge[] their presence in court."

40.     Mounting political pressure on Defendant to "do something" culminated in Defendant issuing an erroneous press release on Friday afternoon on June 7, 2019. In the press release, Defendant asserted that the office of the Charlottesville Commonwealth's attorney has "made the determination that these 'Queen of Virginia' machines are gambling devices and

9

therefore violate Virginia Law." This "determination" is contrary to existing Virginia law and
prior determinations by government officials in Virginia as to the legality of Plaintiffs' Game.

41. Defendant then issued an ultimatum that retail locations housing terminals with
the Game must remove the Game from their premises no later than July 7, 2019 or otherwise
face prosecution for a Class 1 Misdemeanor carrying potential penalties of up to 12 months' jail
time and a fine of $2,500.

42. The Daily Progress immediately reported Defendant's press release in a story
headlined "Charlottesville to ban 'skill machines'" and the lede "Soon, 'skill machines' will no
longer be legal in Charlottesville, following a letter from the city's commonwealth attorney."
The local television stations ran similar stories.

43. The news of Charlottesville "banning" skill games spread across the
Commonwealth, damaging and threatening Plaintiffs' business in other jurisdictions.

44. In a seemingly odd coincidence, on the same day as Defendant's press release, the
Governor of Virginia was in Charlottesville announcing the award of economic incentives to a
slot machine manufacturer located in Albemarle County, less than a mile from the City limits,
whose manufactured games are pure games of chance requiring no skill whatsoever. This story
about a slot machine manufacturer receiving government aid was on the front page of the Daily
Progress directly beside the story about Defendant "banning" Plaintiffs' *skill* games from the
City of Charlottesville.

45. In his press release, Defendant claimed that his decision with respect to Plaintiffs'
skill-based Game was based on a "review" of Va. Code §§ 18.2-325 and 331.

46. Va. Code § 18.2-325 provides, in relevant part:

1. "Illegal gambling" means the making, placing or receipt of any bet or wager
in the Commonwealth of money or other thing of value, made in exchange for

10

a **chance** to win a prize, stake or other consideration or thing of value, dependent upon the result of any game, contest or any other event the outcome of which is **uncertain or a matter of chance**, whether such game, contest or event occurs or is to occur inside or outside the limits of the Commonwealth.

. . .

3. "Gambling device" includes:

a. Any device, machine, paraphernalia, equipment, or other thing, including books, records and other papers, which are actually used in an illegal gambling operation or activity, and

b. Any machine, apparatus, implement, instrument, contrivance, board or other thing, or electronic or video versions thereof, including but not limited to those dependent upon the insertion of a coin or other object for their operation, which operates, either completely automatically or with the aid of some physical act by the player or operator, in such a manner that, **depending upon elements of chance**, it may eject something of value or determine the prize or other thing of value to which the player is entitled . . .

(emphasis added).

47.   Va. Code §18.2-331 provides:

A person is guilty of illegal possession of a gambling device when he manufactures, sells, transports, rents, gives away, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of any gambling device, believing or having reason to believe that the same is to be used in the advancement of unlawful gambling activity. Violation of any provision of this section shall constitute a Class 1 misdemeanor.

48.   Defendant's assertion that the Game is an illegal gambling device is at odds with the irrebuttable fact that the Game is skill-based, and that success or failure in playing the game hinges on the skill of the player, and is not "depend[ent] upon elements of chance." Va. Code § 18.2-325(3)(b). As such, the Game cannot be a gambling device and cannot be subjected to criminal penalty.

49.   While Plaintiffs contend that the Game is clearly a legal skill game under Virginia law, the variance between prior Attorney General opinions, the ABC's review of the Game, and the legal and technical analysis of the Game on the one hand, and Defendant's "determination,"

11

on the other hand, is suggestive of one of two things. Either Defendant's determination exceeds the authority of the Office of the Commonwealth's attorney by improperly legislating or adjudicating – and fundamentally redefining – what comprises an illegal gambling device under Virginia law by reading the language "depending upon elements of chance" out of Va. Code § 18.2-325(3)(b). Or, it means that the statutory definitions of gambling and/or an illegal gambling device violate due process because they are unconstitutionally vague as applied to Plaintiffs and the Game's status as a legal game of skill or an illegal gambling device.

50.     Whether Defendant ultimately prosecutes any retailer with the Game is immaterial. The upshot of his decision is to deprive Plaintiffs of their liberty and property rights guaranteed by the United States and Virginia Constitutions by threatening any person that contracts with Plaintiffs with prosecution, thereby foreclosing the ability of Plaintiffs to transact the legal business of distributing skill game machines in the City of Charlottesville, forcing Plaintiffs out of business, and subjecting Plaintiffs' property – terminals containing the Game – to unjust criminal seizure.

51.     Moreover, there is no pending criminal prosecution against Plaintiffs in which they can defend their interests. In fact, retailers in Charlottesville no longer operate the Game in their establishments because of Defendant's "determination." Thus, if no retailer risks prosecution, then Plaintiffs are without an adequate remedy at law to challenge Defendant's interpretation of the relevant gambling statutes, notwithstanding a clear legal right to operate the Game in the Commonwealth under Virginia gambling law as understood and applied by the Office of the Attorney General for decades.

52.     Defendant's actions unjustly threaten not only Plaintiffs' property rights, but their ongoing business interests in the Commonwealth, as well.

12

## COUNT I

### Violation of the Due Process Clause of the Virginia and United States Constitutions – Declaratory Judgment

53.　Plaintiffs incorporate all prior paragraphs as though fully restated herein, verbatim.

54.　Defendant's imminent threat of criminal prosecution to any retail location housing the Game in Charlottesville violates Article I, Section 11 of the Virginia Constitution and Section 1 of the Fourteenth Amendment to the United States Constitution because it deprives Plaintiffs of their fundamental liberty and property rights by foreclosing Plaintiffs' ability to transact the legal business of distributing skill game machines in the Commonwealth, forcing Plaintiffs out of business, and subjecting their property – terminals containing the Game – to unjust criminal seizure.

55.　Moreover, Defendant's interpretation of the gaming statutes is at odds with prior Attorney General opinions and the ABC review of the Game. As applied to Plaintiffs and under Defendant's "determination," Va. Code §§ 18.2-325 and 331, which define "illegal gambling" and "gambling device" and prohibit the illegal possession of a gambling device, respectively, are void for vagueness. Defendant's interpretation of the gaming statutes leaves Plaintiffs and the retailers with which they contract to speculate at peril of indictment whether their conduct with respect to the Game is prohibited because the necessary level of skill to avoid prosecution thereunder is unclear, if one accepts Defendant's interpretation. Defendant's actions effectively read out the "depending upon elements of chance" language in the definition of gambling device, leaving both Plaintiffs and their retailers without guidance as to the level of skill or chance required in a game to avoid prosecution under the gaming statutes.

13

56.     The gaming statutes, as applied here by Defendant, do not provide a person of ordinary intelligence fair notice of the amount of skill required for an electronic skill game to avoid being designated as an illegal gambling device.

57.     Retail locations with which Plaintiffs contract to host the games face criminal fines and jail time if the Game is deemed an illegal gambling device. However, Plaintiffs' themselves face deprivation of their property and contract rights, and their fundamental right to pursue an occupation and transact business in accordance with state law, without due process of law because Defendant's threatened prosecution has compelled and will continue to compel retail locations to remove the Game from their establishments and Game terminals, which are owned by Plaintiffs, are subject to criminal seizure if they are not so removed, and if Defendant's erroneous "determination" goes unchallenged. Va. Code § 19.2-386.30.

58.     The vagueness has caused Plaintiffs' irreparable injury already insofar as retailers in the City of Charlottesville no longer operate the Game in their establishments, causing significant loss of revenue to Plaintiffs.

59.     Defendant's actions are demonstrative of how the vagueness of the statutes as applied to Plaintiffs and their retailers leaves them open to entirely arbitrary and selective enforcement by Virginia's Commonwealth's attorneys.

60.     An actual, justiciable controversy exists with respect to the application of the gaming statutes to the Game, and declaratory relief is appropriate pursuant to Va. Code § 8.01-184.

61.     The objective in this declaratory judgment proceeding is not to determine a disputed issue of fact because *how* the game operates is indisputable. It always operates as

14

designed by the proprietary and patented software code that governs the Game. Thus, the only question at issue in this proceeding is an adjudication of the parties' rights.

62.     Moreover, the declaratory judgment statute is designed to "afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights asserted by the other as to entitle him to maintain an ordinary action therefor. It is to be liberally interpreted and administered with a view to making the courts more serviceable to the people." Va. Code § 8.01-191.

63.     While Plaintiffs, which own the games, have not been prosecuted for distributing the Game in Virginia, Defendant's press release and ultimatum to their retailers have irreparably harmed and will continue to irreparably harm Plaintiffs' property and liberty rights.

64.     Plaintiffs will lose thousands of dollars in business revenue as a result of Defendant's unilateral announcement of his "decision" to ban Plaintiffs' skill-based Game.

65.     Plaintiffs have no forum in which to assert the legality of the Game and safeguard their property and liberty rights if they cannot bring an action for declaratory relief.

66.     Plaintiffs have a clear right to relief because skill determines the outcome of the Game, and, accordingly, it cannot be an illegal gambling device by the plain language of Va. Code § 18.2-325(3).

67.     The Game is played the same way at all times, is not connected to the Internet, and is not modifiable by retail locations hosting the game or any other third parties. There is no factual dispute as to how the game is played. The sole question to be addressed by the requested declaration is one of law, not fact.

15

68.     Therefore, Plaintiffs are entitled to a declaratory judgment that the Game is not an illegal gambling device because it is a skill game the outcome of which is determined predominantly by the player's skill with pattern recognition and memory retention.

## COUNT II

### Violation of Due Process – 42 U.S.C. § 1983

69.     Plaintiffs incorporate all prior paragraphs as though fully restated herein, verbatim.

70.     Section 1 of the Fourteenth Amendment to the United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law."

71.     As well as for the reasons stated herein, Defendant's actions have violated Plaintiffs' due process rights because Defendant's threatened enforcement of the gaming statutes against retail locations with the Game has impinged Plaintiffs' fundamental property rights and denied Plaintiffs an avenue to effectively protect or defend their property and liberty rights, including the fundamental right to pursue an occupation and transact business in accordance with state law.

72.     Moreover, Defendant's interpretation and enforcement of the Virginia gambling statutes are void for vagueness and violate due process insofar as they leave Plaintiffs and their retailers to speculate at peril of indictment whether their conduct with respect to the Game is prohibited because the necessary level of skill to avoid prosecution thereunder is unclear.

73.     Defendant has caused the violation of Plaintiffs' constitutional rights through his threatened, erroneous enforcement of the Virginia gambling statutes against retailers with which Plaintiffs contract.

16

74.    Defendant is a person for purposes of 42 U.S.C. § 1983.

75.    In violating Plaintiffs' constitutional rights, Defendant has acted and continues to act under color of state law.

76.    Plaintiffs have suffered and will continue to suffer irreparable injury from Defendant's actions with respect to his threatened erroneous enforcement of the Virginia gambling statutes against retailers with which Plaintiffs contract.

## COUNT III

### Writ of Prohibition

77.    Plaintiffs incorporate all prior paragraphs as though fully restated herein, verbatim.

78.    Plaintiffs have been injured and will continue to be injured if Defendant's position with respect to the application of the gambling statutes to the Game is left unchallenged.

79.    Defendant's "determination" that the Game is an illegal gambling device is at odds with the plain language of the relevant statues, decades-old Attorney General Opinions that have not been overturned by statute, case law, or subsequent advisory opinion, and common sense.

80.    Defendant's "determination" exceeds his jurisdictional authority as a Commonwealth's attorney to enforce the law and amounts to impermissible legislation and/or adjudication of Plaintiffs' rights.

81.    Defendant's press release has caused retailers that host the Game, with which Plaintiffs' contract, to remove the Game from their establishments and has functioned as a de facto adjudication of the illegality of the Game, which is not subject to challenge absent the entry of a declaratory judgment, injunction, or writ of prohibition by this court.

17

82.    Plaintiffs have a clear right to relief insofar as the Game is a skill game and not a gambling device. It plainly does not amount to illegal gambling under Virginia law because its operation does not *depend* upon elements of chance. Therefore, its presence in the Commonwealth is lawful.

83.    Plaintiffs lack an adequate remedy at law. Without the issuance of a writ of prohibition from this Court, suspending Defendant's erroneous criminal enforcement of the Virginia gambling statutes as against retailers hosting the Game, Plaintiffs are without an avenue to effectively protect their property rights.

84.    Plaintiffs have a clear right to the issuance of a writ of prohibition against Defendant. There is no factual dispute as to how the Game operates, and as constituted, it is a skill-based game the outcome of which is not dependent on chance, and it does not violate Virginia's gaming statutes.

85.    Defendant has a legal duty to prosecute felonies and the discretion to prosecute misdemeanors arising in the City of Charlottesville. *See* Va. Code § 15.2-1627(B). His authority does not extend to the de facto creation of new legislation with respect to the legality of skill games in the Commonwealth, nor does it extend to the adjudication or authority to *determine* whether or not the Game is an illegal gambling device.

86.    Defendant's threatened prosecution of the retailers that host the Game is *ultra vires* and Plaintiffs are entitled to a writ of prohibition suspending Defendant's *ultra vires* enforcement of Virginia's gaming laws against the Game.

## COUNT IV

### Request for Temporary and Permanent Injunctive Relief

87.     Plaintiffs incorporate all prior paragraphs as though fully restated herein, verbatim.

88.     Temporary injunctive relief is necessary to preserve the status quo ante pending litigation.

89.     Moreover, Plaintiffs have been and will continue to be irreparably harmed absent the issuance of a temporary and permanent injunction

90.     Plaintiffs have no adequate remedy at law.

91.     Defendant will not be harmed if a temporary and/or permanent injunction is granted.

92.     Plaintiffs are likely to succeed on the merits.

93.     The public interest in the consistent application of the criminal statutes and the principle that no one should be required at peril of life, liberty or property to speculate as to the meaning of penal statutes is served by the issuance of a preliminary and/or permanent injunction.

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Enter a declaratory judgment in Plaintiffs' favor that:

    a.  The Game is not an illegal gambling device;

    b.  Defendant has violated Plaintiffs' due process rights by unilaterally announcing his "decision" that Plaintiff's skill-based game is unlawful and banned from the City of Charlottesville;

    c.  Alternatively, Va. Code §§ 18.2-325 and 331 are unconstitutionally void for vagueness as applied to Plaintiffs and/or the Game by Defendant;

19

B.  Issue a writ of prohibition suspending Defendant from prosecuting the Game as an illegal gambling device insofar as the threatened prosecution is *ultra vires*;

C.  Enter a temporary and permanent injunction prohibiting Defendant from prosecuting the Game as an illegal gambling device insofar as the threatened prosecution is *ultra vires* and/or unconstitutional;

D.  Order Defendant to rescind or correct his "press release" which purported to declare Plaintiffs' skill-based Game illegal and banished from Charlottesville; and

E.  Award Plaintiffs all such further relief as it deems just and equitable.


Dated:        June 28, 2019                     Respectfully submitted,

                                                _____
                                                Jason C. Hicks, VSB # 46961
                                                Ian R. Dickinson, VSB # 92736
                                                WOMBLE BOND DICKINSON US, LLP
                                                201 E. Main Street, Suite P
                                                Charlottesville, VA 22902
                                                Tel: 202-857-4536
                                                Fax: 202-261-0013
                                                Jason.Hicks@wbd-us.com

                                                Anthony F. Troy, VSB # 05985
                                                ECKERT SEAMANS CHERIN &
                                                MELLOTT, LLC
                                                919 E. Main Street, Suite 1300
                                                Richmond, VA 23219
                                                Tel: 804-788-7751
                                                Fax: 804-698-2950
                                                ttroy@eckertseamans.com

20

**VERIFICATION**

Pursuant to Va. Code § 8.01-4.3, I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 27, 2019

Queen of Virginia Skill & Entertainment, LLC

By: _

Its *Representative*

## VERIFICATION

Pursuant to Va. Code § 8.01-4.3, I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 27, 2019                                     POM of Virginia, LLC

                                                         B

                                                         Its        _sen/a the_

## VERIFICATION

Pursuant to Va. Code § 8.01-4.3, I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:                                        Miele Manufacturing, Inc.

                                              B
                                                Lou Miele

                                              Its:

# EXHIBIT A

# GENTRY LOCKE
## Attorneys

Guy M. Harbert, III
P: (540) 983-9349
F: (540) 983-9400

June 2, 2016

**VIA EMAIL**

Michael Pace, President and CEO
Pace-O-Matic
4150 Blue Ridge Industrial Parkway
Norcross, GA 30071

      Re:   Virginia Super Skill game

Dear Mr. Pace:

      We have completed our review and analysis of the Virginia Super Skill games manufactured by Pace-O-Matic, Inc. For the reasons set forth below, it is our opinion that the games do not violate the Virginia anti-gambling laws. They are games of skill, not games of chance, and they are legal under the laws of the Commonwealth.

**The Games**

      The Virginia Super Skill game is a video touch screen game that involves puzzle-solving skills. Each game terminal contains four separate games, which all operate on a similar principle and differ primarily in terms of graphic presentation.[1] Each game displays symbols on a three by three square grid, and the object is to align three identical symbols in a row. Winning combinations can be horizontal, vertical or diagonal, so that there are eight possible winning lines, much like a tic-tac-toe game. A winning combination is achieved by selecting any one of the nine boxes, which in effect places a "wild card" symbol that will "connect" any two identical *adjacent* symbols to achieve a winning line. Continuing with the tic-tac-toe analogy, the "wild card" can be both an "X" and an "O" at the same time so that it can connect lines of both "Xs" and "Os" simultaneously. Each game is therefore a puzzle, which is solved by selecting the correct square for the "wild card."

      The games are activated by inserting currency into a bill reader. The currency is converted to points, with each point having the value of one cent. The games may be played at ten levels, from 40 points (40 cents) up to 400 points (four dollars) in 40 point (cent) increments. Once the level is selected, the player touches a "play" button and the nine symbols "spin" and come to rest displaying the next unsolved puzzle. A thirty second timer begins to run when the

---

[1] The four games are "Pirate's Prize" and "Pirates," which have a pirate motif, "Bombs and Bombshells," which has a military motif, and "Cocktail Cove," which has a beach motif.

10 Franklin Road SE, Suite 900 Roanoke, VA 24011 • PO Box 40013 Roanoke, VA 24022-0013
Toll Free: 866.983.0866

23402/1/7589260v1

**GENTRY LOCKE**

Michael Pace, President and CEO
June 2, 2016
Page 2

puzzle is displayed, and the player must make his "wild card" selection within that time. Each unsolved puzzle can be successfully solved, but there are no "automatic" or "default" winners; success depends entirely upon the player using his or her skill to select the correct "wild card" square within the time allotted.

There is frequently more than one "winning" solution to each puzzle. Each game has ten symbols which may be displayed in the puzzle, and each symbol has a different value, ranging from 2.5% of the amount initially played up to 500 times the amount played, and a "bonus" symbol, which takes the player to a different game that will allow him to receive points in an entertaining manner that draws out the excitement of successful skillful play.[2] Therefore, truly successful play depends not only upon selecting a "wild card" square that yields a winning combination, but also selecting the square that results in the greatest number of winning combinations with the highest total value before the time runs out. If the player does not select the square that would give the best result, the game shows the player where the "best spot" is.[3]

The puzzles are randomly built by the machine's central processing unit, and again, every puzzle is capable of being solved, provided the player chooses the correct "wild card" square. However, the lower value symbols appear more often that those with higher value, and often the points yielded for successful play will be less than the amount played (the 2.5, 5, 10% results discussed above). Nevertheless, a player whose skill results in solving the puzzle optionally *always* has an opportunity to win at least 105% of the points played, the player is invited to participate in a "Follow Me" game, very similar to the "electronic game of memory skill invented by Ralph H. Baer and Howard J. Morrison" known as "Simon." (https://en.wikipedia.org/wiki/Simon_(game)). In this game nine animated colored circles are displayed. Using movement and sound, a pattern is

[2] The bonus round in three of the four games are "point and shoot" contests, where the objective is to hit as many moving targets on the screen as possible within a limited time – such as "shooting" various military targets with a "cannon" or "photographing" fish with a "camera." Points are awarded for each successful "hit." The better a player's hand-eye coordination, the greater his chances of winning. A complete lack of success on these bonus games will mean that the player loses whatever his initial play amount was (from 40 to 400 points), but even partial success may generate points considerably in excess of that initial play. In the fourth game, "Pirates," a set number of points is awarded in the bonus round, but the player gets to watch the awarding of those points by means of an entertaining video presentation.

[3] The games contain on screen instructions which summarize the game play as follows:

TO WIN: TOUCH ANY SYMBOL TO MAKE IT 'WILD'. THE OBJECT IS TO MATCH 3 LIKE SYMBOLS IN A ROW (MAYBE MORE THAN ONE LINE) THAT IS THE HIGHEST TOTAL VALUE BEFORE THE TIME RUNS OUT! PARTIAL PRIZES ARE AWARDED FOR LESS THAN PERFECT PLAY. MATCH 3 [bonus symbols] TO START THE BONUS GAME.



**GENTRY LOCKE**

Michael Pace, President and CEO
June 2, 2016
Page 3

established which the player must follow correctly through twenty-five rounds.[4]  The instructions for this game appear on the screen as well:

> Nine symbols will be displayed.  To answer correctly, touch the symbols in the correct animated pattern.  Each time the symbols are touched correctly, an additional symbol will be added to the pattern.

Successful play of the "Follow Me" game will result in a total win of 105% of the points originally played.[5]

Finally, the game also has a feature that allows the player to see the result of the next play or "spin" *before* committing to play any points.  This can be done for every level before any points are played.

## Legal Analysis – The Virginia Anti-Gambling Laws

### *Gambling Offenses*

Virginia law criminalizes certain gambling activities, declaring that it is a misdemeanor to engage in "illegal gambling," Va. Code §18.2-326,[6] or to be in possession of a "gambling device," Va. Code § 18.2-331,[7] and a felony to conduct an "illegal gambling operation," which is generally defined as an operation that generates $2,000 per day. Va. Code §18.2-328.[8]  Certain

---

[4] In the first round, there is a single movement and sound, in the second there are two, three in the third, and so on. Obviously, the more movement and sound there is to remember, the more difficult the task becomes.

[5] If the puzzle was successfully solved, but less than 105% of the original amount of points played is awarded, then successful play of the "Follow Me" game awards whatever number of points is needed in addition to those awarded to net the player 105%.  No points are lost if the "Follow Me" game is not successfully played. The player is not invited to participate in the "Follow Me" game if he fails to solve the puzzle in the manner that gives the best possible outcome.

[6] In pertinent part, this statute provides:  "Except as otherwise provided in this article, any person who illegally gambles or engages in interstate gambling as defined in § 18.2-235 shall be guilty of a Class 3 misdemeanor. If an association or pool of persons illegally gamble, each person therein shall be guilty of illegal gambling."

[7] This statute states:  "A person is guilty of illegal possession of a gambling device when he manufactures, sells, transports, rents, gives away, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of any gambling device, believing or having reason to believe that the same is to be used in the advancement of unlawful gambling activity. Violation of any provision of this section shall constitute a Class 1 misdemeanor."

[8] This statute reads as follows:

> The operator of an illegal gambling enterprise, activity or operation shall be guilty of a

---

GENTRY LOCKE

forfeiture proceedings may also apply with respect to the property used in "illegal gambling." Va. Code §19.2-386.30.[9] Obviously, analysis of any gambling issue must begin with the definition of the two key terms: "illegal gambling," and "gambling device."

*What Constitutes "Illegal Gambling"?*

The code defines "illegal gambling" as "the making, placing or receipt of any bet or wager in the Commonwealth of money or other thing of value, made in exchange for a chance to win a prize, stake or other consideration or thing of value, dependent upon the result of any game, contest or any other event the outcome of which is uncertain or a matter of chance, whether such game, contest or event occurs or is to occur inside or outside the limits of the Commonwealth." Va. Code §18.2-325. This definition contains three essential components: (1) there must be *consideration* in the form of a "bet or wager,"[10] (2) which is made for in exchange

> Class 6 felony. However, any such operator who engages in an illegal gambling operation which (i) has been or remains in substantially continuous operation for a period in excess of thirty days or (ii) has gross revenue of $2,000 or more in any single day shall be fined not more than $20,000 and imprisoned not less than one year nor more than ten years.
>
> As used in this section, the term "gross revenue" means the total amount of illegal gambling transactions handled, dealt with, received by or placed with such operation, as distinguished from any net figure or amount from which deductions are taken, without regard to whether money or any other thing of value actually changes hands.

[9] This statute reads: "All money, gambling devices, office equipment and other personal property used in connection with an illegal gambling enterprise or activity, and all money, stakes and things of value received or proposed to be received by a winner in any illegal gambling transaction, which are lawfully seized by any law-enforcement officer or which shall lawfully come into his custody, shall be forfeited to the Commonwealth in accordance with the procedures contained in Chapter 22.1."

[10] The Virginia Code does not define "wager" or "bet," but we think a Virginia court would adopt the generally accepted definitions. A "wager" has been defined as:

> A contract by which two or more parties agree that a certain sum of money or other thing shall be paid or delivered to one of them or that they shall gain or lose on the happening of an uncertain event or upon the ascertainment of a fact in dispute, where the parties have no interest in the event except that arising from the possibility of such gain or loss. The word "wagering" is practically synonymous with the words betting and gambling, and the terms are so used in common parlance and in statutory and constitutional enactments.

Black's Law Dictionary, (5th Ed.) p. 1416, citing McDonald v. Bryant, 381 S.W.2d 736, 738 (1964). Similarly, the word "bet" has been defined as:

> An agreement between two or more persons that a sum of money or other valuable thing, to which all jointly contribute, shall become the sole property of one or some of them on the happening in the future of an event at present uncertain, or according as a question

GENTRY LOCKE

Michael Pace, President and CEO
June 2, 2016
Page 5

for an opportunity to win a *prize*, and (3) and that opportunity must be decided by a matter of *chance*.[11] If any one of the three elements does not exist, the activity does not constitute "illegal gambling."[12]

*What Constitutes a "Gambling Device"?*

The General Assembly has struggled to define just what constitutes a "gambling device" under Virginia law, having amended Va. Code §18.2-325(3) twice in the past six years in its effort to do so. Under the current version of the statute, anything can be a "gambling device" if it is "actually used in an illegal gambling operation or activity." Va. Code § 18.2-325(3)(a). Therefore, the initial focus must be upon the definition discussed in the preceding section – if the activity constitutes "illegal gambling," then the instruments used to carry out that activity are "gambling devices."

However, there is a more technical definition in subsection (3)(b) of the statute that must be separately analyzed. There, it is declared that a "gambling device" is "any machine[13] ... which operates ... in such manner that, *depending upon elements of chance*, it may ... determine the prize ... to which the player is entitled."[14] Va. Code § 18.2-325(3)(b) (emphasis added).

> disputed between them is settled in one way or the other. A contract by which two or more parties agree that a sum of money, or other thing, shall be paid or delivered to one of them on the happening or not happening of an uncertain event.

Id., p. 146. Key to both definitions is the notion that the payment of the consideration will be based upon the uncertain outcome of an event. Where the outcome is certain, there can be no bet or wager.

[11] This definition of gambling has been accepted by multiple Virginia authorities: 1997 Virginia Attorney General Opinions 97; 1996 Virginia Attorney General Opinions 99; 1991 Virginia Attorney General Opinions 288; Maughs v. Porter, 157 Va. 415, 161 S.E. 242 (1931); see also, Rosenberg v. Commonwealth, 165 Va. 739, 181 S.E. 368 (1935); Vegas Time Ass'ts., Inc. v. Granfield, 18 Va. Cir. 33 (Fairfax Co., 1988); Newport Enterprises, Inc. v. Virginia ABC Board, 13 Va. Cir. 175 (City of Norfolk, 1988).

[12] For example, when skill predominates over chance in determining the outcome of the event, there is no gambling even if the elements of prize and consideration are present. 1987-88 Attorney General Opinions, p.284, May 31, 1988; 1987-88 Attorney General Opinions p. 287, July 20, 1988. Likewise, if nothing is paid or offered in order to participate in the event, there is no gambling even if the game is one of chance and a prize is awarded. 1997 Virginia Attorney General Opinion 97; 1972-73 Virginia Attorney General Opinion 238; 69-70 Virginia Attorney General Opinion 167.

[13] The concept of "machine" in this context specifically includes "electronic and video versions thereof" and "those dependent upon the insertion of a coin or other object for their operation." Va. Code §18.2-325(3)(b).

[14] The current definition is thankfully much simpler and more flexible than the previous version in effect until 1972, which declared illegal any "device that operates on the nickel-in-the-slot principle, in operation of which *any element of chance whatever may enter* ...". Va. Code §18.1-329(1) (emphasis added).

# GENTRY LOCKE

Michael Pace, President and CEO
June 2, 2016
Page 6

## The Virginia Super Skill Games Do Not Violate The Virginia Anti-Gambling Laws

We think it is self-evident that the Virginia Super Skill games involve the element of "consideration;" after all, the player pays to play. The player also has the opportunity to win a "prize." However, although the puzzles are randomly generated, successful play depends upon (1) the player's puzzle solving skills, (2) when a bonus game becomes available on three of the four games,[15] the player's hand-eye coordination,  and, (3) when the puzzle is solved but successful play does not result in an award of points in excess of 105% of those played, the player's memory skills in the "Follow Me" game.  In short, unless the player chooses to forego an opportunity, he can only lose if his skill proves to be insufficient.  Therefore, as a matter of common sense, it would seem that these are not "games of chance."

There are few Virginia court cases that provide much in the way of guidance as to what constitutes an illegal "game of chance." However, the Virginia Attorney General has issued several opinions that shed considerable light upon the issue. In 1988 the Attorney General analyzed two different games, and found both to be legal.  First, she addressed a mechanical crane game, which she described as follows:

> The machine you describe is operated by inserting a coin into it, which activates a crane with claws.  The player then manipulates the crane by the use of two control buttons and attempts to pick up a stuffed toy animal resting at the bottom of the machine beneath the crane.  If the player successfully secures the animal with the crane, the crane moves toward a receptacle where the toy is deposited for retrieval by the player.

(1987-88 Attorney General Opinions, p.284, May 31, 1988).  She concluded that the decisive legal issue was "whether the winning of a prize from the machine … depends upon 'elements of chance' – that is, *whether chance is the predominant factor in winning a prize.*" Id., p. 285 (emphasis added). She concluded that "[w]hile chance undoubtedly plays some role in the operation of the crane, chance does not predominate to the extent that the machine would fall within the meaning of a 'gambling device.'" Id.

Several months later, she analyzed a machine similar to a "coin pusher," which she described as:

> … operated by inserting small tokens that have been purchased from the game operator into a metal slot, or "shooter, which the player moves from

---

[15] Again, the "bonus" award in the "Pirates" game is predetermined; the player is required to do nothing other than start  the animation by which the  points won through the skillful solving of the puzzle are awarded.



Michael Pace, President and CEO
June 2, 2016
Page 7

side to side to roll the game tokens onto the playing surface of the machine. When enough game tokens are on the playing surface, an arm which moves in a forward and backward motion over the rear portion of the surface will come into contact with the game tokens and ultimately cause the game tokens, larger plastic prize tokens, or other prizes to fall off the front ledge of the playing surface and down a chute where they can be recovered by the player. The larger plastic prize tokens can then be exchanged for other prizes. The bar which pushes the tokens forward can be stopped by depressing a button. Prior to reactivating the bar to move it in a forward motion, the player may attempt to place a number of game tokens on the playing surface in order to increase the probability of recovering the larger plastic prize tokens or prizes.

Id., p. 287. She again stated that "the threshold question is whether the winning of a prize from the machine depends upon 'elements of chance' – that is whether chance is the predominant factor in winning a prize" and concluded that "[i]f chance is not the predominant factor in winning a prize, the machine is not a 'gambling device' as defined in 18.2-325(2)(b)." Id., p. 288. Because "[t]he player exerts control over (1) the shooter in attempting to place tokens on the playing surface and (2) the bar in deciding whether or not it should be stopped while the tokens are being played," she found that "skill, rather than chance, is the predominant factor." Id. Finally, she again observed that "[w]hile chance undoubtedly plays some role in the operation of the machine, it is my opinion that chance does not predominate to the extent that the machine would fall within the meaning of a 'gambling device.'" (Id.).

We believe that these two opinions provide very strong support for the conclusion that the Virginia Super Skill games are games of skill, and therefore do not fall within the definition of "gambling device." The player's decisions and actions directly influence the outcome of the games. While some chance may be involved, it is the player's skill that determines the outcome.[16]

---

[16] The "skill predominates over chance" analysis has been applied by other attorney generals in other less similar contexts as well. A bass fishing tournament has been found to be a game of skill. 1975-76 Attorney General Opinions p. 2070. "In contrast, another Opinion concludes that the game of Skilo, which combines the elements of bingo and bowling on a miniature lane, constitutes illegal gambling since 'the opportunity for skill is extremely small.'" 1987-88 Attorney General Opinions p. 285, citing 1971-72 Attorney General Opinions p. 260). Use of this analysis is also consistent with the generally accepted definitions of a "game of chance." Black's Law Dictionary defines the term is as follows:

> One in which result as to success or failure depends less on skill and experience of player than purely fortuitous or accidental circumstances incidental to game or manner of playing it or device or apparatus with which it is played, but not under control of player.

Black's Law Dictionary (5th Ed.), p. 611, citing, Kansas City v. Caresio, 447 S.W.2d 535, 537 (Mo. App. 1974). The standard lay definition is no different: "a game (as a dice game) in which chance rather than skill determines the

 GENTRY LOCKE

Michael Pace, President and CEO
June 2, 2016
Page 8

We think it is also of considerable significance that a court in another jurisdiction – Pennsylvania – has found these games to be legal games of skill. In the case of In re Pace-O-Matic, Inc. Equipment, M.D. 965-2013 (Ct. Common Pleas, Beaver County 2013), the court utilized the "skill vs. chance" analysis that we think a Virginia court would apply,[17] and concluded that the games were legal. The court noted that "[a]lthough there often is ... an 'obvious' position where placement of the wild would generate a nonzero score, several puzzles have a position where placement of the wild will lead to a more advantageous score," and concluded that "[i]t takes skill for a player to recognize both which symbols are most advantageous to his or her payout and which position will maximize the player's score." Id., pp. 7-8. The court went on to note that a player who lacks the skill to determine the most advantageous placement of the wild symbol "will not achieve as high a score as one who does recognize those patterns," and found that "[w]ere the game one predominantly based on chance, one would reasonably expect that a skilled player and an unskilled player would stand to gain roughly the same score ." Id., p. 8. The court found that the fact the game used a random number generator to produce the puzzles was irrelevant, as it did not "determine whether a player wins or loses," but simply to "determine which puzzle in a finite pool of puzzles will be presented to the player." Id. Finally, the court noted that unlike a game of poker where even the most skilled player is "subject to defeat at the turn of the cards ... the players of the Pennsylvania Skill game are not at the mercy of the hand they are dealt .... In this game, the player's choices are the "instrumentality for victory"' – in sharp contrast to the capricious nature of card dealing and shuffling present in a traditional game of Texas Hold 'Em. Id. The court then went on to reach

outcome." http://www.merriam-webster.com/dictionary/game%20of%20chance.

[17] The court observed:

> That successful play is determined by chance rather than skill is an element essential to a finding that the machine is a gambling device per se. Courts must determine in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome. In order for a game to constitute illegal gambling, it must be a game where chance predominates rather than skill. A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. The mere fact that a machine involves a substantial element of chance is insufficient to find that a machine [is] a gambling device.

> A game decided predominantly on the basis of probability than any real input of skill from a player will be a game of chance. The level of interactivity and the consequences of a player's choices in playing the game are relevant in determining whether the game is one of chance or skill ...

(Id., pp. 5-6, citing Commonwealth v. Two Elec. Video Poker Game Machs., 465 A.2d 973, 977 (Pa. 1983). We believe that is precisely the analysis a Virginia court would adopt.

 **GENTRY LOCKE**

Michael Pace, President and CEO
June 2, 2016
Page 9

the rather self-evident conclusions that the bonus game, the outcome of which is dependent upon "hand-eye coordination and dexterity," and the "Follow Me" game, which is decided by the player's memory skill, are not games of chance. Id., pp. 10-11.

## CONCLUSION

It is our opinion that if a Virginia court were to address the question of whether the Virginia Super Skill games constituted "illegal gambling devices," the court would apply a "skill vs. chance" analysis and conclude that the element of skill predominates over the element of chance so that the games are legal. This conclusion would be consistent with prior opinions of the Virginia Attorney General, the commonly accepted definitions of "games of skill" and "games of chance," and the conclusion of court in Pennsylvania, which conducted an exhaustive analysis of the games.

Very truly yours,

GENTRY LOCKE

Guy M. Harbert, III

GMH,III/fv

# EXHIBIT B



**Nick Farley & Associates**

6401 Davis Industrial Parkway
Suite A
Solon, Ohio 44139
(440) 914-TEST (8378)
www.nfa777.com

November 3, 2017

Mr. Guy M. Harbert, III
Gentry Locke Attorneys
10 Franklin Road South East, Suite 900
Roanoke, Virginia 24011

Re:   Report on the review and analysis of the *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* developed by POM of VA, LLC.

Dear Mr. Harbert:

By request of counsel, *Nick Farley & Associates, Inc.* has conducted a review and examination of the *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* developed by POM of VA, LLC. Our review and examination has been undertaken on behalf of Mr. Guy M. Harbert III of Gentry Locke Attorneys for the benefit of POM of VA, LLC, the successor to Pace-O-Matic, Inc. This document will be divided into sections representing the various stages of review and analysis conducted.

## Section I – System Components

The *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* reviewed consisted of the following components:

| Component Name | Version |
|---|---|
| *Cutting EDGE Queen of Virginia Skill System* | *SKL 503.06 VIR 1663* |

The *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* is a stand-alone machine that offers different game themes that a patron may select to play. The *Cutting EDGE Queen of Virginia Skill System* contains a touch screen that is used to navigate through the system. A patron inserts money into the *Cutting EDGE Queen of Virginia Skill System* through a bill acceptor located on the front side of the cabinet. The bill acceptor accepts U.S. notes of varying denominations. Bills inserted are displayed on the video screen as "Points" available for game play purchase, where one "Point" equals one cent.

*Nick Farley & Associates*
www.nfa777.com

## Section II - General Information

The *Cutting EDGE Queen of Virginia Skill System* offers five (5) different game themes. These game themes are identified as follows:

1. *Bombs and Bombshells*
2. *Fishy Loot*
3. *Living Large*
4. *Lucky Fruit*
5. *Pirates*

Game play begins with the patron selecting an available game theme and one of the play levels with which to participate. A patron may change the quantity of points they wish to use at any time prior to engaging in game play. Each game theme contains a "Next Puzzle" feature which allows the patron to view the very next game puzzle by pressing the "Next Puzzle" icon on the video screen. At any given time prior to the initiation of a game, the patron may preview the next game puzzle. No payment or purchase is required for the participant to exercise the ability to cause the electronic system to disclose the next game puzzle for the game theme and play level selected. The patron can then touch the "PLAY" icon on the video screen or press the "PLAY" button on the cabinets' exterior to initiate a game.

Each game theme is constructed of a 3x3 grid that will display symbols to the patron, similar to a "tic-tac-toe" arrangement. Once the patron initiates game play, the symbols in the 3x3 grid will spin and present the patron with a new set of symbols. The patron must then select which symbol in the 3x3 grid to replace with a "Wild" symbol. The patron must also consult the screen to determine if multiple winning combinations may exist, and the value of each combination, to determine the best winning outcome. The patron may place the "Wild" symbol in any one of the 9 spaces in the 3x3 grid. The object of the game is for the patron to recognize the best winning game outcome and select the appropriate symbol to replace with a "*Wild*" symbol that will align three (3) like symbol combinations on any line in the 3x3 grid. There may be several winning combinations; therefore the patron must select the "best" winning combination to maximize the outcome. The patron must make this selection within the allotted time (30 seconds), failure to do so results in a losing outcome.

It should be noted that the initial nine (9) icons displayed will not present an automatic winning combination. The patron must engage in the selection of a symbol to be chosen as "*Wild*" in order to align three like symbols on one or more lines of the game play area in order to obtain a winning game outcome. Additionally, it should be noted that not all plays initiated on the *Cutting EDGE Queen of Virginia Skill System* will have a potential winning outcome. However, as will be described later, every play can still result in a winning outcome when the "Follow Me" feature is invoked and is successfully completed by the patron.

Each game theme on the *Cutting EDGE Queen of Virginia Skill System* contains finite pools of game outcomes for each game theme and play level. The game outcomes that are played

from the finite pools are played without replacement until the entire pool has been exhausted, at which time it is automatically replenished. The game outcomes that are selected from the finite pools are used in the construction of each game puzzle presented to the patron. The "Next puzzle" disclosure is available to the patron in such a way that any patron can preview the next game puzzle. Each *Cutting EDGE Queen of Virginia Skill System* has its own dedicated pools of outcomes assigned to it.

When previewing a game puzzle, patrons are viewing a puzzle from the finite pools that are assigned to the *Cutting EDGE Queen of Virginia Skill System* terminal that they are currently using. Should the patron redeem their points from the *Cutting EDGE Queen of Virginia Skill System* terminal and then insert money to play on a different *Cutting EDGE Queen of Virginia Skill System* terminal, then the patron will be availed to a different game puzzle which is constructed from a different set of game outcomes which are dedicated to that terminal.

The *Cutting EDGE Queen of Virginia Skill System* makes use of a random number generator (RNG) when selecting the game outcomes from the finite pools of available game outcomes. The RNG selects the game outcomes in such a way that there is always a "Next Puzzle" game outcome for the patron to view. As the game outcomes are used, the RNG continues to select the "Next Puzzle" game outcome ensuring that there is always a "Next Puzzle" game outcome for the patron to view. After each game outcome is used, the "Next Puzzle" game outcome becomes the current game outcome, and a new "Next Puzzle" game outcome is selected and available to be viewed by the patron. Thus each game outcome will have a "Next Puzzle" game outcome ready to replace the current game outcome that is used by the patron.

Upon selection of the game theme and play level, which will determine how many points will be expended, the next game puzzle can be displayed by pressing the "Next Puzzle" icon on the screen. The next game puzzle will be displayed in advance of committing any points. The patron can then choose to either play the puzzle displayed or exit the game. A patron is not required to exhaust all of their points at once or on the same game theme. The game themes that are available on the *Cutting EDGE Queen of Virginia Skill System* are covered in more detail in Section III – Game Specific Information.

The *Cutting EDGE Queen of Virginia Skill System* contains a *"Follow Me"* feature, which is configurable by the manufacturer, or by personnel with manufacturer access to the system. As configured, when the patron has correctly solved the puzzle and wins a prize that is less than 105% of the purchase price to play the game, the patron is afforded an option to select the *"Follow Me"* bonus feature. The *"Follow Me"* bonus feature will provide the patron with an opportunity to win 105% of the initial purchase price to play the feature. The *"Follow Me"* bonus feature is similar to the children's game "Simon", whereby the patron must repeat a sequence. When the patron elects to play the *"Follow Me"* bonus feature, the patron terminal will display a page detailing the "instructions" for the *"Follow Me"* bonus feature. The patron terminal will display a 3x3 grid of nine (9) colored circles. These circles will

illuminate in a random sequence that the patron will have to repeat, starting with one (1) circle being lit. As configured, the patron will need to follow (repeat) the correct sequence for a total of twenty-five (25) rounds of play, with each sequence adding another circle, until a total of twenty-five (25) sequences are successfully completed. If performed successfully, the patron is assured a prize of 105% of the purchase price to play the game.

If the patron fails to complete the twenty-five (25) sequences, either by touching the wrong symbol, or by running out of the allotted time for each round, the bonus feature will end and no additional prize will be awarded. Upon completion of the *"Follow Me"* bonus feature, the patron terminal will return to its normal operating state. The *"Follow Me"* bonus feature is not offered if the patron does not correctly solve a puzzle with a potential winning outcome, or if the time to solve a puzzle that contains a potential winning outcome expires.

Each game theme includes a Help feature. Activating the Help feature within a game theme produces a screen which furnishes explanations and displays the awards chart for that particular game theme.

All prizes won are displayed as "Win" and added to the "Points" available for additional game play purchases. The patron may redeem accumulated "Points" after each game play. Redemption of "Points" is accomplished by simply pressing the "TICKET" button, or touching the "Redeem" icon on the video screen. All accumulated "Points" will be issued on a printed ticket showing a monetary value, with each "Point" equivalent to one cent. The printed ticket may be presented to the local venue operator for cash redemption.

## Section III - Game Specific Information

*Nick Farley & Associates, Inc.* has evaluated each of the five (5) game themes offered by the *Cutting EDGE Queen of Virginia Skill System*. Each theme affords a patron an opportunity to select options that determine the number of points to be expended per play, and allows the patron to view the "Next Puzzle" game outcome. The game theme and play level will determine the specific finite pool from which game outcomes will be selected.

### Game Themes
The five (5) game themes that are available on the *Cutting EDGE Queen of Virginia Skill System* are described below:

### Bombs and Bombshells
The *Bombs and Bombshells* game theme contains a total of ten (10) symbols based primarily upon a military theme. The *Bombs and Bombshells* game theme presents nine (9) icons, constructed in a 3x3 grid to the patron. The game theme allows the patron to select a play level, which determines the quantity of points that will be expended to play a game. As configured, the play levels for the game theme are available at 40, 80, 120, 160, 200, and 400 points per play.

POM of VA, LLC - *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* - Harbert
NA_PACE_3995-01_EW – November 3, 2017
Page 5 of 15

The *Bombs and Bombshells* game theme contains a bonus feature. To enter the bonus feature, three (3) "Bonus" symbols must be successfully aligned on a pay line on the 3x3 grid. The bonus feature is based upon a war scene. The patron is presented with a cannon that will fire upon touching the screen. Military icons (ships, tanks, helicopters, planes, etc.) will appear on the screen. The object of the bonus feature is to destroy as many military icons within the allotted time of thirty (30) seconds. There is a prize associated with each military icon. A listing of all the military icons that may appear during the course of the bonus feature, and their associated prize amount, is displayed along the bottom of the screen for the entire duration of the bonus feature. A running record of the destroyed military icons will also be tracked along the bottom of the screen. Upon completion of the bonus feature, the patron will be awarded the points that were earned from participating in the bonus feature. Should the patron fail to destroy any of the war icons that appear on the bonus screen then any potential prizes that could be awarded from the bonus feature will be forfeited.

The *Bombs and Bombshells* game theme offers the patron a "Next Puzzle" feature which will allow the patron to view the next game puzzle. Dependent upon the play level that the patron has selected, a different game puzzle will be displayed to the patron. The "Next Puzzle" feature will present the patron with an alternate display which will temporarily show the next game puzzle on the 3x3 grid.

### Fishy Loot

The *Fishy Loot* game theme contains a total of eleven (11) symbols based primarily upon a fishing theme. The *Fishy Loot* game theme presents nine (9) icons, constructed in a 3x3 grid to the patron. The game theme allows the patron to select a play level, which determines the quantity of points that will be expended to play a game. As configured, the play levels for the game theme are available at 40, 80, 120, 160, 200, and 400 points per play.

The *Fishy Loot* game theme contains a bonus feature. To enter the bonus feature, three (3) "Bonus" symbols must be successfully aligned on a pay line on the 3x3 grid. The bonus feature is based upon a pick style game, in which the patron is presented with five (5) "Fish" symbols. The patron must select from the fish symbols within a thirty (30) second time limit. Each fish symbol selected will reveal a prize amount which will be added the bonus points meter displayed during the bonus. The bonus feature ends when either the thirty (30) timer expires or when a "Fish" icon swims off of the screen. Upon completion of the bonus feature, the patron will be awarded the points that were revealed from participating in the bonus feature. Should the patron fail to select any of the fish icons that are displayed on the bonus screen, then the bonus feature will play and award any prizes to the patron automatically.

The *Fishy Loot* game theme also contains a "Bonus Spin" feature. For the *Bonus Spin* feature to be initiated, three (3) "Bonus Spin" symbols must be successfully aligned on a pay line on the 3x3 grid. When the *Bonus Spin* feature is initiated, the patron is granted ten (10) bonus

*Nick Farley & Associates*
www.nfa777.com

spins which will play automatically.  Upon completion of the bonus feature, the patron will be awarded the total prize amount that was revealed during the bonus.

The *Fishy Loot* game theme offers the patron a "Next Puzzle" feature which will allow the patron to view the next game puzzle.  Dependent upon the play level that the patron has selected, a different game puzzle will be displayed to the patron.  The "Next Puzzle" feature will present the patron with an alternate display which will temporarily show the next game puzzle on the 3x3 grid.

### Living Large

The *Living Large* game theme contains a total of thirteen (13) symbols based primarily upon a luxury theme.  The *Living Large* game theme presents nine (9) icons, constructed in a 3x3 grid to the patron.  The game theme allows the patron to select a play level, which determines the quantity of points that will be expended to play a game.  As configured, the play levels for the game theme are available at 40, 80, 120, 160, 200, and 400 points per play.

The *Living Large* game theme contains three (3) different bonus features.  To enter one of the bonus features, three (3) Bonus symbols must be successfully aligned on a pay line on the 3x3 grid.  Each bonus feature available contains a different multiplier amount which will multiply the total prize amount won by the multiplier associated with the bonus feature.  The bonus feature and associated multiplier amount that is displayed to the patron is dependent upon the bonus symbol that is aligned on the 3x3 grid.  The bonus symbols that are available on the game include the following:

- Three (3) *1x Bonus* symbols presented on the reels will award a 1x bonus multiplier during the bonus.
- Three (3) *2x Bonus* symbols presented on the reels will award a 2x bonus multiplier during the bonus; and
- Three (3) *3x Bonus* symbols presented on the reels will award a 3x bonus multiplier during the bonus.

When the bonus feature is initiated, the patron will be presented with an auto body shop scene with a luxury vehicle.  The patron is also presented with a prize wheel containing various vehicle upgrades.  Each vehicle upgrade on the prize wheel is associated with a multiplier amount, which are also displayed during the bonus feature.  The multiplier amounts that are associated with the various vehicle upgrades will multiply the patron's play level and award the corresponding prizes.  The patron will be awarded prizes equal to the patron's play level multiplied by the multiplier amounts obtained during the bonus feature.  The prizes that are awarded to the patron are also multiplied by the multiplier associated with the *Bonus* symbols that were successfully aligned on a pay line of the 3x3 grid (ex. Three (3) *3x Bonus* symbols will multiplier the patron's total prize amount obtained during the bonus feature by 3x).

*Nick Farley & Associates*
www.nfa777.com

POM of VA, LLC - *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* - Harbert
NA_PACE_3995-01_EW – November 3, 2017
Page 7 of 15

In addition to the various vehicle upgrades, the wheel displayed on the screen also contains "Collect" spaces which will collect the patron's total prize amount and end the bonus feature. The patron must initiate the spin by touching the screen to begin the bonus feature. The wheel will spin and stop on a vehicle upgrade displayed on the wheel. The bonus feature will continue to allow the patron to spin the wheel until the "Collect" value is selected which will end the bonus feature. The bonus feature is merely an entertaining display and the patron's actions with the bonus feature have no control over the game outcome.

The *Living Large* game theme also contains a "Bonus Spin" feature. For the *Bonus Spin* feature to be initiated, three (3) "Bonus Spin" symbols must be successfully aligned on a pay line on the 3x3 grid. When the *Bonus Spin* feature is initiated, the patron is granted ten (10) bonus spins which will play automatically. Upon completion of the bonus feature, the patron will be awarded the total prize amount that was revealed during the bonus.

The *Living Large* game theme offers the patron a "Next Puzzle" feature which will allow the patron to view the next game puzzle. Dependent upon the play level that the patron has selected, a different game puzzle will be displayed to the patron. The "Next Puzzle" feature will present the patron with an alternate display which will temporarily show the next game puzzle on the 3x3 grid.

### Lucky Fruit
The *Lucky Fruit* game theme contains a total of eleven (11) symbols based primarily upon a fruit theme. The *Lucky Fruit* game theme presents nine (9) icons, constructed in a 3x3 grid to the patron. The game theme allows the patron to select a play level, which determines the quantity of points that will be expended to play a game. As configured, the play levels for the game theme are available at 40, 80, 120, 160, 200, and 400 points per play.

The *Lucky Fruit* game theme contains a bonus feature. To enter the bonus feature, three (3) "Bonus" symbols must be successfully aligned on a pay line on the 3x3 grid. The bonus feature is based upon a pick style game, in which the patron is presented with eight (8) "Apple" symbols. In addition to the *Apple* symbols, the available prizes that can be won are displayed along the right side of the screen throughout the duration of the bonus feature. The prizes that may be awarded are presented as a series of four (4) different multipliers. The patron must select from the displayed *Apple* symbols, which will reveal a multiplier amount and will match one of the displayed prize multipliers. The patron must continue to select from the available *Apple* symbols in order to match a pair of *Apples* with one of the displayed prize multipliers. When one of the prizes has been matched, the patron will receive the associated multiplier amount. The actual prize awarded to the patron will be the play level used to enter the bonus feature multiplied by the multiplier obtained during the bonus feature.

The *Lucky Fruit* game theme also contains a "Bonus Spin" feature. For the *Bonus Spin* feature to be initiated, three (3) "Bonus Spin" symbols must be successfully aligned on a pay line on the 3x3 grid. When the *Bonus Spin* feature is initiated, the patron is granted ten (10)

*Nick Farley & Associates*
www.nfa777.com

POM of VA, LLC - *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* - Harbert
NA_PACE_3995-01_EW – November 3, 2017
Page 8 of 15

bonus spins which will play automatically.  Upon completion of the bonus feature, the patron will be awarded the total prize amount that was revealed during the bonus.

The *Lucky Fruit* game theme offers the patron a "Next Puzzle" feature which will allow the patron to view the next game puzzle.  Dependent upon the play level that the patron has selected, a different game puzzle will be displayed to the patron.  The "Next Puzzle" feature will present the patron with an alternate display which will temporarily show the next game puzzle on the 3x3 grid.

## Pirates

The *Pirates* game theme contains a total of twelve (12) symbols based primarily upon a pirate theme.  The *Pirates* game theme presents nine (9) icons, constructed in a 3x3 grid to the patron.  The game theme allows the patron to select a play level, which determines the quantity of points that will be expended to play a game.  As configured, the play levels for the game theme are available at 40, 80, 120, 160, 200, and 400 points per play.

The Pirates game theme contains three (3) different bonus features.  To enter a bonus feature, three (3) matching "Bonus" symbols corresponding with a bonus feature must be successfully aligned on a pay line on the 3x3 grid.  The "Multiplier Bonus" feature presents the patron with a "Prize Wheel" style bonus feature.  The wheel displayed on the screen contains various multiplier values as well as "Collect" spaces which will collect the patron's prize and end the bonus feature.  The patron must initiate the spin by touching the screen to begin the bonus feature.  The wheel will spin and stop on a value displayed on the wheel.  The multiplier values collected during the bonus feature will be tallied and used to calculate the total prize amount that will be awarded to the patron.  The bonus feature will continue to allow the patron to spin the wheel until the "Collect" value is selected which will end the bonus feature.

The prize displayed on the screen, and presented to the patron is dependent on the patron's play level, a default 1x multiplier, and the multipliers obtained and tallied while participating in the bonus feature.  For example, if the patron participates in the game using a play level of 200, enters the bonus feature, and obtains a x2 multiplier during the wheel spin prior to the bonus feature selecting the "Collect" space, the patron will be awarded a prize of 400 (**Play Level: 200 x Bonus Multiplier: 1 x Spin Tally: x2 = 400**).  The bonus feature is merely an entertaining display and the patron's actions with the game theme have no control over the game outcome.

The *Pirates* game theme contains a "Gold Coin" bonus feature.  To enter the bonus feature, three (3) "Bonus" symbols, which corresponds with the "Gold Coin" bonus, must be successfully aligned on a pay line on the 3x3 grid.  After a winning "Gold Coin" configuration appears on the reels, the bonus feature will be initiated.  The bonus feature presents the patron with a 4 X 4 array of "Gold Coin" icons.  The patron must select from the gold coin icons, which reveal prize amounts, until the patron reveals a "Collect" symbol,

*Nick Farley & Associates*
www.nfa777.com

which ends the bonus feature. When the "Collect" symbol is revealed, the bonus feature will end and the prizes revealed during the bonus feature will be awarded to the patron.

The *Pirates* game theme also contains a "Bonus Spin" feature. For the *Bonus Spin* feature to be initiated, three (3) "Bonus Spin" symbols, which correspond with the "Bonus Spin" feature, must be successfully aligned on a pay line on the 3x3 grid. When the *Bonus Spin* feature is initiated, the patron is granted ten (10) bonus spins which will play automatically. Upon completion of the bonus feature, the patron will be awarded the total prize amount that was revealed during the bonus.

### Section IV - Features and Options

The *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* offers several operator-selectable options and features. The options and features offered to the terminal operator are included in the "Operators Main Menu". There are several submenus in the "Operators Main Menu". The features and options available to the device operator are listed in the attached *Appendix A*.

### Section V - Review of Source Code

POM of VA, LLC has provided *Nick Farley & Associates, Inc.* with software source code associated with the *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663*. The review and evaluation of software source code is essential in establishing system operation and game outcome determination.

Our review of the source code indicates that the *Cutting EDGE Queen of Virginia Skill System* possesses a finite number of game outcomes for each game theme and play level. The game outcomes are randomly selected by a random number generator (RNG). Each time that the patron expends points to play a game, game outcomes are removed from the finite pool of available game outcomes. The patron's ability to correctly solve the puzzle by replacing the proper symbol with a *"Wild"* determines whether the patron will receive a prize for a successful outcome.

In addition, the system is designed to provide the player with a "Next Puzzle" feature, allows the patron to view the very next game puzzle by pressing the "Next Puzzle" icon on the video screen. At any given time prior to the initiation of a game, the patron may preview the next game puzzle. No payment or purchase is required for the participant to exercise the ability to cause the electronic system to disclose the next game puzzle for the game theme and play level selected. The player can then choose to either play for the outcome displayed or exit the game theme.

It was noted that the source code associated with this game is structured in such a way that it can accommodate a variety of different types of games. As compiled, the source code

*Nick Farley & Associates*
www.nfa777.com

reviewed only allows for the play of the *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663*. Please note that the operator of this game will not have access to the software program source code, and thus will not have the ability to change the way the game is played. Configuration of game play can only be done by POM of VA's software engineering team.

## Section VI - System Software Information and Identification

The software associated with operating the *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* is housed on the storage media of the *Cutting EDGE Queen of Virginia Skill System*. The software housed on the storage media of the *Cutting EDGE Queen of Virginia Skill System* controls the game processes, including elements that affect win outcome integrity and win outcome determination. The *Cutting EDGE Queen of Virginia Skill System* software is installed using a bootable USB flash drive. A copy of the *Cutting EDGE Queen of Virginia Skill System* software was provided to **Nick Farley & Associates, Inc.** for review. Due to the design of the system software, two (2) methods of software verification were used to provide software signatures of the software.

The first method utilized to obtain software signatures was to verify the installation software prior to installation of the *Cutting EDGE Queen of Virginia Skill System*. This method ensures that the software being installed is the correct version of software. The second method utilized to obtain software signatures requires the assistance of POM of VA, LLC, to obtain elevated user access to the system software in order to obtain a copy of the software that has been installed onto the system. When a copy of the software has been obtained, software signatures can be taken of the copied software. This method verifies the software that is installed and running on the system. Please note that the second method of verifying the software will reset the finite pools on the system.

The software signatures for the files pertaining to system operation, integrity and/or game outcome determination for both methods have been listed in the attached *Appendix B*. In addition to the file names, a **FileCheck** signature has been included for each of the files for verification purposes. The **FileCheck** v1.01 program has been utilized to calculate a 32 bit cyclic redundancy check value (CRC32) by applying a mathematical formula to the contents of each file. This value is a unique "signature" for the non-volatile files examined (each distinct file in each directory in these instances). The previously mentioned **FileCheck** CRC32 values will be obtained provided the files contained on the directories remain the same as tested. Should these files be altered in any way, the **FileCheck** CRC32 values will change. A copy of the **FileCheck** CRC32 program may be obtained by contacting *Nick Farley & Associates, Inc.*

Note: Please contact POM of VA, LLC for instructions on how to obtain signatures for the software that operates the *Cutting EDGE Queen of Virginia Skill System*.

*Nick Farley & Associates*
www.nfa777.com

## Section VII - Findings and Conclusion

The following questions were posed to us by legal counsel for POM of VA, LLC.  Answers to these questions are based upon our review and analysis of the *Cutting EDGE Queen of Virginia Skill System*:

1. *Is a single "play" of the game defined as beginning with consideration and ending when the player cannot proceed without more consideration?*

   Yes. Each play or game is one event which starts with the initial activation of play until additional payment is required to play another game.

2. *Is it possible for the player to know prior to a commitment to play, the puzzle that will be presented in the next played game?*

   Yes.  Each game theme contains a "Next Puzzle" feature which allows the patron to view the very next game puzzle by pressing the "Next Puzzle" icon on the video screen.  At any given time prior to the initiation of a game, the patron may preview the next game puzzle.

3. *Can the next puzzle be viewed free of charge, without inserting any cash into the machine?*

   Yes.  No payment or purchase is required for the patron to exercise the ability to cause the electronic system to disclose the next game puzzle for the game theme and play level selected.

4. *Does the system prevent an automatic win on every play?*

   Yes.  During the review of the system, it was noted that the initial nine (9) icons displayed will not present an automatic winning combination.  The patron must engage in the selection of a symbol to be chosen as "*Wild*" in order to align three like symbols on one or more lines of the game play area in order to obtain a winning game outcome.  Additionally, it should be noted that not all plays initiated on the *Cutting EDGE Queen of Virginia Skill System* will have a potential winning outcome.

5. *Does the solving of the main game puzzle involve skill to attain any possible award?*

   It is our opinion that solving the main game puzzle requires the use of dexterity and hand eye coordination, thus requiring the use of skill by the patron to attain a possible award.  The main game presents the patron with a 3x3 grid that will display symbols to the patron, similar to a "tic-tac-toe" arrangement.  Once the patron initiates game play, the symbols in the 3x3 grid will spin and present the patron with a new set of symbols.  The patron must then skillfully select which symbol in the 3x3 grid to replace with a "Wild" symbol.  The patron may place the "Wild" symbol in any of the nine (9) spaces in the 3x3 grid.

*Nick Farley & Associates*
www.nfa777.com

The object of the main game is for the patron to recognize the best winning game outcome and select the appropriate symbol to replace with a *"Wild"* symbol that will align three (3) like symbols on any line in the 3x3 grid. The patron must make this selection within the allotted time (30 seconds); failure to do so results in a losing outcome. The patron must make several decisions before attempting to solve the puzzle. Since the screen may display several winning combinations, the patron must decide which combination will yield the highest value winning prize. Additionally, the patron may wish to view the next puzzle and decide which combination will be the most advantageous.

6. *Is there a limited amount of time given to a player to solve a puzzle in the main game?*

   Yes. The main game requires the patron to complete the required task within the allotted thirty (30) second time limit.

7. *Does successfully solving a puzzle by lining up a row of like symbols in combination with a player-placed Wild symbol always produce a win value of some non-zero amount?*

   Yes. When the patron successfully completes the required task to align three (3) like symbols on the 3x3 grid, the patron will be awarded the corresponding prize for the aligned symbols.

8. *Can some puzzles be solved that result in a prize that is awarded in an extended entertaining manner like a series of "Bonus Spins" or a "Bonus round screen"?*

   Yes. Each game theme offered on the *Cutting EDGE Queen of Virginia Skill System* contains *Bonus* features, which award prizes in an extended entertaining manner. For details on the various Bonus features, refer to Section III - Game Specific Information.

9. *Can these extended award sequences be considered part of the same game play that awarded them?*

   Yes. Each extended award sequence (Bonus Feature) is considered part of the base game that awarded them. The extended award sequences do not require any additional consideration to play and they may only be triggered after successfully completing the main game.

10. *Can the mini-game of Follow Me be played any time the main game's puzzle provides a perfect play award less than 105% of the cost to play the game?*

    Yes. When the patron has correctly solved the puzzle and wins a prize that is less than 105% of the purchase price to play the game, the patron is afforded an option to

select the *"Follow Me"* bonus feature. The *"Follow Me"* bonus feature will provide the patron with an opportunity to win 105% of the initial purchase price to play the game.

11. *Does a player forfeit the ability to play Follow Me if a mistake results in less than perfect play in the main game puzzle solving phase?*

Yes. The patron will forfeit their opportunity to play the "Follow Me" feature if the patron does not select the "best" winning combination to solve the puzzle and to maximize the outcome.

12. *When Follow Me is made available, can it be played free of charge, without any additional consideration?*

Yes. When the patron has correctly solved the puzzle and wins a prize that is less than 105% of the purchase price to play the game, the patron is afforded an option to select the *"Follow Me"* bonus feature. The *"Follow Me"* feature does not require any additional consideration to enter.

13. *Does successfully completing a Follow Me session take 25 rounds?*

Yes. As configured, the patron will need to follow (repeat) the correct sequence for a total of twenty-five (25) rounds of play, until a total of twenty-five (25) sequences are successfully completed.

14. *Does successfully completing a Follow Me session result in a final game outcome value in excess of the cost to play?*

Yes. In the event that the *"Follow Me"* feature is successfully completed, the patron is assured a prize of 105% of the purchase price to play the game.

15. *Can it be stated that with the combination of perfect skill in the main game and successfully completing any Follow Me mini-game offered that every play can result in an award value in excess of the cost to play the game?*

Yes. It can be stated that with correctly solving the puzzle with the "best" winning combination and successfully completing any *"Follow Me"* feature offered, it is possible that every play can result in a prize 105% of the purchase price to play the game.

Based upon our review and analysis of the *Cutting EDGE Queen of Virginia Skill System*, we have determined that the game outcome is based upon the patron's ability to select the appropriate symbol to replace with a *"Wild"* symbol in order to attain the highest value winning combination as a game play result. The patron must also select between several potential winning combinations. The patron must work quickly, as game play is dependent

upon a time limitation. Additionally, the patron may receive a "Bonus Feature" or "Follow Me" features where additional points may be awarded.

Additionally, the system is designed to provide the player with a "Next Puzzle" feature, which allows the patron to view the very next game puzzle by pressing the "Next Puzzle" icon on the video screen. At any given time prior to the initiation of a game, the patron may preview the next game puzzle. No payment or purchase is required for the participant to exercise the ability to cause the electronic system to disclose the next game puzzle for the game theme and play level selected.

We have determined that the "Next Puzzle" game outcome is based upon finite pools of game outcomes. Each game theme offered on the *Cutting EDGE System* distributes game outcomes from finite pools by way of a random number generator (RNG). Points are expended to use game outcomes from the finite pools based upon the player's selected game theme and play level. The finite pools of game outcomes are generated by the *Cutting EDGE System* and are randomly delivered to the customer.

The RNG selects an initial game outcome and selects the next game outcome. As the game outcomes are used the RNG continues to select the next game outcome ensuring that there is always a next game outcome for the player to view. After each game outcome is used, the "Next Puzzle" game outcome becomes the current game outcome, and a new "Next Puzzle" game outcome is selected and available to be viewed by the player.

## Section VIII – Terms and Conditions

It is hereby expressed that *Nick Farley & Associates, Inc.* has reviewed the submitted game system through the engagement of play of the game themes, and analysis of the submitted software program source code. *Nick Farley & Associates, Inc.* has performed extensive research and analysis to determine the findings and conclusions of fact presented in this document. Our findings and conclusions are based exclusively on the information provided for our review. Any changes or modification of the information provided will require additional review to determine if they support the findings and conclusions of this report. In such an instance, we reserve the right to amend or revise this document.

This document has been prepared by *Nick Farley & Associates, Inc.* for Mr. Guy M. Harbert III of Gentry Locke Attorneys for the benefit of POM of VA, LLC. Distribution of this document is limited exclusively to *Nick Farley & Associates, Inc.*, Mr. Guy M. Harbert III, and POM of VA, LLC. This report shall not be reproduced, except in full, without the written approval of *Nick Farley & Associates, Inc.* Only authorized copies of this report received from *Nick Farley & Associates, Inc.* are considered to be authentic. Upon request by an authorized party, *Nick Farley & Associates, Inc.* will send this report via email as directed. *Nick Farley & Associates, Inc.* takes precautionary measures to secure the PDF

POM of VA, LLC - *Cutting EDGE Queen of Virginia Skill System version SKL 503.06 VIR 1663* - Harbert
NA_PACE_3995-01_EW – November 3, 2017
Page 15 of 15

document, but *Nick Farley & Associates, Inc.* does not send the email via any encrypted methodology.

Given that there are no specific state regulatory specifications available for systems of this nature; this document is NOT intended to express any opinion as to whether this system is authorized under any specific state law. This document, in no way, warrants the operation of this system.

If you should have any questions or require additional information, please feel free to contact our office.

Sincerely,

Nick Farley
*President*

NF/sc
NA_PACE_3995-01_EW
Attachments

*Nick Farley & Associates*
www.nfa777.com

# EXHIBIT C



# COMMONWEALTH of VIRGINIA
## Department of Alcoholic Beverage Control

COMMISSIONERS
JEFFREY L. PAINTER, CHAIRMAN
JUDITH G. NAPIER
HENRY L. MARSH, III

CHIEF OPERATING OFFICER/SECRETARY TO THE BOARD
TRAVIS G. HILL

2901 HERMITAGE ROAD
P. O. BOX 27491
RICHMOND, VIRGINIA 23261
(804) 213-4400
FAX: (804) 213-4411
www.abc.virginia.gov

July 7, 2017

*VIA ELECTRONIC MAIL*
Jeffrey L. McGinness
Pace-O-Matic
4150 Blue Ridge Industrial Pkwy
Norcross, Ga. 30071

Dear Mr. McGinness,

Thank you for your recent inquiry concerning the propriety of alcoholic beverage licensed establishments in Virginia utilizing electronic games developed by Pace-O-Matic. As we discussed, this game is currently being widely used in Pennsylvania (including establishments with alcoholic beverage licenses) and has been found to be a game of skill by the Court of Common Pleas of Beaver County, Pennsylvania.

We have thoroughly reviewed the documents forwarded concerning the Court's finding in Pennsylvania and the letter of Mr. Guy M. Harbet, III of Gentry Locke. Additionally, we have asked our Virginia Office of Attorney General to review these documents, as well as any case law of precedential value in Virginia that might be of significance in reaching a determination in this matter.

After weighing these various pieces of information, we have concluded that this game appears to be predominately a game of skill. While two of the factors in the definition of illegal gambling are present - (1) placing a bet or wage, and 2) the opportunity to win a prize, we don't think the element of chance is a predominant factor in winning a prize in this game. It is apparent that there is a significant element of skill involved in all three games as presented to us.

The" tic-tac-toe" game (while it has a random number generator to determine the puzzle) depends on the player's ability to spot the pattern and determine the best place to put the "wild" to enhance his/her chances of a higher score. The court in Pennsylvania indicated that each puzzle has the ability to win and a player's skill, which includes the ability to recognize the most advantageous spots to play, will result in a higher score.

The shooter game involves manual dexterity and hand eye coordination and the "follow me" game

involves memory. I think these three elements 1) pattern recognition, 2) hand-eye coordination, and 3) memory are sufficient to say that skill is the predominant factor in the game rather than chance. Accordingly, The Virginia Department of Alcoholic Beverage Control will not consider these machines, in their current configuration and intended use, to be gambling devices and no administrative charges will be initiated against any licensee which utilizes the machines on their premises.

I would like to stress that this determination is limited to the aforementioned circumstances and impacts only potential administrative charges that may be initiated by Virginia ABC. This decision is obviously not binding on the multitude of other agencies or elected officials that may have jurisdiction in this arena and reach a different conclusion than that cited above.

If you have any questions, please do not hesitate to give me a call at 804-213-4569.

Sincerely,

*Thomas W Kir*

Thomas W. Kirby
Deputy Chief

Exhibit D



# COMMONWEALTH *of* VIRGINIA

### Department of Alcoholic Beverage Control

COMMISSIONERS
JEFFREY L. PAINTER, CHAIRMAN
JUDITH G. NAPIER
HENRY L. MARSH, III

2901 HERMITAGE ROAD
P. O. BOX 27491
RICHMOND, VIRGINIA 23261
(804) 213-4400
FAX: (804) 213-4411
www.abc.virginia.gov

CHIEF OPERATING OFFICER/SECRETARY TO THE BOARD
TRAVIS G. HILL

July 7, 2017

*VIA ELECTRONIC MAIL*
Jeffrey L. McGinness
Pace-O-Matic
4150 Blue Ridge Industrial Pkwy
Norcross, Ga. 30071

Dear Mr. McGinness,

Thank you for your recent inquiry concerning the propriety of alcoholic beverage licensed establishments in Virginia utilizing electronic games developed by Pace-O-Matic.  As we discussed, this game is currently being widely used in Pennsylvania (including establishments with alcoholic beverage licenses) and has been found to be a game of skill by the Court of Common Pleas of Beaver County, Pennsylvania.

We have thoroughly reviewed the documents forwarded concerning the Court's finding in Pennsylvania and the letter of Mr. Guy M. Harbet, III of Gentry Locke.  Additionally, we have asked our Virginia Office of Attorney General to review these documents, as well as any case law of precedential value in Virginia that might be of significance in reaching a determination in this matter.

After weighing these various pieces of information, we have concluded that this game appears to be predominately a game of skill.  While two of the factors in the definition of illegal gambling are present - (1) placing a bet or wage, and 2) the opportunity to win a prize, we don't think the element of chance is a predominant factor in winning a prize in this game.  It is apparent that there is a significant element of skill involved in all three games as presented to us.

The" tic-tac-toe" game (while it has a random number generator to determine the puzzle) depends on the player's ability to spot the pattern and determine the best place to put the "wild" to enhance his/her chances of a higher score.  The court in Pennsylvania indicated that each puzzle has the ability to win and a player's skill, which includes the ability to recognize the most advantageous spots to play, will result in a higher score.

The shooter game involves manual dexterity and hand eye coordination and the "follow me" game

involves memory.  I think these three elements 1) pattern recognition, 2) hand-eye coordination, and 3) memory are sufficient to say that skill is the predominant factor in the game rather than chance. Accordingly, The Virginia Department of Alcoholic Beverage Control will not consider these machines, in their current configuration and intended use, to be gambling devices and no administrative charges will be initiated against any licensee which utilizes the machines on their premises.

I would like to stress that this determination is limited to the aforementioned circumstances and impacts only potential administrative charges that may be initiated by Virginia ABC.  This decision is obviously not binding on the multitude of other agencies or elected officials that may have jurisdiction in this arena and reach a different conclusion than that cited above.

If you have any questions, please do not hesitate to give me a call at 804-213-4569.

Sincerely,

Thomas W. Kirby
Deputy Chief

# Exhibit E

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Andrew J. Kramer, Esquire (PA I.D. 52613)
KANE, PUGH, KNOELL, TROY & KRAMER, LLP
510 Swede Street
Norristown, PA 19401-4807
610.275.2000 (Phone)
610.275.2018 (Fax)
akramer@kanepugh.com

Mark Stewart, Esquire (PA I.D. 75958)
Kevin M. Skjoldal, Esquire (PA I.D. 200841)
Casey A. Coyle, Esquire (PA I.D. 307712)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
213 Market Street, 8th Floor
Harrisburg, PA 17101
717.237.6000 (Phone)
717.237.6019 (Fax)
mstewart@eckertseamans.com
kskjoldal@eckertseamans.com
ccoyle@eckertseamans.com

*Counsel for Plaintiff Greenwood Gaming and
Entertainment, Inc. (d/b/a Parx Casino)*

## IN THE COURT OF COMMON PLEAS
## BUCKS COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| GREENWOOD GAMING AND ENTERTAINMENT, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. 2019-06832 |
| | : | |
| v. | : | |
| | : | Hon. Robert O. Baldi |
| SMOKER'S EXPRESS, | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

## PLAINTIFF GREENWOOD GAMING AND ENTERTAINMENT, INC.'S BRIEF IN OPPOSITION TO DEFENDANT SMOKER'S EXPRESS' PRELIMINARY OBJECTIONS TO COMPLAINT

### I.   INTRODUCTION

Currently pending before this Court are Defendant Smoker's Express' ("Defendant") Preliminary Objections to the Complaint. Defendant argues that, as a threshold matter, Plaintiff Greenwood Gaming and Entertainment, Inc. d/b/a Parx Casino ("Parx Casino" or "Parx") lacks standing to bring this suit, which seeks to hold Defendant liable for its continued operation of illegal slot machines. That argument is spurious at best. As a slot machine licensee who has paid tens of millions of dollars in fees for the right to lawfully participate in *regulated*, *licensed* gambling, Parx has a direct, substantial, and immediate interest in eliminating *unregulated*,

L0841592.4

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*unlicensed* gambling, especially in its backyard. To conclude otherwise would defy common sense.

In the alternative, Defendant contends that Count I fails to state a viable claim for public nuisance. This position is also meritless, because the Complaint alleges that Defendant is conducting unlicensed gambling operations in violation of two Pennsylvania statutes – specifically, Section 1301 of the Gaming Act and Section 5513 of the Crimes Code – and such conduct amounts to a public nuisance as a matter of law. Defendant's assertion is also inconsistent with what its attorneys argued in *POM of Pennsylvania, LLC v. 3C Amusements, LLC*, No. 2019-3138 (Cambria Cnty. Ct. Com. Pl.) ("*3C Amusements*"), and *POM of Pennsylvania, LLC v. Gary Lagana*, No. 2019-CV-08798 (Luzerne Cnty. Ct. Com. Pl.) ("*Lagana*").

Defendants also maintain that Count III fails to state a plausible cause of action for negligence *per se*. Parx Casino, however, is not asserting a standalone claim for negligence *per se*. Rather, and as the body of Count III makes clear, Parx is raising a claim for negligence against Defendant under a negligence *per se* theory of liability. Parx merely captioned Count III as "Negligence *Per Se*" to reinforce this point. Moreover, the Complaint contains sufficient allegations to satisfy the four-part test announced in *Wagner v. Anzon, Inc.*, 684 A.2d 570 (Pa. Super. Ct. 1996). Accordingly, this Court should overrule Defendants' Preliminary Objections, in all respects.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   Development of legal, regulated gaming in Pennsylvania

When it was enacted in 2004, the Pennsylvania Race Horse Development and Gaming Act, 4 Pa. C.S. §§ 1101-1904 (the "Gaming Act"), established three categories of slot machine

2

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

licensees – Category 1, 2 and 3 licensees – which have the exclusive right to place and operate slot machines in the Commonwealth. 4 Pa. C.S. § 1301.[1] After the completion of a costly and extensive application process, Parx Casino was awarded a Category 1 slot machine license by the Pennsylvania Gaming Control Board ("PGCB"). (Compl. ¶15). Parx Casino paid a $50 million license fee for its Category 1 slot machine license. (*Id.* ¶16).

In 2017, the General Assembly passed Act 42 of 2017, expanding gaming in the Commonwealth. Act of Oct. 30, 2017, P.L. 419, No. 42. As part of Act 42, the Commonwealth authorized interactive gaming in Pennsylvania, with slot machine licensees having the exclusive right, in the first instance, to offer interactive games. Slot machine licensees are entitled to apply for an interactive gaming certificate that will enable them to conduct gaming over the Internet, including offering online slot machines, table games and poker. 4 Pa. C.S. §§ 13B11, 13B12.

On August 15, 2018, Parx Casino was awarded an interactive gaming certificate. (Compl. ¶20). Parx Casino paid a $10 million fee for its interactive gaming certificate. (*Id.* ¶20). On July 15, 2019, Parx Casino began offering interactive gaming. (*Id.* ¶21). Through its interactive gaming platform, Parx Casino currently accepts wagers from eligible gamblers anywhere within the Commonwealth of Pennsylvania. (*Id.* ¶22). In addition to the above fees, Parx Casino has invested approximately $500 million in the development and expansion of its casino, including additions to offer dining options, a poker room, and a live entertainment venue. (*Id.* ¶23).

Parx Casino and Pennsylvania's other licensed casinos have been an unqualified boon to the Commonwealth and its citizens. (*Id.* ¶24). Pennsylvania receives more gaming tax revenue than any other jurisdiction in the United States, taking approximately 54 cents of every dollar

---

[1] In 2017, the Legislature authorized an additional category of slot machine licensee, Category 4. 4 Pa. C.S. § 1305.1.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

wagered in the slot machines of each licensed casino.  (Compl. ¶25).  In Fiscal Year 2017-2018, Pennsylvania's licensed casinos, including Parx Casino, generated over $1.16 billion in slot machine tax revenue for the Commonwealth.  (*Id.* ¶26).

In Fiscal Year 2017-2018, slot operations by Pennsylvania's licensed casinos, including Parx Casino, contributed to more than $123 million in local share funding and fees that were distributed to host counties and municipalities.  (*Id.* ¶27).  Pennsylvania's licensed casinos, including Parx Casino, spend approximately $230 million annually with local business entities in their host and contiguous counties.  (*Id.* ¶28).  Pennsylvania's licensed casinos, including Parx Casino, employ more than 20,000 employees, the vast majority of which reside in Pennsylvania. (*Id.* ¶29).  The success of Pennsylvania's licensed casinos, including Parx Casino, in slot machine gaming was achieved while operating under a highly regulated environment, ensuring the highest integrity in gaming operations, while simultaneously promoting responsible gaming. (*Id.* ¶30).

### 2.  Development of unlicensed, unregulated, and untaxed slot machines across the Commonwealth

With the success of licensed slot machine gaming in Pennsylvania, unlicensed slot machines have started to proliferate across the state at locations such as bars, restaurants, convenience stores, gas stations, and other establishments.  (Compl. ¶31).  Manufacturers of these slot machines have sought to conceal their true nature by branding them as "games of skill" or "skill games."  (*Id.* ¶32).  Despite the manufacturers' clever marketing campaign, these machines are nothing more than unlicensed slot machines.  (*Id.* ¶33).  It is estimated that nearly 12,000 of these unlicensed and illegal slot machines exist at establishments across Pennsylvania. (*Id.* ¶34).  Manufacturers of "skill games," and the establishments that offer them, deceptively market these games as "legal," when, in fact, they are not.  (*Id.* ¶35).

4

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Section 5513 of the Pennsylvania Crimes Code makes it illegal to intentionally or knowingly sell, lease, or maintain a "slot machine" or other gambling device, except as permitted under the State Lottery Law, Bingo Law, Local Option Small Games of Chance Act, or Gaming Act. 18 Pa. C.S. § 5513(a), (e.1). While the term "slot machine" is not defined in the Crimes Code, the Legislature made clear in Act 42 of 2017 that a "slot machine" includes so-called "skill games." 4 Pa. C.S. § 1103. That definition applies to the Crimes Code under on basic rules of statutory construction. *See, e.g.,* 1 Pa. C.S. § 1932; *see also id.* § 1921(c)(5). This is significant because the Commonwealth Court recently found that "skill games" meet the definition of a "slot machine" under Act 42. *POM of Pennsylvania, LLC v. Department of Revenue,* ___ A.3d ___, 2019 WL 6138270, at *5 (Pa. Commw. Ct. Nov. 20, 2019) ("*POM*").

### 3.   Defendant's unlawful conduct

Despite the clear and unmistakable terms of the Gaming Act, slot machines continue to be offered illegally at bars, restaurants, convenience stores, gas stations, and other venues across Pennsylvania. (Compl. ¶41). Defendant is one of those establishments. (*Id.* ¶42). Defendant currently leases and/or maintains at least five slot machines on its premises. (*Id.* ¶¶43, 57).[2] Each illegal slot machine is located in close proximity to a Pennsylvania Lottery terminal. (Compl., Ex. A).

Each illegal slot machine is also located in close proximity to signage for the Pennsylvania Lottery. (*Id.*). Each illegal slot machine is branded as a "Pennsylvania Skill Game." (Compl. ¶46). Each illegal slot machine is manufactured by POM of Pennsylvania, LLC d/b/a Pace-O-Matic d/b/a Miele Manufacturing ("POM"). (*Id.* ¶47). Each illegal slot machine is operated through the insertion of coins or cash. (*Id.* ¶48). Each illegal slot machine

---

[2] A photo of the illegal slot machines is attached as "Exhibit A" to the Complaint.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

offers cash prizes.  (*Id.* ¶51).  Each illegal slot machine utilizes spinning reels, video displays, or both, upon information and belief.  (*Id.* ¶52).

Defendant is located in close proximity to Parx Casino, which is the only licensed casino within Bucks County.  (Compl. ¶53).

**B.**   **Procedural History**

On September 27, 2019, Parx Casino filed a Complaint against Defendant.  On October 9, 2019, Parx served Defendant with the Complaint.  On October 29, 2019, Defendant filed Preliminary Objections.  On November 18, 2019, Parx filed its Response to the Preliminary Objections.  On November 19, 2019, Defendant filed its Brief in Support of its Preliminary Objections.

**III.**   **COUNTERSTATEMENT OF QUESTION PRESENTED**

**A.**   Whether Parx Casino has standing to bring this suit, where Parx is a slot machine licensee who paid tens of millions of dollars in fees for the right to lawfully participate in regulated, licensed gambling, and thus, has a direct, substantial, and immediate interest in eliminating unregulated, unlicensed gambling?

**B.**   Whether Count I states a viable claim for public nuisance, where the Complaint alleges that Defendant is conducting unlicensed gambling operations in violation of two Pennsylvania statutes and such conduct amounts to a public nuisance as a matter of law?

**C.**   Whether Count III asserts a plausible claim for negligence based on a negligence *per se* theory of liability, where the Complaint contains sufficient allegations to satisfy the four-part test announced in *Wagner v. Anzon, Inc.,* 684 A.2d 570 (Pa. Super. Ct. 1996)?

**Suggested answer to all three questions: Yes, overrule Defendant's Preliminary Objections.**

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IV.   ARGUMENT

### A.   This Court Should Overrule The Preliminary Objections, In Their Entirety

Under the Pennsylvania Rules of Civil Procedure, preliminary objections may be filed by any party to any pleading and are limited to certain grounds, including lack of capacity to sue. Pa. R. Civ. P. 1028(a)(5).[3]   Preliminary objections also may be filed on the basis that the pleading fails to state a legally cognizable claim (commonly referred to as a "demurrer"). PA. R. CIV. P. 1028(a)(6).  Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. *See, e.g., Feingold v. Hendrzak*, 15 A.3d 937, 941 (Pa. Super. Ct. 2011). The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. *See, e.g., Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 274 (Pa. 2005).

When reviewing preliminary objections in the nature of lack of standing or a demurrer, a trial court must accept all well-pleaded, material, and relevant facts alleged in the complaint, as well as all inferences reasonably deductible therefrom, as true. *See, e.g., Rellick-Smith v. Rellick*, 147 A.3d 897, 901 (Pa. Super. Ct. 2016); *Haun v. Cmty. Health Sys., Inc.*, 14 A.3d 120, 123 (Pa. Super. Ct. 2011).  Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. *See, e.g., Hykes v. Hughes*, 835 A.2d 382, 383 (Pa. Super. Ct. 2003).  Where a doubt exists as to whether a demurrer should be sustained,

---

[3] It is unclear if Pennsylvania law distinguishes between capacity to sue and standing. *Compare Witt v. Dept. of Banking*, 425 A.2d 374, 377 n. 7 (Pa. 1981) (quoting 67A C.J.S. Parties § 10 distinction between "capacity to sue" and "standing"), *with In re Estate of Alexander*, 758 A.2d 182, 189 (Pa. Super. Ct. 2000) (using the terms "capacity to sue" and "standing" interchangeably).  Regardless, trial courts permit parties to file challenges to standing in preliminary objections. *See, e.g., Kee v. Pa. Tpk. Comm'n*, 685 A.2d 1054, 1056 (Pa. Commw. Ct. 1996); *see also Gen. Crushed Stone Co. v. Caernarvon Twp.*, 605 A.2d 472, 473 n 4 (Pa. Commw. Ct. 1992).

Case# 2019-06832-12 - JUDGE35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

this doubt should be resolved in favor of overruling it. *See, e.g., MacElree v. Philadelphia Newspapers, Inc.*, 674 A.2d 1050, 1056 (Pa. 1996).

Based on the foregoing standard, this Court should overrule Defendant's Preliminary Objections, in all respects.

> 1. **Parx Casino has standing to bring this action, because, as a slot machine licensee who paid tens of millions of dollars in fees for the right to lawfully participate in regulated, licensed gambling, Parx has a direct, substantial, and immediate interest in eliminating unregulated, unlicensed gambling**

A party can establish that it has been aggrieved if it shows that it has a substantial, direct, and immediate interest in the outcome of the litigation. *See, e.g., Commonwealth v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014). An interest is substantial if it is an interest in the resolution of the challenge which surpasses the common interest of all citizens in procuring obedience to the law. *See, e.g., Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 660 (Pa. 2005). An interest is direct if the matter complained of caused harm to the party's interest – *i.e.*, a causal connection between the harm and the violation of law. *See, e.g., In re Hickson*, 821 A.2d 1238, 1243 (Pa. 2003). An interest is immediate if the causal connection is not remote or speculative. *See, e.g., Johnson v. Am. Standard*, 8 A.3d 318, 329 (Pa. 2010). "The keystone to standing in these terms is that the person must be negatively impacted in some real and direct fashion." *Pittsburgh Palisades*, 888 A.2d at 660.

Within the immediacy requirement is a "zone of interests" concept. *Upper Bucks Cnty. Vocational-Tech. Sch. Educ. Ass'n v. Upper Bucks Cnty. Vocational-Tech. Sch. Joint Comm.*, 474 A.2d 1120, 1122 (Pa. 1984). The concept is that the "protection of the type of interest asserted is among the policies underlying the legal rule relied upon by the person claiming to be 'aggrieved.'" *Id.* (citation and quotation marks omitted); *see also William Penn Parking Garage v. City of Pittsburgh*, 346 A.2d 269, 284 & n.23 (Pa. 1975) (plurality) ("Generalization about the

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

degree of causal connection required to confer standing is more difficult than generalization about the other requirements discussed above.  However, it is clear that the possibility that an interest will suffice to confer standing grows less as the causal connection grows more remote.  It is also clear that standing will be found more readily where protection of the type of interest asserted is among the policies underlying the legal rule relied upon by the person claiming to be 'aggrieved.'").

The Supreme Court has clarified as to whether a court must examine the relevant zone of interests to determine if a party has met the immediacy prong of aggrievability, writing:

> [I]n Pennsylvania, a party must be aggrieved in order to possess standing to pursue litigation.  Aggrievability is obtained by having a substantial, direct, and immediate interest in proceedings or litigation.  When the standards for substantiality, directness, and immediacy are readily met, the inquiry into aggrievability, and therefore standing, ends.  Should, however, a party's immediate interest not be apparent, a zone of interests analysis may (and should) be employed to assist a court in determining whether a party has been sufficiently aggrieved, and therefore has standing. . . .
>
> We stress, however, that such consideration is merely a guideline that may be used to find immediacy, and not as an absolute test[.]

*Johnson*, 8 A.3d at 333.

When applying the three-part test for standing, accepting the well-pleaded allegations of the Complaint as true, and drawing all reasonable inferences in Parx Casino's favor, there can be no doubt that Parx has standing to bring this action, because it has a substantial, direct, and immediate interest in stopping the harm it is suffering from Defendant's continued operation of its illegal slot machines.  This Court's intervention is appropriate and necessary to stop Defendant's harmful actions.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

a.   *Parx Casino has a substantial interest in the outcome of this case*

Parx Casino was required, by law, to obtain a license to legally conduct gambling activities in Pennsylvania.  4 Pa. C.S. §§ 1301, 13A11, 13B11, 13B12.  Parx paid a $50 million license fee for its Category 1 slot machine license and a $10 million fee for its interactive gaming certificate.  (Compl. ¶¶16, 20).  Each license or certificate is a legally enforceable property interest.  *See, e.g., MEC Pa. Racing v. Pa. State Horse Racing Comm'n*, 827 A.2d 580, 588 (Pa. Commw. Ct. 2003) (reciting the oft-stated proposition that a party "has a direct interest if the adjudication causes harm to an interest of his" (citation and quotation marks omitted)); *cf. Man O'War Racing Ass'n v. Pa. State Horse Racing Comm'n*, 250 A.2d 172, 176 (Pa. 1969) (holding that a horse racing license is a valuable privilege for which an applicant expends large sums of money, and therefore, an unsuccessful applicant has standing to challenge the granting of licenses to others).  Therefore, as a licensee and certificate holder, Parx Casino has a substantial interest in quelling the spread of unregulated, unlicensed gambling in Pennsylvania.  *See, e.g., Pittsburgh Palisades*, 888 A.2d at 660.

The Commonwealth Court effectively reached this same conclusion in *Churchill Downs, Inc. v. Commonwealth*, No. 476 M.D. 2016 (Pa. Commw. Ct.) (Covey, J.).  There, Parx Casino sought to intervene in an action brought by an out-of-state entity seeking to declare Act 7 of 2016 – which, for the first time, permitted persons other than licensed racing entities to engage in electronic wagering with Commonwealth residents – unconstitutional.  The Commonwealth Court permitted Parx Casino to intervene, in part, due to "Pennsylvania courts' '[recognition of] the interest of a business to be protected from competition allegedly prohibited by a regulatory scheme,' [and testimony from a Parx witness] reflecting the harm that [Parx] would sustain in the

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

absence of Act 7's protections from competition." Memorandum and Order at 5 in *Churchill Downs, Inc. v. Commonwealth*, No. 476 M.D. 2016 (Pa. Commw. Ct. Nov. 4, 2016).[4]

While Defendant may attempt to distinguish *Churchill Downs* on the basis that it involved the standard to intervene as opposed to the question of standing, such efforts would be misguided because the standard to intervene is essentially the same test for standing. *In re Application of Biester*, 409 A.2d 848, 850 n.2 (Pa. 1979) (holding that, if a petitioner lacks standing to file a petition for review, the party also has no legally enforceable interest to intervene). This Court should therefore follow the Commonwealth Court's well-reasoned opinion in *Churchill Downs* and hold that Parx Casino has a substantial interest in this action.

Defendant's contrary arguments are groundless as they are largely unsupported by any caselaw. Instead, they consist almost entirely of commentary. (Br. at 6-8). To the extent that Defendant cites any cases, they are distinct from the present circumstances. For instance, in *Pittsburgh Palisades*, the Court held that the petitioners lacked standing to challenge the constitutionality of Section 1209 of the Gaming Act because, *unlike in this case*, "they have not been issued a gaming license." 888 A.2d at 660-61. The other cases relied upon by Defendant are similarly distinguishable. *See, e.g.*, *In re Milton Hershey School*, 911 A.2d 1258, 1262-63 (Pa. 2006) (holding that a school alumni lacked standing to bring suit against the school, where the school was established by a charitable trust and the alumni sought the rescission of an agreement entered into by the school and the Attorney General).

b.    *Parx Casino has a direct interest in the outcome of this case*

Defendant's illegal gambling activities compete directly with the licensed gaming offered by Parx Casino, which paid hundreds of millions of dollars for the right to lawfully conduct such

---

[4] A true and correct copy of the Memorandum and Order is attached hereto as **"Exhibit 1."**

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Act 81 criminalizes gambling operations that evade the licensing and taxing schemes to which the Casinos are subject. Casinos claim that Internet sweepstakes cafes, such as Plaintiff, have been circumventing the gambling laws, resulting in reduced market share and revenues for Casinos. Though Casinos and Defendants appear to have overlapping interests (*i.e.*, establishing the constitutionality of Act 81) the Court concludes that Casinos would provide a helpful viewpoint in addition to Defendants' position.

7/30/12 Order in *Telesweeps of Butler Valley, Inc. v. Kelley*, No. 3:12-CV-1374 (M.D. Pa.) (Dkt. No. 18). Given the striking similarities between the standard to intervene and the test for standing, as explained above, the rationale employed by the federal district court in *Telesweeps* should apply with full force here.

      c.   *Parx Casino has an immediate interest in the outcome of this case*

Parx Casino's interest in this action is not remote or speculative. As a slot machine licensee who has paid substantial fees for the right to lawfully participate in *regulated, licensed* gambling, Parx has a direct and immediate interest in eliminating *unregulated, unlicensed*

---

(3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or
(4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

(a.1) Electronic video monitor.--A person commits a misdemeanor of the first degree if he owns, operates, maintains, places into operation or has a financial interest in an electronic video monitor or business that owns, operates, maintains or places into operation or has a financial interest in an electronic video monitor:
(1) which is offered or made available to persons to play or participate in a simulated gambling program for direct or indirect consideration, including consideration associated with a related product, service or activity; and
(2) for which the person playing the simulated gambling program may become eligible for a cash or cash-equivalent prize, whether or not the eligibility for or value of the cash or cash-equivalent prize is determined by or has any relationship to the outcome of or play of the simulated gambling program.

18 Pa. C.S. 5513(a), (a.1).

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

gambling, especially in its backyard.[6]  *See, e.g., Johnson*, 8 A.3d at 329.  A contrary finding would defy common sense.

Even if it is found that Parx Casino's interest in fighting against the proliferation of illegal gambling is remote or speculative (even though it is not), Parx can still satisfy the immediacy requirement because, as a highly regulated entity subject to strict financial monitoring and controls, Parx falls within the zone of interests sought to be protected or regulated by the Gaming Act, generally, and Section 5513 of the Crimes Code, specifically. *Malt Beverages Distributors Ass'n v. PLCB*, 881 A.2d 37, 43 (Pa. Commw. Ct. 2005) (holding that a statewide trade association had standing to intervene in a licensure matter involving the Pennsylvania Liquor Control Board because, among other reasons, "[w]ith over 400 beer distributor members, [the association] certainly is integrally involved in the regulated distribution of beer and malt beverages generally").

In sum, Parx Casino has standing to bring this action.  Defendant's arguments to the contrary are nothing more than a desperate attempt to avoid liability for its ongoing illegal activity.

> **2.      Count I states a viable claim for public nuisance, because the Complaint alleges that Defendant is conducting unlicensed gambling operations in violation of two Pennsylvania statutes and such conduct amounts to a public nuisance as a matter of law**

A public nuisance is an "'unreasonable interference with a right common to the general public.'"  *Machipongo Land & Coal Co. v. DEP*, 799 A.2d 751, 773 (Pa. 2002) (quoting RESTATEMENT (SECOND) OF TORTS § 821B (1979)).  A public nuisance differs from a private

---

[6] It stands to reason that Parx Casino has an immediate interest in eliminating unregulated, unregulated gambling across the Commonwealth of Pennsylvania (not just in its backyard), because Parx was awarded an interactive gaming certificate, and through its interactive gaming platform, Parx currently accepts wagers from eligible gamblers anywhere within the Commonwealth.  (Compl. ¶¶20-22).

14

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

nuisance, which "requires an invasion of another's interest in the private use and enjoyment of his or her land." 2 SUMM. PA. JUR. 2D TORTS § 21:4 (2d ed. 2019). By contrast, a public nuisance is an inconvenience or troublesome offense that annoys a whole community in general, and not merely some particular person. *See, e.g., Feeley v. Borough of Ridley Park*, 551 A.2d 373, 375 (Pa. Commw. Ct. 1988).

The circumstances that may sustain a holding that an interference with a public right is unreasonable – and thus, amount to a public nuisance – include various types of conduct. RESTATEMENT (SECOND) OF TORTS § 821B(2)(b). Historically, gambling constituted a public nuisance. *Tull v. United States*, 481 U.S. 412, 421 n.5 (1987). Under the Second Restatement, a public nuisance may be found where the "conduct is proscribed by statute, ordinance or administrative regulation." RESTATEMENT (SECOND) OF TORTS § 821B(2)(b). In light of the proliferation of legalized gambling, courts have found a public nuisance where, as here, a defendant conducted unlicensed gambling operations, in violation of one or more state statutes. *See, e.g., Texas v. del Sur Pueblo*, 220 F.Supp.2d 688, 690, 695-96 (W.D. Tex. 2001).

In order to recover damages in an individual action for a public nuisance, "one must have suffered harm of a kind different from that suffered by the other members of the public exercising the right common to the general public that was the subject of interference." RESTATEMENT (SECOND) OF TORTS § 821C(1) (1979); *see also Pa. & Oh. Canal Co. v. Graham*, 63 Pa. 290, 296 (1869) (observing that, "if a party has sustained any special damage from a public nuisance beyond that which affects the public at large, whether it be direct or consequential, an action will lie against the author of the nuisance, for redress."); *Edmunds v. Duff*, 124 A. 489, 492 (Pa. 1924) (same).

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Here, when accepting the well-pleaded allegations of the Complaint as true and drawing all reasonable inferences in Parx Casino's favor, it is evident that Count I of the Complaint states a viable claim for public nuisance. The Complaint alleges that Defendant has on its premises, and makes available for customer play, at least five slot machines – an allegation that Defendant does not deny. (Compl. ¶57). To the contrary, Defendant appears to concede this fact. (Preliminary Objections ¶22 (admitting to "[t]he operation of five 'Pennsylvania Skill Games' in a convenience store near Plaintiff")). Notably, the Commonwealth Court recently concluded that a "Pennsylvania Skill Game" machine like the ones offered by Defendant meets the definition of a "slot machine" under the Gaming Act. *POM*, 2019 WL 6138270, at *5.

The Complaint alleges that the ongoing and continuing operation of these unlicensed slot machines violate Section 1301 of the Gaming Act, as well as Section 5513 of the Crimes Code. (Compl. ¶¶58-61). Therefore, as alleged in the Complaint, Defendant is conducting unlicensed gambling operations in violation of two Pennsylvania statutes. Such conduct amounts to a public nuisance as a matter of law. RESTATEMENT (SECOND) OF TORTS § 821B(2)(b); *see, e.g., Texas*, 220 F.Supp.2d at 690, 695-96.

While Defendant argues that Parx Casino "has not sufficiently alleged that it suffered actual harm greater in magnitude and different in kind than that suffered by the general public," (Preliminary Objections ¶46), Defendant's position is contradicted by the plain terms of the Complaint:

> 66.    [Defendant's] illegal gambling activities compete directly with the licensed gaming offered by Parx Casino, which paid hundreds of millions of dollars for the right to lawfully conduct such operations.
>
> 67.    [Defendant's] illegal gambling activities take market share and customers away from the slot machines offered by Parx Casino.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

68.    To the extent that such losses can be quantified, [Defendant's] illegal gambling activities deprive Parx Casino of profits and causes it pecuniary harm (and, in turn, a loss of tax revenue for the Commonwealth).

69.    The general public has not suffered this type of harm.

(Compl. ¶¶66-69).  These allegations are more than sufficient to satisfy the harm element of a public nuisance claim.  RESTATEMENT (SECOND) OF TORTS § 821C(1); *see also Graham*, 63 Pa. at 296.

Defendant's position is also directly at odds with what its attorneys argued in *3C Amusements* and in *Lagana*.  In both of those cases, POM instituted an action against a defendant, alleging that it had on its premises, and available for customer play, numerous video game machines that are illegal gambling devices.  In both of those cases, POM raised a claim of public nuisance, and in doing so, specifically alleged that "[i]llegal gambling is a nuisance *per se* under Pennsylvania law."  Compl. ¶44 in *3C Amusements*; Compl. ¶45 in *Lagana*.[7]

In both of those cases, the defendant responded by filing preliminary objections, which included a demurrer as to the public nuisance claim.  In both of those cases, POM opposed the preliminary objections, with same attorneys that are representing Defendant making the following argument:

> 3C's contention that POM cannot premise its independent public nuisance claim on conduct that violates a criminal statute – in this case 18 Pa. C.S. § 5513 – is wrong as a matter of Pennsylvania law.  Pennsylvania Courts have long recognized that nuisance claims can be premised on conduct that also may be criminal and that courts have jurisdiction over such claims.  For example, in *Boggs v. Werner*, 94 A.2d 50, 51 (Pa. 1953), the Pennsylvania Supreme Court held that the trial court had jurisdiction over a nuisance claim based on the practice of dentistry without a license, even though this conduct was prohibited by statute and was a misdemeanor crime.  The Court rejected the argument that the trial court had no jurisdiction because a statute prohibited the conduct and provided for penalties, recognizing that the statute did "not deprive equity of its

---

[7] A true and correct copy of the Complaint that POM filed in *3C Amusements* is attached hereto as "**Exhibit 2**," while copy of the Complaint that POM filed in *Lagana* is attached hereto as "**Exhibit 3**."

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

jurisdiction to enjoin a nuisance merely because the Legislature has prescribed criminal penalties for the conduct sought to be enjoined." *Id.*

Similarly, in *Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 237 A.2d 342, 347-48 (Pa. 1968), the Pennsylvania Supreme Court found that courts had equity jurisdiction to enjoin a public nuisance that was based on conduct that also was criminal. The Court first noted that jurisdiction attached when a plaintiff has shown that the defendant's acts violated the plaintiffs personal, property or civil rights, even if the defendant's conduct also violated criminal law. *Id.* The Court then found:

> Further, if the criminal act sought to be enjoined constitutes a 'public nuisance' then it may properly be restrained on the motion of the proper public authorities. It is also true that a public nuisance may be enjoined at the behest of a private citizen or group of citizens, if the latter, either in their property or civil rights, are specifically injured by the public nuisance over and above the injury suffered by the public generally.

*Id.* at 348 (citations omitted); *see also Bulls v. Southwestern Energy Production Co.*, 2014 WL 3953155 at *7 (M.D. Pa. Aug. 12, 2014) ("Since a public nuisance is a quasi-criminal action, 'the normal remedy is in the hands of the state.' However, in limited circumstances, courts recognize a private right of action for a public nuisance.") (citations omitted).

In short, POM has pled a valid claim for public nuisance based in part on 3C's conduct that violates 18 Pa. C.S. § 5513. POM has not asserted a private cause of action for violation of 18 Pa. C.S. § 5513.

Pltf.'s Br. in Opp'n to Def.'s Preliminary Objections at 5-7 in *3C Amusements*; *accord* Pltf.'s Br. in Opp'n to Def.'s Preliminary Objections at 7-8 in *Lagana*.[8]

In the event that Defendant argues that this Court should overlook their attorneys' prior, inconsistent arguments in light of the Commonwealth Court's recent decision in *POM* – which ruled that POM's games are slot machines, but that the Gaming Act "only applies to licensed slot machines in licensed entities/facilities and does not apply to unlicensed and illegal devices," 2019 WL 6138270, at *11 – Defendant is misguided. For one, that ruling is fundamentally

---

[8] A true and correct copy of POM's Brief in Opposition in *3C Amusements* is attached hereto as "**Exhibit 4,**" while a true and correct copy of POM's Brief in Opposition in *Lagana* is attached hereto as "**Exhibit 5.**"

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

flawed because the Commonwealth Court did not reconcile its holding with the provisions of the Gaming Act that apply to unlicensed persons. For instance, Sections 1518(a)(9), (9.1), and (10) are criminal offenses that apply to any "person" or "individual," and are not limited to only licensed entities. 4 Pa. C.S. §§ 1518(a)(9),(9.1), (10).[9] And Section 1518(f) provides for the seizure of the unlawful machines and money from these unlicensed persons. 4 Pa. C.S. § 1518(f).[10]

Moreover, even if this Court followed *POM* and held that the Gaming Act does not apply to unlicensed and illegal devices (despite express provisions to the contrary), Count I would still state a plausible claim for public nuisance because the Complaint alleges that Defendant's continuing and ongoing operation of unlicensed slot machines violates Section 5513 of the Crimes Code (Compl. ¶60), and *POM* did not reach that issue. 2019 WL 6138270, at *13 n.17 ("Of course, we do not answer the separate question of whether the POM Game qualifies as an illegal gambling device under section 5513 of the Crimes Code, which both parties appear to acknowledge presents a question of fact that requires factual discovery to resolve."). Equally important, Defendant did not raise a demurrer to Count I on the ground that a violation of

---

[9] 4 Pa. C.S. § 1518(a)(9) ("It shall be unlawful for a *person or licensed entity* to possess any device, equipment or material which the person or licensed entity knows has been manufactured, distributed, sold, tampered with or serviced in violation of the provisions of this part with the intent to use the device, equipment or material as though it had been manufactured, distributed, sold, tampered with or serviced pursuant to this part." (emphasis added); *id.* § 1518(a)(9.1) ("It shall be unlawful for a *person* to sell, offer for sale, represent or pass off as lawful any device, equipment or material which the person or licensed entity knows has been manufactured, distributed, sold, tampered with or serviced in violation of this part." (emphasis added)); *id.* § 1518(a)(10) ("It shall be unlawful for an *individual* to work or be employed in a position the duties of which would require licensing or permitting under the provisions of this part without first obtaining the requisite license or permit issued under the provisions of this part." (emphasis added)).

[10] 4 Pa. C.S. § 1518(f) ("Any equipment, device or apparatus, money, material, gaming proceeds or substituted proceeds or real or personal property used, obtained or received or any attempt to use, obtain or receive the device, apparatus, money, material, proceeds or real or personal property in violation of this part shall be subject to the provisions of 42 Pa.C.S. §§ 5803 (relating to asset forfeiture), 5805 (relating to forfeiture procedure), 5806 (relating to motion for return of property), 5807 (relating to restrictions on use), 5807.1 (relating to prohibition on adoptive seizures) and 5808 (relating to exceptions).").

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Section 5513 of the Crimes Code cannot amount to a public nuisance.  Any attempt to do so at this late juncture is waived.[11]

For all of the foregoing reasons, Count I states a viable claim for public nuisance.

### 3. Count III of the Complaint states a plausible claim for negligence based on a *per se* theory of liability under the four-part test announced in *Wagner v. Anzon, Inc.*, 684 A.2d 570 (Pa. Super. Ct. 1996)

The concept of "negligence *per se*" establishes the elements of duty and breach of duty where an individual violates an applicable statute, ordinance, or regulation designed to prevent a public harm.  *See, e.g., Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super. Ct. 2014). However, a plaintiff, having proven negligence *per se*, cannot recover unless it can be proven that such negligence was the proximate cause of the injury suffered.   *See, e.g., Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1058 (Pa. Super. Ct. 2003).

The Pennsylvania Superior Court has defined "negligence *per se*" in the following fashion:

> ["Negligence *per se*" is] conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances.  Pennsylvania recognizes that a violation of a statute or ordinance may serve as the basis for negligence *per se*.  However, a court will not use a statute or regulation as the basis of negligence *per se* where the purpose of the statute is to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public.

> In order to prove a claim based on negligence *per se,* the following four requirements must be met:

> (1) The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally;

---

[11] That said, since the term "slot machine" is not defined in the Crimes Code, the definition set forth in Act 42 applies based on basic rules of statutory construction. *See, e.g.,* 1 Pa. C.S. § 1932; *see also id.* § 1921(c)(5). This is significant because the Commonwealth Court has already determined that "skill games" are "slot machines" under the definition of that term in the Gaming Act. *POM*, 2019 WL 6138270, at *5. While the Commonwealth Court stopped short of deciding whether the particular "skill game" at issue in *POM* amounted to an illegal gambling device under Section 5513 of the Crimes Code because of purported factual disputes, no such disputes exist in this case.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

(2) The statute or regulation must clearly apply to the conduct of the defendant;

(3) The defendant must violate the statute or regulation;

(4) The violation of the statute or regulation must be the proximate cause of the plaintiff's injuries.

*Wagner v. Anzon, Inc.*, 684 A.2d 570, 574 (Pa. Super. Ct. 1996) (citations and quotations omitted).

Regarding the first requirement, the Pennsylvania Supreme Court has stated that the purpose of the asserted statute or regulation must be: "(a) to protect a class of persons which includes the plaintiff; (b) to protect the particular interest which is invaded; (c) to protect that interest against the kind of harm which has resulted and (d) to protect that interest against the particular hazard from which the harm results." *Congini by Congini v. Potersville Valve Co.*, 470 A.2d 515, 517-18 (Pa. 1983) (quoting RESTATEMENT (SECOND) OF TORTS § 286 (1965)).

Here, when accepting the well-pleaded allegations of the Complaint as true and drawing all reasonable inferences in Parx Casino's favor, it is apparent that Count III of the Complaint states a viable negligence claim under a negligence *per se* theory.[12]   Under Section 1301 of the Gaming Act, slot machine licensees like Parx Casino have the exclusive right to place and operate slot machines in the Commonwealth.  4 Pa. C.S. § 1301.  Again, Defendant is violating Section 1301 by placing and operating at least five slot machines on its premises.  (Compl. ¶¶43, 57).

Applying the four-part test announced in *Wagner*, a violation of Section 1301 constitutes negligence *per se* because:

1)   The purpose of Section 1301, at least in part, is to protect the substantial investment of Parx Casino and the other slot machine licensees, who have expended hundreds of millions of dollars for the right to conduct lawful slot operations in Pennsylvania.

---

[12] While Defendant is correct that negligence *per se* is not a separate cause of action, Parx Casino is not asserting a standalone claim for negligence *per se*.  Rather, and as the body of Count III makes clear, Parx is raising a claim for negligence against Defendant under a negligence *per se* theory of liability.  (Compl. ¶¶79-86).  Parx merely captioned Count III as "Negligence *Per Se*" to reinforce this point.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

This is in contrast to Section 5513 of the Crimes Code, which is intended to protect all Pennsylvanians from illegal gambling;

2) Section 1301 clearly applies to the conduct of Defendant, since it is operating at least three slot machines on its premises. To the extent that Defendant relies upon *POM* to claim otherwise, that argument fails because, as explained above, the Commonwealth Court did not reconcile its holding with the provisions of the Gaming Act that are directly applicable to unlicensed persons;

3) Defendant is violating Section 1301 because it is operating those machines without a license; and

4) Defendant's violation of Section 1301 is the proximate cause of Parx Casino's harm based upon the well-pleaded allegations in the Complaint.

*Cf. Wagner*, 684 A.2d at 574 (observing that a "court will not use a statute or regulation as the basis of negligence *per se* where the purpose of the statute is to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public," which is distinguishable from the present circumstances where only licensees are able to conduct lawful slot operations).

While Defendant contends the opposite because the Gaming Act does not provide for a private cause of action, (Preliminary Objections ¶63), the absence of a private cause of action in a statutory scheme does not necessarily preclude that statute's use as the basis for negligence *per se*. To the contrary, numerous courts have found a violation of a statute to constitute negligence *per se* absent a private cause of action. *See, e.g., Schemberg*, 85 A.3d at 1074 (holding that a violation of 18 Pa. C.S. § 5104 can amount to negligence *per se* despite no private cause of action); *Madison v. Bethanna, Inc.*, No. 12-01330, 2012 WL 1867459, at *5 (M.D. Pa. May 23, 2012) (holding that a violation of 55 Pa. Code § 3350.5 can constitute negligence *per se* despite no private cause of action); *Goldsborough v. Columbia Borough*, 48 Pa. D. & C.3d 193 (Lancaster Cnty. Ct. Com. Pl. 1986) (holding that a violation of the Air Pollution Control Act of January 8, 1960, P.L. 2119, 35 Pa. C.S. § 4001 *et seq.*, can amount to negligence *per se* despite no private cause of action). This

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Court should do the same here.

## V.    CONCLUSION

In light of the foregoing, Plaintiff Greenwood Gaming and Entertainment, Inc.

respectfully requests that this Court overrule Defendant RAJ Rajeshwari Inc.'s Preliminary

Objections to the Complaint.

Respectfully submitted,

*/s/ Andrew J. Kramer*

Andrew J. Kramer, Esquire (PA I.D. 52613)
KANE, PUGH, KNOELL, TROY & KRAMER, LLP
510 Swede Street
Norristown, PA 19401-4807
610.275.2000 (Phone)
610.275.2018 (Fax)
akramer@kanepugh.com

Mark S. Stewart, Esquire (PA I.D. 75958)
Kevin M. Skjoldal, Esquire (PA I.D. 200841)
Casey A. Coyle, Esquire (PA I.D. 307712)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
213 Market Street, 8th Floor
Harrisburg, PA 17101
717.237.6000 (Phone)
717.237.6019 (Fax)
mstewart@eckertseamans.com
kskjoldal@eckertseamans.com
ccoyle@eckertseamans.com

Date: December 2, 2019

*Counsel for Plaintiff Greenwood Gaming and
Entertainment, Inc. (d/b/a Parx Casino)*

23

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## CERTIFICATE OF SERVICE

I certify that, on December 2, 2019, I caused a copy of the foregoing PLAINTIFF

GREENWOOD GAMING AND ENTERTAINMENT, INC.'S BRIEF IN OPPOSITION TO

DEFENDANT RAJ RAJESHWARI INC.'S PRELIMINARY OBJECTIONS TO COMPLAINT

to be served via email and First Class U.S. Mail, which service satisfies the Pennsylvania Rules

of Civil Procedure, addressed to:

> Mattew H. Haverstick, Esquire
> Eric J. Schreiner, Esquire
> Shohin H. Vane, Esquire
> Kleinbard LLC
> Three Logan Square, 5th Floor
> 1717 Arch Street
> Philadelphia, PA 19103
> *Counsel for Defendant*

/s/ Andrew J. Kramer
_____
Andrew J. Kramer, Esquire

Date: December 2, 2019

L0841592.4

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 1

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

<u>IN THE COMMONWEALTH COURT OF PENNSYLVANIA</u>

| | |
|---|---|
| Churchill Downs Incorporated and Churchill Downs Technology Initiatives Company,<br>　　　　　　　　　Petitioners | :<br>:<br>:<br>: |
| v. | :<br>:<br>: |
| The Commonwealth of Pennsylvania, acting by and through the Department of Revenue; Eileen H. McNulty, Secretary of Revenue of the Commonwealth of Pennsylvania, and her successors in office; Bruce Castor, Acting Attorney General of the Commonwealth of Pennsylvania, and his successors in office; The Pennsylvania State Horse Racing Commission; Corinne Sweeney; Thomas J. Ellis; C. Edward Rogers, Jr.; Russell B. Jones Jr.; Michele C. Ruddy, Salvatore M. De Bunda, and Russell C. Redding, in their Official Capacity as Commissioners of the Pennsylvania State Horse Racing Commission, and their successors in office,<br>　　　　　　　　　Respondents | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 476 M.D. 2016<br>: Heard: November 1, 2016 |

<u>MEMORANDUM AND ORDER</u>

　　　　Out-of-state entities, Churchill Downs, Inc. and Churchill Downs Technology Initiatives Co. (collectively, Churchill Downs), have filed with this Court a petition for review (Petition) seeking a declaratory judgment that Act 7 of

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

2016 (Act 7)[1] is unconstitutional (Action).  The Office of Attorney General (OAG) is defending the action on the Commonwealth's behalf.

On September 27, 2016, Greenwood Racing, Inc. (Greenwood), Bensalem Racing Association, Inc. (Bensalem Racing) and Keystone Turf Club, Inc. (Keystone) (collectively, the GRI Entities)[2] filed with this Court an Application for Leave to Intervene (Application) in the Action.  On October 6, 2016, the OAG filed a Memorandum in Response to the Application, stating, "[the OAG] do[es] not oppose the GRI Entities['][Application], and leave its determination to the sound discretion of the Court." *Id.* at 1.  On October 7, 2016, Churchill Downs filed its Answer in Opposition to the Application.  On October 13, 2016, this Court ordered that a hearing be held on November 1, 2016 on the Application.  On November 1, 2016, GRI Entities filed a memorandum of law in support of intervention.

On November 1, 2016, this Court held a hearing on the Application at which counsel for Churchill Downs and the GRI Entities presented argument.[3]  In addition, Greenwood's racing division's Chief Operating Officer Joseph Wilson (Wilson) testified on behalf of the GRI Entities.  Wilson explained the GRI Entities' structure and business operations.  Further, he described the significant financial investment which has been made into the organization **and the enormous impact on the GRI Entities** if Act 7 is declared unconstitutional.  At the hearing,

---

[1] Act of February 23, 2016, P.L. 15.  Act 7 was repealed and added as 3 Pa.C.S. Chapter 93 by Act 114 of 2016, Act of October 28, 2016 P.L. __.

[2] Greenwood, the parent company of Bensalem Racing and Keystone, holds licenses through subsidiaries to operate Parx Casino and Racing (a racetrack, casino and entertainment destination) in Bensalem, Pennsylvania.  Bensalem Racing and Keystone conduct horse race meetings with pari-mutuel wagering and electronic wagering.

[3] The OAG did not participate in the hearing.

2

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

this Court granted Churchill Downs permission to file a memorandum in response to that filed by the GRI Entities.  On November 3, 2016, Churchill Downs filed its responsive memorandum.

Pennsylvania Rule of Civil Procedure No. (Rule) 2327 states, in pertinent part:

> At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if
>
> . . . .
>
> **(4) the determination of such action may affect any legally[-]enforceable interest of such person whether or not such person may be bound by a judgment in the action.**

Pa.R.C.P. No. 2327 (emphasis added).  Rule 2329 provides, in relevant part:

> Upon the filing of the petition and after hearing, of which due notice shall be given to all parties, the court, if the allegations of the petition have been established and are found to be sufficient, shall enter an order allowing intervention; but an application for intervention **may** be refused, if
>
> . . . .
>
> **(2) the interest of the petitioner is already adequately represented[.]**

Pa.R.C.P. No. 2329 (emphasis added).  This Court has explained:

> Considering Rules 2327 and 2329 together, the effect of Rule 2329 is that if the petitioner is a person within one of the classes described in Rule 2327, the allowance of intervention is mandatory, not discretionary, unless one of the grounds for refusal under Rule 2329 is present. Equally, if the petitioner does not show himself to be within one of the four classes described in Rule 2327, intervention must be denied, irrespective of whether any

3

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

of the grounds for refusal in Rule 2329 exist. Thus, the court is given the discretion to allow or to refuse intervention only where the petitioner falls within one of the classes enumerated in Rule 2327 and only where one of the grounds under Rule 2329 is present which authorizes the refusal of intervention.

*Larock v. Sugarloaf Twp. Zoning Hearing Bd.*, 740 A.2d 308, 313 (Pa. Cmwlth. 1999) (citations omitted). Thus, "[e]ven if there is a legally[-]enforceable interest under Rule 2327(4), a mere prima facie basis for intervention is not enough and intervention **may** be denied if the interest of the petitioner is already adequately represented." *Keener v. Zoning Hearing Bd. of Millcreek Twp.*, 714 A.2d 1120, 1123 (Pa. Cmwlth. 1998) (emphasis added). Accordingly, although a court **may** deny intervention in such circumstances, there is no requirement that a court do so.

"To satisfy Rule 2327(4), the applicant must own an interest in or a lien upon property in question or must own a cause of action which will be affected by the action. He must have some right, whether legal or equitable which will be affected by the proceedings." *Keener*, 714 A.2d at 1122. Our Supreme Court has stated that "[t]he exact boundaries of a legally[-]enforceable interest have not been set, but clearly, . . . if [the individual seeking intervention] lacks standing to advance the petition for review, he has no legally[-]enforceable interest to assert as an intervenor." *In re Application of Biester*, 409 A.2d 848, 850 n.2 (Pa. 1979).

Pennsylvania courts have recognized "the interest of a business to be protected from competition allegedly prohibited by a regulatory scheme." *Pa. Tavern Ass'n v. Liquor Control Bd.*, 372 A.2d 1187, 1192 (Pa. 1977) (Roberts, J. concurring). In *MEC Pennsylvania Racing v. Pennsylvania State Horse Racing Commission*, 827 A.2d 580 (Pa. Cmwlth. 2003), this Court found that existing racetracks had standing to appeal from the Pennsylvania State Horse Racing Commission's approval of a new license application to conduct horse racing

4

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

meetings with pari-mutuel wagering, since granting the license would have a detrimental impact on the existing racetracks and would dilute attendance and revenue.

Given Pennsylvania courts' "[recognition of] the interest of a business to be protected from competition allegedly prohibited by a regulatory scheme," and Wilson's testimony reflecting the harm that the GRI Entities would sustain in the absence of Act 7's protections from competition, we conclude that the GRI Entities have sufficiently demonstrated a legally-enforceable interest. *Pa. Tavern Ass'n*, 372 A.2d at 1192.[4]

Having satisfied Rule 2327(4), we next consider whether the GRI Entities' interests are adequately represented by the OAG as a reason to deny intervention under Rule 2329(2). In making this determination, we first note that the OAG does not oppose the GRI Entities' Application. Churchill Downs maintains that permitting intervention would "serve only to multiply proceedings, hasten the expenditure of private and judicial resources, and complicate any potential resolution of these issues . . . ." Churchill Downs' Answer in Opposition to Application, at 2. However, these alleged concerns with the litigation procedure and process do not address whether the OAG will adequately represent the GRI Entities' interests.

In its memorandum of law, which was corroborated by Wilson's testimony, the GRI Entities set forth a number of divergent interests between those of the OAG and the GRI Entities. The evidence and argument establish that denial

---

[4] Notably, Churchill Downs acknowledges that the GRI Entities have a legally-enforceable interest. Specifically, in its responsive memorandum filed on November 3, 2016 at 12, Churchill Downs states, the "GRI [Entities'] legally protectable interest in a determination that Act 7 is constitutional mirrors that of the Commonwealth."

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

of intervention under Rule 2329(2) is inapplicable to the facts of this case. Even in the absence of such divergent interests, given the significant concerns Wilson delineated in his testimony, this Court concludes, in its discretion, not to deny intervention under Rule 2329. After considering the testimony and argument presented, the parties' submissions and relevant law, this Court grants the GRI Entities' Application.

AND NOW, this 4th day of November, 2016, the Application is GRANTED.

ANNE E. COVEY, Judge

Certified from the Record

NOV - 4 2016

and Order Exit

6

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 2

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

_____ Cambria _____ **County**

| | |
|---|---|
| **For Prothonotary Use Only:** | *TIME STAMP* |
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- [X] Complaint
- [ ] Writ of Summons
- [ ] Petition
- [ ] Transfer from Another Jurisdiction
- [ ] Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| POM of Pennsylvania, LLC | 3C Amusements, LLC |

**Are money damages requested?** [X] Yes  [ ] No

Dollar Amount Requested: (check one)  [ ] within arbitration limits  [X] outside arbitration limits

**Is this a *Class Action Suit*?** [ ] Yes  [X] No

**Is this an *MDJ Appeal*?** [ ] Yes  [X] No

Name of Plaintiff/Appellant's Attorney:  Eric J. Schreiner, Esq.

[ ]  Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE**. If you are making more than one type of claim, check the one that you consider most important.

**TORT** (*do not include Mass Tort*)
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [X] Nuisance
- [ ] Premises Liability
- [ ] Product Liability (*does not include mass tort*)
- [ ] Slander/Libel/ Defamation
- [ ] Other: _____

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other: _____

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional: _____

**CONTRACT** (*do not include Judgments*)
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other

- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other

- [ ] Other: _____

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other: _____

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other

- [ ] Zoning Board
- [ ] Other: _____

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other: _____

*Updated 1/1/2011*

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>3C AMUSEMENTS, LLC,<br><br>*Defendant.* | IN THE COURT OF COMMON PLEAS<br>FOR CAMBRIA COUNTY,<br>PENNSYLVANIA<br><br>CIVIL DIVISION – LAW<br><br>NO. _____ |

## NOTICE TO DEFEND

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Laurel Legal Services, Inc.
227 Franklin Street
Suite 400
Johnstown, PA 15901
Telephone: (814) 536-8917
Fax: (814) 535-3377

### AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguien-tes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demande. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR RAL SERVCIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Laurel Legal Services, Inc.
227 Franklin Street
Suite 400
Johnstown, PA 15901
Telephone: (814) 536-8917
Fax: (814) 535-3377

{01776245;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
     eschreiner@kleinbard.com
     prosenzweig@kleinbard.com
     svance@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>3C AMUSEMENTS, LLC,<br><br>*Defendant.* | IN THE COURT OF COMMON PLEAS FOR CAMBRIA COUNTY, PENNSYLVANIA<br><br>CIVIL DIVISION – LAW<br><br>NO. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff POM of Pennsylvania, LLC ("POM"), by and through its undersigned counsel, hereby brings its complaint for public nuisance and unfair competition against Defendant 3C Amusements, LLC ("Defendant"), and in support hereof, avers as follows:

### INTRODUCTION

1.      POM licenses and distributes software for a legal skill based video game machine, called the Pennsylvania Skill™ Amusement Device 402.49 PEN (the "Skill Game"), which is used in Cambria County and throughout the Commonwealth of Pennsylvania.

{01776245;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

2.      It has previously been determined by a court of the Commonwealth that the Skill Game is one in which the element of skill rather than chance predominates, and therefore it is not in violation of the Pennsylvania criminal statute regulating games of chance, *see* 18 Pa. C.S. § 5513.

3.      Defendant owns and operates a business known as 3C Amusements located at 1762 Lyter Drive, Johnstown, Pennsylvania (the "Business").

4.      The Business has on its premises and available for customer play numerous video game machines that are illegal gambling devices.

5.      The ongoing and continuing operation of these games at the Business constitutes illegal gambling in violation of 18 Pa. C.S. § 5513.

6.      These illegal games compete directly with the legal Skill Game.

7.      These illegal games take market share and customers away from the legal Skill Game, thereby depriving POM of profits and causing it to suffer pecuniary harm.

8.      Defendant's operation of these illegal games at the Business has created a public nuisance.

9.      Defendant's operation of these illegal games at the Business constitutes unfair competition.

10.      POM is entitled to injunctive relief that prohibits the use or operation of these illegal games at the Business or anywhere else in Cambria County in order to abate the public nuisance and unfair competition.

11.      POM also is entitled to damages based on Defendant's conduct.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## PARTIES AND VENUE

12.       POM is a is a limited liability company formed under the laws of Wyoming, trading and doing business as Pace-O-Matic, with its principal place of business in Duluth, Georgia. POM licenses and distributes software for the Skill Game, which is used throughout the Commonwealth of Pennsylvania.

13.       Defendant is a Pennsylvania Limited Liability Company whose registered address is 1750 Lyter Drive, Johnstown, Pennsylvania. Defendant owns and operates the Business. Defendant operates multiple illegal games of chance at the Business that compete with the legal Skill Game.

14.       Venue exists in this Court pursuant to Pennsylvania Rule of Civil Procedure 1006 because a transaction or occurrence took place in this county out of which the cause of action asserted in this Complaint arose and because the Defendant resides and/or regularly conducts business in this county.

## FACTUAL BACKGROUND

### A.    POM'S SKILL GAME

15.       POM's Skill Game is sold and distributed in the Commonwealth of Pennsylvania and is located primarily in taverns, restaurants and social clubs that serve alcohol under license from LCB.

16.       The Skill Game is a coin-operated video machine.

17.       The primary game the Skill Game offers is a "Tic-Tac-Toe" style puzzle, but the Skill Game also includes a potentially unlockable bonus session and a "Follow Me™" colored dot-matching second phase of game play.

18.       The Tic-Tac-Toe game features six different graphical themes that a player can select, which include "Bombs and Bombshells," "Cocktail Cove," "Pirate's Prize," "Pirates,"

{01776245;v1 }

3

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

"Lucky Fruit," and "Living Large."   While the graphics and some payout amounts differ among the various themes, the gameplay is functionally equivalent in all themes.

19.     A player cannot access the bonus session or the Follow-Me™ second phase of play on the Skill Game without first playing the Tic-Tac-Toe game.

20.     When the Tic-Tac-Toe game is initiated, nine reels arranged in a three-by-three grid are spun.

21.     When the wheels stop spinning, nine symbols based on the player's chosen theme are displayed.

22.     The pattern that is displayed is selected from a finite pool of multiple tens of thousands of puzzles.

23.     Once the reels are spun, the player has thirty seconds to change one of the symbols to a "Wild" symbol in order to complete one or more rows in the grid.

24.     The most advantageous spot in which to place the "Wild" symbol depends on whether multiple rows can be completed and the value of the symbols in the row or rows that were completed.

25.     Failure to place the "Wild" symbol at all within the thirty-second time limit will result in a loss, however, because the Skill Game does not generate automatic wins.

26.     The Skill Game also has a bonus session that can be triggered under certain circumstances by successful completion of the Tic-Tac-Toe game.

27.     The bonus sessions differ among the various themes that are available on the Skill Game.  "Bombs and Bombshells," "Cocktail Cove," and "Pirate's Prize" have skill-based bonus play (shooting for "Bombs and Bombshells" and "Pirate's Prize," picture-taking for "Cocktail Cove"), during which the player can earn less than the maximum bonus available, including

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

zero, based on how well he or she performs during the bonus session. The bonus sessions for "Pirates," "Lucky Fruit," and "Living Large" consist of a process that delivers the bonus points to a player that were already determined by the outcome of the Tic-Tac-Toe game. For these themes, the bonus session simply is an entertaining way to deliver to the player 100% of the reward the player already earned in the Tic-Tac-Toe game.

28.     If a player executes perfect skill and still fails to win at least 105% of the amount paid to play the Tic-Tac-Toe game, the player is given the option of selecting the Follow-Me™ phase of play.

29.     The Follow-Me™ second phase of game play begins with a three-by-three grid of colored dots. The dots flash in a random sequence that the player must repeat.

30.     The player needs to follow the sequences for 25 rounds of play, with each sequence adding another circle.

31.     If ultimately successful, the player is awarded with a combined total of 105% of the original amount spent to play.

32.     The element of skill predominates in the Skill Game.

33.     The Court of Common Pleas of Beaver County has determined that POM's Skill Game was a game in which skill predominated and, consequently, was not a gambling device per se.[1] *See In re: Pace-O-Matic Equipment, Terminal I.D. No. 142613*, M.D. No. 965-2013 at p.p. 7-12 (Beaver Co. C.C.P. 2014) (a true and correct copy of the court's memorandum opinion and order is attached hereto, and made a part hereof, as Exhibit "A").

---

[1] The game involved in the Beaver County case was POM's Pennsylvania Skill™ Amusement Device SKL 402.44 PEN. The current Skill Game is built off of a newer version of POM's software, which provides substantially the same actual game play as the software version at issue in the Beaver County case. The reasoning of the court in Beaver County applies equally in this case.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

34.  Accordingly, the Skill Game is a legal game of skill under Pennsylvania law.

**B.  THE BUSINESS**

35.  The Business has multiple types of video machine games that are available for customers to play.

36.  Most of the games at the Business are illegal gambling devices that violate 18 Pa. C.S. § 5513.

37.  For example, the Business has "SkillTouch" games manufactured by Gracie Technologies, Inc. ("Gracie").

38.  The Court of Common Pleas for Cambria County, Pennsylvania recently held that Gracie's "SkillTouch" game is an illegal gambling device that violates 18 Pa. C.S. § 5513. *See Gracie Technologies Inc., et al. v. Commonwealth*, No. MD 162-2017 (Cambria Co. C.C.P.) (a true and correct copy of the court's opinion and order is attached hereto, and made a part hereof, as Exhibit "B").

39.  The Business also has Banilla games. Upon information and belief, these games are games where chance predominates and, therefore, they also are illegal gambling devices under 18 Pa. C.S. § 5513.

40.  The Business promotes illegal gambling and violates 18 Pa. C.S. § 5513 because it has numerous games that are illegal gambling devices available for customers to play.

**C.  THE PUBLIC NUISANCE**

41.  As stated above, the Business promotes illegal gambling because it has on its premises numerous illegal gambling devices that are available for customer to play.

42.  The ongoing and continuing operation of Gracie's "SkillTouch" game and Banilla games at the Business constitutes illegal gambling in violation of 18 Pa. C.S. § 5513.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

43.     The Business has created an ongoing public nuisance by promoting and allowing illegal gambling activities on its premises.

44.     Illegal gambling is a nuisance *per se* under Pennsylvania law.

45.     The general public has a common right to peaceful enjoyment of life.

46.     The general public also has a common right to be free of activities prohibited by law like illegal gambling.

47.     The Business' activities, including the operation of Gracie's "SkillTouch" games and Banilla games, unreasonably interferes with these common public rights because its activities are prohibited by statute, because they significantly interfere with the public peace, the public comfort and public convenience, and because they are continuing and ongoing in nature.

48.     Accordingly, the Business is both a public nuisance *per se* and a public nuisance under traditional principles of Pennsylvania law that define public nuisances.

**D.    THE SPECIAL HARM TO POM**

49.     The public nuisance described above has caused, and continues to cause, harm to POM that is different in kind and magnitude from the harm caused to the general public.

50.     POM expends significant amounts of time and money to ensure that the Skill Game is compliant with Pennsylvania law.

51.     POM's legal Skill Game directly competes with Gracie's illegal "SkillTouch" games and the illegal Banilla games at the Business, in Cambria County and in the Commonwealth of Pennsylvania.

52.     The legal Skill Game competes for the same customers and market share as these games.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

53.      The Business' operation of Gracie's illegal "SkillTouch" and the illegal Banilla games has caused POM to lose customers and market share in Cambria County and ultimately has caused lost profits.

54.      The general public has not suffered this type of harm.

55.      In addition, POM is being uniquely harmed by the operation of illegal games at the Business and other venues because the operation of illegal games in Pennsylvania is causing state authorities to treat all games the same and advise the public that all skill games are illegal.

56.      For example, the Pennsylvania Liquor Control Board recently sent an e-mail to its licensees that stated:

> According to the Pennsylvania State Police and the Pennsylvania Lottery, skill games are illegal in the commonwealth.  As such, possessing or operating one or more of these machines on your licensed premises may be grounds for the Pennsylvania State Police, Bureau of Liquor Control Enforcement to issue a citation against your license.  While the PLCB cannot provide you with legal guidance as to whether a particular gaming machine is illegal, citations put your license at risk, both through the citation process and upon application for renewal to the PLCB.

A true and correct copy of the PLCB e-mail is attached hereto, and made a part hereof, as Exhibit "C".

57.      As a result of this position taken by state authorities, at least one chain of taverns in Pennsylvania that previously had POM's Skill Game in its locations available for customers to play decided to no longer make the Skill Game available for play to its customers.

58.      The confusion created by the operation of illegal games at the Business and other venues in Pennsylvania has harmed, and will continue to harm, POM's business reputation and its ability to market and sell the Skill Game in Pennsylvania

59.      The general public also has not suffered this type of harm.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## COUNT I—PUBLIC NUISANCE

60.     The foregoing Paragraphs are incorporated by reference as if set forth fully

herein.

61.     As set forth above, Defendant's operation of Gracie's illegal "SkillTouch" games

and the illegal Banilla games at the Business has created an ongoing public nuisance.

62.     These games are illegal gambling devices.

63.     The ongoing and continuing operation of these games at the Business constitutes

illegal gambling in violation of 18 Pa. C.S. § 5513.

64.     Illegal gambling is a nuisance *per se* under Pennsylvania law.

65.     Defendant's operation of Gracie's illegal "SkillTouch" games and the illegal

Banilla games at the Business also constitute a public nuisance because it is an interference with

the general public's common rights to: (i) the peaceful enjoyment of life; and (ii) be free of

illegal activities like illicit gambling.

66.     This interference is unreasonable because the activity—*i.e.*, illegal gambling: (i)

is prohibited by statute, *see* 18 Pa. C.S. § 5513; (ii) significantly interferes with the public peace,

the public comfort and public convenience; and (iii) is continuing and ongoing in nature.

67.     As set forth above, the public nuisance has caused, and continues to cause, harm

to POM that is different in kind and magnitude from the harm caused to the general public

because POM has suffered pecuniary harm in the form of loss of customers, loss of market share

and lost profits.

68.     The general public has not suffered this kind of harm as a result of the illegal

gambling activities described above.

WHEREFORE, POM requests that this Court enter the following judgment on Count

One of the Complaint: (i) an order preliminarily and permanently abating the public nuisance by

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

prohibiting the operation of Gracie's "SkillTouch" games and the Banilla games at the Business or anywhere else in Cambria County; (ii) an award of damages in excess of $50,000.00 for POM's pecuniary losses, including the loss of customers, market share and profits; and (iii) granting such additional relief as the Court deems just and equitable.

## COUNT II—UNFAIR COMPETITION

69.     The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

70.     By breaking the law through the operation of the illegal games while POM is complying with the law, Defendant is unfairly competing and gaining a competitive advantage.

71.     By virtue of this unfair competition, Defendant enjoys a benefit and POM suffers harm.

72.     POM has a reasonable expectation of earning revenue from customers who play the Skill Game.

73.     Defendant has knowledge of POM's expectation of earning revenue from customers who play the Skill Game.

74.     Upon information and belief, Defendant knows it can attract more customers by making the illegal games available and that the loss of those customers can cause harm to POM.

75.     It is foreseeable to Defendant that its use of the illegal games to attract more customers can cause harm to competitors, like POM, that comply with the law and make legal games of skill, not illegal games of chance, available to customers.

76.     Defendant's operation of the illegal games at the Business has and will continue to cause POM to lose customers and suffer damages as a result.

77.     Defendant has engaged in, and continues to engage in, unfair competition.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

WHEREFORE, POM requests that this Court enter the following judgment on Count Two of the Complaint: (i) an order preliminarily and permanently enjoining the unfair competition by prohibiting the operation of Gracie's "SkillTouch" games and the Banilla games at the Business or anywhere else in Cambria County; (ii) an award of damages in excess of $50,000.00 for POM's pecuniary losses, including the loss of customers, market share and profits; and (iii) granting such additional relief as the Court deems just and equitable.

Respectfully submitted,

Dated: July 12, 2019

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
eschreiner@kleinbard.com
prosenzweig@kleinbard.com
svance@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

11

{01776246;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## VERIFICATION

I, Rick Goodling, verify that I am Director of State Compliance for Plaintiff and that the statements made in the foregoing Complaint are true and correct based upon my personal knowledge or information and belief. I understand that false statements therein are subject to penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Dated: July 9, 2019



_____
Rick Goodling

{01776245;v1}

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

POM OF PENNSYLVANIA, LLC,

*Plaintiff,*

v.

3C AMUSEMENTS, LLC,

*Defendant.*

IN THE COURT OF COMMON PLEAS
FOR CAMBRIA COUNTY,
PENNSYLVANIA

CIVIL DIVISION – LAW

NO. _____

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the United Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently from non-confidential information and documents.

Respectfully Submitted,

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
       eschreiner@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

Dated:  July 12, 2019

{01776245;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "A"

Case# 2019-06832-12 – JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| | : | |
| PACE-O-MATIC, INC. EQUIPMENT | : | M.D. 965-2013 |
| | : | |
| | : | |
| TERMINAL I.D. NO. 142613 | : | |

## MEMORANDUM OPINION AND ORDER

H. KNAFELC, J.                                                December 23rd, 2014

### I.     PROCEDURAL HISTORY

On November 19, 2013, agents of the Pennsylvania Bureau of Liquor Control Enforcement seized a Pace-O-Matic, Inc. video game device from the American-Italian Club located in Aliquippa, Beaver County. The manufacturer of the device filed a timely Petition for Return of Seized Property and requested a post-seizure hearing pursuant to Pennsylvania Rule of Criminal Procedure 588. This Court held a hearing on the matter on September 26, 2014. The sole purpose of that hearing was to gather evidence as to whether the confiscated property constituted a gambling device per se. The evidence fails to demonstrate that the machine is a gambling device per se, and Petitioner's motion for its return is GRANTED.

During the hearing, this Court heard testimony on the operation of the confiscated device. The Court heard testimony on two issues: first, whether Petitioner was entitled to lawful possession of the res; and second, whether the games installed on the device were games of

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

chance or games of skill. Both parties stipulated that the other elements of a gambling device per se, consideration and reward, were satisfied. The device requires a player to put in cash in order to access the games installed on the device. Successful play has the potential to reward a player with more credits than he or she put into the device. Thus, this Court is tasked only with resolving whether the games on the device are games of skill or games of chance. Because of the level of interactivity between the game and the player, as well as the gameplay mechanics, the evidence fails to show that the games included on the device—Tic-Tac-Toe, unlockable bonus game, and the "Follow-Me" mini-game—are anything other than games of skill. The device is therefore not a gambling device per se and shall be returned to Pace-O-Matic, Inc.

## II.    STATEMENT OF FACTS

The property seized in this case is a coin-operated table top machine that offers a Tic-Tac-Toe puzzle, an unlockable bonus game, and a "Follow-Me" mini-game. The player uses a touch screen navigate through the system. A player initiates the game by inserting money into the device. A player can place a bet of 40, 80, 120, 160, or 200 "points." One point equals one cent. A player then proceeds to select one of three themes. These are "Bombs and Bombshells," "Pirates Prize," and "Cocktail Cove." While the graphics and some pay amounts differ depending on which theme the player chooses, the gameplay is functionally equivalent among the three themes. The player has access to the same features regardless of which theme he or she chooses, and the themes will thus be treated interchangeably.

The first game that the player interacts with is the Tic-Tac-Toe puzzle. This is the primary game included on the device, and a player cannot access the other features of the game without first playing the Tic-Tac-Toe puzzle. Upon initiating gameplay, the game spins each of the nine reels arranged in a three-by-three grid on the screen. After the reels stop spinning, the

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

player has ten seconds to select one of the nine cells to change a symbol in that position to a wild symbol. The player is tasked with choosing the most advantageous spot to place the wild. Whether one spot is more advantageous than another depends on the value of the symbols in the row, column, or diagonal that was completed, and whether completion of one row, column, or diagonal completes another. If the player does not make a selection in the allotted time, no wild symbol will be placed on the screen. Because a random number generator excludes an automatic winning game, failure to place the wild will always result in a loss for the player. Each game will have at least one spot where placing the wild will result in a nonzero score, and no game will be completely unwinnable.

A player has the opportunity to access a bonus game while playing the Tic-Tac-Toe puzzle. Certain symbols in the three-by-three grid have the potential to unlock the bonus game. A player must align three bonus symbols in a row, column, or diagonal on the three-by-three grid. Where the player manages to place a wild in the proper position, the game awards the player with a bonus shooting game. There are slight differences in the bonus games depending on the theme chosen, but the core gameplay mechanics of the three bonus games are virtually identical, and will be treated in the same manner. The bonus games are shooting-style games. Targets appear at random positions across the screen, and the object of the bonus game is to target all of the symbols on the touch screen during the time allotted (30 or 45 seconds, depending on the theme chosen). The speed with which the targets appear on the screen and the fact that they are scattered about the screen provides the game's challenge. The player is rewarded with points depending on how many of the symbols he or she was able to target and touch.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

If, during the Tic-Tac-Toe game, the player wins an amount that is less than 104% of the purchase price to play the game, the player is afforded the option of selecting the "Follow-Me" mini-game. A player who chooses to proceed with the Follow-Me feature is presented with a three-by-three grid of colored dots. Essentially, the Follow-Me feature is a memory game. The dots flash in a random sequence which the player must repeat. Starting with one circle flashing, the player will need to follow the correct sequence for a total of forty rounds of play, with each sequence adding another circle. If a player successfully follows the pattern each time, the player is awarded with 104% of his or her original wager. For example, if the player had wagered 40 credits, successful completion of the Follow-Me mini-game would result in a payout of 42 credits.

## III.   LEGAL BACKGROUND AND ANALYSIS

A motion for return of property pursuant to Rule 588 is intended to return goods to a person aggrieved by a search and seizure based upon the right to lawful possession and the non-contraband status of the goods. Pa. R. Crim. P. 588; *Com. v. Pomerantz*, 573 A.2d 1149, 1150 (Pa. Super. Ct. 1989). Rule 588 provides, in pertinent part, the following:

**Rule 588. Motion for Return of Property**

(A)   A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B)   The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

A petitioner's motion for return of property must, at a minimum, allege that the petitioner is entitled to lawful possession of the property at issue. *Pomerantz*, 573 A.2d at 1150. The

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

petitioner must prove that he is entitled to possession by a preponderance of the evidence. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. Ct. 2009). A preponderance of evidence standard is tantamount to a "more likely than not" standard. *Com. v. $6,425.00 Seized from Esquilin*, 880 A.2d 523 (Pa. 2005).

Where a petitioner meets the minimal burden of establishing entitlement to lawful possession, unless there is countervailing evidence to defeat the claim, the moving party is entitled to the return of the identified property. *Ibid*. The Commonwealth must prove the per se nature of machines seized as gambling devices by a preponderance of the evidence. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993).

A machine is a gambling device per se if three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. Because both the Petitioner and the Commonwealth have stipulated that the machine meets the consideration and reward elements, only the second element—whether the result is determined predominantly by chance or skill—will be addressed in depth.

That successful play is determined by chance rather than skill is an element essential to a finding that a machine is a gambling device per se. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983). Courts must determine in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome. *Ibid*. In order for a game to constitute gambling, it must be a game where chance predominates rather than skill. *Ibid*. A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. *Ibid*. The mere fact that a machine

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:24 PM EddyDeLucaGravinaTownsen       FAX NO. 412 281 3537       P. 07

involves a substantial element of chance is insufficient to find that a machine a gambling device. *Ibid.*

A game decided predominately on the basis of probability rather than any real input of skill from a player will be a game of chance. The level of interactivity and the consequences of a player's choices in playing the game are relevant in determining whether the game is one of chance or skill. *See id.* at 976 (noting that while skill, in the form of knowledge of probabilities, can improve a player's chances of winning a video poker game, chance ultimately determines the outcome because chance determines the card dealt and the cards from which one can draw); *compare Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010) (holding that although skill can determine the outcome in a poker game, players are still subject to defeat at the turn of the cards), *with Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492 (Neb. 2011) (noting that because the gameplay in a tic-tac-toe puzzle was under the control of the player and not the machine, the game was one of skill rather than chance).

### A.   Lawful Possession

The initial burden is on the Petitioner, Pace-O-Matic, Inc., to prove that it is entitled to lawful possession of the res at issue by a preponderance of the evidence standard. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. 2009). Petitioner has met that burden here. The device at issue is a coin-operated tabletop video game machine manufactured by Pace-O-Matic, Inc. The fact that Petitioner has manufactured, designed, and provided the source code for the machine makes it more likely than not that Petitioner is entitled to lawful possession of the video game machine at issue.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

### B.       Gambling Device Per Se

Upon a showing of lawful entitlement, the burden shifts to the Commonwealth to prove by a preponderance of the evidence that the video game machine seized is contraband. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993). Specifically, the government must show that the video game is a "gambling device per se." *Ibid.* In determining whether a machine can be seized, the machine must be so intrinsically connected with gambling as to constitute a gambling device per se. This intrinsic connection is met where three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. *Ibid.* The parties in this case have stipulated that, because a player must insert money to begin play and is enticed to play by the promise of a payout, the first element, consideration, and the third element, reward, are met. The only issue remaining is whether successful play is determined predominantly by skill or chance.

There is no doubt that the games at issue contain elements of skill and chance. It is therefore the task of this Court to determine, on balance, whether skill or chance is the dominant factor in successful play. The operation of the machine and the way a player interacts with the machine must be evaluated. As noted, the machine contains the following features: (1) a Tic-Tac-Toe puzzle; (2) an unlockable bonus shooting game; and (3) a "Follow-Me" mini-game. The extent to which chance and skill decide the outcome of each game must be evaluated.

### 1.       Tic-Tac-Toe Puzzle

The parties disagree on whether skill or chance dominates the outcome of the Tic-Tac-Toe puzzle. The Commonwealth asserts that the skill required to place the wild symbol in a spot is outweighed by the chance determination of the puzzle itself. This Court respectfully disagrees with the Commonwealth's position. Although there often is, as the Commonwealth points out, an "obvious" position where placement of the wild would generate a nonzero score, several puzzles

**Page 7 of 13**

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

have a position where placement of the wild will lead to a more advantageous score. It takes skill for a player to recognize both which symbols are most advantageous to his or her payout and which position will maximize the player's score. A player who lacks the skill to recognize that the placement of a wild symbol in a particular position will lead to the completion of two or three rows, columns, or diagonals will not achieve as high a score as one who does recognize those patterns. Were the game one predominantly based on chance, one would reasonably expect that a skilled player and an unskilled player would stand to gain roughly the same score. However, a more skilled player is much more likely to achieve a greater score than an unskilled player, which augurs in favor of holding that the game is one of skill, not chance.

The Commonwealth places heavy emphasis on the fact that the device utilizes a random number generator to generate the puzzle itself. However, the fact that a machine utilizes a random generator, without more, is insufficient to push this game into the realm of chance. The function of the random number generator is not to determine whether player wins or loses, but merely to determine which puzzle within a finite pool of puzzles will be presented to the player. The random number generator simply constructs the field on which the player will be playing. It establishes the constraints in which the player must operate to receive the most points possible. Additionally, the generation of a puzzle is not a purely random event. Each puzzle presented to the player has the possibility of a win, and the player will not be presented with a puzzle that is already solved. Thus, the purpose of the random number generator is only to choose, at random, which of a large—yet finite—pool of puzzles to present to the player. Even if the presentation of the puzzle were a "substantial element of chance," this, without more, is insufficient to a finding that the Tic-Tac-Toe game is a game of chance. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983).

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Even more essential to the analysis than how the game is constructed and presented is the gameplay itself. During the course of play, the element of skill predominates and determines the outcome to a much higher degree than chance. It is up to the player to choose which spot to place the wild in order to achieve the most advantageous score. Our Superior Court's holding in *Dent* is instructive. There, the Court held that Texas Hold 'Em is predominantly a game of chance. *Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010). The Court placed great weight on the fact that while skill can determine the outcome in a Texas Hold 'Em poker game, "players are still subject to defeat at the turn of the cards." *Id.* at 196. In the Tic-Tac-Toe game at issue here, the players are not subject to victory or defeat at the spin of the reels. The game's code precludes automatic victories and automatic defeats. Unlike a traditional poker game, the players of the Pennsylvania Skill game are not at the mercy of the hand they are dealt. Every puzzle is winnable, and some have higher wins depending on whether the player has the skill to recognize the most advantageous spot to place the wild. In this game, the player's choices are the "instrumentality for victory"—in sharp contrast to the capricious nature of card dealing and shuffling present in a traditional game of Texas Hold 'Em. *See ibid; see also Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492, 504 (Neb. 2011) (holding that where a puzzle is more controlled by the player than not, it is predominantly a game of skill).

This Tic-Tac-Toe puzzle is also different from the devices confiscated in *Two Electronic Poker Game Machines*. There, the Pennsylvania Supreme Court dealt with a coin-operated video game that simulated the events of five card draw poker. 465 A.2d 973 (Pa. 1983). The deck is "shuffled" by a random number generator, and the player is awarded points for various combinations of cards, ranging from one point for a pair of aces to fifty points for a straight flush. *Id.* at 976. The Court emphasized that chance was the predominant factor in the outcome

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

because chance determined the cards dealt and the cards from which one could draw. *Id.* at 978. The "skill" at issue was knowledge of probabilities. *Ibid.* This is different from the Tic-Tac-Toe game in this case for two reasons. First, the random number generator in the machine here does not determine a win or loss; rather, it merely chooses the puzzle that the player is presented with. Second, knowledge of statistics was the skill at issue in *Two Electronic Poker Game Machines*, whereas the skill at issue here is ability to play Tic-Tac-Toe. Knowledge of statistics was a skill wholly independent of the simulated poker game, and was not contemplated by or integral to the gameplay. It was a skill that was based on the nature of the player rather than the nature of the game. Here, skill at Tic-Tac-Toe and pattern recognition is fully integrated into the gameplay, and is demanded of the player for successful play. A player cannot beat the game with mere knowledge of probabilities; the player must choose the most advantageous spot to place the wild in the allotted time. The player exercises control over the game, and is not at the mercy of getting a lucky hand.

On balance, the outcome of the game is determined predominantly by skill rather than chance.

## 2.    Bonus Game

This shooting-style game is predominantly a game of skill. The game requires that the player recognize, target, and touch the symbol within the allotted time frame. This requires hand-eye coordination and dexterity. Chance or luck has very little to do with the outcome of the game. Instead, the outcome is dependent almost wholly on a player's skill. That the bonus game presents itself only if certain conditions are fulfilled is immaterial to determining whether skill or chance dominates in the bonus game. Rather, the availability of the game is simply a

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

consequence of one possible puzzle that a player may be presented with in the Tic-Tac-Toe game.

### 3.  "Follow-Me" Mini-Game

Successful play of the Follow-Me feature undoubtedly requires a great deal of skill on the part of the player. The game starts out easy, but becomes progressively more difficult with each recurrence of flashing dots. It is true that the average player cannot be expected to complete the Follow-Me feature successfully. After 10 to 15 sequences, most players would be unable to remember the sequence. The feature is immensely difficult and demands a much higher level of cognitive skill than the average player could muster. This immense difficulty does not, as the Commonwealth suggests, transform the game into a game of chance. The only chance involved in the game is the sequence in which the circles flash. The odds against randomly choosing the correct sequence for each of the forty rounds (a total of 820 flashing dots) are astronomical. Skill determines how well a player does.

### IV.  CONCLUSION

Each of the three games installed on the confiscated machine is predominantly a game of skill rather than a game of chance. Successful play at the Tic-Tac-Toe game depends mainly on a player's ability to recognize Tic-Tac-Toe patterns to maximize his or her score. The bonus game is essentially a shooting game, requiring a player to target and touch numerous symbols on the screen to achieve a high score. Finally, the Follow-Me mini-game, though immensely difficult for the average player, requires a great deal of cognitive ability for a player to remember the intricate sequence of flashing dots. Because the preponderance of the evidence fails to show that

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the three games are games of chance, the Commonwealth has failed to prove that the property

seized is a gambling device per se. The machine is therefore not contraband, and Petitioner's

motion for return of property is granted.

Page 12 of 13

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:28 PM EddyDeLucaGravinaTownsen       FAX NO. 412 281 3537              P. 14

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

In re:                                              :
                                                    :
PACE-O-MATIC, INC. EQUIPMENT                        :        M.D. 965-2013
                                                    :
            TERMINAL I.D. NO. 142613                :

## ORDER

AND NOW, this __23rd__ of __December__, 20__14__, it is hereby
ORDERED and DECREED that Petitioner's Motion of Return of Property pursuant to
Pennsylvania Rule of Criminal Procedure 588 is GRANTED. The Commonwealth is ORDERED
to return the Pennsylvania Skill game to Pace-O-Matic, Inc.

BY THE COURT

_____ J.

BY THE COURT

2014 DEC 23  A 9: 58

HARRY E. KNAFELC
JUDGE

Page 13 of 13

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "B"

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

GRACIE TECHNOLOGIES INC.,
FRATERNAL ORDER OF EAGLES
CONEMAUGH AERIE NO. 1811

        Movants,

        v.

COMMONWEALTH OF PENNSYLVANIA,

        Respondent.

Case No. MD 162 – 2017

FILED FOR RECOR
2019 APR 26  P 3: 06
CLERK OF COURTS
CAMBRIA COUNTY, PA

**ORDER**

AND NOW, this 25th day of April, 2019, after review of Movants' Motion for Return of Seized Property Pursuant to Pa. R.Crim.P § 588, hearing, arguments by counsel, briefs, and the laws of Commonwealth of Pennsylvania, Movants' Motion is hereby **DENIED.**

BY THE COURT:

_____
Tamara R. Bernstein, J.

COPIES TO:
- ☐ DEF.   ☐ C & F
- ☑ DA   ☐ SHERIFF
- ☑ ATTY.   ☑ OTHER
- ☐ P.O.   Mail Atty. Barbola A.G.
- ☐ PD   Office
- ☐ JAIL
- ☐ JUDGE
- ☐ CA

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

| | | |
|---|---|---|
| GRACIE TECHNOLOGIES INC.,<br>FRATERNAL ORDER OF EAGLES<br>CONEMAUGH AERIE NO. 1811 | : | Case No. MD 162 – 2017 |
| | : | |
| Movants, | : | |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| | : | |
| Respondent. | : | |

**************

For Movants:        John P. Corcoran, Jr., Esq.
For the Respondent:  Andrew J. Jarbola, Esq.

**************

## OPINION AND ORDER

This case comes before this Court via Gracie Technologies, Inc. and Fraternal Order of Eagles Conemaugh Aerie No. 1811's Motion for Return of Seized Property Pursuant to Pa. R.Crim.P § 588. For the following reasons Movants' Motion is hereby **DENIED**.

## STATEMENT OF FACTS

From December 3, 2016, to June 26, 2017, Officer Stevanus, Pennsylvania State Police Bureau of Liquor Control Enforcement, conducted several visits to the Fraternal Order of Eagles Conemaugh No. 1811 to investigate a complaint of illegal gambling activity. During his visits to the Fraternal Order of Eagles, he played several gaming machines. These machines required consideration for play and rewards were awarded based on his play. As a result of his investigation, on June 26, 2017, Officer Stevanus' seized the sum of $1,076.00 in

1

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

US currency, and five (5) SkillTouch Multi-game ("SkillTouch") machines from the Fraternal Order of Eagles.

On August 31, 2018, QP Industries, LLC. and the Fraternal Order of Eagles filed this Motion for Return of Seized Property. QP Industries argued that because the SkillTouch machines require players to interact with the machine, skills to play the machine and achieve the desired outcome, and the outcome (win/loss) is not automatically generated by chance, the SkillTouch machines are games of skill and not gambling machines within the Commonwealth's definition. Gracie argues that pursuant to Pa. R.Crim.P. §588, the Commonwealth must return the SkillTouch machines and the cash seized. QP Industries was substituted as a party to the action by Gracie Technologies Inc. (hereinafter "Gracie").[1] On November 29, 2018, counsels argued the merits of the case before this Court; and, in January 2019 parties filed briefs in support and in opposition to returning the SkillTouch machines and the cash seized.

## ANALYSIS

Gracie argues that because the SkillTouch machines require user interaction and skills to achieve a winning goal, they are not games of chances. Tr., 11/29/2018, P.73. More precisely, Gracie argues that because the skills of speed, dexterity, task completion, prize recognition and strategy, *inter alia*, are necessary skills to play and achieve the "desired prize" (maximize winnings), the machines are games of skills and not gambling machines.

---

[1] Court Order dated June 15, 2018.

2

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The SkillTouch machines have a timing setting programed into the system that gives a player twelve (12) seconds to make a determination, *e.g.* "nudging"[2] or "picking."[3] *Id.* at 74. Gracie submits that the SkillTouch machine speed component requires players to make a determination within the allotted time frame to achieve the desired prize. For example, if a player makes that determination within the first six (6) seconds (between the twelfth and seventh second of the timer) the player wins a full prize. *Id.* If the player, however, makes that determination between six (6) seconds and one (1) second remaining on the timer, the player only wins half of the prize. *Id.* If the player does not make a determination before the time expires, the player does not win,[4] save for a penny if the player picks the "Take a penny" function. *Id.* at 34. Thus, according to Gracie, speed is instrumental to winning and achieving the desired prize, *i.e.* maximizing winnings. Task completion (making a determination) and dexterity are also essential to winning or maximizing one's winnings.

With regard to the prize recognition and strategic skills, Gracie argues that the prize recognition and strategy skill are implemented by the player selecting the "Prize Viewer" function. *Id.* at 75. Prior to playing a game, the player has the option to select the prize viewer option; this lets the player know what the reward for the next game played would be. The player can then chose to play that game or exit that game (based on indicated reward). *Id.* Thus, Gracie submits that based on these interactions and skills, the SkillTouch machines are games of skills and not gambling devices. In sum, they argue that because skill, not chance, is

---

[2] The SkillTouch machines has a total of twelve (12) games. Some of the games are reel games. The "nudging" feature allows a player to nudge a reel up or down to accomplish a winning combination. TR. 11/29/2018, P.37.

[3] In some games, such as Jewel Quest, the player has an option between picking same like items in a row to create a winning combination. The alleged skill here is that the more "like items" picked, the higher the award. *Id.* at 77.

[4] The "Take a Penny" function allows players to get a penny when the game produces a losing outcome. *Id.* at 34.

3

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the predominate factor in winning or maximizing one's winnings, the SkillTouch machines are games of skill. This Court disagrees.

Pennsylvania's legislation has criminalized unlawful gambling. *See* 18 Pa.C.S.A. § 5513. "'[U]nlawful gambling' is any gambling that has not been authorized by the legislature." *Comm. v. Dent*, 992 A.2d 190, 197 (Pa. Super. 2010). There are "three elements necessary to gambling: consideration, a result determined by chance rather than skill, and a reward." *Comm. v. Two Elec. Poker Game Machines, et al.*, 465 A.2d 973, 977 (Pa. 1983). In determining whether a gaming machine is a game of chance or skill, the Courts must determine "the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome." *Id.* at 977. When the outcome is largely determined by chance, the element of chance predominates. *Id.* at 978.[5] If a gambling device "displays all three qualities, it will then be 'so intrinsically connected with gambling' as to be a gambling device *per se*." *Id.*

Here, there is no dispute that consideration was required to play the SkillTouch machines and that the SkillTouch machines reward players based on their play. Thus, the issue for this Court to determine is the relative amount of skill and chance present in the play of the SkillTouch machines, and the extent to which skill or chance determines the outcome. *Two Electronic Poker Game Machine, supra,* is essential to our determination.

*Two Electronic Poker Game Machine* (hereinafter "*Two Electronic*") involved a poker gambling machine. Like our case, the only issue before the *Two Electronic* Court was the relative amounts of skill and chance present in the play and the extent to which skill or chance determined the outcome. In that case, the tavern's expert testified that by implementing the

---

[5] *Comm. v. Two Elec. Poker Game Machines*, 465 A.2d 973, 978 (Pa. 1983) ("we believe that the element of chance predominates and the outcome is largely determined by chance.")

Case# 2019-06632-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

"smart strategy"[6] skill he increased his odds of winning by a four and one half margin to one (4 1/2 to 1) over the standing pat strategy[7] which he called the "dumb strategy." *Id.* at 978. He concluded that skill was definitely a factor. *Id.* However, the expert conceded that "chance was also a factor both in determining the initial hand dealt and the cards from which one can draw." *Id.* The expert ultimately concluded that there was a "random element" present and he could not say how to apportion the amounts of skill and chance. *Id.*

In analyzing the amount relative that skill or chance controls the outcome, the Court contrasted between the skills necessary to play the gaming machine as opposed to playing poker in person. *Id.* The Court noted that the amount of skills necessary to play the Electro-Sport (*i.e.*, knowledge or probabilities) were not the same skills necessary to play poker with humans. And, in analyzing the extent to which skill or chance determines the outcome, the Court reasoned that, while skills, such as knowledge of probabilities, may improve a player's chance of winning or maximizing the winnings, they are not outcome determinative as are the skills needed to play poker with humans (holding, folding, bluffing and raising). The Court concluded that while "Skill can improve the outcome in Electro-Sport; it cannot determine it." *Id.*

Applying the predominant test, the Court concluded that the poker machines were gambling devices because "chance determines the ultimate outcome despite the presence of certain skill elements." *Id.* at 979. *Two Electronic,* stands for the proposition that even if skills can improve a player's chance of winning or maximizing the size of the winning, if chance ultimately determines the outcome then chance predominates.

---

[6] The expert, a Carnegie-Mellon University professor of statistics, called using his "knowledge of statistics" a "smart" strategy. *Two Elec. Poker Game Mahines, supra,* at 978.
[7] Standing pat on the initial hand dealt by the machine. *Id.*

5

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In the case at bar, Gracie argues the skills such as speed, dexterity, task completion, prize recognition and strategy (including knowing when to walk away from a machine) are necessary to play, win, and to produce the desired outcome, *i.e.*, maximize a player's winnings. This is simply not sufficient to overcome the Commonwealth's showing that in the SkillTouch machines the outcome is predominantly determined by chance.

Nick Farley, Gracie's expert,[8] testified that certain skills are needed to interact with the SkillTouch machines. He testified that by using the prize viewer function, the player develops the skill of "shop[ing] for the best possible outcome." TR., 11/29/2018, P.150. This, in turn, develops the player's strategy of free will as the player can make a determination of whether to play a game with a losing outcome or cash out and walk away. *Id.* at 155. He added that performing necessary tasks such as nudging or picking (which the player is instructed on how to do so by the game's blinking arrows) develops knowledge of what would be the best opportunity for where the player should place his money. *Id.* at 151. The more the player performs this task, the more adept he becomes at winning. He also testified that performing these tasks in an expeditious manner (skill of dexterity and speed) helps the player get the full value prize rather than the half value prize, or no prize at all. *Id.* at 162.

Notwithstanding, Farley ultimately conceded that there is no amount of skill a player can input into playing the machine that will change the outcome or the reward, *Id.* at 154.[9] That is because, as he explained, the ultimate outcome and prizes are pulled from a finite pool of sequential outcomes that are generated by the SkillTouch machines software. *Id.* at 156.

---

[8] Nick Farley was qualified as an expert in the field of review and analysis of game systems.
[9] TR., 11/29/2019, P. 154:
   Deputy AG Jarbola: "And there is no amount of skill whatsoever that a player or patron could input to change that to actually having a winning outcome or an outcome for an award which is greater than the consideration?"
   Nick Farley: "Not on that terminal, but they can take their money and go to a different terminal."

6

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

This finite pool of sequential outcome predetermines losing outcomes, winning outcomes, and the different prize levels. *Id.* The outcomes are shuffled into the finite pool for random sequentially delivery. This, he described, is akin to shuffling a deck of cards and then drawing the cards from the shuffled deck in order. *Id.* at 157. And again, he testified that the outcomes and prizes are predetermined and there is no amount of skill a player possesses that can change the predetermined outcomes. *Id.* In fact, he added, changing these predetermined outcomes was outside the player's skills but fell within a skill of the computer programmer. *Id.* Moreover, the machine's prize values are determined by Gracie Technologies,[10] and "the patron can not affect what ultimately is built into the potential prizes. They can only affect whether they're going to get the full prize of not." *Id.* at 158. In other words, the only aspect of the SkillTouch machines play that is within the control of the player is whether or not the player will maximize his winnings. Maximum winnings are predetermined by Gracie's programmed prize value determination.

In order to find that the SkillTouch machines are a gambling device *per se*, the Commonwealth needs to show more than a substantial element of chance. *Two Elec. Poker Game Machine*, at 977 ("Showing of a large element of chance is not sufficient.") The Commonwealth must show that chance predominates. *Id.* To make this finding, the courts must balance the relative amounts of skill and chance present in the play, and the extent to which skill or chance determines the outcome. *Id.* at 978.

Here, like in *Two Electronic*, unquestionably some degree of skill is required to play the device. However, even if this Court accepts Gracie's argument that speed, dexterity, task completion, prize recognition and strategy are skills that can improve a player's chances of

---

[10] *Id.* at 157.

7

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

winning and achieving a desired prize (as was the case with knowledge of probabilities in *Two Electronic*), this Court cannot ignore the reality that chance ultimately determines losing outcomes, winning outcomes, and the different prize levels: which are programmed into the SkillTouch machine's finite pool for random sequential delivery. Furthermore, this Court cannot overlook the fact that there is no level of skill a player can employ to change the predetermined outcome or predetermined valued prize. Unlike *Two Electronic*, here, by employing the skills of speed, dexterity, task completion, prize recognition and strategy a player does not increase his odds of winning. In fact, a player only controls the amount of his winnings, and that too is limited to the predetermined maximum which is encoded into the software by a programmer. As in *Two Electronic*, here a large random element is always present, and it predominates.

Consequently, because the SkillTouch machine's outcome is predetermined in a sequential order, and there is nothing the player can do to overcome that outcome, it is this Court's finding that the SkillTouch machines are games of chance. Furthermore, because all three elements of gambling are met, the SkillTouch machines are so intrinsically connected with gambling and are therefore gambling devices *per se*. And now the Court issues the following ORDER.

8

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "C"

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**From:** "PLCB" <ra-lblicensing@pa.gov>
**Date:** June 12, 2019 at 10:51:23 AM EDT
**To:** conemaughpna@gmail.com
**Subject:** LCB notice to licensees re: skill games



# pennsylvania
## LIQUOR CONTROL BOARD

Attention Licensee:

In light of recent news coverage regarding illegal gambling devices – games of skill popping up at bars, restaurants, convenience stores and other venues where players pay cash to play a game for a chance of winning cash prizes – the Pennsylvania Liquor Control Board wanted to bring this matter to your attention as a retail liquor licensee.

According to the Pennsylvania State Police and the Pennsylvania Lottery, skill games are illegal in the commonwealth. As such, possessing or operating one or more of these machines on your licensed premises may be grounds for the Pennsylvania State Police, Bureau of Liquor Control Enforcement to issue a citation against your license. While the PLCB cannot provide you with legal guidance as to whether a particular gaming machine is illegal, citations put your license at risk, both through the citation process and upon application for renewal to the PLCB.

Thank you for your attention to this matter.

Pennsylvania Liquor Control Board | Bureau of Licensing
Email: ra-lblicensing@pa.gov

lcb.pa.gov

3

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 3

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Supreme Court of Pennsylvania
## Court of Common Pleas
### Civil Cover Sheet
Luzerne _____ County

| For Prothonotary Use Only: | TIME STAMP |
|---|---|
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: POM of Pennsylvania, LLC | Lead Defendant's Name: Gary Lagana |
|---|---|

**Are money damages requested?** ☒ Yes   ☐ No

**Dollar Amount Requested:** (check one)   ☐ within arbitration limits   ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes   ☒ No

**Is this an *MDJ Appeal*?** ☐ Yes   ☒ No

Name of Plaintiff/Appellant's Attorney: Eric J. Schreiner, Esquire

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** (*do not include Mass Tort*)
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☒ Nuisance
- ☐ Premises Liability
- ☐ Product Liability (*does not include mass tort*)
- ☐ Slander/Libel/ Defamation
- ☐ Other:

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLTY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:

**CONTRACT** (*do not include Judgments*)
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☐ Other:

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:

*Updated 1/1/2011*

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

POM OF PENNSYLVANIA, LLC,

*Plaintiff,*

v.

GARY LAGANA,

*Defendant.*

IN THE COURT OF COMMON PLEAS
FOR LUZERNE COUNTY,
PENNSYLVANIA

CIVIL DIVISION – LAW

NO. _____

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguien-tes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demande. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFFICIENTE DE PAGAR RAL SERVCIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| North Penn Legal Services, Inc. 33 N. Main Street Suite 200 Pittston, PA 18640 (570) 299-4100 (877) 953-4250 Toll free (570) 824 0002 Fax | Servicios Legales de North penn, Inc.. 33 la Calle Main del Norte, Oficina 200 Pittston, PA 18640 (570) 299-4100 (877) 953-4250 Llamada gratuita (570) 824 0002 Fax |
| 101 West Broad Street Suite 513 Hazelton, PA 18201 (570) 455-9512 (877) 953-4250 Toll free (570) 455-3625 Fax | 101 la Calle Broad del Oeste Oficina 513 Hazelton, PA 18201 (570) 455-9512 (877) 953-4250 Llamada gratuita (570) 455-3625 Fax |

{01776141;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
      eschreiner@kleinbard.com
      prosenzweig@kleinbard.com
      svance@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC, | IN THE COURT OF COMMON PLEAS FOR LUZERNE COUNTY, PENNSYLVANIA |
| *Plaintiff,* | |
| v. | CIVIL DIVISION – LAW |
| GARY LAGANA, | NO. _____ |
| *Defendant.* | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff POM of Pennsylvania, LLC ("POM"), by and through its undersigned counsel, hereby brings its complaint for public nuisance and unfair competition against Defendant Gary Lagana ("Defendant"), and in support hereof, avers as follows:

### INTRODUCTION

1.     POM licenses and distributes software for a legal skill based video game machine, called the Pennsylvania Skill™ Amusement Device 402.49 PEN (the "Skill Game"), which is used in Luzerne County and throughout the Commonwealth of Pennsylvania.

{01776141;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

2. It has previously been determined by a court of the Commonwealth that the Skill Game is one in which the element of skill rather than chance predominates, and therefore it is not in violation of the Pennsylvania criminal statute regulating games of chance, *see* 18 Pa. C.S. § 5513.

3. Defendant owns and operates a business known as Got Skillz Game Room located at 239 W. 22nd Street, Hazelton, Pennsylvania (the "Business").

4. The Business has on its premises and available for customer play numerous video game machines that are illegal gambling devices.

5. The ongoing and continuing operation of these games at the Business constitutes illegal gambling in violation of 18 Pa. C.S. § 5513.

6. These illegal games compete directly with the legal Skill Game.

7. These illegal games take market share and customers away from the legal Skill Game, thereby depriving POM of profits and causing it to suffer pecuniary harm.

8. Defendant's operation of these illegal games at the Business has created a public nuisance.

9. Defendant's operation of these illegal games at the Business constitutes unfair competition.

10. POM is entitled to injunctive relief that prohibits the use or operation of these illegal games at the Business or anywhere else in Luzerne County in order to abate the public nuisance and unfair competition.

11. POM also is entitled to damages based on Defendant's conduct.

## PARTIES AND VENUE

12. POM is a is a limited liability company formed under the laws of Wyoming, trading and doing business as Pace-O-Matic, with its principal place of business in Duluth,

{01776141;v1 }

2

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Georgia. POM licenses and distributes software for the Skill Game, which is used throughout the Commonwealth of Pennsylvania.

13.     Defendant is an individual who, upon information and belief, resides in Pennsylvania and owns and operates the Business. Defendant operates multiple illegal games of chance at the Business that compete with the legal Skill Game.

14.     Venue exists in this Court pursuant to Pennsylvania Rule of Civil Procedure 1006 because a transaction or occurrence took place in this county out of which the cause of action asserted in this Complaint arose and because the Defendant resides and/or regularly conducts business in this county.

<div align="center">FACTUAL BACKGROUND</div>

A.     <u>POM'S SKILL GAME</u>

15.     POM's Skill Game is sold and distributed in the Commonwealth of Pennsylvania and is located primarily in taverns, restaurants and social clubs that serve alcohol under license from LCB.

16.     The Skill Game is a coin-operated video machine.

17.     The primary game the Skill Game offers is a "Tic-Tac-Toe" style puzzle, but the Skill Game also includes a potentially unlockable bonus session and a "Follow Me™" colored dot-matching second phase of game play.

18.     The Tic-Tac-Toe game features six different graphical themes that a player can select, which include "Bombs and Bombshells," "Cocktail Cove," "Pirate's Prize," "Pirates," "Lucky Fruit," and "Living Large." While the graphics and some payout amounts differ among the various themes, the gameplay is functionally equivalent in all themes.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

19.     A player cannot access the bonus session or the Follow-Me™ second phase of play on the Skill Game without first playing the Tic-Tac-Toe game.

20.     When the Tic-Tac-Toe game is initiated, nine reels arranged in a three-by-three grid are spun.

21.     When the wheels stop spinning, nine symbols based on the player's chosen theme are displayed.

22.     The pattern that is displayed is selected from a finite pool of multiple tens of thousands of puzzles.

23.     Once the reels are spun, the player has thirty seconds to change one of the symbols to a "Wild" symbol in order to complete one or more rows in the grid.

24.     The most advantageous spot in which to place the "Wild" symbol depends on whether multiple rows can be completed and the value of the symbols in the row or rows that were completed.

25.     Failure to place the "Wild" symbol at all within the thirty-second time limit will result in a loss, however, because the Skill Game does not generate automatic wins.

26.     The Skill Game also has a bonus session that can be triggered under certain circumstances by successful completion of the Tic-Tac-Toe game.

27.     The bonus sessions differ among the various themes that are available on the Skill Game. "Bombs and Bombshells," "Cocktail Cove," and "Pirate's Prize" have skill-based bonus play (shooting for "Bombs and Bombshells" and "Pirate's Prize," picture-taking for "Cocktail Cove"), during which the player can earn less than the maximum bonus available, including zero, based on how well he or she performs during the bonus session. The bonus sessions for "Pirates," "Lucky Fruit," and "Living Large" consist of a process that delivers the bonus points.

4.

{01776141;v1}

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

to a player that were already determined by the outcome of the Tic-Tac-Toe game. For these themes, the bonus session simply is an entertaining way to deliver to the player 100% of the reward the player already earned in the Tic-Tac-Toe game.

28.      If a player executes perfect skill and still fails to win at least 105% of the amount paid to play the Tic-Tac-Toe game, the player is given the option of selecting the Follow-Me™ phase of play.

29.      The Follow-Me™ second phase of game play begins with a three-by-three grid of colored dots. The dots flash in a random sequence that the player must repeat.

30.      The player needs to follow the sequences for 25 rounds of play, with each sequence adding another circle.

31.      If ultimately successful, the player is awarded with a combined total of 105% of the original amount spent to play.

32.      The element of skill predominates in the Skill Game.

33.      The Court of Common Pleas of Beaver County has determined that POM's Skill Game was a game in which skill predominated and, consequently, was not a gambling device per se.[1] *See In re: Pace-O-Matic Equipment, Terminal I.D. No. 142613*, M.D. No. 965-2013 at p.p. 7-12 (Beaver Co. C.C.P. 2014) (a true and correct copy of the court's memorandum opinion and order is attached hereto, and made a part hereof, as Exhibit "A").

34.      Accordingly, the Skill Game is a legal game of skill under Pennsylvania law.

---

[1] The game involved in the Beaver County case was POM's Pennsylvania Skill™ Amusement Device SKL 402.44 PEN. The current Skill Game is built off of a newer version of POM's software, which provides substantially the same actual game play as the software version at issue in the Beaver County case. The reasoning of the court in Beaver County applies equally in this case.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**B.**   **THE BUSINESS**

35.   The Business has multiple types of video machine games that are available for customers to play.

36.   Most of the games at the Business are illegal gambling devices that violate 18 Pa. C.S. § 5513.

37.   For example, the Business has "SkillTouch" games manufactured by Gracie Technologies, Inc. ("Gracie").

38.   The Court of Common Pleas for Cambria, County, Pennsylvania recently held that Gracie's "SkillTouch" game is an illegal gambling device that violates 18 Pa. C.S. § 5513. *See Gracie Technologies Inc., et al. v. Commonwealth*, No. MD 162-2017 (Cambria Co. C.C.P.) (a true and correct copy of the court's opinion and order is attached hereto, and made a part hereof, as Exhibit "B").

39.   The Business also has Blue Sky games, Platinum Plus games and Banilla games. Upon information and belief, these games are all games where chance predominates and, therefore, they are illegal gambling devices under 18 Pa. C.S. § 5513.

40.   The Business also has the legal Skill Game.

41.   The Business promotes illegal gambling and violates 18 Pa. C.S. § 5513 because it has numerous games that are illegal gambling devices available for customers to play.

**C.**   **THE PUBLIC NUISANCE**

42.   As stated above, the Business promotes illegal gambling because it has on its premises numerous illegal gambling devices that are available for customer to play.

43.   The ongoing and continuing operation of Gracie's "SkillTouch" game, Blue Sky games, Platinum Plus games and Banilla games at the Business constitutes illegal gambling in violation of 18 Pa. C.S. § 5513.

{01776141;v1}

44.     The Business has created an ongoing public nuisance by promoting and allowing illegal gambling activities on its premises.

45.     Illegal gambling is a nuisance *per se* under Pennsylvania law.

46.     The general public has a common right to peaceful enjoyment of life.

47.     The general public also has a common right to be free of activities prohibited by law like illegal gambling.

48.     The Business' activities, including the operation of Gracie's "SkillTouch" game, Blue Sky games, Platinum Plus games and Banilla games, unreasonably interferes with these common public rights because its activities are prohibited by statute, because they significantly interfere with the public peace, the public comfort and public convenience, and because they are continuing and ongoing in nature.

49.     Accordingly, the Business is both a public nuisance *per se* and a public nuisance under traditional principles of Pennsylvania law that define public nuisances.

**D.     THE SPECIAL HARM TO POM**

50.     The public nuisance described above has caused, and continues to cause, harm to POM that is different in kind and magnitude from the harm caused to the general public.

51.     POM expends significant amounts of time and money to ensure that the Skill Game is compliant with Pennsylvania law.

52.     POM's legal Skill Game directly competes with Gracie's illegal "SkillTouch" game, the illegal Blue Sky games, the illegal Platinum Plus games and the illegal Banilla games at the Business, in Luzerne County and in the Commonwealth of Pennsylvania.

53.     The legal Skill Game competes for the same customers and market share as these games.

Case# 2019-06832-12 - JUDGE35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

54.      The Business' operation of Gracie's illegal "SkillTouch" game, the illegal Blue Sky games, the illegal Platinum Plus games and the illegal Banilla games has caused POM to lose customers and market share in Luzerne County and ultimately has caused lost profits.

55.      The general public has not suffered this type of harm.

56.      In addition, POM is being uniquely harmed by the operation of illegal games at the Business and other venues because the operation of illegal games in Pennsylvania is causing state authorities to treat all games the same and advise the public that all skill games are illegal.

57.      For example, the Pennsylvania Liquor Control Board recently sent an e-mail to its licensees that stated:

> According to the Pennsylvania State Police and the Pennsylvania Lottery, skill games are illegal in the commonwealth. As such, possessing or operating one or more of these machines on your licensed premises may be grounds for the Pennsylvania State Police, Bureau of Liquor Control Enforcement to issue a citation against your license. While the PLCB cannot provide you with legal guidance as to whether a particular gaming machine is illegal, citations put your license at risk, both through the citation process and upon application for renewal to the PLCB.

A true and correct copy of the PLCB e-mail is attached hereto, and made a part hereof, as Exhibit "C".

58.      As a result of this position taken by state authorities, at least one chain of taverns in Pennsylvania that previously had POM's Skill Game in its locations available for customers to play decided to no longer make the Skill Game available for play to its customers.

59.      The confusion created by the operation of illegal games at the Business and other venues in Pennsylvania has harmed, and will continue to harm, POM's business reputation and its ability to market and sell the Skill Game in Pennsylvania.

60.      The general public also has not suffered this type of harm.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

### COUNT I—PUBLIC NUISANCE

61.     The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

62.     As set forth above, Defendant's operation of Gracie's illegal "SkillTouch" game, the illegal Blue Sky games, the illegal Platinum Plus games and the illegal Banilla games at the Business has created an ongoing public nuisance.

63.     These games are illegal gambling devices.

64.     The ongoing and continuing operation of these games at the Business constitutes illegal gambling in violation of 18 Pa. C.S. § 5513.

65.     Illegal gambling is a nuisance *per se* under Pennsylvania law.

66.     Defendant's operation of Gracie's illegal "SkillTouch" game, the illegal Blue Sky games, the illegal Platinum Plus games and the illegal Banilla games game at the Business also constitute a public nuisance because it is an interference with the general public's common rights to: (i) the peaceful enjoyment of life; and (ii) be free of illegal activities like illicit gambling.

67.     This interference is unreasonable because the activity—*i.e.*, illegal gambling: (i) is prohibited by statute, *see* 18 Pa. C.S. § 5513; (ii) significantly interferes with the public peace, the public comfort and public convenience; and (iii) is continuing and ongoing in nature.

68.     As set forth above, the public nuisance has caused, and continues to cause, harm to POM that is different in kind and magnitude from the harm caused to the general public because POM has suffered pecuniary harm in the form of loss of customers, loss of market share, and lost profits.

69.     The general public has not suffered this kind of harm as a result of the illegal gambling activities described above.

Case# 2019-06832-12 - JUDGE35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

WHEREFORE, POM requests that this Court enter the following judgment on Count One of the Complaint: (i) an order preliminarily and permanently abating the public nuisance by prohibiting the operation of Gracie's "SkillTouch" game, the Blue Sky games, the Platinum Plus games and the Banilla games at the Business or anywhere else in Luzerne County; (ii) an award of damages in excess of $50,000.00 for POM's pecuniary losses, including the loss of customers, market share and profits; and (iii) granting such additional relief as the Court deems just and equitable.

## COUNT II—UNFAIR COMPETITION

70.     The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

71.     By breaking the law through the operation of the illegal games while POM is complying with the law, Defendant is unfairly competing and gaining a competitive advantage.

72.     By virtue of this unfair competition, Defendant enjoys a benefit and POM suffers harm.

73.     POM has a reasonable expectation of earning revenue from customers who play the Skill Game.

74.     Defendant has knowledge of POM's expectation of earning revenue from customers who play the Skill Game.

75.     Upon information and belief, Defendant knows he can attract more customers by making the illegal games available and that the loss of those customers can cause harm to POM.

76.     It is foreseeable to Defendant that his use of the illegal games to attract more customers can cause harm to competitors, like POM, that comply with the law and make legal games of skill, not illegal games of chance, available to customers.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

77.     Defendant's operation of the illegal games at the Business has and will continue to cause POM to lose customers and suffer damages as a result.

78.     Defendant has engaged in, and continues to engage in, unfair competition.

WHEREFORE, POM requests that this Court enter the following judgment on Count Two of the Complaint: (i) an order preliminarily and permanently enjoining the unfair competition by prohibiting the operation of Gracie's "SkillTouch" game, the Blue Sky games, the Platinum Plus games and the Banilla games at the Business or anywhere else in Luzerne County; (ii) an award of damages in excess of $50,000.00 for POM's pecuniary losses, including the loss of customers, market share and profits; and (iii) granting such additional relief as the Court deems just and equitable.

Dated: July 12, 2019

Respectfully submitted,

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
     eschreiner@kleinbard.com
     prosenzweig@kleinbard.com
     svance@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

{01776141;v1}

11

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## VERIFICATION

I, Rick Goodling, verify that I am Director of State Compliance for Plaintiff and that the statements made in the foregoing Complaint are true and correct based upon my personal knowledge or information and belief. I understand that false statements therein are subject to penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Dated: July 9, 2019

_____
Rick Goodling

{01776341;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> GARY LAGANA, <br><br> *Defendant.* | IN THE COURT OF COMMON PLEAS FOR LUZERNE COUNTY, PENNSYLVANIA <br><br> CIVIL DIVISION – LAW <br><br> NO. _____ |

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the United Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently from non-confidential information and documents.

Respectfully Submitted,

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
eschreiner@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

Dated:  July 12, 2019

{01776141;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "A"

DEC-24-2014 WED 12:23 PM EddyDeLucaGravinaTownsen    FAX NO. 412 281 3537          P. 02

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

In re:                                          :
                                                :
                                                :
PACE-O-MATIC, INC. EQUIPMENT                    :          M.D. 965-2013
                                                :
TERMINAL I.D. NO. 142613                        :
                                                :

**MEMORANDUM OPINION AND ORDER**

H. KNAFELC, J.                                    December 23rd, 2014

### I.     PROCEDURAL HISTORY

On November 19, 2013, agents of the Pennsylvania Bureau of Liquor Control Enforcement seized a Pace-O-Matic, Inc. video game device from the American-Italian Club located in Aliquippa, Beaver County. The manufacturer of the device filed a timely Petition for Return of Seized Property and requested a post-seizure hearing pursuant to Pennsylvania Rule of Criminal Procedure 588. This Court held a hearing on the matter on September 26, 2014. The sole purpose of that hearing was to gather evidence as to whether the confiscated property constituted a gambling device per se. The evidence fails to demonstrate that the machine is a gambling device per se, and Petitioner's motion for its return is GRANTED.

During the hearing, this Court heard testimony on the operation of the confiscated device. The Court heard testimony on two issues: first, whether Petitioner was entitled to lawful possession of the res; and second, whether the games installed on the device were games of

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

chance or games of skill. Both parties stipulated that the other elements of a gambling device per se, consideration and reward, were satisfied. The device requires a player to put in cash in order to access the games installed on the device. Successful play has the potential to reward a player with more credits than he or she put into the device. Thus, this Court is tasked only with resolving whether the games on the device are games of skill or games of chance. Because of the level of interactivity between the game and the player, as well as the gameplay mechanics, the evidence fails to show that the games included on the device—Tic-Tac-Toe, unlockable bonus game, and the "Follow-Me" mini-game—are anything other than games of skill. The device is therefore not a gambling device per se and shall be returned to Pace-O-Matic, Inc.

## II.     STATEMENT OF FACTS

The property seized in this case is a coin-operated table top machine that offers a Tic-Tac-Toe puzzle, an unlockable bonus game, and a "Follow-Me" mini-game. The player uses a touch screen navigate through the system. A player initiates the game by inserting money into the device. A player can place a bet of 40, 80, 120, 160, or 200 "points." One point equals one cent. A player then proceeds to select one of three themes. These are "Bombs and Bombshells," "Pirates Prize," and "Cocktail Cove." While the graphics and some pay amounts differ depending on which theme the player chooses, the gameplay is functionally equivalent among the three themes. The player has access to the same features regardless of which theme he or she chooses, and the themes will thus be treated interchangeably.

The first game that the player interacts with is the Tic-Tac-Toe puzzle. This is the primary game included on the device, and a player cannot access the other features of the game without first playing the Tic-Tac-Toe puzzle. Upon initiating gameplay, the game spins each of the nine reels arranged in a three-by-three grid on the screen. After the reels stop spinning, the

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

player has ten seconds to select one of the nine cells to change a symbol in that position to a wild symbol. The player is tasked with choosing the most advantageous spot to place the wild. Whether one spot is more advantageous than another depends on the value of the symbols in the row, column, or diagonal that was completed, and whether completion of one row, column, or diagonal completes another. If the player does not make a selection in the allotted time, no wild symbol will be placed on the screen. Because a random number generator excludes an automatic winning game, failure to place the wild will always result in a loss for the player. Each game will have at least one spot where placing the wild will result in a nonzero score, and no game will be completely unwinnable.

A player has the opportunity to access a bonus game while playing the Tic-Tac-Toe puzzle. Certain symbols in the three-by-three grid have the potential to unlock the bonus game. A player must align three bonus symbols in a row, column, or diagonal on the three-by-three grid. Where the player manages to place a wild in the proper position, the game awards the player with a bonus shooting game. There are slight differences in the bonus games depending on the theme chosen, but the core gameplay mechanics of the three bonus games are virtually identical, and will be treated in the same manner. The bonus games are shooting-style games. Targets appear at random positions across the screen, and the object of the bonus game is to target all of the symbols on the touch screen during the time allotted (30 or 45 seconds, depending on the theme chosen). The speed with which the targets appear on the screen and the fact that they are scattered about the screen provides the game's challenge. The player is rewarded with points depending on how many of the symbols he or she was able to target and touch.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania. Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

If, during the Tic-Tac-Toe game, the player wins an amount that is less than 104% of the purchase price to play the game, the player is afforded the option of selecting the "Follow-Me" mini-game. A player who chooses to proceed with the Follow-Me feature is presented with a three-by-three grid of colored dots. Essentially, the Follow-Me feature is a memory game. The dots flash in a random sequence which the player must repeat. Starting with one circle flashing, the player will need to follow the correct sequence for a total of forty rounds of play, with each sequence adding another circle. If a player successfully follows the pattern each time, the player is awarded with 104% of his or her original wager. For example, if the player had wagered 40 credits, successful completion of the Follow-Me mini-game would result in a payout of 42 credits.

### III.    LEGAL BACKGROUND AND ANALYSIS

A motion for return of property pursuant to Rule 588 is intended to return goods to a person aggrieved by a search and seizure based upon the right to lawful possession and the non-contraband status of the goods. Pa. R. Crim. P. 588; *Com. v. Pomerantz*, 573 A.2d 1149, 1150 (Pa. Super. Ct. 1989). Rule 588 provides, in pertinent part, the following:

**Rule 588. Motion for Return of Property**

(A)    A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B)    The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

A petitioner's motion for return of property must, at a minimum, allege that the petitioner is entitled to lawful possession of the property at issue. *Pomerantz*, 573 A.2d at 1150. The

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:24 PM EddyDeLucaGravinaTownsen    FAX NO. 412 281 3537    P. 06

petitioner must prove that he is entitled to possession by a preponderance of the evidence. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. Ct. 2009). A preponderance of evidence standard is tantamount to a "more likely than not" standard. *Com. v. $6,425.00 Seized from Esquilin*, 880 A.2d 523 (Pa. 2005).

Where a petitioner meets the minimal burden of establishing entitlement to lawful possession, unless there is countervailing evidence to defeat the claim, the moving party is entitled to the return of the identified property. *Ibid.* The Commonwealth must prove the per se nature of machines seized as gambling devices by a preponderance of the evidence. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993).

A machine is a gambling device per se if three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. Because both the Petitioner and the Commonwealth have stipulated that the machine meets the consideration and reward elements, only the second element—whether the result is determined predominantly by chance or skill— will be addressed in depth.

That successful play is determined by chance rather than skill is an element essential to a finding that a machine is a gambling device per se. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983). Courts must determine in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome. *Ibid.* In order for a game to constitute gambling, it must be a game where chance predominates rather than skill. *Ibid.* A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. *Ibid.* The mere fact that a machine

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

involves a substantial element of chance is insufficient to find that a machine a gambling device. *Ibid.*

A game decided predominately on the basis of probability rather than any real input of skill from a player will be a game of chance. The level of interactivity and the consequences of a player's choices in playing the game are relevant in determining whether the game is one of chance or skill. *See id.* at 976 (noting that while skill, in the form of knowledge of probabilities, can improve a player's chances of winning a video poker game, chance ultimately determines the outcome because chance determines the card dealt and the cards from which one can draw); *compare Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010) (holding that although skill can determine the outcome in a poker game, players are still subject to defeat at the turn of the cards), *with Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492 (Neb. 2011) (noting that because the gameplay in a tic-tac-toe puzzle was under the control of the player and not the machine, the game was one of skill rather than chance).

### A.    Lawful Possession

The initial burden is on the Petitioner, Pace-O-Matic, Inc., to prove that it is entitled to lawful possession of the res at issue by a preponderance of the evidence standard. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. 2009). Petitioner has met that burden here. The device at issue is a coin-operated tabletop video game machine manufactured by Pace-O-Matic, Inc. The fact that Petitioner has manufactured, designed, and provided the source code for the machine makes it more likely than not that Petitioner is entitled to lawful possession of the video game machine at issue.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**B.**     **Gambling Device Per Se**

Upon a showing of lawful entitlement, the burden shifts to the Commonwealth to prove by a preponderance of the evidence that the video game machine seized is contraband. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993). Specifically, the government must show that the video game is a "gambling device per se." *Ibid.* In determining whether a machine can be seized, the machine must be so intrinsically connected with gambling as to constitute a gambling device per se. This intrinsic connection is met where three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. *Ibid.* The parties in this case have stipulated that, because a player must insert money to begin play and is enticed to play by the promise of a payout, the first element, consideration, and the third element, reward, are met. The only issue remaining is whether successful play is determined predominantly by skill or chance.

There is no doubt that the games at issue contain elements of skill and chance. It is therefore the task of this Court to determine, on balance, whether skill or chance is the dominant factor in successful play. The operation of the machine and the way a player interacts with the machine must be evaluated. As noted, the machine contains the following features: (1) a Tic-Tac-Toe puzzle; (2) an unlockable bonus shooting game; and (3) a "Follow-Me" mini-game. The extent to which chance and skill decide the outcome of each game must be evaluated.

**1.**     **Tic-Tac-Toe Puzzle**

The parties disagree on whether skill or chance dominates the outcome of the Tic-Tac-Toe puzzle. The Commonwealth asserts that the skill required to place the wild symbol in a spot is outweighed by the chance determination of the puzzle itself. This Court respectfully disagrees with the Commonwealth's position. Although there often is, as the Commonwealth points out, an "obvious" position where placement of the wild would generate a nonzero score, several puzzles

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

have a position where placement of the wild will lead to a more advantageous score. It takes skill for a player to recognize both which symbols are most advantageous to his or her payout and which position will maximize the player's score. A player who lacks the skill to recognize that the placement of a wild symbol in a particular position will lead to the completion of two or three rows, columns, or diagonals will not achieve as high a score as one who does recognize those patterns. Were the game one predominantly based on chance, one would reasonably expect that a skilled player and an unskilled player would stand to gain roughly the same score. However, a more skilled player is much more likely to achieve a greater score than an unskilled player, which augurs in favor of holding that the game is one of skill, not chance.

The Commonwealth places heavy emphasis on the fact that the device utilizes a random number generator to generate the puzzle itself. However, the fact that a machine utilizes a random generator, without more, is insufficient to push this game into the realm of chance. The function of the random number generator is not to determine whether player wins or loses, but merely to determine which puzzle within a finite pool of puzzles will be presented to the player. The random number generator simply constructs the field on which the player will be playing. It establishes the constraints in which the player must operate to receive the most points possible. Additionally, the generation of a puzzle is not a purely random event. Each puzzle presented to the player has the possibility of a win, and the player will not be presented with a puzzle that is already solved. Thus, the purpose of the random number generator is only to choose, at random, which of a large—yet finite—pool of puzzles to present to the player. Even if the presentation of the puzzle were a "substantial element of chance," this, without more, is insufficient to a finding that the Tic-Tac-Toe game is a game of chance. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983).

Page 8 of 13

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Even more essential to the analysis than how the game is constructed and presented is the gameplay itself. During the course of play, the element of skill predominates and determines the outcome to a much higher degree than chance. It is up to the player to choose which spot to place the wild in order to achieve the most advantageous score. Our Superior Court's holding in *Dent* is instructive. There, the Court held that Texas Hold 'Em is predominantly a game of chance. *Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010). The Court placed great weight on the fact that while skill can determine the outcome in a Texas Hold 'Em poker game, "players are still subject to defeat at the turn of the cards." *Id.* at 196. In the Tic-Tac-Toe game at issue here, the players are not subject to victory or defeat at the spin of the reels. The game's code precludes automatic victories and automatic defeats. Unlike a traditional poker game, the players of the Pennsylvania Skill game are not at the mercy of the hand they are dealt. Every puzzle is winnable, and some have higher wins depending on whether the player has the skill to recognize the most advantageous spot to place the wild. In this game, the player's choices are the "instrumentality for victory"—in sharp contrast to the capricious nature of card dealing and shuffling present in a traditional game of Texas Hold 'Em. *See ibid; see also Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492, 504 (Neb. 2011) (holding that where a puzzle is more controlled by the player than not, it is predominantly a game of skill).

This Tic-Tac-Toe puzzle is also different from the devices confiscated in *Two Electronic Poker Game Machines*. There, the Pennsylvania Supreme Court dealt with a coin-operated video game that simulated the events of five card draw poker. 465 A.2d 973 (Pa. 1983). The deck is "shuffled" by a random number generator, and the player is awarded points for various combinations of cards, ranging from one point for a pair of aces to fifty points for a straight flush. *Id.* at 976. The Court emphasized that chance was the predominant factor in the outcome

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

because chance determined the cards dealt and the cards from which one could draw. *Id.* at 978. The "skill" at issue was knowledge of probabilities. *Ibid.* This is different from the Tic-Tac-Toe game in this case for two reasons. First, the random number generator in the machine here does not determine a win or loss; rather, it merely chooses the puzzle that the player is presented with. Second, knowledge of statistics was the skill at issue in *Two Electronic Poker Game Machines*, whereas the skill at issue here is ability to play Tic-Tac-Toe. Knowledge of statistics was a skill wholly independent of the simulated poker game, and was not contemplated by or integral to the gameplay. It was a skill that was based on the nature of the player rather than the nature of the game. Here, skill at Tic-Tac-Toe and pattern recognition is fully integrated into the gameplay, and is demanded of the player for successful play. A player cannot beat the game with mere knowledge of probabilities; the player must choose the most advantageous spot to place the wild in the allotted time. The player exercises control over the game, and is not at the mercy of getting a lucky hand.

On balance, the outcome of the game is determined predominantly by skill rather than chance.

### 2.    Bonus Game

This shooting-style game is predominantly a game of skill. The game requires that the player recognize, target, and touch the symbol within the allotted time frame. This requires hand-eye coordination and dexterity. Chance or luck has very little to do with the outcome of the game. Instead, the outcome is dependent almost wholly on a player's skill. That the bonus game presents itself only if certain conditions are fulfilled is immaterial to determining whether skill or chance dominates in the bonus game. Rather, the availability of the game is simply a

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

consequence of one possible puzzle that a player may be presented with in the Tic-Tac-Toe game.

### 3.    "Follow-Me" Mini-Game

Successful play of the Follow-Me feature undoubtedly requires a great deal of skill on the part of the player. The game starts out easy, but becomes progressively more difficult with each recurrence of flashing dots. It is true that the average player cannot be expected to complete the Follow-Me feature successfully. After 10 to 15 sequences, most players would be unable to remember the sequence. The feature is immensely difficult and demands a much higher level of cognitive skill than the average player could muster. This immense difficulty does not, as the Commonwealth suggests, transform the game into a game of chance. The only chance involved in the game is the sequence in which the circles flash. The odds against randomly choosing the correct sequence for each of the forty rounds (a total of 820 flashing dots) are astronomical. Skill determines how well a player does.

### IV.    CONCLUSION

Each of the three games installed on the confiscated machine is predominantly a game of skill rather than a game of chance. Successful play at the Tic-Tac-Toe game depends mainly on a player's ability to recognize Tic-Tac-Toe patterns to maximize his or her score. The bonus game is essentially a shooting game, requiring a player to target and touch numerous symbols on the screen to achieve a high score. Finally, the Follow-Me mini-game, though immensely difficult for the average player, requires a great deal of cognitive ability for a player to remember the intricate sequence of flashing dots. Because the preponderance of the evidence fails to show that

Page 11 of 13

the three games are games of chance, the Commonwealth has failed to prove that the property

seized is a gambling device per se. The machine is therefore not contraband, and Petitioner's

motion for return of property is granted.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:26 PM EddyDeLucaGravinaTounsen      FAX NO. 412 281 3537          P. 14

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

In re:                                                    :
                                                          :
PACE-O-MATIC, INC. EQUIPMENT                              :      M.D. 965-2013
                                                          :
TERMINAL I.D. NO. 142613                                 :

### ORDER

AND NOW, this __23rd__ of __December__, 20__14__, it is hereby

ORDERED and DECREED that Petitioner's Motion of Return of Property pursuant to

Pennsylvania Rule of Criminal Procedure 588 is GRANTED. The Commonwealth is ORDERED

to return the Pennsylvania Skill game to Pace-O-Matic, Inc.

· BY THE COURT

BY THE COURT

2014 DEC 23  A 9 58

HARRY E. KNAFELC
JUDGE

                                                                                    J.

Page 13 of 13

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "B"

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

GRACIE TECHNOLOGIES INC.,
FRATERNAL ORDER OF EAGLES
CONEMAUGH AERIE NO. 1811

    Movants,

        v.

COMMONWEALTH OF PENNSYLVANIA,

    Respondent.

    :    Case No. MD 162 – 2017
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :

FILED FOR RECORD
2019 APR 26  P 3: 08
CLERK OF COURTS
CAMBRIA COUNTY, PA

## ORDER

AND NOW, this 25th day of April, 2019, after review of Movants' Motion for Return of Seized Property Pursuant to Pa. R.Crim.P § 588, hearing, arguments by counsel, briefs, and the laws of Commonwealth of Pennsylvania, Movants' Motion is hereby DENIED.

BY THE COURT:

_____
Tamara R. Bernstein, J.

COPIES TO:
☐ DEF.        ☐ C & F.
☒ DA         ☐ SHERIFF
☒ ATTY.       ☒ OTHER
☐ PO         Mail Atty. Jarbola A.G.
☐ PD                    Office
☐ JAIL       _____
☐ JUDGE      _____
☐ CA         _____

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

GRACIE TECHNOLOGIES INC.,    : Case No. MD 162 – 2017
FRATERNAL ORDER OF EAGLES   :
CONEMAUGH AERIE NO. 1811    :
               :
     Movants,      :
               :
   v.          :
               :
COMMONWEALTH OF PENNSYLVANIA, :
               :
     Respondent.    :

**••••••••••••••**

For Movants:   John P. Corcoran, Jr., Esq.
For the Respondent: Andrew J. Jarbola, Esq.

**••••••••••••••**

## OPINION AND ORDER

  This case comes before this Court via Gracie Technologies, Inc. and Fraternal Order of Eagles Conemaugh Aerie No. 1811's Motion for Return of Seized Property Pursuant to Pa. R.Crim.P § 588. For the following reasons Movants' Motion is hereby **DENIED**.

## STATEMENT OF FACTS

  From December 3, 2016, to June 26, 2017, Officer Stevanus, Pennsylvania State Police Bureau of Liquor Control Enforcement, conducted several visits to the Fraternal Order of Eagles Conemaugh No. 1811 to investigate a complaint of illegal gambling activity. During his visits to the Fraternal Order of Eagles, he played several gaming machines. These machines required consideration for play and rewards were awarded based on his play. As a result of his investigation, on June 26, 2017, Officer Stevanus' seized the sum of $1,076.00 in

1

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

US currency, and five (5) SkillTouch Multi-game ("SkillTouch") machines from the Fraternal Order of Eagles.

On August 31, 2018, QP Industries, LLC, and the Fraternal Order of Eagles filed this Motion for Return of Seized Property. QP Industries argued that because the SkillTouch machines require players to interact with the machine, skills to play the machine and achieve the desired outcome, and the outcome (win/loss) is not automatically generated by chance, the SkillTouch machines are games of skill and not gambling machines within the Commonwealth's definition. Gracie argues that pursuant to Pa. R.Crim.P. §588, the Commonwealth must return the SkillTouch machines and the cash seized. QP Industries was substituted as a party to the action by Gracie Technologies Inc. (hereinafter "Gracie").[1] On November 29, 2018, counsels argued the merits of the case before this Court; and, in January 2019 parties filed briefs in support and in opposition to returning the SkillTouch machines and the cash seized.

## ANALYSIS

Gracie argues that because the SkillTouch machines require user interaction and skills to achieve a winning goal, they are not games of chances. TR., 11/29/2018, P.73. More precisely, Gracie argues that because the skills of speed, dexterity, task completion, prize recognition and strategy, *inter alia*, are necessary skills to play and achieve the "desired prize" (maximize winnings), the machines are games of skills and not gambling machines.

---

[1] Court Order dated June 15, 2018.

2

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The SkillTouch machines have a timing setting programed into the system that gives a player twelve (12) seconds to make a determination, *e.g.* "nudging"[2] or "picking."[3] *Id.* at 74. Gracie submits that the SkillTouch machine speed component requires players to make a determination within the allotted time frame to achieve the desired prize. For example, if a player makes that determination within the first six (6) seconds (between the twelfth and seventh second of the timer) the player wins a full prize. *Id.* If the player, however, makes that determination between six (6) seconds and one (1) second remaining on the timer, the player only wins half of the prize. *Id.* If the player does not make a determination before the time expires, the player does not win,[4] save for a penny if the player picks the "Take a penny" function. *Id.* at 34. Thus, according to Gracie, speed is instrumental to winning and achieving the desired prize, *i.e.* maximizing winnings. Task completion (making a determination) and dexterity are also essential to winning or maximizing one's winnings.

With regard to the prize recognition and strategic skills, Gracie argues that the prize recognition and strategy skill are implemented by the player selecting the "Prize Viewer" function. *Id.* at 75. Prior to playing a game, the player has the option to select the prize viewer option; this lets the player know what the reward for the next game played would be. The player can then chose to play that game or exit that game (based on indicated reward). *Id.* Thus, Gracie submits that based on these interactions and skills, the SkillTouch machines are games of skills and not gambling devices. In sum, they argue that because skill, not chance, is

---

[2] The SkillTouch machines has a total of twelve (12) games. Some of the games are reel games. The "nudging" feature allows a player to nudge a reel up or down to accomplish a winning combination. Tr. 11/29/2018, P.37.
[3] In some games, such as Jewel Quest, the player has an option between picking same like items in a row to create a winning combination. The alleged skill here is that the more "like items" picked, the higher the award. *Id.* at 77.
[4] The "Take a Penny" function allows players to get a penny when the game produces a losing outcome. *Id.* at 34.

3

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the predominate factor in winning or maximizing one's winnings, the SkillTouch machines are games of skill. This Court disagrees.

Pennsylvania's legislation has criminalized unlawful gambling. *See 18 Pa.C.S.A. § 5513.* "'[U]nlawful gambling' is any gambling that has not been authorized by the legislature." *Comm. v. Dent,* 992 A.2d 190, 197 (Pa. Super. 2010). There are "three elements necessary to gambling: consideration, a result determined by chance rather than skill, and a reward." *Comm. v. Two Elec. Poker Game Machines, et al.,* 465 A.2d 973, 977 (Pa. 1983). In determining whether a gaming machine is a game of chance or skill, the Courts must determine "the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome." *Id.* at 977.  When the outcome is largely determined by chance, the element of chance predominates. *Id.* at 978.[5] If a gambling device "displays all three qualities, it will then be 'so intrinsically connected with gambling' as to be a gambling device *per se.*" *Id.*

Here, there is no dispute that consideration was required to play the SkillTouch machines and that the SkillTouch machines reward players based on their play. Thus, the issue for this Court to determine is the relative amount of skill and chance present in the play of the SkillTouch machines, and the extent to which skill or chance determines the outcome. *Two Electronic Poker Game Machine, supra,* is essential to our determination.

*Two Electronic Poker Game Machine* (hereinafter "*Two Electronic*") involved a poker gambling machine. Like our case, the only issue before the *Two Electronic* Court was the relative amounts of skill and chance present in the play and the extent to which skill or chance determined the outcome. In that case, the tavern's expert testified that by implementing the

---

[5] *Comm. v. Two Elec. Poker Game Machines,* 465 A.2d 973, 978 (Pa. 1983) ("we believe that the element of chance predominates and the outcome is largely determined by chance.")

4

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

"smart strategy"[6] skill he increased his odds of winning by a four and one half margin to one (4 1/2 to 1) over the standing pat strategy[7] which he called the "dumb strategy." *Id.* at 978. He concluded that skill was definitely a factor. *Id.* However, the expert conceded that "chance was also a factor both in determining the initial hand dealt and the cards from which one can draw." *Id.* The expert ultimately concluded that there was a "random element" present and he could not say how to apportion the amounts of skill and chance. *Id.*

In analyzing the amount relative that skill or chance controls the outcome, the Court contrasted between the skills necessary to play the gaming machine as opposed to playing poker in person. *Id.* The Court noted that the amount of skills necessary to play the Electro-Sport (*i.e.*, knowledge or probabilities) were not the same skills necessary to play poker with humans. And, in analyzing the extent to which skill or chance determines the outcome, the Court reasoned that, while skills, such as knowledge of probabilities, may improve a player's chance of winning or maximizing the winnings, they are not outcome determinative as are the skills needed to play poker with humans (holding, folding, bluffing and raising). The Court concluded that while "Skill can improve the outcome in Electro-Sport; it cannot determine it." *Id.*

Applying the predominant test, the Court concluded that the poker machines were gambling devices because "chance determines the ultimate outcome despite the presence of certain skill elements." *Id.* at 979. *Two Electronic,* stands for the proposition that even if skills can improve a player's chance of winning or maximizing the size of the winning, if chance ultimately determines the outcome then chance predominates.

---

[6] The expert, a Carnegie-Mellon University professor of statistics, called using his "knowledge of statistics" a "smart" strategy. *Two Elec. Poker Game Mahines, supra,* at 978.
[7] Standing pat on the initial hand dealt by the machine. *Id.*

5

Case# 2019-06832-12 – JUDGE35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In the case at bar, Gracie argues the skills such as speed, dexterity, task completion, prize recognition and strategy (including knowing when to walk away from a machine) are necessary to play, win, and to produce the desired outcome, *i.e.*, maximize a player's winnings. This is simply not sufficient to overcome the Commonwealth's showing that in the SkillTouch machines the outcome is predominantly determined by chance.

Nick Farley, Gracie's expert,[1] testified that certain skills are needed to interact with the SkillTouch machines. He testified that by using the prize viewer function, the player develops the skill of "shop[ing] for the best possible outcome." TR., 11/29/2018, P.150. This, in turn, develops the player's strategy of free will as the player can make a determination of whether to play a game with a losing outcome or cash out and walk away. *Id.* at 155. He added that performing necessary tasks such as nudging or picking (which the player is instructed on how to do so by the game's blinking arrows) develops knowledge of what would be the best opportunity for where the player should place his money. *Id.* at 151. The more the player performs this task, the more adept he becomes at winning. He also testified that performing these tasks in an expeditious manner (skill of dexterity and speed) helps the player get the full value prize rather than the half value prize, or no prize at all. *Id.* at 162.

Notwithstanding, Farley ultimately conceded that there is no amount of skill a player can input into playing the machine that will change the outcome or the reward. *Id.* at 154.[2] That is because, as he explained, the ultimate outcome and prizes are pulled from a finite pool of sequential outcomes that are generated by the SkillTouch machines software. *Id.* at 156.

---

[1] Nick Farley was qualified as an expert in the field of review and analysis of game systems.
[2] TR., 11/29/2019, P. 154:
    Deputy AG Jarbola: "And there is no amount of skill whatsoever that a player or patron could input to change that to actually having a winning outcome or an outcome for an award which is greater than the consideration?"
    Nick Farley: "Not on that terminal, but they can take their money and go to a different terminal."

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

This finite pool of sequential outcome predetermines losing outcomes, winning outcomes, and the different prize levels. *Id.* The outcomes are shuffled into the finite pool for random sequentially delivery. This, he described, is akin to shuffling a deck of cards and then drawing the cards from the shuffled deck in order. *Id.* at 157. And again, he testified that the outcomes and prizes are predetermined and there is no amount of skill a player possesses that can change the predetermined outcomes. *Id.* In fact, he added, changing these predetermined outcomes was outside the player's skills but fell within a skill of the computer programmer. *Id.* Moreover, the machine's prize values are determined by Gracie Technologies,[10] and "the patron can not affect what ultimately is built into the potential prizes. They can only affect whether they're going to get the full prize of not." *Id.* at 158. In other words, the only aspect of the SkillTouch machines play that is within the control of the player is whether or not the player will maximize his winnings. Maximum winnings are predetermined by Gracie's programmed prize value determination.

In order to find that the SkillTouch machines are a gambling device *per se*, the Commonwealth needs to show more than a substantial element of chance. *Two Elec. Poker Game Machine*, at 977 ("Showing of a large element of chance is not sufficient.") The Commonwealth must show that chance predominates. *Id.* To make this finding, the courts must balance the relative amounts of skill and chance present in the play, and the extent to which skill or chance determines the outcome. *Id.* at 978.

Here, like in *Two Electronic*, unquestionably some degree of skill is required to play the device. However, even if this Court accepts Gracie's argument that speed, dexterity, task completion, prize recognition and strategy are skills that can improve a player's chances of

---

[10] *Id.* at 157.

7

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

winning and achieving a desired prize (as was the case with knowledge of probabilities in *Two Electronic*), this Court cannot ignore the reality that chance ultimately determines losing outcomes, winning outcomes, and the different prize levels; which are programmed into the SkillTouch machine's finite pool for random sequential delivery. Furthermore, this Court cannot overlook the fact that there is no level of skill a player can employ to change the predetermined outcome or predetermined valued prize. Unlike *Two Electronic*, here, by employing the skills of speed, dexterity, task completion, prize recognition and strategy a player does not increase his odds of winning. In fact, a player only controls the amount of his winnings, and that too is limited to the predetermined maximum which is encoded into the software by a programmer. As in *Two Electronic*, here a large random element is always present, and it predominates.

Consequently, because the SkillTouch machine's outcome is predetermined in a sequential order, and there is nothing the player can do to overcome that outcome, it is this Court's finding that the SkillTouch machines are games of chance. Furthermore, because all three elements of gambling are met, the SkillTouch machines are so intrinsically connected with gambling and are therefore gambling devices *per se*. And now the Court issues the following ORDER.

8

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "C"

Case# 2019-06632-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

From: "PLCB" <ra-lblicensing@pa.gov>
Date: June 12, 2019 at 10:51:23 AM EDT
To: conemaughpna@gmail.com
Subject: LCB notice to licensees re: skill games



Attention Licensee:

In light of recent news coverage regarding illegal gambling devices — games of skill popping up at bars, restaurants, convenience stores and other venues where players pay cash to play a game for a chance of winning cash prizes — the Pennsylvania Liquor Control Board wanted to bring this matter to your attention as a retail liquor licensee.

According to the Pennsylvania State Police and the Pennsylvania Lottery, skill games are illegal in the commonwealth. As such, possessing or operating one or more of these machines on your licensed premises may be grounds for the Pennsylvania State Police, Bureau of Liquor Control Enforcement to issue a citation against your license. While the PLCB cannot provide you with legal guidance as to whether a particular gaming machine is illegal, citations put your license at risk, both through the citation process and upon application for renewal to the PLCB.

Thank you for your attention to this matter.

Pennsylvania Liquor Control Board | Bureau of Licensing
Email: ra-lblicensing@pa.gov

lcb.pa.gov

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 4

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
**KLEINBARD LLC**
**Three Logan Square**
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
    eschreiner@kleinbard.com
    prosenzweig@kleinbard.com
    svance@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

FILED FOR RECORD
2019 SEP 23 AM 10: 23
PROTHONOTARY CAMBRIA
COUNTY, PA

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC, | IN THE COURT OF COMMON PLEAS FOR CAMBRIA COUNTY, PENNSYLVANIA |
| *Plaintiff,* | |
| v. | CIVIL DIVISION |
| 3C AMUSEMENTS, LLC, | CASE NO.2019-3138 |
| *Defendant.* | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT

**I.**    **INTRODUCTION**

Plaintiff, POM of Pennsylvania, LLC ("POM"), through its attorneys, hereby submits its

Brief in opposition to Defendant, 3C Amusements, LLC's ("3C"), Preliminary Objections to

Plaintiff's Complaint (the "Preliminary Objections").

POM filed its Complaint in this action on July15, 2019, asserting claims for public

nuisance and unfair competition.  POM has pled valid claims based on 3C's operation of a

business that makes illegal games of chance available to customers for play.  In response,

Defendant filed its Preliminary Objections.  In the Preliminary Objections, Defendant raises two

{01816654:v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

arguments: (i) the Court lacks jurisdiction over this action because 18 Pa. C.S. §5513 does not provide for a private right of action (*see* Preliminary Objections at ¶¶8-28); and (ii) there is a prior pending action that allegedly will "determine the exact issue presented herein" (*id.* at ¶¶29-34).[1]

Neither of these arguments has any merit. First, as set forth in detail below, 3C's lack of jurisdiction argument is based on a fundamental misunderstanding of the claims that POM is asserting. POM has not pled a private cause of action for violation of 18 Pa. C.S. §5513 and is not seeking to assert such a claim. To the contrary, POM has pled independent claims for public nuisance and unfair competition, which 3C does not directly attack. The Court has jurisdiction over these claims. Consequently, the Court should reject 3C's blatant attempt at misdirection and deny its preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(1) based on lack of jurisdiction.

Second, the legality of the machines that 3C makes available to customers is not at issue in the prior action identified in 3C's Preliminary Objections. Furthermore, that prior action does not involve the issues of whether 3C created a public nuisance or engaged in unfair competition. Indeed, that action does not involve 3C at all. Accordingly, that prior action will not determine the issues raised in this case and the Court should deny 3C's preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(6) based on the pendency of a prior action.

POM has adequately pled claims for public nuisance and unfair competition. Accordingly, the Court should overrule the Preliminary Objections.

---

[1] 3C has failed to develop this second argument in its Brief in Support of Preliminary Objections to Plaintiff's Complaint (the "3C Brief"), which does not contain any legal argument addressing this preliminary objection. For this reason alone, this preliminary objection should be dismissed.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

II.   **FACTS**

POM incorporates by reference the facts as pled in its Complaint. A true and correct copy of the Complaint is attached hereto, and made a part hereof, as Exhibit "A".

III.   **ARGUMENT**

A.   **Legal Standard for Preliminary Objections**

When a court is presented with preliminary objections that may result in the dismissal of a cause of action, it should only sustain the preliminary objections whenever "it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief." *Bourke v. Kazaras*, 746 A.2d 642, 643 (Pa. Super. 2000); *see also Bell v. George*, 2003 WL 22250350, *4 (Phila. C.C.P. 2003) (it must be clear from the face of the complaint that the law will not permit recovery). In addition, "all well-pleaded material, factual averments and all inferences fairly deducible therefrom" are presumed to be true. *Tucker v. Philadelphia Daily News*, 757 A.2d 938, 941-42 (Pa. Super. 2000). Based on the foregoing standard, the Court should overrule 3C's Preliminary Objections.

B.   **This Court Should Overrule 3C's Preliminary Objection Based on Lack of Jurisdiction**

In its first preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(1), 3C contends that this Court lacks jurisdiction over this matter. *See* Preliminary Objections at ¶¶8-28; 3C Brief at p.p. 3-13. 3C bases this argument exclusively upon the claim that 18 Pa. C.S. §5513 does not provide for a private cause of action. *Id.* On its face, the Complaint does not plead such a claim. Nevertheless, 3C fails to explain in its Preliminary Objections or Brief the basis for its belief that POM is asserting a claim for violation of 18 Pa. C.S. §5513 in the Complaint; 3C's argument simply assumes that POM has asserted such a cause of action. 3C's argument

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

misapprehends the nature of the claims that POM is asserting and ignores what POM actually pleads in the Complaint.

POM is not asserting a private cause of action for violation of 18 Pa. C.S. §5513, as 3C misleadingly claims. Even a cursory review of the Complaint demonstrates that POM has pled claims for public nuisance and unfair competition. POM has referenced 18 Pa. C.S. §5513 in the Complaint in order to plead the underlying elements of causes of action for public nuisance and unfair competition—the claims it actually is asserting—but it is not asserting a private cause of action for violation of this statute. *See generally Alfred M. Lutheran Distributors, Inc. v. A.P. Weilersbacher, Inc.*, 650 A.2d 83, 91-92 (Pa. Super. 1994) (recognizing "the differences between a cause of action created by statute and a common law tort action pursuant to which a statutorily imposed duty may be enforced" and discussing cases supporting proposition that statute can impose duty on defendant, the violation of which gives rise to action in tort). 3C's attempt to transform POM's Complaint into one asserting an express claim for violation of 18 Pa. C.S. §5513 misses the mark. The Court should reject this argument.

### 1. The Public Nuisance Claim

With respect to public nuisance claims, Pennsylvania courts follow Section 821B of the Restatement (Second) of Torts "to guide [their] determinations as to whether a use of property constitutes a public nuisance. *See Machipongo Land and Coal Co., Inc. v. Com.*, 799 A.2d 751, 773 (Pa. 2002); *see also Kuhns v. City of Allentown*, 636 F.Supp.2d 418, 438 (E.D. Pa. 2009). Section 821B defines a public nuisance as follows:

(1) A public Nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) *Whether the conduct is prohibited by a statute*, ordinance or administrative regulation, or . . . .

*See Machipongo*, 799 A.2d at 773 (quoting restatement (Second) of Torts, §821B) (emphasis added); *see also Com. v. Ebaugh*, 783 A.2d 846, 850 (Pa. Commw. 2001) ("A public nuisance is an unreasonable interference with a right common to the general public; circumstances that constitute a public nuisance are, among other things, conduct that is proscribed by statute or ordinance, or conduct that interferes with the public peace."). In order to plead this claim, POM in the Complaint referenced 18 Pa. C.S. §5513 and alleged that the games 3C offers for play are illegal under this statute to demonstrate that 3C's conduct is "an unreasonable interference with a right common to the general public" because it is, among other things, "prohibited by a statute." *See* Complaint at ¶¶41-47 and 61-66. 18 Pa. C.S. §5513 is the statute that prohibits 3C's conduct and POM pled these facts in order to properly plead the elements of a public nuisance claim, not to assert an actual claim under 18 Pa. C.S. §5513. *See Lutheran*, 650 A.2d at 91-92. Moreover, 3C has not claimed that POM failed to plead a valid public nuisance claim.

Furthermore, 3C's contention that POM cannot premise its independent public nuisance claim on conduct that violates a criminal statute—in this case 18 Pa. C.S. §5513—is wrong as a matter of Pennsylvania law. Pennsylvania Courts have long recognized that nuisance claims can be premised on conduct that also may be criminal and that courts have jurisdiction over such claims. For example, in *Boggs v. Werner*, 94 A.2d 50, 51 (Pa. 1953), the Pennsylvania Supreme Court held that the trial court had jurisdiction over a nuisance claim based on the practice of dentistry without a license, even though this conduct was prohibited by statute and was a misdemeanor crime. The Court rejected the argument that the trial court had no jurisdiction

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

because a statute prohibited the conduct and provided for penalties, recognizing that the statute did "not deprive equity of its jurisdiction to enjoin a nuisance merely because the Legislature has prescribed criminal penalties for the conduct sought to be enjoined." *Id.*[2]

Similarly, in *Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 237 A.2d 342, 347-48 (Pa. 1968), the Pennsylvania Supreme Court found that courts had equity jurisdiction to enjoin a public nuisance that was based on conduct that also was criminal. The Court first noted that jurisdiction attached when a plaintiff has shown that the defendant's acts violated the plaintiff's personal, property or civil rights, even if the defendant's conduct also violated criminal law. *Id.* The Court then found:

> Further, if the criminal act sought to be enjoined constitutes a 'public nuisance' then it may properly be restrained on the motion of the proper public authorities.
>
> It is also true that a public nuisance may be enjoined at the behest of a private citizen or group of citizens, if the latter, either in their property or civil rights, are specifically injured by the public nuisance over and above the injury suffered by the public generally.

Id. at 348 (citations omitted);[3] *see also Butts v. Southwestern Energy Production Co.*, 2014 WL 3953155 at *7 (M.D. Pa. Aug. 12, 2014) ("Since a public nuisance is a quasi-criminal action, 'the normal remedy is in the hands of the state.' However, in limited circumstances, courts recognize a private right of action for a public nuisance.") (citations omitted).

---

[2] Part of the relief POM seeks in this action is injunctive relief to abate the public nuisance. See Complaint at p.p. 9-10 and 11.

[3] The Court went on to find that even though jurisdiction existed, the private plaintiff did not have standing to bring the action because it did not suffer an injury greater than the general public and no statute gave it jurisdiction. *See Bravo Enterprises*, 237 A.2d at 349. 3C has not filed any preliminary objection challenging POM's standing and POM has pled in the Complaint that it suffered harm that is different in kind and magnitude than that suffered by the general public. *See* Complaint at ¶¶49-59 and 67.¶

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In short, POM has pled a valid claim for public nuisance based in part on 3C's conduct that violates 18 Pa. C.S. §5513. POM has not asserted a private cause of action for violation of 18 Pa. C.S. §5513.

2.      **The Unfair Competition Claim**

For reasons similar to those discussed above with regard to POM's public nuisance claim, POM also has validly pled an unfair competition claim by referencing 18 Pa. C.S. §5513 and alleging 3C has violated this statute. As pled in the Complaint, 3C's violation of 18 Pa. C.S. §5513 demonstrates an element of this claim—3C's underlying acts of unfair competition. *See* Complaint at ¶70-75; *see also Lutheran,* 650 A.2d at 91-92. This cause of action, just like the one for public nuisance, is an independent claim under Pennsylvania law and is not a cause of action for violation of 18 Pa. C.S. §5513. Moreover, in its Preliminary Objections, 3C has not directly challenged POM's unfair competition claim and has not argued that POM has not pled a valid claim for unfair competition.

3.      **The Cases Relied on by 3C in its Brief are Inapplicable**

3C devotes virtually all of its Brief to the irrelevant and inapplicable argument that there is no express or implied private right of action under 18 Pa. C.S. §5513, relying on *Lutheran,* 650 A.2d at 83, and *Estate of Witthoeft v. Kiskaddon,* 733 A.2d 623 (Pa. Super. 1999). *See* 3C Brief at p.p. 4-13. In both of these cases, the plaintiffs brought claims under the statutes in question and the courts had to determine whether there were private rights of action under these statutes. *See Lutheran,* 650 A.2d at 85 and 91; *Witthoeft,* 733 A.2d at 625-27. In contrast, as discussed above, POM has not brought a cause of action under 18 Pa. C.S. §5513 and is not arguing that it has either an express or implied private right of action under 18 Pa. C.S. §5513. Consequently,

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the *Lutheran* and *Witthoeft* decisions—and 3C's arguments premised on them—simply do not support dismissal of the complaint for lack of jurisdiction.

Indeed, *Lutheran* actually supports POM's argument here. In *Lutheran*, although the court found the statute at issue did not create a private right of action, it recognized "the differences between a cause of action created by statute and a common law tort action pursuant to which a statutorily imposed duty may be enforced." *Id.* at 92. The court also discussed cases supporting the "ordinary proposition" that a statute can impose a duty on a defendant, the violation of which gives rise to an action in tort. *Id.* at 91-92. That is what POM has pled in the Complaint—that the duties imposed by 18 Pa. C.S. §5513 have given rise to claims for public nuisance and unfair competition.

In sum, POM has not pled or even attempted to assert a cause of action for violation of 18 Pa. C.S. §5513. Rather, it has pled separate and independent claims for public nuisance and unfair competition that reference 18 Pa. C.S. §5513 in connection with pleading the elements of these two causes of action. Consequently, 3C's first preliminary objection based on lack of jurisdiction lacks merit and should be overruled

## C.   This Court Should Overrule 3C's Preliminary Objection Based on Pendency of a Prior Action

In its second preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(6), 3C contends that POM's Complaint should be dismissed or held in abeyance based on the pendency of a prior action. *See* Preliminary Objections at ¶¶29-34.[4]  3C does not develop this argument at all in its Brief and fails to even provide the applicable standard for dismissing a claim under Pa. R. Civ. Proc. 1028(a)(6). For this reason alone, this preliminary objection should be overruled.

---

[4] The exact relief 3C seeks is not clear. The Wherefore Clause after its second preliminary objection requests that the Preliminary Objections be sustained or held in abeyance but also requests that judgment be entered in 3C's favor and against POM. *See* Preliminary Objections. Accordingly, POM will treat this as a request to either dismiss the Complaint or, in the alternative, hold it in abeyance.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

To the extent that the Court address this preliminary objection, however, 3C cannot satisfy the requirements for dismissal of a claim based on the pendency of a prior action. A defendant asserting the pendency of a prior action, or *lis pendens*, as a basis to dismiss a complaint must show that both cases involve the same: (i) parties; (ii) requested relief; (iii) causes of action; and (iv) asserted rights. *See Barren v. Com.*, 74 A.3d 250, 253 (Pa. Super. 2013). This test is strictly applied where a party seeks to dismiss a claim. *See Norristown Automobile Co., Inc. v. Hand*, 562 A2d 902, 904 (Pa. Super. 1989).

3C cannot satisfy any of these elements. First, the parties are not the same—3C is not a party in the prior pending action between POM and the Pennsylvania State Police, Bureau of Liquor Control Enforcement (the "PSP"). *See* Preliminary Objections, Exhibit C. Second, the relief requested is not the same—POM seeks a declaratory judgment and injunction against the PSP concerning POM's own skill game in the prior action (*see id.* at p.p. 14-15), while it seeks injunctive relief and damages against 3C based on 3C's use of games other than POM's skill game here (see Complaint at p.p. 9-10 and 11). Third, the causes of action are not the same—the prior action involves one count for declaratory relief (*see* Preliminary Objections, Exhibit C at p.p. 12-14), while this action involves two counts for public nuisance and unfair competition. (*see* Complaint at p.p. 9-11). Fourth, the rights asserted by POM in each action are completely different. In short, there is no basis to dismiss the Complaint due to the pendency of a prior action.

3C also cannot satisfy the requirements for an "abeyance."[5] While 3C contends that the prior action will determine "the exact issue presented herein," that simply is not the case. The

---

[5] In its Preliminary Objections, 3C cites two cases-- *Hand*, 562 A2d at 905 and *PNC Bank, National Association v. Bluestream Technology, Inc.*, 14 A.3d 831, 835 (Pa. Super 2010)—that suggest a court may stay the later action under certain circumstances even if the party asserting *lis pendens* cannot strictly meet the test for application of this defense. *See* Preliminary Objections at ¶30.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

prior action concerns the legality of POM's skill game. This action concerns whether 3C has created a public nuisance and engaged in unfair competition because it makes available for play illegal games manufactured by other companies (not POM's skill game). Indeed, 3C admits in the Preliminary Objections that it does not do business with POM but rather uses games and devices sold and manufactured by other companies. *See* Preliminary Objections at ¶6; 3C Brief at p. 3. The prior action will not determine the legality of these games. Under these circumstances, there is no basis to stay this proceeding because litigating this matter will not create a duplication of effort or waste judicial resources.

Accordingly, the Court should overrule 3C's preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(6).

## IV.   **CONCLUSION**

For all the reasons set forth above, POM respectfully submits that the Court should overrule 3C's Preliminary Objections and order 3C to answer the Complaint within twenty (20) days.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Respectfully Submitted,

*Eric J. Schreiner*

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
      eschreiner@kleinbard.com

*Attorneys for Plaintiff POM of,*
*Pennsylvania, LLC*

Dated:   September 20, 2019

{01816654:v1 } 11

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

POM OF PENNSYLVANIA, LLC,

*Plaintiff,*

v.

3C AMUSEMENTS, LLC,

*Defendant.*

IN THE COURT OF COMMON PLEAS
FOR CAMBRIA COUNTY,
PENNSYLVANIA

CIVIL DIVISION

CASE NO.2019-3138

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the United Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently from non-confidential information and documents.

Respectfully Submitted,

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
      eschreiner@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

Dated:  September 20, 2019

{01816654;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 5

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
    eschreiner@kleinbard.com
    prosenzweig@kleinbard.com
    svance@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

|  | IN THE COURT OF COMMON PLEAS FOR LUZERNE COUNTY, PENNSYLVANIA |
|---|---|
| POM OF PENNSYLVANIA, LLC, | |
| *Plaintiff,* | |
| v. | CIVIL DIVISION |
| GARY LAGANA, | CASE NO. 2019-CV-08798 |
| *Defendant.* | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT

### I.   INTRODUCTION

Plaintiff, POM of Pennsylvania, LLC ("POM"), through its attorneys, hereby submits its Brief in opposition to Defendant Gary Lagana's ("Lagana"), Preliminary Objections to Plaintiff's Complaint (the "Preliminary Objections").

POM originally filed its Complaint in this action on July 12, 2019, asserting claims for public nuisance and unfair competition.[1] POM has pled valid claims based on Lagana's operation of a business that makes illegal games of chance available to customers for play. In

---

[1] The Complaint was reinstated on September 5, 2019.

{01833800;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

response, Lagana filed his Preliminary Objections.  In the Preliminary Objections, Lagana raises three arguments:  (i) improper service of process (see Preliminary Objections at ¶¶9-14); (ii) there is no private right of action and the Court lacks jurisdiction over this action because 18 Pa. C.S. §5513 does not provide for a private right of action (id. at ¶¶15-35); and (iii) there is a prior pending action that allegedly will determine a fundamental issue presented herein (id. at ¶¶36-42).

None of these arguments have any merit.  First, the Court should reject Lagana's argument as to service of the Complaint because POM attempted in good faith to serve Lagana with the Complaint, Lagana actually received the Complaint and, to the extent there was any defect in service, it has not prejudiced Lagana.

Second, Lagana's no private action/lack of jurisdiction argument is without merit because it is based on a fundamental misunderstanding of the claims that POM is asserting.  POM has not pled a private cause of action for violation of 18 Pa. C.S. §5513 and is not seeking to assert such a claim.  To the contrary, POM has pled independent claims for public nuisance and unfair competition, which Lagana does not directly attack.  The Court has jurisdiction over these claims.  Consequently, the Court should reject Lagana's blatant attempt at misdirection and deny its preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(1) based on no private action/lack of jurisdiction.

Third, the core issue in this case—the legality of the machines that Lagana makes available to customers—is not at issue in the prior action identified in Lagana's Preliminary Objections.  Furthermore, that prior action does not involve the issues of whether Lagana created a public nuisance or engaged in unfair competition.  Indeed, that action does not involve Lagana at all.  Accordingly, that prior action will not determine the issues raised in this case and the

{01833800;v1 }2

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Court should deny Lagana's preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(6) based on the pendency of a prior action.

POM has adequately pled claims for public nuisance and unfair competition.

Accordingly, the Court should overrule the Preliminary Objections.

## II.   FACTS

POM incorporates by reference the facts as pled in its Complaint. A true and correct copy of the Complaint is attached hereto, and made a part hereof, as Exhibit "A".

## III.   ARGUMENT

### A.   Legal Standard for Preliminary Objections

When a court is presented with preliminary objections that may result in the dismissal of a cause of action, it should only sustain the preliminary objections whenever "it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief." *Bourke v. Kazaras*, 746 A.2d 642, 643 (Pa. Super. 2000); *see also Bell v. George*, 2003 WL 22250350, *4 (Phila. C.C.P. 2003) (it must be clear from the face of the complaint that the law will not permit recovery). In addition, "all well-pleaded material, factual averments and all inferences fairly deducible therefrom" are presumed to be true. *Tucker v. Philadelphia Daily News*, 757 A.2d 938, 941-42 (Pa. Super. 2000). Based on the foregoing standard, the Court should overrule 3C's Preliminary Objections.

### B.   This Court Should Overrule Lagana's Preliminary Objection Based on Improper Service of Process

Lagana's first preliminary objection pursuant to Pa. R. Civ. Proc. 402 challenges the service of the Complaint. As a threshold matter, Lagana does not address this preliminary objection at all in his Memorandum of Law in Support of Preliminary Objections to Plaintiff's

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Complaint (the "Lagana MOL"). He provides no supporting legal argument for this preliminary objection and, therefore, the Court should not even consider it.

To the extent that the Court considers this preliminary objection, Lagana contends in his Preliminary Objections that service was improper because the Sheriff served the Complaint on Lagana's daughter-in-law at an address that was not Lagana's residence, but that is in the same town where Lagana resides—Lattimer Mines, Pennsylvania. *See* Preliminary Objections at ¶¶10-11. Presumably, the Sheriff served the Complaint at Lagana's son's house (it is not clear from the Preliminary Objections if Lagana's son also is named Gary Lagana). Assuming for purposes of argument that Lagana's assertions are correct, they demonstrate that POM made a good faith effort to serve the Complaint on Lagana but appears to have served it at his son's residence rather than his own. In any case, based on the fact that Lagana filed his Preliminary Objections in a timely manner, it is clear that he actually received the Complaint and was not prejudiced in any way by any technical defect in service.

Under these circumstances, even if service was not technically proper, the Court should overrule the preliminary objection based on improper service. The Pennsylvania Supreme Court's decision in *McCreesh v. City of Phila.*, 888 A.2d 664 (Pa. 2005), is directly on point in this regard:

> The Superior and Commonwealth Courts have struggled to apply the *Lamp–Farinacci* rule, with some panels requiring plaintiffs to comply strictly with the Rules of Civil Procedure related to service of process and local practice in order to satisfy the good faith requirement, and other panels providing a more flexible approach, excusing plaintiffs' initial procedurally defective service where the defendant has actual notice of the commencement of litigation and is not otherwise prejudiced. We now adopt the more flexible approach, concluding that it sufficiently protects defendants from defending against stale claims without the draconian action of dismissing claims based on technical failings that do not prejudice the defendant.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*Id.* at 666 (internal citations omitted); *see also Am. Interior Constr. & Blinds Inc. v. Benjamin's Desk, LLC*, 206 A.3d 509, 514 (Pa. Super. 2019) (reversing trial court's decision sustaining preliminary objections on basis of ineffective service based principally on rationale articulated in *McCreesh*).

In short, the Court should overrule Lagana's preliminary objection based on improper service of process.[2]

### C.  This Court Should Overrule Lagana's Preliminary Objection Based on Lack of Jurisdiction

In second preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(1), Lagana contends that this Court lacks jurisdiction over this matter. *See* Preliminary Objections at ¶¶15-35; Lagana MOL at p.p. 3-12. Lagana bases this argument exclusively upon the claim that 18 Pa. C.S. §5513 does not provide for a private cause of action. *See* Lagana MOL at p.p. 3-12. On its face, the Complaint does not plead such a claim. Nevertheless, Lagana fails to explain in his Preliminary Objections or MOL the basis for his belief that POM is asserting a claim for violation of 18 Pa. C.S. §5513 in the Complaint; Lagana's argument simply assumes that POM has asserted such a cause of action. Lagana's argument misapprehends the nature of the claims that POM is asserting and ignores what POM actually pleads in the Complaint.

POM is not asserting a private cause of action for violation of 18 Pa. C.S. §5513, as Lagana misleadingly claims. Even a cursory review of the Complaint demonstrates that POM has pled claims for public nuisance and unfair competition. POM has referenced 18 Pa. C.S. §5513 in the Complaint in order to plead the underlying elements of causes of action for public nuisance and unfair competition—the claims it actually is asserting—but it is not asserting a

---

[2] Lagana identified his correct address in the Preliminary Objections. *See* Preliminary Objections at ¶11. Accordingly, solely in the alternative, if the Court is inclined to sustain this preliminary objection, POM respectfully requests that the Court give POM leave to reserve the Complaint on Lagana at this address.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

private cause of action for violation of this statute. *See generally Alfred M. Lutheran Distributors, Inc. v. A.P. Weilersbacher, Inc.*, 650 A.2d 83, 91-92 (Pa. Super. 1994) (recognizing "the differences between a cause of action created by statute and a common law tort action pursuant to which a statutorily imposed duty may be enforced" and discussing cases supporting proposition that statute can impose duty on defendant, the violation of which gives rise to action in tort). Lagana's attempt to transform POM's Complaint into one asserting an express claim for violation of 18 Pa. C.S. §5513 misses the mark. The Court should reject this argument.

1. **The Public Nuisance Claim**

With respect to public nuisance claims, Pennsylvania courts follow Section 821B of the Restatement (Second) of Torts "to guide [their] determinations as to whether a use of property constitutes a public nuisance. *See Machipongo Land and Coal Co., Inc. v. Com.*, 799 A.2d 751, 773 (Pa. 2002); *see also Kuhns v. City of Allentown*, 636 F.Supp.2d 418, 438 (E.D. Pa. 2009). Section 821B defines a public nuisance as follows:

> (1) A public Nuisance is an unreasonable interference with a right common to the general public.
>
> (2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
>
>> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>>
>> (b) *Whether the conduct is prohibited by a statute*, ordinance or administrative regulation, or . . . .

*See Machipongo*, 799 A.2d at 773 (quoting Restatement (Second) of Torts, §821B) (emphasis added); *see also Com. v. Ebaugh*, 783 A.2d 846, 850 (Pa. Commw. 2001) ("A public nuisance is an unreasonable interference with a right common to the general public; circumstances that constitute a public nuisance are, among other things, conduct that is proscribed by statute or

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

ordinance, or conduct that interferes with the public peace."). In order to plead this claim, POM in the Complaint referenced 18 Pa. C.S. §5513 and alleged that the games Lagana offers for play are illegal under this statute to demonstrate that Lagana's conduct is "an unreasonable interference with a right common to the general public" because it is, among other things, "prohibited by a statute." *See* Complaint at ¶¶42-48 and 62-67. 18 Pa. C.S. §5513 is the statute that prohibits Lagana's conduct and POM pled these facts in order to properly plead the elements of a public nuisance claim, not to assert an actual claim under 18 Pa. C.S. §5513. *See Lutheran*, 650 A.2d at 91-92. Moreover, Lagana has not claimed that POM failed to plead a valid public nuisance claim.

Furthermore, Lagana's contention that POM cannot premise its independent public nuisance claim on conduct that violates a criminal statute—in this case 18 Pa. C.S. §5513—is wrong as a matter of Pennsylvania law. Pennsylvania courts have long recognized that nuisance claims can be premised on conduct that also may be criminal and that courts have jurisdiction over such claims. For example, in *Boggs v. Werner*, 94 A.2d 50, 51 (Pa. 1953), the Pennsylvania Supreme Court held that the trial court had jurisdiction over a nuisance claim based on the practice of dentistry without a license, even though this conduct was prohibited by statute and was a misdemeanor crime. The Court rejected the argument that the trial court had no jurisdiction because a statute prohibited the conduct and provided for penalties, recognizing that the statute did "not deprive equity of its jurisdiction to enjoin a nuisance merely because the Legislature has prescribed criminal penalties for the conduct sought to be enjoined." *Id.*[3]

Similarly, in *Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 237 A.2d 342, 347-48 (Pa. 1968), the Pennsylvania Supreme Court found that

---

[3] Part of the relief POM seeks in this action is injunctive relief to abate the public nuisance. *See* Complaint at p.p. 10 and 11.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

courts had equity jurisdiction to enjoin a public nuisance that was based on conduct that also was criminal. The Court first noted that jurisdiction attached when a plaintiff has shown that the defendant's acts violated the plaintiff's personal, property or civil rights, even if the defendant's conduct also violated criminal law. *Id.* The Court then found:

> Further, if the criminal act sought to be enjoined constitutes a 'public nuisance' then it may properly be restrained on the motion of the proper public authorities.
>
> It is also true that a public nuisance may be enjoined at the behest of a private citizen or group of citizens, if the latter, either in their property or civil rights, are specifically injured by the public nuisance over and above the injury suffered by the public generally.

*Id.* at 348 (citations omitted);[4] *see also Butts v. Southwestern Energy Production Co.*, 2014 WL 3953155 at *7 (M.D. Pa. Aug. 12, 2014) ("Since a public nuisance is a quasi-criminal action, 'the normal remedy is in the hands of the state.' However, in limited circumstances, courts recognize a private right of action for a public nuisance.") (citations omitted).

In short, POM has pled a valid claim for public nuisance based in part on Lagana's conduct that violates 18 Pa. C.S. §5513. POM has not asserted a private cause of action for violation of 18 Pa. C.S. §5513.

2. **The Unfair Competition Claim**

For reasons similar to those discussed above with regard to POM's public nuisance claim, POM also has validly pled an unfair competition claim by referencing 18 Pa. C.S. §5513 and alleging Lagana has violated this statute. As pled in the Complaint, Lagana's violation of 18 Pa. C.S. §5513 demonstrates an element of this claim — Lagana's underlying acts of unfair

---

[4] The Court went on to find that even though jurisdiction existed, the private plaintiff did not have standing to bring the action because it did not suffer an injury greater than the general public and no statute gave it jurisdiction. *See Bravo Enterprises*, 237 A.2d at 349. Lagana has not filed any preliminary objection challenging POM's standing and POM has pled in the Complaint that it suffered harm that is different in kind and magnitude than that suffered by the general public. *See* Complaint at ¶¶50-60 and 68.¶

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of
the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

competition. *See* Complaint at ¶71-76; *see also Lutheran*, 650 A.2d at 91-92. This cause of

action, just like the one for public nuisance, is an independent claim under Pennsylvania law and

is not a cause of action for violation of 18 Pa. C.S. §5513. Moreover, in its Preliminary

Objections, Lagana has not directly challenged POM's unfair competition claim and has not

argued that POM has not pled a valid claim for unfair competition.

### 3.   The Cases Relied on by Lagana in his MOL are Inapplicable

Lagana devotes virtually all of his MOL to the irrelevant and inapplicable argument that

there is no express or implied private right of action under 18 Pa. C.S. §5513, relying on

*Lutheran*, 650 A.2d at 83, and *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623 (Pa. Super. 1999).

*See* Lagana MOL at p.p. 4-12. In both of these cases, the plaintiffs brought claims under the

statutes in question and the courts had to determine whether there were private rights of action

under these statutes. *See Lutheran*, 650 A.2d at 85 and 91; *Witthoeft*, 733 A.2d at 625-27. In

contrast, as discussed above, POM has not brought a cause of action under 18 Pa. C.S. §5513 and

is not arguing that it has either an express or implied private right of action under 18 Pa. C.S.

§5513. Consequently, the *Lutheran* and *Witthoeft* decisions—and Lagana's arguments premised

on them—simply do not support dismissal of the complaint for lack of jurisdiction.

Indeed, *Lutheran* actually supports POM's argument here. In *Lutheran*, although the

court found the statute at issue did not create a private right of action, it recognized "the

differences between a cause of action created by statute and a common law tort action pursuant

to which a statutorily imposed duty may be enforced." *Id.* at 92. The court also discussed cases

supporting the "ordinary proposition" that a statute can impose a duty on a defendant, the

violation of which gives rise to an action in tort. *Id.* at 91-92. That is what POM has pled in the

Case# 2019-06832-12 – JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Complaint—that the duties imposed by 18 Pa. C.S. §5513 have given rise to claims for public nuisance and unfair competition.

In sum, POM has not pled or even attempted to assert a cause of action for violation of 18 Pa. C.S. §5513. Rather, it has pled separate and independent claims for public nuisance and unfair competition that reference 18 Pa. C.S. §5513 in connection with pleading the elements of these two causes of action. Consequently, Lagana's second preliminary objection based on lack of jurisdiction lacks merit and should be overruled

**D.** **This Court Should Overrule Lagana's Preliminary Objection Based on Pendency of a Prior Action**

In his third preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(6), Lagana contends that POM's Complaint should be dismissed or held in abeyance based on the pendency of a prior action. *See* Preliminary Objections at ¶¶37-42.[5] Lagana does not meaningfully develop this argument in his MOL and fails to even provide the applicable standard for dismissing a claim under Pa. R. Civ. Proc. 1028(a)(6). For this reason alone, this preliminary objection should be overruled.

To the extent that the Court address this preliminary objection, however, Lagana cannot satisfy the requirements for dismissal of a claim based on the pendency of a prior action. A defendant asserting the pendency of a prior action, or *lis pendens*, as a basis to dismiss a complaint must show that both cases involve the same: (i) parties; (ii) requested relief; (iii) causes of action; and (iv) asserted rights. *See Barren v. Com.,* 74 A.3d 250, 253 (Pa. Super. 2013). This test is strictly applied where a party seeks to dismiss a claim. *See Norristown Automobile Co., Inc. v. Hand,* 562 A2d 902, 904 (Pa. Super. 1989).

---

[5] The exact relief Lagana seeks is not clear. The Wherefore Clause after his third preliminary objection requests that his preliminary objection be sustained or held in abeyance but also requests that judgment be entered in Lagana's favor and against POM. *See* Preliminary Objections at p. 8. Accordingly, POM will treat this as a request to either dismiss the Complaint or, in the alternative, hold it in abeyance.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Lagana cannot satisfy any of these elements. First, the parties are not the same— Lagana is not a party in the prior pending action between POM and the Pennsylvania State Police, Bureau of Liquor Control Enforcement (the "PSP"). *See* Preliminary Objections, Exhibit D. Second, the relief requested is not the same—POM seeks a declaratory judgment and injunction against the PSP concerning POM's own skill game in the prior action (*see id.* at p.p. 14-15), while it seeks injunctive relief and damages against Lagana based on Lagana's use of games other than POM's skill game here (*see* Complaint at p.p. 10 and 11). Third, the causes of action are not the same—the prior action involves one count for declaratory relief (*see* Preliminary Objections, Exhibit D at p.p. 12-14), while this action involves two counts for public nuisance and unfair competition. (*see* Complaint at p.p. 9-11). Fourth, the rights asserted by POM in each action are completely different. In short, there is no basis to dismiss the Complaint due to the pendency of a prior action.

Lagana also cannot satisfy the requirements for an "abeyance."[6] While Lagana contends that the prior action will determine "one of the same issues presented herein," that simply is not the case. The prior action concerns the legality of POM's skill game. This action concerns whether Lagana has created a public nuisance and engaged in unfair competition because it makes available for play illegal games manufactured by other companies (not POM's skill game). Indeed, Lagana admits in the Preliminary Objections that it does not do business with POM but rather uses games and devices sold and manufactured by other companies. *See* Preliminary Objections at ¶7; Lagana MOL at p. 3. The prior action will not determine the legality of these games, whether Lagana has created a public nuisance or whether Lagana has

---

[6] In his Preliminary Objections, Lagana cites two cases— *Hand*, 562 A2d at 905 and *PNC Bank, National Association v. Bluestream Technology, Inc.*, 14 A.3d 831, 835 (Pa. Super 2010)—that suggest a court may stay the later action under certain circumstances even if the party asserting *lis pendens* cannot strictly meet the test for application of this defense. *See* Preliminary Objections at ¶37.

Case# 2019-06832-12 – JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

engaged in unfair competition.  Under these circumstances, there is no basis to stay this proceeding because litigating this matter will not create a duplication of effort or waste judicial resources.[7]

Accordingly, the Court should overrule Lagana's preliminary objection pursuant to Pa. R. Civ. Proc. 1028(a)(6).

## IV.  **CONCLUSION**

For all the reasons set forth above, POM respectfully submits that the Court should overrule Lagana's Preliminary Objections and order Lagana to answer the Complaint within twenty (20) days.

Respectfully Submitted,

*Eric J. Schreiner*

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
       eschreiner@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

Dated:    November 4, 2019

---

[7] Lagana also cites a recent order issued by the Honorable David J. Tulowitzki of the Court of Common Pleas of Cambria County.  *See* Preliminary Objections at ¶42 and Exhibit "E"; Lagana MOL at p. 13.  This Court is not bound by an order from the trial court in another Pennsylvania County.  Furthermore, POM respectfully submits that the preliminary objections in that matter were erroneously decided and POM's complaint in that action should not have been dismissed without prejudice based on the alleged pendency of a prior action.

{01833800;v1 }12

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

POM OF PENNSYLVANIA, LLC,

*Plaintiff,*

v.

GARY LAGANA,

*Defendant.*

IN THE COURT OF COMMON PLEAS
FOR LUZERNE COUNTY, PENNSYLVANIA

CIVIL DIVISION

CASE NO. 2019-CV-08798

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the United Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently from non-confidential information and documents.

Respectfully Submitted,

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
    eschreiner@kleinbard.com

*Attorneys for Plaintiff POM of
Pennsylvania, LLC*

Dated:  November 4, 2019

{01833800;v1 }

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "A"

{01833800;v1 }

Case# 2019-06832-12 - JUDGE35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Supreme Court of Pennsylvania
## Court of Common Pleas
### Civil Cover Sheet
Luzerne _____ County

| For Prothonotary Use Only: | |
|---|---|
| Docket No: | TIME STAMP |

The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

Lead Plaintiff's Name:
POM of Pennsylvania, LLC

Lead Defendant's Name:
Gary Lagana

Are money damages requested?  ☒ Yes   ☐ No

Dollar Amount Requested:
(check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

Is this a *Class Action Suit*?   ☐ Yes   ☒ No

Is this an *MDJ Appeal*?   ☐ Yes   ☒ No

Name of Plaintiff/Appellant's Attorney: Eric J. Schreiner, Esquire

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☒ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other:
_____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:
_____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:
_____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
_____

- ☐ Other:
_____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:
_____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other:
_____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:
_____

*Updated 1/1/2011*

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> GARY LAGANA, <br><br> *Defendant*, | IN THE COURT OF COMMON PLEAS FOR LUZERNE COUNTY, PENNSYLVANIA <br><br> CIVIL DIVISION - LAW <br><br> NO. _____ |

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguien-tes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demande. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| **YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.** | **LLEVE ESTA DEMANDA A UN ABOGADO. INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR RAL SERVCIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.** |
| North Penn Legal Services, Inc. <br> 33 N. Main Street <br> Suite 200 <br> Pittston, PA 18640 <br> (570) 299-4100 <br> (877) 953-4250 Toll free <br> (570) 824 0002 Fax <br><br> 101 West Broad Street <br> Suite 513 <br> Hazelton, PA 18201 <br> (570) 455-9512 <br> (877) 953-4250 Toll free <br> (570) 455-3625 Fax | Servicios Legales de North penn, Inc. <br> 33 la Calle Main del Norte, Oficina 200 <br> Pittston, PA 18640 <br> (570) 299-4100 <br> (877) 953-4250 Llamada gratuita <br> (570) 824 0002 Fax <br><br> 101 la Calle Broad del Oeste <br> Oficina 513 <br> Hazelton, PA 18201 <br> (570) 455-9512 <br> (877) 953-4250 Llamada gratuita <br> (570) 455-3625 Fax |

{01176141;v1}

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
eschreiner@kleinbard.com
prosenzweig@kleinbard.com
svance@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> GARY LAGANA, <br><br> *Defendant*. | IN THE COURT OF COMMON PLEAS FOR LUZERNE COUNTY, PENNSYLVANIA <br><br> CIVIL DIVISION – LAW <br><br> NO. _____ <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff POM of Pennsylvania, LLC ("POM"), by and through its undersigned counsel, hereby brings its complaint for public nuisance and unfair competition against Defendant Gary Lagana ("Defendant"), and in support hereof, avers as follows:

### INTRODUCTION

1.    POM licenses and distributes software for a legal skill based video game machine, called the Pennsylvania Skill™ Amusement Device 40249 PEN (the "Skill Game"), which is used in Luzerne County and throughout the Commonwealth of Pennsylvania.

{00776154v1}

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

2.      It has previously been determined by a court of the Commonwealth that the Skill Game is one in which the element of skill rather than chance predominates, and therefore it is not in violation of the Pennsylvania criminal statute regulating games of chance, *see* 18 Pa. C.S. § 5513.

3.      Defendant owns and operates a business known as Got Skillz Game Room located at 239 W. 22nd Street, Hazelton, Pennsylvania (the "Business").

4.      The Business has on its premises and available for customer play numerous video game machines that are illegal gambling devices.

5.      The ongoing and continuing operation of these games at the Business constitutes illegal gambling in violation of 18 Pa. C.S. § 5513.

6.      These illegal games compete directly with the legal Skill Game.

7.      These illegal games take market share and customers away from the legal Skill Game, thereby depriving POM of profits and causing it to suffer pecuniary harm.

8.      Defendant's operation of these illegal games at the Business has created a public nuisance.

9.      Defendant's operation of these illegal games at the Business constitutes unfair competition.

10.      POM is entitled to injunctive relief that prohibits the use or operation of these illegal games at the Business or anywhere else in Luzerne County in order to abate the public nuisance and unfair competition.

11.      POM also is entitled to damages based on Defendant's conduct.

## PARTIES AND VENUE

12.      POM is a is a limited liability company formed under the laws of Wyoming, trading and doing business as Pace-O-Matic, with its principal place of business in Duluth,

p1776141;11

2

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Georgia.  POM licenses and distributes software for the Skill Game, which is used throughout the Commonwealth of Pennsylvania.

13.    Defendant is an individual who, upon information and belief, resides in Pennsylvania and owns and operates the Business.  Defendant operates multiple illegal games of chance at the Business that compete with the legal Skill Game.

14.    Venue exists in this Court pursuant to Pennsylvania Rule of Civil Procedure 1006 because a transaction or occurrence took place in this county out of which the cause of action asserted in this Complaint arose and because the Defendant resides and/or regularly conducts business in this county.

## FACTUAL BACKGROUND.

### A.    POM'S SKILL GAME

15.    POM's Skill Game is sold and distributed in the Commonwealth of Pennsylvania and is located primarily in taverns, restaurants and social clubs that serve alcohol under license from LCB.

16.    The Skill Game is a coin-operated video machine.

17.    The primary game the Skill Game offers is a "Tic-Tac-Toe" style puzzle, but the Skill Game also includes a potentially unlockable bonus session and a "Follow Me™" colored dot-matching second phase of game play.

18.    The Tic-Tac-Toe game features six different graphical themes that a player can select, which include "Bombs and Bombshells," "Cocktail Cove," "Pirate's Prize," "Pirates," "Lucky Fruit," and "Living Large."  While the graphics and some payout amounts differ among the various themes, the gameplay is functionally equivalent in all themes.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

19.  A player cannot access the bonus session or the Follow-Me™ second phase of play on the Skill Game without first playing the Tic-Tac-Toe game.

20.  When the Tic-Tac-Toe game is initiated, nine reels arranged in a three-by-three grid are spun.

21.  When the wheels stop spinning, nine symbols based on the player's chosen theme are displayed.

22.  The pattern that is displayed is selected from a finite pool of multiple tens of thousands of puzzles.

23.  Once the reels are spun, the player has thirty seconds to change one of the symbols to a "Wild" symbol in order to complete one or more rows in the grid.

24.  The most advantageous spot in which to place the "Wild" symbol depends on whether multiple rows can be completed and the value of the symbols in the row or rows that were completed.

25.  Failure to place the "Wild" symbol at all within the thirty-second time limit will result in a loss, however, because the Skill Game does not generate automatic wins.

26.  The Skill Game also has a bonus session that can be triggered under certain circumstances by successful completion of the Tic-Tac-Toe game.

27.  The bonus sessions differ among the various themes that are available on the Skill Game. "Bombs and Bombshells," "Cocktail Cove," and "Pirate's Prize" have skill-based bonus play (shooting for "Bombs and Bombshells" and "Pirate's Prize," picture-taking for "Cocktail Cove"), during which the player can earn less than the maximum bonus available, including zero, based on how well he or she performs during the bonus session. The bonus sessions for "Pirates," "Lucky Fruit," and "Living Large" consist of a process that delivers the bonus points.

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

to a player that were already determined by the outcome of the Tic-Tac-Toe game. For these themes, the bonus session simply is an entertaining way to deliver to the player 100% of the reward the player already earned in the Tic-Tac-Toe game.

28.    If a player executes perfect skill and still fails to win at least 105% of the amount paid to play the Tic-Tac-Toe game, the player is given the option of selecting the Follow-Me™ phase of play.

29.    The Follow-Me™ second phase of game play begins with a three-by-three grid of colored dots. The dots flash in a random sequence that the player must repeat.

30.    The player needs to follow the sequences for 25 rounds of play, with each sequence adding another circle.

31.    If ultimately successful, the player is awarded with a combined total of 105% of the original amount spent to play.

32.    The element of skill predominates in the Skill Game.

33.    The Court of Common Pleas of Beaver County has determined that POM's Skill Game was a game in which skill predominated and, consequently, was not a gambling device per se.[1]  *See In re: Pace-O-Matic Equipment, Terminal I.D. No. 142613*; M.D. No. 965-2013 at p.p. 7-12 (Beaver Co. C.C.P. 2014) (a true and correct copy of the court's memorandum opinion and order is attached hereto, and made a part hereof, as Exhibit "A").

34.    Accordingly, the Skill Game is a legal game of skill under Pennsylvania law.

---

[1] The game involved in the Beaver County case was POM's Pennsylvania Skill™ Amusement Device SKL-402.44 PEN. The current Skill Game is built off of a newer version of POM's software, which provides substantially the same actual game play as the software version at issue in the Beaver County case. The reasoning of the court in Beaver County applies equally in this case.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**B.**    **THE BUSINESS**

35.    The Business has multiple types of video machine games that are available for customers to play.

36.    Most of the games at the Business are illegal gambling devices that violate 18 Pa. C.S. § 5513.

37.    For example, the Business has "SkillTouch" games manufactured by Gracie Technologies, Inc. ("Gracie").

38.    The Court of Common Pleas for Cambria, County, Pennsylvania recently held that Gracie's "SkillTouch" game is an illegal gambling device that violates 18 Pa. C.S. § 5513. *See Gracie Technologies Inc., et al. v. Commonwealth*, No. MD 162-2017 (Cambria Co. C.C.P.) (a true and correct copy of the court's opinion and order is attached hereto, and made a part hereof, as Exhibit "B").

39.    The Business also has Blue Sky games, Platinum Plus games and Banilla games. Upon information and belief, these games are all games where chance predominates and, therefore, they are illegal gambling devices under 18 Pa. C.S. § 5513.

40.    The Business also has the legal Skill Game.

41.    The Business promotes illegal gambling and violates 18 Pa. C.S. § 5513 because it has numerous games that are illegal gambling devices available for customers to play.

**C.**    **THE PUBLIC NUISANCE**

42.    As stated above, the Business promotes illegal gambling because it has on its premises numerous illegal gambling devices that are available for customer to play.

43.    The ongoing and continuing operation of Gracie's "SkillTouch" game, Blue Sky games, Platinum Plus games and Banilla games at the Business constitutes illegal gambling in violation of 18 Pa. C.S. § 5513.

{01776141;v1}    6

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

44.    The Business has created an ongoing public nuisance by promoting and allowing illegal gambling activities on its premises..

45.    Illegal gambling is a nuisance *per se* under Pennsylvania law.

46.    The general public has a common right to peaceful enjoyment of life.

47.    The general public also has a common right to be free of activities prohibited by law like illegal gambling.

48.    The Business' activities, including the operation of Gracie's "SkillTouch" game, Blue Sky games, Platinum Plus games and Banilla games, unreasonably interferes with these common public rights because its activities are prohibited by statute, because they significantly interfere with the public peace, the public comfort and public convenience, and because they are continuing and ongoing in nature.

49.    Accordingly, the Business is both a public nuisance *per se* and a public nuisance under traditional principles of Pennsylvania law that define public nuisances.

D.    **THE SPECIAL HARM TO POM**

50.    The public nuisance described above has caused, and continues to cause, harm to POM that is different in kind and magnitude from the harm caused to the general public.

51.    POM expends significant amounts of time and money to ensure that the Skill Game is compliant with Pennsylvania law.

52.    POM's legal Skill Game directly competes with Gracie's illegal "SkillTouch" game, the illegal Blue Sky games, the illegal Platinum Plus games and the illegal Banilla games at the Business, in Luzerne County and in the Commonwealth of Pennsylvania.

53.    The legal Skill Game competes for the same customers and market share as these games.

{01776141;v1}

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

54.     The Business' operation of Gracie's illegal "SkillTouch" game, the illegal Blue Sky games, the illegal Platinum Plus games and the illegal Banilla games has caused POM to lose customers and market share in Luzerne County and ultimately has caused lost profits.

55.     The general public has not suffered this type of harm.

56.     In addition, POM is being uniquely harmed by the operation of illegal games at the Business and other venues because the operation of illegal games in Pennsylvania is causing state authorities to treat all games the same and advise the public that all skill games are illegal.

57.     For example, the Pennsylvania Liquor Control Board recently sent an e-mail to its licensees that stated:

> According to the Pennsylvania State Police and the Pennsylvania Lottery, skill games are illegal in the commonwealth. As such, possessing or operating one or more of these machines on your licensed premises may be grounds for the Pennsylvania State Police, Bureau of Liquor Control Enforcement to issue a citation against your license. While the PLCB cannot provide you with legal guidance as to whether a particular gaming machine is illegal, citations put your license at risk, both through the citation process and upon application for renewal to the PLCB.

A true and correct copy of the PLCB e-mail is attached hereto, and made a part hereof, as Exhibit "C".

58.     As a result of this position taken by state authorities, at least one chain of taverns in Pennsylvania that previously had POM's Skill Game in its locations available for customers to play decided to no longer make the Skill Game available for play to its customers.

59.     The confusion created by the operation of illegal games at the Business and other venues in Pennsylvania has harmed, and will continue to harm, POM's business reputation and its ability to market and sell the Skill Game in Pennsylvania.

60.     The general public also has not suffered this type of harm.

{01776141;v1 }

8

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## COUNT I—PUBLIC NUISANCE

61.    The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

62.    As set forth above, Defendant's operation of Gracie's illegal "SkillTouch" game, the illegal Blue Sky games, the illegal Platinum Plus games and the illegal Banilla games at the Business has created an ongoing public nuisance.

63.    These games are illegal gambling devices.

64.    The ongoing and continuing operation of these games at the Business constitutes illegal gambling in violation of 18 Pa. C.S. § 5513.

65.    Illegal gambling is a nuisance *per se* under Pennsylvania law.

66.    Defendant's operation of Gracie's illegal "SkillTouch" game, the illegal Blue Sky games, the illegal Platinum Plus games and the illegal Banilla games game at the Business also constitute a public nuisance because it is an interference with the general public's common rights to: (i) the peaceful enjoyment of life; and (ii) be free of illegal activities like illicit gambling.

67.    This interference is unreasonable because the activity—*i.e.*, illegal gambling: (i) is prohibited by statute, *see* 18 Pa. C.S. § 5513; (ii) significantly interferes with the public peace, the public comfort and public convenience; and (iii) is continuing and ongoing in nature.

68.    As set forth above, the public nuisance has caused, and continues to cause, harm to POM that is different in kind and magnitude from the harm caused to the general public because POM has suffered pecuniary harm in the form of loss of customers, loss of market share, and lost profits.

69.    The general public has not suffered this kind of harm as a result of the illegal gambling activities described above.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

WHEREFORE, POM requests that this Court enter the following judgment on Count One of the Complaint: (i) an order preliminarily and permanently abating the public nuisance by prohibiting the operation of Gracie's "SkillTouch" game, the Blue Sky games, the Platinum Plus games and the Banilla games at the Business or anywhere else in Luzerne County; (ii) an award of damages in excess of $50,000.00 for POM's pecuniary losses, including the loss of customers, market share and profits; and (iii) granting such additional relief as the Court deems just and equitable.

## COUNT II—UNFAIR COMPETITION

70.     The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

71.     By breaking the law through the operation of the illegal games while POM is complying with the law, Defendant is unfairly competing and gaining a competitive advantage.

72.     By virtue of this unfair competition, Defendant enjoys a benefit and POM suffers harm.

73.     POM has a reasonable expectation of earning revenue from customers who play the Skill Game.

74.     Defendant has knowledge of POM's expectation of earning revenue from customers who play the Skill Game.

75.     Upon information and belief, Defendant knows he can attract more customers by making the illegal games available and that the loss of those customers can cause harm to POM.

76.     It is foreseeable to Defendant that his use of the illegal games to attract more customers can cause harm to competitors, like POM, that comply with the law and make legal games of skill, not illegal games of chance, available to customers.

{01776141;v1}                    10.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

77.     Defendant's operation of the illegal games at the Business has and will continue to cause POM to lose customers and suffer damages as a result.

78.     Defendant has engaged in, and continues to engage in, unfair competition.

WHEREFORE, POM requests that this Court enter the following judgment on Count Two of the Complaint:  (i) an order preliminarily and permanently enjoining the unfair competition by prohibiting the operation of Gracie's "SkillTouch" game, the Blue Sky games, the Platinum Plus games and the Banilla games at the Business or anywhere else in Luzerne County; (ii) an award of damages in excess of $50,000.00 for POM's pecuniary losses, including the loss of customers, market share and profits; and (iii) granting such additional relief as the Court deems just and equitable.

Respectfully submitted,

Dated: July 12, 2019

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
      eschreiner@kleinbard.com
      prosenzweig@kleinbard.com
      svance@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

{01776141;v1}

11

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## VERIFICATION

I, Rick Goodling, verify that I am Director of State Compliance for Plaintiff and that the statements made in the foregoing Complaint are true and correct based upon my personal knowledge or information and belief. I understand that false statements therein are subject to penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Dated: July 9, 2019

Rick Goodling

(01718101.v1)

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

POM OF PENNSYLVANIA, LLC,

Plaintiff,

v.

GARY LAGANA,

Defendant.

IN THE COURT OF COMMON PLEAS
FOR LUZERNE COUNTY,
PENNSYLVANIA

CIVIL DIVISION – LAW

NO. _____

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the United Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently from non-confidential information and documents.

Respectfully Submitted,

Matthew H. Haverstick (No. 85072)
Eric J. Schreiner (No. 76721)
Peter R. Rosenzweig (No. 81759)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
    eschreiner@kleinbard.com

*Attorneys for Plaintiff POM of Pennsylvania, LLC*

Dated: July 12, 2019

{01770141;v1}

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "A"

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:23 PM Edd,DiLuciaGrayleaToumees      FAX NO. 412 281 9537              P. 02

## IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

### PENNSYLVANIA

### CRIMINAL DIVISION

In re:                                      :
                                            :
PACE-O-MATIC, INC. EQUIPMENT                :         M.D. 965-2013
                                            :
TERMINAL I.D. NO. 142613                    :

### MEMORANDUM OPINION AND ORDER

H. KNAFELC, J.                                          December 23rd, 2014

### I.      PROCEDURAL HISTORY

On November 19, 2013, agents of the Pennsylvania Bureau of Liquor Control Enforcement seized a Pace-O-Matic, Inc. video game device from the American-Italian Club located in Aliquippa, Beaver County. The manufacturer of the device filed a timely Petition for Return of Seized Property and requested a post-seizure hearing pursuant to Pennsylvania Rule of Criminal Procedure 588. This Court held a hearing on the matter on September 26, 2014. The sole purpose of that hearing was to gather evidence as to whether the confiscated property constituted a gambling device per se. The evidence fails to demonstrate that the machine is a gambling device per se, and Petitioner's motion for its return is GRANTED.

During the hearing, this Court heard testimony on the operation of the confiscated device. The Court heard testimony on two issues: first, whether Petitioner was entitled to lawful possession of the res; and second, whether the games installed on the device were games of

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:25 PM Edd,DeLuca,Gravina,Townsen     FAX NO. 412 281 3537        P. 03

chance or games of skill. Both parties stipulated that the other elements of a gambling device per se, consideration and reward, were satisfied. The device requires a player to put in cash in order to access the games installed on the device. Successful play has the potential to reward a player with more credits than he or she put into the device. Thus, this Court is tasked only with resolving whether the games on the device are games of skill or games of chance. Because of the level of interactivity between the game and the player, as well as the gameplay mechanics, the evidence fails to show that the games included on the device—Tic-Tac-Toe, unlockable bonus game, and the "Follow-Me" mini-game—are anything other than games of skill. The device is therefore not a gambling device per se and shall be returned to Pace-O-Matic, Inc.

## II.    STATEMENT OF FACTS

The property seized in this case is a coin-operated table top machine that offers a Tic-Tac-Toe puzzle, an unlockable bonus game, and a "Follow-Me" mini-game. The player uses a touch screen navigate through the system. A player initiates the game by inserting money into the device. A player can place a bet of 40, 80, 120, 160, or 200 "points." One point equals one cent. A player then proceeds to select one of three themes. These are "Bonibi and Bombshells," "Pirates Prize," and "Cocktail Cove." While the graphics and some pay amounts differ depending on which theme the player chooses, the gameplay is functionally equivalent among the three themes. The player has access to the same features regardless of which theme he or she chooses, and the themes will thus be treated interchangeably.

The first game that the player interacts with is the Tic-Tac-Toe puzzle. This is the primary game included on the device, and a player cannot access the other features of the game without first playing the Tic-Tac-Toe puzzle. Upon initiating gameplay, the game spins each of the nine reels arranged in a three-by-three grid on the screen. After the reels stop spinning, the

DEC-24-2014 WED 12:24 PM EddyDeLucaGravinaTownson       FAX NO. 412 281 3537       P. 04

player has ten seconds to select one of the nine cells to change a symbol in that position to a wild symbol. The player is tasked with choosing the most advantageous spot to place the wild. Whether one spot is more advantageous than another depends on the value of the symbols in the row, column, or diagonal that was completed, and whether completion of one row, column, or diagonal completes another. If the player does not make a selection in the allotted time, no wild symbol will be placed on the screen. Because a random number generator excludes an automatic winning game, failure to place the wild will always result in a loss for the player. Each game will have at least one spot where placing the wild will result in a nonzero score, and no game will be completely unwinnable.

A player has the opportunity to access a bonus game while playing the Tic-Tac-Toe puzzle. Certain symbols in the three-by-three grid have the potential to unlock the bonus game. A player must align three bonus symbols in a row, column, or diagonal on the three-by-three grid. Where the player manages to place a wild in the proper position, the game awards the player with a bonus shooting game. There are slight differences in the bonus games depending on the theme chosen, but the core gameplay mechanics of the three bonus games are virtually identical, and will be treated in the same manner. The bonus games are shooting-style games. Targets appear at random positions across the screen, and the object of the bonus game is to target all of the symbols on the touch screen during the time allotted (30 or 45 seconds, depending on the theme chosen). The speed with which the targets appear on the screen and the fact that they are scattered about the screen provides the game's challenge. The player is rewarded with points depending on how many of the symbols he or she was able to target and touch.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:24 PH Edd;DeLuci;Gravina;Townsen    FAX. NO. 412 281 3537          P. 05

if, during the Tic-Tac-Toe game, the player wins an amount that is less than 104% of the purchase price to play the game, the player is afforded the option of selecting the "Follow-Me" mini-game. A player who chooses to proceed with the Follow-Me feature is presented with a three-by-three grid of colored dots. Essentially, the Follow-Me feature is a memory game. The dots flash in a random sequence which the player must repeat. Starting with one circle flashing, the player will need to follow the correct sequence for a total of forty rounds of play, with each sequence adding another circle. If a player successfully follows the pattern each time, the player is awarded with 104% of his or her original wager. For example, if the player had wagered 40 credits, successful completion of the Follow-Me mini-game would result in a payout of 42 credits.

## III.   LEGAL BACKGROUND AND ANALYSIS

A motion for return of property pursuant to Rule 588 is intended to return goods to a person aggrieved by a search and seizure based upon the right to lawful possession and the non-contraband status of the goods. Pa. R. Crim. P. 588; *Com. v. Pomerantz*, 573 A.2d 1149, 1150 (Pa. Super. Ct. 1989). Rule 588 provides, in pertinent part, the following:

Rule 588. Motion for Return of Property

(A)   A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B)   The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

A petitioner's motion for return of property must, at a minimum, allege that the petitioner is entitled to lawful possession of the property at issue. *Pomerantz*, 573 A.2d at 1150. The

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

petitioner must prove that he is entitled to possession by a preponderance of the evidence. *Beason v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. Ct. 2009). A preponderance of evidence standard is tantamount to a "more likely than not" standard. *Com. v. $6,425.00 Seized from Esquilin*, 880 A.2d 523 (Pa. 2005).

Where a petitioner meets the minimal burden of establishing entitlement to lawful possession, unless there is countervailing evidence to defeat the claim, the moving party is entitled to the return of the identified property. *Ibid*. The Commonwealth must prove the per se nature of machines seized as gambling devices by a preponderance of the evidence. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993).

A machine is a gambling device per se if three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. Because both the Petitioner and the Commonwealth have stipulated that the machine meets the consideration and reward elements, only the second element—whether the result is determined predominantly by chance or skill—will be addressed in depth.

That successful play is determined by chance rather than skill is an element essential to a finding that a machine is a gambling device per se. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983). Courts must determine in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome. *Ibid*. In order for a game to constitute gambling, it must be a game where chance predominates rather than skill. *Ibid*. A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. *Ibid*. The mere fact that a machine

involves a substantial element of chance is insufficient to find that a machine a gambling device. *Ibid.*

A game decided predominately on the basis of probability rather than any real input of skill from a player will be a game of chance. The level of interactivity and the consequences of a player's choices in playing the game are relevant in determining whether the game is one of chance or skill. *See id.* at 976 (noting that while skill, in the form of knowledge of probabilities, can improve a player's chances of winning a video poker game, chance ultimately determines the outcome because chance determines the card dealt and the cards from which one can draw); *compare Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010) (holding that although skill can determine the outcome in a poker game, players are still subject to defeat at the turn of the cards), *with Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492 (Neb. 2011) (noting that because the gameplay in a tic-tac-toe puzzle was under the control of the player and not the machine, the game was one of skill rather than chance).

### A.    Lawful Possession

The initial burden is on the Petitioner, Pace-O-Matic, Inc., to prove that it is entitled to lawful possession of the res at issue by a preponderance of the evidence standard. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. 2009). Petitioner has met that burden here. The device at issue is a coin-operated tabletop video game machine manufactured by Pace-O-Matic, Inc. The fact that Petitioner has manufactured, designed, and provided the source code for the machine makes it more likely than not that Petitioner is entitled to lawful possession of the video game machine at issue.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:25 PM Edds DeLuca Gravina Touasca        FAX NO. 412 281 3537        P. 08

### B:       Gambling Device Per Se.

Upon a showing of lawful entitlement, the burden shifts to the Commonwealth to prove by a preponderance of the evidence that the video game machine seized is contraband. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993). Specifically, the government must show that the video game is a "gambling device per se." *Ibid.* In determining whether a machine can be seized, the machine must be so intrinsically connected with gambling as to constitute a gambling device per se. This intrinsic connection is met where three elements are present: (1) consideration; (2) result determined by chance rather than skill; and (3) reward. *Ibid.* The parties in this case have stipulated that, because a player must insert money to begin play and is enticed to play by the promise of a payout, the first element, consideration, and the third element, reward, are met. The only issue remaining is whether successful play is determined predominantly by skill or chance.

There is no doubt that the games at issue contain elements of skill and chance. It is therefore the task of this Court to determine, on balance, whether skill or chance is the dominant factor in successful play. The operation of the machine and the way a player interacts with the machine must be evaluated. As noted, the machine contains the following features: (1) a Tic-Tac-Toe puzzle; (2) an unlockable bonus shooting game; and (3) a "Follow-Me" mini-game. The extent to which chance and skill decide the outcome of each game must be evaluated.

### I:       Tic-Tac-Toe Puzzle

The parties disagree on whether skill or chance dominates the outcome of the Tic-Tac-Toe puzzle. The Commonwealth asserts that the skill required to place the wild symbol in a spot is outweighed by the chance determination of the puzzle itself. This Court respectfully disagrees with the Commonwealth's position. Although there often is, as the Commonwealth points out, an "obvious" position where placement of the wild would generate a nonzero score, several puzzles

Page 7 of 13

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

have a position where placement of the wild will lead to a more advantageous score. It takes skill for a player to recognize both which symbols are most advantageous to his or her payout and which position will maximize the player's score. A player who lacks the skill to recognize that the placement of a wild symbol in a particular position will lead to the completion of two or three rows, columns, or diagonals will not achieve as high a score as one who does recognize those patterns. Were the game one predominantly based on chance, one would reasonably expect that a skilled player and an unskilled player would stand to gain roughly the same score. However, a more skilled player is much more likely to achieve a greater score than an unskilled player, which augurs in favor of holding that the game is one of skill, not chance.

The Commonwealth places heavy emphasis on the fact that the device utilizes a random number generator to generate the puzzle itself. However, the fact that a machine utilizes a random generator, without more, is insufficient to push this game into the realm of chance. The function of the random number generator is not to determine whether player wins or loses, but merely to determine which puzzle within a finite pool of puzzles will be presented to the player. The random number generator simply constructs the field on which the player will be playing. It establishes the constraints in which the player must operate to receive the most points possible. Additionally, the generation of a puzzle is not a purely random event. Each puzzle presented to the player has the possibility of a win, and the player will not be presented with a puzzle that is already solved. Thus, the purpose of the random number generator is only to choose, at random, which of a large—yet finite—pool of puzzles to present to the player. Even if the presentation of the puzzle were a "substantial element of chance," this, without more, is insufficient to a finding that the Tic-Tac-Toe game is a game of chance. *Com. v. Two Elec. Video Poker Game Mach.,* 465 A.2d 973, 977 (Pa. 1983).

Page 8 of 13

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:25 PM Eddy DeLuca Gravina Townsen        FAX NO. 412 281 3537                P. 10

Even more essential to the analysis than how the game is constructed and presented is the gameplay itself. During the course of play, the element of skill predominates and determines the outcome to a much higher degree than chance. It is up to the player to choose which spot to place the wild in order to achieve the most advantageous score. Our Superior Court's holding in *Dent* is instructive. There, the Court held that Texas Hold 'Em is predominantly a game of chance. *Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010). The Court placed great weight on the fact that while skill can determine the outcome in a Texas Hold 'Em poker game, "players are still subject to defeat at the turn of the cards." *Id.* at 196. In the Tic-Tac-Toe game at issue here, the players are not subject to victory or defeat at the spin of the reels. The game's code precludes automatic victories and automatic defeats. Unlike a traditional poker game, the players of the Pennsylvania Skill game are not at the mercy of the hand they are dealt. Every puzzle is winnable, and some have higher wins depending on whether the player has the skill to recognize the most advantageous spot to place the wild. In this game, the player's choices are the "instrumentality for victory"—in sharp contrast to the capricious nature of card dealing and shuffling present in a traditional game of Texas Hold 'Em. *See ibid; see also Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492, 504 (Neb. 2011) (holding that where a puzzle is more controlled by the player than not, it is predominantly a game of skill).

This Tic-Tac-Toe puzzle is also different from the devices confiscated in *Two Electronic Poker Game Machines*. There, the Pennsylvania Supreme Court dealt with a coin-operated video game that simulated the events of five card draw poker. 465 A.2d 973 (Pa. 1983). The deck is "shuffled" by a random number generator, and the player is awarded points for various combinations of cards, ranging from one point for a pair of aces to fifty points for a straight flush. *Id.* at 976. The Court emphasized that chance was the predominant factor in the outcome

Page 9 of 13

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

because chance determined the cards dealt and the cards from which one could draw. *Id.* at 978. The "skill" at issue was knowledge of probabilities. *Ibid.* This is different from the Tic-Tac-Toe game in this case for two reasons. First, the random number generator in the machine here does not determine a win or loss; rather, it merely chooses the puzzle that the player is presented with. Second, knowledge of statistics was the skill at issue in *Two Electronic Poker Game Machines*, whereas the skill at issue here is ability to play Tic-Tac-Toe. Knowledge of statistics was a skill wholly independent of the simulated poker game, and was not contemplated by or integral to the gameplay. It was a skill that was based on the nature of the player rather than the nature of the game. Here, skill at Tic-Tac-Toe and pattern recognition is fully integrated into the gameplay, and is demanded of the player for successful play. A player cannot beat the game with mere knowledge of probabilities; the player must choose the most advantageous spot to place the wild in the allotted time. The player exercises control over the game, and is not at the mercy of getting a lucky hand.

On balance, the outcome of the game is determined predominantly by skill rather than chance.

## 2.    Bonus Game.

This shooting-style game is predominantly a game of skill. The game requires that the player recognize, target, and touch the symbol within the allotted time frame. This requires hand-eye coordination and dexterity. Chance or luck has very little to do with the outcome of the game. Instead, the outcome is dependent almost wholly on a player's skill. That the bonus game presents itself only if certain conditions are fulfilled is immaterial to determining whether skill or chance dominates in the bonus game. Rather, the availability of the game is simply a

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

consequence of one possible puzzle that a player may be presented with in the Tic-Tac-Toe game.

### 3.   "Follow-Me" Mini-Game

Successful play of the Follow-Me feature undoubtedly requires a great deal of skill on the part of the player. The game starts out easy, but becomes progressively more difficult with each recurrence of flashing dots. It is true that the average player cannot be expected to complete the Follow-Me feature successfully. After 10 to 15 sequences, most players would be unable to remember the sequence. The feature is immensely difficult and demands a much higher level of cognitive skill than the average player could muster. This immense difficulty does not, as the Commonwealth suggests, transform the game into a game of chance. The only chance involved in the game is the sequence in which the circles flash. The odds against randomly choosing the correct sequence for each of the forty rounds (a total of 820 flashing dots) are astronomical. Skill determines how well a player does.

### IV.   CONCLUSION

Each of the three games installed on the confiscated machine is predominantly a game of skill rather than a game of chance. Successful play at the Tic-Tac-Toe game depends mainly on a player's ability to recognize Tic-Tac-Toe patterns to maximize his or her score. The bonus game is essentially a shooting game, requiring a player to target and touch numerous symbols on the screen to achieve a high score. Finally, the Follow-Me mini-game, though immensely difficult for the average player, requires a great deal of cognitive ability for a player to remember the intricate sequences of flashing dots. Because the preponderance of the evidence fails to show that

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEC-24-2014 WED 12:28 PM Eddy DeLuca Gravina Townsea          FAX NO. 412 281 3537                    P. 13

the three games are games of chance, the Commonwealth has failed to prove that the property

seized is a gambling device per se. The machine is therefore not contraband, and Petitioner's

motion for return of property is granted.

DEC-24-2014 WED 12:26 PM Eddy,DeLuca,Gravina,Townsen      FAX NO. 412 281 3537      P. 14

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

## PENNSYLVANIA

### CRIMINAL DIVISION

In re:

PACE-O-MATIC, INC. EQUIPMENT                    M.D. 965-2013

TERMINAL I.D. NO. 142613

## ORDER

AND NOW, this __23rd__ of __December__, 20__14__, it is hereby ORDERED and DECREED that Petitioner's Motion of Return of Property pursuant to Pennsylvania Rule of Criminal Procedure 588 is GRANTED. The Commonwealth is ORDERED to return the Pennsylvania Skill game to Pace-O-Matic, Inc.

BY THE COURT

HARRY E. KNAFELC
JUDGE

Page 13 of 13

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "B"

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

GRACIE TECHNOLOGIES INC.,                              Case No. MD 162 –2017
FRATERNAL ORDER OF EAGLES
CONEMAUGH AERIE NO. 1811

.Movants,

v.

COMMONWEALTH OF PENNSYLVANIA,

Respondent.

FILED FOR RECORD
2019 APR 26  P 3: 48
CLERK OF COURTS
CAMBRIA COUNTY PA

ORDER

AND NOW, this 25th day of April, 2019, after review of Movants' Motion for Return
of Seized Property Pursuant to Pa. R.Crim.P § 588, hearing, arguments by counsel, briefs, and
the laws of Commonwealth of Pennsylvania, Movants' Motion is hereby DENIED.

BY THE COURT:

Tamara R. Bernstein, J.

COPIES TO:
☐ DEF.        ☐ C & F.
☑ DA         ☐ SHERIFF
☐ ATTY.      ☑ OTHER
☐ PO
☐ PD
☐ JAIL
☐ JUDGE
☐ CA.

Case# 2019-06832-12 - JUDGE.35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

| | |
|---|---|
| GRACIE TECHNOLOGIES INC., | Case No. MD 162-2017 |
| FRATERNAL ORDER OF EAGLES | |
| CONEMAUGH AERIE NO. 1811 | |
| | |
| Movants, | |
| | |
| v. | |
| | |
| COMMONWEALTH OF PENNSYLVANIA, | |
| | |
| Respondent. | |

For Movants: John P. Corcoran, Jr., Esq.
For the Respondent: Andrew J. Jarbola, Esq.

### OPINION AND ORDER

This case comes before this Court via Gracie Technologies, Inc. and Fraternal Order of Eagles Conemaugh Aerie No. 1811's Motion for Return of Seized Property Pursuant to Pa. R.Crim.P § 588. For the following reasons Movants' Motion is hereby DENIED.

### STATEMENT OF FACTS

From December 3, 2016, to June 26, 2017, Officer Stevanus, Pennsylvania State Police Bureau of Liquor Control Enforcement, conducted several visits to the Fraternal Order of Eagles Conemaugh No. 1811 to investigate a complaint of illegal gambling activity. During his visits to the Fraternal Order of Eagles, he played several gaming machines. These machines required consideration for play and rewards were awarded based on his play. As a result of his investigation, on June 26, 2017, Officer Stevanus' seized the sum of $1,076.00 in

1

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

US currency, and five (5) SkillTouch Multi-game ("SkillTouch") machines from the Fraternal Order of Eagles.

On August 31, 2018, QP Industries, LLC. and the Fraternal Order of Eagles filed this Motion for Return of Seized Property. QP Industries argued that because the SkillTouch machines require players to interact with the machine, skills to play the machine and achieve the desired outcome, and the outcome (win/loss) is not automatically generated by chance, the SkillTouch machines are games of skill and not gambling machines within the Commonwealth's definition. Gracie argues that pursuant to Pa. R.Crim.P. §588, the Commonwealth must return the SkillTouch machines and the cash seized. QP Industries was substituted as a party to the action by Gracie Technologies Inc. (hereinafter "Gracie").[1] On November 29, 2018, counsels argued the merits of the case before this Court; and, in January 2019 parties filed briefs in support and in opposition to returning the SkillTouch machines and the cash seized.

## ANALYSIS

Gracie argues that because the SkillTouch machines require user interaction and skills to achieve a winning goal, they are not games of chances. Tr., 11/29/2018, p.73. More precisely, Gracie argues that because the skills of speed, dexterity, task completion, prize recognition and strategy, *inter alia*, are necessary skills to play and achieve the "desired prize" (maximize winnings), the machines are games of skills and not gambling machines.

[1] Court Order dated June 15, 2018.

2

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The SkillTouch machines have a timing setting programed into the system that gives a player twelve (12) seconds to make a determination, *e.g.* "nudging"[2] or "picking."[3] *Id.* at 74. Gracie submits that the SkillTouch machine speed component requires players to make a determination within the allotted time frame to achieve the desired prize. For example, if a player makes that determination within the first six (6) seconds (between the twelfth and seventh second of the timer) the player wins a full prize. *Id.* If the player, however, makes that determination between six (6) seconds and one (1) second remaining on the timer, the player only wins half of the prize. *Id.* If the player does not make a determination before the time expires, the player does not win,[4] save for a penny if the player picks the "Take a penny" function. *Id.* at 34. Thus, according to Gracie, speed is instrumental to winning and achieving the desired prize, *i.e.* maximizing winnings. Task completion (making a determination) and dexterity are also essential to winning or maximizing one's winnings.

With regard to the prize recognition and strategic skills, Gracie argues that the prize recognition and strategy skill are implemented by the player selecting the "Prize Viewer" function. *Id.* at 75. Prior to playing a game, the player has the option to select the prize viewer option; this lets the player know what the reward for the next game played would be. The player can then chose to play that game or exit that game (based on indicated reward). *Id.* Thus, Gracie submits that based on these interactions and skills, the SkillTouch machines are games of skills and not gambling devices. In sum, they argue that because skill, not chance, is

---

[2] The SkillTouch machines has a total of twelve (12) games. Some of the games are reel games. The "nudging" feature allows a player to nudge a reel up or down to accomplish a winning combination. Tr. 11/29/2018, p.37.

[3] In some games, such as Jewel Quest, the player has an option between picking same like items in a row to create a winning combination. The alleged skill here is that the more "like items" picked, the higher the award. *Id.* at 77.

[4] The "Take a Penny" function allows players to get a penny when the game produces a losing outcome. *Id.* at 34.

3

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the predominate factor in winning or maximizing one's winnings, the SkillTouch machines are games of skill. This Court disagrees.

Pennsylvania's legislation has criminalized unlawful gambling. *See* 18 Pa.C.S.A. § 5513. "[U]nlawful gambling' is any gambling that has not been authorized by the legislature." *Comm. v. Dent*, 992 A.2d 190, 197 (Pa. Super. 2010). There are "three elements necessary to gambling: consideration, a result determined by chance rather than skill, and a reward." *Comm. v. Two Elec. Poker Game Machines, et al.*, 465 A.2d 973, 977 (Pa. 1983). In determining whether a gaming machine is a game of chance or skill, the Courts must determine "the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome." *Id.* at 977. When the outcome is largely determined by chance, the element of chance predominates. *Id.* at 978.[3] If a gambling device "displays all three qualities, it will then be 'so intrinsically connected with gambling' as to be a gambling device *per se*." *Id.*

Here, there is no dispute that consideration was required to play the SkillTouch machines and that the SkillTouch machines reward players based on their play. Thus, the issue for this Court to determine is the relative amount of skill and chance present in the play of the SkillTouch machines, and the extent to which skill or chance determines the outcome. *Two Electronic Poker Game Machine, supra*, is essential to our determination.

*Two Electronic Poker Game Machine* (hereinafter "*Two Electronic*") involved a poker gambling machine. Like our case, the only issue before the *Two Electronic* Court was the relative amounts of skill and chance present in the play and the extent to which skill or chance determined the outcome. In that case, the tavern's expert testified that by implementing the

___

[3] *Comm. v. Two Elec. Poker Game Machines*, 465 A.2d 973, 978 (Pa. 1983) ("we believe that the element of chance predominates and the outcome is largely determined by chance.")

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

"smart strategy"[6] skill he increased his odds of winning by a four and one half margin to one (4 1/2 to 1) over the standing pat strategy[7] which he called the "dumb strategy." *Id.* at 978. He concluded that skill was definitely a factor. *Id.* However, the expert conceded that "chance was also a factor both in determining the initial hand dealt and the cards from which one can draw." *Id.* The expert ultimately concluded that there was a "random element" present and he could not say how to apportion the amounts of skill and chance. *Id.*

In analyzing the amount relative that skill or chance controls the outcome, the Court contrasted between the skills necessary to play the gaming machine as opposed to playing poker in person. *Id.* The Court noted that the amount of skills necessary to play the Electro-Sport (i.e., knowledge or probabilities) were not the same skills necessary to play poker with humans. And, in analyzing the extent to which skill or chance determines the outcome, the Court reasoned that, while skills, such as knowledge of probabilities, may improve a player's chance of winning or maximizing the winnings, they are not outcome determinative as are the skills needed to play poker with humans (holding, folding, bluffing and raising). The Court concluded that while "Skill can improve the outcome in Electro-Sport; it cannot determine it." *Id.*

Applying the predominant test, the Court concluded that the poker machines were gambling devices because "chance determines the ultimate outcome despite the presence of certain skill elements." *Id.* at 979. *Two Electronic,* stands for the proposition that even if skills can improve a player's chance of winning or maximizing the size of the winning, if chance ultimately determines the outcome then chance predominates.

---

[6] The expert, a Carnegie-Mellon University professor of statistics, called using his "knowledge of statistics" a "smart" strategy. *Two Elec. Poker Game Machines, supra,* at 978.
[7] Standing pat on the initial hand dealt by the machine. *Id.*

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In the case at bar, Gracie argues the skills such as speed, dexterity, task completion, prize recognition and strategy (including knowing when to walk away from a machine) are necessary to play, win, and to produce the desired outcome, *i.e.*, maximize a player's winnings. This is simply not sufficient to overcome the Commonwealth's showing that in the SkillTouch machines the outcome is predominantly determined by chance.

Nick Farley, Gracie's expert,[1] testified that certain skills are needed to interact with the SkillTouch machines. He testified that by using the prize viewer function, the player develops the skill of "shop[ing] for the best possible outcome." Tr., 11/29/2018, P.150. This, in turn, develops the player's strategy of free will as the player can make a determination of whether to play a game with a losing outcome or cash out and walk away. *Id.* at 155. He added that performing necessary tasks such as nudging or picking (which the player is instructed on how to do so by the game's blinking arrows) develops knowledge of what would be the best opportunity for where the player should place his money. *Id.* at 151. The more the player performs this task, the more adept he becomes at winning. He also testified that performing these tasks in an expeditious manner (skill of dexterity and speed) helps the player get the full value prize rather than the half value prize, or no prize at all. *Id.* at 162.

Notwithstanding, Farley ultimately conceded that there is no amount of skill a player can input into playing the machine that will change the outcome or the reward, *Id.* at 154.[2] That is because, as he explained, the ultimate outcome and prizes are pulled from a finite pool of sequential outcomes that are generated by the SkillTouch machines software. *Id.* at 156.

---

[1] Nick Farley was qualified as an expert in the field of review and analysis of game systems.
[2] Tr., 11/29/2019, P.154:
    Deputy AO Jarbola: "And there is no amount of skill whatsoever that a player or patron could input to change that to actually having a winning outcome or an outcome for an award which is greater than the consideration?"
    Nick Farley: "Not on that terminal, but they can take their money and go to a different terminal."

6

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

This finite pool of sequential outcome predetermines losing outcomes, winning outcomes, and the different prize levels. *Id.* The outcomes are shuffled into the finite pool for random sequentially delivery. This, he described, is akin to shuffling a deck of cards and then drawing the cards from the shuffled deck in order. *Id.* at 157. And again, he testified that the outcomes and prizes are predetermined and there is no amount of skill a player possesses that can change the predetermined outcomes. *Id.* In fact, he added, changing these predetermined outcomes was outside the player's skills but fell within a skill of the computer programmer. *Id.* Moreover, the machine's prize values are determined by Gracie Technologies,[10] and "the patron can not affect what ultimately is built into the potential prizes. They can only affect whether they're going to get the full prize or not." *Id.* at 158. In other words, the only aspect of the SkillTouch machines play that is within the control of the player is whether or not the player will maximize his winnings. Maximum winnings are predetermined by Gracie's programmed prize value determination.

In order to find that the SkillTouch machines are a gambling device *per se*, the Commonwealth needs to show more than a substantial element of chance. *Two Elec. Poker Game Machine,* at 977 ("Showing of a large element of chance is not sufficient.") The Commonwealth must show that chance predominates. *Id.* To make this finding, the courts must balance the relative amounts of skill and chance present in the play, and the extent to which skill or chance determines the outcome. *Id.* at 978.

Here, like in *Two Electronic,* unquestionably some degree of skill is required to play the device. However, even if this Court accepts Gracie's argument that speed, dexterity, task completion, prize recognition and strategy are skills that can improve a player's chances of

---

[10] *Id.* at 157.

Case# 2019-06832-12 - - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM. Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

winning and achieving a desired prize (as was the case with knowledge of probabilities in *Two Electronic*), this Court cannot ignore the reality that chance ultimately determines losing outcomes, winning outcomes, and the different prize levels; which are programmed into the SkillTouch machine's finite pool for random sequential delivery. Furthermore, this Court cannot overlook the fact that there is no level of skill a player can employ to change the predetermined outcome or predetermined valued prize. Unlike *Two Electronic*, here, by employing the skills of speed, dexterity, task completion, prize recognition and strategy a player does not increase his odds of winning. In fact, a player only controls the amount of his winnings, and that too is limited to the predetermined maximum which is encoded into the software by a programmer. As in *Two Electronic*, here a large random element is always present, and it predominates.

Consequently, because the SkillTouch machine's outcome is predetermined in a sequential order, and there is nothing the player can do to overcome that outcome; it is this Court's finding that the SkillTouch machines are games of chance. Furthermore, because all three elements of gambling are met, the SkillTouch machines are so intrinsically connected with gambling and are therefore gambling devices *per se*. And now the Court issues the following ORDER.

8

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT "C"

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

From: "PLCB" <ra-lblicensing@pa.gov>
Date: June 12, 2019 at 10:51:23 AM EDT
To: conemaughpna@gmail.com
Subject: LCB notice to licensees re: skill games



**Attention Licensee:**

In light of recent news coverage regarding illegal gambling devices – games of skill popping up at bars, restaurants, convenience stores and other venues where players pay cash to play a game for a chance of winning cash prizes – the Pennsylvania Liquor Control Board wanted to bring this matter to your attention as a retail liquor licensee.

According to the Pennsylvania State Police and the Pennsylvania Lottery, skill games are illegal in the commonwealth. As such, possessing or operating one or more of these machines on your licensed premises may be grounds for the Pennsylvania State Police, Bureau of Liquor Control Enforcement to issue a citation against your license. While the PLCB cannot provide you with legal guidance as to whether a particular gaming machine is illegal, citations put your license at risk, both through the citation process and upon application for renewal to the PLCB.

Thank you for your attention to this matter.

Pennsylvania Liquor Control Board | Bureau of Licensing
Email: ra-lblicensing@pa.gov

lcb.pa.gov

3

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

/s/Andrew J. Kramer

Andrew J. Kramer, Esquire

Date:  December 2, 2019

L0841592.4

Case# 2019-06832-12 - JUDGE:35 Received at County of Bucks Prothonotary on 12/03/2019 9:42 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## CERTIFICATE OF SERVICE

I certify that, on December 2, 2019, I caused a copy of the foregoing PLAINTIFF

GREENWOOD GAMING AND ENTERTAINMENT, INC.'S BRIEF IN OPPOSITION TO

DEFENDANT RAJ RAJESHWARI INC.'S PRELIMINARY OBJECTIONS TO COMPLAINT

to be served via email and First Class U.S. Mail, which service satisfies the Pennsylvania Rules

of Civil Procedure, addressed to:

<div align="center">

Mattew H. Haverstick, Esquire
Eric J. Schreiner, Esquire
Shohin H. Vane, Esquire
Kleinbard LLC
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
*Counsel for Defendant*

</div>

/s/ *Andrew J. Kramer*
Andrew J. Kramer, Esquire

Date: December 2, 2019

L0841592.4

# Exhibit F

<u>Bucks County</u>

1.    Greenwood Gaming and Entertainment Inc. v. Raj Rajeshwari Inc.
      Case No. 2019-06833 filed 09/27/2019

2.    Greenwood Gaming and Entertainment Inc. v. Smokers Express
      Case No. 2019-06832 filed 09/27/2019

3.    Greenwood Gaming and Entertainment Inc. v. JSB Newgas Inc.
      Case No. 2019-06999 filed 10/4/2019

4.    Greenwood Gaming and Entertainment Inc. v. Smokin Joes Tobacco Shop
      Case No. 2019-07021 filed 10/4/2019

5.    Greenwood Gaming and Entertainment Inc. v. USA Gas and Repair Inc.
      Case No. 2019-07055 filed 10/8/2019

6.    Greenwood Gaming and Entertainment Inc. v. Smokers Express
      Case No. 2019-07119 filed 10/10/2019

7.    Greenwood Gaming and Entertainment Inc. v. One Punch Boxing & MMA LLC
      Case No. 2019-07121 filed 10/10/2019

8.    Greenwood Gaming and Entertainment Inc. v. Valley News & Smoke Shop
      Case No. 2019-07120 filed 10/10/2019

9.    Greenwood Gaming and Entertainment Inc. v. Smokers Express
      Case No. 2019-07344 filed 10/17/2019

10.   Greenwood Gaming and Entertainment Inc. v. Smokers Hut LLC
      Case No. 2019-07345 filed 10/17/2019

11.   Greenwood Gaming and Entertainment Inc. v. Spicerite LLC
      Case No. 2019-07343 filed 10/17/19

<u>Montgomery County</u>

1.  Greenwood Gaming and Entertainment Inc. v. BP-AMOCO Norristown
    Case No. 2019-29547 filed 12/31/2019

2.  Greenwood Gaming and Entertainment Inc. v. Franzones Inc. of Plymouth
    Case No. 2019-29548 filed 12/31/2019

3.  Greenwood Gaming and Entertainment Inc. v. The Greene Turtle Sports Bar & Grille
    Case No. 2019-29555 filed 12/31/2019

4.  Greenwood Gaming and Entertainment Inc. v. Main and Haws Inc.
    Case No. 2019-29549 filed 12/31/2019

5.  Greenwood Gaming and Entertainment Inc. v. Market 24 LLC
    Case No. 2019-29550 filed 12/31/2019

6.  Greenwood Gaming and Entertainment Inc. v. Primo Brick Oven Pizza, Inc.
    Case No. 2019-29551 filed 12/31/2019

7.  Greenwood Gaming and Entertainment Inc. v. Quick Mart
    Case No. 2019-29552 filed 12/31/2019

8.  Greenwood Gaming and Entertainment Inc. v. RJ Ventures Inc.
    Case No. 2019-29553 filed 12/31/2019

9.  Greenwood Gaming and Entertainment Inc. v. Shell Gas Station
    Case No. 2019-29554 filed 12/31/2019

10. Greenwood Gaming and Entertainment Inc. v. Via Roma Italian Restaurant & Sports Bar
    Case No. 2019-29556 filed 12/31/2019

# Exhibit G

3/24/2020                      Eckert Seamans' Dec. 13 letter to the borough, in full | Press & Journal

# PRESS &amp; JOURNAL

PENNSYLVANIA'S #1 WEEKLY NEWSPAPER • LOCALLY OWNED SINCE 1854

(/)

Welcome!   Log in (/login.html)   Register (/register/)

MAIN MENU

Search                                                                                         🔍

⚠ You have reached the limit of **2 free items per week.** Subscribe now for continued access (/subscribe/?town_id=0).

# Eckert Seamans' Dec. 13 letter to the borough, in full

**ECKERT SEAMANS ATTORNEYS AT LAW**

(/uploads/original/20200122-133407-Screen

Shot 2020-01-22 at 1.33.28 PM.png.jpg)

Posted Wednesday, January 22, 2020 1:34 pm

December 13, 2019

Ken Klinepeter

Borough Manager

60 West Emaus Street

Middletown, PA 17057

Dear Ken:

We write regarding the proliferation of so-called "skill games" across the Commonwealth, for the purpose of requesting that Middletown Borough consider the adoption of a Slot Machine Nuisance Ordinance to help combat the further expansion of these illegal slot machines in Pennsylvania.

Skill games look and operate similar to the slot machines found at a licensed casino. These machines, however, have been branded as "skill games," and it has been argued that they use the skill of the player as the predominant factor in affecting the outcome of the game. Despite this clever marketing, the Commonwealth Court has recently determined that so-called skill games are nothing more than slot machines. POM of Pennsylvania, LLC v. Commonwealth of Pennsylvania, LLC, NO. 418 M.D. 2018 (Pa. Cmwlth. November 20, 2019).

The Court also determined that, unlike gaming in a licensed casino authorized by the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101-1904 ("Gaming Act"), skill games operate outside of the Gaming Control Board's comprehensive regulatory framework and are instead governed by Pennsylvania's criminal law. The Crimes Code expressly makes it illegal for a person, other than a licensed casino, to make, assemble, sell, lease or maintain a slot machine, or to use their property to allow the play of slot machines. 18 Pa.C.S. § 5513. Despite such actions being crimes, illegal slot machines have spread like wildfire in bars, restaurants, convenience stores, gas stations, and other establishments. It has been estimated that there are tens of thousands of these machines at retail outlets and similar locations throughout the Commonwealth.

Many are concerned about the infiltration of these illegal slot machines plaguing our communities. These machines operate outside of the legal gaming industry authorized in the Commonwealth. They are unregulated, and do not afford any of the protections legal gaming provides, such as the comprehensive oversight of their ownership and operation, safeguards for problem gambling and the prevention of underage gambling by minors. Enclosed is a photograph of an establishment located in a Pennsylvania municipality that is hosting at least seven of these gambling machines. One such machine is being operated by what appears to be an underage boy, while a woman is gambling on another with her little girl in tow on the seat in front of the machine.

These slot machines deprive county and local governments, as well as the Commonwealth, of millions of dollars of gaming tax revenue each year. This has a direct negative impact on property tax relief for Pennsylvanians. In addition, for municipalities that receive local share funds from licensed casinos, or are eligible for local share grants, the operation of these illegal machines reduces the amount of available local share funds to support municipalities and municipal projects.

These slot machines also take money directly from our senior citizens by siphoning funds away from the Pennsylvania Lottery. The annual impact to the Lottery has been estimated at nearly $140 million, with millions more in jeopardy for senior programs as these slot machines continue to spread. In fact, in a letter directed at the Pennsylvania General Assembly, the Board Chair of Meals on Wheels Pennsylvania made clear that our senior population cannot afford to have more money siphoned away from Lottery funded programs, such Home-Delivered Meals, Senior Centers, APPRISE Counseling, Adult Day and the OPTIONS home and community-based services programs.

We believe that your voice needs to be heard. We are asking that you look at the substantial negative impact of these machines and make an informed decision to oppose their spread in your Borough. In our view, municipal enforcement measures are necessary to protect our communities and our youth and seniors from the continued expansion of these slot machines.

We have attached a model Slot Machine Nuisance Ordinance for your consideration. We urge you to consider adopting this proposed Ordinance to address this critical issue. In addition, we note that there are grant funds available to local law enforcement agencies to combat this issue. Grants are awarded through the Pennsylvania Gaming Control Board. Guidelines and application information can be found on the Gaming Board's website at gamingcontrolboard.pa.gov.

We would be happy to work with you on this issue. If there is anything we can do to assist you, or if you have any questions, please do not hesitate to contact us. Thank you for your attention to this important matter.

Sincerely,

Mark S. Stewart

---

Report an inappropriate comment (/report_item.html?sub_id=80937&referring_url=%2Fstories%2Feckert-seamans-dec-13-letter-to-the-borough-in-full%2C80937%3F)

**0 Comments**                                                                                                    Sort by  Oldest

Add a comment...

Facebook Comments Plugin

3/24/2020                                    Eckert Seamans' Dec. 13 letter to the borough, in full | Press & Journal

TRENDING STORIES

Tattered Flag has donated almost 500 gallons of hand sanitizer it is making, with more on the way (/stories/tattered-flag-has-donated-almost-500-gallons-of-hand-sanitizer-it-is-making-more-on-the-way,87928)

Hops and Barleys, Roberto's will give away subs and pizza Saturday (/stories/hops-and-barleys-robertos-willgive-away-subs-and-pizza-saturday,88018)

First coronavirus case reported in Dauphin County, says Lower Swatara emergency management coordinator (/stories/first-coronavirus-case-reported-in-dauphin-county-says-lower-swatara-emergency-management,87496)

CORONAVIRUS LATEST: Six deaths in Pa., Wolf orders residents in six counties to stay at home (/stories/coronavirus-latest-six-deaths-in-pa-wolf-orders-residents-in-six-counties-to-stay-at-home,87919)

BREAKING NEWS: Biggest daily increase yet for Pennsylvania coronavirus cases, jumping by 165 (/stories/breaking-news-biggest-daily-increase-yet-for-pennsylvania-coronavirus-cases-jumping-by-165,87917)

THIS WEEK'S PAPER

3/24/2020    Eckert Seamans' Dec. 13 letter to the borough, in full | Press & Journal




(/stories/march-25-2020-edition,88024)

March 25, 2020 Edition (/stories/march-25-2020-edition,88024)

View this issue (/stories/march-25-2020-edition,88024)

Browse other issues (/eeditions/)

News (/local/)
Sports (/sports/)
Obits (/obituaries/)
Opinion (/opinion-page/)
Community (/community-page/)
PSU Hbg
Terms of service (/terms.html)

WHERE TO BUY
A PRESS AND JOURNAL

Click here for a list of locations where you can pick up a copy! (/racks/)

GET SOCIAL

(http://www.fa

(https://twitte

20 S. Union Street
Middletown, PA 17057-1445
717-944-4628
Office Hours: Mondays - Fridays, 9 a.m. to 4 p.m.
Closed: New Year's Day, Memorial Day,
Fourth of July, Labor Day, Thanksgiving and Christmas

# Exhibit H



ECKERT
S E A M A N S
ATTORNEYS AT LAW

Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA  15219

TEL   412 566 6000
FAX   412 566 6099
www.eckertseamans.com

Timothy S. Coon
412.566.1214
tcoon@eckertseamans.com

January 29, 2020

BY EMAIL dbrier@mbklaw.com

Daniel T. Brier
Myers Brier & Kelly LLP
425 Spruce Street
Suite 200
Scranton, PA 18501

Re: Pace-O-Matic Inc.

Dear Mr. Brier:

I am responding to your January 24, 2020 letter.  In my January 17 letter, I invited a follow-up discussion of the situation, but I take it that your preference is to proceed formally through written correspondence.  If you do wish to discuss, however, feel free to call.  First, I will address the four information requests in your letter.  Next, I lay out the firm's path moving forward.

1.      The National Counsel that I referred to in my January 17 letter is Kleinbard LLC. During our first telephone call noted below, Matt Haverstick indicated that his firm was Pennsylvania counsel for POM and also had a national coordinating counsel role for POM. That is the genesis of my reference to POM's National Counsel.  If for some reason I misconstrued, then please substitute Pennsylvania Counsel for the references to National Counsel in my January 17 letter.

I spoke with Mr. Haverstick four times concerning POM.  Tony Troy participated in each call. This is my summary of the substance.  You can, of course, discuss this with Mr. Haverstick.

The first call with Mr. Haverstick was on October 15, 2019.  It was responding to a request for a call made by Mr. Haverstick in an October 9 email to Mr. Troy to discuss a lawsuit filed by Greenwood in Bucks County, Pennsylvania against Raj Rajeshwaring Inc. in which Eckert attorneys Mark Stewart, Kevin Skojdal and Casey Coyle were counsel to Greenwood.  Mr. Haverstick stated that POM had become aware of this lawsuit, believed that Eckert's role as co-counsel in the suit was a conflict of interest because the suit could affect POM's economic interests, and that POM wanted Eckert to withdraw from that representation.  I listened and responded that Eckert would consider the situation and get back to Mr. Haverstick.



# ECKERT
S E A M A N S
ATTORNEYS AT LAW

The next call was October 24, 2019. I advised Mr. Haverstick that we had carefully reviewed the situation and relevant ethics sources, that our review included a meeting with and advice from Ethics Counsel of the Virginia State Bar, and that our conclusion -- supported by the conclusion expressed by Virginia Bar Ethics Counsel -- was that no ethical conflict existed. I advised that we considered the situation to be (at most) a positional conflict, which is permissible under the Rules of Professional Conduct, a view reinforced by Virginia Bar Ethics Counsel. I advised that Greenwood was a longtime client, that Eckert agreed to undertake representation of POM in Virginia in December 2016 with the understanding and agreement the Eckert would continue to be able to fully represent Greenwood in Pennsylvania even if adverse to POM in Pennsylvania, and that absent this understanding Eckert would not have agreed to represent POM in Virginia in the first place. Finally, I advised Mr. Haverstick that Eckert declined to withdraw from the Rajeshwaring action and similar lawsuits.

The next call was on December 11, 2019 at the request of Mr. Haverstick. He explained that POM was concerned about a statement issued by Mr. Stewart in Pennsylvania concerning a recent decision of the Pennsylvania Commonwealth Court in the matter of *POM of Pennsylvania Inc.. v. Pennsylvania State Police, et al.*, that POM believed created a conflict of interest, and again requested that Eckert withdraw from representing Greenwood in any matters that were of concern to POM. I responded to Mr. Haverstick with essentially the same points as our October 24 call. Mr. Haverstick said he would discuss with POM.

My last call with Mr. Haverstick was December 18, 2019, at my request. I had not heard anything further from him since the December 11 call. I briefly recounted Eckert's position as described above and asked Mr. Haverstick if POM would please confirm its waiver of conflicts as to our representation of Greenwood in Pennsylvania. I reminded that POM had now twice asserted that an ethical conflict existed, that Eckert disagreed, that the positional conflict situation was not going to go away, that we believed that Eckert had been and was doing a good job for POM in Virginia and, if POM agreed, it was best we bring the disagreement to a closure with a clear reaffirmation of waiver of any alleged Pennsylvania conflict from POM. Otherwise, Eckert would need to reevaluate the relationship going forward with POM.

The last communication I had with Mr. Haverstick was an email exchange on January 9, 2020. I asked him if he had a chance to discuss our December 18 call with POM. Mr. Haverstick responded that he had passed on the substance of the call to the client, and would check as to a response from POM.

2.   From the time that POM became a client, Mr. Stewart, who is the lead member of and supervises the "Casino Team" which includes Greenwood, and Mssrs. Troy and Kirsner, who lead and supervise the "POM Team", were aware of the representations of Greenwood in Pennsylvania and POM in Virginia, respectively, and mindful to ensure no sharing of client



information.[1]  The confidentiality screen was further formalized on September 19, 2019, as a result in part of POM having recently asked Eckert to provide services and legal opinions outside of Virginia, including in Massachusetts.

Mr. Troy advised me of the attorneys who were on the POM Team working on any matters for that client.  Mr. Stewart advised me of the attorneys who were on the Casino Team working on any matters for those clients.  The POM Team was Tony Troy, Matt Kirsner, Jessica Glajch, Alison Rienecker, and Stephanie Coleman.  The Casino Team was Mark Stewart , Sarah Stoner, Kevin Skjoldal, Casey Coyle, Susan Yocum, Tara Burns, Kristine Marsilio, Mike Herzog, Adam Scheinvold.

Each member of the teams received an email from me as counsel to the firm advising that the firm wanted to make sure there is no inadvertent sharing of confidential or other business information of one client with firm personnel working for the other client.  I instructed that the Casino Team could not discuss, disclose or share any information concerning any Casino client, or regarding any past/current/future matter or project for a Casino client, with any member of the POM Team and that the reverse was also required in regard to work for or information of POM.  I stated that in the unlikely event that there was a perceived need to share such information between members of the Casino Team and the POM Team in the future, that they should consult with me first.

At my direction, Eckert's IT staff implemented security protocols on the document management network to prevent any member of the Casino team from accessing documents of POM matters, and vice versa.  Other document sources of a team member, such as email, personal computers, etc., are already secured from view or access by other attorneys in the firm through normal security/access processes.  Of further note, the POM Team members work in our Richmond, Virginia or Washington DC offices.  The Casino Team members do not work in those offices, they work in Pennsylvania offices.

I directly advised Matt Haverstick of the confidentiality screen in our October 24 and December 11 calls.  I believe I mentioned it in the other two calls, as well.  In late 2019, Mr. Troy spoke with Lee Wesson, a member of Queen of Virginia Skill & Entertainment and a consultant to POM.  During that discussion, Mr. Troy disclosed the existence of the firm's confidentiality screen to Wesson. Mr. Troy does not recall the specific date.

3.    Earlier this month, Mr. Troy spoke with Mr. Haverstick about the screen and the request for confirmation of the prospective waiver.  Mr. Haverstick responded that he thought that the screen could work but that the client would respond directly, and that it "would be up to the client" to approve or not.  Mr. Troy interpreted that conversation as a positive sign that the

---

[1] POM Team and Casino Team are my terms of convenience, not some formal designation at Eckert.



ECKERT
S E A M A N S
ATTORNEYS AT LAW

Daniel T. Brier
January 29, 2020
Page 4

screen might be acceptable to POM and that the next logical step would be POM's written affirmation of a waiver of any conflicts as requested on the December call.

4.      Eckert has continuously represented Greenwood Gaming/Parx Casino in Pennsylvania since at least April 2009.

In light of your two letters to Eckert, it is clear that POM's affirmation of its agreement to waive any conflict between this firm's concurrent representation of POM and Greenwood is not in the cards. We understand POM's concerns about Eckert's continued representation of Greenwood. However, the positional conflict is likely to continue, and there could be other positional conflicts in the future. In light of all the circumstances, Eckert believes the best course of action is to end the client relationship between POM and Eckert now.

In your January 16 letter, you said that Eckert should only contact you in regard to this situation and it should not discuss with POM. We have honored your request. Therefore, please notify POM of Eckert's decision to withdraw from its representation of POM.

Eckert is willing and able to continue handling all pending POM matters in Virginia. However, we realize that if POM does not agree with the terms of the requested waiver reaffirmation, which we believe is necessary for Eckert to remain as POM's counsel, then the firm's remaining role as POM's counsel will be limited to the time period necessary for POM to arrange substitute counsel. Please let us know POM's final decision so that (if necessary) Eckert can prepare the file materials for transfer expeditiously. New counsel and POM can of course communicate with Mr. Troy or Matt Kirsner about any of the pending matters and the logistics on matter transfers. Eckert will endeavor to make this as seamless as possible.

If you have any further questions please contact me. I would appreciate your confirmation of communicating the withdrawal decision to POM. An email would be fine. Thank you.

Very truly yours,

Timothy S. Coon

Cc:    Tony Troy
       Matt Kirsner