## APPENDIX OF UNPUBLISHED OPINIONS

*Office of Disciplinary Counsel v. Baldwin*, No. 2587 Disciplinary
   Docket No. 3, 2020 WL 808757 (Pa. 2020)

Case 1:20-cv-00292-JPW   Document 13-5   Filed 03/24/20   Page 2 of 35
Office of Disciplinary Counsel v. Baldwin, --- A.3d ---- (2020)

2020 WL 808757

2020 WL 808757
Only the Westlaw citation is currently available.
Supreme Court of Pennsylvania.

OFFICE OF DISCIPLINARY COUNSEL, Petitioner

v.

Cynthia A. BALDWIN, Respondent

No. 2587 Disciplinary Docket No. 3
|
Attorney Registration No. 32119 (Allegheny County)
|
Argued/Submitted September 10, 2019
|
Decided February 19, 2020

**Synopsis**
**Background:** In attorney disciplinary proceeding, Office of Disciplinary Counsel (ODC) sought to impose public censure on attorney in connection with her representation of university and three of its administrators during grand jury proceedings investigating matters relating to child abuse allegations against former assistant football coach at university.

**Holdings:** The Supreme Court, No. 2587, Donohue, J., held that:

[1] attorney was personal counsel to university administrators, for purposes of determining whether she violated Pennsylvania Rules of Professional Conduct;

[2] attorney failed to render competent representation to her clients;

[3] attorney committed multiple violations of Pennsylvania Rule of Professional Conduct requiring attorneys to avoid conflicts of interest in representation of multiple clients;

[4] attorney committed multiple violations of Pennsylvania Rule of Professional Conduct governing confidentiality when testifying during grand jury proceedings;

[5] attorney engaged in conduct prejudicial to administration of justice, in violation of Pennsylvania Rule of Professional Conduct; and

[6] discipline in form of public reprimand, to be administered by Disciplinary Board of Supreme Court of Pennsylvania, was warranted.

Ordered accordingly.

West Headnotes (15)

**[1]     Attorneys and Legal Services** ⟜ Persons entitled to assert or benefit from relationship
Attorney was "personal counsel" to university's president, athletic director and vice president for finance and business, for purposes of determining whether she failed to render competent representation to clients and had impermissible conflicts of interest, in violation of Pennsylvania Rules of Professional Conduct, in connection with her representation of university and administrators during grand jury proceedings investigating matters relating to child abuse allegations against former assistant football coach at university; supervising judge informed administrators regarding their rights to advice and assistance of attorney and ability to consult with attorney at any time throughout their testimonies, administrators reasonably believed attorney was representing them personally and individually, and attorney would not have been permitted to accompany administrators into grand jury proceedings unless she was their personal counsel. 42 Pa. Cons. Stat. Ann. § 4549(c)(1), (3), Pa. R. Crim. P. 231(A), Pa. R. Prof. Conduct 1.1, 1.7.

**[2]     Attorneys and Legal Services** ⟜ Competence and professional judgment in general
Attorney failed to render competent representation to clients, in violation of Pennsylvania Rule of Professional Conduct, in connection with her representation of university and three of its administrators during grand jury proceedings investigating matters relating to child abuse allegations against former assistant football coach at

2020 WL 808757

university; attorney had no criminal law experience and had never represented a client before a grand jury, she did not consult with experienced counsel in preparation for administrators' grand jury testimony or in responding to subpoena duces tecum, she conducted little or no independent investigation prior to accompanying administrators into grand jury room, and she failed to coordinate a search of any of electronically stored data on university's computers before agreeing to concurrently represent university while personally representing administrators in connection with their grand jury testimony. Pa. R. Prof. Conduct 1.1.

1 Cases that cite this headnote

**[3]    Attorneys and Legal Services** ⬧ Grand jury proceedings

Attorney committed multiple violations of Pennsylvania Rule of Professional Conduct requiring attorneys to avoid conflicts of interest in representation of multiple clients, in connection with her concurrent representation of university and three of its administrators during grand jury proceedings investigating matters relating to child abuse allegations against former assistant football coach at university; at time grand jury served testimonial subpoenas on administrators, it also served university with a subpoena for documents related to allegations, such that investigation expanded into possible criminal conduct of university and administrators, attorney could not represent university and administrators without full disclosure of all possible conflicts in order to obtain informed consent, which was not obtained, discrepancies between administrators' testimonies materialized before any testified before grand jury, evidencing actual conflicts of interest, and attorney failed to take any actions in response to this information. Pa. R. Prof. Conduct 1.7.

**[4]    Attorneys and Legal Services** ⬧ Confidentiality

**Privileged Communications and Confidentiality** ⬧ Nature of privilege

The confidentiality provisions of governing Pennsylvania Rule of Professional Conduct provide broader protections than does the attorney-client privilege. Pa. R. Prof. Conduct 1.6.

**[5]    Attorneys and Legal Services** ⬧ Multiple clients; dual representation

Attorney committed multiple violations of Pennsylvania Rule of Professional Conduct governing confidentiality when testifying during grand jury proceedings investigating matters relating to child abuse allegations against former assistant football coach at university, in connection with her representation of university president, athletic director and vice president for finance and business; none of administrators consented to attorney's disclosure of confidential disclosures they made to her in private conversations, and attorney's disclosures of certain confidences were not impliedly authorized in order to carry out the representation. Pa. R. Prof. Conduct 1.6(a).

**[6]    Privileged Communications and Confidentiality** ⬧ Communications from client to attorney and from attorney to client

Communications from an attorney to a client, not just communications by a client to an attorney, are protected under Pennsylvania law. 42 Pa. Cons. Stat. Ann. § 5916.

**[7]    Privileged Communications and Confidentiality** ⬧ Waiver of privilege

Client, a university president, did not waive attorney-client privilege by discussing certain of events arising from grand jury proceedings which investigated matters relating to child abuse allegations against former assistant football coach at university, in communications he made after his termination as university president, but before attorney testified before grand jury, including open letter to university

Case 1:20-cv-00292-JPW   Document 13-5   Filed 03/24/20   Page 4 of 35
Office of Disciplinary Counsel v. Baldwin, --- A.3d ---- (2020)
2020 WL 808757

board of trustees and interviews with magazine and television station, absent an express consent to disclosure of confidential communications.

**[8]    Privileged Communications and Confidentiality** ⚯ Waiver of privilege

Inherent in the determination of waiver of the attorney-client privilege is an evidentiary proceeding, in which the privilege can be claimed by the client, and the assertion of waiver advanced by the party seeking the disclosure.

**[9]    Privileged Communications and Confidentiality** ⚯ Determination

Absent an evidentiary proceeding in which attorney-client privilege and waiver issues can be adjudicated, an attorney cannot rely on his or her self-determined and potentially self-serving conclusion that he or she has been relieved of the duty of confidentiality.

**[10]    Privileged Communications and Confidentiality** ⚯ Waiver of privilege

Clients, a university president, athletic director and vice president for finance and business, did not waive attorney-client privilege by asserting in motions, pleadings and affidavits filed in connection with their defenses to criminal charges, that attorney had engaged in professional misconduct with regard to her alleged representation of them in grand jury proceedings which investigated matters relating to child abuse allegations against former assistant football coach at university; although clients did challenge aspects of attorney's representation of them in criminal proceedings, they did not do so until well after attorney had testified before grand jury as to confidential, privileged matters involving clients. Pa. R. Prof. Conduct 1.6(a).

**[11]    Grand Jury** ⚯ Privilege

Attorney was not justified, under governing Pennsylvania Rule of Professional Conduct, in

disclosing confidential information from her representation of university president, athletic director and vice president for finance and business, when testifying during grand jury proceedings investigating matters relating to child abuse allegations against former assistant football coach at university, despite contention that at time she testified, she knew she was under suspicion of obstruction of justice in connection with university's production of documents in response to subpoena duces tecum; letter she received that raised questions regarding university's continuing failure to provide documents in response to subpoena was addressed to university's failures, not her own, by time she testified before grand jury, university had largely complied with subpoena, she learned "much later" that Office of Attorney General considered her a criminal suspect, and questioning of attorney before grand jury focused almost exclusively on administrators and their efforts to avoid disclosure of incriminating documents. Pa. R. Prof. Conduct 1.6(c)(4).

1 Cases that cite this headnote

**[12]    Attorneys and Legal Services** ⚯ Grand jury proceedings

Attorney engaged in conduct prejudicial to administration of justice, in violation of Pennsylvania Rule of Professional Conduct, in connection with her concurrent representation of university and three of its administrators during grand jury proceedings investigating matters relating to child abuse allegations against former assistant football coach at university; administrators were charged with multiple crimes based on their grand jury testimony, attorney revealed confidential communications between herself and administrators, breached attorney-client privilege and was incompetent to testify during her grand jury testimony, one of administrators was constructively denied counsel during grand jury testimony, and as a result of violation, the Superior Court quashed multiple counts against administrators. Pa. R. Prof. Conduct 1.7.

2020 WL 808757

1 Cases that cite this headnote

**[13]  Attorneys and Legal Services**  Purpose of proceedings in general

The primary purpose of the lawyer discipline system in Pennsylvania is to protect the public, preserve the integrity of the courts, and deter unethical conduct.

**[14]  Attorneys and Legal Services**  Power and discretion to determine sanction

**Attorneys and Legal Services**  Factors Considered

**Attorneys and Legal Services**  Comparable dispositions; proportionality

**Attorneys and Legal Services**  De novo review in general

Consistency in the results reached in attorney disciplinary cases is always an important priority, as similar misconduct should not be punished in radically different ways; the court must be mindful, however, that each case must be judged on its own facts, as it is subject to the court's exclusive jurisdiction and de novo review.

**[15]  Attorneys and Legal Services**  Public Reprimand, Censure, or Admonition

Discipline in form of public reprimand, to be administered by Disciplinary Board of Supreme Court of Pennsylvania, was warranted for attorney's violations of Pennsylvania Rules of Professional Conduct in failing to render competent representation to clients free of conflicts of interest, by breaching her duties to maintain client confidences, and by engaging in conduct prejudicial to administration of justice. Pa. R. Prof. Conduct 1.1, 1.6(a), 1.7, 8.4(d).

No. 151 DB 2017

**Attorneys and Law Firms**

Julia Michelle Frankston-Morris, Esq., pro se.

Laura K. Mohney, Esq., pro se.

Paul J. Killion, Esq., Angelea Allen Mitas, Esq., Samuel Frank Napoli, Esq., Disciplinary Board of the Supreme Court of PA, for Petitioner.

Charles A. DeMonaco, Esq., Robert Steven Tintner, Esq., Jana Volante Walshak, Esq., Fox Rothschild LLP, for Respondent.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

**OPINION**

JUSTICE DONOHUE

**\*1** In this matter, we consider the request of the Petitioner, the Office of Disciplinary Counsel ("ODC"), to impose discipline in the form of a public censure on Respondent, Cynthia A. Baldwin ("Respondent"),[1] in connection with her representation of Pennsylvania State University ("Penn State") and three of its administrators during grand jury proceedings investigating matters relating to child abuse accusations against Gerald A. Sandusky ("Sandusky"), a former assistant football coach at Penn State. On November 21, 2017, the ODC filed a Petition for Discipline against the Respondent, charging her with violations of Rules 1.1, 1.6(a), 1.7(a) and 8.4(d) of the Pennsylvania Rules of Professional Conduct relating to her joint representation of Timothy Curley ("Curley"), Penn State's Athletic Director, Gary Schultz ("Schultz"), Penn State's former Senior Vice-President for Finance and Business, and Graham Spanier ("Spanier"), Penn State's president (collectively "Individual Clients") as well as Penn State (collectively with Individual Clients, the "Clients"). In its findings and recommendations, the Disciplinary Board of the Supreme Court of Pennsylvania ("Disciplinary Board") concluded that Respondent "failed to protect her clients' right to competent counsel and entitlement to unfettered loyalty, which serious misconduct contributed to criminal charges against her clients, and ultimately caused certain charges to be quashed, thereby prejudicing the administration of justice." Disciplinary Board's Report and Recommendations, 3/18/2019, at 48 (hereinafter, the "Disciplinary Board Report"). The Disciplinary Board

Case 1:20-cv-00292-JPW    Document 13-5    Filed 03/24/20    Page 6 of 35
Office of Disciplinary Counsel v. Baldwin, --- A.3d ---- (2020)
2020 WL 808757

recommended discipline in the form of a public censure by this Court. We impose discipline in the form of a public reprimand.

## I. Scope and Standard of Review

This Court recently reiterated its scope and standard of review in disciplinary proceedings:

> Our Court conducts de novo review of all attorney disciplinary matters; however, "the findings of the Hearing Committee and the Board are guidelines for judging the credibility of witnesses and should be given substantial deference." [*Office of Disciplinary Counsel v. Cappuccio*, 616 Pa. 439, 48 A.3d 1231, 1236 (2012)]. In attorney disciplinary proceedings, the ODC bears the burden of proof of establishing an attorney's misconduct by a preponderance of the evidence. *Office of Disciplinary Counsel v. Preski*, 635 Pa. 220, 134 A.3d 1027, 1031 (2016). Because discipline "is imposed on a case-by-case basis, we must consider the totality of facts presented, including any aggravating or mitigating factors." *Id.* However, even though each attorney disciplinary matter must be resolved according to its unique facts and circumstances, our Court nevertheless endeavors to maintain consistency in disciplinary matters "so that similar misconduct is not punished in radically different ways." *Id.* (quoting *Office of Disciplinary Counsel v. Lucarini*, 504 Pa. 271, 472 A.2d 186, 190 (1983) (internal quotation marks omitted)).

*2 *Office of Disciplinary Counsel v. Pozonsky*, 644 Pa. 537, 177 A.3d 830, 838 (2018). Our de novo review requires a review of the voluminous record presented to the Disciplinary Board in this case, including the transcripts of testimony provided at the evidentiary hearing before the Hearing Committee of the Disciplinary Board ("Hearing Committee") on ODC's allegations of rules violations against Respondent. The disciplinary record also contains the exhibits admitted by the parties before the Hearing Committee (all entered into evidence pursuant to a stipulation of the parties, N.T., 5/22/2018, at 11-12). These exhibits include, inter alia, a large number of grand jury materials (including transcripts of relevant testimony before the grand jury, subpoenas issued by the grand jury, and findings of fact and presentments of the grand jury),[2] transcripts and legal opinions of the Court of Common Pleas of Dauphin County and the subsequent opinions of the Superior Court[3] in the appeals from the Dauphin County court's decision relating to criminal charges filed against Curley, Schultz and Spanier, and the Freeh Report.[4]

## II. Factual and Procedural History

### A. Grand Jury Presentment

The facts underlying the ODC's Petition for Discipline against the Respondent are ultimately intertwined with Presentment No. 29, issued by the Thirty-Third Statewide Investigating Grand Jury on October 26, 2012 (hereinafter, the "Grand Jury Presentment"). We provide this summary of facts to provide context for our discussion and analysis of these disciplinary proceedings.

In 2009, the Office of Attorney General ("OAG") presented allegations of Sandusky's repeated sexual abuse of children to a statewide investigating grand jury. Of relevance here, the ensuing investigation uncovered two instances of abuse that took place on the Penn State campus, one in 1998 and a second in 2001.

The 1998 incident involved an eleven-year-old boy. Grand Jury Presentment at 6. Sandusky took the victim to the East Area Locker Room on Penn State's campus, where they wrestled and then used exercise machines. *Id.* Sandusky then insisted that they shower together. *Id.* Sandusky put his arms around the victim and squeezed him, making the boy very uncomfortable. *Id.* When Sandusky took the victim home, his mother asked why his hair was wet and became concerned upon learning of the joint shower. *Id.* The next morning, she filed a report with the University Police Department. *Id.* Centre County Children and Youth Services were also notified, but it referred the case to the Pennsylvania Department of Public Welfare, citing a conflict of interest due to its involvement with the Second Mile Foundation, a charity established by Sandusky in the 1970's that focused on assisting boys between the ages of eight and eighteen. *Id.* at 7.

Tom Harmon was the Chief of Police of the University Police Department in 1998.[5] As his department's investigation proceeded, Chief Harmon kept Schultz, who oversaw the University Police Department as part of his administrative position at Penn State, updated on its progress. *Id.* at 8. Schultz, in turn, kept Curley and Spanier apprised of the investigation's progress, primarily through email messages.

*Id.* at 9. On June 9, 1998, Schultz sent Curley an email, on which Spanier was copied, informing him that the Centre County District Attorney had decided not to pursue criminal charges against Sandusky. *Id.* at 10. The police report of the investigation was not filed in the usual location. Instead, it was assigned an administrative number, which made it difficult, if not impossible, to access the report without that number. *Id.* at 11.

**\*3** The Grand Jury Presentment also reported that in 2001, Michael McQueary, then a graduate assistant for the football team, witnessed Sandusky with a young boy in a locker room shower on the University's main campus. *Id.* at 12. McQueary reported this incident to head football coach Joseph V. Paterno, *id.* at 13, who testified to the grand jury that McQueary described Sandusky as fondling or doing something of a sexual nature to a young boy in the shower. *Id.* Paterno further testified that in turn he relayed this information to Schultz and Curley. *Id.* at 14. Seven to ten days later, Schultz and Curley met with McQueary. *Id.* at 16. McQueary told the grand jury that he described to Schultz and Curley the sexual nature of what he had witnessed. *Id.*

Schultz then decided upon a plan that involved three parts. First, Curley would meet with Sandusky, tell him that they were aware of the 1998 incident, advise him to seek professional help, and prohibit him from ever again bringing boys into campus facilities. *Id.* at 15-16. Second, the chair of Second Mile would be notified. *Id.* And third, the matter would again be reported to the Pennsylvania Department of Public Welfare for investigation, as had been done in 1998. *Id.* Curley responded that he would prefer not to report the matter to the public welfare department so long as Sandusky was cooperative with their efforts. *Id.* at 16-17. Spanier was advised of the modified approach and agreed with the decision not to report the matter to an outside agency. *Id.* at 17-18. Curley then executed the revised two-part plan, conducting separate meetings with Sandusky and a Second Mile representative. *Id.* at 18-19.

### B. Grand Jury Subpoenas to the Clients

On December 28, 2010, Respondent received a telephone call from the OAG regarding a grand jury investigation of multiple claims of child abuse against Sandusky. N.T. 5/23/18, at 366. The OAG asked Respondent to accept service of four subpoenas (which she later did), one for documents directed to Penn State and three for testimony from Curley,

Schultz, and Paterno. *Id.* at 367. The subpoena duces tecum was directed to Penn State and requested "any and all records pertaining to Jerry Sandusky and incidents reported to have occurred on or about March 2002, and any other information concerning Jerry Sandusky and inappropriate contact with underage males both on and off University property. Response shall include any and all correspondence directed to or regarding Jerry Sandusky." Subpoena No. 1179, Attachment. The subpoenas to Curley, Schultz and Paterno [6] were directed to them personally, without reference to Penn State or their employment titles. Subpoena No. 1176 (Curley); Subpoena No. 1178 (Schultz); Subpoena No. 1177 (Paterno). These three subpoenas indicated that the witnesses were to appear to testify before the grand jury on January 12, 2011, just nine days later. *Id.* Curley and Schultz were not served with a subpoena duces tecum.

Respondent first met with Curley in connection with his grand jury testimony in Spanier's office. N.T. 5/23/18, at 371. Respondent later testified that:

> I explained to them [Curley and Spanier] about the grand jury, how it was, that it wasn't like a regular courtroom, how many people were on, that there would be thirty-some people on it, and what they were doing, that it was an investigating grand jury because they really didn't know what a grand jury was, and I – I did explain that [Curley] could have a personal attorney to go with him to the grand jury, and that, you know, he shouldn't be nervous, just tell the truth, that's what all of this is about..."

**\*4** *Id.* at 371. Respondent further testified that Spanier, in Curley's presence, instructed Respondent to go with Curley to the grand jury; that she told them she was general counsel and could not be Curley's personal attorney; that nothing Curley said would be confidential; and that Curley could retain a personal attorney. According to Respondent, Curley said that he did not know any lawyers. *Id.* at 372.

Respondent and Curley then met privately in Respondent's office. Respondent later indicated that they discussed what she had explained to him at the meeting in Spanier's

2020 WL 808757

office and reviewed his recollection of events involving Sandusky. *Id.* at 373-74. With respect to the 2001 incident, Respondent said that "basically he told me yes, he knew about this incident, and it had been described as horseplay." *Id.* Respondent's sole private conversation with Schultz before his grand jury testimony followed, and by Respondent's account, Schultz's recollections were in line with Curley's. *Id.* at 375. Respondent indicated that "[Schultz] told me the same thing that [Curley] told me, that it had been described as horseplay." *Id.* Respondent testified that neither Curley nor Schultz told her that a sex act had taken place between Sandusky and the boy in the shower, *id.* at 376, but the record does not reflect whether or not she specifically asked either of them whether one had occurred. During these meetings with Curley and Schultz, there was no discussion regarding the 1998 incident, as Respondent had no knowledge at that time that any such event had taken place.[7] Both Curley and Schultz denied having any documents relating to Sandusky's activities. *Id.* at 377.

Based on these meetings, Respondent determined that their stories were consistent, as they "told me the same thing." *Id.* at 375. She further decided that the interests of Curley and Schultz were consistent with Penn State's interests. Accordingly, she made the judgment that she could represent them both before the investigating grand jury during their questioning. *Id.* at 378.

On the morning of January 12, 2011, Respondent accompanied Curley and Schultz to interviews with an OAG representative. Report and Recommendations of the Hearing Committee Report ("Hearing Committee Report"), Exhibit D (interview notes). Later that day, she then accompanied each of them to their appearances before the investigating grand jury. In his grand jury testimony, Curley testified that in 2001, Paterno contacted him (and Schultz) and requested an immediate meeting regarding an incident reported to him by McQueary. N.T. (grand jury), 1/12/2011 (Curley testifying), at 4–5. Paterno informed them that McQueary had seen Sandusky in the shower with a child and was "uncomfortable" with what he had observed. *Id.* at 5. According to Curley, when he and Schultz later met with McQueary, McQueary told them that Sandusky and the boy "were horsing around, that they were playful, and that it just did not feel appropriate." *Id.* at 7. Curley insisted that neither McQueary nor Paterno told them, in any form, that there was any sexual conduct involved, including anal intercourse. *Id.* Curley testified that he did not inform campus police of the

incident because he did not think that what had been reported was a crime. *Id.* at 12.

**\*5** Curley testified that he promptly advised Spanier regarding the incident. *Id.* at 8. He stated that he reported the incident to the executive director of the Second Mile Foundation and instructed Sandusky to refrain from bringing young people into the athletic facilities at Penn State. *Id.* at 10–11. Curley acknowledged that there was no follow up investigation into the 2001 report by McQueary. *Id.* at 13. He denied having any knowledge of the 1998 incident involving Sandusky. *Id.* at 13–14.

Also accompanied by Respondent, Schultz testified before the grand jury that he attended a meeting with Paterno and Curley regarding the 2001 incident. Schultz indicated that Paterno had been informed by a graduate student of disturbing and inappropriate behavior by Sandusky in the shower. N.T. (grand jury), 1/12/2011 (Schultz testifying), at 5. Schultz also stated that he and Curley met with McQueary. *Id.* at 9-10. Unlike Curley, Schultz maintained that after talking to both Paterno and McQueary, he was of the view that what had occurred was sexual in nature. He told the grand jury:

> Q. Did you, nevertheless, form an impression about what type of conduct this might have been that occurred in the locker room?
>
> A. Well, I had the impression that it was inappropriate. Telling you what kind of thing I had in my mind without being clear, without him telling me, but, you know. I had the feeling that there was perhaps some kind of wrestling around activity and maybe [Sandusky] might have grabbed the young boy's genitals or something of that sort is kind of the impression that I had.
>
> Q. Would you consider that to be inappropriate sexual conduct?
>
> A. Oh, absolutely. Well, I don't know the definition of sexual, but that's certainly inappropriate for somebody to do.
>
> * * *
>
> Q. We can all agree that an adult male under no circumstances other than a doctor should be grabbing the genitals of a young boy?
>
> A. I agree completely with that.

2020 WL 808757

*Id.* at 22-23.

Schultz testified that between himself, Curley and Spanier, it was agreed that Sandusky would be instructed to never again bring children into the football building. *Id.* at 11. Unlike Curley, Schultz further testified that it was his recollection that the three administrators agreed to request the same child protection agency that had investigated the 1998 incident be contacted regarding the 2001 events. *Id.*

The grand jury did not question Curley as to whether he was in possession of any documents relating to Sandusky. When asked if he had any such documents, Schultz responded as follows:

> Q. Do you believe that you may be in possession of any notes regarding the 2002 incident that you may have written memorializing what occurred?
>
> A. I have none of those in my possession. I believe that there were probably notes taken at the time. Given my retirement in 2009, if I even had them at that time, something that old would have probably been destroyed. I had quite a number of files that I considered confidential matters that go back years that didn't any longer seem pertinent. I wouldn't be surprised. In fact, I would guess if there were any notes, they were destroyed on or before 2009.

*Id.* at 16.

Schultz did not deny knowledge of the 1998 incident involving Sandusky, though he could not recall the specifics of what had occurred. He indicated that the matter was turned over to a Commonwealth-affiliated (rather than a local) child protection agency for investigation and that no charges were ever filed. *Id.* at 11. He testified that he kept Spanier advised as matters proceeded in 1998, as "it would have been a routine way of handling things, that I would have kept him informed [regarding the 1998 and 2001 incidents]." *Id.* at 17-18.

**\*6** On March 22, 2011, OAG investigators interviewed Spanier, who was accompanied by Respondent. N.T. 5/23/18, at 386-87. On March 24, 2011, a subpoena was issued to Spanier for testimony before the grand jury on April 13, 2011. Subpoena No. 92 (Spanier). Respondent interviewed Spanier, found his testimony to be consistent with that of Curley and Schultz (even though their testimony was inconsistent with each others), and thus determined that she could accompany

Spanier during his grand jury testimony. N.T., 5/23/18, at 387-88. Before the grand jury with respect to the 2001 incident, Spanier recalled that on one occasion Curley and Schultz sought his advice regarding a matter involving Sandusky "with a younger child ... horsing around in the shower." N.T. (grand jury), 4/13/2011 (Spanier testifying), at 14. Spanier denied that Curley or Schultz told him that the horseplay could have been sexual in nature. *Id.* at 25-26. He indicated that he instructed them to inform Sandusky that he should not bring children under eighteen years of age into the locker room facilities and to contact the board chair of the Second Mile Foundation. *Id.* at 16-17. Spanier denied any knowledge of the 1998 incident. *Id.* at 34-35 ("I'm not aware of allegations against Mr. Sandusky in 1998....").

On November 7, 2011, the Commonwealth charged Curley and Schultz with one count each of perjury and failure to report suspected child abuse. Hearing Committee Report, Exhibits Q, S. Respondent advised Curley and Schultz to retain private counsel and, at their request, made arrangements for them to do so. N.T., 5/23/2018, at 395. She also advised Spanier to hire private counsel. *Id.* at 396. Newly retained personal counsel for Curley and Schultz notified Respondent by letter that their clients each considered her to have been his personal attorney before the investigating grand jury and that they did not waive any claim of attorney-client privilege. *Id.*, Exhibits K(f), K(g), M. By letter dated June 22, 2012, Respondent, through counsel, denied the invocations of the attorney-client privilege by Curley and Schultz, insisting that as counsel for Penn State, she had acted solely in a corporate capacity with them before the grand jury and not in any individual capacity. *Id.*, Exhibit K(h).

In a letter dated December 19, 2011, counsel for the OAG advised Respondent that Penn State's continuing failure to provide documents in response to the subpoena duces tecum was concerning, and implicitly threatened the university with contempt of court "and any other appropriate measures applicable to obstruction against the institution and those individuals responsible for these decisions." N.T., 5/23/2018, at 402. Respondent was subsequently served with a subpoena to testify before the grand jury on October 26, 2012.[8] Subpoena No. 883 (Baldwin). Four days prior to Respondent's grand jury testimony, the supervising judge of the grand jury held a conference to discuss privilege issues raised by private counsel for Schultz and Curley. Hearing Committee, Exhibit M. To resolve any conflicts, counsel for the OAG, Frank Fina ("Fina"), agreed not to ask Respondent any questions that implicated confidential communications.[9] *Id.*

Case 1:20-cv-00292-JPW    Document 13-5    Filed 03/24/20    Page 10 of 35
Office of Disciplinary Counsel v. Baldwin, --- A.3d ---- (2020)
2020 WL 808757

at 11-12. Meanwhile, counsel for Penn State agreed to waive any attorney-client privileges, except to the extent that such privileges existed between Respondent and Curley and/or Schultz. Hearing Committee Report, Exhibits K(e), K(h).

During her grand jury testimony, Respondent stressed that she had made every effort to comply with the subpoena duces tecum, but that the three administrators had lied to her about the existence of multiple documents that reflected their detailed knowledge and participation in the 1998 and 2001 incidents.

*7  Q. Did they [Schultz, Curley, and Spanier] ever in any way, shape, or form disclose to you when you were asking them for this material anything about 1998 or 2001 and the existence of e-mails from those events?

A. Never.

Q. We also know that Mr. Schultz had a file regarding Jerry Sandusky in his office; and that in that file were documents related to his retirement agreement.

There were drafts and other documents related to his employment and his retirement and then there were handwritten notes and e-mails pertaining to the 1998 crimes of Mr. Sandusky and the 2001 crimes of Mr. Sandusky.

Again, same question, did he ever reveal to you the existence of that Sandusky file or any of its contents?

A. Never. He told me he didn't have anything.

N.T. (grand jury), 10/26/2012 (Respondent testifying), at 20. In other portions of her testimony, Respondent, in response to questions posed by counsel for the OAG, revealed the contents of numerous communications between herself and Curley, Schultz and Spanier. *See, e.g., id.* at 22.

On November 1, 2012, four days after Respondent testified before the investigating grand jury, several new charges were filed against Curley and Schultz, including endangering the welfare of children, obstruction of justice and conspiracy to commit obstruction of justice. Hearing Committee Report, Exhibits P, Q, R, S, T. On the same date, charges were filed against Spanier, including perjury, failure to report suspected child abuse, obstruction of justice, endangering the welfare of children and conspiracy to commit obstruction of justice. *Id.,* Exhibit U.

In 2014, Curley, Schultz and Spanier filed motions to preclude Respondent from testifying in the criminal trials in Dauphin County. Hearing Committee Report, Exhibit W. The trial court denied the motions, but the Superior Court reversed and quashed all of the perjury, obstruction of justice and related conspiracy charges. *Curley,* 131 A.3d at 1007; *Schultz,* 133 A.3d at 328; *Spanier,* 132 A.3d at 498. The Superior Court concluded that Respondent, during her grand jury testimony, had breached the attorney-client privilege. *Curley,* 131 A.3d at 1007; *Schultz,* 133 A.3d at 326; *Spanier,* 132 A.3d at 498. In its ruling, the Superior Court barred Respondent from testifying against Curley, Schultz or Spanier. *Curley,* 131 A.3d at 1007; *Schultz,* 133 A.3d at 328; *Spanier,* 132 A.3d at 498. The OAG did not appeal these rulings, but rather entered into plea bargains with Curley and Schultz, pursuant to which each pleaded guilty to one count of endangering the welfare of children. Spanier's case proceeded to trial, which resulted in a guilty verdict on one count of endangering the welfare of children. Curley and Schultz both testified for the Commonwealth.

### C. Disciplinary Proceedings

On November 24, 2014, the ODC initiated disciplinary proceedings by filing a Petition for Discipline against Respondent, charging her with violations of Rules 1.1, 1.6(a), 1.7(a) and 8.4(d) of our Rules of Professional Conduct. The Hearing Committee conducted an evidentiary hearing and produced a thorough report that reviewed the evidence and made findings of fact and recommendations. The Hearing Committee determined that Respondent represented Curley, Schultz and Spanier in a personal capacity during their grand jury testimony. Hearing Committee Report at 39-42. The Hearing Committee, however, determined that Respondent did not violate Rule 1.7(a), as she had conducted a reasonable investigation into the interests of Penn State and the Individual Clients with respect to the grand jury investigation and had, based upon that investigation, reasonably concluded that the interests of Penn State and the individuals were consistent. *Id.* at 42-44. The Hearing Committee further concluded that Respondent did not violate Rule 1.1, as she had provided competent representation of Curley, Schultz and Spanier. *Id.* at 44-45. Further, Respondent did not violate RPC 1.6(a), as her testimony before the grand jury fell within exceptions to that rule and did not improperly reveal protected information about her representation of the individuals. *Id.* at 44-64. Because Respondent had not engaged in misconduct, the Hearing Committee determined that her actions were

2020 WL 808757

not prejudicial to the administration of justice, and therefore Respondent had not violated Rule 8.4(d). *Id.* at 65.

**\*8** Both parties filed exceptions to the Hearing Committee's report. Respondent took issue with the Hearing Committee's determination that she represented Curley, Schultz and Spanier in their individual capacities, while the ODC filed exceptions to its rulings related to violations of Rules 1.1, 1.6(a), 1.7(a) and 8.4(d). On March 18, 2019, the Disciplinary Board issued a report reversing the determinations of the Hearing Committee. The Disciplinary Board agreed with the Hearing Committee that Respondent had represented the three administrators in their personal capacities before the grand jury but concluded that she failed to recognize the multiple conflicts of interest between her clients. Disciplinary Board Report at 28-30, 33-37. The Board further determined that Respondent did not exercise the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representations of Curley, Schultz and Spanier before the grand jury. *Id.* at 30-33. She further failed to maintain the confidentiality of communications between herself and her clients. *Id.* at 37-42. Finally, the Disciplinary Board found that Respondent's conduct prejudiced the administration of justice. *Id.* at 42-43. The Disciplinary Board found that Respondent poses no danger to the public or the profession and that her character remains of the highest quality. The Disciplinary Board concluded that public censure, rather than a public reprimand, is the appropriate remedy in this case. *Id.* at 48.

Respondent poses two questions for this Court's consideration:

1. Did the [ODC] establish by clear and convincing evidence that [Respondent] committed disciplinary violations of Rules 1.1, 1.6, 1.7 or 8.4 of the Rules of Professional Conduct?

2. Was there any legitimate basis to impose any form of discipline upon [Respondent] in the absence of any aggravating factors, multiple mitigating factors and no prior disciplinary history?

Respondent's Brief at 2.

## III. Analysis

### A. Respondent was Personal Counsel to Curley, Schultz and Spanier

We first consider the ODC's contentions that Respondent violated Rules 1.1 and 1.7, which provide as follows:

#### Rule 1.1. Competence

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

#### Rule 1.7. Conflict of Interest: Current Clients

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent.

Pa.R.P.C. 1.1, 1.7. To evaluate these claims by the ODC, we must first decide the nature of the representation that existed between Respondent and Curley, Schultz and Spanier during the time period immediately before and during their grand jury testimony. Curley, Schultz and Spanier insist that Respondent represented them in their individual capacities without limitation. Respondent, in contrast, posits that she represented them only in a representative capacity in their roles as employees and representatives of Penn State.

2020 WL 808757

We begin with Respondent's testimony at the evidentiary hearing before the Hearing Committee, where she offered the following testimony regarding the events leading to her decision to accompany Curley and Schultz at the grand jury for their interviews and testimony:

A. I – I did explain that Tim could have a personal attorney go to go with him to the grand jury, ... and Graham said, "Well, Cynthia, you go with him, you can go with him, you go with him." And I said, "well, yes, but I can't be his personal attorney because I'm general counsel," and I said - - and I said to him, I said, "You know, Tim, that if I go with you, nothing that you say would be confidential," that – and – and I know that the testimony has been I said I have to tell the board of trustees, but I said, "Just like we're talking here to Graham, Graham could know, the board of trustees could know," and I said to him, you, "If you want a personal attorney, you know, just call someone." He said, "I don't know any lawyers." After that discussion, then he went downstairs to my office.

*9 Q. Did Mr. Curley understand the instructions you gave him, based on your understanding?

A. Oh, yes.

* * *

Q. Okay. Did Mr. Curley ask you to be his personal counsel?

A. No.

* * *

Q. Did at some point in time you speak to Mr. Schultz -

A. I did.

Q. – about your representation of him?

A. When he came back from vacation.

Q. And what did you discuss with Mr. Schultz?

A. I discussed the same thing with him. I went through what we in the office called the corporate *Miranda*, and that is, I told him that I could go in with him, he could get personal counsel, I could go in with him, but he knew that I was general counsel of Penn State, that nothing he told me would be confidential as to my client, Penn State, and that I needed to know what he was going to

tell me to determine whether there was any conflict with the client. Gary told me the same thing that Tim told me.

Q. Did Mr. Schultz ask you to represent him in any type of personal capacity?

A. No.

Q. Did Mr. Curley or Mr. Schultz raise any concern about complying or cooperating with the investigation?

A. None.

Q. Now, a lot has been made about these *Upjohn*[10] warnings. Do you know what the *Upjohn* warnings are?

A. Yes.

Q. Do you believe you gave them?

A. Yes.

Q. Was your inquiry about whether a conflict existed between these individuals and the university satisfied?

A. Yes.

Q. Can you explain to the Panel?

A. Well, the fact is, is that there was no way that I was going in if there was a conflict between Penn State and what they were telling me. They both said that [what they had been told back in 2001 about Sandusky's contact with a youth] was horseplay, that it was wrestling around, and that's what they knew. Okay? And there was – that, therefore, no conflict with the university, and so, that was the reason that I – I went in with them, and – and they were – because it was explained to me that this was about the Sandusky investigation, and Penn State had an obligation to cooperate, I mean, there was no way that the university wasn't going to cooperate with this, and that – and they were executives of the university, so –

N.T., 5/23/2018, at 371-379.

Immediately prior to Curley's and Schultz's testimony before the grand jury, the grand jury supervising judge asked Respondent who she represented. She responded as follows:

OAG: Judge, we're here on Notice 29. We have some witnesses to be sworn, Mr. Curley and Mr. Schultz.

Judge: Represented by?

Office of Disciplinary Counsel v. Baldwin, --- A.3d ---- (2020)
2020 WL 808757

Respondent: My name is Cynthia Baldwin, general counsel for Pennsylvania State University.

Judge: Will you be providing representation for both of those identified witnesses?

Respondent: [Schultz] is retired but was employed by the university and [Curley] is still an employee.

N.T. (grand jury), 1/12/2011, at 7–8. In this exchange, Respondent did not plainly indicate either that she viewed herself as representing these administrators solely in an agency capacity or that she represented them in their personal individual capacities. The supervising grand jury judge, in the presence of Respondent, then advised Curley and Schultz of their rights as grand jury witnesses.

**\*10** As witnesses before the Grand Jury, you're entitled to certain rights and subject to certain duties which I am now going to explain to you. All of these rights and duties are equally important and it's important that you fully understand each of them.

First, you have the right to the advice and assistance of a lawyer. This means you have the right to the services of a lawyer with whom you may consult concerning all matters pertaining to your appearance before the Grand Jury.

You may confer with your lawyer at any time before, during and after your testimony. You may consult with your lawyer throughout your entire contact with the Grand Jury. Your lawyer may be present with you in the Grand Jury room during the time you're actually testifying and you may confer with her at that time.

You also may at any time discuss your testimony with your lawyer and except for cause shown before this Court, you may disclose your testimony to whomever you choose, if you choose.

You also have the right to refuse to answer any question pending a ruling by the Court directing you to respond if you honestly believe there are proper legal grounds for your refusal. In particular, you have the right to refuse to answer any question which you honestly believe may tend to incriminate you.

Should you refuse to answer any question, you may offer a reason for your refusal, but you're not obliged to do so. If you answer some questions or begin to answer

any particular question, that does not necessarily mean you must continue to answer your questions or even complete the answers you have started.

Now, any answers you give to any question can and may be used against you either for the purpose of a Grand Jury Presentment, Grand Jury Report or a Criminal Information.

In other words, if you're uncertain as to whether you may lawfully refuse to answer any question or if any other problem arises during the course of your appearance before the Grand Jury, you may stop the questioning and appear before me, either alone or in this case with your counsel, and I will rule on that matter whatever it may be.

*Id.* at 8–10. Spanier later received the same instructions.

Immediately thereafter, at the outset of Curley's grand jury testimony, the following exchange occurred between Curley and counsel for the OAG:

Q. You have counsel with you?

A. Yes I do.

Q. Would you introduce her, please?

A. My counsel is Cynthia Baldwin.

N.T. (grand jury), 1/12/2011 (Curley testifying), at 3. Respondent did not object to this statement or offer any clarification regarding the nature of her representation of Curley, including in particular no statements indicating, or even suggesting, that she represented Curley only in a representative capacity in his role as the athletic director of Penn State.

Likewise, Schultz's testimony began with the following question and answer:

Q. You are accompanied today by counsel, Cynthia Baldwin; is that correct?

A. That is correct.

N.T. (grand jury), 1/12/2011 (Schultz testifying), at 3. Again, Respondent offered no response or disagreement with this testimony and offered no indication that she represented Schultz only in his capacity as an administrator and representative of Penn State.

Case 1:20-cv-00292-JPW    Document 13-5    Filed 03/24/20    Page 14 of 35
Office of Disciplinary Counsel v. Baldwin, --- A.3d ---- (2020)
2020 WL 808757

In April 2011, the outset of Spanier's grand jury testimony began as follows:

> *11 Q. Sir, could you give us your name for the record, please?
>
> A. Graham Spanier.
>
> Q. Sir, you're represented by counsel today?
>
> A. Yes.
>
> Q. Could you just identify counsel?
>
> A. Cynthia Baldwin sitting behind me.

N.T. (grand jury), 4/13/2011 (Spanier testifying), at 3. As with Curley's and Schultz's similar testimony, Respondent did not object or otherwise respond in an effort to advise the grand jury that she represented Spanier in an agency capacity as a result of his position as the current president of Penn State.

[1] Based upon the entirety of the evidence of record, we agree with the conclusions of both the Hearing Committee and the Disciplinary Board that Respondent represented Curley, Schultz and Spanier in their personal capacities at the time of their grand jury testimony. The Hearing Committee found as follows:

> Respondent very clearly sought to ensure that there was no conflict between their interests and the interests of [Penn State]. She said that she could not go in with them to the Grand Jury proceedings unless she was sure that there was no conflict between them and [Penn State]. Her *Upjohn* or *Miranda* warnings, as they were referred to, expressly provided that she can concurrently represent employees of [Penn State] while representing [Penn State] if their interests align. Indeed, [Amy McCall], [Penn State's] former associate general counsel, confirmed that the *Upjohn* warnings were given and the conflict examination made in order to determine if they **could also** represent the individual employees in matters in which they were representing [Penn State], and if this could not be done, then the employees were advised to get their own counsel. She acknowledged that it was common practice for the [Penn State] office of general counsel to provide joint representation to university employees when their interests were aligned.

> Respondent clearly determined on the basis of what these individuals told her that their interests were aligned with [Penn State's] such that she could represent them.

Based upon this conclusion, she told them that she could accompany them to their Grand Jury testimony. While she clearly advised them that they could engage separate counsel, she never told them they needed separate counsel because she could not represent them or that if they did not get separate counsel they would be unrepresented.

We do not find that her admonitions to at least Mssrs. Curley, Schultz and Spanier that their conversations with her were not privileged from disclosure to [Penn State] in any way undermines the conclusion that she represented the individual employees. It is merely the appropriate advice to give one of multiple clients: Where an attorney represents multiple clients in the same matter, it is in fact imperative that they be advised whether their communications with her are privileged from each other or shared jointly. She never told them that their conversations with her were not privileged from disclosure to third parties because she did not represent them; nor did she tell them that [Penn State] was free to authorize the disclosure of her conversations with them to third parties because she did not represent them individually. Instead, all of her statements in this regard were wholly consistent with her representing them jointly with [Penn State].

*12 Hearing Committee Report at 39-40 (emphasis in original).

In its report, the Disciplinary Board added the following relevant findings:

> Mr. Curley, Mr. Schultz and Dr. Spanier were subpoenaed in their personal capacities. They were aware that Respondent was Penn State's General Counsel. Respondent informed each of them that they could have other counsel if they so desired and that she could not represent them if their stories were not consistent and not aligned with Penn State's interests. After hearing their stories, Respondent agreed she could accompany them to the grand jury. Respondent never advised them that she solely represented them in their capacities as agents of Penn State, nor did she advise them that she did not represent them in their personal capacities. There is no writing memorializing discussions regarding the nature of the representation and inherent conflicts and no writing indicating the individuals gave informed consent.

2020 WL 808757

At the grand jury, each Individual separately identified Respondent on the record as their counsel. They did not identify Respondent as Penn State's counsel nor did they indicate that her representation of them was limited to their status as employees of Penn State. Respondent did not contradict or limit their declarations.... She allowed them to testify under oath that she was their counsel without limitation, and she did not correct these statements. The evidence supports the conclusion that Respondent agreed to represent Mr. Curley, Mr. Schultz, and Dr. Spanier as their personal attorney (and) that they understood this to be the agreement.

It follows that Respondent did not understand the nature of her representation of Mr. Curley, Mr. Schultz and Dr. Spanier, as she maintains that her representation of the individuals was solely in their capacities as agents of Penn State. In the face of the indicia of her representation of the individuals in a personal capacity, we find no evidence that Respondent at any time stated to any of them, that she solely represented them in their capacities as agents of Penn State. Any intention on Respondent's part to limit her representation of Mr. Curley, Mr. Schultz and Dr. Spanier to one only in their capacity as agents of Penn State was ineffective, because Respondent never told them she was so limiting her representation, and Mr. Curley, Mr. Schultz and Dr. Spanier had no basis upon which to conclude that she was doing so.

Disciplinary Board Report at 29-30.

As indicated, the present record of disciplinary proceedings fully supports these findings. In further support of our determination that Respondent represented Curley, Schultz and Spanier in their individual capacities is the guarantee under Pennsylvania law that witnesses offering testimony before a grand jury are entitled to the presence of their counsel. As far back as *In re Groban's Petition*, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957), the United States Supreme Court recognized that a witness testifying before a grand jury remains protected by the privilege against self-incrimination. *Id.* at 333, 77 S.Ct. 510. Further, in *Commonwealth v. McCloskey*, 443 Pa. 117, 277 A.2d 764 (1971), this Court held that a grand jury witness must be advised/warned that he is entitled to come before the court accompanied by counsel and obtain a ruling as to whether he should answer a question that may incriminate him.

*13 Such a warning gives full recognition to the delicate position of a witness before an investigating grand jury. He has been summoned to testify, and he is subject to contempt proceedings should he refuse to testify without justification. The question of when a witness has 'reasonable cause to apprehend danger' and hence can exercise his right against self-incrimination is not always clear. As was stated in *Jones v. United States*, 342 F.2d 863 (D.C. [Cir.] 1964).

If ... [a witness] answers incriminating questions he may make it certain ... that he will be indicted. And testimony before the grand jury may be used ... to impeach his testimony at trial. If he refuses to testify at all, or to answer some questions on the ground that answers might incriminate him, the grand jury may draw conclusions. If he refuses to answer questions that are not incriminating, he may be guilty of contempt.

*Id.* at 868. Determining what is an incriminating statement is not always clear to a layman. We thus conclude that a subpoenaed witness who has given testimony before an investigating grand jury without the above warning has been denied his right against self-incrimination.

*Id.* at 777; *see also id.* at 780 (" 'A potential defendant who is brought before the grand jury without an attorney at his side is almost helpless.") (Eagan, J. concurring and dissenting). As recited, Curley, Schultz and Spanier received the warning in Respondent's presence. It is impossible to conclude in light of the seriousness and solemnity of the warnings administered by the supervising judge that the Individual Clients believed anything other than their personal interests were being protected by Respondent. Likewise, knowing she was the only attorney present with the Individual Clients when the warnings were administered, it cannot be fathomed that Respondent did not understand that she was representing them personally.

In 1978, this Court adopted what is now Rule 231 of the Pennsylvania Rules of Criminal Procedure. It provides in relevant part as follows:

### Rule 231. Who May Be Present During Session of an Investigating Grand Jury

(A) The attorney for the Commonwealth, the alternate grand jurors, the witness under examination, and a

2020 WL 808757

stenographer may be present while the investigating grand jury is in session. Counsel for the witness under examination may be presented as provided by law.

(B) The supervising judge, upon the request of the attorney for the Commonwealth or the grand jury, may order that an interpreter, security officers, and such other persons as the judge may determine are necessary to the presentation of the evidence may be present while the investigating grand jury is in session.

Pa.R.Crim.P. 231(A)-(B). In 1980, our General Assembly included section 4549(c) as part of its enactment of the Investigating Grand Jury Act, 42 Pa.C.S. §§ 4541-4553.

## § 4549. Investigating grand jury proceedings

\* \* \*

**(c) Counsel for witnesses.--**

(1) A witness subpoenaed to appear and testify before an investigating grand jury or to produce documents, records or other evidence before an investigating grand jury shall be entitled to the assistance of counsel, including assistance during such time as the witness is questioned in the presence of the investigating grand jury. In the event counsel of the witness' choice is not available, he shall be required to obtain other counsel within a reasonable time in order that the work of the grand jury may proceed.

*14

\* \* \*

(3) Such counsel shall be allowed to be present in the grand jury room during the questioning of the witness and shall be allowed to advise the witness but shall make no objections or arguments or otherwise address the grand jury or the attorney for the Commonwealth.

42 Pa.C.S. § 4549(c)(1), (3).

Two observations are in order. First, pursuant to Rule 231(A) and subsection 4549(c)(1), Respondent would not have been permitted to accompany Curley, Schultz and Spanier into the grand jury proceedings unless she was their personal counsel. In addition to the grand jurors themselves, Rule 231(A) strictly limits entry to the attorney for the Commonwealth, the alternate grand jurors, a stenographer the witness under examination, and counsel for the witness. Curley, Schultz and

Spanier were each compelled to testify pursuant to a subpoena directed to them individually (not in their corporate capacities as a representative of Penn State), and thus pursuant to section 4549(c)(1) they were each entitled to personal counsel. As such, if Respondent was not their personal counsel, but rather solely counsel for Penn State as she now contends, pursuant to Rule 231(B) she could have gained entry into the grand jury room only by order of the supervising judge. Pa.R.Crim.P. 231(B). The notes of testimony, however, do not reflect that any request was made, either by counsel for the Commonwealth or the grand jury, for permission to permit Respondent's presence in the room. All in attendance must have understood that Respondent represented these witnesses in their personal capacities.

Second, as now provided by rule and statute, a witness's right to representation before the grand jury is a personal right belonging to the witness. As is clear from the above-quoted subsections of 4549(c) of the Investigating Grand Jury Act, counsel is permitted to accompany the witness to provide advice and assistance, and as this Court made clear in, inter alia, *McCloskey*, 277 A.2d at 777, this advice and assistance extends primarily to provide invaluable counsel regarding responses to questions implicating the right against **self-incrimination**. If it were true, as Respondent now contends, that her representation of the three individuals in question here was limited to their roles as administrators of Penn State, then she had no professional obligation during their grand jury testimonies to protect their personal interests, including no duty to assist them with timely advice regarding their proper invocations of objections based upon their rights against self-incrimination. For purposes of Rule 231 and section 4549(c), such representation would be the equivalent to no representation at all. [11] As previously set forth, at the outset of their testimonies, the supervising judge informed the three witnesses in detail regarding their rights to the advice and assistance of their lawyer and the ability to consult with their lawyer at any time throughout their testimonies. Were we to conclude that Respondent did not represent Curley, Schultz and Spanier in their personal capacities, as Respondent argues, it would amount to a determination that these three witnesses effectively waived their rights to counsel before the grand jury. The record contains no indication that any such waivers occurred. Instead, the record unequivocally establishes that the Individual Clients reasonably believed that Respondent was representing them personally and individually. [12]

2020 WL 808757

## B. Competency and Conflicts of Interest

### Pa.R.P.C. 1.1

*15 [2] Pa.R.P.C. 1.1 requires counsel to render competent representation to clients. The Disciplinary Board, based upon its review of the evidentiary record, determined that Respondent "violated this rule, as she failed to exercise the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation of her clients before the grand jury, and further failed to properly advise and advocate on their behalf, to their detriment." Disciplinary Board Report at 30. For the reasons set forth herein, we agree with this conclusion.

By her own admission, Respondent had no criminal law experience and had never represented a client before a grand jury. N.T., 5/23/2018, at 430-31. She also did not testify that she consulted with counsel experienced in these areas in preparation for the grand jury testimony of Curley and Schultz or in responding to the subpoena duces tecum. *Id.* at 434. To the contrary, the record plainly reflects that Respondent did not exhibit any understanding of the magnitude of the challenge that she was facing. Respondent should have understood that by subpoenaing Curley and Schultz, the grand jury investigation was expanding beyond the conduct of Sandusky into the possible roles that individuals associated with Penn State may have had in facilitating or covering up his criminal acts, including in particular those that occurred on the Penn State campus. Their testimony potentially exposed Curley and Schultz (and later Spanier) to significant criminal liability, including prosecution for perjury, obstruction of justice, endangering the welfare of children, failure to report child abuse, and conspiracy. As representatives of Penn State, their testimony also potentially exposed the university to criminal liability as well as massive civil liability.

Despite the enormity of the situation confronting her, Respondent did very little in advance of her clients' appearances before the grand jury. She met separately with Curley and Schultz on one occasion each, at which time she provided a general review of the grand jury process, advised them of their right to counsel of their choosing, and told them to tell the truth. Nothing in the record, however, indicates that she spent any time with either Curley or Schultz reviewing the types of questions that they were likely to be asked by the grand jury or how best to respond to any such questions. Likewise, the record does not reflect

that Respondent advised them of their rights to assert their rights against self-incrimination, or otherwise describe to them the nature and types of crimes to which they might be subjecting themselves if they did not assert this right. Instead, the substance of Respondent's self-described preparation of Curley and Schultz before their grand jury testimony was, in its totality, to "tell the truth." Despite having three additional months to prepare Spanier for his grand jury testimony, the record does not reflect that she did anything more in this regard than she had done for Curley and Schultz.

Respondent asserts that she did not prepare more diligently in advance of the grand jury appearances because Curley and Schultz lied to her, misrepresenting that they were free of all wrongdoing. Concurrent with the representations of Curley and Schultz, Respondent was representing Penn State with regard to its response to the subpoena duces tecum. While it is questionable whether an attorney can ever blindly rely on statements by a client regarding events that occurred years prior to anticipated testimony, it was below any reasonable standard of care to do so here where another client may have been in possession of relevant documents. The duty to investigate becomes all the more important when, as here, counsel undertakes the representation of multiple clients, one of which is a sophisticated institutional client with massive document retention capabilities.

*16 Despite the urgent need, the record here reflects that Respondent conducted little [13] or no independent investigation prior to accompanying Curley and Schultz into the grand jury room. She did not, for instance, interview any members of their staff to inquire regarding their knowledge of prior Sandusky investigations. She also did not have anyone search their offices for relevant documents. As of November 2011, eleven months after Schultz's grand jury testimony (in which he indicated that prior to his retirement he had kept notes regarding Sandusky matters, but thought they had "probably been destroyed"), a file containing said notes (with incriminating details regarding the 1998 and 2001 incidents) remained in his prior office. This file was later obtained by the OAG.

Most importantly, prior to producing the Individual Clients for testimony before the grand jury, Respondent failed entirely to coordinate a search of any of the electronically stored data, including emails, on Penn State's computers. As a result of her multiple representations, Respondent had both an obligation to advise Curley, Schultz and Spanier and an obligation to comply with the subpoena duces tecum

2020 WL 808757

served on Penn State in January 2011. According to the grand jury, Penn State "had in place a well-defined historical practice and procedure for responding to subpoenas," and that "[s]ubpoenas that might encompass electronically stored data (such as emails and documents stored on a computer or network drive) would routinely be sent to the specialized unit called the "SOS." Grand Jury Presentment at 23. The SOS included "information technology professionals [who were] trained and dedicated to assembling responsive electronically stored data in response to litigation needs or other legal process." *Id.* Remarkably, however, the grand jury determined that this "well-defined historical practice and procedure" was not implemented by Respondent:

> None of the SOS professionals were ever shown subpoena 1179 before the arrests of Sandusky, Schultz and Curley [in November 2011]. Likewise, investigators contacted the information technology employees of Penn State, who were not members of the SOS unit but had access to the electronically stored data likely to be searched to fulfill the requirements of subpoena 1179. These information technology employees likewise stated that they were never requested to fulfill any requests for Sandusky related information.

*Id.* at 32.

During her grand jury testimony, Respondent insisted that she did involve Penn State's information technology professionals in her efforts to comply with the subpoena duces tecum.

Q. Now, the subpoena duces tecum, Subpoena 1179, can you go through with the grand jury the efforts you made to enforce the subpoena and comply with it and what happened?

A. Right. What we do is to send out a notice to everybody who is affected by that to say that you have to – you have to preserve everything and because we're going to have to turn over all of this information and so I did tell Tim Curley, Gary Schultz, [and] Graham Spanier that they would have to do that and turn over all of the information over.

Now, we have, of course, IT people, and we have other people who will help to get that information but that is what I told everybody, to try to get all of that information in and turn it over to the Office of Attorney General.

N.T. (grand jury), 10/26/2012 (Respondent testifying), at 16. In an interview with the Freeh group in February 2012, however, Respondent stated that "she did not investigate the Sandusky matter or look for Schultz, Paterno or Curley emails in the [Penn State] system that might relate to the Grand Jury's investigation." Freeh Report at 83 (citing interview with Respondent on February 29, 2012).

**\*17** The significance of Respondent's failure to conduct a proper investigation prior to agreeing to represent Curley, Schultz and Spanier before the grand jury became abundantly clear when in November 2011 the Penn State Board of Directors intervened and ordered university personnel, including in particular its information technology professionals, to work directly with the OAG's office to obtain the emails and other documents sought by the subpoena duces tecum served back in January 2011.

> On November 8, 2011, the Board of Trustees of Penn State terminated Graham Spanier as the President of the University. The Board of Trustees also directed that University personnel were to cooperate with the law enforcement investigation of Jerry Sandusky and Penn State. Almost immediately following those two events, actual compliance with the Grand Jury subpoena (past and present) and cooperation with the investigation began to be realized. Law enforcement investigators, working in conjunction with [the] Penn State IT staff, were able to process massive amounts of electronically stored data and began a lengthy process of review and analysis. For the first four months of 2012, large amounts of evidence – much of which had been sought

2020 WL 808757

and subpoenaed more than a year prior – was uncovered and provided to investigators. This evidence included significant emails from 1998 reflecting knowledge of, and involvement with, the investigation of Sandusky with two young boys in May of 1998. In addition, significant emails were discovered, reflecting direct evidence of involvement by Graham Spanier, Gary Schultz, and Tim Curley in the failure of Penn State to report to child welfare or law enforcement authorities the crimes reported by Michael McQueary in February of 2001.

Grand Jury Presentment at 32.

As such, it is clear that information critical to Respondent's decision to represent simultaneously not only Penn State but also the three administrators was at all times contained within the university's computer servers and available for extraction upon request. Respondent did not conduct this investigation before agreeing to concurrently represent Penn State while personally representing Curley and Schultz (and later Spanier) in connection with their grand jury testimony. While we note that the subpoenas directed to Curley and Schultz provided only nine days between their service (on January 3, 2011) and the scheduled day for testimony (on January 12, 2011), an insufficient amount of time to conduct an investigation, it is also true that Respondent made no attempt to seek a delay. Respondent could have, but did not, request a continuance of their testimony from OAG counsel or file a motion for the same with the supervising judge. N.T., 5/23/2018, at 436. In the absence of adequate time to investigate and garner any documents in the possession of Penn State regarding the Sandusky matters that were generated, received or reviewed by Curley, Schultz and Spanier, Respondent could not conclude that the concurrent representation would be possible due to inadequate information upon which to make a conflict of interest analysis. Moreover, it was imperative for personal counsel for Curley, Schultz and Spanier to fully investigate the available evidence in order to give competent advice on invoking the privilege against self-incrimination in testimony before the grand jury. For these reasons, we conclude that

Respondent failed to provide competent representation to clients in view of Rule 1.1.

## Pa.R.P.C. 1.7

**\*18** **[3]** By agreeing to undertake the concurrent representation of Penn State, Curley, Schultz and Spanier, Respondent committed multiple violations of Pa.R.P.C. 1.7. Rule 1.7 requires attorneys to avoid conflicts of interest in the representation of multiple clients. A conflict of interest exists under Rule 1.7(a)(1) when the representation of one client is materially adverse to the interests of another client or where there is a "significant risk" that the representation of one client will be materially limited by the lawyer's responsibilities to another client as proscribed by Pa.R.P.C. 1.7(a)(2). A client may waive a conflict of interest, but only upon providing informed consent. Pa.R.P.C. 1.7(a)(2). In the present circumstance, the Disciplinary Board properly concluded that Respondent's concurrent representation of Penn State and Curley, Schultz and Spanier "undoubtedly created a significant risk that her ability to consider, recommend or carry out an appropriate course of action for each client could be materially limited by her representation of Penn State." Disciplinary Board Report at 34. According to the Disciplinary Board,

> Respondent understood that the grand jury was investigating Sandusky regarding alleged child abuse, and that Mr. Curley, Mr. Schultz and later Dr. Spanier would be questioned about what they knew. It is difficult to believe that Respondent, a seasoned attorney, did not perceive the danger in her representation of all of these clients.

*Id.*

We agree with these observations of the Disciplinary Board. As noted, Respondent now claims that she did not know of any potential conflicts because Curley, Schultz and Spanier lied to her. Even to the extent that this is true, it does not account for the "significant risks" of substantial conflicts of interest with her representation of Penn State. As indicated, at the time that the grand jury served testimonial subpoenas

Case 1:20-cv-00292-JPW    Document 13-5    Filed 03/24/20    Page 20 of 35
Office of Disciplinary Counsel v. Baldwin, --- A.3d ---- (2020)
2020 WL 808757

on Curley, Schultz and Spanier, it also served Penn State with a subpoena for documents related to Sandusky matters. Its investigation had expanded beyond the criminal conduct of Sandusky into new territory, namely an investigation of the possible criminal conduct of Penn State and its highly ranking representatives. Under Rule 1.7, Respondent could not represent both Penn State and members of its senior leadership without full disclosure of all possible conflicts in order to obtain informed consent, and Penn State documents, especially the trove of emails stored on its computer servers, were the tangible source of information regarding potential conflicts among the four clients. Reliance on painfully cursory interviews with senior leadership to conclude the absence of a conflict was a disservice to Penn State. [14] Proper conflicts analysis required intensive investigation of the actions of said senior leadership. Respondent knew, or clearly should have known, that any wrongdoing by officers of the university would expose **Penn State** to criminal and/ or civil liability. It was obviously in Penn State's interest to avoid these pitfalls and thus, if necessary, to disassociate itself from these individuals. With knowledge of actual wrongdoing by its representatives, as evidenced by available records, Penn State could have avoided the pitfalls of the joint representation. [15]

**\*19** Respondent also failed to recognize the likelihood of conflicts of interests between Curley, Schultz and Spanier. Respondent reasonably should have recognized the substantial risk that the representation of one of the Individual Clients could be materially limited by the responsibilities to each of the other Individual Clients. Spanier, by virtue of his position as President of the University, faced potential criminal liability and was entitled to personal counsel who would seek to isolate him from first level decisions. Schultz and Curley likewise were entitled to personal counsel who would develop a defense unconstrained by consideration of the other's defense given their varying levels of decision making. In *Pirillo v. Takiff*, 462 Pa. 511, 341 A.2d 896 (1975), this Court upheld a decision by the supervising judge of a grand jury to disqualify an attorney and his associate from representing twelve witnesses subpoenaed to appear before the grand jury. In support of the ruling, the Court stated that

> [t]he multiple representation interfered with the individual witness's right to effective counsel. For example, if witness A has information about witness B's

criminal conduct, one attorney could not represent both. It may be in A's best interest for counsel to advise A to cooperate. However, this could operate to the detriment of B.

*Id.* at 899; *see also In re Philadelphia Investigating Grand Jury XII*, 529 Pa. 471, 605 A.2d 318, 320 (1992) (holding that the representation of multiple grand jury witnesses is inappropriate where each witness was a potential defendant and the testimony of each witness might incriminate one or more of the other witnesses).

Discrepancies between the testimonies of Curley, Schultz and Spanier materialized before any of the three testified before the grand jury, evidencing actual conflicts of interest. As noted herein, prior to the grand jury testimony of Curley and Schultz on January 12, 2011, both witnesses were interviewed, accompanied by Respondent, by an OAG investigator. The notes of these interviews reveal important differences in their recollection of events and, critically, they reveal a divergence from what Respondent reported that these individuals told her when she met with them to determine whether she had a conflict of interest in representing them along with Penn State.

Curley's interview notes are relatively consistent with his original description of events when he met with Respondent. Curley indicated that (1) with respect to the 2001 incident, there was no indication that sexual acts had occurred, and that "it seemed to be something that could have been misconstrued and was inappropriate behavior at best;" (2) he did not report the 2001 incident to the police department "because he informed Spanier;" and (3) he had no knowledge of the 1998 incident or any other such matter involving Sandusky." Investigation Notes at 1.

Schultz stands in sharp contrast. Contrary to Curley's recitation and Respondent's version of Schultz's original disclosures to her, Schultz told the OAG investigator (1) that while McQueary's description of the 2001 incident was vague, "it was his impression based upon the information that he was provided that there was inappropriate sexual conduct between Sandusky and a minor;" (2) McQueary had related that "Sandusky may have grabbed genitals;" (3) he was aware of the 1998 incident involving Sandusky and a child and that he "was sure that Spanier knew of the 1998 incident." *Id.*

2020 WL 808757

Both witnesses offered testimony before the grand jury that was substantially identical to these recited interview summaries. The conflicts of interest revealed by these revelations are obvious. Contrary to Respondent's testimony that her interview with Schultz did not result in any report of sexual acts by Sandusky (and thus no knowledge of possible criminal wrongdoing), Schultz revealed in both his OAG interview and before the grand jury that he believed and understood that one or more sexual acts had in fact occurred. Curley was consistent with his denial of any knowledge (much less involvement) in the 1998 incident, but Schultz was not. To the contrary, Schultz not only indicated that he knew about the 1998 incident, he also testified that Spanier was unquestionably aware of it. In his later grand jury testimony, Spanier, also represented by Respondent, testified that he lacked any knowledge or information relating to the events in 1998.

**\*20** The substantial risk of disqualifying conflicts that should have been apparent from the outset of the service of grand jury subpoenas on the Individual Clients became actual conflicts at least as early as the OAG interviews preceding the grand jury testimony. Respondent failed to take any actions in response to this information, resulting in multiple violations of Rule 1.7. After their interviews and prior to their grand jury testimony, Respondent should have advised Curley and Schultz that she could not represent either of them and obtained a continuance until independent counsel could be obtained by them. She also could not subsequently represent Spanier because Schultz's recollection of events linked him (and Penn State) to knowledge of the 1998 incident, which Spanier consistently (including in his grand jury testimony) denied. The interviews and grand jury testimony of Curley and Schultz also implicated Spanier with knowledge of Sandusky's activities. Although it should have been clear at the time of the service of the subpoena that the Individual Clients needed personal counsel, the information obtained in the interviews preceding Curley, Schultz and Spanier's grand jury testimony cried for the conclusion that each required experienced personal counsel. The best interests of one or all of them may have been an offer to cooperate but this advice would or could have been detrimental to the other concurrently represented clients. Concurrent representation of Penn State, Curley and Schultz was patently improper and violative of Pa.R.P.C. 1.7.

## C. Confidentiality

### Pa.R.P.C. 1.6

**[4]** Pennsylvania Rule of Professional Conduct 1.6, regarding confidentiality, provides in relevant part as follows:

(a) A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b) and (c).

(c) A lawyer may reveal such information to the extent that the lawyer reasonably believes necessary:

\* \* \*

(3) to prevent, mitigate or rectify the consequences of a client's criminal or fraudulent act in the commission of which the lawyer's services are being or had been used[.]

(4) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim or disciplinary proceeding against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client;

Pa.R.P.C. 1.6(a), (c). The confidentiality provisions of Rule 1.6 provide broader protections than does the attorney-client privilege. [16] *In re Gartley*, 341 Pa.Super. 350, 491 A.2d 851, 859 (1985), *aff'd sub nom. In re Search Warrant B-21778*, 513 Pa. 429, 521 A.2d 422 (1987) ("The attorney-client privilege is more limited than the ethical obligation of a lawyer to guard the confidences and secrets of his client."). As one court has explained,

"The professional rules ... [embrace] **a broad ethical duty** not to divulge information about a client." [Charles W. Wolfram, Model Legal Ethics § 6.1.1, at 242 (1986) ] (emphasis added). An attorney's duty of confidentiality applies not only to privileged "confidences," but also to unprivileged secrets; it "exists without regard to the nature or source of the information or the fact that others share the knowledge." *Perillo v. Johnson*, 205 F.3d 775, 800 n. 9 (5th Cir. 2000) (quoting ABA Model Code of Professional Responsibility Canon 4, DR 4-101

2020 WL 808757

and EC 4-4) (internal quotation marks and alterations omitted). "The confidentiality rule applies not merely to matters communicated in confidence by the client[,] but also to **all information relating to the representation, whatever its source.**" *Id.* at 800 n. 10 (quoting ABA Model Rules of Professional Responsibility 1.6 & cmt.5) (emphasis added)[.]

*In re Gonzalez*, 773 A.2d 1026, 1031 (D.C. 2001) (emphasis in original).

Before deciding whether Respondent violated Rule 1.6 during her grand jury testimony, we must first review the substance of that testimony. When Respondent was subpoenaed to testify in October 2012, neither she, Curley, Schultz nor Spanier were still employed by Penn State. Curley and Schultz had been criminally charged and retained new counsel. Contending that Respondent had represented their clients in their personal capacities, counsel for Curley and Schultz had both advised the supervising judge of the grand jury that they were asserting claims of attorney-client privilege with respect to all communications with Respondent. In a conference held prior to Respondent's grand jury testimony that included counsel for the OAG, Respondent's private counsel, and Penn State's new counsel, the participants discussed whether questions posed by counsel for the OAG would inquire into areas implicating the attorney-client privilege claimed by Curley and Schultz (and possibly Spanier, who had not yet been charged with a crime). Hearing Committee Report, Exhibit M. Counsel for the OAG represented that there would be no inquiries in these areas, and that as a result these privilege issues could await determination at a future date. Hearing Committee, Exhibits M at 11-12. At this conference, Penn State expressly waived any privilege it had with respect to Respondent's communications with Curley and Schultz (but not Spanier).[17] Hearing Committee Report, Exhibits K(e), K(h). The supervising judge accepted OAG's representation and Respondent's grand jury testimony proceeded a few days later. Hearing Committee Report, Exhibits M at 13.

**\*21** Respondent's grand jury testimony began with a review of her confidential conversations with each of the three administrators regarding Penn State's compliance with its subpoena duces tecum:

Q. And let's go through each one. Tell us about your conversations - we'll start with Tim Curley and what you discussed with him, what he needed to do to comply with that subpoena and what happened.

A. Well, everybody was told that they - that any people who worked under them, they had to notify any people who worked under them to also preserve everything and find out if there was any Sandusky -related materials so that we could turn them over to the Office of Attorney General. That was done with Mr. Curly [sic]. That was done with Mr. Schultz and with Graham Spanier. I remember a conversation with Graham about his emails, and he was telling me about how many emails he had because the IT people would have to go in and get those e-mails.

Q. Did there come a point when you had these conversations one-on-one with these individuals or were there times when some or all of them were together and you had these conversations with him, if you recollect?

A. I know that I had the one-on-one. There may have been times when they were all together that I have these conversations, but I really don't remember one of those times.

Q. Again, staying with Mr. Curley, did he get back to you at any point and tell you whether or not he had evidence or materials that would be responsive to the Subpoena 1179?

A. Right. Yes.

Q. What did he say?

A. No, he didn't have any materials.

Q. And your conversations with these three gentlemen; Schultz, Spanier, and Curley, were specific correct? They involved emails, paper files, any information --

A. Anything that could – any document – documents that they had whether they be electronic or non[-]electronic.

Q. Is it fair to say they assured you they would go through their e-mails and talk to their staff and find anything that was responsive?

A. They said they would check and get back to me.

Q. So Mr. Curley gets back to you and says there is nothing?

A. Correct.

2020 WL 808757

Q. And, of course, everybody in these discussions knows that Sandusky had worked for the Athletic Department for almost 30 years?

A. Right.

Q. And now, tell us about Mr. Schultz, what he told you he would do and then what response he gave you ultimately?

A. He also indicated that he would – he would look. In fact, he told me that he would look for anything that he had; and especially, he was going to look for documents that would help his recollection and he got back to me specifically and said that he didn't have anything.

Q. And, again, you mentioned Mr. Spanier and that he provided detail to you in terms of he told you that he had a great many e-mails that he could go through right?

A. He said he had a lot of emails because he – he never deleted anything. So, yeah, he may have had more emails than anybody else.

Q. That was his claim?

A. Right.

Q. And again, he got back to you and said nothing?

A. No.

Q. He didn't say nothing. He said he didn't have anything?

A. Right. He said, well, all of his e-mails were there, but he didn't have anything else.

Q. Now, as you know and the grand jury knows, since this case was charged against Mr. Sandusky and Mr. Curley and Mr. Schultz, a fair number of e-mails from 1998 and 2001 have been discovered?

\*22  A. I know that now.

Q. Right. And those e-mails relate directly to the 1998 investigation of Sandusky and the 2001 allegations of crime – well, the criminality has actually been found at this point. Observed by Mr. McQueary.

Did they ever in any way, shape or form disclose to you when you were asking them for this materials anything about 1998 or 2001 and the existence of e-mails from those events?

A. Never.

Q. We also know that Mr. Schultz has a file regarding Jerry Sandusky in his office; and that in that file there were documents related to his retirement agreement. There were drafts and other documents related to his employment and his retirement and then there were also handwritten notes and emails pertaining to the 1998 crimes of Mr. Sandusky and the 2001 crimes of Mr. Sandusky. Again, same question, did he ever reveal to you the existence of that Sandusky file or any of its contents?

A. Never. He told me he didn't have anything.

N.T. (grand jury), 10/26/2012 (Respondent testifying), at 16-20.

Respondent's testimony then turned to her conversations with Spanier. The OAG interviewed Spanier, accompanied by Respondent, on or about March 22, 2011. On March 24, 2011, the OAG served Spanier with a subpoena to compel his testimony before the grand jury on April 13, 2011. Respondent offered the following testimony regarding Spanier's preparation for the interview and subsequent testimony:

Q. Okay. Now, tell us, if you would, about your discussions with Spanier before that interview. I'm specifically interested in, you know, that anticipation of questions he would have had going into that interview.

A. Okay. Because being interviewed by the Office of Attorney General is serious in itself, I said to him, you know, when they question you, Graham, they are going to talk about things like – they are going to use words like, sodomy and pedophile because I didn't want him to be shocked by the questioning and the type of questioning.

And you have to, you know – you have to be aware that they are going to use that and you have to tell the truth and you will go in and be interviewed. He said to me, you know that is fine. I know that. No problem. That was it.

Q. Okay. Well, tell us about the context, too, that these questions were likely to rise. In other words, at that point in time, March of 2011, is Graham Spanier fully aware that he is likely to be asked about the 1998

investigation of Sandusky and the 2001 allegations of Mike McQueary?

A. He is fully aware of both 1998 and what was then 2002 but, yes. He was very aware of those and there is – there is no doubt because at some point, I became aware of the 1998 and went to get the report.

Q. Okay. And let's talk about that. You got the report from the 1998 investigation, I believe, in January of 2011, correct?

A. Urn-hum. That is correct.

Q. And that copy of the report that you had, was it copied and given to Spanier or disbursed to Spanier, Schultz, Curley or tell us about that?

A. No. It was not disbursed because we had certain considerations because of various laws that there are and because of that, our office got the copy; but it was not disseminated even though Graham was aware that I had gotten a copy of the report.

*23 Q. Okay. Did he ever ask to – to read it or come to your office as far as you know and read it?

A. No, he did not.

Q. And what was he telling you about the 1998 investigation?

A. That he didn't know anything.

Q. Now, however, before he comes to the interview, he knows that he is going to be questioned about that?

A. He is aware of that.

Q. Okay. Now, is he aware of that just from his conversations with you or did he become aware that he was getting that information from somewhere else as well?

A. He appeared to be getting the information from elsewhere.

Q. Well, tell us, you know, what you come to understand.

A. I came to understand that he was having other discussions with Mr. Curley and Mr. Schultz.

Q. Okay. That understanding – tell us how clear it was. Was that what Spanier was telling you?

A. Correct.

*Id.* at 22-25.

Respondent also provided a review of Spanier's representations to her regarding the limited nature of his involvement in the resolution of the 2001 incident:

Q. Now, as I understand it, and again, I don't want to mischaracterize anything, what Spanier has been telling you through this whole period of time is that he knows nothing about the 1998 investigation of Sandusky, he didn't know anything about it at the time, 1998?

A. Correct.

Q. And that in 2001, he was told very little about that. Can you tell us what he specifically was saying to you about those two incidents?

A. What he was saying is basically this: I'm the President of the University. With this situation, it was a situation I expected my Senior Vice President and the Athletic Director to handle. Needless to say, they came to see me. We had a discussion, and I thought they handled it.

Q. Had he ever provided you any details about his involvement in the 2001 situation?

A. I remember that he had talked about they had come to him and they had reached a decision [about] what they were going to do and that he – his expectation was that Tim and Gary would take care of it.

Q. Well, in addition to that, did he ever articulate, you know, what it was that he was told was seen in the shower?

A. Yeah. Horsing around. Horseplay.

Q. And that was - are those the words or the type of words that he used repeatedly?

A. Those were the words that he used. Horsing around and horseplay.

*Id.* at 39-40.

Finally, Respondent testified to the grand jury regarding her reactions to Spanier's interviews with the New Yorker magazine and ABC Nightline:

Case 1:20-cv-00292-JPW   Document 13-5   Filed 03/24/20   Page 25 of 35
Office of Disciplinary Counsel v. Baldwin, --- A.3d ---- (2020)
2020 WL 808757

Q. Okay. Let me talk to you about your perspective now on all of this. At the time that these events are occurring, and I don't mean to be incredibly obvious here, but at the time that these this investigation is occurring, you have no awareness of the e-mails from 1998 and 2001 and the other documents that demonstrate their awareness and involvement in the 1998 and 2001 incidents, correct?

A. Correct.

Q. And want – what information are you operating on? What presumption are you acting on?

A. I'm operating under the presumption that they have told me the truth. They don't know anything else. They have told me the truth. Graham has said that he – what he doesn't know and I believed him.

*24 Q. There is a great deal of time that has passed, a great deal of new information has come to light, a great deal of water under the bridge. Based upon what you know now, what can you tell us about Spanier's representations to you through this lengthy period of the investigation?

A. That he is - that he is not a person of integrity. He lied to me.

Q. In retrospect, how would you characterize the decisions and actions that he made during the investigation? Why did he tell you the lies? Why did he say the things that he said to you?

A. I can't get inside his mind, but the fact is that there is no doubt that he lied to me. I can't think of any reason, other reason for lying than trying to hide it from me.

*Id.* at 66-70.

Just four days after Respondent's testimony the grand jury recommended criminal charges against Spanier, and the OAG charged him with failure to report suspected child abuse, perjury, obstruction of justice, endangering the welfare of children, and conspiracy related to these crimes. Hearing Committee Report, Exhibit U. Simultaneously, the grand jury recommended additional criminal charges against Curley and Schultz, and the OAG filed charges against them for endangering the welfare of children, obstruction of justice and conspiracy related to obstruction of justice, perjury and endangering the welfare of children. *Id.*, Exhibits R, T.

**[5]** Based upon our review of Respondent's grand jury testimony, we conclude that she violated the strictures of Pa.R.P.C. 1.6(a) on multiple occasions. Rule 1.6(a) prohibits an attorney from disclosing any information relating to a representation, except in circumstances where the client consents to disclosure or where disclosures are impliedly authorized in order to carry out the representation. We agree with the Disciplinary Board that neither Curley, Schultz nor Spanier consented to Respondent's disclosure of confidential disclosures they made to her in private conversations. We likewise agree with the Disciplinary Board that Respondent's disclosures of certain confidences were not "impliedly authorized in order to carry out the representation." While Respondent's disclosures may well have been "impliedly authorized" to carry out her representation of Penn State relative to its production of documents in connection with the subpoena duces tecum, the "representation" at issue with respect to "implied authorization" under Rule 1.6(a) is the representation of the client "whose information is protected by Rule 1.6." ABA Formal Ethics Op. 08-450 (2008). Respondent's disclosures related to the production of documents pursuant to the subpoena duces tecum in no respect were "impliedly authorized" to carry out her personal representations of Curley, Schultz or Spanier, the three clients whose confidences she disclosed and who were not under a subpoena duces tecum. In the absence of their informed consent, Rule 1.6(a) did not permit the disclosure of their confidences to third parties. [18] While each of the Individual Clients were former or current employees of Respondent's client Penn State and, as such, could have been interviewed in connection with Penn State's response to the subpoena duces tecum to Penn State, under the circumstances presented, they were entitled to personal counsel during such an interview. As discussed, it was reasonable for the Individual Clients to believe that Respondent was acting as their personal counsel when discussing matters relating to Sandusky.

*25 Respondent asserts a number of defenses to ODC's claims of violations of Rule 1.6(a). As an overarching defense, Respondent relies on the concept of waiver applicable to the attorney-client privilege. In this regard, we note that Respondent offers no legal analysis to explain the alleged interplay between the attorney-client privilege, an evidentiary privilege, and the duty of confidentiality embodied in the Rules of Professional Conduct, specifically Rule 1.6(a). Pertinently, Respondent does not explain how the waiver of an evidentiary privilege can be the basis of an ex post facto defense to a disciplinary claim when the client, the holder of the claim, was not heard in the evidentiary

2020 WL 808757

proceedings before the allegedly waived communication is discussed.

**[6]** The attorney-client privilege is statutorily codified and provides:

> In a criminal matter counsel shall not be competent or permitted to testify to confidential communications made by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon trial by the client.

42 Pa.C.S. § 5916.[19] Despite the language of the statute, communications from an attorney to a client – not just communications by a client to an attorney – are protected under Pennsylvania law. *Gillard v. AIG Insurance Company*, 609 Pa. 65, 15 A.3d 44 (2011).

**[7]** With regard to this privilege and with respect to Spanier, Respondent contends that he waived his attorney-client privilege when he discussed certain of the events in question here in communications he made after his termination from Penn State but before Respondent testified before the grand jury – including in an open letter Spanier wrote the Penn State Board of Trustees and in interviews with the New Yorker magazine and ABC News. In her brief filed with this Court, Respondent focuses in particular on the following passage from Spanier's open letter to the Board of Trustees:

> In reporting to the Trustees, I was guided by and followed all instructions from the University's General Counsel. She told me very little about how she was handling the Grand Jury investigation. She never told me anything about the content of the interviews with athletic department staff or the Curley and Schultz Grand Jury testimony or the interview of Curley and Schultz by the Attorney General when she was present. She did

tell me on at least three occasions, however, that this was the third or fourth Grand Jury on this matter, that there appeared to be no issue for the University, and that the Attorney General did not seem to have any evidence to suggest that something happened involving Penn State. She had, she said, spoken several times to Attorney General staff. I was never told by her of any materials being subpoenaed from the University, or even that I had been subpoenaed to testify. She told me I was going voluntarily, as I had previously agreed to do, and she accompanied me before the judge and in the Grand Jury room and sat through my testimony. I had no preparation or understanding of the context. As I was being sworn in for my Grand Jury appearance, much to my surprise she handed over to the judge a thumb drive containing my entire history of emails back to 2004.

Hearing Committee Report, Exhibit EEE. Spanier made similar statements in his New Yorker magazine and ABC News interviews. *Id.*, Exhibits LL, MM.

In support of this claim of waiver of the attorney-client privilege, Respondent relies upon this Court's recent decision in *BouSamra v. Excela Health*, —— Pa. ——, 210 A.3d 967 (2019), contending that this case "should put to rest any notion that Spanier's open disclosures of purportedly confidential and attorney-client privileged communications were not a complete waiver." Respondent's Brief at 34. In *BouSamra*, during discovery in a civil suit BouSamra sought the production of certain documents that Excela's in-house counsel shared with the company's media consultants, including in particular a memorandum from Excela's outside counsel containing legal advice on matters related to facts that were subsequently litigated. *BouSamra*, 210 A.3d at 971. This Court, concluding that the attorney-client privilege did not extend to the media consultants, affirmed the lower court's finding of waiver. *Id.* Aside from the fact-specific determination of the relationship of the media consultant as

2020 WL 808757

a third-party to the client, *BouSamra* did not plow new legal ground.

*\*26* [8]    [9] *BouSamra* is irrelevant to this case. In *BouSamra*, we restated the established proposition that evidentiary privileges are not favored because they are in derogation of the truth-determining process. *BouSamra*, 210 A.3d at 975 (citing *Commonwealth v. Stewart*, 547 Pa. 277, 690 A.2d 195, 197 (1997)). Inherent in the determination of waiver of the attorney-client privilege is an evidentiary proceeding[20] in which the privilege can be claimed by the client and the assertion of waiver advanced by the party seeking the disclosure.[21] Respondent takes the position that the mere fact of Spanier's public comments waived the attorney-client privilege and she alone could make the determination that his privilege was destroyed. This is, of course, an untenable proposition. Absent an evidentiary proceeding in which the privilege and waiver issues can be adjudicated, an attorney cannot rely on her self-determined and potentially self-serving conclusion that she has been relieved of her duty of confidentiality. *See, e.g., Commonwealth v. Flor*, 635 Pa. 314, 329, 136 A.3d 150 (2016) (holding that while the filing of a claim of attorney ineffectiveness constitutes a waiver of the attorney-client privilege as to the matters at issue, it was error for the trial court not to conduct an issue-specific analysis to determine the extent and scope of the waiver); *Bagwell v. Pa. Dept. of Edu.*, 103 A.3d 409, 420 (Pa. Commw. 2014) (where the issue of waiver of the attorney-client privilege is raised, the burden shifts to the party asserting waiver to demonstrate that a waiver has in fact occurred).

This Court is acutely aware of the ruling made by the supervising judge of the grand jury prior to Respondent's testimony (see discussion supra at —— – ——). Curley and Schultz, through counsel, advised both the Respondent and the supervising judge of their claims of privilege for their communications with Respondent in connection with their grand jury representation. Spanier had not yet done so but it was anticipated that he would. The supervising judge specifically **decided to postpone deciding** whether Curley, Schultz and Spanier held a personal privilege with Respondent. To the extent that the OAG ever intended to assert the waiver of the privilege in a proceeding where that determination could be made, it did not do so.[22]

The Respondent's claim of waiver of the attorney-client privilege by Spanier to justify her disclosures of confidential communications made during her representation of Spanier

has no merit. Absent an express consent to disclosure of confidential communications, an attorney may not self-determine waiver.

*\*27* [10]    Also relying on principles of waiver, Respondent claims that Curley, Schultz and Spanier waived their attorney-client privilege by asserting, in "motions, pleadings, [and] affidavits" filed in connection with their defenses to criminal charges before the common pleas court, that Respondent had engaged in professional misconduct with regard to her alleged representation of them and had attacked the quality of her advice and counsel as their individual counsel. Respondent's Brief at 32 (citing *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406, 414 (1996) (holding that attorney-client privilege is waived in a case alleging a claim of ineffective assistance of counsel claim under the Post-Conviction Relief Act, 42 Pa.C.S. §§ 9541-46)), and *Nationwide v. Fleming*, 924 A.2d 1259, 1264-65 (Pa. Super. 1997), *aff'd on other grounds by an equally divided court*, 605 Pa. 468, 992 A.2d 65 (2010), *abrogated on other grounds*, *Gillard v. AIG Ins. Co.*, 609 Pa. 65, 15 A.3d 44 (2011).

This claim has no merit. While it is true that Curley, Schultz and Spanier did challenge various aspects of Respondent's representation of them in legal proceedings, they did not do so until well after Respondent had testified before the grand jury. Respondent testified before the grand jury on October 26, 2012. Curley, Schultz and Spanier, however, did not file motions in the Court of Common Pleas of Dauphin County challenging Respondent's representation until a year later, in October and November of 2013. Hearing Committee Report, Exhibits R, T, U. As a result, even if the former administrators' various filings in criminal court resulted in a waiver of the attorney-client privilege in those proceedings, there was no waiver at the time Respondent testified before the grand jury. Moreover, the exception to Pa.R.P.C. 1.6(a) set forth in Rule 1.6(c)(4)[23] has no application. At no time (either before the trial court, the Court of Common Pleas of Dauphin County, or the Hearing Committee) did Respondent testify that prior to her grand jury testimony she had anticipated that she might later be required to defend herself in subsequently commenced criminal or disciplinary proceedings. In reality, Respondent was required to defend herself in subsequent legal proceedings **because of** her disclosure of confidences. Thus, the charges she defended against were created by her violation of Rule 1.6.

In addition to reliance on the attorney-client privilege waiver argument, Respondent points to the exceptions

2020 WL 808757

to Rule 1.6(a)'s disclosure requirements as set forth in Rule 1.6(c). Rule 1.6(c)(3) allows an attorney to disclose confidential communications "to prevent, mitigate, or rectify the consequences of a client's criminal or fraudulent act in the commission of which the lawyer's services are being used or had been used." Pa.R.P.C. 1.6(c)(3). The framework for analyzing whether Respondent's grand jury testimony "prevented, mitigated, or rectified" the criminal conduct of the three Penn State administrators is addressed in the comment to Rule 1.6(c)(3), which provides that "[i]f the lawyer's services were made an instrument of the client's crime or fraud, the lawyer has a legitimate and overriding interest in being able to **rectify** the consequences of such conduct." *Id.* comment 13 (emphasis added).

**\*28**   Respondent argues that the administrators were using her "to hide responsive documents from the OAG," Respondent's Brief at 42, apparently suggesting that her services were used in the commission of the crime of obstruction of justice by concealing documents reflecting their involvement with the Sandusky matters. The Hearing Committee agreed with this contention, explaining as follows:

> Here the individual employees had obstructed justice by failing to produce responsive documents they knew existed with intent to prevent themselves from being incriminated. They did so by lying to Respondent with the understanding that she would knowingly use their denials of additional information in responding to the subpoena for the University and them [sic], which is precisely what she did: She responded to a lawful subpoena in her capacity as their lawyer [sic] and an officer of the court by unwittingly transmitting their lies as the truth. When she discovered how her services had been used in this course of the commission of the crime of obstruction of justice, she revealed how they had done this with her testimony before the Grand Jury. We find this to be a clear example of her right to do so under

Rule 1.6(c)(3), and accordingly find that her testimony in this regard is not misconduct on this basis either.

Hearing Committee Report at 60.

This conclusion is dubious. Curley, Schultz and Spanier did not themselves receive a subpoena duces tecum and Respondent did not respond to Penn State's subpoena duces tecum as their lawyer but rather as Penn State's lawyer. As of early 2011, Curley, Schultz and Spanier could not have been engaged in a conspiracy "to hide responsive documents from the OAG." At most, they delayed a response because Respondent did not avail herself of other resources to produce the documents in the possession of Penn State. These administrators had no control over any responsive documents, which include the contents of the "secret file" found in Schultz's former office and the trove of incriminating emails on Penn State's computer servers. It is pertinent to emphasize that there was no allegation that documents were destroyed by the Individual Clients and, in fact, the smoking gun documents were at all times in the possession of Penn State and were ultimately produced after Penn State hired special investigative counsel (*see* supra footnote 3).

For reasons known only to the OAG, Respondent was never questioned as to what steps, if any, she took to respond to the subpoena duces tecum other than her efforts to locate documents through inquiry to her Individual Clients. By the time of Respondent's grand jury testimony, millions of responsive documents had been produced to the grand jury through the efforts of special investigative counsel in coordination with Penn State's SOS unit. The questions posed by OAG's counsel were specific only to Curley's, Schultz' and Spanier's communications to Respondent in response to her inquiries about their possession of documents responsive to the subpoena duces tecum.

It is clear from Respondent's answers to OAG counsel's questions that she tasked Curley, Spanier and Schultz (who was no longer an employee of Penn State) with the responsibility of cumulating documents, including electronically stored emails, for Penn State's response to the subpoena.

> A Well, everybody was told that they
> —that any people who worked under

Case 1:20-cv-00292-JPW    Document 13-5    Filed 03/24/20    Page 29 of 35
Office of Disciplinary Counsel v. Baldwin, --- A.3d ---- (2020)
2020 WL 808757

them, they had to notify any people who worked under them to also preserve everything and find out if there was any Sandusky-related materials so that we could turn them over to the Office of Attorney General. That was done with Mr. Curly [sic]. That was done with Mr. Schultz and with Graham Spanier. I remember a conversation with Graham about his emails, and he was telling me about how many emails he had because the IT people would have to go in and get those e-mails.

*29 N.T. (grand jury), 10/26/2012 (Respondent testifying), at 16. In that very few documents were produced until special investigative counsel was engaged, we must conclude that she believed her obligation to investigate and respond to the subpoena duces tecum was fulfilled without any independent request to the SOS unit to search for documents, even though the protocol for handling responses to subpoena duces tecum was well established and required the involvement of the SOS unit to respond to any subpoena.

As previously discussed, Respondent's failure to investigate prior to undertaking the concurrent representation of the Clients was a breach of the duty of competent representation pursuant to Rule 1.1. Even so (or because of it), based on the record before us, we cannot conclude that Respondent believed that she had any further responsibilities in responding to the subpoena or that it was anything other than the Individual Clients' responsibilities to gather and produce documents. Moreover, believing the Respondent's grand jury testimony as we must because it is uncontradicted, the responses of Curley, Schultz and Spanier, at the least, delayed the timing of a full response to the grand jury's subpoena duces tecum.

However, the Respondent's disclosure did not rectify the use of her services to the extent they lied to her about the non-existence of documents related to Sandusky matters. By the time she made the disclosures about their confidential communications in her grand jury testimony, all of the responsive documents in the possession of Penn State had been produced to the grand jury. Rule 1.6(c)(3) does not authorize disclosure by an attorney to gratuitously incriminate

a client. When the disclosure does not serve the purpose of preventing, mitigating or rectifying the consequences of the use of the client's services, disclosure is not authorized. [24]

Finally, Respondent now contends that she was justified in disclosing client confidences under Rule 1.6(c)(4), which provides, inter alia, that a lawyer may reveal such information to the extent that the lawyer reasonably believes necessary to establish a defense to a criminal charge or civil claim or disciplinary proceeding against the lawyer based upon conduct in which the client was involved. Pa.R.P.C. 1.6(c)(4).

*30 Respondent argues that she was justified under Rule 1.6(c)(4) in disclosing the confidences because at the time of her testimony before the grand jury, she understood that the OAG suspected her of obstruction of justice in connection with Penn State's production of documents in response to the subpoena duces tecum. She points to the testimony of Fina who indicated that the OAG was "aggressively conducting an investigation as to whether [Respondent] and others may have had criminal liability for, again, obstruction, hindering you know." N.T., 5/22/2018, at 261.

[11] The record does not reflect, however, that at the time of her grand jury testimony Respondent knew that she was under suspicion or faced any criminal liability. While she indicated before the Hearing Committee that she received a letter dated December 19, 2011, raising questions regarding Penn State's continuing failure to provide documents in response to the subpoena duces tecum, she also acknowledged that the letter "was not a personal contempt letter," but rather was addressed to Penn State's failures, not her own. N.T., 5/23/2018, at 402. In this regard, it is also significant that by the time Respondent testified before the grand jury (October 26, 2012), Penn State had largely complied, if not completely, with the subpoena duces tecum. Respondent's testimony before the Hearing Committee failed to establish that she understood that the OAG suspected her of possible criminal wrongdoing at the time she testified before the grand jury. Respondent responded to a question as to whether she understood that the OAG considered her a criminal suspect by indicating that "I did learn that much later." N.T., 5/23/2018, at 403.

Moreover, Fina's testimony at the Hearing Committee's evidentiary proceedings, in which he suggested that she was a target in an "aggressive investigation" regarding possible obstruction of justice charges against her for failure to comply with the subpoena duces tecum, is itself questionable. A

review of the transcript of Respondent's grand jury testimony reflects that Fina's questioning plainly does not reflect any "aggressive investigation" of possible criminal wrongdoing by Respondent. Other than having Respondent confirm that neither Curley, Schultz nor Spanier provided her with any Sandusky-related documents upon her request, Fina did not question Respondent regarding the slow pace of Penn State's production of documents responsive to the subpoena duces tecum while Respondent was primarily responsible for compliance. In this regard, it is significant that Fina asked Respondent no questions relating to the grand jury's finding, as set forth in its Grand Jury Presentment, that upon service of the subpoena duces tecum on Penn State in January 2011, it had not been sent to Penn State's specialized SOS unit or any other information technology professionals to collect documents (including emails) related to Sandusky matters. Grand Jury Presentment at 23. As previously described, Fina's questioning of Respondent focused almost exclusively on implicating Curley, Schultz and Spanier for their efforts to avoid the disclosure of incriminating documents and not on any wrongdoing by Respondent.

Because the record does not reflect that Respondent believed that she was potentially subject to criminal liability at the time she disclosed client confidences during her grand jury testimony, we cannot conclude that her disclosures were made as a defense to any such unanticipated criminal charges. Respondent violated Rule 1.6(a) repeatedly in her grand jury testimony by disclosing client confidences without the Individual Client's informed consent and without justification otherwise set forth in Pa.R.P.C. 1.6(c)(3) or (4).

### D. Conduct Prejudicial to the Administration of Justice

### Pa.R.P.C. 8.4(d)

*31    [12] Pa.R.P.C. 8.4(d) makes it "professional misconduct" for a lawyer to "engage in conduct that is prejudicial to the administration of justice." Pa.R.P.C. 8.4(d). Curley, Schultz and Spanier were charged with multiple crimes based on their testimony before the grand jury. Our Superior Court, in a decision not appealed to this Court, concluded that Respondent had revealed confidential communications between herself and the three administrators and that Respondent breached the attorney-client privilege and was incompetent to testify during her grand jury testimony. The Superior Court also determined that Schultz was constructively denied counsel during his grand jury

testimony. As a result, the Superior Court quashed the counts of obstruction of justice and related conspiracy as to Curley; perjury, obstruction of justice and related conspiracy as to Schultz; and perjury, obstruction of justice and related conspiracy as to Spanier.

Respondent's multiple violations of the Pennsylvania Rules of Professional Conduct thus resulted in an inability to prosecute Curley, Schultz and Spanier on a wide number of criminal charges. The Disciplinary Board thus properly found that her conduct was prejudicial to the administration of justice in violation of Rule of Professional Conduct 8.4(d).

### IV. Discipline

We turn to the appropriate form of discipline for Respondent's professional misconduct. The Disciplinary Board, having concluded that Respondent poses no danger to the public [25] or the profession and recognizing that her misconduct here did not reflect any dishonesty in the practice of law, recommends that this Court neither suspend nor disbar her. Instead, the Disciplinary Board recommends that this Court discipline Respondent by and through a public censure. [26]

[13]    [14] The primary purpose of our lawyer discipline system in Pennsylvania is to protect the public, preserve the integrity of the courts, and deter unethical conduct. See Office of Disciplinary Counsel v. Czmus, 586 Pa. 22, 889 A.2d 1197, 1203 (2005); In re Iulo, 564 Pa. 205, 766 A.2d 335, 339 (2001). Consistency in the results reached in disciplinary cases is always an important priority, as similar misconduct should not be punished in radically different ways. Office of Disciplinary Counsel v. Lucarini, 504 Pa. 271, 472 A.2d 186, 190 (1983). We must be mindful, however, that each case must be judged on its own facts, as it is subject to our exclusive jurisdiction and de novo review. Id.

While the discipline imposed in prior cases is typically instructive, this case presents a unique circumstance, as we have not identified any prior case that presents similar facts and circumstances to those at issue here. Recognizing that Respondent has not been the subject of previous disciplinary proceedings and noting that the current violations do not reflect any intentional dishonesty, the Disciplinary Board has recommended that the appropriate discipline for Respondent is a public censure to be administered by this Court, as opposed to a public reprimand to be administered by the Board. In so recommending, the Disciplinary Board relies

2020 WL 808757

upon prior disciplinary cases that do not effectively capture the totality or the consequences of the violations that are present here. In particular, the Disciplinary Board references the following matters:

- *Office of Disciplinary Counsel v. Blair Harry Hindman*, No. 122 DB 2013 (D.Bd. Rpt. 12/8/2014) (S. Ct. Order 2/10/2015), in which this Court, based upon a recommendation by the Disciplinary Board, publicly censured an attorney who redacted information from a document that was unfavorable to his client and submitted the document to the court.

- *Office of Disciplinary Counsel v. Charles J. Allano*, No. 25 DB 2003 (D. Bd. Rpt. 8/31/2005) (S. Ct. Order 12/1/2005), in which the attorney, while serving as a part-time district attorney, dropped criminal charges against a defendant while simultaneously representing that defendant's wife in an unrelated matter. Based upon the Disciplinary Board's recommendation, this Court publicly censured the attorney.

**\*32** - *Office of Disciplinary Counsel v. John Allen Roth*, No. 139 DB 2016 (D, Bd. Order 9/13/2016), in which the attorney violated RPC 1.7(a) and 8.4(d) by engaging in a conflict of interest in two matters, which required opposing counsel to petition the court to have the respondent disqualified. Noting a prior instance of misconduct that resulted in a public reprimand, the Disciplinary Board recommended another public reprimand, which this Court imposed.

- *Office of Disciplinary Counsel v. Carol Tatum Herring*, No. 153 DB 2017 (D.Bd. Order 10/16/2017), in which the attorney represented the parents of juveniles that county authorities sought to remove as a result of repeated instances of sexual abuse. The attorney was found to have violated Rule 1.1 by failing to follow court orders and directives, demonstrating a lack of understanding of the rules of the court and rules of evidence, and failing to timely appeal the correct adjudication. The attorney also violated Rule 1.7 by failing to recognize a conflict of interest in simultaneously representing both her clients and their two older children. With no prior disciplinary history, the attorney received a public reprimand.

Disciplinary Board Report at 46-48.

[15] Given the unique circumstances presented in the current case, these prior decisions do not adequately guide our decision with regard to the appropriate discipline to impose. Unlike the cases relied upon by the Disciplinary Board, which involved a single (or a limited number) of transgressions of the disciplinary rules, the present situation involves a high profile case subject to intense public scrutiny in which Respondent failed in her responsibilities to four clients by undertaking their representations in a highly specialized forum implicating the criminal laws in which she had no prior experience [27] and without consulting with experienced counsel to guide or advise her. She failed to prepare herself or her clients for their grand jury testimony. She also failed to conduct any proper investigation into potential conflicts of interests between her clients before accepting the multiple representations. In her grand jury testimony, she impermissibly revealed many client confidences, which in turn led to criminal charges being filed against her clients. With respect to Spanier, she all but guaranteed that the grand jury would recommend criminal charges, telling the grand jury that Spanier "knew about the 1998 incident [and] he knew about the shower too," and further referred to him as "not a person of integrity." N.T. (grand jury), 10/26/2012 (Respondent testifying), at 60, 70. Poignantly, as a result of her disclosures of client confidences before the grand jury in violation of Rule 1.6, certain criminal charges against the Penn State administrators were not able to be prosecuted. In sum, her simultaneous representations of Penn State, Curley, Schultz and Spanier reflected incompetence, violated her obligation to avoid conflicts of interest, resulted in the revelation of client confidences, and prejudiced the proper administration of justice in cases with significant personal and public effect.

**\*33** While we agree with the Disciplinary Board's acknowledgement that Respondent has never been the subject of prior disciplinary proceedings, this mitigating factor is offset by her lack of remorse for her actions. In her briefs filed with this Court, Respondent has seen fit to cast blame for her problems on everyone involved here including the Disciplinary Board, the ODC, the Superior Court, and the Individual Clients.

Respondent has held a license to practice law in this Commonwealth for approximately twenty years. [28] During this time, she has had an unblemished record, marred by the two episodes of misconduct detailed in this Opinion: undertaking the conflicted and incompetent representations of the Clients and the subsequent breach of her duties to maintain client confidences.

2020 WL 808757

At the time of her disciplinary hearing testimony in May 2018, Respondent, then 73 years old, testified about the extreme stress associated with the fallout from her representations of the Clients and the emotional and physical impact of it. N.T., 5/23/2019, at 349-51. While we have no doubt that most lawyers who are the subject of disciplinary proceedings experience stress in the process, Respondent's experience was intensified because of the significant and persistent public attention associated with her role as general counsel to Penn State in the aftermath of the Sandusky grand jury investigation.

We are also cognizant that the Respondent's disciplinary process has a public element to it, unlike most such proceedings. The Hearing Committee's and the Disciplinary Board's recommendations attracted media attention, as did the oral argument before this Court. We do not discount the effect of the publication of this Opinion recounting Respondent's violations of our rules. It is, in itself, a public censure.

Even against this background and with confidence that the Respondent is unlikely to violate our Rules of Professional Conduct again, we find it necessary to impose discipline in the nature of a public reprimand to be administered by the Disciplinary Board. This is because we are concerned that Respondent has never contemplated, much less expressed, remorse. It is our belief that a public reprimand will reinforce our trust that the Respondent's legal career will go forward without another blemish.

We hereby impose discipline in the form of a public reprimand, to be administered by the Disciplinary Board. Respondent is ordered to pay the costs of investigation and prosecution in this matter.

Justices Dougherty, Wecht and Mundy join the opinion.

Chief Justice Saylor and Justices Baer and Todd did not participate in the consideration or decision of this case.

**All Citations**

--- A.3d ----, 2020 WL 808757

Footnotes

1    Respondent was admitted to the practice of law in the Commonwealth of Pennsylvania in 1980. She served as a judge on the Court of Common Pleas of Allegheny County for sixteen years. In 2006, she was appointed by Governor Edward Rendell to fill a vacancy on this Court until January 2008. She has no record of prior disciplinary infractions. From February 15, 2010 until June 30, 2012, Respondent was Vice-President, General Counsel, and Chief Legal Officer for Penn State.

2    The grand jury documents in the present disciplinary record were unsealed for public review by order of the supervising judge of the grand jury dated August 30, 2019. In addition, the parties have signed a joint notice of their understanding that, consistent with the supervising judge's disclosure order, all of the grand jury materials (including previously-sealed transcripts and legal memoranda) utilized in proceedings before the Court of Common Pleas of Dauphin County, have been unsealed.

3    *Commonwealth v. Curley*, 131 A.3d 994 (Pa. Super. 2016); *Commonwealth v. Schultz*, 133 A.3d 294 (Pa. Super. 2016); *Commonwealth v. Spanier*, 132 A.3d 481 (Pa. Super. 2016).

4    The "Freeh Report" refers to the lengthy report prepared by Freeh, Sporkin and Sullivan, LLP, a firm engaged by the Special Investigations Task Force on behalf of the Penn State Board of Trustees as "special investigative counsel" on November 21, 2011. Special investigative counsel was tasked with, inter alia, investigating the alleged failure of Penn State personnel to respond to, and report to the appropriate authorities, the sexual abuse of children by former Penn State football coach Sandusky.

5    Chief Harmon and the lead detective on the case, Ronald Schreffler, both provided testimony to the grand jury.

6    Paterno retained independent counsel to represent him during the grand jury proceedings.

7    These meetings took place on January 3, 2011 and Respondent did not learn about the 1998 incident until the next day, at which time she obtained a copy of the police report. Freeh Report at 83.

8    Respondent left the employ of Penn State on July 31, 2012.

9    In a separate disciplinary complaint, ODC charged Fina with various violations of the Rules of Professional Conduct in connection with his questioning of Respondent before the grand jury. He later appealed the Disciplinary Board's decision with this Court. *Office of Disciplinary Counsel v. Frank G. Fina*, J-106-2019. This Court entered an order on even date with the filing of this Opinion imposing discipline and disposing of his appeal.

10    *Upjohn Co. v. U.S.*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)

For these reasons, we decline Respondent's invitation to apply the test for a corporate officer to assert a personal claim of attorney-client privilege in connection with communications with corporate counsel, as first announced in *In the Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 123 (3d Cir. 1986); *see also Maleski by Chronister v. Corporate Life Ins. Co.*, 163 Pa.Cmwlth. 36, 641 A.2d 1, 4 (1994), and *United States v. Norris*, 722 F.Supp.2d 632, 637 (E.D. Pa. 2010). Pursuant to the *Bevill* test, to assert attorney-client privilege, the corporate official must demonstrate as follows:

> First, they must show they approached counsel for the purpose of seeking legal advice. Second, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with counsel were confidential. And, fifth, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*Bevill*, 805 F.2d at 125. In *Bevill*, the Third Circuit held that while "former officers and directors of a corporation may not claim privilege for communications made by them in their corporate capacities, they nonetheless may hold a privilege as to communications made by them in their individual capacities." *Maleski*, 641 A.2d at 4.

This Court has not adopted the *Bevill* test and will not do so here, as we do not consider it suitable or appropriate under the circumstances presented, namely where the corporate officer meets with corporate counsel for the purpose of securing representation before an investigating grand jury relating to criminal matters in which he could be implicated and the record belies any conclusion other than Respondent was acting as personal counsel. As discussed hereinabove, the subpoenas served on Curley, Schultz and Spanier were not served on them in their capacities as Penn State administrators but rather on them personally. The record of the grand jury proceedings prior to the Individual Clients' testimony makes clear that Respondent represented them in their individual capacities. Moreover, as explained, Pa.R.Crim.P. 231(A) and subsection 4549(c)(1) of the Investigating Grand Jury Act operate to provide an individual appearing before a grand jury to be represented by personal counsel and Respondent could not be in the grand jury room unless she was personal counsel.

12 Respondent continues to argue aggressively that she represented Curley, Schultz and Spanier in their capacity as employees of Penn State and that Penn State was her only client. She insists that her administration of *Upjohn* warnings divorced her from any claim that she represented these current/former Penn State administrators in a personal capacity. We find it unnecessary to engage in an extended analysis of the United States Supreme Court seminal decision in *Upjohn Co. v. U.S.*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) or its progeny in the context of this case. *Upjohn* warnings are classically given when a corporation is conducting an internal investigation. *Upjohn* provided a framework to identify when employee communications with corporate counsel qualified as protected attorney-client communications with the corporation holding and controlling the privilege. *Upjohn* held, in part, that the privilege applies when the communications concerned matters in the scope of the employee's duties **"and the employee themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice.** *Id.* at 394, 101 S.Ct. 677 (emphasis added).

This was not an internal investigation. Curley, Schultz and Spanier were under subpoena by an investigating grand jury and required advice and representation for that reason. Even if proper *Upjohn* warnings were administered, we find it difficult to imagine how Respondent could have interviewed Curley, Schultz and Spanier in this obviously potentially criminal matter unless they had their own counsel present, let alone agree to "go in with them" when they testified before the Grand Jury. Only a gross misunderstanding of both *Upjohn* warnings **and** grand jury proceedings could explain the persistent claim by Respondent that she only represented Penn State.

13 Respondent contacted former Penn State counsel, Wendell Courtney, and made a brief inquiry into his knowledge of prior investigations of Sandusky.

14 David Rudovsky, ODC's expert in the proceedings before the Hearing Committee, opined that "there is no legal basis to argue that in a situation of multiple representation, counsel should simply assume that what the clients state as to their possible criminal conduct should be taken at face value in assessing a possible conflict of interest or other reason to consider the appropriateness of joint representation." Response to Expert Report of Nicholas Cafardi, Esquire, 5/14/2018, at 5. In his expert report, Respondent's expert, Nicholas Cafardi, did not disagree that clients frequently withhold information related to possible criminal charges against them, arguing instead that "no lawyer could have been prepared to deal with the level of conspiracy among Spanier, Schultz, and Curley to conceal the truth...." Expert Report of Nicholas P. Cafardi at ¶ 34.

2020 WL 808757

The record does not reflect how Penn State agreed to Respondent's concurrent representation with Schultz, Curley or Spanier, or if Respondent considered Penn State's informed consent to be necessary.

Rule 1.6 encompasses (but is not limited to) the attorney-client privilege which in the criminal context has been codified as follows: "In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5928.

In light of our determination hereinabove that Respondent represented Curley, Schultz and Spanier in their personal capacities, Penn State's waivers had no effect upon the scope of Respondent's grand jury testimony. Because Respondent represented the three administrators individually, Penn State could not waive or otherwise release Respondent from her obligations under Rule 1.6 to protect their confidences.

Concurrent clients' confidences may be shared with each other. See Pa.R.P.C. 1.6 cmt. 30 ("With regard to the attorney-client privilege, the prevailing rule is that, as between commonly represented clients, the privilege does not attach.").

The same definition is codified to apply to civil matters. 42 Pa.C.S. § 5928.

In BouSamra, BouSamra filed a motion to compel the questioned documents and Excela filed a written response, at which time the trial court appointed a special master to review the documents in camera. BouSamra, 210 A.3d at 971.

We are unaware of any reported case involving a claim of a general waiver of the privilege by a client to justify disclosure of confidential communications **after the fact of disclosure**. In the ordinary course of evidentiary proceedings, the party opposing the client in a legal proceeding raises the claim of waiver to overcome the privilege; an attorney called to testify about privileged communications asserts the client's privilege and refuses to testify until the waiver issue is resolved.
Of relevance here on the issue of a prior judicial determination of waiver, Pa.R.P.C. Rule 3.10 prohibits a public prosecutor or government lawyer from subpoenaing an attorney to appear before a grand jury to provide evidence concerning a person who is or has been represented by the attorney/witness "without prior judicial approval." Comment 1 to Rule 3.10 provides that the required "prior judicial approval" specifically requires, inter alia, a finding that "the information sought is not protected by Rule 1.6, the attorney-client privilege or the work product doctrine." In the context of Respondent's testimony before the grand jury, this was the evidentiary proceeding in which to advance any waiver claims.

It is not obvious that waiver of privilege was an issue contemplated by the OAG. It appears from the record that the OAG relied solely on the theory that Respondent did not represent the Individual Clients personally, and the privilege was Penn State's to control. Fina N.T. 8/1/2018 at 926.

Rule 1.6(c)(4) provides:

**Rule 1.6. Confidentiality of Information**

* * *

(c) A lawyer may reveal such information to the extent that the lawyer reasonably believes necessary:

* * *

(4) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim or disciplinary proceeding against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client;
Pa.R.P.C. 1.6(c)(4).

Without any legal analysis, Respondent states that the common law crime-fraud exception to the attorney-client privilege allowed her to disclose client confidences to the grand jury. Respondent's Brief at 37-43.
Respondent does not grapple with the precise language of Rule 1.6(c)(3) which unequivocally states that an attorney may only reveal confidences associated with criminal or fraudulent activities if, at the time of said disclosures, doing so would prevent, mitigate or rectify the consequences of the client's wrongful actions. Rule 1.6(c)(3) does not permit disclosures of prior crimes where the only effect or purpose of the revelations is to incriminate the client. See United States v. Zolin, 491 U.S. 554, 562-63, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (stating that the benefit of revealing a past harm that can no longer be prevented does not outweigh the injury to attorney-client relations that would result from such a disclosure). For the reasons previously discussed, we conclude that Respondent's disclosures of confidential communications with the Individual Clients did not prevent, mitigate or rectify the use of her services to the extent they lied to her about the existence of documents related to Sandusky matters. Rule 1.6(c)(3) thus has no application here.

At the time of the Hearing Committee proceedings, the Respondent was acting as an arbitrator. N.T., 5/23/2018, at 350.

Respondent argues that even if she violated any rule, discipline is not warranted. Respondent's Brief at 59.

On its own, a lack of prior experience in an area in which the attorney is unfamiliar is not grounds for a violation of Rule 1.1. Pa.R.P.C. 1.1 cmt. 2. Per comment 2 to Rule 1.1, a lawyer may provide adequate representation in a wholly novel

field "through necessary study" or consultation with an attorney of established confidence in the field in question. *Id.* For the reasons set forth hereinabove, Respondent made no effort to overcome her lack of experience in the present case. Respondent was admitted to practice in 1980 and did so until 1989 when she became a common pleas court judge and then an appointed justice to the Pennsylvania Supreme Court where she served until January 2008 after which her license to practice was reactivated.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.