## <u>APPENDIX OF UNPUBLISHED OPINIONS</u>

*Mylan, Inc. v. Kirkland & Ellis LLP*, No. 15-581, 2015 WL 12733414 (W.D. Pa. June 9, 2015)

Case 1:20-cv-00292-JPW Document 26-1 Filed 05/08/20 Page 2 of 30

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)
2015 WL 12733414

2015 WL 12733414

Editor's Note: Additions are indicated by Text and deletions by Text .

Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

MYLAN, INC. et al., Plaintiffs,
v.
KIRKLAND & ELLIS LLP, Defendant.

Civil Action No. 15 - 581
|
Signed 06/09/2015

**Attorneys and Law Firms**

Jessica Margolis, Michael S. Sommer, Morris J. Fodeman, Wilson Sonsini Goodrich & Rosati, P.C., New York, NY, Roger J. Ecker, Peacock, Keller & Ecker LLP, Washington, PA, William Pietragallo, II, Pietragallo, Bosick & Gordon, Pittsburgh, PA, for Plaintiffs.

Kevin Rosen, Audrey Tan, Daniel S. Floyd, Shannon E. Mader, Gibson Dunn & Crutcher LLP, Los Angeles, CA, Richard W. Hosking, J. Nicholas Ranjan, Melissa J. Tea, K&L Gates, LLP, Pittsburgh, PA, for Defendant.

ECF No. 5

**REPORT AND RECOMMENDATION
ON PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

LISA PUPO LENIHAN, United States Magistrate Judge

**I. RECOMMENDATION**

 **\*1** For the reasons set forth fully below, it is respectfully recommended that Plaintiffs' Motion for Preliminary Injunction (ECF No. 5) be granted as set forth below, subject to the determination and posting of an appropriate bond in compliance with Fed. R. Civ. Proc. 65(c).

**REPORT**

**II. BACKGROUND SUMMATION**

Plaintiffs Mylan, Inc.; Mylan Pharmaceuticals Inc.; Mylan Technologies Inc.; and Mylan Specialty LP (hereafter "Mylan" or "the Mylan Clients"), affiliated pharmaceutical entities and current clients of the law firm of Defendant Kirkland & Ellis LLP (hereafter "K&E"), [1] filed a Complaint against Defendant in the Court of Common Pleas of Washington County, Pennsylvania, on May 1, 2015 alleging that K&E is in violation of its fiduciary duties to the Mylan Clients and under the Pennsylvania Rules of Professional Conduct ("Pa. R. Prof. Conduct"), by virtue of its representation of competitor Teva Pharmaceutical Industries, Ltd. ("Teva"), in the latter's unsolicited and unwelcome attempt to acquire Mylan N.V., the Mylan Clients' parent holding company (hereafter "Mylan Parent"), which was formed as a public company on February 27, 2015. (The unwelcome acquisition is also hereafter referred to as the "hostile takeover attempt".) Plaintiffs also filed a Motion for Preliminary Injunction. See ECF No. 1 (Defendant's Notice of Removal, attaching Exhibits A (Complaint) and B (Motion for Preliminary Injunction)). [2] Following Defendant's timely removal of that action to this Court on May 4th, Plaintiffs filed, on May 7, 2015, a Motion for Preliminary Injunction largely mirroring their State Court filing (ECF No. 5). A Status Conference was held on May 14th and a briefing and evidentiary schedule set (ECF No. 28). Between May 20th and May 25th, the parties submitted briefs; numerous declarations by, counsel, party executives/lawyers, and Teva's financial advisor (Greenhill & Co., Inc.) and executives; multiple expert reports; and other materials (many redacted and under seal) and numerous hard-copy binders of unredacted documents to this Court. On May 25th, they also submitted Proposed Findings of Fact and Conclusions of Law (ECF Nos. 70 (as to Mylan) and 72 (as to K&E, filed under seal)). [3] Despite the questionable relevance to this proceeding of some of the extensive materials submitted, [4] the Court has completed a thorough review of every submitted document from each party, and the additional authorities and related publications referenced therein. [5]

 **\*2** By Joint Stipulation of May 22nd, the parties elected to forego the testimony of witnesses at the Evidentiary Hearing (ECF No. 54). The Evidentiary Hearing was held on May 26, 2015. The Court wishes to acknowledge the skilled briefing provided by both sides, [6] the qualifications of the parties' experts and helpfulness of their reports, [7] and counsels' articulate presentation of the parties' positions on a myriad of issues during the Hearing.

Upon further review of the briefs, the documentary evidence submitted, and the explication and supplementation provided at the Hearing – as well as further review of the related statutory and case law and secondary materials cited by the parties and its own extensive supplemental research, the Court has made the following findings of fact and reached the following conclusions of law.

The Court observes, in reaching its recommendation, that several considerations raised (expressly or implicitly) by the parties are not within the scope of the present determination. [8] And it has concluded that the subject of its determination – *i.e.*, the minotaur in this particular labyrinth – is, (comparatively) simply, whether it is substantially likely that Defendant may, notwithstanding (a) applicable ethical rules prohibiting its undertaking representation directly adverse to a current client and/or (b) the terms of the parties January 9, 2013 Engagement Letter (the "Engagement Letter"), represent Teva in its hostile takeover attempt of Mylan, N.V. (Said representation is hereafter referred to as the "Subject Representation".). Analysis of this question requires the Court to address – in light of the litigation positions adopted by the parties – whether it is substantially likely that the representation is permissible because it is either (1) directly adverse to the Mylan Parent but not the Mylan Clients, and not otherwise within the prohibition of the background rules, or (2) allowed under the Conflicts of Interest provision of the parties' Engagement Letter permitting K&E's representation of other clients "adversely to [the Mylan Clients] or any of [their] affiliates on matters *that are not related* to (i) [past, present or future legal services by K&E to the Mylan Clients under the Engagement Letter] and (ii) other [past, present or future legal services by K&E to the Mylan Clients] or any of [their] affiliates under a separate engagement ...." (Adverse representations to which a conflict objection is effectively waived are designated "Allowed Adverse Representations" (hereafter an "AAR") by the Engagement Letter.) See ECF No. 76 (Plaintiff's Exhibit List for Preliminary Injunction Hearing, Ex. 1) (filed under seal); Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Plaintiff's PFFCL") (ECF No. 70) at ¶ 29 (emphasis added). [9]

**\*3** Where, as here, the Court concludes it is substantially likely that the representation is *impermissible*, *i.e.*, in violation of the governing ethical rules *and* not permitted by the terms of the Engagement Letter, and that Plaintiffs are substantially likely to succeed on the merits of their underlying action for a permanent injunction (*i.e.*, disqualification of Defendant as counsel in the Subject Representation), it must then complete its analysis of the additional factors in its recommendation on Plaintiffs' Motion for Preliminary Injunction. More specifically, the Court looks to whether (a) Plaintiffs would suffer irreparable harm if the injunction were denied; (b) Defendants would suffer greater irreparable harm if it were granted; [10] and (c) the public interests favor grant of the preliminary injunction.

As fully discussed below, the Court – having given the matter extensive and careful consideration, and with due regard for the substantial interests at stake – is compelled to recommend a grant of the preliminary injunction. The Court concurs with the Pennsylvania Supreme Court's emphasis on the critical importance of every attorney's duty of "undivided loyalty" and its indication that deferential regard for, and diligent protection of, this duty is essential to the public trust. Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 529 Pa. 241, 253-54, 602 A.2d 1277, 1283-84 (1992) (" 'There are few of the business relations of life involving a higher trust and confidence than those of attorney and client or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice[.]' ") (quoting Stockton v. Ford, 52 U.S. 232, 247 (1850)); id. (" '[I]t is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it.' "). See also Hyman Companies, Inc. v. Brozost, 964 F. Supp. 168, 170 (E.D. Pa. 1997) (describing, with reference to Maritrans, "the very heart of a lawyer's ethics [as] the continuing and sacrosanct duty of fidelity to a client, versus the right to be emancipated from that client and to go off to do lawyering elsewhere"). [11]

## III. DELINEATED BACKGROUND FINDINGS OF FACT

**\*4** As noted in Section II the facts underlying the instant action concern Defendant's representation of the Mylan Clients and the terms of the Engagement Letter for such representation; its fiduciary receipt of (and legal counsel based in varying degrees upon) corporate confidential, proprietary information and strategies related to, *e.g.*, pricing/marketing, product development, regulatory matters and competitive positions; its unilateral undertaking to represent Teva in a hostile takeover of the Mylan Clients' recently-formed parent holding company (and thus of the entire

Mylan corporate affiliate group); and the scope/nature of Defendant's Teva representation. See generally Plaintiffs' PFFCL, Plaintiffs' Supplemental Proposed Findings of Fact and Conclusions of Law ("Plaintiffs' Supplemental PFFCL") (ECF No. 88), Defendant's Proposed Findings of Fact and Conclusions of Law ("Defendant's PFFCL") (ECF No. 72, filed under seal), and Defendant's Supplemental Proposed Findings of Fact and Conclusions of Law ("Defendant's Supplemental PFFCL") (ECF No. 86, filed under seal).

The Court finds the following facts:

Plaintiff Mylan Inc., a wholly owned indirect subsidiary of Mylan N.V., is a leading global pharmaceutical company, whose affiliates and subsidiaries develop, license, manufacture, market and distribute generic, branded generic and specialty pharmaceuticals. Mylan Inc. is a Pennsylvania corporation with headquarters in Canonsburg, Pennsylvania. Each of the remaining Plaintiffs is a wholly owned subsidiary of Mylan Inc. Plaintiffs' PFFCL ¶1.

Mylan N.V. is a public limited liability company organized in the Netherlands. On February 27, 2015, Mylan Inc. was reorganized as an indirect wholly owned subsidiary of Mylan N.V. Miner Decl. ¶ 17; Ondos Decl. ¶ 23.

Mylan N.V. was originally incorporated as New Moon B.V.; it became a public company and changed its name on February 27th in connection with its acquisition of Abbott Laboratories, Inc. and Mylan Inc. Defendant's PFFCC at ¶ 11.

In the first quarter of 2015, approximately 90% of Mylan N.V.'s revenue came from K&E client Mylan Inc. and its subsidiaries. Ondos Decl. ¶ 24.

In the event of a hostile takeover of Mylan N.V. by Teva, the ownership and control of the Mylan Clients and their products will be in the hands of Teva, and Teva would become the successor in interest to Mylan N.V. Ondos Decl. ¶ 25.

Defendant K&E is a limited liability partnership organized under the laws of Illinois with its principal place of business in Chicago, Illinois. K&E is a law firm and has offices in various locations throughout the United States and the world. Defendant's PFFCL ¶ 9; Plaintiffs' PFFCL ¶ 6.

Discussions between K&E and the Mylan Clients culminated in an Engagement Letter fully executed effective January 9, 2013, and since that time, K&E has represented Mylan

in numerous matters, including matters involving important pharmaceutical products.

At the time of the Engagement Letter, the Mylan Clients were aware that K&E had long served as counsel for Teva in a variety of subject matter areas, including regulatory matters and products liability litigation with respect to certain drugs, some of which were matters in which Teva's interests were directly adverse to Mylan. See Ondos Decl. ¶ 7, 11; Defendant's PFFCC at ¶ 25.

K&E was lead counsel in connection with Teva's $6.8B acquisition in 2011 of Cephalon, Inc., a biopharmaceutical company. Defendant's PFFCC at ¶ 89.

K&E never informed Mylan of any intent or understanding that under the terms of the Engagement Letter K&E would be permitted to undertake representation in an adverse acquisition of the Mylan corporate affiliate group, including the client subsidiaries and products with respect to which K&E was being provided confidential, proprietary and attorney-client privileged information. Miner Decl. ¶ 23; Ondos Decl. ¶¶ 31-32.

In the course of review and negotiation of the Engagement Letter, the Mylan Clients requested, and K&E accepted and implemented, the removal of the term "substantial" from the K&E draft which sought Mylan's consent to K&E's "represent[ing] other entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to [Mylan Clients] or any of [Mylan Clients'] affiliates on matters that are not *substantially related* to ... the legal services that K&E LLP has rendered, is rendering or in the future will render ...." See Ondos Decl. ¶ 12 and Ex. A (*emphasis added*); Pls.' Ex. 3. [12]

 **\*5**  The Engagement Letter contained provisions regarding confidential information because the parties knew that K&E would inevitably receive confidential information as a result of the process of its legal representations of the Mylan Clients. Tr. at 73 (ECF No. 95 under seal).

In connection with work on behalf of the Mylan Clients with respect to generic lidocaine patch products and olmesartan, in April 2013 the parties executed an addendum to the Engagement Letter the provisions of which addressed financial matters but did not relate to Defendant's ethical duties or obligations regarding client conflicts. Miner Decl. ¶ 3, 4; Ondos Decl. ¶ 10; Pls.' Exs. 2, 8.

During K&E's ongoing representation as to the lidocaine patch product, Mylan provided related confidential information and K&E generated work product related to legal and regulatory strategies. In February 2015, K&E prepared a draft document in connection with this matter for Mylan's review and consideration. Miner Decl. ¶ 5.

During K&E's ongoing representation as to olmesartan (generic Benicar®), a significant part of the Mylan Clients' product portfolio, K&E 's work encompassed securing and maintaining the Mylan Clients' generic market exclusivity and Defendant was entrusted with confidential information. Id. ¶ 6. K&E appeared on the Mylan Clients' behalf in the olmesartan matter on April 27, 2015 in the Northern District of Illinois and filed a brief on the Mylan Clients' behalf with the U.S. Court of Appeals for the Federal Circuit on April 30, 2015. Id. ¶ 7; Pls.' Exs. 22-23.

Following the initial engagement, K&E's work for the Mylan Clients extended. Between May 2013 and November 2014, K&E's representation of the Mylan Clients included work relating to additional drug products, as well as commercial and contractual relationships. Miner Decl. ¶¶ 8-10. See also Pls.' Ex. 20 (May 9, 2015 screenshot of K&E Website identifying K&E as "primary outside counsel" for Mylan).

From February 2013 through late 2014, K&E advised the Mylan Clients with respect to, and was provided confidential information regarding, the Mylan Clients' EpiPen® auto-injector product, one of their most important products. In late 2014, the related information provided included confidential communications regarding Mylan's business, legal and regulatory strategies, including other legal memoranda addressing EpiPen® litigation strategy. Miner Decl. ¶ 11-14; Supplemental Miner Decl. ¶ 13. Although it was public knowledge that Teva had applied to the FDA for approval of an AB-rated version of the EpiPen®, K&E provided legal services with regard to this product. In December, 2014, it informed Mylan that it had discovered a conflict of interest in connection with an EpiPen® representation. Miner Decl. ¶ 15.

The pharmaceutical products as to which K&E represented the Mylan Clients approximated $4 billion in total market revenue last year. Supplemental Miner Decl. ¶ 5.

In October 2013 K&E advised the Mylan Clients as to a business relationship with one of the Mylan Clients' largest customers. The Mylan Clients provided K&E sensitive, confidential, proprietary information regarding this matter, and K&E produced confidential analysis memoranda in response. Id. ¶¶ 7-8; Pls.' Ex. 130.

Six months ago, the Mylan Clients provided K&E with detailed prospective financial forecasts for a not-yet-launched product. The documents provided the Mylan Clients' own internal financial analysis of this particular potential product, and demonstrated the specific modeling utilized by them in financial forecasting. Supplemental Miner Decl. ¶ 9; Pls.' Ex. 132.

**\*6** Defendant has billed the Mylan Clients substantial fees for work performed by dozens of different K&E attorneys and other professionals on various matters. Supplemental Miner Decl. ¶¶ 2, 4.

The Mylan Clients have provided this Court with numerous examples of confidential information shared with K&E during the period of ongoing legal representation. Id. ¶ 11; Pls.' Exs. 130-44 (filed under seal). In sum, Plaintiffs' Declarations and Exhibits of record demonstrate that K&E provided advice to the Mylan Clients regarding substantial product and customer matters, and that the Mylan Clients shared confidential and proprietary information (including, e.g., proprietary and confidential pricing strategies, and confidential market and financial forecast information) and engaged in related attorney-client privileged communications with K&E.

Following K&E's December 2014 conclusion that a conflict of interest precluded it from representation in an EpiPen® matter, but after K&E had provided "comments" to Mylan regarding the same, all K&E attorneys were advised to destroy any related information received from a Mylan affiliate. Defendant's PFFCC at ¶¶ 73-74.

On April 3, 2015, K&E informed Mylan as to the personnel who had worked on Mylan, Inc. matters, the implementation of an ethical screen, and the destruction of confidential materials relating to EpiPen® received in connection with 2013 and 2014 representations. Id. at ¶ 82.

In early April, K&E was contacted by Teva and asked to lead a deal team to advise Teva, at which point Kirkland followed its standard conflict checks procedures to confirm that it could represent Teva; those procedures confirmed that Mylan N.V. (the holding company formed approximately one

month prior) was not and had never been a client of Kirkland. Id. at ¶¶ 90-91.

Kirkland's General Counsel was consulted and concurred that Defendant was permitted under the ethical rules to accept the Teva representation. At his direction, K&E established an "ethical wall" between attorneys who would work on the proposed transaction and those previously, present or prospectively engaged in work for the Mylan Clients. Both "teams" were directed not to discuss confidential aspects of K&E's representation of one client's matter(s) with members of the other client's "team" and to take measures to prevent access to files or related information. Id. ¶¶ 92, 93, 95.

The deal team working on the Teva proposed transaction was orally instructed not to seek or obtain any information concerning the Mylan Clients from K&E lawyers who had previously represented them. Id. at ¶ 97.

Teva's April 21, 2015 letter to Mylan N.V. identified K&E as legal counsel in connection with the proposed transaction. K&E had not previously informed Mylan that it might or would represent Teva in the proposed acquisition and had not then sought a waiver from Mylan permitting it to engage in such a representation. Ondos Decl. ¶¶ 22, 27, 31-32; Miner Decl. ¶ 18. [13]

 **\*7**  By reply of April 27, 2015, the Board of Directors of Mylan N.V. unanimously rejected Teva's unsolicited offer, concluding that Teva had grossly undervalued Mylan and that its communication contained nothing meaningful to indicate why a combination with Teva would be in the best interest of Mylan's employees, patients, customers, communities and other stakeholders. Miner Decl. ¶ 19; Ondos Decl. ¶ 26; Pls.' Ex. 15.

The correspondence between Teva and Mylan N.V. regarding the hostile acquisition attempt reflects plainly adverse interests. See Fox Decl. (ECF No. 35, with unredacted Exhibits): Ex. B (including Teva's April 21, 2015 letter), Ex. C (including Mylan's April 27, 2015 response), Ex. D (including Teva's April 29, 2015 reply).

The customary role of lead counsel in hostile acquisition proposals is to "provide advice, value-relevant information and services about antitrust, litigation, negotiation, disclosure and regulation, all based on information about [the target]'s products, competitors, markets, regulatory strategies and value." Coates Report at 2.

## IV. APPLICABLE STANDARD – PRELIMINARY INJUNCTION

Federal Rule of Civil Procedure 65(a) authorizes district courts to order injunctive relief on an appropriate showing. "To prevail on a motion for preliminary injunctive relief, the moving party must demonstrate that each of the following factors favors the requested relief: '(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.' " McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 356-357 (3d Cir. 2007) (quoting Shire U.S. Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003)); Liberty Lincoln–Mercury, Inc. v. Ford Motor Co., 562 F.3d 553, 556 (3d Cir. 2009).

"Although the moving party must produce evidence to convince the Court that all four factors favor relief, as a practical matter, likelihood of success on the merits and irreparable injury are the most important elements." Philadelphia Inquirer v. Wetzel, 906 F. Supp. 2d 362, 365 (M.D. Pa. 2012) (citing Am. Tel. & Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427, n.8 (3d Cir. 1994)). See also Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. 2000) ("In order to obtain a preliminary injunction, plaintiffs must show both (1) that they are likely to experience irreparable harm without an injunction and (2) that they are reasonably likely to succeed on the merits. A court may not grant this kind of injunctive relief without satisfying these requirements, regardless of what the equities seem to require.") (citing Am. Tel. & Co., supra; Acierno v. New Castle Cty., 40 F.3d 645, 653 (3d Cir. 1994); In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982). [14]

 **\*8**  Defendant asserts that because the requested preliminary injunction "is directed not merely at preserving the *status quo* but ... at providing mandatory relief, the burden on the moving party is particularly heavy." Defendant's Memo in Response to MPI at 13-14 (citing Ferring Pharm., Inc. v. Watson Pharm, Inc., 765 F.3d 205, 210 (3d Cir. 2014) (Lanham Act case in which pharmaceutical entity's requested injunction included "corrective advertising"); Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980)). And it correctly asserts that mandatory injunctions should be issued only sparingly. United States v. Price, 688 F.2d 204, 212 (3d Cir. 1982). Defendant is,

however, mistaken in its characterization of the nature of both the *status quo* and the principal thrust of the requested injunction.

More specifically, the requested preliminary injunction would preserve the *status quo ante*, *i.e.*, the circumstances and relationship that existed between the parties before the wrongdoing complained of. Plaintiffs filed their Complaint shortly after learning, through Teva's April 21, 2015 hostile takeover correspondence, of the Subject Representation. When counsel proceeds without notice to unilaterally and fundamentally change the circumstances between itself and its client, in alleged violation of an ethical duty owed to the client, it cannot be heard to assert that the *status quo* becomes the circumstances *as changed* rather than the circumstances as they were before the alleged ethical violation. See Maritrans, 529 Pa. at 259 (observing that the purpose of a motion for preliminary injunction is to "preserve the status quo" as it existed before the wrongful conduct, "thereby preventing irreparable injury or gross injustice").

As the Pennsylvania Supreme Court long ago explained,

> The modern cases ... have established the rule that the status quo which will be preserved by preliminary injunction is the last actual, peaceable, noncontested status which preceded the pending controversy, and equity will not permit a wrongdoer to shelter himself behind a suddenly or secretly changed status ....

Fredericks v. Huber, 180 Pa. 572, 575, 37 A. 90, 91 (1897). See also, e.g., Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990) ("[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as 'the last, peaceable, noncontested status of the parties' ") (citations omitted); Grkman v. Scanlon, 528 F. Supp. 1032, 1035 (W.D. Pa. 1981) vacated and remanded, 707 F.2d 1388, 1391, 1395 (3d Cir. 1982) ("[T]he very wrong complained of which the instant proceeding seeks to remedy, ... until its validity *vel non* is adjudicated ... cannot be given effect as the status quo ante .... It is the last uncontested status preceding the controversy which constitutes the status quo to be continued ....").

As to the nature of the requested injunction, precisely as the name suggests, a mandatory injunction directs a party in a must, rather than must not, way. The preliminary injunction requested in the instant action would not require Defendant to continue its representation of the Mylan Clients. The requested preliminary injunction would principally direct Defendant as to what it may not do, *i.e.*, it would be prohibitory rather than mandatory. Cf. Punnett, 621 F.2d at 582 (where preliminary injunction would require Government to issue public statements warning of alleged mutagenic effects of servicemen's nuclear testing radiation exposure, it would not preserve the *status quo* and was a mandatory injunction). [15]

**\*9** Nevertheless, it appears that the requested injunction herein is at least partly mandatory, as Plaintiffs seek to require Defendant to retrieve its work product on the hostile takeover campaign from Teva. [16] See SBM Site Servs., LLC v. Garrett, Civ. A. No. 10-cv-00385-WJM-BNB, 2011 WL 7563785, at \*4 (D. Colo. June 13, 2011) (characterizing requirement to retrieve confidential information as "obviously mandatory"). However, a determination that part of the requested relief would be mandatory does not entail that it is unavailable. [17] On the contrary, courts have consistently recognized their power to enter a mandatory injunction, particularly when necessary to restore the *status quo ante.* See, e.g., Taylor v. Sauer, 40 Pa. Super. 229, 232 (1909) ("That a preliminary injunction may be made mandatory is shown by many authorities: [citing cases.] The writ is only granted where the right is clear; where irreparable injury is likely to result or where the status quo between the parties should be restored.") (citations omitted); Sims v. Stuart, 291 F. 707, 707-08 (S.D.N.Y. 1922) (Hand, J.) ("It is, of course, true that equity will at times affirmatively restore the status quo ante pending the suit.") (quoted in In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1145 (3d Cir. 1982)). Cf. Ex parte Lennon, 166 U.S. 548, 556 (1897) ("Perhaps, to a certain extent, the injunction may be termed mandatory, although its object was to continue the existing state of things .... But it was clearly not beyond the power of a court of equity, which is not always limited to the restraint of a contemplated or threatened action, but may even require affirmative action, where the circumstances of the case demand it."). [18]

**V. RELEVANT ETHICS RULES**

The parties do not dispute that Pennsylvania law governs this action. Cf. Air Products and Chemicals, Inc. v. Airgas, Inc., et. al, No. 5249-CC (Del Ch. Ct. Mar. 5, 2010) ("Teleconference

Ruling of the Court" holding "in particular" that Delaware (as opposed to Pennsylvania) rules of Professional Conduct and "common law rules regarding lawyers' disqualifications" applied in determining counsel's representation in litigation pending before Judge). [19]

Pennsylvania's Rules of Professional Conduct provide, in relevant part:

1.7 Conflict of Interest: Current Clients

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) *the representation of one client will be directly adverse to another client*; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

 **\*10** (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) *each affected client gives informed consent.*

Pa. R. Prof. Conduct 1.7 (emphasis added).

In addition, the American Bar Association (the "ABA") codified the concept of impermissible directly adverse representations in the original version of the Model Rules of Professional Conduct (the "Model Rules"). They have been widely adopted in various forms including in Pennsylvania, and district court judges routinely look to the Model Rules for guidance in interpreting their jurisdiction's conflict rules. Like Pennsylvania Rule of Professional Conduct 1.7(a)(1), Model Rule 1.7(a)(1) states that, as to current clients, "a lawyer shall not represent a client if ... the representation of one client will be directly adverse to another client." The official comments further explain the meaning of "directly adverse". See Rule 1.7 cmt. 6 (2014 ed.) ("Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. *Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated.*") (emphasis added). In their illustration of a directly adverse conflict arising outside the litigation context, the official comments note: "Directly adverse conflicts can also arise in transactional matters. *For example, if a lawyer is asked to represent the seller of a business in negotiations with a buyer represented by the lawyer, not in the same transaction but in another, unrelated matter, the lawyer could not undertake the representation without the informed consent of each client.*" Rule 1.7 cmt. 7 (emphasis added). [20]

Despite discussion in its briefs of Pennsylvania Rule of Professional Conduct 1.9, and some apparent assertion that this Rule regarding *former* clients is applicable, [21] Defendant clarified its position during the Evidentiary Hearing as one acknowledging an ongoing client relationship with the Mylan Clients and, related, the applicability of Rule 1.7. See Tr. at 76; see also Painter Report, Section B heading: "The Mylan Entities that are Kirkland Clients". [22] The Court concurs that there can be no question that the relationship between the parties is on-going and, accordingly, the Court need not parse the application of Rule 1.9. Cf. Plaintiff's Memo in Support of MPI at 9-12 (cogently explicating substantial likelihood of impermissibility of Subject Representation under Rule 1.9, were it applicable).

## VI. ANALYSIS – CONCLUSIONS OF LAW

 **\*11** Under Rule 1.7, counsel is unequivocally prohibited from acting as an advocate against a current client. See discussion, *supra*, Section V. In addition, authorities interpreting Rule 1.7, including Formal Op. 95-390, *supra*, conclude that an adverse effect on a client stemming from representation adverse to its affiliate is "directly adverse" to the client in violation of Rule 1.7 where the adverse representation is related to the counsel's services to the client. These limitations on adverse representation under Rule 1.7 are subject to modification by agreement of the parties. An understanding of the circumstances under which counsel will refrain from representation adverse to an affiliate is binding. Similarly, a client's prospective waiver of conflict, made with informed consent, is also binding.

### A. Substantial Likelihood of Ethical Impermissibility of Subject Representation

2015 WL 12733414

### 1. **Application of the Ethics Rules**

#### (a) **The Subject Representation is Directly Adverse to Mylan, N.V. as a Hostile Acquisition Attempt**

K&E presents some argument that the Subject Representation is not directly adverse (*i.e.,* that it is not acting as an advocate against) to Mylan N.V. [23] The Court finds that there is no basis for this argument. See, *e.g.,* Painter Report at ¶ 29 ("There are substantial grounds to challenge the proposition that Teva is acting adversely to Mylan N.V. when it is offering to pay ... 48% more than the trading price ...."); Defendant's Memo in Response to MPI at 1 (noting that K&E's work is "regarding Teva's purchase of Mylan N.V. shares at a premium"); id. at 17 (referring to the irrelevance of "any purported adversity to Mylan N.V. or its shareholders"). [24] All hostile takeover offers are at a premium over market share value. See Coates Report at 3 ("[S]uch premiums are necessary and standard in all hostile bids and do not change the nature of the conflicts between a hostile bidder and target."); Plaintiff's PFFCC at ¶ 84 ("Premiums are necessary and standard in all hostile bids, *because the result is to convey control* rather than a small ownership stake.... The conflicts arise because, as here, the target's board of directors has decided to reject the bid, but the bidder is nevertheless persisting .... [The] core conflict is simple: the bidder wants to pay less, the target wants the bidder to pay more.") (emphasis added) (citing Coates Report at 3, 22).

An unsolicited acquisition/rejected offer, a "hostile takeover attempt", is inherently what its name reflects – "hostile", *i.e.*, "contrary, adverse, antagonistic", as derived from the Latin "*hostilis*" and Old French "*hostis*" meaning "enemy". [25] And an adverse representation is also inherently what its name reflects – "adverse", *i.e.*, "acting against or in opposition to, opposing, contrary, antagonistic, actively hostile", as derived from the Latin "*adversus*" meaning "turned against, hostile". [26] As Plaintiffs observe, "parties on the opposite side of a transaction are necessarily adverse to one another, regardless of whether one side believes the transaction will benefit the other." [27] The takeover correspondence of record between Teva and Mylan, N.V. is increasingly unequivocally opposed, hostile, and adverse. See Fox Decl.: Ex. B (including public release and Teva's April 21, 2015 letter to the Mylan Board of Directors), Ex. C (including public release and Mylan's April 27, 2015 response), Ex. D (including public

release and Teva's April 29, 2015 reply). Teva aggressively seeks to acquire Mylan, N.V. and Mylan, N.V. (on behalf of itself, and through it the affiliated Mylan entities) just as aggressively seeks to avoid acquisition. [28]

**\*12** The Court observes that prior to Mylan N.V.'s acquisition of Mylan, Inc. on February 27, 2015 (*i.e.*, an interval of less than two months before Teva's April 21, 2015 announcement and correspondence and approximately one month before Teva's solicitation of K&E's representation in the takeover attempt), any hostile takeover communication from Teva would necessarily have been addressed to K&E's current client, Mylan, Inc. Thus, throughout virtually all of K&E's ongoing representation, K&E had been clearly prohibited, under Rule 1.7, from lending its services to an attempted hostile takeover of the Mylan Clients. Defendant's contention that the fortuitous circumstance of a recent reorganization adding a tier of holding-company ownership to the Mylan corporate affiliate structure now relieves it of an important component of its fiduciary duty is disquieting. [29] The sacrosanct duties that characterize an attorney's faithfulness to his/her client are not so easily forfeited. [30]

#### (b) **The Subject Representation is Directly Adverse to the Mylan Clients as the Hostile Acquisition Targets**

K&E argues that the Subject Representation, even if adverse to the Mylan Parent, is not adverse to the Mylan Clients. [31] The Mylan Client Plaintiffs are Mylan Inc., the primary asset of Mylan, N.V., the parent holding company (*i.e.*, it undisputedly represents ninety percent (90%) of the revenue of Mylan N.V.), [32] and three of its wholly-owned subsidiaries. They, the Mylan Client corporate affiliates, are the target of a hostile takeover attempt. Teva is not only after the bag (*i.e.*, the quite-recently-formed holding company); it is after the contents (*i.e.*, K&E's clients of several years, Mylan, Inc. and its wholly-owned subsidiaries, owners of the revenue-generating pharmaceutical products). See Coates Report at 3 ("The fact that Mylan, N.V. owns its assets through subsidiaries ... does not alter my analysis. Teva seeks to own Mylan N.V.'s stock not as an end in itself, but because it conveys control and ownership of Mylan and its products."); id. at 18 ("The stock of Mylan [Inc.] is the primary asset of Mylan, N.V.... [T]he value of Mylan N.V. is predominantly a function of the value of Mylan [Inc.]."). [33] As Plaintiffs duly note, it would be hard to imagine a representation more

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

2015 WL 12733414

opposed to a current client's interests, more in breach of a fiduciary duty toward those interests, than one in which the client's counsel sells his professional services to advance the interests of a competitor in a hostile takeover attempt of the clients' entire corporate affiliate group. [34]

**\*13** Second, it is a widely-recognized reality in the mergers and acquisitions landscape that companies acquired, particularly those acquired by an entity with competing lines of business, are reorganized, with resulting layoffs of employees, asset sales, and divestitures/break ups of the acquisition's affiliates. Indeed, the day of its communication to Mylan, Teva publicly announced its intent to eliminate an anticipated $2 billion in redundancies, and acknowledged the prospect of asset sales. See, *e.g.*, *Generic Drugmaker Teva Makes $40 Billion Offer for Rival Mylan,* http://www.nytimes.com/reuters/2015/04/21/business/21reuters-mylan-m-a-teva-pharmind.html?_4=0 ("The acquisition would create an entity with more than $30 billion in annual revenue, ... and eventually generate $2 billion in annual savings, Teva said. It ... pledged a quick response, including selling assets if necessary, to ease any regulatory concerns."). See also Coates Report at 12-13 (reporting from public information that "Teva's own presentations regarding its acquisition proposal for Mylan identify antitrust issues as a key item" and Teva notes "it is prepared to conduct 'divestitures' to obtain antitrust clearance, and that 'several potential purchasers have already shown interest in acquiring likely divested assets' "); id. at 13 (discussing Teva's acknowledgment "that it will need to raise substantial funds to complete its bid, as is also apparent from the amount of cash its current proposal will require (over $20 billion) relative to the cash on hand ... (less than $5 billion ....)") (citing Teva's Form 2-F for the year ended 12/31/2014 at 3). [35]

Thus, the potential adverse effects on the Mylan Clients – beyond the adverse effect of the unwanted change in ownership and concomitant change in, *e.g.*, control over corporate decision-making – include, *e.g.*, losses to and of their employees, losses with regard to product ownership, and/or divestiture (based presumably on legal and financial counsels' informed advice to Teva as to retention/divestiture line-drawing, as well as antitrust and/or regulatory concerns). [36]

The Court does not accept Defendant's attempt to cabin the ethical rule's prohibition of a "representation ... directly adverse" to a client's showing of detrimental outcome.

The plain language of Rule 1.7 looks to the lawyer's representation – his *advocacy against* his client – not merely the potential detrimental effect on the client. The Rule on its face refers to a *representation* which *is* "adverse" (versus one which *results* in "adversity"). [37] It concerns a lawyer's duty of loyalty to a current client, and a corresponding prohibition against his concurrent undertaking to work in opposition to the clients' wishes and interests toward an objective to which the client is opposed. [38] The client who confides in his counsel this afternoon is entitled to rest tonight knowing that s/he will not face that counsel on the opposite side of the table tomorrow. [39]

### (c) The Subject Representation is Also Directly Adverse to the Mylan Clients as a Related Representation Adverse to an Affiliate and Causing Derivative Harm to the Clients

**\*14** In the alternative, even if the adverse effect on the Mylan Clients were solely derivative, the instant circumstances are such that adversity to Mylan N.V. falls within Rule 1.7's prohibition against adversity to a current client.

Formal Op. 95-390 recognizes that where an affiliate is not entitled to be treated as a client for purposes of Rule 1.7, a representation adverse to the affiliate may nevertheless be considered directly adverse to the client under particular circumstances. See Formal Op. 95-390. The Opinion's analysis indicates that *whether the potential adversity is direct, and in violation of Rule 1.7, turns on whether the adverse representation is related* to counsel's representation of the client. See Formal Opinion 95-390. [40]

As Plaintiffs succinctly observe, "[g]iven the broad scope and depth of the current, anticipated, or potential representation of Teva by K&E in the hostile takeover matter, there can be no question that the hostile takeover representation is 'related' to the subjects of K&E's representation of Mylan." Plaintiffs' PFFCC at ¶ 17. [41] Defendant's protestations notwithstanding, it is clear that confidential and proprietary information received and reviewed, and matters advised upon, in the course of Defendant's fiduciary relationship as counsel to the Mylan Clients are pertinent to the Subject Representation. See Section III, Delineated Findings of Fact, *supra*; see also, *e.g.*, Pls.' Ex. 130 (submitted under seal for *in camera* review) (evidencing provision of highly specific and confidential product and pricing information disclosed to

and considered by K&E as legal counsel); Pls.' Exs. 131-44, noted *supra.* [42] The Subject Representation is inherently and uncontrovertibly related to the professional services undertaken by Defendant, in a fiduciary capacity, for the Mylan Clients. [43]

 **\*15**  More specifically, as Professor Coates has cogently explained, the customary role of lead counsel in hostile acquisition proposals is to "provide advice, value-relevant information and services about antitrust, litigation, negotiation, disclosure and regulation, all based on information about [the target]'s products, competitors, markets, regulatory strategies and value." Coates Report at 2; 6-11 (detailing the customary roles of lawyers for hostile bidders). [44] Thus, "[i]nformation that K&E has obtained in its representation of [the Mylan Clients] in defending, prosecuting or advising" with regard to "important existing products – such as the EpiPen®, which generates over a $1 billion per year of revenues – and about its pipeline of potential products, is substantially related to professionally competent work by K&E" in the Subject Representation. Id. at 2-3. In addition, "Teva's disclosures and bid tactics and K&E's advice to assist Teva will need to address the value, operations, and risks of Mylan N.V.'s consolidated group of companies"; and "competent valuation analysis" of Mylan alone and in combination with Teva requires "judgements about sensitivities of value to various factors, including legal and other risks about which K&E received non-public information ...." Id. at 3. As Professor Coates went on to incisively conclude:

> The bottom-line of the combination of customs and facts of this dispute is clear. K&E's work for Mylan is directly and substantially related to professionally competent work as bidder counsel for Teva. That this is so approaches the self-evident. Teva (with K&E's assistance) now seeks to acquire, in a hostile manner, the very products – released and unreleased – about which Mylan confidentially disclosed legal and pricing strategies and FDA issues to K&E and on which K&E advised Mylan. As stated by K&E's Michael Shumsky (Decl. ¶55), who represents Mylan, "I suspect that Teva would engage Teva USA to commercialize the actual branded EpiPen® on Teva's behalf" if Teva acquires Mylan. A more obvious relationship, and conflict, is hard to imagine – a lawyer helping a buyer in its efforts to buy products (including unreleased products) about which the seller has been and is being advised by the same lawyer, about which the seller is providing nonpublic information to the lawyer under the

shelter of the attorney-client relationship. Considering that K&E agreed it would not take on any adverse engagement that was merely "related" to the work K&E performed and continues to perform for Mylan – plainly a lower standard than "substantially related" – any argument that K&E's Teva engagement is not related at all to its work for Mylan could be fairly characterized as frivolous.

See Coates Report at 13-14; id. at 15-16 (recounting the information K&E has obtained including confidential pricing strategies and legal and strategic analysis.... "informed assessments of Mylan's legal positions, its negotiating resources, and the risks that its cash flows may be impaired by litigation with third parties or the government"); id. at 16 (noting that divestiture assessment depends "on a complex blend of public and confidential information, including the kinds of information disclosed by Mylan to K&E"); id. at 17 (summarizing that "K&E's access to Mylan's confidential current, historic and future strategies goes to the core of Mylan's current and future valuation. It is precisely the type of private information that a bidder for Mylan would be most interested having. It would provide crucial assistance for a bidder to determine exactly how much Mylan is worth, on its own and in combination ...."). [45]

 **\*16**  The discussion above illustrates both (a) the relatedness of the information received by Defendant in the course of its representation of Plaintiffs to the Subject Representation, and the broad array of potential advantage that information can provide to the competitor-acquirer, and (b) why the concerns/potentialities resulting from Defendant's concurrent conflicting representations are sufficient to warrant this Court's issuance of a preliminary injunction. [46] Defendant's extensive legal arguments and evidence (including, *e.g.*, Declarations) with regard to its creation and maintenance of physical/technological wall(s) and/or screen(s) to protection Plaintiffs' confidential, proprietary, or attorney-client privileged information from inappropriate disclosure and/or misuse, are immaterial to this Court's analysis. See Plaintiffs' PFFCC at ¶¶ 121-126 (explaining – with citations to applicable Pennsylvania and other law – that, other than in the context of an individual lawyer's change in firm associations, such mechanisms are insufficient, under the ethics rules, to address adverse representation conflicts); id. (further noting that the ethical screen purportedly used by K&E would not be needed if "matters on which K&E worked for Mylan were truly unrelated to its work for Teva" and that "[a] screen cannot turn a 'related' matter into an 'unrelated' one, particularly in a

situation such as here, where a law firm is assisting one client in pursuing a hostile acquisition of another") (citing Coates Report at 3, 23); Plaintiffs' Reply Memo in Support of MPI at 16-17; Moriarty Report at 9, n. 14. [47]

For the reasons discussed in the subsections to Section VI(A)(1) above, absent an effective prospective waiver, the Subject Representation is, at a minimum, substantially likely to be in violation of Rule 1.7. [48]

## 2. Effect of the Engagement Letter and its Conflict of Interest Provisions

**\*17**  The pertinent language of the "Conflicts of Interest" section of the Engagement Letter drafted by K&E provides:

> Accordingly, as an integral part of the Engagement, you agree that K&E LLP may, now or in the future, represent other entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to you or any of your affiliates on matters that are not related to (i) the legal services that K&E LLP has rendered, is rendering or in the future will render to you under the Engagement and (ii) other legal services that K&E LLP has rendered, is rendering or in the future will render to you or any of your affiliates under a separate engagement (an "Allowed Adverse Representation").

There having been no separate engagements, an Allowed Adverse Representation ("AAR") is one adverse to the Mylan Clients or an affiliate but not related to legal services rendered by K&E to the Mylan Clients under the Engagement Letter (which by its terms governs existing and future professional services except as otherwise agreed in writing). See January 9, 2013 Engagement Letter. [49]

## (a) As to the Mylan Clients

### (i) The Subject Representation is Substantially Unlikely to be an AAR Under the Plain Language of the Engagement Letter Because It is Adverse to, and Related to Legal Services Provided to, the Mylan Clients

**\*18**  As discussed, *supra*, the Subject Representation is adverse to the Mylan Clients as well as the Mylan Parent. See Section VI(A)(1). And as noted in this Court's analysis of the applicability of Rule 1.7, the Subject Representation is related to legal services rendered to the Mylan Clients by K&E. [50] More specifically, K&E entered into a fiduciary relationship with the Mylan Clients pursuant to which it (a) received confidential proprietary information pertinent to, and (b) provided representation to subsidiaries as to certain of their pharmaceutical products which subsidiaries and products are now the very target of, Teva's hostile takeover attempt. See discussion, Section VI(A)(1)(c), *supra*, regarding relatedness. [51]

### (ii) The Subject Representation is Substantially Unlikely to Have Been Approved by Effective Prospective Waiver Given the Absence of Informed Consent, Thus Remaining an Ethical Violation Under Rule 1.7

Even if the Subject Representation were unrelated and therefore an AAR under the Engagement Letter, which the Court expressly concludes it was not, any asserted prospective waiver of the Subject Representation is substantially unlikely to be effective under the ethical rules given the absence of informed consent on the part of the Mylan Clients. [52]

More specifically, Rule 1.7 (b) permits a lawyer's representation of another client despite a "concurrent conflict of interest under [1.7(a) ]" if, among other requirements, "each affected client gives informed consent." Rule 1.7(b)(4). Model Rule 1.0(e) in turn indicates that informed consent is characterized by: 1) agreement to a proposed course of conduct, 2) *after the lawyer has communicated adequate information and explanation about the material risks*, and 3) the lawyer has proposed reasonably available alternatives to the proposed course of conduct. Informed consent turns on an objective standard of reasonable disclosure and reasonable understanding. See Model Rules 1.0 & 1.7; Pa. R. Prof. Conduct 1.0(e) (same) and cmt. 6 (explaining that to satisfy Rule 1.0 the lawyer "must make reasonable efforts to ensure that the client or other person possesses information

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)
2015 WL 12733414

reasonably adequate to make an informed decision"); see also Formal Op. 95-390 (observing that when Rule 1.7(a) applies, informed consent requires a "communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question") (citing Model Rules, Terminology); Geoffrey C. Hazard, Jr., *et al*, The Law of Lawyering § 10.8, p. 10.22-1 (3d ed. 2014 supp.) (noting that informed consent is only valid when "the client has been armed with sufficient information about the situation to be able to make a rational choice"). [53] And the language of the agreement is a primary source for determining whether or not a particular client's consent is informed. See Celgene Corp., 2008 WL 2937415, at *8; cf. Formal Op. 95-390.

 **\*19**  First, the commonly acknowledged intent of such prospective waivers in the context of the legal representation of pharmaceutical matters (similarly to that in the representation of intellectual property matters), is to enable competitor clients to retain the services of a limited, select group of counsel with particular qualifications, expertise, and valuable accoutrements, to obtain the perceived advantage of such counsel's representation as to discrete (typically unrelated) products. [54] Here, as discussed above, the conflicting representation is not restricted to an unrelated discrete product but, much to the contrary, encompasses a hostile, opposed acquisition of the very products as to which K&E has received confidential and proprietary information and the very entities to which K&E has provided legal counsel. Second, the plain language of the Conflict of Interest provision takes care to denote "litigation, arbitration or other dispute resolution" representation; it makes no mention of acquisitions (hostile or otherwise). While the plain language does not exclude acquistions, and indeed prefaces the above list with "including", given the standard industry usage and understanding of the intended scope of prospective waivers, and K&E's history of high-profile acquistions (including for Teva), the Court finds it significant that K&E elected to omit reference to any retained right of conflicting representation in that area of the law. If K&E intended to retain a right to act as an advocate against the Mylan Clients in such a fundamental way, it was incumbent upon it to make certain that the clients knew and agreed to such an arrangement. [55]

Third, Defendant bears the burden of showing why this Court should allow an adverse representation otherwise prohibited by the ethics rules. See, *e.g.*, In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 162 (3d Cir. 1984) ("[T]he burden of showing consent is on [the law firm]."). K&E has adduced no evidence that Plaintiffs should reasonably have anticipated,

or would have authorized, Defendant's concurrent sale of its professional services in support of a hostile takeover attempt against their corporate affiliate group. Cf. Plaintiffs' PFFCC at ¶ 18 ("[T]he record in this matter is void of any evidence showing that Mylan knew and understood, and provided "informed consent" to, K&E's representation of Teva in a hostile takeover situation at the time of execution of the engagement letter."); id. at ¶ 25 ("At no point during these discussions did K&E discuss the possibility of representing any entity, including Teva, in connection with an attempted acquisition of Mylan.") (citing Ondos Decl. at ¶ 11); id. at ¶ 53 ("Had K&E requested of Mylan that it waive any conflict of interest arising in connection with K&E's representation of a client pursuing an unsolicited proposal to acquire Mylan, Mylan would not have agreed.") (citing Miner Decl. ¶ 23; Ondos Decl. ¶¶ 31-32); Plaintiffs' Reply Memo in Support of MPI at 11 (citing Lefkowitz Decl. regarded limited types of potential conflicts raised by K&E in discussion/negotiation of Engagement Letter with Plaintiffs). [56]

 **\*20**  Finally, Defendant has requested that this Court consider their "best case", *i.e.* Galderma Labs., L.P. v. Actavis Mid Atl. LLC, 927 F. Supp. 2d 390, 401 (N.D. Tex. 2013) in assessing informed consent. [57] The Court has done so. It notes that in Galderma, the Texas District Court applied the Model Rule's requirement of informed consent (rather than the less restrictive Texas Disciplinary Rule) and held that counsel had met its burden of showing that the information disclosed to the sophisticated, international plaintiff-client, represented by other counsel in execution of the engagement letter, was *reasonably adequate to the client's understanding of the material risks that the waiver entailed* and that the adverse representation at issue was not substantially related to counsel's limited "employment and benefit" services to plaintiff-client. See id. This Court observes that the Texas District Court held that there was an effective waiver of counsel's adverse representation in patent litigation under an engagement letter which *specifically identified* litigation and business transactions as areas of potential conflicting representation. See id. at 393 ("You understand and agree that, with those exceptions, we are free to represent other clients, including clients whose interests may conflict with yours in litigation, business transactions, or other legal matters."). [58] It further observes that, while the Texas District Court disagreed with the New Jersey District Court's analysis in Celgene, *supra*, regarding the scope of language/information necessary to show informed consent, the Texas District Court nonetheless concluded that (a) "for the general, open-ended waiver to be valid ... [counsel] must still establish that

the disclosure was reasonably adequate to allow [client] to understand the material risks involved" and that (b) "the communication necessary to obtain informed consent varies with the situation involved." Id. at 401 (citing Rule 1.0, cmt. 6). Moreover, the Galderma Court *expressly distinguished* Celgene by noting the Third Circuit and New Jersey Supreme Court precedent incorporating New Jersey state rules under which the test for informed consent is whether the attorney provided both "full disclosure and consultation", finding it "a different, more stringent standard" than that applicable in Galderma. See id. at 404-405 (citing Celgene, *supra* at *4 and noting its discussion of In re Congoleum Corp., 426 F.3d 675 (3d Cir. 2005)). Given the patently distinguishable nature of Galderma, this Court need not take issue with its analysis; indeed, it would have reached the same result under the same circumstances. [59]

**(b) As to Mylan N.V. – The Subject Representation is Substantially Unlikely to be Permissible Under Provisions Governing Representations Adverse to Affiliates**

In the alternative, even if the Subject Representation were not directly adverse to the Mylan Clients, which this Court expressly concludes it is for reasons aforesaid, Defendant has also undertaken not to represent other clients "adversely to ... any [Mylan] affiliates on matters" related to its legal services for the Mylan Clients. [60] More specifically, the parties' Engagement Letter, by specifying the circumstances under which K&E may be adverse to a Mylan affiliate, demonstrates a shared expectation that adversity to an affiliate outside those circumstances would be prohibited, *i.e., expressio unius est exclusio alterius.*

Indeed, Plaintiffs expressly assert that "[t]he advance waiver requires that any future representation of an interest adverse to Mylan and any of its affiliates must only involve matters that are "not related" to the legal services rendered or to be rendered by K&E to Mylan." Plaintiffs' PFFCC at ¶16(a). [61] And Defendant's only counterarguments concerning the Engagement Letter's affiliate language in the sentence at issue are that it pertains only to subclause (ii) regarding separate engagements, and any other reading would run afoul of the Engagement Letter's delineation of the "clients". See, *e.g.,* Tr. at 90 ("For Kirkland, we say, adversity to your affiliates only matters if services are rendered to an affiliate under a separate agreement. This makes it clear that the affiliates don't

matter unless there is an explicit separate agreement which is consistent with all of the language."); Defendant's PFFCL at ¶ 28. This position amounts to an implicit concession that where the language does apply it prohibits representation adverse to an affiliate absent an AAR (*i.e.*, it prohibits representation adverse to an Affiliate in a matter related to K&E's representations of Plaintiffs).

**\*21** Moreover, Defendant's interpretation of the phrase "adversely to you or any of your affiliates", which prefaces both subclauses (i) regarding representations under the initial Engagement (between K&E and the Mylan Clients) and (ii) regarding representations under a separate engagement (including prospectively a Mylan affiliate as well as the current clients) – of which there were none, is linguistically and logically untenable.

The Court has no doubt that, if it meant what it now purports, K&E was quite able to express it through the appropriate construction of its subclauses. For example:

> Accordingly, as an integral part of the Engagement, you agree that K&E LLP may, now or in the future, represent other entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to **(i)** you ~~or any of your affiliates~~ on matters that are not related to ~~(i)~~ the legal services that K&E LLP has rendered, is rendering or in the future will render to you under the Engagement and (ii) **you or any of your affiliates on matters that are not related to** other legal services that K&E LLP has rendered, is rendering or in the future will render to you or any of your affiliates under a separate engagement (an "Allowed Adverse Representation").

It did not. And as written, the term "affiliates" expressly prefaces and pertains to both subclauses, *i.e.*, it is applicable to matters related to services rendered to the Mylan Client as well as prospective services under a separate engagement. [62]

2015 WL 12733414

Defendant asserts that *because the Engagement Letter* provides that "representation is solely of [the Mylan Clients], and that no parent, subsidiary, affiliate or other entity or person related to [the Mylan Clients] has the status of a client for conflict of interest purposes", *i.e.* it *provides that no affiliate is a client*, the Engagement Letter "*plainly says that affiliates do not matter for conflict of interest purposes*". See Defendant's Evidentiary Hearing Ex. BB (emphasis added). Defendant then asserts that any reading of the preceding express provision setting forth the parties' understanding of the scope of an Allowed Adverse Representation as "giv[ing] affiliates co-equal status for conflicts purposes" is therefore "nonsensical". Id. [63]

**\*22** A client engaging legal services may certainly employ counsel subject to a negotiated understanding as to related representations adverse not only to that client but to its affiliates. Indeed, such an understanding would be desirable to a corporate client which is either (a) owned by a parent corporation whose interests it does not wish to contravene, and/or (b) the owner of subsidiaries whose welfare is important to its bottom line. A fair reading of the Engagement Letter indicates that is precisely the understanding effectuated in this case. See Coates Report at 19 ("Precisely reflecting a situation like the one in this case, K&E's engagement letter (at page 3) bars it from advising a party 'adversely to you' [*i.e.*, Mylan, as defined above] 'or any of your affiliates' on any matters related to services K&E has rendered to Mylan or to services to Mylan's 'affiliates,' ...."). [64] Accordingly, to give effect to the Engagement Letter's entire clear and precise provision: as a non-client, Mylan N.V. may not enforce any right against K&E (see caption of Complaint in the instant action), *but* as an affiliate, its interests may be invoked by the Mylan Clients.

Finally, to the extent there was any ambiguity under either the language or structure of the Engagement Letter provisions, which this Court expressly concludes there is not, any ambiguity would be construed agint K&E as the drafting firm under the doctrine of *contra proferentum.* See, *e.g.*, Cent. Transp., Inc. v. Bd. of Assessment Appeals of Cambria Cnty., 417 A.2d 144, 149 (Pa. 1980) ("[I]t is well settled that a written agreement will be construed against the party preparing it.").

### 3. Conclusion as to Substantial Likelihood of Success on the Merits of Permanent Injunction, *i.e.* Disqualification of K&E

The Pennsylvania Supreme Court, in the leading case of Maritrans, *supra*, expressly observed the Court's historic "power to enjoin the threatened violation of an attorney's fiduciary duty not to engage in conflicting representations" as follows:

> Where an attorney so far forgets, or ignores, his professional duty as to engage his service to one whose interests are necessarily in conflict with those of his client, or in whose employment he will be in a position to take undue advantage of the confidential communications of such client, there is no doubt of the power of the court to enter and enforce an order restraining the attorney from so acting ....

Maritrans, 602 A.2d at 1284 (quoting 1 Thornton on Attorneys at Law (1914)); id. at 1288 (concluding that, on review of preliminary injunction factors, "substantial grounds exist[ed] to support the trial court's decision that preliminary injunctive relief was necessary to abate an actionable wrong, to prevent further and continuing irreparable harm to [client], and to restore the parties to the *status quo* as it existed prior to the wrongful conduct"); cf. id. at 1284-85 (discussing historic common law, as well as ethics rules, basis for lawyers' obligations to clients). See also United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980) (observing that "disqualification ordinarily is the result of a finding that a disciplinary rule prohibits an attorney's appearance in a case").

**\*23** It is true as Defendant notes, that the court in Miller held that "disqualification never is automatic" and that "[c]ommitment of this matter to the district court's discretion means that the court should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule." Miller, 624 F.2d at 1201. The court further explained that a trial court "should consider the

ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." Id. (noting that district court has "wide discretion in framing its sanctions to be just and fair to all parties involved" and approving district court's disqualification of firm). [65]

The Court notes that the analysis called for under Miller closely parallels the standard preliminary injunction analysis which is the focus of this Report and Recommendation. More particularly, *e.g.*, (a) the purpose of Rule 1.7, which is to secure the client's expectation of counsel's loyalty, can only be fulfilled by enforcement of its strictures; and (b) the adverse client's interest in engaging counsel of his choice and the attorney's interest in freedom from undue restriction are addressed under the third factor of the preliminary injunction analysis, and are given adequate scope by counsel's right to choose either to refrain from potential conflicting representations or to obtain a valid, knowing waiver. Thus, for the reasons given herein, the balance of factors articulated in the Third Circuit's decision in Miller weigh heavily in favor of disqualification.

### B. Prospects of Irreparable Harm to Plaintiffs and Defendant

#### 1. As to Plaintiffs

A preliminary injunction requires a showing of irreparable harm to the Plaintiff. See, *e.g.*, Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. 2000). "The irreparable harm requirement is met [by demonstration of] a significant risk [of] harm that cannot adequately be compensated after the fact by monetary damages." Id. at 484–85. Mere economic harm is insufficient; rather, "irreparable harm" is that "which cannot be redressed by a legal or an equitable remedy following a trial." Instant Air Freight, 882 F.2d at 801. See also Guardian Life Ins. Co. of Am. v. Estate of Cerniglia 446 Fed.Appx. 453, 456 (3d Cir. 2011).

The Pennsylvania Supreme Court has expressly recognized that a law firm's representation of an adverse interest gives rise to the sort of injury that is appropriately remedied by injunction. After reciting the "essential prerequisites" for a preliminary injunction, including "irreparable injury", the Maritrans court observed that attorneys' threatened failure to perform fiduciary duties properly "gives rise to a request for

injunctive relief to prevent the breach of duty". Maritrans, 602 A.2d at 1282-83. The court noted that courts "clearly have the power to enjoin" counsel from breaching duties to keep client confidences and to avoid representing conflicting interests. Id. at 1283; see also Section VI(A)(3), *supra*.

In reinstating a preliminary injunction restraining a large law firm from representing its former client's competitors, the Maritrans court emphasized the extent of the firm's involvement in the former client's affairs, its knowledge of sensitive client information, and the substantial relationship between the prior and adverse representations. 602 A.2d at 1286. The court concluded that the former client's "competitive position could be irreparably injured" by continued adverse representation, and its "right to later seek damages, would be difficult if not impossible to sustain", particularly in light of problems related to piercing the prospective confidential relationship between the client's competitors and counsel. Id.

**\*24** Establishment of damages would be similarly problematic and "inadequate to correct the harm", id., in the present case. Indeed, the circumstances of this case make potential future money damages a particularly inefficacious remedy: if Defendant succeeds in its efforts to deliver ownership of the Mylan entities to Teva, it is highly unlikely that the new ownership will permit Plaintiffs to maintain their claim against Defendant.

This Court finds that Mylan has made a sufficient – indeed compelling – showing of injury to a legally-protected interest that cannot adequately be remedied at law. It therefore concludes that here, as in Maritrans, a "preliminary injunction [is] a proper mechanism to abate ... [a] breach of fiduciary duties to [the Mylan clients] where the facts support such a conclusion." [66]

#### 2. As to Defendant and Teva

##### (a) As to Defendant

K&E asserts that it will lose substantial income if it is enjoined from representing Teva in its hostile takeover bid. The Court presumes for present purposes that this is so (i.e., that at least some of the attorney time and/or other resources that K&E expects to devote to work on the hostile takeover cannot as profitably be applied to other client matters).

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

2015 WL 12733414

However, as noted above, mere economic loss, such as a temporary loss of income, does not constitute irreparable injury. See, *e.g.*, Opticians, 920 F.2d at 192 (listing "the extent to which the defendants will suffer *irreparable* harm if the preliminary injunction is issued" as the third factor in a preliminary injunction inquiry) (emphasis added); Acierno v. New Castle Cnty., 40 F.3d 645, 653 (3d Cir. 1994) ("The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy ... are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). Here, any potential economic harm to K&E as a result of a preliminary injunction may be adequately addressed by the posting of an appropriate bond. [67]

K&E also asserts that the grant of a preliminary injunction in this matter would impugn its reputation. See, *e.g.*, Defendant's PFFCC at ¶ 115. Although of course reputational injury cannot be remedied by money damages, [68] this claimed injury cannot be accorded substantial weight in the present case, for two reasons. First, as set forth above, this Court has analyzed K&E's dual representation of the Mylan clients and Teva, and concluded that it very probably violates Rule 1.7. Any reputational harm to K&E will presumably flow from that analysis and conclusion (and ultimately from K&E's own conduct), rather than from any injunctive enforcement.

 **\*25**  Second, K&E has brought any resulting harm to its reputation upon itself. Cf. Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 596 (3d Cir. 2002) ("As we have previously ruled, the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.") (citing and quoting Pappan Enters., Inc. v. Hardees' Food Sys, Inc., 143 F.3d 800, 806 (3d Cir. 1998) ("The self-inflicted nature of any harm suffered by [the party opposing the injunction] also weighs in favor of granting preliminary injunctive relief.") (brackets in Novartis opinion), *and* Opticians, 920 F.2d at 197 (noting that defendant could "hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself.")).

K&E has attested as to its awareness of and conflict inquiry regarding the ethical and contractual obligations implicated by concurrent representation of the Mylan Clients and Teva's hostile takeover attempt; and as a large, legal business enterprise it presumably had a degree of awareness of the

prospective fees/income from the latter. The Court observes that despite the ABA's express guidance to the contrary, as noted *supra*, K&E elected to proceed in its representation of Teva in its hostile takeover attempt without notifying or consulting the Mylan Clients. [69]

Finally, K&E has, as have numerous other firms large and small, previously been a defendant in litigation asserting ethical violations. See, *e.g.*, Goss Graphics Sys. v. Man Roland Druckmaschinen Aktiengesellschaft, No. C00-0035 MJM, 2000 WL 34031492, at \*6 (N.D. Iowa May 25, 2000) (granting plaintiff's motion to disqualify K&E from bankruptcy proceedings, and finding waiver ineffective, where court "very likely could conclude" that representation of client was "related to" adverse action); id. ("If the Court is to take at face value the 'rule of imputed disqualification,' attorneys at Kirkland owe a duty of loyalty to both [plaintiff client] and to [adverse client] at the same time. Although Kirkland has several hundred attorneys in several different cities, under the Model Rules and the Model Code, every attorney at Kirkland owes a duty of loyalty to Goss and to Goss's adversary .... Such an arrangement is untenable. It is Kirkland's continuing representation of Goss which makes this conclusion relatively straightforward."). [70]

### (b) As to Teva

The third preliminary injunction factor has been stated in multiple decisions of the Court of Appeals for the Third Circuit as "the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued". See, e.g., Liberty Lincoln–Mercury, Inc. v. Ford Motor Co., 562 F.3d 553, 556 (3d Cir. 2009); McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 356-357 (3d Cir. 2007); Shire U.S. Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003); Opticians, 920 F.2d at 192. No mention is made of harm to nonparties. However, in light of the language of some earlier decisions, [71] and the preliminary injunction standard applied by the Pennsylvania Supreme Court in Maritrans, [72] this Court has considered Teva's interests.

 **\*26**  The Court is cognizant of the myriad facts presenting potential detriments to Teva raised in Defendant's briefs, such as: Defendant's credentials and degree of related expertise, the presently unique relationship between individual partners of Defendant and Teva executives, the complexity and sophistication of the transactional and other areas of multi-

national issues at play, the limited availability of other firms to provide comparable services, and the costs to Teva to now bring in other counsel on a highly time-sensitive matter. However:

First, there has been no clear showing that Teva is an innocent party in the occasioning of these unfortunate and unethical circumstances. To the contrary, Teva sought the services of counsel it knew to be also representing Mylan subsidiaries. Second, Defendant's testimony is that it was first approached by Teva regarding the Subject Representation in early April, [73] that it performed two levels of conflict analysis, see Defendant's PFFCC at ¶¶ 91-92, and that it began work on the Subject Representation sometime in April. The initial communication from Teva to Mylan, N.V. is dated April 21, 2015, with subsequent exchange of communications from Mylan, N.V. on April 27th and from Teva in reply on April 29th. On May 1st, Plaintiffs filed their Complaint in Equity in State Court and moved for a preliminary injunction. From that date forward, K&E and Teva were aware that continuing representation (exclusive or otherwise) of Teva by K&E was undertaken with the risk that Defendant would at some future time be enjoined, on the basis of its breach of ethical duties, from future representation. [74] The relevant consideration, then, is the nature and degree of harm to Teva from (a) the loss of familiarity with the hostile acquisition gained by K&E in approximately two to three weeks, and (b) replacement of K&E with other counsel (perhaps other large firm counsel previously engaged by Teva in other matters) [75] with expertise in acquisitions and related international law. Defendant has not introduced evidence either that its services are irreplaceable (as opposed to preferred), or that (particularly given Defendant's ability to obtain deep institutional knowledge in two weeks) the delay in bringing substitute counsel up to speed will likely cause Teva's takeover attempt to fail.

The Court therefore concludes that any potential irreparable harm to Defendant, even together with the potential harm to Teva, either (a) is economic and may be remedied by the posting of the appropriate bond and/or (b) does not begin to approach the irreparable harm to Plaintiffs of Defendant's continued adverse representation in Teva's hostile takeover attempt. [76]

### C. Public Interests Affecting Preliminary Injunction

**\*27** Lastly, the Court must consider whether the issuance of a preliminary injunction serves the public interest before granting preliminary injunctive relief. As noted earlier, *supra* n. 15, "[A]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff. Nonetheless, district courts should award preliminary injunctive relief only upon weighing all four factors." Am. Tel. & Co. v. Winback & Conserve Program, Inc., 42 F.3d at 1427 n.8 (citing Duraco Prods., Inc. v. Joy Plastic Enter., Ltd., 40 F.3d 1431, 1438 (3d Cir. 1994)). But cf. Continental Group, 614 F.2d at 357 (preliminary injunction factors include "when relevant, harm to the public.").

There is little or no discernable public interest at stake in who will prevail in the hostile takeover battle between Teva and Mylan, N.V., or in whether Teva has recourse to its preferred takeover counsel. To the extent that the public interest is concerned, it must be deemed to favor enforcement of ethical rules and contractual undertakings. See Maritrans, 602 A.2d at 1282 (concluding that "[t]he public's trust in the legal profession undoubtedly would be undermined" if the Court did not reinstate the warranted preliminary injunction and recognize the actionability at law of counsels' "breaches of their fiduciary duties by engaging in conflicts of interest"); IBM v. Levin, 579 F.2d at 283 ("The maintenance of the integrity of the legal profession and its high standing in the community are important additional factors to be considered in determining the appropriate sanction for a [disciplinary] Code violation.").

Because the Court has found that Plaintiffs have a strong likelihood of prevailing on the merits, it further finds, largely as a consequence thereof, that the public interest favors injunctive enforcement of K&E's duty to refrain from a representation adverse to an affiliate of the Mylan Clients in a matter related to its services for those clients.

### VII. CONCLUSION

For the reasons set forth above, it is respectfully recommended that Plaintiffs' Motion for Preliminary Injunction (ECF No. 5) be granted. More specifically, the Court concludes that in light of (a) the relationship between the parties; (b) the scope and nature of Defendant's fiduciary role as legal counsel to Plaintiffs, including the information disclosed to and services provided by K&E; and (c) the scope and nature of the Subject Representation, the Subject Representation is at a minimum substantially likely to be impermissible under Rule 1.7 either (a) facially,

as a representation directly adverse to a current client, or (b) as a representation adverse to a corporate affiliate attributable as directly adverse to the corporate client under official interpretation of the Rule. Further, Defendant cannot be excused from its ethical obligations to Plaintiffs, and should be held to the obligations as undertaken by virtue of the Engagement Letter's Conflict of Interest provisions, where it is at a minimum substantially likely that (a) the Subject Representation is not an Allowed Adverse Representation because it is related to work performed for Plaintiffs and adverse to both the Mylan Clients and Mylan Parent (where adversity to either would suffice), and (b) any prospective waiver of the Subject Representation lacked informed consent.

The Court further observes that, as set forth above, the other factors weigh in favor of grant of the requested preliminary injunction.

Finally, the Court concludes that, in light of Plaintiff's strong showing of a clear right, Plaintiffs are also entitled to grant of the mandatory injunction component of the requested preliminary injunction. See discussion, Section IV, *supra*; see also SBM Site Servs., 2011 WL 7563785.

**\*28** The Court will enter a separate Order that will direct the parties to submit filings for a determination of the amount and form of the bond to be posted by Plaintiffs in the event the Report and Recommendation is adopted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: June 9, 2015.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 12733414

Footnotes

1   The Court, in the expeditious issuance of this Report and Recommendation, refers to all four (4) Mylan affiliates as the "Mylan Clients" while cognizant of the disputed status/standing of Mylan Specialty LP. See *infra*, n. 23.

2   The Motion for Preliminary Injunction sought to "enjoin K&E from representing, advising, or otherwise acting on behalf or in support of Teva in connection with its efforts to acquire Mylan N.V. and its subsidiaries, including but not limited to in connection with the proposed transaction as set forth in Teva's letter to Mylan dated April 21, 2015; (ii) prohibit K&E from using, relying on or disclosing any information it learned from its representation of Plaintiffs in any representation of any other K&E client; (iii) require K&E to maintain the confidentiality of all non-public information it has learned as a result of its representation of Plaintiffs; and (iv) require K&E to retrieve all work product provided by K&E to Teva in connection with its efforts to acquire Mylan N.V. and its subsidiaries and maintain the confidentiality of said work product." See Plaintiffs' Proposed Findings of Facts and Conclusions of Law at 2.

3   Additional filings have been made, and additional unredacted documents submitted to the Court, from May 26th through June 1st. The parties filed Supplemental Findings of Fact and Conclusions of Law on May 28th. (ECF Nos. 86 (as to K&E, filed under seal) and 88 (as to Mylan)). The parties also filed, subsequent to the Evidentiary Hearing, additional Declarations which, despite their questionable propriety, the Court has in its discretion reviewed and considered.

4   See, *e.g.*, Defendant's May 20, 2015 Filings Binder Vol. II of II (containing document filed as ECF No. 40 (redacted) and 50 (under seal)), Declaration of Michael D. Shumsky. Defendant's 4" binder consists primarily of extensive, complete medical journal articles regarding anaphylaxis diagnosis and management, Epipen® and generic Epinephrine prescribing information; lengthy *curriculum vitae* information (*e.g.*, the 128-page C.V. of Declarant Dr. Eli Meltzer); and other background documentation regarding Mylan's opposition to Teva's abbreviated new drug application ("ANDA") for a generic epinephrine auto-injector.

5   As to the documents filed under the seal as referenced in this Report and Recommendation, the Court observes: "The public right of access to judicial proceedings and records is integral and essential to the integrity of the judiciary. Mine Safety Appliances Co. v. North River Ins. Co., ___ F. Supp. 3d ____, No. 2:09-cv-348, 2014 WL 1320150, at \*5 (W.D. Pa. Mar. 31, 2014). This right is "pervasive ... [and] applies to all aspects of the judicial process where substantive determinations are made." Id. (citing Bank of Am. Nat'l Trust & Savings Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

Case 1:20-cv-00292-JPW    Document 26-1    Filed 05/08/20    Page 20 of 30

2015 WL 12733414

339, 343 (3d Cir. 1986)). See also Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984) (applying the presumption of public access to a civil hearing for a preliminary injunction and transcripts of that hearing).

"The party seeking to seal any part of a judicial record bears the heavy burden of showing that 'the material is the kind of information that courts will protect' and that 'disclosure will work a clearly defined and serious injury to the party seeking closure." Mine Safety, 2014 WL 1320150, at *8 (quoting Miller v. Indiana Hosp., 16 F.3d 549, 551 (3d Cir. 1994)) (citing Publicker Indus., supra) (internal quotation marks omitted). The moving party must demonstrate such an injury with specificity; " '[b]road allegations of harm, bereft of specific examples or articulated reasoning, are insufficient.' " Id. (quoting In re Cendant Corp., 260 F.3d 183, 194 (3d Cir. 2001)) (internal citation omitted).

Due to the emergency nature of this proceeding and the need to file a large amount of material in an expeditious manner, the Court was very lenient in its grant of the parties' motions to file documents under seal. However, at this stage of the matter, where the Court is entering a ruling on the merits and the public is even more entitled to know the bases underlying that ruling, the burden of allowing documents and statements to remain under seal becomes even heavier. Id. at *11 (citing Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd., Civ. A. No. 09-290, 2013 WL 1336204, *4 (W.D. Pa. Mar. 29, 2013)).

The kind of information courts have protected from disclosure is narrow and includes trade secrets (as defined under Pennsylvania law), where disclosure would create a sufficient threat of irreparable harm. Id. (citing Leucadia, Inc. v. Applied Extrusion Tech., Inc., 998 F.2d 157,166 (3d Cir. 1993)); Publicker Indus., 733 F.2d at 1071) (other citations omitted). In addition, some non-trade secret, confidential business information may also be protected, for example, where the moving party shows that the disclosure of such information might harm its competitive standing. Id. (citing Leucadia, 998 F.2d at 166; Republic of Philippines v. Westinghouse Elec. Corp., 949 F2d 653, 663 (3d Cir. 1991)). However, " 'non-trade secret but confidential business information is not entitled to the same level of protection from disclosure as trade secret information.' " Id. (quoting Littlejohn v. BIC Corp., 851 F.2d 673, 685 (3d Cir. 1988)). For example, courts have declined to protect confidential business information where the interest sought to be preserved was the corporation's reputation from the commercial effects of embarrassment, where the disclosures merely carry a potential to adversely affect sales and/or a potential loss in capital stock value, or where a business's commercial standing may be injured from disclosure of information relating to defects and safety concerns with products. Id. (citing Littlejohn, 851 F.2d at 685 (citing Brown & Williamson Tobacco Corp. v. F.T.C., 710 F.2d 1165, 1180 (6thCir. 1983)).

To the extent the parties are relying on the attorney-client privilege as a basis for requesting that court records remain sealed in adjudicating the motion for preliminary injunction, that privilege does not apply to some or most of the information sought to be protected from disclosure when the attorney-client privilege has been waived. Of particular relevance here, a party can waive the attorney–client privilege by (1) disclosing protected information to a third party, Mine Safety, 2014 WL 1320150, at *18 (citations omitted), or (2) asserting claims or defenses that place the privileged communications at issue, id. at *19 (citing Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 864 (3d Cir. 1994)). Thus, where a party "us[es] the advice of counsel to support a claim for affirmative relief, such as a professional malpractice claim, or to (1) advance an essential element to a defense, (2) prove an affirmative defense, or (3) negate a showing required by the adverse party[,]" the privilege is waived. Id. Here, Teva's attempted hostile takeover of Mylan N.V. was disclosed to the public, see, e.g., *Generic Drugmaker Teva Makes $40 Billion Offer for Rival Mylan,* http://www.nytimes.com/reuters/2015/04/21/business/21reuters-mylan-m-a-teva-pharm-ind.html?_4=0, and is at issue in this litigation.

For these reasons, the Court has now formed the belief that much of the previously sealed information relied upon and cited in this Report and Recommendation is not entitled to protection from disclosure. That being said, the Court (a) has articulated its findings of fact and conclusions of law without disclosing the specifics of any potentially confidential proprietary business information and (b) does not believe it presently needs to disclose such information, available to the parties and the Court under seal, for purposes of this Report and Recommendation. Nothing herein stated implies that any of the documents filed under seal by either party can be publicly disclosed without party agreement or Court order.

6   See, e.g., Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction ("Plaintiffs' Memo in Support of MPI") (ECF No. 6); Defendant's Memorandum of Law in Response to Plaintiff's Motion for Preliminary Injunction ("Defendant's Memo in Response to MPI") (ECF No. 32, redacted, and 46, filed under seal) Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Preliminary Injunction ("Plaintiffs' Reply Memo in Support of MPI") (ECF No. 58, now under seal, and 78).

7   See Expert Report of Professor John C. Coats, IV ("Coates Report") (ECF No. 63); Expert Report of Professor Jane Campbell Moriarty ("Moriarty Report") (ECF No. 66), Expert Report of Geoffrey C. Hazard, Jr. ("Hazard Report") (ECF No. 68); Declaration of Professor Richard Painter ("Painter Report") (ECF No. 49, filed under seal by K&E).

Case 1:20-cv-00292-JPW    Document 26-1    Filed 05/08/20    Page 21 of 30

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

2015 WL 12733414

With regard to the submission of an export report under seal, the Court now observes that the expert reports presented are not the type of material that courts protect from disclosure in an adjudicatory proceeding. Mine Safety, 2014 WL 1320150, at *31-32. Information contained in Prof. Painter's expert report goes to the heart of the dispute here between the parties —he is offering his opinion and conclusions about whether Defendant violated its fiduciary duty to the Mylan Clients, and/or violated the Pennsylvania Rules of Professional Conduct governing the conduct of lawyers representing clients, by virtue of Defendant's representation of Teva in its unsolicited attempt to acquire Mylan, N.V. Thus, the information contained in his expert report is clearly "at issue" and not subject to any privilege. Moreover, if the disclosure of information in Prof. Painter's expert report is essential to understanding the bases for the Court's findings of fact, conclusions of law, and recommended disposition of Plaintiff's motion for a preliminary injunction, then that need is more compelling than protecting information that does not rise to the level of trade secrets or protected confidential, proprietary business information. At present, the minimal references made to the Painter Report herein are to a hypothetical, other experts' responses, his observation that Teva bid at a premium, and a section heading.

8    Considerations outside the scope of this Recommendation include both certain questions of morality, ethics, national/ international social policy, and/or economic or legal philosophy regarding, *e.g.*, (i) inverse tax transactions and other corporate business practices, (ii) a trend toward oligopolies in certain industries and in legal practice, (iii) the evolution of the ethical rules governing lawyers' conduct and the natural constraint considerations reflected in those rules may place on the continued consolidation of law firms and resultant reduction in the availability of qualified counsel to provide unconflicted client representation in specialized areas.

9    The parties do not dispute that there have been no "separate engagement[s]". See Defendant's PFFCC at ¶ 28. Thus, subsection (ii) is not brought into play. To be clear, then, under the express language negotiated by the parties and drafted by K&E, *an AAR is a representation of another client adversely to the Mylan Clients or any affiliate in a matter not related to legal services provided to the Mylan Clients under the Engagement Letter.*

10    Defendant suggests that this Court also weigh in its consideration the potential harm to Teva. See, *e.g.*, Transcript of May 26, 2015 Evidentiary Hearing (Tr. at 109-112) (citing Punnett v. Carter, 621 F.2d 578, 587 (3d Cir. 1980)). Although this Court finds Punnett extraordinarily inapposite as to the circumstances in which it may be appropriate to weigh the harm to others as a factor in the balance for a preliminary injunction, the Court has nonetheless provided its assessment as to Teva for reasons set forth in its Analysis.

11    Cf. Randy Lee, Introduction to Symposium, Legal Ethics for Government Lawyers: Straight Talk for Tough Times, 9 Widener J. Pub. L. 199 (2000) ("The Preambles to both the Pennsylvania Rules of Professional Conduct and the Model Rules, from which the Pennsylvania Rules have been derived, remind us that "[t]he legal profession is largely self-governing[,]" and with that autonomy comes "special responsibilities"); AMERICAN BAR ASSOCIATION COMMISSION ON PROFESSIONALISM REPORT TO THE HOUSE OF DELEGATES, "... in the Spirit of Public Service:' A Blueprint for the Rekindling of Lawyer Professionalism, 112 F.R.D. 243, 261-62 (1986) (noting definition of our profession as: "An occupation whose members have special privileges ... that are justified by the following assumptions", including that "the client's trust presupposes that the practitioner's self-interest is overbalanced by devotion to serving both the client's interest and the public good" and "the occupation is self-regulating – that is, organized in such a way as to assure the public and the courts that its members are competent, do not violate their client's trust, and transcend their own self-interest").

12    The term "substantially related" is used in, *e.g.*, ABA Model Rule 1.9, comment 3 defining it as, among other things, if there "is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter"). See Coates Report at 2 n.1.

13    Cf. ABA Formal Opinion 95-390, *Conflicts of Interest in the Corporate Family Context* (Jan. 25, 1995) (hereafter "Formal Op. 95-390") (observing that even in circumstances where counsel does not believe consent is ethically required, "as a matter of prudence and good practice a lawyer who contemplates undertaking a representation adverse to a corporate affiliate of a client will be well advised to discuss the matter with the client before undertaking the representation"); id. ("[T]he Committee believes that as a general matter, in the absence of a clear understanding otherwise, the better course is for a lawyer to obtain the corporate client's consent before the lawyer undertakes a representation adverse to its affiliate.").

14    "[A]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff. Nonetheless, district courts should award preliminary injunctive relief only upon weighing all four factors." Am. Tel. & Co., 42 F.3d at 1427 n. 8 (citing Duraco Prods., Inc. v. Joy Plastic Enter., Ltd., 40 F.3d 1431, 1438 (3d Cir. 1994)).

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

Case 1:20-cv-00292-JPW    Document 26-1    Filed 05/08/20    Page 22 of 30

2015 WL 12733414

Cf. Neo Gen Screening, Inc. v. TeleChem Int'l, Inc., 69 Fed.Appx. 550, 554 (3d Cir. 2003) (citing Acierno, 40 F.3d at 653 (indicating that the burden is on the moving party on the first two issues, but the District Court should itself consider the second two)); id. (further indicating that "[a]s a matter of logic, the moving party cannot have the burden to introduce evidence showing the harm that will be suffered by the opposing party if the injunction is issued[; r]ather, the moving party has the burden to show the harm it will suffer if no injunction issues ....").

15    The Court is surprised at the extraordinary degree of critically distinguishing facts between a case cited by Defendants as applicable Third Circuit authority, and the instant action. In Punnett, the Third Circuit affirmed the District Court's determination that Plaintiffs had failed each prong of the four-factor test, and held that it could not say that the District Court erred in denying a mandatory preliminary injunction requiring the Government to issue public statements warning servicemen who had participated in certain nuclear testing of alleged mutagenic dangers to themselves and their children. The District Court's conclusion had "rested substantially" on Plaintiffs' failure to show a likelihood of success on the merits and "it also found a strong likelihood" that grant of the injunction would result in substantial harm to others. Punnett, 621 F.2d at 581. The Third Circuit further observed that the District Court weighed "the unconvincing nature of Plaintiff's scientific evidence" against the "immeasurable" anxiety and family distress the requested public warnings would cause. Id. at 582, 587. And it concluded that in the circumstances before it "the injudicious issuance of an injunction might well result in unnecessary damage to other parties, perhaps as irreparable and more grave than the harm that might ensue from the denial of the injunction." Id. at 587-588.

16    See n. 2, supra.

17    The Court notes that despite requiring "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms" to the "disfavored" request for a mandatory preliminary injunction, the SBM Site Servs. court preliminarily enjoined the defendants "and all other persons who receive actual notice ... who are in active concert or participation with" them "from possessing, using, disclosing, reviewing, or accessing, directly or indirectly" the information at issue. SBM Site Servs., 2011 WL 7563785, at *4, *12. See also Genworth Fin. Wealth Mgmt., Inc. v. McMullan, 721 F. Supp. 2d 122, 131 (D. Conn. 2010) (ordering defendants, inter alia, to retrieve the plaintiff's information "from all third parties" to whom defendants had provided it).

18    In accordance with the foregoing authorities, the Court has closely scrutinized the evidence and will grant any mandatory components of Plaintiffs' requested relief only upon a strong showing of a clear right. See SBM Site Servs., 2011 WL 7563785, at *2, *4; Taylor, 40 Pa. Super. at 232. See also, Section VII, Conclusion, infra.

19    Cf. Defendant's Notice of Supplemental Authority (ECF. No. 67) (submitting Air Products and Chemicals, Inc. v. Airgas, Inc., et. al, No. 5249-CC (Del Ch. Ct. Mar. 5, 2010) (transcript of teleconference ruling concluding that, under Delaware law, Cravath, Swaine & Moore (sued by Airgas for ethical breach in its representation of competitor Air Products in hostile takeover attempt, which suit was stayed in the Eastern District of Pennsylvania pending the Delaware Court's determination) could "represent Air Products in the litigation pending in [Chancery] Court" (as distinct from representation in the acquisition, which remained unaddressed) brought by Air Products challenging defensive actions by the Airgas board). This case, permitting, under Delaware law, representation in litigation under the Judge's own auspices, is inapposite.

20    Cf. Restatement (Third) of Law Governing Lawyers § 121 cmt. b (2000) ("[T]he principle underlying the prohibition against a lawyer's filing suit against a present client in an unrelated matter ... may also extend to situations, not involving litigation, in which significant impairment of a client's expectation of the lawyer's loyalty would be similarly likely.") (emphasis added). The ABA has made clear the underlying concerns regarding the sanctity of the client's trust and the corresponding duty of loyalty owed. See, e.g. Formal Op. 95-390 at Conclusion ("The provisions of both paragraphs of Rule 1.7 emphasize the paramount importance of preserving a lawyer's relationship with his client. In that light, doubts about whether one or another requirement of the Rule applies should be resolved by a presumption that favors the client who will be adversely affected by the prospective representation.").

21    See, e.g., Defendant's Memo in Response to MPI at 25, 30, citing to Rule 19 and comments thereto in arguments as to confidential information.

22    Defendant acknowledges the current client status only of the three (3) entities defined as clients under the Engagement Letter, and not Mylan Specialty LP. See Defendant's PFFCL at ¶ 27 (asserting that Mylan Specialty LP is not a client); Tr. at 118 (Plaintiffs' acknowledgement that there are three clients to the Engagement Letter). The Court concurs that Mylan Specialty LP is not a party to the Engagement Letter or identified as a client therein. However, in view of this Court's conclusion that it is substantially likely that the Subject Representation is impermissible, and that the factors weigh heavily in favor of grant of a preliminary injunction, Mylan Specialty's standing is irrelevant for purposes of expeditious issuance

Case 1:20-cv-00292-JPW Document 26-1 Filed 05/08/20 Page 23 of 30

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

2015 WL 12733414

of the Recommendation. As a practical matter, if that Plaintiff lacks standing, a decision in favor of the other Plaintiffs will simply render Mylan Specialty's request moot.

23 See, e.g., Declararation of David Fox at ¶¶ 2-3 ("Fox Decl.") (ECF No. 35, redacted; Ex. A thereto (unredacted professional profile); Declaration of Thomas O. Kuhns at ¶ 2 ("Kuhns Decl.") (ECF No. 38, redacted); Declaration of Jay P. Lefkowitz at ¶ 1("Lefkowitz Decl.") (ECF No. 39, redacted, and 48, filed under seal); Declaration of Michael D. Shumsky at ¶ 1("Shumsky Deposition") (ECF No. 40, redacted, and 50, filed under seal).

24 But cf. Tr. at 51 (Defendant's identification of one analysis as whether there is a conflict because K&E is "adverse only to a non-client, Mylan N.V.").

25 See The Compact Edition of the Oxford English Dictionary (Oxford Univ. Press 1988).

26 See id.

27 Plaintiffs' Reply Memo in Support of MPI at 2.

28 It is not surprising that Teva sought K&E's representation in this complex and high-stakes matter given Defendant's expertise, and its prior relationship with and representations of Teva, including in significant (but less significant – e.g., $6 as opposed to $20 billion) acquisitions. There has been, however, no proffer of record that K&E has ever represented Teva (or any other corporate entity) in a hostile takeover attempt against another current K&E client (or that client's corporate affiliate).

In addition, although K&E pointedly repeats that Mylan, N.V. is presently engaged in an attempted hostile takeover of the Irish pharmaceutical entity Perrigo Co Plc ("Perrigo"), Defendant fails to note that Mylan, N.V. is not trying to facilitate accomplishment of this objective by hiring the target company's lawyers. Cf. Defendant's PFFCL at ¶ 84 ("On April 8, 2015, Mylan N.V. offered to acquire Perrigo ...."). To this Court's knowledge, there is no suggestion that any aspect of Mylan Parent's attempted acquisition of Perrigo or avoidance of Teva's hostile acquisition has crossed an ethical boundary. Relatedly, to the extent Defendant implies that its clients' objection to the Subject Representation is disingenuous and intended as a delaying technique, any such implication is without support in the circumstances sub judice where, e.g., Plaintiffs filed their Complaint and Motion for Preliminary Injunction shortly after learning, by communication from Teva, of their counsel's Subject Representation, and with apparently compelling grounds. Cf. Tr. at 108-109.

29 Cf. Defendant's Memo in Response to MPI at 20 ("What matters here is that the existing Mylan N.V. Dutch corporate structure and British headquarters yields enormous tax benefits to Mylan N.V.").

30 See Plaintiffs' Reply Memo in Support of MPI at 1 ("K&E seems to claim that because [of the February, 2015 transactions] that, among other things, may reduce its tax liability, [Mylan] is now somehow undeserving of having K&E abide by its fiduciary, ethical and professional obligations. See K&E Br. at 1, 19-20.").

31 See Defendant's Memo in Reponse to MPI at 20-21 ("To establish "adversity", Plaintiffs must demonstrate ... that Teva's acquisition ... is adverse to them ....") (emphasis in original); id. at 21-22 (asserting that "[t]he salient fact is that Teva's proposal ... has no adverse effect on the interests of the Mylan [Clients]" because if "information Kirkland lawyers supposedly learned could ... led [sic] Teva to make a higher bid, [it] would not be adverse to any [one]" and if such information "led Teva to make a lower bid", it "would have no adverse impact on the [Mylan Clients] as distinct corporate entities"). The Court observes that Defendant's crabbed view of the potential "adverse effect on the interests" of its clients (i.e., a higher or lower stock offer) should K&E have breached/breach its fiduciary duty ignores both the moral/ ethical considerations and effects to a client of its counsel's betrayal and the true spectrum of potential adverse business/ economic effects flowing from abuse of client trust/misuse of information received in a fiduciary capacity. See discussion page next, infra.

32 Compare Tr. at 47 (wherein Defendant does not dispute Plaintiff's representation that Mylan, N.V. derives 90% of its revenue from Mylan, Inc. but deems it "irrelevant"); with id. at 113 (Plaintiff's reiteration that, accordingly, Mylan, Inc. "is the main asset that [Teva] is [seeking to acquire]").

Cf. Coates Report at 11-12 (noting that '[d]uring 2014, the EpiPen® Auto-Injector became the first Mylan product to reach $1 billion in annual net sales") (citing Mylan, Inc. Form 10-K for the year ended 12/31/2014 at 8).

33 Compare Defendant's Memo in Opposition to MPI at 20 & n.27 (asserting that "any argument about adversity to Mylan N.V. is irrelevant" while noting that "[a] holding company is a corporate body with a concentrated ownership of shares of stock in another company, by which it exercises control, supervision or influence over the policies and management of the company whose shares it holds....") with Plaintiffs' Reply Memo in Support of MPI at 2 ("The value of Mylan N.V., and the reason Teva is willing to pay the billions it has offered, is inextricably intertwined with the value of the drugs developed and manufactured by Mylan – a matter with which K&E is intimately familiar due to its representation of Mylan ....").

34 Professor Painter postulates that a personal injury client's preference as to ownership of his apartment building is insufficient to preclude his lawyer's representation of a prospective buyer. See Painter Report at 15-16. The hypothetical

2015 WL 12733414

is clearly (absent perhaps a buyer with a known history of tenant evictions and/or condominium conversions) correct, but inapposite. My client's interest in who owns his apartment building is not commensurate with my client's interest in who owns my client.

35 Cf. Tr. at 135 (Defendant's asking "where is the evidence of what happens [if Teva acquires Mylan]? There's lots of things that might happen" and observing that Teva's "announcements about — you know, synergies, doesn't necessarily mean anything with respect to Mylan"); id. at 54 (asserting, in specific context of violation of Rule 1.7 and whether there is a prohibited "conflict", the absence of evidence that K&E's "work for Teva" is adverse to the Mylan Clients where: "There is no evidence in the record that Mylan, Inc., and the others won't continue to own and sell their own products. There is no challenge to the patents or any other aspect of Mylan's business or operation. There is no effort to take money from them."); id. at 55 (asserting the absence of any "actual evidence" of how Teva's acquisition of Mylan N.V. stock "is going to affect" the Mylan Clients).

Cf. Plaintiffs' Reply Memo in Support of MPI at 2 (stating that K&E's argument that "its efforts on behalf of Teva to acquire the very drugs on which it advised [Mylan] should be of no concern because even if Teva succeeds in its hostile takeover effort, the Mylan Plaintiffs would still own those drugs ... strains the bounds of good faith [as] ... the whole purpose of the transaction is to obtain control of Mylan and its assets"); id.

36 Cf. Coates Report at 7 (explaining that lawyer's work includes advice/assistance regarding divestitures "required under the antitrust laws or otherwise desirable as a result of the transaction").

37 See Formal Op. 95-390 (explaining that under Rule 1.7(a), as the comment confirms, "a lawyer ordinarily may not act as an advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated" and that representation is prohibited "*unless a lawyer concludes that his relationship with the existing client will not be 'adversely affected'* by the new representation") (emphasis added); id. (further noting that counsel's "subjective judgement is not necessarily dispositive; his belief must be a reasonable one"); id. (explaining that Rule 1.7(a) "in referring to a representation that is 'directly adverse' to another client, contemplates litigating, or maintaining a position, in a given matter, on behalf of one client against a person or entity which is a client of the lawyer (or her firm) in another matter") (quoting with approval Formal Op. 93-377, *Positional Conflicts*).

The Court of Appeals of Michigan has noted in Attorney General v. Mich. Public Serv. Comm'n, 243 Mich. App. 487, 625 N.W.2d 16 (2000), that the conflict rules reflect " 'a frank recognition that, human nature being what it is, a dual relationship involving adverse or conflicting interests, constitutes enormous temptation to take advantage of one or both parties' and that '[t]he purpose of [the rules] is to condemn the creation and existence of the dual relationship instead of merely scrutinizing the results that may flow therefrom"). See Mich. Public Serv. Comm'n, 243 Mich. App. at 501 (citing Barkley v. Detroit, 204 Mich.App. 194, 202–203, 514 N.W.2d 242 (1994), quoting [State Bar of Michigan Ethics Committee] Formal Opinion 160 (November 1954), quoting [State Bar of Michigan Ethics Committee] Formal Opinion 132 (January 1950)).

38 Cf. In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 162 (3d Cir. 1984) (similar observations as to Rule 1.9 and former client). Cf. also Schwartz v. Indus. Valley Title Ins. Co., No. Civ. A. 96-5677, 1997 WL 330366, at *5 (E.D. Pa. June 5, 1997) (noting that regardless of the degree of danger of breach of client confidences, "[b]oth Rule 1.7 and Rule 1.9 give effect to the overarching principle that an attorney owes a duty of loyalty to clients and should not be involved in litigation in which loyalties to two current clients or to a current and a former client are likely to be divided. Thus, an attorney should avoid situations in which the duty of loyalty to one client might be impaired by the equally important duty to vigorously represent the other client.") (quoting Vanderveer Group, Inc. v. Petruny, Nos. Civ. A. 93-3677 & 93-5154, 1994 WL 314257 at *7 (E.D. Pa. 1994)) (counsel disqualified as a result of conflicts of interest).

39 At the time that the Mylan Clients consulted with K&E and provided it with confidential proprietary information regarding, *e.g.*, their most important products, the parties plainly expected that K&E was not eligible to undertake representation in a hostile takeover against Mylan, Inc. Cf. Plaintiffs' PFFCC at 1 ("During the course of that representation, which is ongoing, Mylan entrusted K&E with highly confidential and sensitive information relating to Mylan's legal strategies and success. In so doing, Mylan relied on the fundamental principles – recognized by the Pennsylvania Supreme Court – that an attorney owes her client a duty of 'undivided loyalty,' and that public trust in the legal profession hinges on rigorous protection against attorney conflicts of interest.") (citing Maritrans, 529 Pa. at 253-54, 602 A.2d at 1283).

And, as Plaintiffs properly observe, Defendant's suggestions that if Plaintiffs were truly concerned about the loyalty of K&E they should/would have fired Defendant from its current engagements are inappropriate at best. See Defendant's PFFCC at ¶ 59 ("To date, none of [the Mylan Clients] has terminated Kirkland's engagements ...."); Plaintiffs' Reply Memo in Support of MPI at 2 (citing Defendant's Memo in Opposition to MPI at 1, 20). Cf. Formal Op. 95-390 (Coleman, Deborah A., in concurrence and dissent) (noting that lawyer's failure to consult client regarding new representation adverse to affiliate deprives client of ability to make an informed decision regarding representation and instead forces client "to

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

2015 WL 12733414

decide between discharging the lawyer, even if such discharge will have a material adverse effect on its interests ... or acquiescing in the lawyer's continuing to represent it, with whatever impairment of communication, cooperation and diligence, and whatever threat to confidentiality, results", and concluding that "[i]t cannot be consistent with a lawyer's ethical duties for a lawyer to force his client to such a decision"); id. (Fox, Lawrence J., dissenting) (noting that "firing one's counsel is rarely a satisfactory solution" and that clients should not be "placed in a Hobson's choice of waiving the conflict or firing their lawyers" because counsel took "on a new, more lucrative engagement" from which it was ethically precluded).

40 The following passage in the Formal Opinion, discussing these circumstances, is instructive:

> [W]e have interpreted "directly adverse" to refer not merely to the practical impact (on the adversely affected client) but also to the circumstances in which the conflict arises, and specifically the closeness of the connection between the lawyer's actions and the adverse effect on the client....
>
> ***
>
> We conclude, then, that although in situations involving an *unrelated* suit against an affiliate of a corporate client, the client may be adversely affected, that adverseness is, for purposes of Rule 1.7, indirect rather than direct, since its immediate impact is on the affiliate, and only derivatively upon the client.

Text at n. 12 (footnote omitted) (emphasis added).

41 As Rule 1.7 contains no requirement of relatedness, it contains no definition of the term. Rule 1.9, governing limitations on representations adverse to former (as opposed to current) client includes a requirement of "substantial relatedness", defined in Comment 3 which provides that "[m]atters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the [new/different] client's position in the subsequent matter." See Rule 1.9 cmt. 3. In its issuance of Formal Op. 05-436, the Committee concluded that for purposes of new Comment 22 to Rule 1.7, addressing the permissibility/effectiveness of prospective conflict waivers and informed consent, the comment's observation that a prospective consent "is more likely to be effective" if, among other things, it "is limited to future conflicts unrelated to the subject of the representation", the term "unrelated" would be appropriately defined by reference to Rule 1.9, comment 3's definition of "substantially unrelated". See Formal Op. 05-436.

The Court observes that this definition was adopted for purposes of assessment of the effectiveness of a prospective waiver. It also observes that the parties have negotiated a different, lower standard for purposes of the conflict of interest provisions of the Engagement Letter. Nonetheless, the Court's final observation is that even under application of Rule 1.9's definition of "substantially related", the circumstances here are such that K&E's representations of the Mylan Clients and the Subject Representation meet that standard. See discussion at text, above. Cf. Moriarty Expert Report at 3 (concluding that "[T]he [Engagement] letter is insufficient as an advance waiver under ABA Formal Opinion 05-436 ..., and law on the subject of advance waivers, given the nature of the conflict at issue here and the contractual limitation inserted in the engagement agreement.").

Cf. Defendant's PFFCC at ¶ 29 (asserting that K&E partner, Jay Lefkowitz, understood the term "substantially related" to potentially allow adverse representations "even with respect to a particular product ... so long as the legal services did not have substantial factual or legal overlap" and understood that negotiated term "related to" to prohibit undertaking "representation adverse to that specific product regardless of whether the adverse representation overlapped with Kirkland's work") (citing Lefkowitz Supp. Decl. ¶¶ 5, 6).

42 Cf. Defendant repeatedly suggests in Declarations and briefs that (a) information provided by the Mylan Clients was not, in fact, confidential or proprietary and/or (b) all or most of the information communicated to K&E in the course of its representations of the Mylan Clients was made public in the form of, *e.g.*, regulatory filings or litigation, or ostensibly became "outdated. This suggestion is meritless in light of the nature/scope of K&E's Mylan representations and information, the nature/scope of Teva's hostile acquisition attempt, and Plaintiffs' evidentiary submissions. See discussions in text; see, *e.g.*, Defendant's PFFCL at ¶¶ 37-49; id. at ¶¶ 52-53 (stating that K&E did not receive any confidential information "that involved commercial relationships and strategies" or which was "relevant to an acquisition of Mylan N.V. by Teva"). Compare Defendant's PFFCL at ¶ 54 ("Almost all of the information related to Kirkland's representation of [the Mylan Clients] is now publicly available, outdated or immaterial.") with Plaintiffs' Reply Memo in Support of MPI at 3 ("Clients routinely convey far more information to their lawyers than what actually becomes public ... including information relevant to deciding [courses of public action] and other strategic determinations."); id. at 15-16 (noting that Defendant has not disputed the non-public disclosure of information identified in the Supplemental Miner Decl.

Case 1:20-cv-00292-JPW    Document 26-1    Filed 05/08/20    Page 26 of 30

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

2015 WL 12733414

and further observing that "[i]n the context of Rule 1.7, the threat of disclosure of confidential information is completely irrelevant").

43 Cf., *e.g.*, Greenwood Land Co. v. Omnicare, Inc., Civ. A. No. 09-686, 2009 WL 2595652 (W.D. Pa. Aug. 20, 2009) (question of "substantially related" involved analysis of the nature and scope of the representations and whether confidences may have been disclosed to counsel that could be "relevant and detrimental" in adverse representation); Maritrans, 602 A.2d at 1281 (noting that discovery included evidence "that the type of information [defendant firm] possess[ed] about [former client was] of the type considered to be confidential commercial information in the industry and that [client's competitors] would not reveal that information about their companies to their competitors"); Moriarty Report at 9 (noting that "Teva is seeking to acquire Mylan NV and its affiliates, which means Teva is interested in virtually every aspect of Mylan", that K&E has recently represented/currently represents the Mylan Clients with respect to certain important products, and that in the course of its representation K&E has learned confidential and proprietary information about Mylan not otherwise available to K&E or Teva).

44 Professor Coates expresses his opinion based on his practice experience as a partner at Wachtell Lipton Rosen & Katz; his research and teaching experience at Harvard's Law and Business Schools; and his consulting experience in mergers and acquisitions.

45 Relatedly, the Court observes that neither the hostile acquisition target (*i.e.*, the Mylan affiliate group), nor the Court, are in best position to know the full manner and extent to which the entity seeking acquisition (*i.e.*, Teva) may have benefitted from (and the Mylan Clients been correspondingly harmed by) an inappropriate/unethical disclosure/use of specific related information. Indeed, a full assessment of such benefit can only be made from Teva's perspective.

46 "Pennsylvania courts have repeatedly held that the potential disclosure of information disclosed in the course of the attorney-client relationship constitutes irreparable harm that justifies emergency relief, particularly where that information might be divulged to a business competitor." Plaintiffs' PFFCL at ¶ 135 (citing Maritrans, 529 Pa. at 260-63, 602 A.2d at 1286-88 (reinstating preliminary injunction restraining Pepper Hamilton from representing competitors of former-client plaintiff because "Maritrans' competitive position could be irreparably injured if [Pepper Hamilton] continued"); Hyman, 964 F. Supp. at 172-73 (enjoining plaintiff's former in-house counsel from representing its competitor in certain matters; "[counsel] could divulge specific, valuable, confidential information learned while at Hyman, information that, if disclosed, could injure Hyman's economic health to the point of irreparable harm"); Dougherty v. Phila. Newspapers, LLC, 85 A.3d 1082, 1086 (Pa. Super. Ct. 2014) ("Dougherty has averred facts establishing a colorable claim of the potential disclosure of attorney work product and breach of attorney-client privilege, which could result in irreparable harm.")); see also Maritrans, 602 A.2d at 1282 (noting trial court's conclusion that Maritrans "was entitled to be able to proceed in its business with confidence that its plans and strategies would not be disclosed or used by [former counsel], even inadvertently").

47 Although the employment of screening mechanisms is relevant where a client has consented to a conflicting representation (*i.e.*, the parties have effectively contracted a waiver with informed consent, under Rule 1.7(b)), those are not the circumstances before this Court.

Relatedly, Defendant's extensive evidence (including Declarations by a Teva executive and financial advisor, as well as members of K&E) regarding Defendant's non-disclosure, non-use, and/or return or destruction of confidential proprietary information received from the Mylan Clients is not responsive to the ethical concerns and prohibitions arising from K&E's fiduciary relationship as counsel to the Mylan Clients.

48 See also Hazard Report at §§ I, III (succinctly concluding, as Director Emeritus of the American Law Institute, Reporter for the ABA project that produced the ABA Model Rules of Professional Conduct, and Consultant on Practice and Procedure of the Judicial Conference of the United States, that "K&E has a conflict of interest arising from its acquisition of the confidential information of the Mylan companies it represents and in its newly undertaken representation of Teva in an attempted hostile takeover of Mylan N.V."); id. at ¶ 12 ("K&E is positioned to use confidential information it obtained from its Mylan clients adversely to the interests of Mylan N.V. and correspondingly to Mylan Inc. and its subsidiaries. As Professor Coates explains, those confidences may be relevant to antitrust concerns, securities law concerns, special rights concerning generics, financial forecasts, litigation risk, and other issues. This is the essence of a conflict of interest for K&E. That K&E may have several lawyers separated by an 'ethics wall' is irrelevant to the issue of conflict. The law imputes knowledge of one partner to another, and in this case, seals the conflict.").

49 The Court pauses to note that Defendant's protestation regarding Plaintiffs' counsel's Conflict of Interest provision in an Engagement Letter between it and Teva is a quintessential red herring. See Plaintiffs' Reply Memo in Support of MPI at 13-14:

K&E's opposition points to a 2014 waiver obtained by the law firm of Wilson Sonsini Goodrich & Rosati ("WSGR"), Mylan's co-counsel in this action, from Teva. [citation omitted] Specifically, K&E suggests that the WSGR waiver is

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

2015 WL 12733414

akin to the K&E waiver, and that, since Teva did not raise any concern about a conflict, Mylan's concerns should not be heard.... [T]he WSGR waiver actually demonstrates the enormous shortcomings of the K&E waiver. First, WSGR clearly identified exactly what engagement posed the potential conflict – its continued representation of Labrys, a company for which WSGR was performing legal services when Labrys was acquired by Teva. Second, and just as significant, WSGR assured Teva, the new owner of Labrys, that it would not take on an engagement adverse to Labrys "without ... prior consent[.]" [citation omitted] In other words, under the WSGR waiver, WSGR gave its client the right to be told of any adverse engagement and the right to consent or object.... Teva and its new entity Labrys were informed of all essential facts by WSGR so that they could make an informed decision on waiver, and it was given the right to withhold its consent. Unlike WSGR, K&E gave Mylan no information, no right to consent and no right to object.

More importantly for present purposes, WSGR's prosecution of patents for a Teva subsidiary is apparently unrelated to its defense of Mylan against Teva's hostile takeover bid. Confidential information about the *target's* business and product lines would likely be far more germane to a takeover than information concerning the *acquirer.* Moreover, and in any event, WSGR's representation of its various clients cannot affect either the distinct attorney-client relationship between Mylan and K&E or the parties' attendant rights and duties.

The term "substantially related" was negotiated out of the Engagement Letter's Conflict of Interest provisions by the parties. See Section III, *supra.*

See Hazard Report at ¶ 15 (concluding that "plain language of the 'advance waiver' in the Engagement Letter prohibits K&E from representing Teva in connection with its takeover bid" as it "is clear that K&E's representation of Teva ... is related to the work K&E did, and is doing, for Mylan").

Cf. Celgene Corp. v. KV Pharm. Co., No. 07-4819SDW, 2008 WL 2937415, at *4 (D.N.J. July 29, 2008) (holding that where firm's representation of pharmaceutical competitor constituted a concurrent conflict of interest pursuant to RPC 1.7(a) (1), the key question was whether the firm had satisfied the requirements of the informed consent exception provided by RPC 1.7(b)).

See also Hazard Report at ¶ 16 (concluding that "even if one were to somehow conclude that K&E's representation of Teva ... was not related ..., the waiver is still not enforceable because K&E did not obtain Mylan's ... "informed consent"); id. (discussing waiver provisions and noting that "[h]ere, there was no informed consent to K&E representing Teva [and ending Mylan's independent existence]" and no reasonable person would "expect that a waiver would be contemplated in such an extreme case"); id. at 17 (stating that "[t]he Pennsylvania Rules of Professional Conduct require that counsel actually inform the client of any conflict" and "that Mylan was a 'sophisticated consumer of legal services' does not substitute for informed consent") (citing Celgene Corp., *supra*); id. at ¶ 18 ("Had K&E wished to undertake an adverse representation of such magnitude, it was bound by the Rules to expressly identify such an engagement and obtain express consent in writing.").

Cf. n. 8, *supra.* Cf. also Tr. at 104 (Defendant's observation that: "[I]t is not right or accurate to say, well, conflict waivers are just ways for lawyers to get around their ethical duties.... especially in this industry. Because at the end of the day with the consolidation of the industry, none of the lawyers will be available or at least the marketplace of law firms that might otherwise be available will be significantly reduced.")

Defendant's extensive and continuing protestations regarding Plaintiff's knowledge of K&E's prior transactional experience and acquisition engagements, including on behalf of Teva, fail to meaningfully address how K&E provided specific information sufficient to Plaintiff's informed consent to the Subject Representation. See, *e.g.*, Defendant's Further Supplemental Declaration of Jay P. Lefkowitz (ECF No. 80, filed under seal).

Nor do Defendant's extensive and continuing protestations regarding its adverse representation of other entities, including Teva, in discrete product/litigation matters, meaningfully address informed consent to the Subject Representation. See, *e.g.*, Defendant's PFFCC at ¶¶ 60-67; Defendant's Declaration of Christopher Mizzo (ECF No. 83); Defendant's Further Supplemental Declaration of Audrey Tan (ECF No. 85). Cf. Plaintiffs' Reply Memo in Support of MPI at 13 (noting that "fact that Mylan was aware of and [did not] object to K&E's representation of adverse parties in certain other matters" is not material where "[n]one of the matters [were] remotely akin to representing Mylan's chief competitor in an attempt to acquire Mylan's entire business").

Moreover, the Court is troubled by K&E's argument as to one of these representations, in which it "easily could have been argued to implicate confidences learned" through K&E's representation of the Mylan Clients." This Court expressly repudiates any suggestion that prior "arguable" ethical breaches may render a law firm exempt from its fiduciary duties. Even a client who accepts his lawyer's toe across an ethical line need not later tolerate the lawyer's foot.

See Pa. R. Prof. Conduct 1.7, comment 18 (providing, in language identical to the Model Rules, that "[i]nformed consent requires that each affected client be aware of the relevant circumstances and of the *material and reasonably foreseeable*

Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)

2015 WL 12733414

*ways* that the conflict could have adverse effects on the interests of that client") (emphasis added) (citing Rule 1.0(e) (informed consent)); id. at comment 22 (providing (again as do the Model Rules) that "[t]he effectiveness of [prospective] waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. The more comprehensive the explanation of the types of future representations that might arise and the *actual and reasonably foreseeable adverse consequences* of those representations, the greater the likelihood that the client will have the requisite understanding. Thus, if the client agrees to consent to a particular type of conflict with which the client is already familiar, then the consent ordinarily will be effective with regard to that type of conflict.") (emphasis added). Comment 22 goes on to explain that if the consent is general and openended it will generally be ineffective for want of appreciation of the material risks, but is more likely to be effective if limited to unrelated representations and given by a reasonably informed, experienced client independently represented by counsel. See id.

Compare Tr. at 87-88 (Defendant's assertion that it "wouldn't quite phrase it as reasonably foreseeable" but "the issue is, did you really appreciate what you were getting yourself into?") with Plaintiff's Reply Memo in Support of MPI at 12 ("[No] reasonable person or company [would] ever assume or understand a waiver such as this could be construed as an open invitation to a trusted lawyer to lead the charge of its own demise.").

57    See Tr. at 78, 86, 97; cf. id. at 78 (asserting that Galderma "is really the only case that has the facts and circumstances that are as close to this matter as any case").

58    See Tr. at 121 (articulating same observation with respect to the express identification of "litigation" in the contractual terms of Galderma).

59    Although it is expressly unnecessary to its recommendation, the Court notes that under the standard applied by the Texas District Court, analysis of the facts *sub judice* would lead the Court to the same conclusion, *i.e.*, that the general waiver was ineffective for lack of informed consent where Defendant failed to meet its burden of showing that its contemporaneous disclosure of information to the Mylan Clients was objectively reasonably adequate to an understanding that the material risks encompassed included Defendant's adverse representation in a hostile acquisition attempt.

60    Cf. Model Rule 1.7 cmt. 34 ("A lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary. See Rule 1.13(a). Thus, the lawyer for an organization is not barred from accepting representation adverse to an affiliate in an unrelated matter, unless the circumstances are such that the affiliate should also be considered a client of the lawyer, *there is an understanding between the lawyer and the organizational client that the lawyer will avoid representation adverse to the client's affiliates*, or the lawyer's obligations to either the organizational client or the new client are likely to limit materially the lawyer's representation of the other client.") (emphasis added); Formal Op. 95-390 (noting same).

61    See also Plaintiffs' Reply Memo in Support of MPI at 3, 5 ("Far from excusing K&E's conduct, by its own terms, the advance waiver relied on by K&E plainly prohibits the very representation K&E is urging this Court to allow. The advance waiver permits K&E to represent an entity that is adverse to Mylan or its affiliates only where such representation is "***not related***" to the services provided by K&E to Mylan. Engagement Letter at 3 (emphasis added). This terminology – which encompasses a broader prohibition than the one set forth in the Pennsylvania Rules of Professional Conduct applicable to representations adverse to former clients (*see* Pa.R.P.C. 1.9) – was intentional"); Tr. at 117.

62    Compare, *e.g.*, Galderma, 927 F. Supp. 2d at 393 ("We recognize that we shall be disqualified from representing any other client with interest materially and directly adverse *to yours* (i) in any matter which is substantially related to our representation of you and (ii) with respect to any matter where there is a reasonable probability that confidential information you furnished to us could be used to your disadvantage.' ") (emphasis added) with, *e.g.*, Celgene, 2008 WL 2937415, at *1 ("However, we will not accept an engagement that is directly adverse *to the Company or any of its subsidiaries* if either: (1) it would be substantially related to the subject matter of our representation of the Company or representation of Anthrogenesis Corp.; or (2) would impair the confidentiality of proprietary, sensitive or otherwise confidential communications made to us by the Company or Anthrogenesis Corp.").

63    Cf. Formal Op. 95-390 (noting, after observation that "the onus is squarely on the lawyer to anticipate and resolve conflicts of interests involving corporate affiliates", that "[c]learly the best solution to the problems that may arise by reason of client's corporate affiliations is to have a clear understanding ... at the very start of the representation, as to which entity or entities in the corporate family *are to be the lawyer's clients or are to be so treated for conflicts purposes*") (emphasis added); id. (discussing client's "reasonable expectation that the affiliates will be treated as clients, either generally or for purposes of avoidance of conflicts, and the lawyer is aware of the expectation").

64    See also discussion text and notes, *supra*; Formal Op. 95-390 text at n. 7 (noting that "[t]he client-lawyer relationship is principally a matter of contract" and "it may be one of the terms of the engagement that the corporate client expects some or all of its affiliates to be treated as clients for purposes of Rule 1.7 – *i.e.*, that the lawyer will not accept engagements

2015 WL 12733414

that would be prohibited by that Rule if the affiliates were clients. Clearly, a corporate affiliate must be treated as a client, whether generally or only for purposes of Rule 1.7, if the lawyer has agreed so to treat it ....”). Cf. id. (Fox, Lawrence J., dissenting) (noting, in objecting to majority's conclusion that lawyer may in some circumstances undertake representation adverse to affiliate without corporate client consultation/consent, that “Fortune 500 companies ... will be able to protect themselves from this opinion by sending each lawyer the company engages a letter telling the lawyer to treat all of the corporate affiliates ... as clients for purposes of Rule 1.7”).

65 In explicating the balancing of considerations, the Third Circuit has also observed that: “The plaintiffs' interest in retaining counsel of its choice and the lack of prejudice to [defendant] ... are not the only factors to be considered .... An attorney who fails to observe his obligation of undivided loyalty to his client injures his profession and demeans it in the eyes of the public.” Int'l Business Machines Corp. v. Levin, 579 F.2d 271, 283 (3d Cir. 1978).

66 It is also apparent to this Court that a preliminary injunction in Plaintiffs' favor is necessary to prevent a presently existing actual threat of irreparable harm from K&E's continued representation of Teva in the hostile takeover attempt. See Adams v. Freedom Forge Corp., 204 F.3d at 487-88 (noting that “injunctive force may be unleashed only against conditions generating a presently existing actual threat”) (quoting Holiday Inns of Am., Inc. v. B & B Corp., 409 F.2d 614, 618 (3d Cir. 1969)).

67 See Fed. R. Civ. P. 65(c) (“No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.”).

68 See, e.g., Opticians, 920 F.2d at 195 (“Grounds for finding irreparable injury include loss of control of reputation ....”).

69 See, e.g., Formal Op. 95-390, text at n. 14 (“A lawyer should not strain to conclude that a proposed representation will not adversely affect his relationship with that client. Where it is difficult to ascertain whether a matter will be directly adverse to an existing client, or to judge whether taking on the matter will affect the lawyer's relationship with the client, a lawyer ordinarily would be well advised as a matter of prudence and good practice to discuss the matter with his existing client before undertaking a representation adverse to an affiliate of the client, even though consent may not be ethically required.”).

70 K&E was recently again subject to litigation seeking its disqualification as counsel in Bankruptcy Court. See In re Caesars Entm't Operating Co., Inc., No. 15-B-1145 (N.D. Ill. Bankr.) (under Bankruptcy Code provisions granting debtors' application to retain K&E over the objection of the Noteholders Committee, a creditor claiming that K&E had an interest adverse to the debtors' estates).

71 See Instant Air Freight Co. v. C.F. Air Freight, Inc, 882 F.2d 797, 800 (3d Cir. 1989) (“In order to obtain a preliminary injunction we have repeatedly held that the moving party must demonstrate: (1) the reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showing, the district court “should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.”); Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 356-57 (3d Cir. 1980) (“In addition, the court must weigh the possibility of harm to the nonmoving party as well as to any other interested persons and, when relevant, harm to the public.”); Delaware River Port Authority v. Transamerican Trailer Transportation, Inc., 501 F.2d 917, 919-20 (3d Cir. 1974).

72 See Maritrans, 602 A.2d at 1282-83 (defining “essential prerequisites” as (1) a strong showing that petitioner “is likely to prevail on the merits”, (2) that without the requested relief, petitioner will suffer irreparable injury, (3) that “the issuance of a stay will not substantially harm other interested parties in the proceedings”, and (4) that the issuance of a stay will not adversely affect the public interest”) (quoting Public Utility Comm'n v. Process Gas Consumers Group, 502 Pa. 545, 552-53, 467 A.2d 805, 808-809 (1983)).

73 See, e.g., Tr. at 111.

74 See Tr. at 130 (Plaintiffs' observations that K&E represented Teva for a matter of weeks, Plaintiffs moved immediately on learning of K&E's representation, *i.e.* on May 1 st , and K&E might have then withdrawn in the interests of their client Teva).

75 Even if Mr. Fox were not replaceable with another lawyer with his particular academic and other credentials, experience, and familiarity with Israeli language and culture, the Court cannot but believe that these attributes could undoubtedly be met by another “deal team” in combination.

76 Cf. Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 597 (3d Cir. 2002) (“As other circuit courts have observed, ‘[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor.’ ”) (quoting NLRB v. Electro–Voice, Inc., 83 F.3d 1559, 1568 (7th Cir. 1996)); *accord* Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 12 (7th Cir. 1992).

**Mylan, Inc. v. Kirkland & Ellis LLP, Not Reported in Fed. Supp. (2015)**

2015 WL 12733414

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.