## APPENDIX OF UNPUBLISHED OPINIONS

1.   *Aetna, Inc. v. Mednax, Inc.*, No. 18-02217, 2019 WL 5566705
     (E.D. Pa. Oct. 29, 2019)

2.   *Bowman v. American Homecare Supply, LLC*, No. 07-3945, 2009
     WL 1873667 (E.D. Pa. June 25, 2009)

3.   *Fidelity Bancorporation v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
     No. 90-1866, 1992 WL 55742 (E.D. Pa. Mar. 13, 1992)

4.   *Heller's Gas, Inc. v. International Ins. Co. of Hannover, Ltd.*, No.
     15-1350, 2016 WL 3077366 (M.D. Pa. June 1, 2016)

5.   *Hodczak v. Latrobe Specialty Steel Co.*, No. 08-649, 2010 WL 4137515
     (W.D. Pa. Aug. 10, 2010)

6.   *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*,
     No. 09-1685, 2010 WL 4537002 (M.D. Pa. Nov. 3, 2010)

7.   *New Jersey Manufacturers Ins. Co. v. Brady*, No. 15-02236, 2017 WL
     264457 (M.D. Pa. Jan. 20, 2017)

1

2019 WL 5566705
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

AETNA INC., et al., Plaintiffs,

v.

MEDNAX, INC. et al., Defendants.

CIVIL ACTION NO. 18-cv-02217-WB

|

Filed 10/29/2019

**Attorneys and Law Firms**

Frederick P. Santarelli, Aimee L. Kumer, Gregory S. Voshell, Mark Joseph Schwemler, Elliott Greenleaf & Siedzikowski PC, Blue Bell, PA, Howard L. Pierce, Pierce LLC, West Hartford, CT, for Plaintiffs.

Alison Barnes, Gary A. Orseck, William J. Trunk, Jennifer S. Windom, Robbins Russell Englert Orseck Untereiner & Sauber LLP, Washington, DC, Darren Mitchell Goldman, John Chun, Luke Nikas, Michael B. Carlinsky, Michael Jacob Pemstein, Jennifer J. Barrett, Quinn Emanuel Urquhart & Sullivan LLP, New York, NY, Howard M. Klein, Andrew Kabnick Garden, Robert N. Feltoon, Conrad O'Brien, PC, Philadelphia, PA, Jonathan E. Feuer, Lorelei J. Vanwey, Martin B. Goldberg, Lash & Goldberg LLP, Miami, FL, for Defendants.

## MEMORANDUM AND ORDER CONCERNING

RICHARD A. LLORET, U.S. MAGISTRATE JUDGE

### I. Doc. No. 56: Plaintiffs' motion to quash the subpoena to Dr. Makuch.

*1 The plaintiffs (referred to collectively as "Aetna") have filed a motion to suppress or quash a subpoena directed to their expert witness, Dr. Makuch. Doc. No. 56. I have reviewed the parties' submissions. I have also reviewed *in camera* the engagement letter concerning Dr. Makuch's services. Dr. Makuch supplied a regression analysis of defendants' billing practices. The primary motivating purpose behind the creation of this analysis was to aid in negotiations and potential litigation with defendants. This means that Dr. Makuch's analysis is protected by the attorney work-product doctrine. *See United States v. Rockwell Intern.*, 897 F.2d 1255, 1266 (3d Cir. 1990) (file

was maintained to aid in future negotiations and potential litigation with IRS). I find that Aetna has produced significant discovery concerning the regression analysis performed by Dr. Makuch. That regression analysis formed a basis for the plaintiffs' complaint, and is therefore discoverable, as discussed below. While some discovery into the data used to prepare the regression analysis is appropriate, discovery will be conducted between the parties, not by subpoena directed to Dr. Makuch. I will order that the subpoena be quashed.

### II. Doc. No. 64: Defendants' cross-motion to compel production of discovery.

The defendants (collectively referred to as "Mednax") filed a cross-motion to compel discovery pursuant to Fed. R. Civ. Pro. 37(a). Doc. No. 64. They seek information concerning Dr. Makuch's regression analysis, performed for Aetna, which forms a basis for the complaint. I have reviewed the parties' submissions, and I will grant the cross-motion in part, and deny the rest.

### A. Documents and information previously produced will be identified by Aetna.

Aetna objects that it has provided much of the information to Mednax concerning Dr. Makuch's study. Doc. No. 66 at 3-4. Additionally, Aetna objects that some of the information sought in Mednax's cross-motion has never been requested before the time of the cross-motion. Before and at the time of the meet and confer ordered below, Aetna may simply identify compliance with a particular request by supplying the specific Bates stamp number(s) where the information can be found.

### B. Dr. Makuch's analysis is subject to the attorney work-product doctrine.

I have reviewed *in camera* the retainer agreement signed by Dr. Makuch, as well as the other relevant circumstances. I find that Dr. Makuch was retained and did his analysis in "the course of preparation for possible litigation." *Haines v. Liggett Group Inc.*, 975 F.2d 81, 94 (3d Cir. 1992) (quoting *Hickman v. Taylor*, 329 U.S. 495, 505 (1947)); *see United States v. Rockwell Intern.*, 897 F.2d 1255, 1266 (3d Cir. 1990) (a file maintained to aide in future negotiations and potential litigation was protected work-product). At the time Dr. Makuch was retained there may well have been insufficient proof to justify filing a complaint alleging fraud. That does

not mean his analysis cannot be subject to the attorney work-product doctrine. This was not a routine, in-house review of records. A party can anticipate possible litigation without having a sufficient basis, then and there, to satisfy the pleading standards of Fed. R. Civ. Pro. 8, 9 and 11.

**\*2** Obtaining the required factual basis to file a complaint alleging fraud may require a complex and time-consuming investigation that involves attorneys, their work, and the work of experts hired by the attorneys to assist them in the task. A complex, long-term business relationship is not like an automobile accident. Fraudulent billing may not be obvious. If it were, it likely would not be fraud, which inherently relies upon concealment and deception to succeed. Unlike an automobile accident, there may be substantial doubt at the outset of a fraud investigation about whether a fraud occurred, or whether a loss was caused by fraud. Notwithstanding the suspicions or facts that triggered the investigation, a party may conclude, after conducting such an investigation, that no fraud occurred, or that litigation alleging fraud is not warranted. The fact that litigation is not initiated, in that instance, does not mean the investigative work was not in anticipation of litigation.

Certainly where, as here, a complaint is filed, there should be no penalty attached to pre-suit investigation of whether there is an adequate factual basis for alleging fraud. An alternative rule would tend to encourage parties to file suit on mere suspicion, rather than proper investigation. That is not a tendency that should be encouraged. The rule Mednax suggests would force a choice between two unacceptable alternatives: violating an attorney's professional obligation to diligently represent a client by ensuring that "factual allegations have evidentiary support" (Fed. R. Civ. Pro. 11(b)(3)) or surrendering work-product protection. I find that Dr. Makuch's regression analysis was prepared in anticipation of possible litigation and is subject to protection under the attorney work-product doctrine. That, however, is not the end of the matter.

### C. The "at issue" exception applies and requires production of some, but not all, of the information sought by Mednax.

Plaintiffs have used Dr. Makuch's regression analysis as a basis for filing their complaint, and therefore have put the regression analysis at issue. There is a compelling need for discovery, because the regression analysis and its data are within Aetna's sole possession and are the basis of Aetna's claims against Mednax. *In re Sunrise Securities Litigation*, 130 F.R.D. 560, 568–69 (E.D. Pa. 1989). Nevertheless, plaintiffs have not waived all work-product protection, only the protection that extends to the information put "at issue." *Financial Guaranty Insurance Company v. Putnam Advisory Company, LLC*, 314 F.R.D. 85, 90-91 (S.D.N.Y. 2016). Plaintiffs have conceded that the regression analysis itself must be produced, and allege they have produced it, though Mednax contends the production has been deficient in some respects. The defendants want additional information that ties the regression analysis clearly to Aetna's underlying data, so that the accuracy of the analysis can be tested against its premises.

The scope of the "at issue" waiver is committed to the sound discretion of the trial judge. *Id.* I find that the scope of the waiver is limited to needs that are "compelling," that is, information that bears directly on the reliability of the regression analysis and is within the exclusive control of the plaintiffs. *See In re Sunrise Securities Litigation*, 130 F.R.D. at 568–69; *Bird v. Penn Central Co.*, 61 F.R.D. 43, 47 (E.D. Pa. 1973) (excluding information from waiver where it did not bear directly on the legal theory put at issue by the pleadings). I have applied this standard to the information sought by Mednax and have granted discovery requests where I found that the information bears directly on the reliability of the regression analysis. Where the information does not bear directly, I have denied discovery.

### ORDER

Accordingly, it is on this 29th day of October, 2019 ORDERED, that Mednax's motion to compel (Doc. No. 64) is **GRANTED**, in part. Within 15 days of the date of this Order the parties' counsel will meet and confer to determine which of the items listed below have been produced. To the extent not already produced, within 30 days of the date of this Order Aetna will produce the following information:

**\*3** 1. Aetna's original data from claim forms from which Aetna created the raw data files used by Dr. Makuch to perform the regression analysis referred to in the complaint. This data will include (but not be limited to)

a. Each patient name;

b. Each patient identification number as listed in Box 26 of the CMS 1500 Claim Form;

2019 WL 5566705

c. Each insurance policy subscriber name;

d. Each insurance policy subscriber number;

e. Each claim number;

f. Each patient's date of birth;

g. Each date of service;

h. Each CPT code or codes for the respective dates of service;

i. Each provider name, with Taxpayer Identification Number;

j. The complete regression analysis referenced by Aetna and relied upon by Aetna in its complaint;

k. All provider fee schedules used by Aetna in connection with the regression analysis.

2. The dates upon which Aetna created the raw data files from the internal system or systems.

3. The methodology used to create a) the raw data files used by Dr. Makuch, b) the regression analysis, and c) its results.

**IT IS FURTHER ORDERED**, as follows:

4. With respect to information to be supplied in conformance with this order, Aetna will comply with the court's previously entered ESI order. With respect to information already supplied, Aetna will comply with the court's ESI order if it has not already done so.

5. Aetna's motion to quash the subpoena to Dr. Makuch (Doc. No. 56) is **GRANTED,** and the subpoena is **QUASHED**. Mednax will communicate to Dr. Makuch that the subpoena has been quashed and is withdrawn.

6. Mednax's cross-motion to compel (Doc. No. 64) is otherwise **DENIED**. In particular, communications by and between counsel for Aetna and Dr. Makuch will not be produced.

**All Citations**

Slip Copy, 2019 WL 5566705

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2

2009 WL 1873667
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Alan C. BOWMAN Christina Bowman, Plaintiffs,
v.
AMERICAN HOMECARE SUPPLY, LLC, Defendant.

Civil Action No. 07–3945.
|
June 25, 2009.

West KeySummary

**1    Federal Civil Procedure** ⟶ Waiver

Successor owner of a home healthcare company was obligated to disclose work-product documents in the predecessor company's action seeking a declaratory judgment that the predecessor was not required to indemnify the successor. The successor had placed the subject matter of the work product of its counsel in the underlying suit at issue. Counsel's opinions, mental impressions, and legal theories regarding the strength of the indemnifiable versus non-indemnifiable claims were critical to determining the reasonableness of the cost of settling the underlying suit, and apportioning among all claims the amount for which each party was responsible.

**Attorneys and Law Firms**

Mark S. Halpern, Lisanne L. Mikula, Halpern and Levy, P.C., Drexel Hill, PA, for Plaintiffs.

Troy S. Brown, Margaret E. Rodgers Schmidt, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Defendant.

*MEMORANDUM*

BAYLSON, District Judge.

*1 The issue presented concerns the extent to which the attorney work product must be disclosed in an indemnification claim, arising out of the settlement of underlying litigation. Pending before this Court is Defendant American Homecare Supply's Motion for a Protective Order (Doc. No. 37) and Plaintiffs Alan and Christine Bowman's Cross–Motion to Compel (Doc. No. 40) in this indemnification suit between predecessor and successor corporate owners of a business. Plaintiffs argue that Defendant has waived the privilege as to certain documents related to an underlying lawsuit defended and settled by Defendant under the "advice at issue" and "common interest" doctrines. For the following reasons, Defendant American Homecare Supply's Motion is GRANTED in part, as to all attorney-client privileged documents, and DENIED in part as to certain work-product protected documents as explained in this Memorandum. Plaintiffs Alan and Christina Bowman's Motion will be DENIED in part, as to attorney-client privileged documents, and GRANTED in part as to certain work-product protected documents.

### I. *Factual and Procedural Background*

#### A. Facts

The Court more fully described the facts of this case in its Memorandum Opinion granting Defendant's Motion for Summary Judgment dated October 30, 2008, Doc. No. 34. However the Court will briefly review the relevant facts for the purposes of this Motion. On February 12, 2003, Plaintiffs and Defendant entered into a Stock Purchase Agreement ("Agreement") for Defendant to purchase Plaintiffs' home health care business, C.O.P.D. (Mem.Summ. J. 1.) Under the Agreement, Plaintiffs were required to indemnify Defendant for any product liability or faulty workmanship claims arising from or related to "any event, condition, fact or circumstance" prior to the closing date of the Agreement. (*Id.* at 2.)

On January 24, 2005, a fire occurred in the home of Ms. Connor, killing Ms. Connor's mother Mertle Steves. (*Id.* at 3.) Ms. Steves rented and used a C.O.P.D. electric home healthcare bed. (*Id.* at 3.) C.O.P.D. purchased the bed in 1998, prior to the closing date of the Agreement. (*Id.*) The bed was suspected to be a cause of the fire. (*Id.*) On July 22, 2005, the Estate of Ms. Steves filed a survival and wrongful death suit against C.O.P.D. and other defendants. (*Id.* at 6.) Ms. Connor's insurance company also filed suit against C.O.P.D. on August 22, 2005. (*Id.*) Both suits were later consolidated ("Fire Suit").

2009 WL 1873667

Attorneys for Plaintiffs and Defendant exchanged numerous communications regarding the Fire Suit, but Plaintiffs' attorney took no part in defending the suit. (*Id.* at 4–6.) Defendant settled the Fire Suit for $490,000 on July 12, 2007. (*Id.* at 6) On September 11, 2007, Defendant demanded indemnification from Plaintiffs for the $490,000 settlement plus $624,936.86 in attorneys' fees to be paid from money being held in escrow following Plaintiffs' sale of C.O.P.D. to Defendant. (*Id.*) Plaintiffs refused to indemnify and filed this declaratory judgment action to release the entire $1.75 million in escrow. (*Id.*)

### B. Procedural History

*2 Plaintiffs filed a Complaint on September 20, 2007 (Doc. No. 1). Defendant filed a Motion for Summary Judgment on June 9, 2008 (Doc. No. 21), and Plaintiff filed a Cross–Motion for Summary Judgment on June 30, 2008 (Doc. No. 27). The Court granted Defendant's Motion as to Plaintiff's duty to defend and indemnify and denied Plaintiff's Motion on October 30, 2008. (Doc. No. 34). The Court found that Plaintiffs had a duty to defend and indemnify Defendant as to the product defect count of the Fire Suit but not as to the other three counts (implied warranty, negligent maintenance and repair, and reckless disregard). (Memo.Summ. J. 16.) Therefore, the remaining issues to be resolved was apportionment of the settlement amount and attorneys' fees between the indemnifiable and non-indemnifiable claims.

On April 29, 2009, Defendant filed a Motion for Protective Order (Doc. No. 37), seeking to limit its production obligations to documents not protected by the attorney-client privilege and/or work product doctrine, relying on the seventeen boxes of documents it had already produced to Plaintiffs. On May 6, 2009, Plaintiffs filed a Response and Cross–Motion to Compel (Doc. No. 40), seeking responses to certain interrogatories and document requests withheld by Defendant and unredacted versions of previously produced documents. The Court held a recorded telephone hearing on May 8, 2009, in which it advised the parties that it was holding the matter under advisement pending production of a revised and expanded privilege log, *in camera* inspection of purportedly privileged documents, and supplemental briefing (Doc. No. 42). The parties submitted supplemental briefs on June 9, 2009 (Doc. No. 46, 47).

The Court held an additional hearing on the arguments raised in the parties' supplemental briefs on June 22, 2009. At the hearing, after arguments, the Court advised the parties that

it was denying Defendant's Motion and granting Plaintiffs' Motion but only as to documents in which work product protection was claimed (in whole or part) that specifically relate to (1) settlement amount and/or apportionment and (2) counsel's evaluation of the Fire Suit claims. As to all other documents, the Court granted Defendant's Motion and denied Plaintiffs' Motion. This Memorandum contains supporting legal analysis for this ruling, and outlines the procedure to be followed..

### II. *Discussion*

Plaintiffs concede that the disputed documents listed on the privilege log and produced to the Court *in camera* are generally privileged. Instead, Plaintiffs' Supplemental Brief argues for waiver of the privilege based on the advice at issue doctrine and the common interest doctrine. The party challenging the privilege has the burden of proving that a waiver of the privilege occurred. *See Martin Marietta Materials, Inc. v. Bedford Reinforced Plastics, Inc.,* 227 F.R.D. 382, 390 (W.D.Pa.2005). In addition, Plaintiffs argue that communications between Defendant's Fire Suit counsel and indemnification counsel were not privileged. However, at oral argument on June 22, after the Court expressed doubt as to the discovery of privileged communications, plaintiffs voluntarily withdrew their common interest doctrine argument and their advice at issue argument as to documents protected by the attorney-client privilege. Therefore, the Court will not consider this issue but will confine its analysis to documetns which contain attorney work product, in whole or part.

### A. Work Product Waiver Based on Advice at Issue

*3 In *Rhone–Poulenc Rorer Inc. v. Home Indemnity Co.,* 32 F.3d 851 (3d Cir.1994), the Third Circuit articulated the standard for the advice at issue doctrine: "The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Id.* at 863. Courts within the Third Circuit continue to apply the standard enunciated in *Rhone–Poulenc. See Nesselrotte v. Allegheny Energy, Inc.,* 2008 WL 2858401, at *6 (W.D.Pa. July 22, 2008); *Saltern v. Nor–Car Federal Credit Union,* 2003 WL 21250578, at *1 (E.D.Pa. Apr.17, 2003). However, this standard applies to waiver of the attorney-client privilege, and in *Rhone–Poulenc,* the Third Circuit stated that waiver of the privilege does not necessarily lead to waiver of work product protection. 32 F.3d at 866. *See also Chimie v. PPG Indus., Inc.,* 218 F.R.D. 416, 421 (D.Del.2003) (stating

2009 WL 1873667

that the waiver of the privilege did not necessarily mean waiver of work product protection); *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486–87 n. 17–18 (3d Cir.1995) (applying the *Rhone–Poulenc* standard but noting that had the advice at issue argument been made as to work-product protected documents, as opposed to privileged documents, a different analysis would be required); *but see SmithKline Beecham Corp. v. Apotex Corp.*, 2005 WL 2436662, at *2 (E.D.Pa.2005) (stating that if a defendant raises an advice of counsel defense, it waives both the attorney-client and work product privileges as to that defense); *Novartis Pharm. Corp. v. EON Labs Mfg., Inc.*, 206 F.R.D. 396, 399 (D.Del.2002) (finding that invoking a reliance on advice of counsel as a defense constitutes an express waiver of both attorney-client privilege and work product doctrine); *Northwood Nursing & Convalescent Home, Inc. v. Continental Ins. Co.*, 161 F.R.D. 293, 298 (E.D.Pa.1995) (applying the *Rhone–Poulenc* standard to assess work product waiver and finding that it was not met).

The work product doctrine is a qualified, not absolute, privilege, and "like other qualified privileges, it may be waived." *Harding v. Dana Transport, Inc.*, 914 F.Supp. 1084, 1098 (D.N.J.1996) (quoting *United States v. Nobles*, 422 U.S. 225, 239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (internal quotations omitted)). Attorney work product is discoverable when the party seeking discovery has a "substantial need" for the information, and there is no other source available to obtain the substantial equivalent of the material sought without undue hardship. Fed.R.Civ.P. 26(b)(3) (A)(ii). In considering waiver of work product protection, the Third Circuit in *Rhone–Poulenc* stated that "the protection stemming from the work product doctrine belongs to the professional, rather than the client, and [ ] efforts to obtain disclosure of opinion work product should be evaluated with particular care." 32 F.3d at 866 (citations omitted). Based on this standard, the Court must carefully balance the competing interests in evaluating waiver of the work product protection.

**\*4** Plaintiffs argue that Defendant has placed the subject matter of the work product of Defendant's Fire Suit counsel, of Archer & Grenier, principally Christopher Gibson, Esq. at issue. They assert that Mr. Gibson's opinions, mental impressions, and legal theories regarding the strength of the indemnifiable versus non-indemnifiable claims will be critical to both determining the reasonableness of Fire Suit settlement costs and attorneys' fees, and apportioning among all claims, the amount for which each party is responsible. Plaintiffs' Supplemental Brief relies heavily on two cases

outside of the Third Circuit for this argument: *Abbott Labratories v. Alpha Therapeutic Corp.*, 200 F.R.D. 401 (N.D.Ill.2001) and *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726 (2002).

Although the Third Circuit has not spoken squarely on the applicability of the advice at issue waiver as to work product protection, this Court is persuaded that Plaintiff is correct for two reasons. First, as in *Abbott*, Plaintiffs' and Defendant's Agreement contained a cooperation clause:

> The parties hereto agree to render to each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate defense of any such claim, action, suit or proceeding .... the Indemnitee shall cooperate with the Indemnitor and provide such assistance ... as the Indemnitor may reasonably request in connection with the defense of any such claim, action, suit or proceeding, including providing the Indemnitor with access to and use of all relevant corporate records ...

(Def.'s Mot. Summ. J. Ex. 16 ¶ 9.3(a)(iii).) The *Abbott* court relied on strikingly similar language to find that the purchasing company in that case was contractually obligated to produce documents to the selling company in an indemnification suit following the purchasing company's defense of an underlying suit. 200 F.R.D. at 410 (using the cooperation clause to find both the attorney client privilege and work-product protection inapplicable). Although this Court is not prepared to find that Defendant is breaching a contractual duty to share Fire Suit attorney work product with Plaintiffs, it finds the contractual provision persuasive as to the parties' duty to share all (including attorney work product) documents related to the Fire Suit.

Second, the Court is convinced that fairness and equity dictate production of all work-product protected documents to Plaintiffs relevant on the indemnification issue. The *Abbott* court reasoned that in the interest of fairness, the entire case should not be allowed to "turn on an issue upon which one party has no knowledge and is barred from accessing the necessary information while the other party is able to use

Bowman v. American Homecare Supply, LLC, Not Reported in F.Supp.2d (2009)
2009 WL 1873667

the information to establish its claim while shielding it from disclosure." *Id.* at 410–11. The court continued that since issues surrounding conduct in the underlying litigation are central to the question of indemnification, documents relating to that conduct were not only vital, but also the only, means by which the seller could evaluate the validity of the purchaser's indemnification claim and the reasonableness of the costs claimed. *Id.* at 411. This Court is similarly persuaded by fairness and policy arguments, that in such an indemnification suit based on multiple claims, some indemnifiable and some not, the Fire Suit counsel's work product is central to the indemnification damages that this Court must determine.

*5 In addition, the Court finds the Eighth Circuit's reasoning in *Padima* persuasive. There the Eighth Circuit stated that in evaluating the waiver of work-product protection, the court must look to "whether the interests [of] fairness and consistency mandate a finding of waiver." 281 F.3d at 732. "When a party seeks a greater advantage from its control over work product than the law must provide to maintain a healthy adversary system, the privilege should give way." *Id.* (quoting *In re Sealed Case,* 676 F.2d 793, 818 (D.C.Cir.1982) (internal quotations omitted)). In that case, the Eighth Circuit determined that the indemnitor waived work product protection where the discovery sought involved "crucial issues in the indemnification action," including the reasonableness of attorneys' fees in the underlying litigation. *Id.* Therefore, the court concluded that "[f]airness requires that the work product privilege must give way...." *Id.* Following the court's assessments of fairness in *Abbott* and *Padima,* this Court is persuaded that fairness requires production of attorney work product from the Fire Suit.

Although this Court notes Judge Joyner's assessment that "[e]ven if the attorney's work product is highly relevant to the present litigation [this] does not necessarily mean that the work product is at issue," *Northwood,* 161 F.R.D. at 298, the Court believes that the specific facts of this indemnification claim dictate that Fire Suit work product is directly at issue. In *Northwood,* the insured brought a declaratory judgment action against its insurer that the insurer had a duty to defend two third-party suits, where the insurer had only agreed to defend against one. Judge Joyner reasoned that the insured's counsel's work product in the underlying litigation was not directly at issue to the indemnification suit, which was essentially a breach of insurance contract claim. However, in this case, the Court has already construed the Agreement to determine that an indemnifiable claim, one of the four claims in the Fire Suit, exists. The sole remaining

issue requires assessing and apportioning damages between the multiple claims in the Fire Suit, and Mr. Gibson's work product regarding his assessment of the claims is directly at issue in determining such damages. As Plaintiffs argued, the Court expects that Mr. Gibson will be a witness for Defendant, and therefore Plaintiffs' effective cross-examination of him necessarily depends on access to the documentation about his Fire Suit representation, which has now terminated. Further, this Court finds that Plaintiffs have sufficiently shown "substantial need" and no other means to procure these documents under Rule 26(b)(3)(A)(ii).

Based on the above analysis, the Court finds that Plaintiffs are entitled to Fire Suit counsel's work product documents that specifically discuss: (1) the Fire Suit settlement amount and/or allocation and (2) counsel's evaluation of the Fire Suit claims. Plaintiffs should identify such documents from the privilege log within one week. However, Plaintiffs are not entitled to documents that contain communications to the client. If a document contains attorney work product which was communicated to the client, defendant may redact portions which show the communication, but must produce the portion containing work product. Defendants may redact any other information which does not fall within the two items stated above. Following Plaintiffs' identification, Defendant shall assert any objections to Plaintiffs' document request, and the parties should confer to resolve their disputes. If disputes remain, the parties are to advise the Court by July 17, 2009, and the Court will then review disputed documents one-by-one to determine whether they are discoverable, possibly at a hearing.

**B. Communications Between Fire Suit and Indemnification Counsel**

*6 Plaintiff also argued that certain communications were not privileged and therefore were discoverable. Specifically, Plaintiff asserted that communications between Defendant's indemnification counsel and Fire Suit counsel regarding the indemnification suit, which are listed on the privilege log, are not privileged because the Fire Suit counsel was never retained to defend the indemnification suit and therefore is not Defendant's counsel in this matter.

The Court disagrees. As Judge Joyner articulated in *Northwood,* the attorney-client privilege extends to communication between attorneys and their agents, so communications between the underlying litigation counsel and indemnification counsel are privileged. 161 F.R.D. at 297. Since indemnification counsel may communicate with

**Bowman v. American Homecare Supply, LLC, Not Reported in F.Supp.2d (2009)**

2009 WL 1873667

Fire Suit counsel as an agent, regardless of whether the Fire Suit counsel was retained in the indemnification matter, their communications remain protected by the attorney-client privilege.

## III. *Conclusion*

Based on the above analysis, the Court finds that Plaintiffs are entitled to production of certain work-product protected documents that relate specifically to counsel's mental impressions, legal opinions, and theories regarding settlement and an evaluation of the claims in the underlying Fire Suit.

An appropriate Order follows.

### *ORDER*

AND NOW, this 25th day of June, 2009, upon consideration of the parties' cross-motions for discovery, it is hereby ORDERED as follows:

(1) Defendant American Homecare Supply's Motion for a Protective Order (Doc. No. 37) is GRANTED in part as to attorney-client privileged documents and DENIED in part as to certain work-product protected documents, as explained in the accompanying Memorandum;

(2) Plaintiffs Alan and Christina Bowman's Motion to Compel (Doc. No. 40) is DENIED in part as to attorney-client privileged documents and GRANTED in part as to certain work-product protected documents that specifically discuss (1) the Fire Suit settlement amount and/or allocation and (2) counsel's evaluation of the Fire Suit claims;

(3) Plaintiffs shall provide Defendant within one week of this Order, from the privilege log, a list of the documents described in (2) that it seeks Defendant to produce; Defendant shall promptly produce those documents, or object.

(4) If after counsel confer, disputes remain over documents requested by Plaintiffs, Plaintiffs shall advise this Court by July 17, 2009, of those documents, which Plaintiffs assert should be produced. Defendant shall, by July 21, 2009, provide the Court by letter (which need not be sent to Plaintiffs' counsel) the reasons as to why each document requested by Plaintiffs should not be produced. The Court may schedule a further hearing to resolve the disputes on a document-bydocument basis.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1873667

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

3

Case 1:20-cv-00292-JPW    Document 61-1    Filed 08/14/20    Page 13 of 44
First Fidelity Bancorporation v. National Union Fire Ins. Co...., Not Reported in...
1992 WL 55742

1992 WL 55742
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

FIRST FIDELITY BANCORPORATION, Plaintiff,
v.
NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA and Financial Institutions
Reserve Risk Retention Group, Inc., Defendants.

Civ. A. No. 90–1866.
|
March 13, 1992.

**Attorneys and Law Firms**

Gary R. Battistoni, Stuart A. Law, Jr., Daniel J. Dalton, Richard E. Ruffee, Drinker, Biddle & Reath Philadelphia, Pa., for plaintiff.

Judy L. Leone, Michael F.R. Harris, Seymour Kurland, Jeffrey G. Weil, Jan P. Levine, Gerald D. Wixted, Dechert, Price & Rhoads, Philadelphia, Pa., Mark P. Denbeaux, Westwood, N.J., Nancy J. Gellman, William J. O'Brien, Conrad, O'Brien, Gellman, De Stefano & Rohn, P.C., Philadelphia, Pa., Sandra L. Spear, Washington, D.C., Joel R. Marcus, Bruce A. Baird, Robert D. Fram, David V. Gourevitch, Covington & Burling, Washington, D.C., Gary R. Battistoni, Stuart A. Law, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for defendants.

*MEMORANDUM*

ROBERT F. KELLY, District Judge.

*1 Plaintiff First Fidelity Bancorporation ("Fidelity") and defendant National Union Fire Insurance Company of Pittsburgh, PA ("National") have each filed objections to certain discovery orders entered by Magistrate Judge Hall on January 14, 1992. Fidelity objects to the Order granting National's Motion to Compel the Production of Documents, alleging that the documents are protected by the work product doctrine and attorney-client privilege ("Privileged Discovery"). National objects to the Order granting Fidelity's Motion to Compel Answers to Interrogatories and Production of Documents Concerning Bad Faith Pattern and Practice ("Pattern and Practice Discovery"), claiming that compliance is unduly burdensome. I affirm the Order granting Privileged

Discovery but on somewhat different grounds, and I reverse the Order granting Pattern and Practice Discovery.

I. *BACKGROUND:*

Fidelity, its directors and its officers are insureds under a director and officer insurance policy issued by National (the "Policy")[1]. Fidelity's coverage is determined by the allocation of liability. Specifically, National is obligated to reimburse Fidelity only to the extent that Fidelity indemnifies its directors and officers, up to a limit of 25 million dollars. The Policy does not insure Fidelity for its own liability. The Policy also contains a cooperation clause, which provides that "[t]he Insurer's consent [to settlements] shall not be unreasonably withheld, but the insurer shall be entitled to full information and all particulars it may request in order to reach a decision as to reasonableness." Policy at ¶ 6. National has no duty or right to defend Fidelity.

On December 13, 1988, Fidelity issued a press release announcing its intent to add about 300 million dollars to loan loss reserves. This announcement spawned a one day drop in Fidelity's aggregate share value of over 400 million dollars. Numerous class and derivative actions followed, naming Fidelity and its directors and officers as defendants (the "underlying litigation"). Given the allocation of liability issues, Fidelity wished to position itself against National as well as against the underlying plaintiffs. This led Fidelity to obtain its own counsel in the underlying litigation, and it also set the stage for the present lawsuit. While the defendants in the underlying litigation pursued settlement, National had trouble acquiring information it requested from Fidelity. When the underlying plaintiffs' eventually made a settlement offer of 45 million dollars, Fidelity notified both National and FIRG of its belief that this represented a reasonable settlement. FIRG consented to the settlement, but National did not. Fidelity accepted the settlement and indemnified its directors and officers, and then brought this action.

Fidelity alleges that National violated the Policy and its fiduciary obligations by failing to promote a reasonable settlement of the underlying litigation, and by unreasonably refusing to consent to the settlement offer. Fidelity seeks to recover 25 million dollars under the Policy, punitive damages, costs, attorneys' fees and prejudgment interest. National has filed a cross-claim, alleging that Fidelity breached its duty under the Policy's cooperation clause to share all information.

II. *Order Granting Privileged Discovery:*

Case 1:20-cv-00292-JPW    Document 61-1    Filed 08/14/20    Page 14 of 44

First Fidelity Bancorporation v. National Union Fire Ins. Co...., Not Reported in...

1992 WL 55742

**\*2** Judge Hall's Order granted National's request for essentially all documents generated in connection with the underlying litigation by Fidelity, its attorneys and third party consultants. Fidelity objected on the grounds of work product and attorney-client privilege. Judge Hall rejected the attorney-client objection because Fidelity failed to develop an adequate privilege log, and he found that Fidelity waived the work product objection by bringing this suit and therefore putting the documents at issue. Although I agree with this result, I do not believe it should be based on the sufficiency of Fidelity's privilege log since the parties' submissions dealt exclusively with Fidelity's right to assert the privilege as a matter of law.

It is clear that Fidelity has put the Privileged Discovery at issue by bringing this suit, and it has therefore waived its right to raise both work product *and* attorney-client objections. *See* National Union's Response to Fidelity's Sur-Reply at 8–18 (cases cited therein). Fidelity disputes this, arguing that the issue is not its decision to settle, but rather whether settlement was objectively reasonable given the risks of going to trial. Consequently, Fidelity claims that the only relevant discovery would consist of the events giving rise to the underlying litigation and any evidence which would have been adduced at trial had the case not settled. I agree that a primary focus of this suit is whether the settlement was objectively reasonable. However, to make this determination, all relevant information must be examined. This especially includes the information contained in the Privileged Discovery since it is extremely probative in assessing whether a reasonable person would have settled under the circumstances. Moreover, the reasonableness issue raised in this suit necessarily contains certain subjective aspects. The risks of going to trial and the reasonableness of settlement are immensely influenced by how vigorous a defense Fidelity mounted. The Privileged Discovery will also reveal whether Fidelity met its burden under the Policy to prepare a defense, and whether there was improper collusion among the interested parties.

Additionally, there is a sharp dispute over whether the Policy's cooperation clause requires disclosure of the Privileged Discovery. I find that as to the sophisticated parties involved in the present case, the Policy's language is clearly all encompassing and would normally include privileged documents, for otherwise an insurer could not reasonably assess the proposed settlement. This result is fully supported by the fact that the policy issued by FIRG specifically exempted privileged documents. Thus, the Privileged Discovery is also placed at issue by Fidelity's

allegation of compliance with the Policy's provisions, and National's cross-claim.

Fidelity has also waived its right to object by making selective disclosures of certain protected documents. The rule of law is clear. In order to protect against self-serving disclosure, a party who discloses protected documents waives the right to assert work product or attorney-client protections for all documents dealing with the same subject matter. *See* cases cited in Briefs. Fidelity has skirted National's claim of selective disclosure by merely pointing to certain "discovery compromises" it has unilaterally agreed to. Given Fidelity's failure to address the pertinent issues, I find that Fidelity has waived its right to object to the Privileged Discovery. For the reasons stated above, I affirm [2].

### III. *Order Granting Pattern and Practice Discovery:*

**\*3** By Order and Memorandum dated January 14, 1992, Judge Hall granted Fidelity's requests for Pattern and Practice Discovery. Balancing the extreme burden and expense required to comply with this Order with the relatively minor probative value of this discovery, I will reverse. The only relevance of the Pattern and Practice Discovery is Fidelity's hope to establish National's habit of dealing in bad faith with its insureds, and that National acted in conformity with this habit in the present case. Fed.R.Evid. 406. In this regard, National previously produced the following: (1) all pleadings since 1987 in which insureds alleged bad faith or in which bad faith was a factor; (2) approximately 75 claim files involving the same type of claims as the underlying litigation [3]; (3) and 200 director and officer liability policies. Further, National has already produced documents totaling over 30,000 pages in response to other discovery requests.

The Order would require the *additional* production of almost 20,000 insurance policies and almost 3,000 claim files. It would take years to implement compliance at a horrendous expense. None of these files even contain bad faith actions because, as explained above, National has already produced the pleadings of such actions. Accordingly, I find that the burden and expense of this discovery clearly outweighs its relevance. This ruling is also based on the fact that at trial, the scope of this discovery request far exceeds what would be reasonably admissible under Fed.R.Evid. 406. This is especially so considering National's understandable desire to have a "mini-trial" over each and every instance of bad faith claimed by Fidelity. Thus, it is clear that the Order is also over broad. I find that the type and quantity of production to

1992 WL 55742

date draws a proper balance between discovery opportunities Fidelity genuinely deserves, and the ridiculous desires of counsel. Accordingly, I reverse.

I shall therefore issue the following order.

### ORDER

AND NOW, this 13th day of March, 1992, upon consideration of the parties' objections and all responses thereto, it is hereby ORDERED as follows:

1. Magistrate Judge Hall's Order entered January 14, 1992 granting Fidelity's Motion to Compel is REVERSED and MODIFIED. Within 30 days of receipt of this Order, National Union shall make the 75 claim files already produced available for Fidelity's inspection and copying in complete and unredacted form. Upon compliance, National Union is deemed to have satisfied Interrogatories nos. 4, 5 and 10 and Document Requests nos. 1 and 2.

2. Magistrate Judge Hall's Order entered January 14, 1992 granting National Union's Motion to Compel is AFFIRMED although on somewhat different grounds as explained in the attached Opinion.

3. The Order directing pretrial motions in the above-captioned case to Magistrate Judge Hall is hereby VACATED, and it is FURTHER ORDERED that all future filings shall be submitted to this Court.

**All Citations**

Not Reported in F.Supp., 1992 WL 55742

### Footnotes

1   Defendant Financial Institutions Reserve Risk Retention Group, Inc. ("FIRG") is an excess carrier and is not a party to the present discovery dispute.

2   This ruling makes it unnecessary to settle the complicated factual issues raised by the common interest doctrine.

3   These files were incomplete, and the parties' submissions in connection with FIRG's Second Motion to Compel and FIRG's Motion to Enlarge the Scope clearly show that the 75 files must be produced in complete and unredacted form for Fidelity.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

4

Case 1:20-cv-00292-JPW    Document 61-1    Filed 08/14/20    Page 17 of 44

Heller's Gas, Inc. v. International Insurance Company of..., Not Reported in Fed....

2016 WL 3077366

2016 WL 3077366
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

HELLER'S GAS, INC. Plaintiff,

v.

INTERNATIONAL INSURANCE COMPANY
OF HANNOVER LTD, and International
Insurance Company of Hannover SE, Defendants.

4:15-CV-01350
|
Signed 06/01/2016

**Attorneys and Law Firms**

Michael T. Traxler, Theodore A. Adler, Reager & Adler, P.C., Camp Hill, PA, for Plaintiff.

Edward M. Koch, White and Williams, LLP, Philadelphia, PA, for Defendants.

**MEMORANDUM**

Matthew W. Brann, United States District Judge

**\*1** Pending before the Court is a motion to compel discovery, filed by Defendant International Insurance Company of Hannover LTD and International Insurance Company of Hannover SE (hereinafter "Defendants") against Plaintiff Heller's Gas, Inc. (hereinafter "Plaintiff"). [1] Defendants seek an Order compelling Plaintiff to produce more complete responses to discovery, specifically emails sent among Plaintiff's representatives and its insurance broker and engineer, together with full and complete emails of known records custodians, including various individuals. [2] Plaintiff also filed a letter detailing a discovery dispute regarding Defendants' Privilege Log, together with approximately seventy pages of documents redacted by Defendant.

The parties engaged in a telephone conference with this Court on April 21, 2016, after which an Order was entered, directing the parties to file simultaneous briefs. [3] After submitting their briefs, this Court entered an Order directing Defendants to produce the seventy pages of redacted documents for an *in camera* review. [4] In accordance with the following reasoning,

Defendants' motion to compel is granted and Plaintiff's request is denied.

**I. BACKGROUND**

This case arises from an insurance claim filed by Plaintiff, who had been issued a commercial output insurance program property insurance policy by Defendants. Plaintiffs used this policy to insure property that housed six 30,000 gallon tanks filled with approximately 136,800 gallons of liquid propane. On October 11, 2013, Plaintiffs found evidence of a sinkhole beneath the tanks, which had allegedly damaged them. Plaintiff then removed the liquid propane from the tanks, transported the liquid propane to other facilities, disassembled the tanks, and moved them to stable ground at considerable expense. Defendants denied coverage for the loss, aside from $5,000 under emergency removal expense coverage within the policy. Plaintiff subsequently filed the current action, alleging one count of breach of contract and one count of statutory bad faith.

**II. DISCUSSION**

**A. Defendants' Motion to Compel**

Defendants argue that, after receiving information from various third parties requested through subpoenas, Defendants discovered that Plaintiff failed to produce relevant and discoverable information. For example, Defendants received an email from a records custodian who admitted in the email that there was no physical damage to the propane tanks. This email was discovered, not through documents produced by Plaintiff, but from documents produced from a third party. Defendants request that this Court compel Plaintiff to produce more complete responses to discovery.

**\*2** Federal Rule of Civil Procedure 26(b)(1), recently amended as of December 1, 2015, provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case..." [5] Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and if it "is of consequence in determining the action." [6] Discovery sought "need not be admissible" in trial, so long as it is otherwise obtained within the scope of discovery delineated in Rule 26. [7]

The party objecting to discovery must state the grounds for the objection with specificity. [8] The party requesting the

2016 WL 3077366

discovery then bears the burden to prove that the requested discovery falls within the bounds of Rule 26.[9] If this burden is met, the objecting party must then "convince the court why discovery should not be had."[10]

As stated above, Defendants seek more complete responses to discovery requests. Plaintiff states, in response, that it has already produced four hundred and thirty-one pages of documents at Defendants' request and that Defendants have suffered no prejudice, as they received the disputed documents, albeit from third parties. Plaintiff's counsel also states that he is "amenable to revisiting the issue with Plaintiff and issuing an appropriate discovery certification."[11] As the Plaintiff offers no objection to "revisiting the issue," this Court will grant Defendants' motion to compel and will order Plaintiff to produce the discovery previously requested by Defendants.

**B. Plaintiff's request for a more detailed Privilege Log and discovery of redacted material**

In its letter dated April 15, 2016, Plaintiff argues that Defendants' Privilege Log contains inadequate descriptions of the withheld and redacted documents. It points to examples where Defendants describe documents that contain "legal analysis" or "legal advice;" these descriptions are arguably too vague to determine the scope of the document and the precise reason for preserving its confidentiality.

Additionally, Plaintiffs argue that much of the information that Defendants seek to protect does not fall within the attorney-client privilege, the work product doctrine, or reserve information. Plaintiffs contend that all but one document is either sent to or from employees of Energi Insurance Services, Inc. (hereinafter "Energi") or York Risk Services Group, Inc. (hereinafter "York"), neither of whom are subsidiaries of or owned by Defendants. According to Plaintiff, therefore, the documents do not fall within the

protection of the attorney-client privilege or the work product doctrine.

Defendants argue that the redacted and withheld information is, in fact, protected and need not be disclosed. In their Answer, Defendants do not assert an agency relationship with either Energi, Defendants' broker or third-party administrator, or York, Defendants' authorized claim representative. Curiously, Defendants advance just the opposite in their papers.[12] Communication between in-house counsel for these companies and Defendants, they argue, fall within the scope of attorney-client privilege.[13]

**\*3** Following a review of the parties' supporting briefs and the seventy pages of redacted documents provided to Plaintiff, this Court directed Defendants to submit the documents, unredacted, so that the Court could conduct an *in camera* review. After thoroughly examining the documents, this Court finds that the information redacted appropriately falls within the attorney-client privilege and work product doctrine and is consequently information directly related to or referencing legal strategy regarding the instant litigation. The correspondence further supports Defendants' latterly-advanced argument that Energi and York are essentially agents of Defendants.[14]

**III. CONCLUSION**

For the reasons set forth herein, Defendants' motion to compel discovery is granted and Plaintiff's request for discovery and for the production of a more detailed Privilege Log is denied.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3077366

---

Footnotes

1    ECF No. 32.

2    Hannover lists the following records custodians: Michael Armor, Scott Smith, William Haagen, Robert Ballas, Paul Gardner, Sr., Paul Gardner, Jr., Christian Schlotterbeck, and Susan Peritz.

3    The parties filed their briefs on April 29, 2016. Hannover, however, filed its brief as an attachment to its motion to compel. Defense counsel was notified by the Clerk's Office to file the brief as a separate document, which he did on May 2, 2016.

4    ECF No. 24.

5    Fed. R. Civ. P. 26(b)(1).

6    F.R.E. 401; *see also Shaffer v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 931101, \*1 (M.D. Pa. March 10, 2014).

**Heller's Gas, Inc. v. International Insurance Company of..., Not Reported in Fed....**

2016 WL 3077366

7    Fed. R. Civ. P. 26(b)(1).

8    *Momah v. Albert Einstein Medical Center*, 164 F.R.D. 412, 417 (E.D. Pa. 1996).

9    *Id.*

10   *Id.*

11   ECF No. 21.

12   ECF No. 23 at 7.

13   *In re Ford Motor Co.*, 110 F.3d 954 (3d Cir. 1997) (abrogated on other grounds in *Mokawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2011)).

14   On the other hand, this Court agrees with Plaintiff that Defendants have failed to provide a sufficiently detailed Privilege Log. Defendants cite *Wei v. Bodner*, in support of their argument that their Privilege Log provides sufficient information. *Wei* holds that "[a]t a minimum, for each document asserted to be protected by these privileges, the defendants must provide both plaintiff and the Court with the date of the document, the name of its author, the name of its recipient, the names of all people given copies of the document, the subject of the document and the privilege or privileges asserted." 127 F.D.R. 91, 96 (D.N.J. 1989). This must be done so that the Court can easily determine whether the documents fall under the privilege or doctrine. *Id.* Here, Defendants provide the Bates Ranges, dates, names of the author and recipients, and the basis of privilege asserted. Defendants also have a "Description of Document" category in which they describe the document as "email" or "email requesting legal analysis," among other things. As stated in *Wei*, Defendants must provide the subject of the document. Neither Plaintiff nor this Court could derive the subject of documents simply labeled as "email" or "email correspondence re: legal analysis." However, this point is rendered moot as this Court reviewed the documents in question and determined that the information was redacted appropriately.

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

5

2010 WL 4137515, 110 Fair Empl.Prac.Cas. (BNA) 898

2010 WL 4137515
United States District Court,
W.D. Pennsylvania.

Douglas M. HODCZAK; James M.
Crossman; Thomas J. Magdic; Joseph
A. Litvik, on behalf of themselves and
all others similarly situated, Plaintiffs,

v.

LATROBE SPECIALTY STEEL
COMPANY, Defendant.

Civil Action No. 08–649.
|
Aug. 10, 2010.

**Attorneys and Law Firms**

Bruce C. Fox, Rudy A. Fabian, Obermayer Rebmann Maxwell & Hippel LLP, Pittsburgh, PA, for Plaintiff.

Mark R. Hornak, Thomas S. Giotto, Erin J. McLaughlin, Jaime S. Tuite, Joseph F. Quinn, Buchanan Ingersoll & Rooney PC, Pittsburgh, PA, for Defendant.

### *MEMORANDUM ORDER*

AMY REYNOLDS HAY, United States Chief Magistrate Judge.

**\*1** Presently before the Court is Defendant's Motion to Exclude Testimony and Evidence From LLS' Director of Legal Affairs—Gene F. Zurawsky (ECF No. 137). For the reasons set forth below, the motion will be denied.

Plaintiffs instituted this action against LSS pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, following their involuntary separation from employment with LSS for violating the company's electronic communications policy by sending numerous, graphic and sexually explicit emails. Plaintiffs assert that LSS's stated reason for termination is pretextual alleging that their employment was terminated on the basis of their age. Plaintiffs claim that other, younger employees, including LSS's upper management, engaged in the same conduct charged against Plaintiffs but received dissimilar sanctions. In an effort to establish pretext, Plaintiffs intend to use testimony from Gene F. Zurawsky, a former LSS employee, regarding the infractions committed by, and resulting discipline imposed on, these other employees, as well as other statements made by LSS executives and management relating to personnel decisions. LSS has now moved to preclude Plaintiffs from utilizing Mr. Zurawsky's testimony and evidence derived therefrom, arguing that the information disclosed by Zurawsky was confidential and/or privileged information received by him as LSS's attorney. LSS contends that to allow Plaintiffs to benefit from Mr. Zurawsky breach of his professional obligations to LSS, or from Plaintiffs' present counsel's solicitation of LSS's privileged and/or confidential information from Mr. Zurawsky, would violate Rules 1.6(a) and 1.9(c) of the Pennsylvania Rules of Professional Conduct.

Rule 1.6(a) provides that: "[a] lawyer shall not reveal information relating to representation of a client unless the client gives informed consent." Moreover, the duty is one that continues even after the attorney client relationship has ended. Pa. R.P.C. 1.6(d). Similarly, Pa. R.P.C. 1.9(c) provides that:

> A lawyer who has formally represented a client in a matter ... shall not thereafter:
>
> (1) use information relating to the representation to the disadvantage of the former client ... except when the information has become generally known; or
>
> (2) reveal information relating to the representation ...."

The burden of demonstrating the applicability of these rules falls to the party seeking to invoke them. *Dworkin v. General Motors Corp.*, 906 F.Supp. 273, 277–78 (E.D.Pa.1995).

Plaintiffs argue that these rules are inapplicable to the instant situation and that the issue of whether evidence derived from Mr. Zurawsky should be excluded is governed by the Federal Rule of Evidence 501 (relating to the privileged communications), and that the proper inquiry is whether Zurawsky violated the attorney-client privilege.

The parties do not dispute that there is a distinction between an attorney's ethical obligation to protect confidential information that he or she receives from a client and the attorney-client privilege which is evidentiary in nature. As the Comment to Rule 1.6 states:

> **\*2** The principle of client-lawyer confidentiality is given effect by related bodies of law: the attorney-

client privilege, the work product doctrine and the rule of confidentiality established in professional ethics. *The attorney-client privilege and work-product doctrine apply in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client. The rule of client-lawyer confidentiality applies in situations other than those where evidence is sought from the lawyer through compulsion of law.* The confidentiality rule, for example, applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source.

*Id.* (emphasis added). *See Frieman v. USAir Group, Inc.,* 1994 WL 675221, at *6 (E.D.Pa. Nov.23, 1994). Thus, the law with respect to the attorney-client privilege governs an attorney's duty of confidentiality when called as a witness in a judicial proceedings and not Rule of Professional Conduct 1.6. *Id.* Indeed, it has been repeatedly held that Pennsylvania's attorney-client privilege statute "is the substantive law which applies in court proceedings," and that "the disciplinary rules '[serve] instead as a regulatory guide and basis for disciplinary action within the legal profession.' " *Id.,* quoting *Commonwealth v. Stenhach,* 356 Pa.Super. 5, 13, 514 A.2d 114, 118 (1986).[1] *See Com. v. Chmiel,* 558 Pa. 478, 495, 738 A.2d 406, 415 (1999) ( "The rules that govern the ethical obligations of the legal profession (presently, the Rules of Professional Conduct) do not constitute substantive law" and would, at most, establish a basis for disciplinary proceedings); *In re Estate of Wood,* 818 A.2d 568, 573 (Pa.Super.2003) ("the Rules of Professional Conduct are not substantive law").

Here, LSS has expressly rejected the notion that it seeks to exclude Mr. Zurawsky's testimony as being violative of the attorney-client privilege but maintains that it is properly excluded because he violated the rule of client-lawyer confidentiality. Because, under the circumstances of this case, the Rules of Professional Conduct that speak to the rule of confidentiality are inapplicable, they cannot provide the basis for excluding Mr. Zurawsky's testimony or the evidence derived therefrom.[2]

Whether or not LSS is proceeding under the rule of confidentiality or the attorney-client privilege, however, it is nevertheless required to demonstrate that Mr. Zurawsky and LSS had a attorney-client relationship in the first instance.

LSS appears to acknowledged that there is no express contract between it and Mr. Zurawsky for legal services but contends that an attorney-client relationship may be implied from the various positions Zurawsky held and the role he played at LSS.

Under Pennsylvania law, an attorney-client relationship may be implied from the conduct of the parties where: (1) the purported client sought advice or assistance from the attorney; (2) the advice sought was within the attorney's professional competence; (3) the attorney expressly or impliedly agreed to render such assistance; and (4) it is reasonable for the putative client to believe the attorney was representing him. *Minnich v. Yost,* 817 A.2d 538, 542 (Pa.Super.2003), *quoting Cost v. Cost,* 450 Pa.Super. 685, 691–92, 677 A.2d 1250, 1254 (1996). *See Mursau Corp. v. Florida Penn Oil & Gas, Inc.,* 638 F.Supp. 259, 262 (W.D.Pa.1986), *aff'd,* 813 F.2d 396 (3d Cir.1987). The conduct of the parties, however, "must evidence an offer or request by the client for legal services and an acceptance of the offer by the attorney.... It is clear that an attorney client relationship exists only with the consent of both parties." *Id., quoting Connelly v. Wolf, Block, Schorr and Solis–Cohen,* 463 F.Supp. 914, 919 (E.D.Pa.1978) (internal citations omitted). *See Capitol Surgical Supplies, Inc. v. Casale,* 2004 WL 180412, at *2 (3d Cir. Jan.28, 2004) ("A request for legal services, and an agreement to provide legal services, are necessary elements to form an attorney-client relationship").

**\*3** In an effort to establish that an attorney client relationship existed between LSS and Mr. Zurawsky, LSS has pointed to certain portions of Mr. Zurawsky deposition testimony as well as statements from other LSS employees. Mr. Zurawsky testified that his law school education was paid for by LSS under its tuition reimbursement plan and that he attended law school in order to work in LSS's labor relations department. (Doc. 138–1: pp. 14, 33). Indeed, after Mr. Zurawsky graduated from law school, he was promoted to Manager–HR & Purchasing in 2005, which, according to Susan Lawson, LSS's current Manager of Human Resources and Benefits Administration, requires a law degree. (Doc. 138–2: ¶ 5). Ms. Lawson also attests to the fact that as Manager of HR and Purchasing, Mr. Zurawsky reviewed contracts on

**Hodczak v. Latrobe Specialty Steel Co., Not Reported in F.Supp.2d (2010)**

2010 WL 4137515, 110 Fair Empl.Prac.Cas. (BNA) 898

LSS's behalf; handled contact with outside legal counsel; represented LSS in administrative proceedings; and that she, as well as other management employees, consulted with Zurawsky "and provided him with confidential information for the purpose of seeking his legal advice." (Doc. 138–2: ¶¶ 6, 7). Indeed, the job description for the position not only suggests that a valid attorney licence is required, but states that the purpose of the position is to ensure compliance with Governmental and Customer–Required Certification and Requirements; provide legal advice and counsel to all levels of Management; act as the liaison providing support and assistance to outside counsel; and manage all Labor Relations activities including grievance procedures through arbitration, disciplinary actions and job evaluations for salaried and bargaining unit associates. (Doc. 138–2: pp. 5–6).

The record also demonstrates that in September of 2007, Mr. Zurawsky became Director of Purchasing & Legal Affairs. In a letter memorializing his conversations with LSS regarding the position, Dale B. Mikus, LSS's Vice President and CFO, indicates that "on the legal affairs side" Zurawsky would be responsible for "reviewing contracts" and participating in "other legal aspects involving the company, including environmental matters .... and overseeing due diligence in any refinancing and/or Securities and Exchange Commission registration process and other work relating to project 'Fortuna.' " (Doc. 138–1: p. 34). Mr. Mikus has also submitted a Verification in which he states that he sought and received legal advice from Mr. Zurawsky both as Manager–HR & Purchasing and as Director of Purchasing and Legal Affairs and, to that end, provided him with confidential information. Mr. Mikus also submits that he considered Mr. Zurawsky to be "LSS's on-site lawyer." (Doc. 138–5: ¶¶ 3–5). An identical Verification has been submitted by Daniel Hennessy, another management level employee at LSS. (Doc. 138–4: ¶¶ 4–6).

As well, LSS points to the deposition testimony of Hans Sack who testified that Mr. Zurawsky handles all contact with outside counsel; that he consulted Zurawsky as LSS's Legal Director and HR Director "over many years;" and that he considered Zurawsky to be LSS's "resident lawyer." (Doc. 137: pp. 138–39).

*4 Finally, LSS refers to other portions of Mr. Zurawsky deposition testimony wherein he stated that he gave advice regarding compliance with HR laws; conducted internal investigations to prepare for, and represented company representatives in, arbitration proceedings; expressed his opinion on legal matters to outside counsel; conducted internal investigations, drafted responses to, and represented LSS in, grievance procedures; participated in labor negotiations, albeit not as the lead negotiator; communicated with the Union on behalf of LSS; and submitted his bar association dues and Continuing Legal Education expenses to LSS for payment as business expenses. (Doc. 138–1: pp. 24, 27, 31–32, 35–36).

Mr. Zurawsky also testified, however, that to the extent he gave advice regarding HR laws, he did so as the Director of HR and not as an attorney and that he, in fact, never acted as counsel for LSS at any time; was never asked for nor provided legal advice as an attorney for LSS; never undertook the role of an attorney for LSS in any court or administrative proceeding, including unemployment compensation hearings, workers' compensation hearings or arbitration proceedings, or in any negotiations. (Doc. 138–1: pp. 24, 27, 31, 34, 35, 64). Zurawsky further testified that he never acted as LSS's attorney in any labor relations matter but acted only as the "labor relations representative," and that he was specifically instructed by the company's legal department not to enter his appearance for the company in any legal matters because he had no malpractice insurance. (Doc. 150–4: pp. 22–23). As well, it is Zurawsky's testimony that the words "Legal Affairs" were tacked on to the title of his last position in order to make it look like a lateral move rather than a demotion and that he nevertheless was only in the position for three months before he left the company. (Doc. 150–4: p. 77).

Under these circumstances, the Court finds that there was no attorney-client relationship between Mr. Zurawsky and LSS. The fact that LSS paid for Zurawsky's law school education under their tuition reimbursement program, just as it did his college education, (see Doc. 138–1: p. 14), and that he took advantage of that program so that he could advance within the HR Department appears of little significance and does not, by itself, suggest that Zurawsky acted as LSS's attorney.[3] Indeed, except for the last three months of his employment at LSS, Mr. Zurawsky worked in Human Resources and was never employed in the company's legal department. *See* (Doc. 150–4: p. 23). Although the job description submitted by LSS for the position of Manager of HR & Purchasing indicates that ensuring compliance with Governmental and Customer–Required Certification and Requirements, acting as a liaison to outside counsel, and managing all Labor Relations activities including grievance procedures through arbitration are job responsibilities, there is nothing about these

2010 WL 4137515, 110 Fair Empl.Prac.Cas. (BNA) 898

responsibilities that appears to require a lawyer's expertise. As Mr. Zurawsky testified, to the extent he gave advice regarding HR laws, and to the extent he expressed his opinion on various legal matters and participated in labor negotiations, he was able to do so as the Director of HR and not as an attorney.

**\*5** As well, although the last position Mr. Zurawsky held at LSS was entitled Director of Purchasing and Legal Affairs, he only held that position for a little over three months between September and December of 2007. Moreover, Zurawsky's unrefuted testimony is that the "Legal Affairs" part of the title was tacked on in order to make it look like a lateral move after he was stripped of his HR functions and that he merely continued his purchasing responsibilities as he had previously done as the manager-HR & Purchasing. (Doc. 150–4: p. 77).

Perhaps the most troubling evidence is the Verifications submitted by Ms. Lawson and Messrs. Mikus and Hennessy in which they state that Zurawsky reviewed contracts on LSS's behalf and that they sought and received legal advice from him. The Verifications, however, do not indicate what kind of contracts were involved, when they were reviewed, with whom they were entered into and do not indicate that Zurawsky was involved in any contract negotiations. Nor do they indicate what type of legal advice was sought, when it was sought or in what context it was sought or provided.

Moreover, Plaintiff Hodczak has attested to the fact that when he approached Mr. Zurawsky for legal advice on how to handle inconsistent boilerplate language on a purchase order form, Zurawsky declined to dispense any legal advice and directed Hodczak to the company's legal department. (Doc. 150–5: ¶¶ 21–24). In the absence of any specificity surrounding Mr. Zurawsky's alleged legal activities it cannot be said that the advice allegedly sought was within Mr. Zurawsky's professional competence, that he agreed to render such assistance as an attorney or that it was reasonable for Mikus or Hennessy to believe that Zurawsky was acting as LSS's attorney. *See Minnich v. Yost,* 817 A.2d at 542.[4] Coupled with Mr. Zurawsky's testimony that he never acted as counsel for LSS at any time and was never asked for or provided legal advice, the Court is compelled to conclude that no attorney-client relationship existed.

Accordingly, this 10th day of August, 2010, IT IS HEREBY ORDERED that Defendant's Motion to Exclude Testimony and Evidence From LLS' Director of Legal Affairs–Gene F. Zurawsky (Doc. 137) is DENIED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 4137515, 110 Fair Empl.Prac.Cas. (BNA) 898

Footnotes

1    In federal question cases, such as this, the federal common law governing privilege, rather than State law, applies. *See* Fed.R.Civ.P. 501.

2    In fact, the Court notes that LSS has not addressed Plaintiffs' argument regarding Rule 1.9 in its reply brief and, therefore, has seemingly conceded that the Rule does not apply here. Indeed, Plaintiffs have represented, and LSS does not dispute, that all the information that LSS seeks to exclude is information that has become "generally known" and, thus, falls squarely under the exception to Rule 1.9's prohibition against a lawyer using information relating to the representation of a former client to the client's disadvantage. *See* Pa. R.P.C. 1.9(c)(1). Moreover, although the Court does not find that the Rules of Professional Conduct can never provide the basis for excluding evidence, LSS has not cited any cases where Pa. R.C.P. 1.6 was the basis for excluding the testimony of a lawyer in a legal proceeding against a former client. To the contrary, all of the cases cited by LSS involve situations where a lawyer currently representing a party in a lawsuit took an *ex parte* statement from an employee of the opposing party without notifying opposing counsel in violation of Pa. R.P.C. 4.2. *See Inorganic Coatings, Inc. v. Falberg,* 926 F.Supp. 517, 521 (E.D.Pa.1995); *Cagguila v. Wyeth Laboratories, Inc.,* 127 F.R.D. 653, 655 (E.D.Pa.1989); *Penda Corp. v. STK, LLC,* 2004 WL 1628907 at \*7 (E.D.Pa. July 16, 2004); *Belote v. Maritrans Operating Partners, L.P.,* 1998 WL 136523 at \*6 (E.D.Pa. March 20, 1998). Such is not the case here.

3    Indeed, while LSS makes much of the fact that, according to the job description for the position of Manager of HR & Purchasing, a JD is required, review of the job description indicates that either a JD or a Ph.D. will suffice and appears to suggest that even a lesser education will suffice where relevant work experience would provide the same skills. (Doc. 138–2: p. 6).

4    Although LSS also makes much of the fact that Hans Sack and others considered Zurawsky to be LSS's "resident lawyer," these statements, without more, amount to nothing more than their subjective belief that an attorney-client relationship existed and does not evidence conduct from which a contract can be implied. *See Capitol Surgical Supplies, Inc. v. Casale,* 2004 WL 180412, at \*3.

**Hodczak v. Latrobe Specialty Steel Co., Not Reported in F.Supp.2d (2010)**

2010 WL 4137515, 110 Fair Empl.Prac.Cas. (BNA) 898

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

6

2010 WL 4537002
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

KIMBERLY–CLARK WORLDWIDE, INC., Plaintiff
v.
FIRST QUALITY BABY PRODUCTS, LLC,
First Quality Products, Inc., First Quality
Retail Services, LLC, First Quality Hygienic,
Inc., Defendants and Counterclaim Plaintiffs
v.
Kimberly–Clark Corporation, Kimberly–
Clark Worldwide, Inc., Kimberly–Clark
Global Sales, LLC, Counterclaim Defendants.

Civil No. 1:CV–09–1685.
|
Nov. 3, 2010.

## Attorneys and Law Firms

Andrew G. Klevorn, Chad J. Doellinger, Eimer Stahl Klevorn & Solberg LLP, Janice V. Mitrius, Jason S. Shull, Jeffrey M. Cox, Katherine L. Fink, Marc S. Cooperman, Michael L. Krashin, Thomas J. Lerdal, Banner & Witcoff Ltd., Bradley F. Rademaker, Jeffrey M. Cox, Chicago, IL, Bridget E. Montgomery, Adam M. Shienvold, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA, David J. Schertz, Harrisburg, PA, Vicki Margolis, Kimberly-Clark Corporation, Neenah, WI, for Plaintiff and Counterclaim Defendants.

Aden A. Allen, Jose C. Villarreal, Michele K. Connors, Wilson Sonsini Goodrich & Rosati, PC, Austin, TX, David A. Barrett, Boies, Schiller & Flexner LLP, Ira E. Silfin, Brian A. Comack, Kenneth P. George Amster, Rothstein & Ebenstein LLP, New York, NY, Brian P. Downey, Frederick Alcaro, Pepper Hamilton LLP, Harrisburg, PA, D. Michael Underhill, Evan A. Parke, Michael A. Brille, Boies, Schiller & Flexner LLP, Washington, DC, Julie M. Holloway, Wilson, Sonsini, Goodrich & Rosati, San Francisco, CA, Kalina V. Laleva, Michael A. Ladra, Ron E. Shulman, Thomas T. Carmack, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Thomas B. Schmidt, III, Pepper Hamilton, LLP, Harrisburg, PA, for Defendant and Counterclaim Plaintiffs.

## MEMORANDUM

MARTIN C. CARLSON, United States Magistrate Judge.

### I. Introduction

**\*1** Presently before the court is First Quality's motion to compel discovery pursuant to Rule 37 of the Federal Rules of Civil Procedure seeking production of all test data on which Kimberly–Clark ("KC") relies to support its claims of patent infringement, and all documents that support or refute said test data. In support of its motion, First Quality argues that the testing data and related documents are not protected by the attorney-client privilege nor as attorney work product. In addition, even if a privilege applies, First Quality contends that KC waived any privilege by disclosing and relying on the information in its infringement contentions. Finally, claiming a substantial need for the materials, First Quality argues that attorney work product immunity should not apply. After review of the parties' submissions, we will deny the motion.

### II. Discussion

Rule 26(b) (1) of the Federal Rules of Civil Procedure provides that any party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." It is well settled that Rule 26 establishes a liberal discovery policy. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). As a result of this liberal discovery policy, the burden of demonstrating the existence of a privilege and that it has not been waived rests on the party asserting the privilege. *In re Grand Jury (OO–2H),* 211 F.Supp.2d 555, 557 (M.D.Pa.2001) (Judge Rambo). Likewise, the party claiming work product immunity bears the burden of showing that "the materials in question 'were prepared in the course of preparation for possible litigation.' " *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124, 138 (3d Cir.2000). Here, in both instances, the burden rests on KC.

Communications are protected under the attorney-client privilege when "(1) the legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection may be waived." *In re Impounded,* 241 F.3d 308, 316 n. 6 (3d Cir.2001).

The work product doctrine, in turn, is governed by Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides that:

(A) *Documents and Tangible Things.* Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

(i) they are otherwise discoverable under Rule 26(b)(1); and

(ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

**\*2** (B) *Protection Against Disclosure.* If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed.R.Civ.P. 26(b)(3). Generally, "voluntary disclosure to one's adversary of documents protected by the work-product privilege waives the privilege." *Montgomery County v. MicroVote Corp.,* 175 F.3d 296, 304 (3d Cir.1999) (citing *Westinghouse v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3d Cir.1991)).

The test for determining whether a document was prepared in anticipation of litigation is "where in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Martin v. Bally's Park Place Hotel & Casino,* 983 F.2d 1252, 1258 (3d Cir.1993). Courts generally divide this test into two prongs: the documents were prepared (1) at a time when litigation was reasonably foreseeable; and (2) primarily for the purpose of litigation. *See United States v. Rockwell International,* 897 F.2d 1255, 1266 (3d Cir.1990); *see also Muse–Freeman v. Bhatti,* No. 07–3638, 2008 WL 2165147, at *1 (D.N.J. May 21, 2008). However, the Third Circuit makes clear that the materials must be prepared in anticipation of litigation, and not in the ordinary course of business. *Id.* Otherwise, the privilege does not apply. *Id.*

Here, the testing data and related documents in question are not protected by the attorney-client privilege. As we previously indicated, KC carries the burden of showing the materials are covered by the privilege. In this instance, KC fails to sufficiently demonstrate that the testing materials in question were confidential communications between attorney and client.

Nevertheless, the materials in question are protected as attorney work product prepared in anticipation of litigation. In support of its position, KC offers the declaration of H. Michael Kubicki, counsel for KC since 2001. In his declaration, Mr. Kubicki states, under penalty of perjury, that the materials at issue were made in anticipation of litigation between KC and First Quality. In addition, the submitted privilege logs show that testing data was prepared during a time when litigation was contemplated. (*See* doc. 298.) In fact, First Quality filed its original declaratory judgment action a mere eight months after KC received its first product analysis results. *See First Quality Baby Prods., LLC v. Kimberly–Clark Worldwide, Inc.,* No. 09–0354, 2009 WL 1675088 (M.D.Pa. June 15, 2009); (doc. 298.) In light of these facts, we conclude that the information in question was prepared in anticipation of litigation. Thus, the attorney work product privilege applies to the materials.

In spite of this, we conclude that KC will be deemed to waive attorney work product protection if it relies upon and discloses the testing data at issue in support of its infringement contentions. Indeed, First Quality argues that KC has already relied on the testing data by employing the material in its preliminary infringement contentions. However, preliminary infringement contentions provide notice of the accusing party's specific infringement theories, and are not considered evidence. *Fast Memory Erase, LLC v. Spansion, Inc.,* No. 08–977, 2009 WL 4884091, at *2 (N.D.Tex. Dec. 16, 2009). Thus, KC using testing data to put First Quality on notice is not relying on the materials as evidence in support of its infringement theories. However, like the court in *Tillotson Corporation v. Shijiazhaung Hongray Plastic Products, LTD.,* 244 F.R.D. 683, 693 (N.D.Ga.2007), we conclude that if KC relies on the testing data at issue as evidence to support its infringement claims, justice requires that First Quality has a right to the material in order to defend itself. Thus, in such a situation if KC actually relies upon this data, First Quality will have shown a substantial need for the testing information and disclosure would be required. Likewise, by voluntarily disclosing the materials in such a situation, KC would be waiving the privilege.

*III. Conclusion*

**\*3** Based on the preceding, and to the extent that KC relies on the factual information acquired from any testing, we conclude that plaintiff must disclose that information even if it requires separating mental impressions from factual information. However, we will not require KC to produce the materials in question unless it relies on that information to support its infringement claims or will use said data in the future. We will afford KC fourteen (14) days from the date of this order to determine whether it will rely on the testing data in support of its claims. If it chooses to rely on the data, KC will have ten (10) days thereafter to disclose the information to First Quality. Nonetheless, if KC chooses not to rely on the testing data and then thereafter attempts to use said data in any manner against First Quality, we will not allow such evidence to be admitted.

We will issue an appropriate order.

*ORDER*

AND NOW, this 3rd day of November, 2010, upon consideration of First Quality's motion to compel (doc. 263), and pursuant to the accompanying Memorandum, it is ordered that:

1. The motion to compel is denied.

2. Plaintiff is afforded fourteen (14) days from the date of this order to determine whether it will rely on the testing data in support of its claims and report its decision to the court.

3. If plaintiff chooses to rely on the data, it will have ten (10) days thereafter to disclose its test results to defendants.

4. Failure to comply with this order will result in mandatory disclosure, and any later attempt to rely on said testing data will not be allowed.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4537002

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

7

2017 WL 264457

2017 WL 264457
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

NEW JERSEY MANUFACTURERS
INSURANCE COMPANY, Plaintiff,
v.
J. Scott BRADY, Individually, and
Brady & Grabowski, P.C., Defendants.

CIVIL ACTION NO. 3:15-CV-02236
|
Signed 01/20/2017

**Attorneys and Law Firms**

Lawrence F. Walker, Cozen O'Connor, Philadelphia, PA, John P. Johnson, Jr., Cozen O'Connor, P.C., Cherry Hill, NJ, for Plaintiff.

Barbara A. O'Connell, Sweeney & Sheehan, Philadelphia, PA, for Defendants.

### MEMORANDUM

A. Richard Caputo, United States District Judge

**\*1** Presently before the Court is a Motion for Partial Summary Judgment (Doc. 18) filed by Plaintiff New Jersey Manufacturers Insurance Company ("NJM"), and a Motion to Compel Production of Documents (Doc. 31) filed by Defendants J. Scott Brady, Esquire ("Brady") and Brady & Grabowski, P.C. (collectively, "Defendants"). NJM's Complaint (Doc. 1) alleges that Brady committed legal malpractice when he represented NJM with respect to an Underinsured Motorist (UIM) claim brought by nonparty Gary Wells ("Wells") against his insurer, NJM (the "Wells claim"). Defendants' Answer (Doc. 10) raises multiple affirmative defenses, including a contributory negligence defense based on NJM's alleged bad faith handling of the Wells claim. In response, NJM filed the instant Motion for Partial Summary Judgment, seeking to strike this affirmative defense and preclude further discovery related to its alleged bad faith handling of the Wells claim. Defendants subsequently filed the instant Motion to Compel, seeking production of documents and communications related to the Wells claim that NJM contends are privileged. NJM's Motion for Partial Summary Judgment will be granted in part and

denied in part. Because the Court finds that NJM's exposure to bad faith liability is relevant to the issue of damages, NJM will not be precluded from pursuing discovery on NJM's bad faith handling of the Wells claim. However, as explained below, the Court will strike Defendants' contributory negligence defense only to the extent that the defense is based on conduct that is not causally related to the arbitration award. Additionally, after conducting an *in camera* review of the NJM file, the Court finds that, with the few exceptions noted below, the documents are properly withheld from discovery on the basis of the privilege claimed. Moreover, the Court finds that NJM has not waived its attorney-client privilege or work-product protection with respect to the withheld documents in the NJM file. However, NJM's privilege log entries for the Curtin & Heefner file are insufficiently detailed for the Court to determine whether the documents withheld on the basis of attorney-client privilege and/or work-product protection are actually privileged from discovery. NJM therefore must supplement its privilege log as detailed below. Defendants' Motion to Compel thus will be granted in part and denied in part.

### I. Relevant Factual Background

The facts presented in the record, viewed in the light most favorable to Defendants, are as follows [1]:

**\*2** Plaintiff NJM is a New Jersey corporation authorized to issue automobile insurance policies in Pennsylvania. (Compl. ¶ 1, Doc. 1.) Defendant J. Scott Brady is a licensed Pennsylvania attorney who practiced at the law firm Defendant Brady & Grabowski, P.C. when he represented NJM. (*Id.* ¶¶ 2-3.) The instant dispute arises out of Brady's representation of NJM with respect to a UIM claim brought by one of its insureds, Gary Wells. Specifically, NJM contends that Brady negligently handled the arbitration between NJM and Wells (the "Wells arbitration") and continued to act negligently in the steps he took after the arbitration panel issued its award. (*See id.* ¶¶ 61-63, 74-76.) NJM also claims that Brady breached his fiduciary duties in his handling of the Wells claim, including his handling of the Wells arbitration. (*Id.* Count II.)

Nonparty Gary Wells was injured in a car accident on February 20, 2012. (Pl.'s Statement of Undisputed Facts ("PSUF") ¶ 1, Doc. 19.) NJM provided automobile insurance to Mr. Wells, including Underinsured Motorist (UIM) coverage. (*Id.* ¶ 2.) Under the policy, UIM coverage was

Case 1:20-cv-00292-JPW    Document 61-1    Filed 08/14/20    Page 32 of 44
**New Jersey Manufacturers Insurance Company v. Brady, Not Reported in Fed. Supp....**
2017 WL 264457

limited to $2 million. (*Id.* ¶ 3.) Mr. Wells was represented by the law offices of Lenahan & Dempsey, who submitted a claim on behalf of Mr. Wells to NJM under the UIM provisions of his policy. (*Id.* ¶ 5.) On March 11, 2014, Defendant J. Scott Brady and his firm, Defendant Brady & Grabowski, P.C., were retained to represent NJM with respect to the Wells claim. (*Id.* ¶ 7.) The parties agreed to a common law arbitration before a three-person arbitration panel. (*Id.* ¶ 8; *see* Ex. F, at 4:2-6, Doc. 19.) The arbitration was scheduled to take place on August 19, 2014 in Lackawanna County, Pennsylvania. (PSUF ¶ 8.) On August 14, 2014, John Lenahan, Mr. Wells's attorney, sent Brady a letter that stated: "Enclosed you will find a submission I propose we give the arbitrators in a sealed envelope, to be opened after their deliberations have been completed." (Ex. G, Doc. 19.) The letter further stated that Lenahan was "including the UIM policy limit disclosure" in the proposed sealed envelope "without waiving [plaintiffs'] argument that the arbitrators should be advised of the UIM limits in advance of the arbitration proceedings...." (*Id.*) However, the arbitrators were not made aware of the UIM policy limits prior to issuing their decision. (PSUF ¶ 13.)

For purposes of the arbitration, NJM stipulated that the driver who caused Wells's injuries was negligent. (PSUF ¶ 10.) The only issues before the arbitration panel were the scope and extent of Wells's injuries. (*Id.* ¶ 11.) The issue of NJM's alleged bad faith handling of Wells's UIM claim was not at issue in the arbitration. (*Id.* ¶ 12.) Brady never requested the arbitration panel to mold an award in excess of the $2 million policy limit to match that limit. (*Id.* ¶ 14.) On August 20, 2014, the arbitration panel issued an award in favor of Mr. Wells for $5,921,117. (*Id.* ¶ 15; Ex. J, Doc. 19.) This award was for compensatory damages only, and exceeded the $2 million policy limit by $3,921,117.[2] (PSUF ¶ 16.) The award did not encompass extra-contractual damages, including damages related to any bad faith on the part of NJM. (*Id.*)

On September 2, 2014, Brady filed a Petition with the arbitration panel seeking reconsideration, correction, modification, and/or clarification of the award pursuant to 42 Pa. Cons. Stat. Ann. § 7311. (*Id.* ¶ 17; *see* Ex. K, Doc. 19.) The Petition sought to modify the award, arguing that the amount was arbitrary. (PSUF ¶ 17.) The Petition did not provide the UIM policy limits or expressly request the arbitration panel to mold the award to the policy limits. (*See* Ex. K, Doc. 19.) On September 15, 2014, Brady sent a letter to NJM in which he opined that, because he had "no doubt" that a court would interpret Wells's policy language as

calling for a common law arbitration rather than a statutory arbitration, NJM had very narrow grounds on which to appeal the arbitration award, none of which he believed applied to the Wells arbitration. (Ex. V, Doc. 25-1.) Brady thereafter withdrew the Petition on September 16, 2014 (Ex. L, Doc. 19) and filed an appeal of the award in the Court of Common Pleas of Monroe County, Pennsylvania on September 19, 2014. (PSUF ¶¶ 19-20.) The appeal did not explicitly use the term "molding" in its request for modification of the Wells arbitration award. (*See* Ex. M, Doc. 19.) On September 23, 2014, Lenahan filed a Petition to Confirm Common Law Arbitration Award and Enter Judgment in the Court of Common Pleas of Lackawanna County—the same county where the arbitration took place. (PSUF ¶ 22.) Around this time, NJM discharged Brady and retained new counsel, Curtin & Heefner, to handle the challenge to the Wells arbitration award. (*See* Stein Aff. ¶ 3, Doc. 36-1.) On October 14, 2014, Curtin & Heefner on behalf of NJM filed an Amended Petition in Monroe County requesting the award be molded to the $2 million policy limits, as well as a Motion to Transfer Venue from Monroe County to Lackawanna County. (Ex. 7, p. 3598, Doc. 23.)

**\*3** Lenahan had also drafted a complaint that alleged NJM acted in bad faith in handling the Wells claim. (PSUF ¶ 23; Ex. O, Doc. 19.) Lenahan sent the draft bad faith complaint to Bonnie Stein of Curtin & Heefner on October 23, 2014. (Ex. 13, Doc. 23.) In this email, Lenahan informed Stein that he was "likely" to file the complaint before the end of the following day (October 24, 2014). (*Id.*) On October 26, 2014, Stein emailed Nathan Buurma and Jeffrey Bartolino, members of NJM's in house legal team, a copy of the bad faith complaint. (Ex. 3, Doc. 23.) In that email, Stein stated that she wanted to meet "ASAP" to "speak about some significant developments" and "go over major concerns and the possible benefits of this going [to] the October 30, 2014 Mediation." (*Id.*) Additionally, an email from Buurma concerning the Wells claim sent on October 27, 2014 demonstrates that NJM's legal team was actively strategizing over its ability to mold the arbitration panel's award to the policy limits, as well as its potential exposure to bad faith liability. (Ex. 4, Doc. 23.) On October 28, 2014, Buurma sent a notice to Brady informing him that NJM planned to file a malpractice suit against him in connection with his handling of the Wells arbitration. (Ex. 5, Doc. 23.) A mediation between NJM and Wells was scheduled for October 30, 2014. (*Id.* Exs. 6-7.) Both parties' mediation memoranda dealt extensively with the issue of NJM's bad faith handling of the Wells claim before and after the arbitration. (*See id.*)

On November 10, 2014, NJM and Wells executed a release and settlement agreement. (Ex. P, Doc. 19.) NJM contends that it reasonably believed Brady's failure to submit the policy limits to the arbitration panel or otherwise request a molding of the award would have resulted in the full amount of the arbitration award being confirmed in court, and that its pending motions seeking to reduce the award would have been futile. (*See* PSUF ¶ 24.) NJM therefore agreed to pay Wells the full arbitration award plus interest in exchange for the release of all claims against NJM relating to this matter, including any claims for bad faith. (Ex. P ¶ 1, Doc. 19.) The agreement also states: "[T]he Payment referenced in this Agreement is made by NJM solely for the purposes of avoiding the uncertainty, nuisance and expense of litigation, and [ ] no part of the Payment is for bad faith or extra-contractual liability." (*Id.* ¶ 5.)

NJM subsequently filed its malpractice suit on November 20, 2015. The Complaint alleges that Brady handled the Wells arbitration negligently, and committed legal malpractice by failing to present the arbitration panel with the UIM policy limits and failing to raise the issue of molding the award to the policy limits before the arbitration panel or any subsequent court. NJM seeks damages totaling the difference between its policy limits ($2 million) and the Wells arbitration award ($5,921,117). Defendants filed their Answer on February 1, 2016, in which they raised multiple affirmative defenses, including:

> NJM acted in Bad Faith in violation of 42 Pa.C.S. section 8371 and knew that it had significant bad faith exposure for it's [sic] conduct, some of which is outlined in Lineman's [sic] 125 page draft Bad Faith Complaint submitted to NJM on October 26[th] through NJM's counsel before the mediation that settled the UIM and Bad Faith cases on or about October 30, 2014. As specifically outlined in the draft Bad Faith Complaint, NJM repeatedly ignored demands for the policy limits before Brady was retained, after Brady was retained (but prior to Arbitration) and after Arbitration in spite of

repeated demands that the policy limit and only the policy limit be paid.

(Answer ¶ 3; *see also id.* ¶ 1 ("The Plaintiff's claims are barred by NJM's fault or their contributory negligence....").) NJM argues that a "bad faith contributory negligence defense" should be stricken because NJM's alleged bad faith "bears no causal nexus to the claims and damages asserted by NJM against Brady...." (*See* Pl.'s Br. in Supp. 7, Doc. 20.) A hearing was held on December 22, 2016, and the motions are now ripe for disposition.

## II. Legal Standards

### A. Motion for Partial Summary Judgment on an Affirmative Defense

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As such, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

*4 When there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 247-48. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving

party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Courts differ as to whether a motion for summary judgment under Rule 56 or a motion to strike under Rule 12(f) "is the appropriate procedure by which to challenge an affirmative defense." *Prof'l Buyer's Guild, LLC v. Ace Fire Underwriter Ins. Co.*, No. 06-2127 (GEB), 2007 WL 3227183, at *1 n.1 (D.N.J. Oct. 30, 2007). Here, because both parties refer to matters outside of the pleadings, it is appropriate for the Court to treat NJM's Motion as one for partial summary judgment rather than a motion to strike. *See United States v. Manzo*, 182 F. Supp. 2d 385, 395 n.6 (D.N.J. 2000). "The effect of a grant of partial summary judgment in this situation is that the affirmative defense[ ] [is] stricken." *Kantner v. Sears & Roebuck, Inc.*, 5:15-CV-01039, 2016 WL 739187, at *2 (E.D. Pa. Feb. 25, 2016) (citation omitted).

**B. Legal Malpractice Claim**

"A legal malpractice lawsuit arising out of the conduct of underlying litigation involves a 'case within a case.' " *Scaramuzza v. Sciolla*, No. Civ.A.04-1270, 2006 WL 557716, at *7 (E.D. Pa. Mar. 3, 2006). Under Pennsylvania law,[3] "an allegedly aggrieved client must establish three elements in order to recover for legal malpractice": (1) the employment of the attorney or other basis for duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (3) the attorney's negligence was the proximate cause of damage to the plaintiff. *Rizzo v. Haines*, 555 A.2d 58, 65 (Pa. 1989). This requires "proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or the threat of future harm." *Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998). Stated differently, a plaintiff may recover as damages only the actual losses he suffered as a result of the attorney's misconduct. *Duke & Co. v. Anderson*, 418 A.2d 613, 617 (Pa. Super. Ct. 1980); *see Ammon v. McCloskey*, 655 A.2d 549, 552 (Pa. Super. Ct. 1995) ("Hence, until the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice.") (citation omitted). "Damages are speculative only if the uncertainty concerns the *fact* of damages rather than the amount." *Liberty Bank v. Ruder*, 587 A.2d 761, 765 (Pa. Super. Ct. 1991) (citation omitted) (emphasis in original); *see Ammon*, 655 A.2d at 553 (holding

that the entry of a negligently-obtained judgment constitutes an actual loss giving rise to a cognizable malpractice claim, even if execution of the judgment does not occur, so long as the aggrieved client is able to demonstrate it incurred other actual damages).

**\*5** In a legal malpractice case in which the underlying action involved litigation, actual losses are usually "measured by the judgment the plaintiff lost in the underlying action[,] and the attorney who negligently handled the underlying action is the party held responsible for the lost judgment." *Kituskie*, 714 A.2d at 1030. However, it is inequitable for an aggrieved client to obtain a judgment against his attorney for an amount that is greater than what the client could have obtained from the third party in the underlying action. *Id.* Such a scenario would allow the client to "receiv[e] a windfall at the attorney's expense." *Id.* (citation omitted).

The plaintiff bears the burden of proving damages and establishing that it would have succeeded on its defense in the underlying action but for its attorney's negligence. *Duke*, 418 A.2d at 618.

**C. Contributory Negligence in Legal Malpractice Cases**

"[T]he negligence of a client may be raised as an affirmative defense by an attorney in a legal malpractice action that is based on a theory of negligence." *Gorski v. Smith*, 812 A.2d 683, 700 (Pa. Super. Ct. 2002). Because legal malpractice actions "do not involve bodily injury or damage to property," they fall outside the scope of Pennsylvania's Comparative Negligence Act, and the doctrine of contributory negligence therefore applies. *Id.* at 702. "Contributory negligence is conduct on the part of a plaintiff which falls below the standard [of care] to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm." *Id.* at 703 (citation omitted). Under the doctrine of contributory negligence, "[i]t does not matter how slight the evidence of plaintiffs' contributory negligence is.... Any contributory negligence by the plaintiffs would be a complete bar to recovery." *Rizzo v. Michener*, 584 A.2d 973, 978 (Pa. Super. Ct. 1990). However, a plaintiff "may not be found contributorily negligent unless it appears that he engaged in conduct that was both negligent and a legal cause of his injury." *Fahringer v. Rinehimer*, 423 A.2d 731, 733 (Pa. Super. Ct. 1980); *see Angelo v. Diamontoni*, 871 A.2d 1276, 1280 (Pa. Super. Ct. 2005) ("[T]he burden to establish the plaintiff's conduct as a contributing factor in his injury rests with the defendant, who must show both the negligence of the

Case 1:20-cv-00292-JPW    Document 61-1    Filed 08/14/20    Page 35 of 44
**New Jersey Manufacturers Insurance Company v. Brady, Not Reported in Fed. Supp....**
2017 WL 264457

conduct alleged and the causal relationship of that conduct to the injuries for which damages are sought.").

### III. Discussion

**A. NJM's Motion for Partial Summary Judgment**

NJM's Motion for Partial Summary Judgment is premised on the notion that there is no causal relationship between NJM's purported contributorily negligent conduct—NJM's bad faith handling of the Wells claim—and the damages that NJM seeks from the Defendants—the delta between the arbitration award and the policy limits. (*See* Pl.'s Br. in Supp. 9-10, Doc. 20.) The reasoning underlying NJM's position proceeds as follows: First, NJM correctly argues that the arbitration award issued in favor of Wells was for compensatory damages only and in no way predicated on NJM's bad faith conduct. As such, NJM's bad faith conduct was not factored into the amount of the arbitration award. Second, NJM correctly advances that the arbitration award exceeded the $2 million limit in Wells's UIM policy by approximately $3.9 million. Third, NJM argues that, at the time Lenahan filed the Petition to Confirm the arbitration award in the court of common pleas, NJM had no legal recourse to avoid paying the arbitration award in full. Thus, the entire arbitration award was going to be confirmed by the court and on appeal as a matter of law. NJM therefore elected to settle with Wells instead of engaging in a futile legal challenge. Furthermore, NJM specifically enumerates a clause in the settlement agreement that states "no part of the Payment is for bad faith or extra-contractual liability" as evidence that the settlement payment was contemplated to extinguish NJM's liability with respect to Wells's UIM claim only. (*See* Pl.'s Br. in Supp. 10-11, Doc. 20.) Fourth, NJM contends that it now simply seeks liquidated damages—the difference between the arbitration award that it was bound to pay in full and the policy limits. Based on this foundation, NJM posits that the Court will ultimately have to decide whether NJM would have lost its challenge to the Petition to Confirm the arbitration award and on any subsequent appeal, and therefore have been bound to pay the full amount of the award as a matter of law due to Brady's negligence. (Pl.'s Reply Br. 3, Doc. 25.) Because NJM's bad faith handling of the Wells claim does not affect this inquiry, NJM argues that partial summary judgment on this affirmative defense is warranted.

**\*6** The Court concludes that NJM's exposure to bad faith liability is relevant to the issue of the damages it seeks in

this case. As such, for the reasons that follow, the Court will not preclude discovery on NJM's bad faith conduct. However, NJM's Motion for Partial Summary Judgment will be granted in part, and the Court will strike Defendants' bad faith contributory negligence defense only to the extent that this defense is based on NJM's conduct that is not causally related to the arbitration award.

#### 1. NJM's Exposure to Bad Faith Liability is Relevant to the Issue of Damages

In reaching this conclusion, the Court notes first and most significantly that NJM never paid the Wells arbitration award. Instead, NJM elected to satisfy its obligation on the Wells UIM claim by settling with its insured. Stated differently, even if Brady is found to have been negligent, and even if that negligence would have caused NJM to be bound to pay the entire arbitration award after review in court, NJM never in fact paid this award. Accordingly, NJM cannot directly claim that its damages are the difference between the arbitration award and its policy limits because NJM never suffered an actual loss as a result of paying that award. *See Duke & Co. v. Anderson*, 418 A.2d 613, 617 (Pa. Super. Ct. 1980) (holding that proof of actual loss is necessary in a legal malpractice cause of action); *see also Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998) (noting that a speculative harm does not constitute cognizable damages in a malpractice action). NJM can, however, attempt to prove that the settlement payment, or some portion of it, was made in lieu of direct satisfaction of the arbitration award, assuming NJM first demonstrates that the award would have been confirmed in court.

Second, when read in a light most favorable to Defendants, the record suggests that the settlement payment was made in part to extinguish NJM's exposure to bad faith liability.[4] At the hearing on December 22, 2016, counsel for NJM acknowledged that NJM was motivated by the desire to shield itself from bad faith liability when it entered into the settlement agreement with Wells. The record also demonstrates this fact independently of counsel's statement to the Court. An email sent from Bonnie Stein of Curtin & Heefner to NJM's in-house counsel on October 26, 2014 evidences that Stein had recently received the bad faith complaint from Wells's attorney, who stated that he planned to file that complaint "before the end of business tomorrow [October 24, 2014]." (Exs. 3, 13, Doc. 23.) The email indicates that Stein believed the development involving the bad faith complaint needed to be addressed "very quickly," as

there was only a "limited window of opportunity to go to [the October 30, 2014] mediation." (Ex. 3, Doc. 23.) A subsequent email sent on October 27, 2014 by Nathan Buurma, in-house counsel for NJM, demonstrates that NJM's legal team was strategizing over its exposure to bad faith liability right before the parties began the October 30, 2014 mediation that culminated in the agreement to settle with Wells. (Ex. 4, Doc. 23.) Furthermore, both parties' mediation memoranda dealt extensively with the issue of NJM's bad faith liability right before the parties settled. (Exs. 6-7, Doc. 23.) And it is undisputed that Wells released all claims against NJM under the settlement agreement, including claims sounding in bad faith. (*See* Ex. P, Doc. 19.) Although NJM attempts to elevate language in the agreement stating that "no part of the payment is for bad faith or extra-contractual liability," Defendants were not a party to that agreement and are not bound by those terms.[5] In sum, the record indicates that NJM settled with Wells in order to both satisfy the Wells arbitration award and settle the looming bad faith lawsuit.

*7 Third, because there is evidence that NJM settled with Wells in order to satisfy the arbitration award and settle the looming bad faith claim, it logically follows that some portion of the settlement payment compensated Wells for the release of his bad faith claim. In order to ascertain damages properly, Defendants must be allowed to present evidence on the extent of NJM's bad faith liability as bearing on how much of the settlement payment, if any, went to extinguish that distinct liability. *See Fiorentino v. Rapoport*, 693 A.2d 208, 218 (Pa. Super. Ct. 1997) (noting that the amount of damages to be awarded in a legal malpractice action is a question for the jury).

Fourth, NJM could be unjustly enriched if it were allowed to settle two sources of liability and then turn around and have Defendants pay the costs of extinguishing one of those sources that is unrelated to Defendants' representation of NJM. *See Kituskie*, 714 A.2d at 1030 (noting that it would be inequitable to allow a client to obtain a windfall at his attorney's expense in a legal malpractice action). The record suggests that NJM settled both the UIM claim and the looming bad faith lawsuit with Wells for approximately $5.9 million. It now seeks $3.9 million from Brady for mishandling the UIM claim. If successful, NJM would have effectively paid only the policy limits on the UIM claim ($2 million) in satisfaction of potentially both the Wells arbitration award and a bad faith claim. NJM could receive a windfall at Defendants' expense if it were permitted to settle two claims for the price of one.[6]

Thus, the Court finds the fact and extent of NJM's bad faith handling of the Wells claim and concomitant exposure to bad faith liability are directly relevant to the question of the amount of damages it sustained due to Brady's conduct. If NJM is successful on its malpractice claim, it will have to prove actual losses that it suffered as a result of Defendants' negligence. Because NJM did not pay the arbitration award directly, it cannot claim that the excess award is the damages it now seeks. However, if NJM attempts to prove that the settlement payment constitutes actual losses proximately caused by Defendants' negligence, it must also prove with reasonable certainty what portion of the settlement payment in excess of its policy limits was paid to satisfy the arbitration award. Discovery on NJM's exposure to bad faith liability is therefore relevant to the scope of damages NJM alleges to have sustained. And because NJM's bad faith conduct affects the amount of damages sought, the Court will not preclude Defendants from pursuing discovery on NJM's bad faith.

**2. NJM's Motion Will Be Granted in Part**
Although evidence relating to NJM's alleged bad faith handling of the Wells claim is relevant to the question of damages, the Court concludes that Defendants' affirmative defense of contributory negligence based on NJM's alleged bad faith conduct that is not causally related to the arbitration award fails as a matter of law. Under Pennsylvania law, in order to make out an affirmative defense of contributory negligence, the defendant must show that the plaintiff acted negligently, and that this negligence was "a legally contributing cause" in brining about the plaintiff's complained-of injury. *Gorski v. Smith*, 812 A.2d 683, 703 (Pa. Super. Ct. 2002). In this case, the Court finds the mere fact that NJM allegedly handled the Wells claim in bad faith cannot constitute contributory negligence as a matter of law unless this conduct was a legally contributing cause of the arbitration award. NJM is permitted to claim that the arbitration award entered in Wells's favor is a cognizable injury for the purposes of the instant malpractice action. *See Ammon v. McCloskey*, 655 A.2d 549, 553 (Pa. Super. Ct. 1995) (holding that entry of a negligently-obtained judgment, standing alone, establishes a cognizable injury in a malpractice action). However, as explained above, NJM elected to satisfy this award via a settlement payment that arguably encompassed two separate sources of liability. Discovery on NJM's alleged bad faith conduct therefore is permitted to establish which portion of the settlement payment in excess of the policy limits went to extinguish each respective source of liability, as NJM can recover only "actual losses" in a malpractice action.

Case 1:20-cv-00292-JPW    Document 61-1    Filed 08/14/20    Page 37 of 44

New Jersey Manufacturers Insurance Company v. Brady, Not Reported in Fed. Supp....

2017 WL 264457

*Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998). Accordingly, NJM's relevant injury is the arbitration award, and a cognizable theory of damages is the portion of the settlement payment in excess of the policy limits that went to satisfy this outstanding arbitration award. Any contributory negligence defense therefore must be related to the *injury* for which NJM complains. *See Angelo v. Diamontoni*, 871 A.2d 1276, 1280 (Pa. Super. Ct. 2005) (noting the burden is on defendant to show plaintiff's conduct bears "a causal relationship ... to the *injuries* for which damages are sought") (emphasis added); *Fahringer v. Rinehimer*, 423 A.2d 731, 733 (Pa. Super. Ct. 1980).

**\*8** Thus, the Court will grant NJM's Motion for Partial Summary Judgment and strike Defendants' bad faith contributory negligence defense only to the extent that NJM's bad faith conduct is not causally related to the pertinent injury—the arbitration award. Defendants may still pursue theories of contributory negligence, including theories based on NJM's conduct that could also be characterized as acting in bad faith, so long as that conduct bears a causal relationship to the arbitration award. [7]

### B. Defendants' Motion to Compel

Defendants seek to compel NJM to produce documents that it claims are subject to the attorney-client privilege and/or work-product protection. (Doc. 31.) The withheld documents, as identified in the privilege log (Doc. 31-4), fall into two broad categories: NJM documents (NJM 3876–NJM 4097) and documents in the Curtin & Heefner file (CH00001–CH16270). At the December 22, 2016 hearing, the parties agreed to the Court conducting an *in camera* review of the NJM documents to assess whether they are in fact privileged.

The parties continue to dispute whether the privilege log entries for the Curtin & Heefner file are sufficiently detailed and whether communications that relate to the resolution of the Wells claim have been waived. After conducting an *in camera* review of the NJM file, the Court concludes that documents NJM 4005-4006, 4013-4022, 4048-4050, 4051-4052, and 4060 are discoverable, as they either do not qualify for the protection claimed or the privilege has been waived. The rest of the documents in the NJM file are privileged from disclosure and not subject to a waiver. With respect to the documents in the Curtin & Heefner file, the Court concludes that the privilege log entries are insufficiently detailed because the Attorney Client Communication entries do not contain specific sender and recipient information, and the Attorney Work Product entries do not state the specific party who created the work product. Additionally, the descriptions are too vague to permit the Court to find that each element of the privilege claimed is satisfied. NJM therefore must supplement its privilege log with this information in order for the Court to determine whether the documents are in fact privileged.

### 1. The Attorney-Client Privilege and Work-Product Doctrine

The attorney-client privilege and work-product doctrine are "exception[s] to the general rule that relevant evidence is admissible." *Rhone–Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3rd Cir. 1994). The attorney-client privilege is established if the following elements are satisfied: (1) a communication (2) is made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007). [8] " 'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *Id.* The attorney-client privilege "operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Gillard v. AIG Ins. Co.*, 15 A.3d 44, 59 (Pa. 2011). The party claiming privilege bears the burden of proving that the privilege applies. *EMC Ins. Co. v. Zicolello*, No. 4:13-cv-00825, 2014 WL 123687, at \*2 (M.D. Pa. Jan. 14, 2014). However, once the party claiming privilege meets its burden, the party challenging the privilege bears the burden of demonstrating that a waiver of the attorney-client privilege has occurred. *Id.*

**\*9** Separately, the work-product doctrine generally precludes a party from discovering "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). Materials prepared in the ordinary course of business are not immune from discovery. *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000). Unlike the attorney-client privilege, a valid assertion of work-product protection can be overcome by the party seeking discovery if it can show (1) a substantial need for the materials in order to prepare its case, and (2) it is unable to obtain the substantial equivalent without undue hardship. *Id.* However, work product that contains the

"mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation" is considered to be "core" work product and is "afforded near absolute protection from discovery." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003) (citation omitted). "[T]he doctrine requires only that the material be prepared in anticipation of *some* litigation, not necessarily in anticipation of the particular litigation in which it is being sought." *Cottillion v. United Refining Co.*, 279 F.R.D. 290, 302 (W.D. Pa. 2011) (emphasis in original). The party claiming work product protection has the burden of establishing the elements of the doctrine. *See Berry v. Ohio Cas. Ins. Co.*, No. 3:14-1262, 2015 WL 4066683, at *4 (M.D. Pa. July 2, 2015).

### 2. The NJM Documents

#### a. Claim Notes

NJM claims the redacted portions of its claim notes are privileged under both the work-product doctrine and attorney-client privilege. After conducting an *in camera* review, the Court concludes that NJM has properly identified portions of the Wells claim file subject to the work-product protection and properly withheld them from discovery.

The redacted portions of the claim notes contain the mental impressions and strategies of NJM's attorneys and representatives, and were authored by an NJM attorney or claim handler. *See In re Cendant Corp. Sec. Litig.*, 343 F.3d at 663. Additionally, the claim notes were made in anticipation of litigation. *See Garvey v. Nat'l Grange Mut. Ins. Co.*, 167 F.R.D. 391, 393 (E.D. Pa. 1996) ("The general rule for determining whether a document was prepared in anticipation of litigation is whether the document can fairly be said to have been prepared or obtained because of the prospect of litigation."). The parties' state of mind evidences a subjective anticipation of litigation, and this anticipation was "objectively reasonable." *Berry*, 2015 WL 4066683, at *5. The Court thus concludes that these documents are protected under the work-product doctrine.

Because the Claim Notes in the NJM file are protected under the work-product doctrine, Defendants may obtain discovery of these materials only if they demonstrate (1) substantial need for the materials in order to prepare for their case, and (2) they are unable to obtain the substantial equivalent by other means without suffering undue hardship. *Holmes*,

213 F.3d at 138; *see* Fed. R. Civ. P. 26(b)(3). However, Defendants have not specifically articulated either substantial need or undue hardship, instead focusing their briefs on the relevancy of the information sought and theories of waiver.[9] Moreover, much of the redacted content concerns opinions and impressions, which are subject to even greater work-product protection. Furthermore, Defendants have obtained deposition testimony on the subject at issue from NJM representatives, which indicates they have the ability to obtain the substantial equivalent of the work product they seek. *See Garvey*, 167 F.R.D. at 394. Therefore, Defendants are not entitled to discovery of the privileged Claim Notes (NJM 3876-3893).

#### b. Brady's Correspondence to NJM

Documents NJM 4048-4050 and NJM 4051-4052 are letters written by Brady to John Basgil, an NJM representative, concerning post-arbitration strategy while Brady was still representing NJM. NJM has waived its attorney-client privilege with respect to confidential communications its representatives made to Brady by filing the instant malpractice suit. *See EMC Ins. Co.*, 2014 WL 123687, at *2 (citing *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 862). Additionally, because the documents at issue are the work-product of Brady, NJM cannot claim privilege on this ground. *See Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 866 ("[T]he work product doctrine belongs to the professional, rather than the client."). No interest that the work-product doctrine is designed to protect would be furthered by keeping an attorney's own work product privileged from his request for production. *See Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991) (explaining that the underlying rationale for the work-product doctrine is to promote the adversary system by allowing attorneys to prepare their cases without fear that their own work product will be used against them by their adversaries). For this reason, courts generally do not allow an attorney to withhold work product from her own client. *See, e.g., Gottlieb v. Wiles*, 143 F.R.D. 241, 247 (D. Colo. 1992). Thus, to the extent that a client can claim to be an independent holder of the work-product protection, such a claim is waived when the client files a malpractice suit against the attorney that created the work product, and the work product relates to the subject of the malpractice suit. Accordingly, these documents must be disclosed.

2017 WL 264457

*10 Additionally, NJM 4060 is an email correspondence between Brady and NJM representatives regarding a petition drafted by Brady. As noted above, NJM waived its attorney-client privilege by filing this suit against Brady. Therefore, this email communication must be disclosed.

### c. Brady's Draft Complaint

NJM 4013-4022 is a draft petition requesting the arbitration award be vacated and/or modified. Brady's law firm seal is affixed in the top left corner, along with Brady's attorney I.D. number. Additionally, Brady's signature block is listed at the end of the petition. Although there is some suggestion that Brady was not the author of this draft, NJM has not met its burden of proving this document was created by someone representing NJM other than Brady. As explained above, NJM cannot withhold Brady's own work product from discovery by raising the work-product protection. NJM 4013-4022 therefore must be disclosed.

### d. NJM 4005-4006

NJM 4005-4006 is a two-page document that was emailed by Buurma to Jeffrey Bartolino, Mitch Livingston, and Daniel Toadvine, apparent members of NJM's in-house legal and executive team. The purpose of the correspondence was to provide self-described "background research," and to prepare the parties for an upcoming meeting. The Court concludes that this document is protected by both the attorney-client privilege and the work-product doctrine. However, NJM apparently disclosed this document to Defendants during discovery. (*See* Def.'s Mot. to Compel Ex. D, at P3496-P3497, Doc. 31.) NJM does not claim that this document was inadvertently disclosed, and the Court therefore concludes that it was a voluntary disclosure constituting an express waiver. *See Greater N.Y. Mut. Ins. Co. v. Phila. Indem. Ins. Co.*, No. 1:11-CV-00451, 2014 WL 939454, at *5 (M.D. Pa. Mar. 11, 2014) (citing *Westinghouse Elec. Corp.*, 951 F.2d at 1424). This document is therefore discoverable. But, for the reasons detailed *infra* Part III.B.2.e, this express waiver does not constitute a complete subject matter waiver, and the waiver will be limited to this document only.

In sum, after performing an *in camera* review of the entire NJM file, the Court finds that only documents NJM 4005-4006, 4013-4022, 4048-4050, 4051-4052, and 4060 are discoverable. These documents must be produced.

### e. The Attorney-Client Privilege Has Not Been Waived with Respect to the Remaining Documents in the NJM File

Defendants argue that NJM waived its attorney-client privilege with respect to all communications that pertain to the resolution of the Wells UIM claim because it voluntarily disclosed an attorney-client communication during the depositions of two of NJM's in-house attorneys. (Defs.' Reply Br. 5, Doc. 40.) Additionally, Defendants contend that communications pertaining to the resolution of the Wells claim have been waived because NJM asserted the advice of counsel (Curtin & Heefner) as the justification for why it decided to settle with Wells, thereby placing its outside counsel's advice at issue in the instant litigation. (Defs.' Br. in Supp. 5-7, Doc. 32.) NJM argues that it has not waived the attorney-client privilege because it is the Defendants who seek to base their affirmative defenses on NJM's privileged communications. (Pl.'s Br. in Opp'n 5-8, Doc. 36.) The Court concludes that NJM has not waived its attorney-client privilege with respect to the remaining documents in the NJM file.

*11 The first theory of waiver advanced by Defendants is direct or express waiver. Defendants contend that the deposition testimony of Buurma and Bartolino, both in-house attorneys for NJM, concerning a document that predominantly contains legal research waived the privilege with respect to "all of the opinions and all documentation concerning the opinions on this issue." (Defs.' Reply Br. 5.) In its privilege log, NJM claimed that this document was protected under both the attorney-client privilege and the work-product doctrine (*see* Doc. 31-4, at NJM 4005-4006), and does not offer an explanation for why this document was disclosed to Defendants.

The relevant deposition testimony of Bartolino states:

> Reliance on this document [NJM 4005-4006] and the discussions we had with counsel, as painful as it was, we came to the conclusion that th[e] arbitration award was going to be binding.... we were not going to make frivolous arguments despite the amount of money that was involved

2017 WL 264457

here. There was no doubt in our minds that this award was etched in stone.

(Defs.' Mot. to Compel Ex. D, 117:8-19, Doc. 31.) Additionally, when asked why NJM believed the $5.9 million arbitration award was binding as a matter of law, Bartolino stated, "A detailed analysis from our counsel, Curtin & Heefner, of the case law that applied to that issue...." (*Id.* 109:9-11.)

The relevant deposition testimony of Buurma states:

We relied upon the advice of Bonnie Stein [in deciding to withdraw the pending motions challenging the arbitration award]. We ... reached a consensus as to what the probable outcome was—the likely outcome was of the pending pleadings and the mediator[']s analysis was also figured into it.

(Defs.' Mot. to Compel Ex. C, 146:3-8, Doc. 31.)

The document referred to in Bartolino's testimony (NJM 4005-4006) contains NJM's counsel's research on molding arbitration awards and bad faith liability under Pennsylvania law. The document consists of brief descriptions of relevant case law, the holdings of those cases, and relevant statutory language. Furthermore, the document contains at least one clear instance of an attorney's opinion, which states: "Thus, in my opinion, if the arb. Award is molded to $2 million, then we could still argue that Plaintiff [Wells] would not be entitled to the remaining $4 million as compensatory damages for breach of contract." It is unclear from the document whose opinion this is, but all three authors are attorneys who were representing NJM.

As explained by the Third Circuit in *Westinghouse Electric Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1424 (3d Cir. 1991), "once a client has revealed privileged information to a third party, the basic justification for the privilege no longer applies." Thus, under certain circumstances, courts have found that the "voluntary disclosure of a communication protected by the attorney-client privilege may result in waiver of the privilege for *all* communications pertaining to the same

subject matter." *Greater N.Y. Mut. Ins. Co.*, 2014 WL 939454, at *5 (emphasis in original); *see Murray v. Gemplus Int'l, S.A.*, 217 F.R.D. 362, 366 (E.D. Pa. 2003). However, "the disclosure of confidential attorney-client communications does not constitute a waiver of any other confidential communications between a client and counsel where there is no apparent prejudice to the party seeking further disclosure." *Murray*, 217 F.R.D. at 366 (citation omitted). "Where one party attempts to utilize the privilege as an offensive weapon, selectively disclosing communications in order to help its case, that party should be deemed to have waived the protection otherwise afforded it by the privilege it misused." *Id.* at 367. In deciding whether the waiver of a voluntarily disclosed communication also extends that waiver to any related but undisclosed communications, the "touchstone is fairness." *In re Teleglobe Commn'cs Corp.*, 493 F.3d 345, 361 (3d Cir. 2007). Therefore, "when the disclosure does not create an unfair advantage, courts typically limit the waiver to the communications actually disclosed." *Id.*

**\*12** With respect to the deposition testimony raised by Defendants as evidence of an express waiver, nothing stated by either Bartolino or Buurma equates to the divulgence of the content of confidential communications. *See Greater N.Y. Mut. Ins. Co.*, 2014 WL 939454, at *5 (finding deponent did not divulge confidential information by testifying that she discussed the company's insurance policy limits with counsel); *see also Astrazeneca LP v. Breath Ltd.*, No. 08-1512 (RBK/AMD), 2010 WL 11428457, at *6 (D.N.J. Aug. 26, 2010) (finding party's testimony that she consulted with her attorney did not waive attorney-client privilege). Accordingly, the Court finds no express waiver based on the content of the deposition testimony itself. However, the disclosed document at issue appears to constitute both an attorney-client communication and attorney work-product. NJM has admitted as much by designating it on its privilege log under both forms of privilege. (Doc. 34-1, at NJM 4005-4006.) Because it has been voluntarily disclosed to Defendants, any such privilege has been waived. *See In re Teleglobe Commn'cs Corp.*, 493 F.3d at 361; *Maldonado v. N.J. ex rel. Admin. Office of Courts-Prob. Div.*, 225 F.R.D. 120, 131-32 (D.N.J. 2004) (citations omitted) (noting that a voluntary disclosure to any third party generally waives attorney-client privilege, and disclosure of work-product to an adversary can waive the work-product protection). But although NJM waived its privilege with respect to this document, there is no suggestion that NJM's disclosure gives it an unfair advantage or is prejudicial to Defendants. *See Dalmatia Import Grp., Inc. v. FoodMatch, Inc.*, No. 16-2767,

2016 WL 5930900, at *4 (E.D. Pa. Oct. 12, 2016) (rejecting request for a complete subject matter waiver when moving party failed to specify how the partial waiver had created an unfairness in the particular circumstances of the lawsuit). In fact, NJM's disclosure of this document may benefit Defendants' case, to the extent that it sheds any light on NJM's exposure to bad faith liability. Accordingly, the Court does not find that the disclosure of this document warrants extending the waiver to any related yet undisclosed communications because no unfair advantage has been created by virtue of the disclosure.

The second theory of waiver advanced by Defendants is an implied waiver due to NJM placing its counsel's advice at issue in the instant litigation. Defendants claim that Bartolino and Buurma asserted the advice of counsel as a defense in their respective deposition testimony, specifically, that NJM decided to withdraw its pending motions and settle the case with Wells based on the advice of their attorneys at Curtin & Heefner. (Defs.' Br. in Supp. 6, Doc. 32; Defs.' Reply Br. 5, Doc. 40.) In addition to the testimony quoted above, Defendants also cite to a portion of the Bartolino deposition in which he states that a decision was made to withdraw the petitions challenging the arbitration award after a:

> [F]airly lengthy meeting with Ms. Stein and Mr. Guarrieri [of Curtin & Heefner], and the decision we came to and it didn't involve a lot of struggling, not based on case law that was cited to us and discussed in detail, was that the entirety of that award was going to be binding on NJM and our petition would be—was—was unavailing.

(Defs.' Mot. to Compel Ex. D, at 111:16-22, Doc. 31.) Citing this testimony, Defendants contend that a party testifying that a decision was made based on an attorney-client communication effectively discloses that communication. (Defs.' Br. in Supp. 7, Doc. 32.)

Under the "at issue" waiver doctrine, "a party can waive the attorney-client privilege by asserting claims or defenses that put his or her attorney's advice in issue in the litigation." *Greater N.Y. Mut. Ins. Co.*, 2014 WL 939454, at *7 (citing *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863). However, an attorney's "[a]dvice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner." *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863. Rather, "[t]he advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Id.*; *see Piazza v. Cty. of Luzerne*, No. 3:13-CV-1755, 2015 WL 6690090, at *3 ("*Rhone–Poulenc* identifies a two-step inquiry into whether the privilege has been waived due to advice of counsel: '(1) the assertion of a claim or defense, and (2) an attempt to prove that claim or defense by disclosing or describing an attorney client communication' " (quoting *Nesselrotte v. Allegheny Energy, Inc.*, No. 06-01390, 2008 WL 2858401, at *6 (W.D. Pa. July 22, 2008))); *see also Astrazeneca LP*, 2010 WL 11428457, at *6 (quoting *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863) (declining to find an implied waiver when a party has not asserted as an "essential element" of its defense that it relied upon the advice of counsel). Thus, even if the client's state of mind is in issue in the litigation, and even if the communications sought are "vital, highly probative, directly relevant or even go to the heart of the issue," they cannot be disclosed if they are protected by the attorney-client privilege unless the client takes an "affirmative step" that waives the privilege. *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863, 864.

*13 The Court concludes that NJM has not waived its privilege with respect to the confidential communications in the NJM file by affirmatively placing its attorneys' advice at issue. First, NJM is not attempting to prove a claim or defense by disclosing or describing an attorney-client communication. Rather, it is the Defendants who seek confidential communications between NJM and Curtin & Heefner to ultimately support their own defenses that (1) NJM would have successfully molded the arbitration award to the policy limits had it not elected to settle, and (2) NJM was motivated to settle because of its exposure to bad faith liability. *See EMC Ins. Co. v. Zicolello*, No. 4:13-cv-00825, 2014 WL 123687, at *5 (M.D. Pa. Jan. 14, 2014) ("Here, Defendants seek [plaintiffs' attorney's] confidential advice to his clients regarding their chances of success, in order to prove that the lost appeal was futile. In other words, it is Defendants, not Plaintiffs, who are attempting to prove a defense by virtue of the confidential communication between Plaintiffs and [their attorney]. This does not comport with the definition of 'in issue' provided by the Third Circuit for purposes of waiving the privilege for advice from an attorney."); *see also Cottillion v. United Refining Co.*, 279 F.R.D. 290, 302 (W.D. Pa. 2011) (finding no waiver when defendant

Case 1:20-cv-00292-JPW    Document 61-1    Filed 08/14/20    Page 42 of 44
New Jersey Manufacturers Insurance Company v. Brady, Not Reported in Fed. Supp....
2017 WL 264457

asserted reliance on the advice of counsel as the reason for attempting to alter the benefits paid to plaintiffs because defendant was not attempting to prove a defense based upon any communication it had with counsel); *cf. Piazza*, 2015 WL 6690090, at *3 (finding a waiver when defendant asserted he fired the plaintiff based on the advice of counsel because the propriety of the termination was a defense to the plaintiff's unlawful termination claims). Because NJM has not taken an affirmative step to place the advice of counsel in issue in order to prove an essential element of its malpractice claim or any defense, the Court concludes it has not implicitly waived the attorney-client privilege with respect to the confidential communications in the NJM file. *See Robertson v. Allstate Ins. Co.*, No. A. 98-4909, 1999 WL 179754, at *5 (E.D. Pa. Mar. 10, 1999) (finding no waiver when client did not take an "affirmative step" to place the advice of in-house counsel at issue); *see also Fid. & Deposit Co. of Md. v. McCulloch*, 168 F.R.D. 516, 520 (E.D. Pa. 1996) ("[Plaintiff] asserts no claim or defense in its Complaint or in any of its Responses to Defendants' Counterclaims that rests on the advice of counsel, nor does it attempt to prove any claim or defense by disclosing such advice.").

Second, just as the content of the deposition testimony of Bartolino and Buurma does not constitute an express waiver, it also does not place the confidential communications sought "at issue" in the litigation. No testimony cited by Defendants disclosed or described the details of any confidential communication made between NJM and Curtin & Heefner. *See EMC Ins. Co.*, 2014 WL 123687, at *5. The mere fact that a party states that it relied on the advice of counsel in making a decision, standing alone, does not show that the party took an "affirmative step" to place that advice in issue. *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863; *see Astrazeneca LP*, 2010 WL 11428457, at *6 (concluding that a party stating in her testimony that she had consulted with attorneys does not equate to placing the advice of counsel in issue); *Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 630 (D. Colo. 1998) (finding defendant's deposition testimony that she relied on advice of counsel in denying plaintiff's claim did not establish a waiver because that statement did not indicate that the defendants took affirmative action to place the advice of counsel at issue). This is especially true when the deposition testimony on which an alleged waiver is based was elicited in response to questions posed by defense counsel. *See Robertson*, 1999 WL 179754, at *5 (noting it would defeat the purpose of the "at issue" exception if opposing counsel were permitted to lure deponents into placing the advice of counsel at issue). Accordingly, Defendants are

not entitled to discovery of the documents in the NJM file designated as "Attorney Client Communication" on the basis of waiver.

### f. The Work Product Protection Has Not Been Waived with Respect to the Remaining Documents in the NJM File

Whether a client has or has not waived the attorney-client privilege does not determine whether he also waived the protection of the work-product doctrine. *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 866. Defendants can overcome an assertion of work-product protection only if they show substantial need and undue hardship in obtaining the substantial equivalent. *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000); *see* Fed. R. Civ. P. 26(b)(3). However, even if Defendants were able to show a substantial need, they do not advance a reason for why they are unable to obtain the substantial equivalent without suffering undue hardship. Defendants are able to engage in other forms of discovery related to NJM's decision to settle with Wells and NJM's bad faith handling of the Wells claim as it relates to the damages NJM presently seeks.

### 3. The Curtin & Heefner Documents
*14 The Court has not conducted an *in camera* review of the voluminous Curtin & Heefner file, and therefore must rely on NJM's privilege log in order to assess its claims of privilege. Defendants challenge the sufficiency of the privilege log and raise the same arguments for waiver as detailed above. Because the Court finds the privilege log insufficient with respect to the Curtin & Heefner documents, NJM will be ordered to supplement its log. Thereafter, the Court will provide Defendants another opportunity to raise a challenge to the sufficiency of the log, if they so choose.

### a. A More Detailed Privilege Log Is Required

Under Federal Rule of Civil Procedure 26(b)(5), a party withholding information on the ground that it is privileged must claim the privilege expressly and "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Specific to a claim of attorney-client privilege, "the description of each document

Case 1:20-cv-00292-JPW    Document 61-1    Filed 08/14/20    Page 43 of 44
New Jersey Manufacturers Insurance Company v. Brady, Not Reported in Fed. Supp....
2017 WL 264457

and its contents must be sufficiently detailed to allow the court to determine whether the elements of attorney-client privilege have been established." *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 475 (E.D. Pa. 2005) (citation omitted). In general, a privilege log typically must "identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure." *Id.* at 482 (citation omitted). The party asserting the privilege has the burden of showing that the elements of the privilege are met. *Teltron, Inc. v. Alexander*, 132 F.R.D. 394, 395 (E.D. Pa. 1990).

NJM's privilege log contains the following details: the withheld document's identifying number; the relevant date for every Curtin & Heefner document; a brief description of the withheld document; and the privilege designation (either "Attorney Client Communication" and/or "Attorney Work Product"). (Doc. 31-4.) NJM supplemented its log with affidavits from Bonnie Stein, Nathan Buurma, and Jeffrey Bartolino. (*See* Pl.'s Br. in Opp'n Exs. A-C, Doc. 36.) Stein's Affidavit states that the Curtin & Heefner file contains numerous legal documents and internal communications, many of which had never been produced to NJM during Curtin & Heefner's involvement with the Wells claim and arbitration. The Buurma and Bartolino Affidavits both attest that their communications were made for the purpose of securing or providing legal advice and not made "in the presence of strangers."

The redacted emails in the NJM file were provided to Defendants and the Court. (*See* Defs.' Mot. to Compel Ex. B., Doc. 31.) These emails left the sender and recipient lines unredacted, allowing Defendants and the Court to view the specific parties to the communication. However, the Court has not been presented with any redacted emails in the Curtin & Heefner file which allow it to ascertain the specific sender and recipient. Instead, the privilege log uses the general term "in-house counsel" or "client" to describe which NJM representative(s) was a party to the email and does not state which member(s) of the Curtin & Heefner team was a party to the correspondence. It is unclear if NJM has provided Defendants with the specific sender and recipient information for the emails in the Curtin & Heefner file. Similarly, the documents withheld on the ground of Attorney Work Product do not specify the parties who created the work product being withheld.

*15 NJM must supplement its log to include the specific sender and recipient information for the emails listed in the Curtin & Heefner file, and the names and titles of the specific person(s) who prepared the work product being withheld. *See SmithKline Beecham Corp.*, 232 F.R.D. at 477-78 (finding privilege log entries insufficient because they did not identify a specific attorney with whom a confidential communication was made). Additionally, the descriptions are too vague for the Court to find that NJM has met its burden of proving that each element of the privilege is satisfied. NJM must provide more detailed descriptions explaining the contents of the documents withheld in the Curtin & Heefner file. *See Lady Liberty Transp. Co., Inc. v. Phila. Parking Auth.*, No. 05-1322, 2007 WL 707372, at *2 (E.D. Pa. Mar. 1, 2007). Only then will the Court be able to properly assess its claim of attorney-client privilege and/or work-product protection.

## IV. Conclusion

For the above stated reasons, NJM's Motion for Partial Summary Judgment will be GRANTED in part and DENIED in part. Defendants are not precluded from conducting further discovery related to NJM's bad faith handling of the Wells claim. However, any bad faith contributory negligence defense that is not causally related to the arbitration award fails as a matter of law. Defendants' Motion to Compel will be GRANTED in part and DENIED in part. NJM is hereby compelled to produce NJM documents 4005-4006, 4013-4022, 4048-4050, 4051-4052, and 4060. All other documents in the NJM file listed in the privilege log are privileged from discovery and not subject to waiver. Additionally, NJM is required to supplement its privilege log within fourteen (14) days with the specific sender and recipient information for all documents in the Curtin & Heefner file listed as an Attorney Client Communication. NJM must also specify which attorney(s) prepared the documents listed as Attorney Work Product in the privilege log. Additionally, NJM must provide more detailed descriptions explaining the contents of the documents withheld in the Curtin & Heefner file that allow the Court to determine whether each element of the privilege claimed is satisfied. After the privilege log has been supplemented, the Court will provide Defendants another opportunity to raise a challenge to the sufficiency of the log, if they so choose.

An appropriate order follows.

Case 1:20-cv-00292-JPW    Document 61-1    Filed 08/14/20    Page 44 of 44

New Jersey Manufacturers Insurance Company v. Brady, Not Reported in Fed. Supp....

2017 WL 264457

**All Citations**

Not Reported in Fed. Supp., 2017 WL 264457

**Footnotes**

1    Local Rule 56.1 requires the nonmoving party's statement of facts to respond to the numbered paragraphs set forth in the moving party's statement. L.R. 56.1. The responsive statement "shall include references to the parts of the record that support the statements." *Id.* Defendants' counterstatement of facts contains denials that are unsupported by adequate citations to the record. (*See* Doc. 24.) Therefore, the Court will adopt Plaintiff's statement of facts that are supported by sufficient citations to the record, except for those facts clearly disputed by Defendants with adequate record references. *See* L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."). *See generally United States ex rel. Paranich v. Sorgnard*, 286 F. Supp. 2d 445, 448 n.3 (M.D. Pa. 2003)

2    The arbitrators awarded Wells $ 2,646,117 in economic damages and $ 3,300,000 in noneconomic damages, including $300,000 for Mr. Wells's wife for loss of consortium. (Ex. J, Doc. 19.) The award was offset by $25,000 for a payment made by the tortfeasor. (*Id.*)

3    Pennsylvania substantive law applies to this diversity action. *See Nat'l Grange Mut. Ins. Co. v. Goldstein, Heslop, Steel, Clapper, Oswalt & Stoehr*, 142 Fed. Appx. 117, 120 (3d Cir. 2005).

4    The Court does not decide whether a portion of the settlement payment was in fact made to extinguish NJM's bad faith liability at this time.

5    Settlement agreements are governed by ordinary principles of contract law. *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 193 (3d Cir. 2000). "In general, only parties to a contract are bound by its terms." *Hornicek v. Cardworks Servicing, LLC*, No. 10-3641, 2011 WL 2623274, at *2 (E.D. Pa. June 29, 2011) (citing *AT&T Techs., Inc. v. Comm. Workers*, 475 U.S. 643, 648 (1986)). It thus follows that parties to a settlement agreement cannot impose the terms of the contract on one who is a stranger to the agreement. *FCM Grp., Inc. v. Miller*, 17 A.3d 40, 54 (Conn. 2011); *see Hartford Steam Boiler Inspection v. Int'l Glass Prods., LLC*, No. 2:08-cv-1564, 2016 WL 5468111, at *11 (W.D. Pa. Sept. 29, 2016) (noting strangers to a contract generally are not bound by its terms under Pennsylvania law); *Kerrigan v. Phila. Bd. of Elec.*, No. 07-687, 2008 WL 250522, at *9 (E.D. Pa. Jan. 29, 2008) (holding that nonparties to a settlement agreement were not bound by the terms). Moreover, the Third Circuit has made clear in the context of tax litigation that district courts can look behind the allocation of damages in a settlement agreement to ascertain the payor's true intent. *See Francisco v. United States*, 267 F.3d 303, 322 (3d Cir. 2001) ("It is thus well established that in cases in which the settlement agreement's allocation of damages does not reflect the true nature of the underlying award, the District Court has a duty to look behind the agreement of the parties to discern the true nature of the 'payor's intent' in settling claims."); *see also Peaco v. C.I.R.*, 48 Fed. Appx. 423, 425 (3d Cir. 2002) (noting that district courts should look behind the parties' allocation of damages in a settlement agreement if it appears the allocation is "driven by tax considerations and [does] not reflect the true value of settled claims" (quoting *Francisco*, 267 F.3d at 322)). Given the facts of this case, the Court concludes that it is appropriate to look beyond the language of the settlement agreement to assess NJM's intent.

6    Stated differently, $2 million of the $5.9 million settlement agreement represents the uncontested policy limits that NJM argues it would have paid Wells but for Brady's negligence. The question remains as to what portion of the remaining $3.9 million settled Wells's pending Petition to Confirm the arbitration award in full, and what portion settled the looming bad faith lawsuit.

7    For example, if NJM refused to follow Brady's instructions regarding how to handle the Wells arbitration, such a refusal might be considered "bad faith conduct," but it also might be a cognizable contributory negligence defense if such a refusal contributed to the arbitration award. *See Gorski v. Smith*, 812 A.2d 683, 703-04 (Pa. Super. Ct. 2002).

8    By Pennsylvania statute, "[i]n a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa. Cons. Stat. Ann. § 5928.

9    Defendants' Brief in Support of its Motion to Compel (Doc. 32) also focuses on Pennsylvania Rule of Civil Procedure 4003.3, which is inapplicable in this federal diversity action. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

**End of Document**                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.