1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PACE-O-MATIC, INC.,              )
              Plaintiff          )
          vs                     )    1:20-CV-00292
ECKERT, SEAMANS, CHERIN &        )
MELLOTT, LLC, Et Al,             )
              Defendants         )
_____      )

TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT
BEFORE THE HONORABLE JOSEPH F. SAPORITO, JR.
TUESDAY, OCTOBER 20, 2020
WILKES-BARRE, PENNSYLVANIA

FOR THE PLAINTIFF:
     DANIEL T. BRIER, ESQ.
     DONNA A. WALSH, ESQ.
     Myers, Brier & Kelly, LLP
     425 Spruce Street
     Suite 200
     Scranton, PA 18503

FOR THE DEFENDANTS:
     ROBERT S. TINTNER, ESQ.
     Fox Rothschild, LLP
     2000 Market Street
     10th Floor
     Philadelphia, PA 19103

     GEORGE A. BIBIKOS, ESQ.
     GA BIBIKOS, LLC
     5901 Jonestown Rd. #6330
     Harrisburg, PA 17112

     DENNIS WHITAKER, ESQ.
     Hawke, McKeon & Sniscak, LLP
     100 N. 10th Street
     Harrisburg, PA 17101

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

_____

SUZANNE A HALKO, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

2

THE COURT: We're here for oral argument in this matter. I don't know if you had the opportunity to discuss the logistics of who is going to go first. I know there are several motions here. I don't know that it really matters much. I will give everybody as much time as you need to get your points across. I presume you did not work that out amongst yourselves?

MR. BRIER: We had not discussed it, Judge.

THE COURT: One of the other questions that I had for you was, have you had the opportunity to discuss either; A, a resolution of this issue or; B, did you reengage in any global discussions at all?

MR. TINTNER: I will go first. Robert Tintner for Defendant Eckert. We did not discuss a resolution of this issue. Mr. Brier and I had just a short exchange to follow up on my -- which I think I communicated on the phone call with you, actually. We are still willing to try to work out particularly the injunctive fees. I would like to circulate a revised stipulation.

The depositions that we had referenced -- remember, I think that was July -- took place so we now understand Mr. Lisk's position and what he testified to and I think it will impact our discussions.

So I'm willing to do that. I can circulate a stipulation if you want. I can go through the Court, and with

3

Mr. Brier's permission, I'm happy to talk to the Court first before we do that, whatever makes the most logistical sense. We are still willing to do that.  Certainly I think we can reach a resolution on that.

THE COURT:  Well, I certainly don't want to delay this matter because unfortunately I have to be in the federal building in Scranton at 1:45.  Today I'm riding the district. They used to say riding the circuit.  Today I'm riding the district for another matter.

So what we will do is, we will hear -- why don't we just do plaintiff, defendant, and then the third parties.  We will do that.  Does that work for everybody?

MR. TINTNER:  That's fine, Your Honor.

THE COURT:  So, Mr. Brier, you may want to proceed. I know you want to use the easel, so feel free to do so.

MR. BRIER:  Thank you, Your Honor.  I apologize for being a few minutes late.  We got tied up.

THE COURT:  My rule is that if you leave late, arrive late, so don't worry about that.

MR. BRIER:  We followed your rule.

THE COURT:  Not a problem.  You can use the podium and feel free to turn that around as you can.

MR. BRIER:  Judge, can I present without my mask?

THE COURT:  Yes, you may.

Counsel, if you feel more comfortable, you may remove

4

yours as well.  It's up to you.  You can keep them on or leave them off.  It's your preference.  I think we are sufficiently distanced in this courtroom, and the reason why we chose this courtroom is because there are four counsel tables and it just gives everybody their space.

MR. BRIER:  Good morning, Your Honor.  May it please the Court, Dan Brier and Donna Walsh for Pace-O-Matic, the plaintiff.

THE COURT:  Good morning.

MR. BRIER:  Your Honor, armed with the confidential information that Eckert obtained during their three-plus year representation of Pace-O-Matic, Eckert affirmatively engaged in representation adverse to Pace-O-Matic which puts Pace-O-Matic's very existence at risk.  Pace-O-Matic is in the business of making skill games.  It is their principal primary product.

For three-plus years, Eckert was engaged to defend the legality of those very skill games, and they did so in the Commonwealth of Virginia.

I would like to just put on the easel a timeline that shows the -- if you want to come over and see it, Bob.

MR. TINTNER:  I can see from here.

MR. BRIER:  So the engagement -- POM's engagement of Eckert starts in December of 2016.  It continued until February of 2020 when Eckert withdrew from its representation of POM.

5

There was an individual by the name of Tom Lisk, who was the principal partner of Eckert, who oversaw a team of lawyers that advocated that Pace-O-Matic games are games of skill.

In the Pennsylvania Commonwealth Court, sometime in the summer of -- and I gave the Court the docket for this case -- in July of 2018, POM sues the Department of Revenue and the Pennsylvania State Police in two different cases, essentially asking the Commonwealth Court to declare that POM's machines are legal and games of skill in the Commonwealth of Pennsylvania.

In November of '20 -- my scale is off here -- in November of '20, the Commonwealth Court made a critical decision in that case when it denied the Pennsylvania State Police's petition for review where they asked the Court to declare that POM's games were slot machines.  The Commonwealth Court said that you are not entitled to that finding on the petition for review, which is the equivalent of a summary judgment.

MS. WALSH:  November of '19.

MR. BRIER:  That is November of 19.  I'm off here. Thank you, Donna.

I will point out to you in the docket and in the privilege log that leads to a flurry of activity where Mr. Tintner's client, Eckert, all while it's still representing

6

POM, advocating the games are games of skill, starts engaging directly with the Pennsylvania Attorney General's Office, who is representing the Department of Revenue and the Pennsylvania State Police.  They start providing them information.  They start providing legal advocacy on behalf of the Department of Revenue and the Pennsylvania State Police against POM's position.

They then, with the involvement of Hawke McKeon, collaborate on, prepare, and file an application to intervene in this case and an amicus filing, and they prepared draft pleadings for them.

Now, they're doing all of that while they're still representing Pace-O-Matic, but they're doing it, Judge, behind a mask.  They're not doing it openly.  They didn't enter an appearance in the Commonwealth Court case and say, here, we are Eckert, we are free to be adverse to POM here, and we're going to be adverse to POM.  No; they got a mask.  They do got Hawke McKeon.

Hawke McKeon comes in after they get the draft pleadings from Eckert and they file the intervention and the amicus, and they appear and argue on January 17th of '20 in Commonwealth Court; Hawke McKeon appears and argues.  Mr. Tintner's client, Mark Stewart, is there.

Now, what I am about to tell you we didn't know a scintilla of until we brought this case, and what I'm about to

show you we had no awareness of until we brought this case.  We brought the case in February of '20, breach of fiduciary duty. We brought the case because it became evident to us when Mr. Tintner's client appeared at the January 17th argument and collaborated with Hawke McKeon in the very courtroom where POM was trying to represent its interest that Eckert was over the line.

So I wrote a letter on January 17th, the day of the argument, to the chief legal officer of Eckert and basically said you have to withdraw it.  You can't represent Parx.  You can't represent Parx.  Everything they are doing here, they are doing for Parx, Parx Casino, because Parx Casino wants POM's machines to be declared illegal in Pennsylvania.  They want -- the casinos are adverse to the skill games.

I get a letter back the next day from Tim Coon, the Chief Legal Officer of Eckert, and he says, you are mistaken, Eckert is not representing anybody with an interest in this case, and that leads to the litigation when they drop POM as a client and then I proceed to sue.

I have handed the Court the privilege log and docket from that case, and I also handed the Court a short opinion of Judge McCullough, where on November 20 she makes the ruling that state police are not entitled to the relief that POM's machines are slot machines.

So I want to -- the privilege log is 30-pages long.

I thought it would be helpful to the Court if I bracketed and focused on items that are of significant relevance and importance to us.

Judge, I will ask you to both follow along in the docket of the Commonwealth Court case and follow along in the privilege log. So I highlighted -- everybody has the same entries highlighted.

If you turn to Page 10 of the privilege log, there are a series of communications that start on Page 10 at 2:28 in the afternoon on November 20, and they go over to just before midnight on November 20. These are communications the very day that Judge McCullough issues her decision denying the state police's decision or request.

Now, Judge, some of these are between lawyers at Eckert and their client Parx, some of them are between lawyers at Eckert and government relations people, and the government relations people are Mr. Schafer, Mr. Gmerek, and Mr. Shelly. So there is this flurry of activity where they are communicating about the recent decision of the Commonwealth Court.

I will remind the Court over and over that this is all while Eckert is representing Pace-O-Matic in the Commonwealth of Virginia arguing the games are games of skill.

So the next thing I want to focus on in the privilege log is on December 10 -- and it's on Page 13 -- it's a draft of

a law firm letter, and there is three entries there on December 10, and then over on December 11, Page 14, there's an entry, legal letter; Mark Stewart, Kevin McKeon. So I believe these are highly relevant because now since Eckert has seen what's happened in the Commonwealth Court, they make a very conscious decision, hey, we're representing POM down here. We can't show up in Commonwealth Court. We need a mask. So they draft an engagement letter. I submit to you that when you look at these, you are going to see that they quarterbacked the engagement of Hawke McKeon for Parx and that Hawke McKeon was engaged on December 11th.

Then, the next set of documents begin on December 13 on Page 14 and they go to December 19 on Page 15. What happened on December 13 in the litigation? If you look at the docket, on December 13 there was an emergency order entered where the state police were enjoined from seizing POM's skill games. So now the case is going really poorly for the casinos. December 13, the Commonwealth Court says to the state police, stop seizing these machines. Now, this is the last thing in the world that Parx Casino wants.

You can see again in the privilege log a flurry of activities, which leads up to December 18 at 2:55, Mr. Stewart sends Kevin McKeon a draft brief. Now, this is the mask at work. They can't do it openly. So they are drafting pleadings to send to Hawke McKeon to fight in the Commonwealth Court.

10

THE COURT:  This is Eckert you are referring to, correct?

MR. BRIER:  Yes.

THE COURT:  That's Mark Stewart from Eckert?

MR. BRIER:  Yes, sir.

So Mr. Stewart is openly and actively involved, but covertly involved in an effort to support Hawke McKeon on behalf of Parx, Eckert's other client, to stop -- to get engaged in the Commonwealth Court case to interfere with POM's litigation.  We think all of those communications are highly relevant.

I would like to turn the Court's attention to Page 17 of 30.  There was a critical hearing in the Commonwealth Court case.  I may have misspoke when I said it was January 17.  It might have been January 15.  I think it was.  So I misspoke.  There is a critical hearing on January 15 in the Commonwealth Court case.

THE COURT:  2020?

MR. BRIER:  2020.

This is the hearing where Mark Stewart shows up on behalf of -- God knows who he was there for, but he collaborated with counsel from Hawke McKeon who were advocating for Parx.

You can see starting on January 13, Kevin McKeon to Mark Stewart and Adrian King, Wednesday's hearing, multiple

e-mails about Wednesday's hearing and then e-mails about contacting the Court.  Kevin Skjoldal, you will see at the bottom of Page 17, he is Mr. Stewart's partner.  So what's he contacting the Court about in the case that they are not involved in?  What is he telling Hawke McKeon to do that they can't do?

Then you go over to Page 18 of 30 in the privilege log and you look and they're exchanging notes for the argument that's going to happen on the 15th.  Stewart actively involved along with Mr. McKeon.

So you have overwhelming evidence, overwhelming evidence of Eckert's intimate, contemporaneous, knowing involvement in a matter where they're coming in behind the mask on behalf of Parx Casino, who then moves to intervene in this case.

Today they are seeking still to intervene in this case, still represented by Hawke McKeon, filled with all the knowledge they got from Mr. Stewart, and we file our lawsuit.

I'm doing this 30 years.  Sometimes I think I have become cynical, but I have to tell you that when I filed this lawsuit, I fully expected, fully expected that Eckert would say uncle, we're out, we're done, and look for an exit, but I'm not cynical.  I'm naive.  I'm incredibly naive, because what they did is an affront to this Court.  They filed an answer in February of '20 -- I'm sorry.  They filed an answer on March 10

of '20.

Now, for heaven's sake, Judge, they knew they did everything I just told you about and they knew that there were contemporaneous e-mails that showed their involvement with Hawke McKeon, but they file an answer, and on Page 13, they represent to this Court, Eckert is not counsel in any litigation where POM is an adverse party.  Angels dancing on the head of a pin.

In Paragraph 18, the last sentence reads, no actual conflict of interest existed because different counsel represented POM in Pennsylvania.  Eckert does not represent a party adverse to POM in litigation and POM agreed to a prospective waiver.  Eckert does not represent a party adverse to POM in litigation.

They drafted the intervention, they drafted the amicus, Parx was their client, and they tell the Court they are not involved, but there is more.  They then file a joint case management plan on April 2nd.

Judge, this is my favorite.  At the bottom of Page 3, a joint case management plan, represented by counsel other than Eckert, POM filed a petition for review in the Commonwealth Court of Pennsylvania concerning the legal status of its games in Pennsylvania.  Eckert is not involved in that case.  Eckert is not involved in that case.  Under what construction of the English language can that be true?  They're behind the mask and

they want to stay behind the mask.  They are here today telling you, don't give the plaintiffs the discovery they seek.  It's privileged and the privilege is sacrosanct.

Their position is that their communications with Hawke McKeon relating to their then current client POM, all of which occurred before they withdraw from representing POM down here, because it overlaps with what they are doing in the Commonwealth Court, all those communications regarding their then current client POM with Hawke McKeon are privileged.

The essence of a breach of fiduciary duty, the essence of a conflict of interest is two things:  The duty of loyalty undivided and the duty of confidentiality.  We are entitled to discovery in this case between Hawke McKeon and Eckert because it is overwhelming evidence of their breach of the duty of loyalty, something that I know would offend this Court.

They don't get the benefit of taking a position in this Court that they are not involved in this litigation, and then asking this Court to prevent discovery that unassailably proves their involvement, unassailably proves their involvement.

We have attached to the pleadings -- and I know the Court has seen them -- some information gotten through a right to know request with the Pennsylvania Office of Attorney General.  They never expected to see the light of day, but

Mr. Stewart is e-mailing Karen Romano, who is representing the Pennsylvania State Police, who is trying to seize POM's machines, telling Karen Romano, here's some strategy, here's some things you can do, here's our draft -- he calls it our draft, Mr. Stewart, not Hawke McKeon's draft, not the other intervenor's draft, our draft -- here's our draft of the application to intervene and the amicus brief.  So I stand here today so much more knowledgeable than I was when we brought this action in February of '20.

They have put at issue -- they have put at issue their involvement in the Commonwealth Court case.  They have put at issue the truth of the averment in the answer whether they're representing someone with an interest adverse to Pace-O-Matic.  They can't have it both ways.  They can't tell this Court -- by the way, it hasn't been amended, hasn't been amended.  They haven't amended the answer.  They haven't amended the joint case management plan.  So they stand here as officers of the Court saying that we're involved and we didn't represent anybody adverse, but we want you to shield from discovery what I consider to be evidence of their wrongdoing that is not entitled to any protection.

I submit, Judge, first of all, back to basics, communications between Eckert and Hawke McKeon and government relations folks are not attorney-client privilege.  There is a construction of law that says they might be entitled to work

product protection, but the work product, as this Court knows, is a protection that is held by Eckert. That's not Parx's to assert. Attorney-client privilege is Parx's to assert. Work product is not Parx's to assert. So when Eckert starts sharing its work product and it communicates about adversity to their then current client with Hawke McKeon and with government relations people, they have waived any arguable protection those communications had.

When they come to this Court and make affirmative representations of not being involved, they put at issue their involvement and, as I have pointed out, the overwhelming contemporaneous evidence is that they were directly involved. They were communicating in real time with Hawke McKeon and with their friends at the Attorney General's Office.

Continuing with the privilege log, I would like to turn the Court's attention to Page 21 of 30. This is January 26th of '20. Now, remember, this is shocking. At this point I had already written to Tim Coon, who was the chief legal officer at Eckert, and said, you have to withdraw it. He wrote back and said, we are not representing anybody in a matter adverse to POM. January 26th, less than 10 days later, Stewart's communicating with Kevin McKeon and Adrian King about the intervention petition and brief, two separate. There is another communication on January 27th. Lo and behold, if you go to the docket, on February 14th, Hawke McKeon, through Kevin

16

McKeon, files an application for intervention and a brief, not involved, not truthful.  That's what it is, not truthful.

Then, Judge, if you turn your attention to Page 24 of 30 -- now, this is in February.  This is a full month after I wrote to Mr. Coon.  This is the day after we filed the lawsuit, but that will have to be confirmed.  I think we filed it on February 18th.

THE COURT:  The complaint was filed February 18th, 2020.

MR. BRIER:  Thank you, Judge.

Now, the next day -- now, they're on notice -- the next day, Mr. Stewart is at it again engaged with Mr. McKeon, and it goes over to Page 25 where they are drafting press statements.  I'm sure he wants to make sure their press statement is okay with their client Parx now that they have been sued by their client Pace-O-Matic, but they're circulating statements of what the world is going to be told about their involvement.

THE COURT:  Let me just stop you there for one moment.  You say in all of that communication, the privilege reason is communications providing legal advice and/or transmitting or discussing information for the purpose of providing legal advice, and it also lists the work product doctrine.

Tell me why the attorney-client privilege doesn't

apply in those communications?

MR. BRIER:  It doesn't apply, Judge, because the communications are -- let me go back to the first one -- they don't apply because, No. 1, an attorney-client communication has to be for the purpose of seeking and obtaining legal advice.  It is not something that applies to all communications between a lawyer and a client.  It has to be in furtherance of legal advice.

These are communications the day after POM sues Eckert.  I submit these communications -- and I urge the Court to review them -- I submit these communications are not about what Parx should do and what legal advice Parx -- you know, Parx isn't asking for legal advice.  I think this is communication about what's transpired in the relationship with Eckert -- I'm sorry -- with Pace-O-Matic.  I don't know because I think that representation, the privilege reason, is a template.  There's no differentiation in their log.

THE COURT:  Well, up to this point it was your understanding that Mark Stewart and Eckert took the position that they had no involvement representing anyone adverse to POM, is that correct?

MR. BRIER:  Yes.

THE COURT:  That was the stated representation?

MR. BRIER:  That's correct.

Then in March, on Page 26 of 30, there's a

18

highlighted group of documents from March 4 to March 6. These are principally government relations people.

Let me give you an example. On March 4, Richard Gmerek, who is a government relations person, is e-mailing Sean Shafer, another government relations person, about a meeting with the governor's office.

Now, we obtained in discovery some e-mails that showed that they were meeting with the governor's office to lobby the executive branch to outlaw skill games, but these communications of Gmerek and Shafer and Gmerek and Shelly, they're not in furtherance of legal advice. They are in furtherance of how do we outlaw -- first of all, Gmerek and Shafer are licensed lawyers. They are licensed lawyers. Shelly is not. Peter Shelly is not a licensed lawyer, but if you go to their website, they are government relations people.

If Mr. Tintner is going to stand here and say they were functioning as lawyers, then he should produce their engagement letters. He should produce their engagement letters. He can't say they were offering legal advice, when all they are known for is government relations work and not produce their engagement letters.

Then, Judge, the conduct continued, and I will illustrate on Page 28 of 30, this is on April 6 and April 7, more communications involving McKeon and Stewart about the docketed case that I have before you, 503 MD 2018.

Now, at this point they had moved to intervene.  So Eckert is still, I guess, comforted by the notion, well, that's Hawke McKeon, that's not us.

So I respectfully submit that much of this is discoverable.  We have made more than an ample showing for this Court to review in camera these communications with a careful eye to avoid the release of anything that truly is entitled to protection because someone is seeking or giving legal advice that is protected and not waived, but, Judge, I think a great deal of this is going to be of a different nature and a different kind and has been waived.

There are a couple of other discrete issues.  By the way, I want to make it super clear that I am not taking the position that all communications between Eckert and its client Parx are discoverable.  That is not my position.  My position is their communications that relate to POM in their effort to put POM out of business in Pennsylvania are discoverable and they are discoverable for a couple of reasons:  One, they have put it at issue in this case; they have affirmatively put it at issue.  Two, many of them involved government relations people who are copied on.  So there's a very legitimate issue of waiver.

I want to go back to December of '16 when POM first engaged Eckert.  Judge, remember I told you the engagement letter was effective December of '16, but in discovery

obtained, what I'm just showing you, which is a February 10 e-mail between Mark Stewart, Tim Coon, and Tom Lisk, so Stewart is the guy who represents Parx, Lisk was representing Pace-O-Matic, and Tim Coon is the chief legal officer at Eckert.

Now, this is an interesting e-mail because Eckert put this in the public record -- not Myers, Brier, and Kelly -- Eckert put this in the public record. They attached it to their brief in opposition to our motion for an injunction. They attached it because they wanted to make an argument that there was an advanced and knowing waiver by Pace-O-Matic. Then I was reminded by Mr. Tintner in a footnote that I have an obligation of candor to this Court under Rule 3.3, that how dare I say there's a conflict of interest. I was reminded by my Philadelphia colleague about my obligations.

They put this in the public record. They have, therefore, waived their communication about the quote, unquote advanced waiver, the informed consent that they claim governs their relationship.

They say -- this is Stewart to Coon with a copy to Lisk -- we cannot represent them in PA and they need to waive us being adverse to them there. There will be adverse legislative action to potential litigation against them.

Now, who is he speaking for there? He's speaking for Parx. He's disclosing Parx's future plans. He says in the

first sentence, we have a waiver and separation log.  We need to make sure we are implementing them between Parx and a new client of Tom's.

So Mr. Stewart is telling Mr. Lisk that there will be adverse legislative action and potential litigation against them, so he is disclosing what Parx plans to do.  So I want to know what was the informed consent that Eckert went to Parx to get.  Informed consent under Rule 1.6(b)(4), I think it is, requires the knowing informed consent of both clients.  They just want to focus and say that Pace-O-Matic gave informed consent, which we vigorously dispute.

They don't get it one way.  They can't get informed consent without also putting at issue of what informed consent they got from Parx.  So I'm entitled to this even without a waiver, but this is the waiver of their communications with Parx about their new engagement with Pace-O-Matic, and it's a very discrete set of communications.  It should begin sometime in late December -- it's not on the privilege log -- it should begin sometime in December and carry over in early part of 2017, but you can't cherry-pick this out and then say, oh, you don't get to know what Parx and Eckert talked about in terms of Parx's plan to be adverse to POM.

When we were here last, there was much to do about the fact that Tom Lisk was going to have his deposition taken, and something that's important to understand is the contours of

22

the case.  I have given the Court an excerpt of Mr. Lisk's deposition.

To put this in context, Judge, at the bottom of page 20, this is Mr. Tintner on behalf of Eckert, asking Mr. Lisk questions.  Lisk is no longer with Eckert.  He's with Cozen and O'Connor.  He was being represented in this case by a Cozen and O'Connor partner named Brian Flaherty.

So at the bottom of 20 he says, did you speak with Mr. Stewart about Eckert's potential representation of POM? Yes.  What was discussed?  So Flaherty asserts an objection saying that his answer could disclose confidential information about Parx, and Flaherty wanted to be careful that Lisk didn't waive something that would relate to the confidentiality of Parx.

On Page 22 Flaherty says, I'm going to object and instruct him not to answer that question because it might reveal communications that are privileged between Eckert and Parx.

A discussion among counsel continues.  At the bottom of Page 23, Mr. Tintner says, Brian, I had talked to you about this yesterday.  We are not dealing with privileged communications between Eckert and Parx.  We are trying to understand the nature of the representation.  We have exchanged e-mails, letters, communications on this case on this very issue.  It is not subject to privilege.

Flaherty is very careful.  He says, will you tell me that Parx agrees with what you just said?  Tintner, yes.  Flaherty, okay.  You're speaking on behalf of Parx when you answer that question?  Tintner, I'm speaking on behalf of Eckert who represents Parx.  Flaherty, can I rely upon what you said as meaning that Parx will not object in any way to suggest that Mr. Lisk has done anything in the slightest wrong by answering any question that might reveal information about Parx?  Yes.

So not only did they put at issue their informed consent with Parx when they filed this as a public record, but Mr. Tintner, on September 1 on the record, took the position that communications that he, on behalf of Parx, was authorized to explore the communications that could reveal what Parx was thinking and doing in terms of Pace-O-Matic in the early part of the relationship.

So the evidence I think is extremely strong that Eckert is again trying to have it both ways.  They want to say we got informed consent, but you can't see our communications with Parx at the beginning of the relationship because those are privileged, and then you saw what was represented in the deposition.

There is another discrete issue, and that is attorney's fees.  We have sought discovery of the attorney's fees that Eckert was paid by Parx during this period when

24

Eckert is actively involved behind the mask in a matter adverse to POM.  I don't need to see -- and I'm not asking and I wouldn't expect to receive the details that's in the billing logs, but I'm absolutely entitled to see how much Eckert was paid by Parx for orchestrating, engineering, and executing this blind-side attack on Eckert's then current client POM.  It's going to show, Judge, that they were being paid by Parx -- not by the man on the moon -- they were being paid by Parx to do everything they did before they came to this Court and said we weren't involved in that litigation.

I didn't frame my request well in the beginning because I didn't know what we were going to know at this point, and I just said I wanted to know the total fees, but I am now asking the Court to order that the dates, times, and the units of hours billed on this matter only -- not on all of their work for Parx -- but on this matter only be produced in some redacted form because it's going to show -- it's going to be a roadmap of Mr. Skjoldal and Mr. Stewart's activities on behalf of their current client, Parx, against their current client, Pace-O-Matic.

THE COURT:  Just so I have it clear, your request for total over the amounts billed from Eckert or by Eckert to Parx, the level of detail that you want is what is, I guess, dates, times, a blurb of what it involves so we know that it relates to this Commonwealth Court litigation, is that it?

25

MR. BRIER:  Yes, and billing attorney or paralegal.

THE COURT:  And all other information you have no interest in?

MR. BRIER:  No.

So if you give me a minute, I just want to confer with Donna.

Judge, I don't have anything further at this time.

THE COURT:  Thank you, Mr. Brier.

MR. BRIER:  Thank you.

THE COURT:  I guess whoever.  Mr. Tintner.

MR. TINTNER:  Can I stay here, Your Honor?

THE COURT:  You may stay there or whatever your preference is.

MR. TINTNER:  Robert Tintner on behalf of the Defendant Eckert Seamans.

I did not anticipate that we were going to argue the merits of the case, but I will point out a couple of important points that, Judge, I think the Court is already aware but I do want to point them out.

The team of lawyers who represented POM in Virginia were entirely different lawyers than the team of lawyers who represented Parx in Pennsylvania.  All I can say to Your Honor is that there was no question.  The important thing about Mr. Lisk's deposition is that there is no question now that there was a collapse in obtaining the appropriate level of a

conflict -- of an advanced conflict waiver.  We know that now. We did not know that until Mr. Lisk testified.  I told you this, and the reason I stress this is that the e-mail, one of which Mr. Brier just pointed out, is inconsistent, even that e-mail is entirely inconsistent with what Mr. Lisk testified that he went back to POM to obtain.

Now, interestingly in that deposition -- I don't think it's all that relevant for this, but I will tell you that he does acknowledge that he believed that by sending the December 2016 engagement letter with the advanced conflict waiver, he assumed he was getting an effective conflict waiver. Unfortunately, the restrictions that he was asked to pursue with POM, which included that Parx could continue to be adverse to POM in Pennsylvania potentially and that Eckert could not represent POM in Pennsylvania, he communicated that Eckert could not represent POM in Pennsylvania.  He did not communicate that Eckert potentially could be adverse in Pennsylvania.  We know that now.  We are not disputing it.  We know he was our member at the time.  We are bound by what he said.

That doesn't change the fact that the lawyers who were representing these entities kept their communications separate, adhered to an ethical screen, and continued to go about their business until this issue came up.  There is no question -- and it is in the e-mail that was provided to you --

that Mr. Stewart anticipated that this type of issue could come to head.  Did he know that POM was going to file an action in Commonwealth Court?  No.  In fact, the initial target was not POM.  It was the distributors, the people who basically were having, I will call them from the casino's perspective, unlawful establishments that were not governed by the regulatory scheme in Pennsylvania.

That really is here, unfortunately, a critical distinction that POM would like to overlook, which is that in Virginia, where Eckert was representing POM, gambling is illegal.  So per county, per individual, whatever they call them, county attorneys -- they're not called district attorneys -- they have to seek permission to be able to utilize the games.

That is not the way it works in Pennsylvania, and obviously there are casinos -- by the way, there are many other entities who have an interest in this particular issue, and whether these are games of skill, where they can take place, et cetera.  So all of that is a separate framework.

Mr. Stewart had always contended that Eckert would not have taken on the representation of POM if that was going to be an impediment in continuing to represent Parx, which had been an Eckert client for at that point, I think, 11 years.  So that was the ongoing client.

THE COURT:  If I can interrupt you for one moment?

28

MR. TINTNER:  Of course you may.

THE COURT:  In the e-mail from Mr. Stewart to Tim Coon, with a copy to Mr. Lisk referencing a new client of Tom's, who is the new client?

MR. TINTNER:  POM.

THE COURT:  So at that point in February of '17, at least at that point, Mr. Stewart was aware of the potential representation --

MR. TINTNER:  Absolutely.

THE COURT:  -- by Eckert of POM?

MR. TINTNER:  Correct.  Because Mr. Lisk, immediately when he got the phone call, reached out to the group and said, can I bring this client on?  I know that there may be an issue here.

THE COURT:  Understood.

MR. TINTNER:  By the way, I do want to address this e-mail because -- I don't think it's relevant to this argument, but I'll address it because Mr. Brier said it's some form of a waiver.

First of all, this is an internal e-mail, but I would point out to the Court that when lawyers have to defend themselves, they are allowed to reveal certain confidential information in order to do that.  That is not a waiver.

It's understood.  There's a breach of fiduciary duty claim that has been brought by POM against Eckert.  Eckert is

entitled to some amount of disclosure to defend itself, and that includes this e-mail.

I want to point out that the fact that there was informed consent, the fact from Eckert's perspective both clients gave a waiver, is not the same thing as disclosing those actual communications and what constitutes the informed consent.

I can get up and tell you Parx Casino gave a waiver in order for Eckert to undertake POM's representation, and under our rules of professional conduct, we, as lawyers, are allowed to go to the adverse client to give some amount of information, otherwise, we could never get the waiver to begin with, but what we actually said and what's in those e-mail communications is still protected by privilege and by client confidentiality.

I do want to sort of circle back now and talk really about why we're here. I do not dispute -- Mr. Brier did a very nice presentation with the board, telling you the dates. I don't disagree -- I mean, I agree with most of what was said in terms of dates, how this came about.

What I don't agree with is the fact that information may be relevant, okay, or discoverable on a normal course does not mean that it will eviscerate the attorney-client privilege. I say this because it may seem obvious, because if that were the case in every case where you suspect that there were

privileged communications that may reveal personal injury cases didn't happen the way the plaintiff is saying it, or in a criminal case, the criminal defendant admits his crime, that's pretty relevant to whether the person should be convicted or not.  That doesn't mean that the attorney is permitted to testify to it and it doesn't mean that the client can be compelled to reveal those communications.

I say that because I understand Mr. Brier's arguments.  He's made the arguments.  He's made it in several briefs.  He actually has not just through his right to know request.  We produced hundreds of e-mail communications that are not privileged, that don't involve lawyers or strategy or work product, in which we reveal very telling and helpful information for his argument that Mr. Stewart had involvement in the Commonwealth Court case.  He knows that.

Mr. Stewart -- and Your Honor knows about it because we discussed it.  There was a press release.  So the notion somehow that this was covert or is being hidden and that we're using the privilege to shield that is simply not true.  The privilege is being used to shield privileged communications.

THE COURT:  One of the things, though, that you have to reconcile from my perspective is Eckert's litigation position that neither it, nor any of its lawyers -- that would include Mr. Stewart or anybody -- or counsel in any litigation that was adverse to POM.

MR. TINTNER:  Let me explain.  First of all, Mr. Stewart is not counsel of record in that case.  He is not counsel.  I will also point out that there is an intervention petition.  So those two actions in the Commonwealth Court:  POM versus, I believe, the Liquor Control Board and again the Pennsylvania State Police.

Parx Casino and I believe other casinos have been trying to intervene in that action since it was -- almost since it was initiated.  I think it was in the beginning of last year.  They have not been granted that status, so they are not parties in that litigation.

The other cases -- and this is important -- in Pennsylvania -- they were in Montgomery County and Bucks County -- Parx Casino sued distributors and bars and restaurants that had these games.  They did not sue POM.  So the point is POM then sought to intervene, and I believe they were permitted intervention in Bucks County.  They were not yet permitted intervention in Montgomery County, but, frankly, to the extent that POM was going to intervene in those cases, Eckert was prepared to withdraw regardless of this.

So it is true that they were not counsel of record. I'm not going to say that Mark Stewart and Eckert have not been involved with Parx Casino on a legislative front with dealing with all of these issues.  These issues, Your Honor, they involve more than just POM and these particular skill games.

32

THE COURT: I'm not disputing that. I'm sure that there are other issues that they were involved in, but at least as they pertain to, I guess it would be Parx Casino and POM, we see in the logs where Mr. Stewart especially is all over the logs.

MR. TINTNER: Yes, no question.

THE COURT: He was having obviously some communication -- well, at least it appears as though he was having some communication about this case and about certain strategies and documents that should be filed, whether it's the amicus brief, whether it's an intervention petition, whatever it may be.

MR. TINTNER: No question.

THE COURT: The question then is, how does Mr. Stewart on behalf of Eckert reconcile his involvement? Is he representing somebody or isn't he? What is he doing? Who is paying him to do that, nobody or somebody?

MR. TINTNER: He is serving on the team of lawyers that work for Parx Casino.

THE COURT: So that's adverse to POM, though, isn't it?

MR. TINTNER: Well, technically it's not adverse to POM because Parx Casino is not a party in either of those cases, so technically they're not, but I want to make an important point because before Mark Stewart's name is out there

with this bad actor, let me say this:  Mark Stewart --

THE COURT:  I'm only referencing Mr. Stewart's name because --

MR. TINTNER:  No, no, no.  I know, but I do want to clarify --

THE COURT:  -- he had a substantial majority of the privilege log.

MR. TINTNER:  Absolutely he did.  He's been a lead lawyer for Parx for many years, but Mark Stewart was under the mistaken impression throughout this entire period, and probably leading up until when Mr. Lisk was deposed, based on the e-mails that he had permission to do that in Pennsylvania, so he was going about his business.  He understood that separate and apart from any advanced conflict waiver that he could not enter an appearance if in fact Parx was going to be directly adverse to POM.

THE COURT:  Are you suggesting that Eckert had permission from POM to request the Pennsylvania Attorney General's Office to bring criminal charges against POM?

Are you suggesting that, you know, when you look at whether they're adverse, their position was they were games of skill, as opposed to games of chance, so the games of skill, is that not adverse to POM?

I'm trying to -- you know, I'm trying to navigate through the semantics of it all and see where we end with.

MR. TINTNER:  I will tell you that it's far more complicated than that.  It's not just advocating whether they're games or skill or not as I understand it, but I want to tell Your Honor --

THE COURT:  But that determines whether they're adverse to POM.

MR. TINTNER:  Not necessarily, because the issue could be whether they're regulated or not, not whether they're games of skill, whether they're illegal, or whether they're slot machines.

The real question could be -- and obviously the lawyers who are here can speak to it far more than I can, especially Mr. Whitaker -- but the issue could be whether they should be regulated, the same way that any other casino is where they have games very similar to this within the walls of the casino and they are under state regulations.

So I would agree with you in terms of Virginia -- and Mr. Brier said that -- that was the primary issue, convincing the county attorneys that this is not a slot machine and, therefore, doesn't violate any Virginia criminal law.  It's a different type of game and it should be permitted in this bar, this restaurant, this truck stop.

Here it is far different than that and far more complicated, and there are a lot of moving pieces, but I do want to say, because I'm getting back to this argument --

THE COURT:  I'm sorry for taking you off track.

MR. TINTNER:  No, no, no.  They are valid questions and Mr. Brier raised it.

Whether the privilege applies, whether work product applies, has nothing to do with whether the information may be relevant.  I will tell Your Honor that contrary to what's in the motion to compel, we have produced almost a thousand pages worth of documents and e-mails, the e-mails that they are talking about.  We have no problem producing the ones with third parties.

THE COURT:  But you're trying to prevent their production because of the work product doctrine, because of the attorney-client privilege.

MR. TINTNER:  Only the ones that have work product; in other words, the ones between the lawyers and the client and the ones that involve direct communication, which is the majority of this, with the client where they are giving legal advice.

I do want to point out that there is a very important distinction, government relations attorneys are still functioning lawyers, they're still giving legal advice.

THE COURT:  Let me ask you this:  From Hawke's perspective, now Hawke is representing Parx in the Commonwealth Court litigation?

MR. TINTNER:  Well, in the attempt to intervene,

correct.

THE COURT: So now the work product doctrine may be applicable to Hawke because it's obviously representing Parx in that litigation.

Eckert is taking the position that it is not representing POM. It is not representing anyone that is adverse to POM in that litigation.

MR. TINTNER: Right.

THE COURT: It also claimed that it had no involvement in the Commonwealth Court litigation. How does that come about?

I mean, it doesn't seem to be the case at this point in time that they had no involvement. They have to have some involvement, at least that's the impression that's been painted, and I think by your concession along the lines in terms of the timeline and some of the e-mails, it appears as though there is some concession along those lines.

MR. TINTNER: There is definitely concession that they were involved with a team of lawyers. Eckert was not leading that charge. Eckert was not representing an actual party in the case because Parx is not a party in the case.

The case was initiated by POM against two, in essence, governmental entities. There are a lot of other, I will call them, interested parties who are seeking to intervene. Eckert will not be entering its appearance in that

case on behalf of Parx or any other casino.

THE COURT:  But it did enter its appearance on behalf of Parx in the Commonwealth Court litigation.

MR. TINTNER:  Well, that's what I'm talking about, the Commonwealth Court.

THE COURT:  But, yet, it was still performing some duty and obligation.  Do you follow me, Mr. Tintner?

MR. TINTNER:  I do, Your Honor.

THE COURT:  Maybe you can explain that for me.

MR. TINTNER:  The only thing I can explain to you is they are involved in representing the interest of a client, there is no question about that.

Whether they are directly involved in what's adverse to POM or what's going on with the specifics of the case itself, I really -- you know, I said this before and I will tell you again, I did review the privilege logs.  I have not reviewed the communications because I don't have any, but I certainly don't have Parx Casino's --

THE COURT:  I certainly take you at your word.

MR. TINTNER:  -- consent to review them.

THE COURT:  But what it appears as though, it appears as though Eckert is saying, well, we are not representing anyone that is adverse to POM.  We will wink our eye at somebody and say, okay, but we're going to give all the information that we can to this client, even though it doesn't

put POM in a good light, and that was our client at one time or during a period of time.

MR. TINTNER:  I acknowledge that and I understand that, but I also understand what 1.7 discusses, which is direct adversity, because there are situations -- and, by the way, one of the issues is 19, which is a former client, we do not believe that these issues -- and I know Mr. Brier disagrees and that's fine -- we do not believe they're substantially related, because what Eckert did for POM in Virginia is separate and apart from its advocacy and the position its taking in Pennsylvania on behalf of a different client with a different legal framework.

THE COURT:  What I find difficult to comprehend under these circumstances is that you have a lawyer on behalf of Eckert who is, for lack of a better way of putting it, helping the attorneys of record advance the cause against POM in Pennsylvania, and they had represented the interest of POM in Virginia, and are now taking the position that they should be prosecuted criminally.  To me, that just lacks some level of impropriety.

MR. TINTNER:  Well, I don't think that they're suggesting that they be prosecuted criminally.  I think they're suggesting that the machines, to the extent they violated, be seized.

THE COURT:  I thought there was some representation

made in those press releases that they should be charged criminally or something to that effect.  I recall that in these submissions that were made in connection with the motions that are before the Court, but that's neither here nor there at this point.

But I'm asking you this to try to -- it seems like Eckert is in a situation that they want to have it both ways and they simply can't, either they represent POM or they represent Parx against POM or they don't, and they can't say, well, we're not representing anybody and then on the q.t. give information.

MR. TINTNER:  It's not on the q.t.  I think Mr. Stewart did attend that hearing.  I think Mr. Stewart as an attorney for Parx is very interested in the outcome of the Commonwealth Court cases, as is any other lawyer who is representing casinos or, frankly, any of the other types of games that are out there.  There are many interested parties in what the Commonwealth Court does.

THE COURT:  So I think Mr. Brier may have mentioned this during his presentation, that perhaps we should take or have an in camera review of some of these documents.

Are you opposed to that?

MR. TINTNER:  No, not at all.

THE COURT:  Perhaps maybe the two of you, in consultation with counsel for the third parties, can agree upon

which documents we can look at in camera.  Is that something that you think we can do -- not necessarily at this point in time, but within the next week or so?

MR. TINTNER:  Yes.  I mean, I don't have an objection.  Obviously I want to make sure that --

THE COURT:  We will hear from them.

What I'm saying to you is that at least from your perspective, you don't have any objection to an in camera review?

MR. TINTNER:  No, I do not.  I do not have an objection.

I would like to make a point about the work product.

THE COURT:  Absolutely.

MR. TINTNER:  Which is that the challenge with the work product doctrine is that it's not just lawyer drafting, you know, standards of review and whatever.  The draft contains confidential communication.

I mean, the reason we have a work product doctrine is, yes, our mental impressions, our view of strategy, but it incorporates confidential and attorney-client privilege communication.

Particularly, let's say, there are comments in the draft where you're asking the client, you know, is this true?  Is this correct?  Should we add this?  Does this advance our position?  Especially in the day and age of technology where we

41

have the ability to redline materials and send things in real time, the interplay between lawyer and client and teams of lawyers who are working for the client, that information contains privileged communications, which is why the privilege log identifies both attorney-client privilege and the work product doctrine.

There has been no waiver here of any of that.  The fact that some of the materials we turned over were the third-party communications, the final product of certain documents, press releases, none of that is waiver.  I mean, that is all within the bounds of what has already been finalized and proved, filed, released.

The privilege log was clearly designed to identify the e-mails, the communications that went back and forth. Hawke McKeon is here.  They can answer to some of that, but that is the work product and --

THE COURT:  Doesn't the application of the work product doctrine as a threshold matter require that the lawyer be representing the client?

MR. TINTNER:  No.  I mean, representing the client, yes.  In court or in a case or a proceeding, no.

THE COURT:  Where a client solicits legal advice from a lawyer, the lawyer prepares documents, a letter, a memorandum, something, an executive summary, a strategy of some sort.

MR. TINTNER: Yes. There is no question -- again, I'll say it -- Eckert was involved in strategy involving Parx Casino and maintaining in the legality of their, you know, the regulations and things that they have to adhere to.

THE COURT: That flies in the face of the stated representations here in this Court that Eckert did not represent anyone adverse to POM.

MR. TINTNER: In the proceeding, yes.

THE COURT: Does that just apply to just the proceeding, the Commonwealth Court case, or does it extend beyond that?

MR. TINTNER: I mean, I will read you what was highlighted.

THE COURT: Okay.

MR. TINTNER: Eckert is not counsel in any litigation where POM is an adverse party. They are not counsel of record and --

THE COURT: Well, I know they are not counsel of record.

MR. TINTNER: Parx, their intervention hasn't even been granted. They are not in that case at present. They have filed an application to intervene.

THE COURT: A lawyer can be engaged to represent someone outside of litigation, correct?

MR. TINTNER: Correct, no question. We don't dispute

43

that.

THE COURT:  So were they engaged to represent someone outside of the litigation?

MR. TINTNER:  They have continually represented Parx Casino for the past -- I think it's 12 years, maybe longer.

THE COURT:  In that representation, at least during the timeline that we have heard here today, is that representation adverse to POM?

MR. TINTNER:  Well, is there some adversity between POM's position and Parx's position?  The answer is yes.

THE COURT:  Okay.

MR. TINTNER:  I will let counsel go.

THE COURT:  Mr. Bibikos, Mr. Whitaker, I will let you choose who wants to go first.

MR. BIBIKOS:  Your Honor, I'm ready to go.  George Bibikos on behalf of Parx Casino.

What I would like to remind the Court is that Parx is sort of here the victim in all of this because it is, as Your Honor knows, Parx's privileged communications that are implicated by all of the discovery requests.  It is Parx's confidential communications with its lawyers.

I have heard now Mr. Brier and Mr. Tintner, and I want to remind the Court that at a minimum you have to look at all of this through Parx's viewpoint.  Parx is receiving legal advice from its lawyers, that's what it knows.  Parx is

receiving communications from its lawyers, that's what it sees. In the midst of all of this, Parx is also the beneficiary of all that work product.  Parx is interested in the Commonwealth Court case.  It obviously received a subpoena here.

So at the end of the day, all of this confidential and privileged communication belongs to us, and maybe I'm too simplistic in this view, but I look at the subpoena I received on behalf of my client and I just check off boxes here, and I look at the rules of whether something is a privileged communication and it involves not just legal advice, but discussions about legal matters.  It is a little broader than, what's been represented here.

If you go to that and you say, it's, you know, assistance with legal matters, securing legal advice or securing engagement even, and some facts that are discussed during that process at the front end, and so with that backdrop in mind, you go through at least my subpoena, the discussions about consent, those are very intimate communications between a lawyer and his or her client, among the most awkward sometimes, Your Honor, as Your Honor well knows, and if you can't have candid discussions about those sorts of things without the threat of revealing them because of another problem that the firm that represents us is having with one of its other clients, then we're going to start having sideshow wars over those things in all kinds of cases, and that goes not just for

informed consent, but also the waiver issues and another one was withdrawal of representation.

Leaving aside the relevancy of all of that, and that's Eckert and POM, whatever is going on between them, and as unfortunate as that dispute may be, it is them, and Parx is here now with its privileged communications and its confidential information and the benefit of the work product that it is receiving are all at risk now of disclosure when we're not a party here and, frankly, it is not our fight.

So I would implore the Court to -- just remind the Court that that's the backdrop against which we're evaluating all of these things.

THE COURT:  Mr. Bibikos, let me ask you this:  Are there any responsive documents in Parx's possession that are not also in Eckert's possession which would be subject to production or withholding in response to the document request?

MR. BIBIKOS:  As it relates to the subpoena document, the subpoena that we received, the easy answer is we just don't have any of these things, except for the one about this litigation, and there are a few of those that ended up in the Eckert privilege log that we didn't have that are about this litigation that they have.

My suspicion is -- I mean, that's it.  I mean, whatever was requested of other parties, we don't have any.  We haven't been subpoenaed for those, we haven't had a request for

those and, frankly, I don't think we would have anything beyond what anyone else would have. That's my understanding at least.

So unless Your Honor has specific questions, I really just wanted to make sure that Your Honor was here and -- and, by the way, we heard a lot of talk about waiver and exceptions and all this sort of stuff. There is no waiver here. We're here. There is an infallible way to determine that. We're here and we've demanded that our lawyers assert privilege on our behalf and we're here asserting it on our behalf.

THE COURT: From your perspective, you're asserting the attorney-client privilege as it applies to Parx?

MR. BIBIKOS: Certainly.

THE COURT: So is there some overlap in the communications, say, from lawyers from Eckert to the lawyers representing Parx in the Commonwealth Court litigation that may compromise the attorney-client privilege as it pertains to Parx?

MR. BIBIKOS: I think there would be, Your Honor, because, again, I go back to, remember, we have to, maybe not solely, but at least in a substantial way look at it through the lens of Parx, and if Parx is receiving confidential information, privileged communications, legal advice, strategies and so forth from its lawyers, whether they have entered an appearance or not or whatever, even all those other things that we have discussed all here today, from Parx's

perspective, we have engaged law firms to provide us with legal advice, and that's what we are receiving and that belongs to us.

THE COURT:  So from your perspective, do you have any objection to the Court's in camera review of any of the documents that were referenced by Mr. Brier and Mr. Tintner, and they expressed no objection, at least I believe so, but I would prefer that they consult and see if they can agree upon a group of documents?

MR. BIBIKOS:  Your Honor, I don't think we have an objection to that, I don't.  I've checked in with the client.  I haven't received confirmation yet.

THE COURT:  To the extent that you may have to participate, you don't have any objection to participating in determining which documents we get to see?

MR. BIBIKOS:  None whatsoever, Your Honor.

Unless the Court has questions --

THE COURT:  No, I don't have any further questions.  Thank you.

MR. BIBIKOS:  Thank you.

THE COURT:  Mr. Whitaker, you may proceed.

MR. WHITAKER:  Good afternoon, Your Honor.

Please accept my apologies.  This is a new phone and I thought I had it muted.

THE COURT:  Things of that nature don't upset me.

48

Don't worry about it.

MR. WHITAKER:  Apparently you need to mute the ring tone separate from everything else.

THE COURT:  Don't worry about it.  It happens.

MR. WHITAKER:  I need my 7-year-old niece to handle my IT for me.

THE COURT:  I'm sure it wasn't intentional.

MR. WHITAKER:  It certainly was not.

Hawke McKeon is here today.

THE COURT:  I have heard different pronunciations.

MR. WHITAKER:  Yes.

THE COURT:  So it's McKeon.

MR. WHITAKER:  Yes.  I'm sure Mr. McKeon would be happy -- if people thought he was related to John McCain, he would probably be happy about that, but he's not.

We are here because we received a subpoena from POM, and the subpoena sought all documents that constitute, include, reflect communications with Eckert regarding the two Commonwealth Court matters; the 418 MD and the 503 MD, any and all documents received from Eckert for use or reference or relation to either of the matters identified in Paragraph 1, any communications involving Kevin McKeon or any other employee of Hawke McKeon, and any member, employee, agent or representative of Eckert relating to the Commonwealth Court matters, and then the last item was any documents or

49

communications regarding potential or actual conflicts of interest.

In our pleadings with this Court, we specifically said we do not have anything regarding Item 4, communications regarding the conflict.

Currently before this Court we filed three briefs, and we also have a motion for a protective order and/or in the alternative to quash the subpoena, the supporting brief, a responsive brief to Mr. Brier's, and then a brief in opposition to the motion to compel production under the subpoena.  I think we lay out pretty clearly there and, unfortunately, at least somewhat repetitiously, the various defenses or issues with regard to privilege and the like, so I'm not going to waste Your Honor's time by repeating them back.  If you have any questions, I'm happy to answer.

I would suggest to you that it's an interesting narrative that Mr. Brier weaves, but it's one that's made of old cloth.  First of all, HMS; Hawke, McKeon and Sniscak, represents Parx, and as we lay out in Footnote 3 of document -- it was filed at 74 and now it's 75 -- my partner, Mr. McKeon, has been representing the Parx Company, which includes Greenwood and some others, since 2011 before the Pennsylvania Supreme Court and Pennsylvania Commonwealth Court.  I believe that was refiled as 75 at Footnote 3.  It lists six pages there, four from the Pennsylvania Supreme Court and three

from -- or two from Commonwealth Court, and even in Greenwood Gaming and Entertainment is Parx, SugarHouse, its various partnerships.

So HMS, it's not like HMS was sort of chosen by sticking a pin in the phonebook and Eckert reached out to them and said, hey, how about filing this amicus brief for us?

I think what the story here is, is that there has been an ongoing battle between Mr. Brier's client, POM, the Pennsylvania State Police, the Pennsylvania Gaming Control Board, the Department of Revenue, and apparently the City of Philadelphia.

POM initiated those two actions in Commonwealth Court.  The first one, I belive, was against the Department of Revenue and the City of Philadelphia.  The second was against the Liquor Control Board.  The whole issue here is whether what POM calls skill games are actually legal gaming devices that are covered by the Crimes Code.  I mean, that's really what it is.

So at some point obviously -- or I should say at some point, Mr. Stewart, at Eckert obviously has an ongoing relationship with Parx and he had one with POM.  POM filed these actions, but, to my understanding at least, nobody from Eckert ever entered an appearance in that case, and at some point, apparently whatever date and time -- again, I really know nothing, you know, about all the sort of background here

and, frankly, the less I know, the better -- but whatever date and time there was regarding representation in Virginia by Eckert, representation in Pennsylvania fell apart, at which point Eckert reached out to our firm saying, you know, can you do this for us?  We had represented Parx before, so the answer was yes.  So what we have -- so that, hence, filing the amicus. I don't think it matters who prepared it, but for right now, we represent Parx, Eckert represents Parx.

So our communications with Parx regarding this litigation are protected by attorney-client privilege and/or the work product.  Our communications with Eckert are protected by the work product.  Eckert's communications with us, if it's attorney-client with Parx and they are communicating with Parx other lawyer, they're still all protected.

So where we're at here right now is HMS is being subpoenaed for either documents that it created on its own in its representation of Parx or documents that it received from Eckert from when Eckert was representing Parx.

We can't give the documents up.  Parx has instructed us to assert the attorney-client privilege and we're doing it. So we're sort of in a tough -- we're in a tough position here. Right now we represent the intervenors or the punitive intervenors in the Commonwealth Court in both actions.  I believe the hearing is 10/29, October 29th on the intervention petition where my partner, Mr. McKeon, is representing them.

52

We also -- we argued in our earlier filings that why else would POM be doing this unless they were looking to advantage themselves in a Commonwealth Court action, and lo and behold, in our last briefing, I think, the proof of the pudding came out with the two filings from POM suggesting that they were going to move to disqualify our firm from representing the intervenors.  That has hasn't happened yet, but I'm assuming -- you know, we're assuming it's going to happen any day.  If it doesn't happen, then it doesn't happen, but for right now, as I said in my earlier filing, what was suspected in covert is now proven and overt that that was really what the subpoena to Hawke McKeon was about, which was advantaging POM in a Commonwealth Court litigation, and as we said in our filings, that alone is sufficient to quash the subpoena or provide a protective order.

THE COURT:  If I can interrupt you for a moment?

MR. WHITAKER:  Sure.

THE COURT:  Your firm representing Parx in the Commonwealth Court litigation, it appears based upon the laws that have already been provided, that Eckert lawyers, in particular Mr. Stewart -- I'm not picking on him.  I'm just pointing it out because his name appears there more than others -- for example, Mr. Stewart, you know, took the position that he was not representing anyone adverse to POM, but it appears based upon Mr. Tintner's concession that he was in fact

53

providing legal advice in the form of drafts of a petition to intervene, an amicus brief, strategies, I presume, which appears to be adverse to POM in that litigation.

Do you have any way to reconcile Eckert's litigation position that neither it, nor any of its attorneys were counsel in any litigation adverse to POM with, you know, privileged log entries, documenting communications between them?

MR. WHITAKER:  I will tell you, Your Honor, that I have sort of purposely tried to remain ignorant of what's in the background here.

My, again, understanding is, is that apparently at some point prior to POM filing these actions in Commonwealth Court, there was some sort of -- at least Eckert thought it had some sort of waiver agreement with POM with regard to representation in Virginia, but not in Pennsylvania, and it's not clear to me that Eckert ever appeared in -- ever appeared in a court action adverse to POM.

It appears to me that that's sort of a narrow distinction here, which is they may have been giving and Eckert -- and I don't even know this -- Eckert may have been giving advice to POM about -- I'm sorry -- to Parx, rather, about how to deal with Eckert -- I'm sorry.  Eckert may have been giving advice to Parx about how to deal with POM, but they weren't doing it in the context of being in court.

THE COURT:  But what if they were doing it in the

54

context of providing papers that your firm filed on behalf of Parx?

MR. WHITAKER:  I can only speculate at that point that they were putting those papers together based on what their understanding of the waiver agreement was with regard to Virginia and Pennsylvania, which I think at least Eckert's position is that we're representing them, but we told them we were going to be adverse to them in Pennsylvania.

So, again, that is my assumption.  I don't know. That's a question that Eckert has to answer.  Frankly, anything that HMS received from Eckert, obviously Eckert has.  So if the Court wants to do an in camera review, he can do that.

THE COURT:  You don't have any objection either then?

MR. WHITAKER:  Well, I'm trying to be careful here. Right now -- and one of the other things we argued is that essentially what POM is seeking from HMS is the same thing that they're looking at from Eckert.  They're just trying to go around that.  I would have to say -- and, I mean, it's Mr. Bibikos' client's privilege -- if it's about whatever Eckert gave to us, I mean, that's up to, you know, Mr. Bibikos, but, frankly, our view is that none of our work product and none of our communication with Parx should be involved here at all.

Frankly, you know, this has been enough of a burden on our firm.  Like I said, we filed a motion, three briefs, we're up here today and we're not even a party to litigation.

55

I mean, I guess looking at it in some ways, we were the ones who were unlucky enough that Mark Stewart knew that we had also represented Parx in the past and got the phone call, so here we are.

I need to chat with Mr. McKeon before I can give an affirmative, but I guess the first thing I would say is if Eckert has no problem with giving documents to the Court to be reviewed internally, I don't think we do either as long as they are not our documents going to Eckert.  I will check with Mr. McKeon about whether we have any concerns, because otherwise that's our work product and, you know, to the extent that they're attorney-client privilege, it's Parx's privilege, and so I need to check with that, but, I mean, at this point, you know, other than the fact that we're in Commonwealth Court representing Parx, it's not clear to me why else we're here or that we honestly should be at this point.

THE COURT:  Well, I think looking at the pleadings and the other documents that have been filed of record, for lack of a better way of putting it, it appears as though many of those file documents that you filed on behalf of Parx may have been ghostwritten by someone from Eckert's firm and under the guise that Eckert really wasn't counsel of record but you were, but, you know, given the advice to you to be adverse to POM.  I think that's the implication or at least the allegation that has been made.  I summarized it briefly.  I know that it's

more extensive than that, but that's just a thumbnail sketch of it.

MR. WHITAKER:  I mean, regardless of whether -- regardless of whether Mr. Stewart began the brief or handed it over in whole or in part to Hawke McKeon, who then filed it, so that Hawke McKeon is now representing Parx, and in that litigation -- or at least wants to represent Parx in that litigation, and it's not clear to me that Eckert ever represented them in that litigation by filing an appearance in court.

THE COURT:  If that were the case and counsel from Eckert did that, that kind of flies in the face of the duty of loyalty that a lawyer owes to a client, and that's where the love comes in, as I understand it, here today.

MR. WHITAKER:  Again, as I said, Your Honor, I'm not privilege to all the stuff that went on in the background.

THE COURT:  No, I understand that and I understand your role here.

Mr. Bibikos, you wanted to say something?

MR. BIBIKOS:  Your Honor, just very briefly, I know Your Honor is struggling with that particular issue, and I think I come back to just remind Your Honor, again, whatever the case, it's still in the nature of privileged communication, and that's really the question we're after.  I come back to, again, at least in substantial part that we have to look at it

57

through Parx's lens, and if Parx is getting advice from one party that is about slot machines or other types of games and another law firm, the nature of those communications are still privileged.

The fact that one firm filed because the other one didn't, remember, it's still the underlying communication about legal advice and legal assistance that is at play.  If that attaches, if Your Honor finds that the privilege does attach to those, absent a waiver or some exception, which I don't think there is any evidence of here, I think that's the end of the analysis.

I know why Your Honor is struggling with it.  I can certainly understand that, but I just want to provide the Court that that's -- at least from Parx's perspective that may help the Court along.

THE COURT:  I understand that.

MR. BIBIKOS:  Thank you.

THE COURT:  I will ask Mr. Brier if you want to have any rebuttal or follow up.

MR. BRIER:  I know you're riding the district so I will keep it focused.

So I would agree with my colleague, Mr. Bibikos, that if Parx was getting advice from its lawyers, I shouldn't have access to that.  That's not what this is about.  I made that clear earlier.

I want to address what Mr. Whitaker said, and candidly his purposeful ignorance is of little comfort. He said it doesn't matter who prepared it. He said Stewart called HMS and said, can you do this for us? Can you do this for us? That's exactly why we're here and their eyes were wide open, Hawke McKeon.

MR. WHITAKER: McKeon, sir.

THE COURT: He said McKeon.

MR. BRIER: Their eyes were wide open. Can you do this for us? I almost fell out of my chair.

Then he files this document, Document No. 53 in the Court. On Page 2, I'm quoting, HMS seeks relief before this Court because HMS had the apparent temerity to agree to step in as conflict counsel and to file an amicus brief in a matter initiated by POM in the Pennsylvania Commonwealth Court. HMS had the apparent temerity to step in as conflict counsel. So now they're also known as conflict counsel. What is conflict counsel? That's a firm that steps in to do something that another firm can't do. That's what they call themselves.

The log in front of you shows it was a pretext. They were ghostwriters. The puppeteer was Stewart. I mean, it's egregious. Professional Rule of Conduct 8.4, the name of the rule is misconduct. It says, it's professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do

59

so or to do so through the acts of another.  It's pretty simple; you can't get one firm to do for you what you can't do.

This nonsense, nonsense about them not being involved in the Commonwealth Court, Mr. McKeon argued on January 15th. He was there and the Court indulged him and said that I know you are here as amicus, do you want to be heard?  He stood up and argued.  He argued for Mr. Bibikos' client.  Eckert was representing us then.  So this nonsense that we're not technically involved, we're not of record.

There was a deposition recently.  Did your partner attend it?  Purposeful ignorance.  They were there in the Commonwealth Court case.  They're not involved?  They're not of record?

It does matter who wrote it, and here is why it matters:  When Eckert ghostwrote the filings that Hawke McKeon filed, they were our lawyers.  They had a duty of confidentiality, they had a duty of loyalty.

My colleague says, let's not -- let's not confuse 1.7 with 1.9, that these aren't substantially related.  I'm focused on 1.7 covers a concurrent conflict of interest.  You have two clients at one time; one is Eckert and one is -- I'm sorry. Eckert had two clients at one time; one is Parx, one is Pace-O-Matic.  That's a concurrent conflict of interest.  It doesn't matter if they're substantially related.

I think we heard today, and I would like to confirm

60

it, has the informed consent defense been dropped?  Has it been dropped?

MR. TINTNER:  No.

MR. BRIER:  I thought I heard they were withdrawing the informed consent.  So when the Court was examining -- I'm sorry -- when Mr. Tintner and the Court were having a discussion, the Court recalled correctly that Eckert on November 22nd, while they were still representing Pace-O-Matic, sent an e-mail to the Pennsylvania Office of Attorney General.  This is filed.  It is part of Document 51-4.  It was filed on July 20.  I want to read to the Court what the Court recalled.  It says, regardless -- now, this is Kevin Skjoldal from Eckert writing to Karen Romano at the AG's Office -- regardless of whether you seek reconsideration, the plain language of the Gaming Act is clear that your gaming unit and the district attorneys are specifically authorized to investigate and prosecute these offenses against unlicensed persons.

Here is the money ball one -- the Court did not address these provisions in its opinions, so it would seem that the OAG would still have the power in its arsenal to go after POM's slot machines, encouraging a criminal prosecution of their then current client.  The Court recalled it correctly.

I think my colleague, Mr. Tintner, said that his client, Mr. Stewart, was under the mistaken impression that he could do what he was doing, and I guess the mistaken

impression -- or he thought he had permission to undermine POM while it was a client of his firm, but the facts don't support that.  He would have come out in the open.  He would have acted in the open if he thought he had permission and he didn't do that.  We know he didn't do it, and it doesn't matter if the Hawke firm represented Parx prior to this.

What we now know based on today is the reason they got into the Commonwealth Court case is because Stewart called and said, can you did this?  Because Stewart knew he couldn't do it.  He knew he didn't have permission.

Judge, very briefly, Mr. Tintner said that that document that I handed to the Court, the February 10 e-mail, didn't constitute a waiver because his client is entitled to defend itself.  Well, I agree with that, but when your defense is, we got informed consent from Parx and from POM, and then you make that an affirmative defense and put it in the record, you can't just stop the inquiry there.  We don't have to accept their representation.  The question is, did you get informed consent?

If they want to withdraw informed consent as a defense, then I'm not entitled to see the communications that occurred between Parx and Eckert late in '16 and early in '17 when Eckert decided to represent POM, but if informed consent is going to be their position, then on that narrow focus, no matter how sensitive it is, Mr. Bibikos, we are entitled to see

what the understanding was.  If there is information in the documents that you look at, Judge, that you think genuinely fits within attorney-client privilege, I know you will redact it or order it redacted or not produced, but so much here is of a different kind and I said that earlier.

I thank the Court for its time.  I know you have paid a lot of attention to this.  It's of extreme importance to my client.  We look forward to hopefully getting an agreement on a process for you to review in camera the materials.

I do have an issue with the Hawke firm's privilege log.  It groups families of e-mails and you can't tell really what is going on.  He is here today saying, we don't have anything that you can't get from Eckert.  Well, it's hard to know that because they put on their privilege log the date of the initial e-mail, and then they put all the different people that were involved in the chains of it.  I don't know if they went to places that Eckert wasn't involved in, but I thank the Court for its time and I'll answer any questions.

THE COURT:  Mr. Tintner, do you have anything?

MR. TINTNER:  Just to clarify what I said or maybe I meant to say and didn't say it correctly -- I will take credit if I didn't -- was that we admit that Mr. Stewart was under the mistaken impression that he had a fully informed advanced conflict waiver based on the e-mail exchange that has been -- I think Your Honor has seen it -- between Mr. Lisk, Mr. Stewart,

63

and ultimately with Mr. Coon.

THE COURT:  But that was just an e-mail amongst --

MR. TINTNER:  That's just the one you're looking at. There are a series of e-mails where Mr. Stewart lays out exactly what would constitute --

THE COURT:  But most importantly, is POM a party to those informed e-mails?

MR. TINTNER:  Those are internal e-mails.

THE COURT:  I know, but POM would be the person that would have to sign off on a consent.

MR. TINTNER:  Correct.

THE COURT:  So is POM aware of that?

MR. TINTNER:  No.  Mr. Lisk was representing that he was going to be communicating with POM directly on those issues.  That's what the e-mails say.

THE COURT:  Was POM a signatory to some consent?

MR. TINTNER:  No, there was no signed consent.

MR. BRIER:  Nor were they included on e-mails.  That was the question you were asked.

MR. TINTNER:  Internal e-mails, but the important e-mails that Mr. Stewart relied on was when Mr. Stewart laid out what were the parameters.  Mr. Lisk wrote back confirmed. That we have.  So I did want to clarify that point.

We have no problem with an in camera review by the Court.  We will be happy to work that out.

64

THE COURT:  Here is what I would like you to do, if you can -- and I'm not here to try to make your lives more difficult in this case, and I know that this has been a bear of a case from everybody's perspective -- I will leave it up to your good judgment in terms of how much time you need.

So I will not impose a deadline that creates any problems for you.  I will let you set the deadlines.  If you want to do that now, we can do that now, or if you want to communicate that to me, let's say, maybe by Friday, if you want to give me some deadlines by Friday, or why don't we just say Monday just to be on the safe side?

MR. BRIER:  Sure.

THE COURT:  Why don't you communicate with the Court sometime by Monday?  We won't put any order of record today. We will await your submission.  You can do that by e-mail, if you would like, or if you want to put something on the docket, you could do that too, that's fine.  You're probably better off putting it on the docket, everybody gets notice of it.

Anything further from anyone?

I want to thank everybody for coming today and participating.  It's evident that you have all spent a lot of time in this case.  Believe it or not, we have too, and I know that we will be spending more time.  That's why I was asking earlier if there was any opportunity to maybe discuss the case in terms of motion resolution and/or preferentially a global

65

resolution would be better yet, but if not, that's okay too. We'll do what we have to do.

If there's anything further and something develops with your discussions over the next few days and you need my involvement, let me know that and we will communicate by telephone.

Thank you all for coming. We're adjourned.

(At this time, the proceedings in the above-captioned matter adjourned.)

66

# C E R T I F I C A T E

I, SUZANNE A. HALKO, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

```
_____
SUZANNE A. HALKO, RMR,CRR
Official Court Reporter
```

REPORTED BY:

    SUZANNE A. HALKO, RMR,CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    Scranton, Pennsylvania  18501

        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)