## APPENDIX OF UNPUBLISHED OPINIONS

1.  *Aetna, Inc. v. Mednax, Inc.*, No. 18-CV-02217, 2019 WL 5566705 (E.D. Pa. Oct. 29, 2019)

2.  *Bowman v. American Homecare Supply, LLC*, 07-3945, 2009 WL 1873667 (E.D. Pa. June 25, 2009)

3.  *First Fidelity Bancorporation v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 90-1866, 1992 WL 55742 (E.D. Pa. Mar. 13, 1992)

4.  *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. CV-09-1685, LLC, 2010 WL 4537002 (M.D. Pa. Nov. 3, 2010)

1

2019 WL 5566705

2019 WL 5566705
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

AETNA INC., et al., Plaintiffs,

v.

MEDNAX, INC. et al., Defendants.

CIVIL ACTION NO. 18-cv-02217-WB
|
Filed 10/29/2019

**Attorneys and Law Firms**

Frederick P. Santarelli, Aimee L. Kumer, Gregory S. Voshell, Mark Joseph Schwemler, Elliott Greenleaf & Siedzikowski PC, Blue Bell, PA, Howard L. Pierce, Pierce LLC, West Hartford, CT, for Plaintiffs.

Alison Barnes, Gary A. Orseck, William J. Trunk, Jennifer S. Windom, Robbins Russell Englert Orseck Untereiner & Sauber LLP, Washington, DC, Darren Mitchell Goldman, John Chun, Luke Nikas, Michael B. Carlinsky, Michael Jacob Pemstein, Jennifer J. Barrett, Quinn Emanuel Urquhart & Sullivan LLP, New York, NY, Howard M. Klein, Andrew Kabnick Garden, Robert N. Feltoon, Conrad O'Brien, PC, Philadelphia, PA, Jonathan E. Feuer, Lorelei J. Vanwey, Martin B. Goldberg, Lash & Goldberg LLP, Miami, FL, for Defendants.

**MEMORANDUM AND ORDER CONCERNING**

RICHARD A. LLORET, U.S. MAGISTRATE JUDGE

### I. Doc. No. 56: Plaintiffs' motion to quash the subpoena to Dr. Makuch.

*1  The plaintiffs (referred to collectively as "Aetna") have filed a motion to suppress or quash a subpoena directed to their expert witness, Dr. Makuch. Doc. No. 56. I have reviewed the parties' submissions. I have also reviewed *in camera* the engagement letter concerning Dr. Makuch's services. Dr. Makuch supplied a regression analysis of defendants' billing practices. The primary motivating purpose behind the creation of this analysis was to aid in negotiations and potential litigation with defendants. This means that Dr. Makuch's analysis is protected by the attorney work-product doctrine. *See United States v.*

*Rockwell Intern.*, 897 F.2d 1255, 1266 (3d Cir. 1990) (file was maintained to aid in future negotiations and potential litigation with IRS). I find that Aetna has produced significant discovery concerning the regression analysis performed by Dr. Makuch. That regression analysis formed a basis for the plaintiffs' complaint, and is therefore discoverable, as discussed below. While some discovery into the data used to prepare the regression analysis is appropriate, discovery will be conducted between the parties, not by subpoena directed to Dr. Makuch. I will order that the subpoena be quashed.

### II. Doc. No. 64: Defendants' cross-motion to compel production of discovery.

The defendants (collectively referred to as "Mednax") filed a cross-motion to compel discovery pursuant to Fed. R. Civ. Pro. 37(a). Doc. No. 64. They seek information concerning Dr. Makuch's regression analysis, performed for Aetna, which forms a basis for the complaint. I have reviewed the parties' submissions, and I will grant the cross-motion in part, and deny the rest.

### A. Documents and information previously produced will be identified by Aetna.

Aetna objects that it has provided much of the information to Mednax concerning Dr. Makuch's study. Doc. No. 66 at 3-4. Additionally, Aetna objects that some of the information sought in Mednax's cross-motion has never been requested before the time of the cross-motion. Before and at the time of the meet and confer ordered below, Aetna may simply identify compliance with a particular request by supplying the specific Bates stamp number(s) where the information can be found.

### B. Dr. Makuch's analysis is subject to the attorney work-product doctrine.

I have reviewed *in camera* the retainer agreement signed by Dr. Makuch, as well as the other relevant circumstances. I find that Dr. Makuch was retained and did his analysis in "the course of preparation for possible litigation." *Haines v. Liggett Group Inc.*, 975 F.2d 81, 94 (3d Cir. 1992) (quoting *Hickman v. Taylor*, 329 U.S. 495, 505 (1947)); *see United States v. Rockwell Intern.*, 897 F.2d 1255, 1266 (3d Cir. 1990) (a file maintained to aide in future negotiations and potential litigation was protected work-product). At the time Dr. Makuch was retained there may well have been insufficient

**Aetna Inc. v. Mednax, Inc., Slip Copy (2019)**

2019 WL 5566705

proof to justify filing a complaint alleging fraud. That does not mean his analysis cannot be subject to the attorney work-product doctrine. This was not a routine, in-house review of records. A party can anticipate possible litigation without having a sufficient basis, then and there, to satisfy the pleading standards of Fed. R. Civ. Pro. 8, 9 and 11.

**\*2** Obtaining the required factual basis to file a complaint alleging fraud may require a complex and time-consuming investigation that involves attorneys, their work, and the work of experts hired by the attorneys to assist them in the task. A complex, long-term business relationship is not like an automobile accident. Fraudulent billing may not be obvious. If it were, it likely would not be fraud, which inherently relies upon concealment and deception to succeed. Unlike an automobile accident, there may be substantial doubt at the outset of a fraud investigation about whether a fraud occurred, or whether a loss was caused by fraud. Notwithstanding the suspicions or facts that triggered the investigation, a party may conclude, after conducting such an investigation, that no fraud occurred, or that litigation alleging fraud is not warranted. The fact that litigation is not initiated, in that instance, does not mean the investigative work was not in anticipation of litigation.

Certainly where, as here, a complaint is filed, there should be no penalty attached to pre-suit investigation of whether there is an adequate factual basis for alleging fraud. An alternative rule would tend to encourage parties to file suit on mere suspicion, rather than proper investigation. That is not a tendency that should be encouraged. The rule Mednax suggests would force a choice between two unacceptable alternatives: violating an attorney's professional obligation to diligently represent a client by ensuring that "factual allegations have evidentiary support" (Fed. R. Civ. Pro. 11(b)(3)) or surrendering work-product protection. I find that Dr. Makuch's regression analysis was prepared in anticipation of possible litigation and is subject to protection under the attorney work-product doctrine. That, however, is not the end of the matter.

**C. The "at issue" exception applies and requires production of some, but not all, of the information sought by Mednax.**

Plaintiffs have used Dr. Makuch's regression analysis as a basis for filing their complaint, and therefore have put the regression analysis at issue. There is a compelling need for

discovery, because the regression analysis and its data are within Aetna's sole possession and are the basis of Aetna's claims against Mednax. *In re Sunrise Securities Litigation*, 130 F.R.D. 560, 568–69 (E.D. Pa. 1989). Nevertheless, plaintiffs have not waived all work-product protection, only the protection that extends to the information put "at issue." *Financial Guaranty Insurance Company v. Putnam Advisory Company, LLC*, 314 F.R.D. 85, 90-91 (S.D.N.Y. 2016). Plaintiffs have conceded that the regression analysis itself must be produced, and allege they have produced it, though Mednax contends the production has been deficient in some respects. The defendants want additional information that ties the regression analysis clearly to Aetna's underlying data, so that the accuracy of the analysis can be tested against its premises.

The scope of the "at issue" waiver is committed to the sound discretion of the trial judge. *Id.* I find that the scope of the waiver is limited to needs that are "compelling," that is, information that bears directly on the reliability of the regression analysis and is within the exclusive control of the plaintiffs. *See In re Sunrise Securities Litigation*, 130 F.R.D. at 568–69; *Bird v. Penn Central Co.*, 61 F.R.D. 43, 47 (E.D. Pa. 1973) (excluding information from waiver where it did not bear directly on the legal theory put at issue by the pleadings). I have applied this standard to the information sought by Mednax and have granted discovery requests where I found that the information bears directly on the reliability of the regression analysis. Where the information does not bear directly, I have denied discovery.

**ORDER**

Accordingly, it is on this 29th day of October, 2019 ORDERED, that Mednax's motion to compel (Doc. No. 64) is **GRANTED**, in part. Within 15 days of the date of this Order the parties' counsel will meet and confer to determine which of the items listed below have been produced. To the extent not already produced, within 30 days of the date of this Order Aetna will produce the following information:

**\*3** 1. Aetna's original data from claim forms from which Aetna created the raw data files used by Dr. Makuch to perform the regression analysis referred to in the complaint. This data will include (but not be limited to)

a. Each patient name;

2019 WL 5566705

b. Each patient identification number as listed in Box 26 of the CMS 1500 Claim Form;

c. Each insurance policy subscriber name;

d. Each insurance policy subscriber number;

e. Each claim number;

f. Each patient's date of birth;

g. Each date of service;

h. Each CPT code or codes for the respective dates of service;

i. Each provider name, with Taxpayer Identification Number;

j. The complete regression analysis referenced by Aetna and relied upon by Aetna in its complaint;

k. All provider fee schedules used by Aetna in connection with the regression analysis.

2. The dates upon which Aetna created the raw data files from the internal system or systems.

3. The methodology used to create a) the raw data files used by Dr. Makuch, b) the regression analysis, and c) its results.

**IT IS FURTHER ORDERED**, as follows:

4. With respect to information to be supplied in conformance with this order, Aetna will comply with the court's previously entered ESI order. With respect to information already supplied, Aetna will comply with the court's ESI order if it has not already done so.

5. Aetna's motion to quash the subpoena to Dr. Makuch (Doc. No. 56) is **GRANTED,** and the subpoena is **QUASHED**. Mednax will communicate to Dr. Makuch that the subpoena has been quashed and is withdrawn.

6. Mednax's cross-motion to compel (Doc. No. 64) is otherwise **DENIED**. In particular, communications by and between counsel for Aetna and Dr. Makuch will not be produced.

**All Citations**

Slip Copy, 2019 WL 5566705

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2

2009 WL 1873667
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Alan C. BOWMAN Christina
Bowman, Plaintiffs,

v.

AMERICAN HOMECARE
SUPPLY, LLC, Defendant.

Civil Action No. 07–3945.
|
June 25, 2009.

West KeySummary

1    **Federal Civil Procedure** 🔑 Waiver

Successor owner of a home healthcare company was obligated to disclose work-product documents in the predecessor company's action seeking a declaratory judgment that the predecessor was not required to indemnify the successor. The successor had placed the subject matter of the work product of its counsel in the underlying suit at issue. Counsel's opinions, mental impressions, and legal theories regarding the strength of the indemnifiable versus non-indemnifiable claims were critical to determining the reasonableness of the cost of settling the underlying suit, and apportioning among all claims the amount for which each party was responsible.

**Attorneys and Law Firms**

Mark S. Halpern, Lisanne L. Mikula, Halpern and Levy, P.C., Drexel Hill, PA, for Plaintiffs.

Troy S. Brown, Margaret E. Rodgers Schmidt, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Defendant.

*MEMORANDUM*

BAYLSON, District Judge.

**\*1** The issue presented concerns the extent to which the attorney work product must be disclosed in an indemnification claim, arising out of the settlement of underlying litigation. Pending before this Court is Defendant American Homecare Supply's Motion for a Protective Order (Doc. No. 37) and Plaintiffs Alan and Christine Bowman's Cross–Motion to Compel (Doc. No. 40) in this indemnification suit between predecessor and successor corporate owners of a business. Plaintiffs argue that Defendant has waived the privilege as to certain documents related to an underlying lawsuit defended and settled by Defendant under the "advice at issue" and "common interest" doctrines. For the following reasons, Defendant American Homecare Supply's Motion is GRANTED in part, as to all attorney-client privileged documents, and DENIED in part as to certain work-product protected documents as explained in this Memorandum. Plaintiffs Alan and Christina Bowman's Motion will be DENIED in part, as to attorney-client privileged documents, and GRANTED in part as to certain work-product protected documents.

**I. *Factual and Procedural Background***

**A. Facts**
The Court more fully described the facts of this case in its Memorandum Opinion granting Defendant's Motion for Summary Judgment dated October 30, 2008, Doc. No. 34. However the Court will briefly review the relevant facts for the purposes of this Motion. On February 12, 2003, Plaintiffs and Defendant entered into a Stock Purchase Agreement ("Agreement") for Defendant to purchase Plaintiffs' home health care business, C.O.P.D. (Mem.Summ. J. 1.) Under the Agreement, Plaintiffs were required to indemnify Defendant for any product liability or faulty workmanship claims arising from or related to "any event, condition, fact or circumstance" prior to the closing date of the Agreement. (*Id.* at 2.)

On January 24, 2005, a fire occurred in the home of Ms. Connor, killing Ms. Connor's mother Mertle Steves. (*Id.* at 3.) Ms. Steves rented and used a C.O.P.D. electric home healthcare bed. (*Id.* at 3.) C.O.P.D. purchased the bed in 1998, prior to the closing date of the Agreement. (*Id.*) The bed was suspected to be a cause of the fire. (*Id.*) On July 22, 2005,

2009 WL 1873667

the Estate of Ms. Steves filed a survival and wrongful death suit against C.O.P.D. and other defendants. (*Id.* at 6.) Ms. Connor's insurance company also filed suit against C.O.P.D. on August 22, 2005. (*Id.*) Both suits were later consolidated ("Fire Suit").

Attorneys for Plaintiffs and Defendant exchanged numerous communications regarding the Fire Suit, but Plaintiffs' attorney took no part in defending the suit. (*Id.* at 4–6.) Defendant settled the Fire Suit for $490,000 on July 12, 2007. (*Id.* at 6) On September 11, 2007, Defendant demanded indemnification from Plaintiffs for the $490,000 settlement plus $624,936.86 in attorneys' fees to be paid from money being held in escrow following Plaintiffs' sale of C.O.P.D. to Defendant. (*Id.*) Plaintiffs refused to indemnify and filed this declaratory judgment action to release the entire $1.75 million in escrow. (*Id.*)

### B. Procedural History

*2 Plaintiffs filed a Complaint on September 20, 2007 (Doc. No. 1). Defendant filed a Motion for Summary Judgment on June 9, 2008 (Doc. No. 21), and Plaintiff filed a Cross–Motion for Summary Judgment on June 30, 2008 (Doc. No. 27). The Court granted Defendant's Motion as to Plaintiff's duty to defend and indemnify and denied Plaintiff's Motion on October 30, 2008. (Doc. No. 34). The Court found that Plaintiffs had a duty to defend and indemnify Defendant as to the product defect count of the Fire Suit but not as to the other three counts (implied warranty, negligent maintenance and repair, and reckless disregard). (Memo.Summ. J. 16.) Therefore, the remaining issues to be resolved was apportionment of the settlement amount and attorneys' fees between the indemnifiable and non-indemnifiable claims.

On April 29, 2009, Defendant filed a Motion for Protective Order (Doc. No. 37), seeking to limit its production obligations to documents not protected by the attorney-client privilege and/or work product doctrine, relying on the seventeen boxes of documents it had already produced to Plaintiffs. On May 6, 2009, Plaintiffs filed a Response and Cross–Motion to Compel (Doc. No. 40), seeking responses to certain interrogatories and document requests withheld by Defendant and unredacted versions of previously produced documents. The Court held a recorded telephone hearing on May 8, 2009, in which it advised the parties that it was holding the matter under advisement pending production of a revised and expanded privilege log, *in camera* inspection of purportedly privileged documents, and supplemental briefing

(Doc. No. 42). The parties submitted supplemental briefs on June 9, 2009 (Doc. No. 46, 47).

The Court held an additional hearing on the arguments raised in the parties' supplemental briefs on June 22, 2009. At the hearing, after arguments, the Court advised the parties that it was denying Defendant's Motion and granting Plaintiffs' Motion but only as to documents in which work product protection was claimed (in whole or part) that specifically relate to (1) settlement amount and/or apportionment and (2) counsel's evaluation of the Fire Suit claims. As to all other documents, the Court granted Defendant's Motion and denied Plaintiffs' Motion. This Memorandum contains supporting legal analysis for this ruling, and outlines the procedure to be followed..

### II. *Discussion*

Plaintiffs concede that the disputed documents listed on the privilege log and produced to the Court *in camera* are generally privileged. Instead, Plaintiffs' Supplemental Brief argues for waiver of the privilege based on the advice at issue doctrine and the common interest doctrine. The party challenging the privilege has the burden of proving that a waiver of the privilege occurred. *See Martin Marietta Materials, Inc. v. Bedford Reinforced Plastics, Inc.,* 227 F.R.D. 382, 390 (W.D.Pa.2005). In addition, Plaintiffs argue that communications between Defendant's Fire Suit counsel and indemnification counsel were not privileged. However, at oral argument on June 22, after the Court expressed doubt as to the discovery of privileged communications, plaintiffs voluntarily withdrew their common interest doctrine argument and their advice at issue argument as to documents protected by the attorney-client privilege. Therefore, the Court will not consider this issue but will confine its analysis to documetns which contain attorney work product, in whole or part.

### A. Work Product Waiver Based on Advice at Issue

*3 In *Rhone–Poulenc Rorer Inc. v. Home Indemnity Co.,* 32 F.3d 851 (3d Cir.1994), the Third Circuit articulated the standard for the advice at issue doctrine: "The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Id.* at 863. Courts within the Third Circuit continue to apply the standard enunciated in *Rhone–Poulenc. See Nesselrotte v. Allegheny Energy, Inc.,* 2008 WL 2858401, at *6 (W.D.Pa. July 22, 2008); *Saltern v. Nor–Car Federal Credit Union,*

**Bowman v. American Homecare Supply, LLC, Not Reported in F.Supp.2d (2009)**

2009 WL 1873667

2003 WL 21250578, at *1 (E.D.Pa. Apr.17, 2003). However, this standard applies to waiver of the attorney-client privilege, and in *Rhone–Poulenc,* the Third Circuit stated that waiver of the privilege does not necessarily lead to waiver of work product protection. 32 F.3d at 866. *See also Chimie v. PPG Indus., Inc.,* 218 F.R.D. 416, 421 (D.Del.2003) (stating that the waiver of the privilege did not necessarily mean waiver of work product protection); *Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 486–87 n. 17–18 (3d Cir.1995) (applying the *Rhone–Poulenc* standard but noting that had the advice at issue argument been made as to work-product protected documents, as opposed to privileged documents, a different analysis would be required); *but see SmithKline Beecham Corp. v. Apotex Corp.,* 2005 WL 2436662, at *2 (E.D.Pa.2005) (stating that if a defendant raises an advice of counsel defense, it waives both the attorney-client and work product privileges as to that defense); *Novartis Pharm. Corp. v. EON Labs Mfg., Inc.,* 206 F.R.D. 396, 399 (D.Del.2002) (finding that invoking a reliance on advice of counsel as a defense constitutes an express waiver of both attorney-client privilege and work product doctrine); *Northwood Nursing & Convalescent Home, Inc. v. Continental Ins. Co.,* 161 F.R.D. 293, 298 (E.D.Pa.1995) (applying the *Rhone–Poulenc* standard to assess work product waiver and finding that it was not met).

The work product doctrine is a qualified, not absolute, privilege, and "like other qualified privileges, it may be waived." *Harding v. Dana Transport, Inc.,* 914 F.Supp. 1084, 1098 (D.N.J.1996) (quoting *United States v. Nobles,* 422 U.S. 225, 239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (internal quotations omitted)). Attorney work product is discoverable when the party seeking discovery has a "substantial need" for the information, and there is no other source available to obtain the substantial equivalent of the material sought without undue hardship. Fed.R.Civ.P. 26(b)(3)(A)(ii). In considering waiver of work product protection, the Third Circuit in *Rhone–Poulenc* stated that "the protection stemming from the work product doctrine belongs to the professional, rather than the client, and [ ] efforts to obtain disclosure of opinion work product should be evaluated with particular care." 32 F.3d at 866 (citations omitted). Based on this standard, the Court must carefully balance the competing interests in evaluating waiver of the work product protection.

*\*4 Plaintiffs argue that Defendant has placed the subject matter of the work product of Defendant's Fire Suit counsel, of Archer & Grenier, principally Christopher Gibson, Esq. at issue. They assert that Mr. Gibson's opinions, mental impressions, and legal theories regarding the strength of the indemnifiable versus non-indemnifiable claims will be critical to both determining the reasonableness of Fire Suit settlement costs and attorneys' fees, and apportioning among all claims, the amount for which each party is responsible. Plaintiffs' Supplemental Brief relies heavily on two cases outside of the Third Circuit for this argument: *Abbott Laboratories v. Alpha Therapeutic Corp.,* 200 F.R.D. 401 (N.D.Ill.2001) and *Pamida, Inc. v. E.S. Originals, Inc.,* 281 F.3d 726 (2002).

Although the Third Circuit has not spoken squarely on the applicability of the advice at issue waiver as to work product protection, this Court is persuaded that Plaintiff is correct for two reasons. First, as in *Abbott,* Plaintiffs' and Defendant's Agreement contained a cooperation clause:

> The parties hereto agree to render to each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate defense of any such claim, action, suit or proceeding .... the Indemnitee shall cooperate with the Indemnitor and provide such assistance ... as the Indemnitor may reasonably request in connection with the defense of any such claim, action, suit or proceeding, including providing the Indemnitor with access to and use of all relevant corporate records ...

(Def.'s Mot. Summ. J. Ex. 16 ¶ 9.3(a)(iii).) The *Abbott* court relied on strikingly similar language to find that the purchasing company in that case was contractually obligated to produce documents to the selling company in an indemnification suit following the purchasing company's defense of an underlying suit. 200 F.R.D. at 410 (using the cooperation clause to find both the attorney client privilege and work-product protection inapplicable). Although this Court is not prepared to find that Defendant is breaching a contractual duty to share Fire Suit attorney work product with Plaintiffs, it finds the contractual provision persuasive as to the parties' duty to share all (including attorney work product) documents related to the Fire Suit.

Second, the Court is convinced that fairness and equity dictate production of all work-product protected documents to Plaintiffs relevant on the indemnification issue. The *Abbott* court reasoned that in the interest of fairness, the entire case should not be allowed to "turn on an issue upon which one party has no knowledge and is barred from accessing the necessary information while the other party is able to use the information to establish its claim while shielding it from disclosure." *Id.* at 410–11. The court continued that since issues surrounding conduct in the underlying litigation are

2009 WL 1873667

central to the question of indemnification, documents relating to that conduct were not only vital, but also the only, means by which the seller could evaluate the validity of the purchaser's indemnification claim and the reasonableness of the costs claimed. *Id.* at 411. This Court is similarly persuaded by fairness and policy arguments, that in such an indemnification suit based on multiple claims, some indemnifiable and some not, the Fire Suit counsel's work product is central to the indemnification damages that this Court must determine.

**\*5** In addition, the Court finds the Eighth Circuit's reasoning in *Padima* persuasive. There the Eighth Circuit stated that in evaluating the waiver of work-product protection, the court must look to "whether the interests [of] fairness and consistency mandate a finding of waiver." 281 F.3d at 732. "When a party seeks a greater advantage from its control over work product than the law must provide to maintain a healthy adversary system, the privilege should give way." *Id.* (quoting *In re Sealed Case,* 676 F.2d 793, 818 (D.C.Cir.1982) (internal quotations omitted)). In that case, the Eighth Circuit determined that the indemnitor waived work product protection where the discovery sought involved "crucial issues in the indemnification action," including the reasonableness of attorneys' fees in the underlying litigation. *Id.* Therefore, the court concluded that "[f]airness requires that the work product privilege must give way...." *Id.* Following the court's assessments of fairness in *Abbott* and *Padima,* this Court is persuaded that fairness requires production of attorney work product from the Fire Suit.

Although this Court notes Judge Joyner's assessment that "[e]ven if the attorney's work product is highly relevant to the present litigation [this] does not necessarily mean that the work product is at issue," *Northwood,* 161 F.R.D. at 298, the Court believes that the specific facts of this indemnification claim dictate that Fire Suit work product is directly at issue. In *Northwood,* the insured brought a declaratory judgment action against its insurer that the insurer had a duty to defend two third-party suits, where the insurer had only agreed to defend against one. Judge Joyner reasoned that the insured's counsel's work product in the underlying litigation was not directly at issue to the indemnification suit, which was essentially a breach of insurance contract claim. However, in this case, the Court has already construed the Agreement to determine that an indemnifiable claim, one of the four claims in the Fire Suit, exists. The sole remaining issue requires assessing and apportioning damages between the multiple claims in the Fire Suit, and Mr. Gibson's work product regarding his assessment of the claims is directly at

issue in determining such damages. As Plaintiffs argued, the Court expects that Mr. Gibson will be a witness for Defendant, and therefore Plaintiffs' effective cross-examination of him necessarily depends on access to the documentation about his Fire Suit representation, which has now terminated. Further, this Court finds that Plaintiffs have sufficiently shown "substantial need" and no other means to procure these documents under Rule 26(b)(3)(A)(ii).

Based on the above analysis, the Court finds that Plaintiffs are entitled to Fire Suit counsel's work product documents that specifically discuss: (1) the Fire Suit settlement amount and/or allocation and (2) counsel's evaluation of the Fire Suit claims. Plaintiffs should identify such documents from the privilege log within one week. However, Plaintiffs are not entitled to documents that contain communications to the client. If a document contains attorney work product which was communicated to the client, defendant may redact portions which show the communication, but must produce the portion containing work product. Defendants may redact any other information which does not fall within the two items stated above. Following Plaintiffs' identification, Defendant shall assert any objections to Plaintiffs' document request, and the parties should confer to resolve their disputes. If disputes remain, the parties are to advise the Court by July 17, 2009, and the Court will then review disputed documents one-byone to determine whether they are discoverable, possibly at a hearing.

**B. Communications Between Fire Suit and Indemnification Counsel**

**\*6** Plaintiff also argued that certain communications were not privileged and therefore were discoverable. Specifically, Plaintiff asserted that communications between Defendant's indemnification counsel and Fire Suit counsel regarding the indemnification suit, which are listed on the privilege log, are not privileged because the Fire Suit counsel was never retained to defend the indemnification suit and therefore is not Defendant's counsel in this matter.

The Court disagrees. As Judge Joyner articulated in *Northwood,* the attorney-client privilege extends to communication between attorneys and their agents, so communications between the underlying litigation counsel and indemnification counsel are privileged. 161 F.R.D. at 297. Since indemnification counsel may communicate with Fire Suit counsel as an agent, regardless of whether the Fire Suit counsel was retained in the indemnification matter,

2009 WL 1873667

their communications remain protected by the attorney-client privilege.

### III. *Conclusion*

Based on the above analysis, the Court finds that Plaintiffs are entitled to production of certain work-product protected documents that relate specifically to counsel's mental impressions, legal opinions, and theories regarding settlement and an evaluation of the claims in the underlying Fire Suit.

An appropriate Order follows.

### ORDER

AND NOW, this 25th day of June, 2009, upon consideration of the parties' cross-motions for discovery, it is hereby ORDERED as follows:

(1) Defendant American Homecare Supply's Motion for a Protective Order (Doc. No. 37) is GRANTED in part as to attorney-client privileged documents and DENIED in part as to certain work-product protected documents, as explained in the accompanying Memorandum;

(2) Plaintiffs Alan and Christina Bowman's Motion to Compel (Doc. No. 40) is DENIED in part as to attorney-client privileged documents and GRANTED in part as to certain work-product protected documents that specifically discuss (1) the Fire Suit settlement amount and/or allocation and (2) counsel's evaluation of the Fire Suit claims;

(3) Plaintiffs shall provide Defendant within one week of this Order, from the privilege log, a list of the documents described in (2) that it seeks Defendant to produce; Defendant shall promptly produce those documents, or object.

(4) If after counsel confer, disputes remain over documents requested by Plaintiffs, Plaintiffs shall advise this Court by July 17, 2009, of those documents, which Plaintiffs assert should be produced. Defendant shall, by July 21, 2009, provide the Court by letter (which need not be sent to Plaintiffs' counsel) the reasons as to why each document requested by Plaintiffs should not be produced. The Court may schedule a further hearing to resolve the disputes on a document-bydocument basis.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 1873667

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

3

Case 1:20-cv-00292-JPW    Document 107-8    Filed 03/11/21    Page 13 of 19

First Fidelity Bancorporation v. National Union Fire Ins. Co...., Not Reported in...

1992 WL 55742

1992 WL 55742
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

FIRST FIDELITY

BANCORPORATION, Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA and
Financial Institutions Reserve Risk
Retention Group, Inc., Defendants.

Civ. A. No. 90–1866.
|
March 13, 1992.

**Attorneys and Law Firms**

Gary R. Battistoni, Stuart A. Law, Jr., Daniel J. Dalton, Richard E. Ruffee, Drinker, Biddle & Reath Philadelphia, Pa., for plaintiff.

Judy L. Leone, Michael F.R. Harris, Seymour Kurland, Jeffrey G. Weil, Jan P. Levine, Gerald D. Wixted, Dechert, Price & Rhoads, Philadelphia, Pa., Mark P. Denbeaux, Westwood, N.J., Nancy J. Gellman, William J. O'Brien, Conrad, O'Brien, Gellman, De Stefano & Rohn, P.C., Philadelphia, Pa., Sandra L. Spear, Washington, D.C., Joel R. Marcus, Bruce A. Baird, Robert D. Fram, David V. Gourevitch, Covington & Burling, Washington, D.C., Gary R. Battistoni, Stuart A. Law, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for defendants.

*MEMORANDUM*

ROBERT F. KELLY, District Judge.

**\*1** Plaintiff First Fidelity Bancorporation ("Fidelity") and defendant National Union Fire Insurance Company of Pittsburgh, PA ("National") have each filed objections to certain discovery orders entered by Magistrate Judge Hall on January 14, 1992. Fidelity objects to the Order granting National's Motion to Compel the Production of Documents, alleging that the documents are protected by the work product doctrine and attorney-client privilege ("Privileged Discovery"). National objects to the Order granting Fidelity's

Motion to Compel Answers to Interrogatories and Production of Documents Concerning Bad Faith Pattern and Practice ("Pattern and Practice Discovery"), claiming that compliance is unduly burdensome. I affirm the Order granting Privileged Discovery but on somewhat different grounds, and I reverse the Order granting Pattern and Practice Discovery.

I. *BACKGROUND:*

Fidelity, its directors and its officers are insureds under a director and officer insurance policy issued by National (the "Policy")[1]. Fidelity's coverage is determined by the allocation of liability. Specifically, National is obligated to reimburse Fidelity only to the extent that Fidelity indemnifies its directors and officers, up to a limit of 25 million dollars. The Policy does not insure Fidelity for its own liability. The Policy also contains a cooperation clause, which provides that "[t]he Insurer's consent [to settlements] shall not be unreasonably withheld, but the insurer shall be entitled to full information and all particulars it may request in order to reach a decision as to reasonableness." Policy at ¶ 6. National has no duty or right to defend Fidelity.

On December 13, 1988, Fidelity issued a press release announcing its intent to add about 300 million dollars to loan loss reserves. This announcement spawned a one day drop in Fidelity's aggregate share value of over 400 million dollars. Numerous class and derivative actions followed, naming Fidelity and its directors and officers as defendants (the "underlying litigation"). Given the allocation of liability issues, Fidelity wished to position itself against National as well as against the underlying plaintiffs. This led Fidelity to obtain its own counsel in the underlying litigation, and it also set the stage for the present lawsuit. While the defendants in the underlying litigation pursued settlement, National had trouble acquiring information it requested from Fidelity. When the underlying plaintiffs' eventually made a settlement offer of 45 million dollars, Fidelity notified both National and FIRG of its belief that this represented a reasonable settlement. FIRG consented to the settlement, but National did not. Fidelity accepted the settlement and indemnified its directors and officers, and then brought this action.

Fidelity alleges that National violated the Policy and its fiduciary obligations by failing to promote a reasonable settlement of the underlying litigation, and by unreasonably refusing to consent to the settlement offer. Fidelity seeks to recover 25 million dollars under the Policy, punitive damages, costs, attorneys' fees and prejudgment interest. National has

filed a cross-claim, alleging that Fidelity breached its duty under the Policy's cooperation clause to share all information.

## II. *Order Granting Privileged Discovery:*

*2 Judge Hall's Order granted National's request for essentially all documents generated in connection with the underlying litigation by Fidelity, its attorneys and third party consultants. Fidelity objected on the grounds of work product and attorney-client privilege. Judge Hall rejected the attorney-client objection because Fidelity failed to develop an adequate privilege log, and he found that Fidelity waived the work product objection by bringing this suit and therefore putting the documents at issue. Although I agree with this result, I do not believe it should be based on the sufficiency of Fidelity's privilege log since the parties' submissions dealt exclusively with Fidelity's right to assert the privilege as a matter of law.

It is clear that Fidelity has put the Privileged Discovery at issue by bringing this suit, and it has therefore waived its right to raise both work product *and* attorney-client objections. *See* National Union's Response to Fidelity's Sur-Reply at 8–18 (cases cited therein). Fidelity disputes this, arguing that the issue is not its decision to settle, but rather whether settlement was objectively reasonable given the risks of going to trial. Consequently, Fidelity claims that the only relevant discovery would consist of the events giving rise to the underlying litigation and any evidence which would have been adduced at trial had the case not settled. I agree that a primary focus of this suit is whether the settlement was objectively reasonable. However, to make this determination, all relevant information must be examined. This especially includes the information contained in the Privileged Discovery since it is extremely probative in assessing whether a reasonable person would have settled under the circumstances. Moreover, the reasonableness issue raised in this suit necessarily contains certain subjective aspects. The risks of going to trial and the reasonableness of settlement are immensely influenced by how vigorous a defense Fidelity mounted. The Privileged Discovery will also reveal whether Fidelity met its burden under the Policy to prepare a defense, and whether there was improper collusion among the interested parties.

Additionally, there is a sharp dispute over whether the Policy's cooperation clause requires disclosure of the Privileged Discovery. I find that as to the sophisticated parties involved in the present case, the Policy's language is clearly all encompassing and would normally include privileged documents, for otherwise an insurer could not reasonably assess the proposed settlement. This result is fully supported by the fact that the policy issued by FIRG specifically exempted privileged documents. Thus, the Privileged Discovery is also placed at issue by Fidelity's allegation of compliance with the Policy's provisions, and National's cross-claim.

Fidelity has also waived its right to object by making selective disclosures of certain protected documents. The rule of law is clear. In order to protect against self-serving disclosure, a party who discloses protected documents waives the right to assert work product or attorney-client protections for all documents dealing with the same subject matter. *See* cases cited in Briefs. Fidelity has skirted National's claim of selective disclosure by merely pointing to certain "discovery compromises" it has unilaterally agreed to. Given Fidelity's failure to address the pertinent issues, I find that Fidelity has waived its right to object to the Privileged Discovery. For the reasons stated above, I affirm[2].

## III. *Order Granting Pattern and Practice Discovery:*

*3 By Order and Memorandum dated January 14, 1992, Judge Hall granted Fidelity's requests for Pattern and Practice Discovery. Balancing the extreme burden and expense required to comply with this Order with the relatively minor probative value of this discovery, I will reverse. The only relevance of the Pattern and Practice Discovery is Fidelity's hope to establish National's habit of dealing in bad faith with its insureds, and that National acted in conformity with this habit in the present case. Fed.R.Evid. 406. In this regard, National previously produced the following: (1) all pleadings since 1987 in which insureds alleged bad faith or in which bad faith was a factor; (2) approximately 75 claim files involving the same type of claims as the underlying litigation[3]; (3) and 200 director and officer liability policies. Further, National has already produced documents totaling over 30,000 pages in response to other discovery requests.

The Order would require the *additional* production of almost 20,000 insurance policies and almost 3,000 claim files. It would take years to implement compliance at a horrendous expense. None of these files even contain bad faith actions because, as explained above, National has already produced the pleadings of such actions. Accordingly, I find that the burden and expense of this discovery clearly outweighs its relevance. This ruling is also based on the fact that at trial, the scope of this discovery request far exceeds what would be reasonably admissible under Fed.R.Evid. 406. This is especially so considering National's understandable desire to

**First Fidelity Bancorporation v. National Union Fire Ins. Co...., Not Reported in...**

1992 WL 55742

have a "mini-trial" over each and every instance of bad faith claimed by Fidelity. Thus, it is clear that the Order is also over broad. I find that the type and quantity of production to date draws a proper balance between discovery opportunities Fidelity genuinely deserves, and the ridiculous desires of counsel. Accordingly, I reverse.

I shall therefore issue the following order.

*ORDER*

AND NOW, this 13th day of March, 1992, upon consideration of the parties' objections and all responses thereto, it is hereby ORDERED as follows:

1. Magistrate Judge Hall's Order entered January 14, 1992 granting Fidelity's Motion to Compel is REVERSED and MODIFIED. Within 30 days of receipt of this Order, National Union shall make the 75 claim files already produced available for Fidelity's inspection and copying in complete and unredacted form. Upon compliance, National Union is deemed to have satisfied Interrogatories nos. 4, 5 and 10 and Document Requests nos. 1 and 2.

2. Magistrate Judge Hall's Order entered January 14, 1992 granting National Union's Motion to Compel is AFFIRMED although on somewhat different grounds as explained in the attached Opinion.

3. The Order directing pretrial motions in the above-captioned case to Magistrate Judge Hall is hereby VACATED, and it is FURTHER ORDERED that all future filings shall be submitted to this Court.

**All Citations**

Not Reported in F.Supp., 1992 WL 55742

**Footnotes**

1   Defendant Financial Institutions Reserve Risk Retention Group, Inc. ("FIRG") is an excess carrier and is not a party to the present discovery dispute.

2   This ruling makes it unnecessary to settle the complicated factual issues raised by the common interest doctrine.

3   These files were incomplete, and the parties' submissions in connection with FIRG's Second Motion to Compel and FIRG's Motion to Enlarge the Scope clearly show that the 75 files must be produced in complete and unredacted form for Fidelity.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

4

Case 1:20-cv-00292-JPW    Document 107-8    Filed 03/11/21    Page 17 of 19

Kimberly-Clark Worldwide, Inc. v. First Quality Baby..., Not Reported in...

2010 WL 4537002

2010 WL 4537002
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

KIMBERLY–CLARK
WORLDWIDE, INC., Plaintiff
v.
FIRST QUALITY BABY PRODUCTS,
LLC, First Quality Products, Inc.,
First Quality Retail Services,
LLC, First Quality Hygienic, Inc.,
Defendants and Counterclaim Plaintiffs
v.
Kimberly–Clark Corporation,
Kimberly–Clark Worldwide, Inc.,
Kimberly–Clark Global Sales,
LLC, Counterclaim Defendants.

Civil No. 1:CV–09–1685.
|
Nov. 3, 2010.

**Attorneys and Law Firms**

Andrew G. Klevorn, Chad J. Doellinger, Eimer Stahl Klevorn & Solberg LLP, Janice V. Mitrius, Jason S. Shull, Jeffrey M. Cox, Katherine L. Fink, Marc S. Cooperman, Michael L. Krashin, Thomas J. Lerdal, Banner & Witcoff Ltd., Bradley F. Rademaker, Jeffrey M. Cox, Chicago, IL, Bridget E. Montgomery, Adam M. Shienvold, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA, David J. Schertz, Harrisburg, PA, Vicki Margolis, Kimberly-Clark Corporation, Neenah, WI, for Plaintiff and Counterclaim Defendants.

Aden A. Allen, Jose C. Villarreal, Michele K. Connors, Wilson Sonsini Goodrich & Rosati, PC, Austin, TX, David A. Barrett, Boies, Schiller & Flexner LLP, Ira E. Silfin, Brian A. Comack, Kenneth P. George Amster, Rothstein & Ebenstein LLP, New York, NY, Brian P. Downey, Frederick Alcaro, Pepper Hamilton LLP, Harrisburg, PA, D. Michael Underhill, Evan A. Parke, Michael A. Brille, Boies, Schiller & Flexner LLP, Washington, DC, Julie M. Holloway, Wilson, Sonsini, Goodrich & Rosati, San Francisco, CA, Kalina V. Laleva, Michael A. Ladra, Ron E. Shulman, Thomas T. Carmack, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Thomas B. Schmidt, III, Pepper Hamilton, LLP, Harrisburg, PA, for Defendant and Counterclaim Plaintiffs.

*MEMORANDUM*

MARTIN C. CARLSON, United States Magistrate Judge.

*I. Introduction*

**\*1** Presently before the court is First Quality's motion to compel discovery pursuant to Rule 37 of the Federal Rules of Civil Procedure seeking production of all test data on which Kimberly–Clark ("KC") relies to support its claims of patent infringement, and all documents that support or refute said test data. In support of its motion, First Quality argues that the testing data and related documents are not protected by the attorney-client privilege nor as attorney work product. In addition, even if a privilege applies, First Quality contends that KC waived any privilege by disclosing and relying on the information in its infringement contentions. Finally, claiming a substantial need for the materials, First Quality argues that attorney work product immunity should not apply. After review of the parties' submissions, we will deny the motion.

*II. Discussion*

Rule 26(b) (1) of the Federal Rules of Civil Procedure provides that any party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." It is well settled that Rule 26 establishes a liberal discovery policy. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). As a result of this liberal discovery policy, the burden of demonstrating the existence of a privilege and that it has not been waived rests on the party asserting the privilege. *In re Grand Jury (OO–2H),* 211 F.Supp.2d 555, 557 (M.D.Pa.2001) (Judge Rambo). Likewise, the party claiming work product immunity bears the burden of showing that "the materials in question 'were prepared in the course of preparation for possible litigation.' " *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124, 138 (3d Cir.2000). Here, in both instances, the burden rests on KC.

Communications are protected under the attorney-client privilege when "(1) the legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence

Case 1:20-cv-00292-JPW    Document 107-8    Filed 03/11/21    Page 18 of 19

Kimberly-Clark Worldwide, Inc. v. First Quality Baby..., Not Reported in...

2010 WL 4537002

permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection may be waived." *In re Impounded,* 241 F.3d 308, 316 n. 6 (3d Cir.2001).

The work product doctrine, in turn, is governed by Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides that:

> (A) *Documents and Tangible Things.* Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

> (i) they are otherwise discoverable under Rule 26(b)(1); and

> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

> **\*2** (B) *Protection Against Disclosure.* If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed.R.Civ.P. 26(b)(3). Generally, "voluntary disclosure to one's adversary of documents protected by the work-product privilege waives the privilege." *Montgomery County v. MicroVote Corp.,* 175 F.3d 296, 304 (3d Cir.1999) (citing *Westinghouse v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3d Cir.1991)).

The test for determining whether a document was prepared in anticipation of litigation is "where in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Martin v. Bally's Park Place Hotel & Casino,* 983 F.2d 1252, 1258 (3d Cir.1993). Courts generally divide this test into two prongs: the documents were prepared (1) at a time when litigation was reasonably foreseeable; and (2) primarily for the purpose of litigation. *See United States v. Rockwell International,* 897 F.2d 1255, 1266 (3d Cir.1990); *see also Muse–Freeman v. Bhatti,* No. 07–3638, 2008 WL 2165147, at \*1 (D.N.J. May 21, 2008). However, the Third Circuit makes clear that the materials must be prepared in anticipation of litigation, and

not in the ordinary course of business. *Id.* Otherwise, the privilege does not apply. *Id.*

Here, the testing data and related documents in question are not protected by the attorney-client privilege. As we previously indicated, KC carries the burden of showing the materials are covered by the privilege. In this instance, KC fails to sufficiently demonstrate that the testing materials in question were confidential communications between attorney and client.

Nevertheless, the materials in question are protected as attorney work product prepared in anticipation of litigation. In support of its position, KC offers the declaration of H. Michael Kubicki, counsel for KC since 2001. In his declaration, Mr. Kubicki states, under penalty of perjury, that the materials at issue were made in anticipation of litigation between KC and First Quality. In addition, the submitted privilege logs show that testing data was prepared during a time when litigation was contemplated. (*See* doc. 298.) In fact, First Quality filed its original declaratory judgment action a mere eight months after KC received its first product analysis results. *See First Quality Baby Prods., LLC v. Kimberly–Clark Worldwide, Inc.,* No. 09–0354, 2009 WL 1675088 (M.D.Pa. June 15, 2009); (doc. 298.) In light of these facts, we conclude that the information in question was prepared in anticipation of litigation. Thus, the attorney work product privilege applies to the materials.

In spite of this, we conclude that KC will be deemed to waive attorney work product protection if it relies upon and discloses the testing data at issue in support of its infringement contentions. Indeed, First Quality argues that KC has already relied on the testing data by employing the material in its preliminary infringement contentions. However, preliminary infringement contentions provide notice of the accusing party's specific infringement theories, and are not considered evidence. *Fast Memory Erase, LLC v. Spansion, Inc.,* No. 08–977, 2009 WL 4884091, at \*2 (N.D.Tex. Dec. 16, 2009). Thus, KC using testing data to put First Quality on notice is not relying on the materials as evidence in support of its infringement theories. However, like the court in *Tillotson Corporation v. Shijiazhaung Hongray Plastic Products, LTD.,* 244 F.R.D. 683, 693 (N.D.Ga.2007), we conclude that if KC relies on the testing data at issue as evidence to support its infringement claims, justice requires that First Quality has a right to the material in order to defend itself. Thus, in such a situation if KC actually relies upon this data, First Quality will have shown a substantial need for the testing information

2010 WL 4537002

and disclosure would be required. Likewise, by voluntarily disclosing the materials in such a situation, KC would be waiving the privilege.

### III. Conclusion

*3 Based on the preceding, and to the extent that KC relies on the factual information acquired from any testing, we conclude that plaintiff must disclose that information even if it requires separating mental impressions from factual information. However, we will not require KC to produce the materials in question unless it relies on that information to support its infringement claims or will use said data in the future. We will afford KC fourteen (14) days from the date of this order to determine whether it will rely on the testing data in support of its claims. If it chooses to rely on the data, KC will have ten (10) days thereafter to disclose the information to First Quality. Nonetheless, if KC chooses not to rely on the testing data and then thereafter attempts to use said data in any manner against First Quality, we will not allow such evidence to be admitted.

We will issue an appropriate order.

### ORDER

AND NOW, this 3rd day of November, 2010, upon consideration of First Quality's motion to compel (doc. 263), and pursuant to the accompanying Memorandum, it is ordered that:

1. The motion to compel is denied.

2. Plaintiff is afforded fourteen (14) days from the date of this order to determine whether it will rely on the testing data in support of its claims and report its decision to the court.

3. If plaintiff chooses to rely on the data, it will have ten (10) days thereafter to disclose its test results to defendants.

4. Failure to comply with this order will result in mandatory disclosure, and any later attempt to rely on said testing data will not be allowed.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4537002

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.