*E X H I B I T* "*A*"

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PACE-O-MATIC, INC.,

    Plaintiff,         Docket Number

vs               1:20-CV-00292

ECKERT SEAMANS CHERIN &

MELLOTT, LLC,

    Defendant.

----------------------------

DEPOSITION OF

THOMAS LISK, ESQUIRE

September 1, 2020

11:00 a.m.

ESQUIRE DEPOSITION SOLUTIONS

1835 Mark Street - Suite 555

Philadelphia, PA 19103

Gena M. Nardone, RPR

**Page 2**

APPEARANCES OF COUNSEL

On behalf of the Plaintiff
MYERS BRIER & KELLY
DANIEL BRIER, ESQ. (Via Teleconference)
DONNA WALSH, ESQ. (Via Teleconference)
425 Spruce Street - Suite 200
Scranton, PA 18053

On behalf of the Defendant
FOX ROTHSCHILD
ROBERT TINTNER, ESQ. (Via Teleconference)
2000 Market Street - 20th Floor
Philadelphia, PA 19103

On behalf of the Witness
COZEN O'CONNOR
BRIAN FLAHERTY, ESQ. (Via Teleconference)
1650 Market Street - Suite 2800
Philadelphia, PA 19103

Also Present:  Timothy Coon
             Greg Cline

**Page 3**

INDEX

| Examination | | Page |
|---|---|---|
| By: Mr. Tintner | | 4, 85 |
| By: Mr. Brier | | 64 |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| Lisk-1 | Subpoena | 9 |
| Lisk-2 | Notice | 9 |
| Lisk-3 | Engagement letter | 29 |
| Lisk-4 | Series of e-mails | 34 |
| Lisk-5 | Series of e-mails | 48 |
| Lisk-6 | Series of e-mails | 51 |
| Lisk-7 | Series of e-mails | 53 |
| Lisk-8 | Declaration | 54 |
| Lisk-9 | Series of e-mails | 62 |
| Lisk-10 | Eckert-131 through Eckert-133 | 75 |

**Page 4**

(It is hereby stipulated and agreed by between counsel that the reading, signing, sealing, filing and certification are waived; and that all objections except as to the form of the question are reserved until the time of trial.)

    * * *

THOMAS LISK, ESQUIRE, having been duly sworn, was examined and testified as follows:

    * * *

EXAMINATION

    * * *

BY MR. TINTNER:

Q.   Mr. Lisk, my name is Robert Tintner.  I represent the defendant, Eckert Seamans in this lawsuit that was brought by Pace-O-Matic, Inc. which I'm going to call -- I'm going to refer to this as POM, that's how we've referred to it throughout these proceedings -- in the United States District Court for the Middle District of Pennsylvania.

    This is a fact deposition.  I'm going to ask you a series of questions.

    Have you been deposed before?

A.   No.

Q.   Are you familiar with depositions?



Page 5

A.   Yes.

Q.   I mean, I'll just very briefly -- I mean, some of this is logistical.  I'm going to try and go pretty deliberately and slowly asking my questions. I'm going to try to stop to allow you -- well, first to allow counsel if there's going to be any objections raised, to raise their objection.  I would ask you to wait.  There's a slight -- very slight lag time.  So, obviously, we have to be respectful of that.  We're not all in the same room. We also have to be respectful that the court reporter is trying to transcribe both my questions, any objections that are lodged and your responses. We have to go and be very deliberate.

Do you understand?

A.   Yes.

Q.   I will try not to cut you off.  If I'm doing so, someone will remind me I'm sure, but I will try to keep track of that.  And I will also ask you to not -- even if you know what my question is or you know how to respond, if you would wait until I finish my question, because there may be an objection and there may be, you know, some further, you know, phrase or something that I'm about to get

Page 6

out.

Do you understand that?

A.   Yes.

Q.   The other thing is this is certainly no normal conversation, but to the extent that we're having a bit of a conversation with questions and answers, all of your responses have to be verbal. So you can shake your head.  Obviously, that's fine, but you still have to give a verbal response.

Do you understand?

A.   Yes.

Q.   We may have some questions about objections.  I'm going to try to stay away from anything that's potentially objectionable, but there's always things that potentially may come up. I think I've already spoken with Mr. Flaherty that you may have to have an off-line conversation about that and we will take a break and give you the time to do so.

Okay?

A.   Yes.

Q.   If you'd like to take a break, just say, I'd like to take a break.  I would prefer you to take a break if we're done with a question but,

Page 7

obviously, any time you need to take a break, we can take a break.

Okay?

A.   I understand.

Q.   The exhibits are -- what's going to end up happening is I have a share screen option.  So when I start to refer to exhibits, and I'm going to actually start with one very quickly because it's the subpoena, it's going to appear on the screen. And I am going to have to scroll through it for you. That does not mean that you don't have the time to review it.  All I need you to say is, please go slowly or let me review it.

Okay?

A.   I understand.

MR. BRIER:  Will you also be circulating those so that we can print and have physical copies of them?

MR. TINTNER:  Yeah, they've been given to -- they've been premarked and they've been given to the court reporter.  I will make sure that everybody gets a set as soon as we're done here.

MR. BRIER:  I didn't mean to interrupt

Page 8

you.

MR. TINTNER:  No, not at all.

MR. BRIER:  I would ask you to have them e-mailed during the deposition so that -- I don't want to see them in advance of when you're using them, but they should be e-mailed so we can print them and have physical copies here, if that's available.

MR. TINTNER:  Let me do that right now.  I can send it to you and Donna.  Hold on one second, everyone.

Off the record.

(Discussion held off the record.)

Q.   Mr. Lisk, could you state your full name, please, for the record?

A.   Yes, Thomas Alan Lisk.

Q.   You're here today pursuant to a subpoena and a notice of deposition?

A.   Yes.

Q.   I'm actually going -- we're going to try this.  I'm going to scroll through this very carefully.  Mr. Lisk, is this the subpoena that you received?

A.   Yes, it is.



Page 9

(Whereupon a document was marked as Lisk-1 for Identification.)

Q.   It's been marked as Lisk-1.  I'm just going to scroll through so you can see the whole document.  Did you also -- did you produce documents in advance of this deposition through counsel?

A.   Yes.

(Whereupon a document was marked as Lisk-2 for Identification.)

Q.   This is the notice of deposition.  Do you recognize this document, which has been marked as Lisk-2?

A.   No, I don't recall seeing that document.

Q.   Do you know whether a notice of deposition was sent in this case?

A.   I received an original notice of deposition, I think, for the date in June.  I don't recall seeing a subsequent notice of deposition.

Q.   Are you taking any medications today which would inhibit your ability to answer my questions?

A.   No.

Q.   Did you do anything, Mr. Lisk, to prepare for this deposition?

A.   I reviewed documents.  Essentially the

Page 10

e-mails that have been produced previously.

Q.   Produced by whom?

A.   They are all stamped Eckert Seamans or POM with numbers.  I received them from Mr. Flaherty, who I believe -- I know I received them from Mr. Flaherty.

Q.   Do you know where Mr. Flaherty received them from?

A.   I am not certain of that.  I believe it may have been from Mr. --

MR. FLAHERTY:  Hold on.  Don't guess. If you know, you know.  If you don't, you don't.  Just answer what you know.

THE WITNESS:  I do not know with certainty, no.

Q.   Are you represented by counsel here today? Let's make sure we're clear on that.

A.   Yes.

Q.   That would be Mr. Flaherty?

A.   Yes.

Q.   Now, you're an attorney licensed to practice law in Virginia, is that correct?

A.   Yes.

Q.   Where else are you licensed to practice

Page 11

law?

A.   District of Columbia.

Q.   Are you licensed to practice law in Pennsylvania?

A.   No.

Q.   Are you licensed to practice law before any Federal court jurisdictions?

A.   Yes.

Q.   Which ones?

MR. FLAHERTY:  Hold on one second. I'll be right back.

(Recess taken.)

MR. TINTNER:  Can you read back the question?

(Reporter read back.)

THE WITNESS:  I'm licensed to practice before the US District Court for the Eastern District of Virginia, as well as the Board Circuit Court of Appeals.

Q.   Could you tell us briefly about your educational background, very briefly?

A.   I graduated with a Bachelor of Arts in 1980 from Washington and Lee University.  I graduated with a JD in 1985 from Washington and Lee

Page 12

University School of Law.

Q.   Mr. Lisk, where are you currently employed?

A.   I'm employed by the law firm Cozen O'Connor and Cozen Public Strategies.

Q.   How long have you been with Cozen O'Connor?

A.   Since September 2018.

Q.   Where did you work before that, Mr. Lisk?

A.   Before that I was employed with the law firm Eckert Seamans from January 2010 till September of 2018.  And before that -- did you want before that?

Q.   Sure.

A.   Before that I was employed with the law firm LeClair Ryan from June of 1994 to January of 2010.  And before that with the law firm Thomas and Fisk, which later became Hazel Thomas, from August of 1985 until June of 1994.

Q.   When you were at Eckert Seamans were you an equity partner?

A.   Not initially, but eventually, yes.

Q.   When you started in 2010 at Eckert Seamans, did you come in as a partner, associate



Page 13

counsel, what was your role with Eckert when you started?

A.   I was a non-equity member.

Q.   Then when did you become an equity member?

A.   Roughly in 2012, sometime in the spring.

Q.   Do you belong to any professional associations or organizations?

A.   Yes, I'm a member of the Virginia Bar Association.  I am a member of -- most memberships are through the law firm not through me individually.  So the Virginia Bar Association.

Q.   Mr. Lisk, have you ever been sued before?

A.   No.

Q.   I asked you before, but you've never been deposed before, correct?

A.   Correct.

Q.   Let's talk about POM, when I refer to POM, I already mentioned this, but it's Pace-O-Matic, correct?

A.   Yes.

Q.   Do you currently represent POM at Cozen O'Connor?

A.   Yes.

Q.   Do the matters in which you represent POM,

Page 14

are they matters pending in the Commonwealth of Virginia?

A.   Yes.

Q.   When you were at Eckert, how did -- well, first of all, did you know POM, the company, while you were at Eckert, before they retained Eckert?

A.   No.

Q.   How did you become aware of POM?

A.   I was contacted by a representative of POM in December of 2016.  That person had been referred to me by another attorney outside of --

Q.   Who was that?  I'm sorry, I didn't mean to interrupt you.  You can finish your answer.  I'm sorry.

A.   By another attorney outside of Eckert.

Q.   I'm not asking you who that person was, but who was the person at POM that reached out to you?

A.   The person's name is Lee Wesson.

Q.   What was his role with POM?

A.   Special advisor to the president of the company.

Q.   Is he an employee of POM?

A.   I do not know what the relationship is,

Page 15

whether it's employee or contractor.  I don't know.

Q.   Is he still with POM?

A.   He is still a representative of POM, yes.

Q.   What is his role now with POM at the present?

MR. BRIER:  Bob, I'm going to object.  I don't know what Mr. Wesson's current role with POM, how it's relevant to these matters but, more importantly, I think it intrudes on the current representation and privilege issues.

MR. TINTNER:  I'm not asking anything privileged.  I'm asking whether he knows what Mr. Wesson's role is with POM.  That's not privileged.

MR. FLAHERTY:  Hang on.  This is Brian speaking here.  I represent the witness and I am -- it's not -- I don't know if it's privileged or not, but there are privileges here, that of POM and that of Parx as well.  I believe that Mr. Brier represents POM.  So in the case of assertions of privilege, if appropriate, I'm going to assume that Mr. Brier is going to object in the event that he

Page 16

believes that a question calls for the revelation of privileged information.  I will instruct the witness not to answer a question if on behalf of POM Mr. Brier asserts that there's an objection.  Is that your understanding as well, Mr. Brier?  I think that's right, but I just want to make sure you have the same understanding as I have.

MR. BRIER:  Yes, that's my understanding.

MR. FLAHERTY:  As to whether this particular question is privileged or not, I don't think Mr. Brier has specifically stated yet, as clearly as he might, I don't know, it's up to him, as to whether he believes it calls for privileged information.  It could, depends upon how the witness learned the information that he would be revealing.  So I'll leave it at that.  I'm not going to instruct him, at this point, to not answer the question.  I would simply ask Mr. Brier to state whether or not he believes the question calls for the revelation of privileged information, and if he's going to assert the privilege, and if so,



Page 17

I will instruct the witness not to answer.

MR. BRIER: My position is that if the witness would need to disclose privileged information to answer the question, then I am asserting privilege. I don't know if he's able to answer it without disclosing privileged information or not.

MR. FLAHERTY: Mr. Lisk, I'll give you this advice, on the record, and that is, if you can answer that question, which I believe is the current position of Mr. Wesson, without revealing privileged information, which would mean a communication by Mr. Wesson or someone else to POM, then you may answer it. So, for example, if you know the answer to that question because you've seen it on some public website and you know that that's what the position is or if you've heard Mr. Wesson state it at some forum or someplace other than to you privately, you may answer it but if you know that information only because Mr. Wesson has told you, then I instruct you not to answer the question. Do you understand my instruction?

THE WITNESS: Yeah.

Page 18

MR. FLAHERTY: Go ahead and respond to the question one way or another, depending upon how you would know that information.

THE WITNESS: I do not know what Mr. Wesson's title or position is today.

Q. At the time in December of 2016 was Eckert doing any work for POM?

A. Prior to me being contacted by Mr. Wesson, I was not aware, at that time, whether or not Eckert was doing work for POM.

Q. Did you subsequently become aware that Eckert was or had been doing work for POM?

A. Yes.

Q. What did you learn?

A. I learned that POM was an active client in Eckert's conflict database and that Dave Mayernick, a partner with Eckert, was the responsible attorney for the POM relationship.

Q. Were you aware whether Mr. Mayernick was doing any work for POM in December of 2016?

A. No.

Q. Did you come to learn that Mr. Mayernick was not doing work for POM at the time that POM contacted you in December of 2016?

Page 19

A. I came to learn that Mr. Mayernick had completed his work for POM.

Q. What was it that POM asked you to do, Eckert and you, for POM in December of 2016?

A. POM asked me to assist them with a Virginia strategy, to introduce their skill games into Virginia and to make contact with various governmental authorities at the state and local level to make those introductions.

Q. Is gambling legal in Virginia?

A. There are some forms of authorized gaming that are legal in Virginia, yes.

Q. That are legal, is that what you said? I'm sorry.

A. Yes.

Q. Are there casinos in Virginia?

A. Casinos have been authorized by a recent change in state law, but today there are no operating casinos in Virginia.

Q. At the time that POM reached out to you in December of 2016, did Mr. Wesson or anybody else at POM ask you about having Eckert represent POM in Pennsylvania?

A. Yes.

Page 20

Q. What did they ask you to do?

A. POM was interested in having Eckert provide the similar services in Pennsylvania and Massachusetts.

Q. Now, what did you do when you first got the request from Mr. Wesson about POM representing -- I'm sorry -- about Eckert representing POM? Did you run a conflict check?

A. Yes.

Q. Did you reach out to any other attorneys at Eckert about this potential representation?

A. Yes.

Q. And to whom did you reach out?

A. I sent an e-mail to Mark Stewart, who was heading the Eckert gaming practice and Loudon Campbell, who was heading the Eckert government relations practice, advising them of the contact from POM and asking for their input, given that it was a gaming and legislative client.

Q. At that point did you think that there was a potential for a conflict with any of the firm's existing clients?

A. No.

Q. Did you speak with Mr. Stewart about



THOMAS LISK, ESQ.                                    September 01, 2020
PACE-O-MATIC vs 120- ECKERT SEAMANS CHERIN                      21–24

Page 21

Eckert's potential representation of POM?

A.    Yes.

Q.    What was discussed?

MR. FLAHERTY:  Hang on.  I want to make sure I understand the privilege issues here.  You're now asking about internal discussions at the Eckert firm between a lawyer, Mr. Lisk, who had requested to do work for POM and a lawyer, Mr. Stewart, who I believe represented Eckert.  It is possible that revelation -- I'm sorry, I misspoke -- represented Parx, forgive me.  And it is possible that those communications would reveal confidential communications between some lawyer at Eckert and a person at Parx that could be subject to the attorney-client privilege.  Therefore, I want to be very careful about not having Mr. Lisk answer questions that would invade that privilege.  Parx, I gather, is not represented here today.  Eckert Seamans is represented here today.  And Eckert Seamans represents Parx.  So if that means that by asking these questions Parx through you, its counsel, is asking the witness to testify and

Page 22

answer questions, even if it would reveal privileged information as between Eckert and Parx, then I will not object because Parx' counsel will have effectively said --

MR. TINTNER:  I'm not Parx' counsel.

MR. FLAHERTY:  Let me finish.  Okay.  Well, then I'm going to object and instruct him not to answer that question because it might reveal communications that are privileged as between Eckert and Parx.  Next question.

MR. TINTNER:  What is the basis for your objection, Brian?

MR. FLAHERTY:  You've asked this witness to tell you what he discussed with Mr. Stewart.

MR. TINTNER:  Correct.

MR. FLAHERTY:  Internally or externally, it doesn't matter, that could reveal communications between Mr. Stewart and Parx and those communications would be privileged.  And if shared with Mr. Lisk, they would still be privileged because Mr. Lisk was Mr. Stewart's partner.  And, therefore, I am concerned about putting this witness in a

Page 23

position where he is being asked questions and somebody from Parx, who you've now said you do not represent at this deposition, even though Eckert does, that's fine, is not here to either object or not.  And that gives me great concern.  Now, you are representing the interests of Parx, I believe in this matter, as I understand it.  I'm not a party to this case, but I think Eckert's interests and Parx interest is aligned, but I don't want to be having this witness be put in a position where Parx could say that was privileged and you shouldn't have testified about it.

MR. TINTNER:  I'm not asking for privileged communications.

MR. FLAHERTY:  We'll proceed all day if you want to keep asking questions.  I'm going to object as I see appropriate.  Why don't you restate the question and we'll see where we go?

MR. TINTNER:  Brian, we have -- I talked to you about this yesterday.  We are not dealing with privileged communications between Eckert and Parx.  We're trying to understand

Page 24

the nature of the representation.  We have exchanged e-mails, letters, communications in this case on this very issue.  It is not subject to privilege.  We are not asking Mr. Lisk to reveal privileged communications.  And I don't believe that Mr. Lisk is aware of any of those privileged communications.

MR. FLAHERTY:  Will you tell me that Parx agrees with what you just said?

MR. TINTNER:  Yes.

MR. FLAHERTY:  Okay.  You're speaking on behalf of Parx when you answer that question?

MR. TINTNER:  I am speaking on behalf of Eckert, who represents Parx.

MR. FLAHERTY:  Well, then, are you speaking on behalf of Parx?  Can I rely upon what you just said as meaning that Parx will not object or in any way suggest that Mr. Lisk has done anything in the slightest wrong by answering any question you ask that might reveal information about Parx?

MR. TINTNER:  Yes.

MR. FLAHERTY:  Okay.  Fine.



Page 25

MR. TINTNER:  Could you read back the question, please?

(Reporter read back.)

MR. FLAHERTY:  With the understanding that I have been assured by counsel for Eckert, that on behalf of Parx there is no assertion of attorney-client privilege as to any communications to which Mr. Lisk may have been a party.  He may answer that question.

THE WITNESS:  I've discussed with Mr. Stewart the fact that Parx did not want Eckert to represent POM in Pennsylvania.  I also discussed with Mr. Stewart the fact that Parx was interested in potential future casino opportunities in Virginia.  And he wanted to be sure that representation of POM in Virginia would not impede or impair the ability to represent -- Eckert's ability to represent Parx in Virginia.

Q.    And did you understand that partly that was because there was a potential positional conflict as between their interests in Pennsylvania?

A.    I understood -- oh, no.

Q.    Well, what did you understand about those

Page 26

conversations?

MR. FLAHERTY:  I object to the form of the question.  You can answer, if you understand it.

THE WITNESS:  I understood from Mr. Stewart that Parx saw POM skill machines as a competitor and that Parx may be interested in the future in seeking legislation to somehow restrict skill games in Pennsylvania.

Q.    Did you understand that to be a potential positional adversity?

A.    At the time, no, I did not.

Q.    At the time that POM -- you knew that Parx Casino was an existing client of Eckert in December of 2016, correct?

A.    Yes.

Q.    And in part you had the discussion with Mr. Stewart about that, isn't that correct?

A.    Yes.

Q.    Do you recall Mr. Stewart telling you that Eckert could not represent POM in Virginia if POM could not consent to Eckert's representation of Parx and other gaming clients in Pennsylvania?

A.    No.

Page 27

MR. FLAHERTY:  Would you read that back?  I'm sorry, could you read that back?  I just want to follow that question carefully.

(Reporter read back.)

Q.    So that was not your understanding?

A.    No, I never heard Mr. Stewart articulate that statement.

Q.    Did he articulate that Parx potentially needed to be adverse to POM in the future?

A.    Yes.

Q.    Did he tell you that he wanted POM to agree to that potential limitation?

A.    He told me that he wanted POM to agree to a waiver of future conflicts.

Q.    Did you also ask him to confirm with Parx that they also would agree with that understanding?

A.    Agree with what understanding?

Q.    You wanted Parx to agree so that you could undertake --

MR. FLAHERTY:  At least on my computer that came through very garbled.  Can you restate that?

MR. BRIER:  It did for me as well.

THE COURT REPORTER:  It came back

Page 28

garbled for me as well.

Q.    Do you recall discussing with Mr. Stewart that POM wanted Parx to agree that they understood that there was this potential adversity before Eckert could undertake the representation?

A.    No.

Q.    You don't remember asking Mr. Stewart to confirm that Parx was okay, in essence, with Eckert representing POM in Virginia?

A.    Yes, I agree with that.

Q.    Why did you ask for that?

A.    I've asked for that from Mr. Stewart as a matter of respect for Mr. Stewart in the gaming practice in Pennsylvania.

Q.    Wasn't that for POM?

MR. FLAHERTY:  Object to the form. You can answer.

THE WITNESS:  I wasn't asking for Parx' permission to represent POM.  I was looking for an assurance that it was not going to create an issue within Eckert for us to represent POM in Virginia.

Q.    Do you remember discussing an ethical screen or a confidential screen with Mr. Stewart?



Page 29

A. Yes.

Q. You remember discussing the need to keep the representations you and your team of POM in Virginia and Mr. Stewart and his team of potential gaming clients, including Parx in Pennsylvania, separate?

A. Yes.

Q. Do you remember also having that discussion with Mr. Coon, who is the general counsel to Eckert?

A. Yes.

Q. Now, did you send an engagement letter to POM?

A. Yes.

(Whereupon a document was marked as Lisk-3 for Identification.)

Q. I'm going to scroll down this very slowly. Does this look like the engagement letter, it's been marked as Lisk-3, that you sent to POM in December of 2016?

A. Yes.

Q. I'll scroll down to the end. Is that your signature?

A. Yes.

Page 30

Q. Do you know who signed on behalf of POM?

A. I cannot make out the signature.

Q. It says it's the VP of finance and operation. Do you see that?

A. Yes.

Q. Do you know who the VP of finance and operation was?

A. No, not with certainty.

Q. And you sent the letter to Michael Pace, is that correct?

A. The letter is addressed to Michael Pace. I sent the letter via e-mail to Lee Wesson.

Q. Now, do you remember having any discussion prior to sending this letter with POM about the representation?

A. I had a telephone conversation with Mr. Wesson prior to sending the letter.

Q. What was discussed during that conversation?

A. It was a discussion regarding Pace-O-Matic, who made up the company, what the company did, its objectives in Virginia.

Q. Did you raise with Mr. Wesson any of the concerns that were discussed with Mr. Stewart about

Page 31

the representation?

A. Not in that telephone conversation because I had not spoken to Mr. Stewart at that time.

Q. After you spoke with Mr. Stewart, did you have a discussion with someone from POM about the issues with the representation and the concerns raised?

A. I had a conversation with Mr. Wesson regarding the fact that we had -- we, Eckert, had gaming clients in Pennsylvania and, therefore, could not represent POM in Pennsylvania.

Q. Did you discuss with Mr. Wesson or anyone else at POM the potential concerns about why you couldn't represent POM in Pennsylvania?

A. No, I felt that would be divulging client information.

Q. Did you ask Mr. Coon whether there was any amount of discussion you could have with POM about that potential limitation?

A. No, the discussion did not take place.

Q. Did you discuss with anyone from POM about the fact that Eckert was going to implement a confidentiality screen?

A. No.

Page 32

Q. Did you think that was something that POM should know?

A. No, because the people that were going to be involved with POM were not effected by the confidentiality screen.

Q. Did you have these conversations about the representation with general counsel for POM?

A. No.

Q. Who did you have conversations with at POM other than Mr. Wesson about the representation?

MR. FLAHERTY: Object to the form. You can answer, if you understand it.

THE WITNESS: The only conversations I had with representatives of POM regarding the representation itself was with Mr. Wesson.

Q. Did you discuss with Mr. Wesson about the scope of the work that was going to be performed?

A. Yes.

Q. Did you discuss with him the rates that Eckert was going to charge?

A. Yes.

Q. Did Mr. Wesson ask you any questions about why Eckert could not represent POM in Pennsylvania?

A. No, not after I explained to him that we



THOMAS LISK, ESQ.
PACE-O-MATIC vs 120- ECKERT SEAMANS CHERIN

September 01, 2020
33–36

Page 33

had gaming interests and because of that we could not represent POM in Pennsylvania.

Q.   Now, at some point did you fly down to -- I think you flew to Atlanta to meet with representatives of POM?

A.   Yes.

Q.   When was that?

A.   It was the middle of January of 2017.  I would have to refresh my recollection of the date, but I remember it was the Sunday of the Martin Luther King holiday weekend.

Q.   Was that to sort of go over the strategy for Virginia?

A.   It was primarily to learn more about the company, see the business operations, see how the machines were made, see the technology, but it did include some discussions about the Virginia plan and strategy.

Q.   I'm actually -- I just lost video.  Hang on one second.

(Discussion held off the record.)

(Reporter read back.)

Q.   Did anyone from Eckert go with you to that meeting, Mr. Lisk?

Page 34

A.   No.

Q.   Did you speak with Mr. Stewart before or after that meeting?

A.   My first conversation with Mr. Stewart was after that meeting.

(Whereupon a document was marked as Lisk-4 for Identification.)

Q.   We're going to go to what's been marked as Lisk-4.  Mr. Lisk, do you see what's on the screen?  It's been marked as Lisk-4.  I'll just show you, roughly, the bottom of the first page.  This is a series of e-mails between you and Mr. Stewart and others.  Do you recognize this e-mail?

A.   Yes.

Q.   Did you send this roughly when Mr. Wesson reached out you about Eckert representing POM?

A.   Yes.

Q.   Why did you send this e-mail?

A.   I sent the e-mail to let him handle the head of the lobbying practice know about the new client representation and the fact that they had interests and similar representation in Massachusetts and Pennsylvania.  And I let Mr. Stewart -- I included Mr. Stewart in the e-mail,

Page 35

to give him a head's up as head of his firm's gaming practice.

Q.   I'm going to turn to page two.  It's within Lisk-4.  It's the second e-mail in the chain.  I'll show you -- the best way to do it is to show you.  There's your e-mail at the bottom and this is the response.  Do you see that?

A.   Yes.

Q.   Was this, as you recall, Mr. Stewart's response to you?

A.   Yes.

Q.   Did you understand from this e-mail that Mr. Stewart was concerned that Parx not want Eckert to represent POM in Pennsylvania because of potential adversity?

A.   No, that was not my understanding.

Q.   What was your understanding of the sentence that says, our client, Parx, asked that we not take the engagement on the basis that our casino clients here anyway will likely be adverse to such interests?

A.   I took that to mean --

MR. FLAHERTY:  Hold on.  Object to the form.  You can answer.

Page 36

THE WITNESS:  I took that to mean that's why he did not take on the prior engagement from a company out of Florida.

Q.   Where is Mr. Stewart located?

A.   Harrisburg, Pennsylvania.

Q.   So when he said here anyway, you didn't think that meant that he meant in Pennsylvania?

A.   I'm not sure I understand the question.

Q.   You see where in parentheses in the middle of the e-mail he says here anyway?

A.   Uh-huh, yes.  I took that to mean --

Q.   You took that to mean -- go ahead.  I'm sorry.

A.   I took that to mean that he could not take on the similar company out of Florida here in Pennsylvania.

Q.   When he said I would not anticipate an objection to representation in Virginia or Massachusetts, but we would need to retain our ability to be adverse to them in Pennsylvania, what did you take that to mean?

A.   I took that to mean that he was going to check with a client, because that was modified by the remaining sentence in that paragraph.



Page 37

Q. At any point did Mr. Stewart tell you that they were concerned about -- that Parx was concerned about being adverse to POM?

A. I believe later in February he raised that concern, yes.

Q. Now, next in the e-mail chain, and just so you see this, this is Mark Stewart's e-mail to you on December 20, 2016, below that, and above this, this would appear to be your response to Mr. Stewart, copying others. Do you see this?

A. Yes.

Q. You asked Mr. Stewart to confirm with Parx that it would be okay to -- it says present but I assume you mean represent -- this client outside of Pennsylvania?

A. Yes.

Q. Do you also see where it says, if Parx so agrees, I will confirm that Pace-O-Matic also will agree with this restriction?

A. Yes.

Q. What did you mean by that?

A. I meant that I would check to confirm that Pace-O-Matic would agree that we could not represent them in Pennsylvania.

Page 38

Q. Did you also, when you said that, mean that you needed POM's consent so that Eckert could retain its ability to be adverse to POM in Pennsylvania?

MR. BRIER: Objection to form.

THE WITNESS: Could you restate the question, please?

MR. TINTNER: I'm going to ask the court reporter to read it back.

(Reporter read back.)

THE WITNESS: No.

Q. Well, you see where Mr. Stewart says that, correct, in the e-mail, the last sentence of the e-mail before yours?

MR. FLAHERTY: Objection to the form. You can answer it.

THE WITNESS: I took that to mean that Mr. Stewart was going to check with Parx to see if there was any difference. So in my mind the issue was unresolved at that point.

Q. But you acknowledge that he said that we would need to retain our ability to be adverse to them in Pennsylvania?

A. Based on his understanding of the inquiry

Page 39

from a Florida client, yes, but that he was going to check to see if there was a difference.

Q. Right. And your response to that e-mail said, if Parx so agrees, I will confirm that Pace-O-Matic also will agree with this restriction?

A. The restriction that we -- that Eckert would not represent POM in Pennsylvania.

Q. Now, if you turn to the e-mail that I just put up on the screen dated Friday, January 6, 2017, that's your e-mail to Mr. Stewart asking whether he had heard back from Parx?

A. Yes.

Q. Did you ever hear back from Mr. Stewart?

A. Much, much later, yes.

Q. What did he say, if you recall?

A. My recollection captured in this e-mail was something to the effect of, that we still could not represent POM in Pennsylvania, that we would need a waiver, which we already had obtained, and that we would need to create a wall or a separation.

Q. I'm going to put up a later e-mail in the chain. Do you recall Mr. Stewart writing to you on January 25, 2017 about having discussed this --

A. Yes -- no, not about having discussed the

Page 40

issue.

Q. Do you see where he says, at a minimum I think we will need to be able to be adverse in Virginia and PA and, I guess, establish a wall from you or have the opportunity to have Rich or someone who could work for Parx?

A. I see that language, yes.

Q. Did you understand that was potentially if somebody was going to be representing Parx in Virginia?

A. I understood that it was still an unresolved issue and he was still working with Parx to resolve it.

Q. Is this your response on Wednesday, January 25?

A. Yes.

Q. Do you know whether the issue got resolved before you flew to Atlanta?

A. No, it was not.

Q. Do you recall this e-mail from Mr. Stewart later that day on January 25?

A. Yes, I do now.

Q. Do you see where he says, they are okay, so as long as we have the waiver discussed below?



Page 41

A.    Yes.

Q.    Do you see where it says, it has to be explicit that we won't represent them in Pennsylvania and we can't do anything to preclude casino gaming opportunities?

A.    I see the language where it says they would like that, not that they were requiring.

Q.    What did you understand about the waiver that you were going to get?

A.    Well, I understood I already obtained a waiver.

Q.    What was your understanding of the waiver?

A.    It's the language included in the engagement letter.

Q.    When you're talking about that language, are you talking about the language in the last paragraph on this page?  It is possible that some of our present or future clients will have matters adverse to POM while we are representing POM?

A.    Yes.

Q.    We understand that POM will have no objection to our representations of parties with interests adverse to it and that POM will waive any actual or potential conflict of interest as long as

Page 42

those engagements are not substantially related to our representation of POM?

A.    Yes.

Q.    Mr. Stewart also mentions the wall again in an e-mail to you, looks like at 4:44 p.m.?

A.    Yes.

Q.    Do you see Mr. Stewart on February 1 asking you about your trip?

A.    Yes.

Q.    And coordinating with him on the waiver language?

A.    Yes.

Q.    Did you coordinate with him on the waiver language?

A.    We had a subsequent telephone conversation after this e-mail and there was no -- we discussed the waiver, the fact that we obtained an advanced waiver.  I do not recall Mr. Stewart asking for any additional waiver language beyond that.

Q.    So you told Mr. Stewart during that call that you had already gotten, in essence, a signed engagement letter with an advanced conflict waiver?

A.    Yes.

Q.    With whom did you discuss the advanced

Page 43

conflict waiver language at POM?

A.    There was no discussion.  It was included in the engagement letter, which the client signed and returned.

Q.    Did you direct the client's attention to it as part of the engagement process?

A.    No.

Q.    Did the client or anybody who represents the client ask you any questions about it?

A.    No.

Q.    Did you ask Mr. Coon or anybody at Eckert about how to approach that subject with the client?

MR. FLAHERTY:  Objection to form.

THE WITNESS:  I shared with Mr. Coon in a telephone conversation that we had obtained the standard advanced waiver from the client.

Q.    Now, at some point in that e-mail that I just showed you, it's actually right below this.  Do you see where Mr. Stewart says that we will definitely be affirmatively going after this industry in PA, so the waiver language is important?

A.    Yeah.

Q.    Do you see that?

Page 44

A.    Yes.

Q.    You asked him about that, correct?

A.    Yes.

Q.    Did you discuss that with him and what that meant?

A.    I asked him by e-mail what it meant.  I did not have a telephone conversation.

Q.    Did he respond by e-mail?

A.    Yes.

Q.    This e-mail that I'm pulling up from Monday, February 6, 2017, is that his response?

A.    Yes.

Q.    Was it your opinion that the advanced conflict waiver covered this?

A.    It was my opinion that it likely did, but I was not completely certain, which led to our conversation with Mr. Stewart and Tim Coon.

Q.    Do you remember how soon after this series of e-mails that you spoke with Mr. Stewart and Mr. Coon together?

A.    There were a lot of details in scheduling the call, but I believe the call took place in early March.

Q.    What was the point of the call?



Page 45

A.    The point of the call was to make sure we were all on the same page about the representation and, in particular, to focus on establishing a wall or a separation between those representing POM and those representing Parx.

Q.    During that call, did you bring up the last set of e-mails about the potential adversity that Eckert's gaming clients may need to take against POM in Pennsylvania?

MR. FLAHERTY:  Objection to form.

THE WITNESS:  I recall that telephone call focusing mostly on the issue of separation and creating a wall.  I did not bring up the e-mails, nor do I recall Mr. Stewart bringing up the e-mails or a request for different waiver language.

Q.    Did anyone on that call suggest doing a separate conflict waiver that you recall?

A.    I do not recall anybody suggesting a separate conflict waiver.  If it had been suggested, I would have requested one from the client, from POM.

Q.    Based on the e-mails that you shared with people, whether you and Mr. Stewart exchanged, did

Page 46

you think that you needed a separate conflict waiver letter?

A.    No.

Q.    At that time in, I'll say March of 2017, were POM and Parx actually adverse to each other?

A.    To the best of my knowledge, no.

Q.    Do you remember Mr. Coon describing this as a positional conflict?

A.    I do not recall him using that term, no.

Q.    Do you know what a positional conflict is?

A.    My understanding of it is two clients with different positions in the same legal issue.

Q.    At the point that you had that conversation, were Mr. Stewart and Mr. Coon aware of the fact that your client had already signed an engagement letter that included the advanced conflict waiver language?

A.    Yes.

Q.    What was your understanding about the confidentiality screening that was going to be set up?

A.    My understanding was that Mr. Coon was going to draft a document to establish the screen and that no one in the Richmond office of Eckert

Page 47

other than myself would be working on Pace-O-Matic/POM issues, therefore, allowing other attorneys and governmental relation professionals in that office to later represent Parx, should Parx be interested in pursuing a casino opportunity in Virginia.

Q.    Do you know whether Eckert ever undertook the representation of Parx in Virginia?

A.    I know that at least one Eckert partner subsequently had conversations with Mr. Stewart regarding Parx' interest in casino opportunities in Virginia.

Q.    But you don't know whether actually Eckert undertook any work on behalf of Parx in Virginia?

A.    After the engagement by POM, no, I do not.

Q.    Do you know whether an ethical screen was set up?

A.    I never saw any indication of it, no.

Q.    But that doesn't mean that it was not set up, correct?

MR. FLAHERTY:  Objection to form.

THE WITNESS:  I don't know.  Other Eckert attorneys in the Richmond office later provided representation to POM.  So I don't

Page 48

believe it was set up, but I cannot say with certainty.

(Whereupon a document was marked as Lisk-5 for Identification.)

Q.    I'm going to show you what's been marked as Lisk-5.  Do you recall this?  There's a very small e-mail chain here.  Do you recall this e-mail from Mr. Stewart to Mr. Coon copying you?

A.    Yes.

Q.    Do you see where Mr. Stewart says, we cannot represent them in PA and they need to waive us being adverse to them there?

A.    Yes.

Q.    You understood that, correct?  When Mr. Stewart sent that e-mail to Mr. Coon, you understood that that was what was being done?

A.    I understood that was Mr. Stewart's position.

Q.    Well, did you tell anyone that Mr. Stewart's position was not your understanding?

A.    My understanding was that Mr. Stewart was pushing for an additional waiver and, hence, our agreement to have a conversation with Mr. Coon.

Q.    Did that conversation, did that come up



Page 49

during your call with Mr. Coon?

A.   I don't recall any further conversation outside of the fact that we had the -- already had the waiver, which in my opinion, would cover any adverse legislative action in Pennsylvania.

Q.   The e-mails that follow this ultimately were going back and forth about a call.  The call occurred in early March of 2017, is that correct?

A.   Yes.

Q.   Do you recall at some point in April 2017 Tom wanting Eckert to represent POM in Pennsylvania?

A.   I received a courtesy copy and a conflict check indicating that another Eckert partner was trying to open a new matter for POM and pursuant to Eckert's internal procedures, since I already had an open matter, I was copied on that e-mail.  I did learn of that by e-mail.

Q.   Who was that other partner?

A.   Warren Vogel.

Q.   What ended up happening with that representation -- potential representation I should say?

A.   It was declined.

Q.   Why was it declined?

Page 50

A.   I can't say with certainty.  I saw e-mail traffic regarding the potential engagement, but I can't say specifically the reasons.  I think Mr. Vogel was being differential to Dot Davis, who was the co-CEO of the firm at the time.

Q.   Was it also because there had been an agreement where Eckert could not represent POM in Pennsylvania?

A.   I don't have a specific recollection that that was cited.

Q.   But you knew that -- you knew that that was true, correct?

A.   I knew it was true that we could not represent POM in Pennsylvania.  I did not know if that had changed in the subsequent time.

Q.   You actually sent an e-mail confirming that that had not changed, correct?

A.   I did send an e-mail in response to Dot Davis' e-mail.

Q.   But did you reach out to Mr. Stewart about it?

A.   No, because I was not involved in the proposed new representation.

Q.   Ultimately the firm did not undertake that

Page 51

representation, correct?

A.   That is my understanding, yes.

(Whereupon a document was marked as Lisk-6 for Identification.)

Q.   I'll just show what's been marked -- this has been premarked, but it's Lisk-6.  Do you see this e-mail?  You're copied on this e-mail from April 7, 2017?

A.   Yes, I see it.

Q.   Did this relate to, if you go down, somebody is asking the question to Dot Davis about a criminal forfeiture.  Is that your recollection about what was the potential representation involved?

A.   I really didn't know anything about potential representation other than what I saw in the e-mail on which I was copied.  POM had no communications with me about this potential engagement.

Q.   If you go down -- I'm going to take you down quickly through this e-mail chain.  There is an e-mail from you back to Dot Davis.  I think it starts right here.  Do you see this, on Saturday, April 8, 2017?

Page 52

A.   Yes.

Q.   You see where you reference that you've had a conversation with Mr. Coon to reconcile the respective client interests in PA and Virginia?

A.   Yeah.

Q.   You were telling the group at that point the issue was at least resolved from the firm's perspective?

A.   That was my understanding after the conference call with Mr. Coon and Mr. Stewart.

Q.   Now, was there another potential representation where POM came to Eckert and wanted Eckert to represent POM in Pennsylvania?  Do you recall that?

A.   Yes, I do.

Q.   What was the nature of that potential representation?

A.   Jeff McGinness, who was then with POM, had reached out to me, to see if anything had changed because POM was looking to hire new counsel in Pennsylvania.

Q.   What did you do in response to that request?

A.   E-mailed Mr. Stewart, to see if anything



THOMAS LISK, ESQ.                                                September 01, 2020
PACE-O-MATIC vs 120- ECKERT SEAMANS CHERIN                              53–56

Page 53

had changed in relation to Parx' view that we could not represent POM in Pennsylvania.

Q.   Do you recall what Mr. Stewart's response was?

A.   Mr. Stewart confirmed that nothing had changed and we, Eckert, could not represent POM in Pennsylvania.

(Whereupon a document was marked as Lisk-7 for Identification.)

Q.   I'm going to show you what's been marked as Lisk-7.  Do you see this e-mail from Mr. McGinness?

A.   Yes.

Q.   Following this e-mail, is this the e-mail that you sent to Mr. Stewart about POM?

A.   Yes.

Q.   And this September 27, 2017 from 2:24, is this Mr. Stewart's response?

A.   Yes.

Q.   Did you give a declaration in connection with this case pending in the United States District Court for the Middle District of Pennsylvania?

A.   Yes.

Q.   How did that declaration come about?

Page 54

A.   I was contacted by counsel for POM, asking if I would be willing to submit a declaration.

Q.   Who prepared the declaration?

A.   An initial draft was prepared by Mr. Brier's law firm and sent to me.

Q.   Did you see the complaint when you were asked to sign a declaration?

A.   Yes.

Q.   Did you agree with the allegations in the complaint?

A.   Which ones?

Q.   Well, the allegations that accused Eckert of breaching a fiduciary duty to POM.

A.   I mean, it seems to me that that's a legal conclusion I'm not prepared to draw.

(Whereupon a document was marked as Lisk-8 for Identification.)

Q.   I'm going to pull up the declaration.  Mr. Lisk, do you recognize this.  It says page two of eight, but page one, I believe, was the exhibit page.  I'm going to scroll down.  I want to make sure that you see the whole document.  It's marked as Lisk-8.

Do you recognize this?

Page 55

A.   Yes.

Q.   And it's a three-page declaration and there's an Exhibit-1 to it, which is the -- I'm representing to you is the engagement letter, but it's in its as filed form.  Do you recognize that?  Is that the entire document?

A.   Yes.

Q.   Let me ask you, when you were given the draft declaration, did you make changes to it?

A.   Yes.

Q.   Let's just go through it.  Paragraph one, you're an attorney licensed to practice law in the Commonwealth of Pennsylvania (sic) and a partner at the Cozen O'Connor firm?

A.   No.

Q.   Are you a member of the Cozen O'Connor firm?

A.   No, I'm attorney licensed to practice in the Commonwealth of Virginia, not Pennsylvania.

Q.   I'm sorry, it says Commonwealth of Virginia.  I apologize.  So that paragraph one is correct, you're a partner at Cozen O'Connor?

A.   Yes.

Q.   It's correct in 2010 to 2018 you were a

Page 56

partner at Eckert Seamans?

A.   Yes.

Q.   Now, in paragraph three, while at Eckert you became the partner in charge of the firm's relationship with POM.  Is that because Mr. Mayernick had previously done work for POM?

A.   It's because the engagement from POM came in directly from me and not from Mr. Mayernick.

Q.   You remained that partner in charge until you left Eckert in 2018, as it says in paragraph three?

A.   Yes.

Q.   Paragraph four where you talk about the legal services that were being provided, that's consistent with what's contained in the engagement letter, correct?

A.   Yes.

Q.   Those excerpts are literally quotations, where the quotations are come directly out of the engagement letter, is that true?

A.   Yes.

Q.   Now, in paragraph five you said you never discussed with any representative of POM or advised POM that Eckert would undertake the representation



Page 57

only if POM agreed to waive any future conflict of Parx Casino.  Do you see that?

A.   Yes, I do.

Q.   Isn't that inconsistent with the engagement letter and the advanced waiver that you had the client execute?

A.   No.

Q.   Why not?

A.   Because I never discussed with POM any specifics as to Parx Casino.

Q.   Did you discuss with POM Eckert's representation of gaming clients in Pennsylvania?

A.   Yes, I did discuss generically gaming clients.

Q.   So POM understood that, correct?

MR. FLAHERTY:  Objection to form.

THE WITNESS:  POM understood what?

Q.   That Eckert represented gaming clients in Pennsylvania?

A.   Yes.

Q.   It's your position that POM signed the engagement letter with the advanced conflict waiver language, correct?

A.   Yes.

Page 58

Q.   Now, in paragraph six you say, it was not a condition of Eckert's engagement that POM agree that Eckert could represent Parx or other gaming clients in a matter or matters adverse to POM in Pennsylvania.  Do you see that?

A.   Yes, I do.

Q.   Wasn't it a condition of Eckert's engagement that Eckert could continue to represent Parx and its other gaming clients in Pennsylvania?

A.   It was a condition that we could represent -- Eckert could represent other clients that are in conflict with POM, but the engagement letter did not specify gaming clients or Parx Casino.

Q.   In paragraph seven -- I apologize, I'm not trying to repeat, but it's in your declaration, you say you never discussed the waiver language in the 2016 engagement letter or the meaning of that language with POM, correct?

A.   Correct.

Q.   So you didn't have a specific discussion, but it was in the -- it was in the engagement letter, correct?

A.   Correct.

Page 59

Q.   Nobody at POM asked you any questions about it, correct?

A.   Correct.

Q.   Now, in paragraph eight you say that the firm acquired, retained and had access to highly sensitive, confidential and proprietary product and business information concerning POM and its affiliates and their skill game products during the representation of POM.  Do you see that?

A.   Yes.

Q.   Who else had access to that information while you were at Eckert?

A.   Tony Troy, a partner, Rich Savage, another partner.  There may have been others but I couldn't say with certainty.

Q.   When you talk about their skill game products, this is their Queen of Virginia product, their game called the Queen of Virginia?  Isn't that the product that you dealt with?

MR. FLAHERTY:  Objection to form.

THE WITNESS:  Yeah, yes.

Q.   Do you know whether Mr. Stewart had any access to this information?

A.   I do not know.

Page 60

Q.   Do you have any reason to believe that he did or tried to access this information?

A.   I have no reason to believe one way or the other.

Q.   Do you know that Mr. Stewart also took a declaration in this case?

A.   Yes.

Q.   Do you know that he said that he did not have access and that, in essence, because of the screen that was set up he would not have access?  Do you recall seeing that?

A.   I know that's what he stated in his declaration.

Q.   Do you have any reason to disbelieve him?

A.   I have no independent knowledge one way or the other.

Q.   Now, in paragraph nine you said you were never made aware of any confidentiality screen.  Do you see that?

A.   Yes.

Q.   But, in fact, such a screen was discussed, isn't that correct?

A.   Yes, it was discussed, but to the best of my knowledge, never implemented.



Page 61

Q.   Well, you don't know for sure whether it was implemented or not, do you?

A.   No, to the best of my knowledge, I don't know one way or the other.

Q.   Now, you say an Eckert lawyer who worked on POM matters met with an Eckert partner and Parx Casino representatives in Harrisburg, Pennsylvania regarding work for Parx Casino in Virginia.  Who was that Eckert lawyer?

A.   Rich Savage, an Eckert lawyer traveled to Harrisburg, Pennsylvania to meet with Mark Stewart and representatives of Parx Casino.

Q.   Do you know when that meeting occurred?

A.   I do not recall the date, no.

Q.   Do you know what the purpose of that meeting was?

A.   To explore casino gaming opportunities in Virginia.

Q.   You don't know whether those opportunities came to fruition, correct?

A.   I know that after I left Eckert, the Virginia legislature approved legalization of casino gaming.  I do not know, because I was no longer with the firm, whether Parx pursued those opportunities.

Page 62

MR. TINTNER:  Can we take a restroom break and I'll try to wrap up?

(Brief recess.)

(Whereupon a document was marked as Lisk-9 for Identification.)

Q.   Mr. Lisk, one last exhibit.  This is an e-mail from Mr. Brier to you copying Miss Walsh.  It's been marked as Lisk-9.  This was actually produced by your counsel.  Do you see this e-mail?  Actually, this is directed to you.  Do you see this e-mail?

A.   Yes.

Q.   And was this the e-mail and the attachment sending you the draft declaration?

A.   Yes, I believe so.

Q.   You see it's -- you see it's not signed, correct?

A.   Correct.

Q.   This is a draft.  Do you remember what changes you made?

A.   No.

Q.   Do you remember taking out the sentence in paragraph five that said, I did not disclose to POM prior to POM signing the December 20, 2016

Page 63

engagement letter that the Eckert firm also represented Parx Casino?  Do you see that?

MR. FLAHERTY:  What was the question?  Does he see the language or does he remember taking it out?

Q.   One, do you see the language in paragraph five, the first sentence?

A.   Yes, I see the language.

Q.   And did you take that out of the declaration?

MR. FLAHERTY:  Object to the form.  You can answer it.

THE WITNESS:  To the best of my knowledge, I must have.  I don't specifically remember taking that out, but I'm the only one that made changes to this document.

Q.   Did you have a discussion with POM about Eckert's representation of Parx Casino prior to POM signing the letter?

A.   I do not recall having a discussion with them about it but I can't -- I cannot say with certainty that I did or did not and, therefore, would not feel comfortable putting that in a declaration.

Page 64

Q.   Okay.  I have no further questions as of this time.

BY MR. BRIER:

Q.   I have some questions, Mr. Lisk.

MR. BRIER:  Can we put Lisk-4 back up, please?

MR. TINTNER:  Tell me where to go.

MR. BRIER:  Just the first page.

Q.   Mr. Lisk, we're looking at the first page of what's been marked as Lisk-4.  And I'm directing your attention to the second paragraph.  The second paragraph starts with the phrase, while the potential client's products are skill-based games, do you see that language?

A.   Yes.

Q.   That is information that you shared with Mr. Stewart and Mr. Campbell the same day that the engagement letter was prepared, correct?

A.   Yes.

Q.   Is it true that while you were with Eckert and representing Pace-O-Matic, you spent significant time and energy and resources presenting on behalf of Pace-O-Matic the position that its games are skill-based games, is that fair?



Page 65

A. Yes.

Q. In furtherance of that effort, is it correct that Pace-O-Matic shared with you, while you were with Eckert, very proprietary, confidential information to support your advocacy that Pace-O-Matic's games are skill-based games?

A. Yes.

Q. As part of your effort while you were at Eckert, did you and other Eckert attorneys use the decision out of Beaver County, Pennsylvania where the trial court in Beaver County made a determination that Eckert's -- I'm sorry -- that Pace-O-Matic's games in Pennsylvania were skill-based games?

A. Yes, we used that court decision widely with public officials in Virginia.

Q. Can you explain to us why you viewed that Pennsylvania court decision, which dealt with Pennsylvania Pace-O-Matic games, as helpful to your representation in Virginia?

A. Yes, it was our understanding from our review of the Pennsylvania law defining what constitutes gambling that the legal standard was identical to the legal standard in Virginia.

Page 66

Therefore, if a competent court found the games to be skill-based rather than based on chance in Pennsylvania, the similar interpretation of law should apply in Virginia.

Q. Did you have success in persuading public officials in Virginia that based on the Beaver County, Pennsylvania case that Pace-O-Matic's games were, in fact, games of skill?

A. Yes, we did.

Q. As part of that, did you -- were you able to represent that the software and algorithms in the Pace-O-Matic Pennsylvania machines was the same as the software and algorithms in the Virginia -- Queen of Virginia Pace-O-Matic games?

A. Yes, we made that representation.

Q. While you were with Eckert, you satisfied yourself and did enough investigation and diligence to be comfortable representing to Virginia public officials that the Beaver County case was a case that analyzed the same software and equipment algorithms that you were urging them to permit in Virginia, correct?

A. Yes.

Q. That issue whether they are skill-based

Page 67

games or games of chance, would you describe that as the heartland of your effort in Virginia, that that was essential and material to the representation?

A. Yes, if they were chance based, the games would be illegal in Virginia.

Q. Who along with you looked at the Pennsylvania statutes to be able to make a representation to the Virginia public officials that the statutes were analogous enough that the Pennsylvania court decision should be respected by the Virginia officials?

A. Together with myself, Tony Troy, a partner in the Richmond office of Eckert.

Q. Mr. Troy is the former Attorney General of the Commonwealth of Virginia, isn't he?

A. Yes.

MR. BRIER: Can you, please, put up Lisk-3? If we can turn to the bottom of page two and the top of page three? Is it possible, Bob, to show the top of page three and that bottom paragraph on two? I guess it won't fit. We'll do it one at a time. Thank you.

Q. Mr. Lisk, when my colleague, Mr. Tintner, was asking you questions, he questioned you about

Page 68

your declaration that was signed and is dated March 20 of 2020. My first question is, as you sit here today, on September 1, 2020, having reviewed your executed declaration, are you confident that your executed declaration is accurate and truthful?

A. Yes.

Q. Now, referring to the bottom of page two of the engagement letter, which is on the screen, Mr. Tintner read the second sentence that reads, we understand that POM will have no objection to our representation of parties with interests adverse to it and that POM will waive any actual or potential conflict of interest, as long as those engagements are not substantially related to our representation of POM, correct?

A. Yes.

Q. This language in this paragraph was boilerplate language that was in your template at Eckert Seamans for use when engaging with new clients, correct?

A. Yes.

Q. So there was nothing unique about this language that we're looking at that was tailored or revised in any way to address any potential conflict



Page 69

issue that might arise between Pace-O-Matic and any of Eckert's clients, correct?

A.   Correct.

Q.   Is your understanding, looking at the sentence I just read, that if Eckert intended to represent a client in a matter adverse to POM that was substantially related to Eckert's representation of POM, that the waiver would not be effective, there would be no waiver in that instance?

A.   That is correct.

Q.   So for the waiver to have any relevance or effect, the potential future engagement could not be substantially related to the work that you were going to do for POM, correct?

A.   Correct.

Q.   The next sentence, which is at the top of page three reads, we agree that this consent shall not apply in any instance where as a result of our representation of POM we have obtained confidential information that if known to such other client could be used to its material disadvantage.  Is that accurate?

A.   That's an accurate reading of the sentence, yes.

Page 70

Q.   In your declaration dated March 20, your declaration states that the Eckert firm acquired, retained and had access to highly sensitive, confidential and proprietary product and business information concerning POM and its affiliates and their skill game products during the representation of POM.  So did anyone at Eckert from the time this engagement letter was signed in December of '16 through when you left in September of 2018 ever represent to you that the information, that highly sensitive and confidential information that was obtained from POM -- let me strike that.  I'll rephrase the question.  I got myself turned around.

Is it your position, as you sit here today, Mr. Lisk, that the information that was shared with you while at Eckert about POM's skill games, if known to Eckert's gaming clients could be used to the material disadvantage of POM?

A.   I don't really know one way or another if that's possible.

Q.   Well, did you work with experts when you were working on behalf of POM in Virginia?

A.   I'm not sure what you mean by experts.  I worked with representatives of the company and they

Page 71

shared with me independent laboratory testing by experts of the Pace-O-Matic equipment.

Q.   I'm not waiving the protections that relate to that -- to those tests, but as a representative of Eckert you had access to that testing, correct?

A.   Yes.

Q.   And others at Eckert had access to that testing, correct?

A.   Yes.

Q.   Was it your understanding when you were engaged by POM that Eckert was prohibited from representing anyone adverse to Eckert if as part of your representation you received that type of confidential information, including the testing and that that type of confidential information could be used to harm POM on behalf of another Eckert client?

MR. TINTNER:  Objection to the form.

THE WITNESS:  I apologize.  I don't think I quite understood the question.

Q.   I'll try to rephrase it.

When you were representing Eckert, would you have considered it fair game for Eckert attorneys to access the confidential information

Page 72

that you had received from POM while representing parties who were adverse to POM?

A.   No, I would not.

Q.   You don't have any doubt in your mind that you had, while you were at Eckert, a great deal of POM's confidential and sensitive information relating to the operation of its skill games, correct?

A.   Correct.

Q.   Are you aware, sir, that today Eckert is taking the position that POM's games are not games of skill and that rather they are games of chance?

A.   That is my understanding of Eckert's position, yes.

Q.   As part of your representation of POM, was it ever contemplated or disclosed to you while you were at Eckert that Eckert was going to take that type of a contrary position relating to POM while POM was still a client of Eckert?

A.   I would not -- I was not aware that Eckert intended to take that position, no.

Q.   Would taking such a contrary position on such a fundamental issue as it relates to whether POM's machines are games of skill or not be



Page 73

substantially related to the work you had done for POM?

A.   In my view that calls for a legal conclusion. I don't feel comfortable making that conclusion.

Q.   Well, factually. I'm not asking you to make a legal conclusion.

MR. FLAHERTY:  Object to the form.

Q.   I'll rephrase it. As a factual matter --

MR. FLAHERTY:  Same objection.

MR. BRIER:  I hadn't asked the question yet.

MR. FLAHERTY:  Okay.

Q.   How central to your representation of POM, when you were with Eckert, was the advocacy relating to the fact that POM's machines are games of skill?

MR. FLAHERTY:  Object to the form. You can answer.

THE WITNESS:  It was critical, otherwise, the conclusion would follow that they were games of chance and, therefore, illegal to be possessed or used in the Commonwealth of Virginia.

MR. BRIER:  Can we look at Mr. Lisk's

Page 74

declaration? It's Lisk-8. Can we go down to paragraph five, please?

Q.   Mr. Lisk, you were asked about paragraph five earlier. I want to ask you about paragraph five in the context of the engagement letter that we just looked at, the advanced waiver. Paragraph five does not contain any of the language that the engagement letter contains about not engaging in adverse matters that are substantially related to the representation of POM or any of the language about obtaining confidential information that if known to the other client could be used to POM's disadvantage, correct?

I'm sorry, I didn't hear your answer.

A.   Correct.

Q.   Paragraph five makes reference to any future conflict with Parx Casino. Is it correct, sir, that as you sit here today, it's your view that Pace-O-Matic did not waive any future conflict with Parx Casino when it engaged Eckert?

A.   I don't believe, based on the engagement letter, that POM agreed to waive any future conflict regarding any particular client, including but not limited to Parx.

Page 75

Q.   I'm going to take a two-second break and talk to my colleague here.

MR. BRIER:  All right?

MR. TINTNER:  Sure.

(Recess taken.)

MR. BRIER:  I have a document I want to mark as Lisk-10 that we'll e-mail to you guys. There should be a document coming through to you momentarily. Let me know when you have it.

Q.   Okay?

A.   Okay.

MR. BRIER:  Do guys have that exhibit?

MR. FLAHERTY:  I see it on mine.

(Whereupon a document was marked as Lisk-10 for Identification.)

MR. BRIER:  We'll mark this as Lisk-10. It's Bates stamped Eckert 131 through Eckert 133.

Q.   Mr. Lisk, I'm showing you a document produced by Eckert in this litigation. This was after -- this e-mail chain was sent after you left Eckert in 2018. Directing your attention, sir, to the bottom of page 132, Eckert 132. Take a moment

Page 76

to review the e-mail from Mr. Coon to colleagues of his at Eckert on September 19, 2019.

A.   I've read it.

Q.   You testified earlier that while there had been discussions about a confidentiality screen while you were at Eckert, you were not aware of them ever establishing one while you were there. Do you recall that testimony?

A.   Yes, I recall it.

Q.   The September 19 e-mail from Mr. Coon states, we are establishing a confidentiality screen between the firm's legal staff who do work for client Pace-O-Matic and those who do work for our casino clients listed below. Was any such communication sent establishing any type of screen at Eckert from December 2016 to September 2018 when you left Eckert?

A.   I'm sorry, what were the dates again?

Q.   December 2016 and September 2018 when you left Eckert.

A.   No, I never saw anything like this from December 2016 until my departure in September of 2018.

Q.   Moving to the second paragraph of



Page 77

Mr. Coon's e-mail to his colleagues, it says, accordingly, the casino client team, please do not discuss, disclose or share any information concerning any casino client or regarding any past, current, future matter or project for a casino project with any member of the Pace-O-Matic team. Do you see that?

A.   Yes, I do.

Q.   It goes on to say, of course, the reverse is also required in regard to work for or information of Pace-O-Matic.  Was there ever a communication sent while you were at Eckert from December of '16 through September of '18 that advised all members of those two respective teams that they should not disclose or share any information regarding those clients?

A.   No, I never saw a similar communication.

Q.   While you were at Eckert did you use the document management system Worldox?

A.   Yes.

Q.   If you would go to page 1 of 131.  When you left Eckert, Mr. Troy continued to represent Pace-O-Matic on behalf of Eckert, correct?

A.   Yes.

Page 78

Q.   So when you left Eckert, is it accurate that communications, documents, drafts and other matters that would have been saved into Worldox by you and the team working for Pace-O-Matic would have stayed behind at Eckert?  You left that stuff behind because Eckert was going to continue to represent Pace-O-Matic, correct?

A.   Correct.

Q.   Now, looking at page one of Exhibit-10, there is an e-mail from Christina Myer to a number of colleagues.  And it reads, good morning, the ethical wall is now set up in Worldox with Mark Stewart, Sarah Stoner, Kevin Skjoldal, Casey Coyle, Susan Yocum, Tara Burns, Christine Marzolino (phonetic), Mike Herzog and Adam Shienvold blocked from Pace-O-Matic.  Then there's some numbers there. While you were at Eckert was there any similar electronic block put in Worldox to prevent those individuals who were doing work for any casino clients of Eckert from looking at the Pace-O-Matic Worldox files?

A.   Not to my knowledge, no.

Q.   Referring to Lisk-10 again.  Are the individuals -- let me back up.

Page 79

Q.   Did you have legal assistants, paralegals that helped you in your representation of Pace-O-Matic while at Eckert?

A.   Yes.

Q.   Do you recall their names?

A.   I believe the assistant was Cathy Fling. My paralegal was Lisa Foster.  And Tony Troy and Rich Savage both had legal assistants.  I don't recall who was working with them at that time.

Q.   I didn't hear your paralegal's name.  Did you say Karen?

A.   No, paralegal was Lisa Foster and she left Eckert the same time I did.

Q.   Who was the other woman you mentioned, Karen something?

A.   Cathy Fling was my legal assistant up until the time I departed Eckert.

Q.   Did she stay at Eckert?

A.   Yes.

Q.   If you would look at page one of Lisk-10. Was Matt Kirsner at Eckert while you were there?

A.   Yes, he was the partner in charge of the Richmond office.

Q.   Tony Troy we talked about.  Jessica

Page 80

Glajch, was she there?

A.   I do not know.

Q.   Allison Rynicker (phonetic)?

A.   She was an associate attorney.

Q.   Did she work on Pace-O-Matic with you?

A.   Not with me.  After my departure, I don't know if she did.

Q.   Stephanie Coleman, do you know who Stephanie is?

A.   Also an associate.  She didn't work with me on Pace-O-Matic.  I do not know if she worked on it after I departed.

Q.   Shannon Kapadia?

A.   I do not know the person.

Q.   Earlier today you were asked about a conversation you had in early March with Mr. Lisk -- I'm sorry, strike that.

Earlier today you were asked about a conversation you had in early March with Mr. Stewart and Mr. Coon.  And I believe you indicated that it was as a result of that conversation you thought that the issues that had been raised in the e-mails with Mr. Stewart were satisfactorily resolved by Eckert.  Do you recall that?



Page 81

A.   I recall that, yes.

Q.   Can you tell us what was agreed to or what you recall about that discussion in early March with Mr. Coon and Mr. Stewart?

A.   My recollection is that Mr. Coon was going to put into place a separation between those working on the casino clients and those working on the Pace-O-Matic client in Virginia.

Q.   Was there any further discussion about whether or not to go back to Pace-O-Matic and seek a waiver other than the December 2016 engagement letter?

A.   I do not recall any request or expression of need to go back and get an additional waiver.  My recollection is that Mr. Stewart and Mr. Coon were satisfied that we had the advanced waiver and that the client understood that we could not represent them in Pennsylvania.

Q.   I'm going to take a few minute break.  I may be finished, but I want to speak with my colleague.

(Recess taken.)

MR. BRIER:  If we could put up Lisk-6, please.  Can you put that on the screen?

Page 82

MR. TINTNER:  I'm trying.  It's giving me a difficult time.  Can everyone see that?

THE WITNESS:  Yes.

Q.   Mr. Lisk, I'm showing you the first page of what was previously marked as Lisk-6.  I would like to go to, I think about the eighth page of it.  It is the e-mail from Tom Lisk to Dot Davis.

Mr. Lisk, April 8 you responded to Miss Davis with the e-mail that's on the screen.  Are you able to see the e-mail?

A.   Yes.

Q.   This is the e-mail where you memorialize that in very early March 2017, Mark and you and Tim Coon had a telephone conference to determine how we could possibly reconcile the respective clients interests in Pennsylvania and Virginia.  Do you see that?

A.   Yes, I do.

Q.   The e-mail ends with, what additional steps are you suggesting should have been taken?  Did Miss Davis get back to you as the co-CEO of Eckert and advise you to go back to POM and get an informed consent waiver from POM when you sent her this e-mail?

Page 83

A.   No.

Q.   Did she respond at all?

A.   Not by e-mail, that I recall.

Q.   We looked at this e-mail chain, in this e-mail chain as the co-CEO of Eckert she was made aware of Mr. Stewart's representations about what Parx Casino's concerns were about representation of Pace-O-Matic, correct?

A.   I believe so, yes.

Q.   We've seen in the e-mails today that there were some exchanges between you and Mr. Stewart, where Mr. Stewart made representations about what potential adversity would exist between Parx and Pace-O-Matic.  Other than what we've seen in the e-mails, did Mr. Stewart ever describe with more particularity to you what adversity he foresaw between Pace-O-Matic and Parx Casino?

A.   The only thing I recall was Mr. Stewart indicating that this may be an effort to seek legislation in Pennsylvania to, in some fashion, restrict skill games.

Q.   So to the best of your knowledge, he never told you that Parx intended to argue in courts of law that Eckert's -- I'm sorry -- that

Page 84

Pace-O-Matic's machines are illegal and that Pace-O-Matic should be criminally prosecuted?

A.   We never had that conversation, no.

Q.   Did he tell you that Eckert intended to argue that Pace-O-Matic's machines are deceptively marketed?

A.   Not that I recall, no.

Q.   I'm sorry, you broke up.  Could you repeat your answer, please?

A.   Not that I recall, no.

Q.   Earlier in your deposition you were asked by my colleague, Mr. Tintner, whether you went back to Pace-O-Matic and told Pace-O-Matic what Mr. Stewart shared with you about Parx' plans for the future with respect to Pace-O-Matic.  And I think you said --

MR. TINTNER:  Objection.

Q.   I think you said you didn't do that because you didn't think you could do it without waiving Parx' or breaching Parx' confidentiality.  Do you recall that?

A.   I recall that, yes.

Q.   Can you explain that to us a little bit further, please?



Page 85

A.   Well, I was concerned that if Parx had an intention to seek legislation that may be harmful to POM in Pennsylvania, that I would be divulging that client confidentiality if I shared that with POM.

Q.   And, therefore, you did not share it, correct?

A.   Correct.

Q.   Did you share with POM that, in Mr. Stewart's view, it was also likely that Parx would be adverse in litigation matters with Pace-O-Matic?

A.   No, I did not.

Q.   Did you not share that for the same reason that you thought you would be disclosing Parx' confidential information if you did so?

A.   Correct.

Q.   Okay.  I don't have anything further, sir.  Thank you.

MR. FLAHERTY:  I don't have anything.

MR. TINTNER:  I just have a couple follow-up questions.

BY MR. TINTNER:

Q.   Mr. Lisk, you testified earlier about the Beaver County, Pennsylvania decision involving POM.

Page 86

Do you recall that?  Do you remember that?

A.   Yes.

Q.   Was Eckert involved on behalf of POM in that litigation matter pending in PA?

A.   Not that I'm aware of, no.

Q.   You said that you or members of Eckert that worked with you used that decision on POM's behalf in Virginia?  Is that what you said?  I don't want to mischaracterize your testimony, but I want to understand it.  Is that correct?

A.   Yes, that is correct.

Q.   You're not suggesting that that trial court decision in Pennsylvania is binding upon anyone in Virginia, are you?

A.   No, we were suggesting that the analysis in that court decision was persuasive in that it followed the same law as to what constitutes the legal gambling.

Q.   Now, when you met with, I guess, regulators or what are they called -- commonwealth attorneys in Virginia -- to discuss POM's games, is that what you typically would do?

A.   We met with state regulators, as well as with local commonwealth attorneys, which are

Page 87

Virginia's version of prosecutors, as well as police chiefs, sheriffs, mayors and other local elected officials.

Q.   Did you make a case for why POM's games were, as you called them, games of skill?

A.   Yes.

Q.   Did you actually do demonstrations for them about the games and the equipment?

A.   We offered demonstrations to all.  Some accepted.  Some did not.

Q.   As part of those demonstrations did you include the testing reports that you testified to earlier?

A.   I do not recall providing the testing reports.  I recall sharing the fact that we had conducted independent laboratory testing.

Q.   Did you provide any of that information to the regulators or other people in Virginia about POM's games?

A.   I do not recall if we did or did not.

Q.   Well, what did you typically include in your demonstrations?

A.   Demonstrating the machine, to the extent that any regulator was interested in seeing the

Page 88

actual equipment.  We shared the Beaver County court case.  We talked about the Virginia law and how this fit within Virginia's laws defining what is the skill versus chance.

Q.   Did you take them through the actual equipment and go through it and demonstrate it for them?

A.   We demonstrated how the equipment -- how to operate the equipment.

Q.   You said you discussed the contents of the testing reports, even though you didn't necessarily share the testing reports with them?

MR. FLAHERTY:  Objection to form.

THE WITNESS:  We shared the fact that we had independent laboratory testing.  We did not share the specifics of the actual report.

Q.   Did you share the data with them?

A.   No.

Q.   I don't have any further questions.

MR. FLAHERTY:  Thank you, Mr. Lisk.  Thanks, everybody.

(Deposition concluded at 1:50 p.m.)



Page 89

C E R T I F I C A T E

I hereby certify that the proceedings and evidence noted on September 1, 2020, contained fully and accurately in the notes taken by me on the deposition of the above matter, and that this is a correct transcript of the same.

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

_Gena Nardone_

GENA M. NARDONE

Registered Professional Reporter

Notary Public

Page 91

DEPOSITION ERRATA SHEET

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page 90

DEPOSITION ERRATA SHEET

Our Assignment No. J5981785

Case: Pace-O-Matic vs. Eckert Seamans

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer those changes as if still under oath.

Signed on the _____ day of _____, 2020.

_____

Page 92

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

Page No.___Line No.___Change to:_____
_____

SIGNATURE:_____DATE:_____

