# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PACE-O-MATIC, INC.,

    Plaintiff,               Docket Number

vs                         1:20-CV-00292

ECKERT SEAMANS CHERIN &

MELLOTT, LLC,

    Defendant.

------------------------------

DEPOSITION OF

THOMAS LISK, ESQUIRE

September 1, 2020

11:00 a.m.

ESQUIRE DEPOSITION SOLUTIONS

1835 Mark Street - Suite 555

Philadelphia, PA 19103

Gena M. Nardone, RPR



APPEARANCES OF COUNSEL

On behalf of the Plaintiff

MYERS BRIER & KELLY
DANIEL BRIER, ESQ. (Via Teleconference)
DONNA WALSH, ESQ. (Via Teleconference)
425 Spruce Street - Suite 200
Scranton, PA 18053


On behalf of the Defendant

FOX ROTHSCHILD
ROBERT TINTNER, ESQ. (Via Teleconference)
2000 Market Street - 20th Floor
Philadelphia, PA 19103


On behalf of the Witness

COZEN O'CONNOR
BRIAN FLAHERTY, ESQ. (Via Teleconference)
1650 Market Street - Suite 2800
Philadelphia, PA 19103



Also Present:    Timothy Coon
                 Greg Cline



only if POM agreed to waive any future conflict of Parx Casino. Do you see that?

A.    Yes, I do.

Q.    Isn't that inconsistent with the engagement letter and the advanced waiver that you had the client execute?

A.    No.

Q.    Why not?

A.    Because I never discussed with POM any specifics as to Parx Casino.

Q.    Did you discuss with POM Eckert's representation of gaming clients in Pennsylvania?

A.    Yes, I did discuss generically gaming clients.

Q.    So POM understood that, correct?

        MR. FLAHERTY:  Objection to form.

        THE WITNESS:  POM understood what?

Q.    That Eckert represented gaming clients in Pennsylvania?

A.    Yes.

Q.    It's your position that POM signed the engagement letter with the advanced conflict waiver language, correct?

A.    Yes.



Q.    Now, in paragraph six you say, it was not a condition of Eckert's engagement that POM agree that Eckert could represent Parx or other gaming clients in a matter or matters adverse to POM in Pennsylvania.  Do you see that?

A.    Yes, I do.

Q.    Wasn't it a condition of Eckert's engagement that Eckert could continue to represent Parx and its other gaming clients in Pennsylvania?

A.    It was a condition that we could represent -- Eckert could represent other clients that are in conflict with POM, but the engagement letter did not specify gaming clients or Parx Casino.

Q.    In paragraph seven -- I apologize, I'm not trying to repeat, but it's in your declaration, you say you never discussed the waiver language in the 2016 engagement letter or the meaning of that language with POM, correct?

A.    Correct.

Q.    So you didn't have a specific discussion, but it was in the -- it was in the engagement letter, correct?

A.    Correct.



Q.    Nobody at POM asked you any questions about it, correct?

A.    Correct.

Q.    Now, in paragraph eight you say that the firm acquired, retained and had access to highly sensitive, confidential and proprietary product and business information concerning POM and its affiliates and their skill game products during the representation of POM.  Do you see that?

A.    Yes.

Q.    Who else had access to that information while you were at Eckert?

A.    Tony Troy, a partner, Rich Savage, another partner.  There may have been others but I couldn't say with certainty.

Q.    When you talk about their skill game products, this is their Queen of Virginia product, their game called the Queen of Virginia?  Isn't that the product that you dealt with?

                MR. FLAHERTY:  Objection to form.

                THE WITNESS:  Yeah, yes.

Q.    Do you know whether Mr. Stewart had any access to this information?

A.    I do not know.



Q.    Well, you don't know for sure whether it was implemented or not, do you?

A.    No, to the best of my knowledge, I don't know one way or the other.

Q.    Now, you say an Eckert lawyer who worked on POM matters met with an Eckert partner and Parx Casino representatives in Harrisburg, Pennsylvania regarding work for Parx Casino in Virginia.  Who was that Eckert lawyer?

A.    Rich Savage, an Eckert lawyer traveled to Harrisburg, Pennsylvania to meet with Mark Stewart and representatives of Parx Casino.

Q.    Do you know when that meeting occurred?

A.    I do not recall the date, no.

Q.    Do you know what the purpose of that meeting was?

A.    To explore casino gaming opportunities in Virginia.

Q.    You don't know whether those opportunities came to fruition, correct?

A.    I know that after I left Eckert, the Virginia legislature approved legalization of casino gaming.  I do not know, because I was no longer with the firm, whether Parx pursued those opportunities.



issue that might arise between Pace-O-Matic and any of Eckert's clients, correct?

A.    Correct.

Q.    Is your understanding, looking at the sentence I just read, that if Eckert intended to represent a client in a matter adverse to POM that was substantially related to Eckert's representation of POM, that the waiver would not be effective, there would be no waiver in that instance?

A.    That is correct.

Q.    So for the waiver to have any relevance or effect, the potential future engagement could not be substantially related to the work that you were going to do for POM, correct?

A.    Correct.

Q.    The next sentence, which is at the top of page three reads, we agree that this consent shall not apply in any instance where as a result of our representation of POM we have obtained confidential information that if known to such other client could be used to its material disadvantage.  Is that accurate?

A.    That's an accurate reading of the sentence, yes.



Mr. Coon's e-mail to his colleagues, it says, accordingly, the casino client team, please do not discuss, disclose or share any information concerning any casino client or regarding any past, current, future matter or project for a casino project with any member of the Pace-O-Matic team. Do you see that?

A.    Yes, I do.

Q.    It goes on to say, of course, the reverse is also required in regard to work for or information of Pace-O-Matic.  Was there ever a communication sent while you were at Eckert from December of '16 through September of '18 that advised all members of those two respective teams that they should not disclose or share any information regarding those clients?

A.    No, I never saw a similar communication.

Q.    While you were at Eckert did you use the document management system Worldox?

A.    Yes.

Q.    If you would go to page 1 of 131.  When you left Eckert, Mr. Troy continued to represent Pace-O-Matic on behalf of Eckert, correct?

A.    Yes.



Pace-O-Matic's machines are illegal and that Pace-O-Matic should be criminally prosecuted?

A.    We never had that conversation, no.

Q.    Did he tell you that Eckert intended to argue that Pace-O-Matic's machines are deceptively marketed?

A.    Not that I recall, no.

Q.    I'm sorry, you broke up.  Could you repeat your answer, please?

A.    Not that I recall, no.

Q.    Earlier in your deposition you were asked by my colleague, Mr. Tintner, whether you went back to Pace-O-Matic and told Pace-O-Matic what Mr. Stewart shared with you about Parx' plans for the future with respect to Pace-O-Matic.  And I think you said --

MR. TINTNER:  Objection.

Q.    I think you said you didn't do that because you didn't think you could do it without waiving Parx' or breaching Parx' confidentiality. Do you recall that?

A.    I recall that, yes.

Q.    Can you explain that to us a little bit further, please?



A.    Well, I was concerned that if Parx had an intention to seek legislation that may be harmful to POM in Pennsylvania, that I would be divulging that client confidentiality if I shared that with POM.

Q.    And, therefore, you did not share it, correct?

A.    Correct.

Q.    Did you share with POM that, in Mr. Stewart's view, it was also likely that Parx would be adverse in litigation matters with Pace-O-Matic?

A.    No, I did not.

Q.    Did you not share that for the same reason that you thought you would be disclosing Parx' confidential information if you did so?

A.    Correct.

Q.    Okay.  I don't have anything further, sir. Thank you.

             MR. FLAHERTY:  I don't have anything.

             MR. TINTNER:  I just have a couple follow-up questions.

BY MR. TINTNER:

Q.    Mr. Lisk, you testified earlier about the Beaver County, Pennsylvania decision involving POM.



C E R T I F I C A T E

I hereby certify that the proceedings and evidence noted on September 1, 2020, contained fully and accurately in the notes taken by me on the deposition of the above matter, and that this is a correct transcript of the same.

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)



_____

GENA M. NARDONE

Registered Professional Reporter

Notary Public

