*E X H I B I T* "A"

**In the Matter Of:**

PACE-O-MATIC vs 120- ECKERT SEAMANS CHERIN

1:20-CV-00292

**THOMAS LISK, ESQ.**

*September 01, 2020*



800.211.DEPO (3376)
*EsquireSolutions.com*

garbled for me as well.

Q.    Do you recall discussing with Mr. Stewart that POM wanted Parx to agree that they understood that there was this potential adversity before Eckert could undertake the representation?

A.    No.

Q.    You don't remember asking Mr. Stewart to confirm that Parx was okay, in essence, with Eckert representing POM in Virginia?

A.    Yes, I agree with that.

Q.    Why did you ask for that?

A.    I've asked for that from Mr. Stewart as a matter of respect for Mr. Stewart in the gaming practice in Pennsylvania.

Q.    Wasn't that for POM?

MR. FLAHERTY:  Object to the form. You can answer.

THE WITNESS:  I wasn't asking for Parx' permission to represent POM.  I was looking for an assurance that it was not going to create an issue within Eckert for us to represent POM in Virginia.

Q.    Do you remember discussing an ethical screen or a confidential screen with Mr. Stewart?



A.    Yes.

Q.    You remember discussing the need to keep the representations you and your team of POM in Virginia and Mr. Stewart and his team of potential gaming clients, including Parx in Pennsylvania, separate?

A.    Yes.

Q.    Do you remember also having that discussion with Mr. Coon, who is the general counsel to Eckert?

A.    Yes.

Q.    Now, did you send an engagement letter to POM?

A.    Yes.

(Whereupon a document was marked as Lisk-3 for Identification.)

Q.    I'm going to scroll down this very slowly. Does this look like the engagement letter, it's been marked as Lisk-3, that you sent to POM in December of 2016?

A.    Yes.

Q.    I'll scroll down to the end.  Is that your signature?

A.    Yes.



from a Florida client, yes, but that he was going to check to see if there was a difference.

Q.    Right.  And your response to that e-mail said, if Parx so agrees, I will confirm that Pace-O-Matic also will agree with this restriction?

A.    The restriction that we -- that Eckert would not represent POM in Pennsylvania.

Q.    Now, if you turn to the e-mail that I just put up on the screen dated Friday, January 6, 2017, that's your e-mail to Mr. Stewart asking whether he had heard back from Parx?

A.    Yes.

Q.    Did you ever hear back from Mr. Stewart?

A.    Much, much later, yes.

Q.    What did he say, if you recall?

A.    My recollection captured in this e-mail was something to the effect of, that we still could not represent POM in Pennsylvania, that we would need a waiver, which we already had obtained, and that we would need to create a wall or a separation.

Q.    I'm going to put up a later e-mail in the chain.  Do you recall Mr. Stewart writing to you on January 25, 2017 about having discussed this --

A.    Yes -- no, not about having discussed the



A.    Yes.

Q.    Do you see where it says, it has to be explicit that we won't represent them in Pennsylvania and we can't do anything to preclude casino gaming opportunities?

A.    I see the language where it says they would like that, not that they were requiring.

Q.    What did you understand about the waiver that you were going to get?

A.    Well, I understood I already obtained a waiver.

Q.    What was your understanding of the waiver?

A.    It's the language included in the engagement letter.

Q.    When you're talking about that language, are you talking about the language in the last paragraph on this page?  It is possible that some of our present or future clients will have matters adverse to POM while we are representing POM?

A.    Yes.

Q.    We understand that POM will have no objection to our representations of parties with interests adverse to it and that POM will waive any actual or potential conflict of interest as long as


DEPOSITION SOLUTIONS                              800.211.DEPO (3376)
                                                 EsquireSolutions.com

those engagements are not substantially related to our representation of POM?

A.    Yes.

Q.    Mr. Stewart also mentions the wall again in an e-mail to you, looks like at 4:44 p.m.?

A.    Yes.

Q.    Do you see Mr. Stewart on February 1 asking you about your trip?

A.    Yes.

Q.    And coordinating with him on the waiver language?

A.    Yes.

Q.    Did you coordinate with him on the waiver language?

A.    We had a subsequent telephone conversation after this e-mail and there was no -- we discussed the waiver, the fact that we obtained an advanced waiver.  I do not recall Mr. Stewart asking for any additional waiver language beyond that.

Q.    So you told Mr. Stewart during that call that you had already gotten, in essence, a signed engagement letter with an advanced conflict waiver?

A.    Yes.

Q.    With whom did you discuss the advanced

