## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PACE-O-MATIC, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | **NO. 1:20-cv-292** |
| | : | |
| **v.** | : | **ELECTRONICALLY FILED** |
| | : | |
| **ECKERT SEAMANS CHERIN &** | : | **JUDGE WILSON** |
| **MELLOTT, LLC, MARK S.** | : | |
| **STEWART and KEVIN M.** | : | **JURY TRIAL DEMANDED** |
| **SKJOLDAL,** | : | |
| | : | |
| **Defendants.** | : | |

## SECOND AMENDED COMPLAINT

Plaintiff Pace-O-Matic, Inc. ("POM"), by and through its undersigned counsel, states the following as its Second Amended Complaint against Defendants Eckert Seamans Cherin & Mellott, LLC ("Eckert"), Mark S. Stewart, and Kevin M. Skjoldal in the above-captioned matter:

## NATURE OF THE ACTION

For years, POM relied on Eckert for legal advice concerning the marketing and sale of its electronic skill games and, in the course of that years-long representation, entrusted Eckert with highly proprietary and confidential information concerning the design, development and operation of its skill games and its legal, business and marketing strategies. Eckert's representation of POM was extensive and multi-dimensional and included the defense of POM's skill games in litigation

as well as development and implementation of government relations strategies to educate public officials and otherwise advocate the legality of POM's skill games.

While representing POM, however, Eckert took up arms ***against*** POM on behalf of another client, Greenwood Gaming & Entertainment, Inc. d/b/a Parx Casino ("Parx ~~Casino").~~."). While Eckert advocated on behalf of POM that its devices are games of skill and not illegal gambling devices, Eckert ***at the same time*** argued on behalf of Parx ~~Casino~~ that the ***same POM games*** should be outlawed as illegal gambling devices. This is a plain breach of fiduciary duty.

When POM confronted Eckert over its impermissible conflict, Eckert further breached the duty of undivided loyalty owed to POM by dropping POM like the proverbial "hot potato" in favor of its more lucrative relationship with Parx Casino.

It gets worse. After this action was filed, POM discovered that, contrary to Eckert's express representations to POM and to this Court that Eckert "is not involved" in litigation adverse to POM, *see* Joint Case Management Plan (ECF 18) at 3, Defendant Mark S. Stewart, the co-chair of Eckert's gaming practice group, and another member of the Eckert firm, Defendant Kevin M. Skjoldal, actively participated in and covertly manipulated litigation in Pennsylvania Commonwealth Court adverse to POM's interests, both directly and surreptitiously through another law firm, Hawke McKeon & Sniscak LLP ("Hawke McKeon"). And even worse, Mr. Stewart and Mr. Skjoldal participated in a campaign intended to destroy POM's

2

business by attempting to convince elected and appointed public officials that POM's games are gambling devices that should be seized and outlawed.

Documents disclosed by Eckert years after this litigation was filed revealed another layer of treachery. The newly disclosed evidence reveals that, in addition to advocating against POM on behalf of their other client, Parx, Mr. Stewart and Eckert developed, implemented, and coordinated a broad-based "PR campaign" to destroy POM's business and recruited other casino interests to participate—all while Eckert was representing POM.

Defendants violated ~~the~~their most basic fiduciary duties ~~owed to POM and as~~and concealed and misrepresented material facts to POM's great detriment. As a result, POM is entitled to ~~injunctive and other~~ relief as detailed herein.

## **PARTIES**

1.      POM is a corporation organized and existing under the laws of the State of Wyoming with a principal place of business at 3450 Corporate Way, Duluth, Georgia.  POM developed, produced, and licensed legally compliant electronic games of skill ~~which~~that are sold in Pennsylvania, Virginia, and elsewhere~~and~~.  POM retained Eckert to provide legal services for itself and its affiliates concerning its skill game products.  The skill games that POM sells in Virginia and Pennsylvania utilize identical software and algorithms, and there is no difference in how the machines sold in those jurisdictions operate or function.

3

2.      Eckert is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania with a place of business at 213 Market Street, 8th Floor, Harrisburg, Pennsylvania. Eckert is a law firm that touts its ability to "develop[] strategies . . . to establish an environment in which [its gaming] clients can achieve maximum success." On information and belief, Eckert does not maintain a place of business in Wyoming or Georgia and none of its members are citizens of Wyoming or Georgia.

3.      Mr. Stewart is a member of the Eckert firm with an office address in Harrisburg, Pennsylvania and is believed to be a resident and citizen of the Commonwealth of Pennsylvania. Mr. Stewart is the Co-Chair of the Hospitality & Gaming practice group at Eckert and a member of the firm's Board of Directors.

4.      Mr. Skjoldal is a member of the Eckert firm with an office address in Harrisburg, Pennsylvania and is believed to be a resident and citizen of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(1) in that this action is between citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs. The object of the litigation is enforcement of POM's right to conflict-free legal representation and enforcement of the fiduciary duties owed to POM. The

4

deprivation of that right and ongoing breaches of fiduciary duties threaten the very future of POM's business in Pennsylvania and elsewhere. ~~POM's sales of skill games in Pennsylvania exceed $75,000 and the fees paid to Eckert which are subject to disgorgement far exceed $75,000 and therefore the amount in controversy requirement in 28 U.S.C. § 1332(a) is met.~~

6.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Eckert has a place of business in this district ~~and~~, Messrs. Stewart and Skjoldal reside in this district, and a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

## BACKGROUND

~~1.     Pursuant to a written engagement letter dated September 13, 2011, Eckert agreed to provide legal services to POM in relation to "distribution of [POM]'s 'Palmetto Gold' skill games or similar devices within the Commonwealth of Pennsylvania, and any legal issues which may arise from the distribution of any such devices within the Commonwealth of Pennsylvania."~~

~~2.     Eckert provided legal services pursuant to the engagement in 2011 and continuously thereafter identified POM as an active client of the firm.~~

7.     On December 20, 2016, Eckert and POM executed ~~a second~~an engagement letter pursuant to which Eckert agreed to provide legal services to POM

relating to "legal, regulatory and possible legislative matters in Virginia" concerning "sales and marketing of [POM's] electronics and software."[1]

~~3.     Eckert's representation of POM and its affiliates pursuant to the December 20, 2016 engagement letter relates to substantially the same electronics and software referenced in the September 13, 2011 engagement letter.[2]~~

8.     ~~At the time~~Eckert was aware that a central aspect of this representation would be to contend that POM's games constitute games of skill and thus do not constitute gambling devices subject to state gaming laws.

~~8.~~9.    Documents obtained in this litigation demonstrate that, from the very beginning of the 2016 engagement, Eckert knew and planned that it would advocate on behalf of its other client, Parx ~~Casino~~, against POM's interests, specifically through "adverse legislative action and potential litigation." ~~Mr. Stewart confirmed in an email message on February 6, 2017 that "our clients"—i.e. Parx Casino—"do not agree [POM's products] are games of skill and will likely be actively opposing them [i.e. POM] on legal and legislative fronts."~~

_____

[1]  The nature of Eckert's years-long representation of POM and its affiliates is described in only general terms to protect and preserve the attorney-client and attorney work product privileges.  POM does not in any way waive, but on the contrary expressly reserves and asserts, the attorney-client and work product privileges with respect to all communications with and legal services provided by Eckert.

~~[2] The nature of Eckert's years-long representation of POM and its affiliates is described in only general terms to protect and preserve the attorney-client and attorney work product privileges. POM does not in any way waive, but on the contrary expressly reserves and asserts, the attorney-client and work product privileges with respect to all communications with and legal services provided by Eckert.~~

10.    In a January 25, 2017 internal email, Mr. Stewart straightforwardly explained that his work for Parx would "be adverse [to POM] in VA and PA."

11.    In a February 1, 2017 internal email discussing the conflict between POM and Parx, Mr. Stewart emphasized that "we will definitely be affirmatively going after" skill games like POM's.

12.    In a February 6, 2017 internal email, Mr. Stewart explained that his expected work for Parx would involve "actively opposing [POM] on legal and legislative fronts."

13.    In a February 8, 2017 internal email, Mr. Skjoldal noted that Eckert— on behalf of Parx—"would likely contend [that POM's game] is a gambling devise [sic]."

14.    As noted above, a central aspect of Eckert's representation of POM was contending that POM's games *are not* gambling devices.

~~9.~~15.   Despite ~~the acknowledgement~~Eckert's clear awareness of an obvious and egregious conflict, Eckert~~, with the knowledge, approval and involvement of Eckert's Chief Legal Officer, Timothy S. Coon,~~ nevertheless undertook to represent POM in advocating for and defending the legality of POM skill games.

16.   Eckert made this decision with the knowledge, approval, and involvement of Eckert's Chief Legal Officer, Timothy S. Coon.

17.     Eckert did not disclose ~~to POM~~this clear and egregious conflict to POM, nor did Eckert obtain informed and knowing consent from POM to this conflict.

~~10.~~18.   While Eckert hid this serious conflict from POM, documents produced in this case indicate that Eckert *did* notify Parx of this conflict.  In particular, a series of internal Eckert emails indicated that on or about January 6, 2017, Mr. Stewart discussed the ~~Eckert was planning "adverse legislative action and potential litigation  against" POM on behalf if Parx Casino, another Eckert client.~~ conflict with Parx.

19.     Thus, on information and belief, at all relevant times, Parx was plainly aware that its lawyers were violating their fiduciary and ethical duties owed to POM.

~~11.~~20.Eckert regularly billed POM for its legal services, and POM remitted very substantial fees for those legal services.

21.     In total, POM paid more than $800,000 in legal fees to Eckert from 2016 to 2020.

~~12.~~22.Relying on the duties of undivided loyalty and confidentiality owed to POM as a client of Eckert and in furtherance of the requested legal services, POM provided Eckert with highly sensitive, proprietary, confidential, and non-public information concerning its skill games and business operations, as well as confidential and privileged communications concerning the development and execution of legal strategies to preserve and defend the legality of those games.

8

13.23. Eckert regularly participated in privileged conferences with POM representatives involving and relating to POM's short and long-term business objectives, competitive business strategies, litigation matters and legal, regulatory and legislative strategies in, *inter alia*, the Commonwealth of Pennsylvania and Commonwealth of Virginia concerning POM's skill games. As legal counsel for POM, Eckert was intimately involved in POM's affairs.

14.24. Eckert's representation of POM includesincluded, but is not limited to: representing POM and its affiliates in meetings with law enforcement and government personnel; representing POM and its affiliates in litigation matters concerning the legality of POM's skill games; negotiating and drafting agreements between POM and its affiliates and third parties; and providing advice and counsel relating to legal, legislative, and litigation strategies for marketing and selling POM skill games.

15.25. As counsel for POM and its affiliates, Eckert secured legal and governmental opinions attesting that POM's products are games of skill and not gambling devices and, citing those opinions, accurately asserted on June 28, 2019 in state court in Virginia that POM's games "are not illegal gambling" because "skill is determinative of successful play." The expert legal opinion that Eckert submitted to the court in Virginia relied on *In re Pace-O-Matic, Inc. Equip.*, M.D. 965-2013

(Ct. Common Pleas Beaver Cty. Dec. 23, 2014), which holds that POM's skill games are legal in Pennsylvania.

26.     As would any client, POM believed that Eckert would serve as a loyal advisor and advocate.  But Eckert was anything but loyal.

27.     While POM entrusted some of its most sensitive and consequential legal matters to Eckert, Eckert orchestrated a sprawling effort intended to—in Eckert's own words—"kill" POM's games, which Stewart described as "our mortal enemy."

28.     Eckert's plot against its own client, POM, was breathtaking in scope.

29.     Eckert, Stewart, and Skjoldal created and operated a wide-ranging "PR" campaign attacking POM and its games, contending that POM's games were illegal, that POM's games should be expressly prohibited by law, and that POM's games are socially harmful.

30.     Eckert, Stewart, and Skjoldal led and played a central role in nationwide efforts by trade organizations, including the American Gaming Association and Gaming Laboratories International, seeking to prohibit skill games (including POM's skill games) in States across the nation and to encourage law-enforcement authorities to take legal action against skill games (including POM's skill games).

31.    On information and belief, at least some of these nationwide efforts were directed at governmental actors within the Commonwealth of Virginia and contributed, at least in part, to Virginia's (now-enjoined) prohibition of skill games.

32.    Eckert, Stewart, and Skjoldal led extensive lobbying efforts at both the state and local level seeking the enactment of legislation that would outlaw POM's games.

33.    For example, at the state level, documents produced in discovery demonstrate that Eckert was effectively ghostwriting materials regarding the prohibition of POM's games for State Senator Tommy Tomlinson, the leading legislative proponent for banning POM's games.

34.    Documents produced in discovery also show that Eckert, Stewart, and Skjoldal also drafted a proposed municipal ordinance that would ban POM's games and circulated that proposed ordinance to approximately 600 municipalities throughout Pennsylvania.

35.    While POM was aware of the legislative and PR efforts against it, POM had no idea that its own lawyer—Eckert—was behind and directing those efforts.

36.    Eckert, Stewart, and Skjoldal also actively encouraged Pennsylvania law enforcement authorities to take criminal and regulatory action against POM—Eckert's client—and locations hosting POM game machines.  For example, Eckert,

Stewart, and Skjoldal orchestrated the seizure of POM games in Dauphin County, Pennsylvania.

37.    Eckert, Stewart, and Skjoldal also actively and repeatedly lobbied the Pennsylvania State Police and Bureau of Liquor Control Enforcement to take criminal and regulatory action against POM.  Those law enforcement agencies did seize POM machines as a result of Defendants' efforts.

38.    Eckert, Stewart, and Skjoldal also repeatedly lobbied the Pennsylvania Gaming Control Board ("PGCB") to take adverse regulatory action against POM, despite the fact that the PGCB lacks any colorable claim of regulatory authority regarding POM.

39.    In one instance, on June 14, 2019, Stewart sent an email to Kevin O'Toole, the PGCB's Executive Director, and Cyrus Pitre, the PGCB's Chief Enforcement Counsel.  Stewart attached a letter that he had previously sent to the Pennsylvania Liquor Control Board ("PLCB"), in which Stewart had lambasted a letter sent to the PLCB by POM's counsel regarding the legality of POM's games.

40.    Eckert's efforts to obtain criminal prosecution of its own client—POM—were made with the knowledge of and at the behest of Parx.

41.    For example, on March 7, 2018, the Chairman of Parx, Bob Green, urgently directed Eckert "we have to . . . get a successful prosecution."

42.   As a direct result of these law-enforcement actions orchestrated by Eckert, POM was forced to defend or initiate several state-court lawsuits to ensure that it could continue to operate in Pennsylvania.

43.   In the course of litigating those lawsuits (several of which remain ongoing), POM expended millions of dollars in legal fees that it would not have incurred but for Eckert's efforts against POM.

44.   In at least two instances, Eckert litigated directly against POM.  In both of those cases, Eckert advanced the position that POM's games constitute illegal gambling machines, which directly contradicts the position that POM hired Eckert and paid it more than $800,000 to advance.

45.   On July 31, 2019, in the course of representing Parx, Stewart sent an email to two lawyers representing other casinos, Adrian King and William Downey.

46.   In that email, Stewart proposed that a cartel of casinos jointly "launch a coordinated litigation strike on the same day against a large number" of stores at which POM games were located, arguing that POM games constituted a public nuisance.

47.   Stewart's email uses the phrase "PA Skill," a reference to "Pennsylvania Skill," the trade name under which POM's games are offered in Pennsylvania.

48.     Stewart's email also makes clear that prevailing on the merits of those cases was, at most, a secondary concern.  Stewart enumerated the reasons why he believed that this "coordinated litigation strike" would be "a good move."  These reasons included:

> a.  "It would put PA Skill [*i.e.*, Eckert's client, POM] on the defensive, having to run around, spend money, and dedicate time and personnel resources to defending the numerous suits;"
>
> b.  "It would draw public and political attention to the illegality of the machines;"
>
> c.  "It could give businesses we don't sue pause about keeping their [POM] machines and certainly would chill the desire of businesses who don't have them from getting them[.]"

49.     Stewart offered to send "a draft complaint that could be used as a template and an info sheet to be used in identifying targets" and to share legal research that Eckert had done.

50.     Several days later, Stewart reached out to Churchill Downs—which owns the famous Kentucky racetrack as well as a large portfolio of gambling establishments—in an effort to recruit Churchill Downs to join the conspiracy against Eckert's client, POM.

14

51.    Based on documents produced in this case, it appears that the proposed "coordinated litigation strike" against POM led to internal questions within Eckert about whether conducting such a frontal attack on a firm client was permissible.

52.    Based on documents produced in this case, it appears that this issue was elevated to the Chair of Eckert's Executive Committee, Michael Flammia, on or about September 10, 2019.

53.    Flammia apparently gave his blessing to launching a "coordinated litigation strike" against Eckert's own client, because on October 9, 2019, Eckert filed—on behalf of Parx—dozens of lawsuits against retail locations hosting skill games, most of which hosted POM games.

54.    In this litigation, Eckert took positions that were directly adverse to POM.  For example, in one case, Eckert argued to the Court that POM manufactures "illegal slot machine[s]" and "deceptively market[s] these games as 'legal,' when, in fact, they are not."

55.    Eckert was actively representing POM when it accused POM of manufacturing "illegal slot machine[s]" and sought a declaratory judgment declaring that POM's skill games are a public nuisance.

56.    The filing of these lawsuits provided the first notice to POM that its own lawyers were actually working to destroy it.

57.     POM promptly objected to the conflicted representation and demanded that Eckert withdraw from the litigation directly adverse to POM.

58.     Eckert refused to do so.

59.     The "coordinated litigation strike" was not the only—indeed, was not even the most egregious—instance of Eckert litigating directly against its own client, POM.

60.     In response to the seizure of POM machines from a business in Dauphin County, on or about June 8, 2018, POM filed litigation against the Commonwealth of Pennsylvania to seek an injunction against further unlawful seizures of its machines.   That litigation is referred to herein as the "Commonwealth Court" litigation.

61.     As filed, Parx was not a party to the Commonwealth Court litigation.

62.     However, Eckert, Stewart, and Skjoldal persuaded Parx to participate directly in that litigation—first as an *amicus curiae*, then as an intervening defendant—directly adverse to POM.

63.     In the Commonwealth Court litigation, Parx expressly argued that POM's games are illegal gambling machines.

64.     As Judge Saporito's November 16, 2021 Memorandum (ECF No. 166) explains in meticulous detail—and with ample citations to documents reviewed *in camera*—Eckert, Stewart, and Skjoldal quarterbacked the representation of Parx in

the Commonwealth Court litigation.  Eckert, Stewart, and Skjoldal directed and controlled Parx's litigation.  They drafted all or substantially all of the key filings in the case.  They actively coordinated on behalf of Parx with counsel for the Commonwealth regarding potential arguments for concluding that POM's games are illegal.

65.   Eckert, Stewart, and Skjoldal recognized that they could not serve as counsel of record for Parx without giving away that they were actively trying to destroy Eckert's own client, POM.

66.   Thus, Eckert, Stewart, and Skjoldal decided to have another law firm—Hawke McKeon—serve as counsel of record and make all court appearances.  Although Eckert, Stewart, and Skjoldal served as Parx's lead counsel in the Commonwealth Court litigation, they conducted this role surreptitiously, without POM's knowledge.

67.   Eckert, Stewart, and Skjoldal adopted this surreptitious approach precisely to hide their misconduct and because they recognized the impropriety of their involvement in the Commonwealth Court litigation.

68.   In a text message to a Hawke McKeon attorney on December 17, 2019, Stewart stated "We can discuss but I may need you to be solo name on this brief. Will explain."

69.   In a December 13, 2019 email, Stewart noted that he had sent unsolicited legal advice to the attorneys representing the Commonwealth but emphasized that he had "remov[ed] any reference to law firms" from the documents.

70.   Eckert did not merely hide its involvement in the Commonwealth Court litigation from POM; it hid this information from the Court in this case.

71.   Over and over again, Eckert falsely represented to this Court that Eckert was not involved (or was minimally involved) in the Commonwealth Court litigation.

72.   For example, in its original Answer, Eckert pleaded that "Eckert does not represent a party adverse to POM in litigation" and that "Eckert is not counsel in any litigation where POM is an adverse party."  (ECF No. 9)

73.   In the Joint Case Managed Plan, Eckert represented that "Eckert is not involved in [the Commonwealth Court] case."  (ECF No. 18)

74.   In its opposition to POM's request for a preliminary injunction, Eckert represented that "Eckert is not representing parties in litigation adverse to POM."  (ECF No. 21)

75.   As Judge Saporito explained in detail in the November 16, 2021 Memorandum, Eckert's representations were false. Eckert "advanced litigation positions directly adverse to the legal interests of its other client, POM."  "[I]t actively and clandestinely managed and participated in the representation of Parx . . .

18

against its other client, POM." And "it did so with full knowledge that the conflict asserted by POM precluded its active and continuing representation of Parx."

76.     Eckert's outright lies about its involvement in the Commonwealth Case litigation further demonstrate Defendants' awareness of the impropriety and the seriousness of their actions in that litigation.

16.77. Unbeknownst to POM, while Eckert was in possession of POM's confidential information and privileged communications, Eckert, led by Mr. Stewart, was representing Parx Casino and/or its affiliates in matters directly adverse to POM's interests and substantially related to matters that Eckert handled or was handling for POM. In addition, while Eckert was representing POM, Eckert and Mr. Stewart were developing, coordinating and implementing a "PR campaign" against skill games on behalf of casino interests that Eckert did not represent.   Eckert continued to represent POM, continued to advocate for the legality of POM's skill games and continued to participate in confidential conferences regarding POM's legal and business strategies while secretly and simultaneously advising Parx Casino and working for the benefit of other casinos on matters materially adverse to the interests of POM.

4.     Eckert's conflicting representations were exposed when Eckert openly and publicly attacked POM in the context of an action filed on behalf of Parx Casino against establishments that offer POM skill games. In one of the actions filed in the Court of Common

Pleas of Bucks County, Pennsylvania, Eckert fired a shot directly at POM—its own client—by positing on December 2, 2019 that POM manufactures "illegal slot machine[s]" and "deceptively market[s] these games as 'legal,' when, in fact, they are not."

5.     Eckert was actively representing POM when it accused POM of manufacturing "illegal slot machine[s]" and sought a declaratory judgment declaring that POM's skill games are a public nuisance.

6.     Before Eckert openly attacked POM, an Eckert lawyer participated in privileged conference calls with POM and POM's other counsel in Pennsylvania relating to, *inter alia*, POM's Pennsylvania legal matters affecting POM and its affiliates.

7.     On or about January 10, 2020, while Eckert was representing POM, Mr. Stewart, the Harrisburg-based co-chair of Eckert's gaming practice, authored letters sent on behalf of Parx Casino to hundreds of Pennsylvania municipalities advocating that skill games, including those manufactured by POM, are "illegal slot machines" that should be outlawed through a local ordinance which Eckert drafted and enclosed with the letters.

8.     Also while Eckert was representing POM, Mr. Stewart appeared and collaborated with Parx Casino's purported *amicus* counsel at a January 15, 2020 hearing on POM's motion to prevent the unlawful seizure of its skill games in the matter captioned *POM of Pennsylvania, LLC v. Pennsylvania State Police, Bureau of Liquor Control Enforcement* pending in Pennsylvania

Commonwealth Court at No. 503 MD 2018.³

9.      In addition, Eckert hosted a gaming industry meeting and legislative reception in Harrisburg on February 4, 2020, just after Eckert declared its intention to drop POM as a client, at which Eckert advocated for legislation banning skill games like POM's.

17.78. These and other activities by Eckert on behalf of Parx Casino are attempts were intended to secure judicial and/or legislative determinations that POM's skill games—the same games that Eckert simultaneously promoted in Virginia as *legal* games of skill—should be declared illegal in Pennsylvania. Eckert, Mr. Stewart and Mr., to generate negative publicity and animosity toward POM and other skill game manufacturers, to deter businesses from hosting POM games and to cause POM to devote resources to defending itself against the casinos' many baseless attacks. Eckert, Mr. Stewart and Mr. Skjoldal engaged in these actions against POM during Eckert's concurrent representation of POM and these actions continued after the representation ended.

18.79. Eckert's representation of Parx Casino is directly and materially adverse to the interests of POM. Eckert's argument on behalf of Parx Casino that POM's skill games should be illegal in Pennsylvania cannot be reconciled with Eckert's express and repeated reliance on *In re Pace-O-Matic, Inc. Equip.* which

---

³ There is a related matter pending in the Commonwealth Court captioned *POM of Pennsylvania, LLC v. Commonwealth of Pennsylvania, Department of Revenue, and City of Philadelphia*, which is docketed at No. 418 MD 2018.

holds that POM's games are "predominantly . . . game[s] of skill rather than . . . game[s] of chance" and therefore not illegal gambling devices under Pennsylvania law.

80.    On information and belief, as part of the same course of conduct, Eckert, Stewart, and Skjoldal also performed work on behalf of other clients that was directly and materially adverse to POM's interests.

81.    On information and belief, those other clients include the following:

a.  The Mohegan Tribal Gaming Authority;

b.  Cordish Companies; and

c.  Caesars Entertainment.

82.    On information and belief, Eckert, Stewart, and Skjoldal received substantial legal fees for their work directly adverse to POM's interests from Parx, the Mohegan Tribal Gaming Authority; Cordish Companies; and Caesars Entertainment.

19.83.  Eckert simultaneously worked for and against POM in direct violation of its fiduciary and ethical duties to POM.

20.84.  Eckert's conflicted efforts on behalf of Parx Casino and others to destroy POM's Pennsylvania market threaten POM's continued existence.

21.85.  Eckert breached its fiduciary duty to POM, violated its duty of loyalty and violated its ethical obligations by advocating on behalf of Parx Casino and others

directly against POM while representing POM and while in possession of POM's confidential information.

22.86.Rule 1.7 of the Pennsylvania Rules of Professional Conduct provides in pertinent part that "a lawyer shall not represent a client if . . . the representation of one client will be directly adverse to another client" unless "each client affected informed consent." Pa. R. Prof. Conduct 1.7(a)(1), (b)(4).

23.87.Rule 1.9 of the Pennsylvania Rules of Professional Conduct provides in pertinent part that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." Pa. R. Prof. Conduct 1.9(a).

24.88.Rule 1.10(a) of the Pennsylvania Rules of Professional Conduct provides that, "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9 . . . ." Pa. R. Prof. Conduct 1.10(a).

25.89.Eckert did not communicate information to POM concerning its direct conflict of interest before undertaking the representation of POM or at any time during the representation and POM did not knowingly consent to waive Eckert's

conflict of interest. _Nor was Eckert's conflict the type that could ethically or lawfully be waived.

26.90.Eckert engaged in an impermissible conflict of interest in violation of Rules 1.7 and 1.9 by working for and against POM and, as a result, the Eckert firm and all of its attorneys were and are barred by Rule 1.10(a) from continuing the conflicting representation of Parx Casino. and others.

27.91.POM confronted Eckert concerning its impermissible conflict and requested that Eckert withdraw from any representation of Parx Casino adverse to POM. _Eckert refused to withdraw on behalf of Parx Casino and misrepresented that Eckert obtained an advance waiver of any conflict.

28.92.Eckert also tried to negate its conflict by dropping POM like a "hot potato" on January 29, 2020. _Eckert's termination of its representation of POM is a further breach of the fiduciary and ethical duties owed to POM.

93.    Soon thereafter, on February 4, 2020, Eckert hosted a gaming industry meeting and legislative reception in Harrisburg, at which Eckert advocated for legislation banning skill games like POM's.

29.94. Both before Eckert withdrew from the representation of POM and after this case was filed, Eckert asserted that it is not counsel for a party in any litigation matter where POM is an adverse party.

30.95. In a letter to POM's counsel dated January 17, 2020, Mr. Coon, Eckert's Chief Legal Officer, tried to justify Eckert's conflicting representation of POM and Parx Casino by denying that Eckert played any role in any litigation adverse to POM. He wrote: "Eckert made a careful examination of the facts and law and concluded there is no ethical conflict under the Rules of Professional Conduct of either Pennsylvania or Virginia. The key points are: Eckert is not counsel for a party in a litigation where POM is an adverse party" . . . ."

10.    Eckert similarly claimed in its Answer filed in this action that it "does not represent a party adverse to POM in litigation." *See* Answer & Affirmative Defenses (Doc. No. 9) ¶ 18; *see also id.* at Seventeenth Defense. Further, Eckert misrepresented in the Joint Case Management Plan that it "is not involved" in the action commenced by POM in the Commonwealth Court. *See* Joint Case Management Plan (Doc. No. 18) at 3.

31.96. These representations are were intentionally and knowingly false.

11.    While Eckert was denying involvement in the Commonwealth Court litigation, Mr. Stewart and Mr. Skjoldal were actively and covertly participating By surreptitiously advocating on behalf of Parx Casino in the Commonwealth Court litigation and were actively and covertly supporting, assisting and encouraging POM's adversaries in those litigation matters.

12.    Among other things, on behalf of Parx Casino, Mr. Stewart and Mr. Skjoldal suggested legal theories and arguments, prepared court filings and offered to coordinate legal

strategies adverse and others in opposition to POM in the Commonwealth Court litigation.

13. For example, while Eckert was still representing POM, on November 22, 2019, Mr. Skjoldal sent an email to the Office of the Pennsylvania Attorney General which was counsel for POM's adversaries, with a copy to Mr. Stewart which included a legal analysis of the recent Commonwealth Court opinion in the matter docketed at No. 418 MD 2018. Mr. Skjoldal ended the email by encouraging the Office of Attorney General to prosecute the use of POM's machines. He wrote: "[I]t would seem that the OAG would still have this power in its arsenal to go after POM's slot machines. Please let us know how you intend to proceed. We would welcome the chance to discuss these issues       If we can be of any assistance, please let us know."

14. On November 26, 2019, while Eckert was still representing POM, Mr. Stewart sent an email to the Pennsylvania Office of Attorney General providing his own legal analysis of the opinion issued by the Commonwealth Court. He wrote: "Ultimately, should you move for summary relief on POM's claims under [18 Pa. C.S.A. §] 5513, based on the slot machine argument, we (and other casinos) would be interested in filing an amicus brief in support of your position. So, just trying to provide some guidance for the clients on that front."

15. To avoid detection, Mr. and elsewhere Stewart and Mr. Skjoldal arranged for Parx Casino to be publicly represented by Hawke McKeon in the Commonwealth Court litigation, first as *amicus* counsel and later as counsel to Parx Casino as proposed intervenor, while Mr. Stewart and Mr. Skjoldal directed the Commonwealth Court litigation for Parx Casino behind the scenes.

16.     Hawke McKeon characterizes its role in the Commonwealth Court litigation as "conflict counsel," ECF 53 at 2, but subsequent proceedings and discovery compelled by the February 16, 2021 ruling, ECF 87, 88, revealed that Mr. Stewart and Mr. Skjoldal remained substantially involved in the Commonwealth Court litigation on behalf of Parx Casino and continued to covertly advance Parx Casino's interests which were adverse to POM. Among other things, Mr. Stewart and Mr. Skjoldal drafted court filings, encouraged participation of the casino gaming regulatory agency, advocated legal theories and strategies and served as go between with Parx Casino personnel concerning the litigation.

17.     In a December 7, 2020 filing in Commonwealth Court, Hawke McKeon admitted that Eckert and Mr. Stewart directed the representation of Parx Casino behind the scenes because POM notified Eckert that POM viewed Eckert's concurrent representation of POM and Parx Casino as a conflict of interest. In short, Eckert deliberately stayed behind the scenes to conceal its improper participation from POM.

32.97. By surreptitiously representing Parx Casino in the Commonwealth Court litigation, Mr. Stewart and Mr. Skjoldal violated Rule 8.4 of the Pennsylvania Rules of Professional Conduct which prohibits lawyers from inducing another to do that which he or she cannot do directly.

33.98. In addition to covertly advocating against POM in relation to the Commonwealth Court litigation, Eckert, Mr. Stewart and Mr. Skjoldal actively encouraged criminal, administrative, regulatory and legislative actions against POM

and POM games, both while Eckert was representing POM and after that representation ended.

99.        Eckert and Mr. Stewart also coordinated and led a "PR campaign" on behalf of multiple casinos aimed at destroying POM's business, but concealed its involvement from POM.

~~34.~~100.        Eckert and its lawyers, including Mr. Stewart and Mr. Skjoldal, repeatedly, intentionally and overtly placed their own conflicted interests and Parx Casino's interests over the interests of POM and thereby breached and continue to breach fiduciary duties owed to POM.

~~35.~~101.        Mr. Stewart continues to advocate against the legality of POM skill games in legislative, government relations and regulatory contexts.

~~36.~~102.        POM has been forced to retain counsel to enforce Eckert's fiduciary and ethical obligations, to address Eckert's refusal to withdraw from the adverse representation of Parx Casino and to protect POM's interests.

~~37.~~103.        This Court has the power and the obligation to enforce fiduciary duties owed by a lawyer to a client and to restrain violations of a lawyer's fiduciary duties.

**COUNT I**
**CLAIM FOR DECLARATORY JUDGMENT**
**28 U.S.C. §§ 2201-02**
**Against Defendants Eckert, Seamans, Cherin & Mellott, LLC,**

**Mark S. Stewart and Kevin M. Skjoldal**

~~38.~~104.      Paragraphs 1 through ~~54~~103 of this Second Amended Complaint are incorporated by reference as if set forth fully herein.

~~39.~~105.      Under Pennsylvania common law, Eckert and its lawyers owe a fiduciary duty to POM to act with undivided loyalty. _Accordingly, Eckert is prohibited from undertaking ~~a~~any representation adverse to POM and from misusing POM's confidences.

~~40.~~106.      While representing POM, Eckert acquired detailed confidential and proprietary information and privileged communications concerning POM's skill games, business operations and legal strategies that ~~is~~are highly relevant to its representation of Parx Casino and Parx Casino's efforts to challenge the legality of the very same POM skill games.

~~41.~~107.      Eckert, Mr. Stewart and Mr. Skjoldal breached fiduciary duties owed to POM by representing Parx Casino in matters directly and materially adverse to POM and its affiliates concerning POM skill games and in otherwise advocating against POM skill games on behalf of Parx Casino and others.

~~42.~~108.      Eckert further breached fiduciary duties owed to POM by claiming to have obtained an advance waiver from POM permitting Eckert's conflicting representations when no such waiver was obtained and by terminating

Eckert's representation of POM when POM challenged its concurrent conflicting representation of Parx Casino.

43.109.     There exists an actual controversy between the parties as to the breaches of fiduciary and ethical duties by Eckert, Mr. Stewart and Mr. Skjoldal and thus declaratory relief under 28 U.S.C. § 2201 is warranted.

44.110.     POM is entitled to a judicial declaration under 28 U.S.C. § 2201 that ~~Eckert~~Eckert's, Mr. ~~Stewart~~Stewart's, and Mr. ~~Skjoldal breached~~Skjoldal's fiduciary duties ~~owed~~preclude them from engaging in any current or future representation directly adverse to POM ~~as detailed herein.~~or that would involve them asserted that POM's games constitute games of chance and/or gambling machines.

45.111.     Pursuant to the authority in 28 U.S.C. § 2202 to grant further necessary relief based on a declaratory judgment, POM is also entitled to an injunction barring Eckert and its lawyers from representing Parx Casino or any other client in any matter directly adverse to POM or POM games and an order compelling Eckert to disgorge all fees paid by POM and awarding other relief to remedy Eckert's unlawful conduct.

WHEREFORE, POM respectfully requests:[4]

---

[4]   The parties agreed to a Stipulated Order (ECF 191) that disposed of the issues presented in POM's Motion for Preliminary Injunction and Amended Motion for Preliminary Injunction.  The Stipulated Order is a stipulated permanent injunction. POM asserts that this claim for declaratory relief in Count I is intended to supplement the Stipulated Order based on information revealed in discovery.

(1)   A judicial declaration that ~~Eckert, Mr. Stewart~~Eckert's, Stewart's, and ~~Mr. Skjoldal breached~~Skjoldal's fiduciary duties ~~owed to POM and violated ethical obligations imposed by Rules 1.7, 1.9 and 8.4 of the Pennsylvania Rules of Professional Conduct;~~

(1)   ~~A judicial declaration that Eckert and its lawyers are enjoined~~preclude them from representing, advising or otherwise supporting, directly or indirectly, any client adverse to POM in any matter substantially related to its representation of POM, and an injunction implementing this decree;

(2)   A judicial declaration that ~~Eckert~~Eckert's, Stewart's, and ~~its lawyers are enjoined~~Skjoldal's fiduciary duties preclude them from communicating, directly or indirectly, with any party, *amicus curiae*, intervenor or proposed intervenor or counsel for any party, *amicus curiae*, intervenor or proposed intervenor regarding the litigation matters initiated by POM in Pennsylvania Commonwealth Court, and an injunction implementing this decree;

(3)   A judicial declaration that ~~Eckert~~that Eckert's, Stewart's, and ~~its lawyers are enjoined~~Skjoldal's fiduciary duties preclude them from representing any party, directly or indirectly, in any capacity and from assisting, helping or communicating with any party or counsel for any party in any legal proceeding against any entity that hosts or offers POM's skill games or where POM's skill games are at issue~~;~~, and an injunction implementing this decree;

(4)   A judicial declaration that ~~Eckert~~that Eckert's, Stewart's, and ~~its~~

~~lawyers are enjoined~~Skjoldal's fiduciary duties preclude them from representing any party, directly or indirectly, in any capacity, including as counsel for any industry group or association, in any matter adverse to POM or any POM affiliate directly or indirectly related to POM skill games~~;~~, and an injunction implementing this decree;

(5)   A judicial declaration that ~~Eckert~~that Eckert's, Stewart's, and ~~its lawyers are enjoined~~Skjoldal's fiduciary duties preclude them from advocating, directly or indirectly, in any forum, including in any legislative, lobbying, government relations and/or public relations context, against the legality of electronic games of skill manufactured or distributed by POM or any POM affiliate and from advocating, directly or indirectly, that POM games are not games of skill or are not games where skill predominates over chance~~;~~, and an injunction implementing this decree;

(6)   A judicial declaration that ~~Eckert is prohibited~~that Eckert's, Stewart's, and Skjoldal's fiduciary duties preclude them from using, relying on or disclosing any information acquired from its representation of POM~~;~~, and an injunction implementing this decree;

(7)   An order requiring Eckert to disgorge all fees paid by POM and otherwise remedy the breach of fiduciary duty; and

(8)   Such other and further relief as the Court deems appropriate under the circumstances.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**Against Defendants Eckert, Seamans, Cherin & Mellott, LLC,**
**Mark S. Stewart and Kevin M. Skjoldal**

46.112.     Paragraphs 1 through 62111 of this Second Amended Complaint

are incorporated by reference as if set forth fully herein.

47.113.     A fiduciary relationship exists between Eckert and POM and its

affiliates by virtue of POM's retention of Eckert to provide legal services to it and

to its affiliates.

48.114.     Eckert knowingly failed to act in good faith and solely for the

benefit of POM in matters for which Eckert was employed.

49.115.     As members of the Eckert firm, Mr. Stewart and Mr. Skjoldal

likewise owed a fiduciary duty to act in good faith and solely for the benefit of POM

in matters for which the Eckert firm was employed and they were likewise prohibited

from representing any client directly adverse to POM.

50.116.     Eckert, Mr. Stewart and Mr. Skjoldal breached the fiduciary duty

owed to POM by actively collaborating with POM's adversaryadversaries in the

Commonwealth Court litigation, by surreptitiously directing the representation of

Parx Casino through the Hawke McKeon firm and, by advocating for criminal

prosecution of POM and seizure of POM's machines, by encouraging litigation

33

against POM, by advocating for legislation banning POM games, by deterring businesses from offering POM gamesand by developing, implementing and leading a public relations campaign aimed at destroying POM's business.

51.117.    Eckert and Mr. Stewart further breached the fiduciary duty owed to POM by undertaking to represent POM knowing that Eckert would take action adverse to POM on behalf of its other client, Parx Casino.

52.118.    POM suffered and continues to suffer substantial injury as a direct result of the breaches of fiduciary duty detailed herein, including, but not limited to, by incurring costs and fees to enforce its right to conflict-free representation and otherwise protect itself against the breaches of fiduciary duty as well as the costs incurred in defending against the litigation and "PR campaign" engineered and managed by Eckert.

53.119.    The conduct of Eckert, Mr. Stewart and Mr. Skjoldal was malicious, wanton and willful and done with reckless indifference to the rights of POM and therefore warrants an award of punitive damages.

120. Again and again, Eckert, Mr. Stewart and Mr. Skjoldal acted with wanton disregard for the rights of POM and did so pursuant to a calculated strategy to destroy POM's business.  A substantial punitive award is necessary to punish Eckert, Mr. Stewart and Mr. Skjoldal for their intentional wrongdoing against their own client and deter similar breaches of loyalty.

WHEREFORE, POM demands the entry of judgment in its favor and against Eckert, Mr. Stewart, and Mr. Skjoldal, together with an providing the following relief:

a.  Disgorgement of all legal fees paid by POM (or any of its affiliates) to Eckert;

b.  An award of compensatory and punitive damages and suchequal to the fees, expenses, and costs incurred by POM in litigating this case, which has been necessary to enforce the fiduciary duties owed by Defendants to POM;

c.  An award of compensatory damages equal to the fees, expenses, and costs incurred by POM in litigating those state-court actions that were necessitated by Defendants' efforts to orchestrate law-enforcement and/or regulatory actions against POM and/or its machines;

d.  An award of compensatory damages equal to the fees, expenses, and costs incurred by POM in litigating the state-court actions filed by Defendants on behalf of Parx that were adverse to the interests of POM and/or its machines;

e.  Disgorgement of all legal fees and other and further relief as the Court deems appropriate under the circumstancespayments to Eckert relating to any representation that was adverse to POM, including but not limited to representations of Parx;

f.   An award of punitive damages;

g.  Prejudgment and post-judgment interest; and

a.h.      A permanent injunction prohibiting Defendants from future actions that violate their fiduciary duties.

**COUNT III**
**FRAUD**
**Against Eckert, Seamans, Cherin & Mellott, LLC**

54.121.      Paragraphs 1 through 70120 of this Second Amended Complaint are incorporated by reference as if set forth fully herein.

18.   Eckert knowingly misrepresented the firm's involvement in the Commonwealth Court litigation in the January 17, 2020 letter sent by Mr. Coon.

19.   Eckert further misrepresented its involvement in the Commonwealth Court litigation in, *inter alia*, the Joint Case Management Plan filed in this case.

20.   Eckert denied involvement in the Commonwealth Court litigation intending that POM would rely on the denial and POM justifiably relied on the denial to its detriment.

21.   POM suffered substantial damage as a result. Among other things, Eckert personnel secretly continued to communicate and collaborate with parties in litigation adverse to POM and met with government officials concerning POM's games after Eckert denied involvement in such matters. All of this was discovered after this litigation was commenced.

122.   ~~Eckert's~~From January 2017 until at least October 9, 2019, Eckert and Stewart knowingly, intentionally, and willfully omitted to disclose to POM highly material facts regarding Eckert's representation of Parx and its plot to destroy POM.

123.   Among other omissions, at no relevant time did Defendants disclose to POM that Defendants were engaged in a representation directly adverse to POM's interests; that Defendants would contend that POM's machines constitute illegal gambling machines and/or games of chance; that Defendants would aggressively seek criminal and regulatory actions against POM; that Defendants would launch extensive lobbying and/or PR efforts that would severely harm POM; that Defendants would ghostwrite legislation whose intent and effect would be to outlaw POM's business; or that Defendants intended to participate in litigation directly adverse to POM and/or to POM's interests.

124.   Defendants omitted these material facts for the specific purpose of causing POM to remain a client of Eckert and continue paying substantial fees to Eckert.

125.   Defendants had obligations under both the common law and the applicable Rules of Professional Conduct to proactively disclose such information to POM.

126.   Had Defendants disclosed these material facts to POM, POM would not have continued as a client of Eckert and would not have continued to pay substantial fees to Eckert.

127.   In reliance on these highly material omissions, POM continued as a client of Eckert and continued to pay substantial legal fees to Eckert, ultimately paying $820,554 in fees to Eckert.

128.   POM's reliance was justifiable.

129.   Defendants' conduct was malicious, wanton and willful and done with reckless indifference to the rights of POM—its own client—and therefore warrants an award of punitive damages.  Again and again, Eckert, Mr. Stewart and Mr. Skjoldal acted with wanton disregard for the rights of POM and did so pursuant to a calculated strategy to destroy POM's business.  A substantial punitive award is necessary to punish Eckert, Mr. Stewart and Mr. Skjoldal for their intentional wrongdoing against their own client and deter similar breaches of loyalty.

WHEREFORE, POM demands the entry of judgment in its favor and against Eckert and Mr. Stewart providing the following relief:

a.  Disgorgement of all legal fees paid by POM (or any of its affiliates) to Eckert;

b.  Prejudgment and post-judgment interest; and

c.  An award of punitive damages.

**COUNT IV**
**ABUSE OF PROCESS**
**Against Eckert; Stewart; and Skjoldal**

128.   Paragraphs 1 through 127 of this Second Amended Complaint are incorporated by reference as if set forth fully herein.

129.   Eckert, Stewart, and Skjoldal used legal process when they filed a series of state-court lawsuits seeking a declaration that POM's machines constitute a public nuisance as illegal gambling machines.  Such process includes but is not limited to the initial court filings, summons, and other filings that necessitated a response or argument from POM.

130.   Eckert, Stewart, and Skjoldal used these lawsuits and the legal process associated with these lawsuits primarily to accomplish purposes for which the process was not designed.

131.   In particular, as Stewart candidly explained, the lawsuits were filed primarily for the following reasons:

> a.  "[They] would put PA Skill [*i.e.*, Eckert's client, POM] on the defensive, having to run around, spend money, and dedicate time and personnel resources to defending the numerous suits;"

> b.  "[They] would draw public and political attention to the illegality of the machines;"

c.  "[They] could give businesses we don't sue pause about keeping their [POM] machines and certainly would chill the desire of businesses who don't have them from getting them[.]"

132.   The filing of these lawsuits and the use of process within these lawsuits has directly harmed POM by requiring POM to expend legal fees and other litigation expenses opposing these improper lawsuits.

128.133.   Defendants' conduct was malicious, wanton and willful and done with reckless indifference to the rights of POM—its own client—and therefore warrants an award of punitive damages.

WHEREFORE, POM demands the entry of judgment in its favor and against Eckert, together with anMr. Stewart, and Mr. Skjoldal providing the following relief:

a.  An award of compensatory and damages equal to the fees, expenses, and costs incurred by POM in litigating the state-court cases filed by Defendants;

b.  Prejudgment and post-judgment interest; and

a.c.   An award of punitive damages and such other and further relief as the Court deems appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, POM demands a jury trial on all issues so triable.

_____

Respectfully submitted,

HUSCH BLACKWELL LLP

/s/ Jeffrey B. Jensen
Jeffrey B. Jensen*
Michael Nolan*
Michael Martinich-Sauter#
Bola Adeniran#
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
314-345-6464 (Telephone)
314-480-1505 (Facsimile)
Jeff.jensen@huschblackwell.com

* Appearing by special admission
# Application for special admission forthcoming

George W. Westervelt, Jr.
Attorney ID No. 18195
706 Monroe Street, PO Box 549
Stroudsburg, Pennsylvania 18360
570-421-6100
geowwest@ptd.net

**Counsel for Plaintiff Pace-O-Matic, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that a true and correct copy of the foregoing Second

Amended Complaint was served upon the following counsel of record via the

Court's ECF filing system on this 28th29th day of June 2022:

Abraham C. Reich, Esquire
Robert S. Tintner, Esquire
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA  19103-3291


*/s/ Jeffrey B. Jensen*
