# APPENDIX OF UNREPORTED DECISIONS

# *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*

KeyCite Blue Flag – Appeal Notification

Appeal Filed by EPSILON ENERGY USA INC v. CHESAPEAKE APPALACHIA LLC, 3rd Cir., March 2, 2022

2022 WL 178816
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

EPSILON ENERGY USA, INC., Plaintiff,
v.
CHESAPEAKE APPALACHIA, LLC, Defendant.

Civil No. 1:21-CV-00658
|
Signed 01/18/2022

**Attorneys and Law Firms**

Elizabeth M. Thomas, McGuireWoods, Charlotte, NC, Gregory J. Krock, McGuireWoods LLP, Pittsburgh, PA, Jonathan T. Blank, Pro Hac Vice, McGuire Woods LLP, Charlottesville, VA, Yasser A. Madriz, Pro Hac Vice, McGuireWoods LLP, Houston, TX, for Plaintiff.

Daniel T. Brier, John B. Dempsey, Nicholas F. Kravitz, Richard L. Armezzani, Myers Brier & Kelly, LLP, Scranton, PA, for Defendant.

### **MEMORANDUM**

JENNIFER P. WILSON, United States District Court Judge

**\*1** This is a diversity action arising from several contracts between two oil and gas companies. The court dismissed the case on September 22, 2021, finding that the well proposals on which Plaintiff's complaint were based had expired. Plaintiff has moved for partial reconsideration, arguing that the dismissal of the case should have been limited to Plaintiff's claims for injunctive relief and that Plaintiff's declaratory judgment claim should not have been dismissed. For the reasons that follow, the motion for reconsideration is denied.

### **BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff Epsilon Energy USA, Inc. is an Ohio corporation with its principal place of business in Texas. (Doc. 4, ¶ 1; Doc. 72, ¶ 1.) Defendant Chesapeake Appalachia, LLC

("Chesapeake") is an Oklahoma corporation with its principal place of business in that state. (Doc. 4, ¶ 4; Doc. 72, ¶ 4.) Beginning in 2009, Epsilon, Chesapeake, and several other oil and gas companies entered into several Joint Operating Agreements ("JOAs") for the purpose of developing natural gas at locations in Pennsylvania. [1]

Chesapeake is designated as the operator under the JOAs, which accordingly requires Chesapeake to "conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of [the JOAs]". (JOAs, Art. V.A.) Chesapeake may be permanently removed as operator under a JOA for good cause upon the affirmative vote of the other parties to the JOA that own a majority interest of the property that is subject to the JOA. (JOAs, Art. V.B.1.) In order for such a vote to be effective, a written notice must be provided to Chesapeake detailing its alleged defaults as operator. (*Id.*) Chesapeake then has thirty days in which to cure such defaults. (*Id.*)

Although Chesapeake is the operator, the JOAs provide that any party to the JOAs may propose the drilling of a new well or propose a project to rework, sidetrack, deepen, recomplete, or plug back a well. (*Id.* Art. VI.1.) A party proposing such work is required to provide the other JOA parties that "have not otherwise relinquished their interest in [the] objective Zone" of the proposal with written notice of the proposal "specifying the work to be performed, the location, proposed depth, objective Zone, and the estimated cost of the operation." (*Id.*) The other parties receiving notice have thirty days after receipt of the notice "within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation." (*Id.*)

**\*2** The JOAs require different procedures for projects that have received the unanimous consent of the JOA parties and projects that have not received unanimous consent. When a project has received unanimous consent:

> the parties shall be contractually committed to participate therein provided such operations are commenced within the period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the

Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC, Slip Copy (2022)
2022 WL 178816

expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made.

(*Id.* Art. VI.1.) When, on the other hand, a proposal receives less than unanimous support:

the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account

of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2 [sic], shall comply with all terms and conditions of this agreement.

(*Id.* Art. VI.2(a).)

In 2018, a dispute arose over whether Chesapeake was complying with the JOAs with regard to wells proposed by Epsilon. The dispute led to Epsilon filing suit against Chesapeake in this district in September 2018. (*See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 3:18-CV-01852 (M.D. Pa. filed Sept. 20, 2018) [hereinafter *Epsilon I*].) Epsilon moved for preliminary injunctive relief in the suit. (*Epsilon I*, Doc. 2.) United States District Judge Malachy E. Mannion scheduled the case for a preliminary injunction hearing. (*Epsilon I*, Doc. 17.) Before the court conducted the hearing, however, the parties settled the case. (Doc. 96-8 [hereinafter Settlement Agreement].)

**\*3** As part of the Settlement Agreement, the parties agreed that Epsilon could propose new wells under the JOAs "in accordance with the terms of the JOAs." (*Id.* ¶ 8.) The parties further agreed that if Chesapeake did not consent to a proposal and did not agree to act as the operator, Chesapeake would "cooperate with the party designated, to the extent permitted under the JOA, as operator" and would "not unreasonably withhold cooperation, including but not limited to, permitting and access to co-owned assets, such as water withdrawal points and impoundments." (*Id.* ¶ 8.d.)

The present dispute began when Epsilon formally proposed four new wells on December 22, 2020, which would be located on the Craige Well Pad in Rush Township, Susquehanna County. The proposed wells were labeled as Craige N 1LH, Craige N 1UHC, Craige N 4UHC (collectively, "the Craige North Wells"), and Craige S 3LHC ("the Craige South Well"). (*Id.*)

On January 19, 2021, Chesapeake advised that it would not participate in the drilling of the proposed wells and that it would not serve as the operator on the projects. (Doc. 1, ¶ 80.) Chesapeake also stated its position that Epsilon was not allowed to serve as the operator with regard to the proposed wells and refused to grant Epsilon access to the Craige Well Pad on that basis. (*Id.*) In a separate communication on January 19, 2021, Chesapeake proposed a separate well, labeled the Koromlan 107HC ("Koromlan Well"), which Chesapeake asserted would conflict with the proposed Craige Wells. (Doc. 1, ¶¶ 81–82.) Chesapeake announced plans to drill the Koromlan Well in January 2022. (*Id.* ¶ 83.)

Subsequent to the proposal of the Craige Wells, Epsilon sent a draft commitment letter ("SRBC Letter") to Chesapeake that sought confirmation that Chesapeake was willing to provide water to Epsilon for the Craige Wells in accordance with permits that Chesapeake held with the Susquehanna River Basin Commission ("SRBC"). (*See* Doc. 96-9, p. 2 [hereinafter SRBC Letter].) Chesapeake informed Epsilon on February 11, 2021 that it would not sign the letter. (Doc. 1, ¶ 98.)

Epsilon brought suit against Chesapeake on March 10, 2021, seeking declarations that (1) if Chesapeake did not participate in the proposed Craige Wells, Epsilon had the right to drill the wells; (2) Chesapeake was required to allow Epsilon to access and use jointly owned assets; and (3) Chesapeake must cooperate with the operator of the proposed wells in order to facilitate the drilling of the wells. (*See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 1:21-CV-00433 (M.D. Pa. filed Mar. 10, 2021) [hereinafter *Epsilon II*].) The complaint also brought claims for breach of the parties' JOAs and breach of the parties' settlement agreement in *Epsilon I*, sought a declaration that Chesapeake's proposed Koromlan Well did not comply with the terms of the JOAs, and sought specific performance and injunctive relief. (*Epsilon II*, Doc. 5.)

Epsilon filed a motion for preliminary injunction in *Epsilon II* on March 10, 2021. (Doc. 7.) The court conducted a status conference with the parties on March 26, 2021 to discuss a briefing schedule for the preliminary injunction motion and to schedule a hearing on the motion. During that call, the parties discussed the fact that Chesapeake's filing for Chapter 11 bankruptcy was being litigated in the United States Bankruptcy Court for the Southern District of Texas ("the Bankruptcy Court") and that Chesapeake had recently filed a motion for emergency relief in the Bankruptcy Court seeking to enjoin Epsilon from proceeding with a suit against Chesapeake in this district.

**\*4** Following the March 26, 2021 conference, the court issued a scheduling order that set a briefing scheduled for Epsilon's motion for preliminary injunction, scheduled a preliminary injunction hearing, and set an expedited schedule for letter briefs on the issue of whether Chesapeake should be compelled to sign the SRBC Letter. (*Epsilon II*, Doc. 25.)

The Bankruptcy Court granted Chesapeake's motion for emergency relief on March 30, 2021, ordering Epsilon to dismiss the case in this district without prejudice and specifying that Epsilon could refile the case subject to conditions laid out by the Bankruptcy Court. (*See Epsilon II*, Doc. 30-1; *see also In re Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. hearing held Mar. 30, 2021).) Epsilon complied with the Bankruptcy Court's order on April 5, 2021, and filed a notice of voluntary dismissal. (*Epsilon II*, Docs. 31–32.) This court accepted the notice of voluntary dismissal on April 6, 2021, and formally closed the case. (*Epsilon II*, Doc. 33.)

Epsilon filed the instant case three days later, on April 9, 2021, moving for a preliminary injunction and expedited discovery on the same day. (Docs. 4–5, 7.) On April 12, 2021, the court scheduled a status conference for April 19, 2021. (Doc. 13.) Prior to the conference, Epsilon filed a letter brief on the SRBC Letter issue in conformity with the requirements that the court had previously imposed in *Epsilon II*. (Doc. 15.) The court accordingly set an expedited schedule for an opposition letter brief and reply letter brief on that issue. (Doc. 16.)

On April 16, 2021, Chesapeake moved to dismiss the case for failure to join an indispensable party under Federal Rule of Civil Procedure 12(b)(7). (Doc. 22.) The motion sought dismissal on the grounds that Epsilon had failed to join the other parties to the JOAs, which Chesapeake contended were

Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC, Slip Copy (2022)
2022 WL 178816

indispensable parties under Federal Rule of Civil Procedure 19. (*Id.*)

On April 26, 2021, the court denied Chesapeake's motion to dismiss for failure to join an indispensable party, concluding that the absent JOA parties were necessary parties under Federal Rule of Civil Procedure 19(a), but that they were not indispensable parties under Rule 19(b). (Docs. 33–34.) On April 27, 2021, the court denied Epsilon's request for preliminary injunctive relief on the SRBC Letter issue without prejudice, concluding that Epsilon had not shown a sufficient likelihood of success on the merits as to that issue. (Docs. 44–45.) The court then denied Epsilon's motion for expedited discovery on May 3, 2021. (Docs. 50–51.)

Following a preliminary injunction hearing on May 11 and May 12, 2021, the court denied the motion for preliminary injunction on May 14, 2021, concluding that Epsilon's well proposals had expired and that Epsilon therefore had not shown a likelihood of success on the merits. (Docs. 81, 89.) [2] Given that conclusion, the court declined to decide whether Article VI.2(a), which specifies the procedures for certain projects receiving less than unanimous support from JOA parties, could apply to proposals to drill new wells. (*Id.* at p. 4 n.4.)

Following the denial of its motion for preliminary injunction, Epsilon reproposed the four Craige Wells on May 26, 2021. (*See* Doc. 104, ¶ 129.) Epsilon then moved for leave to amend its complaint on June 7, 2021, seeking to add allegations based on the reproposed wells. (Doc. 96.) Epsilon's proposed amended complaint included four counts for relief. In Count I, Epsilon sought a declaratory judgment declaring that it had the right to drill the proposed wells. (*Id.* ¶¶ 144–54.) In Count II, Epsilon sought specific performance of the parties' settlement agreement in *Epsilon I.* (*Id.* ¶¶ 154–66.) In Count III, Epsilon sought specific performance of the JOAs. (*Id.* ¶¶ 167–83.) In Count IV, Epsilon sought a declaratory judgment declaring that the Koromlan Well proposal did not comply with the terms of the JOAs. (*Id.* ¶¶ 184–91.)

**\*5** Chesapeake opposed the motion for leave to amend, Doc. 98, and in response to Chesapeake's opposition, Epsilon conceded that Count IV of the proposed amended complaint could be dismissed along with the portions of Counts I–III that pertained to the Craige South Well. (Doc. 101, p. 9.) The court granted the motion for leave to amend on July 2, 2021, allowing Epsilon to file its amended complaint but dismissing Count IV of the amended complaint and Counts I–III to the

extent that they were based on the Craige South Well. (Docs. 102–03.) Epsilon's amended complaint was filed later that day. (Doc. 104.)

Chesapeake moved to dismiss the amended complaint on July 16, 2021 and filed a brief in support of the motion on July 30, 2021. (Docs. 109–10.) Chesapeake argued that dismissal was appropriate because the plain language of Article VI.2(a) limited operator shifting to proposals to rework, sidetrack, deepen, recomplete, or plug back an existing well and accordingly did not allow for operator shifting for the drilling of a new well. (Doc. 110, pp. 13–14.) Chesapeake also argued that even if Article VI.2(a) did allow operator shifting for new wells, Epsilon's amended complaint should still be dismissed because Epsilon had failed to allege that it had completed the necessary conditions precedent in order to complete such an operator shift under the terms of the JOAs. (*Id.* at 8–12.) Specifically, Chesapeake argued that Epsilon's well proposals violated the JOAs because (1) no other parties had consented to the proposals, and the JOAs only allowed the designation of a consenting party as operator when multiple parties consented to that action and (2) the proposals proposed commencement dates that were past the 90-day time limit required by the JOAs. (*Id.*)

The court addressed the motion to dismiss through a memorandum and order on September 22, 2021. (Docs. 121–22.) The court concluded that dismissal was not warranted based on the language of Article VI.2(a) because the parties presented conflicting readings of the contract that were both reasonable in light of the language of the contract. (Doc. 121, pp. 12–17.) The court also rejected Chesapeake's argument that the JOAs conditioned operator shifting on the action of multiple consenting parties. (*Id.* at 18–19.) The court ultimately granted the motion to dismiss, however, because Epsilon's well proposals included proposed commencement dates that violated the timing requirements of the JOAs. (*Id.* at 20–26.) The court accordingly dismissed the amended complaint without further leave to amend but emphasized that this dismissal was "without prejudice to Epsilon's right to file a new lawsuit based on new proposals made after this opinion." (*Id.* at 26.)

Epsilon moved for partial reconsideration on October 4, 2021 and filed a brief in support of the motion on the same day. (Docs. 123–24.) Epsilon argues (1) that dismissal of its amended complaint should have been limited to its injunctive relief claims and should not have affected its declaratory judgment claim because the declaratory judgment

claim was not tied to the validity of any particular well proposal; (2) that the court already ruled that Epsilon could pursue its declaratory judgment claim even in the absence of a valid well proposal; and (3) that it will suffer significant prejudice if reconsideration is denied because Chesapeake can always cause Epsilon's well proposals to expire by not cooperating with the proposals, meaning that Epsilon's declaratory judgment claim will never be decided if it must be tied to an unexpired well proposal. (Doc. 124.) The parties have fully briefed the motion for reconsideration, and it is ripe for the court's disposition. (*See* Docs. 124–26, 130.)

**\*6** Epsilon has additionally filed a notice of supplemental evidence in support of the motion for reconsideration. (Doc. 131.) In the notice, Epsilon asserts that after the motion for reconsideration was filed, Chesapeake "took action that constitutes an additional violation of its settlement agreement with Epsilon." (*Id.* at 1.) Specifically, Epsilon asserts that it began the process of trying to propose new wells after the case was dismissed and accordingly sought to renew the requisite drilling permits with the Pennsylvania Department of Environmental Protection. (*Id.* at 2.) Chesapeake actively opposed Epsilon's efforts to secure the permits, which hindered Epsilon's ability to move forward with the renewed well proposals. (*Id.*) Epsilon asserts that this court should consider this evidence of Chesapeake's continued lack of cooperation as further support for its motion for reconsideration. (*Id.*) Chesapeake responded to the notice on January 12, 2022. (Doc. 132.) Chesapeake asserts that the additional evidence should not be considered in conjunction with the motion for reconsideration. (*Id.*)

**JURISDICTION**

This court has jurisdiction under 28 U.S.C. § 1332, which allows a district court to exercise subject matter jurisdiction where the parties are citizens of different states and the amount in controversy exceeds $75,000.

**STANDARD OF REVIEW**

A party seeking reconsideration of a district court's order must show either (1) "an intervening change in the controlling law"; (2) the availability of new evidence that was not available when the court issued its prior order; or (3) "the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc.*

*v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). Motions for reconsideration "cannot be used to reargue issues that the court has already considered and disposed of." *McSparren v. Pennsylvania*, 289 F. Supp. 3d 616, 621 (M.D. Pa. 2018) (citing *Blanchard v. Gallick*, No. 1:09-CV-01875, 2011 WL 1878226 at \*1 (M.D. Pa. May 17, 2011)). Additionally, a motion for reconsideration "may not be used to present a new legal theory for the first time" or "to raise new arguments that could have been made in support of the original motion." *MMG Ins. Co. v. Guiro, Inc.*, 432 F. Supp. 3d 471, 474 (M.D. PA. 2020) (citing *Vaidya Xerox Corp.*, No. 97-CV-00547, 1997 WL 732464, \*2 (E.D. Pa. Nov. 25, 1997)). A "mere disagreement" with a court's legal conclusion is not a sufficient basis for reconsideration. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 73 F. Supp. 3d 488, 491 (M.D. Pa. 2014) (citing *Mpala v. Smith*, No. 3:06-CV-00841, 2007 WL 136750, at \*2 (M.D. Pa. Jan. 16, 2007)).

Although a court may reconsider a prior order based on a party's motion, motions for reconsideration "should be granted sparingly as federal courts have a strong interest in the finality of judgments." *Kitzmiller v. Dover Area Sch. Dist.*, 388 F. Supp. 2d 484, 488 (M.D. Pa. 2005). The decision of whether to grant a motion for reconsideration is left to the discretion of the district court. *Le v. Univ. of Pa.*, 321 F.3d 403, 405 (3d Cir. 2003).

**DISCUSSION**

Epsilon's motion for reconsideration argues that the court committed a clear error of law when it dismissed Epsilon's declaratory judgment claim. (Doc. 124, pp. 1–2.) Epsilon asserts that its "request for declaratory relief in Count I was not dependent upon the existence of a valid, current proposal to drill a particular well" and that "the request for declaratory relief sets forth a ripe controversy even if no proposal is pending." (*Id.* at 5, 8.) Epsilon further argues that the court already ruled, in its May 14, 2021 opinion denying Epsilon's motion for preliminary injunction, that Epsilon may "pursue its claim for declaratory relief in the absence of any breach of contract claim." (*Id.* at 9.)

Epsilon's argument for reconsideration is belied by the plain language of its amended complaint. Contrary to Epsilon's argument, the amended complaint made clear, repeatedly, that its request for declaratory relief was based on the specific

wells proposed in this case and not on the language of the JOAs pertaining to well proposals generally. (*See* Doc. 104, pp. 32–35.) Most notably, the heading of Count I labels the claim for relief "DECLARATORY JUDGMENT (Epsilon's Right to Drill the Proposed Wells)." (*Id.* at 32.) The text of the declaratory judgment claim also indicates that Epsilon's request for declaratory judgment is based on the proposed Craige Wells. (*See, e.g., id.* ¶ 146 ("CHK has unambiguously communicated that it will not to [sic] participate in the Proposed Wells and will not serve as the operator for the Proposed Wells"); *id.* ¶ 148 ("CHK continuously refuses to cooperate with Epsilon so that Epsilon ... can drill and operate the Proposed Wells."); *id.* ¶ 154 (noting that an actual controversy arises from, inter alia, Chesapeake's "refusal to sign the SRBC commitment letter so that Epsilon may complete its permitting requirements to obtain water necessary to drill the Proposed Wells" and Chesapeake's "refusal to otherwise cooperate with Epsilon so that it can drill the Proposed Wells.").

 **\*7**  Thus, while Epsilon is correct that it *could have* proceeded with a declaratory judgment claim based on the language of the JOAs generally rather than the specific wells proposed in this case, the claim that it actually raised sought declaratory relief only with regard to the proposed wells. [3] The court's decision that the terms of the well proposals did not conform to the timing requirements of the JOAs was therefore fatal both to Epsilon's claims for injunctive relief and its claim for declaratory relief. Because the well proposals did not comply with the JOAs, any declaratory relief that the court could issue with respect to the proposals would amount to an advisory opinion.

The court's prior opinion denying the motion for preliminary injunction is not to the contrary. In that opinion, the court considered and rejected a threshold argument made by Chesapeake that Epsilon's declaratory judgment claim needed to be dismissed because it was not tied to an independent substantive claim. (*See* Doc. 80, pp. 20–23.) [4] The court noted that the Declaratory Judgment Act does not extend the jurisdiction of federal courts and that a party seeking a declaratory judgment therefore "must establish that there is a justiciable case or controversy giving rise to the declaratory judgment claim." (Doc. 80, p. 21.) The court reasoned, however, that a plaintiff seeking a declaratory judgment does not have to bring a substantive claim for the court

to have jurisdiction over the declaratory judgment claim, as the standard instead is whether there exists "a case or controversy between the parties that could give rise to a coercive judgment action for which the court would have subject matter jurisdiction." (*Id.* at 21–22.) The court concluded that Epsilon's declaratory judgment claim met that standard both because its injunctive relief claim remained viable and because a hypothetical breach of contract claim between the parties would still present a justiciable case or controversy notwithstanding the Bankruptcy Court's order for Epsilon to dismiss its breach of contract claim. (*Id.* at 22–23.)

The court's opinion therefore addressed the narrow jurisdictional issue of whether the dismissal of Epsilon's breach of contract claim deprived the court of jurisdiction to hear Epsilon's declaratory judgment claim. It did not address the scope of the declaratory relief that Epsilon sought. And as Epsilon's amended complaint makes clear, the scope of the declaratory judgment claim was limited to a request for declaratory relief relating to the proposed Craige Wells. (*See* Doc. 104, pp. 32–35.) In light of this limitation, dismissal of the declaratory judgment claim was appropriate because the proposals for the Craige Wells did not comply with the timing requirements of the JOAs and there was therefore no basis for the court to declare the parties' rights with respect to the proposed Craige Wells.

Finally, the additional evidence provided by Epsilon that Chesapeake has refused to cooperate with Epsilon's efforts to secure drilling permits does not alter the court's conclusion. The drilling permits that Epsilon seeks are related to renewed well proposals and not to the May 26, 2021 well proposals at issue in Epsilon's amended complaint. Thus, this evidence is not relevant to the motion for reconsideration that is currently before the court.

## CONCLUSION

 **\*8**  For the foregoing reasons, Epsilon's motion for reconsideration is denied. An appropriate order follows.

**All Citations**

Slip Copy, 2022 WL 178816

2022 WL 178816

## Footnotes

1      The four JOAs relevant to this case are the Baltzley North JOA, dated October 18, 2010, the Baltzley South JOA, dated October 18, 2010, the Craige JOA, dated December 16, 2010, and the Poulsen JOA, which was a draft model JOA that was subsequently incorporated into the Farmout Agreement between Epsilon and Chesapeake. Because the parties agree that the relevant provisions of the JOAs are legally indistinguishable from one another, *see* Transcript of Preliminary Injunction Hearing, May 11, 2021, pp. 90–91, the court will cite the four JOAs collectively as "JOAs" throughout the remainder of this opinion.

2      Doc. 89 is a corrected version of the court's memorandum that was issued to correct typographical errors in the original version.

3      The question of whether the court would have subject matter jurisdiction to decide a declaratory judgment claim based on the language of the JOAs generally rather than discrete wells proposed by Epsilon is not currently before the court and has not previously been raised in this litigation. Accordingly, nothing in this opinion shall be construed as a ruling that the court would have subject matter jurisdiction over such a claim.

4      Chesapeake's argument was based on the fact that Epsilon had brought a breach of contract claim in *Epsilon II* but that it had abandoned the breach of contract claim when it voluntarily dismissed *Epsilon II* at the direction of the Bankruptcy Court. (*See* Doc. 53 at 17–19.)

---

**End of Document**           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Lower Susquehanna Riverkeeper v. Keystone Protein Co.*

2021 WL 2778563
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

LOWER SUSQUEHANNA RIVERKEEPER and the
Lower Susquehanna Riverkeeper Association, Plaintiffs,

v.

KEYSTONE PROTEIN COMPANY, Defendant.

Civil No. 1:19-CV-01307
|
Signed 07/02/2021

**Attorneys and Law Firms**

James M. Hecker, Pro Hac Vice, Public Justice, Washington, DC, Stephen G. Harvey, Steve Harvey LLC, Philadelphia, PA, for Plaintiffs.

Paul M. Schmidt, Aaron S. Mapes, Post & Schell, P.C., Philadelphia, PA, Erin R. Kawa, Post & Schell, P.C., Harrisburg, PA, for Defendant.

## MEMORANDUM

JENNIFER P. WILSON, United States District Court Judge

**\*1** This is a citizen suit under the Clean Water Act in which the court recently resolved cross motions for summary judgment. The case is presently before the court on a motion for certificate of appealability filed by Defendant Keystone Protein Company ("Keystone"), which seeks leave of the court to file an interlocutory appeal regarding a portion of the court's summary judgment ruling. For the reasons that follow, the motion is denied.

## BACKGROUND AND PROCEDURAL HISTORY [1]

Plaintiffs Lower Susquehanna Riverkeeper and the Lower Susquehanna Riverkeeper Association initiated this case by filing a complaint on July 29, 2019 against Keystone, which owns and operates a poultry rendering facility that generates industrial wastewater. (Doc. 1.) Keystone answered the complaint on August 21, 2019. (Doc. 7.) In the complaint, Plaintiffs allege that Keystone "has discharged and continues to discharge pollutants into waters of the United States in violation of" the Clean Water Act as well as "the conditions

and limitations" established by a related permit system. (Doc. 1 ¶ 2.) Plaintiffs request damages as well as declaratory and injunctive relief. (*Id.* ¶ 1.)

The parties filed cross motions for summary judgment on May 29, 2020. (Docs. 32, 38.) In its motion for summary judgment, Keystone argued, inter alia, that Plaintiffs' claims were precluded by 33 U.S.C. § 1319(g)(6)(A)(ii), which bars citizen suits in cases in which "a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection," because the Pennsylvania Department of Environmental Protection ("DEP") was already prosecuting enforcement actions against Keystone under Pennsylvania's Clean Streams Law. (Doc. 37, pp. 9–24.) The court resolved the motions for summary judgment on February 18, 2021, granting in part and denying in part the Plaintiffs' motion and denying Keystone's motion in its entirety. (Docs. 51–52.)

In denying Keystone's motion, the court rejected Keystone's argument that Plaintiffs' claims were precluded. (Doc. 51, p. 19.) The court noted that there is a circuit split as to which standard a court must use to determine whether a state law is comparable to the Clean Water Act, with some courts applying the "overall comparability" standard, and other courts applying the more restrictive "rough comparability" standard. (*Id.* at 14.) Because the Third Circuit has not addressed this issue, the court undertook its own analysis and concluded that the rough comparability standard was the appropriate standard. (*Id.* at 15–16.) The court then determined that the Clean Streams Law was not comparable to the Clean Water Act under the rough comparability standard and accordingly rejected Keystone's preclusion argument. (*Id.* at 16–19.)

**\*2** Keystone filed the instant motion for certificate of appealability on February 26, 2021, seeking leave to file an interlocutory appeal to the Third Circuit on the issue of whether the rough comparability standard or the overall comparability standard is the appropriate standard of review. (Doc. 53.) Briefing on the motion for certificate of appealability has concluded, and it is ripe for the court's review. (*See* Docs. 55–57.)

## DISCUSSION

A district court may certify an order for appeal if the court finds that it "involves a controlling question of law as to which there is substantial ground for difference of opinion

and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Thus, certification under § 1292(b) is only proper when "(1) the issue involve[s] a controlling question of law; (2) as to which there are substantial grounds for difference of opinion; and (3) an immediate appeal of the order may materially advance the ultimate termination of the litigation." *Simon v. United States*, 341 F.3d 193, 199 (3d Cir. 2003).

An order presents a controlling question of law if (1) "an incorrect disposition would constitute reversible error if presented on final appeal"; or (2) there is a question presented by the order that is "serious to the conduct of the litigation either practically or legally." *Knopick v. Downey*, 963 F. Supp. 2d 378, 398 (M.D. Pa. 2013) (quoting *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974)). Substantial grounds for difference of opinion exist "when the matter involves 'one or more difficult and pivotal questions of law not settled by controlling authority.' " *Id.* (quoting *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 599 (E.D. Pa. 2008)). Conflicting interpretations of the issue from numerous courts is the "clearest evidence" that this factor is satisfied. *Id.* (quoting *Beazer East, Inc. v. Mead Corp.*, No. 91-CV-00408, 2006 WL 2927627, at *2 (W.D. Pa. Oct. 12, 2006)). Finally, the question of whether litigation would be materially advanced hinges on "(1) whether the need for trial would be eliminated; (2) whether the trial would be simplified by the elimination of complex issues; and (3) whether discovery could be conducted more expeditiously and at less expense to the parties." *Id.* (quoting *Patrick v. Dell Fin. Servs.*, 366 B.R. 378, 387 (M.D. Pa. 2007)).

The decision of whether to certify an order for appeal under § 1292(b) is left to the discretion of the district court, "and the court may decline to certify an order even if the parties have satisfied all elements enumerated in the statute." *In re Chocolate Confectionary Antitrust Litigation*, 607 F. Supp. 2d 701, 704 (M.D. Pa. 2009) (quoting *Knipe*, 583 F. Supp. 2d at 599). A district court should certify orders for appeal "only sparingly and in exceptional circumstances." *Id.* at 708 (quoting *Sabree v. Williams*, No. 06-CV-02164, 2008 WL 4534073, at *1 (D.N.J. Oct. 2, 2008)). The party moving for certification under § 1292(b) "bears the burden of showing that 'exceptional circumstances justify a departure from the basic policy against piecemeal litigation and of postponing appellate review until after entry of a final judgment.' " *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 162 F.R.D. 482, 489 (E.D. Pa. 1995) (quoting *Rottmund v. Cont'l Assurance Co.*, 813 F. Supp. 1104, 1112 (E.D. Pa. 1992)).

Here, Keystone argues that the question of whether the rough comparability standard or overall comparability standard should apply is a controlling question of law because the court would have found the Clean Water Act and the Clean Streams Law to be comparable if it had applied the overall comparability standard instead of the rough comparability standard. (Doc. 55, p. 9.) Keystone further argues that the circuit split on this issue illustrates that there is substantial ground for difference of opinion on the issue. (*Id.*) Finally, Keystone argues that a certificate of appealability would advance the ultimate termination of the litigation because a finding that the overall comparability standard is the correct standard of review "would likely lead to the determination that the CSL and CWA are indeed comparable and that, as such, Plaintiffs' claims are barred." (*Id.* at 10.)

**\*3** Plaintiffs acknowledge that the court's order presents substantial grounds for difference of opinion, *see* Doc. 56, pp. 7–8, but argue that the order does not present a controlling question of law because the court would reach the same conclusion regardless of whether it applied the rough comparability standard or the overall comparability standard. (*Id.* at 2–7.) Plaintiffs further argue that certifying the order for an immediate appeal would not advance the ultimate termination of the litigation because the appeal would only address the comparability issue and would not address whether the DEP was diligently prosecuting its enforcement action under the Clean Streams Law. (Doc. 56, pp. 8–10.) Finally, Plaintiffs assert that a trial in this matter would likely be brief because it would focus only on the amount of civil penalties to be imposed, and they therefore argue that certifying the case for appeal is not necessary to avoid a lengthy trial. (*Id.* at 10–12.)

Keystone argues in its reply brief that it is inappropriate for the court to speculate as to whether the Clean Water Act and Clean Streams Law would be deemed comparable under the overall comparability standard given that no such ruling was previously made by the court. (Doc. 57, pp. 2–3.) As for whether an immediate appeal would advance the ultimate termination of the litigation, Keystone acknowledges that the court would need to determine the issue of diligent prosecution if Keystone succeeded on its appeal, but argues that that issue could be summarily resolved without the need for trial. (*Id.* at 4–5.) Keystone further argues that an immediate appeal would help to avoid a "lengthy and complex" trial, given that there are five experts who are likely to testify and that the court will need to consider testimony

and evidence pertaining to years of Keystone's activities. (*Id.* at 5–6.)

Having reviewed the parties' arguments, the court will deny the certificate of appealability because it is not clear that an appeal would materially advance the ultimate termination of the litigation. As Keystone acknowledges, a successful appeal on the comparability issue would not by itself lead to the conclusion that Plaintiffs' claims are precluded by 33 U.S.C. § 1319(g)(6)(A)(ii), as the court would still need to determine whether the DEP is diligently prosecuting an enforcement action under the Clean Streams Law in order to make the ultimate decision regarding preclusion. Determining whether a certificate of appealability would advance the ultimate termination of this litigation therefore calls for

inappropriate speculation as to how the court would rule on the diligent prosecution issue. The court declines to engage in such speculation and will accordingly deny the motion for certificate of appealability.

## CONCLUSION

For the foregoing reasons, Keystone's motion for certificate of appealability (Doc. 53) is denied. An appropriate order follows.

**All Citations**

Slip Copy, 2021 WL 2778563

## Footnotes

1      This section provides background and procedural history that is relevant to the instant motion for certificate of appealability. A more complete background and procedural history can be found in the court's February 18, 2021 summary judgment opinion. (*See* Doc. 51.)

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Orgain Inc. v. Northern Innovations Holding Corp.*

2021 WL 6103528
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

ORGAIN, INC.

v.

NORTHERN INNOVATIONS HOLDING CORP. et al

Case No.: 8:18-cv-01253-JLS-ADS
|
Filed 09/29/2021

**Attorneys and Law Firms**

Daniel Scott Silverman, Venable LLP, Los Angeles, CA, Jed H. Hansen, Pro Hac Vice, Kurtis M. Hendricks, Pro Hac Vice, Mark M. Bettilyon, Pro Hac Vice, Peter M. de Jonge, Pro Hac Vice, Thorpe North and Western LLP, Salt Lake City, UT, for Plaintiff.

David W. Reid, Scott J. Ferrell, Pacific Trial Attorneys APC, James B. Hardin, Hardin Law Group APC, Newport Beach, CA, Alexandra H. Bistline, Pro Hac Vice, Ann C. Kuhn, Pro Hac Vice, Stephen P. Meleen, Pro Hac Vice, Pirkey Barber PLLC, Austin, TX, for Defendant Northern Innovations Holding Corp., Lakeside Innovations Holding Corp., Iovate Health Sciences International U.S.A., Inc., Kerr Investment Holding Corp.

Scott J. Ferrell, Pacific Trial Attorneys APC, Newport Beach, CA, for Defendant Does.

**PROCEEDINGS: (IN CHAMBERS) ORDER DENYING PLAINTIFF'S MOTION TO CERTIFY QUESTION FOR INTERLOCUTORY APPEAL AND FOR RECONSIDERATION (Doc. 188)**

JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is Plaintiff Orgain, Inc.'s Motion to Certify Question for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) and for Reconsideration. (Mot., Doc. 188; Mem., Doc. 188-1.) Defendants Northern Innovations Holding Corp., Lakeside Innovations Holding Corp., Iovate Health Sciences International, Inc., Iovate Health Sciences International U.S.A., Inc., and Kerr Investment Holding Corp. (collectively "Defendants") opposed, and Plaintiff replied. (Docs. 234, 240.) The Court finds this matter appropriate for

decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15. Accordingly, the hearing set for **October 1, 2021 at 10:30 a.m.**, is VACATED. Having considered the pleadings, the parties' briefs, and for the reasons stated below, the Court DENIES the Motion.

**I. BACKGROUND**

On July 18, 2018, Plaintiff filed a Complaint. (Compl., Doc. 1.) On January 7, 2019, Plaintiff filed its First Amended Complaint, the operative complaint, bringing claims under the Lanham Trademark Act, 15 U.S.C. § 1051, *et seq,* the California Business and Professional Code §§ 17200 and 17500, *et seq*, and California common law. (First Amended Compl. ("FAC"), Doc. 53 ¶ 1.)

Subsequently, Defendants moved for summary judgment and Plaintiff filed a cross-motion for summary judgment, both as to all causes of action in the FAC. (Docs. 86, 108.) The Court heard oral argument, and on March 22, 2021, the Court issued an order denying Plaintiff's motion and granting, in part, Defendants' motion. (MSJ Order, Doc. 184.) As relevant here, the Court granted Defendants' motion as to Plaintiff's trademark claim. (MSJ Order at 22.) The Court concluded Plaintiff failed to carry its burden to prove validity because: (1) Plaintiff failed to offer sufficient facts that could establish that "organic protein" was not generic, and (2) alternatively, it failed to offer sufficient facts to prove "organic protein" has acquired secondary meaning. (*Id.* at 10.)

In reaching its conclusion as to genericness, the Court considered the parties' survey evidence illustrating how the public understands the term "organic protein." (*Id.* at 14.) Orgain proffered a modified Teflon survey, referred to as the Poret Survey, as evidence that "organic protein" is descriptive, not generic. (*Id.* at 16-17.) The Court found that "that the Poret Survey side-stepped the key inquiry—namely, whether [survey] respondents understood 'organic protein' to refer to Orgain's goods or whether they understood the term to refer to a category of products." (*Id.* at 17.) Although the Poret Survey asked respondents to identify words and terms as descriptive or generic, the "genericness inquiry asks whether consumers perceive the term as identifying a common name for a certain type or class of products," and the Poret survey "failed to ask respondents whether 'organic protein' is a common name or source-identifier." (*Id.* at 17-18.) Thus, "it provides no evidence of whether the consuming public views 'organic protein' as a mark that identifies Orgain's product." (*Id.* at 18.) Separately, the Court concluded that even if the question posed by the Poret Survey was relevant

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                    1

2021 WL 6103528

to non-genericness, the survey "provided overlapping and confusing definitions of 'generic' and 'descriptive,' " as well as confusing examples, such that its conclusions "would not be admissible at trial." (*Id.* at 18.)

**\*2** In the present motion Plaintiff asks the Court to certify the following question to the Ninth Circuit:

> Whether the traditional Teflon survey format is the only appropriate survey format to demonstrate non-genericness, particularly for a mark that is not a coined term but is a descriptive mark, and whether the Poret Survey was an acceptable survey format to demonstrate non-genericness.

(Mem. at 2.) Plaintiff also asks that the Court reconsider its prior order on the grounds that:

1. There is a factual question regarding whether the ORGANIC PROTEIN Mark is descriptive or generic. Meaning, there is a factual question whether ORGANIC PROTEIN is capable of functioning as a trademark.

2. There is a factual question regarding whether the ORGANIC PROTEIN Mark acquired secondary meaning. Meaning, there is a factual question whether the term does function as a trademark.

(*Id.*)

The Court will address each motion in turn.

## II. MOTION TO CERTIFY QUESTION FOR INTERLOCUTORY APPEAL

### A. Legal Standard

28 U.S.C. § 1292(b) provides a "narrow exception to the final judgment rule" and permits a district judge to certify an order not otherwise appealable if (1) the "order involves a controlling question of law as to which there is substantial ground for difference of opinion," and (2) "immediate appeal from the order may materially advance the ultimate termination of the litigation." *Couch v. Telescope, Inc.*, 611

F.3d 629, 633 (9th Cir. 2010). "[T]he party pursuing the interlocutory appeal bears the burden" of demonstrating that these requirements have been met. *Id.* Additionally, "[E]ven when all three statutory criteria are satisfied, district court judges have unfettered discretion to deny certification." *Villarreal v. Caremark LLC*, 85 F. Supp.3d 1063, 1068 (D. Ariz. 2015) (internal quotations omitted).

### B. Discussion

Plaintiff argues that its question regarding the Poret Survey should be certified because it is a controlling question of law, substantial ground for difference of opinion exists, and the ultimate termination of this action would be advanced by certification. (Mem. at 8, 9, 14.) Defendants counter that Plaintiff's question for certification misrepresents the Court's order, the question presented for certification is not a controlling question of law, there is no substantial ground for difference of opinion on the question posed, and an immediate appeal would only delay the termination of the litigation. (Opp. at 13, 15, 18.) The Court agrees with Defendants that Plaintiff's proposed question for certification does not involve a controlling question of law and therefore is not suitable for immediate appeal. *See Couch*, 611 F.3d at 633 ("Because the requirements of § 1292(b) are jurisdictional, if this appeal does not present circumstances satisfying the statutory prerequisites for granting certification, this court cannot allow the appeal." (quotations and alterations omitted)).

"In this Circuit, 'all that must be shown in order for a question to be controlling is that the resolution of the issue on appeal could materially affect the outcome of litigation in the district court.' " *Villareal*, 85 F. Supp.3d at 1068 (quoting *Kight v. Eskanos & Adler, P.C.*, 2007 WL 173825, at \*2 (S.D. Cal. Jan. 8, 2007)). "Examples of controlling questions of law include fundamental issues such as the determination of who are necessary and proper parties, whether a court to which a case has been transferred has jurisdiction, or whether state or federal law should be applied." *Id.* (quoting *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp.2d 856, 879 (C.D. Cal. 2012)).

**\*3** As an initial matter, the first portion of Plaintiff's question for certification—whether the traditional Teflon survey format is the only appropriate survey format to demonstrate non-genericness—was not decided by this Court. (*See* MSJ Order at 14-19.) As this hypothetical question did not bear on the Court's summary judgment order, it has

no bearing on the outcome of the litigation and is not a controlling question of law.

The second portion of Plaintiff's question—whether the Poret Survey was an acceptable survey format to demonstrate non-genericness—is also not a controlling question of law in light of the Court's alternate holding. The Court ruled on the "separate and alternate ground" that "organic protein" has not acquired secondary meaning; this renders any decision as to the Poret Survey not determinative of the litigation's outcome before the district court. (MSJ Order at 19-22.) Therefore, even if an immediate appeal to the Ninth Circuit somehow impacted the Court's analysis with respect to genericness, Plaintiff still failed to carry its burden of proving validity, and accordingly, Plaintiff's question is not a controlling one of law. [1]

In light of this conclusion, the Court need not and does not reach any of Plaintiff's additional arguments in support of its motion for immediate appeal.

### III. MOTION FOR RECONSIDERATION

#### A. Legal Standard

"Rule 59(e) permits a district court to reconsider and amend a previous order," but the "rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (internal quotations and citations omitted). "Motions for reconsideration are disfavored and [ ] rarely granted for obvious reasons: litigation could be prolonged indefinitely if the parties were permitted to challenge the accuracy of every interlocutory order." *Jordan-Benel v. Universal City Studios, Inc.*, 2015 WL 12733471, at *2 (C.D. Cal. Nov. 20, 2015) (internal quotations and citations omitted).

The Local Rules impose additional requirements for motions for reconsideration. "Courts in this district have interpreted Local Rule 7-18 to be coextensive with Rules 59(e) and 60(b)." *Dragan v. Valladolid*, 2021 WL 3260605, at *1 (C.D. Cal. April 5, 2021) (quoting *Gish v. Newsom*, 2020 WL 6054912, at *2 (C.D. Cal. Oct. 9, 2020)). Absent a showing of good cause, Local Rule 7-18 imposes a 14-day time period for moving for reconsideration. L.R. 7-18.

#### B. Discussion

Plaintiff's Motion for Reconsideration is denied as untimely. Plaintiff's motion was filed on April 26, 2021, thirty-five days after the Court's Summary Judgment Order. (Mot. at 1.). Having reviewed Plaintiff's Motion and Reply, the Court concludes that Plaintiff has not shown good cause to excuse its untimely filing. Counsel's change in strategy does not amount to good cause, and particularly in light of the fact Plaintiff overlooked the filing requirements set forth in the local rules, Plaintiff was not diligent. *See Combs v. Arizona*, 2008 WL 1994911, at *1 (D. Ariz. May 6, 2008) (explaining the "good cause standard primarily considers the diligence of the party in filing the untimely motion," in denying defendant's untimely motion for reconsideration); (*see also* Reply at 13-14.)

### IV. CONCLUSION

**\*4** For the foregoing reasons, the Court DENIES the Motion.

### All Citations

Slip Copy, 2021 WL 6103528

## Footnotes

[1]    Plaintiff does not argue that the Poret Survey provides evidence of secondary meaning, nor does the Poret Survey purport to do so.

**End of Document**                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Litgo New Jersey v. Martin*

Case 1:20-cv-00292-JPW Document 240-1 Filed 07/22/22 Page 19 of 54
Litgo New Jersey, Inc. v. Martin, Not Reported in F.Supp.2d (2011)
2011 WL 1134676

2011 WL 1134676
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

LITGO NEW JERSEY, INC.,
and Sheldon Goldstein, Plaintiffs,

v.

Bob MARTIN, in his official capacity as the
Commissioner of the New Jersey Department
of Environmental Protection, et al., Defendants.

Civ. No. 06–2891 (AET).
|
March 25, 2011.

**Attorneys and Law Firms**

Andrew J. Mcnally, Brendan Michael Walsh, Daniel Francis
Mulvihill, IV, John Mcgahren, Patton Boggs LLP, Newark,
NJ, for Plaintiffs.

A. Paul Stofa, Edward Devine, Rachel J. Lehr, Office of the
Attorney General, Trenton, NJ, Jessica O'Donnell, John E.
Sullivan, Christina Louise Richmond, T. Monique Jones, U.S.
Department of Justice, Washington, DC, Anthony J. Reitano,
Craig S. Provorny, David Jason Singer, Herold Law, Warren,
NJ, Kenneth Kaufmann Lehn, Michael Jason Cohen, Rodney
Neill Tendai Richards, Winne, Banta, Hetherington, Basralian
& Kahn, PC, Hackensack, NJ, for Defendants.

OPINION & ORDER

THOMPSON, District Judge.

*INTRODUCTION*

 **\*1** This matter comes before the Court upon Plaintiffs
Litgo New Jersey, Inc., and Sheldon Goldstein's Motion to
Certify Issues for Appeal [docket # 385]. The United States
Defendants [386] and the Sanzari Defendants [387] oppose
the motion, and the Sanzari Defendants alternatively cross-
move to certify their own issues for interlocutory appeal
[387]. The Court has decided the matter upon consideration
of the parties' written responses, without oral argument,
pursuant to Fed.R.Civ.P. 78(b). For the reasons set forth
below, Plaintiffs' motion and the Sanzari Defendants' cross-
motion are both denied.

*BACKGROUND*

The Court presumes that all parties are familiar with the
procedural history and facts of this case and therefore
provides only a brief overview. The primary issue in
this case is the presence of TCE and other hazardous
substances at and emanating from the Litgo Property and
the Defendants' alleged responsibility for these hazardous
substances. Following a seventeen-day bench trial, on June
10, 2010, the Court entered findings of fact and conclusions
of law regarding the parties' liability under CERCLA, RCRA,
the New Jersey Spill Act, and the New Jersey Closure Act.
The Court found that the United States Defendants, the
Sanzari Defendants, and Plaintiffs are liable under CERCLA,
that the Sanzari Defendants and Plaintiff Litgo are liable
under the Spill Act, and that the United States Defendants
and the Commissioner are liable under RCRA. The Court
dismissed all claims brought under the Closure Act.

After making its determination on liability, the Court went
on to consider how damages should be equitably allocated
under § 113 of CERCLA and the Spill Act. The Court
initially allocated under § 113 the CERCLA-recoverable
costs as follows: 65% to Plaintiffs, 32% to the Sanzari
Defendants, and 3% to the United States Defendants. [1] The
Court further found that Plaintiffs were responsible for 67% of
costs recoverable only under the Spill Act, while the Sanzari
Defendants were responsible for 33% of those costs. The
Court did not set an amount of damages, as it had been decided
at trial that the damages portion of the proceeding would be
bifurcated and resolved after a determination on liability had
been reached.

Following the June 10 Opinion, Plaintiffs and the Sanzari
Defendants filed motions asking the Court to reconsider its
Opinion on liability and the equitable allocation of costs.
In an Opinion filed on January 7, 2011, the Court rejected
Plaintiffs' arguments that Plaintiff Goldstein could not be
liable as a current operator pursuant to § 113 of CERCLA
and that the Court should have held a separate hearing
on the equitable allocation of costs. We also rejected the
argument from both movants that the Court should have
allocated an orphan share to Columbia Aircraft. In addition,
both movants also set out a number of reasons why they
believed that the Court's equitable allocation of costs was
misguided. The Court rejected most of those arguments,
but after reconsidering the equitable issues, particularly the

Sanzari Defendants' exercise of due care, the Court modified the equitable allocation of CERCLA-recoverable costs as follows: 70% to Plaintiffs; 27% to the Sanzari Defendants; and 3% to the United States Defendants.

**\*2** While the motions for reconsideration were being briefed, the Plaintiffs and the Commissioner reached a settlement agreement and applied for a consent decree on October 22, 2010[370]. The United States Defendants and the Sanzari Defendant objected to the Consent Decree, arguing that certain of its provisions were ambiguous and that it could be interpreted so as to contravene the June 10 Opinion and excuse Plaintiffs from their share of the liability. The Court heard oral argument on the motions for reconsideration and the application for a consent decree on January 3, 2011, and after filing its Opinion on the motions for reconsideration, the Court conducted a conference call on February 24, 2011. Pursuant to these meetings, the Plaintiffs and the Commissioner agreed to accept a modification to the Consent Decree proposed by the United States Defendants, and in return, the United States Defendants dropped their objections. The revised settlement agreement is currently being re-published in the New Jersey Register for a thirty-day comment period, after which time the parties will re-apply for a consent decree. In addition, Plaintiffs agreed to dismiss their RCRA claim for injunctive relief against the United States, subject to reopener if the United States pursues Plaintiffs for future cleanup of the site.

Finally, the parties have agreed to participate in an informal process to determine Plaintiffs' recoverable past costs under CERCLA and the Spill Act. Representatives of the parties will meet to review Plaintiffs' costs, and the parties will inform the Court if they are able to reach an agreement on the total amount of recoverable costs. The Court has indicated its intent to proceed with a damages hearing if the parties are not able to reach an agreement.

Plaintiffs now move to certify four issues for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b): (1) whether the Court erred in finding Plaintiff Goldstein liable as a current operator under § 107(a)(1) of CERCLA; (2) whether the Court's equitable allocation of CERCLA-recoverable costs was an abuse of discretion; (3) whether the Court's equitable allocation of costs under the Spill Act was an abuse of discretion; (4) whether the Court was wrong to dismiss Plaintiffs' RCRA claim against the Sanzari Defendants; and (5) whether the Court was wrong to dismiss Plaitiffs' Closure Act claim against the Sanzari Defendants.

*ANALYSIS*

**A. Legal Standard**

A district court may certify an order for interlocutory appeal when the party seeking certification shows that the order "[1] involves a controlling question of law [2] as to which there is substantial ground for a difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 755 (3d Cir.1974). The burden is on the movant to demonstrate that all three requirements are met. *Couch v. Telescope Inc.,* 611 F.3d 629, 633 (9th Cir.2010); *McFarlin v. Conseco Servs., LLC,* 381 F.3d 1251, 1264 (11th Cir.2004). Even if all three requirements are met, the decision to grant certification remains wholly within the district court's discretion. *Bachowski v. Usery,* 545 F.2d 363, 368 (3d Cir.1976) (citing *Katz,* 496 F.2d at 754). Section 1292(b) certification should be used sparingly because only "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (internal quotations omitted). Certification was not intended merely "to provide early review of difficult rulings in hard cases." *Jackson Hewitt, Inc. v. DJSG Utah Tax Serv., LLC,* 2011 WL 601585, at \*2 (D.N.J. Feb.17, 2011) (internal quotations omitted).

*1. Controlling question of law*

**\*3** The Third Circuit has defined a "controlling question of law" as encompassing not only "every order which, if erroneous, would be reversible error on final appeal," but also those orders which are "serious to the conduct of the litigation, either practically or legally." *Katz,* 496 F.2d at 755. On a practical level, saving the district court's time and the litigants' expenses is "a highly relevant factor." *Id.* Even an order involving the exercise of discretion may be considered a controlling question of law if it "truly implicates the policies favoring interlocutory appeal." *Id.* at 756. A district court is to be guided "by a practical application of those policies, not by a mechanical application of labels such as 'discretionary' or 'nondiscretionary.' " *Id.*

*2. Substantial ground for difference of opinion*

Section 1292(b)'s second factor, a substantial ground for difference of opinion, "must arise out of genuine doubt as to the correct legal standard." *In re Dwek,* 2011 WL 487582, at *4 (D.N.J. Feb.4, 2011) (quotation and citation omitted). Such doubt can stem from conflicting precedent, the absence of controlling law on a particular issue, or novel and complex issues of statutory interpretation. *See New Jersey, Dept. of Treasury v. Fuld,* 2009 WL 2905432, at *2 (D.N.J. Sept.8, 2009) (citations omitted). However, a movant's mere disagreement with the district court's ruling is not a substantial ground for difference of opinion. *In re Dwek,* 2011 WL 487582, at *4.

### 3. Materially advance termination of litigation

A § 1292(b) certification materially advances the ultimate termination of the litigation where the interlocutory appeal eliminates: (1) the need for trial; (2) complex issues that would complicate the trial; or (3) issues that would make discovery more costly or burdensome. *See Fuld,* 2009 WL 2905432, at *2 (citing *Orson, Inc. v. Miramax Film Corp.,* 867 F.Supp. 319, 322 (E.D.Pa.1994)).

### B. Application

During the conference call on February 24, 2011, the Court suggested that it was willing to consider a motion for § 1292(b) certification, given the complexity of this case and the intricacy of the legal and equitable issues presented. While we see no basis for altering our prior rulings, we recognize that the unique facts of this case may give rise to a difference of opinion as to the correct application of the various statutory schemes involved. However, in light of the present status of this case, we find that certifying an interlocutory appeal at this stage would not materially advance the termination of the litigation and may instead delay resolution and lead to piecemeal appeals. Accordingly, the motions are denied.

First, the appeal Plaintiffs seek would not eliminate a trial, simplify a trial, or make discovery less burdensome. *See Fuld,* 2009 WL 2905432, at *2. This matter has already involved extended discovery, a seventeen-day trial, and a host of post-trial motions. Plaintiffs' appeal would not prevent unnecessary litigation; rather, the issues presented for appeal have already been litigated thoroughly. *See Johnson v. Alldredge,* 488 F.2d 820, 823 (3d Cir.1973) (stating that purpose of § 1292(b) is to resolve legal issues "without requiring the parties to first participate in a trial that may be unnecessary"). Nearly five years since this case was filed, the only issue remaining is a determination of the amount of past costs Plaintiff can recover under CERCLA and the Spill Act. The parties are currently working to reach an amicable agreement on the amount of recoverable past costs. Should they fail, the Court is prepared to resolve that issue in a hearing, which we expect would be significantly shorter than the original trial on liability. Simply put, the end is near, and we see no reason to delay it further.

**\*4** Second, permitting an interlocutory appeal in this case would almost certainly lead to multiple appeals, thereby "deviat[ing] from the ordinary policy of avoiding piecemeal appellate review ...." *Kapossy v. McGraw–Hill, Inc.,* 942 F.Supp. 996, 1001 (D.N.J.1996) (quotation and citation omitted). Once the question of past costs is resolved, the Court is prepared to issue a final judgment, and the parties can then appeal all aspects of the case at once. If instead the Plaintiffs are permitted to appeal their four issues now, then final judgment would need to be delayed pending the resolution of that appeal. If our rulings are affirmed on appeal, then the parties can simply return to the district court to resolve the damages issue; resolution of the case will be merely delayed. However, if the Court of Appeals reverses and remands any aspect of the case, the parties would need to re-litigate those issues and, in all likelihood, the parties would take appeals from this second round of litigation as well. Plaintiffs argue that certifying the question of Goldstein's CERCLA liability or the Court's CERCLA allocation will somehow simplify matters going forward. We disagree. At this point, anything that would require the Court to revisit its equitable allocation will only delay the resolution of this case and, given the zero-sum nature of the allocation, will almost certainly spawn further appeals.

Finally, two of the questions Plaintiffs seek to appeal are premised on this Court's abuse of discretion. Certainly Plaintiffs are entitled to ultimate appellate review of those decisions, but the equitable and discretionary nature of those rulings makes them inappropriate for interlocutory review. Although an order involving discretion can be certified under § 1292(b), *see Katz,* 496 F.2d at 756, the archetypal case for certification occurs when the court of appeals "can decide quickly and cleanly without having to study the record," *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.,* 219 F.3d 674, 676–77 (7th Cir.2000). The Court's equitable allocation of recoverable costs required an intensive analysis of the complex facts of this case. For the Court of Appeals to provide meaningful review of that allocation would require a similarly thorough examination of the facts, and an interlocutory appeal is simply not the proper setting for such an examination. *See*

2011 WL 1134676

*Johnson,* 488 F.2d at 822 (doubting propriety of § 1292(b) certification where certified question "comprehends factual as well as legal matters, requiring a factual decision ... as well as a legal decision"); *Hulmes v. Honda Motor Co.,* 936 F.Supp. 195, 210 (D.N.J.1996) (stating that § 1292(b) was "not designed to secure appellate review of 'factual matters' or of the application of the acknowledged law to the facts of a particular case").

*CONCLUSION*

For the foregoing reasons, IT IS on this 25th day of March, 2011,

ORDERED that Plaintiffs' Motion to Certify Issues for Appeal [docket # 385] is DENIED; and it is further

**\*5** ORDERED that the Sanzari Defendants' Cross–Motion for Certification [docket # 387] is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1134676

## Footnotes

1    The Court originally assigned equitable shares of 50% to Plaintiffs, 25% to the Sanzari Defendants, 2% to the United States Defendants, and an orphan share of 23% to the Commissioner. The final allocation was determined after distributing the Commissioner's orphan share pro rata between Plaintiffs, the Sanzari Defendants, and the United States Defendants.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Tucker v. Closure Systems International*

Case 1:20-cv-00292-JPW   Document 240-1   Filed 07/22/22   Page 24 of 54

2012 WL 1997866
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

Teresa TUCKER, Plaintiff,
v.
CLOSURE SYSTEMS INTERNATIONAL (CSI),
a division of Reynolds Packaging, Defendant.

No. 1:10–cv–1476–RLY–TAB.
|
June 4, 2012.

**Attorneys and Law Firms**

James E. Ayers, Wernle Ristine & Ayers, Crawfordsville, IN, for Plaintiff.

David J. Pryzbylski, Susan M. Zoeller, Barnes & Thornburg LLP, Indianapolis, IN, for Defendant.

**ENTRY ON CSI'S MOTION TO CERTIFY ISSUE FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b)**

RICHARD L. YOUNG, Chief Judge.

 **\*1** Plaintiff's former employer and the defendant in this action, Closure Systems International ("CSI"), moves for interlocutory appeal of the court's Entry denying Defendant's 12(b)(1) Motion to Dismiss. For the reasons set forth below, the motion is **DENIED.**

**I. Background**
Plaintiff filed her Equal Employment Opportunity Commission ("EEOC") charge of discrimination against her former employer, CSI, on December 23, 2009, and, five days later, filed a voluntary petition of bankruptcy relief under Chapter 13 of the United States Bankruptcy Code. Although Plaintiff was required to submit a sworn statement reflecting all pending suits to which she was a party, 11 U.S.C. § § 521(1), 1306(a), in her bankruptcy schedule of assets and liabilities, Plaintiff did not include the EEOC charge of discrimination.

On October 25, 2010, Plaintiff filed the present Complaint based on the allegations contained in her EEOC charge of discrimination. Plaintiff amended her schedules on November 10, 2010, but she did not include the present lawsuit in the amended schedules.

The bankruptcy court reviewed her sworn financial statements and Chapter 13 payment plan and, on March 2, 2010, confirmed the 5–year plan without including the present lawsuit.

On February 23, 2011, CSI filed its 12(b)(1) Motion to Dismiss. On March 23, 2011, Plaintiff amended her bankruptcy schedules to reflect this lawsuit, and, five days later, the bankruptcy court appointed Plaintiff's attorney as special counsel to represent the bankruptcy estate.

On September 27, 2011, the court denied CSI's 12(b)(1) Motion to Dismiss, finding that Plaintiff had concurrent standing with the bankruptcy Trustee to pursue her employment discrimination claim for the benefit of her creditors, and that the doctrine of judicial estoppel did not bar her claim. This motion timely followed.

**II. Standard for Interlocutory Appeal**
Under Section 1292(b), a district judge may certify an interlocutory order for immediate appeal whenever the order: (1) involves a controlling question of law; (2) as to which there is substantial ground for difference of opinion; and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). The issue before the court is whether there is substantial ground for difference of opinion as to whether a Chapter 13 debtor's undisclosed employment discrimination claim is barred by the doctrine of judicial estoppel where the debtor later amended her bankruptcy schedules and joined the Trustee after the defendant-employer brought the omission to the court's attention.

A party moving for an interlocutory appeal bears the burden of showing that "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)). Stated differently, the grant of an interlocutory appeal is an exception to the general rule that a party may only appeal a final judgment, and, as such, should be granted "sparingly and with discrimination." *Smith v. Ford Motor Co.,* 908 F.Supp. 590, 600 (N.D.Ind.1995). The

2012 WL 1997866

decision of whether to grant or deny an interlocutory appeal lies within the discretion of the district court. *Id.*

## III. Discussion

### A. Motion for Interlocutory Appeal

**\*2** Judicial estoppel is an equitable doctrine designed "to protect the integrity of the judicial process ... by prohibiting parties from deliberately changing positions according to the exigencies of the moment," *New Hampshire v. Maine,* 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal citations and quotation omitted), and its application is within the discretion of the court, *In re Cassidy,* 892 F.2d 637, 642 (7th Cir.1990). "Judicial estoppel may apply when (1) the later position is clearly inconsistent with the earlier position; (2) the facts at issue are the same in both cases; (3) the party to be estopped convinced the first court to adopt its position; and (4) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *United States v. Christian,* 342 F.3d 744, 747 (7th Cir.2003) (citing *Maine,* 532 U.S. at 750).

In the court's prior Entry denying CSI's motion to dismiss, the court recognized that the Seventh Circuit has applied the doctrine of judicial estoppel to *former* debtors, *see Cannon–Stokes v. Potter,* 453 F.3d 446 (7th Cir.2006) and *Becker v. Verizon N., Inc.,* 2007 WL 1224039 (7th Cir. Apr.25, 2007), but not to *existing* debtors, as in this case. The court further found that there existed a split of authority on that issue within the district courts of the Seventh Circuit. *Compare Smith v. American Gen. Life Ins. Co.,* 544 F.Supp.2d 734–35 (C.D.Ill.2008) (finding the doctrine applied to prevent such "procedural chicanery"), *and Bland v. Rahar,* 2008 WL 109388 (C.D.Ill. Jan.9, 2008) (finding the doctrine applied even though the plaintiff did not understand the disclosure requirements), *with Williams v. Hainje,* 2009 U.S. Dist. LEXIS 82268, at \*12–16, 2009 WL 2923148 (N.D.Ind. Sept. 10, 2009) (finding the doctrine applied to the extent the claim was pursued for the plaintiff's own benefit, but the doctrine did not apply to the plaintiff's bankruptcy estate as the real party in interest). It is this alleged split of authority that forms the basis of CSI's motion for interlocutory appeal. Having reviewed the facts and the law pertinent to these cases, the court finds they do not present a split of authority warranting an interlocutory appeal.

In *Smith* and *Bland,* the debtors filed for bankruptcy under Chapter 7, failed to disclose their respective lawsuits on their

bankruptcy schedules and, after receiving a discharge, moved to reopen their bankruptcies to reflect their legal claims. *Smith,* 544 F.Supp. at 733; *Bland,* 2008 WL 109388, at \*1–2. In addition, the Trustee abandoned the claims back to the debtors, providing the debtors with standing to bring their respective claims for their own benefit. *Smith,* 544 F.Supp.2d at 734 n. 3; *Bland,* 2008 WL 109388, at \* 1. Thus, in both cases, the debtor-plaintiffs stood to gain financially from a lawsuit their creditors knew nothing about. Applying the law to the facts, the *Smith* and *Bland* courts held that judicial estoppel applied to prevent injustice. *Smith,* 544 F.Supp.2d at 735–36; *Bland,* 2008 WL 109388, at \*3. *See also Cannon–Stokes,* 453 F.3d at 448 (reasoning that "if the estate (through the trustee) abandons the claim, then the creditors no longer have an interest, and with the claim in the debtor's hands the possibility of judicial estoppel comes to the fore"); *Biesek v. Soo Line R. Co.,* 440 F.3d 410, 413 (7th Cir.2006) (explaining that "judicial estoppel assume[s] that the tort claim belongs to the debtor" because "[o]nly then is one person on both sides of the same issue").

**\*3** By contrast, in *Hainje,* the plaintiff filed for bankruptcy under Chapter 13, and failed to disclose his excessive force claim. 2009 U.S. Dist. LEXIS 82268, at \*3, 2009 WL 2923148. After the defendant filed a motion for summary judgment on grounds that the plaintiff filed false bankruptcy schedules and should be judicially estopped from pursuing his claim, the plaintiff amended his bankruptcy schedules to identify his federal claim. *Id.* at \*4–5. The district court, citing the Seventh Circuit's decisions in *Cannon–Stokes* and *Biesek,* held that judicial estoppel did not apply because the real party in interest was the estate, the plaintiff's standing was limited to seeking recovery for the benefit of the estate, and the estate had not "engaged in contradictory litigation tactics." *Id.* at \*9–11 (quoting *Cannon–Stokes,* 453 F.3d at 448, and citing *Biesek,* 440 F.3d at 413 ("Judicial estoppel is an equitable doctrine, and using it to land another blow on the victims of bankruptcy fraud [i.e., creditors] is not an equitable application.")). Thus, the elements of judicial estoppel were not satisfied. *Id.* at \* 11.

The court finds that *Smith, Rahar,* and *Hainje* do not present a split of authority warranting interlocutory review. The fact that judicial estoppel was applied in *Smith* and *Rahar,* but not in *Hainje,* is easily explained due to the fact that *Smith* and *Rahar* involved plaintiffs who received a Chapter 7 discharge from the bankruptcy court without scheduling their preexisting legal claims as assets. Allowing the plaintiffs' claims to proceed for their own benefit could result in an

unfair windfall to the plaintiffs. *See Biesek,* 440 F.3d at 412 (holding that "a debtor who receives a discharges (and thus a personal financial benefit) by representing that he has no valuable choses in action cannot turn around after the bankruptcy ends and recover on a supposedly nonexistent claim"). *Hainje,* on the other hand, involved a plaintiff who failed to schedule his claim, but, during the pendency of his Chapter 13 bankruptcy, amended his schedules. Any recovery for the plaintiff would inure for the benefit of his creditors, and thus, invoking the doctrine of judicial estoppel would only serve to hurt the plaintiff's creditors. In addition, the doctrine was inapplicable because the estate did not engage in contraditory litigation tactics; the plaintiff did.

Furthermore, whether to employ judicial estoppel is a matter left to the court's discretion. Discretionary decisions "are exceptionally poor candidates for § 1292(b) certification" because they rarely involve a controlling question of law. *Coan v. Nightingale Home Healthcare, Inc.,* 2006 WL 1994772, at *4 (citations omitted).

In conclusion, CSI has not met its burden of showing that this case presents a controlling question of law suitable for interlocutory appeal. Accordingly, CSI's motion for interlocutory appeal is **DENIED.**

### B. *Back v. Town of Cloverdale*

**\*4**  There is one other case worthy of mention—*Back v. Town of Cloverdale,* 2001 WL 987832, 2001 U.S. Dist. LEXIS 13107 (S.D.Ind. July 30, 2001). CSI cites *Back* for the proposition that the Plaintiff and the Trustee should be barred from asserting Plaintiff's employment discrimination claim for the benefit of her creditors in her Chapter 13 bankruptcy case. Although CSI's argument sounds more like a motion to reconsider the court's Entry denying its motion to dismiss, the court accepts CSI's invitation to discuss this case.

In *Back,* the district court granted the defendants' motion to dismiss the plaintiff's civil rights lawsuit with prejudice, reasoning that the plaintiff's failure to disclose the civil rights claim on his Chapter 7 schedules prior to discharge deprived him of standing. *Id.* at *3. Plaintiff thereafter filed a Chapter 13 bankruptcy petition and listed his civil rights claim as an asset on his bankruptcy schedules, stating falsely that the claim was dismissed *without* prejudice. *Id.* The Chapter 7 Trustee learned that there may have been assets belonging to the plaintiff that were not properly scheduled, and the bankruptcy court granted the Trustee's motion to vacate the bankruptcy court's "no asset" order and to reopen

the bankruptcy. *Id.* at *4. After these events transpired, the plaintiff moved for relief from judgment under Rule 60(b)(5) based upon the bankruptcy court's Confirmation Order in his Chapter 13 bankruptcy case. *Id.* The district court ruled that judicial estoppel barred him from asserting his civil rights claim, relying primarily on the fact that the plaintiff failed to disclose his civil rights claim in his Chapter 7 bankruptcy case during its pendency:

> Plaintiff's assertion of a claim against Defendants in this case is inconsistent with his position in the prior bankruptcy proceeding that he had no assets; Plaintiff obtained relief in that bankruptcy case on the basis of his representation of no assets; and the facts regarding the claim are the same in this case as in the bankruptcy case. Moreover, Plaintiff was aware of his civil rights claim during the pendency of that bankruptcy proceeding; indeed, in this case he alleges the Defendants' actions caused him to petition for bankruptcy. Yet, Plaintiff failed to disclose the civil rights claim in his prior bankruptcy proceeding, and only disclosed the claim in his [ ] Chapter 13 petition once his failure was discovered by his adversaries in this case.

*Id.* at * 11–12 (internal citations omitted).

While it is true that the plaintiff did have a Chapter 13 bankruptcy case pending at the time the court ruled on the plaintiff's motion for relief from judgment, this fact was not pivotal to the court's reasoning. What was pivotal was the fact that the plaintiff had been discharged from the debts in his Chapter 7 case, and his civil rights claim was not a listed asset at that time. The ruling in *Back* is consistent with the rulings in *Smith* and *Rahar.*

**\*5**  Moreover, contrary to CSI's representations, the facts of *Back* are far more egregious than those presented in the present case. Here, Plaintiff filed a Chapter 13 bankruptcy petition but failed to schedule her claim as an asset. Plaintiff is under a 5–year plan, and her case remains open. The

**Tucker v. Closure Systems Intern., Not Reported in F.Supp.2d (2012)**

2012 WL 1997866

bankruptcy court granted Plaintiff's motion to amend her bankruptcy schedules to include the present lawsuit and appointed special counsel to represent her in this proceeding. (*See* Docket # 18, Order on Debtor's Application to Employ Special Counsel). Plaintiff's initial failure to disclose is not comparable to the *Back* plaintiff's misrepresentations, multiple bankruptcy filings, and procedural maneuvering.

The court therefore reaffirms its prior ruling that Plaintiff may pursue her employment discrimination claim against CSI for the benefit of her creditors. In the event the Trustee abandons the claim and the Plaintiff pursues the claim for her own benefit, such that the Plaintiff would have standing to pursue

it on her own behalf, then judicial estoppel would apply and bar her from continuing to prosecute her claim.

## IV. Conclusion

For the reasons set forth above, CSI's Application to Certify Issue for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) (Docket # 25) is **DENIED.**

## SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 1997866

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

*McCoy v. Favata*

2020 WL 5891898
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Isaiah W. MCCOY, Plaintiff,
v.
R. David FAVATA, et al., Defendants.

C.A. No. 17-1046 (MN)
|
Signed 10/05/2020

**Attorneys and Law Firms**

Herbert W. Mondros, Margolis Edelstein, Wilmington, DE – attorneys for Plaintiff.

Aaron R. Goldstein, Joseph C. Handlon, Stephen M. Ferguson, Deputy Attorneys General, State of Delaware Department of Justice, Wilmington, DE – attorneys for Defendants Matthew Denn, Gregory Babowal, Stephen Smith, and Deborah Weaver.

George T. Lees, III, Deputy Attorney General, State of Delaware Department of Justice, Wilmington, DE – attorney for Defendants Robert M. Coupe, Nathaniel McQueen, Jr., and Mark Ryde.

Shawn E. Martyniak, Deputy Attorney General, State of Delaware Department of Justice, Wilmington, DE – attorney for Robert M. Coupe, David Pierce, Marcello Rispoli, Todd Drace, and George Gill.

Scott G. Wilcox, Moore and Rutt, P.A., Wilmington, DE – Attorneys for Defendant Anthony DiGirolomo.

**MEMORANDUM OPINION**

NOREIKA, U.S. DISTRICT JUDGE:

**\*1** Before the Court is Plaintiff Isaiah McCoy's ("Plaintiff" or "McCoy") "Motion for Leave to Certify Order for Interlocutory Appeal." (D.I. 10). Defendants Matthew Denn, Gregory Babowal, Stephen Smith, and Deborah Weaver ("Prosecutor Defendants"), Defendants Robert Coupe, Nathaniel McQueen, Jr. and Mark Ryde ("DSP Defendants") and Defendant Anthony DiGirolomo opposed the motion (D.I. 107; D.I. 108; D.I. 110). Defendants, Robert M. Coupe (in his capacity as Commissioner of the

Department of Corrections) and David Pierce joined in the oppositions filed by the Prosecutor Defendants and the DSP Defendants. (D.I. 109). Defendants Todd Drace, George Gill, and Marcello Rispoli "take no position on the Plaintiff's Motion." (*Id.*). For the reasons stated below, Plaintiff's motion is DENIED.

**I. BACKGROUND**

As set out in the Court's earlier opinions, this case stems from the investigation, prosecution, conviction, and incarceration of Plaintiff for the May 4, 2010 murder of James Munford. (D.I. 66 ¶¶ 1-17). On July 6, 2010, Plaintiff was indicted for the murder of Munford. *See State v. McCoy*, No. 1005008059A, 2012 WL 5552033, at \*1 (Del. Super. Ct. Oct. 11, 2012). His first trial was prosecuted by former Defendant R. David Favata and Weaver. (D.I. 66 ¶¶ 38, 48). During that trial, Plaintiff represented himself *pro se* with the aid of stand-by counsel. (*See, e.g., id.* ¶¶ 199, 208). On June 29, 2012, the jury returned a guilty verdict against Plaintiff for the murder. (*Id.* ¶ 193). On October 11, 2012, the court sentenced Plaintiff to death. (*Id.* ¶ 196).

Thereafter, Plaintiff filed for post-conviction relief and, on January 20, 2015, the Delaware Supreme Court reversed his conviction and remanded the case for a new trial. (*Id.* ¶ 214). Explaining the reversal, the Delaware Supreme Court noted that the trial court had committed a "reverse-*Batson*" error and Favata had engaged in a number of improper actions during the prosecution. *See generally McCoy v. State*, 112 A.3d 239 (Del. 2015). The Delaware Supreme Court also found that, "[a]lthough there was no physical evidence linking McCoy to the crime, the record does not support McCoy's argument that the evidence was insufficient to convict him." *Id.* at 268.

Plaintiff's second trial began on January 9, 2017. (D.I. 66 ¶ 253). The second trial was prosecuted by Defendants Babowal and Smith. (*Id.* ¶¶ 53-59). McCoy was represented by counsel. (*Id.* ¶ 248). On January 19, 2017, he was found not guilty of the murder and released from prison. (*Id.* ¶¶ 255, 258).

On July 28, 2017, Plaintiff filed this lawsuit. (D.I. 1 ("Original Complaint")). The Original Complaint included seven counts raising theories of liability under federal and state law against twelve defendants. (*Id.*). On March 29, 2019, this Court granted motions to dismiss filed by the DSP Defendants, the DOC Defendants, and the Prosecutor Defendants, dismissing all claims against those parties without prejudice. (D.I. 64 ("First Opinion"); D.I. 65).

On April 22, 2019, Plaintiff filed an amended complaint. (D.I. 66 ("Amended Complaint")). The Amended Complaint included fourteen counts and added a defendant, Anthony DiGirolomo. (*Id.*). On April 21, 2020, the Court dismissed Plaintiff's claims against the DSP Defendants, the Prosecutor Defendants, Defendant DiGirolomo, and Defendants Coupe and Pierce. (D.I. 100; D.I. 101). The Court, however, allowed Plaintiff's claims against Defendants Rispoli, Drace, and Gill to proceed. Plaintiff's current motion seeks leave to appeal the Court's dismissal of his claims.

## II. LEGAL STANDARDS

**\*2** "The decision of whether to grant leave to file an interlocutory appeal is 'informed by the criteria set forth in 28 U.S.C. § 1292(b).' " *Chase Bank USA, N.A. v. Hess*, No. 08-121 (LPS), 2011 WL 4459604, at \*1 (D. Del. Sept. 26, 2011) (quoting *In re Philadelphia Newspapers, LLC*, 418 B.R. 548, 556 (E.D. Pa. 2009)). Under § 1292(b), an interlocutory appeal is permitted only when the order at issue (1) involves a controlling question of law upon which there is (2) substantial grounds for a difference of opinion as to its correctness, and (3) if appealed immediately may materially advance the ultimate termination of the litigation. *Id. (citing* 28 U.S.C. § 1292(b) and *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974)). "[T]hese three criteria[, however,] do not limit the Court's discretion to grant or deny an interlocutory appeal." *In re SemCrude L.P.*, 407 B.R. 553, 557 (D. Del. 2009). Leave to file an interlocutory appeal may be denied for "entirely unrelated reasons such as the state of the appellate docket or the desire to have a full record before considering the disputed legal issue." *Katz*, 496 F.2d at 754.

An interlocutory appeal under § 1292(b) is appropriate only when the party seeking leave to appeal "establishes [that] exceptional circumstances justify a departure from the basic policy of postponing review until after the entry of final judgment." *In re Del. and Hudson Ry. Co.*, 96 B.R. 469, 472–73 (D. Del. 1989), *aff'd*, 884 F.2d 1383 (3d Cir. 1989). "In part, this stems from the fact that '[p]iecemeal litigation is generally disfavored by the Third Circuit.' " *Chase Bank*, 2011 WL 4459504 at \*1 (quoting *In re SemCrude*, Bank. No. 08–11525 (BLS), 2010 WL 4537921, at \*2 (D. Del. Oct. 26, 2010).

## III. DISCUSSION

### A. Controlling Question of Law

For the purpose of certifying an interlocutory appeal, a "controlling question of law" is "one which would result in a reversal of a judgment after final hearing." *Katz,* 496 F.2d at 47. "An order involves a 'controlling question of law' when it concerns a question of law, as opposed to one of fact or a mixed question of law and fact.' " *See In re Maxus Energy Corp.*, 611 B.R. 532, 540 (D. Del. Dec. 19, 2019) (quoting *Mata v. Eclipse Aerospace, Inc. (In re AE Liquidation, Inc.)*, 451 B.R. 343, 347-48 (D. Del. 2011)). In his motion, Plaintiff states in conclusory fashion that "[t]his case presents a controlling question of law both because the Court's Order dismissing the case against all defendants except Defendants Rispoli, Drace and Gill would constitute reversible error if presented on final appeal, and because the question is 'serious to the conduct of the litigation' practically, and legally." (D.I. 102 at 6). Plaintiff then goes on to point to six areas where Plaintiff suggests the Court erred. [1]

In doing so, however, Plaintiff does not identify which of the legal standard or standards the Court applied, based on precedent from the United States Supreme Court and the Third Circuit, Plaintiff contends is in doubt. Indeed, Plaintiff identifies no "genuine disagreement as to the correct legal standard" or how the Court's determination is not "consistent with well established Third Circuit law." *See Maxus Energy,* 611 B.R. at 546. Instead, his complaints appear to be directed to the Court's application of the facts of his case to the law. That, however, is not the standard for certification under § 1292(b). *See Premick v. Dick's Sporting Goods, Inc.*, No. 02: 06-530, 2007 WL 588992, at \*2 (W.D. Pa. Feb. 20, 2007) ("questions about a court's application of the facts of the case to the established legal standards are not controlling questions of law for purposes of section 1292(b)"). Therefore, the Court is not persuaded that Plaintiff has raised a controlling question of law.

### B. Other Considerations

**\*3** In light of the Court's conclusion that Plaintiff has not raised a controlling question of law, it is not necessary to determine whether there are substantial grounds for a difference of opinion and whether an immediate appeal would materially advance the termination of the litigation. The Court does note, however, that Plaintiff has failed to present exceptional circumstances justifying the need for immediate review. *See DeLalla v. Hanover Ins.,* No. 09–2340 (RBK/JS), 2010 WL 3908597, at \*3 (D.N.J. Sept. 30, 2010) ("Interlocutory appeal is meant to be used sparingly

and only in exceptional cases where the interests cutting in favor of immediate appeal overcome the presumption against piecemeal litigation."). The Court does not find any "circumstance or reason that distinguishes the case from the procedural norm and establishes the need for immediate review." *In re Magic Rests., Inc.,* 202 B.R. 24, 26–27 (D. Del. 1996). Thus, the Court concludes that an interlocutory review of its April 21, 2020 Memorandum Opinion and Order (D.I. 100; D.I. 101) is not warranted.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for leave to certify the Court's order for interlocutory appeal (D.I. 102) is denied. An appropriate order will follow.

**All Citations**

Slip Copy, 2020 WL 5891898

## Footnotes

1    Specifically, Plaintiff states that "if the Third Circuit disagrees with this Court's holdings that i) there was probable cause to arrest Plaintiff notwithstanding the defects in the affidavit of probable cause; ii) the defendants are protected by absolute immunity; iii) Plaintiff has failed to plead an underlying constitutional violation by Defendant Ryde; iv) Plaintiff has failed to plead a claim of inadequate supervision and training against Defendants Coupe and McQueen, or a civil conspiracy claim against Defendants Coupe Ryde and McQueen; v) Plaintiff's claims against Defendant DiGirolamo are barred by the statute of limitations; and vi) Plaintiff has not stated a constitutional claim against Defendants Denn or Weaver, then the Order would be reversed." (D.I. 102 at 6).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

*RFC and RESCAP Liquidating Trust Litigation*

Case 1:20-cv-00292-JPW     Document 240-1     Filed 07/22/22     Page 33 of 54

RFC and RESCAP Liquidating Trust Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3410332

2016 WL 3410332
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

In Re: RFC AND RESCAP
LIQUIDATING TRUST LITIGATION
This document relates to Residential Funding Company,
LLC v. Impac Funding Corporation, No. 13–CV–3506

Civil File No. 13–3451(SRN/HB)
|
Signed 06/20/2016

**Attorneys and Law Firms**

Jessica J. Nelson and Donald G. Heeman, Felhaber Larson, 220 South Sixth Street, Suite 2200, Minneapolis, Minnesota 55402; Isaac Nesser, Peter E. Calamari, and David Elsberg, Quinn, Emanuel, Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010; Anthony P. Alden and Johanna Ong, Quinn, Emanuel, Urquhart & Sullivan, LLP, 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017; Jeffrey A. Lipps and Jennifer A.L. Battle, Carpenter Lipps & Leland LLP, 280 Plaza, Suite 1300, 280 North High Street, Columbus, Ohio 43215, for Plaintiffs.

Erin Sindberg Porter, Janine W. Kimble, Katherine M. Swenson, and Jenny Gassman–Pines, Greene Espel PLLP, 222 South 9th Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant Impac Funding Corporation.

**MEMORANDUM OPINION AND ORDER**

SUSAN RICHARD NELSON, United States District Judge

 **\*1** Before the Court is the Motion to Certify an Order for Interlocutory Review filed by Defendant Impac Funding Corporation ("Impac") [Doc. No. 1596]. For the reasons stated herein, Impac's motion is denied.

**I. BACKGROUND**
In the breach of contract and indemnification action brought by Plaintiff Residential Funding Company, LLC ("RFC") against Impac, RFC asserts liability based on successor liability. (RFC v. Impac, No. 13–CV–3506, Compl. ¶¶ 17–20 [Doc. No. 34].) In support of RFC's allegations of successor liability, it points to separate agreements between RFC and Pinnacle Direct Corporation ("Pinnacle

Direct"), Pinnacle Direct and Pinnacle Financial Corporation ("Pinnacle Financial"), and Pinnacle Financial and Impac. (Id.) Impac subsequently moved for summary judgment on this issue, claiming that no liability attached to the successor entities. (Impac's Mot. for Summ. J. [Doc. No. 943].)

This Court's Order of April 27, 2016 ("the Order") denied Impac's motion. Based on the contractual language of the agreements, the Court found that Impac was not entitled to summary judgment on RFC's indemnification claim and that disputed issues of fact precluded summary judgment as to RFC's breach of contract claim. (Order at 45 [Doc. No. 1523].) The Court did not address RFC's alternative common law theories of successor liability, because, by finding that Impac was not entitled to summary judgment based on the contractual language of the agreements, the Court did not need to reach any other basis of liability. (Id.)

One of the primary contracts at issue is the Asset Purchase Agreement ("APA") between Pinnacle Financial and Impac. In construing various APA terms in the Order, the Court distinguished between the term "Assets," spelled with an uppercase "A," as opposed to "assets," spelled with a lowercase "a:"

> Impac also argues that the language in Section 2.7(f) excludes liability here. (Def.'s Mem. Supp. Mot. for Summ. J. at 19 [Doc. No. 945].) Section 2.7(f), however, makes no mention of "Assets," i.e., the Client Contract, unlike Sections 2.6(d) and 2.7(c). Rather, it excludes liability "related to or arising from the Loan Origination Platform and its operation prior to the Closing Date." (APA § 2.7(f), Ex. 23 to Sindberg Porter Aff.) While the Loan Origination Platform is defined as "the assets used or held for use in connection with the Seller's mortgage and construction loan origination business," (id. § 1.1 at IMP000014), "assets" used in this context, with a lowercase "a," are not the same as "Assets," as defined with an uppercase "A." The Court agrees with RFC that the drafters of the APA knew how to reference the Client Contract as an Asset in Sections 2.6(d) and 2.7(c). Accordingly, the exclusion of liability in Section 2.7(f) for "[a]ny Liability related to or arising from the Loan Origination Platform and its operation prior to the Closing Date" does not encompass the Assets, including the Client Contract. Moreover, as discussed, the liability at issue here arose after the May 21, 2007 closing date, as to RFC's indemnification claim, and it is not yet certain when the liability arose as to RFC's breach of contract claim. Accordingly, Impac is not entitled to summary judgment based on the language of the APA.

Case 1:20-cv-00292-JPW    Document 240-1    Filed 07/22/22    Page 34 of 54

RFC and RESCAP Liquidating Trust Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3410332

**\*2**  (Id. at 44–45.)

In the instant motion before the Court, Impac seeks leave to file an interlocutory appeal to the Eighth Circuit Court of Appeals, arguing that the Order involves a controlling question of law on which there is substantial ground for a difference of opinion. (Def.'s Mem. at 2 [Doc. No. 1598].) Specifically, Impac defines the controlling question of law as: "where the first letter of a defined term in a contract is in upper case, how should a court interpret the same word in lower case? In other words, how should the word "asset" be interpreted in the definition of the Loan Origination Platform?" (Id.) Additionally, Impac argues that certification is appropriate because an immediate appeal would expedite the termination of this litigation and could prevent protracted and expensive litigation, as successor liability is a threshold determination. (Id.)

## II. DISCUSSION

While courts of appeals have jurisdiction over "all final decisions of the district courts," 28 U.S.C. § 1291, under certain circumstances, a district court may determine that an otherwise non-final order is certified for interlocutory appeal under 28 U.S.C. § 1292(b). See 28 U.S.C.§ 1292(b). Section 1292(b) provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Id. The Eighth Circuit has held that certification is an "extraordinary course," requiring the moving party to satisfy three criteria: (1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion as to that controlling question of law; and (3) certification will materially advance the ultimate termination of litigation.

Union Cnty., Iowa v. Piper Jaffray & Co., 525 F.3d 643, 646 (8th Cir.2008) (citations omitted).

Although district courts have discretion to certify orders for interlocutory appeal, "[it] has ... long been the policy of the courts to discourage piece-meal appeals because most often such appeals result in additional burdens on both the court and the litigants." White v. Nix, 43 F.3d 374, 376 (8th Cir.1994). Due to this additional burden, motions for certification should be "granted sparingly and with discrimination." Id. The legislative history of section 1292 indicates that "it was to be used only in extraordinary cases where decision of an interlocutory appeal might avoid protracted and expensive litigation. It was not intended merely to provide review of difficult rulings in hard cases." Union Cnty., Iowa, 525 F.3d at 646 (quoting United States Rubber Co. v. Wright, 359 F.2d 784, 785 (9th Cir.1966)). In requesting this extraordinary relief, the movant must meet a heavy burden of establishing that the case is "an exceptional one in which immediate appeal is warranted." Nix, 43 F.3d at 376. In reviewing Impac's request for certification, the Court finds that none of the elements for interlocutory appeal are satisfied.

### A. Whether the Order Addresses a Controlling Question of Law

**\*3**  First, the significance given to the difference between a contractual term's uppercase "A" in one passage, and lowercase "a" in another passage, as a matter of contract interpretation, does not involve a controlling question of law. "A 'question of law,' as construed in § 1292(b), refers to a purely, abstract legal question." See Employers Reinsurance Corp. v. Mass. Mut. Life Ins. Co., No. 06–188–CV–W–FJG, 2010 WL 2540097, at \*2 (W.D.Mo. June 16, 2010) (citing Ahrenholz v. Bd. of Trustees of Univ. of Ill., 219 F.3d 674, 676–77 (7th Cir.2000)).

Challenging the application of settled law to a specific set of facts is not a question of law. McFarlin v. Conseco Services, L.L.C., 381 F.3d 1251, 1258 (11th Cir.2004) (citing Ahrenholz, 219 F.3d at 676). In Ahrenholz, the court stated that "the question of the meaning of a contract, though technically a question of law when there is no other evidence but the written contract itself, is not what the framers of section 1292(b) had in mind either." 219 F.3d at 676.

Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minnesota, LLC, No. 09–CV–3037 (SRN/LIB), 2013 WL

Case 1:20-cv-00292-JPW    Document 240-1    Filed 07/22/22    Page 35 of 54

RFC and RESCAP Liquidating Trust Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 3410332

4028144, at *5 (D.Minn. Aug. 7, 2013) (denying motion for interlocutory appeal where the question involved the meaning of a contract) (citing Employers Reinsurance, 2010 WL 2540097, at *2). See also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, 426 F.Supp.2d 125, 128 (S.D.N.Y.2005) (stating that "a question of contract interpretation typically is not a 'controlling question of law' that serves as a basis for interlocutory appeal.") As the issue here is one of contract interpretation, it fails to constitute a controlling question of law under § 1292.

Moreover, the Court's ruling in the Order cannot be considering "controlling," as the Court declined to rule on RFC's alternative common law basis for successor liability. See Shukh v. Seagate Tech., LLC, No. 10–CV–404 (JRT/JJK), 2011 WL 4947608, at *3 (D.Minn. Oct. 18, 2011) (stating that where an alternative basis exists for an order, the basis challenged on appeal is not "controlling.") In addition, the Court determined that RFC's indemnification claim arose after the May 21, 2007 closing date and that a fact question existed as to when RFC's breach of contract claim arose. A question is not controlling if the litigation would necessarily continue, regardless of how the question were decided. Conlin v. Sw. Cmty. Coll., No. 99–CV–247–C, 2001 WL 1018799, at *2 (W.D.N.C. Mar. 2, 2001). At the very least, if the Eighth Circuit were to reverse this Court's ruling, the matter would be remanded for this Court to consider RFC's alternative basis for successor liability. For all of these reasons, the Court finds lacking the requirement that the issue concern a controlling question of law.

### B. Whether There is a Substantial Ground for Difference of Opinion

Notably, the Order did not impose or apply a rule of law concerning how a court should interpret a previously capitalized word in lower case. (Pls.' Opp'n Mem. at 6 [Doc. No. 1606].) While Impac has identified cases in which courts have interpreted upper and lower case contractual terms either the same or differently, (Def.'s Mem. at 10 [Doc. No. 1598] ), none of the cases apply a general rule of law regarding the significance of capitalization of contractual terms in contract interpretation, and none of them arise under California law, which is the applicable law at issue. Impac identifies no contradictory authority in this regard. In interpreting the APA, the Court applied the familiar rule of contract construction that requires contracts to be interpreted according to their plain language and ordinary meaning. (Order at 23; 35–36 [Doc. No. 1523].) "[M]ere disagreement with the district court's ruling does not constitute a 'substantial ground for difference of opinion' within the meaning of § 1292(b).

Rather, the 'difference of opinion' must arise out of genuine doubt as to the correct legal standard." Kapossy v. McGraw–Hill, Inc., 942 F.Supp. 996, 1001 (D.N.J.1996). It appears here, however, that Impac simply disagrees with the Court's ruling. But this is not a proper basis for certification for interlocutory review.

**\*4** While Impac contends that a dearth of precedent may influence a court's decision to permit an interlocutory appeal, (Def.'s Mem. at 9 [Doc. No. 1598] ), the Eighth Circuit has stated that " 'a dearth of cases' does not constitute 'substantial ground for difference of opinion.' " Union Cnty., 525 F.3d at 647 (citing White, 43 F.3d at 378). Moreover, there is no dearth of precedent here, as California law follows the general rule that a plain reading of a contract governs contract interpretation. See George v. Automobile Club of S.Cal, 135 Cal. Rptr. 3d 480, 484 (Cal.Ct.App.2011).

### C. Whether an Interlocutory Appeal Would Materially Advance the Ultimate Termination of the Litigation

Again, certification of an interlocutory appeal is proper only when it will materially advance the ultimate termination of the litigation. Union Cnty., 525 F.3d at 646. Permitting Impac to file an interlocutory appeal would not materially advance the ultimate termination of this litigation because other legal bases support the Order and the Court declined to address RFC's alternative theory of successor liability based on the common law, as noted above. Under these circumstances, permitting an interlocutory appeal would likely unnecessarily prolong the litigation. See Ray, 971 F.Supp.2d at 896 (noting that if the movant were to prevail on interlocutory appeal, the appeal would advance the ultimate termination of the litigation, but finding that an alternative outcome was reasonably likely, namely, that the Court of Appeals would affirm the district court's ruling, thus "dramatically and unnecessarily prolong[ing the litigation], at significant expense to both parties.").

Accordingly, for the reasons stated herein, the Court finds that Impac has not met the heavy burden of establishing the factors necessary to warrant the exceptional relief of interlocutory appeal.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Impac Funding Corporation's Motion to Certify an Order for Interlocutory Review [Doc. No. 1596] is **DENIED**

Case 1:20-cv-00292-JPW    Document 240-1    Filed 07/22/22    Page 36 of 54

2016 WL 3410332

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3410332

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW    Document 240-1    Filed 07/22/22    Page 36 of 54

2016 WL 3410332

# *EPIC v. Pacific Lumber Co.*

2004 WL 838160
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

ENVIRONMENTAL PROTECTION INFORMATION
CENTER, a non-profit corporation, Plaintiff,
v.
PACIFIC LUMBER COMPANY, a Delaware
corporation; Scotia Pacific Company LLC, a Delaware
corporation; Environmental Protection Agency, a
federal agency; and Christine Todd Whitman, in
her capacity as EPA Administrator, Defendants.

No. C 01–2821.
|
April 19, 2004.

Motion to Certify for Immediate Appeal.

**Attorneys and Law Firms**

Michael R. Lozeau, Deborah A. Sivas, Stanford, CA, Sharon
Eileen Duggan, Law Offices of Sharon E. Duggan, Berkeley,
CA, for Plaintiff.

Bruce Stewart Flushman, Christopher J. Carr, Edgar B.
Washburn, Stoel Rives LLP, Mark A. Rigau, U.S. Dept
of Justice, Environmental & Natural Resources Div, San
Francisco, CA, Frank Shaw Bacik, John A. Behnke, Carter
Behnke Oglesby & Bacik, Ukiah, CA, for Defendants.

*Order*

PATEL, Chief J.

 **\*1**  On July 24, 2001, plaintiff Environmental Protection
Information Center ("EPIC"), a non-profit environmental
organization, brought a citizen-suit action under section
505(a) of the Clean Water Act ("CWA"), 33 U.S.C.
§ 1365(a), against Pacific Lumber Company and Scotia
Pacific Lumber Company (collectively "PALCO"), the
Environmental Protection Agency ("EPA"), and Christine
Todd Whitman as EPA Administrator.[1] EPIC's complaint
alleges that PALCO violated the CWA, the Porter–Cologne
Act, and California's Unfair Competition Law, Cal. Bus &
Prof.Code § 17200 *et seq.,* when it discharged pollutants
without a CWA permit. For these alleged violations, EPIC

seeks declaratory and injunctive relief, civil remedies, and
restitution.

On August 16, 2001, the court denied EPIC's motion for a
temporary restraining order. PALCO and EPA subsequently
filed separate motions to dismiss the action, and EPIC,
in response, filed an amended complaint on September
24, 2001, adding a third claim challenging the nonpoint
source provision of the relevant regulation. On June 6,
2003, the court denied EPA's motion to dismiss and denied
PALCO's motion to dismiss in part, concluding that EPIC
could pursue a claim under the Administrative Procedures
Act ("APA") in this court and that EPIC's claim was not
time-barred. On October 13, 2003, the court denied EPIC's
motion for summary judgment on its third claim for relief,
granting PALCO's and EPA's cross-motions and construing
the relevant EPA regulation in a manner consistent with
germane federal law. On January 23, 2004, the court denied
PALCO's motion to dismiss EPIC's remaining claims under
Federal Rule of Civil Procedure 12(b)(6).

Now before the court is PALCO's motion for certification for
interlocutory appeal of the court's three most recent decisions
in this matter. *See* 28 U.S.C. § 1292(b). The court has
considered the parties' arguments fully, and for the reasons set
forth below, the court rules as follows.

*BACKGROUND*[2]

In each of its prior decisions, the court has set forth the
background of this action in significant detail, and, for the
motion before the court, it is not necessary to restate all of
that background here. The court, rather, need only reframe
the core dispute and briefly summarize the three relevant
court decisions. At the heart of this litigation is Bear Creek,
a brook situated several miles upstream of Scotia, California.
A tributary of the Eel River, Bear Creek creates a watershed
that covers 5500 acres of land throughout Humboldt County,
California. Pacific Lumber Company and its wholly owned
subsidiary, defendant Scotia Pacific Lumber Company, own
some ninety-five percent of the land in the Bear Creek
watershed, much of which PALCO uses for logging.[3]

According to EPIC, substantial logging activity (primarily
PALCO's) in the watershed area has spurred a dramatic
increase in the amount of sediment deposited in Bear Creek.
Before significant logging began, EPIC claims, Bear Creek's
sediment deposit peaked at approximately 8,000 tons per
year; after logging practices commenced, sediment deposit

climbed to 27,000 tons per year. This sediment increase, EPIC alleges, has a specific source: PALCO's timber harvesting and construction of unpaved roads. According to EPIC, PALCO's logging activity creates a deleterious environmental process. First, EPIC notes, timber harvesting removes vegetation from the ground surface, making soil more susceptible to erosion and landslides; construction of unpaved roads then exposes more soil, which, in turn, further destabilizes slopes. The effect of timber harvesting and road construction, EPIC contends, is to expose far more destabilized soil than is environmentally sustainable. When it rains, EPIC explains, the rain water carries the exposed silts and sediments–as well as other pollutants, like pesticides and diesel fuel–into culverts, ditches, erosion gullies, and other alleged channels. From these various channels, silts, sediments, and pollutants flow directly into Bear Creek. The consequences of PALCO's drainage system, EPIC notes, are predictable and environmentally adverse; PALCO's present and future timber harvest plans, EPIC adds, promise only to make the situation worse.

**\*2** EPIC believes PALCO's present drainage system violates various provisions of the Clean Water Act, including (but not necessarily limited to) the National Pollutant Discharge Elimination System ("NPDES"). *See* 33 U.S.C. §§ 1251(a), 1311(a), 1342(a); *see also Environmental Def. Ctr., Inc. v. United States Envtl. Prot. Agency,* 345 F.3d 840, 2003 WL 22119563, \*2 (9th Cir.2003); *Association to Protect Hammersley v. Taylor Res., Inc.,* 299 F.3d 1007, 1016 (9th Cir.2002) (noting that, in 1972, "Congress passed the Clean Water Act amendments, 33 U.S.C. §§ 1251–1387, to respond to environmental degradation of the nation's waters"); *Natural Resources Defense Council ("NRDC") v. EPA,* 822 F.2d 104, 109 (D.C.Cir.1987) (citing 33 U.S.C. § 1311(a)) *NRDC v. EPA,* 822 F.2d at 110 (noting that, when necessary, water quality-based standards may supplement technology standards). In substantial part, EPIC alleges that PALCO has used a variety of "point sources," *see* 33 U.S.C. § 1362(14), to discharge pollutants without first securing necessary NPDES permits. *Cf., e.g., League of Wilderness Defenders v. Forsgren,* 309 F.3d 1181, 1183 (9th Cir.2002) ("Point source pollution is distinguished from 'nonpoint source pollution, which is regulated in a different way and does not require [the NPDES] type of permit."). Absent such permits, EPIC claims, PALCO's system conflicts with defendants' CWA obligations.

In an effort to compel PALCO to comply with the putative terms of the CWA, EPIC brought a citizen-suit action under

section 505(a) of the CWA, 33 U.S.C. § 1365(a), against PALCO, EPA, and then-EPA Administrator Christine Todd Whitman. EPIC's first two causes of action allege, generally stated, that PALCO drainage system employs a number of unpermitted "point sources" to discharge pollutants; EPIC later added a third cause of action, alleging that the adoption of a particular EPA regulation–viz., 40 C.F.R. section 122.27 [4] –constituted an *ultra vires* act. A number of potentially dispositive motions followed.

On June 6, 2003, the court denied EPA's motion to dismiss and denied PALCO's motion to dismiss in part, concluding that EPIC could pursue a claim under the Administrative Procedures Act ("APA") in *this* court and that EPIC's claim was not time-barred. On October 14, 2003, the court denied EPIC's motion for summary adjudication on its third claim for relief, granting EPA's and PALCO's cross-motions for summary adjudication and reading 40 C.F.R. section 122.27 to be consistent with the governing provisions of the CWA. And, on January 23, 2004, the court denied PALCO's motion to dismiss EPIC's remaining claims (that is, its first and second claims for relief) under Federal Rule of Civil Procedure 12(b)(6). PALCO has now requested that the court certify each of these three decisions for immediate appellate review under 28 U.S.C. section 1292(b).

*DISCUSSION*

The test for whether to grant a motion to certify a decision for interlocutory appeal under section 1292(b) is, by now, a familiar one. [5] For a district court decision to warrant immediate interlocutory review, that decision must "involve[ ] a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b). Courts have parsed section 1292(b) into a three-part test, *see, e.g., Loritz v. CMT Blues,* 271 F.Supp.2d 1252, 1253–54 (S.D.Cal.2003) (assessing (1) whether a decision involves a controlling issue of law; (2) whether there exists a substantial ground for difference of opinion; and (3) whether immediate appeal may speed ultimate resolution of the case), cautioning that interlocutory appeals are not appropriate "merely to provide review of difficult rulings in hard cases." *United States Rubber Co. v. Wright,* 359 F.2d 784, 785 (9th Cir.1966). Instead, interlocutory appeals under section 1292(b) are to be permitted "sparingly," i.e., only in "exceptional" and "extraordinary" circumstances. *See James v. Price Stern Sloan, Inc.,* 283 F.3d 1064, 1068 n. 6

(9th Cir.2002) (noting that such certification is appropriate only "in rare circumstances"); *United States Rubber Co.,* 359 F.2d at 785; *United States v. Woodbury,* 263 F.2d 784, 788 n. 11 (9th Cir.1959); *Rottmund v. Continental Assur. Co.,* 813 F.Supp. 1104, 1112 (E.D.Pa.1992) (noting that section 1292(b) demands nothing less than "exceptional circumstances [to] justify a departure from the basic policy against piecemeal litigation and of postponing appellate review until after entry of a final judgment"). Decisions regarding whether or not to certify an order for appeal rest within the sound discretion of the district court, *see, e.g., Loritz,* 271 F.Supp.2d at 1253–54; still, the court of appeals retains the authority to reject a interlocutory appeal certified by the district court, and it "does so quite frequently." *See James,* 283 F.3d at 1068 n. 6. [6]

**\*3** The court does not believe that any of the three challenged orders merit interlocutory review, nor is the court convinced that the Ninth Circuit would accede to such review were this court to allow it. *Cf. Chiron Corp. v. Abbott Labs.,* 1996 WL 15758, \*2–3 (N.D.Cal.1996) (Patel, J.). Neither party disputes, of course, that each of the three relevant dispositions present–and resolve–"controlling question[s] of law." 28 U.S.C. § 1292(b). The court's June 6, 2003, opinion confirms that this court has jurisdiction to hear part of EPIC's complaint; the court's October 14, 2003, opinion finds that section 122.27 is not an *ultra vires* provision; and the court's January 23, 2004, order assures that PALCO's "point sources"–to the extent they exist–must comply with the terms of the NPDES and the CWA. Section 1292(b)'s "controlling issue of law" language has long been construed broadly, *see, e.g., In re Cement Antitrust Litig.,* 673 F.2d 1020, 1026 (9th Cir.1982) (noting that an issue qualifies as a "controlling" one if its resolution "materially affect[s]" the outcome of an action), and all three dispositions fit within this expansive standard.

Nor does either party clearly dispute that *reversal* of any of this court's orders might "speed" the ultimate disposition of this action. *See* 28 U.S.C. § 1292(b). [7] All three of the relevant decisions were, in some fashion, potentially dispositive: the first because it discussed–and confirmed–this court's jurisdiction to hear particular portions of EPIC's complaint; the second because it eliminated EPIC's third claim for relief; and the third because it concluded (again) that EPIC had stated two claims on which relief could be granted. Reversal of any of the three court decisions might speed the ultimate resolution of this litigation, or at least a good portion of it. *Id.*

To PALCO, this is enough to justify immediate interlocutory review. But PALCO's interpretation of section 1292(b) is both incomplete and overbroad. Every denial of a dispositive motion *may* result in a reversal at the appellate court, which *may,* in turn, conclude the case outright. Under PALCO's expansive reading of section 1292(b), nearly all denials of potentially dispositive interlocutory orders (e.g., summary adjudication, failure to state a claim) would be immediately appealable. Neither the statute nor existing precedent demand such a result. As the Ninth Circuit has long reminded, it is not enough to say that appellate reversal of a particular decision might dispose of an action (i.e., "speed ultimate resolution"). *See, e.g., James,* 283 F.3d at 1068 n. 6. This is true even where, as here, the remaining issues may be difficult and proceeding to trial may be somewhat costly. *See United States Rubber Co.,* 359 F.2d at 785.

And this is doubly true where, as here, the putative "substantial ground for difference of opinion" is significantly overstated. *See* 28 U.S.C. § 1292(b). Neither party argues, and the court does not mean to suggest, that there is absolutely *no* ground for difference of opinion regarding the court's relevant decisions. If nothing else, the length, detail, and vigor of PALCO's moving papers prove that there is a difference of a kind. But PALCO's protests do not show that there is a "substantial ground for difference of opinion" *among the courts. See* 28 U.S.C. § 1292(b). They show, rather, that there is a difference of opinion *between PALCO and this court* –and that PALCO would like the court to revisit the many, often intricate arguments EPIC, PALCO, and EPA articulated when litigating the predicate motions. *See, e.g.,* PALCO's Motion, at 12–14 (arguing only that, in the October 14, 2003, opinion, the court extended a particular Ninth Circuit rationale too far). This is not the kind of "difference" section 1292(b) targets, and PALCO's reiteration of previously stated arguments–however forceful–is no surrogate for a demonstration of a legitimate and "substantial ground for difference of opinion" between and among judicial bodies. *See United States Rubber Co.,* 359 F.2d at 785; *APCC Services, Inc. v. AT & T Corp.,* 297 F.Supp.2d 101, 107 (D.D.C.2003.) ("A substantial ground for dispute [ ] exists where a court's challenged decision conflicts *with decisions of several other courts."* ) (emphasis added); *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group,* 233 F.Supp.2d 16, 31 (D.D.C.2002) ("[D]efendants' conviction of the correctness of their position is insufficient to carry them over the high threshold posed by the standard governing certification for interlocutory appeal.").

**\*4** To be sure, PALCO cites a string of federal cases, most of which this court cited in its relevant decisions–but all of which supposedly confirm the requisite difference of opinion. *See, e .g., Envtl. Defense Ctr. v. EPA,* 344 F.3d 832 (9th Cir.2003); *Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307 (9th Cir.1992); *NRDC v. EPA,* 966 F.2d 1292 (9th Cir.1992). When read closely, however, none of the relevant cases actually differ–in logic or effect–from this court's orders. [8] Rather, PALCO's catalog of cases simply rephrases *PALCO's* disagreement with the court, albeit in a novel and more abstruse fashion. *See, e.g.,* PALCO Motion, at 4 (attempting to establish the necessary "difference" by arguing that this court construed some caselaw in an "unduly cramped" manner). PALCO may disagree with the way the court has interpreted the relevant doctrine, but "at least one party [is always] convinced that the court got it wrong." *See Chiron Corp.,* 1996 WL 15758, at \*3. Such disagreement is *not* tantamount to a disagreement among the courts, and it does not itself compel section 1292(b) review. *Id.* If it did, nearly "every judgment would give rise to an interlocutory appeal." *Id.*

All of this court's decisions have been careful and methodical. The parties' motions have presented difficult questions, and the court does not pretend that the answers were always easy to divine. Still, the fact that the court's decisions were neither easy nor obvious is not sufficient reason to certify an immediate interlocutory appeal. *See United States Rubber Co.,* 359 F.2d at 785. Certification for interlocutory review is appropriate only in "exceptional" or "extraordinary" circumstances, not simply where issues are hard or questions are somewhat new. *See Coopers & Lybrand v. Livesay,* 437 U.S. 463, 474, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); *James,* 283 F.3d at 1068 n. 6; 28 U.S.C. § 1292(b). This action is a challenging one, but it is not in this sense "exceptional." None of the three challenged orders satisfy section 1292(b)'s requirements, and, as a result, interlocutory review is not appropriate.

*CONCLUSION*

PALCO's motion to certify three of the court's decisions for interlocutory review under 28 U.S.C. section 1292(b) is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 838160

## Footnotes

1      Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael Leavitt, new Administrator of EPA, automatically replaces his predecessor in this suit. *See* Fed.R.Civ.P. 25(d)(1).

2      Unless otherwise noted, this fact recitation is culled from the parties' moving papers.

3      Both Pacific Lumber and Scotia Pacific Lumber Company are Delaware corporations; both maintain principal places of business in Scotia, California.

4      In significant part, the current regulation defines a "[s]ilvicultural point source" as:

> any discernible, confined, and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of the United States. *The term does not include* non-point source silvicultural activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, *surface drainage, or road construction and maintenance from which there is natural runoff.*

> 40 C.F.R. § 122.27(b)(1) (emphasis added).

2004 WL 838160

At the outset, the court must question PALCO's right to appeal all three of the challenged decisions. As the Ninth Circuit has long suggested, the right to appeal generally redounds to the party aggrieved by a particular decision. *See, e.g., United States v. Good Samaritan Church,* 29 F.3d 487, 488 (9th Cir.1994). This court's October 2003 opinion does not leave PALCO as an aggrieved party; in fact, that opinion expressly grants *PALCO′* s motion for summary judgment and denies EPIC's cross-motion. With respect to that opinion, all PALCO endeavors to challenge is a rationale it dislikes–and the appellate process greatly disfavors such attempts. *Id.* Even so, because section 1292(b) provides a simpler answer to PALCO's motion, the court will decide this motion on the basis of that section instead.

By contrast, a district court's denial of a motion to certify a decision for immediate appeal under section 1292(b) is not reviewable by the appellate court. *Executive Software N. Am., Inc. v. United States,* 24 F.3d 1545, 1550 (9th Cir.1994).

EPIC argues that an immediate appeal by PALCO "has little, if any, likelihood of success on the merits," adding that most civil appeals to the Ninth Circuit take "15 to 23 months" to resolve. EPIC Opp., p. 12. This may all be true, but it is also question-begging, albeit of a mild form. Section 1292(b) directs the court to consider whether immediate appellate review *"may"* speed the ultimate resolution of the litigation. *See* 28 U.S.C. § 1292(b). Much as the court believes that the Ninth Circuit will affirm this court's many decisions, section 1292(b)'s conditional language has long been read to require courts to consider the effect of immediate review and *reversal,* not just review. To this end, the court must assess whether immediate appellate court reversal will speed the outright disposition of this action (even if this conflates the "controlling issue" analysis with the "speed disposition" one). The likelihood of success on the merits, and the typical lifespan of an appeal, do not answer the relevant question. Nor do EPIC's claims that the trial might be short or that the court of appeals would benefit from a fully developed record.

Two cases do interpret section 122.27 differently than has this court, though neither is binding precedent. *See Newton County Wildlife Ass'n v. Rogers,* 141 F.3d 803 (8th Cir.1998); *Sierra Club v. Martin,* 71 F.Supp.2d 1268 (N.D.Ga.1999). Binding precedent, in fact, demands that this court *ignore Rogers* and *Martin.* Quite recently, the Ninth Circuit expressly disagreed with *Rogers* and *Martin,* reading section 122.27's catalog of silvicultural point sources to be illustrative, not exhaustive. *See Forsgren,* 309 F.3d at 1188 n. 7. Even more recently, the Supreme Court held that "a point source need not be the original source of the pollution," thus confirming the correctness of this court's "point source" understanding. *See South Florida Water Mgmt. Dist. v. Miccosukee Tribe,* 541 U.S. 95, 124 S.Ct. 1537, 1543; Slip Op. at 7. To the extent any court "difference" exists, then, it is a difference is mandated by two notable sources (viz., the Ninth Circuit and the Supreme Court), and it does not justify immediate appellate review.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Ussery v. Allstate Fire and Casualty Insurance Company*

2016 WL 9131968
Only the Westlaw citation is currently available.
United States District Court,
M.D. Georgia, Macon Division.

Albert USSERY and the Estate of Miriam Ussery,
By and Through Adminstratrix Tammy Jean
Martin f/k/a Tammy Jean Ussery, Plaintiffs,
v.
ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY, Defendant.

CASE NO.: 5:13-CV-83 (LJA)
|
Signed 03/31/2016

**Attorneys and Law Firms**

Christy Crowe Childers, David Hamilton McCain, Jay
Clifford Traynham, Macon, GA, for Plaintiffs.

Melissa C. Patton, Marvin D. Dikeman, Atlanta, GA, for
Defendant.

**ORDER**

LESLIE J. ABRAMS, JUDGE

 *1  On December 14, 2015, the Court entered an Order
granting Plaintiff's Motion for Summary Judgment and
denying Defendant's Motion for Summary Judgment. (Doc.
32.) The Court, however, did not enter a final judgment
because the issue of bad faith damages had yet to be resolved.
Defendant has moved the Court to certify the Order for
an interlocutory appeal, contending that the Court erred in
applying the Georgia doctrine of judicial estoppel. (Doc. 33.)

Interlocutory appeals are governed by 28 U.S.C. § 1292(b),
pursuant to which the Court may certify an order for appeal if
it is "of the opinion that such order [1] involves a controlling
question of law [2] as to which there is substantial ground for
difference of opinion and [3] that an immediate appeal from
the order may materially advance the ultimate termination
of the litigation." 28 U.S.C. § 1292(b). Even when all these
factors are present, the court of appeals and the district have
discretion to deny a § 1292(b) appeal. See OFS Fitel, LLC
v. Epstein, Becker & Green, P.C., 549 F.3d 1344, 1358 (11th
Cir. 2008) (finding that "§ 1292(b) certification is wholly

discretionary with both the district court and this Court"). This
is because "interlocutory appeals are inherently disruptive,
time-consuming, and expensive ... and consequently are
generally disfavored." Prado-Steiman ex rel. Prado v. Bush,
221 F.3d 1266, 1276 (11th Cir. 2000). Indeed, "Section 1292
is intended to be used sparingly and only in exceptional cases
where a speedy appeal would avoid protracted litigation."
U.S., ex rel. Powell v. Am. InterContinental Univ., Inc., 756 F.
Supp. 2d 1374, 1378 (N.D. Ga. 2010).

Defendant has failed to establish that the Court's Order meets
the requirements for certification under Section 1292(b).
First, whether the doctrine of judicial estoppel, which is well-
settled under both Georgia and federal law, applies in this
case so as to preclude Plaintiff's claims does not constitute a
"controlling question of law" as contemplated by 28 U.S.C. §
1292(b). As the Eleventh Circuit held in McFarlin v. Conseco
Servs., LLC, 381 F.3d 1251, 1258 (11th Cir. 2004), "[t]he term
'question of law' does not mean the application of settled law
to fact."

Second, Defendant has failed to establish that there are
substantial grounds for a difference of opinion regarding the
application of Georgia's doctrine of judicial estoppel to the
facts of this case. The Eleventh Circuit has clearly stated that
in "a diversity case, the application of the doctrine of judicial
estoppel is governed by state law." Original Appalachian
Artworks, Inc. v. S. Diamond Associates, Inc., 44 F.3d 925,
930 (11th Cir. 1995); see also Chrysler Credit Corp. v.
Rebhan, 842 F.2d 1257, 1261 (11th Cir. 1988) ("Had this
case originated as a diversity action, it appears this court
would be bound to apply the relevant state formulation of
judicial estoppel."), abrogated on other grounds by Grogan
v. Garner, 498 U.S. 279 (1991). And, Georgia's doctrine of
judicial estoppel has been uniformly applied by district courts
in diversity cases in Georgia, including those where the prior
proceeding was a bankruptcy action. See, e.g., Job v. AirTran
Airways, Inc., No. 1:13-CV-2061, 2014 WL 414224, at *3
(N.D. Ga. Feb. 4, 2014); Tuten v. Target Corp., No. 4:14-
CV-3, 2014 WL 6908866, at *2 (S.D. Ga. Dec. 8, 2014).

 *2  Third, certifying the Order for appeal would not
materially advance the termination of this action. Discovery
in this case has concluded and all issues have been resolved,
but for the issue of bad faith damages. The best way to
avoid protracted litigation and numerous piecemeal appeals
is to proceed to trial on the sole issue remaining in this case.
After the trial on this limited issue, Defendant will have the
opportunity to appeal all issues in this case, rather than in

a piecemeal fashion. The Eleventh Circuit has discouraged allowing interlocutory appeals in cases such as this because, as "permitting piecemeal appeals is bad policy, permitting liberal use of § 1292(b) interlocutory appeals is bad policy." *McFarlin*, 381 F.3d at 1259. Therefore, the Court declines to do so here. Accordingly, Defendant's Motion for a Certificate of Appealability (Doc. 33) is **DENIED**. Trial in this matter will be set for October 17, 2016 in the Macon Division.

**SO ORDERED**, this 31st day of March, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 9131968

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Henriquez-Disla v. Allstate Property and Casualty Insurance Co. (E.D. Pa.)*

2014 WL 3887750
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Francis HENRIQUEZ–DISLA and Magalay Pacheco
v.
ALLSTATE PROPERTY AND
CASUALTY INSURANCE CO.

Civil Action No. 13–284.
|
Signed Aug. 7, 2014.

### MEMORANDUM AND ORDER

ELIZABETH T. HEY, United States Magistrate Judge.

**\*1** Allstate has sought reconsideration of this court's decision requiring it to produce partially unredacted claim logs to Plaintiffs in this bad faith/insurance fraud case. For the reasons that follow, I will grant the motion for reconsideration with respect to specific log entries identified in this memorandum, grant the request to certify the issue for an interlocutory appeal with respect to the log entries that I have ordered unredacted, and will stay further proceedings pending the Third Circuit's consideration.

The applicability and scope of the attorney-client privilege is at the heart of this discovery dispute. [1] Although Defendant provided redacted copies of the logs relevant to Plaintiffs' insurance claims, Plaintiffs sought unredacted versions of the logs as well as policy and procedural manuals used in Allstate's decision-making process. After reviewing the logs in camera, I ordered Allstate to produce partially unredacted versions of the logs, requiring production of those portions that reflected that counsel performed the ordinary business of claims investigation and not as counsel. [2] I also ordered the production of the policy and procedural manuals governing Allstate's coverage decisions and the course of the investigation, subject to a confidentiality agreement. [3] Allstate has filed a motion for reconsideration to correct what it considers to be a manifest error of law and to protect privileged material from production.

### I. LEGAL STANDARD

Motions to reconsider may be brought pursuant to Federal Rule of Civil Procedure 59(e) and Local Rule 7.1(i). The purpose of a motion to reconsider is to correct manifest errors of law or fact, or to present newly discovered evidence. *Harsco v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985), *cert. denied,* 476 U.S. 1171 (1986). A court should grant a motion to reconsider "only if the moving party establishes one of three grounds: (1) there is newly available evidence; (2) there is an intervening change in the controlling law; or (3) there is a need to correct a clear error of law or prevent manifest injustice." *Drake v. Steamfitters Local Union No. 420,* No. 97–585, 1998 WL 564486, at \*3 (E.D.Pa. Sept. 3, 1998), *aff'd,* 242 F.3d 370 (3d Cir.2000). Moreover, "[b]ecause federal courts have a strong interest in finality of judgments, motions for reconsideration should be granted sparingly." *Continental Cas. Co. v. Diversified Indus., Inc.,* 884 F.Supp. 937, 943 (E.D.Pa.1995). A motion to reconsider may not raise new arguments that could have (or should have) been made in the context of the original motion. *See Helfrich v. Lehigh Valley Hosp.,* No. 03–5793, 2005 WL 1715689 at \*3 (E.D.Pa. July 21, 2005) (citing *Balogun v. Alden Park Mgmt. Corp.,* No. 98–0612, 1998 WL 692956 at \*1 (E.D.Pa. Oct. 1, 1998)).

### II. DISCUSSION

Initially, it bears noting that Defendant does not appear to have examined the specific entries affected by my prior order. Rather, both now and in its initial redactions, Defendant appears to have taken an all-or-nothing approach to its redactions. Review of the logs in their entirety reveals that any entry mentioning counsel has been redacted without regard to the content of the entry. For example, Defendant redacted the entries stating that they hired Curtin and Heefner. *See* February 6, 2012 at 12:07 p.m., and 12:20 p.m. (Fire Claim Bates 29). Such information is clearly not privileged and this information was disclosed in counsel's discussions with Plaintiffs and in Defendant's own motion. The result of Allstate's redactions is that Defendant slashed with a sword that which should have been excised with a pen knife.

**\*2** Additionally, Defendant has not drawn any distinction with respect to the different bases for ordering the unredactions. For example, the original redactions on the two claim files contained an inconsistency with respect to two nearly identical entries, and I concluded that Defendant's failure to claim privilege as to one claim file required unredaction for the entry in the other claim file. *See* Doc. 31 at 7 n. 3. Defendant fails to address this or any other specific unredaction. Defendant's failure to analyze the specific entries at issue undermines its claim of privilege—wherein it has

2014 WL 3887750

the burden to show that each entry meets the elements of the attorney-client privilege.

A. *Nature of the Work Performed*

In my earlier opinion, I relied on a decision from the district court in Minnesota discussing the attorney-client privilege which drew a distinction between legal work done by attorneys and claims investigation performed by attorneys. *See Mission Nat'l Ins. Co. v. Lilly,* 112 F.R.D. 160 (D.Minn.1986) (privilege not applicable to fact investigation performed by attorney on behalf of carrier). The former was covered by the attorney-client privilege, while the latter was not. Although I have not found any case in Pennsylvania drawing this distinction, the district court in New Jersey has done the same. *See Cellco P'ship v. Certain Underwriters at Lloyd's London,* No. 05–3158, 2006 WL 1320067, at *4 (D.N.J. May 12, 2006) (review of the documents revealed counsel provided legal advice not claims investigation).

Recognizing that Pennsylvania courts would likely draw the same distinction, Allstate argues that it never hired Curtin and Heefner for anything other than legal services. Counsel has attached an affidavit from Holly Kelly, a claims adjuster assigned to Plaintiffs' claims, in which Ms. Kelly states that Allstate retained Curtin and Heefner "to render legal services including the taking of Plaintiffs' Examinations Under Oath ["EUO"] to ultimately render legal/coverage opinions," and also states that "[a]t no time, did Defendant retain Curtin & Heefner LLP as a 'Claims Investigator' or to perform any non-legal claim related functions." Doc. 35–1 ¶¶ 4–5.[4] However, the log entries belie the affidavit.[5] Without disclosing their contents, review of the redacted log entries reveals that they contain direction to conduct routine investigation, whether to be done by counsel or by a claims representative, *see e.g.,* February 8, 2012, at 5:41 p.m. (Fire Claim Bates 200);[6] contain notations on the efforts to schedule the EUO's, *see e.g.,* March 7, 2012 at 12:52 p.m. (Fire Claim Bates 192); March 20, 2012 at 1:27 p.m. and 3:54 p.m. (Fire Claim Bates 191), April 5, 2012 at 8:14 a.m. (Fire Claim Bates 189), and memorialize efforts to pursue subrogation and direction to counsel to retain a cause and origin specialist to determine the cause of the fire. *See e.g.,* February 3, 2012 at 9:08 a.m. (Fire Claim Bates 30); January 25, 2012 at 3:06 p.m. (Fire Claim Bates 39).[7] As explained in my earlier opinion, such activities (investigating subrogation possibilities, determining the cause of the fire, gathering background information on the claimants, and arranging for EUO's) are ordinary business functions in claims investigation. The fact that they were performed by an attorney at the behest of a claims adjuster does not change the character of the activity—basic claims investigation.[8]

**\*3** In support of its argument that all of the redacted information is protected by the attorney-client privilege, Allstate relies on a 1996 opinion from the Honorable R. Stanton Wettick, Jr., of the Court of Common Pleas of Allegheny County. *See* Doc. 34–2 at 1 (quoting *Mueller v. Nationwide Mut. I ns. Co.,* 31 Pa. D. & C.4th 23, 41–42 (Allegheny Com. Pl.1996)). In the excerpt of the opinion quoted by Allstate, Judge Wettick extolls the benefits of insurance companies hiring counsel in the decisionmaking process and cautions that open and honest exchanges between company and counsel are less likely if such communications are discoverable. *See Mueller,* 31 Pa. D. & C.4th at 41–42. What Allstate fails to acknowledge is that earlier in the opinion Judge Wettick noted that the privilege applies only when, in connection with the communication in question, the lawyer is acting as a lawyer. *Id.* at 31. "The *sine qua non* of any claim of privilege is that the information sought to be shielded is legal advice." *United States v. Rockwell Intern.,* 897 F.2d 1255, 1264 (3d Cir.1990).

Guided by Judge Wettick's reasoning encouraging open and honest exchanges between counsel and the insurance company, I have again reviewed the log entries that I previously ordered unredacted and will grant Defendant's motion for reconsideration with respect to eight of them. I believe an argument can be made that Allstate and counsel were participating in the type of information exchange Judge Wettick discussed with respect to these eight entries. Each entry pertains to an actual or contemplated communication with counsel and can be read to touch on strategy or thought process, rather than solely directing an item of basic claims investigation. Therefore, I vacate my prior decision with respect to the following log entries:

January 26, 2012 at 12:06 p.m. (Fire Claim Bates 37),

Email dated February 10, 2012 at 10:26 a.m. (Fire Claim Bates 48),

May 2, 2012 at 9:03 a.m. (Fire Claim Bates 187),

March 19, 2012 at 9:55 a.m. (Fire Claim Bates 191),

February 10, 2012 at 12:41 p.m. (Fire Claim Bates 198),

Case 1:20-cv-00292-JPW   Document 240-1   Filed 07/22/22   Page 49 of 54
Henriquez-Disla v. Allstate Property and Cas. Ins. Co., Not Reported in F.Supp.3d (2014)
2014 WL 3887750

February 8, 2012 at 5:41 p.m. (Fire Claim Bates 200) (In the fifth paragraph of the entry, the first line to the comma in the second line remains redacted. The remainder of that paragraph should be unredacted.),

March 12, 2012 at 1:23 p.m. (Theft Claim Bates 63), and

May 2, 2012 at 9:02 a.m. (Theft Claim Bates 65).

The redacted portions of these log entries shall remain redacted unless specified otherwise.

### B. *Waiver of Privilege*

In the response to the motion for reconsideration, Plaintiffs argue that Defendant has waived the privilege by placing the advice of counsel at issue. Doc. 39. In defending Plaintiffs' bad faith claim, Allstate pled as a defense that "Allstate's alleged withholding of any benefits at issue was made in good faith and was reasonable." Doc. 17 ¶ 62. Because the decision-maker identified by Allstate (Ms. Kelly) has stated in her affidavit that counsel was hired to render legal and coverage decisions, see Doc. 35–1, Plaintiffs argue that Allstate placed counsel's advice in issue and cannot now shield that advice by the attorney-client privilege. Doc. 39 at 2–3. Allstate argues that it has not waived the privilege and has not placed the advice of counsel at issue in the case. Doc. 34–2 at 4.

**\*4** A party to a lawsuit may waive the attorney-client privilege by asserting claims or defenses that put the attorney's advice in issue in the litigation. *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.,* 32 F.3d 851, 863 (3d Cir.1994).

> However, advice is not placed in issue merely because it is relevant.... A waiver can be found only where a client has made the decision and taken an affirmative step in the litigation to place the advice of attorney in issue.... This occurs where the client attempts to prove a claim or defense by disclosing or describing an attorney client communication.
>
> ....

*Saltern v. Nor–Car Fed. Credit Union,* Civ. No. 02–7175, 2003 WL 21250578, at \*1 (E.D.Pa. Apr. 17, 2003) (citing *Rhone–Poulenc,* 32 F.3d at 863). *Rhone–Poulenc* teaches that the advice of counsel "does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner." 32 F.3d at 863. Only when the client "asserts a claim or defense, and attempts to prove

that claim or defense by disclosing or describing an attorney client communication," does the client waive the attorney-client privilege. *Id.*

In *Saltern,* the Honorable Jacob Hart of this court found that the defendant's production of a document referring to the company's president having consulted with an attorney was insufficient to waive the attorney-client privilege. Similarly in *Fidelity and Deposit Co. v. McCulloch,* 168 F.R.D. 516 (E.D.Pa.1996), upon which Judge Hart relied, the Honorable J. Curtis Joyner found that the plaintiff had not waived the privilege even when documents produced in discovery established that the plaintiff's "state of mind (to the extent that a corporation can have one) was affected in a relevant manner by the advice of its outside counsel." Relying on *Rhone–Poulenc,* Judge Joyner concluded "this simply does not amount to a waiver." *Id.* at 519.

In this case, Plaintiff pieces together two allegations to tailor the waiver of privilege. First, answering the allegations of bad faith in the complaint, Allstate stated that it had acted in good faith. *See* Doc. 17 ¶ 62. Second, in Ms. Kelly's affidavit regarding the attorney-client privilege, she stated that Allstate retained counsel to render legal services including coverage opinions. Doc. 35–1 ¶ 4. At no point has Allstate asserted the advice of counsel as a defense. Although Ms. Kelly's affidavit suggests that counsel may have affected Allstate's state of mind, as Judge Joyner so aptly put it, "this simply does not amount to a waiver" of the privilege. *McCulloch,* 168 F.R.D. at 519. Therefore, I reject Plaintiffs' theory of wholesale waiver.

### C. *Certification for Interlocutory Appeal*

Finally, Defendant asks this court to certify the memorandum and order for interlocutory appeal. Doc. 34–2 at 9. Section 1292(b) of Title 28 of the United States Code provides in relevant part:

> **\*5** When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate

Henriquez-Disla v. Allstate Property and Cas. Ins. Co., Not Reported in F.Supp.3d (2014)
2014 WL 3887750

termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b). The statute requires that three elements be present to grant the certification for interlocutory appeal: (1) the order at issue involves a controlling issue of law; (2) substantial ground for difference of opinion exists regarding the resolution of the issue; and (3) an immediate appeal will materially advance the ultimate termination of the litigation. *Katz v. Carte Blanche Corp* . 496 F.2d 747, 754–55 (3d Cir.1974). The burden is on the party seeking certification to establish that "exceptional circumstances justify a departure from the basic policy against piecemeal litigation and of postponing appellate review until after the entry of final judgment." *Hall v. Wyeth, Inc.,* No. 10–738, 2010 WL 4925258, at *1 (E.D.Pa. Dec. 2, 2010) (quoting *L.R. v. Manheim Twp. Sch. Dist.,* 540 F.Supp.2d 603, 608 (E.D.Pa.2008)).

A controlling issue of law is one in which either, if decided erroneously, would lead to reversal on appeal, or is "serious to the conduct of the litigation either practically or legally." *Hall,* 2010 WL 4925258, at *1 (quoting *Katz,* 496 F.2d at 755). Here, at the discovery phase, disclosure of allegedly privileged information is serious to the conduct of the litigation. If the case proceeded in the ordinary course and post-trial Allstate succeeded in challenging this court's pretrial ruling, a second trial could be required and privileged information would have been improperly revealed. Saving judicial time and the resources of the litigants have been recognized as relevant factors in the analysis. *Id.*

"Substantial grounds for difference of opinion exist where there is genuine doubt or conflicting precedent as to the correct legal standard." *Hall,* 2010 WL 4925258, at *1 (quoting *Bradburn Parent Teacher Store, Inc. v. 3M,* Civ. No. 02–7676, 2005 WL 1819969, at *4 (E.D.Pa. Aug. 2, 2005)). Although I am of the opinion, like the courts in *Mission National* and *Cellco,* that log entries regarding basic claims investigation performed by counsel are not protected, I have found no Pennsylvania case drawing this distinction and Judge Wettick's opinion did not specifically address this issue, other than to acknowledge the basic tenet that, for the communication to be protected, the attorney must be acting as a lawyer. *Mueller,* 31 Pa. D. & C.4th at 31. Under the circumstances, direction from the Court of Appeals is appropriate.

Although the Supreme Court has concluded that postjudgment appeals "generally suffice to protect the rights of litigants and ensure the vitality of the attorney-client privilege," the Court has noted that interlocutory appeal pursuant to section 1292(b) is available for "a particularly injurious or novel privilege ruling." *Mohawk Indus., Inc. v. Carpenter,* 558 U.S. 100, 109–10 (2009). Considering the dearth of caselaw regarding the applicability of the attorney-client privilege to basic claims investigatory work and the lack of a suitable definition for that work, I believe this case presents a novel privilege ruling in this district and circuit, qualifying for interlocutory appeal.

**\*6** Finally, the court must consider whether an interlocutory appeal would materially advance the termination of this litigation. Although the need for a trial will not be affected by an interlocutory appeal, the course of discovery and the ensuing trial would be affected. Once this issue is resolved, discovery will likely proceed more expeditiously. Although I recognize the hazard of permitting piecemeal litigation, considering the early stage at which the case is, I will grant certification as all three factors have been met. I will also grant Allstate's request for a stay of proceedings pending the appeal, with the exception of Allstate's production of manuals previously ordered. The issue certified for interlocutory appeal impacts the discovery in the matter and it would be counterproductive to proceed without resolution of this underlying issue.

An appropriate order follows.

### *ORDER*

AND NOW, this 7th day of August, 2014, upon consideration of Defendant's motion for reconsideration (Doc. 34–2) and the response, thereto (Doc. 39), IT IS HEREBY ORDERED that the motion is GRANTED IN PART and DENIED IN PART. Defendant's request for reconsideration of this court's Order dated May 29, 2014, is GRANTED. The following log entries which I previously ordered unredacted, shall remain redacted:

January 26, 2012 at 12:06 p.m. (Fire Claim Bates 37),

Email dated February 10, 2012 at 10:26 a.m. (Fire Claim Bates 48),

May 2, 2012 at 9:03 a.m. (Fire Claim Bates 187),

March 19, 2012 at 9:55 a.m. (Fire Claim Bates 191),

February 10, 2012 at 12:41 p.m. (Fire Claim Bates 198),

February 8, 2012 at 5:41 p.m. (Fire Claim Bates 200) (In the fifth paragraph of the entry, the first line to the comma in the second line remains redacted. The remainder of that paragraph should be unredacted.),

March 12, 2012 at 1:23 p.m. (Theft Claim Bates 63), and

May 2, 2012 at 9:02 a.m. (Theft Claim Bates 65).
Defendant's request for certification for interlocutory appeal is GRANTED and IT IS FURTHER ORDERED that this Court's order of May 29, 2014, is certified for interlocutory appeal. The court certifies the following question as a controlling question of law, as to which there is a difference of opinion, and as to which an immediate appeal will expedite the resolution of this litigation:

Are the log entries which this court found to relate to basic claims investigation and ordered unredacted subject to the attorney-client privilege?

IT IS FURTHER ORDERED that the proceedings in this action are STAYED pending resolution by the Third Circuit Court of Appeals with the exception of Allstate's production of manuals previously ordered.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3887750

## Footnotes

1    In the privilege logs, Defendant identifies certain entries as "Attorney Client Privilege or Work Product Doctrine." However, throughout the response to the motion to compel and in seeking reconsideration, Allstate relies solely on the attorney client privilege.

2    Throughout its motion for reconsideration, Allstate frames the question at issue as "whether the attorney-client privilege applies to legal services provided by a law firm to a client and also relates to subrogation issues." Doc. 34–2 at 11. If the log entries revealed that the attorney retained in this case was acting as legal counsel and not as a claims investigator, I would agree.

3    Allstate's motion for reconsideration is dedicated to the log entries, focusing on the relationship between Allstate and its counsel. Despite this fact, it appears that Defendant has failed to comply with the remainder of my May 29 ruling, requiring the production of the portions of claims manuals and policies which informed Allstate's coverage decision and the course of the investigation. *See* Docs. 36 & 38. In Allstate's most recent filing, Doc. 41, it explains that it is working to obtain the manuals ordered produced in my earlier ruling. Although I entered an order staying discovery on July 30, 2014, *see* Doc. 44, I direct that the manuals be produced without respect to the stay, in light of my earlier ruling.

4    Although Allstate argued in response to Plaintiffs' motion to compel that Curtin and Heefner had been retained in a legal capacity with no involvement in claims investigation, *see* Doc. 29 ¶ 20, Allstate did not include the affidavit in its original response; instead attaching it to the motion for reconsideration in the first instance. No affidavit has been submitted with respect to communications with attorneys of White and Williams, who were hired to pursue subrogation.

5    In Allstate's motion for reconsideration, they focus on this court's notation that counsel was hired early in the claims process. Although the timing of counsel's entry onto the claims scene was one factor I considered in determining whether counsel was providing legal advice or acting as a claims investigator (counsel retained

2014 WL 3887750

to conduct EUO on February 6, 2012, and denial letter prepared October 15, 2012), the log entries were the primary reason I determined that counsel's activities were related to claims investigation.

6    This entry poses a problem. This entry contains the notes made by a claims manager to a claims representative. To the extent it contains a directive to counsel to obtain specific information during the EUO, that directive may be subject to the attorney-client privilege. The remainder of the entry involves direction regarding other avenues of investigation. It appears that this additional investigation is directed to the claims representative and the claims manager is requesting basic investigation be done. Therefore, I will vacate the prior order unredacting the first line of this entry to the comma. *See* February 8, 2012 at 5:41 p.m. (Fire Claim Bates 199–200).

7    Despite the fact that Allstate considers direction to counsel to hire a cause and origin specialist to be privileged, the cause and origin specialist's conclusions were not redacted. *See* February 28, 2012 at 1:25 p.m. (Fire Claim Bates 194) (reciting cause and origin specialist's conclusions).

8    Similarly, to the extent Allstate attempts to distinguish the cases upon which I relied by arguing that the lawyers in those cases were retained to conduct investigation, I reject the argument. I will not be guided by the label attached by Defendant. Rather, I am guided by the character of the work—sustaining the redaction of entries relating to legal work, while ordering the disclosure of the entries related to basic claims investigation.

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Henriquez-Disla v. Allstate Property and Casualty Insurance Co. (3d Cir.)*

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

September 17, 2014
ACO-127

No. 14-8108

FRANCIS HENRIQUEZ-DISLA;
MAGALAY PACHECO

v.

ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY.
Petitioner

(E.D. Pa. No. 13-cv-00284)

Present:  RENDELL, FISHER and GREENAWAY, JR., Circuit Judges

1. Petition for Permission to Appeal under 28 U.S.C. Section 1292(b)
by Petitioner Allstate Property & Casualty Insurance Co.;

2. Opposition to Petition for Permission to Appeal or in the Alternative
Cross-Petition for Permission to Appeal by Respondents Francis
Henriquez-Disla and Magalay Pacheco;

3. Allstate Property & Casualty Insurance Co.'s Opposition to Respondent's
Cross-Petition for Remission to Appeal.

Respectfully,
Clerk/tmk

_____ORDER_____

The foregoing motion is denied.

By the Court,

s/Joseph A. Greenaway, Jr.
Circuit Judge

Dated: October 8, 2014
CLW/TMK/cc: ALL COUNSEL OF RECORD

**A True Copy:**

Marcia M. Waldron

Marcia M. Waldron, Clerk