*EXHIBIT "E"*

2022 WL 2901015
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

AVCO CORPORATION, Appellant

v.

Veronica W. Saltz TURNER

No. 21-2750
|
Argued on June 15, 2022
|
(Filed: July 22, 2022)

On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. No. 2-20-cv-04073), District Judge: Honorable Joshua D. Wolson

**Attorneys and Law Firms**

Nicole Benjamin [ARGUED], John A. Tarantino, Adler Pollock & Sheehan, One Citizens Plaza, 8th Floor, Providence, RI 02903, Counsel for Appellant

Wayne A. Ely [ARGUED], 59 Andrea Drive, Richboro, PA 18954, Counsel for Appellee

Before: HARDIMAN, SMITH and FISHER, Circuit Judges.

OPINION[*]

FISHER, Circuit Judge.

**\*1** Lycoming Engines, a division of Avco Corporation, manufactures engines for what are often called small or private airplanes. Attorney Veronica Saltz Turner defended Avco and Lycoming in product liability lawsuits. But after her relationship with them ended, she performed legal work on behalf of the plaintiffs in *Torres v. Honeywell, Inc.*,[1] a lawsuit involving a plane with a Lycoming engine. Avco sued Turner for breach of fiduciary duty. It sought damages, disgorgement, and declaratory and injunctive relief. The District Court entered summary judgment for Turner. Avco appeals. We will vacate in part and remand for further proceedings.[2]

Under Pennsylvania law,[3] "an attorney owes a fiduciary duty to his client; [this] duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest."[4] "[A] lawyer [may] not undertake a representation adverse to a former client in a matter 'substantially related' to that in which the lawyer previously had served the client."[5] We have explained that the duty "is not merely a matter of revealing or using the client's confidences and secrets, but of a duty of continuing loyalty to the client."[6]

A plaintiff bringing a claim for breach of fiduciary duty must establish: (1) a fiduciary relationship existed, (2) the defendant "negligently or intentionally failed to act in good faith and solely for [the plaintiff's] benefit," and (3) the breach caused an injury to the plaintiff.[7]

### A. The Breach of Fiduciary Duty Claim

**\*2** The District Court held that, even assuming there was a genuine factual dispute about the existence and breach of a fiduciary duty, Avco did not establish a triable issue of fact with regard to an "actionable injury." J.A. 16. The type of injury a plaintiff must establish, however, depends on the type of remedy sought. We consider, in turn, the kinds of monetary remedies at issue: disgorgement, compensatory damages, attorney's fees and costs, and nominal damages.

#### 1. Disgorgement

Avco argues that under Pennsylvania law, it does not need to show a separate injury, apart from the fiduciary breach, to be entitled to disgorgement. We agree. In *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, the Pepper Hamilton law firm represented Maritrans for many years and "came to know [its] complete inner[ ] workings" and "competitive strategies."[8] "Armed with this information," Pepper began representing four of Maritrans' competitors in similar matters.[9] Maritrans sued Pepper, requesting injunctive relief and compensatory and punitive damages.[10] The Pennsylvania Supreme Court held that Maritrans was entitled to a preliminary injunction.[11]

The Court went on to observe that "[c]ourts throughout the country have ordered the disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interests."[12] The Court quoted with approval the United States Supreme Court's holding that a fiduciary laboring under a conflict "may not perfect [her] claim to

compensation by insisting that although [she] had conflicting interests, [she] served [her] several masters equally well." [13] In other words, an attorney may not argue that she should be paid because her conflict of interest did not hurt her client. Avco is correct that in such a situation, the client is entitled to "disgorgement or forfeiture of fees for services rendered." [14] The client need not show injury beyond the breach of fiduciary duty itself. [15]

In *Maritrans*, only the preliminary injunction was at issue, so the disgorgement discussion could be characterized as dicta. If so, it is "considered dicta." [16] The Pennsylvania Supreme Court was not musing about hypotheticals, but explaining the remedies available to Maritrans on remand. This is persuasive evidence of how the Court would rule on damages here. [17]

**\*3** Turner argues Avco is not entitled to disgorgement because it did not pay her for her work in the *Torres* case and "[a] party cannot seek disgorgement of monies it has not paid." [18] But disgorgement need not be a refund of fees paid; it can, for example, consist of an accounting of profits wrongfully made. [19] According to its definition, after all, disgorgement centers on the wrongdoer's gain, not the plaintiff's loss: it is "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." [20]

Thus, the District Court erred by holding Turner was entitled to summary judgment on the breach of fiduciary duty claim without addressing disgorgement.

### 2. Compensatory Damages

The District Court did not err in holding that Avco failed to create a triable issue with regard to compensatory damages. In *Maritrans*, the Pennsylvania Supreme Court held that a client may receive compensatory damages "for an attorney's breach of his fiduciary duties by engaging in conflicts of interest." [21] In support, the Court cited two California cases where clients suffered identifiable financial losses due to their attorneys' fiduciary breaches. [22] Avco similarly would be entitled to compensatory damages if it could demonstrate pecuniary harm due to Turner's alleged breach.

Avco argues there is a genuine issue of material fact on compensatory damages because Turner "was provided with a wide array of confidential and trade secret information," "worked with [Avco's] experts," and "prepared ... motions submitted on behalf of the plaintiffs in *Torres*." [23] Those facts create the possibility of injury and damages. But "summary judgment is essentially 'put up or shut up' time." [24] It is not enough for Avco to say it "cannot know the full extent of the harm caused by Ms. Turner's representation of the *Torres* plaintiffs." [25] With discovery complete, Avco must "point to some evidence in the record that creates a genuine issue of material fact" regarding identifiable compensatory damages. [26] It has not done so.

### 3. Attorney's Fees and Costs

**\*4** The District Court did not err in holding that Avco may not recover, as compensatory damages, the attorney's fees and costs it has incurred in this litigation. Avco attacks this holding by citing state cases from outside Pennsylvania and a few federal court cases. But "reliance on cases from non-Pennsylvania jurisdictions ... is misplaced, as those cases ... do not bind the Pennsylvania Supreme Court." [27] Indeed, the Pennsylvania Supreme Court has "consistently reaffirmed" the American Rule: "in this Commonwealth, a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." [28] Avco's four federal district court cases do not show otherwise. One of them, *Fidelity Bank v. Commonwealth Marine & General Assurance Co.*, awards attorney's fees without citing any authority. [29] The other three cases cite *Fidelity* or one another. [30]

In sum, there is no indication that, in a case like this, the Pennsylvania Supreme Court would depart from its faithful adherence to the American Rule.

### 4. Nominal Damages

Avco argues that an attorney's breach of fiduciary duty creates an entitlement to nominal damages. Avco did not plead entitlement to such damages in its complaint or address their availability at summary judgment. "[A]rguments asserted for the first time on appeal ... are not susceptible of review in this Court absent exceptional circumstances," such as when "the public interest requires that the issue[ ] be heard or manifest

Case 1:20-cv-00292-JPW   Document 258-5   Filed 08/30/22   Page 4 of 39

Avco Corporation v. Turner, Not Reported in Fed. Rptr. (2022)

injustice would result from the failure to consider [it]." [31] Avco has not argued there are exceptional circumstances, and we do not perceive any.

### B. The Permanent Injunction

Avco requested an injunction prohibiting Turner from "provid[ing] legal services to any person ... materially adverse to Avco in matters" involving issues "substantially related or similar to [those raised in] Turner's past representation of Avco." [32] To obtain a permanent injunction, a party must (among other requirements) prevail on the merits. [33] Before the District Court, Avco lost on its injunction request for the same reason it lost on summary judgment: because the District Court concluded it had not shown a material factual issue regarding injury. On appeal, Avco argues that the Court "erred in determining that Ms. Turner was entitled to summary judgment on both Avco's claim for breach of fiduciary duty and its related claim for injunctive relief because Avco had not 'established an actionable injury.' " [34] Since we will vacate the summary judgment, we will also vacate the permanent injunction ruling that flowed from it.

### C. Conclusion

To survive summary judgment, Avco needed to demonstrate a factual dispute regarding each element of its claim: a fiduciary relationship, a breach, and an injury. The District Court reached only the injury prong and granted summary judgment because it concluded Avco had not suffered a cognizable injury. That was error. The District Court will need to consider, on remand, the claim for disgorgement and whether Avco has carried its burden on the other two elements of the claim.

**\*5** For the reasons explained, we will vacate the entry of summary judgment on the breach of fiduciary duty claim, vacate the denial of injunctive relief, and remand for further proceedings.

### All Citations

Not Reported in Fed. Rptr., 2022 WL 2901015

### Footnotes

\*      This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1      No. CV2017-007542 (Ariz. Super. Ct. Maricopa Cnty.).

2      The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity). We have jurisdiction under 28 U.S.C. § 1291 (final decisions of district courts). We review a district court's grant of summary judgment on a plenary basis. *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020). We generally review a grant or denial of a permanent injunction for abuse of discretion, but where an injunction is denied because of the entry of summary judgment, "we must determine whether the District Court erred in granting summary judgment."

       *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 819 (3d Cir.), *as amended* (May 5, 2006). Avco does not appeal the denial of its request for a declaratory judgment.

3      The District Court and the parties have applied Pennsylvania law, and we will as well. *See* *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316–17 (3d Cir. 2014) (holding that argument regarding choice of law may be waived).

4      *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1283 (Pa. 1992).

Case 1:20-cv-00292-JPW    Document 258-5    Filed 08/30/22    Page 5 of 39

Avco Corporation v. Turner, Not Reported in Fed. Rptr. (2022)

5    *Id.* at 1284 (quoting ⚑*Consol. Theatres v. Warner Bros. Cir. Mgmt. Corp.*, 216 F.2d 920, 924 (2d Cir. 1954)).

6    ⚑*In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 161–62 (3d Cir. 1984) (holding that, where a law firm represented two plaintiffs whose positions had become adverse, the firm could not withdraw from representing one and continue representing the other). *Corn Derivatives* concerned ABA Model Rule of Professional Conduct 1.9(a), which is essentially identical to Pennsylvania Rule of Professional Conduct 1.9(a).

7    *Snyder v. Crusader Servicing Corp.*, 231 A.3d 20, 31 (Pa. Super. Ct. 2020).

8    ⚑602 A.2d at 1280.

9    *Id.*

10   *Id.* at 1279.

11   *Id.* at 1287.

12   *Id.* at 1285 (collecting cases from state courts in Florida, Minnesota, New York, and California and federal courts in the District of Columbia).

13   *Id.* at 1286 (quoting ⚑*Woods v. City Nat'l Bank & Trust Co. of Chi.*, 312 U.S. 262, 269 (1941)).

14   *Id.* at 1285.

15   *See* ⚑*Maritrans*, 602 A.2d at 1285, citing, among other cases, ⚑*Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209, 212 (Minn. 1984) ("[I]f the attorney breaches his or her fiduciary duty to the client, the client is deemed injured even if no actual loss results" and "is entitled to recover, as damages, the compensation paid [to the attorney]."); *Zeiden v. Oliphant*, 54 N.Y.S.2d 27, 28–29 (N.Y. Sup. Ct. 1945) ("It is true that plaintiff suffered no real injury or damage for she had no valid claim .... [and] the information disclosed would not seem particularly secret or confidential for the matter was a public court record...." But because the lawyer "did, at least technically, pre-empt to himself an opportunity for profit that plaintiff herself might conceivably have utilized," he was "not ... permitted to retain any personal profit.").

16   ⚑*McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980).

17   *See id.* (when forecasting state law, we consider "any ... reliable data tending convincingly to show how the highest court in the state would decide the issue at hand," including "relevant state precedents, analogous decisions, [and] considered dicta").

18   Appellee's Br. 17.

19   *See, e.g.,* ⚑*Boyd v. Cooper*, 410 A.2d 860, 861 (Pa. Super. Ct. 1979). One of Avco's key cases supports the conclusion that disgorgement is not limited to a refund of fees to the client. In that case, the Reed Smith law firm had a conflict of interest because it represented first Axcan and later a party adverse to Axcan. *Axcan Scandipharm, Inc. v. Reed Smith, LLP*, 2007 Phila. Com. Pl. LEXIS 78, at *2 (Pa. Com. Pl. Mar. 26, 2007). Axcan sued, demanding disgorgement of Reed Smith's fees. *Id.* However, the fees had been paid on Axcan's behalf by a third party. *Id.* at *12-13. Disgorgement of the entire fee would result in a windfall to Axcan, so Axcan was entitled to disgorgement only of "Reed Smith's net profit resulting from its alleged breach of fiduciary duty." *Id.* at *15.

We generally do not look to trial court decisions to determine state law. *See Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 84 (3d Cir. 2018). We mention *Axcan* because Avco relies on it heavily and the District Court discussed it.

20    *Disgorgement, Black's Law Dictionary* (11th ed. 2019).

21    602 A.2d at 1286.

22    *See* Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg, 216 Cal. App. 3d 1139, 1146–49, 1154 (1989) (law firm bought real estate it knew the client wanted to acquire); *David Welch Co. v. Erskine & Tulley*, 203 Cal. App. 3d 884, 889 (1988) (law firm competed with its former client to win collections contracts), *overruled by* Lee v. Hanley, 354 P.3d 334, 343–44 (Cal. 2015).

23    Appellant's Br. 30.

24    *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

25    Reply Br. 10.

26    *See* Berckeley, 455 F.3d at 201.

27    *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 227–28 (3d Cir. 2008).

28    *Lavelle v. Koch*, 617 A.2d 319, 323 (Pa. 1992).

29    592 F. Supp. 513, 529–30 (E.D. Pa. 1984).

30    *Airgas, Inc. v. Cravath, Swaine & Moore LLP*, 2010 WL 3046586, at *6 (E.D. Pa. Aug. 3, 2010) (citing *Fidelity*); *Tress v. AXA Advisors, LLC*, 2013 WL 12248219, at *4 (E.D. Pa. June 6, 2013) (citing *Airgas*); *NBN Broad., Inc. v. Sheridan Broad. Networks, Inc.*, 2015 WL 1489902, at *4 (W.D. Pa. Mar. 31, 2015) (citing *Airgas* and *Fidelity*).

31    *Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001).

32    J.A. 47.

33    *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (citing eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006)).

34    Appellant's Br. 16 (quoting J.A. 16).

End of Document                                         © 2022 Thomson Reuters. No claim to original U.S. Government Works.

J.W. Hall, Inc. v. Nalli, Not Reported in Atl. Rptr. (2017)

2017 WL 626715
Only the Westlaw citation is currently available.
**NON–PRECEDENTIAL DECISION—
SEE SUPERIOR COURT I.O.P. 65.37**
Superior Court of Pennsylvania.

J.W. HALL, INC., a Corporation Appellant
v.
Michael W. NALLI, Esquire and Michael W. Nalli, P.C.

No. 771 WDA 2016
|
FILED FEBRUARY 15, 2017

Appeal from the Judgment Entered April 25, 2016, In the Court of Common Pleas of Beaver County, Civil Division at No(s): 11132–2013

BEFORE: GANTMAN, P.J., MOULTON, J., STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:

**\*1** J.W. Hall, Inc. appeals from the order entered by the Court of Common Pleas of Beaver County granting summary judgment in favor of Michael W. Nalli, Esq. and Michael W. Nalli, P.C., Defendants/Appellees in a legal malpractice action brought by Appellant. We affirm.

In its Opinion, the trial court set forth the relevant factual and procedural history as follows:

> The [present] action arises as the result of a sale of a restaurant and liquor license for an establishment located in Hopewell Township, Beaver County, Pennsylvania, in 2011. Defendant Michael W. Nalli drafted the purchase agreement, and the claims arise from that transaction. Plaintiff [J.W. Hall, Inc.,] asserts that it was represented by Nalli in that transaction and, further, that as a result of that representation, negligence occurred that caused plaintiff [J.W. Hall, Inc.,] to incur losses after the purchasing entity, J.B. Culinary Enterprises, Inc., defaulted on its obligations under the purchase agreement and went into bankruptcy.

> \* \* \* \*

> The pleadings and discovery ... give rise to the facts that are discussed herein. Commencing in the spring of 2011, an individual by the name of Jeffrey Belsky (hereinafter "Belsky") entered into negotiations with Joseph Hall

(hereinafter "Hall"), president of plaintiff, J.W. Hall, Inc.,[ ] in an attempt to purchase J.W. Hall's Steak and Seafood Inn located in Hopewell Township, Beaver County, Pennsylvania. The parties initially haggled over the price and ultimately agreed on $800,000 as the purchase price.

Belsky thereafter contacted attorney Michael Nalli, whose office was, and is, located in Center Township, Beaver County, for the purpose of incorporating J.B. Culinary Enterprises, Inc. (hereinafter "J.B. Culinary") to operate the restaurant after sale and to draft the purchase agreement. Attorney Nalli provided Belsky with an engagement letter, which Belsky signed.

Shortly thereafter, Belsky and Hall met at Attorney Nalli's office to discuss a draft of the purchase agreement on June 23, 2011. At that meeting, Attorney Nalli asked Hall if he had an attorney, to which Hall responded "No, Mike, I don't. You can take care of this, can't you?" There is a reference in the record that Nalli responded "Sure, Joe, no problem." It should also be noted that there are several references in the record to confirm that Hall and Belsky shared the expense of Attorney Nalli's legal fees for preparing the documents.

Following this meeting, Attorney Nalli made revisions to the purchase agreement, and sent an email to Belsky regarding what would happen in the event of a default on the agreement. The email stated that the purchase agreement would include a provision for an unsecured note so that [J.W. Hall, Inc.] could not simply take back the collateral in the event of a default.

Hall contacted his son, a tenured professor at Harvard Business School, regarding the proposed agreement. His son reviewed the agreement and raised questions regarding re-purchasing the property in the event of default and potential tax implications. In July of 2011, Belsky and Hall finalized the agreement on behalf of their respective companies for the purchase price of $800,000. The sum of $225,000 was to be paid up-front and the remaining $575,000 was to be paid in monthly increments of $5,761.05. After execution of the agreement, the liquor license was transferred and J.B. Culinary began to operate the establishment.

**\*2** After J.B. Culinary assumed operation of the restaurant, it made some improvements. J.B. Culinary operated the restaurant and made approximately 14 monthly installment payments, but the payments stopped

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

in December of 2012. J.B. Culinary sought to renegotiate the monthly payments, but Hall declined that offer. Both parties to this action agree that Hall contacted defendant Nalli about the situation, and Nalli stated he could not do anything for Hall because he was representing Belsky.

J.B. Culinary filed for bankruptcy, and Hall created a new entity, JoeWillRoger, LLC, which purchased the restaurant [out of bankruptcy] for $178,000. Hall also claims to have spent $75,000 in legal fees for counsel to represent him in the repurchase, but only $56,394.24 in fees can actually be documented and accounted for, all of which were paid by personal checks of Hall and his wife or by the account of JoeWillRoger, LLC. Hall also, either personally or through the new entity, JoeWillRoger, LLC, expended approximately $50,000 to $60,000 for renovations to the restaurant in connection with reopening it [ ].

Trial Court Opinion, 4/25/16, at 1–4.

On September 30, 2013, J.W. Hall, Inc., commenced a legal malpractice and breach of fiduciary duty action against Attorney Nalli and his professional corporation. Among the averments in the complaint were that Defendants/Appellees knew J.W. Hall, Inc., relied solely on them to facilitate the closing with J.B. Culinary, failed to discuss or include in the purchase agreement the personal guaranty of Belsky as guarantor for the loan in the event of default, and failed to prepare and file a UCC–1 financing statement in order to perfect J.W. Hall, Inc.'s, security interest in the restaurant/ business as collateral. With respect to the last averment, J.W. Hall, Inc., computed its losses with reference to what its financial position would have been had such a security clause existed.

On February 4, 2016, after discovery was complete, Defendants/Appellees filed a motion for summary judgment asserting J.W. Hall, Inc., failed to present sufficient evidence to establish a question of material as to whether: (1) an attorney-client relationship between the parties existed; (2) J.B. Culinary would have agreed to a security clause in the purchase agreement; and (3) J.W. Hall, Inc., incurred actual damages. Viewing the record in a light most favorable to non-movant J.W. Hall, Inc., the court perceived a dispute of material fact in each of Defendants/Appellees' first two issues and, thus, declined to grant summary judgment thereon.

With respect to the final issue, however, the trial court first determined that J.W. Hall, Inc., failed to establish a dispute of material fact over whether it incurred actual losses. Undisputed evidence shows J.W. Hall, Inc., has both its restaurant and an amount of funds—from receipt of J.B. Culinary's down-payment and subsequent installment payments—greater than or at least equal to those funds it expended to reacquire the restaurant from bankruptcy. The court concluded, therefore, that J.W. Hall, Inc., cannot show it suffered actual losses when it was essentially in the same position in which it would have been had it never entered into the agreement drafted by Attorney Nalli. Accordingly, in its Order of April 25, 2016, the court granted Defendants/Appellees' motion for summary judgment and entered judgment in their favor. This timely appeal followed.

Appellant J.W. Hall, Inc., presents the following questions for our review:

> *3  I. DID THE TRIAL COURT ERR IN FAILING TO FIND THAT THE PLAINTIFF SUFFERED PECUNIARY HARM BY THE DEFENDANTS' ESTABLISHED FAILURE TO INCLUDE A SECURITY AGREEMENT IN THE SALES AGREEMENT?
>
> II. DID THE TRIAL COURT ERR IN REFUSING TO TREAT AS IDENTICAL THE CORPORATION AND THE INDIVIDUALS OWNING ALL ITS STOCK AND ASSETS AND THAT THE COSTS WERE PAID BY A 'MULTITUDE OF SOURCES' OTHER THAN PLAINTIFF WHERE JUSTICE AND PUBLIC POLICY DEMANDED DOING SO AND WHEN THE RIGHTS OF INNOCENT PARTIES WERE NOT PREJUDICED THEREBY NOR THE THEORY OF CORPORATE ENTITY MADE USELESS?
>
> III. DID THE TRIAL COURT ERR IN FINDING THAT PLAINTIFF WOULD RECEIVE A WINDFALL WHERE PLAINTIFF, VIS A VIS JOSEPH HALL, INCURRED OVER $313,000 IN DAMAGES?

Appellant's brief at 4.

In reviewing a trial court's decision to grant summary judgment, our standard review is as follows:

> As has been oft declared by this Court, summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment,

the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt.

On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Allen–Myland, Inc. v. Garmin Int'l, Inc.*, 140 A.3d 677, 682 (Pa.Super. 2016) (quoting *Summers v. Certainteed Corp.*, 606 Pa. 294, 307, 997 A.2d 1152, 1159 (2010) (internal citations and quotation marks omitted)).

We have, recently, discussed the burden borne by a plaintiff in a legal malpractice action:

The Supreme Court of Pennsylvania has described the unique nature of a legal malpractice claim:

[A] legal malpractice action is distinctly different from any other type of lawsuit brought in the Commonwealth. A legal malpractice action is different because ... a plaintiff must prove a case within a case since he must initially establish by a preponderance of the evidence that he would have recovered a judgment in the underlying action.... It is only after the plaintiff proves he would have recovered a judgment in the underlying action that the plaintiff can then proceed with proof that the attorney he engaged to prosecute or defend the underlying action was negligent in the handling of the underlying action and that negligence was the proximate cause of the plaintiff's loss since it prevented the plaintiff from being properly compensated for his loss.

**\*4** *Kituskie v. Corbman*, 552 Pa. 275, 714 A.2d 1027, 1030 (1998) (footnote omitted). Therefore, an important question in a legal malpractice action is whether the plaintiff "had a viable cause of action against the party he

wished to sue in the underlying case and that the attorney he hired was negligent in prosecuting or defending that underlying case (often referred to as proving a 'case within a case')." *Poole v. W.C.A.B. (Warehouse Club, Inc.)*, 570 Pa. 495, 810 A.2d 1182, 1184 (2002).

*Heldring v. Lundy Beldecos & Milby, P.C.*, —— A.3d ——, 2016 WL 6946583 (Pa.Super. Nov. 28, 2016).

The case *sub judice* involves not the would-be recovery of a judgment in an underlying litigation, but, instead, an analogous would-be recovery of collateral through the exercise of a security clause in a purchase/sale agreement. In both instances, the claim states that, but for the negligence of counsel in an underlying matter involving a third party, the legal malpractice plaintiff would have recovered its due from such third party. Accordingly, the trial court properly turned to *Kituskie* for guidance in the present matter.

To support its view, the court relied on the *Kituskie* rationale that the "collectibility of damages in the underlying action" is part of the analysis of actual loss compensable in a legal malpractice action. In this regard, *Kituskie* explained that "actual losses in a legal malpractice action are measured by the judgment the plaintiff lost in the underlying action and the attorney who negligently handled the underlying action is the party held responsible for the lost judgment." *Kituskie*, 552 Pa. at 282, 714 A.3d at 1030. A legal malpractice plaintiff should not obtain a judgment "against an attorney which is greater than the judgment the plaintiff could have collected from the third party; the plaintiff would be receiving a windfall at the attorney's expense." *Id.* at 283, 714 A.3d at 1030.

As noted, *supra*, the trial court purported to apply these principles in finding that J.W. Hall, Inc., failed to demonstrate an issue of material fact as to actual losses where it ultimately experienced a "break-even" result. That is, because the discovery record established that J.W. Hall, Inc., owned essentially the same restaurant after default as it did before selling to J.B. Culinary, and the income it earned from the sale offset the expenses incurred from re-purchasing the restaurant from bankruptcy, it could not establish losses requisite to a legal malpractice claim.

We discern error with the court's assessment of losses, however, as it reflects a comparison of J.W. Hall, Inc.'s,[1] pre-transaction and post-transaction economic realities, when

the proper computation of actual losses should instead reflect what, if any, rightful benefits eluded J.W. Hall, Inc., due to its attorney's alleged malpractice. Just as a judgment lost due to courtroom malpractice defines a litigant's actual loss, so, too, would collateral lost due to transactional malpractice define a contracting party's loss. While we do not dispute the trial court's observation that J.W. Hall, Inc., appeared no worse off after repurchasing the restaurant than it was before transacting with J.B. Culinary, the *Kituskie* inquiry concerns itself with a different assessment of damages flowing from alleged malpractice.

**\*5** Here, J.W. Hall, Inc., framed the inquiry properly when it effectively claimed that its loss was the rightful benefit it was denied when Attorney Nalli negligently failed to incorporate in the purchase/sale agreement an industry-standard security clause authorizing J.W. Hall, Inc., to retake ownership of the collateralized restaurant in the event of buyer's default. This loss, moreover, was not speculative, incalculable, or illusory; it was the total of all requisite expenses made to buy the collateral out of bankruptcy, and J.W. Hall, Inc., identified them during discovery. We, therefore, reject the court's grant of summary judgment for want of evidence of actual losses.

The trial court's determination that J.W. Hall, Inc., failed to demonstrate actual losses had a second component, however, that proves more problematic to the Appellant company's cause. The record establishes that it was not actually J.W. Hall, Inc., that paid $178,000 to purchase the restaurant out of bankruptcy and $56,394.24 in legal fees to effectuate such purchase, but was, instead, the separate entities of JoeWillRoger, LLC, and Mr. and Mrs. J.W. Hall in their individual capacities. As such, the trial court entertained the question of whether damages claimed by Plaintiff/Appellant J.W. Hall, Inc., were, in fact, incurred by separate and distinct entities even though it is undisputed that Mr. Hall and his wife are the sole owners of the two corporations in question.

In addressing this issue, the trial court turned to, *inter alia,* *Sams v. Redevelopment Authority of New Kensington,* 431 Pa. 240, 244 A.2d 779 (Pa. 1968). The court aptly summarized *Sams* as follows:

In *Sams,* the New Kensington Redevelopment Authority adopted a resolution condemning a plot of land owned individually by Mr. Sams and Mr. Mannarino. That plot of land was used as a scrap yard for the receipt of shipping of scrap metal.

At the time of the condemnation, Sams and Mannarino also owned, through a corporation, another plot of land located on the opposite side of the street, which was being operated as a foundry.

When awarding damages, the Board of Viewers awarded damages to Sams and Mannarino individually, [and] as copartners, trading and doing business as the corporation. The Redevelopment Authority appealed on the basis that evidence should not have been admitted regarding the corporate property in that it did not have the same owner and was not used for the same purpose.

Trial Court Opinion, at 11.

The Pennsylvania Supreme Court noted at the outset of its decision that, under the then-governing Eminent Domain Code, damages may be assessed as if two or more non-contiguous tracts of land were one parcel only upon a demonstration that the tracts are owned by one owner and are used together for a unified purpose. The corporate shareholders, Messers Sams and Mannarino, argued that the Court should pierce the corporate veil of their corporation to find an identity of ownership between the two lots, as the two men were the sole shareholders of the corporation and doing so would further the practical application of the intent of the law. *Id.* at 781. The Court refused to do so.

Precedent allowed courts to disregard the corporate entity or personality "only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime," the Court noted. Because the partnership in question was not formed for such purpose, the Court refused to disregard its corporate status and recognize an identity of ownership between the two lots. The Court reasoned:

> The cases on disregarding the corporate entity suggest that in order for the courts to justify piercing the corporate veil, it must be determined that the corporate fiction is being used by the corporation itself to defeat public convenience, justify wrong either to third parties dealing with the corporation, or internally between shareholders' (derivative suits), perpetrate fraud or other similar reprehensible conduct. **Since, in the**

J.W. Hall, Inc. v. Nalli, Not Reported in Atl. Rptr. (2017)

instant case, the corporate fiction is not being employed as a means to shield itself from its ultimate responsibilities and liabilities, no sound reason exists for piercing the veil for the benefit of the individual shareholders, who created the veil in order to procure other business advantages. In our view, one cannot choose to accept the benefits incident to a corporate enterprise and at the same time brush aside the corporate form when it works to their (shareholders') detriment. The advantages and disadvantages of the corporate structure should be seriously considered and evaluated at the time such organization is contemplated and after incorporation has been selected, the shareholders cannot be heard to argue that the courts should not treat them as a corporation for some purposes and as a corporation for other purposes, which suits their present economic interest.

*6 *Id.* (emphasis added).

The trial court relied upon *Sams* to grant Defendants/Appellees' motion, and as J.W. Hall, Inc., fails to distinguish *Sams* on the facts,[2] we agree that the rationale expressed therein is directly on point and represents controlling precedent. To buy back their former restaurant, Mr. and Mrs. Hall formed a new corporate entity, JoeWillRoger, LLC, that was separate and distinct from both Appellant/Plaintiff J.W. Hall, Inc., and themselves in their individual capacities. There is no reason to doubt that the Halls discerned some advantage to forming this new entity,[3] and *Sams* admonishes that the corporate status providing such advantage may not simply be "brushed aside" whenever consequential disadvantages do not suit shareholders' individual interests.

It was the Halls' election to re-purchase the restaurant with their own personal monies and the funds of a newly-incorporated JoeWillRoger LLC, exclusively. Restaurant seller, Appellant/Plaintiff J.W. Hall, Inc., a separate legal entity, expended no funds in the re-purchase effort, and so it may not now identify the re-purchase payment as an actual loss it sustained for purposes of satisfying a necessary element to its legal malpractice claim. Because the trial court's finding to this effect was dispositive of the action, it properly granted Defendants/Appellees' motion for summary judgment, and we affirm for this reason.

*7 Order Affirmed.

**All Citations**

Not Reported in Atl. Rptr., 2017 WL 626715

**Footnotes**

\*     Former Justice specially assigned to the Superior Court.

1     It is only for ease of discussion regarding the issue of actual losses that we identify J.W. Hall, Inc., as both the seller and re-purchaser of the restaurant in question. By doing so, we do not mean to suggest a disposition of the subsequent issue premised on the charge that a different entity bought the restaurant out of bankruptcy.

2     Appellant contends our decision in *Kellytown Co. v. Williams*, 426 A.2d 663 (Pa.Super. 1981) supports piercing the corporate veil in the present case. We disagree, as *Kellytown* approves of treating a corporation and its owners as identical entities only within the framework announced in *Sams*. *Kellytown* provides:

The established rule in Pennsylvania is that a court will not hesitate to treat as identical the corporation and the individual or individuals owning all its stock and assets whenever justice and public policy demand

and when the rights of innocent parties are not prejudiced thereby **nor the theory of corporate entity made useless.** *Great Oak B & L, et al. v. Rosenheim, supra, Pasos v. Ferber*, 263 F.Supp. 877, 881–82 (1967); *Gagnon v. Speback*, 389 Pa. 17, 131 A.2d 619 (1957); *Wedner Unemployment Compensation Case*, 449 Pa. 460, 296 A.2d 792 (1972); *Tucker v. Bienstock*, 310 Pa. 254, 165 A. 247 (1933). In *Sams v. Redevelopment Authority*, 431 Pa. 240, 244 A.2d 779 (1968), the Supreme Court of Pennsylvania held that:

> The corporate entity or personality will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime.

*Kellytown*, 426 A.2d at 668 (emphasis added). As explained, *infra*, Appellant fails to meet this standard for piercing the corporate veil.

3    Appellant's request to pierce the corporate veil to its benefit is not without a degree of convolution, as it is asking the courts to pierce both its corporate veil and that of "JoeWillRoger, LLC" so that the two distinct corporate entities may effectively be considered the same entity for this discrete purpose. This would allow the courts to consider the money expended by JoeWillRoger, LLC as money expended by J.W. Hall, Inc. Of course, this begs the question of why the Halls elected to form a different corporation to repurchase the restaurant in the first place, and how requiring it to accept not only the presumptive advantages of its election but also the disadvantages would work the kinds of injustice addressed in *Sams*.

---

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Larry Pitt & Associates v. Lundy Law, LLP, Not Reported in F.Supp.2d (2013)
2013-2 Trade Cases P 78,618

2013 WL 6536739
United States District Court,
E.D. Pennsylvania.

LARRY PITT & ASSOCIATES, Plaintiff,

v.

LUNDY LAW, LLP, et al., Defendants.

Civil Action No. 13–2398.
|
Dec. 13, 2013.

**Attorneys and Law Firms**

Carl W. Hittinger, Adam D. Brown, Lesli C. Esposito, Robert E. Connolly, Dla Piper LLP, Philadelphia, PA, for Plaintiff.

Brian Savage, Carolyn M. Hazard, Robert C. Heim, Dechert, Philadelphia, PA, for Defendants.

### *MEMORANDUM OPINION*

RUFE, District Judge.

**\*1** Plaintiff, a law firm, has sued a second law firm and its managing partner, alleging state and federal causes of action. Defendants[1] have moved to dismiss all claims. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I. FACTS ALLEGED IN THE AMENDED COMPLAINT

Plaintiff Pitt is a Pennsylvania-based law firm which provides representation to clients in greater Philadelphia area, including Philadelphia and its Pennsylvania, New Jersey, and Delaware suburbs. The firm provides representation primarily in the areas of "small personal injury, social security disability, and workers' compensation law."[2] Defendant Lundy Law is a Pennsylvania-based law firm serving the same region and advertising that it provides representation to individuals pursuing personal injury, social security disability, and workers' compensation claims. The two firms directly compete for clients, and for prime advertising opportunities used to attract clients.

Consumers wishing to retain a lawyer in the areas of personal injury, social security disability, and workers' compensation

select their lawyers based upon brand name or name recall. Accordingly, effective advertising such that consumers become familiar with the name of a law firm is important to the business success of that firm. Law firms such as Pitt and Lundy seek advertising opportunities which provide "[m]ass reach, constant messaging, [and] saturation,"[3] as such advertising creates name recognition. According to Pitt, the most highly coveted advertising venues are: 1) the exterior of buses; 2) radio time slots just before and after traffic and weather updates; and 3) inside sports arenas. Phonebooks, internet advertisements, roadside stationary billboards, and advertising posted inside buses and trains and at bus stops are all less effective.[4]

Historically, Pitt purchased advertising space on the exteriors and interiors of Southeastern Pennsylvania Transportation Authority ("SEPTA") buses and trains, and on SEPTA bus stops. SEPTA advertisements are sold by a national advertising agency called Titan. Defendant L. Leonard Lundy's daughter, Sara Lundy, has been an Account Executive at Titan since March 2011, and is responsible for selling advertisements for SEPTA. Since approximately January 2012, Lundy Law has had the exclusive right to advertise legal services on the outside of SEPTA buses, pursuant to one-year, renewable contracts with SEPTA. In consideration for this exclusive right, Lundy Law paid a substantial advertising fee, above the market prices SEPTA typically charges for such advertising. For the period of the contract, Pitt and other law firms[5] cannot advertise on the exterior of SEPTA buses, even if the advertising space is not being used by Lundy or any other business. Pitt and other firms may purchase advertising space inside SEPTA buses and trains and on SEPTA bus stops. Pitt alleges that Lundy's exclusive contract with SEPTA for exterior advertising is renewable indefinitely, but does not allege that the contract *requires* either party to renew at the end of each one year term.[6] Pitt has not alleged that it has been or will be denied the opportunity to make its own offer for an exclusive contract with SEPTA at the expiration of Lundy's one-year exclusive contract,[7] nor has it alleged that SEPTA has rejected higher offers for exclusive contracts in favor of Lundy Law.

**\*2** Pitt notes that exterior bus advertisements are very effective, and are unique in that they serve as moving billboards, reaching more prospective clients than stationary billboards or interior bus and train advertisements. Pitt provides no data with regard to how many individuals in the greater Philadelphia area see interior versus exterior

Larry Pitt & Associates v. Lundy Law, LLP, Not Reported in F.Supp.2d (2013)
2013-2 Trade Cases P 78,618

SEPTA ads each day, but does note that average weekday ridership on SEPTA-operated vehicles is over 1 million passengers, and overall ridership is 3.9 million passengers annually. Pitt received 142 client referrals from SEPTA advertisements (presumably including both interior and exterior advertisements) in 2008, 160 in 2009, 197 in 2010, and 146 in 2011, but only 16 in 2012 and 12 in 2013 after it was barred from running advertisements on the exteriors of SEPTA buses.

In addition to the SEPTA contract, Lundy has entered into a one-year exclusive contract to advertise on the exterior of Berks Area Regional Transportation Authority ("BARTA") buses. The BARTA system serves 3.1 million riders annually in and around Reading, Pennsylvania. In the past, Pitt has advertised on the KYW radio station during rush hour, but now Lundy has an exclusive contract for rush hour advertising slots scheduled around weather and traffic updates on KYW, precluding other law firms from buying advertising in those desirable time slots on that station for at least one year. [8] Finally, Lundy has an exclusive contract with the Wells Fargo Center sports and entertainment arena, which precludes advertising by competing law firms for at least one year. Lundy obtained all of these exclusive contracts by paying "unusually high" advertising fees, well above market rates. [9] These facts form the basis of Pitt's antitrust and unfair competition claims.

Pitt's false advertising claim is premised on the fact that Lundy Law advertises itself as a law firm representing clients in Social Security disability and workers' compensation cases, when in fact it refers such cases to other firms in exchange for a referral fee, and does not actually represent clients in such cases.

Finally, the Amended Complaint alleges that Lundy Law, which uses the phrase "Remember this Name" in its advertising, filed a meritless trademark infringement lawsuit against Pitt for Pitt's use of the phrase "Remember this Number" in its advertising. The suit was filed on March 4, 2013. The parties submitted briefs on Lundy Law's motion for a preliminary injunction and began discovery efforts. Then, on April 18, 2013, Lundy Law voluntarily dismissed the trademark infringement suit within hours of learning that Pitt's insurance carrier was covering the costs of litigation for Pitt. The Amended Complaint notes that "Remember this Name" is not a registered trademark.

As a result of these above described activities, Pitt has suffered a decrease in net income, whereas in the years before Lundy Law entered into the exclusive advertising contracts, Pitt had typically seen an increase in net income from year to year.

## II. STANDARD OF REVIEW

**\*3** Dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain statement" does not possess enough substance to show that plaintiff is entitled to relief. [10] In determining whether a motion to dismiss is appropriate the court must consider those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party. [11] Courts are not bound to accept as true legal conclusions couched as factual allegations. [12] Something more than a mere *possibility* of a claim must be alleged; the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." [13] Even in complex antitrust cases, courts must apply the plausibility standard and not a heightened standard. [14] The Complaint must set forth direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory. [15] The court has no duty "to conjure up unpleaded facts that might turn a frivolous ... action into a substantial one." [16]

## III. DISCUSSION

### A. *Antitrust Claims*

*1. Sherman Act, Section 2 Claims (Count I and II)*
In Counts I and II, Pitt alleges that Lundy Law has violated Section 2 of the Sherman Act, which prohibits people or entities from monopolizing or attempting to monopolize trade. [17] A party can violate Section 2 through unilateral conduct which creates or attempts to create a monopoly, or by harmfully exercising monopoly power. [18] To state a claim under Section 2, a plaintiff must demonstrate "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." [19] To demonstrate that a dangerous probability of achieving monopoly power exists, a plaintiff must define the relevant geographic market and product market, and explain

defendant's power within that market.[20] "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."[21]

Pitt argues that it is a direct competitor of Lundy Law and that Lundy Law has engaged in an anti-competitive scheme in restraint of trade, causing injury to Pitt by monopolizing or attempting to monopolize two markets in the greater Philadelphia region: the market for legal services providers primarily representing clients in small personal injury, Social Security disability, and workers' compensation cases; and the market for "mass reach, constant messaging, saturation advertising for [such] legal services."[22] It is alleged that Lundy Law and Pitt compete with each other, and with other firms and businesses, in both product markets. Lundy Law challenges the adequacy of the pleadings as to both the geographic and the product market definitions proposed by Pitt.

*4 The Court finds that Pitt has adequately defined the proposed geographic market at this stage in the litigation. While on a complete factual record Lundy Law might mount a challenge to the proposed geographic market, the Court finds that Pitt's geographic market definition is adequately supported for notice and pleading purposes.

The Court will assume, for purposes of this motion, that Pitt has sufficiently defined the first of its proposed product market definitions—the legal market consisting of law firms focused on small personal injury, Social Security disability, and workers' compensation claims.[23] However, the Court finds that Pitt has failed to allege sufficiently that Lundy Law has engaged in predatory or anticompetitive conduct with a specific intent to monopolize that legal market. Although Lundy Law may well wish to dominate that legal market, it has not been adequately pled that Lundy Law has engaged in predatory or anticompetitive conduct to achieve that goal.[24] The goal of all advertising is to increase market share, and the fact that advertising is effective does not render its use anticompetitive or predatory. In fact, in seeking exclusive advertising opportunities, it appears that Lundy Law is responding to competition in the legal market. Pitt has alleged no facts, beyond Lundy Law's acquisition of discrete,

albeit highly effective, advertising opportunities, in support of its claim that Lundy Law has engaged in predatory or anticompetitive conduct.

Additionally, Pitt has failed to allege facts demonstrating that Lundy Law dominates or is in danger of monopolizing this legal market. Pitt has not alleged facts to support its assertions that Lundy Law's clients may be charged higher prices because of Lundy Law's superior market power,[25] that Lundy Law's practices have limited consumer choice, or that Lundy Law's practices have created barriers to entry in the relevant market.[26] While Pitt alleges that it has received fewer workers' compensation cases since losing the opportunity to advertise on the exterior of SEPTA buses, this allegation only demonstrates an injury to Pitt, and not to consumer choice or to competition for clients. As antitrust laws protect competition, not competitors, these allegations are insufficient.[27]

Pitt also asserts that Lundy Law has illegally monopolized or attempted to monopolize the market for "mass reach, constant messaging, saturation advertising for legal services." However, this proposed product market definition is not sufficiently pled. Law firms are not the only entities competing for "mass reach, constant messaging, saturation advertising" opportunities in the greater Philadelphia region, and the Court sees no rationale for including the qualifier "for legal services" in defining the proposed advertising market. From the perspective of an entity selling advertising space, law firms and non-legal purchasers of advertising space are readily substituted for one another. Furthermore, the Court cannot infer from the facts alleged that the four advertising opportunities currently dominated by Lundy Law pursuant to exclusive contracts constitute the entirety of the market for "mass reach, constant messaging, saturation advertising for legal services." While the Court accepts, for the purposes of this motion, the allegation that the four advertising opportunities at issue have proven to be unusually effective, it is not persuaded that they alone constitute a *market,* in light of the universe of regional venues for similar advertising, including other radio stations, sports stadiums, and transit systems serving the greater Philadelphia region, as well as billboards, taxi cab advertising, advertising space inside buses and trains and at bus stops, television, internet, and newspaper advertising. Lundy Law clearly does not control all avenues for advertising in the greater Philadelphia region, and, additionally, it is not clear from the complaint that Pitt has been or will be foreclosed from bidding for the very

contracts from which Lundy Law now benefits, at the end of the contract terms.

**\*5** Moreover, exclusive dealing contracts are unlawful only if the probable effect is to lessen competition in the relevant market.[28] Even if the Court accepted that four advertising opportunities constituted a market, Pitt cannot allege that Lundy Law's exclusive contracts have damaged competition in that market because those contracts have not precluded non-legal entities from competing for advertising opportunities with the relevant entities. While *Pitt* is not able to compete for advertising space in the four venues at issue during Lundy Law's exclusive contract term, companies advertising other products and services may. Therefore, even taking the facts alleged as true, the Court cannot find that competition is harmed by these exclusive dealing contracts.[29]

Finally, Pitt argues that Lundy Law filed a frivolous trademark lawsuit against Pitt motivated by an anticompetitive purpose, and dismissed that case two months after it was filed once Lundy Law learned that Pitt's defense costs were covered by insurance. Even accepting as true, for the purpose of this analysis, the allegation that this suit was baseless and filed only to cause financial injury to Pitt, Pitt has not alleged any facts from which the Court can find that the suit was intended to cause an injury to *competition* in the relevant markets, nor has it alleged a dangerous probability of achieving monopoly power.

*2. Sherman Act, Section 1 Claims (Counts III and IV)*
Section 1 of the Sherman act prohibits contracts, conspiracies, and combinations in restraint of trade.[30] A claim under Section 1 must allege collective action—i.e. an agreement between two or more actors.[31] A plaintiff must also plead: 1) concerted action by the parties to the agreement, acting with unity of purpose or common design to engage in unlawful behavior; 2) causing anti-competitive effects within the relevant product and geographic markets; and 3) causing injury to the plaintiff.[32]

In Count IV, Pitt alleges unlawful exclusive dealing in violation of the Sherman Act. Pitt argues that the aggregate effect of the four exclusive dealing contracts Lundy Law has entered into is to lessen competition in the legal marketplace. However, Pitt fails to allege that Lundy Law and the entities with which Lundy Law has an exclusive

advertising contract acted "with unity of purpose" to "engage in unlawful" anticompetitive behavior. While Lundy Law clearly acted with the intent of excluding competitors from specific advertising opportunities during exclusive contract periods, it is alleged that they paid well above market rates for exclusive advertising rights in these venues, suggesting that the entities with which they contracted acted out of economic self-interest and not with an anticompetitive purpose.

With regard to SEPTA, Plaintiff alleges that Leonard Lundy's daughter, Sara Lundy, was the Account Executive at Titan who arranged the exclusive advertising deal between SEPTA and Lundy Law, and Pitts asks the Court to infer that that Sara Lundy shared with Lundy Law the goal of engaging in unlawful, anticompetitive behavior. However, even if an employee of Titan wanted to benefit Lundy Law, it would be unfair to infer that Titan or SEPTA had illegal motives, as opposed to legitimate economic motives, when the three other entities, which are not alleged to employ Lundy family members, agreed to enter into similar business deals with Lundy Law.[33]

**\*6** In addition, Pitt has not argued that any one of the exclusive contracts would have created an anticompetitive effect, but only that the aggregate effect of the four exclusive contracts is anticompetitive or constituted an illegal boycott. Therefore, the Amended Complaint must set forth facts which demonstrate the existence of a horizontal conspiracy (i.e. collusion among the sellers of advertising), not just four vertical conspiracies (i.e. collusion between Lundy Law and each seller of advertising).[34] However, Pitt has failed to allege any facts from which the Court can infer that the four entities with which Lundy Law exclusively contracted colluded with each other, as well as with Lundy Law, with the object of restraining competition for advertising space. In fact, Pitt has not even alleged that any of the four entities were aware of Lundy Law's exclusive contracts with the others. Moreover, Pitt asserts no rational motive for the non-party entities to so collude or to participate in a "boycott." While charging a premium in exchange for exclusive rights to advertise legal services during a contract period makes economic sense, eliminating the buyer's competitors for future exclusive contracts would be economically irrational. The conduct of the relevant entities is consistent with permissible competition. Accordingly, Count III will be dismissed for failure to state a claim.

*5. Lanham Act Claim (Count V)*

The Lanham Act creates civil liability when a person is likely to be injured by a false or misleading statement made in advertising, when that statement is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...."[35] To state a claim for false advertising under the Lanham Act, a plaintiff must allege: "1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc."[36] The second element is presumed if Plaintiff demonstrates that an advertisement is unambiguous and literally false.[37]

In Count V, Pitt argues that, in violation of Pennsylvania Rule of Professional Conduct 7.2, Lundy Law has falsely advertised that it represents clients with Social Security disability and workers' compensation claims, when in fact it refers such clients to other firms for representation in exchange for a referral fee, and that these deceptive statements are likely to influence the decision of potential clients to contact Lundy Law rather than one of its competitors. Assuming, for the purpose of this motion, that the allegations in the Amended Complaint are true and Lundy Law does not represent clients in Social Security disability and workers' compensation claims, the Court finds that the Complaint sufficiently alleges that Lundy Law's advertisements have a tendency to deceive or mislead a substantial portion of the intended audience, and may even be literally false.[38] Plaintiff has also sufficiently pled that advertising for the types of legal services at issue here does influence consumers' "purchasing" decisions, and therefore Lundy Law's advertisements may draw business which would otherwise go to Pitt or other firms, causing injury to Pitt. As this claim is better decided on a complete factual record, the Court will not dismiss this claim on the pleadings.

### B. *State Law Claims*[39]

#### 1. *Unfair Competition (Count VI)*
**\*7** Lundy Law argues that Pitt's unfair competition claims asserted under state common law are co-extensive with

and fail for the same reasons Plaintiff's antitrust claims fail. Pennsylvania follows the Restatement (Third) of Unfair Competition, which provides that one engaging in a business or trade can be liable for harm to the commercial relations of another only if the acts or practices are actionable under federal or state statutes *or* the acts or practices "substantially interfere[ ] with the ability of others to compete on the merits of their products."[40] Courts in this district have held that in order to assert a claim pursuant to Pennsylvania's common law prohibition against unfair competition, a plaintiff must set forth adequate allegations regarding relevant markets and market share.[41] Although Pitt argues otherwise, the Court finds that Pitt relies on the same deficient factual allegations to support both his antitrust claims and his state law unfair competition claims. As Pitt's antitrust claims fail, so too do his state law unfair competition claims.

#### 2. *Tortious Interference Claim (Count VII)*
Pitt alleges that Lundy Law tortuously interfered with Pitt's anticipated future advertising contracts with KYW, SEPTA, BARTA, and the Wells Fargo Center. To state a claim for tortious interference under Pennsylvania law, a plaintiff must plead: 1) the existence of a prospective contractual relationship between the plaintiff and a third party; and 2) purposeful action by defendant to interfere with that prospective relationship; 3) without privilege or justification; 4) causing legal injury.[42]

Lundy Law argues that Pitt's tortious interference with contract is inadequately pled and fails to state a claim because Pitt has not alleged facts sufficient to show that Pitt had a prospective contractual relationship with the four entities. Furthermore, Lundy Law argues that it did not enter into exclusive contracts with those entities for the purpose of harming Pitt's business relationships, but rather for the purpose of enhancing its own visibility in a competitive industry. The Court agrees that Pitt has not adequately pled the elements of a tortious interference with contract claim, for the reasons Lundy Law raises. Pitt alleges only that it contracted for advertising space with the four entities in the past; it does not allege any facts from which the Court can infer that the parties had mutually anticipated entering into such agreements in the future. Moreover, exclusive contracts by their nature interfere with the ability of third parties to enter into contracts with the bound parties; this does not make exclusive contracts inherently tortious.

### 3. Dragonetti Claim (Count VII)

Pennsylvania's Dragonetti Act allows a civil suit for wrongful initiation of civil court proceedings without probable cause and for a purpose other than securing adjudication of a legal claim, when the proceedings end in favor of the defendant.[43]

**\*8** Here, Lundy Law, which uses the unregistered slogan "Remember this Name" in advertising, sued Pitt when Pitt began using the slogan "Remember this Number" in its advertising. Lundy Law dismissed the lawsuit without prejudice two months after it was filed, after briefing on the Motion for Preliminary Injunction was complete, and allegedly the same day it learned that Pitt's insurance company was covering the cost of the defense, without any rulings on the merits being made. Pitt now argues that the suit was filed without probable cause, not to resolve a legal dispute, but in an effort to negatively impact on its advertising and cause financial harm to Pitt.

Lundy Law argues that Pitt cannot state a Dragonetti claim because Pitt is unable to allege that the trademark suit brought by Lundy Law was terminated in Pitt's favor.[44] Lundy Law points out that the case was not voluntarily dismissed on the eve of trial or after a motion for summary judgment had been filed, in anticipation of imminent loss on the merits, but rather was dismissed without prejudice less than two months after it was filed.[45] However, the Court notes that a Motion for Preliminary Injunction was fully briefed and pending, and a hearing on that motion was scheduled at the time of the voluntary dismissal. The court's ruling on the motion would have included an assessment of the likelihood of success on the merits.[46]

At this stage of the proceedings, the Court finds that the Dragonetti claim is adequately pled. The Court will allow Pitt to conduct discovery on this claim, and will decide the question of whether voluntary dismissal at the motion for preliminary injunction stage can constitute termination in the defendant's favor upon a complete factual record.[47]

### 3. Abuse of Process (Count IX)

Pitt also argues that the trademark infringement lawsuit constituted violated the common law intentional tort of abuse of process, which does not require a showing that the underlying litigation was terminated in its favor. An abuse of process claim must allege: 1) an abuse or perversion of process in a case already initiated; 2) primarily to achieve an unlawful or ulterior purpose; 3) causing harm to the other party.[48] In other words, abuse of process is the use of civil litigation as a tactical weapon to accomplish a purpose other than legitimate object of the litigation.[49] "[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions."[50]

Plaintiff alleges that the suit was filed in order to drain Pitt's financial resources, an improper purpose.[51] However, unlike a Dragonetti claim, one cannot rest an abuse of process claim on an allegation that the suit was *initiated* for an improper purpose.[52] It has not been alleged that Lundy Law took any steps to inflate the cost of defending this suit beyond what was required to address the merits of the claims,[53] nor was any other perversion of process alleged. Finally, Pitt has not alleged an injury, as its costs in the litigation were covered by their insurance carrier, and it has not alleged any other harm.

### IV. CONCLUSION

**\*9** For the reasons set forth herein, Counts I, II, III, IV, VI, VII, and IX are dismissed without prejudice, and Plaintiff may proceed with Counts V and VIII.

### ORDER

**AND NOW,** this 13th day of December 2013, upon consideration of Defendant's Motion to Dismiss [Doc. No. 19], Plaintiff's response in opposition, Defendants' reply and Plaintiff's sur-reply, it is hereby **ORDERED** that the Motion is **GRANTED** in part and **DENIED** in part for the reasons set forth in the accompanying Memorandum Opinion. Counts I, II, III, IV, VI, VII and IX are dismissed without prejudice to Plaintiff's right to replead them on or before January 3, 2014. If Plaintiff does not amend the complaint, Defendants' answer to the surviving counts of the Amended Complaint (Counts V and VIII) will be due on January 17, 2014. If Plaintiff files a second amended complaint, Defendant's answer or responsive motion will be due on or before January 24, 2013.

It is so **ORDERED.**

Larry Pitt & Associates v. Lundy Law, LLP, Not Reported in F.Supp.2d (2013)

2013-2 Trade Cases P 78,618

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6536739, 2013-2 Trade
Cases P 78,618

## Footnotes

1       Defendant L. Leonard Lundy is a principal and managing partner of Lundy Law. The Court will refer to both
        Defendants collectively as "Lundy Law" throughout.

2       Am. Compl. ¶ 3.

3       Am. Compl. ¶ 30.

4       As Lundy notes, the Amended Complaint makes no mention of television advertising.

5       The Amended Complaint describes failed attempts by non-party law firms Spear, Greenfield & Richman, P.C.
        and Hill & Associates, P.C. to purchase exterior ads on SEPTA buses in 2012 and 2013 (Am.Compl.¶¶ 82–
        90, 91–98).

6       *See* Am. Compl. ¶ 96 ("[Pitt] may later be able to secure advertising on the exteriors of buses if and when
        Defendant Lundy's agreement expires and Defendant Lundy decides not to renew it.")

7       Pitt alleges that because other types of advertisements are not viable substitutes, it and similar law firms
        would compete vigorously and be willing to pay higher prices for exterior bus advertising before turning to
        other, less effective forms of advertising. Am. Compl. ¶ 53.

8       Pitt provides no data regarding the number of listeners in the region tuned to KYW, versus other commercial
        radio stations serving the greater Philadelphia region, during the rush hour.

9       Amended Complaint at ¶ 120.

10      *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

11      *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); *Fay v. Muhlenberg Coll.,* No. 07–4516, 2008
        WL 205227, at *2 (E.D.Pa. Jan.24, 2008).

12      *Twombly,* 550 U.S. at 555.

13      *Id.* at 570.

14      *West Penn Allegheny Health System, Inc. v. UPMC,* 627 F.3d 85, 98 (3d Cir.2010) (holding that it is
        inappropriate to apply heightened scrutiny to antitrust and other complex cases).

15      *Twombly,* 550 U.S. at 562.

16      *Id.* (citing *O'Brien v. DiGrazia,* 544 F.2d 543, 546 n. 3 (1st Cir.1976)).

Larry Pitt & Associates v. Lundy Law, LLP, Not Reported in F.Supp.2d (2013)

2013-2 Trade Cases P 78,618

15 U.S.C. ¶ 2.

The Amended Complaint does not allege the exercise of monopoly power.

*Pastore v. Bell Tel. Co. of Pa.,* 24 F.3d 508, 512 (3d Cir.1994).

*Id.*

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997).

Doc. No. 22 at 11.

*Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 307 (3d Cir.2007) (in determining whether competing entities are in the same market, the Court must examine whether products or services are readily substituted for one another).

Under § 2 of the Sherman Act, an increase in market share, even to the level of monopoly power, is only suspect if achieved by improper means, rather than as a consequence of a superior product or savvy business dealings. *Queen City Pizza,* 124 F.3d at 437.

Pitt admits that Lundy Law has not raised its fees above market levels, but argues that it could potentially do so. However, while Pitt's factual allegations support its claim that Lundy Law's superior name recognition may lead potential clients to call Lundy Law first, they are not sufficient to support a claim that Lundy Law has the market power to raise fees above those typically charged for equivalent services without losing clients to lower-priced competitors.

Pitt quotes *Broadcom:* "Barriers to entry are factors ... that prevent new competition from entering a market in response to a monopolist's supracompetitive prices," but has admitted that Lundy Law does not currently charge supracompetitive prices and does not allege any facts from which the Court can conclude that there would be significant barriers to new competitors entering the legal market if Lundy Law did, given the wide array of possible advertising opportunities in the geographic region which have not entered into exclusive contracts with Lundy Law, and the fact that Pitt has alleged that consumers of the type of legal services it provides do not chose law firms based on entrenched brand preferences or law firm reputations, but rather on name recognition. *See Broadcom,* 501 F.3d at 307.

*Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

*ZFMeritor, LLC v. Eaton Corp.,* 696 F.3d 254, 268 (2012).

The fact that the entities charged Lundy Law a premium, well above typical market rates, for exclusive advertising contracts does not make those contracts anti-competitive. In fact, the premium Lundy Law paid for exclusive advertising contracts indicates that Lundy Law *lacks* the market power to drive down its cost of buying advertisements in the relevant markets. *Id.* at 270–71; *Queen City Pizza,* 124 F.3d at 438.

15 U.S.C. ¶ 1.

*Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 639 (3d Cir.1996).

Larry Pitt & Associates v. Lundy Law, LLP, Not Reported in F.Supp.2d (2013)
2013-2 Trade Cases P 78,618

32    *Id.*

33    Moreover, as noted above, Plaintiff has not adequately defined an advertising market, and thus cannot demonstrate that Lundy Law's contract for SEPTA advertising causes an anti-competitive effect within that market.

34    "Courts have refused to find a horizontal conspiracy, where a single entity or person engages in separate vertical conspiracies with multiple parties, who do not conspire amongst themselves horizontally." *Brunson Commc'ns, Inc. v. Arbitron, Inc.,* 239 F.Supp.2d 550, 562 (E.D.Pa.2002). "A horizontal group boycott involves entities at the same level of the market structure conspiring amongst themselves, with a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both." *Id.* at 561–62 (internal quotations omitted).

35    15 U.S.C. § 1125(a)(1)(A).

36    *Pernod Ricard USA, LLC v. Bacardi USA, Inc.,* 653 F.3d 241, 248 (3d Cir.2011).

37    *Id.*

38    See *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.,* 401 F.3d 123, 136 (3d Cir.2005).

39    Because one of Plaintiff's federal law claims survives, the Court has supplemental jurisdiction to hear Plaintiff's related state law claims.

40    *Yeager's Fuel, Inc. v. Pa. Power & Light, Co.,* 953 F.Supp. 617, 668 (E.D.Pa.1997).

41    See *Fresh Made, Inc. v. Lifeway Foods, Inc.,* No. 01–4254, 2002 WL 31246922 at *9 (E.D.Pa. Aug.9, 2002).

42    *CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.,* 357 F.3d 375, 384 (3d Cir.2004).

43    42 Pa. Cons.Stat. §§ 8351–8355.

44    *Sports Int'l Ltd. v. Obermayer, Rebmann, Maxwell & Hippel,* No. 95–1331, 1996 WL 50632, *2–3 (E.D.Pa. Jan.30, 1995).

45    *Cf. Mistick v. Mistick,* No. 08–17689, 2011 WL 9106050 (Pa.Com.Pl., Nov.17, 2011); *Bannar v. Miller,* 701 A.2d 242, 248 (Pa.Super.1997).

46    *Doe v. National Bd. of Med. Examiners,* 199 F.3d 146, 154 (3d Cir.1999) (discussing standard for deciding motions for preliminary injunctions).

47    See *Clausi v. Stuck,* 74 A.3d 242, 246 (Pa.Super.2013) (when considering the question of whether a voluntary dismissal constitutes a favorable, final termination of a case, the court must consider the factual circumstances under which the proceedings are withdrawn.).

48    *Shaffer v. Stewart,* 326 Pa.Super. 135, 473 A.2d 1017, 1019 (Pa.Super.1984); *Tomalonis v. Levant,* No. 731–EDA–2004, 2005 WL 1677555, at *2 (Pa.Super. May 10, 2005).

Larry Pitt & Associates v. Lundy Law, LLP, Not Reported in F.Supp.2d (2013)
2013-2 Trade Cases P 78,618

49  *General Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 304 (3d Cir.2003); *Tomalonis,* 2005 WL 1677555, at *2.

50  *Tomalonis,* 2005 WL 1677555, at *3.

51  Pitt also argues that Lundy Law perverted legal process in order to "eliminate or undermine [Pitt's] advertising." Am. Compl. ¶ 121. However, this goal is consistent with the express purpose of Lundy Law's trademark litigation over Pitt's use of the slogan "Remember this Number" in its advertising.

52  *Koresko v. Crosswhite,* No. 05–4817, 2006 WL 263623, at *7 (E.D.Pa. Feb.1, 2006) (noting that abuse of process is concerned with the perversion of a civil process after it has been issued, not with the bad motives which caused a litigant to file the lawsuit, and dismissing abuse of process claims that only alleged improper motive in filing lawsuit).

53  Lundy Law's filing of a motion for preliminary injunction was consistent with the stated purpose of the suit: to put a stop to the alleged trademark infringement.

---

End of Document  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 273035
United States District Court,
E.D. Pennsylvania.

Dr. Manhua Mandy LIN, Plaintiff,
v.
ROHM AND HAAS COMPANY, Defendant.

Civil Action No. 11–3158.
|
Signed Jan. 20, 2015.

**Attorneys and Law Firms**

Eugene J. Malady, Eugene J. Malady, LLC, Joseph M. Fioravanti, Media, PA, for Plaintiff.

Jonathan R. Cavalier, Raymond A. Kresge, Emily Simpson Miller, Philip G. Kircher, Cozen O'Connor, Philadelphia, PA, for Defendant.

**MEMORANDUM**

YOHN, District Judge.

**\*1** This motion in limine presents an intersection of Title VII retaliation law and Pennsylvania corporate law. Dr. Manhua Mandy Lin, a former Rohm and Haas employee, has accused Rohm and Haas of violating Title VII's antiretaliation provision by harming EverNu, her single-member Pennsylvania limited liability corporation (LLC). I previously denied defendant's motion for summary judgment with reference to Rohm and Haas's alleged retaliatory *acts* subsequent to 2004 against EverNu as part of Lin's retaliation claim. With this motion in limine, Rohm and Haas seeks to preclude Lin from collecting any of EverNu's *damages*, if I find that Rohm and Haas retaliated against Lin via EverNu in violation of Title VII. Rohm and Haas argues that Lin cannot collect EverNu's damages because they belong only to EverNu—not to her. It also contends that I cannot pierce EverNu's corporate veil to allow Lin to collect these damages. Although Lin can present Rohm and Haas's alleged acts against EverNu as retaliatory acts against her under Title VII, she cannot recover EverNu's damages based on such retaliatory acts. When Lin chose to structure EverNu as a Pennsylvania LLC, she relinquished her right to sue for EverNu's damages.

**I. Background** [1]

Lin started her legal journey in 1999. That year, Lin, who had worked as a research scientist at Rohm and Haas for ten years, filed a complaint with the U.S. Equal Employment Opportunity Commission (EEOC) against Rohm and Haas alleging discrimination and retaliation. Lin then left Rohm and Haas as part of an EEOC-mediated settlement that allowed Rohm and Haas to review any of her work for trade-secret violations before she published it. In March 2000, Lin sent a proposed presentation on her work with acrylic acid to Rohm and Haas for its review. Concluding that it revealed Rohm and Haas trade secrets, Rohm and Haas threatened to sue Lin to preserve the trade secrets. Lin presented the information anyway, and so Rohm and Haas sued her in June 2000 in the Montgomery County Court of Common Pleas, claiming that Lin had revealed Rohm and Haas trade secrets in her presentation. Lin responded by filing an EEOC complaint that same month in which she alleged that Rohm and Haas filed the Montgomery County lawsuit in retaliation for her earlier EEOC complaint.

About two years later, in June 2002, Lin filed a Title VII and Pennsylvania Human Relations Act (PHRA) lawsuit in this judicial district (*Lin I* ). Arguing that her March 2000 acrylic acid presentation complied with any obligations she owed to Rohm and Haas, she again claimed that Rohm and Haas was pursuing the Montgomery County litigation as retaliation for her earlier EEOC complaint. In January 2004, after holding that the Montgomery County litigation was not an adverse action under Title VII's antiretaliation provision, the Honorable J. Curtis Joyner of this court granted Rohm and Haas summary judgment on Lin's Title VII and PHRA retaliation claims.

**\*2** While *Lin I* was pending, Rohm and Haas shifted its focus in the Montgomery County litigation from Lin's work with acrylic acid to Lin's work with methacrylic acid (MAA). In March 2003, Rohm and Haas learned that Lin was conducting Department of Energy (DOE)—funded research through EverNu—a single-member Pennsylvania LLC formed in 2000 by Lin. Soon after learning of EverNu, in April 2003, Rohm and Haas moved to compel Lin to produce information on EverNu's grant proposal to the DOE. And in August 2003, it subpoenaed EverNu's corporate designee, demanding documents related to EverNu's incorporation, operation, and business and technical activities. Rohm and Haas in 2004 then requested that Lin produce any information on MAA that she had submitted to the DOE. Lin never produced any of this

information, and on June 21, 2004, shortly after she lost *Lin I*, she filed another EEOC complaint, this time contending that Rohm and Haas had retaliated against her with these discovery requests.

Rohm and Haas nevertheless continued in Montgomery County to pursue MAA-related discovery and the case against Lin. In July 2004, Rohm and Haas successfully moved for court orders to enforce the MAA-related discovery requests. At Rohm and Haas's request, the court then sanctioned Lin for noncompliance. Rohm and Haas also sought and obtained a default judgment against Lin that enjoined her from using Rohm and Haas trade secrets and from continuing to research MAA, though the Pennsylvania Superior Court later overturned the MAA portion of the injunction.

Following this default judgment, Rohm and Haas contacted the DOE about Lin and EverNu. In a May 2008 letter, Rohm and Haas asked the DOE to sanction Lin and EverNu and also to disclose its plans for the MAA information that Lin and EverNu had generated. Rohm and Haas, through its in-house litigation chief, James Vouros, also sent six emails to the DOE in which it asked about the status of DOE funding for EverNu's MAA project.

A few years later, on May 13, 2011, Lin alone filed this lawsuit—EverNu is not a party. As relevant here, she claimed that Rohm and Haas violated the Title VII and PHRA antiretaliation provisions and intentionally interfered with prospective contractual relations. On March 26, 2012, in deciding Rohm and Haas's motion to dismiss, I held that Lin could not assert retaliation claims based on Rohm and Haas's August 2003 discovery requests and any prior events. Because she litigated and lost those claims in *Lin I*, she was barred from litigating them again here. But I also held that Lin could bring retaliation claims grounded in events after 2004.

Then on April 14, 2014, I denied Rohm and Haas's motion for summary judgment on the Title VII and PHRA retaliation claims. Although Judge Joyner in *Lin I* had held that the Montgomery County litigation was not an adverse action under Title VII's antiretaliation provision, I found that they could now constitute adverse actions given the Supreme Court's intervening decision in *Burlington Northern and Sante Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). As for Lin's tortious interference with prospective contractual relations claim, however, I held that she lacked standing to bring this claim because it belonged to EverNu. Responding to her claim that EverNu

is her alter ego, I found that she had adduced no evidence showing that EverNu's corporate veil should be pierced to allow her to bring this claim for EverNu.

**\*3** On September 12, 2014, with trial approaching on Lin's retaliation claims, Rohm and Haas moved to exclude/strike Lin's claims for EverNu's damages. As damages for Rohm and Haas's alleged retaliatory actions against her, Lin seeks lost licensing fees belonging to EverNu, lost profits in grants awarded to EverNu, and lost salary to Lin from EverNu as a derivative of the harm to EverNu that left EverNu unable to pay her. Highlighting my earlier ruling that Lin cannot bring EverNu's tortious interference with prospective contractual relations claim, Rohm and Haas argues that Lin also cannot collect EverNu's damages as part of her retaliation claims. Rohm and Haas also contends that I cannot pierce EverNu's corporate veil because veil piercing is never done for the shareholder's benefit and since EverNu is an entity that is separate from Lin, barring Lin from collecting its damages. After the parties argued this motion on October 9, I ordered additional briefing. With the parties' supplemental briefs submitted, I can now decide this motion.

## II. Discussion

### A. Title VII Law and EverNu's Damages
Under Title VII's antiretaliation provision, an employer may not "discriminate against" an employee "because [she] has opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated" in a Title VII proceeding. 42 U.S.C. § 2000e–3. This provision "provide[s] [employees with] broad protection from retaliation." *Burlington*, 548 U.S. at 67. Given this broad protection, Lin argues that Rohm and Haas must pay her personally for damages it caused EverNu as part of an alleged retaliatory campaign against her, and that it matters not that she and EverNu are separate entities under Pennsylvania corporate law. That position is untenable. Although Title VII provides employees with broad protection from retaliatory acts, it does not nullify state corporate law and allow Lin to collect EverNu's damages.

The Supreme Court has held that Title VII's antiretaliation provision forbids a wide range of employer action. In *Burlington*, the Court established an expansive standard for determining if an employer's action was retaliatory. In considering whether the antiretaliation provision reached employer actions taken outside of the workplace, the Court

concluded that "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace."

*Id.* at 63. The Court thus held that a plaintiff must show that the employer's action, regardless of where it took place, "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citations omitted) (internal quotation marks omitted).

The Court then held in *Thompson v. North American Stainless* that this standard applies to third-party reprisals. 562 U.S. 170, 131 S.Ct. 863, 867–69, 178 L.Ed.2d 694 (2011). There, the Court considered, in part, whether the defendant violated Title VII when it fired an employee's fiancé in retaliation for the employee's filing of an EEOC charge so that the fiancé could bring a Title VII action. *Id.* Finding it "obvious" that the defendant's action would dissuade a reasonable employee from engaging in protected activity, the Court held that this third-party reprisal—and others—violate Title VII's antiretaliation provision. *Id.* at 868. According to the Court, to hold otherwise would run counter to *Burlington'*s "broad standard," a standard adopted "because Title VII's antiretaliation provision is worded broadly." *Id.* [2]

**\*4** Lin argues that *Burlington* and *Thompson* allow her to collect EverNu's damages, without any consideration of Pennsylvania corporate law. She claims that "[t]hese decisions demonstrate that when an employer retaliates against a third party in order to punish the plaintiff, Title VII entitles the plaintiff to recover for profits that she would have received from the third party and other damages that she suffered as a result of the retaliation against the third party." Lin Supplemental Br. 1. [3] Lin further argues that *"Burlington Northern* and *Thompson* do not require analysis of corporate technicalities, such as the tax treatment of LLCs or veil piercing, when an employer retaliates against the employee's single member company." *Id.* at 7.

Despite the Court's expansive reading of the antiretaliation provision in these cases, Lin overstates its reach as applied to EverNu's damages. In both cases, the Court determined what employer actions qualify as retaliatory actions such that a plaintiff can sue under Title VII's antiretaliation provision. The Court, in essence, established only the broad standard that a plaintiff must meet to satisfy the "adverse action" component of a prima facie retaliation case. [4] The Court said nothing about collecting a third-party's damages, nothing

about disregarding the corporate structure, and nothing about Title VII nullifying state corporate law. The text of Title VII is likewise silent on Lin's position. Title VII "is thus like many another congressional enactment in giving no indication that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute." *United States v. Bestfoods,* 524 U.S. 51, 63, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (internal quotation marks omitted).

**B. Pennsylvania Corporate Law**
I thus turn to Pennsylvania corporate law to ascertain whether Lin can collect EverNu's damages should I find Rohm and Haas liable for retaliation. Lin chose to organize EverNu as a Pennsylvania LLC. As a result, Lin was able to obtain millions in federal grant dollars for EverNu [5] while also shrouding EverNu in a "corporate veil" that limited her personal liability for EverNu's debts and obligations. But with these benefits came costs, namely that Lin forfeited the right to sue for EverNu's damages. Now Lin requests that I ignore these "corporate technicalities" and, in essence, pierce EverNu's corporate veil (if Rohm and Haas is liable), allowing her to collect damages that belong to EverNu—not to Lin—under Pennsylvania corporate law. But "there is a strong presumption in Pennsylvania against piercing the corporate veil." *Lumax Indus. v. Aultman,* 543 Pa. 38, 669 A.2d 893, 895 (Pa.1995). And it is almost never done to benefit the shareholder "who created the veil in order to procure ... business advantages," as Lin has done here. *Sams v. Redevelopment Auth. of New Kensington,* 431 Pa. 240, 244 A.2d 779, 781 (Pa.1968).

**\*5** A court usually pierces the corporate veil after finding that the shareholder and the corporation are the same entity—that there is a unity of interest between them. To determine whether this is the case, the court considers the following factors: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud." *Lumax,* 669 A.2d at 895 (citation omitted).

Lin, for good reason, has not alleged any of these factors. As Rohm and Haas points out, that is because "of course, Lin would never so allege that EverNu was illegitimately established to perpetuate a fraud or that the factors for piercing the EverNu corporate veil exist, because that would

be tantamount to Lin stating that she defrauded the federal government out of millions of dollars in grant monies awarded to EverNu." Rohm & Haas Mot. Limine 10.

Besides, the Pennsylvania Supreme Court has repeatedly refused to pierce a corporate veil to benefit a shareholder who created the veil to obtain business advantages. That is because shareholders "cannot choose to accept the benefits incident to a corporate enterprise and at the same time brush aside the corporate form when it works to their (shareholders') detriment." *Sams,* 244 A.2d at 781. Before choosing a corporate form, shareholders should evaluate the "advantages and disadvantages" of that form "and after incorporation has been selected, the shareholders cannot be heard to argue that the courts should not treat them as a corporation for some purposes and as corporation for other purposes, whichever suits their present economic interest." *Id.; see also Patton v. Worthington Assocs. Inc.,* 89 A.3d 643, 649 (Pa.2014) ("Individuals elect to conduct their affairs using the corporate form for various reasons, including to insulate their personal assets from exposure to liability for the debts of the corporation.... Once these choices are made, such persons and entities are not free to blur the lines of the capacity in which they act as it may suit them, and the courts must take care to maintain the necessary distinctions.").

For similar reasons, the U.S. Supreme Court, too, has rejected the idea that a court can pierce a corporation's veil to benefit its shareholder. In *Domino's Pizza v. McDonald,* a sole shareholder sought to pierce his corporation's veil to state a claim under 42 U.S.C. § 1981, a statute that combats racial discrimination in contracts, and to collect damages under contracts that were between his corporation and Domino's. 546 U.S. 470, 473, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006). In dismissing the shareholder's claim, the Court asserted that "it is fundamental corporation and agency law—indeed, it can be said to be the whole purpose of corporation and agency law—that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." *Id.* at 477. By choosing to incorporate his company, the shareholder had accepted the advantages accompanying that decision, like limited personal liability, as well as the disadvantages, namely a lack of personal contractual rights under his corporation's contracts. *Id.* at 477. The Court thus held that the shareholder could not state a § 1981 claim to seek contractual damages that belonged to his corporation, as this outcome would "make[ ] light of the law of corporations." *Id.*

**\*6** Here, when Lin chose to structure EverNu as a LLC, she insulated herself from personal liability for EverNu's debts and obligations. *See* 15 Pa. Cons.Stat. Ann. § 8922(a) ("[T]he members of a limited liability company shall not be liable, solely by reason of being a member, ... for a debt, obligation or liability of the company of any kind or for the acts of any member, manager, agent or employee of the company."). Indeed, as a Pennsylvania LLC, EverNu was "a separate, fictional legal person distinct from [Lin]." *Missett v. Hub Int'l Pennsylvania, LLC,* 6 A.3d 530, 535 (Pa.Super.Ct.2010).[6] A cornerstone of corporate law, this corporate veil provided Lin with a significant benefit—limited liability for the debts and obligations of EverNu.

By forming EverNu as a Pennsylvania LLC, Lin also positioned EverNu to receive millions of dollars in DOE grant money. Between January 2002 and April 2008, EverNu received $3.2 million in grants under the DOE Small Business Innovative Research Program (SBIR). To receive this money under the SBIR, EverNu had to qualify as a "business concern," meaning Lin as an individual never could have obtained this SBIR grant money. 13 C.F.R. § 121.702. Lin, in effect, formed EverNu LLC to obtain federal grant money that she needed to pursue her MAA research, inuring to her another benefit of her chosen corporate form.

But Lin's decision to form EverNu as a Pennsylvania LLC did not come without costs. When she structured EverNu in this way, she forfeited her rights to any property acquired by EverNu, such as EverNu's MAA patent. *See* 15 Pa. Cons.Stat. Ann. § 8923(a) ("Property transferred to or otherwise acquired by a limited liability company becomes property of the company. A member has no interest in specific property of a company."). Most importantly, she relinquished her right to sue for damages that belong to EverNu. *See id.* § 8991(b) ("A member of a company is not a proper party to an action or proceeding by ... the company ....").

In light of the forgoing authority, I refuse to pierce EverNu's corporate veil at the request of Lin, the person who created it. By structuring EverNu as a Pennsylvania LLC, Lin accepted not only the business benefits accompanying that corporate form, such as limited personal liability and millions of dollars in federal grant money, but also the costs associated with it, namely the inability to sue for damages that belong to EverNu.

She therefore cannot now try to avoid that cost because it suits her economic interests in this litigation. [7]

### III. Conclusion

For these reasons, I exclude Lin's claims for lost licensing fees belonging to EverNu, lost profits in grants awarded to EverNu, and lost salary to Lin from EverNu as a derivative of the harm to EverNu that left EverNu unable to pay her. While Lin correctly asserts that Rohm and Haas's alleged acts against EverNu can qualify as retaliatory acts under Title VII against her, she cannot recover EverNu's damages based on such retaliatory acts against EverNu. An appropriate order has previously been issued.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 273035, 125 Fair Empl.Prac.Cas. (BNA) 1820

## Footnotes

1    I recount only an abbreviated version of this case's background and concentrate on facts relevant to this motion.

2    The Court, however, said nothing to suggest that the employee who filed the EEOC complaint could recover whatever damages the fiancé may have suffered as a result of the defendant's actions. Indeed, in *Thompson* it was the terminated fiancé who brought the action.

3    Besides *Burlington Northern* and *Thompson,* which do not support this position, Lin cites only *Allen v. Radio One of Texas II, LLC,* Civ. No. H–09–4088, 2011 WL 5156688 (S.D.Tex. Oct.28, 2011). That case has no precedential effect here, and, in any event, the Fifth Circuit later reversed the district court's decision on a different ground. *See Allen v. Radio One II, LLC,* 515 F. App'x 295 (5th Cir.2013).

4    Indeed, at the summary judgment stage, I held that Lin had alleged facts sufficient to satisfy this broad standard. *See Lin v. Rohm & Haas,* No. 2:11–cv–3158–WY, 2014 WL 1414304, at *6 (E.D.Pa. Apr.14, 2014) ("The Montgomery County Litigation requests at issue in this case ... are sufficient to establish a prima facie case that they 'might well have dissuaded a reasonable [scientist-employee] from making or supporting a charge of discrimination.' " (quoting *Burlington,* 548 U.S. at 57)).

5    The Small Business Administration regulation governing the Small Business Innovative Research Program offering federal grant monies through the DOE requires the grantee to be a business and not an individual.

6    Lin agrees that "EverNu and [she] are separate legal entities with separate legal interests." Rohm & Haas Mot. Limine, Ex. B. At oral argument, however, she retreated from this position, claiming that federal tax law views her and EverNu as one and the same because EverNu's profits pass through EverNu directly to her. But this is not true for Pennsylvania (the incorporating state) tax law. *See* 15 Pa. Cons.Stat. Ann. § 8925(a) (treating LLCs as corporations for tax purposes). Moreover, federal tax law is only one factor, of many, determining whether this corporate veil should be pierced under Pennsylvania law.

7    EverNu certainly has the right to sue Rohm and Haas under a different legal theory for the damages Lin seeks here, and it has already done so in the Philadelphia Court of Common Pleas in 2010. Rohm & Haas Mot. Limine, Ex. B.

End of Document                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 23162399
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

PROJECT MANAGEMENT
INSTITUTE, INC. et al. Plaintiffs,
v.
Lewis R. IRELAND et al. Defendants.

No. Civ.A. 03–1712.
|
Filed March 21, 2003.
|
Dec. 30, 2003.

**Attorneys and Law Firms**

represented by Julie L. Kitze, Neil Alan Morris, Neil A. Morris Associates, PC, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, for Project Management Institute, Inc., Plaintiff.

represented by Julie L. Kitze, Neil Alan Morris, (See above for address), Lead Attorney, Attorney to be Noticed, for Harold Reeve, Ph.D., Plaintiff.

represented by Neil Alan Morris, (See above for address), Lead Attorney, Attorney to be Noticed, for Hugh Woodward, Plaintiff.

represented by Lewis R. Ireland, Clarksville, TN, Defendant, pro se.

represented by Lewis R. Ireland, Clarksville, TN, (See above for address), Counter Claimant, pro se.

*MEMORANDUM and ORDER*

YOHN, J.

*1 Plaintiffs, Project Management Institute, Inc. ("PMI"), Harold Reeve and Hugh Woodward, bring this suit against defendants, Lewis R. Ireland and Lew Ireland & Associates, Inc. ("Ireland, Inc."), alleging violation of the settlement agreement and consent decree from the parties' previous action before this court (count I), wrongful use of civil proceedings in violation of 42 PA. CONS.STAT. § 8351 et seq. (count II), and abuse of process (count III). Defendant

Ireland also brings a counterclaim, alleging "aggressive and unlawful actions intended to do harm and materially affect [defendant]'s reputation as well as his ability to earn a living for himself and his family." Counterclaim 1. Defendant Ireland's counterclaim has been dismissed in a separate order.

Presently before this court is plaintiffs' motion for partial summary judgment. More specifically, plaintiffs seek summary judgment on liability for all counts, but leave judgment on damages and potential punishment or penalty for defendants to be decided at trial. The court has considered plaintiffs' motion for summary judgment and brief in support thereof, defendant Ireland's response thereto and brief in support of his opposition, and Ireland's addendum to his response. For the reasons set forth below, I will grant plaintiffs' motion for summary judgment on liability for count I against defendant Ireland, but will deny their motion for summary judgment on liability for counts II and III.

BACKGROUND

This is the fourth time these parties are before this court, now addressing substantially the same issues that have previously been before the court. The original case was filed on October 1, 1999 by the current plaintiffs against the current defendants, alleging defamation, breach of contract, tortious interference with existing contracts, intentional infliction of emotional distress and negligence. On April 11, 2000 the parties reached a settlement agreement, which was entered as a consent decree by this court on May 23, 2000. The portion of the consent decree at issue in the instant case is defendants' release and discharge of plaintiffs "from any and all claims, liabilities, demands and causes of action known or unknown, fixed or contingent, which they may have or claim to have against plaintiffs ... arising from or relating to the subject matter of the lawsuit." Consent Decree 5. Defendant Ireland filed a lawsuit in the District of Colorado on October 1, 2001. [1] That court dismissed the case on March 26, 2002, following the January 24, 2002 recommendation of a magistrate judge. The court concluded that (1) it did not have jurisdiction to hear the case, and (2) even if it allowed Ireland to cure the jurisdictional deficiency, the May 23, 2000 consent decree of this court barred the suit. [2] After the magistrate judge issued his recommendation, but before the court issued its final decision, Ireland filed a motion to dismiss the original action in this court, which this court interpreted as an action for relief from judgment under FED. R. CIV. P.

60(b). Ireland's motion was denied, which means that the May 23, 2000 consent decree remained (and still does remain) in effect. Plaintiffs filed the instant action on March 21, 2003. On June 9, 2003, Ireland again attempted to reopen the original case, filing a motion for summary judgment or new hearing. This motion was dismissed on July 18, 2003.

## STANDARD OF REVIEW

**\*2** Either party to a lawsuit may file a motion for summary judgment, and the court will grant it "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, LTD.,* 90 F.3d 737, 743 (3d Cir.1996) (citation omitted). When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986), and "all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* Additionally, "[s]ummary judgment may not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy,* 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990).

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex v. Catrett,* 477 U.S. 317, 325 (1986)). Further, the non-moving party has the burden of producing evidence to establish prima facie each element of his claim. *Celotex,*

477 U.S. at 322–23. The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson,* 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." ' *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citations omitted).

## DISCUSSION

I. Count I—Violation of the Consent Decree
Plaintiffs provide two different, but similar legal arguments in support of their motion for summary judgment on liability for defendant Ireland's failure to abide by the terms of the consent decree entered May 23, 2000. Plaintiffs argue that defendant's initiation of a suit against plaintiffs in the District of Colorado on October 1, 2001 violated the May 23, 2000 consent decree of this court and that defendant should therefore be liable for civil contempt or, in the alternative, breach of contract. Count I of plaintiffs' complaint is clearly for civil contempt (although not explicitly stated), as opposed to breach of contract. It appears plaintiffs include the breach of contract argument in their motion for summary judgment in case the court does not find its civil contempt argument convincing. [3] Since I will grant summary judgment on plaintiffs' claim for civil contempt, I need not address the breach of contract claim.

**\*3** The Third Circuit has made clear that "[t]o prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order. *Harris v. City of Philadelphia,* 47 F.3d 1311, 1326 (3d Cir.1995) (citation omitted). Although Ireland argues that a valid order did not exist, Def. Resp. to Pl.'s Mot. for Partial Summ. J. 6, he provides no evidence that this court's May 23, 2000 consent decree was invalid. In fact, this court has previously rejected defendant's arguments to this effect. Defendant filed a motion for relief from judgment under FED. R. CIV. P. 60(b) on March 18, 2002, arguing: (1) he was not mentally competent to enter into the settlement agreement because he was "overmedicated;" (2) the text of the agreement had been altered from what he negotiated; (3) PMI already violated the confidentiality clause of the agreement; and (4) the initiation of the suit by plaintiff Reeve was in violation of PMI's own regulations. *See* Order of July 18, 2002. These claims were

dismissed without prejudice. *See id.;* Order of August 16, 2002. Ireland also filed a motion for summary judgment or new hearing on June 9, 2003, again arguing that he was not competent to enter into the settlement agreement. Defendant additionally complained of deficiencies in the hearing that resulted in the court's August 16, 2002 decision. This motion was denied on July 18, 2003. *See* Order of July 18, 2003. The court noted in that order that "[t]his litigation ended three years ago by the agreement of the parties. The present issue [as to Ireland's mental state] has also been previously litigated. It is time for the defendant[ ] ... to move on." In other words, the court made it abundantly clear that the settlement agreement and resulting consent decree were valid and enforceable. Ireland has only offered the allegations and arguments previously dismissed by this court, and has failed to show that there is a genuine issue of material fact regarding the validity of the consent decree. Hence, the first prong of the three-part test for a finding of civil contempt is established.

Ireland clearly knew of the order. First, plaintiffs filed a petition to find Ireland in contempt of court and/or to enforce the consent decree on September 1, 2000, and the court held a hearing on this petition. After defendant agreed to comply with the consent decree, plaintiffs asked this court to consider their request for contempt sanctions. The court responded:

> Let's— let's see how quickly he complies with this, before I make a ruling on that [the request for contempt sanctions]. What I will do is, I will continue this hearing until next Friday and assuming that everything gets done as has been promised, then I will dismiss the petition as moot; if it doesn't get done as promised, then we'll be back here next Friday and I'll consider what other remedies, including counsel fees and fines and jail terms and things like that. All right.

**\*4** Defendant cannot claim, after being threatened with sanctions for failure to abide by the consent decree, that when he filed his suit in Colorado a year later he did not know about the consent decree.

In fact, Ireland referenced the initial suit in his complaint filed in the District of Colorado. *See* Colo. Compl. ¶¶ 33–

34. Defendant does not now deny that he knew of the order when he filed his action in Colorado. Rather, as he has done many times before, including during the suit in Colorado, defendant denies the validity of the order because (1) he was "overmedicated" during the negotiation and final settlement, and (2) the agreement was altered after he signed it. As the magistrate judge in the Colorado action noted, "While plaintiff now claims that he did not sign the Consent Decree that was filed in Pennsylvania, ... and that he allegedly raised that claim before the Pennsylvania court, his remedy is either with the Pennsylvania court or an appellate court, rather than filing an action here on the same issues." Colo. Mag. Rep. & Rec. 7. The court, accepting the magistrate judge's recommendation to dismiss Ireland's suit, stated further, "The fact that Plaintiff's 'many efforts to correct the records have not been successful because of a lack of understanding about how one can achieve the action' provides no basis to allow Plaintiff to circumvent the Consent Decree and raise these issues in this Court." Colo. Op. 4–5. Clearly, the court in Colorado was under the impression that Ireland knew about this court's May 23, 2000. Since defendant has provided no evidence to the contrary, I must also conclude that defendant knew about the May 23, 2000 consent decree when he filed suit in Colorado, thereby satisfying the second prong of the three-part test for a finding of civil contempt.

Finally, it is beyond doubt that the defendant violated he consent decree, which provides in pertinent part:

> Defendant[ ] Lewis Ireland ... agree[s] to release and forever discharge Plaintiffs PMI, Harold Reeve ... from any and all claims, liabilities, demands and causes of action known or unknown, fixed or contingent, which they may have or claim to have against Plaintiffs, PMI and Harold Reeve, Ph.D., arising from or relating to the subject matter of the Lawsuit. Defendant[ ] Lewis R. Ireland ... further expressly acknowledge[s] that this settlement agreement and mutual release is intended to include in its effect, without limitation, all claims unknown or unsuspected to exist at the time of execution hereof, and that this settlement agreement and mutual release contemplates the

extinguishment of any and all such claim or claims. This release is not intended to and does not release or waive any claims which are derived from events which occur after the date of this Agreement.

As the court in the District of Colorado noted, "Plaintiff agreed not to bring the very type of action against PMI and its representatives that is at issue in this lawsuit, and ... the Consent Decree is a bar to this action." Colo. Op. 4. After reviewing both Ireland's complaint in the Colorado action and plaintiffs' complaint in the original action before this court, I agree with the court in the District of Colorado that the suit filed in that court is in violation of the May 23, 2000 consent decree.

**\*5** Ireland has failed to show that there is a genuine issue of material fact that would preclude this court from granting plaintiffs' motion for summary judgment on liability for count I. Defendant has also neglected to raise any doubt as to whether plaintiffs are therefore entitled to judgment as a matter of law. Accordingly, I will grant plaintiffs' motion for summary judgment on liability for civil contempt.

## II. Count II—Wrongful Use of Civil Proceedings

Plaintiffs allege that defendant's filing of the suit in the District of Colorado constitutes a wrongful use of civil proceedings under 42 PA. CONS.STAT. §§ 8351–54, also known as the "Dragonetti Act." [4] To recover under this statute, plaintiff must prove that: "(1) The underlying proceedings terminated in his or her favor; (2) The defendant caused those proceedings to be instituted without probable cause; and, (3) The proceedings were instituted for an improper purpose." *Hart v. O'Malley*, 781 A.2d 1211, 1219 (Pa.Super.Ct.2001).

Because Ireland is currently *pro se* and was when he filed suit in the District of Colorado, I will consider issues that defendant did not raise himself in the instant suit. First, it is important to ensure that a claim for wrongful use of civil proceedings could be brought under Pennsylvania law based on a proceeding filed elsewhere. The Pennsylvania courts have made it clear that the proceeding at issue need not have been conducted in Pennsylvania for an individual to be liable under the Dragonetti Act. *See* *Werner v. Plater–Zyberk*, 799 A.2d 776, 786–787 (Pa.Super.Ct.2002) ("Neither

the Dragonetti Act itself, nor subsequently decided case law concerning malicious prosecution or abuse of process, impose any restriction prohibiting an aggrieved party from seeking redress in Pennsylvania state court predicated on process served in, or 'civil proceedings' conducted in, a jurisdiction other than this Commonwealth."). So, the fact that the proceedings at issue were brought in the District Court of Colorado does not preclude liability for wrongful use of civil proceedings under 42 PA. CONS.STAT. § 8351.

Next, it is necessary to determine whether a claim for wrongful use of civil proceedings could be brought against an individual who was *pro se* when he or she brought the relevant proceeding. The state courts in Pennsylvania and federal district courts in Pennsylvania have found individuals liable for wrongful use of civil proceeding and abuse of process even though they were *pro se* when they brought the proceedings at issue. *See Cilo v. Shields*, 33 Pa. D. & C.4th 10 (Pa.Com.Pl.1996); *Lal v. Borough of Kennett Square*, 786 A.2d 1019 (Pa.Commw.Ct.2001); *Toner v. Wilson*, 102 F.R.D. 275 (M.D.Pa.1984); *Frempong–Atuahene v. City of Philadelphia*, 2000 WL 233216 (E.D.Pa.2000); *Wexler v. Citibank*, 1994 WL 580191 (E.D.Pa.1994). The actions of the defendants in these cases, however, are much more egregious than those of defendant Ireland in the instant case. For example, in *Shields*, defendant "acknowledged that he had no proof of the allegations in his complaint that [plaintiff] committed fraud and deception." *Cilo*, 33 Pa. D & C.4th at 13. In *Toner*, plaintiff, against whom sanctions were sought for abusing the discovery process in this particular case, had brought eleven suits over a three year period. *Toner*, 102 F.R.D. at 276. This court has consistently recognized that "courts traditionally have shown *pro se* litigants a leniency not extended to those with legal representation." *Wexler*, 1994 WL 58019, at \*6*Wexler*, 1994 WL 58019, at \*6 (citing *In re McDonald*, 489 U.S. 180, 184 (1989)). So, although defendant Ireland's *pro se* status does not preclude a finding of liability for wrongful use of civil proceedings, it will be taken into consideration when addressing plaintiffs' claims. More specifically, Ireland's actions will be viewed with some degree of leniency.

**\*6** Regardless of this leniency, plaintiffs easily meet the first prong, that the proceedings at issue terminated in plaintiffs' favor, as the case Ireland filed in the District of Colorado against plaintiffs was dismissed for lack of jurisdiction and because the action was barred by this court's May 23, 2000 consent decree. Plaintiff does not challenge that the dismissal

constitutes a termination in plaintiffs' favor. The other two prongs are not as easily met, however.

Section 8352 of the Dragonetti Act explains that an individual "has probable cause for [initiating a proceeding] if he reasonably believes in the existence of the facts upon which the claim is based, and ... [r]easonably believes that under those facts the claim may be valid under the existing or developing law...." 42 PA. CONS.STAT. § 8352. Pennsylvania courts have made it clear that "probable cause is properly determined by the court when there are no material conflicts in the evidence." *Bannar v. Miller*, 701 A.2d 242, 248 (Pa.Super.Ct.1997). In the instant case, there are no material conflicts in the evidence concerning the existence of probable cause; in the May 23, 2000 consent decree, Ireland agreed to release plaintiffs from all claims arising from the subject of the original lawsuit and then a year later Ireland filed suit in the District of Colorado for claims that were the subject of the original lawsuit in Pennsylvania. Even though I must show some leniency toward defendant because he was *pro se* when he filed suit in Colorado, the "reasonable belief" standard is an objective one. I conclude that it is not reasonable for a person who knowingly and voluntarily waived his right to pursue claims against some individuals to believe that he could then, one year later, file another suit against those same individuals on the same claims. Hence, plaintiffs meet the second prong of the three-part test for a finding of wrongful use of civil proceedings.

However, plaintiffs fail to meet the third prong of this test, that the proceedings were instituted for an improper purpose. As the Dragonetti Act itself states, "[T]he plaintiff has the burden of proving that [*inter alia* ] ... [t]he primary purpose for which the proceedings were brought was not that of securing the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based." 42 PA. CONS.STAT. § 8354. This court has explained, "Even if a party lacked probable cause ... in filing a suit, that party is not liable under the Dragonetti Act unless the suit also was filed for an improper purpose." *Beasley v. Hartman, Nugent, & Zamost*, 2002 WL 31478855, at *5 (E.D.Pa.2002) (citing 42 PA. CONS.STAT. ANN. § 8351 (West 1998) and *Broadwater v. Sentner*, 725 A.2d 779, 784 (Pa.Super.Ct.1999)). Plaintiffs point out that it is not necessary to "present a 'confession' that defendant acted with an improper purpose," *Gentzler v. Atlee*, 660 A.2d 1378, 1385 (Pa.Super.Ct.1995), and rely instead on the oft-repeated holding that "improper purpose may be inferred from want

of probable cause to maintain or continue the proceedings." *Buchleitner v. Perer*, 794 A.2d 366, 377 (Pa.Super.Ct.2002). Although such an inference is permissible, it is not required.

**\*7** Given defendant's *pro se* status when he filed suit in Colorado, it is entirely possible that a factfinder could conclude that even though defendant did not have a reasonable belief that he could bring the cause of action, defendant did not actually file suit for an improper purpose. Rather, a factfinder could believe that the "primary purpose for which the proceedings were brought *was* ... adjudication of the claim on which the proceedings were based." 42 PA. CONS.STAT. § 8354 (emphasis added). A factfinder could conclude that defendant simply did not understand the consequences of the consent decree, and that this ignorance does not constitute an improper purpose. This would mean plaintiffs failed to meet the third prong of the three-part test for wrongful use of civil proceedings. Because this is a motion for summary judgment, I must interpret all inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Since I find that a reasonable factfinder could infer from the facts that defendant did not act with an improper purpose, plaintiffs' motion for summary judgment on liability for wrongful use of civil proceedings must be denied.

### III. Count III—Abuse of Process

"Abuse of process" is defined as "the use of legal process against another 'primarily to accomplish a purpose for which it is not designed." ' *Rosen v. American Bank of Rolla*, 627 A.2d 190, 192 (Pa.Super.Ct.1993) (quoting RESTATEMENT (SECOND) OF TORTS, § 682). This tort, like wrongful use of civil proceedings, requires plaintiff to meet a three-part test. "[I]t must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." *Id.* Although plaintiffs claim in their complaint that Ireland should be liable for the tort of abuse of process, they do not spend much time or energy arguing that they are entitled to summary judgment on this claim. Instead, they define the tort and then simply state, "Plaintiffs submit that judgment is warranted, in their favor on the abuse of process claims as well." Pl. Mot. for Summ. J. 29–30. I disagree with plaintiffs' conclusory statement for two reasons. First, as discussed above, there is a genuine issue of material fact concerning whether or not defendant brought the suit in Colorado for an improper purpose, the second prong of the three-part test. Second,

"[t]he Supreme Court of Pennsylvania, as well as lower appellate courts, have held that the abuse of process tort is inapplicable to the improper *initiation* of a civil proceeding." *Barakat v. Delaware County Memorial Hospital,* 1997 WL 381607, at *2 (E.D.Pa.1997) (citing five Pennsylvania court cases in support of its conclusion). Plaintiffs do not allege, or produce any evidence, that defendant was responsible for a perversion of a process after it had issued. Their claim focuses on defendant's initiation of the suit in Colorado. This does not support a finding of liability for the tort of abuse of process under Pennsylvania law. Hence, plaintiffs' motion for summary judgment on liability for abuse of process is denied.

## CONCLUSION

**\*8** Plaintiffs' motion for summary judgment will be granted in part and denied in part. Ireland has failed to show that there is a genuine issue of fact concerning plaintiffs' claim for civil contempt against him. Hence, plaintiffs' motion for summary judgment on liability for this claim will be granted. In contrast, defendant has shown that (1) there is a genuine issue of material fact concerning plaintiffs' claim for wrongful use of civil proceedings, and (2) plaintiffs' are not entitled to judgment as a matter of law on their claim for abuse of

process. For these reasons, plaintiffs' motion for summary judgment on these claims will be denied. An appropriate order follows.

## ORDER

And now, this 30th day of December, 2003, upon consideration of plaintiffs Project Management Institute, Inc., Harold Reeve and Hugh Woodward's motion for partial summary judgment and brief in support thereof, defendant Ireland's response thereto and brief in support of his opposition, and Ireland's addendum to his response, it is hereby ORDERED that the plaintiffs' motion is GRANTED in part and DENIED in part. Judgment is ENTERED as to liability in favor of Project Management Institute, Inc., Reeve and Woodward on their claim against defendant Lewis R. Ireland on liability for civil contempt (count I). Summary judgment is DENIED on plaintiffs' claims for wrongful use of civil proceedings (count II) and abuse of process (count III).

## All Citations

Not Reported in F.Supp.2d, 2003 WL 23162399

## Footnotes

1    Defendant Ireland, Inc. was not a party to the suit filed in Colorado. *See* Pl. Exs. G–I. Plaintiffs do not explain how defendant Ireland, Inc. could be responsible for the initiation of proceedings by defendant Lewis Ireland. Although defendant Ireland, Inc. has not filed a motion for summary judgment on all claims against it, and hence, has not been officially dismissed from this suit, this memorandum and order will only deal with defendant Lewis Ireland individually.

2    The Colorado district court found that the consent decree barred the Colorado action because "[t]he allegations [in the Colorado suit] clearly involve the same issues as the Pennsylvania action, and arise from or relate to the subject matter of that lawsuit." Pl.Ex. I at 4. It does appear, however, that some of the claims asserted in the Colorado action were based on events that took place after the consent decree was entered on May 23, 2000. There is no need to address this discrepancy here, though, because the vast majority of the claims asserted by Ireland in the Colorado action appear to violate the consent decree. These claims are the focus of the instant action.

3    A claim for breach of contract does not allow for some of the types of remedies plaintiffs seek, i.e. punitive damages. *See Axcan Scandipharm, Inc. v. American Home Products,* 2003 WL 21731124, at *4 (Pa.Com.Pl.2003) ("Punitive damages are not available for a mere breach of contract.") (citing *Baker v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* 536 A.2d 1357, 1367 (Pa.Super.1987), *aff'd* 522 Pa. 80, 559 A.2d 914 (1989)); *Williams v. Katawczik,* 53 Pa. D. & C.4th 558, 568 (Pa.Com.Pl.2001) ("Claims for punitive damages

are dismissed because Pennsylvania does not award punitive damages for a bad faith breach of contract.")

(citing *Johnson v. Hyundai Motor Am.*, 698 A.2d 631, 639 (Pa.Super.1997)). Hence, it is clear that plaintiffs intend their breach of contract argument to be considered only in the event that their civil contempt claim fails.

4     Plaintiffs also allege in their complaint that defendant's attempt in this court to set aside the May 23, 2000 consent decree more two years after it was entered constitutes a wrongful use of civil proceedings under the Dragonetti Act. Compl ¶ 56–61. However, since plaintiffs did not address this claim in their motion for summary judgment on liability, I will not address it here.

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Sondesky v. Cherry Scaffolding, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 3873578, 2017 Wage & Hour Cas.2d (BNA) 311,489

2017 WL 3873578
United States District Court, E.D. Pennsylvania.

Linda SONDESKY, Plaintiff,

v.

CHERRY SCAFFOLDING, INC., et al., Defendants.

CIVIL ACTION No. 16-5667
|
Filed 09/05/2017

**Attorneys and Law Firms**

Timothy M. Kolman, Wayne A. Ely, W. Charles Sipio, Kolman Ely PC, Penndel, PA, for Plaintiff.

Steven F. Marino, Marino Associates, Michael D. Homans, Flaster/Greenberg P.C., Philadelphia, PA, Melissa Hazell Davis, Flaster Greenburg, PC, Cherry Hill, NJ, for Defendants.

## MEMORANDUM

ANITA B. BRODY, DISTRICT JUDGE

**\*1** Plaintiff Linda Sondesky brings suit against Defendants Cherry Scaffolding, Inc. ("Cherry Scaffolding") and Stephen Ellis. Sondesky asserts claims under the Fair Labor Standards Act ("FLSA") and the Pennsylvania Wage Payment and Collection Law ("WPCL") against all Defendants. First Am. Compl. 4-5, ECF No. 12. In addition, Sondesky asserts Dragonetti Act and common law abuse of process claims against Cherry Scaffolding only. *Id.* at 5. Cherry Scaffolding asserts counterclaims against Sondesky for conversion and breach of fiduciary duty.[1] Defs.' Answer and Countercl. 12-16, ECF No. 31.

Defendants have moved to dismiss Plaintiff's First Amended Complaint for failure to state a claim and have also moved for judgment on the pleadings as to all counts of Plaintiff's First Amended Complaint. Defs.' Mot. Dismiss, ECF No. 15; Defs.' Mot. J. Pleadings, ECF No. 38. Plaintiff has moved for judgment on the pleadings as to Cherry Scaffolding's counterclaims. Pl.'s Mot. J. Pleadings, ECF No. 34. I will grant Defendants' motion to dismiss Sondesky's WPCL claim and her abuse of process claim. I will deny Defendants' motion to dismiss Sondesky's FLSA and Dragonetti Act

claims. I will deny both parties' motions for judgment on the pleadings.

## I. BACKGROUND[2]

Sondesky was employed by Cherry Scaffolding as a bookkeeper from October 22, 2015 until March 7, 2016. Sondesky's rate of pay on her last day of work was $28.85 per hour. Sondesky asserts that she was a non-management employee and that her position was not exempt from any state or federal laws governing overtime pay. At some point during her employment, Sondesky had a telephone conversation with Ellis, who serves as President and Treasurer of Cherry Scaffolding. Sondesky informed Ellis that the office was in disarray and that she would need to be paid in full for all hours that she worked as the bookkeeper. Ellis confirmed that he understood Sondesky's position. Sondesky subsequently submitted all of her hours, including overtime, to payroll, and Cherry Scaffolding's management approved her compensation.

In early March of 2016, Cherry Scaffolding terminated Sondesky without a specific reason. Following her termination, Cherry Scaffolding filed a lawsuit against Sondesky in Pennsylvania Magisterial District Court (the "State Court Action") seeking to recover overtime compensation from Sondesky. On June 23, 2016, judgment in that suit was entered in Sondesky's favor.

**\*2** In its Answer and Counterclaim, Cherry Scaffolding asserts that Sondesky had access to Cherry Scaffolding's bank accounts and withdrew $2,566.09 without justification. Sondesky refused Cherry Scaffolding's demands to return the money.

## II. STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial —a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment will only be granted where the

Sondesky v. Cherry Scaffolding, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3873578, 2017 Wage & Hour Cas.2d (BNA) 311,489

moving party clearly establishes there are no material issues of fact, and that he or she is entitled to judgment as a matter of law." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 259 (3d Cir. 2008). There is "no material difference in the applicable legal standards" for a motion for judgment on the pleadings under Rule 12(c) and a motion to dismiss under Rule 12(b)(6). *Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered...." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (citations omitted) (internal quotation marks omitted). Thus, a court may "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). Further, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. DISCUSSION

Defendants move to dismiss and move for judgment on the pleadings on all claims brought against them. I will deny both of Defendants' motions as to the FLSA claim (Count I) and the Dragonetti Act claim (Count III) because the facts alleged in the Amended Complaint raise a plausible right to relief.[3] I will dismiss the WPCL claim (Count II) and the abuse of process claim (Count IV) because Sondesky has failed to state a claim under both.

**\*3** Plaintiff moves for judgment on the pleadings on Cherry Scaffolding's counterclaims, arguing the counter claims are barred by res judicata. I will deny Plaintiff's motion because, based on the limited record before me, it is insufficiently clear that Cherry Scaffolding's counterclaims were previously adjudicated on the merits.

### A. Defendants' Motion to Dismiss & Motion for Judgment on the Pleadings

#### i. Count I—FLSA

Defendants move to dismiss Sondesky's claim alleging retaliation in violation of the FLSA (Count I). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (applying *McDonnell Douglas* framework to analogous provision of Pennsylvania law); *Cononie v. Allegheny Gen. Hosp.*, 29 Fed.Appx. 94, 95 (3d Cir. 2002) (holding FLSA retaliation claims are analyzed under *McDonnell Douglass* framework).

Defendants argue that Sondesky's claim fails because she has not alleged that she engaged in a protected activity. Sondesky contends that her telephone conversation with Ellis —during which she demanded that she be compensated for all hours actually worked, including overtime—constitutes an oral complaint that is protected under the FLSA. "To fall within the scope of the [FLSA] antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection. This standard can be met, however, by oral complaints, as well as by written ones." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).

Based on the facts alleged in the Amended Complaint, Sondesky's telephone conversation with Ellis plausibly satisfies the standard set by the Supreme Court in *Kasten*.

Sondesky v. Cherry Scaffolding, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3873578, 2017 Wage & Hour Cas.2d (BNA) 311,489

Sondesky asserts that she told Ellis that she would need to be paid for all hours actually worked, including overtime. Sondesky's right to overtime compensation is a right protected under the FLSA, and her demand to be paid any overtime compensation actually due is a clear assertion of that right.[4] See 29 U.S.C. § 207(a)(1). I will therefore deny Defendants' motion to dismiss and motion for judgment on the pleadings as to Count I.

### ii. Count II—WPCL

Defendants move to dismiss Sondesky's claim alleging violation of the Pennsylvania WPCL (Count II). They argue that the WPCL does not include an anti-retaliation provision comparable to that found in the FLSA and that Sondesky has failed to allege any other facts that could give rise to a claim under the WPCL. This is correct. The WPCL includes a private right of action for an employee to recover unpaid wages and liquidated damages. 43 P.S. § 260.9a. The statute is silent about an employee's right to bring a claim for retaliation. Federal courts that have considered the issue have concluded that the WPCL does not include a cause of action for retaliatory termination. *See Donaldson v. Informatica Corp.*, 792 F. Supp.2d 850 (W.D. Pa. 2011) (predicting the Pennsylvania Supreme Court would not allow a cause of action for wrongful discharge based on the WPCL); *Pease v. Faro Techs.*, No. 15-CV-3586, 2016 WL 705240 (E.D. Pa. Feb. 22, 2016) (concluding the WPCL does not provide an exception to the strong presumption of at-will employment). I will therefore grant Defendants' motion to dismiss Count II of Sondesky's First Amended Complaint.[5]

### iii. Count III—Dragonetti Act

*4 Cherry Scaffolding moves to dismiss Sondesky's claim alleging wrongful use of civil proceedings in violation of Pennsylvania's Dragonetti Act (Count III). To prove a claim for wrongful use of civil proceedings, plaintiffs must show that "(1) the underlying proceedings were terminated in [plaintiffs'] favor; (2) defendants caused those proceedings to be instituted against plaintiffs without probable cause; and (3) the proceedings were instituted for an improper cause." *Sabella v. Estate of Milides*, 992 A.2d 180, 188 (Pa. Super. Ct. 2010).

Sondesky has unquestionably pled the first element; the parties do not dispute that Cherry Scaffolding filed the State Court Action against Sondesky and that judgment was entered in Sondesky's favor. Cherry Scaffolding argues, however, that Sondesky has not sufficiently pled the second and third elements of her claim. Cherry Scaffolding asserts that the allegations in Sondesky's complaint "merely establish[ ] that Cherry Scaffolding brought the [State Court Action] to recover overtime that it believed should not have been paid to Plaintiff." Defs.' Mot. Dismiss 6, ECF No. 15. This argument ignores other portions of Sondesky's First Amended Complaint. Sondesky explicitly alleges that the suit was brought as "an act of further retaliation for trying to be paid fair wages." First Am. Compl. 4, ECF No. 12. The complaint also alleges that, in bringing the state court suit, Cherry Scaffolding "acted in a grossly negligent manner or without probable cause" and brought the suit for an improper purpose. *Id.* at 5. An action brought solely for the purpose of retaliation could serve as the basis for a valid Dragonetti Act claim. Thus Sondesky has sufficiently pled her claim for wrongful use of civil proceedings, and I will therefore deny Cherry Scaffolding's motion to dismiss and motion for judgment on the pleadings as to Count III.

### iv. Count IV—Abuse of Process

Cherry Scaffolding moves to dismiss Sondesky's claim for common law abuse of process when it initiated the State Court Action (Count IV). The elements of an abuse of process claim are: "(1) use [of] legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed, and (3) harm has been caused to the plaintiff." *Lerner v. Lerner*, 954 A.2d 1229, 1238 (Pa. Super. Ct. 2008). "The gist of an action for abuse of process is the improper use of process *after it has been issued* ...." *Publix Drug Co. v. Breyer Ice Cream Co.*, 32 A.2d 413, 415 (Pa. 1943) (internal citations omitted). Both the courts of Pennsylvania and the Court of Appeals for the Third Circuit have continued to recognize this requirement. *See, e.g.,* *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 304-07 (3d Cir. 2003) (noting that "the test that courts should use in deciding what circumstances amount to an abuse of process has been clearly enunciated by the Supreme Court of Pennsylvania"); *McGee v. Feege*, 535 A.2d 1020, 1023 (Pa. 1987) (reaffirming *Publix*).

Sondesky v. Cherry Scaffolding, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3873578, 2017 Wage & Hour Cas.2d (BNA) 311,489

In her First Amended Complaint, Sondesky fails to include any facts involving conduct by the Defendants after the initiation of the state court suit. Sondesky urges this Court to "surmise ... that the entire process was used in a way to intimidate" her. Pl.'s Rsp. Opp'n Defs.' Mot. Dismiss 7, ECF No. 19. The motion to dismiss standard does not allow for such generous supposition. Sondesky cannot maintain a claim for abuse of process when she has failed to allege any act by the Defendants after the process was initiated. I will therefore grant Defendants' motion to dismiss Count IV. [6]

### B. Plaintiff's Motion for Judgment on the Pleadings

**\*5** Defendants assert counterclaims against Sondesky for conversion and breach of fiduciary duty. They allege that, during her employment, Sondesky misappropriated $2,566.09 from a bank account belonging to Cherry Scaffolding. Defs.' Answer & Affirmative Defenses 12-16, ECF No. 31. Sondesky has moved for judgment on the pleadings as to these counterclaims. She asserts that Defendants' counterclaims are, in fact, the same claims that Defendants brought against her in the State Court Action. Judgment in the State Court Action was entered in Sondesky's favor, and Sondesky argues that Defendants' counterclaims are therefore barred by res judicata.

"In order to raise successfully the defense of *res judicata,* the party asserting the defense must demonstrate that (1) there has been a final judgment on the merits in a prior suit; (2) the prior suit involves the same parties or their privies and (3) the subsequent suit is based on the same causes of action." *Purter v. Heckler,* 771 F.2d 682, 690 (3d Cir. 1985) (citing *United States v. Athlone Indus., Inc.,* 746 F.2d 977, 983 (3d Cir. 1984)). Thus, a prior final judgment *on the merits* is an essential element of res judicata.

In the State Court Action, judgment was entered in Sondesky's favor on June 23, 2016. Pl.'s Mot. J. Pleadings Ex. 1 at 2,

ECF No. 34. Based on the limited evidence available at this stage, however, it is unclear that this judgment was rendered on the merits. The limited record attached to Plaintiff's motion simply indicates that judgment was entered in favor of Sondesky—no reason or explanation is included. *Id.* In their response, Defendants characterize the state court judgment as resulting from a technical violation of Pa. R.C.P.D.J. No. 207. Defs.' Rsp. Opp. Pl.'s Mot. J. Pleadings 10, ECF No. 36. In Sondesky's reply brief she indicated that the prior judgment in her favor resulted from Cherry Scaffolding's failure to appear in Magisterial District Court. Pl.'s Reply Br. Supp. Mot. J. Pleadings 1, ECF No. 37. It is possible that the Magisterial District Court's judgment may have preclusive effect in this case, even if the judgment was entered solely on the basis of Cherry Scaffolding's failure to appear. *Cf., e.g., Kuhnle v. Prudential Sec., Inc., et al.,* 439 F.3d 187, 189-91 (3d Cir. 2006) (finding claims barred by res judicata where start court had previously entered judgment of non pros). On such a limited record, however, I cannot reasonably conclude that there are clearly no material issues of fact in dispute. I will therefore deny Sondesky's motion for judgment on the pleadings as to Defendants' counterclaims, without prejudice to Sondesky to reassert her res judicata defense at a later stage of the litigation.

### IV. CONCLUSION

I will grant Defendants' motion to dismiss Counts II and IV of Sondesky's First Amended Complaint and will deny Defendants' motion to dismiss Counts I and III of Sondesky's First Amended Complaint. I will deny as moot Defendants' duplicative motion for judgment on the pleadings. I will deny Sondesky's motion for judgment on the pleadings, without prejudice to Sondesky to reassert the defense of res judicata following the close of discovery.

### All Citations

Not Reported in Fed. Supp., 2017 WL 3873578, 2017 Wage & Hour Cas.2d (BNA) 311,489

### Footnotes

1       I exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Count I of Sondesky's Amended Complaint asserts a claim arising under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* I

Sondesky v. Cherry Scaffolding, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3873578, 2017 Wage & Hour Cas.2d (BNA) 311,489

exercise supplemental jurisdiction over Sondesky's Pennsylvania state law claims and Cherry Scaffolding's counterclaims pursuant to 28 U.S.C. § 1367.

2      The facts are taken from Plaintiff's First Amended Complaint, Defendants' Answer and Counterclaim, and public records. See *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (stating that a court may "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case" in deciding a motion to dismiss).

3      Defendants' motion to dismiss and Defendants' motion for judgment on the pleadings are duplicative and assert virtually identical arguments. As already explained, the applicable standards for a motion to dismiss and a motion for judgment on the pleadings are the same. I will therefore resolve Defendants' two motions together.

4      Because Sondesky's Amended Complaint asserts that she was a non-exempt employee, I assume, for purposes of a motion to dismiss, that she is entitled to the overtime protections of section 207.

5      I will deny as moot Defendants' motion for judgment on the pleadings as to Count II, given the entirely duplicative nature of this motion.

6      I will deny as moot Defendants' duplicative motion for judgment on the pleadings as to Count IV.

---

End of Document                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.