IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PACE-O-MATIC, INC.,                    )
                                       )
                    Plaintiff,         )        No. 1:20-cv-292-JPW
                                       )
          v.                           )        Judge Wilson
                                       )
ECKERT SEAMANS CHERIN &                )
MELLOTT, LLC, et al.,                  )
                                       )
                    Defendants.        )

**PACE-O-MATIC, INC.'S APPENDIX OF UNREPORTED CASES**

# TABLE OF CONTENTS

Airgas, Inc v. Cravath, Swaine and Moore, LLP (E.D. Pa. August 3, 2010)…………………………..……………………………………..000001

Avco Corporation v. Turner (E.D. Pa. September 21, 2020)…………………………...…………………………………....000010

Avco Corporation v. Turner (3d Cir. 2022)………………………………….000015

Axcan Scandipharm, Inc. v. Reed Smith, LLP (Phil. Ct. Com. Pl. March 26, 2007). …………………………………………………………000021

De Lage Landen Financial Services, Inc. v. Miramax Film Corp (E.D. Pa. September 23, 2008)……………………………………………………000033

J.W. Hall, Inc. v. Nalli (Sup. Ct. Pa. February 15, 2017)……………………000048

Levert v. Philadelphia Intern. (E.D. Pa. October 26, 2005)……………….....000055

Myers v. Shinseki (U.S. Vet. App. June 14, 2012)………………………….000062

Perry v. McGee (E.D. Mich. August 8, 2006)………………………………000066

Phillips-Kerley v. City of Fresno (E.D. Cali. October 19, 2018)……………000069

Segal v. Strausser Enterprise, Inc (E.D. Penn. June 12, 2019)………………000077

# Airgas, Inc. v. Cravath, Swaine & Moore, LLP (E.D. Pa. August 3, 2010)

000001

Airgas, Inc. v. Cravath, Swaine & Moore LLP, Not Reported in F.Supp.2d (2010)

2010 WL 3046586

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by CRIT Corp. v. Wilkinson, Ind.App., January 23, 2018

2010 WL 3046586
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

AIRGAS, INC., Plaintiff,
v.
CRAVATH, SWAINE & MOORE LLP, Defendant.

Civil Action No. 10–612.
|
Aug. 3, 2010.

West KeySummary

**1** **Attorneys and Legal Services** 🔑 Concurrent clients

Former client's allegation that law firm failed to act in good faith and solely for its benefit stated a claim, under Pennsylvania law, for breach of fiduciary duty. The client alleged that the law firm disregarded its duty of undivided loyalty by accepting, without prior disclosure, a representation of the competitor designed to help the competitor take over the client. The client also alleged that the law firm covertly advised the competitor about how to end the client's independent existence at the same time that the client was assuming the firm's undivided loyalty. Rules of Prof.Conduct, Rule 1.7, 42 Pa.C.S.A.

8 Cases that cite this headnote

MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

**I. INTRODUCTION**

 **\*1** Defendant Cravath, Swaine and Moore LLP ("Cravath") moves for judgment on the pleadings arguing that the pleadings fail to establish that Cravath's conduct caused

Plaintiff to suffer any legally cognizable injury. Plaintiff Airgas, Inc. ("Airgas"), opposes the motion. For the following reasons, the motion will be denied.

**II. BACKGROUND** [1]

Cravath is a New York-based law firm. Airgas is a Delaware corporation with its principal place of business in Pennsylvania. Air Products and Chemicals, Inc. ("Air Products") is a Delaware corporation with its principal place of business in Pennsylvania, located forty miles from Airgas. Airgas and Air Products are competitors in the industrial, packaged gases business. Cravath has provided legal representation to Air Products for over forty years. Meanwhile, Airgas was a client of Cravath for nine years.

The parties hotly dispute the nature of Cravath's representation of the parties, the scope of the representation and when Cravath's representation of Airgas came to an end. Also in dispute is the nature of the information Cravath learned while representing Airgas.

These issues came to the forefront in February 2010 when Air Products, with the assistance of Cravath, sought to engage Airgas in discussions about a possible merger of the two companies. On February 4, 2010, when these initial overtures were rejected by Airgas, Air Products publicly announced an all cash offer to purchase all outstanding Airgas shares. That same day, Air Products filed suit in the Delaware Chancery Court against Airgas and its Board of Directors alleging that their failure to consider Air Products' offer was a breach of fiduciary duty ("the Delaware Action"). Cravath is representing Air Products in that action.

The next day, on February 5, 2010, Airgas sued Cravath in the Philadelphia Court of Common Pleas for damages and also a special injunction (TRO) and preliminary injunction restraining Cravath from representing Air Products in the Delaware Action and from otherwise representing Air Products in the proposed acquisition of Airgas (the "Pennsylvania Action"). Airgas claims that Cravath violated Rule 1.7 of the Pennsylvania Rules of Professional Conduct [2] by simultaneously representing Airgas in financing related matters and advising Air Products on a potential takeover of Airgas. As discussed herein, the Pennsylvania Supreme Court in *Maritrans* established that a cause of action may be maintained against an attorney for breach of his or her fiduciary duty to a client through concurrent representation that results in a conflict of interest. *Maritrans GP, Inc. v.*

2010 WL 3046586

*Pepper, Hamilton, & Scheetz,* 529 Pa. 241, 602 A.2d 1277 (Pa.1992).

Airgas's complaint sets forth three counts, each premised on an alleged breach of fiduciary duty, seeking (1) an injunction precluding Cravath from representing Air Products in any matter related to a proposed transaction with Airgas, (2) damages, and (3) punitive damages, respectively. (Compl.¶¶ 52–73.) To support its claim for breach of fiduciary duty, Airgas claims that it has suffered four discrete injuries as a result of Cravath's alleged misconduct.

**\*2** First, Airgas alleges that, "[a]s a proximate result of Cravath's wrongful conduct, Airgas has been required to retain new outside counsel to seek to enforce Cravath's ethical and fiduciary obligations, and has incurred legal fees and costs in doing so, which legal fees and costs should be reimbursed by Cravath." (*Id .* ¶ 68, 602 A.2d 1277.) Second, Airgas contends that it was "proximately damaged to the extent it has been required to retain replacement outside counsel to develop an understanding of Airgas's financing needs and objectives in order to provide legal services concerning the Airgas credit facilities and financing requirements that would otherwise have been provided by Cravath." (*Id.* ¶ 69, 602 A.2d 1277.) Third, Airgas alleges that it has been "proximately damaged in that it has been unable to obtain new financing because of Air Products' takeover offer, and Cravath, Air Products' counsel with respect to the takeover, knew that the timing of Air Products' offer letter could negatively affect Airgas's ability to seek new financing." (*Id.* ¶ 70, 602 A.2d 1277.) Fourth, Airgas seeks disgorgement of $322,800 in fees paid to Cravath in October 2009, during the time period Airgas alleges that Cravath simultaneously was working for and against its client Airgas. (*Id.* ¶ 10, 602 A.2d 1277.)

Airgas, in the Pennsylvania Action, previously sought to enjoin Cravath from representing Air Products in any matter related to the attempted acquisition of Airgas, including banning Cravath from representing Air Products in the Delaware Action. On February 12, 2010, Cravath removed the Pennsylvania Action to this Court (the "Federal Action"). Immediately thereafter, Cravath moved for this Court to abstain and/or stay the Federal Action pending resolution of the issue of disqualification in the Delaware Action.

On February 22, 2010, this Court granted Cravath's motion to stay the action. *See Airgas, Inc. v. Cravath, Swaine & Moore LLP,* No. 10–612, 2010 WL 624955 (E.D.Pa. Feb.22,

2010). On March 5, 2010, Chancellor Chandler determined that under Delaware law, Airgas had not demonstrated that Cravath's behavior sufficiently prejudiced the fairness of the proceedings to warrant the remedy of disqualification. (*See* Ex. D to Def.'s Mem. at 10–11.) [3]

On May 26, 2010, this Court held a status conference with the parties. The Court was informed that the Delaware Action is scheduled for trial starting on October 4, 2010. (Hrg. Tr. at 6, May 26, 2010.) The Court ordered that discovery be stayed until October 15, 2010, but that Cravath could file the instant Rule 12(c) motion in the interim. (*Id.* at 21–22.) A status and scheduling conference currently is scheduled for October 15, 2010.

## III. LEGAL STANDARD

Rule 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed-but early enough not to delay trial." Fed.R.Civ.P. 12(c). Where, as here, a Rule 12(c) motion challenges the plaintiff's failure to state a claim upon which relief can be granted, the court evaluates the motion under the same standard as a motion to dismiss pursuant to Rule 12(b)(6). *Turbe v. Gov't of V.I.,* 938 F.2d 427, 428 (3d Cir.1991); *Foreman v. Lowe,* 261 F. App'x 401, 403 n. 1 (3d Cir.2008).

**\*3** "To survive a motion to dismiss [pursuant to Rule 12(b) (6) ], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Factual allegations "that are 'merely consistent with' a defendant's liability," or that permit the court to infer no more than "the mere possibility of misconduct" are not enough. *Id.* at 1949–50 (quoting *Twombly,* 550 U.S. at 557). Rather, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* at 1949. In evaluating a motion to dismiss, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009); *see also Iqbal,* 129 S.Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Moreover, when deciding a Rule 12(c) motion for judgment on the pleadings, a district court must view the facts and

Airgas, Inc. v. Cravath, Swaine & Moore LLP, Not Reported in F.Supp.2d (2010)
2010 WL 3046586

inferences to be drawn from the pleadings in the light most favorable to the non-moving party. *Green v. Fund Asset Mgmt., L.P.,* 245 F.3d 214, 220 (3d Cir.2001).

## IV. ANALYSIS

### A. Applicable Law

Airgas believes that Pennsylvania law applies to the case and instant motion. Cravath believes that either New York or Delaware law applies to the larger action; however, it applied Pennsylvania law in the instant motion because it "steadfastly maintains its actions were proper under the Pennsylvania ethics rules, and ... any other applicable rules." (Def.'s Mot. at 9 n. 3.) Thus, Cravath has agreed that, "for the purposes of this motion, [ ] the Court may evaluate Airgas's claim under Pennsylvania law." (Def.'s Reply. at 3 n. 2)

Cravath does not argue that analysis of the breach of fiduciary claim would produce different results under Pennsylvania, New York or Delaware law. Indeed, Cravath claims Airgas's claims fail under all three state laws. Accordingly, the Court need not conduct a conflict of laws analysis to determine which state's law governs. *Berg Chilling Sys., Inc. v. Hull Corp.,* 435 F.3d 455, 462 (3d Cir.2006) (finding that where applying the laws of both jurisdictions would produce an identical result, a court should not engage in a choice of law analysis) (citing *Williams v. Stone,* 109 F.3d 890, 893 (3d Cir.1997)).

As neither party has cited to a potential conflict between these three forums, and the Court finds that the basic elements required under Pennsylvania, New York and Delaware are identical, [4] the Court finds that no conflict exists and the law of the forum controls. *See Lucker Mfg. v. Home Ins. Co.,* 23 F.3d 808, 813 (3d Cir.1994) (avoiding choice of law question where neither party pressed the issue and there was no apparent conflict between the laws of the forums) (citing *Melville v. American Home Assur. Co.,* 584 F.2d 1306, 1311 (3d Cir.1978) (warning courts to avoid dicta on conflicts questions when not put in issue by the parties)).

### B. Breach of Fiduciary Duty

#### 1. Elements of a Breach of Fiduciary Duty claim

**\*4** To establish a breach of fiduciary duty under Pennsylvania law, Airgas must first prove that a fiduciary relationship existed between the parties. Then, Airgas must prove " '(1) that the defendant negligently or intentionally

failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring[ing] about plaintiff's injuries.' " *McDermott,* 11 F.Supp.2d at 626 n. 18 (citing Pa. Std. Jury Instructions (Civ.) § 4.16 (1991).

Here, Airgas has pleaded that Cravath allegedly breached its fiduciary duty of loyalty to Airgas by simultaneously and secretly representing another party whose interests were directly adverse to Airgas. Airgas relies on the *Maritrans* case where the Pennsylvania Supreme Court held that an attorney's subsequent representation of a client, whose interests were materially adverse to a former client in a matter substantially related to that in which he or she represented the former client, was an impermissible conflict of interest, giving rise to breach of a fiduciary duty. *Maritrans,* 602 A.2d at 1283–85. The Pennsylvania Supreme Court reasoned that an action at law was available because the common-law fiduciary duty imposed on attorneys prohibited them from engaging in impermissible conflicts of interest. *Id.* at 1283; *see also Gorski v. Smith,* 812 A.2d 683, 711 (Pa.Super.Ct.2002).

Airgas has pleaded its claim in detail and alleged facts that Cravath disregarded its duty of undivided loyalty to its client Airgas by accepting, without prior disclosure, a representation of Air Products designed explicitly to help Air Products take over Airgas. Airgas alleges that at the same time (August—October 2009) that Airgas had engaged Cravath and assumed its undivided loyalty, Cravath was covertly advising Air Products on how to end Airgas's independent corporate existence. (Compl.¶¶ 7, 13–16, 23, 51.) This pleading sufficiently sets forth a claim for breach of fiduciary duty. *See Maritrans,* 602 A.2d at 1283–85; *see also Motorup Corp. v. Galland, Kharasch & Garfinkle, P.C.,* No. 00–2212, 2001 WL 34368760, at \*5 (E.D.Pa. Dec.4, 2001) ("Plaintiff asserts that Defendants owed a fiduciary duty to [plaintiff] and breached that duty by having divided loyalties and by placing the interests of National Media above and in conflict with the interests of [plaintiff], to the detriment of [plaintiff]. Plaintiff has therefore adequately pled an action for breach of fiduciary duty.").

#### 2. Injury and Causation

Airgas alleges that Cravath's representation of Air Products in the takeover bid and the related Delaware Action caused Airgas to suffer four specific harms: (1) attorneys' fees related to this litigation; (2) the cost of finding replacement counsel

Airgas, Inc. v. Cravath, Swaine & Moore LLP, Not Reported in F.Supp.2d (2010)
2010 WL 3046586

for Cravath; (3) Airgas's inability to obtain new financing because of Air Products' takeover offer; and (4) disgorgement of fees paid to Cravath. (Compl.¶¶ 68–70.)

**\*5** Cravath's main argument is that Airgas must prove harm from the alleged breach of fiduciary duty; yet, the complaint fails to plead that Cravath's actions caused any legally cognizable injury. *See Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58, 68 (Pa.1989) ("The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence." (Internal quotations omitted)). Cravath also argues that each of the alleged harms is insufficient to state a claim for relief because each is either speculative, not plausibly attributable to Cravath's alleged misconduct or does not constitute harm as a matter of law. Each of Airgas's alleged items of damages is examined in turn.

### i. Attorneys' Fees

Airgas alleges that "[a]s a proximate result of Cravath's wrongful conduct, Airgas has been required to ... enforce Cravath's ethical and fiduciary obligations, and has incurred legal fees and costs in doing so, which legal fees and costs should be reimbursed by Cravath." (Compl.¶ 68.) Airgas further pleads that it repeatedly objected to Cravath's representation of Air Products in its attempt to acquire Airgas. (*Id.* ¶¶ 19, 21, 27, 34–38, 40.) Airgas also pleads that Cravath ignored Airgas's repeated objections to Cravath's representation of Air Products (*id.* ¶¶ 29–30, 39, 42, 47); and, after keeping its representation of Air Products secret for months, Cravath chose to drop Airgas in favor of a higher paying client once the conflict was finally disclosed. (*Id.* at ¶¶ 48–50.) Consequently, Airgas brought this action to enjoin Cravath's conduct and seek redress.

Cravath responds that: (1) Airgas's request for costs incurred in this litigation amounts to a request for attorneys' fees and violates the American Rule that each party bears its own legal expenses; (2) to the extent that Airgas seeks to recover costs incurred in connection with its unsuccessful attempt to disqualify Cravath from the litigation pending in Delaware, it is plainly not entitled to relief; and (3) the incurred expenses related to the costs of litigation are insufficient to state a plausible claim of injury. *See Merlino v. Delaware County,* 556 Pa. 422, 728 A.2d 949, 951 (Pa.1999) (noting the rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception).

Here, Airgas seeks attorneys' fees as compensatory damages and not as reimbursement of litigation expenses. In *Axcan,* a case that both parties heavily rely on, a client sought payment of the attorneys' fees it incurred while seeking an injunction against its attorney, who had violated its fiduciary duties by engaging in an impermissible conflict of interest. *Axcan Scandipharm, Inc. V. Reed Smith, LLP,* 2007 Phila. Ct. Com. Pl. LEXIS 78, at *9 (Pa.Com.Pl. Mar. 26, 2007). The Philadelphia Court of Common Pleas found that "[s]uch damages may be awarded to address the concrete loss that [Axcan] has suffered by reason of [its attorney's] wrongful conduct." *Id.* The court reasoned that "Axcan will never be made whole without payment of those attorneys fees it was forced to incur [to protect its interests]. In this respect, Pennsylvania law is more akin to the law of New Jersey [which does not follow the American rule]." [5]

**\*6** Similarly, in *Fidelity Bank v. Com. Marine and Gen. Assur. Co., Ltd.,* 592 F.Supp. 513 (E.D.Pa.1984), Judge Pollak denied a counterclaimant defendant's motion for judgment on the pleadings, finding, *inter alia,* that the counterclaimant plaintiff had pleaded a "legally cognizable injury" by alleging that it had "incurred costs in asserting its rights" to pursue its claim of fiduciary breach. As Judge Pollak stated, "Horizon's costs incurred in this action ... form cognizable damages in this suit for breach of fiduciary duty." *Id.* at 529–30. [6]

In this case, Airgas alleges it was forced to retain counsel to protect itself against Cravath's alleged breach of loyalty and after repeated requests for Cravath to cease the concurrent representation. Airgas argues the retention of outside counsel was made necessary only because of Cravath's alleged breach of its fiduciary duties in simultaneously working for and against Airgas.

Under these averments, the Complaint states a cause of action and judgment on the pleadings is not appropriate here.

### ii. Replacement Counsel

Airgas also alleges that it was damaged by having to hire new counsel to replace Cravath, which had been Airgas's financing counsel for the last decade. (Compl.¶ 69.) Airgas alleges that as of October 2009, Airgas was an active client of Cravath and was beginning to work with Cravath in a series of new financing transactions that would shortly occur. (*Id.* ¶ 14.) Airgas also alleges that Cravath was aware that Airgas was about to engage it for these financings, (*id.* ¶ 24), as it had been

Airgas, Inc. v. Cravath, Swaine & Moore LLP, Not Reported in F.Supp.2d (2010)
2010 WL 3046586

engaged for the past nine years. (*Id.* ¶¶ 7, 14.) Airgas alleges that Cravath dropped Airgas as a client "like a hot potato" in an attempt to cure an impermissible conflict of interest. (Pl.'s Resp. at 15–16.) Thus, Airgas claims it was forced to incur the cost of hiring replacement counsel to handle its financings.

First, Cravath disagrees with the factual predicate for Airgas's claim. Cravath argues that Airgas could not have had any legitimate expectation that Cravath would serve as its counsel in perpetuity and there was no retainer or other agreement that existed between the parties that would have prevented Cravath from declining to accept future financing work from Airgas. Thus, Airgas could not have reasonably expected that Cravath would accept any and all future financing work from Airgas. Moreover, had Airgas simply chosen to hire new financing counsel—as it had every right to do—it would have incurred the same costs that it now claims as injury.

Second, Cravath makes a causation argument that because the alleged harm would have occurred regardless of whether Cravath's decision to decline future work from Airgas was proper, that purported harm is not attributable to any alleged breach of fiduciary duty.

Cravath's arguments that Airgas could not "have had any legitimate expectation that Cravath would serve as its counsel in perpetuity" or that Airgas could not have "reasonably expected that Cravath would accept any and all future financing work from Airgas[ ]" are conclusory allegations not appropriate for a motion for judgment on the pleadings. (Def.'s Mem. at 15.) Questions of fact, including whether Airgas had a reasonable expectation of continued representation by Cravath, are not to be determined at this juncture. *See, e.g., Winslow v. The Borough of Malvern Pa.,* No. 08–1890, 2009 WL 4609590, at *7 (E.D.Pa. Dec.7, 2009) (denying defendant's motion to dismiss a battery claim because "reasonableness is a question of fact for a jury to decide"); *see also Motorup,* 2001 WL 34368760, at *5 (finding that a factual disagreement was inappropriate on a 12(b)(6) motion to dismiss, stating that "these diametrically opposed versions of the facts must be tested after full and complete discovery, not by a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)."). At this stage of the litigation, the Court must only consider whether the claim was properly pleaded, not whether the facts pleaded are true.

**\*7** Cravath also argues that Airgas may have one day decided to use different counsel than Cravath, or that one day Cravath may have decided to cease representation of

Airgas. Based on this conjecture, Cravath argues that Airgas would have borne the costs of hiring and training replacement counsel regardless of Cravath's alleged fiduciary breach. This argument misses the mark. It is not Airgas's burden to plead how the damages would have been different had Cravath not engaged in its alleged conflict of interest and alleged breach of fiduciary duty. *See, e.g., Amato v. KPMG LLP,* 433 F.Supp.2d 460, 471 (M.D.Pa.2006) (stating, in response to defendant's argument that plaintiff's claims for damages for attorney's breach of fiduciary duty would have accrued even without the breach: "Plaintiffs need not specifically plead how the alleged damages at issue would have been avoided had Sidley Austin conducted itself differently after Plaintiffs entered the transaction in which Sidley Austin's fiduciary obligations allegedly arose."), vacated in part on other grounds by *Amato v. KPMG LLP,* 2006 WL 2376245 (M.D.Pa. Aug.14, 2006)). Ultimately, the case turns on "what it was" i.e., that which Cravath is alleged to have done, not "what might have been" i.e., that which Airgas may or may not have decided to do.

### iii. Inability to Obtain Financing

Airgas also pleads that it has been "proximately damaged in that it has been unable to obtain new financing because of Air Products' takeover offer, and Cravath, Air Products' counsel with respect to the takeover, knew that the timing of Air Products' offer letter could negatively affect Airgas's ability to seek new financing. Moreover, as Airgas's long-time counsel, Cravath knew that Airgas was planning to seek new financing around the time Air Products [began its efforts to acquire Airas.]" (Compl.¶ 70.) [7]

This injury is properly pleaded, because Airgas provides sufficient facts from which the Court can conclude that it is plausible that Cravath's representation of Air Products, simultaneous with and adverse to its representation of Airgas, enabled Air Products—allegedly armed with Cravath's intimate knowledge of Airgas's financing plans—to launch its takeover attack at a time when Airgas was planning for additional financing or refinancing.

Cravath attempts to undermine this pleaded injury by pointing to two financing transactions on which Airgas closed in March 2010. (Def.'s Mem. at 16–17.) This argument fails, because it does not consider—nor can it, at this stage of the proceedings—whether these subsequent financings were on the same terms as Airgas would have obtained in the absence of Cravath's representation of Airgas's pursuer. The documents Cravath attaches as support for its argument do

not indicate whether these March 2010 financings were those financings in which Airgas was interested and could have obtained if Cravath had not allegedly breached its duty. These questions implicate issues of fact that cannot be resolved in a motion under Rule 12(c). [8]

### iv. Disgorgement

**\*8**  Airgas's allegations state a claim of breach of fiduciary duty where the breach itself is recognized to be the injury and the damages are the forfeiture of the fees paid to the breaching attorney. In its Complaint, Airgas alleges with factual specificity, that in October 2009 Cravath issued an invoice to Airgas in the amount of $322,800 and that this sum was promptly paid. (Compl.¶ 10.) Airgas further alleges that at this time Cravath was simultaneously working for and against its client Airgas. Airgas specifically sets forth the facts of that alleged concurrent representation at Paragraphs 13–16, 21, 23, 53 and 56 of the Complaint.

The Pennsylvania Supreme Court has recognized that a client is entitled to return of fees paid to an attorney who has breached his or her fiduciary duties. In *Maritrans,* the Pennsylvania Supreme Court stated: "[c]ourts throughout this country have ordered the disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interest." 602 A.2d at 1285 (citing cases in which forfeiture was ordered). *See also Synthes (USA) v. Globus Med., Inc.,* No. 04–1235, 2007 WL 2043184, at *11 (E.D.Pa. Jul.12, 2007) ("Under Pennsylvania law, breaches of fiduciary duty are remediable by returning to the complainant the benefit taken by the offending party") (citing *Sack v. Feinman,* 489 Pa. 152, 413 A.2d 1059 (Pa.1980)); *Axcan,* 2007 Phila. Ct. Com. Pl. LEXIS 78, at *12–13 (recognizing disgorgement as a theory of damages for a breach of fiduciary duty claim but refusing to extend it to a plaintiff who had a third party pay the fees of an attorney who engaged in an impermissible conflict of interest).

When a party claiming breach of fiduciary duty has pleaded payment of fees to the breaching attorney, there is no requirement to plead further injury or damages. A pleading of the breach itself is sufficient to state a claim. *Feinberg v. Eckelmeyer,* No. 09–1536, 2009 WL 4906376, at *10 (E.D.Pa. Dec.16, 2009) ("A plaintiff alleging a breach of fiduciary duty need not show the existence of damages other than

the offending party's receipt of a benefit that should have inured to the complainant."); *Synthes,* 2007 WL 2043184, at *11 (finding that injury element of breach of fiduciary duty claim was adequately pleaded without provision of information such as lost profits, because a party pleading breach of fiduciary duty need not plead more than "the offending party's receipt of a benefit that should have inured to the complainant.").

Because Airgas has pleaded payment of fees to Cravath for services rendered while Cravath was simultaneously working both for and against Airgas, Airgas has properly pleaded a claim for breach of fiduciary duty.

### C. Punitive Damages

Cravath argues that because Airgas's complaint fails to state a claim for breach of fiduciary duty, its punitive damages claim must also fail. *See e.g., DiGregorio v. Keystone Health Plan East,* 840 A.2d 361, 370 (Pa.Super.Ct.2003) ("If no cause of action exists, then no independent action exists for a claim of punitive damage[s].")

 **\*9**  However, as the Court has already explained, Airgas has properly pleaded a claim for breach of fiduciary duty against Cravath, and therefore Airgas's claim for punitive damages cannot be dismissed at this stage of the litigation.

### V. CONCLUSION

For the reasons discussed above, Cravath's motion for judgment on the pleadings is denied. An appropriate order follows.

### *ORDER*

**AND NOW,** this **3rd** day of **August, 2010,** it is hereby **ORDERED** that Defendant's motion for judgment on the pleadings (doc. no. 32) is **DENIED.**

**AND IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3046586

2010 WL 3046586

**Footnotes**

1    The Court previously discussed the relevant background of this case. *See Airgas, Inc. v. Cravath, Swaine & Moore LLP,* No. 10–612, 2010 WL 624955, at *1–2 (E.D.Pa. Feb.22, 2010).

2    Rule 1.7 states: Conflict of Interest: Current Clients

     (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

     (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent.

     Pa. R.P.C. 1.7.

3    The Delaware Chancery Court was explicit that its ruling did not resolve whether Cravath breached a rule of professional responsibility or its fiduciary duty of loyalty to Airgas. (*See* Ex. D to Def.'s Mem., at 8–9) ("Although the parties strenuously disagree regarding the propriety of Cravath's role in connection with its previous work for Airgas while it was simultaneously engaged as counsel for Air Products ... I need not formally decide that question in order to dispose of the motion and objections before me.")

4    To establish a breach of fiduciary duty under Pennsylvania law, plaintiff must first prove that a fiduciary relationship existed between the parties. Then, plaintiff must prove "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring[ing] about plaintiff's injuries." *McDermott v. Party City Corp.,* 11 F.Supp.2d 612, 626 n. 18 (E.D.Pa.1998) (Robreno, J.) (citing Pa. Std. Jury Instructions (Civ.) § 4.16 (1991); *see also Dinger v. Allfirst Fin. ., Inc.,* 82 F. App'x 261, 265 (3d Cir.2003); *Health Robotics, LLC v. Bennett,* No. 09–0627, 2009 WL 5033966, at *2 (E.D.Pa. Dec.22, 2009); Pa. Std. Jury Instructions (Civ.) § 4.16 (3d ed.2005).

     To establish a claim for breach of fiduciary duty under New York law, a plaintiff must prove (1) the existence of a fiduciary relationship; (2) misconduct by defendant constituting a breach of its fiduciary duty to plaintiff; and (3) damages to plaintiff directly caused by defendant's misconduct. *See Berman v. Sugo LLC,* 580 F.Supp.2d 191, 204 (S.D.N.Y.2008).

     To establish a claim for breach of fiduciary duty under Delaware law, a plaintiff must prove: (1) that a fiduciary duty existed and (2) that the defendant breached that duty. *ZRII, LLC v. Wellness Acquisition Group, Inc.,* No. 4374, 2009 WL 2998169 (Del.Ch. Sept.21, 2009).

5    Cravath emphasizes that Airgas seeks to recover costs incurred in connection with its unsuccessful attempt to disqualify Cravath from the litigation pending in Delaware. Whereas, in *Axcan,* the court allowed a former client to recover the costs that it incurred in successfully moving to disqualify its former law firm from prior litigation. Cravath argues there is a sharp distinction between the recovery of fees incurred in making a successful motion for disqualification in prior litigation with the legal fees incurred in suing for a breach of

2010 WL 3046586

fiduciary duty. "[I]n this case, Axcan is not trying to recover its attorneys fees from its adversary. It is not claiming that it is entitled to the fees it has incurred in this action, where Reed Smith is Axcan's adversary." *Axcan,* 2007 Phila. Ct. Com. Pl. LEXIS 78, at *7.

6    Cravath argues that Fidelity does not apply in this case because that court found that Horizon's legal costs constituted injury because Fidelity actively misled Horizon into incurring those costs. *Fidelity,* 592 F.Supp. at 529–30. To the extent that the facts in this case differ from those in *Fidelity,* that is a defense which Cravath may assert at trial.

7    Airgas also attached to its Complaint a New York Times article concerning Air Products' public offer to acquire Airgas which noted that "[b]y making its offer now, Air Products is hoping to seize upon some current weakness in Airgas's financial health." (Compl. ¶ 49; Compl. Ex. D.)

8    Moreover, Cravath's argument that these alleged damages are too speculative also fails. The "test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages.... Thus, damages are speculative only if the uncertainty concerns the fact of damages rather than the amount." *Rizzo,* 555 A.2d at 68 (emphasis added, citation omitted). Taken as true, Airgas's allegations clearly plead that it lost financing opportunities because of Cravath's breach of loyalty; the only issue left open is the amount of damage this caused, not the fact of damage. Thus, Airgas has properly pleaded lost financing as one of its components of damages.

---

**End of Document**      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Avco Corporation v. Turner  (E.D. Pa. September 21, 2020)

000010

2020 WL 5630543
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

AVCO CORPORATION, Plaintiff,
v.
Veronica Saltz TURNER, Defendant.

Case No. 2:20-cv-04073-JDW
|
Signed 09/21/2020

**Attorneys and Law Firms**

Heidi Grace Crikelair, James T. Smith, Rebecca D. Ward, Taylor Lake, Blank Rome Comisky & McCauley LLP, Philadelphia, PA, for Plaintiff.

Wayne A. Ely, Richboro, PA, for Defendant.

### MEMORANDUM

JOSHUA D. WOLSON, J.

**\*1** Avco Corporation wants a preliminary injunction to stop its former outside counsel Veronical Saltz Turner from representing or providing legal assistance to Avco's adversaries in litigation around the country. But at the moment, Ms. Turner is not representing anyone in a case against Avco, or even in a case that could harm Avco's interests. The most that Avco can show is that Ms. Turner already undertook—and completed—such a representation. When she did so, it is possible that she breached a fiduciary duty to Avco, as Avco contends. But the Court cannot do anything about that fact now. Because Avco cannot show a risk of an immediate, irreparable injury, the Court will deny its motion for a preliminary injunction and its motion for expedited discovery.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Ms. Turner's Representation of Avco

Avco makes piston engines for general aviation. Lycoming Engines is an unincorporated operating division of Avco that has a facility in Williamsport, Pennsylvania. From 2005 to mid-2018, Ms. Turner acted as outside counsel for Avco and/ or Lycoming Engines (together "Avco") in products liability, intellectual property, employment, and other commercial disputes. Avco alleges that Ms. Turner was its "go-to" regional counsel in Pennsylvania and that she defended Avco in numerous matters involving alleged engine defects. She also provided legal advice and guidance on matters for which other counsel appeared in court. During the course of her representation, Ms. Turner defended Avco in personal injury and wrongful death lawsuits that the Wolk Law Firm filed. Avco and the Wolk Firm are frequent adversaries. Indeed, Avco estimates that since 2006, the Wolk Firm has sued it at least 18 times. When the Wolk Firm sues Avco, the case often includes allegations of a loss of engine power, and the proper mixture of air and fuel is a frequent issue.

Avco alleges that as its counsel, Ms. Turner was "exposed to all of the various aspects of Avco's design, development and operation of its engines," "provided an in-depth education about the company's quality control and product support systems for identifying and addressing any concerns related to Avco's engines," and "given access to extensive information about the company's trade secrets and other confidential information about all aspects of Avco's engines[.]" (ECF No. 1 at ¶¶ 29-31.) Ms. Turner also worked directly with Avco's experts and strategized how to challenge plaintiffs' experts in various lawsuits.

According to Avco, Ms. Turner's work began to decline in 2016 and 2017. As a result, Avco transferred some of Ms. Turner's matter to different counsel. Eventually, by letter dated November 13, 2017, Ms. Turner terminated her representation of Avco, and by mid-2018, she no longer provided any legal services to Avco.

### B. The *Torres* Litigation

On May 17, 2015, a private aircraft with an Avco engine crashed outside of Laughlin, Arizona. Three passengers were killed, and the pilot, Robert Torres, was injured. As a result, the Wolk Firm filed actions against Avco in Arizona, California, Delaware, and New Jersey, alleging defects in the turbocharger portion of the engine (the "*Torres*" matters). The action in New Jersey has been dismissed. On June 18, 2019, the Arizona court dismissed Avco for lack of personal jurisdiction. The plaintiffs have appealed that decision. Meantime, that case is scheduled for trial in January 2021. Avco is still a defendant in the California and Delaware *Torres* matters.

**\*2** On June 26, 2020, over a year after Avco had been dismissed from the *Torres* case in Arizona, Ms. Turner sought to be admitted in that case *pro hac vice* so that

she could present argument on plaintiffs' *Daubert* motions. The plaintiffs sought to exclude one of the defense experts, Randall Knuteson, who opined regarding the turbocharger portion of the aircraft's engine. Avco had in the past retained Mr. Knuteson as an expert to assist with accident investigations and litigation matters. Ms. Turner had "worked extensively" with him while she was still Avco's outside counsel. (ECF No. 1 at ¶ 59.) Upon learning that Ms. Turner sought to appear on behalf of the plaintiffs in the Arizona matter and challenge Mr. Knuteson as an expert, Avco objected to her admission. At the same time, however, Avco acknowledged that the *Daubert* motions did "not involve or appear to implicate Avco...." (ECF No. 1-6 at 4.) The Arizona court permitted Ms. Turner to represent the *Torres* plaintiffs on a temporary basis. She argued their *Daubert* motions at a hearing on July 1, 2020. On July 21 and 22, 2020, at an evidentiary hearing on those motions, Ms. Turner cross-examined Mr. Knuteson and another defense expert.

### C. The Present Matter

Given Ms. Turner's participation in the *Torres* Arizona matter, "involving the same or substantially similar issues from her prior representations" of Avco, Avco believes that she "has used or will use confidential, proprietary or privileged information" to support engine defect claims that are materially adverse to Avco in an effort to further develop her relationship with the Wolk Firm. (ECF No. 1 at ¶ 84.) For her part, Ms. Turner declares that she only worked on a discrete assignment in the Arizona *Torres* matter. She did so as an independent contractor for the Wolk Firm, at a time that Avco was not a party to the case. After the evidentiary hearing on July 22, 2020, Ms. Turner's discrete assignment for the Wolk Firm ended, and she does not represent the plaintiffs in that case. Likewise, Ms. Turner is not involved with the *Torres* litigation in California and Delaware. In fact, since she terminated her relationship with Avco in November 2017, she has never represented any plaintiffs who asserted claims against it.

On August 20, 2020, Avco sued Ms. Turner for breach of fiduciary duty and a declaratory judgment, seeking both compensatory damages and injunctive relief. (ECF No. 1.) At the same time, Avco asked this Court to enter a preliminary injunction against Ms. Turner, enjoining her from counseling, advising, representing or providing legal services "to any person or persons materially adverse to Avco in matters in which the plaintiffs allege (a) claims of engine power loss arising from anything affecting the fuel/ air mixture, including but not limited to alleged defects in

Avco piston engines' ignition systems, magnetos, tappets, valves, exhausts, propeller or crankshaft systems or third-party accessories thereto, or airframe-engine integration, or (b) any other issue substantially related or similar to [Ms.] Turner's past representation of Avco." (ECF No. 2 at ¶ 1.) Avco also seeks the return all information pertaining to Avco and/or its designs or products that Ms. Turner may have or a certification that such material has been destroyed. (*Id.* at ¶ 2.) It has moved for expedited discovery in order to support its injunction request. (ECF No. 3.)

On September 1, 2020, mindful of its obligation to ensure that subject-matter jurisdiction exists, the Court ordered both Parties to address whether 28 U.S.C. § 1332(a) has been satisfied. The Parties have submitted their briefs, and the issues are ripe for disposition.

### II. LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that: (1) it is reasonably likely to prevail in the litigation and (2) it is likely to suffer irreparable injury without relief. *Hope v. Warden York Cty. Prison*, —— F.3d ——, 2020 WL 5001785, at \*3 (3d Cir. Aug. 25, 2020). "If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest." *Id.* (quotation omitted). The movant bears the burden of showing that these four factors weigh in favor of granting the injunction. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

**\*3** A district court can rule on a preliminary injunction motion on the papers alone if the facts are not in dispute or when the issues are strictly legal. *See Prof'l Plan Exam'rs of New Jersey, Inc. v. Lefante*, 750 F.2d 282, 288 (3d Cir. 1984); *ASI Bus. Solutions, Inc. v. Otsuka Am. Pharm., Inc.*, 233 F. Supp.3d 432, 438 (E.D. Pa. 2017). A district court "is not obliged to hold a hearing when the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175-76 (3d Cir. 1990).

### III. ANALYSIS

## A. Subject Matter Jurisdiction

In every case, the Court has "an independent obligation to determine whether subject-matter jurisdiction exist[s]." *Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 131 (3d Cir. 2019) (quotation omitted). As the plaintiff, Avco bears the burden of demonstrating this Court's subject-matter jurisdiction over its claims. *Lightfoot v. United States*, 564 F.3d 625, 627 (3d Cir. 2009). It must show this by a preponderance of the evidence. *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006). Avco has satisfied its burden.

In diversity cases such as this one, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *Huber v. Taylor*, 532 F.3d 237, 243 (3d Cir. 2008) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938)). Where a party alleges a breach of a fiduciary duty by its former counsel and is forced to hire new counsel to prosecute such a claim, that party may seek to recover those attorneys' fees and costs as compensatory damages. *See Airgas, Inc. v. Cravath, Swaine & Moore LLP*, No. 10-cv-612, 2010 WL 3046586, at *5-6 (E.D. Pa. Aug. 3, 2010). Avco seeks similar compensatory damages here (ECF No. 1 at 22), and its counsel, subject to Fed. R. Civ. P. 11, has represented that Avco "had incurred fees in excess of $75,000.00" by the time it filed its Complaint in this action. (ECF No. 18 at 4-5.) Given this representation, and the allegations in the Complaint, the Court is satisfied that subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a).

## B. Irreparable Injury

A party seeking a preliminary injunction has the burden of making "a 'clear showing of immediate irreparable injury[ ] or a presently existing actual threat.' " *Talbert v. Corizon Med.*, 605 F. App'x 86, 87 (3d Cir. 2015) (quotation omitted). "This is not an easy burden." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485 (3d Cir. 2000). "To be imminent, the injury cannot be remote or speculative; it must be poised to occur before the District Court can hold a trial on the merits." *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 279 (3d Cir. 2019) (quotation omitted); *see also Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) ("[A] showing of irreparable harm is insufficient if the harm will occur only in the indefinite future.") (quotation omitted). "A failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." *Ace Am. Ins.*

*Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x 727, 732 (3d Cir. 2009) (citation omitted).

Avco has not demonstrated that Ms. Turner is engaging in any conduct that will cause it an immediate, irreparable injury. Ms. Turner has declared, under penalty of perjury, that she is not working on any cases adverse to Avco. Instead, she worked on a single, discrete assignment that has now concluded in a case in which Avco was no longer a party. Because Avco has no basis to claim that Ms. Turner is working on any matters adverse to it, it cannot satisfy its burden of demonstrating that Ms. Turner will disclose Avco's confidential material to any of Avco's adversaries, let alone that she will do so in one of the *Torres* matters.

**\*4** Though Avco may have valid concerns about Ms. Turner, "[i]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued to restrain one from doing what he is not attempting and does not intend to do." *Campbell Soup,* 977 F.2d at 92 (quotation omitted). It is possible, as Avco suggests, that Ms. Turner's work on the *Torres* case violated an ethical or fiduciary duty to Avco. But that question is for another day. Avco's apprehensions, though understandable, do not establish the immediate irreparable harm needed to support the extraordinary remedy of injunctive relief before a trial on the merits.

Faced with Ms. Turner's declaration, Avco's reply brief shifts its focus and argues that *if* Avco loses the personal jurisdiction appeal in Arizona and *if* the plaintiffs re-animate their California and Delaware claims, then they will "reap the benefits conferred by Turner's work in Arizona." (ECF No. 17 at 5.) There are at least three flaws with this argument. First, Ms. Turner has already disclosed whatever information she was going to disclose in the Arizona *Torres* matter. As the Court has noted before, an injunction "cannot put the toothpaste back in the tube." *Night Vision Devices, Inc. v. Carson Indus., Inc.*, No. 19-cv-04686, 2020 WL 430755, at *2 (E.D. Pa. Jan. 28, 2020); *see also Campbell Soup*, 977 F.2d at 92 ("A threat of disclosure may establish immediate irreparable injury but 'further' disclosure of something already revealed cannot."). Second, the Court cannot enjoin the *Torres* plaintiffs, who are not parties to this matter, from somehow "reaping the benefits" of Ms. Turner's prior work. Third, the argument is speculative, based only on what might happen if Avco loses its appeal in Arizona. That speculation is not enough for Avco to satisfy its burden.

**Avco Corporation v. Turner, Slip Copy (2020)**

2020 WL 5630543

Avco suggests that because only Ms. Turner has information about the work she has done in the *Torres* matters, the Court should permit Avco to take discovery of her. But Avco needs more than worry, or a pleading on information and belief, to justify imposing the burdens of expedited discovery on Ms. Turner. If Avco had some evidence—not concern or logical leaps, but evidence—that called Ms. Turner's declaration into doubt, then discovery might be appropriate. But as it stands now, Avco has none of that. The Court need not order discovery just to give Avco a chance to ask at a deposition whether Ms. Turner really meant it when she made a statement under oath.

Finally, Avco claims that, even if Ms. Turner is not working on any matters adverse to it, it needs full disclosure of Ms. Turner's involvement in the Arizona matter and the return of any files or information that Ms. Turner has from her representation of Avco. Avco has not demonstrated that it needs a preliminary injunction for either of these purposes.

Ms. Turner is no longer working on the Arizona litigation, and Avco is not a party to that case. So there's no immediate harm that requires Ms. Turner to disclose her work on that matter to Avco right now. (Whether there might be in the future is a question for another day.) In addition, because Ms. Turner is not working on any matters adverse to Avco, there is no immediate injury that justifies a preliminary injunction concerning the return of information to Avco.

**IV. CONCLUSION**

Avco cannot get a preliminary injunction based only on its worries about Ms. Turner. It must show more, and it has not done so. Indeed, the Court does not even see a basis for Avco to seek discovery of Ms. Turner.

**All Citations**

Slip Copy, 2020 WL 5630543

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**Avco Corporation v. Turner  (3d Cir. 2022)**

000015

Case 1:20-cv-00292-JPW   Document 259-1   Filed 09/12/22   Page 18 of 96

Avco Corporation v. Turner, Not Reported in Fed. Rptr. (2022)
2022 WL 2901015

2022 WL 2901015
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

AVCO CORPORATION, Appellant
v.
Veronica W. Saltz TURNER

No. 21-2750
|
Argued on June 15, 2022
|
(Filed: July 22, 2022)

On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. No. 2-20-cv-04073), District Judge: Honorable Joshua D. Wolson

**Attorneys and Law Firms**

Nicole Benjamin [ARGUED], John A. Tarantino, Adler Pollock & Sheehan, One Citizens Plaza, 8th Floor, Providence, RI 02903, Counsel for Appellant

Wayne A. Ely [ARGUED], 59 Andrea Drive, Richboro, PA 18954, Counsel for Appellee

Before: HARDIMAN, SMITH and FISHER, Circuit Judges.

OPINION [*]

FISHER, Circuit Judge.

**\*1** Lycoming Engines, a division of Avco Corporation, manufactures engines for what are often called small or private airplanes. Attorney Veronica Saltz Turner defended Avco and Lycoming in product liability lawsuits. But after her relationship with them ended, she performed legal work on behalf of the plaintiffs in *Torres v. Honeywell, Inc.*, [1] a lawsuit involving a plane with a Lycoming engine. Avco sued Turner for breach of fiduciary duty. It sought damages, disgorgement, and declaratory and injunctive relief. The District Court entered summary judgment for Turner. Avco appeals. We will vacate in part and remand for further proceedings. [2]

Under Pennsylvania law, [3] "an attorney owes a fiduciary duty to his client; [this] duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest." [4] "[A] lawyer [may] not undertake a representation adverse to a former client in a matter 'substantially related' to that in which the lawyer previously had served the client." [5] We have explained that the duty "is not merely a matter of revealing or using the client's confidences and secrets, but of a duty of continuing loyalty to the client." [6]

A plaintiff bringing a claim for breach of fiduciary duty must establish: (1) a fiduciary relationship existed, (2) the defendant "negligently or intentionally failed to act in good faith and solely for [the plaintiff's] benefit," and (3) the breach caused an injury to the plaintiff. [7]

A. The Breach of Fiduciary Duty Claim

**\*2** The District Court held that, even assuming there was a genuine factual dispute about the existence and breach of a fiduciary duty, Avco did not establish a triable issue of fact with regard to an "actionable injury." J.A. 16. The type of injury a plaintiff must establish, however, depends on the type of remedy sought. We consider, in turn, the kinds of monetary remedies at issue: disgorgement, compensatory damages, attorney's fees and costs, and nominal damages.

1. Disgorgement

Avco argues that under Pennsylvania law, it does not need to show a separate injury, apart from the fiduciary breach, to be entitled to disgorgement. We agree. In *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, the Pepper Hamilton law firm represented Maritrans for many years and "came to know [its] complete inner[ ] workings" and "competitive strategies." [8] "Armed with this information," Pepper began representing four of Maritrans' competitors in similar matters. [9] Maritrans sued Pepper, requesting injunctive relief and compensatory and punitive damages. [10] The Pennsylvania Supreme Court held that Maritrans was entitled to a preliminary injunction. [11]

The Court went on to observe that "[c]ourts throughout the country have ordered the disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interests." [12] The Court quoted with approval the United States Supreme Court's holding that a fiduciary laboring under a conflict "may not perfect [her] claim to

Case 1:20-cv-00292-JPW   Document 259-1   Filed 09/12/22   Page 19 of 96

Avco Corporation v. Turner, Not Reported in Fed. Rptr. (2022)

2022 WL 2901015

compensation by insisting that although [she] had conflicting interests, [she] served [her] several masters equally well." [13] In other words, an attorney may not argue that she should be paid because her conflict of interest did not hurt her client. Avco is correct that in such a situation, the client is entitled to "disgorgement or forfeiture of fees for services rendered." [14] The client need not show injury beyond the breach of fiduciary duty itself. [15]

In *Maritrans*, only the preliminary injunction was at issue, so the disgorgement discussion could be characterized as dicta. If so, it is "considered dicta." [16] The Pennsylvania Supreme Court was not musing about hypotheticals, but explaining the remedies available to Maritrans on remand. This is persuasive evidence of how the Court would rule on damages here. [17]

**\*3** Turner argues Avco is not entitled to disgorgement because it did not pay her for her work in the *Torres* case and "[a] party cannot seek disgorgement of monies it has not paid." [18] But disgorgement need not be a refund of fees paid; it can, for example, consist of an accounting of profits wrongfully made. [19] According to its definition, after all, disgorgement centers on the wrongdoer's gain, not the plaintiff's loss: it is "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." [20]

Thus, the District Court erred by holding Turner was entitled to summary judgment on the breach of fiduciary duty claim without addressing disgorgement.

### 2. Compensatory Damages

The District Court did not err in holding that Avco failed to create a triable issue with regard to compensatory damages. In *Maritrans*, the Pennsylvania Supreme Court held that a client may receive compensatory damages "for an attorney's breach of his fiduciary duties by engaging in conflicts of interest." [21] In support, the Court cited two California cases where clients suffered identifiable financial losses due to their attorneys' fiduciary breaches. [22] Avco similarly would be entitled to compensatory damages if it could demonstrate pecuniary harm due to Turner's alleged breach.

Avco argues there is a genuine issue of material fact on compensatory damages because Turner "was provided with a wide array of confidential and trade secret information," "worked with [Avco's] experts," and "prepared ... motions submitted on behalf of the plaintiffs in *Torres*." [23] Those facts create the possibility of injury and damages. But "summary judgment is essentially 'put up or shut up' time." [24] It is not enough for Avco to say it "cannot know the full extent of the harm caused by Ms. Turner's representation of the *Torres* plaintiffs." [25] With discovery complete, Avco must "point to some evidence in the record that creates a genuine issue of material fact" regarding identifiable compensatory damages. [26] It has not done so.

### 3. Attorney's Fees and Costs

**\*4** The District Court did not err in holding that Avco may not recover, as compensatory damages, the attorney's fees and costs it has incurred in this litigation. Avco attacks this holding by citing state cases from outside Pennsylvania and a few federal court cases. But "reliance on cases from non-Pennsylvania jurisdictions ... is misplaced, as those cases ... do not bind the Pennsylvania Supreme Court." [27] Indeed, the Pennsylvania Supreme Court has "consistently reaffirmed" the American Rule: "in this Commonwealth, a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." [28] Avco's four federal district court cases do not show otherwise. One of them, *Fidelity Bank v. Commonwealth Marine & General Assurance Co.*, awards attorney's fees without citing any authority. [29] The other three cases cite *Fidelity* or one another. [30]

In sum, there is no indication that, in a case like this, the Pennsylvania Supreme Court would depart from its faithful adherence to the American Rule.

### 4. Nominal Damages

Avco argues that an attorney's breach of fiduciary duty creates an entitlement to nominal damages. Avco did not plead entitlement to such damages in its complaint or address their availability at summary judgment. "[A]rguments asserted for the first time on appeal ... are not susceptible of review in this Court absent exceptional circumstances," such as when "the public interest requires that the issue[ ] be heard or manifest

Case 1:20-cv-00292-JPW   Document 259-1   Filed 09/12/22   Page 20 of 96

Avco Corporation v. Turner, Not Reported in Fed. Rptr. (2022)

2022 WL 2901015

injustice would result from the failure to consider [it]." [31]
Avco has not argued there are exceptional circumstances, and
we do not perceive any.

### B. The Permanent Injunction

Avco requested an injunction prohibiting Turner from
"provid[ing] legal services to any person ... materially adverse
to Avco in matters" involving issues "substantially related
or similar to [those raised in] Turner's past representation of
Avco." [32] To obtain a permanent injunction, a party must
(among other requirements) prevail on the merits. [33] Before
the District Court, Avco lost on its injunction request for
the same reason it lost on summary judgment: because the
District Court concluded it had not shown a material factual
issue regarding injury. On appeal, Avco argues that the
Court "erred in determining that Ms. Turner was entitled
to summary judgment on both Avco's claim for breach of
fiduciary duty and its related claim for injunctive relief
because Avco had not 'established an actionable injury.' " [34]
Since we will vacate the summary judgment, we will also
vacate the permanent injunction ruling that flowed from it.

### C. Conclusion

To survive summary judgment, Avco needed to demonstrate
a factual dispute regarding each element of its claim: a
fiduciary relationship, a breach, and an injury. The District
Court reached only the injury prong and granted summary
judgment because it concluded Avco had not suffered a
cognizable injury. That was error. The District Court will
need to consider, on remand, the claim for disgorgement and
whether Avco has carried its burden on the other two elements
of the claim.

**\*5** For the reasons explained, we will vacate the entry of
summary judgment on the breach of fiduciary duty claim,
vacate the denial of injunctive relief, and remand for further
proceedings.

### All Citations

Not Reported in Fed. Rptr., 2022 WL 2901015

---

**Footnotes**

\*      This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding
       precedent.

1      No. CV2017-007542 (Ariz. Super. Ct. Maricopa Cnty.).

2      The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity). We have jurisdiction under 28
       U.S.C. § 1291 (final decisions of district courts). We review a district court's grant of summary judgment on
       a plenary basis. *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020). We generally review a grant or denial
       of a permanent injunction for abuse of discretion, but where an injunction is denied because of the entry of
       summary judgment, "we must determine whether the District Court erred in granting summary judgment."
       *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 819 (3d Cir.), *as amended* (May 5, 2006). Avco does
       not appeal the denial of its request for a declaratory judgment.

3      The District Court and the parties have applied Pennsylvania law, and we will as well. *See Williams v. BASF
       Catalysts LLC*, 765 F.3d 306, 316–17 (3d Cir. 2014) (holding that argument regarding choice of law may
       be waived).

4      *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1283 (Pa. 1992).

5      *Id.* at 1284 (quoting *Consol. Theatres v. Warner Bros. Cir. Mgmt. Corp.*, 216 F.2d 920, 924 (2d Cir. 1954)).

2022 WL 2901015

6 *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 161–62 (3d Cir. 1984) (holding that, where a law firm represented two plaintiffs whose positions had become adverse, the firm could not withdraw from representing one and continue representing the other). *Corn Derivatives* concerned ABA Model Rule of Professional Conduct 1.9(a), which is essentially identical to Pennsylvania Rule of Professional Conduct 1.9(a).

7 *Snyder v. Crusader Servicing Corp.*, 231 A.3d 20, 31 (Pa. Super. Ct. 2020).

8 602 A.2d at 1280.

9 *Id.*

10 *Id.* at 1279.

11 *Id.* at 1287.

12 *Id.* at 1285 (collecting cases from state courts in Florida, Minnesota, New York, and California and federal courts in the District of Columbia).

13 *Id.* at 1286 (quoting *Woods v. City Nat'l Bank & Trust Co. of Chi.*, 312 U.S. 262, 269 (1941)).

14 *Id.* at 1285.

15 *See Maritrans*, 602 A.2d at 1285, citing, among other cases, *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209, 212 (Minn. 1984) ("[I]f the attorney breaches his or her fiduciary duty to the client, the client is deemed injured even if no actual loss results" and "is entitled to recover, as damages, the compensation paid [to the attorney]."); *Zeiden v. Oliphant*, 54 N.Y.S.2d 27, 28–29 (N.Y. Sup. Ct. 1945) ("It is true that plaintiff suffered no real injury or damage for she had no valid claim .... [and] the information disclosed would not seem particularly secret or confidential for the matter was a public court record...." But because the lawyer "did, at least technically, pre-empt to himself an opportunity for profit that plaintiff herself might conceivably have utilized," he was "not ... permitted to retain any personal profit.").

16 *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980).

17 *See id.* (when forecasting state law, we consider "any ... reliable data tending convincingly to show how the highest court in the state would decide the issue at hand," including "relevant state precedents, analogous decisions, [and] considered dicta").

18 Appellee's Br. 17.

19 *See, e.g., Boyd v. Cooper*, 410 A.2d 860, 861 (Pa. Super. Ct. 1979). One of Avco's key cases supports the conclusion that disgorgement is not limited to a refund of fees to the client. In that case, the Reed Smith law firm had a conflict of interest because it represented first Axcan and later a party adverse to Axcan. *Axcan Scandipharm, Inc. v. Reed Smith, LLP*, 2007 Phila. Com. Pl. LEXIS 78, at *2 (Pa. Com. Pl. Mar. 26, 2007). Axcan sued, demanding disgorgement of Reed Smith's fees. *Id.* However, the fees had been paid on Axcan's behalf by a third party. *Id.* at *12-13. Disgorgement of the entire fee would result in a windfall to Axcan, so Axcan was entitled to disgorgement only of "Reed Smith's net profit resulting from its alleged breach of fiduciary duty." *Id.* at *15.

We generally do not look to trial court decisions to determine state law. *See Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 84 (3d Cir. 2018). We mention *Axcan* because Avco relies on it heavily and the District Court discussed it.

20 *Disgorgement, Black's Law Dictionary* (11th ed. 2019).

000019

21   602 A.2d at 1286.

22   *See Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg*, 216 Cal. App. 3d 1139, 1146–49, 1154 (1989) (law firm bought real estate it knew the client wanted to acquire); *David Welch Co. v. Erskine & Tulley*, 203 Cal. App. 3d 884, 889 (1988) (law firm competed with its former client to win collections contracts), *overruled by Lee v. Hanley*, 354 P.3d 334, 343–44 (Cal. 2015).

23   Appellant's Br. 30.

24   *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

25   Reply Br. 10.

26   *See Berckeley*, 455 F.3d at 201.

27   *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 227–28 (3d Cir. 2008).

28   *Lavelle v. Koch*, 617 A.2d 319, 323 (Pa. 1992).

29   592 F. Supp. 513, 529–30 (E.D. Pa. 1984).

30   *Airgas, Inc. v. Cravath, Swaine & Moore LLP*, 2010 WL 3046586, at *6 (E.D. Pa. Aug. 3, 2010) (citing *Fidelity*); *Tress v. AXA Advisors, LLC*, 2013 WL 12248219, at *4 (E.D. Pa. June 6, 2013) (citing *Airgas*); *NBN Broad., Inc. v. Sheridan Broad. Networks, Inc.*, 2015 WL 1489902, at *4 (W.D. Pa. Mar. 31, 2015) (citing *Airgas* and *Fidelity*).

31   *Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001).

32   J.A. 47.

33   *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

34   Appellant's Br. 16 (quoting J.A. 16).

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**Axcan Scandipharm, Inc. v. Reed Smith, LLP (Phil. Ct. Com. Pl. March 26, 2007)**

000021

⚠️ Caution
As of: September 9, 2022 7:00 PM Z

# *Axcan Scandipharm, Inc. v. Reed Smith, LLP*

Common Pleas Court of Philadelphia County, Pennsylvania, Civil Trial Division

March 26, 2007, Decided

NO. 03827

**Reporter**
2007 Phila. Ct. Com. Pl. LEXIS 78 *

AXCAN SCANDIPHARM, INC., Plaintiff, v. REED SMITH, LLP, Defendant.

**Prior History: [*1]**   COMMERCE PROGRAM. Control Nos. 091988, 111836.

*Axcan Scandipharm, Inc. v. Reed Smith, LLP, 2006 Phila. Ct. Com. Pl. LEXIS 211 (2006)*

## Core Terms

Indemnification, damages, disgorge, punitive damages, fiduciary duty, Amend, breach of fiduciary duty, compensatory damages, motion to dismiss, attorney's fees, disqualified, breached

## Case Summary

**Procedural Posture**
Plaintiff client brought suit against defendant law firm, alleging breach of fiduciary duty and professional negligence. Defendant, arguing that plaintiff's alleged damages were not recoverable, filed a motion to dismiss. Plaintiff filed a motion to amend its complaint to plead its claims and damages with more specificity.

**Overview**
Defendant represented plaintiff in patent litigation in federal court. A second client provided and paid for plaintiff's defense in the patent litigation. Later, the second client, represented by defendant, sought indemnification from plaintiff. Plaintiff argued that defendant's representation of the second client conflicted with defendant's representation of plaintiff. The court stated that the attorney fees that plaintiff incurred in successfully filing a motion to disqualify defendant from representing the second client in the indemnification action were compensable damages. Likewise, plaintiff might be able to recover any other fees that it incurred in the indemnification action that resulted solely from defendant's breach of its fiduciary duties to plaintiff. Plaintiff was not entitled to disgorgement of attorney fees paid in the patent action, because the second client, not plaintiff, had paid the fees. It could, however, recover defendant's net profit in the indemnification action resulting from its alleged breach of fiduciary duty. Punitive damages were also recoverable, provided that they comported with due process and did not duplicate other damages.

**Outcome**
The court granted the motion to amend the complaint in part and granted the motion to dismiss in part. It limited plaintiff to recovering the attorney fees it incurred and any net profits defendant might have earned as a direct result of defendant's alleged breach of fiduciary duty, as well as reasonable punitive damages if defendant's conduct was proven to have been sufficiently reprehensible.

## LexisNexis® Headnotes

Civil Procedure > Judicial
Officers > Judges > Discretionary Powers

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

*HN1*[⬇️]  **Judges, Discretionary Powers**

Amendments to pleadings will be liberally allowed to secure a determination of cases on their merits. Leave to amend lies within the sound discretion of the trial court and the right to amend should be liberally granted at any stage of the proceedings unless there is an error of law or resulting prejudice to an adverse party. The

000022

2007 Phila. Ct. Com. Pl. LEXIS 78, *1

right to amend will be withheld if there does not appear to be a reasonable possibility that amendment will be successful. A court is not required to allow amendment of a pleading if a party will be unable to state a claim on which relief could be granted. In other words, a proposed amended complaint must satisfy the preliminary objection standards for demurrer.

> Torts > Malpractice & Professional Liability > Attorneys

> Torts > Intentional Torts > Breach of Fiduciary Duty > Elements

*HN2*[⤓] **Malpractice & Professional Liability, Attorneys**

In making a claim that a law firm breached its fiduciary duty and was professionally negligent as counsel, a plaintiff has the burden of proving: (1) that a past attorney/client relationship existed which was adverse to a subsequent representation by the law firm of the other client; (2) that the subject matter of the relationship was substantially related; (3) that the member of the law firm acquired knowledge of confidential information from or concerning the former client, actually or by operation of law.

> Torts > Intentional Torts > Breach of Fiduciary Duty > Elements

> Torts > Intentional Torts > Breach of Fiduciary Duty > Remedies

*HN3*[⤓] **Breach of Fiduciary Duty, Elements**

In order to recover damages for breach of fiduciary duty, a plaintiff must show that it suffered economic damages that could be measured with certainty and, if awarded, would compensate it for all financial losses it suffered as a result of the defendant's conduct, including the value of property taken.

> Torts > Malpractice & Professional Liability > Attorneys

> Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview

*HN4*[⤓] **Malpractice & Professional Liability, Attorneys**

Courts have allowed civil actions for damages for an attorney's breach of his fiduciary duties by engaging in conflicts of interest.

> Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > American Rule

> Civil Procedure > ... > Costs & Attorney Fees > Costs > General Overview

*HN5*[⤓] **Basis of Recovery, American Rule**

In Pennsylvania, the American Rule is embodied in *42 Pa.C.S. § 1726(a)(1)*, which provides that attorneys' fees are not an item of taxable costs except as permitted by *42 Pa.C.S. § 2503* (relating to right of participants to receive counsel fees).

> Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > American Rule

> Torts > Malpractice & Professional Liability > Attorneys

*HN6*[⤓] **Basis of Recovery, American Rule**

In New Jersey, under a special judicially created exception to the American Rule, a client who successfully sues its attorney for legal malpractice may recover as compensatory damages from its attorney-adversary the fees that the client incurred in prosecuting the malpractice action against the attorney. This common law exception to the "American Rule" has not been adopted in Pennsylvania.

> Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

*HN7*[⤓] **Basis of Recovery, Statutory Awards**

Pennsylvania does provide by statute and rule of court for the recovery of attorney fees from an adversary in some cases. *42 Pa.C.S. § 2503(6)*, *(7)*, *(9)* (attorney fees may be awarded for certain improper litigation conduct); *Pa.R.C.P. No. 1023.1*, *1023.4* (attorney fees may be awarded for improper litigation conduct);

000023

Case 1:20-cv-00292-JPW     Document 259-1     Filed 09/12/22     Page 26 of 96
Page 3 of 11

2007 Phila. Ct. Com. Pl. LEXIS 78, *1

*Pa.R.C.P. No. 4019(g)* (attorney fees may be awarded for improper discovery conduct).

Civil Procedure > Remedies > Injunctions > General Overview

Torts > Intentional Torts > Breach of Fiduciary Duty > Remedies

*HN8*[⬇] **Remedies, Injunctions**

A fiduciary who breaches his duty of loyalty to his principal is liable to his principal, and an injunction is a proper remedy for the breach.

Torts > Malpractice & Professional Liability > Attorneys

Torts > Intentional Torts > Breach of Fiduciary Duty > Remedies

*HN9*[⬇] **Malpractice & Professional Liability, Attorneys**

Under Pennsylvania law, a client is entitled to receive, in a separate legal action, compensatory damages flowing from its attorney's breach of fiduciary duty. Compensatory damages are those which will make the client "whole."

Torts > Malpractice & Professional Liability > Attorneys

Torts > ... > Malicious Prosecution > Elements > General Overview

*HN10*[⬇] **Malpractice & Professional Liability, Attorneys**

Pursuant to *42 Pa.C.S. §§ 8351*, *8352*, under the "Dragonetti" Act, an attorney of record may be liable for wrongful use of civil proceedings if the initiation or continuation of a civil cause is intended merely to harass or maliciously injure the opposite party.

Torts > Malpractice & Professional Liability > Attorneys

Torts > Intentional Torts > Breach of Fiduciary Duty > Remedies

*HN11*[⬇] **Malpractice & Professional Liability, Attorneys**

Courts throughout the country have ordered the disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interests. However, in most cases where courts have ordered such disgorgement, the attorney fees that were being disgorged were paid by the client, so the disgorgement was in essence a refund and qualifies as compensatory damages.

Civil Procedure > Remedies > Equitable Accountings > General Overview

Torts > Intentional Torts > Breach of Fiduciary Duty > Remedies

Civil Procedure > Remedies > Injunctions > General Overview

*HN12*[⬇] **Remedies, Equitable Accountings**

Where a fiduciary acquires information in confidence and adopts or uses it for his own private benefit and personal profit to the exclusion and detriment of the client, he may be enjoined at the instance of the client and he may be required to account to the client for any profits derived therefrom as well as be subject to liability for damages sustained as a result of such breach of his fiduciary duties.

Civil Procedure > Remedies > Damages > Punitive Damages

*HN13*[⬇] **Damages, Punitive Damages**

Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

000024

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 27 of 96

Page 4 of 11

2007 Phila. Ct. Com. Pl. LEXIS 78, *1

Civil Procedure > Remedies > Damages > Punitive Damages

Torts > Malpractice & Professional Liability > Attorneys

Torts > ... > Types of Damages > Punitive Damages > General Overview

Torts > Intentional Torts > Breach of Fiduciary Duty > Remedies

*HN14*[ ]  **Damages, Punitive Damages**

Unlike compensatory damages, which are intended to redress the concrete loss that the plaintiff has suffered, punitive damages serve a broader function; they are aimed at deterrence and retribution. Punitive damages may be awarded for a breach of fiduciary duty by an attorney. In fact, the reasons for imposing punitive damages on an errant attorney are even more compelling than those where a non-attorney breaches a fiduciary or other tort duty to a plaintiff.

Legal Ethics > Client Relations > General Overview

Torts > Malpractice & Professional Liability > Attorneys

*HN15*[ ]  **Legal Ethics, Client Relations**

An attorney at law has been said to be a public officer. He is an officer of the court sworn to aid in the administration of justice and to act with all good fidelity both to his clients and to the court. The public have a deep and vital interest in his integrity. It is a matter of profound importance from every point of view that members of the bar be men of probity and rectitude, zealous to maintain relations of utmost honesty with their clients and solicitous to protect them against legal wrong. Unflinching fidelity to their genuine interests is the duty of every attorney to his clients. Public policy can hardly touch matters of more general concern than the maintenance of an untarnished standard of conduct by the attorney at law toward his client. The attorney and client do not deal with each other at arms' length. The client often is in many respects powerless to resist the influence of his attorney. If that influence be vicious, untoward, criminal, the relation of trust is abused and becomes a source of wrong.

Civil Procedure > Remedies > Damages > Punitive Damages

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN16*[ ]  **Damages, Punitive Damages**

Any punitive damages award must comport with the requirements of due process. In particular, such punitive damages must bear a reasonable relationship, and must be proportionate, to the compensatory damages, if any, awarded against the defendant for its misconduct. Furthermore, any such punitive damages must not duplicate the other damages awarded, such as any profits that the defendant may be required to disgorge.

Civil Procedure > Remedies > Damages > Punitive Damages

*HN17*[ ]  **Damages, Punitive Damages**

An award of punitive damages must make sense in view of (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

Civil Procedure > Remedies > Damages > Punitive Damages

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN18*[ ]  **Damages, Punitive Damages**

Courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered. Few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. A higher ratio might be necessary where the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. The converse is also true, however. When compensatory damages are

Case 1:20-cv-00292-JPW     Document 259-1     Filed 09/12/22     Page 28 of 96     Page 5 of 11

2007 Phila. Ct. Com. Pl. LEXIS 78, *1

substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

Torts > Intentional Torts > Breach of Fiduciary Duty > Remedies

**HN19**[ ] **Breach of Fiduciary Duty, Remedies**

In classic fiduciary relationships such as doctor-patient and lawyer-client, the Gatherer owes, in Cardozo's gaseous phrase, "the punctilio of an honor most sensitive." In these relationships, a Source shares Data with a Gatherer in reliance on the Gatherer's expertise, and with the expectation that the Gatherer will act disinterestedly on the Source's behalf. The expectation of disinterestedness includes the obligation not to disclose Data. A strong property rule should protect against a classic fiduciary's intentional Taking of Data. Intentional, in this context, should include any Taking with intent greater than lack of precaution, because the classic fiduciary should err on the side of protecting confidentiality. Because there are fewer concerns about overdeterrence, the property rule would include damages for restitution and proximate cause, the Gatherer's monetary gain (less any overlap with restitution damages) and its illicit gain. The fencing cost factor should be high, given the especially destabilizing effect of a Taking by a classic fiduciary. The Source should also receive its enforcement costs and an appropriate correction factor.

**Judges:** HOWLAND W. ABRAMSON, J.

**Opinion by:** HOWLAND W. ABRAMSON

# Opinion

In this action, Axcan Scandipharm, Inc. ("Axcan") alleges that Reed Smith, LLP ("Reed Smith") represented Axcan in certain federal court litigation brought against Axcan by McNeilab, Inc. (the "Patent Litigation"). Apparently, pursuant to an indemnification agreement American Home Products Corporation ("AHP"), and/or Eurand International, S.p.A. ("Eurand") provided and paid for Reed Smith's defense of Axcan in the Patent Litigation. Subsequently, Reed Smith

undertook the representation of AHP/Eurand in a separate action in which AHP/Eurand sought indemnification from Axcan (the "Indemnification Action") for damages AHP/Eurand incurred in connection with certain underlying product liability suits brought against them and Axcan. [1]

 **[\*2]** Due to Reed Smith's prior representation of Axcan in the Patent Litigation, Axcan alleged in both this action and in the Indemnification Action that Reed Smith had an impermissible conflict of interest and should be barred from representing AHP/Eurand adverse to Axcan in the Indemnification Action. The arbitrator in the Indemnification Action ultimately precluded Reed Smith from further representing AHP/Eurand in that action.

In this action, Axcan seeks damages flowing from Reed Smith's alleged conflicting representations of Axcan and AHP/Eurand and from Reed Smith's alleged disclosure of Axcan's confidences to AHP/Eurand in connection with the Indemnification Action. [2] **[\*3]** Reed Smith moved to dismiss Axcan's claims on the basis that none of its alleged damages are recoverable. Axcan moved to Amend its Complaint to plead its breach of fiduciary duty and professional negligence claims and damages with more specificity. In order to decide both parties' motions in accordance with the applicable legal standards, the court will view Axcan's proposed Amended Complaint in the light of Reed Smith's Motion to Dismiss, rather than simply looking at the claims pled in Axcan's existing Complaint. [3]

**HN1**[ ] "Amendments to pleadings will be liberally

---

[1] By agreement of the parties to the Indemnification Action, the claims in that action were arbitrated before former Judge Gafni.

[2] In addition to its claims for damages, Axcan also sought a declaratory judgment that Reed Smith must turn over Axcan's file from the Patent Litigation and that Reed Smith is precluded from representing AHP/Eurand adverse to Axcan in the Indemnification Action. Since the Patent Litigation file was turned over and Judge Gafni disqualified Reed Smith in the Indemnification Action, the declaratory judgment claim is effectively moot.

[3] Given the present procedural posture of this case, the court must accept all factual allegations in Axcan's Complaint and proposed Amended Complaint as true. See *Emerich v. Phila. Center for Human Development, Inc., 554 Pa. 209, 213, 720 A.2d 1032, 1035, n.1 (1998)*. In doing so, the court does not hold that Reed Smith has, in fact, breached any fiduciary duty to Axcan. That determination must await the parties' proofs at trial or, at least, at summary judgment.

000026

Case 1:20-cv-00292-JPW     Document 259-1     Filed 09/12/22     Page 29 of 96

Page 6 of 11

2007 Phila. Ct. Com. Pl. LEXIS 78, *3

allowed to secure a determination of cases on their merits." [4] "Leave to amend lies within the sound discretion of the trial court and the right to amend should be liberally granted at any stage of the proceedings unless there is an error of law or resulting prejudice to an adverse party." [5] "The right to amend will be withheld if there does not appear to be a reasonable possibility that amendment will be successful." [6] "A court is not required to allow amendment of a pleading if a party will be unable to state a claim on which relief could be granted." [7] In other words, **[*4]** Axcan's proposed Amended Complaint must satisfy the preliminary objection standards for demurrer.

In its Motion to Dismiss **[*5]** and its opposition to Axcan's Motion to Amend, Reed Smith contends that Axcan has failed to allege that it suffered any legally cognizable damages. In order to prevail on its Motion to Amend and to defeat Reed Smith's Motion to Dismiss, Axcan must show that the relief it demands in its proposed Amended Complaint constitutes recoverable damages; otherwise its proposed amendments would be futile and will be disallowed.

In its proposed Amended Complaint, Axcan claims that Reed Smith breached its fiduciary duty and was professionally negligent as counsel to Axcan. *HN2*[↑] In making such a claim, Axcan "has the burden of proving: (1) that a past attorney/client relationship existed which was adverse to a subsequent representation by the law firm of the other client; (2) that the subject matter of the relationship was substantially related; (3) that the member of the law firm . . . acquired knowledge of confidential information from or concerning the former client, actually or by operation of law." [8] In support of its claim, Axcan has pled that: Reed Smith represented Axcan in the Patent Litigation; Reed Smith acquired confidential information concerning Axcan during the course of that litigation; Reed Smith subsequently

represented AHP/Eurand adverse to Axcan in the Indemnification Action; and Reed Smith divulged Axcan's confidential information to AHP/Eurand. In other words, Axcan accuses Reed Smith of engaging in a impermissible conflict of interest. Such allegations make out a claim for breach of fiduciary duty/professional negligence against Reed Smith.

**[*6]** *HN3*[↑] In order to recover damages for Reed Smith's alleged breach of fiduciary duty, Axcan must show that it suffered "economic damages that could be measured with certainty and, if awarded, would compensate [Axcan] for all financial losses [it] suffered as a result of [Reed Smith's] conduct, including the value of property taken." [9] Axcan claims several different types of damages due to Reed Smith's alleged breach. Axcan claims that it is entitled to compensatory damages, which it argues includes the fees it paid other counsel to have Reed Smith disqualified in the Indemnification Action and to obtain the Patent Litigation client file from Reed Smith. Axcan also claims that Reed Smith must disgorge to Axcan the fees that Reed Smith earned representing Axcan in the Patent Litigation. Axcan further claims that Reed Smith must disgorge to Axcan the fees that Reed Smith earned representing AHP/Eurand in the Indemnification Action. Finally, Axcan claims that it is entitled to punitive damages due to the egregiousness of Reed Smith's breach of fiduciary duty. Some, but not all, of such damages may be sought by Axcan in this action.

**[*7]** Reed Smith's primary argument in support of its Motion to Dismiss is that Axcan is barred by the "American Rule" from recovering any damages comprised of attorneys fees. "The American Rule states that a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties or some other established exception." [10] However, in this case,

---

[4] *Capobianchi v. BIC Corp., 446 Pa. Super. 130, 134, 666 A.2d 344, 346 (1995)*.

[5] *Werner v. Zazyczny, 545 Pa. 570, 584, 681 A.2d 1331, 1338 (1996)*.

[6] *Spain v. Vicente, 315 Pa. Super. 135, 142, 461 A.2d 833, 837 (1983)*.

[7] *Werner, 545 Pa. at 584, 681 A.2d at 1338*.

[8] *In re Estate of Pew, 440 Pa. Super. 195, 244, 655 A.2d 521, 545-6 (1994)*.

[9] *Paves v. Corson, 569 Pa. 171, 177, 801 A.2d 546, 550 (2002)* (citing lower court's jury instructions with approval). *See also Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz, 529 Pa. 241, 258, 602 A.2d 1277, 1285 (1992)* (*HN4*[↑]) "Courts have also allowed civil actions for damages for an attorney's breach of his fiduciary duties by engaging in conflicts of interest.")

[10] *Mosaica Academy Charter School v. Commonwealth Dept. of Education, 572 Pa. 191, 206-7, 813 A.2d 813, 822 (2002)* (*HN5*[↑]) "In Pennsylvania, the American Rule is embodied in *42 Pa.C.S. § 1726(a)(1)*, which provides that attorneys' fees are not an item of taxable costs except as permitted by *42*

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 30 of 96

Page 7 of 11

2007 Phila. Ct. Com. Pl. LEXIS 78, *7

Axcan is not trying to recover its attorneys fees from its adversary. It is not claiming that it is entitled to the fees it has incurred in this action, where Reed Smith is Axcan's adversary. [11] Instead, it is trying to recover at least a portion of the fees it incurred in the separate Indemnification Action. Furthermore, Axcan is not trying to recover those fees from AHP/Eurand, which was its adversary in the Indemnification Action, but rather Axcan is trying to recover them from its former agent and fiduciary, Reed Smith, who allegedly breached its pre-existing fiduciary duties to Axcan during the course of representing AHP/Eurand in the Indemnification Action.

**[*8]**

**[*9]** The duty Reed Smith allegedly breached was the duty of loyalty, *i.e.,* the duty not to undertake a conflicting representation or otherwise to violate client confidences. Reed Smith allegedly refused to withdraw from representing AHP/Eurand adverse to Axcan, so in order to protect its confidences, Axcan had to petition to have Reed Smith enjoined or disqualified from representing AHP/Eurand in the Indemnification Action. [12] The arbitrator apparently believed that Reed Smith's representation of AHP/Eurand did constitute such a

---

*Pa.C.S. § 2503* (relating to right of participants to receive counsel fees)").

[11] **HN6**[⬆] In New Jersey, under a special judicially-created exception to the "American Rule," a client who successfully sues its attorney for legal malpractice may recover as compensatory damages from its attorney-adversary the fees that the client incurred in prosecuting the malpractice action against the attorney. *See Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427, 771 A.2d 1194 (2001); Saffer v. Willoughby, 143 N.J. 256, 670 A.2d 527 (1996).* This common law exception to the "American Rule" has not been adopted in Pennsylvania, and this court declines to do so here.

**HN7**[⬆] Pennsylvania does provide by statute and rule of court for the recovery of attorneys fees from an adversary in some cases. *See 42 Pa. C.S. § 2503 (6), (7), (9)* (attorneys fees may be awarded for certain improper litigation conduct); *Pa. R. Civ. P. 1023.1*, *1023.4* (attorneys fees may be awarded for improper litigation conduct); *Pa. R. Civ. P. 4019(g)* (attorneys fees may be awarded for improper discovery conduct). The court does not decide at this juncture whether any such award of fees may be appropriate in this case.

[12] *See Maritrans, 529 Pa. at 262, 602 A.2d at 1287* (**HN8**[⬆]) "[A] fiduciary who breaches his duty of loyalty to his principal is liable to his principle, and an injunction is a proper remedy for the breach.").

breach of fiduciary duty because he ultimately disqualified Reed Smith. Therefore, the attorneys' fees Axcan was compelled to incur in successfully moving to disqualify Reed Smith are compensable damages which Axcan may claim in this malpractice action against Reed Smith. [13] Such damages may be awarded "to address the concrete loss that [Axcan] has suffered by reason of [Reed Smith's] wrongful conduct" in representing AHP/Eurand in the Indemnification Action. [14]

**[*10]**

**[*11]**

While it appears that Axcan incurred fees in seeking to have Reed Smith disqualified, it is not as clear whether Axcan incurred any fees in compelling Reed Smith to turn over Axcan's file from the Patent Action. If Axcan did incur such fees, and if such failure to turn over the file rises to the level of attorney malpractice, then Axcan may also be able to collect those fees and costs as compensatory damages. Likewise, Axcan may be able to recover any other fees that Axcan incurred in the Indemnification Action that resulted solely from Reed Smith's breach of its fiduciary duties to Axcan.

Axcan is not entitled to recover all of its other attorneys' fees incurred in defending the Indemnification Action, unless it pleads and proves a "Dragonetti" claim against

---

[13] In reaching this conclusion, the court recognizes that it disagrees with at least one New York state court, which held that "the request for [attorneys fees incurred in litigating an attorney's disqualification], if recoverable, should have been raised in the proceeding in which the disqualification occurred." **Steinberg v. Harmon, 259 A.D.2d. 318, 686 N.Y.S.2d 423 (1999)**. Under that reasoning, Judge Gafni should have been the one to award such fees, or not.

**HN9**[⬆] Under Pennsylvania law, a client is entitled to receive, in a separate legal action, compensatory damages flowing from its attorney's breach of fiduciary duty. *See Maritrans, 529 Pa. at 258, 602 A.2d at 1285. See also Paves, 569 Pa. at 177, 801 A.2d at 550.* Compensatory damages are those which will make the client "whole." *See Feingold v. SEPTA, 512 Pa. 567, 579, 517 A.2d 1270, 1276 (1986).* Axcan will never be made whole without payment of those attorneys fees it was forced to incur to disqualify Reed Smith in the Indemnification Action. In this respect, Pennsylvania law is more akin to the law of New Jersey, discussed, *supra,* footnote 11, than it is to that of New York.

[14] *State Farm Mut. Automobile Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519, 155 L. Ed. 2d 585 (2003)* (defining compensatory damages).

000028

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 31 of 96

Page 8 of 11

2007 Phila. Ct. Com. Pl. LEXIS 78, *11

Reed Smith. [15] If AHP/Eurand had a good faith claim against Axcan for indemnification, then presumably some other counsel would have chosen to represent AHP/Eurand in bringing such a claim, **[\*12]** even if Reed Smith had not chosen to do so. Therefore, Axcan would have incurred those defense costs anyway, without any breach of fiduciary duty by Reed Smith.

In addition to its claims for compensatory damages, Axcan also asks for disgorgement. *HN11*[⬆] "Courts throughout the country have ordered the disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interests." [16] However, in most cases where courts have ordered such disgorgement, the attorneys fees that were being disgorged were paid by the client, so the disgorgement was in essence a refund and qualifies as compensatory damages. [17] In this case, Axcan did not pay Reed Smith

anything for **[\*13]** Reed Smith's representation of Axcan in the Patent Litigation. Instead, AHP/Eurand apparently paid Reed Smith's fees incurred on Axcan's behalf. If the court were to order Reed Smith to disgorge those fees to Axcan, Axcan would not be made whole; it would receive a windfall.

**[\*15]**   Axcan also claims that Reed Smith should disgorge, and Axcan should receive, the fees paid to Reed Smith by AHP/Eurand in the Indemnification Action. This is partially true.

> *HN12*[⬆] Where [a fiduciary] acquires information in confidence and adopts or uses it for his own private benefit and personal profit to the exclusion and detriment of the [client], he may be enjoined at the instance of the [client] and he may be required to account to the [client] for any profits derived therefrom as well as be subject to liability for damages sustained as a result of such breach of his fiduciary duties. [18]

However, the court does not read the case law as permitting Axcan to recover the entire fee earned by Reed Smith in the Indemnification Action, but only Reed Smith's net profit resulting from its alleged breach of fiduciary duty.

**[\*16]**   In addition to compensatory and disgorgement damages, Axcan also claims it is entitled to recover punitive damages for Reed Smith's breach of fiduciary duty.

> *HN13*[⬆] Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference

---

[15] *See* *HN10*[⬆] *42 Pa.C.S. §§ 8351*, *8352* (under the "Dragonetti" Act, an attorney of record may be liable for wrongful use of civil proceedings if the initiation or continuation of a civil cause is intended merely to harass or maliciously injure the opposite party).

[16] *Maritrans, 529 Pa. at 258, 602 A.2d at 1285*.

[17] The court in <u>Maritrans</u> cited to a number of disgorgement cases from other jurisdictions. *529 Pa. at 258, 602 A.2d at 1285*. None of those cases are factually similar to the present case, in that most involve the disgorgement of fees paid by the client, not a third party on behalf of the client. *See* *Perl v. St. Paul Fire and Marine Ins. Co., 345 N.W.2d 209 (Minn. 1984)* ("the **[\*14]** forfeiture of an insured attorney's fees for breach of a fiduciary duty owed the client is 'money damages' within the meaning of [malpractice] policy"); *Rice v. Perl, 320 N.W.2d 407 (Minn. 1982)* (attorney was ordered to refund contingency fee paid by client where the attorney simultaneously employed a party adverse to client); *Financial Gen. Bankshares v. Metzger, 523 F. Supp. 744, 773 (D.D.C. 1981)* vacated on jurisdictional grounds, *220 U.S. App. D.C. 219, 680 F.2d 768 (D.C. Cir. 1982)* (attorney could not recover fees from, and had to forfeit fees paid by, first client where its representation of second client was a breach of its duties to its first client); <u>White v. Roundtree Transport, Inc.,</u> *386 So.2d 1287 (Fla. 3d. Dist 1980)* (attorney who simultaneously represented two clients with conflicting interest was not entitled to receive fee for representation of second client); *Goldstein v. Lees, 46 Cal. App. 3d 614, 120 Cal. Rptr. 253 (2d Dist. 1975)* (attorney could not recover fee from second client where its representation of second client was a breach of its duties to its first client.) The remaining case cited by the court in <u>Maritrans</u> is addressed, *infra,* note 18.

---

[18] *Boyd v. Cooper, 269 Pa. Super. 594, 597, 410 A.2d 860, 862 (1979)*. *See also* *Sack v. Feinman, 489 Pa. 152, 163, 413 A.2d 1059, 1065 (1980)* ("If the fiduciary makes profits, or gets interest on the money he wrongly takes from the beneficiary, he must be held liable not only for the profits or interest he makes on such funds, but also for interest on those profits or the interest itself."); Restatement (Second) Agency, § 396(c) (1958) ("Unless otherwise agreed, after the termination of the agency, the agent . . . has a duty to account for profits made by the sale or use of trade secrets and other confidential information, whether or not in competition with the principal"); *Zeiden v. Oliphant, 54 N.Y.S.2d 27 (N.Y. Co. 1945)* ("No doubt damages may be recovered resulting from misconduct of an attorney in revealing confidential matter obtained in such capacity; and, indeed, the attorney may well be declared a trustee *ex maleficio* for any advantage or profit thus obtained at the expense of the client.")(case cited with approval in <u>Maritrans</u>).

000029

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 32 of 96

Page 9 of 11

2007 Phila. Ct. Com. Pl. LEXIS 78, *16

to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant. [19]

HN14[⬆️] Unlike compensatory damages which "are intended to redress the concrete loss that the plaintiff has suffered . . . [P]unitive damages serve a broader function; they are aimed at deterrence and retribution." [20] Punitive damages may be awarded for a breach of fiduciary duty by an attorney. [21] In fact, the reasons for imposing punitive damages on an errant attorney are even more compelling than those where a non-attorney breaches a fiduciary or other tort duty to a plaintiff.

HN15[⬆️] An attorney at law has been said to be a public officer. He is an officer of the court sworn to aid in the administration [*17] of justice and to act with all good fidelity both to his clients and to the court. The public have a deep and vital interest in his integrity. It is a matter of profound importance from every point of view that members of the bar be men of probity and rectitude, zealous to maintain relations of utmost honesty with their clients and solicitous to protect them against legal wrong. Unflinching fidelity to their genuine interests is the duty of every attorney to his clients. Public policy can hardly touch matters of more general concern than the maintenance of an untarnished standard of conduct by the attorney at law toward his client.

The attorney and client do not deal with each other at arms' length. The client often is in many respects powerless to resist the influence of his attorney. If that influence be vicious, untoward, criminal, the relation of trust is abused and becomes a source of wrong. [22]

Therefore, Axcan may assert a claim for punitive damages against Reed Smith in this instance. However, HN16[⬆️] any punitive damages award must comport with the requirements of due process. [23] In particular, such punitive damages must bear a reasonable relationship, and must [*18] be proportionate, to the compensatory damages, if any, awarded against Reed Smith for its misconduct. [24] Furthermore, any such punitive damages must not duplicate the other damages awarded, such as any profits that Reed Smith may be required to disgorge. [25]

---

[22] *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot, 312 Pa. Super. 125, 140-141, 458 A.2d 545, 553 (1983)* citing with approval from *Berman v. Coakley, 243 Mass. 348, 137 N.E. 667 (1923)*.

[23] HN17[⬆️] An award of punitive damages must make sense in view of "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm, 538 U.S. at 418, 123 S.Ct. at 1520*.

[24] *Id., 538 U.S. at 426, 123 S.Ct. at 1524* (HN18[⬆️] "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.") "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . [A] higher ratio might be necessary where the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id., 538 U.S. at 425, 123 S.Ct. at 1524*.

[25] *See id., 538 U.S. at 426, 123 S.Ct. at 1524* -5 (punitive damages were disallowed where they duplicated compensatory damages for emotional distress).

---

[19] *Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 102, 555 A.2d 800, 803 (1989)*, citing, *Restatement (Second) Torts § 908(2)* (1979).

[20] *State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519, 155 L. Ed. 2d 585 (2003)*.

[21] *See Rizzo v. Haines, 520 Pa. 484, 507-8, 555 A.2d 58, 69 (1989)* ("Haines used his confidential position to persuade his injured client and good friend that he should transfer to him the $ 50,000 that Judge Marshall had awarded him due to Haines' misconduct. Haines secured this transfer after intentionally withholding Judge Marshall's findings of misconduct, in order to evade her ruling. He also secured this transfer by telling his client that he needed the money to pursue a claim against the doctor and the hospital. That claim, however, proved meritless. In addition, he overreached on costs and expenses. These breaches of fiduciary duty, intentional withholding of critical information and fraudulent misrepresentation, were more than sufficient to justify the punitive damage award.")

Case 1:20-cv-00292-JPW   Document 259-1   Filed 09/12/22   Page 33 of 96   Page 10 of 11

2007 Phila. Ct. Com. Pl. LEXIS 78, *18

[*19]

[*20]

## CONCLUSION

For all the foregoing reasons, Axcan may amend its Complaint, and its claims against Reed Smith will not be dismissed. However, Axcan is limited to recovering the attorneys fees it incurred, and any net profits Reed Smith may have earned, as a direct result of Reed Smith's alleged breach of fiduciary duty to Axcan, as well as reasonable punitive damages if Reed Smith's conduct is proven to have been sufficiently reprehensible. [26]

[*21]

**BY THE COURT,**

--------

[26] Further support for the court's holdings regarding damages may be found in the following article: Jay Weiser, *Measure of Damages for Violation of Property Rules: Breach of Confidentiality, 9 U. Chi. L. Sch. Roundtable 75 (2002).* Employing the inimitable language of the law-and-economics school, the author opined that:

> HN19[⬆] In classic fiduciary relationships such as doctor-patient and lawyer-client, the Gatherer owes, in Cardozo's gaseous phrase, 'the punctilio of an honor most sensitive.' In these relationships, a Source shares Data with a Gatherer in reliance on the Gatherer's expertise, and with the expectation that the Gatherer will act disinterestedly on the Source's behalf. The expectation of disinterestedness includes the obligation not to disclose Data. . . . A strong property rule should protect against a classic fiduciary's intentional Taking of Data. Intentional, in this context, should include any Taking with intent greater than lack of precaution, because the classic fiduciary should err on the side of protecting confidentiality. . . . Because there are fewer concerns about overdeterrence, the property rule would include damages for restitution and proximate cause, the Gatherer's monetary gain (less any overlap with restitution damages) and its illicit gain. The fencing cost factor should be high, given the especially destabilizing effect of a Taking by a classic fiduciary. The Source should also receive its enforcement costs and an appropriate correction factor.

*Id. at 121-2*.

**HOWLAND W. ABRAMSON, J.**

## ORDER

**AND NOW,** this 26<th> day of March, 2007, upon consideration of defendant's Motion to Dismiss, plaintiff's Motion for Leave to File Amended Complaint, the responses thereto, the briefs in support and opposition, and all other matters of record, and in accord with the court's Opinion issued contemporaneously, it is hereby **ORDERED** as follows:

1. Defendant's Motion to Dismiss is **GRANTED** in part, and plaintiff's claims for damages are limited as set forth in the court's accompanying Opinion. The remainder of the Motion to Dismiss is **DENIED.**

2. Plaintiff's Motion to Amend is **GRANTED,** and plaintiff may file an Amended Complaint under seal substantially in the form proffered by it in its Motion to Amend, but modified to comport with the court's accompanying Opinion regarding recoverable damages.

It is further **ORDERED** that the Case Management Order in this case is hereby amended as follows:

1. The parties shall have until June 2, 2007, to complete fact discovery limited to the issues of damages and the circumstances and effect of Judge Gafni's ruling disqualifying **[*22]** defendant as counsel in the indemnification arbitration.

2. On or before July 7, 2007, plaintiff shall identify and submit to all other parties curriculum vitae and expert reports for any damages expert witnesses plaintiff intends to have testify at trial.

3. On or before August 4, 2007, defendant shall identify and submit to all other parties curriculum vitae and expert reports for any damages expert witnesses defendant intends to have testify at trial.

4. All pre-trial motions (other than motions in limine) shall be filed not later than August 18, 2007.

A new Case Management Order setting forth these and other deadlines will be issued simultaneously with this Order.

**BY THE COURT,**

**HOWLAND W. ABRAMSON, J.**

000031

2007 Phila. Ct. Com. Pl. LEXIS 78, *22

**End of Document**

000032

# De Lage Landen Financial Services, Inc. v. Miramax Film Corp. (E.D. Pa. September 23, 2008)

000033

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 36 of 96

De Lage Landen Financial Services, Inc. v. Miramax Film Corp., Not Reported in...

2008 WL 4348074

2008 WL 4348074
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

DE LAGE LANDEN FINANCIAL SERVICES, INC.

v.

MIRAMAX FILM CORP.

Civil Action No. 06-2319.
|
Sept. 23, 2008.

**Attorneys and Law Firms**

Rosetta B. Packer, Lisa M. Salazar, Peter J. Boyer, Stephen Charles Foytlin, McCarter & English, LLP, Philadelphia, PA, for De Lage Landen Financial Services, Inc.

James J. Dougherty, Wilson M. Brown, III, Elizabeth Y. McCuskey, Drinker Biddle & Reath LLP, Philadelphia, PA, for Miramax Film Corp.

*MEMORANDUM AND ORDER*

McLAUGHLIN, District Judge.

 **\*1**  This case involves a dispute about the rental of copy machines by Miramax Film Corp. ("Miramax"). De Lage Landen Financial Services, Inc. ("DLL"), a financial services company, initially sued Miramax to recover on an alleged contract among it, MWB Copy Products, Inc. ("MWB"), a lessor of copy machines, and Miramax. Miramax defended against DLL's claim by contending that it did not assent to the contract on which DLL sued and brought a third-party complaint against MWB for fraud, alleging that MWB perpetrated a fraud on Miramax when its Vice President of Sales, Robert Kaminsky, falsified contract documents it sent to DLL. DLL then brought claims against MWB for fraud, breach of contract, and breach of warranty.

The Court held a bench trial on December 10-11, 2007. This memorandum comprises the Court's findings of fact and conclusions of law. The Court finds for Miramax on DLL's claims against Miramax and on Miramax's claims against MWB. The Court finds for DLL on its claims for breach of contract and breach of warranty against MWB and for MWB on DLL's fraud claim.

I. *Findings of Fact*

 A. *Parties*

1. Miramax is an indirect subsidiary of The Walt Disney Corporation with a principal place of business at 161 Avenue of the Americas, New York, New York. Between 2000 and 2005, Miramax maintained offices in Los Angeles, California, and New York City.

2. DLL is a Michigan corporation with its principal place of business at 1111 Old Eagle School Road, Wayne, Pennsylvania.

3. DLL is a financial services company that provides financial products to vendors. One such product is the leasing of office equipment through dealers. These dealers originate transactions for the sale of equipment. A dealer will prepare the documents for any given transaction and send them to DLL for DLL to consider funding the transaction. Once DLL approves the credit transaction, DLL then sends the credit approval to the dealer, who will negotiate and prepare documents with the end users. The dealer then sends the documents to DLL for funding. DLL reviews the transaction for accuracy, performs an audit, and funds the dealer. DLL then commences invoicing to the end user.

4. MWB is a California corporation with its principal place of business at 5700 Warland Drive, Cypress, California. A large component of MWB's business is the sale and lease of copiers and printers in various local markets.

5. MWB has relationships with a number of third-party lessors who provide the financing for the copiers it offers. The third-party lessors with whom MWB works include DLL.

6. In most cases, MWB solicits and negotiates directly with the end user and then seeks financing from third-party lessors, such as DLL. DLL and MWB carried out their business relationship in the manner described in paragraph 3 above.

7. With MWB, DLL used an arrangement known as a "private label agreement." Under the private label agreement, the lease documents and subsequent invoices listed the leasing company name as "MWB Business Systems" rather than DLL.

 B. *Robert Kaminsky*

De Lage Landen Financial Services, Inc. v. Miramax Film Corp., Not Reported in...
2008 WL 4348074

**\*2** 8. Robert Kaminsky served as MWB's Vice President of Sales from November 2003 through June 2005. As Vice President of Sales, Kaminsky reported directly to the President of MWB and was "responsible for overall sales performance and all functions as it relates to the Sales Department."

9. MWB's job description for Vice President of Sales includes no limitation on his authority in that position.

10. MWB terminated Kaminsky on June 2, 2005.

11. In December 2004, prior to Kaminsky's termination, MWB executives emailed Kaminsky to inquire about a customer that appeared to feel that it had a 36-month lease instead of a 60-month lease.

12. After MWB terminated Kaminsky, DLL learned that Kaminsky was involved in a separate transaction in which DLL funded a lease for an end user in Florida, and that there were irregularities concerning the lease documents in that transaction. In addition, after MWB terminated Kaminsky, MWB further learned that Kaminsky had converted MWB funds by endorsing and depositing into his personal account checks from MWB customers made out to MWB totaling approximately $35,000.

C. *The 2000 Agreement*

13. On or about October 25, 2000, Miramax entered into a rental agreement with MWB and DLL under which Miramax obtained document reproduction machines from MWB (the "2000 Agreement"). The 2000 Agreement covered a total of four machines-three new machines and four used machines-and was for a term of sixty months, expiring on December 31, 2005. Under the 2000 Agreement, Miramax was charged on a cost-per-image basis, with a minimum monthly payment of $12,820.50. The Agreement went into effect on January 1, 2001, and was scheduled to end on December 21, 2005.

14. After the 2000 Agreement went into effect, Miramax received invoices from an entity called MWB Business Systems. Miramax did not know, and was never informed, that MWB Business Systems was a name used by DLL for the purpose of servicing payments under agreements DLL had financed. Miramax made payments to MWB Business Systems throughout the term of the 2000 Agreement.

15. Following the execution of the 2000 Agreement, Miramax, MWB, and DLL entered into four separate addenda

to the 2000 Agreement. These addenda were executed by Miramax on May 9, 2001, October 22, 2001, September 17, 2002, and June 23, 2003, respectively. Through each of these addenda, one or more machines were added to the 2000 Agreement. After the final addendum went into effect, Miramax's minimum monthly payment was approximately $21,480.30.

D. *The 2004 Agreement*

16. Jennifer Conine was Director of Facilities for Miramax from June 2003 until September 2006. One of her duties was to oversee the copier contracts.

17. When Conine took over, she reviewed the equipment contracts with Miramax's vendors. Miramax had a national agreement through Disney with Canon under which the price per copier was approximately $500. The cost with MWB, on the other hand, was approximately $23,000 for eight copy machines. She thus concluded that the pricing with MWB was too high.

**\*3** 18. Conine met with all of the vendors during her first year at Miramax, either in person or by telephone. In early 2004, she reached out to Kaminsky to discuss all aspects of the MWB equipment rental. She met with him in person. He told her that he represented MWB and that he was Vice President of Sales for the company.

19. When Conine expressed her concern about the price of the machines to Kaminsky, he offered to reduce the price on the monthly invoice they were paying. He told her that he wanted to keep Miramax's business.

20. Conine thought that the leasing company-"MWB Business Systems"-was part of MWB. She was never told that the leasing company was actually a different company from MWB. Kaminsky referred to it as the "leasing division." Thus, when Kaminsky ended up telling Conine to make changes to their contract, Conine believed that he was speaking for the leasing company.

21. Neither MWB nor DLL ever communicated to Miramax any limitations on Kaminsky's authority.

22. In his dealings with Miramax, Kaminsky identified himself as the Vice President of Sales of MWB.

23. Through his actions, Kaminsky left Miramax with the impression that he was negotiating with Miramax on behalf of MWB and DLL.

24. Although Miramax was aware of the existence of a leasing company that was involved in its copier leases, it believed that Kaminsky had the authority to negotiate on behalf of any leasing company.

25. MWB was the only entity with which Jennifer Conine, Miramax's Director of Facilities, dealt in negotiating the copier agreements here at issue.

26. Conine did not have an understanding of MWB's relationship with DLL or its role in any transactions with Miramax.

27. Prior to the summer of 2005, DLL had no contact with Conine or anyone else at Miramax.

28. After Conine complained to Kaminsky about the cost of the copiers, Kaminsky furnished to Miramax a draft of a new rental agreement to replace the 2000 Agreement.

29. From the outset of the parties' discussions, Conine informed Kaminsky that Miramax would not enter into any renegotiated agreement with MWB unless the renegotiated agreement had the same December 31, 2005, expiration date as the 2000 Rental Agreement.

30. Specifically, on May 28, 2004, when Kaminsky proposed the signing of a new lease, Conine responded in an email to Kaminsky, "I do not want to extend any leases."

31. At some time prior to June 17, 2004, Kaminsky forwarded a draft contract to Conine for a new 60-month term.

32. On June 17, 2004, after reviewing Kaminsky's proposed draft agreement, Conine emailed Kaminsky and told him, "The contract you sent me is for 60 months. I am not signing a new contract for anything that goes past ... 2005." In the same email exchange, Kaminsky agreed that any new agreement would coincide with the original 2005 expiration date, to which Conine responded, "The contract needs to reflect that."

33. Similarly, on August 9, 2004, Conine reminded Kaminsky, "As I mentioned to you, I do not want to start a new lease term."

**\*4** 34. On August 25, 2004, Conine specifically requested that Kaminsky provide a written proposal, preferably in the form of a spreadsheet, setting forth the numbers related to Miramax's current contract and what was being proposed.

35. Kaminsky responded the next day with a written proposal via email, wherein he assured Conine that "this lease supercedes the old one and only runs thru the original expiration date."

36. On September 9, 2004, Kaminsky followed up on this proposal with a draft of an addendum to the new rental agreement, which provided that the new rental agreement would expire in 2005. His cover email again promised that the new rental agreement would have the same expiration date as the 2000 Agreement.

37. On September 17, 2004, Conine and Kaminsky exchanged emails concerning the possibility of making a change to the proposed rental agreement. In this exchange, Conine asked Kaminsky to "find out from the leasing dept if the change can be made on the contract first." When Conine suggested that she would like to write the change directly on the rental agreement, Kaminsky responded in writing, "I agree." Conine then asked, "Does the lease company approve this?"

38. In response, also on September 17, 2004, Kaminsky specifically instructed Conine, via email, that she should proceed and write in the following at the bottom of the new rental agreement:

> This lease supercedes original contract # 24368657, start date 11/29/2000- expiration is 12/31/05. This contract will expire on 12/31/05 as did the original contract.

39. On or about September 21, 2004, MWB forwarded to Conine a final version of the new rental agreement and an addendum to the new rental agreement for execution by Miramax. Pursuant to MWB's instructions, Conine hand-wrote the following on the new rental agreement:

> This lease supercedes original contract # 24268657, start date 11/29/2000

000036 3

(expires 12/31/05). This lease will also expire on 12/31/05 as did the original contract.

40. On or about September 22, 2004, Miramax, through its Chief Financial Officer, Ross Landsbaum, accepted and executed the 2004 Rental Agreement and accompanying Addendum.

41. On September 22, 2004, Miramax faxed to MWB the executed 2004 Rental Agreement and Addendum.

42. Under the 2004 Rental Agreement, Miramax agreed to pay a base monthly rental of $17,650 through December 2005.

43. The 2004 Rental Agreement provided, "This Agreement goes into effect on the day YOU [Miramax] sign the Delivery and Acceptance Form ('Effective Date')." MWB delivered and Miramax accepted six machines on September 30, 2004. The remainder of the machines were delivered in January 2005.

### E. *The 2005 Agreement*

44. In early December 2004, MWB, through Kaminsky, contacted Miramax and stated that MWB wished to enter into two new agreements to replace the 2004 Agreement.

45. On or about December 23, 2004, Kaminsky wrote to Conine and to Ross Landsbaum, Miramax's CEO, that the two proposed agreements would be the equivalent of the 2004 Rental Agreement, with the same terms and conditions. Kaminsky explained that MWB and DLL required separate agreements to replace the 2004 Rental Agreement for bookkeeping purposes.

**\*5** 46. On December 28, 2004, Kaminsky requested, via email, that Landsbaum confirm that Miramax intended to sign the new agreements. In response, Landsbaum wrote, "Assuming that the new documents are consistent with our prior agreement, I am not aware of any reason why we would not be able to accommodate you."

47. On January 10, 2005, Kaminsky, in an email to Conine, wrote:

both agreements are being signed (totaling apx 18,000.00 per month as agreed) but they will be only for the original term with the 14 months left and the addendum pertains to both.

Conine responded by writing "What do you mean by both agreements?" Kaminsky replied, "I'll call u to explain, there is one for the new equipment and the other was the old payoff of the old deal which both expire at end of term as per our new deal."

48. At some point prior to Miramax executing the two new agreements, Conine underscored to Kaminsky that Miramax was not "going to be making 60 additional payments on the lease."

49. On or about January 19, 2005, Kaminsky again instructed Miramax that it should make handwritten additions to the agreements.

50. On or about January 20, 2005, Kaminsky, on behalf of MWB and DLL, furnished a draft of the payment agreement to Miramax (the "Draft Payment Agreement"). Section 1 of the Draft Payment Agreement included a number of payment options, one of which was to be selected.

51. Option 5 of the Draft Payment Agreement called for 60 monthly payments in the amount of $5,819.86.

52. Upon furnishing the Draft Payment Agreement to Miramax, on January 20, 2005, Kaminsky specifically instructed Miramax in writing that Miramax should insert "12 months" in option 5, and initial that insertion. Miramax complied with this instruction.

53. On or about January 20, 2005, Miramax accepted and executed the final version of the payment agreement (the "Final Payment Agreement"), which it had filled in and initialed as Kaminsky had instructed.

54. On or about January 20, 2005, Conine, pursuant to Kaminsky's instructions, hand-wrote the expiration term on the draft rental agreement that Kaminsky provided.

000037

De Lage Landen Financial Services, Inc. v. Miramax Film Corp., Not Reported in...
2008 WL 4348074

55. On or about January 20, 2005, Miramax accepted and executed the final version of the new rental agreement (the "2005 Rental Agreement"). This agreement incorporated the term handwritten by Conine, per MWB's instructions, which read:

> 21. THIS LEASE SUPERCEDES ORIGINAL CONTRACT # 24368657 START DATE 11/29/00 (EXPIRES 12/31/05) AND SUPPLEMENTAL CONTRACT SIGNED ON 9/22/04. THIS LEASE WILL ALSO EXPIRE ON 12/31/05, AS DID THE ORIGINAL LEASE.

56. Upon execution, the Final Payment Agreement was delivered to and received by MWB.

57. Upon execution, the Final Rental Agreement was delivered to and received by MWB.

58. The 2005 Rental Agreement called for monthly payments in the amount of $11,830.14.

59. Under the Final Payment Agreement and the 2005 Rental Agreement, Miramax was to make total monthly payments of $17,650. This combined amount is identical to the amount of each monthly payment Miramax owed under the 2004 Rental Agreement.

 *6 60. If neither the 2004 Rental Agreement nor the 2005 Rental Agreement and Payment Agreement had existed, and Miramax had made payments based on the 2000 Agreement and related addenda (at the rate of $21,480.30 per month), in the final year of the 2000 Agreement, Miramax would have made 12 monthly payments of approximately $21,480.30 each, for a total of approximately $257,763. During that final year, Miramax made monthly payments to DLL ranging between $18,326 and $19,122, for a total of $221,820 for the period. Thus, the new agreements represented a discount of approximately $36,000 over the final year-a discount of approximately 14%.

61. In late January 2005, MWB delivered the remainder of the new machines to Miramax. The 2005 Rental Agreement contained the same provisions regarding the effective date of the agreement as the 2004 Rental Agreement.

62. Following the delivery of all the new machines, MWB continued to provide service to Miramax when requested.

63. Following Miramax's execution and delivery of the Final Rental Agreement and Final Payment Agreement, Conine made six written requests to Kaminsky for copies of fully executed versions of these agreements. Neither Conine nor anyone else at Miramax received any documents in response to these requests.

F. *Termination of 2005 Agreement*
64. On August 1, 2005, Michael Stamolis of MWB informed Conine via email that Kaminsky was no longer employed at MWB. On August 2, 2005, Conine responded with another request for copies of the fully executed agreement.

65. On August 2, 2005, Stamolis emailed to Conine a version of the rental agreement. This document, however, differed from the version of the document executed by Miramax.

66. The version of the rental agreement Conine received from Stamolis did not include the handwritten changes Conine had made to the document pursuant to Kaminsky's instructions. Specifically, this version of the rental agreement did not include the additional term stating that this agreement expired on December 31, 2005. Instead, the portion of the payment agreement wherein Conine had included the handwritten terms appeared to have been whited out, and the initials "R.L." had been written in. Ross Landsbaum testified, and the Court accepts, that those initials were not placed there by him.

67. On September 16, 2005, Dee Berlanga of MWB emailed to Conine a version of the payment agreement executed by MWB and/or DLL representatives. This document was also different from the version that had been executed by Miramax.

68. The version of the payment agreement received by Conine from Berlanga did not include the handwritten changes Conine had made to the document pursuant to Kaminsky's instructions. Instead, this version of the payment agreement contained an entirely different second page that contained a typewritten "x" rather than initials and called for Miramax to make sixty payments of $5,819.86, rather than the twelve payments to which Kaminsky had agreed.

De Lage Landen Financial Services, Inc. v. Miramax Film Corp., Not Reported in...
2008 WL 4348074

**\*7** 69. The versions of the payment and rental agreements received by Conine from Berlanga are the same versions upon which DLL bases its claims against Miramax.

70. Kaminsky committed fraud on both Miramax and DLL in connection with the 2005 Agreement. Kaminsky did not send copies or originals of the documents Miramax signed to DLL. Kaminsky falsified the documents sent to DLL.

71. Berlanga's email of September 16, 2005, also included a copy of an unsigned letter from Bill O'Donnell of DLL to Ross Landsbaum, dated February 22, 2005, purporting to confirm the 60-month arrangement. Neither DLL or MWB has proven by a preponderance of the evidence that this letter was ever actually sent to or received by Landsbaum, Conine, or anyone else at Miramax at any point prior to Berlanga's September 16, 2005, email.

72. During the discovery phase of this litigation, DLL produced another document purporting to be a letter confirming that the new agreement with Miramax was for a new 60-month term. The document purported to contain Landsbaum's signature.

73. The letter DLL produced is not an original. Instead, the letter is a scanned image appearing on an email string that does not include Landsbaum at any point. No original of the document or letter has ever been found in or produced from of DLL's, MWB's, or Miramax's files.

74. Landsbaum testified that although he agreed that the image appearing on the purported letter resembled his signature, he doubted that he signed the letter. Specifically, when questioned about the letter, Landsbaum testified:

> I guess what I would say is that given that it's inconsistent with what our lawyer would have had in his files or Jen [Conine] would have had in the files, I find it highly unlikely that I would have signed it.

The Court concludes that neither DLL nor MWB proved by a preponderance of the evidence that Landsbaum signed this letter.

75. Beginning with the invoice dated December 7, 2004, in accordance with the terms of the 2004 Agreement, Miramax began making payments to MWB Business Systems at the reduced monthly rate of $19,122.67.

76. Beginning in March 2005, in accordance with the terms of the Final Payment Agreement and the Final Rental Agreement, Miramax began making monthly payments to MWB Business Systems in the amount of $12,865.97 and monthly payments to DLL in the amount of $5,770.48.

77. As of November 2005, Miramax was current on all of its payments to MWB Business Systems and to DLL.

78. On September 26, 2005, in accordance with the Final Rental Agreement, Conine notified MWB via email that Miramax would not be renewing the Final Rental Agreement past December 31, 2005.

79. On September 27, 2005, Stamolis replied to Conine's email, requesting that the termination be sent on Miramax letterhead and either stamped or faxed.

80. On September 28, 2005, Conine complied with Stamolis's request and faxed a termination letter to him.

81. In December 2005, Conine made numerous requests to MWB via email that MWB pick up the copiers from Miramax. Miramax never received any instructions from MWB or DLL concerning the retrieval of the copiers. Miramax has since placed the machines into storage and has paid all storage fees to date.

G. *Agreements Between DLL and MWB*

**\*8** 82. On September 5, 2000, DLL entered into a Master Contracting Financing Program Agreement with Imagine Technology Group, Inc. (the "2000 Program Agreement").

83. Pursuant to the 2000 Program Agreement, Imagine Technology, through wholly-owned subsidiaries, also called "dealers," would negotiate equipment leases with end users. One such dealer under the 2000 Program Agreement was MWB.

84. Section 9.1 of the Program Agreement specifically provides that DLL, Imagine Technology, and the dealers are separate entities, and that "[n]either DLL, Imagine Technology or the Dealers have acted, act, or shall be deemed to have acted or act, as an agent for the others."

000039   6

85. Each dealer who executed an Acknowledgment of the Program Agreement agreed to be bound by the Program Agreement's terms and conditions, and also made various further representations and warranties to DLL.

86. MWB executed such an Acknowledgment.

87. The warranties made by the acknowledging dealers included a promise by each dealer to deliver to DLL originals of the various contracts entered into with end users on DLL's behalf, including all equipment leases and rental agreements.

88. Further included in these warranties was a promise that, to the best of each dealer's knowledge, all contracts and related documents delivered to DLL would be duly authorized, executed, and delivered.

89. Moreover, each dealer promised that there would be no other agreements between the dealer and the end user that would modify, amend, or waive any terms or conditions. Any refinancing or changes to the terms for repayment of existing contracts required DLL's approval. Although permitted, changes made to pre-printed documents used by the dealers and end users to execute rental and payment agreements must also be approved by DLL.

90. DLL would not have approved the changes made in the new payment agreement entered into with Miramax by Kaminsky because DLL generally will not refinance existing contracts unless there is a need for new equipment or a specific need for refinancing.

91. In the 2000 Program Agreement, each dealer also promised that neither the dealer nor its agents would commit fraud or engage in any fraudulent activity or take any action to cause the various contracts to become "invalid, cancelable, or enforceable."

92. Under Section Seven of the Program Agreement, the dealers and Imagine Technology further agreed to indemnify DLL for losses, claims, liabilities, demands, and expenses in the event of any breach of warranty. Under Section Six of the Program Agreement, they also agreed that if any contract were to become in default as a result of a breach of the Program Agreement by Imagine Technology or by a dealer, Imagine Technology or the breaching dealer would cure the breach within sixty days. Section Six further lays out the

specific damages due in such situations, which do not include attorneys' fees.

93. On September 7, 2004, DLL received a letter from Global Imaging Systems, Inc. ("Global"), Imagine Technology's successor corporation.

**\*9** 94. This letter stated, "[Global], as successor to [Imagine Technology], will not renew, and by this letter hereby terminates, effective September 7, 2004," Global's obligations under the 2000 Program Agreement and any amendments thereto.

95. Global's letter did not terminate, or purport to terminate, the obligations of any of the dealers under the Program Agreement.

96. Subsequent to Global's letter DLL continued to underwrite applications from MWB and the operating subsidiaries, and continued to book and fund according to the provisions of the 2000 Program Agreement.

97. In continuing to do business with MWB, DLL paid invoice costs, broker fees, and acquisition fees pursuant to the 2000 Program Agreement. The pricing for deals after September 7, 2004 continued to be governed by the pricing in the 2000 Program Agreement.

## II. *Conclusions of Law* [1]

The Court will address the disputes between DLL and Miramax, then Miramax and MWB, and finally DLL and MWB. Except as otherwise noted, the parties agree that Pennsylvania law governs these issues.

### A. *DLL Versus Miramax*

DLL brings two claims against Miramax. First, DLL seeks rental payments under its own versions of the 2004 and 2005 Payment and Rental Agreements. Second, it contends that Miramax is liable to it for having retained the copiers past the expiration of its lease. Both of these claims fail.

### 1. *Rental Payments Due to DLL*

The first count of DLL's second amended complaint alleges that Miramax is bound by DLL's versions of the Payment Agreement and Rental Agreement dated 2004 and 2005, and that Miramax has violated the terms of those agreements. As a result, DLL seeks to hold Miramax liable for the

monthly payments due as part of the 60-month term of those agreements.

This claim fails. To establish breach of contract under Pennsylvania law, a party must show (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Ruthrauff, Inc. v. Ravin, Inc.,* 914 A.2d 880, 888 (Pa.Super.Ct.2006). For a contract to be valid and binding, the parties must manifest mutual assent-that is, a meeting of the minds on the contract's essential terms. *Brisbin v. Superior Valve Co.,* 398 F.3d 279, 293 (3d Cir.2005) (citing *Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd.,* 285 Pa.Super. 84, 426 A.2d 1152, 1154 (Pa.Super.Ct.1981)).

As the Court has found, Miramax did not execute or otherwise assent to the versions of the agreements that DLL proffered at trial. Therefore, no contracts on those terms were ever formed, and Miramax cannot be liable under them. Moreover, in its post-trial memorandum, DLL all but abandons its claim that the 2004 and 2005 Agreements with the 60-month terms should be enforced directly against Miramax. Instead, it devotes most of its space to arguing that MWB is liable to DLL for essentially the value of the contract, plus attorneys' fees, pursuant to their Program Agreement. The Court will take up this claim below.

**\*10** DLL argues that even if Miramax did not initially agree to DLL's version of the contracts, Miramax ratified that version in February 2005 when a confirmation was allegedly signed by Miramax CFO Landsbaum, or in August or September 2005, when Conine received copies of DLL's versions of the Rental Agreement and Payment Agreement, and failed to complain.

This argument fails as well. First, the cases that DLL cites in support of this proposition are inapposite because they concern situations in which a contract actually exists but one party argues that there was fraud in the inducement. DLL Br. in Opp'n to Mot. for Summ. J. 11 (citing *Associated Hardware Supply Co. v. Big Wheel Distrib. Co.,* 355 F.2d 114, 120-21 (3d Cir.1965); *Retail Brand Alliance, Inc. v. Rockvale Outlet Ctr., LP,* No. 06-1857, 2007 WL 403885, at \*6 (E.D.Pa. Jan.31, 2007)). Here, in contrast, there was never any contract between DLL and Miramax on DLL's terms because there was no meeting of the minds on the contract's essential terms. It is not the case that Kaminsky tricked Miramax into signing a document that did not say what Miramax thought or expected it to say. Rather, Kaminsky provided one purported

contract to Miramax and a materially different one to DLL. Miramax was not fraudulently induced to accept DLL's terms. Rather, it never accepted, or even knew about, DLL's terms. The concept of subsequently ratifying a voidable contract that was initially based on fraud is therefore inapplicable.

Second, even if the concept of ratification were appropriate in this case, Miramax never manifested assent to DLL's terms. DLL has not proven by a preponderance of the evidence that Landsbaum read, let alone signed, the February 2005 letter. FOF ¶ 71. Furthermore, Conine acted reasonably in not immediately reading the entire copies of the agreements that she received in August and September 2005. Based on the information and instructions she had received from Kaminsky, whom she believed to be the agent of MWB and DLL, she had no reason to believe that these copies contained terms that were any different from those she had received from Kaminsky months earlier. FOF ¶¶ 46-54.

### 2. *Miramax's Liability For Keeping and Using the Copiers*

DLL argues that Miramax is liable to it for the value of the use that Miramax admits it made of the copiers after it stopped making rental payments in December 2005. Plaintiff's Exhibit 8, which contains DLL's calculation of damages against Miramax, includes language that Miramax argues amounts to an attempt to raise a quantum meruit claim.

There is no quantum meruit claim in this case. In its post-trial memorandum, DLL argues only that Miramax is liable for breach of the 2005 Rental Agreement for using the copy machines after it stopped making rental payments. Because Miramax never agreed to DLL's version of the 2005 Rental Agreement, Miramax is not liable to DLL on that contract for its continued possession or use of the copiers. Because DLL has not properly raised a quantum meruit claim, there is no basis for DLL to recover from Miramax for such continued possession or use.

**\*11** Moreover, even had such a claim been raised properly, Miramax repeatedly requested that DLL remove the machines, and it used the machines only because DLL failed to remove them and Miramax could not fit any other machines into the space. It is therefore far from certain that a quantum meruit claim would succeed, given that Miramax did not wrongfully withhold the copiers and indeed only reluctantly retained the copiers and paid for their storage during the pendency of this case. FOF ¶ 81; Miramax Post-Trial Br. 17-18.

Case 1:20-cv-00292-JPW Document 259-1 Filed 09/12/22 Page 44 of 96
De Lage Landen Financial Services, Inc. v. Miramax Film Corp., Not Reported in...
2008 WL 4348074

B. *Miramax Versus DLL and MWB*

As third-party plaintiff, Miramax brings claims against both DLL and MWB. First, it seeks a declaratory judgment that its versions of the Payment and Rental Agreements are binding on the parties. Second, it brings a claim for damages based on the fraud committed by Kaminsky, as MWB's agent. The Court finds for Miramax on both of these claims.

1. *Declaratory Judgment that Miramax's Versions of the Agreements Are Binding on DLL and MWB*

Miramax claims that both MWB and DLL are bound by the versions of the contracts negotiated by Kaminsky. The Court agrees. Kaminsky had inherent authority to bind MWB to the agreements he negotiated with Miramax. As to DLL, the Court disagrees with Miramax's contention that Kaminsky had actual authority to act on behalf of DLL. However, the Court finds that Kaminsky had apparent authority to bind DLL.

By virtue of his position as MWB's Vice President of Sales, Kaminsky had inherent authority to bind MWB with respect to a third party unless that third party had notice that Kaminsky's actions exceeded his authority. *Ortiz v. Duff-Norton Co.,* 975 F.Supp. 713, 720 (E.D.Pa.1997) (citing Restatement (Second) of Agency § 9). A general agent for a disclosed principal has inherent authority to take actions that "normally accompany his position simply by virtue of being given the position by the principal." *Id.* This determination does not rest on whether the principal actually authorized the agent's actions, but whether the agent's acts are those that "usually accompany or are incidental to transactions which the agent is authorized to conduct" as long as "the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized." *Id.* (citing Restatement (Second) of Agency § 161). Kaminsky was MWB's general agent for the purpose of negotiating sales contracts with those customers for whom he was the sales contact. MWB is therefore bound by his actions.

MWB argues that it is not bound by Kaminsky's actions because Miramax should have known that his actions exceeded the scope of his authority to act on MWB's behalf. Specifically, MWB argues that Miramax had "reason to know" of a limitation on Kaminsky's authority "because of information made available to [it]." *Ortiz,* 975 F.Supp. at 720 (citing Restatement (Second) of Agency § 9).

This argument is meritless. Miramax acted reasonably in believing that Kaminsky, as Vice President for Sales, had authority to enter into the contract with Miramax. Miramax justifiably believed that a salesperson was authorized to give its customer a good deal in order to preserve its business relationship, as Kaminsky claimed he was doing. FOF ¶ 19.

**\*12** MWB's arguments that Miramax was sophisticated and that it already mistrusted Kaminsky and was taking precautions in dealing with him are to no avail. Miramax took reasonable precautions under the circumstances, including its insistence that any changes to the terms of the contract be written on the face of the contract, and not in an addendum. FOF ¶ 37. Miramax should not bear the risk that Kaminsky, its only contact at MWB, one of its vendors, proposed terms to Miramax that were materially different from the terms he conveyed to the entities on his side of the transaction. Kaminsky's principal, MWB, is therefore bound by the version of the agreements that Kaminsky provided to Miramax and that Miramax signed. [2]

As to Kaminsky's authority to bind DLL contractually, Miramax argues that Kaminsky had actual authority to do so. This argument is incorrect. Actual authority consists of both the express authority that the principal has directly granted to the agent, and the implied authority to do those things that are necessary, proper, and usual in the exercise of the agent's express authority. *Residential Reroofers Local 30-B Health & Welfare Fund v. A & B Metal & Roofing, Inc.,* 976 F.Supp. 341, 345 (E.D.Pa.1997); *Bolus v. United Penn Bank,* 555 A.2d 1215, 1221 (Pa.Super.Ct.1987). Here, any trade-up deal for new equipment that involved refinancing an existing lease required DLL's prior approval. Additionally, handwritten changes to a pre-printed form were permissible, but only with DLL's prior approval. FOF ¶ 89. DLL's witness testified credibly that DLL would not have approved the refinancing if the new deal proposed to it had not involved an extension of the previous lease term. FOF ¶ 90. Kaminsky did not obtain DLL's approval for the handwritten changes stating that the new contract would terminate on the same date as the previous contract. Although Kaminsky had actual authority to conduct negotiations, DLL explicitly required him to obtain prior approval before committing to certain provisions. Kaminsky thus did not have actual authority-express or implied-to make handwritten changes to pre-printed forms on DLL's behalf, nor to approve a refinancing deal that did not involve an extension of the existing lease term.

Kaminsky did, however, have apparent authority to bind DLL to the terms of the contract he proposed to Miramax. An agent has apparent authority "where the principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent the authority he purports to exercise." *Residential Reroofers,* 976 F.Supp. at 345. Kaminsky held himself out as Vice President of Sales of MWB Business Systems, a private label entity. That entity, created by the agreement between MWB and DLL, was listed in the lease as the owner of the equipment Miramax was leasing. DLL's agreements with MWB provided that the customer would be presented with the private label name and would never deal with or hear about DLL except in unusual circumstances. DLL's own actions, therefore, were intended to, and did, create the impression that the only entity Miramax was dealing with was MWB Business Systems, represented by its Vice President of Sales, Kaminsky.

**\*13** Moreover, the 2004 Rental Agreement provided that it was effective as soon as MWB Business Systems signed the delivery and acceptance form for the leased equipment. FOF ¶ 43. By delivering the copiers to Miramax after Miramax signed the new agreements, DLL manifested by its actions that Kaminsky had appropriately exercised his authority to enter into a contract on its behalf.

Both MWB and DLL are thus bound by the versions of the 2004 Rental Agreement that Miramax actually signed. That Agreement provided for monthly rent of $17,650. FOF ¶ 42. Miramax's 2005 Rental Agreement and 2005 Payment Agreement reflect the same total monthly payment, $11,830.14 under the Rental Agreement plus $5,819.86 under the Payment Agreement. FOF ¶¶ 58-59. Miramax paid more than this amount each month. FOF ¶ 60. DLL has not produced competent evidence to show otherwise. Miramax has fulfilled its obligations under the parties' valid agreements and owes nothing further to DLL or to MWB.

As a result of the fact that these 2004 and 2005 agreements are binding on DLL and MWB, Miramax is no longer liable under its prior 2000 lease with DLL because the 2004 and 2005 Rental Agreements state that "[t]his lease supercedes original contract # 24368657." FOF ¶ 39, 55. Moreover, as the Court ruled during trial, DLL cannot bring any claim based on Miramax's alleged failure to make payments as due under the 2000 lease. Plaintiff's Exhibit 8 therefore was excluded to the extent that it attempted to assert damages based on Miramax's alleged failure to make full payment under the 2000 lease. Trial Tr. 4-8, Dec. 10, 2007.

2. *Miramax's Fraud Claim Against MWB*

Miramax also brings a claim of fraud against MWB, arguing that MWB, through Kaminsky, perpetrated a fraud on Miramax and is therefore liable to Miramax for the damages arising from that fraud. Miramax asserts that it has shown all of the elements necessary to a fraud claim under Pennsylvania law: "(1) a misrepresentation, or a fraudulent utterance or nondisclosure, (2) an intention by the maker that the recipient will thereby be induced to act, (3) justifiable reliance by the recipient upon the misrepresentation, and (4) damage to the recipient as a proximate result." *C & K Petroleum Prods., Inc. v. Equibank,* 839 F.2d 188, 191 (3d Cir.1988) (citing *Thomas v. Seaman,* 451 Pa. 347, 304 A.2d 134, 137 (Pa.1973)).

Miramax contends that it reasonably relied on Kaminsky's misrepresentations that he had the authority to enter into a lease containing the terms that he proposed to Miramax. In addition, it argues, Kaminsky's misrepresentations "appear to have caused DLL mistakenly to believe it had an enforceable agreement against Miramax. This mistaken belief led to this lawsuit," and to Miramax's attorneys' fees in defending the suit. Miramax Br. in Supp. of Mot. for Summ. J. 29.

In response, MWB argues that an action for fraud is not an established exception to the rule that a litigant is responsible for its own attorneys' fees absent an agreement. *See Hoffman v. Smith,* 453 Pa.Super. 15, 682 A.2d 1282, 1292 (Pa.Super.Ct.1996) (citing *Pittsburgh Live, Inc. v. Servo,* 419 Pa.Super. 423, 615 A.2d 438, 441-42 (Pa.Super.Ct.1992)). MWB further argues that Miramax has not cited a case in which the court awarded attorneys' fees to a fraud plaintiff.

**\*14** Although Miramax does not cite to it, there is in fact a body of case law establishing that a fraud plaintiff may recover the costs of defending or bringing a suit against a third party as a result of the fraud defendant's deception. In contrast, the cases that MWB cites establish that the fraud plaintiff cannot recover the attorneys' fees associated with prosecuting the fraud action itself against the fraud defendant.

Under Pennsylvania law, the victim of a fraud is entitled to recover actual loss proximately caused by its reliance on the defendant's misrepresentations. The victim is not, on the other hand, entitled to recover benefit of the bargain damages. *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 735 (3d Cir.1991). Pennsylvania recognizes the Restatement (Second) of Torts § 914, which provides that "[o]ne who through the tort of another has been required to act in the protection of

his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for the loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action." *See also Vadim v. Lower Bucks Hosp., Inc.,* 502 Pa. 241, 465 A.2d 1231, 1235 (Pa.1983).

The Court of Appeals for the Third Circuit has ruled that the Pennsylvania courts would recognize a claim for fraud damages in the amount of attorneys' fees expended on a suit with a third party occasioned by the fraudulent party's actions. In making its ruling, the court of appeals rejected the same argument that MWB makes here. That is, it found that the general rule regarding attorneys' fees did not apply in the case before it, in which a plaintiff was seeking to recover money spent investigating a claim by a third party. *Seaboard Sur. Co. v. Permacrete Const. Corp.,* 221 F.2d 366, 371-72 (3d Cir.1955) (citing Restatement (First) of Torts § 914) (internal citations omitted). Although this case is not recent, it has been cited with approval more recently by courts in this district, and this Court has found no indication that the its ruling is not still good law. *See, e.g., Lexington Ins. Co. v. Forrest,* 263 F.Supp.2d 986, 1004 (E.D.Pa.2003); *Guadagnini v. LaGioia,* No. 92-1323, 1996 WL 431830, at *5 (E.D.Pa. July 31, 1996).

Moreover, the comments to the Restatement state that the recovery of attorneys' fees for litigation with a third party is appropriate in a circumstance similar to the present situation: "A, fraudulently purporting to be an agent for B, contracts with C, who, upon B's failure to perform and in the belief that B is liable, brings unsuccessfully a suit against B. C can recover damages from A for the cost of the proceeding." Restatement (Second) of Torts § 914 cmt. b, illus. 2. In this illustration, a party fraudulently led to enter into a contract can recover the costs of bringing an unsuccessful suit against the purported other party to the contract. The present case is simply a mirror image of that scenario: here, Miramax was sued in contract and successfully defended the suit, after Kaminsky fraudulently led Miramax to sign a contract the contents of which Kaminsky later misrepresented to DLL.

**\*15** Having found that, under Pennsylvania law, fraud damages are available to reimburse a party for its costs in defending third-party litigation proximately caused by a defendant's fraud, the Court must now examine first whether Kaminsky committed fraud and, if so, whether MWB is liable for Kaminsky's fraud. The Court finds that Kaminsky's behavior in connection with the Miramax contract fulfills the first two requirements for a fraud claim: "a misrepresentation"

and "an intention by the maker that the recipient will thereby be induced to act." Kaminsky misrepresented to Conine that the reduction in the contract price could be made, and he represented that MWB could make the changes because it wanted to keep Miramax's business. FOF ¶ 19. In addition, as the Court has just explained, Miramax has also proven the fourth fraud requirement: damage as a proximate result of the misrepresentation, in the form of its attorneys' fees in defending against DLL's claims.

As to the third requirement, justifiable reliance upon the misrepresentation, MWB argues that Miramax did not justifiably rely on Kaminsky's representations. In particular, it argues that Miramax was unreasonable in accepting Kaminsky's proposals because they were too good to be true, so to speak. According to MWB, Miramax therefore had constructive notice that Kaminsky had exceeded his authority as an agent for MWB. However, as the Court has already found in the above discussion of Kaminsky's authority to act on behalf of MWB, Miramax reasonably relied on Kaminsky's representations and did not have notice that Kaminsky had exceeded his authority to act. Kaminsky therefore committed fraud against Miramax.

Having found that Kaminsky committed fraud, the Court must now determine whether MWB is liable for Kaminsky's fraud. The Court has little difficulty finding that it is. Under Pennsylvania law, a principal is liable to third parties for "the frauds, deceits, concealments, misrepresentations, torts, negligent acts and other malfeasances of his agent," regardless of whether they were authorized or justified, and regardless of whether the principal knew, so long as the fraudulent act occurred within the scope of the agent's employment. *Travelers Cas. & Sur. Co. v. Castegnaro,* 565 Pa. 246, 772 A.2d 456, 460 (Pa.2001) (citing *Aiello v. Ed Saxe Real Estate, Inc.,* 508 Pa. 553, 499 A.2d 282, 285 (Pa.1985)) (internal citations omitted). This rule is premised upon the notion that it is more reasonable for the principal, who has placed the agent in a position of trust, to suffer than an innocent stranger. *Id.* As the Court has already explained, Miramax was indeed the "innocent" party in this transaction, in that it did not act unreasonably in relying on Kaminsky's representations and it had no part in any wrongdoing.

MWB is therefore liable to Miramax for Kaminsky's fraud against Miramax, and, accordingly, the attorneys' fees that Miramax expended in defending against DLL's claims. However, MWB is not liable for the attorneys' fees that Miramax expended in litigating against MWB itself. The

Court will determine the amount of reasonable attorneys' fees at a later date, following an opportunity for Miramax and MWB to be heard on this issue.

C. *DLL Versus MWB*

**\*16** DLL claims that MWB's behavior constitutes a breach of the 2000 Program Agreement and the warranties contained therein. It further claims that MWB is liable for having perpetuated a fraud against it. The Court finds that MWB did in fact breach the terms of the 2000 Program Agreement. The fraud claim, however, fails.

1. *Breach of Contract and Breach of Implied Warranty*

DLL argues that MWB breached warranties contained in the September 5, 2000, Program Agreement and that MWB is therefore liable to DLL under the terms of that agreement. MWB argues in response that the 2000 Program Agreement had been terminated prior to the events at issue in this suit, and that, in any case, DLL should have known the lease documents were not originals and thus should not have entered into the transaction.

As explained above, DLL and Imagine Technologies were the primary parties to the 2000 Program Agreement, and that various subsidiaries of Imagine Technologies, referred to as "dealers," separately agreed to the terms of the Program Agreement. FOF ¶¶ 82, 85. Moreover, the contract specifically noted that Imagine Technology and the dealers are all "separate entities" and that they have not acted, nor shall they be deemed to have acted or act as agents for one another. FOF ¶ 84. Appended to the Program Agreement is an acknowledgment signed by MWB in which MWB agreed to be bound by the terms and conditions of the Program Agreement. FOF ¶ 86.

As for the September 7, 2004, letter from Global Imaging Systems, the Court finds that this letter only terminated the Program Agreement as between DLL and Global Imaging Systems, as successor to Imagine Technology. It did not, however, terminate the Program Agreement as between DLL and the various dealers who separately agreed to the Program Agreement. FOF ¶¶ 93-95. The termination letter stated only that *Global* would not renew the amended Program Agreement. FOF ¶ 94. The termination letter is silent as to the dealers, each of whom separately and on its own behalf acknowledged its acceptance of the Program Agreement. Having signed a contract in which it separately and explicitly agreed that Imagine Technology did not act as its agent,

MWB cannot now rely on the termination of that contract by Imagine Technology's successor as having been an act taken on MWB's behalf.

DLL also presented further evidence that the termination letter did not apply to MWB and that MWB continued to conduct business as usual with DLL even after the termination letter. FOF ¶¶ 96-97. Although MWB subjected that evidence to cross-examination, it provided no testimony or other evidence of its own beyond the termination letter itself that MWB was included in the termination.

The Court thus concludes that the termination letter did not affect MWB's obligations under the Program Agreement. The Court cannot imagine that DLL would continue to buy equipment contracts from MWB, or that MWB would continue to negotiate such contracts on behalf of DLL, if the parties were not each protected by the continuing contractual assurances embodied in the 2000 Program Agreement.

**\*17** As explained above, the 2000 Program Agreement contains warranties by Imagine Technology and by the dealers that any equipment contract delivered to DLL under the terms of the Program Agreement is an original copy that has been duly authorized and executed, and which is not the product of any fraud on the part of Imagine Technology or the dealers. FOF ¶¶ 87-88, 91. The Program Agreement further provides that if Imagine Technology or any dealer breaches any of the warranties and as a result a lease with an end user "becomes in default," then Imagine Technology the breaching dealer must make the payments already due on the lease, future unpaid payments, and the estimated fair market value of the equipment. FOF ¶ 92.

MWB, through Kaminsky, breached the warranties described above. After Miramax stopped making payments, its contract became in default-according to DLL's version of the contract. The provision requiring a dealer to cure breaches by end users that are the result of the dealer's own acts thus applies to the present situation. MWB is therefore liable to DLL for the amount of damages laid out in Section Six of the Program Agreement. Whether DLL should have known that the lease documents Kaminsky gave them were phony is irrelevant to the question of whether MWB breached the express warranties laid out in the Program Agreement. The Court will give both DLL and MWB an opportunity to be heard on the amount of these damages.

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 48 of 96
De Lage Landen Financial Services, Inc. v. Miramax Film Corp., Not Reported in...
2008 WL 4348074

MWB is not, however, liable for attorneys' fees as described in Section Seven of the Program Agreement. Under that provision, MWB agrees to indemnify DLL for any losses, including attorneys' fees, that DLL incurs in connection with or related to MWB's breach of representations or warranties. FOF ¶ 92. This provision addresses indemnification in the event that DLL is forced to make payments as a result of MWB's breach. Although it mentions attorneys' fees, Section Seven's indemnification provision does not mean that DLL can recover attorneys' fees in an action against MWB to recover the damages due to DLL under Section Six of the Program Agreement. This provision would apply, for example, if as a result of MWB's fraud, DLL were itself sued by an end user for not providing what that end user had expected based on MWB's representations. Here, having chosen throughout most of the litigation to persist in its argument that Miramax had agreed to the terms in DLL's version of the agreements, DLL cannot now force MWB to incur the costs of prosecuting the breach of contract claim against Miramax.

### 2. *Fraud*

DLL's second amended complaint also includes a fraud claim against MWB. DLL does not mention the fraud claim in its post-trial memorandum, and does not mention fraud damages in Exhibit 9, in which it lays out all of the damages it believes it is owed by MWB. In addition, DLL fails to respond to the argument in MWB's post-trial memorandum that the fraud claim is barred by the gist of the action doctrine if governed by Pennsylvania law or the economic loss doctrine if governed by Ohio law. [3]

**\*18** The Court has already awarded DLL contract damages based on the 2000 Program Agreement. In fact, one of the contractual provisions on which DLL will recover specifically contemplates that DLL will receive damages if "Imagine Technology or Dealer and its agents and employees ... committed any fraudulent act or participated in any fraudulent act or activity in connection with the execution, delivery or assignment" of an equipment contract governed by the PA. The contract therefore contemplated the possibility of fraud and provided contractual damages for just such an event. In any case, any damages based on a fraud claim would likely be lower than the contract damages the Court has awarded, since a fraud plaintiff can recover only actual loss proximately caused by its reliance on the defendant's misrepresentations, not benefit of the bargain damages. *Tunis Bros.,* 952 F.2d at 735.

The Court finds that DLL has waived its fraud claim against MWB by failing to mention that claim and by failing to respond to MWB's arguments regarding the gist of the action doctrine and the economic loss rule. Even if the claim were not waived, it appears that DLL's contract recovery may bar its fraud claim. Because DLL did not brief this question and because the fraud claim was waived, however, the Court does not reach the question of whether the fraud claim is barred by the gist of the action or economic loss doctrines.

An appropriate order follows.

### *ORDER*

AND NOW, this 23rd day of September, 2008, following a bench trial held before the Court on December 10 and 11, 2007, and upon consideration of the parties' summary judgment briefs and post-trial memoranda and other submissions, IT IS HEREBY ORDERED that, for the reasons discussed in a Memorandum and Order of this date:

1. On DLL's contract claims against Miramax, judgment is entered for Miramax and against DLL.

2. On Miramax's claims against DLL and MWB for a declaratory judgment, judgment is entered for Miramax and against DLL and MWB.

3. On Miramax's fraud claim against MWB, judgment is entered for Miramax and against MWB.

4. On DLL's breach of contract and breach of warranty claims against MWB, judgment is entered for MWB and against DLL with respect to attorneys' fees. In all other respects, judgment is entered on these claims for DLL and against MWB.

5. On DLL's fraud claim against MWB, judgment is entered for MWB and against DLL.

IT IS FURTHER ORDERED THAT:

6. Miramax may submit to the Court a petition to recover from MWB attorneys' fees that Miramax expended in defending against DLL's claims. This petition must be filed on or before October 7, 2008. Any opposition must be filed on or before

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 49 of 96
De Lage Landen Financial Services, Inc. v. Miramax Film Corp., Not Reported in...
2008 WL 4348074

October 24, 2008, and any reply thereto must be filed on or before November 3, 2008.

6. DLL may submit to the Court any request for damages from MWB in accordance with Section Six of the September 7, 2005 Master Contracting Financing Program Agreement and MWB's Acknowledgment thereof. This petition must be filed on or before October 10, 2008. Any opposition must be filed on or before October 27, 2008, and any reply thereto must be filed on or before November 6, 2008.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4348074

## Footnotes

1       Reference to the above Findings of Fact shall be abbreviated "FOF."

2       Because the Court holds that Kaminsky had inherent authority to bind MWB, it will not address Miramax's argument that he also had both actual and apparent authority to bind MWB.

3       MWB states that because the 2000 Program Agreement includes an Ohio choice of law clause, the question of whether the fraud claim is barred may be governed by Ohio law. Neither party discusses which state's law should apply, but the Court's conclusion is the same regardless of which law governs.

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**J.W. Hall, Inc. v. Nalli (Sup. Ct. Pa. February 15, 2017)**

000048

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 51 of 96

J.W. Hall, Inc. v. Nalli, Not Reported in Atl. Rptr. (2017)

2017 WL 626715

2017 WL 626715
Only the Westlaw citation is currently available.
**NON–PRECEDENTIAL DECISION—
SEE SUPERIOR COURT I.O.P. 65.37**
Superior Court of Pennsylvania.

J.W. HALL, INC., a Corporation Appellant

v.

Michael W. NALLI, Esquire and Michael W. Nalli, P.C.

No. 771 WDA 2016
|
FILED FEBRUARY 15, 2017

Appeal from the Judgment Entered April 25, 2016, In the Court of Common Pleas of Beaver County, Civil Division at No(s): 11132–2013

BEFORE: GANTMAN, P.J., MOULTON, J., STEVENS [*], P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:

**\*1** J.W. Hall, Inc. appeals from the order entered by the Court of Common Pleas of Beaver County granting summary judgment in favor of Michael W. Nalli, Esq. and Michael W. Nalli, P.C., Defendants/Appellees in a legal malpractice action brought by Appellant. We affirm.

In its Opinion, the trial court set forth the relevant factual and procedural history as follows:

> The [present] action arises as the result of a sale of a restaurant and liquor license for an establishment located in Hopewell Township, Beaver County, Pennsylvania, in 2011. Defendant Michael W. Nalli drafted the purchase agreement, and the claims arise from that transaction. Plaintiff [J.W. Hall, Inc.,] asserts that it was represented by Nalli in that transaction and, further, that as a result of that representation, negligence occurred that caused plaintiff [J.W. Hall, Inc.,] to incur losses after the purchasing entity, J.B. Culinary Enterprises, Inc., defaulted on its obligations under the purchase agreement and went into bankruptcy.
>
> \* \* \* \*
>
> The pleadings and discovery ... give rise to the facts that are discussed herein. Commencing in the spring of 2011, an individual by the name of Jeffrey Belsky (hereinafter "Belsky") entered into negotiations with Joseph Hall

(hereinafter "Hall"), president of plaintiff, J.W. Hall, Inc.,[ ] in an attempt to purchase J.W. Hall's Steak and Seafood Inn located in Hopewell Township, Beaver County, Pennsylvania. The parties initially haggled over the price and ultimately agreed on $800,000 as the purchase price.

Belsky thereafter contacted attorney Michael Nalli, whose office was, and is, located in Center Township, Beaver County, for the purpose of incorporating J.B. Culinary Enterprises, Inc. (hereinafter "J.B. Culinary") to operate the restaurant after sale and to draft the purchase agreement. Attorney Nalli provided Belsky with an engagement letter, which Belsky signed.

Shortly thereafter, Belsky and Hall met at Attorney Nalli's office to discuss a draft of the purchase agreement on June 23, 2011. At that meeting, Attorney Nalli asked Hall if he had an attorney, to which Hall responded "No, Mike, I don't. You can take care of this, can't you?" There is a reference in the record that Nalli responded "Sure, Joe, no problem." It should also be noted that there are several references in the record to confirm that Hall and Belsky shared the expense of Attorney Nalli's legal fees for preparing the documents.

Following this meeting, Attorney Nalli made revisions to the purchase agreement, and sent an email to Belsky regarding what would happen in the event of a default on the agreement. The email stated that the purchase agreement would include a provision for an unsecured note so that [J.W. Hall, Inc.] could not simply take back the collateral in the event of a default.

Hall contacted his son, a tenured professor at Harvard Business School, regarding the proposed agreement. His son reviewed the agreement and raised questions regarding re-purchasing the property in the event of default and potential tax implications. In July of 2011, Belsky and Hall finalized the agreement on behalf of their respective companies for the purchase price of $800,000. The sum of $225,000 was to be paid up-front and the remaining $575,000 was to be paid in monthly increments of $5,761.05. After execution of the agreement, the liquor license was transferred and J.B. Culinary began to operate the establishment.

**\*2** After J.B. Culinary assumed operation of the restaurant, it made some improvements. J.B. Culinary operated the restaurant and made approximately 14 monthly installment payments, but the payments stopped

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 52 of 96

J.W. Hall, Inc. v. Nalli, Not Reported in Atl. Rptr. (2017)

2017 WL 626715

in December of 2012. J.B. Culinary sought to renegotiate the monthly payments, but Hall declined that offer. Both parties to this action agree that Hall contacted defendant Nalli about the situation, and Nalli stated he could not do anything for Hall because he was representing Belsky.

J.B. Culinary filed for bankruptcy, and Hall created a new entity, JoeWillRoger, LLC, which purchased the restaurant [out of bankruptcy] for $178,000. Hall also claims to have spent $75,000 in legal fees for counsel to represent him in the repurchase, but only $56,394.24 in fees can actually be documented and accounted for, all of which were paid by personal checks of Hall and his wife or by the account of JoeWillRoger, LLC. Hall also, either personally or through the new entity, JoeWillRoger, LLC, expended approximately $50,000 to $60,000 for renovations to the restaurant in connection with reopening it [ ].

Trial Court Opinion, 4/25/16, at 1–4.

On September 30, 2013, J.W. Hall, Inc., commenced a legal malpractice and breach of fiduciary duty action against Attorney Nalli and his professional corporation. Among the averments in the complaint were that Defendants/Appellees knew J.W. Hall, Inc., relied solely on them to facilitate the closing with J.B. Culinary, failed to discuss or include in the purchase agreement the personal guaranty of Belsky as guarantor for the loan in the event of default, and failed to prepare and file a UCC–1 financing statement in order to perfect J.W. Hall, Inc.'s, security interest in the restaurant/ business as collateral. With respect to the last averment, J.W. Hall, Inc., computed its losses with reference to what its financial position would have been had such a security clause existed.

On February 4, 2016, after discovery was complete, Defendants/Appellees filed a motion for summary judgment asserting J.W. Hall, Inc., failed to present sufficient evidence to establish a question of material as to whether: (1) an attorney-client relationship between the parties existed; (2) J.B. Culinary would have agreed to a security clause in the purchase agreement; and (3) J.W. Hall, Inc., incurred actual damages. Viewing the record in a light most favorable to non-movant J.W. Hall, Inc., the court perceived a dispute of material fact in each of Defendants/Appellees' first two issues and, thus, declined to grant summary judgment thereon.

With respect to the final issue, however, the trial court first determined that J.W. Hall, Inc., failed to establish a dispute of material fact over whether it incurred actual

losses. Undisputed evidence shows J.W. Hall, Inc., has both its restaurant and an amount of funds—from receipt of J.B. Culinary's down-payment and subsequent installment payments—greater than or at least equal to those funds it expended to reacquire the restaurant from bankruptcy. The court concluded, therefore, that J.W. Hall, Inc., cannot show it suffered actual losses when it was essentially in the same position in which it would have been had it never entered into the agreement drafted by Attorney Nalli. Accordingly, in its Order of April 25, 2016, the court granted Defendants/Appellees' motion for summary judgment and entered judgment in their favor. This timely appeal followed.

Appellant J.W. Hall, Inc., presents the following questions for our review:

**\*3 I. DID THE TRIAL COURT ERR IN FAILING TO FIND THAT THE PLAINTIFF SUFFERED PECUNIARY HARM BY THE DEFENDANTS' ESTABLISHED FAILURE TO INCLUDE A SECURITY AGREEMENT IN THE SALES AGREEMENT?**

**II. DID THE TRIAL COURT ERR IN REFUSING TO TREAT AS IDENTICAL THE CORPORATION AND THE INDIVIDUALS OWNING ALL ITS STOCK AND ASSETS AND THAT THE COSTS WERE PAID BY A 'MULTITUDE OF SOURCES' OTHER THAN PLAINTIFF WHERE JUSTICE AND PUBLIC POLICY DEMANDED DOING SO AND WHEN THE RIGHTS OF INNOCENT PARTIES WERE NOT PREJUDICED THEREBY NOR THE THEORY OF CORPORATE ENTITY MADE USELESS?**

**III. DID THE TRIAL COURT ERR IN FINDING THAT PLAINTIFF WOULD RECEIVE A WINDFALL WHERE PLAINTIFF, VIS A VIS JOSEPH HALL, INCURRED OVER $313,000 IN DAMAGES?**

Appellant's brief at 4.

In reviewing a trial court's decision to grant summary judgment, our standard review is as follows:

As has been oft declared by this Court, summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment,

the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt.

On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Allen–Myland, Inc. v. Garmin Int'l, Inc.*, 140 A.3d 677, 682 (Pa.Super. 2016) (quoting *Summers v. Certainteed Corp.*, 606 Pa. 294, 307, 997 A.2d 1152, 1159 (2010) (internal citations and quotation marks omitted)).

We have, recently, discussed the burden borne by a plaintiff in a legal malpractice action:

The Supreme Court of Pennsylvania has described the unique nature of a legal malpractice claim:

[A] legal malpractice action is distinctly different from any other type of lawsuit brought in the Commonwealth. A legal malpractice action is different because ... a plaintiff must prove a case within a case since he must initially establish by a preponderance of the evidence that he would have recovered a judgment in the underlying action.... It is only after the plaintiff proves he would have recovered a judgment in the underlying action that the plaintiff can then proceed with proof that the attorney he engaged to prosecute or defend the underlying action was negligent in the handling of the underlying action and that negligence was the proximate cause of the plaintiff's loss since it prevented the plaintiff from being properly compensated for his loss.

 **\*4** *Kituskie v. Corbman*, 552 Pa. 275, 714 A.2d 1027, 1030 (1998) (footnote omitted). Therefore, an important question in a legal malpractice action is whether the plaintiff "had a viable cause of action against the party he wished to sue in the underlying case and that the attorney he hired was negligent in prosecuting or defending that underlying case (often referred to as proving a 'case within a case')." *Poole v. W.C.A.B. (Warehouse Club, Inc.)*, 570 Pa. 495, 810 A.2d 1182, 1184 (2002).

*Heldring v. Lundy Beldecos & Milby, P.C.*, —— A.3d ——, 2016 WL 6946583 (Pa.Super. Nov. 28, 2016).

The case *sub judice* involves not the would-be recovery of a judgment in an underlying litigation, but, instead, an analogous would-be recovery of collateral through the exercise of a security clause in a purchase/sale agreement. In both instances, the claim states that, but for the negligence of counsel in an underlying matter involving a third party, the legal malpractice plaintiff would have recovered its due from such third party. Accordingly, the trial court properly turned to *Kituskie* for guidance in the present matter.

To support its view, the court relied on the *Kituskie* rationale that the "collectibility of damages in the underlying action" is part of the analysis of actual loss compensable in a legal malpractice action. In this regard, *Kituskie* explained that "actual losses in a legal malpractice action are measured by the judgment the plaintiff lost in the underlying action and the attorney who negligently handled the underlying action is the party held responsible for the lost judgment." *Kituskie*, 552 Pa. at 282, 714 A.3d at 1030. A legal malpractice plaintiff should not obtain a judgment "against an attorney which is greater than the judgment the plaintiff could have collected from the third party; the plaintiff would be receiving a windfall at the attorney's expense." *Id.* at 283, 714 A.3d at 1030.

As noted, *supra*, the trial court purported to apply these principles in finding that J.W. Hall, Inc., failed to demonstrate an issue of material fact as to actual losses where it ultimately experienced a "break-even" result. That is, because the discovery record established that J.W. Hall, Inc., owned essentially the same restaurant after default as it did before selling to J.B. Culinary, and the income it earned from the sale offset the expenses incurred from re-purchasing the restaurant from bankruptcy, it could not establish losses requisite to a legal malpractice claim.

We discern error with the court's assessment of losses, however, as it reflects a comparison of J.W. Hall, Inc.'s, [1] pre-transaction and post-transaction economic realities, when the proper computation of actual losses should instead reflect what, if any, rightful benefits eluded J.W. Hall, Inc., due to its attorney's alleged malpractice. Just as a judgment lost due

Case 1:20-cv-00292-JPW   Document 259-1   Filed 09/12/22   Page 54 of 96

J.W. Hall, Inc. v. Nalli, Not Reported in Atl. Rptr. (2017)
2017 WL 626715

to courtroom malpractice defines a litigant's actual loss, so, too, would collateral lost due to transactional malpractice define a contracting party's loss. While we do not dispute the trial court's observation that J.W. Hall, Inc., appeared no worse off after repurchasing the restaurant than it was before transacting with J.B. Culinary, the *Kituskie* inquiry concerns itself with a different assessment of damages flowing from alleged malpractice.

**\*5** Here, J.W. Hall, Inc., framed the inquiry properly when it effectively claimed that its loss was the rightful benefit it was denied when Attorney Nalli negligently failed to incorporate in the purchase/sale agreement an industry-standard security clause authorizing J.W. Hall, Inc., to retake ownership of the collateralized restaurant in the event of buyer's default. This loss, moreover, was not speculative, incalculable, or illusory; it was the total of all requisite expenses made to buy the collateral out of bankruptcy, and J.W. Hall, Inc., identified them during discovery. We, therefore, reject the court's grant of summary judgment for want of evidence of actual losses.

The trial court's determination that J.W. Hall, Inc., failed to demonstrate actual losses had a second component, however, that proves more problematic to the Appellant company's cause. The record establishes that it was not actually J.W. Hall, Inc., that paid $178,000 to purchase the restaurant out of bankruptcy and $56,394.24 in legal fees to effectuate such purchase, but was, instead, the separate entities of JoeWillRoger, LLC, and Mr. and Mrs. J.W. Hall in their individual capacities. As such, the trial court entertained the question of whether damages claimed by Plaintiff/Appellant J.W. Hall, Inc., were, in fact, incurred by separate and distinct entities even though it is undisputed that Mr. Hall and his wife are the sole owners of the two corporations in question.

In addressing this issue, the trial court turned to, *inter alia*, *Sams v. Redevelopment Authority of New Kensington*, 431 Pa. 240, 244 A.2d 779 (Pa. 1968). The court aptly summarized *Sams* as follows:

In *Sams*, the New Kensington Redevelopment Authority adopted a resolution condemning a plot of land owned individually by Mr. Sams and Mr. Mannarino. That plot of land was used as a scrap yard for the receipt of shipping of scrap metal.

At the time of the condemnation, Sams and Mannarino also owned, through a corporation, another plot of land located on the opposite side of the street, which was being operated as a foundry.

When awarding damages, the Board of Viewers awarded damages to Sams and Mannarino individually, [and] as copartners, trading and doing business as the corporation. The Redevelopment Authority appealed on the basis that evidence should not have been admitted regarding the corporate property in that it did not have the same owner and was not used for the same purpose.

Trial Court Opinion, at 11.

The Pennsylvania Supreme Court noted at the outset of its decision that, under the then-governing Eminent Domain Code, damages may be assessed as if two or more non-contiguous tracts of land were one parcel only upon a demonstration that the tracts are owned by one owner and are used together for a unified purpose. The corporate shareholders, Messers Sams and Mannarino, argued that the Court should pierce the corporate veil of their corporation to find an identity of ownership between the two lots, as the two men were the sole shareholders of the corporation and doing so would further the practical application of the intent of the law. *Id.* at 781. The Court refused to do so.

Precedent allowed courts to disregard the corporate entity or personality "only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime," the Court noted. Because the partnership in question was not formed for such purpose, the Court refused to disregard its corporate status and recognize an identity of ownership between the two lots. The Court reasoned:

> The cases on disregarding the corporate entity suggest that in order for the courts to justify piercing the corporate veil, it must be determined that the corporate fiction is being used by the corporation itself to defeat public convenience, justify wrong either to third parties dealing with the corporation, or internally between shareholders' (derivative suits), perpetrate fraud or other similar reprehensible conduct. **Since, in the instant case, the corporate fiction is not being employed as a means to shield itself from its ultimate responsibilities and liabilities, no sound reason exists for piercing the**

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 55 of 96

J.W. Hall, Inc. v. Nafri, Not Reported in Atl. Rptr. (2017)
2017 WL 626715

**veil for the benefit of the individual shareholders, who created the veil in order to procure other business advantages. In our view, one cannot choose to accept the benefits incident to a corporate enterprise and at the same time brush aside the corporate form when it works to their (shareholders') detriment. The advantages and disadvantages of the corporate structure should be seriously considered and evaluated at the time such organization is contemplated and after incorporation has been selected, the shareholders cannot be heard to argue that the courts should not treat them as a corporation for some purposes and as a corporation for other purposes, which suits their present economic interest.**

**\*6** *Id.* (emphasis added).

The trial court relied upon *Sams* to grant Defendants/ Appellees' motion, and as J.W. Hall, Inc., fails to distinguish *Sams* on the facts,[2] we agree that the rationale expressed

therein is directly on point and represents controlling precedent. To buy back their former restaurant, Mr. and Mrs. Hall formed a new corporate entity, JoeWillRoger, LLC, that was separate and distinct from both Appellant/Plaintiff J.W. Hall, Inc., and themselves in their individual capacities. There is no reason to doubt that the Halls discerned some advantage to forming this new entity,[3] and *Sams* admonishes that the corporate status providing such advantage may not simply be "brushed aside" whenever consequential disadvantages do not suit shareholders' individual interests.

It was the Halls' election to re-purchase the restaurant with their own personal monies and the funds of a newly-incorporated JoeWillRoger LLC, exclusively. Restaurant seller, Appellant/Plaintiff J.W. Hall, Inc., a separate legal entity, expended no funds in the re-purchase effort, and so it may not now identify the re-purchase payment as an actual loss it sustained for purposes of satisfying a necessary element to its legal malpractice claim. Because the trial court's finding to this effect was dispositive of the action, it properly granted Defendants/Appellees' motion for summary judgment, and we affirm for this reason.

**\*7** Order Affirmed.

**All Citations**

Not Reported in Atl. Rptr., 2017 WL 626715

## Footnotes

\*      Former Justice specially assigned to the Superior Court.

1      It is only for ease of discussion regarding the issue of actual losses that we identify J.W. Hall, Inc., as both the seller and re-purchaser of the restaurant in question. By doing so, we do not mean to suggest a disposition of the subsequent issue premised on the charge that a different entity bought the restaurant out of bankruptcy.

2      Appellant contends our decision in *Kellytown Co. v. Williams*, 426 A.2d 663 (Pa.Super. 1981) supports piercing the corporate veil in the present case. We disagree, as *Kellytown* approves of treating a corporation and its owners as identical entities only within the framework announced in *Sams. Kellytown* provides:

The established rule in Pennsylvania is that a court will not hesitate to treat as identical the corporation and the individual or individuals owning all its stock and assets whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby **nor the theory of corporate entity**

made useless. *Great Oak B & L, et al. v. Rosenheim, supra, Pasos v. Ferber*, 263 F.Supp. 877, 881–82 (1967); *Gagnon v. Speback*, 389 Pa. 17, 131 A.2d 619 (1957); *Wedner Unemployment Compensation Case*, 449 Pa. 460, 296 A.2d 792 (1972); *Tucker v. Bienstock*, 310 Pa. 254, 165 A. 247 (1933). In *Sams v. Redevelopment Authority*, 431 Pa. 240, 244 A.2d 779 (1968), the Supreme Court of Pennsylvania held that:

> The corporate entity or personality will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime.

*Kellytown*, 426 A.2d at 668 (emphasis added). As explained, *infra*, Appellant fails to meet this standard for piercing the corporate veil.

3      Appellant's request to pierce the corporate veil to its benefit is not without a degree of convolution, as it is asking the courts to pierce both its corporate veil and that of "JoeWillRoger, LLC" so that the two distinct corporate entities may effectively be considered the same entity for this discrete purpose. This would allow the courts to consider the money expended by JoeWillRoger, LLC as money expended by J.W. Hall, Inc. Of course, this begs the question of why the Halls elected to form a different corporation to repurchase the restaurant in the first place, and how requiring it to accept not only the presumptive advantages of its election but also the disadvantages would work the kinds of injustice addressed in *Sams*.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Levert v. Philadelphia Intern. (E.D. Pa. October 26, 2005)

000055

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 58 of 96
Levert v. Philadelphia Intern. Records, Not Reported in F.Supp.2d (2005)
2005 WL 2789099

2005 WL 2789099
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Eddie LEVERT and Walter Williams d/b/a the O'Jays
v.
PHILADELPHIA INTERNATIONAL RECORDS,
Assorted Music, Inc., Gamble-Huff Productions,
Kenneth Gamble, Chuck Gamble and Leon Huff

No. Civ.A. 04-1489.
|
Oct. 26, 2005.

**Attorneys and Law Firms**

Ann C. Lebowitz, Charles J. Grant, Grant & Lebowitz, LLC, Philadelphia, PA, for Eddie Levert, Walter Williams d/b/a the O'Jays.

Denis James Lawler, Blank Rome LLP, Philadelphia, PA, Oren J. Warshavsky, Gibbons Del Deo Dolan Griffinger & Vecchione P.C., New York, NY, for Philadelphia International Records, Assorted Mucic, Inc., Kenneth Gamble, Chuck Gamble, Leon Huff, Gamble-Huff Productions.

*MEMORANDUM AND ORDER*

SHAPIRO, J.

 **\*1**  Plaintiffs Eddie Levert and Walter Williams ("plaintiffs") are citizens of Nevada; they are singers, songwriters and original members of the "rhythm and blues" group, "The O'Jays." Defendants Kenneth Gamble and Leon Huff are citizens of Pennsylvania; they produced and wrote many of the songs performed by The O'Jays. Chuck Gamble, also a Pennsylvania citizen, is the Executive Vice President of Philadelphia International Records.

Plaintiffs allege defendant Assorted Music, Inc. ("Assorted Music"), a Nevada corporation with its principal place of business in Philadelphia, Pennsylvania, is the "alter ego" of Kenneth Gamble and Leon Huff. Am. Compl. at 2. Defendant Gamble-Huff Productions is the predecessor in interest to Assorted Music, d/b/a Philadelphia International Records ("PIR"). Defs.' Prop. Counterst. of Facts at 21. Kenneth Gamble is the president of Assorted Music and Leon Huff

holds the offices of Vice-President, Secretary and Treasurer. Am. Compl. at 2.

Plaintiffs have alleged defendants[1] owe them royalty payments on recording contracts dating as far back as 1972. The contracts provide that advances and production costs incurred by defendants are to be deducted from royalties earned by plaintiffs. Plaintiffs allege that defendants have assessed bogus and inflated production costs and false advances against royalties earned to overstate amounts supposedly owed by plaintiffs and to avoid payment of royalties to them.[2]

Plaintiffs' amended complaint asserted six counts: two counts alleged copyright infringement; three counts alleged breach of contract; and one count alleged fraud. In their second amended complaint, plaintiffs added another count for conversion against Chuck Gamble.

Before the court are four motions for summary judgment: (1) defendants Kenneth Gamble, Leon Huff and Gamble-Huff Productions' motion for summary judgment on all counts; (2) plaintiffs' motion for summary judgment on count III alleging non-payment of royalties; (3) plaintiffs' motion for summary judgment on defendants' counterclaim for abuse of process; and (4) defendants' motion for summary judgment on counts III, IV and V alleging breach of contract.

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Only a factual dispute that might affect the outcome under governing law precludes the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reviewing a motion for summary judgment, a court must evaluate the facts in a light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor. *Id.* at 255.

JURISDICTION

Plaintiffs originally claimed two bases for jurisdiction: diversity jurisdiction (28 U.S.C. § 1332), and federal question jurisdiction for alleged copyright violations (28 U.S.C. § 1338). Under 28 U.S.C. § 1332(a)(1), a district court may exercise diversity jurisdiction only if there is "complete diversity;" "no plaintiff can have the same state citizenship as any of the defendants." *Grand Union Supermarkets of the*

Case 1:20-cv-00292-JPW   Document 259-1   Filed 09/12/22   Page 59 of 96

Levert v. Philadelphia Intern. Records, Not Reported in F.Supp.2d (2005)
2005 WL 2789099

*Virgin Islands, Inc. v. H.E. Lockhart Management, Inc.,* 316 F.3d 408, 410 (3d Cir.2003) (citations omitted). Plaintiffs now concede there is no diversity jurisdiction because plaintiffs are citizens of Nevada and Assorted Music is a Nevada corporation.

**\*2** During the final pretrial conference, the plaintiffs informed the court they were withdrawing Counts I and Counts II alleging copyright violations. Jan. 5, 2005 Tr. at 7. Only state law claims remain. Under 28 U.S.C. § 1367(c), a district court may "exercise supplemental jurisdiction over a [state law claim] if ... the district court has dismissed all claims over which it has original jurisdiction." A district court may decide that considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for exercising its supplemental jurisdiction. *See Borough of West Mifflin v. Lancaster, et al.,* 45 F.3d 780, 788 (3d Cir.1995).

Defendants have not filed a motion to transfer for lack of jurisdiction and plaintiffs have requested the court to retain supplemental jurisdiction over the remaining state law claims. Judicial economy and the court's familiarity with the complex factual history of the present action justify the continued exercise of supplemental jurisdiction.

DISCUSSION

1. Defendants Kenneth Gamble, Leon Huff, and Gamble-Huff Productions' Motion for Summary Judgment:
Plaintiffs have asserted three breach of contract counts against defendants Kenneth Gamble, Leon Huff and Gamble-Huff Productions. These defendants seek summary judgment on each of the breach of contract counts because none of them were parties to the contracts at issue.

Plaintiffs entered into a contract with Gamble-Huff Productions, Inc. in 1972, which was amended in 1975. Plaintiffs, William Powell [3] and Leon Huff signed the 1972 contract; above Leon Huff's name are the words, "Gamble-Huff Productions, Inc." [4] Ex. I to Warshavsky Decl. at 18 and 22. Plaintiffs entered into a contract with Assorted Music, d/b/a PIR, in 1977. Plaintiffs and Kenneth Gamble signed the 1977 contract; above Kenneth Gamble's name are the words, "Assorted Music Inc. d/b/a Phila[delphia] International Records." Ex. K to Warshavsky Decl. at 18. Plaintiffs again entered into a contract with Assorted Music, d/b/a PIR, in 1979, which was amended in 1980,

1982 and 1984. Plaintiffs and Kenneth Gamble signed the 1979 contract; above Kenneth Gamble's name are the words, "Assorted Music, Inc. d/b/a Philadelphia International Records." [5] Ex. L to Warshavsky Decl. at 27. On the next and last page of the 1979 contract, there is an additional clause that states in full:

> In order to induce Assorted Music, Inc., d/b/a Philadelphia International Records to enter into the foregoing agreement with Eddie Levert and Walter Williams dated March 2, 1979, the undersigned hereby assents to the execution of such agreement and agrees to be bound by the terms and conditions thereof.
> *Id.* at 28. Below this clause is Kenneth Gamble's signature; above his signature are the words, "Gamble-Huff Productions."

For each of the contracts at issue, Defendants assert that Kenneth Gamble or Leon Huff signed as agents of PIR, not on behalf of themselves or their partnership, Gamble-Huff Productions. Therefore, defendants argue that plaintiffs cannot seek to hold Kenneth Gamble or Leon Huff, or their partnership, liable for the breach of contract counts. Plaintiffs make two arguments in response. First, plaintiffs argue liability is appropriate for Kenneth Gamble and Leon Huff, and their partnership, because Assorted Music is sham corporation that operates as the alter ego of the two men and piercing the corporate veil is appropriate. Second, plaintiffs argue Gamble-Huff Productions and its two partners assumed the obligations of the 1979 contract by signing the "inducement clause" cited above and including it as an addendum to the 1979 contract. Defendants respond by arguing that the inducement clause was between PRI and Gamble-Huff Productions, and not between plaintiffs and Gamble-Huff Productions.

**\*3** With regard to the 1979 contract, defendants argument is weak given the clear language of the inducement clause: "the undersigned [Gamble-Huff Productions and Kenneth Gamble] hereby assents to the execution of such agreement [between PRI and plaintiffs] and agrees to be bound by the terms and conditions thereof." With regard to the other contracts, plaintiffs have set forth some evidence suggesting that Assorted Music could be the alter ego of Kenneth Gamble and Leon Huff. For example, the testimony of Earl Morgenstern, Assorted Music's outside accountant, suggests that Assorted Music might be, among other things, an underfunded corporate structure that practices few corporate formalities. Morgenstern Dep. at 22-26.

Whether Kenneth Gamble, Leon Huff and Gamble-Huff Productions were parties to the contracts at issue are disputed issues of material fact. The court will deny defendants Kenneth Gamble, Huff and Gamble-Huff Productions' motion for summary judgment.

2. Plaintiff's Motion for Summary Judgment on Count III

Count III of plaintiffs' second amended complaint alleges defendants breached the contracts by making improper royalty accounting statements and improper charges against plaintiffs' royalty account or failing to make timely royalty accounting statements at all. Plaintiffs request summary judgment on count III because "[n]otwithstanding the reasons proffered by Defendants to explain their consistent underreporting, and non-reporting of royalties owed to Plaintiffs, Defendants, through their own testimony, admit liability for breach of contract." Pls.' Br. at 3.

PIR concedes in its brief it "has not always reported to Plaintiffs in a timely fashion .... [and] there have been mistakes in the reporting procedures." Defs.' Resp. at 4. Defense counsel also admitted at oral argument that during the four years prior to the filing of the complaint "[t]here were times ... PIR did not timely give statements at various points." [6] 1/5/05 Hr'g Tr. at 26. Defense counsel admitted that "PIR missed gaps" but argued PIR would attempt to remedy the problem by reconstructing missing royalty statements. *Id.* Notwithstanding PIR's reconstructed royalty statements, defense counsel admitted that failing to make timely statements "was a mistake ... [t]hat's what happened at times and it was a mistake, it was." *Id.* at 61. [7]

Despite defendants' concessions that royalty statements were not always properly filed, defendants argue plaintiffs' motion should be denied because: (1) plaintiffs' failure to make timely written objections to the contested or absent royalty statements as purportedly required under the various contracts foreclosed their right to challenge the royalty accountings; and (2) plaintiffs incurred no damages as a result of defendants' reporting errors or omissions because plaintiffs were always in a deficit position and thus not entitled to any royalty payments. Defendants' first argument appears to have no merit. Defendants' second argument might have merit but genuine issues of material fact exist relating to damages.

**\*4** Each of the contracts at issue remain in effect with regard to PIR's ongoing obligation to make timely royalty *payments.* However, with regard to PIR's obligation to make timely royalty *statements,* the 1979 contract as amended is the operative contract. [8] Although defendants argue plaintiffs foreclosed their right to challenge the royalty statements made or due under the 1972 and 1977 contracts, defendants do not argue plaintiffs' claims are barred under the 1979 contract. The applicable provision of the 1979 contract does not foreclose plaintiffs' right to challenge the statements due them. Paragraph 10 states in relevant part:

(a) We will compute royalties payable to you hereunder within ninety (90) after June 30 and after December 31 of each year during which records made hereunder are sold for the preceding six (6) month period, and will render accountings for and pay such royalties, except as provided in paragraph 17 hereof [dealing with PIR's options in case of plaintiffs' failure to fulfill recording commitments], less any unrecouped advances under this and/or any other agreement between you and us within such ninety (90) days except with respect to sales of records upon which royalties are payable to us by a distributor thereof.

(e) Unless notice shall have been given to us as provided in subparagraph (c) hereof [dealing with plaintiffs' right to inspect PIR's books and records], each royalty statement *rendered* to you shall be final, conclusive and binding on you and shall constitute an account stated. You shall be foreclosed from maintaining any action, claim or proceeding against us in any forum or tribunal with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against us in a court of competent jurisdiction within three (3) years after the date on which such statement is *rendered.*

Ex. L. to Warshavsky Decl. at 8-9 (emphasis added). [9] Because timely statements were not "rendered," the specific limitations period in which to challenge royalty statements is inapplicable. [10]

Although defendants have conceded their failure to timely produce royalty accountings in accordance with their contractual obligations, and plaintiffs are not barred from challenging the missing royalty statements under the limitations period of the 1979 contract, plaintiffs have not yet made a showing of damages incurred as a result of defendants' failure to provide royalty statements. Genuine issues of material fact exist relating to damages. The court will deny plaintiffs' motion for summary judgment on count III.

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 61 of 96
Levert v. Philadelphia Intern. Records, Not Reported in F.Supp.2d (2005)
2005 WL 2789099

3. Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim for Abuse of Process

Defendants have asserted a counterclaim alleging abuse of process based on plaintiffs' attempt to secure an injunction preventing the release of the "Together We Are One" ("Together") album. The "Together" album was composed of previously recorded but unreleased songs by The O'Jays. Plaintiffs allege they sought to block the album's release because plaintiffs "believed the recordings to be inferior" since they "had been rejected for release when initially recorded." Pls. Br. at 1. Defendants assert plaintiffs had "no basis whatsoever for the preliminary injunction proceeding." Jan. 5, 2005 Tr. at 31. Injunctive relief was denied by the Honorable R. Barclay Surrick.

**\*5** In assessing a claim of abuse of process under Pennsylvania law, "a court should ask whether there has been a 'perversion' of the process, or, whether a legal process has been used 'as a tactical weapon to coerce a desired result that is not the legitimate object of that process." ' *Gen. Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 307 (3d. Cir.2003); *McGee v. Feege,* 517 Pa. 247, 535 A.2d 1020, 1026 (Pa.1987). A court must look at the legal process used and determine whether it was used primarily-not exclusively-to achieve a goal unauthorized by the procedure in question. *Gen. Refractories,* 337 F.3d at 305. If plaintiffs' *primary* purpose in seeking injunctive relief was not legitimate, defendants' abuse of process claim can survive, even if plaintiffs' *secondary* purpose was legitimate.

There is some evidence that plaintiffs' primary purpose for seeking injunctive relief was not legitimate. Plaintiffs had previously agreed to produce an album consisting in part of the unreleased songs included in the "Together" album, the same songs plaintiffs later claimed where inferior when they sought to block that album's release. April 9, 2004 Order at 2 ("Defendants offered ... to produce a record comprised in part ... of Unreleased Songs, which were owned by Defendants. Plaintiffs agreed to this proposal.") Taking all inferences in favor of defendants (i.e., counterclaim plaintiffs), genuine issues of material fact remain regarding plaintiffs' primary purpose for seeking injunctive relief. The court will deny plaintiffs' motion for summary judgment on defendants' counterclaim for abuse of process.

4. Defendants' Motion for Partial Summary Judgment

Plaintiffs allege defendants owe them royalty payments for income reported to PIR by Sony Music Entertainment, Inc., ("Sony") on statements bearing the codes 0144640059 and 01446345059. At the relevant time, Sony was the entity distributing The O'Jays recordings; it reported sales and made payments to PIR. Under the terms of the contracts between The O'Jays and PIR, a certain percentage of the royalties was due plaintiffs and a certain percentage was retained by PIR. Not surprisingly, the parties dispute how the percentages were calculated under their various contracts. Defendants contend the two disputed statement codes reported income owed to PIR and seek partial summary judgment in favor of PIR on plaintiffs' counts III, IV and V alleging breach of contract for claims relying on income detailed in the codes 0144640059 and 01446345059.

The parties have deposed two individuals with knowledge of the disputed statements: James Harrington, the former Director of Royalty Audits and Licensing for Sony Music Entertainment, and Earl Morgenstern, a former accountant for PIR.

Defendants claim the "unequivocal testimony" of Mr. Harrington "is that Plaintiffs have no claim to this income." Defs.' Br. at 2. Defendants argue that Mr. Harrington testified the two accounts report income to be paid to PIR because codes ending in numbers lower than "50" "were artist codes" (i.e., accounts reporting income that plaintiffs could claim) and that accounts ending in numbers between 50 and 99 were producer codes (i.e., accounts reporting income that defendants could claim). Defs.' Br. at 4.

**\*6** Mr. Harrington's testimony is inconsistent. He testified one account ending in the number "80" was an artist account, and he also testified an account ending in the number "17" was a producer account. Harrington Dep. at 96:24-25; 144:24-145:2. There are disputed issues of material fact relating to whether the codes 0144640059 and 01446345059 were artist or producer accounts. Because of the inconsistency of Mr. Harrington's testimony, the court need not address the testimony of Mr. Morgenstern. The court will deny defendants' motion for partial summary judgment.

An appropriate order follows.

*ORDER*

000059   4

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 62 of 96

Levert v. Philadelphia Intern. Records, Not Reported in F.Supp.2d (2005)
2005 WL 2789099

AND NOW, this 25th day of October, 2005, upon consideration of defendants Kenneth Gamble, Leon Huff and Gamble-Huff Productions' motion for summary judgment on all counts (Paper # 37), plaintiffs' motion for summary judgment on count III alleging non-payment of royalties (Paper # 42), plaintiffs' motion for summary judgment on defendants' counterclaim for abuse of process (Paper # 45), and defendants' motion for summary judgment on counts III, IV and V alleging breach of contract (Paper # 64), and the responses thereto, for the reasons stated in the accompanying Memorandum, it is ORDERED:

1. Defendants Kenneth Gamble, Leon Huff and Gamble-Huff Productions' motion for summary judgment (Paper # 37) is DENIED.

2. Plaintiffs' motion for partial summary judgment (Paper # 42) is DENIED.

3. Plaintiffs' motion for partial summary judgment (Paper # 45) is DENIED.

4. Defendants' motion for partial summary judgment (Paper # 64) is DENIED.

5. The final pretrial conference is scheduled for *November 10, 2005* at *4:00 p.m.*. This case will be placed in the jury trial pool on *November 14, 2005*.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2789099

## Footnotes

1    In this memorandum opinion, "defendants" refers to all parties named as defendants in the case caption.

2    Discovery in this case was limited to the period of 1998 to present. Dec. 12, 2004 Mem. and Order at 3 (finding that plaintiffs failed to exercise the due diligence required to toll the Pennsylvania statute of limitations for a breach of contract action). This ruling applies to plaintiffs and defendants alike; plaintiffs may not seek royalty payments owed to them before 1998, and defendants may not offset any liability incurred since 1998 by deficits outstanding before 1998. *Id.*

3    Powell, who died in 1977, is one of the original members of The O'Jays.

4    Plaintiffs, Powell and James A. Bishop signed the 1975 amendment. Ex. J to Warshavsky Decl. at 2 (letter) and 5 (amendment). Above Bishop's name are the words, "Gamble-Huff Productions, Inc."; below his name appears the words, "Exec. V.P. Gen. Mg." *Id.*

5    Plaintiffs and Kenneth Gamble signed the 1980 amendment; above Kenneth Gamble's signature are the words, "Assorted Music, Inc. d/b/a Philadelphia International Records." Ex. M to Warshavsky Decl. at 6. Plaintiffs, Sammy Strain (the performer who replaced Powell) and another person whose signature is illegible signed the 1982 amendment; above the illegible signature are the words, "Assorted Music, Inc. d/b/a Philadelphia International Records," and below the signature are the words, "V.P. Business Affairs." Ex. N to Warshavsky Decl. at 4. Plaintiffs, Strain and Kenneth Gamble signed the 1984 amendment; above Kenneth Gamble's signature are the words, "Assorted Music, Inc. d/b/a Philadelphia International Records." Ex. O to Warshavsky Decl. at 3.

6    Discovery in this case was limited to the period of 1998 to present. *See supra* note 1.

7    This admission superceded defendants' statement to the opposite effect in its pretrial memorandum. *See* Defs' Pre-Trial Memo. at 100.

000060    5

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 63 of 96

Levert v. Philadelphia Intern. Records, Not Reported in F.Supp.2d (2005)
2005 WL 2789099

8        With regard to PIR's obligation to make timely royalty accounting *statements,* the 1977 contract supercedes the 1972 contract as amended. Paragraph 35 of the 1977 contract states: "It is agreed and understood between all of the parties hereto that the agreement of January 15, 1972 between Walter Williams, Eddie Levert and William Powell and Gamble-Huff Productions, Inc. as amended August 25, 1975 shall be deemed to have expired as though the term thereof had been completed." Ex. K to Warshavsky Decl. at 18. However, PIR's obligation to continue to make timely royalty *payments* for the recordings produced under the royalty provisions of the 1972 contract as amended remains intact because of the savings clause in paragraph 35: "It is agreed between all of the parties hereto that the normal obligations on each of the parties that would continue after the expiration of the term of said Agreement as amended shall remain as obligations on all of said parties." *Id.*

         With regard to PIR's obligation to make timely royalty accounting *statements,* the 1979 contract supercedes the 1977 contract in the same way the 1977 contract supercedes the 1972 contract as amended. Paragraph 1(c) of the 1979 contract states: "Effective upon the execution of this agreement, the term of the agreement between you and us dated as of March 15, 1977 (the "1977 Agreement") is hereby terminated as of the date hereof and all parties shall be deemed to have fulfilled all of their obligations thereunder, except those which survive the end of the term (e.g. warranties, re-recording restrictions and royalty payments)." Ex. L to Warshavsky Decl. at 1. PIR's obligation to continue to make timely royalty *payments* for the recordings produced under the royalty provisions of the 1977 contract and the 1972 contract as amended remains intact because of the savings clause in paragraph 1(c) of the 1979 contract: "this subparagraph shall not be deemed to terminate our obligations to pay royalties to you in accordance with the terms and conditions of the 1977 Agreement or any other agreement between you and us with respect to sales of phonograph records derived from master recordings recorded under any such agreement, subject to recoupment of all advances chargeable against such royalties." *Id.* at 1-2.

         Because no future contract superceded the 1979 contract as amended, PIR's obligation to continue to make timely royalty *payments* for the recordings produced under the royalty provisions of the 1979 contract as amended remains unchanged. However, the 1979 contract as amended is the operative contract with regards to PIR's obligation to make timely royalty accounting *statements.*

9        The 1980, 1982 and 1984 amendments do not have any effect on the terms in section (a) or (e) of paragraph 10 of the 1979 contract.

10       Pennsylvania law permits parties to agree to a limitations period shorter than the applicable statute of limitations. 42 Pa.C.S. § 5501(a) states: "An action, proceeding or appeal must be commenced within the time specified in or pursuant to this chapter [entitled "Limitations of Time"] unless, in the case of a civil action or proceeding, a different time is provided by this title or another statute or a shorter time which is not manifestly unreasonable is prescribed by written agreement." *See also Smith v. Am. Equity Ins. Co.,* 235 F.Supp.2d 410, 412 (E.D.Pa.2002) (Pollak, J.) (holding one-year contractual limitations period for action not manifestly unreasonable). A three-year limitation period is not manifestly unreasonable.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**Myers v. Shinseki (U.S. Vet. App. June 14, 2012)**

000062

2012 WL 2149922

2012 WL 2149922
Only the Westlaw citation is currently available.

NOTE: PURSUANT TO PUB.L. 100-687,
TITLE III, § 4067(D)(2), THIS DECISION WILL
BECOME THE DECISION OF THE COURT
THIRTY DAYS FROM THE DATE HEREOF.

Designated for electronic publication only
United States Court of Appeals for Veterans Claims.

Harold E. MYERS, Appellant,

v.

Eric K. SHINSEKI, Secretary
of Veterans Affairs, Appellee.

No. 09–1558(E).
|
June 14, 2012.

**ORDER**

*Note: Pursuant to U.S. Vet.App. R. 30(a),
this action may not be cited as precedent.*

ROBERT N. DAVIS, Judge.

**\*1** On February 22, 2012, the appellant, through counsel, filed an application for attorney fees and expenses under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412. On March 8, 2012, the Secretary filed a motion to dismiss the appellant's EAJA application because he asserts it was untimely. The Secretary asserts that the appellant's EAJA application was due no later than February 21, 2012. On March 8, 2012, the Secretary also filed a motion to stay the EAJA proceedings pending a ruling on the motion to dismiss. On March 22, 2012, the appellant filed a response to the motion for a stay and a response to the Secretary's motion to dismiss. The appellant argues that he filed a timely EAJA application and that even if it was untimely, the EAJA filing period should be equitably tolled because his counsel reasonably relied on the deadline of February 22, 2012, which was communicated to him by "two senior clerks" at the Court. Mar. 22, 2012, Appellant's Response to Motion to Dismiss at 9.

An EAJA application must be filed with the Court within 30 days after this Court's judgment becomes final. 28

U.S.C. § 2412(d)(1)(B) (providing that the application must be submitted "within thirty days of final judgment in the action[.]"); U.S. VET.APP. R. 39(a) (effective Sept. 15, 2011) ("An application pursuant to 28 U.S.C. § 2412(d) for award of attorney fees and/or other expenses in a case shall be submitted for filing with the Clerk not later than 30 days after the Court's judgment becomes final."). "[T]he 30–day period to file an EAJA application with the Court begins to run when the judgment becomes final and not when the Court issues its mandate." *Strouth v. Brown,* 8 Vet.App. 502, 504 (1996) (per curiam order). This Court's judgment becomes final 60 days after the entry of judgment, if no appeal is filed with the U.S. Court of Appeals for the Federal Circuit. *Id.*

The 60–day period is determined pursuant to 38 U.S.C. §§ 7291 and 7292 and the Court's Rules of Practice and Procedure (Rules). Rule 39(a), which is cited above, refers to Rule 41. Rule 41 provides: "Mandate is when the Court's judgment becomes final and is effective as a matter of law pursuant to 38 U.S.C. § 7291." U.S. VET.APP. R. 41. It also instructs that "Mandate generally is 60 days after judgment [is] entered" (Rule 41(b)) but that the "*entry* of mandate on the docket is a ministerial act and may not occur on the date of mandate" and cautions practitioners "to use diligence when calculating time periods so as to ensure timely filings." U.S. VET.APP. R. 41, Practitioner's Note (emphasis added). Pursuant to statute, a decision of this Court "shall become final upon the expiration of the time allowed for filing, under section 7292 of this title, a notice of appeal from such decision, if no such notice is duly filed within such time." 38 U.S.C. § 7291(a). Section 7292, in turn, provides that the time allowed for filing a[N]otice of [A]ppeal from a decision of this Court shall be "within the time ... prescribed for appeal to United States courts of appeals from United States district courts." 38 U.S.C. § 7292(a). Pursuant to the Federal Rules of Appellate Procedure, a Notice of Appeal "must be filed" within 60 days after the decision appealed from is entered. FED. R.APP. P. 4(a)(1)(B) (providing that 60–day period is applicable if one of the parties is a United States agency or a United States officer or employee sued in an official capacity); FED. CIR. R. 4.

**\*2** Here, judgment was entered on the docket on November 21, 2011, and judgment became final 60 days later on January 20, 2012. While mandate was not entered on the docket until January 23, 2012, that is of no consequence regarding the timeliness of the appellant's EAJA application. *See Strouth,* 8 Vet.App. at 504 ("The issuance of mandate is a ministerial function which is irrelevant to the timeliness of the EAJA

    000063    1

application in this case."). In order to have been timely filed, the appellant's EAJA application was due no later than February 21, 2012, i.e., 30 days after final judgment. [1] However, because the appellant's EAJA application was filed on February 22, 2012, it was untimely. *See Hernandez–Garcia v. Nicholson,* 485 F.3d 651, 652 (Fed.Cir.2007).

Although the appellant's EAJA application is untimely, the Court will consider the appellant's assertion that equitable tolling should apply. As noted above, the EAJA's 30–day filing period is a statutory requirement set forth in 28 U.S.C. § 2412(d)(1)(B). *See Scarborough v. Principi,* 541 U.S. 401 (2004). This statutory time limit is not jurisdictional. *Id.* at 414 ("30–day deadline for [EAJA] applications and its application-content specifications are not properly [termed] 'jurisdictional'.") This statutory time limit, as with other statutory time limits including that applicable to filing an appeal to the Court, has been held to be subject to equitable tolling. *See Bove v. Shinseki,* 25 Vet.App. 136 (2011) (per curiam order) (holding that the 120–day filing period for a Notice of Appeal is subject to equitable tolling within the parameters of the precedential decisions on equitable tolling that predated this Court's now-reversed decision in *Henderson v. Peake,* 22 Vet.App. 217 (2008), *aff'd sub nom. Henderson v. Shinseki,* 589 F.3d 1201 (Fed.Cir.2009) (en banc), *rev'd, Henderson v. Shinseki,* 131 S.Ct. 1197, 1206 (2011)); *see also Townsend v. Comm'r of Social Sec.,* 415 F.3d 578, 583 (6th Cir.2005) (concluding that, "based on the Supreme Court's decision in *Scarborough,* the EAJA time limitation for fee applications is subject to equitable tolling").

For purposes of this appeal, the Court assumes that the 30–day period for filing an EAJA application is subject to equitable tolling. *See Strouth,* 8 Vet.App. at 503–04; *see also Lee v. Gober,* 14 Vet.App. 204, 209 (2000) (concluding that, even if equitable tolling were available and if the facts alleged by the appellant were sufficient to warrant its application—i.e., (1) appellant's single inquiry to the Clerk of the Court that prompted a warning from the Clerk that the Court insists on strict compliance with the EAJA statute and (2) three hours of legal research in an area in which the appellant-attorney was, by his own admission, inexperienced—the Court "would be unlikely to find that the appellant exercised due diligence in connection with the initial preparation of and subsequent litigation regarding his EAJA application"). As the basis for the appellant's assertion that equitable tolling should apply here, counsel for the appellant states that she called the Clerk's office on "numerous occasions from 2001 until February 22, 2012 and was informed by two senior clerks that the deadline

for filing the EAJA application was February 22, 2012." Mar. 22, 2012, Appellant's Response to Motion To Dismiss at 9. Counsel further states that "Court officials are presumed to act with regularity" and she "reasonab[ly] relied upon the[ir] assertions." *Id.* at 10.

**\*3** Counsel's reason for filing the EAJA application one day after the deadline is to lay blame on Court staff in the Public Office. The Court notes that, if misleading advice was given to counsel by an employee of the Court, this advice was directly counter to the express direction found in this Court's Rules. The Court's Rule 39(a), as noted above, specified that the EAJA application was due 30 days after the Court's judgment became final and directed counsel to the Court's Rule 36 concerning the entry of judgment, which notes that the entry of judgment starts the 60–day period for appellant to the Federal Circuit, and Rule 41 concerning mandate, which includes a note that cautions practitioners that the entry of mandate on the docket is "a ministerial act" and "may not occur on the date of mandate" and "to use diligence when calculating time periods so as to ensure timely filings." U.S. VET.APP. R. 41. Indeed, the Court's caselaw also includes the caution concerning the entry of mandate on the docket as being a "ministerial act." *See, e.g., Pelea v. Nicholson,* 20 Vet.App. 93, 94 n. 1 (2006) (per curiam order); *Strouth,* 8 Vet.App. at 504. Rule 41 specifically provides that mandate is 60 days after judgment unless an appeal to the Federal Circuit is filed or mandate is issued as part of an order on consent or the Court directs otherwise. The 60th day after judgment issued in this case was January 20, 2012; it is not relevant that mandate was entered on the docket on January 23, 2012.

Any deviation from this Court's Rules was undertaken at counsel's peril. *See Strouth,* 8 Vet.App. at 503 (holding EAJA application untimely because the Court found no basis for awarding equitable relief where counsel relied upon misleading Court information contrary to direction contained in a Court order). It is counsel's responsibility to know the Court's Rules and to conduct research on significant legal questions that arise, such as when a judgment from this Court is final. Counsel's failure to comply with the Court's Rules due to counsel's own neglect and counsel's reliance on alleged misinformation from a Court clerk does not rise to the requisite level warranting the tolling of the deadline for filing an EAJA application here. Accordingly, the Court concludes that, even assuming the alleged misinformation was given to the appellant's counsel, the facts here do not warrant equitable tolling of the EAJA 30–day period.

Upon consideration of the foregoing, it is

ORDERED that the Secretary's motion to dismiss the appellant's EAJA application is granted and the EAJA application is DISMISSED as untimely.

**All Citations**

Not Reported in Vet.App., 2012 WL 2149922

### Footnotes

1    Thirty days after final judgment was Sunday, February 19, 2012. The following Monday was a legal holiday. Therefore, according to Rule 26(a) of the Court's Rules of Practice and Procedure, the EAJA application was due on Tuesday, February 21, 2012.

**End of Document**                                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.                 000065    3

**Perry v. McGee (E.D. Mich. August 8, 2006)**

000066

2006 WL 8459653
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Latoya PERRY, Plaintiff,

v.

Kurt MCGEE, the Wackenhut Corporation, a foreign
corporation, and the City of Detroit, Defendants.

Case number 04-74481
|
Signed 08/08/2006

**Attorneys and Law Firms**

Scott P. Batey, Scott P. Batey Assoc., William J. Yochim, Jr., William J. Yochim, Jr. Assoc., Bingham Farms, MI, for Plaintiff.

Eric D. Smith, Hopkins, Curran, Southfield, MI, for Defendants.

ORDER

JULIAN ABELE COOK, JR., United States District Court Judge

 **\*1**  On November 17, 2004, The Wackenhut Corporation ("Wackenhut"), one of the Defendants, caused this case to be removed from the Wayne County Circuit Court of Michigan to this federal court on the basis of its diversity jurisdiction. This litigation was initiated by Latoya Perry ("Perry") who charged each of the Defendants [1] with (1) violations of 42 U.S.C. § 1983, (2) gross negligence, (3) premises liability, (4) negligence, and (5) negligent supervision.

On May 22, 2006, another Defendant, The City of Detroit ("City"), filed a motion for the entry of a summary judgment pursuant to Fed. R. Civ. P. 56. Several days later (June 8, 2006), Wackenhut joined the City in its request for dispositive relief by filing a similar motion for a summary judgment. However, and prior to a resolution of these two requests for dispositive relief by the Court, Perry filed a motion on June 29, 2006, in which she requested the Court to strike Wackenhut's motion for summary judgment. In support of her request, Perry notes that this Court entered a Scheduling

Order on December 5, 2005 which required all dispositive motions to be filed on or before May 22, 2006. Although the City complied with the December 5th Order, the official records indicate that Wackenhut did not file its motion for summary judgment until June 8, 2006 - well after the deadline of May 22, 2006.

Wackenhut, while acknowledging that the submission of its motion for summary judgment was tardy, contends that it relied upon the advice of a Court staff member who had allegedly asserted that (1) the filing of a dispositive motion by the City on May 22, 2006 had the practical effect of suspending all scheduling deadlines, (2) a motion to modify the Scheduling Order would not be necessary under these circumstances, and (3) the filing of a dispositive motion subsequent to the designated deadline would be appropriate.

Although the representations by Wackenhut may have been correctly reported, this Court maintains and insists that all parties must fully comply with its orders. It is axiomatic that the Court speaks only through its orders. Compliance with the Scheduling Order is no exception to this basic and fundamental rule. While this Court has complete faith and confidence in the integrity and skill of its entire staff, a litigant's reliance upon their unauthorized advice and counsel is never a substitute for the efficacy of an order. Thus, it is absolutely imperative that all parties to any litigation before this Court rely upon the terms in all existing orders, as well as every rule and regulation which governs this case. Reliance upon the advice and counsel of staff personnel, while understandable, does not, and shall not, ever serve as an unofficial basis for the modification of any substantive or procedural ruling by the Court. [2]

 **\*2**  In specifically addressing Perry's motion, it is clear to this Court that the Wackenhut motion was not filed in a timely manner. Hence, Perry's motion does have merit and, therefore, it must be, and is, granted. Furthermore, Wackenhut's motion for summary judgment must be stricken from the record for the reasons that have been noted in this order and the Clerk of the Court is directed to remove the image from the ECF system.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2006 WL 8459653

**Perry v. McGee, Slip Copy (2006)**

2006 WL 8459653

## Footnotes

1       The Defendants in this lawsuit have been identified as Kurt McGee, The Wackenhut Corporation, and the City of Detroit.

2       While Wackenhut submits that it would have filed a motion for the extension of the deadline but for the advice from a Court staff person, it is not evident that its request would have been granted.

**End of Document**                                           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**Phillips-Kerley v. City of Fresno (E.D. Cali. October 19, 2018)**

000069

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 72 of 96

Phillips-Kerley v. City of Fresno, Not Reported in Fed. Supp. (2018)

2018 WL 5255224

2018 WL 5255224
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

David PHILLIPS-KERLEY, Plaintiff

v.

CITY OF FRESNO, et al., Defendants

Case No. 1:18-CV-438 AWI BAM
|
Signed 10/18/2018
|
Filed 10/19/2018

**Attorneys and Law Firms**

Steve Allan Whitworth, Law Office of Steve Whitworth, Elk Grove, CA, for Plaintiff.

Joseph D. Rubin, Betts & Rubin, Fresno, CA, for Defendants.

**ORDER ON DEFENDANTS' MOTION TO DISMISS; MOTION FOR A MORE DEFINITE STATEMENT; AND MOTION TO STRIKE**

(Doc. No. 16)

Anthony W. Ishii, SENIOR DISTRICT JUDGE

**\*1** David Phillips-Kerley ("Plaintiff") has alleged twenty-one claims against the City of Fresno and various employees of the City's Fire Department ("Defendants"), arising from alleged harassing, discriminatory, and retaliatory conduct over an eight-year span. Doc. No. 13.

Defendants now move for dismissal of most of Plaintiff's claims for lack of subject matter jurisdiction and failure to state a claim. Doc. No. 16. Defendants also request the Court either strike portions of the complaint or order a more definite statement. Id.

For the reasons that follow, the Court will grant in part and deny in part Defendants' Motion to Dismiss, grant Defendants' Motion for a More Definite Statement, and deny Defendants' Motion to Strike as moot. Plaintiff will be granted leave to amend his complaint. The Court instructs the parties to consider the reasoning of this Order as applied to the Second Amended Complaint.

For purposes of comprehension, the Court will first discuss the motion for a more definite statement (Section I), then resolve Defendants' motion to dismiss (Section II). [1]

**I. Defendants' Motion for a More Definite Statement**

*Procedural Background*

Plaintiff filed his complaint on March 28, 2018, pressing twenty-one causes of action against the Fresno Fire Department (as his employer), twenty-three named employees of the fire department, and ten "Doe" employees. See Doc. No. 1. Defendants moved for dismissal, contending among other things that the Fresno City Charter only grants Plaintiff power to sue the City itself, not the Fire Department. See Doc. No. 10. In mid-June, the parties informed the Court of their agreement to allow Plaintiff to amend his complaint, stipulating "Plaintiff has prepared a First Amended Complaint ["1AC"] which attempts to cure the defects raised in the [dismissal] motion." Doc. No. 12.

Plaintiff filed his 1AC. Doc. No. 13. Other than a few minor alterations for grammar, syntax, and word choice, the 1AC appears to be identical to his original Complaint. The major substantive changes are as follows:

- Plaintiff deleted the words "Fire Department" from the caption and from par. 2;

- Plaintiff altered his fifth and ninth causes of action to exclude the City from these claims (Doc. No. 13, at p. 32, 35);

- Plaintiff changed the header in his sixth cause of action to add the City as a Defendant (Doc. No. 13, at p. 33).

Compare Doc. No. 1 and 13. Even though the "Fire Department" is no longer named as a party to this action, Plaintiff continues to allege his claims against "Defendant Fire Department" throughout his 1AC. See id.

Defendants' filed the instant motion to dismiss, pressing eighteen separate arguments. Doc. No. 16. In response, Plaintiff concedes that twelve of his twenty-one causes of action are duplicative, barred by the statute of limitations, or legally baseless; he also concedes dismissal of his prayer for punitive damages. Doc. No. 19, at p. 3. Claims seven and eight

Phillips-Kerley v. City of Fresno, Not Reported in Fed. Supp. (2018)

2018 WL 5255224

also appear to be identical. Doc. No. 13 p. 33-35. Stripped down, then, the 1AC is left with eight claims:

**\*2**  • Causes of action I, II, and III, under Title VII;

• Causes of action IV and VI, under the Fair Employment and Housing Act ("FEHA");

• Cause of action VII, under the Cal. Labor Code;

• Cause of action XVI, under the Cal. Firefighter's Bill of Rights; and

• Cause of action XXI, under a Fresno City Administrative Order.

Despite Plaintiff's concessions as to his claims, the 1AC is also left with a 92-paragraph statement of facts. Doc. No. 13 ¶¶ 33-125. Based on this and other issues, Defendants have moved for a more definite statement, which Plaintiff formally opposes.

*Analysis*

Prior to filing a responsive pleading, a party may move for a more definite statement of a pleading if it "is so vague or ambiguous that the party cannot reasonably prepare a response." Rule 12(e).[2] The purpose of Rule 12(e) is to provide relief from a pleading that is unintelligible, not one that is merely lacking detail. Neveu v. City of Fresno, 392 F.Supp.2d 1159, 1169 (E. D. Cal. 2005). Motions pursuant to Rule 12(e) are generally "viewed with disfavor and are rarely granted[.]" Sagan v. Apple Computer, Inc., 874 F.Supp. 1072, 1077 (C.D. Cal. 1994).

Plaintiff's complaint does not lack detail. The factual allegations plainly state the events, dates, and participants surrounding his claims, and these individual paragraphs do not themselves make the 1AC unintelligible. See Neveu, 392 F.Supp.2d at 1169; see also Starr v. Baca, 652 F.3d 1202, 1212 (9th Cir. 2011) ("[A] complaint is required only to give the notice of the claim such that the opposing party may defend himself or herself effectively."); Abikar v. Bristol Bay Native Corp., 300 F. Supp. 3d 1092, 1106 (S.D. Cal. 2018) (denying motion for more definite statement where complaint made harassment claim clear, alleged sufficient factual basis, and explicitly named responsible supervisors).

Overall, though, the 1AC is left in a terrible state that may leave Defendants "unable to adequately frame a responsive pleading." See Rule 12(e). Now that Plaintiff has conceded that nearly two-thirds of his claims and his prayer for punitive damages are not cognizable, and that that incidents prior to December 2015 are time-barred for his Title VII claims, it is highly likely that Plaintiff's statement of facts contains numerous orphaned allegations irrelevant to his case. Additionally, many of these remaining causes of action specifically incorporate prior paragraphs that do not appear to line up with Plaintiff's intended citations. See Doc. No. 13 at p. 33, "¶ 3" (referencing "paragraphs 113 to 118 (Discrimination), 122 to 154 (Retaliation), and 157 to 165 (Harassment)," which do not appear to be paragraphs specifically tied to discrimination, retaliation, or harassment[3]). Further, though Plaintiff changed the caption to read "City of Fresno", he still continues to assert his claims against "Defendant Fire Department. See Wangler v. Hawaiian Elec. Co., 742 F. Supp. 1458, 1464 (D. Haw. 1990) (granting the defendants' motion for a more definite statement where employee's complaint against former co-worker was unclear as to whether co-worker was included in employee's state law claims as well as in Title VII claim). The lack of a plain statement has been found to be actionable under Rule 12(e). See McHenry v. Renne, 84 F.3d 1172, 1175 (9th Cir. 1996) (stating confusing and unclear complaints "impose unfair burdens on litigants and judges."); see also Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll., 77 F.3d 364, 366 (11th Cir. 1996) (affirming Rule 12(e) grant where each claim incorporated by reference segments of the complaint that did not match with the allegations); McLaughlin v. Castro, 2018 WL 1726630, at \*4 (E.D. Cal. Apr. 10, 2018) ("Shotgun pleadings ... are unacceptable.").

**\*3**  Further, the Court notes that some of Plaintiff's causes of action may face other obvious legal barriers unaddressed by Defendants. The Ninth Circuit has consistently held that non-employer individuals cannot be held personally liable under Title VII. See Holly D. v. Cal. Institute of Technology, 339 F.3d 1158, 1179 (9th Cir. 2003) ("We have consistently held that Title VII does not provide a cause of action for damages against supervisors or fellow employees."); Greenlaw v. Garrett, 59 F.3d 994, 1001 (9th Cir. 1995) (same). Similarly, only the employer is liable for discrimination or retaliation under FEHA, and so the Court questions Plaintiff's incorporation of discrimination and retaliation paragraphs against "All Defendants". See Jones v. Lodge at Torrey Pines Partnership, 42 Cal.4th 1158, 1173 (Cal. 2008) ("[N]on-employer individuals are not personally liable for their

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 74 of 96

Phillips-Kerley v. City of Fresno, Not Reported in Fed. Supp. (2018)
2018 WL 5255224

role in that retaliation"); Reno v. Baird, 18 Cal.4th 640, 644 (Cal. 1998) ("FEHA [ ] prohibits only 'an employer' from engaging in improper discrimination."). Whistleblower protections under Cal. Labor Code § 1102.5(B) are also based upon an employer/employee relationship. See Vierria v. Cal. Highway Patrol, 644 F.Supp.2d 1219, (E.D. Cal. 2009); Lloyd v. Cnty. of Los Angeles 172 Cal. App. 4th 320, 330 (2009).

Simply, to allow the parties to proceed on the 1AC would be to invite a danger that Defendants may not be able to adequately answer Plaintiff's allegations, and may needlessly complicate this litigation down the road. Though Plaintiff formally opposes Defendants' Rule 12(e) motion, he also states he is aware he must strip allegations from the complaint —mainly because he is abandoning nearly two-thirds of his claims just a few months after filing the 1AC. See Doc. No. 19 at p. 3. The Court takes Plaintiff's awareness and concessions as an implicit admission that a more definite statement is required. Thus, the court will grant Defendants' Motion for a More Definite Statement, and allow Plaintiff to amend. Rule 12(e); Starr, 652 F.3d at 1212; McHenry, 84 F.3d at 1175; see also Anderson., 77 F.3d at 366.

Upon amendment, Plaintiff should endeavor to eliminate any orphaned factual allegations, consider which parties he intends to sue, be clear as to which claims correspond with which parties, and make sure any incorporations in the 2AC reference the proper paragraphs. As to Plaintiff's concessions that multiple claims and prayers for relief are legally baseless, he is reminded that pleadings are "representations to the court" that require a reasonable and competent inquiry into the factual and legal bases *prior to filing*. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 409, 110 S. Ct. 2447, 2463, 110 L.Ed. 2d 359 (1990) (Stevens, J., concurring) ("[A] litigant who wastes judicial resources by filing a pleading that is not well grounded in fact and warranted by existing law or a good-faith argument for its extension, modification, or reversal" risks sanctions, including terminating sanctions).

**II. Defendants' Motion to Dismiss**
Plaintiff has conceded that nearly two-thirds of his claims are not legally cognizable. Defendants also argue the following should be dismissed under Rule 12:

(A) Cause of Action IV (FEHA Hostile Work Environment), concerning any events that occurred more than a year prior to Plaintiff's Department of Fair Employment and Housing ("DFEH") complaint, due to FEHA's administrative-exhaustion requirement;

(B) Causes of Action III, IV, and VI (Harassment under Title VII, Hostile Work Environment under FEHA, and Failure to Prevent Harassment under FEHA), due to Plaintiff's failure to allege conduct tied to his membership in a protected class;

(C) Cause of Action VII (Retaliation under Cal. Labor Code § 1102.5(B) ), which "fails [because] it is duplicative of his Title VII retaliation claim."

*Factual Background*[4]

**\*4** Plaintiff is an African-American employee of the Fresno City Fire Department and a certified firefighter. Doc. No. 13 at ¶¶ 33-35. In September of 2010, Plaintiff was interrogated by Fire Captains Mike Gill and Ronald Caldwell, his supervisors at the time, who indicated "they were looking for a reason to discipline Plaintiff." Id. at ¶¶ 40-41. Gill and Caldwell refused to allow Plaintiff any Union representation at the meeting, despite his rights under the California Firefighter's Bill of Rights. Id. Plaintiff complained to Fire Chief Randy Bruegman about this encounter, and was told he should "move forward with caution." Id. at ¶ 42.

From there, Plaintiff's 1AC details a series of escalating actions undertaken by various individual Defendants, rooted in Plaintiff's perceived violation of "the unwritten policy that firefighters do not tell on one another ... without dire consequences." Doc. No. 19 at p. 11. Between 2010 and 2017, Plaintiff alleges he pursued multiple grievances against his superiors, and each time was met with further resistance from his co-workers, his superiors, and the City. Doc. No. 13 at ¶¶ 42-112. The 1AC concludes with details of events that occurred from June 2017 forward, alleging certain Defendants interfered with Plaintiff's application for transfer to a different fire house, Defendant City failed to investigate his prior grievances, and the supervisory Defendants imposed a week-long suspension as a part of the alleged retaliatory scheme. Id. at ¶¶ 113-123. In February 2018, Plaintiff states he was "forced to obtain a right-to-sue notice in order to obtain some remedy [given the] years of deliberate sanction or negligent inaction" by Defendants. Id. at ¶ 125.

**(A) Events that occurred more than a year prior to Plaintiff's filing of his DFEH Complaint are sufficiently connected to the events within the year.**

Case 1:20-cv-00292-JPW   Document 259-1   Filed 09/12/22   Page 75 of 96

Phillips-Kerley v. City of Fresno, Not Reported in Fed. Supp. (2018)
2018 WL 5255224

*Legal Standard*

A motion to dismiss for lack of subject-matter jurisdiction questions whether the plaintiff has a right to be in federal court. Rule 12(b)(1); Trustees of the Screen Actors Guild-Producers Pension & Health Plans v. NYCA. Inc., 572 F.3d 771, 775 (9th Cir. 2009).

Under California law, the requirement of exhaustion of administrative remedies is a jurisdictional prerequisite to resort to the courts. Johnson v. City of Loma Linda, 24 Cal.4th 61, 70, 99 Cal.Rptr.2d 316, 5 P.3d 874 (2000); see also Doe v. Regents of the Univ. of California, 891 F.3d 1147, 1155 (9th Cir. 2018). Thus, a claim for failure to exhaust administrative remedies under FEHA falls under Rule 12(b)(1). See Garcia v. Los Banos Unified Sch. Dist., 418 F. Supp. 2d 1194, 1215 (E.D. Cal. 2006).

*Analysis*

To bring a civil action under FEHA, a plaintiff must first file an administrative complaint with DFEH no later than one year after the violation occurred. Cal. Gov. Code § 12960; Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1127 (9th Cir. 2008). However, this statute of limitations may be equitably tolled under California law if the older events are "sufficiently connected to unlawful conduct within the limitations period[.]" Richards v. CH2M Hill, Inc., 29 P.3d 175, 176 (2001). To show a continuing violation, a plaintiff must establish that the allegedly unlawful conduct occurring outside the limitations period (1) was sufficiently similar in kind to the alleged conduct within the limitations period; (2) occurred with reasonable frequency; and (3) has not acquired a degree of permanence. Fahnestock v. Waggoner, 674 F. App'x 708, 710 (9th Cir. 2017) (citing Richards, 29 P.3d at 190). Permanence means that "an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile." Yanowitz v. L'Oreal USA, Inc., 36 Cal.4th 1028, 1059 n. 19 (2005); Richards, 26 Cal.4th at 175. FEHA provisions are to be "liberally construed for the accomplishment of the purposes thereof, including the resolution of potentially meritorious claims on the merits." Id.; see also Garcia, 418 F. Supp. 2d at 1214 (finding a continuing violation for FEHA-exhaustion purposes where events outside of the one-year period were

"reasonably understood as the root of the retaliation of which [the plaintiff] complained[.]").

**\*5** Here, Plaintiff's allegations sufficiently qualify as a continuing violation for purposes of FEHA exhaustion. The 1AC alleges a string of incidents that appear to stem from Plaintiff's 2010 complaint regarding his supervisor's refusal to allow him a Union representative during a disciplinary action. Doc. No. 13 at ¶¶ 40-41. From there, Plaintiff's 1AC details a series of escalating actions undertaken by various individual Defendants, rooted in Plaintiff's perceived violation of "the unwritten policy that firefighters do not tell on one another ... without dire consequences." Doc. No. 19 at p. 11. Between 2010 and 2017, Plaintiff alleges he pursued multiple grievances against his superiors, and each time was met with further resistance from his co-workers, his superiors, and the City. Doc. No. 13 at ¶¶ 42-112. The 1AC concludes with details of events that occurred from July 2017 forward, alleging certain Defendants interfered with Plaintiff's application for transfer to a different fire house, Defendant City failed to investigate his prior grievances, and the supervisory Defendants imposed a week-long suspension as a part of the alleged retaliatory scheme. Id. at ¶¶ 113-123. The 1AC sufficiently alleges conduct of a continuous nature that occurred with reasonable frequency, thus meeting the first two prongs of the Richards' test. 29 P.3d at 190. Further, the Defendants' conduct had not "acquired a degree of permanence," such that Plaintiff should have been aware his conciliation efforts would have been futile. Yanowitz, 36 Cal.4th at 1059. Plaintiff alleges he pursued multiple grievances about his superiors' and co-workers' conduct, but the city did not finalize any punishment or dismiss the grievances until late 2017. Id.; Garcia, 418 F. Supp. 2d at 1214.

Therefore, should Plaintiff wish to resubmit his FEHA claim in the Second Amended Complaint (see Section II(B) below), these claims would not be barred by the one-year statute of limitations imposed by § 12960. Fahnestock, 674 F. App'x at 710; Richards, 29 P.3d at 190.

**(B) Plaintiff's claims for Harassment under Title VII, Hostile Work Environment claim under FEHA, and Failure to Prevent Harassment under FEHA, fail because he has not alleged conduct tied to his membership in a protected class.**

Phillips-Kerley v. City of Fresno, Not Reported in Fed. Supp. (2018)

2018 WL 5255224

*Legal Standard*

A claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted." Rule 12(b)(6). A Rule 12(b)(6) dismissal may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015). All well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Faulkner v. ADT Sec. Servs., 706 F.3d 1017, 1019 (9th Cir. 2013).

To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Mollett, 795 F.3d at 1065. The Ninth Circuit has distilled the following principles to apply to Rule 12(b)(6) motions:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014). If a motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made," unless amendment would be futile or the plaintiff has failed to cure deficiencies despite repeated opportunities. Garmon v. County of L.A., 828 F.3d 837, 842 (9th Cir. 2016).

*Analysis*

Title VII provides that it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ...." 42 U.S.C. § 2000e–2(a)(1). [5] Similarly, FEHA makes it unlawful for an employer to harass an employee because of race. Cal. Gov. Code § 12940(j)(1). FEHA imposes personal liability on any harassing employee. § 12940(j)(3). FEHA also creates a cause of action against an employer for failing to "take all reasonable steps necessary to prevent discrimination and harassment from occurring." § 12940(k). At the root of each of these causes of action is the fact that any harassment a plaintiff is subjected to must have occurred "because of his race." Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003); Kortan v. State of Cal., 5 F. Supp. 2d 843, 850 (C.D. Cal. 1998) ("[H]arassment must come because of the plaintiff's protected characteristic."); Kirton v. Summit Med. Ctr., 982 F. Supp. 1381, 1389–90 (N.D. Cal. 1997) ("The public policy underlying section 12940 is to prohibit harassment and discrimination in employment on the basis of any protected classification.").

 *6 Here, Plaintiff identifies himself as African-American. Doc. No. 13 at ¶ 34. However, after scouring the 1AC, the Court finds no allegation that Defendants acted as they did *because* of Plaintiff's race. See id. In fact, as Plaintiff argues in his opposition to Defendants' motion to dismiss, the core of Plaintiff's complaints appear to stem from alleged retaliatory actions. See Doc. No. 19 at p. 11, ¶¶10-12 ("[T]his matter [stems] from his original whistleblowing act of reporting to Fire Chief Randy Bruegman regarding Battalion Chief Caldwell's refusal to allow Plaintiff a Union representative during an unwarranted disciplinary action."). Plaintiff states that Defendants' subsequent acts "were all a part of a connected pattern of retaliation for Plaintiff's whistleblower act." Id. at ¶¶ 13-14. While this conduct may form the basis for a claim under 42 U.S.C. § 2000e-3 for retaliation, it lacks the necessary allegation that Defendants acted *because of Plaintiff's race* for a claim under § 2000e-2 or § 12940(j). Thus, causes of action three and four must be dismissed. [6] Vasquez, 349 F.3d at 642. Further, since Plaintiff's sixth cause of action is premised on a "failure to prevent harassment" under § 12940(k), it too must be dismissed. [7] See Escriba v. Foster Poultry Farms, 793 F.Supp.2d 1147 (E.D. Cal. 2011) (dismissing § 12940(k) cause of action where the plaintiff failed to allege an underlying FEHA claim).

**(C) Plaintiff may simultaneously allege retaliation under Title VII and state law**

2018 WL 5255224

Defendants argue, without the benefit of any citation to precedent, that since "Plaintiff's claim mirrors his Title VII claim for retaliation ... the claim is unnecessary as the elements are the same." Defendants conclude this is reason enough to dismiss Plaintiff's claim under § 1102.5(B).

The Court finds no support for this argument. Litigants often bring multiple claims based on the same conduct, and Defendants present no reason why the case should be different in the retaliation context. In fact, the Ninth Circuit has specifically allowed retaliation claims under Title VII and § 1102.5(B) to be brought together. See Waisgerber v. City of Los Angeles, 406 F. App'x 150, 152 (9th Cir. 2010) ("It is possible Waisgerber can amend her complaint to allege [claims] under Title VII or FEHA. For the same reason, an amendment could save her claim under California Labor Code § 1102.5, which protects employees from retaliatory termination."); see also Fleming v. Purcell Painting & Coating Sw., Inc., 2014 WL 7409467 at *14 (E.D. Cal. Dec. 30, 2014) (finding "section 1102.5(B) mirrors the Title VII analysis," and allowing plaintiff to plead retaliation claim under both statutes); Devlyn v. Lassen Mun. Util. Dist., 737 F. Supp. 2d 1116 (E.D. Cal. 2010) (finding employee's allegations were sufficient to state retaliation claims under Title VII, FEHA, and § 1102.5(B) ). As the Court advised Plaintiff above, Defendants are reminded that Rule 11 governs motions as well as pleadings—each requires a reasonable and competent inquiry into the legal basis prior to filing. See Cooter, 496 U.S. at 409.

Thus, upon amendment, Plaintiff may allege his retaliation claim under both 42 U.S.C. § 2000e-3 and § 1102.5(B).

## ORDER

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' Motion to Dismiss (Doc. No. 16) is GRANTED IN PART and DENIED IN PART;

2. Defendants' Motion for a More Definite Statement (Doc. No. 16) is GRANTED;

3. Defendants' Motion to Strike (Doc. No. 16) is DENIED as moot;

   **\*7** 4. Plaintiff is granted 14 days from the date of service of this Order to file a Second Amended Complaint; and

5. The remainder of this case is referred to the magistrate judge for further proceedings.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 5255224

## Footnotes

1    Though the Rule 12(e) motion will be granted, the Court will examine the substance of some of Defendants' arguments from their motion to dismiss, to provide the parties with guidance prior to any further amendment of the pleadings.

2    Citations to the "Rules" are to the Federal Rules of Civil Procedure (2018), unless otherwise noted.

3    It is possible Plaintiff intends to reference ¶¶ 127-186, the first three Title VII claims for discrimination, retaliation, and harassment, but the Court cannot say for certain. This ambiguity will leave Defendants unable to adequately respond to the 1AC.

4    These facts derive from the 1AC, and are construed in the light most favorable to Plaintiff, the non-moving party. _Faulkner v. ADT Sec. Servs._, 706 F.3d 1017, 1019 (9th Cir. 2013). Rather than provide a full account of the events alleged, the Court concentrates here on those events relevant to its disposition in Section II.

5    In the 1AC, Plaintiff's third cause of action cites to § 2000e-3 for the basis of his harassment claim, but this is in error. The Court assumes Plaintiff intended § 2000e-2, which provides the statutory basis for such claims.

000075

6

2018 WL 5255224

§ 2000e-3 concerns, in Plaintiff's context, retaliation claims, which he alleges as his second cause of action. While a simple error in statutory citation would be a minor issue, it further illuminates the confused nature of the 1AC, and is another reason why the Court granted Defendants' motion for a more definite statement. See Section I, above.

6    As to Plaintiff's first cause of action for "Discrimination" under § 2000e-2, which Defendants do not challenge, the Court will simply say this: claims under § 2000e-2 must be based on a protected characteristic. Vasquez, 349 F.3d at 642. If Plaintiff intended to allege that Defendants acted against Plaintiff because of his race in any discrimination or harassment claims, and has a factual basis for doing so under Rule 11, he must explicitly say so.

7    § 12940(k) may be premised on claims of discrimination, harassment or retaliation. See Andrade v. Arby's Restaurant Group, Inc., 225 F.Supp.3d 1115 (N.D. Cal. 2016). If Plaintiff intends to base his § 12940(k) claim on a different set of alleged conduct, he should be clear about saying so in his 2AC.

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.    000076

**Segal v. Strausser Enterprises, Inc. (E.D. Penn. June 12, 2019)**

000077

2019 WL 2450416

2019 WL 2450416
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Kenneth SEGAL, Adam Segal, as trustee for
and on behalf of the Karen and Kenneth Segal
Descendants Trust, and Segal and Morel, Inc., Plaintiffs,

v.

STRAUSSER ENTERPRISES, INC., Gary
Strausser, and Leonard Mellon, Defendants.

CIVIL ACTION NO. 07-4647
|
Filed 06/12/2019

**Attorneys and Law Firms**

Brian S. Paszamant, John P. Wixted, Blank Rome LLP,
Philadelphia, PA, James T. Smith, Goldfein & Joseph, Lee
M. Herman, Lee M. Herman, Esq. P.C., Media, PA, Marc
Evan Weitzman, Park America, Inc., Bala Cynwyd, PA, for
Plaintiffs.

Brandon J. Verdream, Bryan J. Smith, Laura E. Plank, Dell
Moser Lane & Loughney LLC, Pittsburgh, PA, Joseph B.
Mayers, John A. Anastasia, The Mayers Firm, LLC, Patrick
C. Campbell, Jr., Offit Kurman, P.A., Plymouth Meeting,
PA, Christopher M. Shipman, Easton, PA, for Defendants
Strausser Enterprises, Inc., Gary Strausser.

James R. Kahn, Elit R. Felix, II, James M. Prahler, Jonathan
D. Herbst, Margolis Edelstein, Philadelphia, PA, Joseph B.
Mayers, The Mayers Firm, LLC, Plymouth Meeting, PA, for
Defendant Leonard Mellon.

Stephanie Carfley, McNees Wallace & Nurick LLC,
Lancaster, PA, for Defendant Lafayette Ambassador Bank.

Paul C. Troy, Kane Pugh Knoell and Driscoll, L.L.P.,
Norristown, PA, for Defendant Gross McGinley Labarre &
Eaton, LLP.

**MEMORANDUM**

SCHMEHL, District Judge

**\*1** This is a contract dispute between multiple parties
involving the transfer and proposed development of several
real estate lots in Forks Township, Pennsylvania. Specifically,

parcels of land were divided into three separate phases
and agreements for construction of single-family homes,
condominiums, and townhomes. Plaintiffs bring these claims
against Defendants for improperly filing a State Court
Complaint and *Lis Pendens* in the Court of Common Pleas of
Northampton County, which frustrated a proposed transaction
between Plaintiffs and a third-party purchaser. Plaintiffs bring
four claims against Defendants: Tortious Interference with
Contract (Count I); Tortious Interference with Prospective
Contractual Relations (Count II); Dragonetti Act (Count III);
and Abuse of Process (Count IV). Defendants SEI and Mr.
Mellon individually move for summary judgment arguing
Plaintiffs' federal claims are precluded under collateral
estoppel given the 2012 Redding Panel arbitration decision,
and the claims fail as a matter of law. For the reasons
explained below, this Court will deny Defendant SEI and
Defendant Mr. Mellon's motions for summary judgment.
We will first address Defendant SEI's collateral estoppel
argument and then turn to the claims as a matter of law.

**I. UNDISPUTED FACTS**
The parties stipulated to the below facts for use in connection
with Defendants' motions for summary judgment. This matter
has a complicated history and involves numerous parties.
Plaintiffs in this action are: 1) Segal and Morel, Inc. ("S&M,
Inc."), builders and developers; 2) Kenneth Segal, President
of S&M, Inc.; and 3) Adam Segal, sole trustee of The
Karen and Kenneth Segal Descendants Trust (the "Trust")
(collectively "S&M"). (ECF Docket No. 395, ¶¶ 1-3.) Also, at
the time of this dispute, Mr. Segal and the Trust were the sole
members of the following limited liability companies: Segal
and Morel at Forks Township II, LLC; Segal and Morel at
Forks Township III, LLC; Segal and Morel at Forks Township
IV, LLC; and Segal and Morel at Forks Township X, LLC f/k/
a Segal and morel at Forks Township VII, LLC ("S&M LLC
VII") (collectively the "S&M LLCs").

Defendants in this action are: 1) Strausser Enterprises, Inc., a
corporation engaged in the business of home building and real
estate/community development; 2) Gary Strausser, President
of SEI (collectively with Strausser Enterprises, "SEI"); and 3)
Leonard Mellon, attorney at law and duly licensed to practice
in the Commonwealth of Pennsylvania. [1] (Id. at ¶¶ 6-10.)
During this time, SEI built homes and developed a community
known as the Riverview Estates ("Riverview") located in
Forks Township, Pennsylvania. (Id. at ¶ 8.) Riverview is a
multi-phase real estate development of single-family homes,

000078

condominiums, and townhomes, which includes a golf course and recreational center. (Id. at ¶ 9.)

S&M, Inc. contracted to purchase from SEI multiple parcels of land located in Forks Township, Northampton County, Pennsylvania, at a collective cost of more than $ 15,000,000. (Id. at ¶ 12.) The parcels of land were divided into three separate phases and agreements for construction of single-family homes, condominiums, and townhomes. (Id. at ¶ 13.) The first agreement, dated July 5, 2001, provided for a total of 105 single family dwellings known as Phase I (consisting of a maximum of 76 subdivided single family residential lots) and Phase III (consisting of 29 subdivided single family residential lots). (Id. at ¶ 14.) The second agreement, dated June 11, 2002, provided for a maximum amount of 110 condominiums, a parcel designation for a community center, and one single family residential lot known as Phase II. (Id.) And the third agreement, dated April 25, 2003, provided for a maximum of 56 townhouse lots known as Phase III. (Id.)

 *2  The July 5, 2001 (Phase I), and April 25, 2003 (Phase III), agreements were amended three times through a series of documents known as: 1) Amendment to Agreements of Sale of July 5, 2001, and April 25, 2003 ("First Amendment"); 2) Second Amendment to Agreements of Sale of July 5, 2001, and April 25, 2003 ("Second Amendment"); and 3) Third Addendum to Agreements of Sale of July 5, 2001, and April 25, 2003 ("Third Addendum"). (Id. at ¶ 15.) Specifically, the Second Amendment included an agreement where SEI would sell additional lots in Riverview – known as Phase IV – to S&M, Inc. (Id. at ¶ 16.) The Third Addendum contained a binding arbitration provision. (Id. at ¶ 17.) And the First Amendment and Third Addendum contained clauses ratifying and confirming the July 5, 2001, Agreement, and April 25, 2003, Agreement. (Id. at ¶ 18.) More specifically, the arbitration provisions in the Third Addendum expanded the scope to encompass not only disputes "concerning the terms of the Purchase Agreements and earlier Amendments, but also all other 'disputes arising under or from [the Third Addendum] or any previous Addendum or the Agreements of Sale between the parties.' " (ECF Docket No. 1, ¶ 27.)

On September 7, 2001, SEI entered into an Agreement of Sale with Michael and Anthony Rinaldi to purchase about 125 acres of land located in Forks Township, Pennsylvania, known as the "Rinaldi Tract" or "Riverview West" (the "Rinaldi Agreement"). (ECF Docket No. No. 395, ¶ 19.) On February 28, 2003, SEI subsequently entered into an Assignment of the Rinaldi Agreement to S&M VII, LLC by

contract which assigned SEI's rights and obligations under the Rinaldi Agreement to S&M VII, LLC. (Id. at ¶¶ 20-21.) Under the Rinaldi Agreement, SEI was to receive 25 acres of the approximate 125 total acres conveyed under the Rinaldi Assignment. (Id. at ¶ 22.) The Agreements mentioned above, along with the First Amendment, Second Amendment, Third Addendum, Rinaldi Agreement, and Rinaldi Assignment – collectively known as the "Purchase Agreements" – closed in multiple phases: December 5, 2001 (Phase I); March 7, 2003 (Riverview West); October 3, 2003 (Phase II); April 20, 2004 (Phase III Townhouses and Singles); and, February 17, 2005 (Phase IV). (Id. at ¶ 24.)

The current dispute between the parties arises out of the "Buy Back Option" language in the June 11, 2002 (Phase I), Agreement, and "Right of First Refusal" language in the April 25, 2003 (Phase III), Agreement. (Id. at ¶ 25.) First, the June 11, 2002, Agreement included a "Buy Back" provision under clause 5.17.4, which stated:

> Buyer acknowledges that Phase II is a four-year build out and agrees to aggressively market the purchased properties to homebuyers. Should Buyer be unable to market the properties successfully, absent any government imposed moratorium, building an average of 20 units per year over a four (4) year period, it hereby agrees to give Seller a right of first refusal to take back the approved and improved lots at the same price contained herein.

> This buy back option creates no obligation on Seller to re-purchase any lots, nor is it a guarantee of their marketability. This option is also not intended to have priority over any mortgage interest in the property and Seller agrees to subordinate this option to any and all financing or Buyer.

(Id.) Second, the April 25, 2003, Agreement included a "Right of First Refusal" provision under clause 5.17.4, which stated:

> Should Buyer decide to sell all or some of the lots Buyer hereby agrees to give Seller a right of first refusal to take back the approved and improved lots.

> This buy back option creates no obligation on Seller to re-purchase any lots, nor is it a guarantee of their marketability. This option is also not intended to have priority over any mortgage interest in the property and Seller agrees to subordinate this option to any and all financing or Buyer.

 000079

Case 1:20-cv-00292-JPW Document 259-1 Filed 09/12/22 Page 82 of 96

Segal v. Strausser Enterprises, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 2450416

(Id. at ¶ 28.) Prior to finalizing the language in the "Right of First Refusal" provision under clause 5.17.4 of the April 25, 2003, Agreement, the parties agreed to strike two phrases: 1) "be unable to market the properties successfully, absent any government imposed moratorium, building an average of 25 units per year"; and 2) "at the same price contained herein." (Id. at ¶ 26-27.)

**\*3** Following execution of the Purchase Agreements, S&M, Inc. assigned "its rights, interests, and obligations under the Purchase Agreements to" certain limited liability companies, such as S&M LLC, whose sole members were Mr. Segal and the Trust. (Id. at ¶¶ 29-30.) Specifically, S&M states: "[S&M, Inc.] shall have the right to designate one or more of its subsidiaries or affiliate entities to acquire title to the Property hereunder." (ECF Docket No. 1, ¶ 15.) S&M, Inc. then assigned "all of its rights, interests and obligations under and pertaining to" the Purchase Agreements and the Amendments, to the S&M LLCs – affiliates of S&M, Inc. (Id. at ¶ 17.) Accordingly, all of S&M, Inc.'s rights were transferred to the S&M LLCs.

On December 21, 2005, Mr. Segal and the Trust entered into an Agreement of Sale with K. Hovnanian Pennsylvania Acquisitions, LLC ("KHOV"). (Id. at ¶ 31.) According to the contract, KHOV was acquiring "all Membership Interests in the LLCs, pursuant to the terms and conditions of [the Hovnanian Agreement]" from Mr. Segal and the Trust. (Id. at ¶ 32.) The Hovnanian Agreement defined "Membership Interest" as:

> [A]ll Assets defined herein, but shall not include any assumption of debts, claims, accounts payable, liabilities or obligations of Seller's of any kind or nature, whether accrued or unaccrued, absolute or contingent; and Seller shall, after Closing, remain responsible for all debts, claims or accounts payable, liabilities or obligations of Seller.

(Id. at ¶ 33.) The Hovnanian Agreement defined "Assets" as:

> [I]nclude[ing] but not limited to all real property, including all model homes, homes under construction, some of which are sold, some of which are speculative, signed agreements of sale for homes, inventories, work in progress, raw materials, office supplies and office equipment, vehicles, furniture, licenses, permits, approvals, goodwill, architectural plans, blue prints, trademarks, rights, title and interest in all of Seller's contracts, deposits, correspondence and sales files and escrow funds held by an entity in favor of the LLC. The Assets are listed on Exhibit C attached hereto. All Assets which are to remain with Seller or which will be transferred at an additional cost to Buyer are delineated on Exhibit C. Seller shall have the right to retain use of the plans for the single family homes. Buyer may not use such plans on another Buyer project; however, Buyer retains the right to use the multi family home plans on other projects, without restriction.

(Id. at ¶ 34.) The parties anticipated closing the Hovnanian Agreement on February 15, 2006, for a total of $ 39,000,000. (Id. at ¶¶ 35-36.)

On February 3, 2006, Mr. Segal offered to sell Mr. Strausser and SEI 56 townhouse units in Phase III – then owned by S&M III, LLC – for $ 74,000 per unit. (Id. at ¶¶ 37-38.) At the time of this offer, Mr. Segal and the Trust signed the Hovnanian Agreement. (Id. at ¶ 39.) Mr. Segal did not inform Mr. Strausser of the proposed KHOV deal when he offered to sell the townhomes to Mr. Strausser. (Id. at ¶ 40.) On February 10, 2006, Mr. Strausser offered to pay Mr. Segal $ 74,000 per unit and begin the title work to settle within 3-4 weeks. (Id. at ¶ 41.) The following day, Mr. Strausser expressed his intent to exercise his "right of first refusal to purchase the townhouse lots of Riverview Estate Phase III as per the Agreement of Sale executed in April 2003 Section 5.17 Sub-paragraph 4." (Id. at ¶ 42.) Although Mr. Stausser

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 83 of 96

Segal v. Strausser Enterprises, Inc., Not Reported in Fed. Supp. (2019)
2019 WL 2450416

expressed his intent to exercise his right of first refusal, the 56 townhouse units were never conveyed. (Id. at ¶ 43.)

Ten days after the offer to Mr. Strausser, and because of the above, SEI filed both a Complaint in Equity ("State Court Complaint") against S&M, Inc. and S&M VII, LLC, and a Praecipe for *Lis Pendens* in the Court of Common Pleas of Northampton County. (Id. at ¶ 44-45.) The Northampton County Prothonotary entered a Notice of Entry of *Lis Pendens* for the following real estate parcels: 1) the Rinaldi Tract; 2) Phase II of Riverview Estates; 3) Phase III of Riverview Estates; and 4) Phase IV of Riverview Estates. (Id. at ¶ 47.)

 **\*4** SEI's State Court Complaint alleged four counts against S&M, Inc. and S&M VII, LLC. (Id. at ¶ 48.) Count I alleged: SEI complied with all conditions precedent in the Rinaldi Assignment to close on its 25 acre parcel; it notified S&M VII, LLC of its desire to close; and S&M VII, LLC had not yet agreed to a time and place for settlement. (Id. at ¶ 49.) Count I sought specific enforcement of the Assignment Agreement, enjoin S&M VII, LLC from selling the 25 acres to a third party, and order S&M, LLC VII to convey the 25 acre parcel to SEI. (Id. at 50.) Count II alleged: SEI intended to exercise its option to purchase back the lots that were subject to the June 11, 2002, Agreement, but that it could not do so because S&M, Inc. intended to sell the lots to a third party. (Id. at ¶ 51.) Count II sought to order S&M, Inc. convey the lots in Phase II to SEI. (Id. at ¶ 52.) Count III alleged: SEI intended to exercise its option to purchase back the lots that were subject to the April 25, 2003, Agreement, but could not do so because S&M, Inc. was in the process of selling the lots to a third party. (Id. at ¶ 53.) Count III sought to enjoin S&M, Inc. from selling the lots to a third party and instead order S&M, Inc. to convey the lots to SEI. (Id. at ¶ 54.) Count IV alleged: the Agreements of July 5, 2001, and April 25, 2003, provided SEI with a right of first refusal to buy back certain lots in the event S&M, Inc. decided to sell the lots to a third party; SEI intended to exercise its option to purchase those lots, but S&M, Inc. refused to honor the option because it was in the process of selling the lots to a third party in violation of the Agreements. (Id. at ¶¶ 55-56.)

S&M, Inc. and S&M VII, LLC moved to strike the *Lis Pendens* and dismiss SEI's State Court Complaint. (Id. at ¶ 57.) On February 28, 2006, in an Opinion discussed more fully below, Judge Paula A. Roscioli of the Court of Common Pleas of Northampton County granted S&M, Inc. and S&M VII, LLC petition to strike the *Lis Pendens* and dismiss SEI's State Court Complaint; Judge Roscioli directed the

prothonotary to remove any indexed *Lis Pendens.* (Id. at ¶ 58; ECF Docket No. 396-3, Ex. X., at 133-142.) But the day before Judge Roscioli entered her Order and Opinion, KHOV terminated the Hovnanian Agreement alleging Segal and the Trust were in violation of the representations and warranties and the "time of the essence" clause in the Hovnanian Agreement. (Id. at 59; ECF Docket No. 1, at ¶¶ 36-37.) Following Judge Roscioli's Opinion striking the *Lis Pendens* and dismissing the State Court Complaint, SEI appealed the decision to the Pennsylvania Superior Court. (Id. at ¶ 60.) Judge Roscioli issued a Pa.R.A.P. 1925(a) Statement, and on October 20, 2006, the Superior Court affirmed Judge Roscioli's February 28, 2006, Opinion striking the *Lis Pendens* and dismissing the State Court Complaint. (Id. at ¶¶ 61-62.)

During the pendency of the appeal to the Superior Court, the parties continued to arbitration seeking determinations of various rights and obligations under the Purchase Agreements. (Id. at ¶ 63.) The first arbitration – the Walters Panel – consisted of a three-member panel chaired by Thomas Walters, Esquire. The Walters Panel produced five awards between July 14, 2006, and December 19, 2008. Specifically, the July 14, 2006, award stated:

> The transfer of membership interest, in whole or in part, by the L.L.C. assignees of Segal and Morel, Inc., as set forth in the afore referred to agreements will not trigger, and are not subject to, the right of first refusal as set forth in the agreement of April 25, 2003, as amended.

(Id. at ¶ 66.)

On November 5, 2007, Mr. Segal, the Trust, and S&M, Inc., initiated this federal action against SEI, Mr. Strausser, and Mr. Mellon, alleging Tortious Interference with Contract, Tortious Interference with Prospective Contractual Relations, Malicious Prosecution under 42 Pa. C.S.A. § 8351, and Abuse of Process. (Id. at ¶¶ 67-70.) SEI filed a counterclaim against S&M alleging SEI exercised its option to reacquire the Phase II lots under Paragraph 5.17.4 of the June 11, 2002, Agreement. (Id. at ¶ 73.) SEI also counterclaimed that SEI accepted S&M's offer to sell certain lots in Phase III, and after that acceptance, S&M, Inc. refused to convey the plots

2019 WL 2450416

of land to SEI given they were improperly included in the sale to KHOV. (Id. at ¶ 74.) By accepting the offer, SEI alleged it was at least the equitable owner of the lots in Phase III, meaning S&M, Inc. breached the April 25, 2003, Agreement by failing to honor SEI's exercise of the option. (Id. at ¶ 75.) S&M moved to dismiss the Counterclaim arguing the parties already submitted to binding arbitration. (Id. at ¶ 77.) SEI moved to stay its Counterclaim pending resolution of the claims at arbitration. (Id. at ¶ 78.) This Court stayed SEI's Counterclaim and the claims proceeded to arbitration. (Id. at ¶¶ 79-80.)

**\*5** On May 6, 2010, SEI filed a Petition to Compel the Appointment of an Arbitrator to Serve as if Appointed by the Respondents in the Court of Common Pleas of Northampton County, identifying two claims against S&M, Inc., S&M II, LLC, and S&M III, LLC. (Id. at ¶ 81.) On October 17, 2011, SEI filed a complaint in arbitration against S&M, Inc. and Mr. Segal, which covered other entities not a party to this action, like S&M II, LLC, S&M III, LLC, and S&M IV, LLC. (Id. at ¶ 82.)

The second arbitration – the Redding Panel – chaired by Edward L. Redding, Esquire, issued its Order on October 23, 2012, finding in favor of SEI on all claims except for attorneys' fees. (Id. at ¶¶ 83-85.) Although the arbitration panel found in favor of SEI, the panel produced multiple documents – the Majority Order, Majority Opinion, and Dissenting Opinion – which required more litigation. (Id. at ¶ 84.) The parties litigated whether any of the Opinions constituted an "award" susceptible to confirmation by the Northampton County Court of Common Pleas. (Id. at ¶ 86.) On August 23, 2013, this Court stayed the present action so the parties could litigate the "meaning and effect" of the Redding Panel's 2012 Majority Order, Majority Opinion, and Dissenting Opinion. (Id. at ¶ 87.) On July 6, 2016, the Pennsylvania Superior Court affirmed the final judgment entered on the Redding Panel's arbitration award by the Court of Common Pleas; all appeals concluded when the Pennsylvania Supreme Court denied the Petition for Allowance of Appeal filed by S&M, Inc., S&M II, LLC, S&M III, LLC, S&M IV, LLC, and Mr. Segal. (Id. at ¶ 89.) On April 6, 2017, this Court lifted the stay and reassigned the matter to the undersigned.

## II. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute

as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

## III. ANALYSIS

1. Issue Preclusion is not Applicable to any of S&M's Claims.

Issue preclusion prevents parties from litigating the same issues after a court of competent jurisdiction already adjudicated the issue on the merits, and entered a final judgment as to those parties and their privies. *Witkowski v. Welch*, 173 F.3d 192, 198 (3d Cir. 1999) (citing *Schroeder v. Acceleration Life Ins. Co.*, 972 F.2d 41, 45 (3d Cir. 1992)). This prevents and precludes re-litigation of issues already litigated and necessary to the outcome of the first action. *Disney Enterprises, Inc. v. Entertainment Theatre Group*, 2014 WL 5483487, at \*3-4 (E.D. Pa. 2014). Issue preclusion requires three elements:

> **\*6** (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.

*Id.* at \*4 (citing *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 247–48 (3d Cir. 2010)) (quoting *Szehinskyj v. Atty. Gen. of U.S.*, 432 F.3d 253, 255 (3d Cir. 2005)); *see also PrecisionIR, Inc. v. Slawter,* 686 F.Supp.2d 540, 543 (E.D. Pa. 2010) (citing *Dici v. Pennsylvania*, 91 F.3d 542, 548 (3d Cir. 1996)); *Bortz v. Workmen's Compensation Appeal Bd.*, 683 A.2d 259, 261 (Pa. 1996); *Safeguard Mut. Ins. Co. v. Williams*, 345 A.2d 664, 668 (Pa. 1975); *Shaffer v. Smith*, 673 A.2d 872, 874 (Pa. 1996); *Kelley v. TYK Refractories Co.*, 860 F.2d 1188, 1194 (3d Cir. 1988); *Bradley v. Pittsburgh Bd. Of Ed.*, 913 F.2d 1064, 1073 (3d Cir. 1990); *Gregory v. Chehi*, 843 F.2d 111, 121 (3d Cir. 1988); *Rider v. Commonwealth of Pennsylvania*, 850 F.2d 982, 989-90 (3d Cir. 1988), *cert. denied*, 488 U.S. 993, (1988). Our Court of Appeals expanded on these elements by "consider[ing] whether the party being precluded had a full and fair opportunity to litigate the issue in question in the prior action and whether the issue was determined by a final and valid judgment." *Disney*, 2014 WL 5483487 at \*4 (citing *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006)).

Issue preclusion also applies to the arbitration process where a judgment is obtained. *Witkowski v. Welch*, 173 F.3d at 199. "Under Pennsylvania law, arbitration proceedings and their findings are considered final judgments for the purposes of [issue preclusion]." *Dyer v. Travelers*, 572 A.2d 762, 764 (Pa. Super. Ct. 1990) ("An arbitration award from which no appeal is taken has the effect of a final judgment on the merits."); *Ottaviano v. Southeastern Pennsylvania Trans. Auth.*, 361 A.2d 810, 814 (Pa. Super. Ct. 1976); Restatement (Second) of Judgments § 84 (1982) ("[A] valid and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court."); *Id.* § 13 ("[F]or purposes of issue preclusion ... 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."). SEI argue the 2012 Redding Panel's decision is a final judgment of the court and should be given preclusive effect in this case.

For the reasons below, this Court concludes the issues between the Redding Panel's 2012 decision and this current action lack identity and were not previously litigated. Therefore, issue preclusion will not apply to any of S&M's claims.

*a. The issues decided by the Redding Panel lack identity with the issues Plaintiffs present in this action.*

The Redding Panel's 2012 Opinion does not satisfy the requirements of issue preclusion because the issues here, while tangentially related, are not identical. Under the Restatement (Second) of Judgments, courts consider four factors in determining whether issues are identical:

> (1) substantial overlap between the evidence or argument to be advanced in the two proceedings; (2) application of the same rule of law; (3) overlap in discovery and pretrial preparation; and (4) how closely related the claims are.

**\*7** *PrecisionIR*, 686 F.Supp.2d at 543 (citing Restatement (Second) of Judgments § 27 cmt. c (1982)). When two issues involve different facts, issue preclusion will only apply if the factual differences "are of no legal significance whatever in resolving the issue presented." *Id.* (citing *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 172 (1984)).

In *PrecisionIR v. Slawter*, the Slawter defendants argued PrecisionIR's withdrawal of its Virginia Uniform Trade Secrets Act ("VUTSA") claim in a related case pending in the Southern District of New York – *PrecisionIR v. Clepper* – precluded PrecisionIR's similar VUTSA claim against defendants in *Slawter. Slawter,* 686 F.Supp.2d at 541. In *Clepper*, PrecisionIR asserted claims under Virginia law against defendants Brent Clepper and TalkPoint Communications that were similar in *Slawter*. *Id.* at 542. Count IV of the original complaint in *Clepper* alleged defendant Clepper and TalkPoint violated the VUTSA. *Id.* Specifically, PrecisionIR alleged defendant Clepper learned trade secrets while employed at PrecisionIR and later utilized those secrets as an employee at TalkPoint – a competitor to PrecisionIR. *Id.* Similarly, in *Slawter*, PrecisionIR alleged former employee Michael Slawter misappropriated its trade secrets. *Id.* But in *Clepper*, PrecisionIR Amended its complaint withdrawing its VUTSA claim against defendant Clepper and TalkPoint. *Id.* As a result, defendants in *Slawter* moved to preclude plaintiff PrecisionIR from asserting the VUTSA claim given PrecisionIR's withdrawal of the VUTSA claim in *Clepper. Id.*

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

This Court in *Slawter* declined to give preclusive effect as the issues in *Clepper* were not identical to the issues in *Slawter*. *Id.* at 543. The evidence advanced to prove the VUTSA claim in each case, as this Court explained, would not significantly overlap as defendant Slawter and defendant Clapper had different roles at PrecisionIR. *Id.* The distinct nature of Slawter's and Clepper's work would have required PrecisionIR to present different evidence to prove VUTSA allegations in each case. *Id.* And that means, the court continued, the alleged methods of misappropriation were different in the two cases and declined to give preclusive effect to the issues. *Id.* at 543-44.

In *Disney Enterprises, Inc. v. Entertainment Theatre Group*, the parties argued whether SLMI was precluded from asserting ownership of Spider-Man given earlier decisions in other jurisdictions which concluded "SLMI cannot prove its ownership of the copyrights because it is barred from re-litigating that issue due to issue preclusion." *Disney*, 2014 WL 5483487 at *4. This Court agreed with other jurisdictions and gave preclusive effect to Judge Crotty and Judge Martinez's decision precluding SLMI's ownership assertion to Spider-Man. *Id.* The specific issue in *Disney* was whether "Judge Crotty's decision precludes SLMI's claim in this case, and that issue may be addressed by reference to the other decisions that have already relied on Judge Crotty's opinion, particularly Judge Martinez's decision." *Id.* In short, the issue was whether the preclusive effect of Judge Crotty's decision on SLMI's assertion of ownership was also preclusive in the *Disney* case. *Id.* This Court found all factors of issue preclusion present: 1) the issues were identical because the issue of ownership of the copyrighted comic book characters based on the 1998 Agreement was decided against Disney in several prior cases; 2) the issue was actually litigated as the briefing on Disney's motion to dismiss addressed issues relating to SLMI's inability to prove ownership of the copyrights because it was barred from re-litigating the issue due to issue preclusion; 3) the issue was necessary to the decision as Judge Martinez addressed only personal jurisdiction and issue preclusion and dismissed based upon issue preclusion; and 4) SLMI was fully represented in the action decided by Judge Martinez because SLMI itself was the plaintiff in that case. *Id.* at 4-5.

 **\*8**  Here, SEI argues issue preclusion applies to S&M's claims because the Redding Panel already decided the issues raised in S&M's Complaint. First, SEI argues issue preclusion applies to the Dragonetti Act claim following the Redding Panel's final award granting SEI a legitimate buyback option and right of first refusal. (ECF Docket No. 394-2, at 12.) SEI claims S&M cannot now prove SEI lacked probable cause to file the State Court Complaint and *Lis Pendens* – one element under the Dragonetti Act – given the Redding Panel's final award. Second, SEI argues issue preclusion applies to S&M's abuse of process claim because SEI possessed a legitimate basis and probable cause to file the State Court Complaint and *Lis Pendens* given the Redding Panel's final award. (Id. at 16.) And finally, SEI argues issue preclusion applies to S&M's claims of tortious interference because SEI acted to protect some legitimate interest – its buyback option/right of first refusal – following the Redding Panel's final award. (Id. at 22-23.) Essentially, SEI argues S&M is precluded from bringing any claims because the Redding Panel's award effectively permitted SEI to file the State Court Complaint and *Lis Pendens* six years after S&M's Complaint was filed in this Court.

Before the Redding Panel's 2012 award, as we previously explained, SEI filed a State Court Complaint and *Lis Pendens* in 2006 to enforce its rights in the Northampton County Court of Common Pleas. But, the state court refused to address the merits of SEI's complaint and *Lis Pendens* and the court dismissed the action due to the parties' enforceable binding arbitration agreement. (ECF Docket No. 396-3, at 133-134.) Specifically, the court noted that neither party requested the court direct the parties to submit the dispute to arbitration, as no party disputed they were subject to binding arbitration, and therefore found it unnecessary to direct the parties. (Id.)

The court highlighted SEI's request to stay the complaint and continue the equitable protection of the *Lis Pendens* pending the resolution of the dispute through arbitration. (Id. at 134.) More specifically, the state court dismissed SEI's complaint and struck the *Lis Pendens* stating: "By its own admission, [SEI's] complaint is inappropriate. This admission undermines the notion that [SEI] has pursued its complaint in good faith, and in the Court's opinion, tips any balance of the equities against it." (ECF Docket No. 1-20, at 9.) Regarding the *Lis Pendens*, the court continued: "Plaintiff has used the *lis pendens* mechanism as a procedural weapon, and this is inappropriate"; the court refused to extend the *Lis Pendens* to the subject properties. (Id. at 10.) The court determined, "Plaintiff filed its Complaint in order to secure a *lis pendens* attached to the properties at issue in its dispute ... the practical effect of a recorded *lis pendens* is to render a defendant's property unmarketable." (Id.) Following the state court's determination that SEI's complaint and *Lis Pendens* were inappropriate and pursued in bad faith, the Superior

2019 WL 2450416

Court affirmed the state court's decision. (ECF Docket No. 396-3, at 141.) Six years after the state court's decision and Superior Court appeal, the Redding Panel recognized SEI's legitimate buyback rights/options in relation to Phase II and Phase III of the Purchase Agreements. (ECF Docket No. 396-4, 19-71.)

The issues litigated by the Redding Panel focused on whether KHOV agreement constituted a sale of assets or membership interest and whether SEI's rights were triggered by the sale. (ECF Docket No. 396-4, at 26.) Specifically, the Redding Panel's opinion calculated damages for a breach of Phase II and Phase III buybacks, and whether the KHOV agreement was a sale of assets or membership interest. (Id.) First, the Redding Panel concluded the Phase II buyback was an option and not a right of first refusal which did not require a third-party offer to trigger buyback rights. The Redding Panel analyzed the language in the Phase II and Phase III Purchase Agreements and determined Phase II consisted of a buyback option because:

> The description of the buyback right as an "option," the failure to include any mechanism for notification of either the offer or the exercise of the right of first refusal, and the fact that SEI had the right to require the lots for a strike price as opposed to a match, all point to the conclusion: that the Phase II Buyback was intended as an option and not a right of first refusal.

 **\*9**  (Id. at 11.) Second, the Redding Panel concluded the agreement between KHOV and S&M was a sale of assets which triggered SEI's buyback rights under Phase III. (ECF Docket No. 394-2, at 3-4.) The panel analyzed the language in the KHOV Agreement and concluded it was a sale of lots given how "Membership Interests" is defined to include only the assets. (Id. at 20.) The panel also concluded the agreement was a sale of assets because the title in the agreement contained "sale of all ... assets of the" LLC's, and because of the way KHOV was taking title at closing. (Id. at 20-21.)

Although the Redding Panel determined SEI had legitimate buyback rights, S&M does not dispute the legitimacy of the Redding Panel's decision; instead, S&M argues SEI weaponized the legal proceedings by improperly filing the State Court Complaint and *Lis Pendens* and purposefully interferred with the KHOV transaction. (ECF Docket No. 400, at 2.) S&M's Complaint alleges the parties agreed "that they (as well as their assigns) would litigate all disputes arising between them by virtue of the Purchase Agreements, as amended, by binding arbitration." (ECF Docket No. 1, ¶ 28.) S&M also contends:

> SEI was aware of the impending transaction and desperately wanted to stop it, hoping that doing so would garner leverage from which to secure monetary concessions from the Segal Sellers. SEI and Strausser, along with Mellon, their long-time counsel, hatched a baseless, spiteful and malicious plan to derail the transaction by filing a frivolous lawsuit mentioned below. Despite knowing that the Purchase Agreements, as amended, mandated that all disputes between SEI and S&M, Inc. (or their assigns) arising under such Agreements be adjudicated by binding arbitration, SEI instituted suit on February 13, 2006 in the Court of Common Pleas for Northampton County against S&M, Inc. and one of the S&M LLCs, Segal and Morel at Forks Township VII, LLC.

(Id. at ¶¶ 42-43.) Although S&M's Complaint alleges SEI lacked a buyback options or right of first refusal, the gravamen of S&M's claims arises out of SEI's improper use of the legal proceedings to interfere with the KHOV deal. The Complaint focuses on SEI's Phase II and Phase III rights primarily as they relate to the State Court Complaint and *Lis Pendens.* (ECF Docket No. 1; ECF Docket No. 396-3; ECF Docket No. 400, at 2.)

The factual differences between the Redding Panel arbitration and the instant case, like those in *PrecisionIR*, are of legal significance in resolving the issues presented. The issues before this Court lack an application of the same rule of law, lack overlap in discovery and pretrial preparation, and are not closely related. The issues SEI is trying to preclude – whether SEI had probable cause and a legitimate interest to

000085

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 88 of 96

Segal v. Strausser Enterprises, Inc., Not Reported in Fed. Supp. (2019)
2019 WL 2450416

file the *Lis Pendens* and State Court Complaint – were not litigated by the Redding Panel. In fact, the Redding Panel never made a factual determination that SEI had probable cause or a legitimate interest to file its 2006 Northampton County action; the Redding Panel merely determined SEI had legitimate buyback rights in Phase II and Phase III. (ECF Docket No. 396-4.) The Redding Panel never addressed the legitimacy of SEI's State Court Complaint and *Lis Pendens*. (ECF Docket No. 396-4.) S&M filed its Complaint in response to SEI's improper State Court filing and *Lis Pendens* and not in response to the Redding Panel's award granting SEI legitimate buyback and first refusal rights; rights that no court of competent jurisdiction recognized until six years after S&M's Complaint in this Court.

**\*10**  Even if this Court were to accept SEI's argument that the 2012 Redding Panel's decision retroactively created probable cause and a legitimate interest, the issues would still lack identity as the Dragonetti Act, Abuse of Process, and Tortious Interference claims require more than a showing of probable cause and legitimate interest. And although a showing of probable cause may be considered a complete defense to a Dragonetti Act claim – usually a question of law for the court – the existence of probable cause "may be submitted to the jury when facts material to the issue of probable cause are in controversy." *Gigli v. Palisades Collection, L.L.C.*, 2008 WL 3853295, at \*13 (M.D. Pa. 2008) (citing *Broadwater v. Sentner*, 725 A.2d 779, 782 (Pa. Super. Ct. 1999); *see also McKibben v. Schmotzer*, 700 A.2d 484, 492-93 (Pa. Super. Ct. 1997) (quoting *Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Local Union 249*, 544 A.2d 940, 941 (Pa. 1988))). Likewise, this case certainly lacks an overlap in discovery from the 2012 Redding Panel as different evidence would need to be presented and different witnesses would need to be deposed and examined. Given all these factors and issues, this Court will not give preclusive effect to S&M's claims as the claims should be submitted to the jury.

### b. The parties did not waive their right to arbitration.

SEI claims the parties waived their binding arbitration agreement when SEI filed his State Court Complaint and *Lis Pendens*. Citing *Goral v. Fox Ridge, Inc.*, SEI claims "the existence of an arbitration clause clearly does not preclude the filing of a lawsuit. Indeed, arbitration clauses are waivable," and therefore filing a claim on a contract with an arbitration clause is not a Dragonetti claim. (ECF Docket No. 402, at 7) (citing *Goral v. Fox Ridge, Inc.*, 683 A.2d 931, 933 (Pa.

Super. Ct. 1996)). Under Pennsylvania law, a waiver of the right to proceed in arbitration may be explicitly stated or may be inferred from "a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary." *Keystone Technology Group, Inc. v. Kerr Group, Inc.*, 824 A.2d 1223, 1226 (Pa. Super. Ct. 2003) (citing *Goral*, 683 A.2d at 933). But, as the court in *Keystone* stated: "the mere filing of a complaint or an answer without resulting prejudice to the objecting party will not justify a finding of waiver of the right to arbitration." *Id.* (citing *Kwalick v. Bosacco*, 329 Pa.Super. 235, 238, 478 A.2d 50, 52 (1984)).

*Goral* is distinguishable because the appellants in *Goral* sought relief from the trial court and failed to obtain a favorable ruling; only then did the appellants seek arbitration as an alternative forum. *Goral*, 683 A.2d 934. *Keystone* also differs because plaintiff sought to arbitrate a few weeks after filing the complaint. *Keystone*, 824 A.2d at 1226. In *Keystone*, the court concluded the plaintiff did not waive the right to arbitrate given the lack of discovery conducted and the defendant's failure to argue they suffered prejudice or that plaintiff gained an unfair advantage. *Id.* at 1227.

Here, SEI and S&M agreed beforehand – and the state court agreed – the dispute was subject to binding arbitration; however, SEI bypassed the binding arbitration in favor of the courts while knowing of the binding arbitration agreement. The state court refused to address the merits of the dispute given the agreement between all parties to resolve any disputes via binding arbitration. SEI's did not waive its right to arbitrate by filing the State Court Complaint and *Lis Pendens* and was subject to the arbitration agreement with S&M. Again, SEI appears to be using the courts as a procedural weapon against S&M and its federal claims.

Accordingly, this Court does not find the parties waived their right to binding arbitration following SEI's State Court filing and *Lis Pendens*.

### 2. Genuine Issues of Material Fact Exist for Claims Against SEI.

### a. Dragonetti Act claim (Count III) [2]

**\*11**  The gist of S&M's Dragonetti Act claim is that SEI and Mr. Mellon were grossly negligent and lacked probable cause when they filed and maintained the state court action

and *Lis Pendens* given the existence of the binding arbitration agreement. (ECF Docket No. 1, ¶¶121-125.) According to S&M, the parties entered into an agreement to participate in binding arbitration for any and all disputes over the property development. (Id. at ¶123.)

Under the Dragonetti Act, liability may be imposed for wrongful use of civil proceedings if:

> (1) [they] act[ ] in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

> (2) The proceedings have terminated in favor of the person against whom they are brought.

42 Pa.C.S. § 8351(a). A claim for Dragonetti Act requires: (1) the Dragonetti defendant procured, initiated or continued the civil proceedings against the other party; (2) the proceedings were terminated in favor of the person against whom they are brought; (3) the Dragonetti defendant did not have probable cause; (4) the primary purpose for which the proceedings were brought was not that of securing proper discovery, joiner of parties or adjudication of the claim on which the proceedings were based; and (5) the Dragonetti plaintiff suffered damages as set forth in 42 Pa.C.S. § 8353. *Adams v. Wells Fargo Bank, N.A.*, 2017 WL 1355421, at *2 (E.D. Pa. 2017); *see also Villani v. Seibert*, 159 A.3d 478, 491 (Pa. 2017). This Court also recognizes the Dragonetti plaintiff must show the Dragonetti defendant filed the underlying action with both a lack of probable cause and for an improper purpose. *Id.*; *see also Broadwater v. Sentner*, 725 A.2d 779, 784 (Pa. Super. Ct. 1999).

This Court will first address S&M's claim for Dragonetti Act violations individually against Mr. Mellon, then address the claim for Dragonetti Act violations against SEI.

### i. *Leonard Mellon, Esq.*

Mr. Mellon claims he cannot be held liable under the Dragonetti Act because the legal position, although not upheld by the lower court, was based on probable cause and supported by appropriate case law. (ECF Docket No. 397, at 9.) Under the Dragonetti Act, an individual has probable cause in pursuing the underlying action if they "believe[ ] in

the existence of the facts upon which the claim is based" and also:

> (1) reasonably believes that under those facts the claim may be valid under the existing or developing law; ... or

> (3) believes as an attorney of record, in good faith that his procurement, initiation or continuation of a civil cause is not intended to merely harass or maliciously injure the opposite party.

42 Pa.C.S. § 8352.[3] Under the Dragonetti Act, Courts should assess attorneys objectively. *Bannar v. Miller*, 701 A.2d 232, 238 (Pa. Super. Ct. 1997). Attorneys who initiate civil proceedings on behalf of their client without probable cause, this Court explained, will not be liable "if [they] act[ ] primarily for the purpose of aiding [their] client in obtaining a proper adjudication of [their] claim." *Schmidt v. Currie*, 470 F.Supp.2d 477, 480 (E.D. Pa. 2005) (citing *Gentzler v. Atlee*, 660 A.2d 1378, 1382 n.6 (1995)). But, where an underlying action is filed or maintained without justification, the court may infer an improper purpose. *Id.* (citing *Broadwater v. Sentner*, 725 A.2d 779, 784 (Pa. Super. Ct. 1999)). Pennsylvania courts explain:

> **\*12** [a]n attorney is not required or expected to prejudge [their] client's claim, and although [they are] fully aware that its chances of success are comparatively slight, it is [their] responsibility to present it to the court for adjudication if [their] client so insists after [they have] explained to the client the nature of the chances.

*Id.* at 481 (citing *Broadwater*, 725 A.2d at 784). But where an attorney knowingly prosecutes a groundless action for a malicious purpose, the attorney would be liable under the Dragonetti Act.

In *Schmidt*, the issue was whether the plaintiff's patient's attorney violated the Dragonetti Act by pursuing a state-court medical malpractice action against the plaintiff when the plaintiff prevailed. *Id.* at 482. This Court compared a Dragonetti action against an attorney to a legal malpractice action which requires analysis of an attorney's standard of care under the Dragonetti Act. *Id.* This Court in *Schmidt* found

that the standard of care in a professional malpractice case is a question of fact for the jury which requires the use of expert evidence to rebut summary judgment. Id. at 482-483; *see also Gans v. Mundy*, 762 F.2d 338 (3d Cir. 1985) (applying the requirement of expert evidence to a motion for summary judgment). Citing Our Court of Appeals in *Gans*, this Court in *Schmidt* shifted the burden from the moving party to the non-moving party once the moving party averred facts and alleged they were not negligent. This Court explained, "a plaintiff who fails to produce expert evidence cannot meet [their] burden of proof." *Id.* at 483 (citing *Gans*, 762 F.2d at 343). The plaintiff in *Schmidt* did not produce an expert to establish evidence the defendants failed to meet the standard of care required for attorneys under the Dragonetti Act. *Id.* Given how the standard of care is a question of fact for the jury, "no jury could possibly assess whether the chances of success of the underlying action rose to the level of 'comparatively slight' without expert testimony." *Id.* at 484.

Mr. Mellon argues no improper purpose exists for "simply thwarting the sale to KHOV" by indexing the *Lis Pendens* as the *Lis Pendens* is an equitable device that "does not establish an actual lien on the affected property but merely give[s] notice to third parties that the real estate is subject to litigation." (ECF Docket No. 397, at 11) (citing *Michael v. GLD Foremost Holdings*, LLC, 156 A.3d 318, 322 (Pa. Super Ct. 2017)). Mr. Mellon and Mr. Strausser testified at deposition the "purpose of indexing the *lis pendens* in the original injunction suit in Northampton County was, indeed, in perfect accord with its proper legal purpose of giving due notice of a dispute in litigation over property rights." (Id. at 11 n.2.) Mr. Mellon argues the urgent need to take immediate action to protect his clients' interest established both his probable cause and lack of gross negligence. (Id.) But, Mr. Mellon also argues whether he prevailed on SEI's behalf in the suit for injunctive relief before the lower court is "immaterial" for this Court's determination of whether he possessed probable cause or acted for an improper purpose. (Id. at 12.)

Unlike *Schmidt*, where the non-moving party failed to create a dispute of material fact regarding the standard of care to withstand summary judgment, S&M has created a genuine dispute regarding the standard of care required for attorneys under the Dragonetti Act. S&M submitted the testimony of an expert – Honorable Timothy K. Lewis [4] – who carefully and thoroughly explained the standard of care, and concluded that Mr. Mellon did not meet this standard of care. "Indeed, his own sworn testimony makes abundantly

clear that he was fully aware of the contract requirement to proceed in arbitration." (ECF Docket No. 399-12, Ex. 12, at 36.) Judge Lewis opines, "no representative of Strausser Enterprises thoroughly reviewed, investigated, or understood the allegations in the complaint before they filed it and the *lis pendens*." (Id. at 2.)

**\*13** Like *Schmidt*, where this Court shifted the burden on the non-moving party (plaintiff) to oppose the factual averments with expert evidence that the moving (defendant) party's conduct failed to meet the appropriate standard of care, the burden shifts on Mr. Mellon to provide evidence his conduct met the appropriate standard of care. As Mr. Mellon did not respond by providing expert testimony, Mr. Mellon cannot prevail against S&M at this stage in the litigation because S&M has succeeded in creating a dispute of material fact.

This Court will deny Mr. Mellon's summary judgment. We continue our analysis of the SEI Defendants below.

### ii. *SEI Defendants* [5]

SEI argues it had probable cause to file the state court action and index the *Lis Pendens* to secure its rights over the property. (ECF Docket No. 394-2, at 13-14.) As this Court noted above, an individual has probable cause in pursuing the underlying action if they "believe[ ] in the existence of the facts upon which the claim is based" and also:

(1) reasonably believes that under those facts the claim may be valid under the existing or developing law; [or]

(2) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information;

42 Pa.C.S. § 8352. [6]

SEI maintains it possessed the right to file a state court action and *Lis Pendens* in 2006 given the Redding Panel's 2012 decision. (ECF Docket No. 394-2, at 13-14.) SEI alleges S&M failed to meet the second element of the Dragonetti Act because the underlying proceeding – the binding arbitration – was terminated in SEI's favor. (Id. at 14.) SEI argues that although the 2006 Northampton County Action was "arguably adjudicated" in S&M's favor, SEI succeeded before the Redding Panel and therefore the proceedings were terminated in SEI's favor. (Id.) Likewise,

2019 WL 2450416

SEI claims it merely relied on the advice and consent of its counsel and therefore cannot be held liable for Dragonetti Act violations. (Id. at 25-26.)

S&M disputes SEI's claims and argues SEI filed its state court action and *Lis Pendens* for an improper purpose, creating a violation of the Dragonetti Act given the lack of probable cause. Specifically, S&M states: "the Strausser Defendants knowingly and deliberately breached their duty to arbitrate because they believed a court filing would be more likely to affect the KHOV transaction." Salvatore J. Panto, Jr., SEI's Chief Administrative Officer, testified Mr. Mellon expressed to him the need to stop the closing, specifically stating Mr. Mellon conveyed the following: "the arbitration allowed would take too long, it wouldn't put the buyer on notice because the arbitration hearing couldn't be set up for at least a week or more. And then that he researched the best way to put the buyer on notice is through a *lis pendens*." (ECF Docket No. 399-6, Ex. 6, Panto Dep. At 145:13-17.)

The import of the parties' strategy, opined Judge Lewis, "was the obvious ramifications filing the complaint and *lis pendens* would have on any potential transaction by Mr. Segal, the Trust, and Segal and Morel." (ECF Docket No. 399-12, Ex. 12, at 2.) Judge Lewis continued:

> Mr. Strausser, Strausser Enterprises, and its counsel knew that their actions would encumber property and, in all likelihood, cause the pending transaction with K. Hovnanian to fall through. After their trial-level filings were dismissed, Mr. Strausser approved filing an appeal after learning Mr. Mellon's advice that an appeal would 'keep a cloud on the title' longer, even though Mr. Mellon had also made it clear that they would likely lose the appeal. Mr. Panto explained that the appeal 'would bring the buyer to Strausser, not just to Segal, just like it did with K. Hovnanian.' Thus, the clear purpose of pursuing the appeal was to further Strausser Enterprises' goals of payment for open items and luring potential buyers to it.

**\*14**  (Id. at 38-39.) Given SEI's use of the court system to secure monetary payment "that was not tethered to the title to land (as they had alleged)," Judge Lewis concluded SEI and Mr. Mellon acted for an improper purpose in filing the state court action and indexing the *Lis Pendens*. The state court also determined SEI used the *Lis Pendens* as a procedural weapon, and found it inappropriate and not filed in good faith. (ECF Docket No. 400, Ex. X. Apr. 26, 2006 Opinion at 6.)

As there are genuine issues of material fact as to whether probable cause existed and whether the State Court Complaint and *Lis Pendens* were filed for an improper purpose, S&M's Dragonetti Act claim against SEI will remain.

### b. Abuse of Process claim (Count IV)

SEI contends S&M's abuse of process claim fails as a matter of law because it filed the State Court Complaint and *Lis Pendens* primarily to protect its property interests. (ECF Docket No. 394-2, at 17.) Under Pennsylvania law, abuse of process requires three elements: (1) the party used a legal process against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed; and (3) caused harm to the plaintiff. *ManorCare of Easton PA LLC v. Estate of Nagy*, 2017 WL 4347624, at \*8 (E.D. Pa. 2017). We again are unpersuaded and find genuine issues of material fact remain.

Mr. Strausser and SEI's counsel, Mr. Mellon, testified: "that the purpose of the filing of the *Lis Pendens* and Complaint was consistent with the legally recognized purpose of a *Lis Pendens*, i.e. to put third party buyers on notice that there was a dispute as to property rights." (Id.) Mr. Mellon testified he filed the State Court Complaint and *Lis Pendens* primarily to "put any third party purchaser on notice of what Mr. Strausser's rights were, and that they would be taking the property subject to those rights." (ECF Docket No. 396, ¶ 33; ECF Docket No. 396-2, Ex. I, 134:21-135:22; ECF Docket No. 394-2, at 18.) Mr. Mellon also testified Mr. Strausser never expressed any "ill motive" in trying to enforce his legal rights. (Id.) Mr. Strausser testified he only filed the state court action and *Lis Pendens* to secure and protect his property rights in the agreements which he claimed were not being honored. (ECF Docket No. 396, Ex. T, 746:22-747:15.) SEI maintains it did not file the state court action and *Lis Pendens* to accomplish a purpose for which the process was not designed.

S&M disagrees with SEI's argument that SEI solely intended to enforce its legal rights. SEI admits to filing the State Court Complaint and *Lis Pendens* to disturb the KHOV transaction. Specifically, e-mail communication from Mr. Strausser to Mr. Panto states: "[S]omething has to be filed PRIOR to the Havanian [sic] sale so we get paid for ALL open items." (ECF Docket No. 399, Ex. 5), E-mail from G. Strausser to S. Panto (Feb. 9, 2006, 6:18 p.m. EST.) Mr. Strausser testified he told KHOV that S&M owed him money and "[he] wanted to get

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 92 of 96
Segal v. Strausser Enterprises, Inc., Not Reported in Fed. Supp. (2019)
2019 WL 2450416

paid." (ECF Docket No. 399, Ex. 3, 505:11-22.) According to S&M, Mr. Panto sent an e-mail to Mr. Strausser which stated:

> Len Mellon asked if you want to appeal the lis pendence [sic] ruling. The only advantage Len said is that it would keep a cloud on the title because the arbitration will be done by the time it gets to the superior court but he doesn't think we would win."

(ECF Docket No. 400, at 30) (citing 399-11, Ex. 11, Mar. 21-22, 2006, E-mail Exchange between S. Panto and G. Strausser.) The only advantage of filing the appeal on the state court action and *Lis Pendens* would be to place a "cloud on the title," not to succeed on the merits. It appears SEI and Mr. Mellon filed and appealed the state court action to "accomplish a purpose for which the process was not designed," which is required under abuse of process.

**\*15** S&M's argument is further bolstered by Judge Paula A. Roscioli's 2006 Opinion: "Plaintiff has used the *lis pendens* mechanism as a procedural weapon, and this is inappropriate." (ECF Docket No. 396-3, Ex. X., at 141.) Judge Roscioli continued: "By its own admission, [SEI's] Complaint is inappropriate. This admission undermines the notion that Plaintiff has pursued its Complaint in good faith, and in the Court's opinion, tips any balance of the equities against it." (Id.)

As S&M has created a genuine issue of material fact, S&M's claim for abuse of process will remain.

### c. Tortious Interference with Contract and Prospective Contractual Relations (Counts I and II)

SEI argues it should not be held liable under tortious interference with contract and prospective contractual relations given the absence of any purposeful action to harm existing relations. (ECF Docket No. 394-2, at 20-21.) To prove tortious interference with contract or prospective contractual relations under Pennsylvania law, four elements must be met: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to

prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *Lehigh Riverport Realty, L.P. v. Unity Bank*, 2016 WL 3213357, at \*2 (E.D. Pa. 2016).

The second and third elements are intertwined and require a showing the defendant acted intentionally to harm the plaintiff and that those actions were improper. *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 934 (Pa. Super. Ct. 2013). In determining improper conduct, the courts look to the factors of the Restatement (Second) of Torts Section 767:

> (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

*Id.* (citing Restatement (Second) of Torts § 767). Showing both harm and improper conduct is required because some intentionally harmful conduct is done "at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff." *Id.* (citing *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008)). Comment b to section 767 also states:

> The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each

Case 1:20-cv-00292-JPW    Document 259-1    Filed 09/12/22    Page 93 of 96

other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors.

*Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008) (citing Restatement (Second) of Torts § 767 cmt. b (1979)). In evaluating the above factors, the central inquiry is whether the defendant's conduct is "sanctioned by the 'rules of the game' which society has adopted." *Empire Trucking Co., Inc.*, 71 A.3d at 934; *see also Triffin v. Janssen*, 626 A.2d 571, 575 (Pa. Super. Ct. 1993) (holding refusal to consent to withdrawal of opposing party's attorney was not improper because conduct was consistent with the rules of court); *Small v. Juniata College*, 682 A.2d 350, 354 (Pa. Super Ct. 1996) (finding players on football team did not act improperly by voicing negative opinions of coach to college administration, which, upon investigation, discharged him, since in the academic world students are encouraged to voice their opinions).

 **\*16**  SEI argues it was merely protecting its legitimate interests when it filed the State Court Complaint and *Lis Pendens*. Specifically, according to SEI, the 2012 Redding Panel further legitimized those rights precluding SEI from liability for tortious interference with contract and prospective contractual relations. (ECF Docket No. 394-2, at 22-24.) SEI continuously cites the 2012 Redding Panel decision as the basis for S&M's claims now failing as a matter of law. (Id. at 23.) But, S&M argues and the lower court agreed, the parties submitted to binding arbitration for any dispute arising out of the original land deal between the two parties. (ECF Docket No. 400, at 23-24.) It certainly appears SEI initiated the state court action and *Lis Pendens* to prevent the KHOV from being finalized. (Id. at 24, n.13.) As S&M provides, Mr. Strausser sent an e-mail to Mr. Panto six days before the KHOV closing, stating: "If we do a[n] arbitration, it will not get filed against the property for their title insurance to pick up to the new buyers." (ECF Docket No. 400, at 24) (citing ECF Docket No. 399-5, Ex. 5, e-mail from G. Strausser to S. Panto (Feb. 9, 2006, 6:18 p.m. EST.)

Whether SEI's conduct was improper is a factual inquiry and credibility determination best reserved for a jury. As this Court cannot make a determination given the issues of material fact regarding S&M's tortious interference claims, this Court declines to dismiss this claim. At this stage in the proceedings, this Court cannot allow SEI to circumvent its contractual obligations and use the court system as a procedural weapon to enforce its rights. As we have discussed, SEI and S&M contemplated this exact situation and agreed to subject themselves to binding arbitration.

As there is a genuine issue of material fact regarding SEI's conduct, S&M's tortious interference claims will remain.

### 3. SEI is not Entitled to Summary Judgment Against S&M for Relying on the Advice of its Counsel.

SEI argues it is entitled to summary judgment on the Dragonetti Act and Abuse of Process claims because it reasonably relied on the advice of its counsel, Mr. Mellon. SEI advances this defense to establish probable cause and negate malice. *Ciolli v. Iravani*, 625 F. Supp. 2d 276 (E.D. Pa. 2009). SEI's reliance, however, is misguided. In *Bannar v. Miller*, the Superior Court of Pennsylvania stated: "Mere claims of reliance on one's lawyer does not insulate one from liability for an unfounded lawsuit." *Bannar v. Miller*, 701 A.2d 232, 238 (Pa. Super. Ct. 1997). Nothing in the record, the court continued, supported the suggestion that the defendant's reliance on the attorney would insulate him from determining whether he had probable cause to bring the suit. *Id.* "The decade of litigation shows appellant was no neophyte, swept away by an overzealous counsel." *Id.* We agree with the analysis in *Bannar* and find nothing in the record that would suggest the SEI Defendants were swept away by Mr. Mellon's years of "overzealous representation." SEI's involvement in its litigation strategy actually reveals the opposite. Because of this, this Court will not grant summary judgment.

### 4. SEI is not Entitled to Summary Judgment on the Issue of Standing.

Standing is an issue of federal law. *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537 (3d Cir. 1994). A party advocating a legal right does not have standing to seek relief based upon the rights of third parties. *Rakas v. Illinois*, 439 U.S. 128, 139 (1978). And so, under Article III standing, the "case and controversy" requirement compels the proponent of a legal right demonstrate: "(1) an 'injury in fact' or 'invasion of a legally protected interest' which is 'concrete and particularized'; (2) a 'causal connection between the injury and conduct'; and (3) a likelihood 'the injury will be redressed by a favorable decision.' " *Decus, Inc. v. Heenan*, 2017 WL 1396044, at \*3 (E.D. Pa. 2017) (quoting *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017)).

SEI maintains S&M does not have standing to bring its claims for two reasons: 1) S&M was not a party

to the Hovnanian Agreement; and 2) only S&M, Inc. and Segal VII were named Defendants in the state court action. (ECF Docket No. 394-2, at 29-33.) S&M argues SEI is precluded from arguing "irreconcilably inconsistent" positions regarding standing. Specifically, during the Redding Panel arbitration, SEI argued S&M, Inc., Mr. Segal, and the various S&M LLCs were "legally indistinguishable under the Purchase Agreements." (ECF Docket No. 400, at 31.) The Pennsylvania Superior Court agreed, concluding:

> **\*17** [S&M, Inc.] is the parent corporation of a number of single purpose limited liability companies created for the development of The Riverview Estates in Forks Township, including Segal and Morel at Forks Township VII, LLC, which was named in the prior dispute, and Segal and Morel at Forks Township II, LLC, Segal and Morel at Forks Township III, LLC, Segal and Morel at Forks Township IV, LLC, which are named in the present dispute ... Futhermore, Kenneth Segal is an owner and the president of all the aforementioned corporations. Therefore, we find the parties involved in this dispute are in privity with those involved in the prior dispute.

*Id.* at 31-32 (quoting *Strausser Enters. v. Segal & Morel, Inc.*, 154 A.3d 842 (Pa. Super. Ct. 2016)).

S&M's Complaint alleges: all rights, interests, and obligations previously held by S&M, Inc. were transferred to the S&M LLCs – Segal and Morel at Forks Township II, III, IV, and IV. But now, SEI contends, because SEI itself did not include all parties in the original state court action, none of the parties have standing in this case. We refuse to accept such a strict argument. SEI's State Court Complaint and *Lis Pendens* directly influenced the KHOV deal and caused injury to all "Segal Sellers," not just the parties named in SEI's state court action. As SEI and Mr. Mellon already admitted, they sought to block the Hovnanian Agreement by filing the State Court Complaint and *Lis Pendens*. Besides, Mr. Segal and the Trust have standing to sue because they were the actual parties to the Hovnanian Agreement. As S&M maintains, "the

Pennsylvania Supreme Court has recognized that '[t]here can, of course, be no doubt that a stockholder can maintain an action, where the act of which complaint is made is not only a wrong against the corporation, but is also in violation of duties arising from contract, or otherwise, and owing to him directly.' " (ECF Docket No. 400, at 33) (citing *White v. First Nat'l Bank*, 97 A. 403, 406 (Pa. 1916)).

While claims under the Dragonetti Act cannot be maintained by an individual not a party to the underlying suit, an exception applies to indispensable parties that should have been joined in the underlying action. *Long v. Holtry*, 673 F. Supp. 2d 341, 354 (M.D. Pa. 2009). An indispensable party is defined as one "whose rights are so connected with the claims of the litigants that no decree can be made without impairing its rights." *Hart v. O'Malley*, 647 A.2d 542, 549 (Pa. Super. Ct. 1994); *see also Sprague v. Casey*, 550 A.2d 184 (Pa. 1988). And Pennsylvania courts have consistently held "property owners are indispensable parties in lawsuits concerning the owners' property rights." *Id.*; *see also Columbia Gas Transmission Corp. v. Diamond Fuel Co.*, 346 A.2d 788 (Pa. 1975). Given SEI intended to block the Hovnanian deal by filing the state court action – a deal which included Mr. Segal and the Trust's property rights – Mr. Segal and the Trust should have been joined in the state court proceeding as indispensable parties.

Because S&M alleges an Article III injury-in-fact which is concrete and particularized, and because Mr. Segal and the Trust were indispensable parties to the underlying state court action, S&M does not lack standing for any claim. [7]

### 5. SEI is not Entitled to Summary Judgment on Punitive Damages.

**\*18** Punitive damages are awarded as punishment when the defendant's behavior is "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Ruehl v. S.N.M. Enterprises, Inc.*, 2015 WL 2374256, at \*3 (M.D. Pa. 2015) (quoting *Feld v. Merriam*, 485 A.2d 742, 746–47 (Pa. 1984)). The defendant's conduct must be so outrageous as to amount to "willful, wanton or reckless" behavior. *Id.*; *see also Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005). Importantly, assessing defendant's state of mind is noteworthy as the conduct must be intentional, reckless, or malicious. *Id.* (citing *Feld*, 485 A.2d at 748).

In assessing state of mind and "reckless indifference," Pennsylvania courts look to Section 500 of the Restatement

Case 1:20-cv-00292-JPW   Document 259-1   Filed 09/12/22   Page 95 of 96

Segal v. Strausser Enterprises, Inc., Not Reported in Fed. Supp. (2019)
2019 WL 2450416

(Second) of Torts. *Id.* (citing *Hutchison*, 870 A.2d at 771). Section 500 of the Restatement (Second) Restatement of Torts applies two different states of mind regarding "reckless indifference": 1) "where the 'actor knows, or has reason to know, ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk' "; and 2) "where the 'actor has such knowledge, or reason to know, of facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.' " *Id.* (quoting *Martin v. Johns–Manville Corp.*, 494 A.2d 1088, 1098 (Pa. 1985) (quoting Restatement (Second) of Torts § 500, cmt. a)). But, under Pennsylvania law, the first "state of mind" prong in Section 500 is sufficient to create a question for the jury on punitive damages. A claim for punitive damages requires a plaintiff establish: "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act ... in conscious disregard of that risk." *Hutchison*, 870 A.2d at 772 (citing *Martin*, 494 A.2d at 1097–98).

S&M alleges SEI Defendants acted with reckless indifference when they interfered with S&M's rights under the KHOV agreement. So, S&M sufficiently created a dispute of material fact regarding SEI subjective appreciation of the risk of harm and SEI's conscious disregard of that risk. Specifically, S&M offers:

> (a) the Strausser Defendants did not know anything about the substance of the Hovnanian Agreement and made no effort to contact Plaintiffs or KHOV to understand the nature of the transaction, but commenced and pursued legal proceedings in an effort to block that transaction anyway; (b) Mr. Strausser admitted that he never carefully reviewed the pertinent contracts before signing the Complaint's Verification, or otherwise made an effort to confirm the allegations advanced within that Complaint; (c) despite knowing that they had a contractual duty to arbitrate, the Strausser Defendants willfully commenced their action in court in order to make their filing publicly known and thereby interfere with the Hovnanian Agreement; (d) the State Court determined that the lis pendens was filed as

an inappropriate 'procedural weapon' and that SEI did not pursue its Complaint in good faith; (e) Mr. Edelman testified that Mr. Strausser told him that he wanted to 'get some skin out of Segal and Morel,' which he understood to mean that Mr. Strausser wanted to 'make someone hurt, make someone make sure that they feel the pain than just the mere loss of an asset or some money or something'; and (f) even though their counsel admitted to them that he did not think they would win on appeal—and that the 'only advantage' to pursuing such an appeal was that it would keep a cloud on the title to the Riverview properties—the Strausser Defendants decided to pursue the appeal for this improper purpose anyway.

**\*19** (ECF Docket No. 400, at 34.) According to SEI, S&M fails to show intentional or reckless conduct given the Redding Panel's award concluding SEI possessed legitimate rights relative to the underlying agreements. This, SEI maintains, satisfies the doctrine of issue preclusion and precludes S&M from litigating these issues which negates any allegation of intentional or reckless conduct.

Given the overwhelming evidence of SEI's state of mind before, during, and after SEI filed the State Court Complaint and *Lis Pendens*, this Court finds that the evidence presented is sufficient to show SEI appreciated the risk of harm and acted in conscious disregard of that risk – two elements required under punitive damages. As this is sufficient to create a question for the jury, the issue of punitive damages will remain.

## IV. CONCLUSION

In the accompanying order, this Court denies Defendants' motions for summary judgment. Genuine issues of material fact exist regarding SEI and Mr. Mellon's liability under the Dragonetti Act, Abuse of Process, and Tortious Interference claims.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2450416

**Footnotes**

1    This Court will refer to Defendants collectively as SEI until we reach our analysis of Dragonetti Act claim for Mr. Mellon.

2    This Court will address the claims in the order presented in Defendants' brief.

3    The second factor, omitted here, applies only to non-attorneys.

4    The Honorable Timothy K. Lewis currently serves as Co-Chair of the ADR Practice Group and the former Co-Chair of the Appellate Practice Group at Schnader Harrison Segal & Lewis, where he also serves as a mediator, arbitrator, settlement counselor, and appellate practitioner. Before moving to private practice, Judge Lewis served on the United States Court of Appeals for the Third Circuit and as a United States District Court Judge. (ECF Docket No. 399-12, Ex. B., at 49.)

5    SEI in this subsection, and only this subsection, refers to Strausser Enterprises and Mr. Strausser, not Mr. Mellon.

6    The second factor, included here, was omitted from our analysis of Mr. Mellon as it only applies to non-attorneys. The third factor, omitted here, applies only to attorneys.

7    This Court does not accept SEI's argument that Mr. Segal and the Trust lacked standing to assert causes of action for Tortious Interference because they did not own the land subject to the purchase agreement with KHOV. (ECF Docket No. 394-2, at 33.) The Redding Panel determined the Hovnanian agreement triggered SEI's right of first refusal. The Redding Panel could not have come to that conclusion unless Mr. Segal and the Trust owned the land and possessed the authority to enter into the Hovnanian agreement in the first place.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.