# EXHIBIT 4

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

Lycoming _____ County

**For Prothonotary Use Only:**

Docket No:
CV22 - 00305

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

Lead Plaintiff's Name:
POM OF PA, LLC t/d/b/a PACE-O-MATIC

Lead Defendant's Name:
PETER J. SHELLY and SHELLY COMMUNICATIONS,

Are money damages requested? ☒ Yes  ☐ No

Dollar Amount Requested:
(check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

Is this a *Class Action Suit*? ☐ Yes ☒ No

Is this an *MDJ Appeal*? ☐ Yes ☒ No

Name of Plaintiff/Appellant's Attorney: Austin White

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☒ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
_____
_____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
_____
_____
- ☐ Other: _____
_____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____
_____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
_____
_____
- ☐ Zoning Board
- ☐ Other: _____
_____
_____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____
_____

*Updated 1/1/2011*

## IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| POM OF PENNSYLVANIA, LLC<br>t/d/b/a PACE-O-MATIC, | : | **CV22-00305** |
| | : | |
| Plaintiff, | : | DOCKET NO. _____ |
| v. | : | |
| | : | CIVIL ACTION |
| PETER J. SHELLY, and SHELLY | : | |
| COMMUNICATIONS, INC., d/b/a | : | |
| SHELLY LYONS PUBLIC | : | |
| AFFAIRS & COMMUNICATIONS, INC., | : | |
| | : | |
| Defendants. | : | |

### CASE MONITORITNG NOTICE

I. This matter is:

_____ **Mortgage Foreclosure** (file once an **Answer** has been filed).
Time needed for trial ____ (1 day) ____ (1/2 day).

_____ **Credit Card Collection Case** (file once an **Answer** has been filed)
a) ____ Arbitration. ($50,000 or less) Time needed for discovery? ____ months
b) ____ Trial. Time needed for discovery? ____ months

_____ **Forfeiture** (file once an **Answer** has been filed)

_____ **Administrative Agency Appeal** (file with **Notice of Appeal**)

__X__ **General Civil Case** (file with **Complaint**):
a) ____ Arbitration. ($50,000 or less) Time needed for discovery? ____ months
b) ____ Fast track (4 month discovery period)
c) __X__ Normal track (9 month discovery period)
d) ____ Complex track (12 month discovery period)
e) ____ Medical Malpractice (14 month discovery period)
_____ **Other.** Action requested: _____

II. Jury trial demanded? __X__ YES _____ NO

III. Please note any special scheduling concerns: _____

_____

Name of filing counsel or pro se party: _Austin White_ for Plaintiff

Address: McCormick Law Firm, 835 West Fourth Street, Williamsport, PA 17701

Telephone number: (570)-326-5131

Email address: awhite@mcclaw.com

Opposing counsel or pro se party: _____ for _____

Address: _____

Telephone number: _____

Email address: _____

## IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

POM OF PENNSYLVANIA, LLC
t/d/b/a PACE-O-MATIC,

        Plaintiff,

        v.

PETER J. SHELLY, and SHELLY
COMMUNICATIONS, INC., d/b/a
SHELLY LYONS PUBLIC
AFFAIRS & COMMUNICATIONS, INC.,

        Defendants.

DOCKET NO. CV22 - 00305

CIVIL ACTION

### NOTICE TO DEFEND

You have been sued in Court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and notice are served by entering a written appearance personally or by an attorney and filing in writing with the Court your defenses or objections to the claims set forth.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed by the Plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

Pennsylvania Bar Association
100 South Street, P. O. Box 186
Harrisburg, PA 17108-0186
Telephone (800) 692-7375

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

North Penn Legal Services
25 West Third Street, Suite 400
Penn Tower Building
Williamsport, PA  17701
Telephone 570-323-8741

### AMERICANS WITH DISABILITIES ACT OF 1990

The Court of Common Pleas of Lycoming County is required by law to comply with the Americans With Disabilities Act of 1990.  For information about accessible facilities and reasonable accommodations available to disabled individuals having business before the Court, please contact the office of the Lycoming County Court, Administrator, Lycoming County Courthouse, 48 West Third Street, Williamsport, PA 17701, Telephone No. (570) 327-2330.  All arrangements must be made at least 72 hours prior to any hearing or business before the Court.  You must attend the scheduled conference or hearing.

McCORMICK LAW FIRM

By: _____

Austin White
I.D. No. 312789
Counsel for Plaintiff


835 West Fourth Street
Williamsport, PA 17701
(570) 326-5131
(570) 326-5529 (fax)
awhite@mcclaw.com

**McCormick Law Firm**
835 West Fourth Street
Williamsport, Pennsylvania 17701
(570)-326-5131

*Counsel for Plaintiff POM of Pennsylvania, LLC*

## IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| POM OF PENNSYLVANIA, LLC t/d/b/a PACE-O-MATIC, | : | NO.  CV22 - 00305 |
| Plaintiff, | : | |
| v. | : | |
| PETER J. SHELLY, and SHELLY COMMUNICATIONS, INC., d/b/a SHELLY LYONS PUBLIC AFFAIRS & COMMUNICATIONS, INC., | : | |
| Defendants. | : | |

### COMPLAINT

Plaintiff POM of Pennsylvania, LLC, t/d/b/a Pace-O-Matic ("POM"), by and through its

attorneys, bring this action against Peter J. Shelly and Shelly Communications, Inc., d/b/a Shelly

Lyons Public Affairs and Communications, Inc., and in support thereof, alleges as follows:

### NATURE OF THE ACTION

1.      This is a civil action for tortious interference with current and prospective

contractual relations, arising from Defendants' propagation of false and malicious misinformation

regarding Plaintiff and its business.

**PARTIES AND VENUE**

2.      Plaintiff POM of Pennsylvania, LLC ("POM") is a limited liability company

formed under the laws of Wyoming, trading and doing business primarily in Pennsylvania under

Pennsylvania Skill, which is a registered mark under the Pennsylvania Trademark Act, *see* 54

Pa.C.S. §§ 1301, *et seq.*

3.      Shelly Communications, Inc., d/b/a Shelly Lyons Public Affairs &

Communications, Inc., ("Shelly Lyons") is a Pennsylvania corporation, registered under the laws

of this Commonwealth, with its principal place of business in Harrisburg, Pennsylvania.

4.      Defendant Peter J. Shelly is a natural person residing in Cumberland County,

Pennsylvania and is the President of Shelly Lyons.  At all times relevant hereto, Mr. Shelly acted

either individually or by and on behalf of Shelly Lyons.

5.      Venue exists in this Court pursuant to Pennsylvania Rules of Civil Procedure 1006

and 2179 because a transaction or occurrence out of which the cause of action arose took place in

this County and at least some of Defendants' conduct occurred in this County.

**FACTS**

*POM of Pennsylvania, LLC*

6.      POM is a manufacturer and developer of software for innovative skill-based video

game machines, called Pennsylvania Skill™ Amusement Devices (the "Skill Game"), which are

distributed throughout the Commonwealth of Pennsylvania.

7.      Although certain segments of the law enforcement community initially questioned

the legality of the Skill Game under the Crimes Code's prohibition against gambling, *see* 18

Pa.C.S. § 5513, in a 2014 decision, the Beaver County Court of Common Pleas held they were

legal, settling any serious doubts in this respect.  *See In re: Pace-O-Matic Equipment, Terminal

I.D. No. 142613*, M.D. No. 965-2013 (Beaver Co. C.C.P. 2014) (holding the Skill Game is a game

2

of skill and, thus, legal under Pennsylvania law) (a true and correct copy of this Opinion and Order is attached hereto, and made a part hereof, as Exhibit A).

8.    Thereafter, the District Attorney for Centre County issued a formal letter stating that, in light of the Beaver County opinion, her office would not confiscate the same machine. *See* December 3, 2015 Letter from the Office of District Attorney for Centre County (a true and correct copy of this letter is attached hereto, and made a part hereof, as Exhibit B).

9.    The District Attorney for Lawrence County issued a similar letter in 2016, stating that, for the reasons set forth in the Beaver County Opinion, "the Pace-O-Matic machine is not considered a game of chance under Pennsylvania gaming laws." *See* October 12, 2016 Letter from the District Attorney for Lawrence County (a true and correct copy of this letter is attached hereto, and made a part hereof, as Exhibit C).

10.   Recognizing that the legality of the Skill Games was now beyond peradventure, various other District Attorneys followed suit, ceasing any adverse actions relative to these devices.

11.   Furthermore, between 2014 and 2018, POM and its partner-locations submitted to the Pennsylvania Liquor Control Board (the "LCB") at least five requests for a legal opinion between 2014 and 2018 regarding the operation of Skill Games in licensed establishments and, in response to each of these submissions, LCB expressly declined to comment on their legality, pointing, instead, to the three-part test that was applied by the Beaver County Court of Common Pleas in finding the Skill Game legal. (True and correct copies of each of the correspondence from the LCB are attached hereto as Exhibits D-H.)

12.   To date, POM's Skill Game remains the only game of its kind whose legality has been recognized in the Commonwealth of Pennsylvania, with several other types of purported skill-based games having been judicially declared illegal gambling devices.

3

13.     As a result, since 2014, POM has expended significant time, money, and resources in marketing, advertising, and otherwise promoting the Skill Game in the Commonwealth of Pennsylvania.

14.     As a result of those efforts and its substantial investments, POM – acting through its route operators responsible for distributing the Skill Game – has entered into countless contracts with locations for the placement of its Skill Games within their locations.

**Commonwealth Court Proceedings and Defendant's Subsequent Misinformation Campaign**

15.     Notwithstanding the foregoing legal authority and prosecutorial announcements, in or around 2017, a small contingent within the Commonwealth's administrative apparatus emerged, which continued to dispute the Skill Game's legality and engaged in repeated warrantless seizures of Skill Games throughout Pennsylvania.

16.     As a result of such seizures, in 2018, POM commenced a pair of actions in the Commonwealth Court of Pennsylvania against, *inter alia*, the Pennsylvania State Police, Bureau of Liquor Enforcement ("BLCE"), seeking a declaration that the Skill Game does not violate Section 5513 of the Crimes Code because it is a game of skill, rather than a game of chance, and further requesting that BLCE be enjoined from initiating any adverse action against the Skill Games. *See POM OF Pennsylvania, LLC v. Bureau of Liquor Control Enforcement, Pennsylvania State Police*, 503 M.D. 2018 (Pa. Cmwlth. Ct.).

17.     In August 2018, BLCE filed responsive pleadings, which included a Counterclaim alleging that POM's conduct is governed by the Gaming Act, *see* 4 Pa.C.S. §§ 1101, *et seq.* because the Skill Games are "slot machines," and POM is both a "manufacturer" and a "supplier" of "slot machines."

18.     In January 2019, after the pleadings were closed, PSP filed an Application for Summary Relief relative to its Counterclaim, seeking a declaration that would place "all gaming activity in the Commonwealth of Pennsylvania[,]" which, according to the BLCE, included POM

4

and its Skill Games, within the purview of the Gaming Act. *See* BLCE App. for Summary Rel.,

WHEREFORE Clause.

19.     On November 20, 2019, after hearing argument on the matter, an *en banc* panel of

the Commonwealth Court entered an Order denying the Application, holding that the Skill Game

is not subject to the Gaming Act and its attendant regulatory scheme. *POM of Pennsylvania, LLC*

*v. Pennsylvania State Police*, 503 M.D. 2018, 2019 WL 6173719, at *3 (Pa. Cmwlth. Nov. 20,

2019) (*POM I*) ("[B]ecause the plain language of the Gaming Act indicates that the General

Assembly did not intend for the Act to regulate unlicensed slot machines and/or supplant the

Crimes Code's regulation of the same, the POM Game is not subject to the Gaming Act.").

20.     In a published opinion in support of its Order, the Commonwealth Court repeatedly

admonished that its "denial of the PSP's application does not decide the separate question of

whether the POM Game is an illegal gambling device under the Crimes Code, which both parties

appear to acknowledge requires discovery in order to resolve." *Id.* at 3; *see also POM of*

*Pennsylvania, LLC v. Dep't of Revenue*, 221 A.3d 717, 737 n. 19 (Pa. Cmwlth. Nov. 20, 2019)

(*POM II*); *see also id.* at 735 n. 17 ("Of course, we do not answer the separate question of whether

the POM Game qualifies as an illegal gambling device under section 5513 of the Crimes Code,

which both parties appear to acknowledge presents a question of fact that requires factual

discovery to resolve.")

21.     Around the same time that the Commonwealth Court held that the Skill Games are

entirely outside the purview of the Gaming Act, Defendants were retained by various casinos and

special-interest groups ostensibly to assist with public relations efforts.

***Defendants' Ongoing Public Relations Campaign to Cause Injury to Skill Game***

22.     Beginning on November 20, 2019, Defendants, acting on behalf of Parx casino, as

well as other casinos opposed to the legalization of Skill Games, have engaged in an ongoing

multi-pronged misinformation campaign aimed at POM and its Skill Games.

23.     Specifically, Defendants have systematically and continually orchestrated efforts to publicly undermine POM's reputation by authoring, editing, forwarding, and transmitting various public statements regarding the alleged illegality of POM's Skill Game.

24.     In these statements, Defendants repeatedly and without any cause or basis, represented that the Commonwealth Court had held that POM's Skill Games were illegal slot machines.

25.     Having been informed by various individuals, including counsel for Parx casino, of the Commonwealth Court's *actual* holding, and blatantly disregarding such, Defendants knew that their statements were false and misleading.

26.     In addition to falsely stating that the Skill Games are illegal, Defendants have also repeatedly and continuously published other statements with the express purpose of undermining the reputation of the Skill Game.

27.     More specifically, Defendants sought to associate the following with POM's Skill Games: underage gambling, crime, lost tax revenue, and lost jobs.

28.     In an effort to promote his claim that the Skill Games "[e]ncourage underage gambling[,]" Shelly publicly distributed pictures allegedly depicting children near skill games.

29.     Among other things, Defendants have propagated the false narrative that the Skill Game and those associated with it encourage, promote, and/or facilitate underage gambling. For example, on one occasion, Shelly forwarded—or as he said "sen[t] up to the hill"—a news article and an attachment that contained excerpts from Facebook conversations that allegedly appeared on the "PA Skills Facebook" page where people were allegedly "defending bringing kids along when they play."

30.     Moreover, on another occasion, Shelly helped author and create a power point presentation for Pennsylvania state senators that encouraged the senators to "STOP THESE MACHINES!" and to be a "Leader" in "combating" skill games by passing Senate Bill 212.

6

31.     The above referenced presentation also baselessly, and erroneously, cast POM's Skill Games as "[i]llegal gambling" that "hurts our children, seniors, and communities."

32.     Defendants have also engaged in an ongoing campaign to cast the Skill Game as causing increased criminal behavior—including robbery, assault, property damage, and embezzlement—without any evidence or basis for drawing a link between the devices and criminal conduct.

33.     By way of example, on one occasion Defendants attempted to associate Skill Games with crime by distributing a mass e-mail correspondence citing news coverage of criminal acts that allegedly involved Skill Games and declaring that "Skill Games Attract Crime[.]"

34.     Often, after causing their statements to be published by various quasi-news sources, Shelly would repackage these publications and transmit them to Pennsylvania law enforcement and lawmakers with his commentary.

35.     Shelly also publicly rebuked skill games for "[t]hreatening the jobs of 18,000 Pennsylvanians" as well as "[s]iphoning off millions of dollars in State gaming tax revenue" and "[u]ndercut[ting] the Pennsylvania Lottery and programs for seniors" because skill games allegedly draw customers away from casinos.

36.     Most recently, in an article published by the Williamsport Sun-Gazette, Shelly continued to assert that POM's Skill Games are illegal.[1]

37.     Moreover, Shelly continued to erroneously claim that POM's Skill Games direct money away from the Lottery, and baselessly assert that the Skill Games do not create any jobs or revenue for the Commonwealth.

38.     As evidenced by this most recent interview, Shelly's disinformation campaign is ongoing, and continues to harm POM's Skill Games' operation in Pennsylvania.

---

[1] *available at*, https://www.sungazette.com/news/top-news/2022/03/fair-fun-that-helps-the-little-guys-or-illegal-gambling-machines/.

7

39.     Shelly publicly made each of these claims despite the fact that none of them are based in fact or reality.

40.     In this light, Shelly has engaged in a systematic effort to control the public narrative with disinformation designed specifically to undermine the POM's Skill Games' operation in Pennsylvania by harming its reputation.

***Defendants Create Pennsylvania Against Gaming Expansion and Influence Law Enforcement Officials to Seize POM's Skill Games***

41.     Sometime after the Commonwealth Court's decision in November 2019, Defendants also assisted in creating an organization called Pennsylvanians Against Illegal Gambling, which now operates as Pennsylvanians Against Gaming Expansion ("PAGE").

42.     Among other things, Defendants maintain a website for PAGE at https://www.paagainstgamingexpansion.com/,[2] which republishes many of the false claims described above.

43.     Specifically, the top of the page features the following text, with a rolling montage of POM's Skill Games in the background:

> Some lawmakers want to add up to 85,000 illegal slot machines (some called "skill games", others called "VGTs") to every PA community; in places where our kids gather. It's a reckless proposal that would hurt kids, seniors, and communities.

44.     The bottom of the page lists "Peter Shelly (Spokesperson)" as the sole contact.

45.     In addition to creating the website, Defendants have also established a toll-free hotline number for PAGE, which urges concerned citizens to report locations throughout the Commonwealth that operate "illegal slot machines."

46.     On multiple occasions, Shelly "passed along" the information he received via the PAGE hotline to state and local police, or district attorneys.

---

[2] Notably, the domain name www.pagainstillegalgambling.com also redirects to the PAGE website.

47.     Upon information and belief, Shelly hoped that these law enforcement officials would use the information to search the identified locations and seize skill games—specifically POM's Skill Game.

48.     For example, when a coffee shop named West Side Coffee and News opened in Kingston, Shelly was notified by a Mohegan Sun representative about the coffee shop "which appear[ed] to show 2-3 tables and (4) Pace-O-Matic games" and that had "PA Skill Signage prominently displayed on the store front."

49.     On March 25, 2021, Shelly, apparently strategizing with Parx and its agents and representatives about the most effective way to notify local authorities about the foregoing, suggested that rather than informing "PSP or local police" they should "send a letter to [the] Luzerne County DA[.]"

50.     On April 1, 2021, in response to a raid in Delaware County where the District Attorney seized certain amusement devices from a location, Shelly expressed hope that "maybe we can get move more [sic] DAs to act" in light of the Delaware County District Attorney's statement that he will continue to investigate and prosecute skill game operators pending clarifying legislation.

51.     Upon information and belief, as supported by the various facts made available thus far, Defendants' efforts were aimed primarily at POM's Skill Games.

52.     Defendants endeavored to promote the seizure of POM's Skill Games, despite Shelly knowing that, as it stands, POM's Skill Games are legal in Pennsylvania.

53.     Because POM's Skill Games are presently legal under Pennsylvania law, Shelly had no justification to actively seek out and send along information to elected officials and law enforcement agencies for the express purpose of interfering with POM's contractual relations.

54.     As a result of Defendants' misinformation campaign, POM's Skill Games have come under increased scrutiny, causing several warrantless seizures of its machines including, in Lycoming, Monroe, Luzerne and Clearfield counties.

55.     Although none of these seizures have resulted in any criminal or civil sanctions—and, in fact, several of the devices have already been returned—the unjustified interference with POM's Skill Games has harmed its relationships with the various operators and locations.

56.     By way of example, as a result of lost business by one Lycoming-based operator responsible for distributing the Skill Game, POM has suffered damages in excess of $ 100,000.

57.     Using estimated losses from the first third of 2020, Defendants continued and persistent interference with POM's business caused one vendor to lose almost $32,000 worth of business across eight locations in Dauphin, Cumberland, York, and Lancaster Counties.

58.     The foregoing are just a few examples of the monetary harm to POM.

59.     Projected over an entire year, therefore, POM stands to suffer substantial revenue loss as result of Defendants' actions.  This revenue loss includes prospective economic advantages.

60.     Upon information and belief, Defendants have also been responsible for at least some of the contracts that have either been terminated, or not renewed.

61.     Furthermore, POM has also been forced to expend additional resources to protect its contractual relations and combat Defendants' misinformation campaign.

## COUNT I

### Tortious Interference with Existing and Prospective Business Relations

62.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

63.     As detailed above, Defendants have intentionally interfered and continue to interfere with existing and prospective contractual relationships between Plaintiffs and their customers.

10

64.     Defendants do not have a valid basis for interfering with such contractual relationships and, given that they have employed plainly tortious means in doing so, their conduct is not privileged or justified.

65.     Specifically, because Defendants' clients—licensed casinos regulated by the Gaming Act—are not competitors with POM—a skill game manufacturer who contracts with vendors and third parties for machine placement—the Defendants were not privileged in their conduct.

66.     Defendants' actions in interfering with Plaintiffs' existing and contractual relationships with their customers was and is undertaken with the knowledge, intent, and/or purpose of:

       a. gaining a perceived economic advantage for Pennsylvania-based casinos, including Mohegan Sun and, by extension, Defendants and Defendants' clients;

       b. causing economic harm to Plaintiffs; and,

       c. inducing or otherwise causing Plaintiff's customers not to perform with the terms of a valid contract, or enter into a contractual relationship with Plaintiffs.

67.     Defendants' actions in interfering with Plaintiffs' existing and prospective contractual relationships with their customers was and is undertaken with the knowledge, intent, and/or purpose of harming Plaintiffs and gaining an economic advantage for the Lottery Bureau.

68.     As set forth above, POM has been harmed by Defendants' wrongful interference and has suffered monetary damages therefore and will continue to suffer additional, substantial harm arising from the wrongful conduct.

WHEREFORE, Plaintiff POM of Pennsylvania, LLC respectfully requests that this Court enter judgment in its favor and against Defendants in an amount in excess of $ 50,000, plus costs,

interests, punitive damages, attorneys' fees, and such other relief as the Court deems jut and proper.

JURY TRIAL DEMANDED

**McCormick Law Firm**

Dated: March 23, 2022                    By: _____

Austin White
I.D. No. 312789
Counsel for Plaintiff

835 West Fourth Street
Williamsport, PA 17701
(570) 326-5131
(570) 326-5529 (fax)
awhite@mcclaw.com

## VERIFICATION

I, Paul Goldean, verify that I am President and Chief Operating Offficer for Plaintiff and that the statements made in the foregoing Complaint are true and correct based upon my personal knowledge or information and belief. I understand that false statements therein are subject to penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Dated: March 14, 2022

_____
Paul Goldean

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

P E N N S Y L V A N I A

CRIMINAL DIVISION

In re:                                       :
                                             :
                                             :
PACE-O-MATIC, INC. EQUIPMENT                 :       M.D. 965-2013
                                             :
                                             :
        TERMINAL I.D. NO. 142613             :

**MEMORANDUM OPINION AND ORDER**

H. KNAFELC, J.                               December 23rd, 2014

### I.    PROCEDURAL HISTORY

On November 19, 2013, agents of the Pennsylvania Bureau of Liquor Control

Enforcement seized a Pace-O-Matic, Inc. video game device from the American-Italian Club

located in Aliquippa, Beaver County. The manufacturer of the device filed a timely Petition for

Return of Seized Property and requested a post-seizure hearing pursuant to Pennsylvania Rule of

Criminal Procedure 588. This Court held a hearing on the matter on September 26, 2014. The

sole purpose of that hearing was to gather evidence as to whether the confiscated property

constituted a gambling device per se. The evidence fails to demonstrate that the machine is a

gambling device per se, and Petitioner's motion for its return is GRANTED.

During the hearing, this Court heard testimony on the operation of the confiscated device.

The Court heard testimony on two issues: first, whether Petitioner was entitled to lawful

possession of the res; and second, whether the games installed on the device were games of

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

In re:                                           :
                                                 :
PACE-O-MATIC, INC. EQUIPMENT                     :     M.D. 965-2013
                                                 :
TERMINAL I.D. NO. 142613                         :

## ORDER

AND NOW, this __23rd__ of __December__ , 20 _14_, it is hereby

ORDERED and DECREED that Petitioner's Motion of Return of Property pursuant to

Pennsylvania Rule of Criminal Procedure 588 is GRANTED. The Commonwealth is ORDERED

to return the Pennsylvania Skill game to Pace-O-Matic, Inc.

BY THE COURT

_____
                                          J.

Page 13 of 13

chance or games of skill. Both parties stipulated that the other elements of a gambling device per se, consideration and reward, were satisfied. The device requires a player to put in cash in order to access the games installed on the device. Successful play has the potential to reward a player with more credits than he or she put into the device. Thus, this Court is tasked only with resolving whether the games on the device are games of skill or games of chance. Because of the level of interactivity between the game and the player, as well as the gameplay mechanics, the evidence fails to show that the games included on the device—Tic-Tac-Toe, unlockable bonus game, and the "Follow-Me" mini-game—are anything other than games of skill. The device is therefore not a gambling device per se and shall be returned to Pace-O-Matic, Inc.

## II.     STATEMENT OF FACTS

The property seized in this case is a coin-operated table top machine that offers a Tic-Tac-Toe puzzle, an unlockable bonus game, and a "Follow-Me" mini-game. The player uses a touch screen navigate through the system. A player initiates the game by inserting money into the device. A player can place a bet of 40, 80, 120, 160, or 200 "points." One point equals one cent. A player then proceeds to select one of three themes. These are "Bombs and Bombshells," "Pirates Prize," and "Cocktail Cove." While the graphics and some pay amounts differ depending on which theme the player chooses, the gameplay is functionally equivalent among the three themes. The player has access to the same features regardless of which theme he or she chooses, and the themes will thus be treated interchangeably.

The first game that the player interacts with is the Tic-Tac-Toe puzzle. This is the primary game included on the device, and a player cannot access the other features of the game without first playing the Tic-Tac-Toe puzzle. Upon initiating gameplay, the game spins each of the nine reels arranged in a three-by-three grid on the screen. After the reels stop spinning, the

player has ten seconds to select one of the nine cells to change a symbol in that position to a wild symbol. The player is tasked with choosing the most advantageous spot to place the wild. Whether one spot is more advantageous than another depends on the value of the symbols in the row, column, or diagonal that was completed, and whether completion of one row, column, or diagonal completes another. If the player does not make a selection in the allotted time, no wild symbol will be placed on the screen. Because a random number generator excludes an automatic winning game, failure to place the wild will always result in a loss for the player. Each game will have at least one spot where placing the wild will result in a nonzero score, and no game will be completely unwinnable.

A player has the opportunity to access a bonus game while playing the Tic-Tac-Toe puzzle. Certain symbols in the three-by-three grid have the potential to unlock the bonus game. A player must align three bonus symbols in a row, column, or diagonal on the three-by-three grid. Where the player manages to place a wild in the proper position, the game awards the player with a bonus shooting game. There are slight differences in the bonus games depending on the theme chosen, but the core gameplay mechanics of the three bonus games are virtually identical, and will be treated in the same manner. The bonus games are shooting-style games. Targets appear at random positions across the screen, and the object of the bonus game is to target all of the symbols on the touch screen during the time allotted (30 or 45 seconds, depending on the theme chosen). The speed with which the targets appear on the screen and the fact that they are scattered about the screen provides the game's challenge. The player is rewarded with points depending on how many of the symbols he or she was able to target and touch.

If, during the Tic-Tac-Toe game, the player wins an amount that is less than 104% of the purchase price to play the game, the player is afforded the option of selecting the "Follow-Me" mini-game. A player who chooses to proceed with the Follow-Me feature is presented with a three-by-three grid of colored dots. Essentially, the Follow-Me feature is a memory game. The dots flash in a random sequence which the player must repeat. Starting with one circle flashing, the player will need to follow the correct sequence for a total of forty rounds of play, with each sequence adding another circle. If a player successfully follows the pattern each time, the player is awarded with 104% of his or her original wager. For example, if the player had wagered 40 credits, successful completion of the Follow-Me mini-game would result in a payout of 42 credits.

## III.   LEGAL BACKGROUND AND ANALYSIS

A motion for return of property pursuant to Rule 588 is intended to return goods to a person aggrieved by a search and seizure based upon the right to lawful possession and the non-contraband status of the goods. Pa. R. Crim. P. 588; *Com. v. Pomerantz*, 573 A.2d 1149, 1150 (Pa. Super. Ct. 1989). Rule 588 provides, in pertinent part, the following:

**Rule 588. Motion for Return of Property**

(A)   A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B)   The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

A petitioner's motion for return of property must, at a minimum, allege that the petitioner is entitled to lawful possession of the property at issue. *Pomerantz*, 573 A.2d at 1150. The

petitioner must prove that he is entitled to possession by a preponderance of the evidence. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. Ct. 2009). A preponderance of evidence standard is tantamount to a "more likely than not" standard. *Com. v. $6,425.00 Seized from Esquilin*, 880 A.2d 523 (Pa. 2005).

Where a petitioner meets the minimal burden of establishing entitlement to lawful possession, unless there is countervailing evidence to defeat the claim, the moving party is entitled to the return of the identified property. *Ibid.* The Commonwealth must prove the per se nature of machines seized as gambling devices by a preponderance of the evidence. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993).

A machine is a gambling device per se if three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. Because both the Petitioner and the Commonwealth have stipulated that the machine meets the consideration and reward elements, only the second element—whether the result is determined predominantly by chance or skill— will be addressed in depth.

That successful play is determined by chance rather than skill is an element essential to a finding that a machine is a gambling device per se. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983). Courts must determine in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome. *Ibid.* In order for a game to constitute gambling, it must be a game where chance predominates rather than skill. *Ibid.* A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. *Ibid.* The mere fact that a machine

involves a substantial element of chance is insufficient to find that a machine a gambling device. *Ibid.*

A game decided predominately on the basis of probability rather than any real input of skill from a player will be a game of chance. The level of interactivity and the consequences of a player's choices in playing the game are relevant in determining whether the game is one of chance or skill. *See id.* at 976 (noting that while skill, in the form of knowledge of probabilities, can improve a player's chances of winning a video poker game, chance ultimately determines the outcome because chance determines the card dealt and the cards from which one can draw); *compare Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010) (holding that although skill can determine the outcome in a poker game, players are still subject to defeat at the turn of the cards), *with Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492 (Neb. 2011) (noting that because the gameplay in a tic-tac-toe puzzle was under the control of the player and not the machine, the game was one of skill rather than chance).

### A.    Lawful Possession

The initial burden is on the Petitioner, Pace-O-Matic, Inc., to prove that it is entitled to lawful possession of the res at issue by a preponderance of the evidence standard. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. 2009). Petitioner has met that burden here. The device at issue is a coin-operated tabletop video game machine manufactured by Pace-O-Matic, Inc. The fact that Petitioner has manufactured, designed, and provided the source code for the machine makes it more likely than not that Petitioner is entitled to lawful possession of the video game machine at issue.

**B.     Gambling Device Per Se**

Upon a showing of lawful entitlement, the burden shifts to the Commonwealth to prove by a preponderance of the evidence that the video game machine seized is contraband. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993). Specifically, the government must show that the video game is a "gambling device per se." *Ibid.* In determining whether a machine can be seized, the machine must be so intrinsically connected with gambling as to constitute a gambling device per se. This intrinsic connection is met where three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. *Ibid.* The parties in this case have stipulated that, because a player must insert money to begin play and is enticed to play by the promise of a payout, the first element, consideration, and the third element, reward, are met. The only issue remaining is whether successful play is determined predominantly by skill or chance.

There is no doubt that the games at issue contain elements of skill and chance. It is therefore the task of this Court to determine, on balance, whether skill or chance is the dominant factor in successful play. The operation of the machine and the way a player interacts with the machine must be evaluated. As noted, the machine contains the following features: (1) a Tic-Tac-Toe puzzle; (2) an unlockable bonus shooting game; and (3) a "Follow-Me" mini-game. The extent to which chance and skill decide the outcome of each game must be evaluated.

**1.     Tic-Tac-Toe Puzzle**

The parties disagree on whether skill or chance dominates the outcome of the Tic-Tac-Toe puzzle. The Commonwealth asserts that the skill required to place the wild symbol in a spot is outweighed by the chance determination of the puzzle itself. This Court respectfully disagrees with the Commonwealth's position. Although there often is, as the Commonwealth points out, an "obvious" position where placement of the wild would generate a nonzero score, several puzzles

have a position where placement of the wild will lead to a more advantageous score. It takes skill for a player to recognize both which symbols are most advantageous to his or her payout and which position will maximize the player's score. A player who lacks the skill to recognize that the placement of a wild symbol in a particular position will lead to the completion of two or three rows, columns, or diagonals will not achieve as high a score as one who does recognize those patterns. Were the game one predominantly based on chance, one would reasonably expect that a skilled player and an unskilled player would stand to gain roughly the same score. However, a more skilled player is much more likely to achieve a greater score than an unskilled player, which augurs in favor of holding that the game is one of skill, not chance.

The Commonwealth places heavy emphasis on the fact that the device utilizes a random number generator to generate the puzzle itself. However, the fact that a machine utilizes a random generator, without more, is insufficient to push this game into the realm of chance. The function of the random number generator is not to determine whether player wins or loses, but merely to determine which puzzle within a finite pool of puzzles will be presented to the player. The random number generator simply constructs the field on which the player will be playing. It establishes the constraints in which the player must operate to receive the most points possible. Additionally, the generation of a puzzle is not a purely random event. Each puzzle presented to the player has the possibility of a win, and the player will not be presented with a puzzle that is already solved. Thus, the purpose of the random number generator is only to choose, at random, which of a large—yet finite—pool of puzzles to present to the player. Even if the presentation of the puzzle were a "substantial element of chance," this, without more, is insufficient to a finding that the Tic-Tac-Toe game is a game of chance. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983).

Even more essential to the analysis than how the game is constructed and presented is the gameplay itself. During the course of play, the element of skill predominates and determines the outcome to a much higher degree than chance. It is up to the player to choose which spot to place the wild in order to achieve the most advantageous score. Our Superior Court's holding in *Dent* is instructive. There, the Court held that Texas Hold 'Em is predominantly a game of chance. *Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010). The Court placed great weight on the fact that while skill can determine the outcome in a Texas Hold 'Em poker game, "players are still subject to defeat at the turn of the cards." *Id.* at 196. In the Tic-Tac-Toe game at issue here, the players are not subject to victory or defeat at the spin of the reels. The game's code precludes automatic victories and automatic defeats. Unlike a traditional poker game, the players of the Pennsylvania Skill game are not at the mercy of the hand they are dealt. Every puzzle is winnable, and some have higher wins depending on whether the player has the skill to recognize the most advantageous spot to place the wild. In this game, the player's choices are the "instrumentality for victory"—in sharp contrast to the capricious nature of card dealing and shuffling present in a traditional game of Texas Hold 'Em. *See ibid; see also Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492, 504 (Neb. 2011) (holding that where a puzzle is more controlled by the player than not, it is predominantly a game of skill).

This Tic-Tac-Toe puzzle is also different from the devices confiscated in *Two Electronic Poker Game Machines*. There, the Pennsylvania Supreme Court dealt with a coin-operated video game that simulated the events of five card draw poker. 465 A.2d 973 (Pa. 1983). The deck is "shuffled" by a random number generator, and the player is awarded points for various combinations of cards, ranging from one point for a pair of aces to fifty points for a straight flush. *Id.* at 976. The Court emphasized that chance was the predominant factor in the outcome

because chance determined the cards dealt and the cards from which one could draw. *Id.* at 978. The "skill" at issue was knowledge of probabilities. *Ibid.* This is different from the Tic-Tac-Toe game in this case for two reasons. First, the random number generator in the machine here does not determine a win or loss; rather, it merely chooses the puzzle that the player is presented with. Second, knowledge of statistics was the skill at issue in *Two Electronic Poker Game Machines*, whereas the skill at issue here is ability to play Tic-Tac-Toe. Knowledge of statistics was a skill wholly independent of the simulated poker game, and was not contemplated by or integral to the gameplay. It was a skill that was based on the nature of the player rather than the nature of the game. Here, skill at Tic-Tac-Toe and pattern recognition is fully integrated into the gameplay, and is demanded of the player for successful play. A player cannot beat the game with mere knowledge of probabilities; the player must choose the most advantageous spot to place the wild in the allotted time. The player exercises control over the game, and is not at the mercy of getting a lucky hand.

On balance, the outcome of the game is determined predominantly by skill rather than chance.

### 2.    Bonus Game

This shooting-style game is predominantly a game of skill. The game requires that the player recognize, target, and touch the symbol within the allotted time frame. This requires hand-eye coordination and dexterity. Chance or luck has very little to do with the outcome of the game. Instead, the outcome is dependent almost wholly on a player's skill. That the bonus game presents itself only if certain conditions are fulfilled is immaterial to determining whether skill or chance dominates in the bonus game. Rather, the availability of the game is simply a

consequence of one possible puzzle that a player may be presented with in the Tic-Tac-Toe game.

### 3.    "Follow-Me" Mini-Game

Successful play of the Follow-Me feature undoubtedly requires a great deal of skill on the part of the player. The game starts out easy, but becomes progressively more difficult with each recurrence of flashing dots. It is true that the average player cannot be expected to complete the Follow-Me feature successfully. After 10 to 15 sequences, most players would be unable to remember the sequence. The feature is immensely difficult and demands a much higher level of cognitive skill than the average player could muster. This immense difficulty does not, as the Commonwealth suggests, transform the game into a game of chance. The only chance involved in the game is the sequence in which the circles flash. The odds against randomly choosing the correct sequence for each of the forty rounds (a total of 820 flashing dots) are astronomical. Skill determines how well a player does.

### IV.    CONCLUSION

Each of the three games installed on the confiscated machine is predominantly a game of skill rather than a game of chance. Successful play at the Tic-Tac-Toe game depends mainly on a player's ability to recognize Tic-Tac-Toe patterns to maximize his or her score. The bonus game is essentially a shooting game, requiring a player to target and touch numerous symbols on the screen to achieve a high score. Finally, the Follow-Me mini-game, though immensely difficult for the average player, requires a great deal of cognitive ability for a player to remember the intricate sequence of flashing dots. Because the preponderance of the evidence fails to show that

the three games are games of chance, the Commonwealth has failed to prove that the property seized is a gambling device per se. The machine is therefore not contraband, and Petitioner's motion for return of property is granted.



### County of Centre

COMMONWEALTH OF PENNSYLVANIA
**OFFICE OF THE DISTRICT ATTORNEY**

**STACY PARKS MILLER**
District Attorney

**MARK S. SMITH**
First Assistant District Attorney

Courthouse, Room 404
Bellefonte, PA 16823
Telephone (814) 355-6735

Victim/Witness (814) 548-1107
FAX (814) 355-6756
www.centreda.org

December 3, 2015

Richard Campbell, Esquire
Law Offices of Campbell, Miller, Williams, Benson, Etter & Consiglio, Inc.
720 South Atherton Street, Suite 201
State College, PA 16801

Re:   Opinion on Pace-O-Matic Machine

Dear Dick:

We received an inquiry from you regarding distribution of a video game in Centre County.

Your client, Pace-O-Matic, Inc., would like to place these games in various clubs (most having liquor licenses) and obviously wants to avoid their confiscation as illegal gambling devices.

As you know, the District Attorney of a county can prosecute Gambling charges, but PSP Liquor Control Enforcement (LCE) can administratively seek the suspension or revocation of a liquor license.

Your memorandum included a Common Pleas Court opinion from Beaver County where the court did NOT find that the video games were gambling devices per se.

In the past, we have worked with LCE in the confiscation and forfeiture of video poker machines, which were considered gambling devices per se because they possessed a "knock-down" switch, which allowed for the elimination of accumulated points, prior to pay-off.

Centre County District Attorney Pg. 1 of 2

The Pace-O-Matic video games are different and more advanced than the old video poker machines.

First Assistant District Attorney Mark Smith contacted LCE in Duncansville and the Compliance, Auditing and Gambling Enforcement (CAGE) Unit that specializes in gambling complaints.

The CAGE Unit was slow to respond, but finally conferred with Attorney Smith so that we could reconcile our position with theirs. The Supervisor in the CAGE Unit was quite familiar with Pace-O-Matic, Inc., as well as the history of the Beaver County court opinion.

The Supervisor explained the video games and how they contain both elements of skill and chance. The question with this machine was whether skill or chance is dominant factors in successful play. They recognized that the Court found the games are predominantly a game of skill.

Therefore, as a result of the Opinion, the CAGE Unit is not confiscating these games. Additionally, if the law changes or another county obtains a different opinion from an appellate court, then their position may change.

In addition, if their position would ever change, the LCE will give an advanced warning and time for licensed establishments to remove the games from their premises.

My Office will follow their interpretation of the Beaver County Court's opinion as well as LCE's position on the machine.

I hope this opinion letter satisfies your inquiry. I apologize for the delayed response due to the slow reply of the agency. Please feel free to contact either First Assistant District Attorney Mark Smith or myself with any questions. It is always a pleasure dealing with you!

Warmly,

Stacy Parks Miller, Esquire
Centre County District Attorney

SPM/sy



JOSHUA D. LAMANCUSA
DISTRICT ATTORNEY

Diane M. Shaffer
Luanne Parkonen
William Flannery
Jonathan Miller
Jessica Sullivan
Thomas W. Minett

Lawrence County
Government Center
430 Court Street
New Castle, PA 16101

Phone 724-656-1916
Fax: 724-656-1986

COUNTY OF LAWRENCE
New Castle, Pennsylvania
www.colawrence.pa.us/DA/Index.htm

Eddy, DeLuca, Gravina & Townsend
Manor building Penthouse
564 Forbes Avenue
Pittsburgh, PA 15219

12 OCT 16

RE:  Pace-O-Matic

Dear Attorney DeLuca,

I am in receipt of your correspondence regarding the lawfulness of placing Pace-O-Matic games of skill in Lawrence County.  I have reviewed Judge Knafelc's Memorandum Opinion and Order regarding the Pace-O-Matic machines and I have contacted the Pennsylvania State Police and Pennsylvania Liquor Control Board regarding the possibility of appeal from Judge Knafelc's Order of Court.  I have been informed that the Commonwealth will not appeal the decision.  Therefore, the Pace-O-Matic machine is not considered a game of chance under Pennsylvania gaming laws and therefore is legal within the Commonwealth.  This letter serves to authorize you to place <u>only</u> Pace-O-Matic machines in Lawrence County.  Specifically the only machine that is permissible is the machine that was the subject of Judge Knafelc's Order of Court.  Variations or modifications of that machine may result in criminal and/or civil sanctions.  Lastly, I would strongly recommend that you refrain from serving alcohol at any establishment where you are operating Pace-O-Matic machines as this letter only serves to insulate you from criminal liability but in no way is controlling or persuasive regarding the legality of a liquor license.

Very Respectfully,

Joshua Lamancusa

July 9, 2015

Gerard Dubois, Manager
District 9 President
LOOM Clearfield Lodge 97
2375 Wallaceton Morrisdale Road
Morrisdale, PA  16858
**VIA E-MAIL**: unbrick49@hotmail.com

      **RE:  Skill-Based Machines**

Dear Mr. Dubois:

ISSUE:  This is in response to your e-mail of June 14, 2015, wherein you state that you are writing on behalf of the Loyal Order of Moose Clearfield Lodge 97 with inquiries related to the placement of skill-based machines on premises.  The machines are similar to modified slot machines that do not have accounting.  It is your understanding that some lower courts have found the machines to be legal. You inquire whether it would be permissible to make cash payouts for points accumulated on machines placed on the premises. You state that, from your reading of Advisory Notice No. 14, it would not be permitted.  Additionally, you inquire whether machine-generated income would constitute a second business on licensed premises that would require permission from the Pennsylvania Liquor Control Board ("Board").

Records of the Board indicate that Loyal Order of Moose Clearfield Lodge 97 holds Club Liquor License No. C-00548 (LID 621) for use by it at 2375 Wallaceton Morrisdale Road, Morrisdale, Pennsylvania.

OPINION:  As a threshold matter, section 5.32(f) of the Board's Regulations prohibits unlawful gambling directly or indirectly associated with an activity on licensed premises. [40 Pa. Code § 5.32(f)].  Advisory Notice No. 14 further enumerates the parameters of conducting events, tournaments, contents and the awarding of prizes on licensed premises.

Please be advised that section 5.32(e) of the Board's Regulations permits retail licensees, including clubs, to hold, or permit to be held, on their licensed premises

Gerard Dubois
July 9, 2015
Page 2

an event, tournament or contest, but only under certain conditions. [40 Pa. Code §
5.32(e)]. One (1) of the conditions is that no unlawful gambling may be directly or
indirectly associated with any event, tournament, contest or activity on the licensed
premises. If there is unlawful gambling, the licensee will be held strictly liable for
such activity and could be cited for violation of the Liquor Code and the Board's
Regulations. [40 Pa. Code § 5.32(f)(2)].

Because unlawful gambling is a violation of the Pennsylvania Crimes Code [18 Pa.
C.S. §§ 5512-5513], this office cannot provide you with a legal opinion as to
whether a particular gaming machine would constitute unlawful
gambling. However, it should be noted that unlawful gambling consists of the
following elements: (1) consideration or a fee or charge to play, (2) an element of
chance, and (3) a prize or reward. <u>Pennsylvania Liquor Control Board v. Circus
Bar, Inc.</u>, 96 Pa. Cmwlth. 115, 506 A.2d 521 (1986). Also, certain items are
considered gambling devices *per se* and therefore their possession is illegal in and
of itself. You may wish to contact your local police, the Pennsylvania State Police,
or your county district attorney for an official opinion concerning whether the
operation of these gaming machines constitutes unlawful gambling or whether the
machines are gambling devices *per se*.

An entity that holds a small games of chance ("SGOC") permit may conduct
certain gambling activities on the premises. Please be advised that the Board does
not regulate the SGOC Act [10 P.S. §§ 311-327] and as such, the interpretation of
this law falls outside of the scope of the Board's authority. To determine exactly
what activities are allowable pursuant to a small games of chance permit, you are
advised to contact the Department of Revenue, Miscellaneous Tax Division at
(717) 787-8275. In addition, please note that the Pennsylvania Department of
Revenue publishes a "Small Games of Chance Overview" that may be helpful to
you. This overview can be obtained through the Department of Revenue's website
located at http://www.revenue.state.pa.us/SGOC.

Finally, section 5.81 of the Board's Regulations requires that a licensed club
adhere to the provisions of its constitution and bylaws. [40 Pa. Code §
5.81]. Therefore, if your club's bylaws or constitution prohibit use of such
machines, you would be required to adhere to your constitution and bylaws.

Gerard Dubois
July 9, 2015
Page 3

Without first ascertaining if the machines are permitted on premises and if the use of the machines would be lawful, responses to your specific inquiries as to payoffs and income generation would be premature.

Should you have any other questions and/or issues related to the Liquor Code or the Board's Regulations, please feel free to once again contact this office.

THIS OPINION APPLIES ONLY TO THE FACTUAL SITUATION DESCRIBED HEREIN AND DOES NOT INSULATE THE LICENSEE OR OTHERS FROM CONSEQUENCES OF CONDUCT OCCURRING PRIOR TO ITS ISSUANCE. THE PROPRIETY OF THE PROPOSED CONDUCT HAS BEEN ADDRESSED ONLY UNDER THE LIQUOR CODE AND REGULATIONS. THE LAWS AND POLICIES ON WHICH THIS OPINION IS BASED ARE SUBJECT TO CHANGE BY THE LEGISLATURE OR THE PENNSYLVANIA LIQUOR CONTROL BOARD.

Very truly yours,

FAITH S. DIEHL
CHIEF COUNSEL

cc:  Pennsylvania State Police, Bureau of Liquor Control Enforcement
     Jerry W. Waters, Director of Office of Regulatory Affairs
     Tisha Albert, Director, Bureau of Licensing
     Jeffrey Lawrence, Assistant Director, Bureau of Licensing

LCB Advisory Opinion No. 15-281

May 16, 2016

Philip Chow
Hitch'n Post Bar & Grille
**VIA E-MAIL**

       **RE:  Pennsylvania Skill Game Machine**

Dear Mr. Chow:

ISSUE:   This is in response to your e-mail dated April 27, 2016 in which you ask whether the "Pennsylvania Skill Game Machine" is legal and may be placed by the machine manufacturer in licensed Pennsylvania establishments.  You reference the manufacturer's website of www.mielemfg.com.

Records of the Pennsylvania Liquor Control Board ("PLCB") indicate that Narlee Entertainment LLC holds Restaurant Liquor License No. R-13424 (LID 67331) for use at the premises located at 438 Hadley Road, Greenville, Pennsylvania.

OPINION:   Section 5.32 of the PLCB's Regulations generally prohibits retail licensees from holding or permitting to be held events, tournaments, or contests on their licensed premises.  40 Pa. Code § 5.32(d).  However, one of several exceptions permits retail licenses to conduct self-sponsored (i.e., paid for and carried out by the licensee) events, tournaments, and contests on their licensed premises, provided they comply with certain conditions.  40 Pa. Code § 5.32(d)(5).

Events, tournaments and contests are defined as "a competitive endeavor involving skill, speed, strength or endurance.  The term includes a competitive endeavor involving physical attributes of contestants."  40 Pa. Code § 5.30.  Events, tournaments, and contests that are sponsored by the licensee are subject to specific rules, including most relevantly that there may be no unlawful gambling associated with the event, tournament, or contest.  40 Pa. Code § 5.32(e)(2).

If there is unlawful gambling, the licensee will be held strictly liable for such activity and could be cited for violation of the Liquor Code and the PLCB's Regulations.  40 Pa. Code § 5.32(e)(2).  Because unlawful gambling is a violation

Philip Chow
May 16, 2016
Page 2

of the Pennsylvania Crimes Code, this office cannot provide you with a legal opinion as to whether the gaming machine that you describe would constitute unlawful gambling. However, it should be noted that unlawful gambling consists of the following elements: (1) consideration or a fee or charge to play; (2) an element of chance; and (3) a prize or reward. Pennsylvania Liquor Control Bd. v. PPC Circus Bar, Inc., 96 Pa. Cmwlth. 115, 506 A.2d 521 (1986).

You should contact the local police, the Pennsylvania State Police, or the County District Attorney's Office for an official opinion regarding whether the gaming machine in question would constitute unlawful gambling. You may also wish to consult private counsel to advise you on the lawful operation of your licensed establishment.

THIS OPINION APPLIES ONLY TO THE FACTUAL SITUATION DESCRIBED HEREIN AND DOES NOT INSULATE THE LICENSEE OR OTHERS FROM CONSEQUENCES OF CONDUCT OCCURRING PRIOR TO ITS ISSUANCE. THE PROPRIETY OF THE PROPOSED CONDUCT HAS BEEN ADDRESSED ONLY UNDER THE LIQUOR CODE AND REGULATIONS. THE LAWS AND POLICIES ON WHICH THIS OPINION IS BASED ARE SUBJECT TO CHANGE BY THE LEGISLATURE OR THE PENNSYLVANIA LIQUOR CONTROL BOARD.

Sincerely,

RODRIGO J. DIAZ
CHIEF COUNSEL

cc:    Pennsylvania State Police, Bureau of Liquor Control Enforcement
       Jerry W. Waters, Director of Office of Regulatory Affairs
       Tisha Albert, Director, Bureau of Licensing
       Jeffrey Lawrence, Assistant Director, Bureau of Licensing

LCB Advisory Opinion No. 16-181

March 1, 2018

Nicholas E. Dunphy
**VIA E-MAIL**

**Re:   PA Skill Games**

Dear Mr. Dunphy:

ISSUE:  This office is in receipt of your e-mail dated January 29, 2018, in which you inquire as to the Pennsylvania Liquor Control Board's ("PLCB") opinion regarding games of skill video terminals.

Records of the PLCB indicate that Caddy Shack holds Municipal Golf Course License No. GR-8 (LID 57702) for use at the premises located at 800 Orrs Bridge Road, Mechanicsburg, Pennsylvania.  Records show that you are the president, secretary, treasurer, director, manager, and shareholder.

OPINION:  Initially, because you are involved in a highly-regulated industry, it is recommended that you consult private counsel experienced in Pennsylvania liquor law.  Further, note that it is the Pennsylvania State Police, Bureau of Liquor Control Enforcement ("BLCE"), and not the PLCB, that is authorized to enforce the Liquor Code and other laws applicable to businesses licensed to sell alcohol.

Section 5.32(e) of the PLCB's Regulations, 40 Pa. Code § 5.32(e), permits a hotel, restaurant, club, brew pub, or malt beverage eating place licensee to hold, or permit to be held on the licensed premises, an event, tournament, or contest, but only under certain conditions.  One of the conditions is that no unlawful gambling may be directly or indirectly associated with any event, tournament, contest, or activity on the licensed premises.

Because unlawful gambling is a violation of the Pennsylvania Crimes Code, 18 Pa. C.S. §§ 5512-5513, this office cannot provide you with a legal opinion as to whether a particular gaming machine would constitute unlawful gambling.  However, it should be noted that unlawful gambling consists of the following elements: (1) consideration or a fee or charge to play, (2) an element of chance, and (3) a prize or reward.  PLCB v.  PPC Circus Bar, Inc., 506 A.2d 521 (Pa. Cmwlth. 1986).  Also, certain items may be considered gambling devices *per se* and therefore their

Nick Dunphy
March 1, 2018
Page 2

possession may be illegal in and of itself. You may wish to contact your local police, the Pennsylvania State Police, or your county district attorney for an official opinion concerning whether the operation of these gaming machines constitutes unlawful gambling or whether the machines are gambling devices *per se*.

In addition, an entity that holds a small games of chance ("SGOC") permit may conduct certain gambling activities on the premises. Please be advised that the PLCB does not regulate the Local Option SGOC Act, 10 P.S. §§ 311-327, and as such, the interpretation of this law falls outside of the scope of the PLCB's authority. To determine exactly what activities are allowable pursuant to a SGOC permit, you are advised to contact the Department of Revenue, Miscellaneous Tax Division at (717) 787-8275. In addition, please note that the Pennsylvania Department of Revenue publishes a "Small Games of Chance Overview" that may be helpful to you. This overview can be obtained through the Department of Revenue's website located at http://www.revenue.state.pa.us/SGOC.

THIS OPINION APPLIES ONLY TO THE FACTUAL SITUATION DESCRIBED HEREIN AND DOES NOT INSULATE THE LICENSEE OR OTHERS FROM CONSEQUENCES OF CONDUCT OCCURRING PRIOR TO ITS ISSUANCE. THE PROPRIETY OF THE PROPOSED CONDUCT HAS BEEN ADDRESSED ONLY UNDER THE LIQUOR CODE AND REGULATIONS. THE LAWS AND POLICIES ON WHICH THIS OPINION IS BASED ARE SUBJECT TO CHANGE BY THE LEGISLATURE OR THE PENNSYLVANIA LIQUOR CONTROL BOARD.

Sincerely,

RODRIGO J. DIAZ
CHIEF COUNSEL

cc:   Pennsylvania State Police, Bureau of Liquor Control Enforcement
      Tisha Albert, Director of Office of Regulatory Affairs
      B.L. Peifer, Director, Bureau of Licensing

LCB Advisory Opinion No. 18-047

John Romain
March 7, 2018
Page 2

In addition, an entity that holds a small games of chance ("SGOC") permit may conduct certain gambling activities on the premises.  Please be advised that the PLCB does not regulate the Local Option SGOC Act, 10 P.S. §§ 311-327, and as such, the interpretation of this law falls outside of the scope of the PLCB's authority.

To determine exactly what activities are allowable pursuant to a SGOC permit, you are advised to contact the Department of Revenue, Miscellaneous Tax Division at (717) 787-8275.  Finally, please note that the Pennsylvania Department of Revenue publishes a "Small Games of Chance Overview" that may be helpful to you. This overview can be obtained through the Department of Revenue's website located at http://www.revenue.pa.gov/FormsandPublications/FormsforBusinesses/Documents/Small%20Games%20of%20Chance/sgoc_overview.pdf.

Please do not hesitate to contact this office should you have additional questions.

THIS OPINION APPLIES ONLY TO THE FACTUAL SITUATION DESCRIBED HEREIN AND DOES NOT INSULATE THE LICENSEE OR OTHERS FROM CONSEQUENCES OF CONDUCT OCCURRING PRIOR TO ITS ISSUANCE. THE PROPRIETY OF THE PROPOSED CONDUCT HAS BEEN ADDRESSED ONLY UNDER THE LIQUOR CODE AND REGULATIONS.  THE LAWS AND POLICIES ON WHICH THIS OPINION IS BASED ARE SUBJECT TO CHANGE BY THE LEGISLATURE OR THE PENNSYLVANIA LIQUOR CONTROL BOARD.

Sincerely,

RODRIGO J. DIAZ
CHIEF COUNSEL

cc:     Pennsylvania State Police, Bureau of Liquor Control Enforcement
        Tisha Albert, Director, Office of Regulatory Affairs
        B.L. Peifer, Director, Bureau of Licensing


LCB Advisory Opinion No. 18-048

March 7, 2018

John Romain
**VIA E-MAIL**

    **RE:  Skill Machines**

Dear Mr. Romain:

ISSUE:  This office is in receipt of your e-mail dated February 7, 2018, wherein you ask if it is legal to have and operate skill machines on a licensed premises.

Records of the Pennsylvania Liquor Control Board ("PLCB") indicate that American Legion Home Corporation of Wheatland, holds Catering Club Liquor License No. CC-6053 (LID 53882) for the premises located at 2 Cherry Street, PO Box 1, Wheatland, Pennsylvania.

OPINION:  Initially, because you are involved in a highly-regulated industry, it is recommended that you consult private counsel experienced in Pennsylvania liquor law.  Further, note that it is the Pennsylvania State Police, Bureau of Liquor Control Enforcement ("BLCE"), and not the PLCB, that is authorized to enforce the Liquor Code.

Because unlawful gambling is a violation of the Pennsylvania Crimes Code, 18 Pa. C.S. §§ 5512-5513, this office cannot provide you with a legal opinion as to whether a particular gaming machine would constitute unlawful gambling.  However, it should be noted that unlawful gambling consists of the following elements: (1) consideration or a fee or charge to play, (2) an element of chance, and (3) a prize or reward.  PLCB v. PPC Circus Bar, Inc., 506 A.2d 521 (Pa. Cmwlth. 1986).  Also, certain items may be considered gambling devices *per se* and therefore their possession may be illegal in and of itself.

You may wish to contact your local police, the Pennsylvania State Police, or your county district attorney for an official opinion concerning whether the operation of these gaming machines constitutes unlawful gambling or whether the machines are gambling devices *per se*.

June 5, 2018

Joseph W. Grad, Esquire
**VIA E-MAIL**

    **RE:  Skill Games**

Dear Mr. Grad:

ISSUE:  This office is in receipt of your e-mail dated April 21, 2018, wherein you indicate that you are seeking an advisory opinion on behalf of your client.  Your client is considering an arrangement with a third-party vendor to install "Skill Games software" on the licensed premises.  You ask if this arrangement would violate any state laws or any regulations promulgated by the Pennsylvania Liquor Control Board ("PLCB").  You provide a detailed description of how this software would operate.

Records of the PLCB indicate that American Legion Home Assn. of New Holland, holds Catering Club Liquor License No. CC-5306 (LID 3887) for the premises located at 35 South Hoover Avenue, PO Box 143, New Holland, Pennsylvania.

OPINION:  Section 5.32(d) of the PLCB's Regulations permit retail licensees to hold self-sponsored[1] events, tournaments, or contests on their licensed premises and to award prizes or premiums (either separate or as a part of an event, tournament, or contest), but only under certain conditions.  40 Pa. Code § 5.32(d).  Those conditions are as follows: there may be no unlawful gambling directly or indirectly associated with the event, tournament or contest; there may be no consumption of alcohol by participants as part of the event, tournament or contest[2]; the price of admission may not include a charge for or entitle the participant to receive an alcoholic beverage; the value of all prizes awarded (including both cash and non-cash prizes) may not exceed $1,000.00; the total value of all prizes awarded (including both cash and non-cash prizes) in a seven-day period may not exceed $25,000.00; and licensees must maintain on the licensed premises for two years, from the date of the event, an

---

[1] Self-sponsored means paid for and carried out by the licensee.
[2] This provision does not preclude persons who are present at a promotional event from consuming alcoholic beverages; it only prohibits making the consumption of alcoholic beverages part of a competitive endeavor comprising an event.

Joseph W. Grad, Esquire
June 5, 2018
Page 2

itemized list of all prizes for each event, tournament, or contest indicating each prize, its value, and the name and address of the recipient.  40 Pa. Code § 5.32(d).

One of the conditions mentioned above is that no unlawful gambling may be directly or indirectly associated with any event, tournament, contest or activity on the licensed premises.  If there is unlawful gambling, the licensee will be held strictly liable for such activity and could be cited for violation of the Liquor Code and the PLCB's Regulations.  40 Pa. Code § 5.32(d).

Because unlawful gambling is a violation of the Pennsylvania Crimes Code, 18 Pa. C.S. §§ 5512-5513, this office cannot provide you with a legal opinion as to whether a particular gaming machine would constitute unlawful gambling.  However, it should be noted that unlawful gambling consists of the following elements: (1) consideration or a fee or charge to play, (2) an element of chance, and (3) a prize or reward.  Pennsylvania Liquor Control Bd. v. PPC Circus Bar, Inc., 506 A.2d 521 (Pa. Cmwlth. 1986).  Also, certain items may be considered gambling devices *per se* and therefore their possession may be illegal in and of itself.

You may wish to contact the local police, the Pennsylvania State Police, or the county district attorney for an official opinion concerning whether the operation of these gaming machines constitutes unlawful gambling or whether the machines are gambling devices *per se*.

In addition, an entity that holds a small games of chance ("SGOC") permit may conduct certain gambling activities on the premises.  Please be advised that the PLCB does not regulate the Local Option SGOC Act, 10 P.S. §§ 311-327, and as such, the interpretation of this law falls outside of the scope of the PLCB's authority.

To determine exactly what activities are allowable pursuant to a SGOC permit, you are advised to contact the Department of Revenue, Miscellaneous Tax Division at (717) 787-8275.  Finally, please note that the Pennsylvania Department of Revenue publishes a "Small Games of Chance Overview" that may be helpful to you. This overview can be obtained through the Department of Revenue's website located at http://www.revenue.pa.gov/FormsandPublications/FormsforBusinesses/ Documents/Small%20Games%20of%20Chance/sgoc_overview.pdf.

Although this office cannot opine on the legality of the proposed arrangement in your e-mail, please note that licensees are not permitted to give alcohol away as a prize.  Therefore, a gift certificate is only acceptable as a prize if the winner can

Joseph W. Grad, Esquire
June 5, 2018
Page 3

redeem it for something other than alcohol.  It is permissible for a gift certificate to be redeemed for food and non-alcoholic beverages, but not if it is redeemable for only alcohol.

Please do not hesitate to contact this office should you have additional questions.

THIS OPINION APPLIES ONLY TO THE FACTUAL SITUATION DESCRIBED HEREIN AND DOES NOT INSULATE THE LICENSEE OR OTHERS FROM CONSEQUENCES OF CONDUCT OCCURRING PRIOR TO ITS ISSUANCE. THE PROPRIETY OF THE PROPOSED CONDUCT HAS BEEN ADDRESSED ONLY UNDER THE LIQUOR CODE AND REGULATIONS.  THE LAWS AND POLICIES ON WHICH THIS OPINION IS BASED ARE SUBJECT TO CHANGE BY THE LEGISLATURE OR THE PENNSYLVANIA LIQUOR CONTROL BOARD.

Sincerely,

RODRIGO J. DIAZ
CHIEF COUNSEL

cc:     Pennsylvania State Police, Bureau of Liquor Control Enforcement
        Tisha Albert, Director, Office of Regulatory Affairs
        B.L. Peifer, Director, Bureau of Licensing


LCB Advisory Opinion No. 18-210

**IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| POM OF PENNSYLVANIA, LLC | : | |
| t/d/b/a PACE-O-MATIC, | : | |
| | : | DOCKET NO. _____ |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION |
| | : | |
| PETER J. SHELLY, and SHELLY | : | |
| COMMUNICATIONS, INC., d/b/a | : | |
| SHELLY LYONS PUBLIC | : | |
| AFFAIRS & COMMUNICATIONS, INC., | : | |
| | : | |
| Defendants. | : | |

### CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania:  Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

**McCormick Law Firm**

By: _____

Austin White
I.D. No. 312789
Counsel for Plaintiff


835 West Fourth Street
Williamsport, PA 17701
(570) 326-5131
(570) 326-5529 (fax)
awhite@mcclaw.com