# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - x

PACE-O-MATIC, INC.,      :

PLAINTIFF,      :

v.                      :   NO. 1:20-cv-292-JPW

ECKERT SEAMANS CHERIN    :

& MELLOTT, LLC,  et      :   JUDGE WILSON

al.,                    :

DEFENDANTS.    :

- - - - - - - - - - - - x

Videotaped Deposition of KEVIN O'TOOLE

HARRISBURG, PENNSYLVANIA

Friday, July 21, 2023

9:04 A.M.

Job No.: 498725

Pages: 1 - 334

Reported By:  Denise L. Travis, RPR

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023                            81

MR. HUDDELL:  Object to form.                    10:56:43

THE WITNESS:  Not that I'm aware of.             10:56:45

(Exhibit 4 was marked for identification.)       10:56:46

BY MR. NOLAN:                                        10:56:46

Q  Okay.  I'm handing you what has been           10:56:47
marked as Exhibit 4.  Do you recognize that         10:57:06
document?                                            10:57:09

A  Yes, I do.                                      10:57:11

Q  What is it?                                     10:57:18

A  It is a transcript of the presentation         10:57:21
that I gave to the House Gaming Oversight           10:57:27
Committee during their public hearing on House      10:57:32
Bill 1598, dated October 30th, 2019.                10:57:37

Q  Did you review this document to prepare        10:57:41
for today's deposition?                             10:57:43

A  I did.                                          10:57:44

Q  Were you asked questions about it at your      10:57:45
deposition roughly six weeks ago?                    10:57:49

A  I may have, but I don't specifically           10:57:52
recall.                                              10:57:57

Q  Did you read -- strike that.                    10:57:57

After giving that deposition six months          10:58:03
ago, did you have the opportunity to read the       10:58:05
transcript?                                          10:58:07

MR. HUDDELL:  Object to form.                    10:58:08

THE WITNESS:  What do you refer to as the transcript?

BY MR. NOLAN:

Q  The words that were typed down.  Like madam court reporter here is typing down everything that we say and she will generate a transcript of this deposition, did you read the transcript from the last --

A  Yes, I did read the transcript.

Q  Okay.

A  I know I was questioned about some testimony.  If -- if it was this one, then I would acknowledge that, yeah, I -- I answered a question or two on this one.

Q  As you sit here today, do you remember after reading through your deposition transcript, did you feel that any of your testimony was incorrect or wrong?

A  No, none of my testimony was incorrect or wrong.  And I -- and I -- you know, I object to sitting here and being asked questions that are solely for the purpose of determining if my previous deposition was accurate or inaccurate.

Q  That's not my purpose.

A  Okay.  I am sorry, but you've got me now

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023                                    83

to the point where I think that all you're trying
to do is find some kind of fault with the previous
deposition.  And I testified -- I testified
honestly and fully and answered every question.

Q  I appreciate that.

A  And I would like the record to reflect
that I incorporate by reference all of my answers
from June 5th, if that's the date of that
deposition.  I incorporate them by reference as if
they are set forth in full and if I say those same
answers again today that they were truthful then.
They're truthful now.  And if I -- if I answer a
question today using slightly different words,
it's not because I've changed my mind.

Sir, are you interested in my analysis of
this?

Q  Oh, I am.

(Exhibit 5 was marked for identification.)

Q  I've handed you what has been marked as
Exhibit 5.  Do you recognize that to be the
deposition that you've just incorporated by
reference?

A  Yes, I do.

Q  Let's look back at your testimony before
the House Gaming Oversight Committee on October

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023                                    84

30th, 2019.  What was your purpose for giving this
testimony?

    A   The Pennsylvania Gaming Control Board was
requested by the House Gaming Oversight Committee
to attend and to present testimony to their
committee.  And they identified that they would
like us to talk about our agency and House Bill
1598.

    Q   You would agree with me in your
deposition, which is Exhibit 5, you testified
under oath that the PGCB does not have authority
over unlicensed skill games.  Yes?

        MR. HUDDELL:  Object to form.  And object,
beyond the scope.

        THE WITNESS:  I testified to -- in what
sense, sir?

BY MR. NOLAN:

    Q   You testified that the PGCB does not have
authority over unlicensed skill games.  Yes?

        MR. HUDDELL:  The same objections.

        THE WITNESS:  Is there a citation where I
would confer -- you've given me the transcript.
And you're telling me that I said something in
this transcript.  Do you have the page number and
the line number?

BY MR. NOLAN:

Q   Yeah.  I can get that for you.

A   Okay.  Then I would like to read that line and page number.  Otherwise, I -- I would be concerned that you're only trying to find out by parsing words that maybe I said something -- I would say something different now.

Q   Right.  Well, let's -- let's explore that.  As you sit here today, do you feel that the PGCB does have authority over unlicensed skill games?

MR. COOK:  Objection.  Can you define authority?

MR. NOLAN:  Regulatory authority, authority given to the Agency by the legislature.

MR. HUDDELL:  I object to the form.  And I think the question is beyond the scope of the deposition notice.

THE WITNESS:  The -- as -- as I indicated previously and as I would indicate today that our position is that it's unlawful activity and -- and that it is activity that should be the sole regulatory oversight of the Gaming Control Board as -- as -- as directed by the State legislature when they enacted the Board in 2004.  We put together our agency in 2005.  And we have been the

11:01:56
11:01:56
11:01:58
11:02:00
11:02:05
11:02:08
11:02:11
11:02:12
11:02:15
11:02:17
11:02:21
11:02:23
11:02:25
11:02:27
11:02:33
11:02:34
11:02:37
11:02:42
11:02:47
11:02:53
11:03:00
11:03:05
11:03:09
11:03:20
11:03:25

sole and primary regulator of legalized gambling in -- in the state as it relates to slot machines since that time.  And the -- the conduct of slot machines out in locations other than a casino facility is outside of the scope of -- of the Gaming Act and, therefore, not authorized and, therefore, not appropriate and, therefore, not legal to be engaged in the Commonwealth of Pennsylvania.

BY MR. NOLAN:

    Q  Sorry.  I don't understand your answer. As you sit here today, do you think that the Gaming Act gives the PGCB authority over unlicensed skill games?

    MR. HUDDELL:  Object to the form of the question.

    MR. COOK:  The same objection.

    MR. HUDDELL:  And I think the question is beyond the scope of the deposition notice.

    THE WITNESS:  I think it gives us authority to articulate that it's improper and unauthorized activity and -- and contrary to -- contrary to the intent of the legislature when they passed Title 4.

BY MR. NOLAN:

Q  Would you turn to page 18 in your prior
deposition, which is Exhibit 5?

A  Okay.

Q  Are you there?

A  Yes, I am.

Q  Do you see at line 11 you were asked under
oath, Okay, that brings me to my next question --

A  I'm sorry.  Page -- page 18 of the
transcript or page 18 of the -- of the copy?

MR. COOK:  It's page --

BY MR. NOLAN:

Q  Eighteen of the transcript, not -- not the
PDF, the transcript.  So it's the 18th page --

A  The 18th page --

Q  -- of the transcript?

A  Which is 44 to 49?

Q  No.  No.  Go back.

A  Okay.

Q  Right here.  Could I direct your attention
to line 11?  Are you there?

A  Yes, I am.

Q  Do you see you were asked under oath,
Okay, that brings me to my next question then; the
Pennsylvania Gaming Control Board only regulates
entities, businesses, individuals that hold

11:05:09
11:05:13
11:05:16
11:05:17
11:05:17
11:05:18
11:05:21
11:05:24
11:05:26
11:05:30
11:05:32
11:05:33
11:05:34
11:05:38
11:05:40
11:05:41
11:05:44
11:05:47
11:05:55
11:05:58
11:06:04
11:06:05
11:06:07
11:06:09
11:06:13

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023                                88

licenses from the Pennsylvania Gaming Control
Board; is that fair and accurate; and you
answered, Well, that's fair and accurate; but
there are certain activities out there that I
would consider to be improper to be operational if
there was not legislative approval or legislative
authorization to do so?  Did I read that
correctly?

    A  Yes, you did.

    Q  So in answer to your question, you said
that it was fair and accurate that the PGCB only
regulates entities that hold licenses from the
PGCB.  Correct?

    A  Yes.

    MR. HUDDELL:  Object to the form and
object to questions beyond the scope of deposition
notice.

BY MR. NOLAN:

    Q  I'm sorry.  What was your answer?

    A  It was yes.

    Q  Okay.  And does POM hold any licenses from
the PGCB regarding its games?

    A  No.

    Q  Okay.  So then you would agree with me
that the PGCB does not regulate POM's games?

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023                    89

MR. HUDDELL:  Object to the form of the question.  And I object that this question is beyond the scope of the deposition notice.

THE WITNESS:  Yes.

BY MR. NOLAN:

Q   Would you agree that there is no legislative authority that gives the PGCB the ability to regulate skill-based games?

A   No.

MR. HUDDELL:  Object to the form and object --

BY MR. NOLAN:

Q   You don't agree with that?

A   I do not agree with that.

THE REPORTER:  I'm sorry.  One at a time.

Can you repeat your objection?

MR. HUDDELL:  I object to the form of the question.  And I object to the question on the basis that it exceeds the scope of the deposition notice.

THE REPORTER:  Thank you.

MR. HUDDELL:  Thank you.

BY MR. NOLAN:

Q   Okay.  Would you turn to page 19 of your deposition?

A  Okay.

Q  And could I direct your attention to line 13 -- excuse me -- line 8?

A  Okay.

Q  Do you see where you were asked, Okay, that does not answer my question, and then you said, Well, repeat your question, and then thereafter, your transcript indicates that the court reporter read the last question back to you? Do you see that?

A  Yes, I do.

Q  And then you answered that question stating, quote, Based upon the word authority, if that is legislative authority, then, no, there is no legislative authority that gives us the ability to regulate skill-based games.

Did I read that correctly?

A  You read that correctly.

Q  And you were asked, Beyond that, where else would Pennsylvania Gaming Control Board get its authority?

And you answered, Nowhere else.

Did I read that correctly?

A  Yes.  But I would request that you go back to the original question that says does the

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023

91

Pennsylvania Gaming Control Board have authority to regulate an individual business or a location that does not hold a license or has not applied for a license from the Pennsylvania Gaming Control Board.

So my subsequent answers focused on that license question and location of where they operate these skill-based machines.

Q  All right.

A  And -- okay.  That -- that's my answer to that.

Q  So you would agree with me that the PGCB's authority is limited to those businesses that have licenses regarding the games.  Fair?

MR. HUDDELL:  I object to the form of the question.  I object on the grounds that it's asked and answered.  I object to the question on the grounds that I think it exceeds the scope of the deposition notice.

MR. COOK:  I object to scope as well.

THE WITNESS:  Yes, our authority applies to people who are applicants or licensees.

BY MR. NOLAN:

Q  POM is neither an applicant nor a licensee.  Fair?

11:08:59
11:09:03
11:09:04
11:09:07
11:09:12
11:09:12
11:09:18
11:09:21
11:09:23
11:09:25
11:09:29
11:09:31
11:09:40
11:09:45
11:09:49
11:09:50
11:09:52
11:09:54
11:09:57
11:09:57
11:10:00
11:10:03
11:10:07
11:10:07
11:10:10

MR. HUDDELL:  The same objections, form and scope.    11:10:11 / 11:10:13

THE WITNESS:  Correct.    11:10:14

BY MR. NOLAN:    11:10:15

Q  So because you have no regulatory authority over POM games, anything that PGCB does or did would be an ultra vires act?    11:10:16 / 11:10:22 / 11:10:26

MR. COOK:  Objection.    11:10:28

MR. HUDDELL:  I object to the form of the question.  I object on the grounds that -- on the basis that it exceeds the scope of the deposition notice.  And I also want to object for the record that it seems like you're trying to use this deposition, with respect, Mike, for purposes that go way beyond any legitimate use in this litigation.    11:10:29 / 11:10:30 / 11:10:31 / 11:10:34 / 11:10:36 / 11:10:38 / 11:10:40 / 11:10:43

MR. COOK:  I absolutely agree.  And I would -- I further object that you're asking the witness to make a legal conclusion.  He's not a practicing lawyer in the Commonwealth.    11:10:43 / 11:10:45 / 11:10:49 / 11:10:53

BY MR. NOLAN:    11:10:56

Q  Do you understand the question?    11:10:56

A  No.  I have not researched ultra vires in quite a while.  So I'm not going to answer that question.    11:10:58 / 11:11:01 / 11:11:03

Q   Do you remember from your law school days when it comes to governmental entities, it's an act which falls outside of their scope of authority?

MR. HUDDELL:  The same objections.

MR. COOK:  Objection.

MR. HUDDELL:  I object to the form of the question.  And I object on the grounds that it's beyond the scope of the deposition notice.

THE WITNESS:  It may or it may not.  That may be -- I don't know.  I would have to research that concept to see if it's changed or expanded or contracted.

BY MR. NOLAN:

Q   So looking back at Exhibit 4, which is your testimony to the House Gaming Oversight Committee on October 30th, 2019, at the end of Paragraph 2, you state, For the most part, activities regulated by the Board constitute legalized gambling, which by definition are games predominated by chance and not skill.

Did I read that correctly?

A   I don't have page numbers on the document that you gave me.

Q   The first page, Paragraph 2, last

BY MR. NOLAN:

Q   I'm handing you what's been marked as Exhibit 10.  Do you recognize that document?

A   Yes, I recognize the document.

Q   Okay.  Do you understand this to be an e-mail chain between various individuals in your gaming lab regarding the -- their analysis of the POM machine in a Monroe County case?

A   Yes.

Q   Okay.  All right.  At the bottom of page 1, Mr. Leister says to Mr. Dinse, Here is a rough draft of the report of the skill game.  I copied a significant portion of the previous PSP report.  Please let me know if you feel any of it is inapplicable to this machine or if you think we should not be making any of the claims.

Did I read that correctly?

A   Yes.

Q   What PSP report is he referring to there?

A   I believe he was referring to a report prepared in a matter not involving POM skill.

Q   Do you know what manufacturer or game designer's game that involved?

A   I believe it was Banilla.

Q   Do you know if the name of that case was

Pinnacle Amusement v. Bureau of Liquor Control Enforcement?

MR. HUDDELL:  Object to form.  Object to scope.

THE WITNESS:  I could not confirm that.

BY MR. NOLAN:

Q  Are you familiar with that recent opinion -- appellate out of the Commonwealth Court of the Pennsylvania?

MR. HUDDELL:  Object to form.  Object to scope.

BY MR. NOLAN:

Q  Fairly recent.

A  Yeah, I have not really not studied that one or -- or read it at length.  I just heard that an opinion was made.  The time frame of that other one was, I believe, in late 2020.  So if that corresponds with any of your records, you know, maybe it does.

Q  Well, to your knowledge, was there a determination by the Court in the Banilla case as to the legality of their games?

MR. HUDDELL:  Object to form.  Object to scope.

THE WITNESS:  I believe that the machines

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023

135

were -- were returned to the manufacturer.

BY MR. NOLAN:

Q   Is that --

A   I don't recall exactly what -- what -- you know, how the judge determined that; but, you know, it could have been that he found -- it could have been the way the other cases were decided.

Q   Okay.  Okay.  So can we go down to page 5 of the PDF?  It's not Bates labeled.  And under Scope of Review, do you see that this PGCB report says that the lab conducted a review of the game play only.  Did I read that correctly?

A   Yes.

Q   All right.  Under WILD Placement, the report states the patron cannot affect how the game is generated.  They may only exercise skill via WILD placement on the game outcome presented to them.

     Did I read that correctly?

A   Yes.

Q   Okay.  And is it your understanding that what they're describing there is the first phase of the POM game, the WILD phase?

A   Yes.

Q   Okay.  So in that first phase, although

12:18:50
12:18:53
12:18:53
12:18:54
12:19:00
12:19:03
12:19:07
12:19:11
12:19:37
12:19:48
12:19:57
12:20:00
12:20:04
12:20:05
12:20:17
12:20:21
12:20:25
12:20:29
12:20:30
12:20:32
12:20:32
12:20:40
12:20:44
12:20:50
12:20:54

they don't control how the game is generated, they
are able to exercise some skill via the WILD
placement on the game outcome?

MR. HUDDELL:  Object to form.  Object
beyond the scope.

THE WITNESS:  Yes.

BY MR. NOLAN:

Q  Okay.  Reading down below -- I want to say
maybe six or seven lines up from the bottom of
that paragraph -- do you see the line that starts
with the word winnings?

A  In that same paragraph?

Q  Yeah.  So do you see the word winnings?

A  Oh, okay.  Okay.  That line.  Okay.

Q  So now the next sentence reads, also GLO,
the Gaming Laboratory Operations, questions
whether the act of being able to place a WILD in
order to create a three-of-a-kind winning
combination can be considered a skill, especially
when the games provide instructions for optimal
play to the patron.  This is significantly easier
than other games that require greater skill for
optimal payback, such as video poker or blackjack.

Did I read that correctly?

A  Yes.

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023

137

Q  So they're saying because the Pace-O-Matic games include instructions which tell you how to utilize your skill and because that makes it easier, they're saying it's not as hard as some of the other games that require skill like video poker or blackjack.  Right?

MR. HUDDELL:  Object to form.

THE WITNESS:  Yes.

BY MR. NOLAN:

Q  So it still requires skill in that phase. The manufacturers are just making it easier by giving the player instructions.  Right?

MR. HUDDELL:  Object to form.  Beyond the scope of the deposition notice.

THE WITNESS:  It's -- it's like lining up three lemons or lining up three bananas.  It's an extremely minimal amount of skill to put the third banana in a row of two other bananas.

BY MR. NOLAN:

Q  Okay.  But it is still a skill.  Right?

MR. HUDDELL:  Object to form.  Object, beyond the scope.

MR. COOK:  Objection.

THE WITNESS:  It's described as skill in -- in POM instructions.

BY MR. NOLAN:

Q  So it would be more skillful if they didn't include the instructions?

MR. HUDDELL:  Object to the form.  Object, beyond the scope of the deposition notice.

MR. COOK:  Objection.

THE WITNESS:  I don't know.

BY MR. NOLAN:

Q  Okay.

A  I can't answer that.

Q  All right.  Let's go down to -- I think it's on the next page at the bottom.  It says, Noncompliant Features and Other Issues.  Actually, let's go to the next page, the second full paragraph starts with, If the game.  Do you see that?

A  Yes, I do.

Q  The PGCB lab when analyzing the POM game stated, If the game, in its entirely -- entirety, including all features, were to be played with optimal skill, meaning no mistakes were made, then the player would be guaranteed to win more money than they lose.

Did I read that correctly?

A  Yes.

12:23:48
12:23:48
12:23:51
12:23:53
12:23:56
12:23:56
12:23:57
12:23:58
12:23:59
12:24:00
12:24:00
12:24:05
12:24:07
12:24:18
12:24:24
12:24:27
12:24:27
12:24:28
12:24:35
12:24:39
12:24:42
12:24:45
12:24:48
12:24:48
12:24:49

Q  So what they're describing there is a
player has the opportunity using optimal skill
every single time they play to win more than they
lose.  Fair?

MR. HUDDELL:  Object to form.  Object to
scope.

THE WITNESS:  That's what that first
sentence says, yes.

BY MR. NOLAN:

Q  Okay.  But your gaming lab analyst says
that there's a feature of the Follow Me phase that
is noncompliant with the PGCB rules that pertain
to games of chance.  Fair?

A  I -- I've read below that.  I don't see
the reference to it saying that something is not
compatible with our --

Q  Let's look at --

THE REPORTER:  With our what?

THE WITNESS:  With our regulations.

BY MR. NOLAN:

Q  All right.  Let's look at the top of the
following page.

I'm sorry.  Let's go back one page, the
bottom.  He says, However, since optimal play in
the Follow Me feature pays back 105 percent of the

12:24:50
12:24:55
12:24:58
12:25:01
12:25:03
12:25:06
12:25:06
12:25:08
12:25:09
12:25:09
12:25:13
12:25:17
12:25:21
12:25:50
12:25:53
12:25:59
12:25:59
12:25:59
12:26:06
12:26:12
12:26:12
12:26:14
12:26:24
12:26:27
12:26:31

patron's wager, this game would violate the PGCB

regulation that all slot machines must have a

theoretical payback of 85 to 100 percent.

     Did I read that correctly?

   A  Yes, you did.

   Q  Okay.  So your analyst is saying that the

POM game is designed to pay out higher than the

games of chance pursuant to the regulations.

Fair?

   A  Yes.

     MR. HUDDELL:  Object to form.

BY MR. NOLAN:

   Q  Hmm?

   A  Yes.

   Q  Okay.  In other words, if I'm a consumer

or a player, I would rather play the game that

might yield me 105 percent as opposed to at the

most 100 percent.  Right?

     MR. COOK:  Objection.

     MR. HUDDELL:  Object to form.  Beyond the

scope of the deposition notice.

     THE WITNESS:  In actuality, to get to the

point where you have the possibility of winning

105 percent is less than 50 percent, somewhat

significantly less than 50 percent.  So that --

that aspect of this game can be viewed as

misleading.  It's attracting people to come in

thinking that they can win 105 percent; but the

actual play makes that very, very difficult to

even get into that round.

    So in our regulations, we would not permit

that, because it would be an enticement to play a

game that you've got very little chance of

succeeding at.  So that's why we cap the

theoretical payout percentage allowed at 100

percent.

BY MR. NOLAN:

    Q  So --

    A  You can win 100 percent, but not over

that.

    Q  So you're saying it's difficult to get

into the Follow Me phase if you win in the first

phase.  Right?

        MR. HUDDELL:  Object to form.  Object,

beyond the scope.

        THE WITNESS:  I'm saying there's a couple

of aspects of the game that make it difficult to

get into Follow Me.

BY MR. NOLAN:

    Q  Which is either A, they win in the first

phase, or B, they just choose the option not to do the Follow Me phase?

A   Well, again, I think that you have to win in a certain way.  I mean, let's say that they have ten different symbols that you line up, bananas, lemons, oranges, apples.  My understanding is that maybe only the oranges and the apples are the only ones that kick you to Follow Me.  The bananas don't get you there.  The -- the -- the lemons don't get you there.

Q   Okay.  If they don't get you there, you don't win in that phase.  Right?

MR. HUDDELL:  Object to form.  Object beyond the scope of the deposition notice.

BY MR. NOLAN:

Q   If you don't win in the first phase and if you choose to exercise your option, you get to move on to the Follow Me phase.  Right?

MR. HUDDELL:  Objection to scope.

THE WITNESS:  Well, the other two phases, the lemon and the banana may have gotten you that 50 cent win instead of the dollar win.  And if you bet a dollar, you've got to -- you've got to win a dollar or more to get to the Follow Me stage.

BY MR. NOLAN:

12:28:41
12:28:44
12:28:45
12:28:47
12:28:50
12:28:54
12:28:59
12:29:02
12:29:05
12:29:08
12:29:11
12:29:13
12:29:15
12:29:17
12:29:19
12:29:19
12:29:21
12:29:23
12:29:25
12:29:25
12:29:29
12:29:29
12:29:35
12:29:35
12:29:40

Q  So in other words, you either break even or you get to go to the Follow Me phase.  That's your understanding of the game?

A  No.

MR. HUDDELL:  Object to form.  Object to beyond the notice of the deposition.

THE WITNESS:  You don't break even.  You win less than what you paid.  You actually lost 50 cents.

BY MR. NOLAN:

Q  Have you ever played one of the POM games?

A  I have not.

MR. HUDDELL:  Beyond the scope of the deposition notice.

THE REPORTER:  Wait.  Wait.  It has to be one at a time.

Repeat your question, please.

BY MR. NOLAN:

Q  Do you see at the top of the following page your analyst says, quote, It must be noted that the game play of, quote, Follow Me, unquote, would be permissible in a slot machine under PGCB regulations.  It is solely the return to the player, RTP, in excess of 100 percent that is a regulatory violation.

12:29:40
12:29:41
12:29:44
12:29:45
12:29:45
12:29:45
12:29:46
12:29:46
12:29:51
12:29:51
12:29:59
12:29:59
12:30:07
12:30:10
12:30:14
12:30:18
12:30:23
12:30:26

Did I read that correctly?

A   Yes, you did.

Q   If Follow Me was somehow changed to only pay out a maximum of 100 percent, then it would be permissible under the regulations?

A   That is correct.  Yes, sir.

Q   Don't you think players would rather have a payout of 105 percent as opposed to 100 percent?

MR. HUDDELL:  I'm going to object to the form.

MR. COOK:  Objection.

MR. HUDDELL:  And object that the question is beyond the scope of the deposition notice.

THE WITNESS:  Only if there is a -- a fair opportunity to get to that phase and to win at -- and to win at the Follow Me phase.

BY MR. NOLAN:

Q   Okay.  Can we go down to the end of this, Report Summation and Regulatory Evaluation?

Do you see your analyst said, This is a slot machine.  It's just a noncompliant slot machine.

Did I read that correctly?

A   Yes, you did.

Q   Reading on, he says, it would need to

12:30:28
12:30:30
12:30:31
12:30:34
12:30:38
12:30:40
12:30:42
12:30:46
12:30:49
12:30:50
12:30:51
12:30:51
12:30:53
12:30:55
12:30:57
12:31:02
12:31:06
12:31:39
12:31:43
12:31:52
12:31:55
12:31:58
12:31:59
12:31:59
12:32:00

remove the next Puzzle feature and the Follow Me
feature in order to possibly be compliant.

      Did I read that correctly?

A  Yes, you did.

Q  The regulations that would make this
machine not approvable are in place to ensure
approved slot machines are fair to the player and
casino alike.

      Did I read that correctly?

A  Yes, you did.

Q  Reading on, they state, Slot machines that
do not meet these regulations are not
automatically considered to not be slot machines
but are regarded instead as unfair slot machines
in the Pennsylvania market and are subsequently
not approved by the GLO for play.

      Did I read that correctly?

A  Yes, you did.

Q  Reading on, they state, This machine is
intended to appear as a slot machine complete with
spinning reels, paylines, and paytables.  No other
game genres have these elements featured so
prominently.

      Did I read that correctly?

A  Yes, you did.

Q   Anywhere in this Summation and Regulatory Evaluation does your gaming lab state that this is a game of chance?

A   Not in that summation, no.  In that summation, they're focusing on would the machine meet regulatory standards to go on the floor of a casino.

Q   Okay.  So did they conduct the predominant factor test in this report?

A   Yes.  It's in the paragraph of Wild Placement.  And we did read the first sentence -- maybe the first two sentences.  And if you go further on and you go to the third line, the sentence that begins towards the end, In GLO's professional opinion, it is highly likely that spins where zero points would be won regardless of the placement of the WILD will occur with a probability of greater than 50 percent.  This opinion is based on virtually all slot machines' math having winning spin probabilities of less than 50 percent.  If the benchmark to be considered a game of skill rather than a slot-like game of chance is to be predominantly skill based, over half of the base game spins would need to result in an outcome where WILD placement would

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023                    147

have an effect on the patron's winnings.    12:35:09

Also GLO questions whether the act of    12:35:14
being able to place a WILD in order to create a    12:35:16
three of a kind winning combination can be    12:35:20
considered a skill, especially when the games    12:35:22
provide instructions for optimum play to the    12:35:25
player.  This is significantly easier than other    12:35:28
games that require greater skill for optimal    12:35:31
payback such as video poker or blackjack.  It    12:35:34
should be noted that the WILD placement feature    12:35:38
would be -- would not disqualify a slot machine    12:35:40
submission from PGCB approval, provided the game    12:35:44
complied with all slot machine minimum design    12:35:47
standards in Chapter 461.50.    12:35:50

I believe that the predominance test was    12:36:00
concluded to be on the side of chance because of    12:36:02
what I just read as well as analysis of -- of the    12:36:09
-- the number of -- or the percent -- or the    12:36:20
number of incidences where games would be won    12:36:23
based upon games that are played.    12:36:28

Q  You just described to me in the first    12:36:30
phase WILD placement.  What about their    12:36:33
determination as to the predominant factor test    12:36:36
related to the game in its entirety?    12:36:41

MR. HUDDELL:  Object to form.    12:36:46

Transcript of Kevin O'Toole, Designative Representative
Conducted on July 21, 2023                                148

THE WITNESS:  Well, I -- I think that they concluded in its entirety, because there's limited ways to get into the -- into the skill component of the game, that over 50 percent of games played are played without skill.  And that -- that was the factual basis upon which they concluded that the game is not predominantly skill and is predominantly chance.

BY MR. NOLAN:

Q  Well, what about the sentence where they do actually use the phrase in its entirety where your lab states on the following page, If the game in its entirety, including all features, were to be played with optimal skill, meaning no mistakes were made, then the player would be guaranteed to win more money than they lose, isn't that their ultimate outcome in terms of their analysis of the game in its entirety?

A  No, it's not.  It's qualified by the following sentences.  You have to read the next two or three sentences to -- to see what context they put that first sentence in.  That first sentence is here's -- here's the -- here's the goal; but you're not going to get to that goal.  You know, very few people are going to get to that

goal.  And most of the people that don't get to that goal are stopping with just the chance element.

Q  Okay.  So this analysis was done by your lab in relation to a Monroe County case.  Correct?

A  Yes.

Q  Do you know what the status of that case is?

A  I -- I do not.

Q  Do you know whether the Court in that case has made a determination as to whether the game is predominantly skill or chance?

MR. HUDDELL:  Object, beyond the scope of the deposition notice.

THE WITNESS:  I do not.

BY MR. NOLAN:

Q  Okay.

A  I would have to research that.

Q  Do you know whether the game has been returned to the manufacturer or the licensee?

MR. HUDDELL:  The same objection.

THE WITNESS:  That's not within the realm of -- of our -- of our assistance.

BY MR. NOLAN:

Q  Well, certainly, to the extent your lab

12:38:16
12:38:19
12:38:23
12:38:25
12:38:29
12:38:33
12:38:33
12:38:35
12:38:36
12:38:39
12:38:43
12:38:47
12:38:49
12:38:53
12:38:53
12:38:54
12:38:54
12:38:55
12:38:56
12:38:58
12:39:02
12:39:03
12:39:06
12:39:12
12:39:12

150

did actually say that somehow the predominant factor test rendered it as a game of chance, you would agree with me that you're not aware of any court that has agreed with that?

MR. HUDDELL:  Object to the form.

MR. COOK:  Objection.

MR. HUDDELL:  Object, beyond the scope of the dep notice.

THE WITNESS:  Yes.  That's correct.

(Exhibit 6 was marked for identification.)

BY MR. NOLAN:

Q  I'm handing you what has been marked as Exhibit 6.  I believe earlier you made reference to a decision that came out in November of 2019. Do you remember that?

A  Yes.

Q  You even wondered if the Court that had issued that opinion had actually read your testimony to the House committee on gaming. Right?

A  I don't recall -- I don't recall that.

Q  Do you recall telling me that there was a Commonwealth Court opinion where the Court held that POM's games were slot machines?

A  Yes.  I believe that is the one that

12:39:18
12:39:22
12:39:26
12:39:28
12:39:31
12:39:31
12:39:35
12:39:38
12:39:38
12:39:48
12:39:48
12:40:20
12:40:25
12:40:28
12:40:38
12:40:40
12:40:40
12:40:45
12:40:48
12:40:53
12:40:53
12:41:05
12:41:08
12:41:12
12:41:17