# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CIVIL


----------------------------X

PACE-O-MATIC,                    :

            Plaintiff   :

       v.                        :

ECKERT SEAMANS CHERIN &     : No. 1:20-cv-292-JPW

MELLOT, LLC, et al,              :

            Defendants   :

----------------------------X



        Deposition of PETER SHELLY

        Harrisburg, Pennsylvania

      Wednesday, September 20,2019

            9:08 a.m.







Job No.:  505537

Pages: 1 - 411

Reported by:  Joyce A. Wise, RMR

Page 2

Deposition of PETER SHELLY, held at of:

HILTON HARRISBURG

1 North 2nd Street

Governor's Room

Harrisburg, PA 17101

Pursuant to agreement, before Joyce A. Wise, RMR, Notary Public in and for the Commonwealth of Pennsylvania.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF PACE-O-MATIC:

MICHAEL NOLAN, ESQUIRE

HUSCH BLACKWELL, LLP

8001 Forsyth Boulevard

St. Louis, MO 63105

(314) 480-1500

ON BEHALF OF DEFENDANT ECKERT SEAMANS

CHERIN & MELLOT, LLC:

NATHAN HUDDELL, ESQUIRE

FOX ROTHSCHILD, LLP

2000 Market Street

10th Floor

Philadelphia, PA  19103-3291

(215 ) 299-2000

Page 4

APPEARANCES CONTINUED:

ON BEHALF OF DEPONENT PETER SHELLY,

WILLIAM R. CRUSE, ESQUIRE

BLANK ROME

One Logan Square

130 North 18th Street

Philadelphia, PA 19103

(215) 560-5500

Page 5

INDEX TO DEPONENT

EXAMINATION                                    PAGE

By Mr. Nolan ........................12

INDEX OF EXHIBITS

SHELLY                                         PAGE

1: Code of Ethics ...................36

2: Code of Ethics for Public ........87
Relations Professionals

3: Complaint ......................150

4: E-mail chain from Charlie Lyons ..195

5: E-mail chain from Charlie Lyons ..221

6: E-mail chain ...................245

7: E-main chain from Mark Stewart ...265

8: E-mail from Karin Ashford .......288

9: E-mail string ..................298

10:Press release ..................324

11:E-mail string from Mr. Stewart ...335

12:E-mail string ..................353

13:E-mail string ..................358

14:E-mail string ..................362

15:E-mail string ..................372

16:E-mail string ..................379

17:Advertisement ..................387

18:E-mail string ..................390
              INDEX TO EXHIBITS (cont'd)

Page 6

PAGE

19:Draft press release  ............ 391

20:Column to Editor by Tom Bonner ...396

21:E-mail string ...................398

22:February 20, 2020 statement ..... 401

23:E-mail string ...................403

24:E-mail string ...................406

THE VIDEOGRAPHER:  Here begins Media Number 1 in the videotaped deposition of Pete Shelly in the matter of Pace-O-Matic Inc. versus Eckert, Seamans, Cherin & Mellott, LLC, et al, in the United States District Court for the Middle District of Pennsylvania, Case Number 1:20-cv-292-JPW.

Today's date is September 20th, 2023.  Time on the video monitor is 9:08 a.m. Eastern time.

The videographer today is Kylan Barry representing Planet Depos.

This video deposition is taking place at 1 North Second Street, Harrisburg, Pa., 17101.

Would counsel please voice identify themselves and state whom they represent?

MR. NOLAN:  Mike Nolan, Husch Blackwell, on behalf of plaintiff Pace-O-Matic.

MR. HUDDELL:  Nathan Huddell, Fox Rothschild, on behalf of Defendants Mark Stewart, Kevin Skjoldal and Eckert,

Page 8

Seamans, Cherin & Mellott, LLC.

MR. CRUSE:  Bill Cruse of Blank Rome on behalf of non-party, Pete Shelly.

THE VIDOGRAPHER:  The court reporter today is Joyce Wise, representing Planet Depos.

The witness will now been sworn.

PETE SHELLY, called upon by Plaintiff to give testimony, being duly sworn or affirmed by me, testified as follows:

*    *    *    *    *

MR. CRUSE:  Before we begin, Mr. Nolan, I'd like to read a brief statement into the record.

Pursuant to the Court's order dated July 21st, 2023, ECF Number 23, this deposition shall be designated for attorneys' eyes only for a period of 30 days, during which time Mr. Shelly will move for AEO protection of specific portions of the transcript and video.

Furthermore, pursuant to the stipulated confidentiality agreement and protective order in this case, ECF 196,

Mr. Shelly will be designating portions of the transcript and video as confidential pursuant to paragraph four thereof.

And as Mr. Shelly can verify during today's deposition, at all times he has served as an agent of Greenwood Gaming and Entertainment, Inc., doing business as Parks Casino, working as a communications consultant.

Mr. Shelly worked under the direction of Parks Casino and its legal counsel, Mark Stewart and Eckert, Seaman's firm and his responsibilities included assisting Mr. Stuart's legal representation of Parks Casino through Mr. Shelly's expertise in communications and publications relation field.

Although the Court ordered the defendants in this case to produce certain documents, many of which contain communications between Mr. Stewart and privileged persons, specifically Parks Casino, its agents and other privileged persons, Mr. Shelly is not at liberty to

disclose in this deposition any communications subject to the attorney/client privilege, the privilege belongs to his principle Parks Casino and only Parks Casino can waive the privilege.

To be clear, Mr. Shelly can testify about the contents of documents you show him, his own actions and those of others that he knows about.

He cannot and will not testify about communications subject to Parks Casino's attorney/client privilege with Mr. Stewart, Mr. Skjoldal and the Eckert, Seamans firm.

MR. HUDDELL: And, Mike, before we get started, I'd like to note for the record --

MR. NOLAN: Hold on.

Mr. Cruse, you said that Mr. Shelly will be moving to designate certain portions of today's deposition as attorneys' eyes only.

Did I hear you correctly?

MR. CRUSE: That's what the order

says, that for 30 days it is attorneys' eyes only. And during that 30-day period, we are entitled to move to designate for attorneys' eyes only.

MR. NOLAN: Oh, I know what the order says.

I thought you just represented to the Court that he would be moving to designate certain portion as attorneys' eyes only.

MR. CRUSE: I suspect there will be portions but I'm not committing -- if you don't touch on anything that's covered, then I won't.

MR. NOLAN: It sounded to me like you already anticipated that certain questions would cover certain information that would be attorneys' eyes only?

MR. CRUSE: I think I clarified what I stated to satisfy here in court.

MR. NOLAN: Go ahead, Mr. Huddle.

MR. HUDDELL: It's hereby stipulated by counsel and the respective parties, that all objections, except as to the form of question, are reserved

Page 12

until the time of trial.

EXAMINATION

BY MR. NOLAN:

Q.    Please state your name.

A.    Peter Shelly.

Q.    Mr. Shelly, you just heard your attorney read a statement in which, and I'm paraphrasing, but he basically said you were working at the direction of Mark Stewart, is that correct?

A.    That's correct.

Q.    Everything you did relative to this case you were doing at Mark Stewart's direction?

A.    That's correct.

Q.    So any lies you told in regards to the legality of Pace-O-Matic was at Mark Stuart's direction?

MR. CRUSE:  Objection, argumentative.

THE DEPONENT:  I'm not going to answer.  My attorney just objected.

BY MR. NOLAN:

Q.    You do have to answer.

MR. CRUSE:  Let me just explain.

Page 13

Unless I instruct you not to answer on the basis of privilege or on other grounds, you do have to answer the questions.

But if you don't understand the question that counsel has asked, based on verbiage he uses, you can ask him to rephrase it.

THE DEPONENT:  You'll have to be more specific.

MR. NOLAN:  Would you please read my question back, madam court reporter?

MR. CRUSE:  If you don't understand the question based on words he uses, ask for clarification.

(Reporter read back last question.)

THE DEPONENT:  You're gonna have to clarify what lies you believe I told.

BY MR. NOLAN:

Q.    Well, let me put it this way.

Any statements you made about Pace-O-Matic's gains were at the direction of Mark Stewart?

A.    They were at the direction of Mark

Page 14

Stewart 90 percent of the time, yes.

Q.    Any statements that you made about the legality of Pace-O-Matic's gains, were they at the direction of Mark Stewart?

A.    Yes, sir.

Q.    Did Mark Stewart basically tell you what to say?

A.    Mark Stewart --

MR. CRUSE:  I caution you.  You can talk --

MR. NOLAN:  Please do not make speaking objections.

MR. CRUSE:  I'm instructing --

MR. NOLAN:  Please stop coaching your witness.

MR. CRUSE:  You are not to disclose any communications that you had with Mr. Stewart, the specifics of those.

You can talk about your actions and things you did and how the structure worked.  But you're not entitled to get into the communications you had with Mr. Stewart.

MR. NOLAN:  Please stop coaching your witness.

MR. CRUSE:  That's not coaching. That's objecting to privilege.

MR. NOLAN:  Did you object on that grounds?

MR. HUDDELL:  Yes, I did.

MR. NOLAN:  I didn't hear an objection.  I heard you coaching.

MR. CRUSE:  Just to be clear, I object and we are going to protect the privilege all day today.

MR. NOLAN:  You understand the rules do not allow you to coach this witness during the deposition?

MR. CRUSE:  That was not coaching. I'll let the tape speak for itself.

MR. NOLAN:  It will speak for itself.

And if you continue throughout this deposition to obstruct and coach your witness, I'm going to be moving for sanctions.

Do you understand?

MR. CRUSE:  I welcome you to move for sanctions of anything I said, because it would be completely frivolous, much

Page 16

like your statements just now.

MR. NOLAN:  Would you please read my last question back, madam court reporter?

(Reporter read back last question.)

MR. HUDDELL:  Object to the form. Vague.

MR. CRUSE:  Join the objection.

THE DEPONENT:  Mr. Stewart approved documents that I prepared on behalf of Parks Casino.

BY MR. NOLAN:

Q.    Would you have disseminated those documents in terms of statements if Mr. Stewart had not approved them?

MR. HUDDELL:  Object to form, vague.

MR. CRUSE:  Join the objection.

THE DEPONENT:  If not Mr. Stewart, another attorney would have approved those statements.

BY MR. NOLAN:

Q.    What other attorney?

A.    There were -- I am sure that in

the course of my work for Parks, Mr. Stewart might have been away, he might have been out-of-pocket, and if not, an attorney at Eckert, an attorney at Parks Casino would have approved those statements.

Q.    Which attorney at Parks Casino?

MR. HUDDELL:  I'm gonna object to form.  Vague.

THE DEPONENT:  Tom Bonner, B-O-N-N-E-R, I believe.  His title was general counsel or something like that.

So Mr. Bonner would have approved those statements.

BY MR. NOLAN:

Q.    Would you have disseminated any of those statements if Mr. Stewart or any of the attorneys at Eckert disapproved of them?

MR. CRUSE:  Objection to form.

THE DEPONENT:  No.

MR. CRUSE:  I just ask that you give me a few beats after the question to give me an opportunity to make objections.

THE DEPONENT:  I apologize.  Could you repeat the question?  I apologize.

BY MR. NOLAN:

Q.    If any of the attorneys at Eckert would have disapproved of any of your proposed statements, would you have disseminated them?

MR. CRUSE:  Objection to form.

MR. HUDDELL:  Same objection.

THE DEPONENT:  No, sir.

BY MR. NOLAN:

Q.    In essence, in the job that you did, are you saying that the attorneys at Eckert were in an authority position over you?

MR. HUDDELL:  Object to form. Vague.

MR. CRUSE:  Join the objection.

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.    They were calling the shots?

MR. HUDDELL:  Objection to form, vague.

MR. CRUSE:  Objection to form.

THE DEPONENT:  In terms of preparing documents and reviewing documents, yes, sir.

BY MR. NOLAN:

Q.    Do you remember a few moments ago

when the madam court reporter administered an oath to you?

A.   I do.

Q.   Basically you promised to tell the truth, the whole truth and nothing but the truth.

Do you remember that?

A.   I do.

Q.   Are you committed to do that?

A.   I am.

Q.   Do you understand that that necessarily means that when you answer my question, you actually have to answer the question that's posed to you.

Do you understand that?

A.   Yes, sir.

Q.   Okay.  In other words, if you don't answer the question posed, then you're not really being truthful, are you?

MR. CRUSE:  Objection, argumentative.

MR. HUDDEL:  Same objection.

THE DEPONENT:  No, sir.  I don't agree with that.  I defer to the attorneys in the room.

BY MR. NOLAN:

Page 20

Q.    So you feel that you could truthfully answer a question when you don't even answer the question posed?

MR. CRUSE:  Objection, argumentative.  Don't answer.

MR. HUDDEL:  Same objections.

MR. CRUSE:  Don't answer that.

He's arguing with you and harassing you.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice and refuse to answer that question?

MR. CRUSE:  Follow my advice and refuse to answer that question.

He can file his motion.

THE DEPONENT:  I refuse to answer that question, based on my attorney's advice.

BY MR. NOLAN:

Q.    Okay.  Do you feel that you are able to understand my questions today, generally speaking?

A.    Yes, I do.

Q.    To your knowledge, is there anything that would prevent you from

Page 21

understanding my questions and forming a responsive answer?

A.    No.

Q.    For instance, are you on any medications today that make you feel groggy or tired?

A.    No, sir.

Q.    Do you have any health conditions that you feel would impede your ability to understand and answer my questions?

A.    No, sir.

Q.    Okay.  Ordinarily, I wouldn't address this, but it did come up when we were trying to schedule your deposition.

I believe originally it was noticed for August 30th, but your attorney, Mr. Cruse, said that you would not be able to appear for a deposition that day due to some kind of health issues.

Are you familiar with that?

A.    Yes sir, I am.

Q.    Can you just tell me generally at a very high level what those health issues are that prevented you from giving your deposition on the 30th?

Page 22

A.      I was taken by ambulance to an emergency room while on vacation.  Chest pains, shortness of breath.

Q.      Okay.  When was that?

A.      Sometime in August.  I don't remember the exact date.

Q.      Okay.  Was there anything that prevented you from participating in the deposition on August 30th?

A.      Yes, sir.  I believe I was still grappling with doctor appointments and persistent chest pain, shortness of breath.

        And ultimately I had three stents installed in my heart.

Q.      Did you ever have a cardiac stress test?

A.      Yes, sir.

Q.      What date was that?

A.      I have no recollection.  It would have been sometime in the last month.  I can't recall the date.

Q.      I apologize.  Earlier I referenced August 30th.  I believe it was the 31st that your deposition was scheduled for.

        Did you have any -- did you have a

Page 23

cardiac stress test on August 31st?

A.   I very well could have.  It was after we returned from the vacation, but I don't recall the date.  Upon my -- I don't recall the date.

Q.   What did you do to prepare for today's deposition?

A.   I re-read the complaint that Pace-O-Matic has filed against me -- or the litigation that Pace-O-Matic filed against me in Lycoming County.

MR. CRUSE:  Can you pause for a moment?

THE DEPONENT:  Yes, sir.

MR. CRUSE:  I do have to warn you about the privilege here and about attorney work product.

You are not disclose any communications you had with me or your counsel --

MR. NOLAN:  You're coaching the witness.

MR. CRUSE:  -- and with respect to any documents that you reviewed, you're not to identify them, because that's

Page 24

attorney work product.

And it is not coaching the witness and I encourage you to file your motion against me for everything I just said.

MR. NOLAN:  If you have an objection, please make it succinctly; otherwise, you just don't get to coach your witness.

MR. CRUSE:  That's not coaching.

File your emotion.

BY MR. NOLAN:

Q.    Please answer the question.

A.    And I read the complaint that is at the heart of this deposition.

Q.    Okay.  Any other documents that you reviewed other than the complaint in your case and the complaint in this case?

A.    No, sir.

Q.    Why did you feel it necessary to review the complaint in your case to prepare for this deposition?

A.    They seem related to me.

Q.    So you would anticipate that some of the information that's covered in the complaint against you personally might be

Page 25

relevant to this case, is that fair?

            MR. CRUSE:  Objection to form.

            THE DEPONENT:  That's fair.

BY MR. NOLAN:

        Q.    Basically talking about a lot of
the same stuff, right?

            MR. CRUSE:  Objection to form.

            THE DEPONENT:  Common sense
        dictated that these are related matters.

BY MR. NOLAN:

        Q.    Okay.  Thank you.

            Any other documents that you
reviewed other than those two complaints?

            MR. HUDDEL:  Objection.  Asked and
        answered.

            MR. CRUSE:  Join.

            THE DEPONENT:  No, sir.

BY MR. NOLAN:

        Q.    Did you talk to anyone to prepare
for today's deposition?

        A.    My attorney.

        Q.    Was anyone else present while you
were talking to your attorney?

        A.    No, sir.

        Q.    How long did you talk to your

attorney to prepare for today's deposition?

A.    Approximately two-and-a-half hours.

Q.    Was that in person or over the phone?

A.    It was in person.

Q.    When did that occur?

A.    My offices at 219 State Street, Harrisburg, Pennsylvania.

Q.    Have you spoken to Mark Stewart in preparation for today's deposition?

A.    No, sir.

Q.    When was the last time you spoke to Mr. Stewart?

A.    I bumped into Mr. Stewart at a local book store eight, 10 weeks ago.

We had a social conversation about the author, David Sedaris.

Q.    On that occasion, did you discuss your deposition with Mr. Stewart?

A.    I don't believe it had been scheduled.  If it had been -- no, I did not.  It was a social conversation strictly.

Q.    When was the last time you spoke to Mr. Skjoldal?

Page 27

A.     I don't recall.  A year, two years.

I do not recall the last time -- or, frankly, the first time I spoke to Mr. Skjoldal.

Q.     So other than reading those two complaints and talking to your attorney for two-and-a-half hours, is there anything else that you did to prepare for today's deposition?

A.     No, sir.

Q.     Did you go back and look at any of your correspondence related to these matters?

A.     I did not.

Q.     Why not?

A.     I didn't feel it necessary.

Q.     How would you describe your relationship with Mark Stewart?

MR. CRUSE:  Objection to form.

THE DEPONENT:  We were colleagues working for Parks Casino.

BY MR. NOLAN:

Q.     The work that you did in relation to this case, was that pursuant to a contract?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.    Who was the contract with?

A.    Greenwood Gaming doing business as Parks Casino, I believe, was the --

Q.    Is that a written contract?

A.    Yes, sir.

Q.    What's your recollection of the scope of work that was described in that contract?

A.    My job is to provide communication support to the team -- to the legislative and legal team, principally the team upon engagement.

Q.    Who's the legal team?

A.    At that -- it was Eckert -- it was Mark Stewart.

Q.    In your contract with Parks, did it specifically name Mark Stewart?

A.    No, sir.

Q.    When did you enter that contract with Parks?

A.    October, November, in that timeframe, 2020.

Q.    Let me shift gears and go talk a little bit about your background.

Page 29

Where did you go to college?

A.    I attended Ohio Wesley and Temple University.

Q.    Do you have any degrees?

A.    I do not.

Q.    What did you study in college?

A.    I was an English major.

Q.    Why didn't you continue on and get a degree?

A.    I kept finding good jobs and I didn't find it necessary.

Q.    What good jobs are you talking about?

A.    I was a reporter for a very long time before I started my own businesses.

Q.    Do you have any educational background in journalism?

A.    I was raised by a journalist.  My background is B & A and mentoring from my mother, Mary Jane Shelly.

Q.    She was a journalist?

A.    Yes, sir.

Q.    Was she proud of the work that she did as a journalist?

A.    She was.

Q.    Were you proud of her?

A.    I am.

Q.    What other jobs did you hold in journalism?

A.    Going backwards from my career, I worked for -- I'm sorry.  Do it the easier way.

I worked for the Philadelphia Inquirer as a correspondent.

I worked for the Harrisburg Patriot News.  I worked for the Pittsburgh Post Gazette.

I started a company called CapitolWire.com which was a legislative news site tracking website.

I worked for the Associated Press when they purchased CapitolWire.com.

And I apologize, I should have mentioned, early on I wrote for the Chestnut Hill Local, which is where my mother was the editor.

Q.    Any other significant jobs that you've held in journalism?

A.    No.

Q.    What other work have you done other than as a journalist?

A.    I've been in journalism and around

journalism my entire professional career until I became a communications consultant.

Q.   What is a communications consultant?

A.   My job is to assist clients in achieving principally right now legislative goals.

So very briefly, we develop communications plans for an array of clients who have issues, either locally, at the state house or federally principally.

We do have other clients occasionally, not specific to communications, around legislative or executive actions, government actions, but those are few and far between.

Q.   When you talk about communications, is that sometimes referred to as public relations?

A.   It is.

Q.   Do you have any educational background in communications or public relations?

A.   No.

Q.   Do you have any type of accreditation in that regard?

A.     No.

Q.     Is there -- are there degrees available in public relations or communications?

A.     I am sure there are.

Q.     Do you know if there's any accrediting body relating to communications or public relations?

A.     I am not aware of any as I sit here.

Q.     Do you hold any type of accreditation -- excuse me, accreditation as a journalist?

A.     I'm not aware that there are any.

Q.     Were you aware of whether or not journalists are governed by a Code of Ethics?

MR. HUDDEL:  Object to form, vague.

MR. CRUSE:  Join.

THE DEPONENT:  I am not aware of a Code of Ethics, generally speaking.

BY MR. NOLAN:

Q.     What did your mom teach you about how journalists should do his or her job?

MR. HUDDEL:  Object to form, vague.

MR. CRUSE:  Join.

THE DEPONENT:  Write plainly and clearly and as succinctly as possible.

BY MR. NOLAN:

Q.    Is that it?

A.    That's the main lesson.

Q.    Anything else?

A.    I'm sure there are many other lessons my mother taught me, but those are the ones relevant to being a journalist.

Q.    So let's just focus to what she taught you in regards to what you should or shouldn't do as a journalist.

Anything else that you can think of?

MR. CRUSE:  Objection.

THE DEPONENT:  No.

BY MR. NOLAN:

Q.    She never told you don't print lies?

MR. CRUSE:  Objection, argumentative.  Don't answer that.

Counsel, you keep doing this. You're doing things to harass my client and to intimidate him.

Page 34

And I'm going to instruct him not to answer every time.  And you can make your motion.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice and refuse to answer my question?

A.    Yes, sir.

Q.    Did your mom, as an editor, ever tell you that as a journalist you should endeavor to tell the truth?

A.    Yes.

Q.    Well, I just asked you what she taught you about that and you didn't mention it.

A.    I mentioned that my mother taught me many lessons and that was not just in the context of being a journalist.

Q.    Okay.  Well, then I'm just talking about as a journalist.

Did she tell you that it's important to only write or publish truthful things about other people?

MR. CRUSE:  Objection.

MR. HUDDEL:  Object to form.

Asked and answered.

THE DEPONENT:  Do I answer?

MR. CRUSE:  Uh-huh.

THE DEPONENT:  Yes.

The goal is to report, to write accurate -- accurately and share facts with people.

BY MR. NOLAN:

Q.    And all journalists should endeavor to do that, correct?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I believe that should be the case.

BY MR. NOLAN:

Q.    How about people in the PR world or communications world, is it important for them to tell the truth?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  It's important to me to tell the truth on behalf of my clients.

Other people in Harrisburg, maybe not so much.

(Shelly Deposition Exhibit Number 1 marked.)

BY MR. NOLAN:

Q.   Okay.  I'm handing you what's been marked Exhibit 1.

It's entitled Society of Professional Journalists, Code of Ethics.

Do you see that?

A.   I do.

Q.   Have you ever seen this before?

A.   I have not.

Q.   Are you familiar with the Society of Professional Journalists?

A.   I believe I won an award from the Society of Professional Journalists at one point in my career.

So, yes, I am aware of them.

Q.   Do you believe them to be a legitimate professional organization that deals with journalism?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.   Do you see here under the heading preamble it says, members of the Society of

Professional Journalists believe that public enlightenment is the forerunner of justice and the foundation of democracy?

Do you see that?

A.   Yes, sir.

Q.   Do you agree with that statement?

A.   Yes, sir.

Q.   Are you a member of the Society of Professional Journalists?

A.   I am not.

Q.   Why not?

A.   I've never felt a need to join the Society of Professional Journalists.

Q.   Reading on, it says, ethical journalism strives to ensure the free exchange of information that is accurate, fair and thorough.

Did I read that correctly?

A.   Yes, sir.

Q.   And do you agree with that statement?

A.   I do.

Q.   Reading on it states, an ethical journalist acts integrity.

Did I read that correctly?

A.   Yes, sir.

Page 38

Q.      Do you agree with that statement?

A.      I do.

Q.      What does integrity mean to you?

        MR. HUDDEL:  Objection to form.

        MR. CRUSE:  Objection to form.

        THE DEPONENT:  Integrity is the way you carry yourself.  It governs your conduct.

BY MR. NOLAN:

Q.      The Oxford dictionary defines integrity as the quality of being honest and having strong moral principles, moral uprightness.

        Do you agree with that definition?

A.      Absolutely.  Yes, sir.

Q.      Okay.  Does that kind of incorporate what we were talking about earlier, that it's important for journalists to be accurate?

        MR. HUDDEL:  Object to form.

        MR. CRUSE:  Object to the form.

        THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.      You would agree if you were publishing statements that were inaccurate, it

Page 39

would mean that you were not being -- not acting with integrity?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.   What do you think of journalists who publish statements that are untrue?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  I am not -- I don't know as I sit here, having been a journalist for 20-some years, a single reporter who would do that intentionally.

It doesn't happen in my experience.

BY MR. NOLAN:

Q.   How about folks from the PR world, the communications world, do you think it's important for them to act with integrity?

A.   Yes, sir.

Q.   Do you know anyone in the PR world that doesn't act with integrity?

MR. HUDDEL:  Object to form.

THE DEPONENT:  I am not in a

position to judge other people's integrity.

I'm in a position to worry about my integrity, not -- nobody else's.

BY MR. NOLAN:

Q.   Why aren't you in a position to judge other people's integrity?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Objection to form, relevance.

THE DEPONENT:  Respectfully, my job here is not to judge anybody for their conduct.

BY MR. NOLAN:

Q.   Okay.  All right.  Looking back at Exhibit 1, do you see where it says under the heading, seek truth and report it, it states, ethical journalism should be accurate and fair.

Journalists should be honest and courageous in gathering and reporting and interpreting information.

Did I read that correctly?

A.   I did.

Q.   Do you agree with that statement?

A.   I do.

Page 41

Q.      Does it apply to the PR world?

MR. HUDDEL:  Object to form.

THE DEPONENT:  In my --

MR. CRUSE:  I would just ask that you remember again to give some time for objections to happen, because it's happening -- you're answering really quick and we're not able to do objections and she has to be able to record it all.

THE DEPONENT:  Thank you.

Could you repeat that again, sir?

BY MR. NOLAN:

Q.      Do you believe that applies to the PR world or the communication world that you live in?

MR. CRUSE:  Objection to form.

THE WITNESS:  I do.

BY MR. NOLAN:

Q.      Okay.  Reading down below that, in the first bullet point, it says, journalists should take responsibility for the accuracy of their work, verify information before releasing it, use original sources whenever possible.

Did I read that correctly?

A.      Yes, sir.

Page 42

Q.      Do you agree with that statement?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.      Does that equally apply to the work that you do in public relations or communications?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Same objection.

THE DEPONENT:  I believe so, yes, sir.

BY MR. NOLAN:

Q.      So in your work in communications, what do you do to verify information before you release it?

MR. HUDDEL:  Object to form, vague.

MR. CRUSE:  Join.

THE DEPONENT:  Consult public records and in many, many instances, rely on the advice of an attorney.

BY MR. NOLAN:

Q.      Okay.  Did you ever consider Mr. Stewart to be your attorney?

A.      No, sir.

Q.      How about Mr. Skjoldal?

A.      No, sir.

Q.      How about Mr. Bonner?

A.      No, sir.

Q.      How about any of the other attorneys at Eckert?

A.      No, sir.

Q.      Looking back at Exhibit 1 in the third bullet point, it says, journalists should provide context, take special care not to misrepresent or oversimplify in promoting, previewing or summarizing a story.

Did I read that correctly?

A.      I apologize.  I don't see that.

Where is that?

Q.      The third bullet point.

A.      There.  I apologize.

Generally, yes, the word oversimplified is rather vague.

Q.      Do you believe that that statement, subject to your qualification, equally applies to the world of public relations or communications?

A.      Yes.

Page 44

MR. CRUSE:  Objection to form.

THE DEPONENT:  Provide context is vague for what I do for a living.

The answer is no, I don't.

BY MR. NOLAN:

Q.    So that one doesn't apply to public relations?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I'm not sure how it could apply to public relations.  It's --

BY MR. NOLAN:

Q.    Well, it says take special care not to misrepresent.

Isn't that important in public relations?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I believe -- you can ask the reporter to read it back, but I thought I said context and oversimply.

That's kind of different possibly when it comes to public relations communications work.

Page 45

BY MR. NOLAN:

Q.    Okay.  So do I understand you correctly that in public relations, you would agree that it's important to take special care not to misrepresent things, but sometimes you might oversimply things or not provide context?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I believe that's what I am saying, yes, sir.

BY MR. NOLAN:

Q.    Okay.  The next bullet point says that a journalist should gather, update and correct information throughout the life of a news story.

Did I read that correctly?

A.    Yes.

Q.    Do you agree with that statement?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Throughout the life of a news story, correct, that is accurate when it comes to a news story.

BY MR. NOLAN:

Q.    Let me ask you this.  As a

Page 46

journalist, if you ever published a statement that was inaccurate and you came to learn of its inaccuracy, what, if anything, would you do to address that?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.  It calls for speculation.

THE DEPONENT:  We would -- I would make every effort to correct the record.

BY MR. NOLAN:

Q.   How would you do that?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Provide a correction.

BY MR. NOLAN:

Q.   How?

MR. CRUSE:  Objection to form.

THE DEPONENT:  The daily newspaper invariably will have on the inside of the first page or someplace else corrections.

BY MR. NOLAN:

Q.   Does that apply equally to the world of publication and communications?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I believe so.

BY MR. NOLAN:

Q.    So if in your work as a PR person, you published a statement that was inaccurate and you came to learn of its inaccuracy, what would you do?

MR. CRUSE:  Objection to form, speculation.

THE DEPONENT:  There is no newspaper of record.

We would -- I would not repeat the mistake, not repeat the error.

We would update content necessarily as needed.

BY MR. NOLAN:

Q.    Do you see the bullet point, it's, I think, several down, it starts with identify sources clearly?

A.    Yes, sir.

Q.    Reading on it says, the public is entitled to as much information as possible to judge the reliability and motivation of sources.

Did I read that correctly?

A.    Yes, sir.

Page 48

Q.      Do you agree with that statement?

MR. HUDDEL:  Object to form,
vague.

MR. CRUSE:  Join.

THE DEPONENT:  As a journalist, I
agree with that statement.

BY MR. NOLAN:

Q.      How about the work that you do in
public relations and communications, does that
apply there?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Objection to form.

THE DEPONENT:  We don't identify
sources as a journalist.  It's a tenant
of journalism.

Public relations does not
typically have to identify a source to
say -- to repeat a message or a fact.

BY MR. NOLAN:

Q.      Well, in the work that do you in
public relations, don't you think it's important
that the public have as much information as
possible to judge the reliability and motivations
of your sources?

MR. CRUSE:  Objection to form.

Page 49

MR. HUDDEL:  Same objection.

THE DEPONENT:  Again, sources are a journalistic -- that's the language of journalism.

I do believe it is important to share -- to provide as much information as possible in all of our work, including identifying sources.

It is different in journalism, however, than it is for public relations.

BY MR. NOLAN:

Q.    Why is it important to identify sources in journalism?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Journalists are protected by the First Amendment to privilege.  It's in the Constitution.  It's the First Amendment.  It's a right and you have a responsibility to tell -- to share with your readers, viewers, listeners as much as possible about where you gather your information.

BY MR. NOLAN:

Q.    Well, as this Code of Ethics says,

Page 50

don't you think it's important so that listeners can judge the reliability and motivations of sources?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Well, isn't that also true in the statements that you make in the PR world?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I believe I said that is correct.

The challenge with this language is sources.  It's different for journalists.

BY MR. NOLAN:

Q.    Well, but in the statements that you make on behalf of your clients in public relations, is it important that the public be able to judge the reliability and motivations of those sources?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Objection to form.

Asked and answered.

Page 51

THE DEPONENT:  It is.

The difference is a confidential source for a newspaper article is entirely different than a report prepared by the Pennsylvania Lottery, testimony offered by the Pennsylvania State Police.

There are different -- entirely different rules, in my opinion, in my experience, between sources for news and sources for public relations.

Generally, the principles here apply, but it is an entirely different universe.  And I don't want to overstep or overreach.

BY MR. NOLAN:

Q.    Thank you.

Let's look at the second to last bullet point.

It says, journalists shall -- should never deliberately distort facts or contexts, including visual information clearly labeled illustrations and reenactments.

Did I read that correctly?

A.    You did.

Q.    Do you agree with that statement?

A.      I do.

Q.      Does it apply to the work that you do at public relations?

MR. CRUSE:  Object to form.

MR. HUDDEL:  Join.

THE DEPONENT:  It does.

BY MR. NOLAN:

Q.      Over in the right-hand column, do you see under the heading it says, act independently.  And the first bullet point says, journalists should avoid conflicts of interest, real or perceived, disclose unavoidable conflicts.

Did I read that correctly?

A.      Yes, sir, you did.

Q.      Did you agree with that statement?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  For journalists, yes, sir.

BY MR. NOLAN:

Q.      How about in the public relations world?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

Page 53

THE DEPONENT:  In my world, I do avoid conflicts of interest, real or perceived.  And I do disclose unavoidable conflicts.

And, in fact, we do not take on clients where there is a conflict of interest.

BY MR. NOLAN:

Q.   What's your understanding of what the phrase conflict of interest means?

A.   I think it speaks for itself.

You have a conflict between two parties and you're in the middle of it.

Q.   Okay.  Did Mark Stewart or anyone at Eckert ever tell you that while they were directing you to make statements against Pace-O-Matic's gains that Pace-O-Matic was then a client of their law firm?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  No.

BY MR. NOLAN:

Q.   Were you aware that when you first started doing this work at the direction of Mr. Stewart that POM was a client of his law firm?

Page 54

MR. CRUSE:  Object to form.

MR. HUDDEL:  Join.

THE DEPONENT:  No.

BY MR. NOLAN:

Q.    When did you first become aware of that?

A.    My firm recollection is that I became aware of this entire matter when it was reported at a website called either Law360 or Law.com.

Q.    Roughly when was that?

A.    I really have no recollection.

It would have been sometime after I started the engagement with Parks.  So I'll say -- I don't even know when this case started.  2021, roughly.

Q.    Would it surprise you to learn that Eckert was representing Pace-O-Matic while at the same time Mr. Stewart and Mr. Skjoldal were directing you to make statements trying to put it out of business?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Objection to form.

THE DEPONENT:  I'm sorry.  Did it surprise me?

BY MR. NOLAN:

Q.      Yes.

A.      Yes, sir.

Q.      Why did it surprise you?

A.      It surprised me because it was a conflict of interest and had an impact on our work and my client at Parks Casino.  And it was surprising that we learned about it in the meeting.

Can I offer one clarification?

Nothing to do with the conversation.  It's about when I became aware of this.

Q.      Please do.

A.      I just want to make sure that that's my recollection.  Now -- is when I saw it in print.

There could have been -- around that time, there was a reporter from Spotlight Pennsylvania and she had obtained e-mails that were associated with this case.

I don't know which came first.

My recollection is it was the article was followed by the reporter from Spotlight Pa.  I might be wrong about that but

Page 56

that is my firm recollection.

I just wanted to clarify.

Q.   Okay.  You have had occasions to hire your own attorneys, yes?

A.   Yes.

Q.   You've got one here today, right?

A.   Correct.

Q.   Okay.  And when you hire an attorney, you expect that attorney to act in your best interest, right?

MR. CRUSE:  Objection to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.   Not to do something behind your back that would undermine your interest, fair?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Form.

THE DEPONENT:  Correct.

BY MR. NOLAN:

Q.   Okay.  Generally speaking, the work that Mr. Stewart and Mr. Skjoldal and Eckert were doing with regards to these skill games -- have you ever heard it referenced as kill skill?

MR. HUDDEL:  Object to form.

THE DEPONENT:  I have not.  I did

not -- I heard it -- it must have been in one of the -- not until very recently.

BY MR. NOLAN:

Q.    You would agree with me that basically the campaign that they were involved in was to drive the skill games out of business.

Fair?

MR. HUDDEL:  Objection to form.

THE DEPONENT:  My jobs as the communications consultant was to help legislation or enforcement measures to shut down skill games.

BY MR. NOLAN:

Q.    Okay.  So the purpose was to shut down skill games?

A.    Correct.

Q.    And what do you mean when you say shut down skill games?

A.    Shut them down.

Q.    Drive them out of business?

A.    Drive them out of business.

Q.    Kill skill, right?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  I had not heard

Page 58

that until very recently.

I might have, but my job, again, was to do communications work to prevent skill games from continuing to explode across Pennsylvania.

BY MR. NOLAN:

Q.    And drive them out of business?

A.    Is to get rid of skill games.

Q.    Right.

Okay.  So when you first became aware that Mr. Stewart and Mr. Skjoldal were trying to drive one of their firm's client's out of business, what, if anything, did you say to them?

MR. HUDDEL:  Object to form.

THE DEPONENT:  I don't recall ever having a conversation with Mr. Stewart specifically about that litigation -- this litigation.

BY MR. NOLAN:

Q.    Did you talk to anyone about it?

A.    I would have talked -- I would have spoken to folk -- other people on the Parks team, yes.  But not -- not Mr. Stewart or Mr. Skjoldal.

Page 59

Q.    Why didn't you talk to Mr. Stewart or Skjoldal about it?

A.    Not my responsibility.

Q.    Why did you talk to the folks at Parks about it?

A.    I'm sorry?

Q.    Why did you talk to the folks at Parks about it?

A.    The context -- my client is Parks Casino.

This matter presented communications challenges.  On that context, yes, we've had conversations about this matter.

Q.    What did you discuss with Parks about this conflict of interest that Eckert had?

MR. CRUSE:  I'll direct you -- you can answer his question.  But to the extent that any of your communications involved communication with Parks' legal counsel, I instruct you that that information is privileged and you shouldn't disclose communications with legal counsel for Parks Casino.

Otherwise, you can answer.

Page 60

BY MR. NOLAN:

Q.    Is there any part of your response that you believe would be privileged based on your attorney's objection there?

MR. CRUSE:  Objection to form.

THE DEPONENT:  I am not an attorney.

However, I will state, 90 percent, 95 percent of the conversations I would have had with Parks Casino would have involved an attorney from Parks Casino.

BY MR. NOLAN:

Q.    Okay.  But they're not your attorney, right?

A.    I'm sorry?

Q.    Those attorneys at Parks are not your attorneys, fair?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Objection to form.

THE DEPONENT:  Fair.

BY MR. NOLAN:

Q.    And you're not an attorney.  So you're not their attorney.  Fair?

A.    Fair.

Q.    Okay.  So none of the

Page 61

communications that you had with Parks about this issue of Eckert's conflict of interest would be protected by attorney/client privilege.

Fair?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Okay.  I have no idea.  I am not an attorney.

BY MR. NOLAN:

Q.    Okay.  Well, let's go back to the original question I posed.

A.    Uh-huh.

Q.    What did you talk to Parks about with regards to this conflict of interest of Eckert?

MR. CRUSE:  Same instruction I gave you before.

Answer the question to the extent you can.  But don't disclose any communications you had with attorneys representing Parks Casino.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice and refuse to answer my

Page 62

question regarding any communications with Parks
attorneys?

A.     I am.

Q.     Were there communications with
Parks attorneys?

A.     There were.

Q.     Okay.  And you're not gonna tell
me about those.

Fair?

A.     Fair.

Q.     Okay.  All right.  So what other
communications did you have with Parks about this
issue of Eckert's conflict?

MR. HUDDEL:  Object to form,
vague.

THE DEPONENT:  What other
conversations -- I'm sorry.

Could you repeat that?

BY MR. NOLAN:

Q.     Yeah.

Remember I was asking you about
once you read the article and you realized that
Mark Stewart and Kevin Skjoldal were trying to
run their then existing client out of business,
you said you talked to the folks at Parks about

Page 63

it.

What did you say to them?  What did they say to you?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Object to form, argumentative.

THE DEPONENT:  So I can answer that question?

MR. CRUSE:  If you understand it.

THE DEPONENT:  Yeah.  I'm a communications consultant.

Virtually every conversation would have been regarding the impact on the key audiences that we were trying to communicate with.

BY MR. NOLAN:

Q.    Okay.

A.    Does that answer your question, sir?

Q.    It starts to.  Thank you.

A.    You're welcome.

Q.    I would imagine being a communications person, you said more than just that to them.

Did you talk about what the impact

Page 64

might be?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Objection to form.

THE DEPONENT:  You know, it was tricky.

My -- the questions were, for instance -- the conversations were, for instance, what impact would this have on our ability to get legislation passed to ban illegal skill games.

That would have been the entire context.  That's what I get paid to do.

BY MR. NOLAN:

Q.    Okay.  And what did you tell them, what impact might that have?

MR. CRUSE:  Same instruction I gave you before.

THE DEPONENT:  So I can answer?

MR. CRUSE:  You can answer if it doesn't involve communications with Parks' legal counsel, either inside or outside of Parks.

THE DEPONENT:  Parks' legal counsel would have been in the room for that conversation.

Page 65

I don't remember their -- I'm sure there were phone calls.

Actually I'm not even sure. Parks' in-house or outside counsel would have been on those calls.

MR. CRUSE:  On that basis, I instruct you not to answer.

BY MR. NOLAN:

Q.    Was there anyone on those calls other than Parks' in-house counsel?

A.    Typically, yes.

Q.    Who?

A.    The people who would participate in those calls would be people that would involve, for instance, Bob Green, who is the Chairman of the Board at Greenwood Gaming.

And from Parks it would have been Tom Bonner early on.

And other than that, I don't believe there was anybody routinely on those calls who works at Parks Casino or at Greenwood Gaming.

Q.    Okay.

So back to my question.  What did you tell them about the impact?

Page 66

MR. CRUSE:  Same instruction.  I instruct you not to answer if you reference calls involving Parks' legal counsel and Parks itself and you, yourself, as Parks' agent, I instruct you not to answer.

THE DEPONENT:  I'm not going to answer the question.

MR. CRUSE:  On the basis of privilege, excuse me.

BY MR. NOLAN:

Q.    Did you form in your mind an impression after reading that article about the conflict of interest what impact it might have on your -- the work that you were doing to drive POM out of business?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  I did.

BY MR. NOLAN:

Q.    Okay.  And what was that impression?

A.    We think, in my world, in terms of audiences, who we need to influence to achieve our goal.

Page 67

Lawmakers, the administration, allies, everybody who might have a say, that was my prism.

And, frankly, in terms of the impact on the legislative battle to outlaw, you know, legal skill games, I was not too concerned about it.

I didn't think it would have an impact up in the capitol, in the 254 people who we care about, 253 lawmakers and one governor.

Q.    I've got to ask you.  Do you know what the term oxymoron means?

A.    I do.

Q.    What?

A.    Jumbo shrimp, military intelligence.

Q.    Okay.  How about the phrase outlaw illegal skill games, is that an oxymoron?

A.    That is.  You are correct.

Q.    If they were illegal, you wouldn't need a legislation to outlaw them, correct?

MR. HUDDEL:  Objection.

MR. CRUSE:  Objection, argumentative.

Page 68

BY MR. NOLAN:

Q.     Fair?

A.     That's not fair by any standard.

Q.     It's not fair?

MR. CRUSE:  Objection,
argumentative.

BY MR. NOLAN:

Q.     If they're illegal, why do you
need to pass legislation to outlaw them?

MR. HUDDEL:  Objection.

MR. CRUSE:  Objection,
argumentative.  Calls for a legal
conclusion.  Badgering the witness,
harassing, oppressive.

THE DEPONENT:  But I shall answer
it?

MR. CRUSE:  Uh-huh.

THE DEPONENT:  There's, I believe,
a Commonwealth Court hearing today or
tomorrow, next week, regarding the
legality of skill games.

It is not a settled matter.

BY MR. NOLAN:

Q.     You mean you don't know whether
they're legal or illegal?

Page 69

MR. CRUSE:  Objection to form. Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I have told many reporters, many people, the Office of Attorney General, the Office of the Governor, the Pennsylvania Gaming Control Board, Department of Revenue, Pennsylvania Lottery and any number of District Attorneys contend and share the belief that those games are illegal.

Perhaps, if it makes you feel better, I should say they should clarify state law so there's no question about the fact that those games, according to all of those agencies and all those individuals, including our current Attorney General, testified recently they are illegal.

BY MR. NOLAN:

Q.    So no clarification is needed, right?

MR. CRUSE:  Objection to form, argumentative.  Calls for a legal conclusion.  Badgering the witness,

Page 70

oppressive, harassing.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I'm sorry.  Your question is what?

BY MR. NOLAN:

Q.    Why would you need clarification on the issue?

MR. CRUSE:  Same round of objections.

How long is this show going to go on, Mike?

MR. HUDDEL:  Same objections.

THE DEPONENT:  I think I answered the question.  I'm happy to answer it again.

The Office of Attorney General, the Pennsylvania State Police, the local District Attorneys, two Attorney Generals in a row actually, also the Governor contend that these machines are, in fact, illegal.

BY MR. NOLAN:

Q.    Okay.  But you said that in fairness, maybe they should qualify it with -- it needs some clarification.

Page 71

Do you remember that testimony?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Do you remember the testimony is the question?

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  So why does it need clarification?

MR. CRUSE:  Object.  That's been asked and answered.

You're really trying to badger him, Mike.

And if you want to move for sanctions against me for telling him not to answer it again, go ahead.  I instruct you not to answer.

You are being harassed.

BY MR. NOLAN:

Q.    Are you following your attorney's advice?

A.    I am going to follow my attorney's advice throughout this deposition.

Q.    You are gonna refuse to answer my question?

MR. CRUSE:  You literally asked

Page 72

the same question again.

THE DEPONENT:  I answered the question, sir.

I'm sorry if you don't like the answer, I can't control that.

BY MR. NOLAN:

Q.    Well, you mentioned a court case either today or tomorrow.

MR. CRUSE:  That's a different question.

MR. NOLAN:  Please stop interrupting my examination.

MR. CRUSE:  Please stop badgering my witness.

BY MR. NOLAN:

Q.    You mentioned a court case, a hearing that was happening today or tomorrow that was going to rule on this issue of the legality of skill games.

Do you recall that testimony?

A.    Yes, sir.

Q.    Why did you bring that up?

A.    The issue is the legality of skill games is not a settled matter.

Q.    What do you mean by that?

Page 73

A.    There's ongoing litigation in the Commonwealth Court to address that very issue.

Q.    What do you mean it's not a settled matter?

MR. CRUSE:  Objection.  Asked and answered.

MR. HUDDEL:  Objection.  Asked and answered.

THE DEPONENT:  Not being an attorney, I can get to the point where if it were a settled matter, then we would not be having the Commonwealth Court hearing tomorrow on the legality of skill games.

BY MR. NOLAN:

Q.    Okay.  So in your mind what is the Court going to do that might bring some clarity to that issue?

MR. CRUSE:  Objection.  Calls for speculation.  Calls for a legal conclusion.  Relevance as to what it matters what Pete Shelly thinks.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I have not the foggiest idea what the Commonwealth Court

Page 74

is going to do tomorrow.

BY MR. NOLAN:

Q.    In other words, you brought it up for a reason, that it's an issue that's not settled.  You brought up the court hearing for a reason, am I correct?

You think the Court is going to do something that, what, will clarify the issue?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Objection.  Asked and answered.  Many times.

THE DEPONENT:  I think I said that when you asked the question the first time, Mr. Nolan.

BY MR. NOLAN:

Q.    So you -- it's your anticipation that the Court might issue some type of ruling that declares skill games to either be legal or illegal.

Is that fair?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  That's fair, yes, sir.

Page 75

BY MR. NOLAN:

Q.     Okay.  Because it's not a settled issue at this point, right?

MR. CRUSE:  Objection.  Asked and answered.

MR. HUDDEL:  Same.

THE DEPONENT:  Respectfully, your client has argued -- your client contends that it is a settled matter.

BY MR. NOLAN:

Q.     You just said a minute ago that this issue of the legality of skill games is not a settled matter.

Fair?

A.     It remains fair.

Q.     Okay.  And until the Court issues a ruling, it's your belief that it remains unsettled as to whether they are legal or illegal.

Fair?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

THE DEPONENT:  It's not my belief. It's a statement of fact.

Page 76

BY MR. NOLAN:

Q.    What, it remains unsettled?

A.    Correct.

Despite your client's assertions to the contrary.

Q.    Okay.  So anyone who was making the assertion today that POM's skill games are illegal, that's inaccurate.

Fair?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  No, sir.

My statements have consistently been the State Police, Office of Attorney General, local District Attorneys, Pennsylvania Gaming Control Board, Pennsylvania Department of Revenue, very recently our current Attorney General testified we believe these machines are illegal.

BY MR. NOLAN:

Q.    But they would be inaccurate when they say that, because it's an unsettled matter.

Fair?

MR. HUDDEL:  Object to form.

Page 77

MR. CRUSE:  Join.

THE DEPONENT:  That is their legal opinion.  Your folks have your legal opinion.

And that's what the Commonwealth Court is going to settle, I imagine.

BY MR. NOLAN:

Q.    Okay.  But because it is not a settled matter, any statements saying that they are unequivocally illegal would be inaccurate.

Fair?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  No, sir.

I don't believe that's fair in my world.

I would happily go to war with every law enforcement agency statewide in the Commonwealth that agrees and continues to fight that these machines in operation today are illegal.

I think that is, in my world, the Code of Ethics you discussed earlier is absolutely fair play.

The Philadelphia Inquirer, the

Page 78

Harrisburg Patriot News editorialized last week about these illegal skill games, Mr. Nolan.

That's a fair assessment -- a fair statement. I apologize.

BY MR. NOLAN:

Q. But you feel that the legislature needs to pass a bill that would ban them?

MR. CRUSE: Objection to form. Calls for a legal conclusion. Relevance.

MR. HUDDEL: Joined.

THE DEPONENT: My opinion doesn't matter, Mr. Nolan.

BY MR. NOLAN:

Q. It does to me.

A. Okay.

MR. HUDDEL: Object to form.

MR. CRUSE: Object to the relevance of Mr. Nolan's need for your opinion for his personal needs.

THE DEPONENT: My opinion is I believe the Office of Attorney General and the Pennsylvania State Police, that these machines are, in fact, illegal right now.

BY MR. NOLAN:

Q.    So there's no need for any further legislation.

Fair?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Objection to form.  Repeat the -- they're too long to list at this point.

THE DEPONENT:  I don't know how to address that question.

I'm glad I gave you a chuckle.

But to me, Mr. Nolan, I -- my job -- I get paid to help clients to advance their issues.

And when you have the chief law enforcement officer, office, under Governor Shapiro and under the current Attorney General and the State police feel these -- or contend that under state law, these constitute illegal gaming devices, I believe that to be the case.

BY MR. NOLAN:

Q.    So there's no need for further legislation on it, right?

MR. CRUSE:  Objection to form,

Page 80

relevance.  Calls for a legal conclusion.

MR. HUDDEL:  Join.

THE DEPONENT:  It's not my job to decide what legislation is necessary or not.

BY MR. NOLAN:

Q.    I didn't ask you that.

A.    I'm sorry.

Q.    I didn't ask you that.

MR. CRUSE:  That is exactly what you asked him.

BY MR. NOLAN:

Q.    If they're already illegal -- excuse me.  Strike that.

If they are already illegal, why would you need any further legislation to ban them?

MR. CRUSE:  Objection to form. Calls for a legal conclusion.  Relevance.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Mr. Nolan, illegal drugs, narcotics are illegal in Pennsylvania.  Heroin is illegal.  Crack cocaine is illegal.

That doesn't mean you don't need

Page 81

further legislation to crack down on crack cocaine, heroin sales.

There are many, many issues where it's crystal clear and additional enforcement powers might be needed. Money might be needed in the state budget process.

There are many examples of laws on the books that outlaw certain activities, revisit them often, that need to be strengthened. That's not uncommon in Harrisburg, Pennsylvania, and the state capitol.

BY MR. NOLAN:

Q. Let's look back at Exhibit 1, Code of Ethics for journalists. Down in the lower right-hand corner, under be accountable and transparent, do you see the third bullet point from the bottom, it says, journalists should acknowledge mistakes and correct them promptly and prominently and explain corrections and clarifications carefully and clearly.

Did I read that correctly?

MR. CRUSE: Objection to form.

THE DEPONENT: Yes, sir, you did.

BY MR. NOLAN:

Q.    Do you agree with that statement?

A.    I do.

Q.    Does it apply in your work as a public relations person?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  In this matter, I don't believe that I had to make a correction or a clarification, Mr. Nolan.

BY MR. NOLAN:

Q.    Well, that wasn't my question.

A.    Generally I agree with that principle, but in this matter, it has not been necessary.

Did that answer your question?

Q.    Okay.  But it does apply to the work that you do in public relations, yes?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  Absolutely there are limitations.

BY MR. NOLAN:

Q.    In other words, if you do make a mistake or publish an inaccurate statement, you

Page 83

need to correct them promptly and prominently?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  That is not the way public relations work -- works.

BY MR. NOLAN:

Q.    Why not?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  If I place an op ed or essay in the Harrisburg Patriot News and a mistake is found out, I will call the editor or the reporter and inform them that there's been a mistake, either mine or one of my colleagues, or, for instance, Pace-O-Matic might make a mistake in issuing a press release or a news statement or an opinion piece.

My job, in the interests of my client, is to make sure the information is accurate.

It's up to the news source, Mr. Nolan -- they control the printing press.  So that's the difference.

This is -- it's not apples to

Page 84

apples and they think it's a straight
line.  It's not.

BY MR. NOLAN:

Q.    What if you issue a press release
that has inaccurate information in it, how do you
correct that?

MR. CRUSE:  Objection to form.
Calls for speculation.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I have never been
asked, as I sit here -- maybe a typo.  My
specific -- to this engagement, I had
every evidence in the statements that we
issued based on, frankly, the legal
review.

Gaming is -- based on the legal
review.  I don't need to add to that.

BY MR. NOLAN:

Q.    My question was, if you made a
press release that had an inaccurate statement in
it, how would you correct it?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  I don't recall
having to do that.

Page 85

We would correct the press release and re-issue it.

BY MR. NOLAN:

Q.    Okay.  So you'd send out another press release?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

We have been going about an hour and a half, when you're at a good time for a break?

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  If you made a statement to a journalist that was published and later you came to learn that your statement was inaccurate, you would contact that journalist and let the person know.

Fair?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  Yes.

MR. NOLAN:  Okay.  Let's take a break.  About five minutes?

THE VIDEOGRAPHER:  We are going off the record at 10:24 a.m.

Page 86

(Off the record.)

THE VIDEOGRAPHER:  We're going back on the record at 10:33 a.m.

BY MR. NOLAN:

Q.    Are you familiar with the Public Relations Society of America?

A.    I am.

Q.    What is that organization?

A.    It's the National Society of Public Relations Professionals.

Q.    Are you a member?

A.    I am not.

Q.    Why not?

A.    I never felt the need to join.

Q.    Do you feel that they are a leading professional organization serving the public relations community?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  I have no idea.

BY MR. NOLAN:

Q.    Are you familiar with their Code of Ethics?

A.    I am not.

Q.    Have you ever seen a published

Code of Ethics that governs Public Relations Professionals?

A.      No, sir.

(Shelly Deposition Exhibit Number 2 marked.)

BY MR. NOLAN:

Q.      I'm handing you what's been marked Exhibit 2.

I'll represent to you that this is the PRSA Code of Ethics that's on their website.

Have you ever seen this before?

A.      I have not.

Q.      Okay.  Would you turn to the second page?

MR. CRUSE:  Mr. shelly, if you've never seen this document before, you can take your time to review it.

Make sure you understand it before he asks you questions about it.

BY MR. NOLAN:

Q.      Do you see on the second page at the top, the heading, honesty?

MR. CRUSE:  Mr. Shelly, again, you can take your time to read the document.

BY MR. NOLAN:

Q.    Do you see that?

A.    I'm reading page 1.  I'll get there in a second, sir.

Q.    Well, my question is just about page 2.

MR. CRUSE:  Mr. Shelly, you're allowed to read the entire document that he has presented to you that you said you've never seen before before he asks you questions about it.

THE DEPONENT:  And I'm sorry, which one do you want me to look at?

BY MR. NOLAN:

Q.    Page 2.  Do you see the heading honesty?

A.    I do, yes, sir.

Q.    The PSRA Code of Ethics says, we adhere to the highest standards of accuracy and truth in advancing the interests of those we represent in communicating with the public.

Did I read that correctly?

A.    You did.

Q.    Do you agree with that statement?

A.    I do.

Page 89

Q.     Do you believe that that's what you're required to do as a public relations professional?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Objection to form.

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.     Do you see at the top of page 3 it says, a member shall preserve the integrity of the process of communication.

Did I read that correctly?

A.     You did.

Q.     Reading on it says, be honest and accurate in all communications.

Did I read that correctly?

A.     You did.

Q.     Reading on, it states, act promptly to correct erroneous communications for which practitioner is responsible.

Did I read that correctly?

A.     Yes, sir.

Q.     Reading on it says, preserve the free flow of unprejudiced information when giving or receiving gifts by ensuring that gifts are nominal, legal and infrequent.

Page 90

Did I read that correctly?

A.      You did.

Q.      Do you agree with that statement?

A.      I do.

Q.      Do you feel it's important for you to live -- or excuse me, to conduct yourself consistent with those statements when acting as a PR professional?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.      Down at the bottom of page 3, under disclosure of information, it says, core principle, open communication fosters informed decision making in a democratic society.

Did I read that correctly?

A.      Yes, sir.

Q.      And then it continues on stating that the intent is to build trust with the public by revealing all information needed for responsible decision making.

Did I read that correctly?

A.      Yes, sir, you did.

Q.      Do you agree with that statement?

Page 91

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes, sir, I do.

BY MR. NOLAN:

Q.   Do you believe when you're working as a public relations professional that it's important you to follow that statement?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes, sir, I do.

BY MR. NOLAN:

Q.   Let's look at the page 4.

Do you see a list of bullet points there at the top?

A.   Yes.

Q.   In the fourth bullet point down, it says, a member shall reveal the sponsors for causes and interests represented.

Did I read that correctly?

A.   Yes.

Q.   Do you agree with that statement?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

MR. CRUSE:  Relevance.

THE DEPONENT:  Yes.

Page 92

BY MR. NOLAN:

Q.   Do you think it's important when you're operating as a public relations professional to reveal the sponsors for the causes that you're promoting?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I do.

BY MR. NOLAN:

Q.   The last bullet point there is, a member shall avoid deceptive practices.

Did I read that correctly?

A.   You did.

Q.   Do you agree with that statement?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I do.

BY MR. NOLAN:

Q.   When did you first meet Mark Stewart?

A.   I met -- my introduction to Mark in this engagement would have been on the first conference calls I was involved in.

Mark did inform me I met him a hundred years ago roughly when I was a reporter

Page 93

at the Harrisburg Patriot News, a meeting I do not recall.

Q.    Okay.  So to your recollection, your first interactions with Mr. Stewart were when you were engaged to work on this matter?

A.    That is correct.

Q.    How is it you came to be engaged in this matter?

MR. CRUSE:  Objection.  Asked and answered.

THE DEPONENT:  I was hired by -- or how did I become hired?

I was recommended to Parks Casino by a lobbyist in town who has been around for quite a long time.  He's been doing Parks' work for many years.  His name is Richard G-M-E-R-E-K.

BY MR. NOLAN:

Q.    So it's your understanding that -- or excuse me, it's your understanding that Mr. Gmerek recommended that Parks hire you?

A.    That's a statement of fact.

Q.    So yes?

A.    Yes.

Q.    Okay.  Did you have discussions

with Mr. Gmerek about the work before you were retained?

A. Yes.

Q. What do you recall Mr. Gmerek telling you about it?

A. So, again, as a communications consultant, Mr. Gmerek laid out the challenges and what we were hoping to achieve on behalf of Greenwood Gaming Parks and I developed a communications plan.

Q. For what purpose?

A. For what purpose?

The purpose was to get rid of illegal skill games in Pennsylvania.

Q. And do you recall roughly when that was?

A. I do.

In fact, I misspoke earlier. I believe I said I was engaged in 2020. It was 2019.

So it would have been sometime in the fall, late fall of 2019.

Q. Okay. Were you -- you're familiar with a Commonwealth Court decision that came out in November of 2019, correct?

Page 95

A.    I am.

Q.    Okay.  Were you retained before or after that came out?

A.    Shortly before that came out is my recollection.  It could have been sometime in October, maybe September, but I doubt it.

Q.    Had you ever done any work for Parks prior to that?

A.    No.

Q.    Are you still doing work for Parks?

A.    Yes, sir, I am.

Q.    Under the same contract that you mentioned earlier?

A.    The contract was updated six or eight -- some time ago.  I believe -- yes.  I mean, it's virtually the same contract.  It was updated or renewed maybe six or seven months ago.

Q.    And that contract generally describes the scope of your work as doing public relations work to basically get rid of skill games?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I believe it just

Page 96

says public relations work.

I do not believe it has any mention of skill games in that contract.

There have been other issues that I have assisted Parks with.

BY MR. NOLAN:

Q.    Such as what?

A.    Re-opening of the casinos during COVID.  COVID mitigation measures.

The local impact of a casino in Bucks County, economically, jobs, local share revenues, investment in other businesses.

I think that covers it for the most part.  There might have been others, but --

Q.    If you had to apportion or estimate what amount of your work for Parks was done with regards to skill games, what would your estimate be?

A.    75 percent.

I'm sorry.  Skill games and -- I just recall there was a massive legislative battle over video gaming terminals.

So there were -- expanded gaming more broadly would be 75 percent, I think.

Q.    I appreciate that.  Thank you.

So if we cut out the VGT piece of it, and we just focus on the skill game part, what portion of your work do you think would be for Parks in that regard?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  60 percent.  More than half.  It might be higher, but yeah, something --

BY MR. NOLAN:

Q.    So generally speaking, they hired you to do public relations work, yes?

A.    Yes.

Q.    Okay.  And the name public relations necessarily implies there's going to be some interface with the public, yes?

A.    Yes.

Q.    So the work that you did for Parks regarding skill games, tell me how you interfaced with the public.

A.    We interface with the public by developing newspaper op eds, opinion pieces, letters to the editor.

We interface with the public through paid media, digital, social, billboards,

Page 98

radio.  All the tactics that that one would expect.

Q.    Is Parks your only casino client?

A.    Currently it is my only casino client.

Q.    Have any of the other Pennsylvania casinos ever been a client of yours?

A.    I had a very short contract for three or four months is my recollection, it might be longer, with Mohegan Sun.

Q.    Roughly when was that?

A.    That would have been 2021.  Maybe 20 -- either 2021 or 2022.

Q.    What was the scope of your work for Mohegan?

A.    There was an effort to expand gaming by legalizing, allowing video gaming terminals across the state.

Q.    And Mohegan retained you to do public relations to prevent that?

A.    More strategic communications, frankly.  But if you want to call it public relations, you can.

But we do more strategic communications than we do public relations.

There's a big difference.

Q.    What's the difference?

A.    So our job, again, at Clearpoint Communications is to help clients achieve legislative victories.  75 percent, 85 percent of our work is focused on that.

The public relations component might spin out of that, but not necessarily.

So we will develop a communications plan that includes four components; goals, audiences, messages, and tactics.

And so I apologize, I would not necessarily call it public relations, because we -- public relations would be if Coca Cola wants to sell a new, you know, cherry coke.  We do not do that kind of work.

We very rarely will we have a commercial purely public facing.  In fact, 90 -- as I sit here, I can't recall a client we had that was public facing first.

Invariably, we are hired to help legislative executive decision, government decisions, government activities.

Though I did misspeak, I

Page 100

apologize.  I should have been more concise.

Q.    Any other casinos that you've done work for?

A.    In 2018, 2017, we had a project with Penn Gaming that, I believe, was two months, three months.

Q.    What work did you do for them?

A.    We placed op eds around the state regarding a gaming expansion bill.

Q.    Any other work for casinos?

A.    No, sir.

Q.    When did you first meet Mr. Gmerek?

A.    1993, 1994.

Q.    How did you meet him?

A.    Through my work as a reporter in the Capitol newsroom.

Q.    How would you describe your relationship with Mr. Gmerek?

A.    He is a trusted colleague.

Q.    Social friend?

A.    We have not socialized.

Q.    How would you describe your relationship with Mr. Stewart?

A.    Professional colleague.

Page 101

Q.      Do you consider him a social friend?

A.      No, sir.

Q.      How about with Mr. Skjoldal?

A.      I had very little interaction with Mr. Skjoldal.

So I would have to say he was on the team, if that's helpful.

Q.      Any other relationship you had with Eckert other than being on this team with Mr. Stewart and Mr. Skjoldal?

MR. CRUSE:  Object to the form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  None.

BY MR. NOLAN:

Q.      Your contract with Parks, does that describe how you're compensated for your work?

A.      Yes, sir, it does.

Q.      How are you compensated?

A.      We have a monthly retainer with Parks Casino.

Page 102

Q.    How about whether they have to defend and indemnify you in any litigation that results from your work?

A.    I'm sorry.  I'm confused by the question.  Are you asking me if Parks has done that?  Or is it in my contract?

Q.    Is it in your contract?

A.    I don't -- I don't believe it is.

Q.    Okay.  You have retained Mr. Cruse and his firm to represent you in this matter, right?

A.    Yes, sir, I have.

Q.    Who's paying for that?

A.    Parks Casino is paying for that.

Q.    Why are they paying for that?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Yeah.

Page 103

MR. CRUSE:  Calls for speculation.

THE DEPONENT:  You'll have to ask Parks Casino.

BY MR. NOLAN:

Q.    Well, did you ask them to pay for it?

A.    I contacted the general counsel, in-house counsel, and I did -- I don't recall if I said specifically, but it was, hey, we have a problem here and -- I don't know if I asked specifically, but Parks has agreed to pay for my representation in this matter.

Q.    How about your representation in the lawsuit?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I'm sorry, the lawsuit in Lycoming County?

BY MR. NOLAN:

Q.    Yeah.  The one where you're a defendant.

A.    Parks Casino is not paying for that representation.

Q.    Who's paying for that?

A.    I have a liability insurance

policy that covers that circumstance.

It specifically does not cover a subpoena, which is what I raised with Karin Ashford, K-A-R-I-N, A-S-H-F-O-R-D. And that, I believe, was how we got to the conversation of paying for my representation here.

I made it clear that my insurance company was not going to cover it.

Q. So when you first found out that you were being sued in Lycoming County, did you make a claim on your professional liability insurance policy?

A. Yes, sir.

Q. Did you make any written statements to them, to the carrier?

A. I don't recall. No, I don't believe I did.

Q. Okay. What -- who's the carrier that's underwriting that?

MR. HUDDEL: Objection.

MR. CRUSE: Objection.

MR. HUDDEL: I'm gonna object on the basis that this appears calculated for use in other litigations.

MR. CRUSE: I'll join that

objection.

BY MR. NOLAN:

Q.    Okay.  Well --

MR. CRUSE:  Can you make a proffer of how it's relevant to any claims or defenses in your case against Eckert Seamans?

MR. NOLAN:  Well, he said earlier that the case that he's a defendant in deals with the same issues that we're dealing with in our case.

Remember that?

MR. CRUSE:  Yeah.

MR. NOLAN:  And so if he made statements to his carrier about that case, then I think it would probably be relevant in this case.

MR. CRUSE:  He already answered that question.

You're now asking him about --

MR. NOLAN:  Who the carrier is.

MR. CRUSE:  Who the carrier is.

MR. NOLAN:  Right.

MR. CRUSE:  Yeah.  He said he didn't make a statement, so there's no

Page 106

longer really --

MR. NOLAN:  He said he didn't remember if he did or not.  Come on.  Pay attention.

MR. CRUSE:  Let's stop and go off the record for a second.

MR. NOLAN:  No.

MR. CRUSE:  Let's go off the record.

MR. NOLAN:  Nope.  I am not going off the record.

MR. CRUSE:  You are not entitled to be an absolute rude person to other counsel in here, whatever your client has directed you to do as far as your personal behavior.

Please comport yourself as a gentleman.  Do not snap at me.  Do not speak derisively to me at all.

BY MR. NOLAN:

Q.    Okay.  Who's your carrier?

MR. HUDDEL:  Same objection.

MR. CRUSE:  Same objection.

THE DEPONENT:  I don't know.

Page 107

BY MR. NOLAN:

Q.    You don't know who your liability carrier is?

MR. CRUSE:  Objection.  Asked and answered.

MR. HUDDEL:  Same objection.

MR. CRUSE:  Pay attention.

BY MR. NOLAN:

Q.    You don't know?

A.    I don't know.  I think it's CNA, CNIA.  I do not know the name of my insurance carrier.

Q.    Do you recall the person that you -- the person that you've communicated with with the carrier regarding the lawsuit?

MR. HUDDEL:  Same objection.

MR. CRUSE:  Same objection.

MR. HUDDEL:  I object.  This question appears calculated to elicit testimony that's relevant only to other litigations filed by your client's affiliate.

MR. CRUSE:  This is precisely the concern we raised during our motion to quash with the Court.

Page 108

THE DEPONENT:  I can answer the
question?

MR. CRUSE:  You have to answer the
question.

THE DEPONENT:  I'm sorry.  I
believe it is Annemarie, A-N-N-E, Marie,
one word.  K-A-I-S-E-R.  Annemarie
Kaiser.

BY MR. NOLAN:

Q.    Okay.  When you communicated with
Ms. Kaiser, has it been in writing, like by
e-mail or anything like that?

MR. HUDDEL:  Same objection.

MR. CRUSE:  Same objection.

THE DEPONENT:  Mostly phone calls.

BY MR. NOLAN:

Q.    Is she in Harrisburg?

MR. HUDDEL:  Same objection.

MR. CRUSE:  Same objection.

THE DEPONENT:  I'm not aware of
where Ms. Kaiser is located.  I don't
believe it is Harrisburg.

BY MR. NOLAN:

Q.    Have you ever had a contract
directly with Eckert or Mr. Stewart or

Mr. Skjoldal?

A.    I don't believe so.

Q.    Okay.

A.    I will -- we have done a ton of work in the last -- in the 15 years that I've had my business that I launched.

It is possible at some point we shared a client.

I've never had a contract directly with Eckert to the best of my recollection as I sit here.

Q.    Okay.

A.    I just want to be clear.

Q.    Now, the work that you've done for Parks, this public relations work, earlier you described to me how you usually develop like a four point plan.

Do you remember that?

A.    Yes, sir, I do.

Q.    Did you do that for Parks related to this PR work that you're doing for them?

A.    I do not -- I don't believe we did develop a communications plan.

Q.    Can you remind me again -- I don't remember what the four parts of those plans

entail.

A.    So this is our approach to strategic communications.  Not just a plan.

It's goals, audiences, messages, tactics.

Q.    Why didn't you -- well, strike that.

Is there a reason why you wouldn't have developed a written plan like that for Parks?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Everybody's hair was on fire.  It was -- it was crystal clear that things were flying down the track and there was no time or need to develop a plan like that.

A key element -- I think it's important to note, a plan like that is often included in a proposal for our services to a potential client.

That way they know how we operate and what we're going to do.

So that reflects our approach, as I said earlier, as much as it does a document on a piece of paper.

BY MR. NOLAN:

Q.    Did you draft a proposal for Parks related to your potential work?

A.    I believe it would not have been a proposal.  We drafted -- I think it was a memo, here's what we're going to do.

So it was not a standard -- it wasn't a typical RFP, RFI response.  But we did, if memory serves, produce a, here's what we think is necessary right now.

So it was different than other engagements in that regard.

Q.    Would that have been before or after you were retained by Parks?

A.    That was a -- 99 percent certain that was after I was retained by Parks.

Q.    Okay.  So generally speaking, you got involved, they retained you, you gathered information.  And then you sent this written memo of here's what we're gonna do or here's what we need to do?

A.    As best I can recall, yes, that's the way it developed.

Now, again, I want to be clear. There might have been some kind of a proposal

Page 112

with here's who we are kind of a -- but it was not -- it was a very short -- we have some challenges, can you help.  So it was different.

So I want to be clear for the record that there might -- there was not a full-blown 10-page glossy proposal.

I don't think I ever went into those four key elements.  Parks has been in business for quite some time.  They don't need to see that necessarily.

That's to the best of my recollection.

Q.    You mentioned that your contract with Parks was amended.  Am I recalling that correctly?

A.    I don't believe it was amended. It was just updated.

Q.    How was it updated?

A.    I think time.  It expired, I believe, was the -- it was a housecleaning matter.

Q.    Okay.  When the contract was updated, was the scope of work changed at all?

A.    Again, there was no scope of work, to my recollection, in the first contract.

Page 113

So there's no changes to the first contract, I believe, other than the -- other than the time and -- I don't recall my fee with Parks changed early on in the engagement.

So it's been the same for six months after I was involved or three months or five months.  It hasn't changed since then.  So 2019 -- I'm sorry, early 2020 until current, there's been no substantial -- no real change to that contract at all.

Q.    How did the payment terms change?

A.    I asked for a higher fee because we were doing much more work than anticipated.

Q.    So that was the reason for the change.  But how did it change in terms of dollars?

A.    Respectfully that wasn't the reason for the change.  They had been paying that fee for several years.

I want to be clear.  There was no change in what the actual -- how much they were paying me.  There was no change in that at all.

Mr. Bonner said, we are doing some housecleaning.  We're just trying to update things, clean things up, get them current.

Q.    I apologize if I didn't hear correctly.  I thought you said at some point -- and I thought it might have been early on in your retention they -- you changed the fee structure because you were doing more work?

A.    That's correct.

Q.    Okay.  When was that?

A.    I would have to say, Mr. Nolan, it was within the first six months of the arrangement.

Q.    Was it like an hourly basis?

A.    No, sir.  Monthly retainer.

Q.    Now, your firm, it's called Clearpoint Communications, is that right?

A.    Correct.

Q.    Okay.  Does Shelly Lyons still exist?

Page 115

A.     We are doing business as Clearpoint.  We are doing -- I believe it is Shelly Communication doing business as Shelly Lyons and now Clearpoint Communications.

I started the firm.  I was the sole person at the firm.  So it has evolved over the years.

Q.     Okay. What's Mr. Lyon's role been in this work for Parks?

A.     De minimis.

Q.     Mainly been you?

A.     Yes, sir.

Q.     Has he helped out at all?

A.     He helped review some -- yeah. Yes.

Charlie is an attorney.  He's a very good writer.  Respectfully, you don't get that a lot of times.  Attorneys are not.

He would have helped early on just kind of standing up for our work for the client. But as a routine matter, I am the point person and I do the lion's share of the work for Parks Casino.

Charlie might have been there for one visit.  I remember we had a visit -- a

meeting in August and I only remember it because my wife was furious I left the beach.

Other than that, Charlie and I -- he is not day-to-day or even week-to-week involved, month-to-month involved in this engagement.

Q. Is Mr. Lyons a practicing attorney?

A. He has his law license.

Q. Does he do legal work for your firm?

A. He has done legal work in terms of, you know, routine corporation -- doing business as.

We have not had the need for a whole lot of legal work at Shelly Lyons, Shelly Communications, Shelly Lyons or Clearpoint.

He did, for instance, draft -- he would draft an employee contract, so not -- so that was -- I'm sure there are other matters that he, you know, was our attorney.

But as a practice, he is a consultant, just like I am.

Q. Okay. So any work that he did in relation to Parks, it was as a PR consultant, not

as an attorney?

A.    Yes.  Well, Charlie has served the role as my attorney in some matters.

Q.    What matters?

A.    I was subpoenaed to testify before a Grand Jury some years ago and Charlie was helpful in finding another attorney and providing kind of guide rails.  So he was a legal advisor.

But I'm trying to think, employee contracts, bylaws for the corporation.  I don't -- there might have been some other legal matters that he might have responded with a letter or something like that.

So he has provided legal services to the company.  It's not a focus of his role -- of his job, I should say.

Q.    When did you transfer the ownership of the company?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Two week ago.

BY MR. NOLAN:

Q.    Why?

A.    I'm sorry?

Q.    Why?

A.    I made a decision to sell my shares and I made the decision to make it as

sense, so I sold them my shares.

Q.    Is there a written contract on that?

A.    Yes.

Q.    How much did you sell your shares for?

A.    I'm not sure what --

MR. CRUSE:  I'll make an objection as to relevance and but -- and you asked

me earlier if that will be things that will be declared for AEO purposes.  This will be one of them among many.

Q.    And that's pursuant to a written contract?

A.    Yes, sir.

Q.    Do you have a right to repurchase it?

A.    I don't -- I don't know.  It did not -- it did not come up -- I don't know of the legal terminology.

I do know it -- I didn't think this would be on the table.  I'd have to look at documents again.

It's over a period of time.  And so if something goes wrong and if I'm not -- if payments are missed, there is some kind of a mechanism to enforce it or for, you know, the shares -- I can get the shares back, I imagine.

I don't know what the specific

Page 120

language is.  I mean, if I died, they go to my wife.  So that's the best I can do.

Q.    So why did you sell your ownership interest in the company?

MR. CRUSE:  Objection.  Asked and answered.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I have been doing this work for quite a long time and I'm tired.

BY MR. NOLAN:

Q.    Are you still doing the work?

A.    I am.

Q.    So I don't understand your answer.

If you're still doing the work, tired or not, why would you sell your ownership interest in the company?

A.    There's a very big difference between an owner and being an employee of a company, in my experience.

So, for instance, I'm not responsible for meeting this week's payroll.  That's why I sold the company.  Among other reasons.

Q.    How are you compensated?

A.      I have an employee contract.

Q.      And what does that contract entail?

A.      An annual salary, benefits, any -- a standard employee contract.

█    █    ███████████

█    █    █████████████

Q.      And benefits?

A.      Benefits, yes, sir.

Q.      Anything else?

A.      And just for the record, I don't necessarily need the benefits, because my wife is our CFO and I am covered under my wife.

So I'm sorry, any other -- you asked a question.  You said benefits?

Q.      Yeah.  Well, any other compensation, like stock options or anything like that, bonuses?

A.      Bonuses for business brought into firm.  Commissions, I should say.  The same as I -- the terms of the contract are virtually identical to John and Danielle in terms of compensation benefits.

I'm just a regular employee.  It's not totally identical, but for obvious reasons.

Page 122

Q.    Did you have an employee contract before you sold your ownership interest in the company?

A.    I did not.

Q.    How were you compensated back when you were an owner?

A.    We had a salary and dividends.

Q.    Okay.  The work that you do pursuant to your contract with Parks, do you have an understanding as to how that's funded?

MR. HUDDEL:  Object to form. Vague.

Page 123

MR. CRUSE:  I join.

THE DEPONENT:  I have not the foggiest idea.

BY MR. NOLAN:

Q.    In other words, does Parks, to your knowledge, receive any money from any other casinos that might benefit from your work?

MR. CRUSE:  Object to form.

MR. HUDDEL:  Same objection, yeah.

THE DEPONENT:  Does Parks receive any -- no, sir, they do not.

BY MR. NOLAN:

Q.    The firm Clearpoint, do you all have a document retention policy?

A.    I am not aware of one.

Q.    Okay.  Does the firm have a document management platform?

MR. HUDDEL:  Objection.

MR. CRUSE:  Objection to form.

This appears to be questioning that definitely is not in any way related to the subpoena that brings you here today in the Eckert Seamans' lawsuit.

And I would like a proffer as to what the relevance of this line of

Page 124

questioning, as to the lawsuit that brings us here today, expressly because of concerns raised to the Court about this deposition being a subterfuge for use in other cases.

BY MR. NOLAN:

Q.    You can answer the question.

MR. CRUSE:  No, don't answer the question.

BY MR. NOLAN:

Q.    Are you refusing to answer that question?

MR. CRUSE:  What is the relevance to this case?

MR. NOLAN:  Yeah, you don't get to interrupt my examination.

MR. CRUSE:  Are you not going to provide any idea of what the relevance is?

MR. NOLAN:  You don't get to interrupt my examination.

MR. CRUSE:  So that's a no?

MR. NOLAN:  You can object, if you want to object on relevance, feel free to do so.

But, otherwise, please stop interfering with my examination.

MR. CRUSE:  I'm not interfering with your examination.

I'm representing a client who's entitled to representation at your examination, much of which appears to be a charade to get information for another lawsuit.

MR. NOLAN:  Relevance is not a legitimate objection during a deposition.

MR. CRUSE:  I disagree with that. I can make the objections that I wish to make and you can move against it as you so please.

BY MR. NOLAN:

Q.    You can answer.

A.    I'm going to follow my --

MR. CRUSE:  I haven't instructed you not to answer.

THE DEPONENT:  I'm sorry, sir?

MR. CRUSE:  What is the question pending?

Again, about his document retention policies?

Page 126

MR. NOLAN:  No.  It was a document management system.

MR. CRUSE:  Document management system.

THE DEPONENT:  Can I answer that question?

MR. CRUSE:  Uh-huh.

THE DEPONENT:  Okay.  No.

BY MR. NOLAN:

Q.    You don't have a document management system?

MR. CRUSE:  Objection to form, vague.

MR. HUDDEL:  Same objection.

THE DEPONENT:  We have a server where documents are stored.

Is that what you meant?

BY MR. NOLAN:

Q.    Well, I think that's part of it.

In other words, do you just -- if you want to type up a document, a proposal, do you just open up a Word document and where do you save it?

A.    On the server.

Q.    Okay.  So you have a server?

A.      Correct.

Q.      Okay.  Who controls the server?

A.      Who controls the server?  Our technology partner.

Q.      And who's that?

A.      KirbTech, K-I-R-B-T-E-C-H.

Q.      So any work that you had done pursuant to your Parks contract, where does that -- where is that stored?

A.      It would be someplace on -- we call it the share.  I apologize.  I missed the point of the question.

We call it the share drive.

Q.      Okay.  And is the share drive -- does that exist on the server or is it actually on your hard drive?

MR. CRUSE:  I can't make an objection to every one of these questions because it would be a long-standing one.

But I'm going to have a standing objection to this line of questioning being inappropriate and for fishing expedition for use in another litigation and having nothing to do with the lawsuit today against Eckert Seamans.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I don't know how it works, Mr. Nolan.  I know just -- I'm sorry.  Go ahead.

BY MR. NOLAN:

Q.    Well, in other words, if I wanted to ask you to see the documents that reflect the work that you have done pursuant to your contract with Parks, where would you look?

A.    On the shared drive.

Q.    Okay.  And that's something you can access over your computer?

A.    Yes, sir.

Q.    And do you retain those files or do you delete them?

MR. HUDDEL:  Object to form, vague.

THE DEPONENT:  I imagine I have deleted some files.  I imagine I've retained a lot of files.

BY MR. NOLAN:

Q.    What rule do you follow to determine whether you're going to retain or delete a certain document?

MR. HUDDEL:  Object to form.

Page 129

THE DEPONENT:  My rule, my practice is as you work on a document, make changes and share those changes, you update the file, you change the name.

And in the past we have -- I have deleted earlier versions.  I do it often.

BY MR. NOLAN:

Q.     But once you get to -- the final form of a document, do you retain it or delete it?

A.     I would have to say 90 percent of the time we retain.  There might be some -- you know, I call it the folder and I have 12 versions of this or eight versions of this or I have sent a proposal out or a memo out that's worthless, I dump them.

Q.     Have you deleted any of the written work product that you have done pursuant to your contract with Parks?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Objection to form.

THE DEPONENT:  I cannot say one way or the other.

It is entirely possible that there were old proposals that were no longer

relevant and I was cleaning out a folder Our Drive/Parks folder, so it is entirely possible that not -- that some of the documents that I prepared for Parks are not in our server anymore.  I've deleted them.

BY MR. NOLAN:

Q.    Okay.

A.    Just like I would do for any other client.

Q.    Okay.  Just so you know, we may want to subpoena you for documents related to this case.

So I would ask you to please do not delete any documents related to the work that you have done for Parks or in combination with the Eckert firm.

Understand?

A.    Yes, sir.

Q.    Okay.

A.    You're welcome.

Q.    What e-mail provider do you use at your firm?

A.    It's all Microsoft.

Q.    Is that like Outlook Express or

Outlook?

A.    Outlook.

Q.    Okay.  In Outlook, do you have a series of folders that represent the different clients and matters that you work on?

A.    I do not.  I have folders, but they are -- they are not client related for the most part.

I can't recall -- I don't know of one that I have a folder dedicated to a specific client.

So the answer is no, it's not.  I do not.

Q.    So when you received or sent emails related to the work that you did for Parks, did you do anything to save those?

A.    No, sir.

Q.    Have you deleted them?

A.    I'm sure I have.

Q.    How far back can you look in your sent and received e-mails to look at historical e-mails?

A.    I have not the foggiest idea.  I think maybe it's two years, a year.  I have been chastised by my technology company to dump

e-mail.

It's not uncommon to have 25,000 e-mails, 30,000 e-mails.  It's stupid.  So I do dump them independent of the client.

Q.    Same request, I would ask that you take whatever steps you need to to retain all emails related to your work for Parks.

Fair?

A.    Understood, yes, sir.

Q.    Thank you.

A.    You're welcome.

Q.    Do you have a cell phone?

A.    I do.

Q.    Who's your cell phone carrier?

A.    That would be Verizon.

Q.    How long has Verizon been your cell phone carrier?

A.    This is a personal -- yeah, 10 years, 15 years.  Quite a long time.

Q.    Okay.  Do you -- well, strike that.

Have you ever texted with Mark Stewart, Kevin Skjoldal or anyone else related to your work for Parks?

A.    I don't recall any texts going to

Kevin Skjoldal frankly.

I am sure I would have texted with people at Parks, people related to Parks, as you phrased it.

Q.    Have you deleted any of those texts?

A.    I delete a lot of text messages just to keep stuff from piling up.

Q.    How does it pile up in your text message?

A.    I open it up and sometimes you have to go through a whole conversation and I'm trying to find someone's name.  I don't have the time and energy for it.

So it's not as common as I do my e-mail.  But in the interest of just being 100 percent transparent and careful, it's entirely possible that I do -- I'll wake up in the morning and if I see a text that I have already dealt with, I just dump it.

Q.    Okay.

Prior to this deposition, had you taken any steps to collect and preserve any documents related to the subject matter of this case?

Page 134

A.      No, I've not.

Q.      How about the other case that you're involved in?

MR. HUDDEL:  Objection.

MR. CRUSE:  Objection.  This absolutely specifically goes to the other case without a doubt.

MR. HUDDEL:  Same objection.

Yeah, this question is calculated to elicit testimony relevant only to separate litigation.

I object to it on that basis.

MR. NOLAN:  You mean, the other case that we said is basically involving the same matter?

MR. HUDDEL:  I mean a lawsuit that is not this lawsuit.

MR. NOLAN:  Right.

So don't you think if he saved documents for that case, it would be the same documents that would be relevant to this case?

MR. HUDDEL:  Yeah, I mean I stated my objection.  The record will reflect it.

Page 135

THE DEPONENT:  Can I ask you a quick question?

Okay.  We're good.  So I'm not going to answer that question.

BY MR. NOLAN:

Q.    You're not going to answer that question?

A.    Based on the advice of counsel --

MR. CRUSE:  I haven't instructed you not to answer.

We're going to make a motion to strike.

THE DEPONENT:  Oh, I apologize.  Your question again was?  I apologize.

BY MR. NOLAN:

Q.    Have you done anything to collect or preserve documents related to the case that you're a defendant in?

A.    No, sir, I have not.

Q.    Have you been asked to do so?

MR. CRUSE:  You can answer the facts of the question.

But I would warn you to not get into any specific discussions that you had with whoever your counsel is, because

Page 136

that's, again, falls under your privilege.

I'm not your counsel in that case, but just raising that to your attention.

But you can answer the facts of the question.

THE DEPONENT:  No.

BY MR. NOLAN:

Q.    Okay.  Generally speaking, I think you told me that basically the work you've done for Parks is public relations.

Do you remember that?

A.    Strategic communications first, public relations second.

Q.    Okay.  And I believe earlier you told me that you have had interface with the public related to that work, yes?

A.    Yes.

Q.    Okay.  Have you always interfaced with certain law enforcement agencies relevant to that work?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Which ones?

Page 137

A.    Local district attorneys and Pennsylvania State Police.

Q.    Any others?

A.    Not that I can think of, no, sir.

Q.    How about the PGCD?

A.    None.

Q.    Have you communicated with anyone at the PGCD regarding skill games?

A.    My communication with the PC -- control board is I asked to be included on their daily e-mail blasts of all the relevant clicks that they -- I'm sorry, media coverage of gaming in Pennsylvania surrounding jurisdictions and then nationally.

I asked -- I had one other conversation. I was confused about how the funding that the casinos dedicated to the compulsive gambling fund works. And I wasn't sure if its -- so those are the two buckets that I've had communications with the communications folks at the Gaming Control Board.

Q.    Who have you had communications with at the Pennsylvania State Police?

A.    So I have contacted -- I would have to say no more than three or four

Page 138

Pennsylvania State Police barracks alerting them that we have gotten a call regarding illegal skill games at a location.

As I sit here, I'd be surprised if it was five. And I have no recollection of which five they were. I know it happened, so I want to make sure that's clear, but de minimis.

Q. You're saying -- roughly, how many calls did you make to those police barracks?

In other words, just five or is it five barracks that you contacted numerous times?

A. It's just five.

Q. Okay.

A. Total. All in.

Q. All right. And those were based on information you received from an 800 number?

A. Correct.

Q. Okay. Every time you received information via the 800 number on skill games, did you then relay that to the Pennsylvania State Police?

A. Not every time, no, sir.

Q. Why not?

A. We would call the local district attorney on other occasions.

Q. Okay. Do you remember the names of anyone you spoke with at the Pennsylvania State Police?

A. I never -- it was -- no, sir. It was a -- somebody answering the phone, so I could get it on the record.

I never had any conversation with anybody at the Pennsylvania State Police period regarding this engagement, substantive conversation.

Q. Okay. How about the local DAs. Can you give me the names of local DAs you communicated with?

A. I can't give you all of them. But I can give you the ones I recollect.

Clearfield County was one, Lycoming County. I think there's one in Bucks County. I'd say 10 total.

Q. Do you remember the names of anyone that you spoke with at those DA's Offices?

A. I never had any substantive conversations regarding the 800 number with any of those officials at all.

Q. How about just generally about skill games?

Page 140

A.    I had a conversation with an Assistant District Attorney in Delaware County regarding skill games.  His name escapes me.  And I believe that is the only one.

Q.    Okay.  How about Pennsylvania state legislators, have you spoke to legislators?  Have you spoken with any of them about skill games?

A.    Yes, sir, I have.

Q.    Who?

A.    Well, starting early on it would have been Senator Tomlinson.  State Senator Frank Farry, who replaced Senator Tomlinson.

At the time it would have been state senators with a group of casino representatives, Senator Jake Corman, C-O-R-M-A-N.  I'm trying to think.

Those are the ones that come to mind.

Q.    Any others that you can think of?

A.    I am sure there are others.  Representative Fleming, who's a new lawmaker.  I spoke to him about an illegal skill game casino that opened up in his district.

And I'm sure there have been

others, casual conversations.

But in terms of setting up a meeting and going to speak with a lawmaker about the challenge of illegal skill games across the State, I mean, it's not what we do typically.

I apologize.  House Gaming Oversight Committee.  I participated in the meeting with the former chairman of that committee, whose name escapes me, which is kind of embarrassing.

That would have been like two years ago.

I've traded e-mail with any number of lawmakers.  But in terms of a sit-down, I -- you know, maybe 10 or 12.  It could be more.  It could be less.  But not a focus of what I do.

Q.    Okay.  Generally speaking, you're in communications with the legislators.  What do those involve?

A.    My role is essentially to sit there and take notes and listen.  That's what I do.

So the casino industry, must like the car -- Realtor Associates having meeting here, trial bar, defense bar, the Widgets

Association will routinely set up meetings with lawmakers to discuss legislation.

So the last time -- so that is the purpose of the meeting.

Senator Farry is speaking with, I know, all the casinos and he has also spoken with some of the other interested in gaming.  I was not there but I was informed as much.

But my role, it is as the communications person, to try to figure out is it a yes vote, a no vote.  You tell me, guys, what we're looking at here and I'll come up with some idea on how to keep them there, move them, influence them one way or another.

Q.    Okay.

A.    Does that make sense?

Q.    So generally speaking, your communications with the lawmakers have been in furtherance of your purpose to have skill games banned legislatively.

Is that fair?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  Skill games and video gaming terminals.  It was not

Page 143

strictly related to skill games.

And, in fact, the biggest battle since I've been involved with Parks was a push to expand video gaming terminals.

And your clients' representative were as deeply involved in that fight as my client was and my clients -- my colleagues on the team.

BY MR. NOLAN:

Q.     What other casinos, other than Parks, is involved in this campaign to drive skill games out of business?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Objection to form, foundation.

THE DEPONENT:  So you're going to have to ask all the other casinos.

My client is Parks casino.  So they have paid me for my services.

There is no statewide trade association.  There is no Keystone Casino Association.

We do have routine calls to update people on meetings that they might have -- that they've had in the building,

Page 144

you know, what are you hearing.

We do it for our labor clients, our environmental clients, your education clients. And I believe, whatever the number of owners there are in the state -- there are, you know, a majority of them, it's not necessarily a unified industry.

So when it comes to re-opening for COVID, I believe everyone would have been on that call.

Maybe -- there's a few -- Valley Forge Casino is a very small resort casino. It's a little different. So they're not -- they're not -- it's not a cookie cutter industry.

So just the majority of the casinos are involved in those calls.

BY MR. NOLAN:

Q. Okay. The calls that you're talking about, are they scheduled like monthly, weekly?

A. As needed.

Q. About how often do they occur?

A. Well, it depends on what's going

on in the building.  Again, it's all about legislation.

So when the video gaming terminal folks made a really hard push, there were two calls a week.  Now it's as needed.

We are -- there is a committee hearing coming up.  It's a lot of coordination among the casinos.  You can't all -- you can't have 18 -- or 10 general managers testifying.  So who's going to testify?

And so they try and figure that out.  And sometimes it works and sometimes a casino will go and ask -- just chart their own path.  Parks has done it.  They've all done it.

So it's a loose affiliation, just to make sure -- mainly to share information.  Not affiliation.  That's the wrong word.  Group.

Could I clarify one thing?

Q.    Sure.

A.    The thought does occur, when they're in session, there would be -- it would be uncommon to have a standing call on calendars but that you would dump it if there's nothing going on.

Just so you're clear -- just so

I'm clear.

Q.      Did you ever talk to the group of casino representatives about the work that you were doing to try to drive the skill games out of business?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.      Who was on those calls?

A.      It would have been the government relations professionals for the casinos.  Some number of them.

Q.      Which ones to your memory?

A.      It changes, respectfully.

Different casinos have different priorities.  Different casinos have different missions in the building.  So it is a fluid dynamic for the most part.

Again, when it comes to the VGT fight, I think there was one casino company that was open to allowing VGTs.  They have a VGT practice of business someplace else.

But it's a call for the government relations professionals to update one another on

Page 147

meetings that they have had, what do we think about this proposal, what do we think -- what's going to happen here.  Everything from smoking bans to the legality of skill games.

Q.    Were there any of the Pennsylvania casinos that weren't on board with the kill skill campaign?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Objection to form.

THE DEPONENT:  I am not sure what you mean.  Can you say that again?

BY MR. NOLAN:

Q.    Were there any of the Pennsylvania casinos that weren't on board with the kill skill campaign?

MR. HUDDEL:  Objection to form.

THE DEPONENT:  I don't know.  I mean, there are -- I was not counting heads.

I knew my client was there.  That's all I really needed to know.  So I can't answer that question.

BY MR. NOLAN:

Q.    Generally was it your impression that most of the major casinos in Pennsylvania

Page 148

were in agreement with the campaign to try to drive skill games out of Pennsylvania?

MR. CRUSE:  Objection, form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I think most of the casinos in Pennsylvania were in favor of banning skill games.

That does not mean that most of the casinos in Pennsylvania were on board with the campaign that I developed on behalf of Parks.

BY MR. NOLAN:

Q.    Which casinos were on board with your campaign?

A.    You're going to have to ask the individual casinos.

It changed based on the legislation that people were floating around, this is not a naming-a-bridge matter.

If you -- and so different provisions are more important to some casinos than others.

A national casino company might have different priorities and challenges than my client, Bob Green.

Page 149

So my work was done for Parks Casino.  And whoever was on those calls, which I didn't manage and arrange -- you know, I participated -- I frankly didn't care.

Q.    Who did manage and arrange those?

A.    It has shifted.  Dick Gmerek is kind of the senior member of the team, but it's important to note that just because Dick scheduled a call doesn't mean that Dick wanted the call.

So another casino would call -- would send a note out and say, hey, could we talk about the widget issue or this issue.

Again, there is no unified casino association trade group in Pennsylvania.  They're a very competitive business.

So it's not a, you know, standing meeting and any of that stuff.  It was standing.  It was just as a safety valve thing.  Hey, what are we hearing, what are we doing.

That's as best I can do.

MR. NOLAN:  Okay.  I need to refresh my coffee.  Do you want to take another short break, five minutes?

THE VIDEOGRAPHER:  We are going

Page 150

off the record at 11:42 a.m.

(Off the record.)

THE VIDEOGRAPHER:  We're going back on the record at 11:51 a.m.

(Shelly Deposition Exhibit Number 3 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 3.

Do you recognize that document?

A.    Yes.

Q.    What is it?

A.    It's an opinion by Judge McCullough in the POM versus Department of Revenue, City of Philadelphia.

Q.    When did you first review it?

A.    Say again?  I apologize.

Q.    When did you first review it?

A.    I first looked at it sometime on either November 20 or November 21, 2019.

Q.    Because over the past couple of years, you've referenced this opinion numerous times, yes?

A.    I don't recall how many times I've referenced it.

Page 151

Q.    More than a few, right?

A.    I don't recall.  It could be, yes, sir.

Q.    Did you review it thoroughly carefully?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I relied on the lawyers for reviewing the Commonwealth Court's opinion.

BY MR. NOLAN:

Q.    That wasn't my question.

A.    That's my answer.

Q.    Okay.  But you're supposed to answer my questions.  And my question was, did you review it thoroughly and carefully?

A.    I looked it over.  I reviewed it.

Q.    Thoroughly?

A.    No.

Q.    Carefully?

A.    Yes.

Q.    Okay.  Did you read it in its entirety?

A.    No, sir.

Q.    What portions did you read?

Page 152

A.   I don't recall.

Typically my reporter-trained, cut to the chase and rely on the lawyers to tell you exactly what the judges are saying.

Q.   What lawyers did you rely on with regards to what this opinion says?

A.   Mark Stewart.

Q.   Anyone else?

A.   No.  Mark Stewart was driving the bus on this, sir.

Q.   He's the one who told you what to say about it?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Objection to form and I instruct you to the extent that you had communications with Mr. Stewart, as counsel to Parks and you as an agent, you are not to disclose any communications you had with Mr. Stewart.

BY MR. NOLAN:

Q.   Are you going to follow your attorney's advice and refuse to answer my question?

MR. CRUSE:  I would ask that you do.

Page 153

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.    What did Mr. Stewart tell you about this opinion?

MR. HUDDEL:  Same objection.

MR. CRUSE:  Same objection.  Same instruction.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice and refuse to answer my question?

A.    Yes, sir.

Q.    Now, you understand that this opinion involved a case filed by POM of Pennsylvania?

A.    It's on the sheet here, yes, sir.

Q.    And you've understood that since November 20th, 2019?

A.    November 20th, November 21, yes, sir.  November 20th, yeah.

Q.    And you understood that the Court rendered an opinion relative to the application of the Gaming Act to POM of Pennsylvania's games, right?

MR. CRUSE:  Objection.  Calls for

a legal conclusion.

MR. HUDDEL:  Yeah.  Object to form.  Same objection.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.   Okay.  What efforts did you make to understand what that ruling was?

A.   I relied on the advice of counsel of Parks' legal experts.

Q.   Okay.  So you talked to Mark Stewart about it, right?

A.   Correct.

Q.   And you read it yourself, right?

A.   Correct.

MR. CRUSE:  Objection to form.

BY MR. NOLAN:

Q.   Did you do anything else to try to understand what this -- what the Court said about the application of the Gaming Act to those games?

A.   No.

Q.   Was it your understanding that the Commonwealth of Pennsylvania, Department of Revenue, was a defendant in that lawsuit?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

Page 155

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Could I get you to turn to the bottom of page 4 of the opinion?

Do you see the last paragraph?  It says, the Department seeks a declaration that, one, the Gaming Act regulates the manufacture, possession and operation of slot machines; two, the Gaming Act and its regulations prohibit any person from possessing a slot machine, unless lawfully manufactured by a licensed manufacturer; three, the Gaming Act prohibits the possession and operation of any slot machine, unless on the premises of a licensed casino facility; four, the POM game is an illegal gambling device under the Gaming Act; five, the POM game is a slot machine under the Gaming Act and subject to daily tax of 34 percent of its revenue; and six, POM is a manufacturer and/or supplier of slot machines and required to obtain a license from the Gaming Control Board.

Did I read that sentence correctly?

A.    Yes, sir.

Q.    And you understood that when you

read this opinion, right?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  I don't recall reading this specific sentence under any circumstance.

Again, I relied on the guidance and the direction of counsel to Parks Casino.

BY MR. NOLAN:

Q.   You mean Mark Stewart, right?

A.   It was Mark Stewart principally, but there were -- again, Tom Bonner was involved. He is a lawyer at Parks Casino.

But I relied almost exclusively on the guidance and direction of Mark Stewart.

Q.   Did you look at Gaming Act yourself?

A.   No, sir.

Q.   Are you familiar with the Gaming Act?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  Not especially, no, sir.  I know what it is.  But that's it.

BY MR. NOLAN:

Q.    What do you know it to be?

A.    It's the act that governs gaming in Pennsylvania.  State law that governs gaming in Pennsylvania.

Q.    Okay.  Could I get you to turn to page 9 of the opinion?

Do you see here at the bottom of page 9 the Court defines or includes the definition of a slot machine in the Gaming Act?

MR. HUDDEL:  Object to form.

MR. CRUSE:  If you need to read the opinion now during this deposition, asking questions about it, given that you stated that you didn't read it thoroughly and he is asking you specific things about it, to answer your questions, you have the right in this deposition to take the entirety of time necessary to read this opinion during this deposition.

THE DEPONENT:  That would be helpful.

MR. CRUSE:  Okay.  I would recommend that you do so.

MR. NOLAN:  Well, let's then go

Page 158

off the record.

MR. CRUSE:  No, let's do it on the record.  You do it on the record. It's your time.  You're asking him about the document, he can read it on the record.

MR. NOLAN:  Well, he made numerous statements about this document.  So I am assuming that he is familiar with it.

MR. CRUSE:  He told you that he reviewed it not thoroughly, read only parts of it.

You're asking him about this part. He has a right, as the deponent -- you want him to answer questions about this document, he's gonna read this document and it's on your time.

BY MR. NOLAN:

Q.    You see here where the report includes the definition of a slot machine that's contained in the Gaming Act on page 9?

MR. CRUSE:  Please read the --

THE DEPONENT:  Yeah, I'm gonna look through this.  I'm not answering any questions about this document.  I have not reviewed it thoroughly.  I'm gonna

Page 159

read it.

BY MR. NOLAN:

Q.    Go ahead and read it.

MR. CRUSE:  No court in the world would hold you in any kind of contempt for wanting to read a document you're being asked questions about.

THE DEPONENT:  Your question is, what page?

BY MR. NOLAN:

Q.    You've had a chance to review the opinion that is Exhibit 3, yes?

A.    Yes.

Q.    Okay.  All right.  Let's look at the top of page 9.

The Court says, we first address the definitions of slot machine manufacturer and supplier under the Gaming Act to determine whether if the Gaming Act applies to unlicensed slot machines.

The POM game would be considered a slot machine and a POM a manufacturer and/or supplier of slot machines.

Did I read that correctly?

A.    Yes, sir.

Page 160

Q.    Okay.  And having reviewed it, you understand that?

A.    I do understand that.

Q.    Okay.  Down below, in the next sentence, the Court says, yes, at the outset, we are merely deciding whether, based on the factual allegations, the POM games are slot machines pursuant to the definitions of the Gaming Act.

Did I read that correctly?

A.    You did, yes, sir.

Q.    Okay.  You understand that, right?

MR. CRUSE:  Object to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I do.

BY MR. NOLAN:

Q.    Okay.  So then if we look down towards the bottom of the page, the Court includes the definition of a slot machine contained in the Gaming Act.

Do you understand that?

MR. CRUSE:  Objection to form.

THE DEPONENT:  I do, yes, sir.

BY MR. NOLAN:

Q.    And do you see where the Court has placed in bold type several portions of the

Page 161

definition of a slot machine?

A.    I do.

MR. CRUSE:  Please slow down so we can make objections.

BY MR. NOLAN:

Q.    So you understand that the Gaming Act defines a slot machine to be any mechanical, electrical or computerized contrivance, terminal machine or other device approved by the Pennsylvania Gaming Control Board, which upon the insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever, is available to play or operate.  The play or operation of which, whether by reason of skill or the application of chance or both, may deliver or entitle the person or persons playing or operating the contrivance, terminal machine or other device, to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever.

Did I read that portion of the definition correctly?

A.    Yes, sir.

Q.    Okay.  So if we look at the

Page 162

beginning of it, you would agree with me that to qualify as a slot machine under the Gaming Act, it has to be approved by the Pennsylvania Gaming Control Board?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion.

MR. HUDDEL:  Objection.  Yes, same objections.

THE DEPONENT:  I would defer to my lawyer involved in this fight before I would attempt to interpret a single syllable in this opinion.

BY MR. NOLAN:

Q.    Okay.  But you see that that is included in the definition of a slot machine, that it has to be approved by the Pennsylvania Gaming Control Board, yes?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I would defer to Mark Stewart at the time.

BY MR. NOLAN:

Q.    That's not my question.

A.    You're asking -- my answer is,

Page 163

lawyers interpret.  I write.  That's my forte.

I'm not gonna speculate about a legal document opinion, because I am not an attorney.

My opinion is worthless to Parks Casino in this regard.

Q.    Right.

You can read these words contained in the opinion, yes?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  And you understand that part of the definition of slot machines says approved by the Pennsylvania Gaming Control Board, yes?

MR. CRUSE:  Objection to form. Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Those are the words on the written page in front of me, yes.

BY MR. NOLAN:

Q.    That's part of the definition of a slot machine, yes?

MR. CRUSE:  Objection to form.

Page 164

Calls for a legal conclusion.

MR. HUDDEL:  Same objection.

THE DEPONENT:  It says slot machine is defined.  So, yes.

BY MR. NOLAN:

Q.    Okay.  So to meet that definition, it has to be approved by the Pennsylvania Gaming Control Board, yes?

MR. CRUSE:  Objection to form. Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I have no idea if that's the case.

BY MR. NOLAN:

Q.    Okay.  All right.  Would you turn to page 11, please?

Can I direct your attention to the first full paragraph?

It begins with section 1103.  And can I direct your attention to midway through the paragraph, towards the end of the line that starts with the word because?

Do you see that?

A.    Yes, sir.

Q.    Okay.  And do you see that in the

Page 165

opinion, the Court says, because POM alleges that

its game requires consideration to play, provides

something of value and is skill-based, if POM's

activities are subject to the Gaming Act, then

the POM game fits within the definition of a slot

machine under the Gaming Act.

           Did I read that correctly?

      A.    You did.

      Q.    Okay.  You understand how if then

sentence structure works, right?

           MR. HUDDEL:  Object to form.

           MR. CRUSE:  Join.

           THE DEPONENT:  I understand how if

      then works --

BY MR. NOLAN:

      Q.    Okay.

      A.    -- in every context.

           This is not my role.  I would have

deferred to Mark Stewart to interpret this

sentence, this paragraph and this entire opinion

and not only -- that's my answer.

      Q.    Thank you.

           How does the if then sentence

structure work?

           MR. HUDDEL:  Object to form.

Page 166

MR. CRUSE:  Join.

THE DEPONENT:  If something occurs, then something happens.

How's that?

BY MR. NOLAN:

Q.    Okay.  So, for instance, if we break it down, if there's a sentence that says if A exists, then B exists, you know that if A exists, then according to that sentence, then B should exist, right?

MR. CRUSE:  Objection to form.

THE DEPONENT:  No, I don't agree with that.  It's not a straight line.

If it were a straight line -- it's not a straight line.  That's why I rely on the direction, supervision and guidance of Mark Stewart.

BY MR. NOLAN:

Q.    You understand here that what the Court is saying is, the POM game fits within the definition of a slot machine under Gaming Act only if POM's activities are subject to the gaming act, right?

MR. CRUSE:  Objection to form.

Calls for a legal conclusion.

Page 167

MR. HUDDEL:  Same objections.

THE DEPONENT:  I would have relied on Mark Stewart.

BY MR. NOLAN:

Q.    That wasn't the question?

A.    That's my answer.

Q.    Well, you're supposed to answer my questions.

Remember at the beginning when I said, will you promise to tell the truth, the whole truth and nothing but the truth?  That -- it's supposed to be responsive to my question.

So my question is, having read this, you agree that what the Court is saying is the POM game fits within the definition of slot machine under the Gaming Act, only if POM's activities are subject the Gaming Act, yes?

MR. CRUSE:  Two objections.

Well, two different subject matter objections.

As to the question itself, objection to the form, calls for a legal conclusion.

As to Mr. Nolan's recitation of his view of the law of what you're

required to do as a witness, object to that in the dep itself.

MR. HUDDEL:  Same objections.

I also want to clearly object to the question on the basis that the word only does not appear anywhere in the sentence that Mr. Nolan is asking about.

MR. CRUSE:  I join in that objection.

You can answer.

THE DEPONENT:  I'm going to give you the same answer.

Mark Stewart would have explained to me what this paragraph and every other paragraph in this opinion says.

And I would have relied on his guidance, expertise, supervision, his direction.

BY MR. NOLAN:

Q.    That wasn't my question.

A.    That's my answer, Mr. Nolan.

Q.    My question was, don't you agree that the Court made the statement such that it would only indicate that POM's game was a slot machine if the Gaming Act applied?

Page 169

Do you understand that?

MR. CRUSE:  Object to form.  Asked and answered.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

Also, noting for the record to the extent Mr. Nolan is asking about this one sentence in the opinion, the word only does not appear in it.

MR. CRUSE:  Join that objection.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  So what did Mr. Stewart tell you about this opinion?

MR. CRUSE:  I instruct you not to answer that on the grounds of attorney/client privilege.

That privilege belongs to Parks Casino.  You were an agent of Parks casino.  You were working with Mr. Stewart.  He is a privileged person.  You are not entitled to waive that privilege.

BY MR. NOLAN:

Q.    Are you going to follow your attorney's advice and refuse to answer my

Page 170

question?

MR. CRUSE:  You should definitely follow my advice and refuse to answer that question.

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.    Did Mr. Stewart talk to you about this paragraph that we just read on page 11?

MR. CRUSE:  Just give me a moment, please.

THE DEPONENT:  I don't recall this paragraph coming up specifically.

BY MR. NOLAN:

Q.    Would you turn to the next page?

Do you see in the first full paragraph it says, accordingly, there is one dispositive question remaining before us, which is a pure question of law.  Whether the Gaming Act applies to POM's conduct.

Did I read that correctly?

A.    Yes, sir.

Q.    So you understand that is what the Court is focusing on, whether the Gaming Act applies to POM's conduct, yes?

MR. CRUSE:  Objection to form.

Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Again, I would have relied upon Mr. Stewart's guidance.  But I can read the words on the page and they are what you said they are, yes, sir.

BY MR. NOLAN:

Q.    You understand what they mean, yes?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion.  Asked and answered.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Do you know how the Court answered that question?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  No.  I am not familiar with the specific machinations.

BY MR. NOLAN:

Q.    Well, you did say that when you got it, you certainly read the end of the

Page 172

opinion, right, where they answer the question?

MR. CRUSE: Objection to form.

MR. HUDDEL: Same objection.

THE DEPONENT: Yes, sir, I did say that.

I did not say that everything in the front of this document is included in the back end. There are some -- that's my answer.

BY MR. NOLAN:

Q. Well, you know, the Court said the Gaming Acting didn't apply to POM's conduct, yes?

MR. CRUSE: Objection to form. Calls for a legal conclusion.

MR. HUDDEL: Same objections.

THE DEPONENT: That's what the opinion says, yes, sir.

BY MR. NOLAN:

Q. And you knew that as of November 20th, 2019, right?

MR. CRUSE: Objection to form.

MR. HUDDEL: Same objection.

THE DEPONENT: No, sir, not necessarily.

BY MR. NOLAN:

Q.    Well, you said you went to the end of the opinion and you read what the Court said.

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Yeah, objection to form.

BY MR. NOLAN:

Q.    Right?

A.    I read the end of the opinion so I could start writing my communications on behalf of Parks Casino.

The nuances -- I did not get into any of the details, the specific paragraphs, A, B, C, D, one through eight.

It's not my job.  Mr. Stewart would have called me and said --

MR. CRUSE:  I caution you against disclosing communications with counsel. That is not your privilege to waive.

THE DEPONENT:  I would have deferred to the attorneys in every single turn, as I do in every engagement.

BY MR. NOLAN:

Q.    So if what you stated about the holding in this opinion is inaccurate, it's

because Mr. Stewart told you to say it, right?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Objection.  Calls for speculation.

THE DEPONENT:  Everything I wrote about this opinion was approved by, guided by, directed by Mr. Stewart.

BY MR. NOLAN:

Q.    So yes?

MR. HUDDEL:  Same objections.

MR. CRUSE:  Join.

THE DEPONENT:  That's a yes.

BY MR. NOLAN:

Q.    So if you said something inaccurate, it's Mark Stewart's fault, right?

MR. CRUSE:  Objection.

MR. HUDDEL:  Object to form.  And object to the extent it's essentially seeking to have the witness opine on a legal question.

MR. CRUSE:  Definitely objection to a legal conclusion.

THE DEPONENT:  Could you read back that question again?  I'm sorry.

(Reporter read back last

Page 175

question.)

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.   Are you familiar with Section 5513 of the Crimes Code?

MR. HUDDEL:  Object to form.

Object to the extent you're asking the witness to opine on the law.

MR. CRUSE:  Join the objection to form.

THE DEPONENT:  No.

BY MR. NOLAN:

Q.   Can I get you to turn to page 19 of that opinion?

Are you there?

A.   Yes, sir.

Q.   Did you see at the bottom of the page the opinion references Section 5513 (a) of the Crimes Code titled gambling devices, gambling, et cetera?

A.   Yes, sir, I do see that.

Q.   Do you see it states that a person is guilty of a first degree misdemeanor if he does any of the following.

And in subparagraph one it states

Page 176

intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away or offers for sale, loan, lease or gift any punchboard, drawing card, slot machine, or any device to be used for gambling purposes, except playing cards.

Did I read that subsection correctly?

A.    Absolutely.

Q.    Okay.  So you see the term slot machine there, right?

A.    Uh-huh.  Yes, sir.

Q.    Okay.  Do you have any idea whether or not the Crimes Code defines slot machine?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I have no idea.

BY MR. NOLAN:

Q.    Were you aware that for over 50 years in Pennsylvania Courts had ruled that to be illegal under this subsection, that it had to be predominantly a game of chance as opposed to skill?

Page 177

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Yeah, same objection.

THE DEPONENT:  No.

BY MR. NOLAN:

Q.    You weren't aware of that?

A.    No, sir.

MR. HUDDEL:  Yeah, same objection.

THE DEPONENT:  No.  I'm sorry.

BY MR. NOLAN:

Q.    Let's turn to the next page.

Do you see in the sixth line down from the top, do you see the sentence beginning with the word thus?

A.    Yes, sir.

Q.    Do you see the Court states, thus, the Crimes Code defines what constitutes illegal gambling and the Liquor Code gives the Pennsylvania State Police primary enforcement duties with respect to illegal gambling occurring at premises where unlicensed liquor core sales are also taking place.

Do I read that correctly?

A.    You did.

Q.    So you understand that the Court

Page 178

is saying you have to look to the Crimes Code to determine what constitutes illegal gambling, yes?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection. Object to form.

THE DEPONENT:  Do I understand that the Court would turn to the Crimes Code?  Is that your question, Mr. Nolan?

MR. HUDDEL:  Same objections.

MR. CRUSE:  Same objections.

THE DEPONENT:  That's what the opinion says, yes.

BY MR. NOLAN:

Q.     Okay.  And is that what Mr. Stewart told you back in November of 2019?

MR. CRUSE:  I instruct you not to answer on the basis of privilege.  It's not your privilege to waive.

BY MR. NOLAN:

Q.     Are you gonna follow your attorney's advice?

MR. CRUSE:  You should follow your attorney's advice.

THE DEPONENT:  Yes, sir.

Page 179

BY MR. NOLAN:

Q.    Would you look down in the first paragraph under subsection two of this opinion, fourth line down?

Do you see the sentence that starts with in other words?

A.    I'm sorry.  Bottom of page 20?

Q.    No.  First paragraph under Section 2.

A.    Oh, I apologize.  Yes, I do see that.

Q.    Do you see the fourth line down, the sentence beginning with in other words?

A.    I do, yes, sir.

Q.    So the Court is stating, in other words, we must decide whether the General Assembly intended for the Gaming Act to comprehensively regulate all gambling in the Commonwealth and thus apply to both legal and illegal gambling.

Did I read that correctly?

A.    You did.

Q.    Would you turn to the next page?

The first full paragraph, do you see the Court stated, we conclude that the Gaming

Page 180

Act does not apply to unlicensed and/or illegal slot machines?

A.    I do see that, yes, sir.

Q.    Would you look at the last paragraph on that page, the second sentence beginning with in particular.

Are you there?

A.    Yes, sir.

Q.    You would agree with me that the Court states in particular, Section 1103 of the Gaming Act defines slot machines as devices that are approved by the Gaming Control Board.

Did I read that correctly?

A.    Yes, sir.

Q.    And they emboldened the word approved, correct?

A.    Correct.

Q.    To your knowledge, has any POM game ever been approved by the Gaming Control Board?

MR. HUDDEL:  I object to the extent this effectively requires this witness to opine on a legal matter.

THE DEPONENT:  I'm not aware.

Page 181

BY MR. NOLAN:

Q.    Would you look at -- let me see. It's the fourth line up from the bottom. Towards the end of the line -- excuse me, fifth line up, starts with the word the.

A.    Not especially helpful. But I believe I have it.

The definitional, is that the sentence?

Q.    Yes.

A.    Yes, I see that.

Q.    The Court states the definitional provisions the Gaming Act clearly demonstrate that the General Assembly intended for the Gaming Act to regulate slot machines that are licensed and approved by the Gaming Board, not those that are illegal or unlicensed.

Did I read that correctly?

A.    Yes, sir.

Q.    And, again, they emboldened the word licensed and approved by the Gaming Board, correct?

A.    Correct.

Q.    Reading on, the Court states the Department argues that the POM games are illegal;

Page 182

however, even if we were to assume arguendo, they are illegal and thus in violation of the Crimes Code.

There's nothing in the Gaming Act to suggest the General Assembly intended for the Gaming Control Board to also have the authority to regulate gambling devices that are unlawful pursuant to the Crimes Code.

Did I read that correctly?

A.    Yes, sir.

Q.    What is your understanding of what the word arguendo means?

MR. CRUSE:  Objection to form. Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I don't know what the word arguendo means.

I would have relied on Mr. Stewart to explain it to me, having had a discussion about page 22.

BY MR. NOLAN:

Q.    How about the Court's phrasing, even if we were to assume that the games are illegal?

MR. HUDDEL:  I object to the form.

Page 183

BY MR. NOLAN:

Q.      What's your understanding of what that means?

MR. CRUSE:  Objection to form. Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  It means what it says.

If they were to assume that they were illegal, bup, bup, bup.

BY MR. NOLAN:

Q.      In other words, do you interpret that as the Court saying that the POM games are illegal?

MR. CRUSE:  Objection to form. Asking a layperson expressly to opine on what the Court means calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I have not the foggiest idea what that -- where you're -- I don't know.  But on paper --

Can you repeat that again?  I'm sorry.

Page 184

BY MR. NOLAN:

Q.    Do you think that the Court, in that sentence, is actually stating that they have determined that POM's games are illegal?

MR. CRUSE:  Objection to form.

Calls for speculation, calls for a legal conclusion.

MR. NOLAN:  Same objections.

Asked and answered repeatedly.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    You think that the Court is saying POM's games are illegal there?

A.    No.

MR. CRUSE:  Same objections.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I apologize.  No. The answer is no.

BY MR. NOLAN:

Q.    Could I get you to turn to page 24?

Could I direct your attention to the first full paragraph, kind of in the middle on the left-hand side?

Do you see the sentence that

Page 185

states there is no?

A.      I do, yes, sir.

Q.      You agree with me that the Court stated there is no indication in Section 1207 Gaming Control Board -- excuse me, strike that.

You would agree with me that the Court stated that there is no indication in Section 1207 that the Gaming Control Board was given comprehensive authority over all illegal gambling activities in the Commonwealth, nor can we create such authority.

Did I read that correctly?

A.      Yes, sir.

Q.      Reading on it states, therefore, even if the POM games were considered illegal gaming devices, illegal devices have been historically regulated by the Crimes Code and the Gaming Act does not provide any authority for regulating such devices.

Did I read that correctly?

A.      Yes.

Q.      When the Court says, even if the POM games are considered illegal, do you interpret that to mean that the Court is saying they are illegal?

Page 186

MR. CRUSE:  Objection to form.
Calls for a legal conclusion.  Calls for
speculation.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I have no idea.

Do you want to repeat the last
part of that question again?

BY MR. NOLAN:

Q.    Yeah.

Where they say, even if the POM
games were considered illegal gambling devices,
do you think that they're saying right there that
they are illegal?

MR. CRUSE:  Objection to form.
Calls for speculation.  Calls for a legal
conclusion.

THE DEPONENT:  No.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I apologize, sir.
No, I do not.

BY MR. NOLAN:

Q.    Would you agree that what the
Court is saying is you have to look at the Crimes
Code, yes, --

MR. CRUSE:  Objection to form.

Page 187

BY MR. NOLAN:

Q.    -- to determine whether or not they're illegal?

MR. CRUSE:  Compound.  Calls for speculation.

MR. HUDDEL:  Same objections.

MR. CRUSE:  Calls for a legal conclusion.

THE DEPONENT:  That appears to be what the Court is saying, yes, sir.

BY MR. NOLAN:

Q.    Would you turn to the next page?

Do you see the first full sentence at the top of the page, it begins with accordingly?

A.    I do.

Q.    You would agree with me that the Court stated, quote, accordingly, based on the overall framework and context of the Gaming Act, we hold that it only applies to licensed slot machines and licensed entities/facilities and does not apply to unlicensed illegal devices.

Did I read that correctly?

A.    Yes, sir, you did.

Q.    Reading on then, the Court states,

Page 188

our conclusion that the Gaming Act does not apply to the unlicensed POM game is further bolstered by comment made during the 2004 Senate floor debate for the Gaming Act.

Did I read that correctly?

A.    Yes, sir, you did.

Q.    Okay.  So you understand the Court is saying that the Gaming Act does not apply to POM's unlicensed games?

MR. CRUSE:  Objection to form. Calls for speculation.  Calls for conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Would you turn to page 27?

Could I direct your attention to the last paragraph?

Do you see where the Court says, quote, therefore, based on both the plain language of the Gaming Act, as well as its legislative history, we conclude that unlicensed slot machines and or slot machines that are not approved by the Gaming Control Board, such as the POM game, are not subject the Gaming Act.

Did I read that correctly?

A.     Yes, sir.

Q.     So you understand that the Court is saying that the POM games at issue in this lawsuit are not subject to the Gaming Act?

MR. CRUSE:  Objection to form. Calls for speculation.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.     Do you see in that sentence where the Court emboldened the words are not approved?

A.     Yes, I see the bold.

Q.     And you recall those were the same words that they emboldened in the definition of slot machine under the Gaming Act.

Do you remember that?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  Yes, I do.

BY MR. NOLAN:

Q.     Okay.  So the Court here is saying if the games are not approved by the Gaming Control Board, then they're not subject to the

Page 190

Gaming Act, right?

MR. CRUSE:  Objection to form.
Calls for speculation.  Calls for a legal
conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  That appears to be
the case, yes.

BY MR. NOLAN:

Q.    And, therefore, wouldn't be
defined as slot machines under that Act.

Fair?

MR. CRUSE:  Objection to form.
Calls for speculation.  Calls for a legal
conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Reading on, they state,
consequently -- well, strike that.

Do you see footnote 17?

A.    I do.

Q.    Okay.  In footnote 17 the Court
says, quote, of course we do not answer the
separate question of whether the POM game
qualifies as an illegal gambling device under

Page 191

Section 5513 of the Crimes Code, which both parties appear to acknowledge present a question of fact that requires factual discovery to resolve.

Did I read that correctly?

A.     Yes, sir.

Q.     So would you agree with me that the Court is not saying that these games are illegal under Section 5513 of the Crimes Code, yes?

MR. CRUSE:  Objection to form. Calls for speculation.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  That appears to be what the Court is saying.

BY MR. NOLAN:

Q.     Okay.  Now let's go back up to the paragraph.

Reading on, the Court says, quote, consequently, we hold that even if the POM games were considered an illegal gambling device, the Gaming Act does not give the Gaming Control Board the power to regulate illegal gambling devices.

Did I read that correctly?

Page 192

A.      Yes, sir.

Q.      When the Court says, even if the POM game were considered an illegal gambling device, do you think the Court is saying that they are illegal gambling devices?

MR. CRUSE:  Objection to form. Calls for speculation.  Calls for a legal conclusion.

MR. HUDDEL:  Same questions -- same objections.

THE DEPONENT:  I don't think that's what it says.

BY MR. NOLAN:

Q.      Okay.  Could I get you to turn to page 30 of the opinion?

A.      Yes, sir.

Q.      Sixth line up from the bottom of the main paragraph, the first paragraph.

Do you see the sentence, I'm picking it up in the middle, we decline?

A.      I'm sorry, on page 30?

Q.      Yeah.

A.      No.  I apologize.  Where is it? Oh, there it is.

Yep.  I see we decline.  Yes, sir.

Page 193

Q.    You see where the Court says, we decline to conclude that the Gaming Act impliedly repealed the Crimes Code's regulation of the legally gambling devices and slot machines?

A.    Yes, sir.

Q.    Reading on, the Court states, quote, therefore, pursuant to our rules of statutory construction, we hold that Section 5513 of the Crimes Code, rather than any relevant provision of the Gaming Act, remains the preeminent statute governing illegal and unlicensed slot machines in the Commonwealth.

Did I read that correctly?

A.    Yes, sir.

Q.    You understand the Court to mean that you've got to look at 5513 of the Crimes Code to determine whether or not a slot machine is illegal, yes?

MR. CRUSE:  Objection to form. Calls for speculation.

Asking a communications expert to agree with a Court's interpretation of the rules of statutory construction under Pennsylvania law expressly calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  Could I get you to turn to page 31 and look at footnote 19?

Are you there?

A.    Yes, sir.

Q.    You would agree with me that in footnote 19 the Court reminds us again, quote, our denial of the Department's application, however, does not decide the separate question raised in POM's claim; i.e., whether the POM game is an illegal gambling device under the Crimes Code, which both parties appear to acknowledge requires discovery in order to resolve.

Did I read that correctly?

A.    Yes, sir, you did.

Q.    So would you agree with me that nowhere in this opinion does the Court say that POM's games are illegal?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.  Asking the witness to speculate.

THE DEPONENT:  I agree.

Page 195

BY MR. NOLAN:

Q.    Okay.  In other words, can you direct me to any language anywhere in this opinion where the Court says POM's games are illegal?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I can't find that in this opinion.

BY MR. NOLAN:

Q.    Can you point me to any language in this opinion where the Court says that POM games are slot machines?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  No, sir.

(Shelly Deposition Exhibit Number 4 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 4.

Do you recognize that document?

A.    I do.

Q.    Would you agree with me that this is an e-mail chain that you ultimately were copied on but were not copied initially?

A.    That appears to be the case, yes, sir.

Q.    Okay.  In the second most recent e-mail in this string, do you see it's an e-mail from Mark Stewart to you copying Mr. Gmerek, November 20th, 2019 at 11:29 a.m.?

A.    I do.

Q.    And he states, hi, Pete.  Lots going on today.  Please see below.  Re: Commonwealth Court decision on skill games.  Sure we will be discussing.

Did I read that correctly?

A.    Yes, sir.

Q.    Was this kind of at the beginning of your retention to do the public relations for Parks?

A.    It would have been very close to the beginning, yes, sir.

Q.    Okay.  So by that point in time you were already retained to do PR work for Parks, yes?

MR. HUDDEL:  Object to form.

          Asked and answered.

               MR. CRUSE:  Join.

               THE DEPONENT:  Yes.

BY MR. NOLAN:

     Q.    So you took this e-mail string
very seriously when you first received it, yes?

               MR. HUDDEL:  Object to form.

               MR. CRUSE:  Join.

               THE DEPONENT:  Yes.

BY MR. NOLAN:

     Q.    In other words, you got a job to
do and Mark Stewart is telling you lots going on
today, right?

               MR. HUDDEL:  Object to form.

               MR. CRUSE:  Join.

               THE DEPONENT:  Yes.

BY MR. NOLAN:

     Q.    Is this what you were describing
when you said everyone was running around with
their hair on fire?

               MR. HUDDEL:  Object to form.

               MR. CRUSE:  Join.

               THE DEPONENT:  That might have
          been an overstatement.

               My hair was on fire, because I was

Page 198

brand new to this issue and to this challenge and that's why, again, I deferred to the attorney, yes.

BY MR. NOLAN:

Q.   But you knew you had to spring into action as Parks' PR's person, yes?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Same objection.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.   You had to get up to speed?

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.   To gather as much information as you could?

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.   Because you knew you were going to be discussing it with him, right?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes, as of 2:30.

BY MR. NOLAN:

Q.   And you wanted to be prepared for

Page 199

those discussions, yes?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Yes?

A.    Yes.

Q.    So you read through the e-mail string, correct?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    The whole thing?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Do you see the very first e-mail in the string is an e-mail from Kevin Skjoldal to Mark Stewart and some other folks at Eckert that included a link to the opinion that we just discussed, yes?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Did you click on that link?

A.    I don't recall.

Q.    Did you open up or review that opinion on the 20th?

A.    I am sure I did.

Q.    Okay.  Do you see that in the second e-mail Mark Stewart forwards on the link to Bob Green at Parks Casino, Tom Bonner at Parks and Mr. Gmerek?

A.    Yes, sir.

Q.    And Mr. Stewart changed the subject line to state, in all caps, Commonwealth Court decision out, not good.

Did I read that correctly?

A.    You did.

Q.    Okay.  And you understand that that's the Commonwealth Court decision where the Court held that the Gaming Act didn't apply to POM's games, yes?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Yes.

Page 201

BY MR. NOLAN:

Q.    Okay.  And that was at 9:28 in the morning, correct?

A.    Yes, sir.

Q.    And then Mr. Stewart e-mailed that same group at 9:48, still under the same subject line, he stated, hold, may actually be pretty positive, right?

A.    That's what the e-mail says, yes, sir.

Q.    Okay.  Now, let's look at the next e-mail up from Mark Stewart on November 20th, 2019, at 10:19 a.m.

He e-mails the same group and now copies Sean Schafer.  And in the second bullet point regarding the opinion, he says, Court expressly says it is not commenting on whether the machines are a violation of 5513.

Did I read that portion correctly?

A.    You did.

Q.    Okay.  So he's acknowledging that the Court did not say whether or not the machines are illegal?

MR. CRUSE:  Objection.  Calls for speculation.  Calls for a legal

Page 202

conclusion.

MR. HUDDEL:  Same objections.
Object to form.

THE DEPONENT:  In terms of 5513,
that appears to be what he said.

BY MR. NOLAN:

Q.    Right.

Which is the section that the
Court in the opinion instructed that you'd have
to look at that section to determine whether
they're illegal, right?

MR. CRUSE:  Objection to form.
Calls for speculation.  Calls for a legal
conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I imagine so, yes,
sir.

BY MR. NOLAN:

Q.    Would you turn to the next page?
And let's look at his third bullet point.

Mr. Stewart states, Court found
that their machines are slot machines under Title
4.  This should be very good for our cases.

Did I read that correctly?

A.    Yes, sir.

Page 203

Q.    Now, just a short while ago you read through the opinion, did you see anywhere where the Court held that POM's games are slot machines under Title 4?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection. Object to form.

THE DEPONENT:  I would not have looked for that specific language and since Mark Stewart told me that's what the Court found, I trusted his guidance and what he -- his reading of the opinion.

I would not ever have thought to compare -- that's what I did.  I followed Mark Stewart's interpretation of the ruling.

BY MR. NOLAN:

Q.    Well, we just went through that entire order.  You took a fair amount of time to read through it to your satisfaction.

And you agree with me that nowhere in there did the Court say that POM games were slot machines, am I correct?

Page 204

MR. CRUSE:  Objection to form.

Prior examination called for multiple legal conclusions from a communications expert who has not attended a day of law school.

MR. HUDDEL:  Same objections to this question itself calls for a legal conclusion.

THE DEPONENT:  I explained that I did not see it, Mr. Nolan.  That doesn't mean that it's not in there.

BY MR. NOLAN:

Q.    Well, I asked you, are you able to direct my attention to anywhere in that opinion where the Court held that POM's games are slot machines?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  To the extent this is a question, I object.

MR. CRUSE:  Calls for a legal conclusion if it is a question.

THE DEPONENT:  Of all the words on this page and that I would have reviewed in preparing any communication pieces for my client, Parks Casino, the Court found

Page 205

that their machines are slot machines under Title 4, this should be very good for our cases.

That would have carried the day for me, the communications consultant.

BY MR. NOLAN:

Q.    That wasn't my question.

My question was, you'd agree with me that you are unable to point to any language in that opinion where the Court held that POM's machines are slot machines.

Fair?

MR. CRUSE:  Objection to form. Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  As I sit here today, that is fair.

BY MR. NOLAN:

Q.    Okay.  So Mark's statement here in the third bullet point is inaccurate.

Fair?

MR. CRUSE:  Objection to form. Expressly calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I would defer to

you and Mr. Stewart.

BY MR. NOLAN:

Q.    Well, if you're gonna defer to me, I will tell you, it's inaccurate.

MR. CRUSE:  I caution you against deferring to your interrogator.

THE DEPONENT:  I apologize.

I deferred to Mark Stewart.

Because I didn't see it in here, doesn't mean it's not in here.

That is the answer to my question.

BY MR. NOLAN:

Q.    Well, we went through the language together.  I gave you the chance to read it.

A.    Upon reading it here today, I do not find it in there.

Q.    Okay.

A.    That does not mean that working on deadline, trying to turn something around about a very complicated legal matter, that it could not have been an error, that I might have missed it.

MR. CRUSE:  Before you ask the next question, it's almost 1:00.

Can we break for lunch?

MR. NOLAN:  Very soon.  Very.

Page 207

MR. CRUSE:  Hungry.  Bye a break.
It's a civilized.

MR. NOLAN:  Yeah.

BY MR. NOLAN:

Q.    Would you agree with me that if it's not in the opinion, then Mark Stewart misled you?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.  Asking him to speculate.

MR. CRUSE:  Join that objection, speculation.

THE DEPONENT:  I would not agree with that statement.  I don't believe -- I was not aware and I am not aware today of any conscious effort by Mark Stewart or Kevin Skjoldal to mislead me in my work on behalf of Parks Casino, certainly on November 20, 19 -- 2019, sir.

That's just -- frankly not based -- that's just not where we were.

No sense whatsoever that Mark wasn't an expert in this law.  And, in fact, was the expert hired by Parks

Page 208

Casino.

That's where I was on November whatever the date is, 20th, 2019.

BY MR. NOLAN:

Q.    Did you ever ask Mark Stewart, hey, what do you mean in this subject line, Commonwealth Court decision out, not good?

MR. CRUSE:  I instruct you not to answer that because that violates a privilege that is not yours to waive.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice?

MR. CRUSE:  You should follow your attorney's advice.

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.    Did you ever form an impression as to what was not good about this Commonwealth -- Commonwealth Court decision from Mark Stewart's perspective?

MR. CRUSE:  Objection.  Calls for speculation.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.  And

Page 209

object to form.

THE DEPONENT:  No, sir, I would not have.

BY MR. NOLAN:

Q.    Do you think maybe it's because the Court held that the Gaming Act didn't apply to POM's games?

MR. CRUSE:  Objection to form. Calls for a legal conclusion.  It's based on a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I don't understand your question.

What is based on the Court's -- my opinion?

BY MR. NOLAN:

Q.    Yeah.

As a journalist -- as a journalist, didn't you want to know why Mr. Stewart typed the words in all caps, not good, when he forwarded on this opinion?

A.    No.

MR. HUDDEL:  I object to the form.

BY MR. NOLAN:

Q.    Don't you think inquiring minds

Page 210

would want to know why he thought it was not good?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Calls for speculation.  Object to form.

THE DEPONENT:  He could have said it after he read the first couple of paragraphs.  He could have went back to the final order, the final sentences, which is as a reporter -- and again, I'm a public relations strategic communications consultant.  I am not a reporter at this point in time.

My job was to take this matter, rely on the opinion, guidance and direction of the attorneys and come up with a statement, e-mail, a blast or whatever it might be.

BY MR. NOLAN:

Q.    Looking back at this Code of Ethics for Journalists, where it talked about seeking the truth and reporting it, do you remember you were saying that the Code of Ethics for a journalist required you to try to figure out what the truth is?

Page 211

MR. CRUSE:  Objection to form.

Misstates prior testimony.

MR. HUDDEL:  The same objection.

Asked and answered.

BY MR. NOLAN:

Q.    Do you remember that?

A.    I do.

MR. CRUSE:  Same objections.

BY MR. NOLAN:

Q.    So if you did have your journalist hat on, isn't that something that you should have inquired about?  Hey, Mark, what do you mean it's not good?

MR. CRUSE:  Objection to form.  It calls for speculation.  Argumentative.

MR. HUDDEL:  Same objections.

THE DEPONENT:  No, sir.

BY MR. NOLAN:

Q.    Why?

MR. HUDDEL:  Same objections.

MR. CRUSE:  Same objections.

THE DEPONENT:  We were doing a call that afternoon.  And on those calls, people tend to translate this language in a Court opinion halfway to plain English.

Page 212

My job was to get it all the way there. I rely on lawyers who argue the cases, who write the legislation, who do lawyering.

And if they tell me here's what this means, I react and respond to that.

That's my job.

BY MR. NOLAN:

Q. Okay. We'll wrap up this and then we'll break for lunch.

On this page, the third bullet point down says, we will provide thoughts on how this can move forward positively from a legal standpoint, e.g., AG files another application for summary relief based on the right argument, we try to get right to the Supreme Court review, and then file an amicus.

Did I read that correctly?

A. Yes.

Q. Did you guys discuss that on your call?

A. I --

MR. CRUSE: Guys.

THE DEPONENT: I'm sorry. I apologize.

Page 213

MR. CRUSE:  I instruct you not to disclose any communications you had with Mr. Mark Stewart, who is counsel to Parks, whose team you were part of, because that privilege does not belong to you and you cannot waive it.  It belongs to Parks Casino.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice and refuse to answer that question?

MR. CRUSE:  You should follow my advice.

THE DEPONENT:  I am, yes, sir.

BY MR. NOLAN:

Q.    Down below he states, legislatively, I see this is as leading to two potential scenarios.

Number one, it's ammunition for a simple amendment to 5513 to add a definition of slot machine.

Did I read that portion of the statement correctly?

A.    You did.

Q.    Did you understand him to mean

Page 214

that there is no definition of slot machine under 5513?

MR. CRUSE:  Objection.  Calls for speculation and calls for legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Sitting here today, that's exactly what the sentence says, yes, sir.

BY MR. NOLAN:

Q.    Because there is no definition of slot machine under 5513, right?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

BY MR. NOLAN:

Q.    That's what he is telling you in this e-mail, right?

MR. HUDDEL:  Same objections.

MR. CRUSE:  Same objection.  Calls for speculation.  Calls for a legal conclusion.

THE DEPONENT:  I would have stopped at ammunition.  And I would have highlighted that in my mind and said,

Page 215

okay, well, what are we gonna do about this.

But that is what the sentence says, yes.

BY MR. NOLAN:

Q.    Is that how you understood it?

MR. HUDDEL:  Same objections.

MR. CRUSE:  Join.

THE DEPONENT:  I mean, I have absolutely no recollection of a conversation about Section -- about 5513 and the definition of slot machine.

I don't recall any specific conversation about it.

BY MR. NOLAN:

Q.    He says, we have this drafted, in parenthesis, I thought Jake would use it.

Do you have an understanding of who Jake is?

A.    Yeah, I do.

Q.    Who?

A.    I'm sorry?

Q.    Oh, who?

A.    I believe it would have been State Senator Jake Corman.  Might be another Jake, but

Page 216

I doubt it.

Q.    Okay.  Tom, you think that's Tomlinson?

MR. CRUSE:  Objection.  Calls for speculation.

THE DEPONENT:  Sorry.  Senator Tomlinson.

BY MR. NOLAN:

Q.    Martin, who's that?

MR. CRUSE:  Objection.  Calls for speculation.

THE DEPONENT:  That would probably -- I apologize.  State Senator Scott Martin.

BY MR. NOLAN:

Q.    Okay.  In the second paragraph there he says, this could conceivably lead to push to open and amend Title 4.

You understand that's the Gaming Act, right?

MR. CRUSE:  Objection.  Calls for speculation.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I do.

BY MR. NOLAN:

Q.    At the end of that paragraph, he says, and to fix it, directly and completely, you need to amend Title 4, which as will know means all hell breaks loose on the other amendments.

Did I read that correctly?

A.    Yes, sir, you did.

Q.    What do you understand that to mean?

MR. HUDDEL:  Objection.  Calls for speculation.

MR. CRUSE:  Objection.  Calls for speculation.

THE DEPONENT:  What Mr. Stewart is saying here is that if you open up the Gaming Act, all hell would break loose.

BY MR. NOLAN:

Q.    What did you understand that to mean?

MR. HUDDEL:  Same objections.

MR. CRUSE:  Join.

THE DEPONENT:  I'm not sure how much more clear I could be from beyond all hell breaks loose on other amendments.

BY MR. NOLAN:

Q.    Like what other amendments were you envisioning?

MR. CRUSE:  Objection.  Calls for speculation.

MR. HUDDEL:  Same objection. Object to the form.

THE DEPONENT:  At this point in my engagement with Parks, I had zero amendments in my mind.  None.  It could have been anything under the sun.

BY MR. NOLAN:

Q.    Reading on, in the last sentence of this e-mail, Mr. Stewart states, by the way, the decision is arguably the worst -- is by arguably the worst judge on the Court.

Did I read that correctly?

A.    Yes, sir.

Q.    In your follow-up conversations, did Mr. Stewart say anything about that judge?

MR. CRUSE:  Objection.

Attorney/client privilege.  You're not to disclose any communications you've had with legal counsel to Parks Casino in your capacity as an agent to Parks

Page 219

Casino.

It's not your privilege to waive and, yes, you should take my advice and not answer the question.

THE DEPONENT:  I am not going to answer the question based on advice of my counsel.

MR. NOLAN:  Thank you.

Would you like to break for lunch?

MR. CRUSE:  Yes.

THE WITNESS:  Yes.

THE VIDEOGRAPHER:  We are going off the record, 1:05 p.m.

(Off the record.)

THE VIDEOGRAPHER:  Let's stand by.

We're going back on the record at 1:55 p.m.

BY MR. NOLAN:

Q.    Okay.  Looking back at Exhibit 4, which is that e-mail string of November 20th, 2019, do you recall when you received this e-mail?

Had you already had verbal communications with Mr. Stewart or anyone else copied on these e-mails about the Court's

Page 220

decision?

A.    I don't recall.

Q.    On the 20th, did you have verbal communications with any of these folks?

A.    I don't recall.  There was a reference to a call that afternoon, I believe, but I don't recall specifically.

Q.    You said a call at noon?

MR. CRUSE:  Objection to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Where is that?

A.    I'm sorry, hold on.  I may have read that from an e-mail.

I don't recall having any conversations specifically on that day and I don't see a reference to one.

I misspoke.

Q.    Well, at that point did you come up with your PR plan?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  No.

BY MR. NOLAN:

Q.    At what point did you come up with

Page 221

the PR plan?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  I don't recall.  It was not this day though.  It took some time to prepare it.

(Shelly Deposition Exhibit Number 5 marked.)

BY MR. NOLAN:

Q.    Did you -- strike that.

Handing you what's been marked Exhibit 5.

Do you recognize that document?

A.    Yes.

Q.    Okay.  So at least in terms of the last e-mail string that we looked at, you were first copied at 11:29 a.m. on the 20th, right?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  And by 4:12 p.m. that same day, you had already sent the group a proposed statement.

Is that fair?

MR. HUDDEL:  Object to form.

Page 222

MR. CRUSE:  Join.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Who told you to draft a statement?

MR. CRUSE:  Objection to form.

THE DEPONENT:  I don't recall.

BY MR. NOLAN:

Q.    Did someone tell you to draft a statement?

A.    I imagine so, but I'm not -- I might have just assumed it was necessary.  I don't recall who directed me to draft a statement.

Q.    Do you believe that at some point between 11:29 in the morning and 4:12 in the afternoon that you had a conversation with any of these folks?

MR. HUDDEL:  Objection.  Calls for speculation.

THE DEPONENT:  Yes.

MR. CRUSE:  Join.

THE DEPONENT:  I apologize.  Yes, I must have.

BY MR. NOLAN:

Q.    Okay.  And during that

Page 223

conversation, is that where you got the information that would go into this draft statement?

A.    Yes, sir.

MR. CRUSE:  Objection to form.

THE DEPONENT:  I apologize.

MR. CRUSE:  Please leave the safe.

No need to apologize.  Just leave the space.

BY MR. NOLAN:

Q.    So everything that's in this draft statement, which you attached, which is Bates labeled Eckert 01015, that all came from Mr. Stewart?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes, that was my recollection.

BY MR. NOLAN:

Q.    So is Mr. Stewart the one that told you that Pennsylvania Commonwealth Court rules that Pennsylvania Skill games are illegal?

MR. CRUSE:  I maintain my instruction to you to not discuss any specific oral communications you had with Mr. Stewart.

Page 224

I agree the court ordered the production of these documents.  As I said in my opening statement, Parks holds the privilege.  You're an agent of Parks, so is Mr. Stewart.  And Parks is not waiving that privilege.

You are not authorized to waive that privilege.

So I instruct you not to answer about any specific discussions that you had with Mr. Stewart.

BY MR. NOLAN:

Q.    Are you gonna refuse to answer my question?

A.    Upon advice of counsel, yes.

Q.    Okay.  The heading for this draft statement, Pennsylvania Commonwealth Court rules that Pennsylvania Skill games are illegal, where did you get that information?

A.    It would have been from the attorneys at -- it would have been from Mr. Stewart.

Q.    Okay.  So Mr. Stewart told you that the Pennsylvania Commonwealth Court ruled that Pennsylvania Skill games are illegal?

Page 225

MR. CRUSE:  I instruct you not to answer that question because it asks for specific discussions with counsel.

BY MR. NOLAN:

Q.     Are you gonna follow your attorney's advice?

A.     Yes, sir, I am.

Q.     Okay.  In the subheading, it says, to stop Pennsylvania's illegal gambling coalition, in paren, Stop PIG, urges law enforcement agencies to act.

Did I read that correctly?

A.     Yes, you did.

Q.     What is Stop PIG?

A.     It was a -- at that time it was just a placeholder for something.

We hadn't established or built any kind of outside presence.  So clearly it was just -- we never did start something called Stop PIG, so it was more of a form of a news release.

Q.     Okay.  What is Pennsylvania's illegal gambling coalition?

A.     That was just a -- we were in the middle, if memory serves, of creating some group outside of -- an outward-facing group of

Page 226

citizens, interested parties, and so we hadn't created it yet. But that was not the name of it.

So this would have been -- my recollection is just would have been a placeholder, so we had something there for folks to look at.

Q. Is that something that you all came up with on the 20th that there would be this outward-facing collision?

MR. HUDDEL: Object to form.

MR. CRUSE: Object to form.

THE DEPONENT: I don't recall when we came up with the idea of an outward-looking coalition.

BY MR. NOLAN:

Q. Who came up with it?

MR. HUDDEL: Object to form.

MR. CRUSE: Join.

THE DEPONENT: I did.

BY MR. NOLAN:

Q. Was that part of your PR plan that you were going to interface with the public and disseminate information about this Court ruling?

A. That was part of our strategy. Again, I don't recall if we had

time or if they needed a specific plan as they're flying down the road.

Q.    Ultimately, you did form something called PAIG, correct?

A.    Yes, sir.

Q.    Pennsylvanians Against Illegal Gambling?

A.    Yes, sir.

Q.    What is that?

A.    It's a placeholder website.  It's a landing spot for people who care about the issue to look for further information.

Q.    Is it actually like an entity?

A.    No, it's not an entity.

Q.    It's just a website?

A.    Correct.

Q.    Who runs the website?

A.    I did.

Q.    You created it?

A.    We had a vendor -- yes, I was responsible for creation of a website.

Q.    Who's the vendor that created the website?

A.    I have -- I have no recollection at this point.  There are three or four different

folks we were working at the time and I just don't recall.

Q.    Okay.  In the first paragraph, you state in your draft statement, in a blow to illegal gambling and a victory for families and communities in Pennsylvania, the Pennsylvania Commonwealth Court confirmed in a ruling today that video game machines manufactured and distributed by the company POM, under the Pennsylvania Skill, are considered, quote, slot machines, unquote, under Pennsylvania.

Did I read that correctly?

A.    You did.

Q.    Where did you get that information from?

A.    That would --

Q.    I instruct you that to the extent that the question solicits you to disclose any oral communications you had with counsel for Parks Casino, that you as an agent of Parks Casino are not authorized to waive the privilege on behalf of Parks Casino.

I recognize we are in a situation because of the Court's order disclosing these documents, having to address these documents, but

Page 229

you are to go no further than what is in these documents as to discussions with counsel.

BY MR. NOLAN:

Q.    You can answer.

A.    You're gonna have to repeat the question.

Q.    Where did you get the information in the first paragraph?

A.    The Court ruling that they are distributed -- under the name are considered slot machine under Pennsylvania law.

Q.    The whole first paragraph, where did you get that information?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Well, I wrote this draft based on my understanding of the impact of the legal skill games, which had been widely reported in Pennsylvania in terms of the Pennsylvania Commonwealth Court confirming in a ruling that came from Mark Stewart.

BY MR. NOLAN:

Q.    So Mark Stewart told you that the Commonwealth Court confirmed in a ruling today that video game machines manufactured and

Page 230

distributed by the company POM under the name Pennsylvania Skill were considered, quote, slot machines, unquote, under Pennsylvania law?

MR. CRUSE:  I instruct you not to answer, because that question directly asks for a disclosure of a communication made between privileged persons in confidence relating to the legal representation; and therefore, it's privileged and you're not to answer that question.

You're not authorized to waive the privilege.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice and refuse to answer my question?

A.    Yes, sir, I am.

Q.    When you wrote under Pennsylvania law, what Pennsylvania law are you referring to there?

A.    I have no recollection which Pennsylvania law that would have been under.

Q.    Would it have been under the Gaming Act, the Crimes Code?

Page 231

MR. HUDDEL:  Object to form.

THE DEPONENT:  I don't know.

MR. HUDDEL:  Object to the extent it calls for a legal conclusion.

MR. CRUSE:  Join.

THE DEPONENT:  I don't recall.

BY MR. NOLAN:

Q.    In the next paragraph, you make a statement in quotes, and then at the end of that quoted statement, you wrote, said and then there's a blank line, right?

A.    Yes, sir.  That's what the page says, yes, sir.

Q.    Okay.  Safe to say that when you wrote that, no one had actually made that statement.

Fair?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  Fair.

BY MR. NOLAN:

Q.    Okay.  So in other words, you're creating this statement that basically someone's gonna make or not make?

MR. HUDDEL:  Object to form.

Page 232

MR. CRUSE: Objection. Calls for speculation.

THE DEPONENT: That's correct.

BY MR. NOLAN:

Q. Okay. Who told you to draft that second paragraph that someone was going to urge the Pennsylvania State Police, the Office of Attorney General, police departments and District Attorneys across the state to enforce Pennsylvania law to halt the proliferation of thousands of illegal Pennsylvania Skill slot machines now, in the convenience stores, bars, restaurants and other establishments and communities across the state?

MR. CRUSE: I'll give you the same warning that to the extent your answer involves communications with counsel, that you're not to answer.

Otherwise, go ahead.

BY MR. NOLAN:

Q. Who told you to write that?

A. I don't believe anybody -- I don't recall being told to write that. That's my job.

Q. Okay. So you came up with that?

A. That is my recollection, yes, sir.

Page 233

Q.     So you're creating some statement that's going to be attributed to someone else.

Fair?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  I am writing a news release and sharing with a client.  This is my recommended way to approach this.

BY MR. NOLAN:

Q.     Because based on your discussions with this group of folks about this opinion, it was your job to come up with the public relations plan to try to create an impression in the public that the Court had ruled that POM's games were illegal.

Fair?

MR. CRUSE:  Objection, form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Did I come up with this based on conversations?

I'll be totally honest, I might have come up with this all by myself upon first draft, in an effort to write a first draft in the wake of the opinion being issued.

Page 234

BY MR. NOLAN:

Q.    Sorry.  Go ahead.

A.    No, I'm done.

Q.    So what's your purpose in drafting this?  Why is this important?

MR. CRUSE:  Objection to form.

THE DEPONENT:  It's a Commonwealth Court ruling that some reporters are going to pay attention to and, therefore, it was very important to my client.

BY MR. NOLAN:

Q.    Who?

A.    I'm sorry?

Q.    Parks?

A.    My client, Parks Casino.  Yes, sir.

Q.    And it was important to do what?

A.    I don't understand that question.

Q.    To publish a statement about the Court's ruling?

A.    Why is that important?

Q.    Was it important?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes.

Page 235

BY MR. NOLAN:

Q.    Why?

A.    I was engaged to help get rid of thousands, tens of thousands of illegal gaming devices.

Commonwealth Court issued a ruling specific to that matter.  The audiences we were trying to influence would have included members of the General Assembly.  It's an important step, development in the case, in the legislative battle.

I felt it was important to write a statement.  And I might have been -- it might not have been my idea necessarily, but it's -- it's almost like why I tie my shoes in the morning, this is what we do.

Q.    To try to influence public opinion on the topic.

Fair?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Objection to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    So to drive POM out of business, you took it upon yourself to draft a public

Page 236

statement that would be published to the

public-at-large about this Court ruling.

Is that fair?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  One, I said I could have taken it upon myself.  I might have had a conversation with somebody at Parks or Mark Stewart.

So I did not say -- I think you misquoted me.

I said I might have come up with this on my own based on my experience as a communications consultant.  Might have.

I very clearly could have had a conversation or two or three with Mark Stewart about this.

BY MR. NOLAN:

Q.    I'm sorry.

A.    That's okay.

Q.    But the whole point of this endeavor here, the e-mail string, the verbal communications, you all are coming up with a plan to try to effectuate Parks' goal of driving POM out of business.

Fair?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  That's not fair.

The goal was and remains to get rid of illegal skill games across Pennsylvania.

Whether or not that drives POM out of business, I have no idea.

BY MR. NOLAN:

Q.    Well, let's -- in other words, in the statement that you drafted, you are calling POM's games illegal, yes?

A.    Yes.

Q.    Okay.  And down in the third paragraph, the last sentence, you state, it's time to confiscate these machines and put these illegal casinos out of business, blank, at it.

Did I read that correctly?

A.    You did.

Q.    So in other words, you're envisioning sending out a statement that is basically encouraging different people in different agencies to put POM out of business, yes?

Page 238

MR. CRUSE:  Object.

MR. HUDDEL:  I object to form.

BY MR. NOLAN:

Q.    Isn't that what it says, put these illegal casinos out of business?

MR. HUDDEL:  Object to form.

BY MR. NOLAN:

Q.    Isn't that your purpose?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Objection to form.

THE DEPONENT:  POM does not want casinos.

POM puts their machines in commercial enterprises.

POM has held news conferences in front of skill game casinos to drive them out of business.

You're mistaken.

It's not -- illegal casinos is not specific to POM, number one.

Number two -- well, that's it.

POM has mounted a campaign to put illegal skill casinos out of business as well.

Now, I'm not sure --

Page 239

BY MR. NOLAN:

Q.    Are you saying that POM's games are legal?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Yeah, same objection. Calls for a legal conclusion.

THE DEPONENT:  I have no idea how you got there.

There is a difference between, apparently to your client, having 25 or 30 machines in a storefront that aren't theirs as opposed to five machines in a storefront that are theirs.

Not -- it's the casino versus skill games in commercial establishments.

BY MR. NOLAN:

Q.    Okay.  In the fourth paragraph, you state, POM had argued that their machines were a, quote, game of skill, unquote; and therefore, not a slot machine under Pennsylvania law.

The manufacturer set up sale, lease or ownership of a, quote, slot machine, unquote, for gambling purposes is illegal under the Pennsylvania Crimes Code, Title 18, Section

5513, and these machines are subject to forfeiture under the law.

Did I read that correctly?

A.    Yes.

Q.    What are you saying?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  I can read this back to you, but it says what it says.

BY MR. NOLAN:

Q.    All right.  What was your purpose in writing that?

MR. CRUSE:  Object to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I believe -- I don't remember this specific document.

I clearly wrote it and I will clearly take ownership for it.

I believe this would have been a drafted statement to get the conversation going, to get people paying attention to what we wanted to say.

I doubt very much that this went out in its current -- in the form that you have put in front of me today.

Page 241

I don't know the answer to that question.  But I'm sure I -- Title 18, Section 5513, that would not have come from Pete Shelly.

BY MR. NOLAN:

Q.    So who did it come from?

A.    My strong --

MR. HUDDEL:  Object to the extent it calls for speculation.

MR. CRUSE:  If you know, answer the question.

THE DEPONENT:  I don't know.  I don't know.

BY MR. NOLAN:

Q.    Okay.  When you refer to, quote, these machines, what machines are you referring to?

A.    Which paragraph are you in here?

Q.    Fourth paragraph at the end of the last sentence where you write these machines are subject to forfeiture under the law.

What machines are you talking about?

A.    The way I interpret this, read this right now, skill game machines.

Page 242

Q.      Whose skill game?

A.      Pace-O-Matic.  It says right there on the first word of that paragraph, POM.

Q.      So you're stating in this paragraph that POM's games are subject to forfeiture under, what, the Crimes Code?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I don't recall which -- yes.

BY MR. NOLAN:

Q.      Okay.  But you just read in the opinion how the Court said that she wasn't making a decision on whether POM's games were illegal under the Crimes Code.

Do you remember that?

MR. CRUSE:  Object to the form. It calls for a legal conclusion.

THE DEPONENT:  I said I skimmed that opinion and I relied on counsel, legal counsel.

BY MR. NOLAN:

Q.      Who?

Page 243

MR. CRUSE:  Objection.  Asked and answered.

MR. HUDDEL:  Same objection.

BY MR. NOLAN:

Q.    Who?  You can answer.

MR. HUDDEL:  Same objection.

MR. CRUSE:  Same objection.

THE DEPONENT:  I'll answer the first question first and then I'll answer the second question, if that's okay.

BY MR. NOLAN:

Q.    Sure.

A.    Okay.  I hammered out a draft. That's my job.

I have no idea as I sit here what made the final cut and what didn't.  If this was it, I doubt it, but I take full ownership of it.

Any reference to specific title, to specific even language in that opinion would have been approved and drafted under the guidance, supervision and direction of Mark Stewart.

Q.    All right.  Down at the very bottom of your draft statement it says, 30.

What does that mean?

Page 244

A.    That's an old newspaper trick.  It means you're done.

Q.    In the subject line of your e-mail, you type attorney/client privilege/confidential work product protected.

Did I read that correctly?

A.    You did.

Q.    Why did you type that?

A.    I don't recall typing that.  I assume that this was a follow-up e-mail.  So I might have just opened up the last e-mail I received and replied all.

Q.    Well, at that point were you anticipating litigation with someone?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I had no idea if I was anticipating litigation.

BY MR. NOLAN:

Q.    Did you send it to Mark Stewart and Mr. Gmerek and Bob Green and Mr. Bonner because they had to approve it?

MR. HUDDEL:  Object to the form.

MR. CRUSE:  Join.

THE DEPONENT:  Yes.

(Shelly Deposition Exhibit Number 6

marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked

Exhibit 6.

Do you recognize that document?

A.    I'm familiar with the document,

yes, sir.

Q.    Can I see the front of it, please?

Okay.  So still the same day.

Now it's 5:26 p.m. and you forward

a revised statement, yes?

A.    Yes, sir.

Q.    Okay.  Why was your statement

revised?

MR. CRUSE:  Warning about the

privilege issue.

To the extent it doesn't involve

communications with counsel, which is

Parks, you can answer.

THE DEPONENT:  Never in my career

as a PR professional or as a reporter has

a first draft gone from point A all the

way out to point B, either publication or

Page 246

distribution.

It's very, very common for people to offer edits.  In fact, the first draft didn't even have anybody quoted.  This draft does.

So it's just part of the process of developing a news release.

BY MR. NOLAN:

Q.    Who told you to make these edits?

MR. CRUSE:  Same warning again involving communications with counsel. To the extent that you can answer the question without disclosing communications with counsel, do so.

THE DEPONENT:  I don't -- in that case, I can't answer the question, I don't believe.

BY MR. NOLAN:

Q.    Because it was counsel?

MR. CRUSE:  You can't answer that question if it involves communications with counsel and answering would require you to disclose communications with counsel.

Despite what the court ordered

Page 247

production of this case, we're going no further with that as far as what's happened to the attorney/client privilege in this case.

And if it involves that, say that answer. If it involves and implicates the attorney/client privilege, say it implicates the attorney/client privilege and I can't answer that question.

THE DEPONENT:  I can't answer that question.

BY MR. NOLAN:

Q.    So someone told you to take out the word illegal from the heading.

Fair?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  Fair.

BY MR. NOLAN:

Q.    Okay.  In other words, you just didn't make that edit on your own, did you?

MR. HUDDEL:  Objection to form. Asked and answered.

MR. CRUSE:  Join.

THE DEPONENT:  I don't recall on

Page 248

November 20, 2019, if someone specifically stated A, B, C, D.

It is not uncommon for a reporter or a PR person to change headlines, to add new messages to edit documents.

I do not know where the suggestion or the decision came from to remove illegal from the headline.

BY MR. NOLAN:

Q.    Do you recall anyone telling you, hey, you've got to remove that, because that's not what the Court ruled?

MR. CRUSE:  Objection to form.

THE DEPONENT:  No.

BY MR. NOLAN:

Q.    Okay.  Well, because you do recall from reviewing the opinion at length, you agree with me that there was nowhere in that opinion where the Court held that POM's games are illegal.

Fair?

MR. CRUSE:  Objection to form.

Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

Misstates the witness' prior testimony.

Page 249

THE DEPONENT:  I'm not sure if that's what I said earlier, but your question is -- say it again, please, sir.

BY MR. NOLAN:

Q.    Well, you remember in the opinion the Court specifically said, I'm not ruling whether these are illegal under the Crimes Code.

You remember that, right?

A.    Correct.

MR. CRUSE:  Objection.  Calls for a legal conclusion.

BY MR. NOLAN:

Q.    So your original statement in there about the Court ruled they're illegal, you understand that was inaccurate, right?

MR. CRUSE:  Same objections.

MR. HUDDEL:  Same objections as before.  Misstates the witness' prior testimony.  Calls for a legal conclusion.

THE DEPONENT:  I was not clear on the entire ruling of the court ruling.

As I explained, working on deadline, I relied on counsel.  The word illegal was removed from the headline.

I wrote the headline, it's my news

Page 250

release.  I'll take responsibility for it.

But all of the edits, all of the words in that news release were approved by counsel.

BY MR. NOLAN:

Q.    Well, thank you, but my question was, having gone through the opinion, you understand that your use of the word illegal in that heading was inaccurate, yes?

MR. CRUSE:  Objection.  Asked and answered.  You are here to answer questions.

You're not here to give him answers he wants.  And he does ask the same question over and over again --

MR. NOLAN:  Please stop coaching your witness and obstructing my deposition.

MR. CRUSE:  He can make a motion after this deposition, if he believes in some way that you have done something improper.  And that's for the Judge to decide.

MR. NOLAN:  Please stop coaching

Page 251

your witness.

MR. CRUSE:  I'm not coaching my witness at all.  I'm protecting him against your persistent bullying and harassing.

MR. HUDDEL:  The same objection.  Form.  Seeks legal conclusion.  Misstates the witness' prior testimony.  Asked and answered several times.

BY MR. NOLAN:

Q.    You can answer.

MR. CRUSE:  If your answer is the same, you can say I stick by my prior answer.

THE DEPONENT:  My answer is the same.

MR. NOLAN:  Please stop coaching the witness.

MR. CRUSE:  I'm not coaching my witness.

MR. NOLAN:  He just told -- said exactly what you coached him to say.

MR. CRUSE:  If you want to make a motion, make a motion.

Page 252

BY MR. NOLAN:

Q.    You agree with me that the use of the word illegal in the heading of that draft was inaccurate now that you've read through the opinion, yes?

MR. CRUSE:  Objection.  Asked and answered.

MR. HUDDEL:  Same objection. Seeks a legal conclusion.  Misstates prior testimony.  Form.

MR. CRUSE:  Join in those objections.

THE DEPONENT:  The headline was changed, either by me or by attorney -- I'm sorry, the headline was changed at the direction of an attorney at Parks Casino.

That could have been for any number of reasons, but the headline was changed.

That's all I can tell you about it.

BY MR. NOLAN:

Q.    That wasn't my question.

My question is, you understand

Page 253

that your use of the word illegal in that heading was inaccurate, yes?

MR. CRUSE:  Objection.  Asked and answered.  Calls for a legal conclusion.  Misstates his prior testimony.

MR. HUDDEL:  Same objections.

THE DEPONENT:  No, I don't accept that.

BY MR. NOLAN:

Q.    Well, you told me you weren't -- you couldn't find anywhere in that opinion that the Court held that it was illegal, and, in fact, we read two footnotes where the Court said they're not ruling on that?

MR. CRUSE:  Objection.  Asked and answered.  Calls for a legal conclusion.  Misstates prior testimony.

MR. HUDDEL:  Same objections.

BY MR. NOLAN:

Q.    Am I right?

MR. CRUSE:  Objection.  Calls for a legal conclusion.  Misstates prior testimony.  Asked and answered.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Working on

Page 254

deadline, a first draft news release, an opinion I had very little time, zero expertise to tear through.

BY MR. NOLAN:

Q.    That wasn't my question.

A.    I'm sorry.

Can I finish?

MR. CRUSE:  Yes.

BY MR. NOLAN:

Q.    I'd like you to answer my question.

MR. CRUSE:  You can finish your testimony.  You're allowed to say -- finish your statements.  He can't stop you from finishing your statements.

THE DEPONENT:  First drafts get edited all the time, especially when it involves a Court ruling with a lot of moving parts.

This release was edited and changed.  This is accurate.

Commonwealth Court rules Pennsylvania Skill games are slot machines.

That's -- I believe this is the

Page 255

release that we issued.  That's my testimony.

That's the best I can do for you.

BY MR. NOLAN:

Q.    That wasn't my question.

My question -- listen very carefully.  You would agree with me that having read through the opinion, having read the parts where the Court said we are not ruling on legality under the Crimes Code, you would agree with me that your use of the word illegal in that heading was inaccurate?

MR. CRUSE:  Objection.  Calls for a legal conclusion.  Misstates prior testimony.  Asked and answered.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Sitting here today, yes.

BY MR. NOLAN:

Q.    Thank you.

And, therefore, every other time since November 20th, 2019, when you have said that the Commonwealth Court ruled that they're illegal, each time your statement was inaccurate, yes?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection.  Form.  Calls for a legal conclusion.  Argumentative.

THE DEPONENT:  I don't know the answer to that question.

BY MR. NOLAN:

Q.    Why wouldn't you know the answer?

MR. HUDDEL:  Object to form.

MR. CRUSE:  That was completely argumentative.

BY MR. NOLAN:

Q.    You just said it was inaccurate on the 20th, because you read through the opinion and you know the Court did not say that they were illegal, which means every day past that point, every time you said the Commonwealth Court ruled that they're illegal, your statement was inaccurate, yes?

MR. CRUSE:  Lower your tone, first of all.

And objection to form.  Calls for a legal conclusion, like all your questioning over the past two hours of

Page 257

this deposition.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I have said repeatedly that skill games are illegal in Pennsylvania, according to every law enforcement agent I've already quoted.

That's an accurate statement.

BY MR. NOLAN:

Q.    Wasn't my question.

A.    That's my answer.

Q.    Well, you have to answer my questions.

My question was, every time since November 20th, 2019, when you stated the Commonwealth Court ruled that they're illegal, your statement was inaccurate, yes?

MR. CRUSE:  You are allowed to answer the questions the way you want to answer.

MR. NOLAN:  Stop coaching the witness.

MR. CRUSE:  No, I'm not going to stop, because you're a complete tyrant and a bully.

You can answer the questions.  You

Page 258

do not have to give him what he wants.

If you notice, he asks you the same question over and over and over and over and over again.

You're not here to please him. You're here to offer honest testimony.

So please answer the question to the best of your ability.

THE DEPONENT:  I have answered the question to the best of my ability.

BY MR. NOLAN:

Q.    Would you agree with me -- in other words, if it was inaccurate on November 20th, how did it suddenly become accurate a week later when you again said the Commonwealth Court ruled that they're illegal?

How did it change?  Explain that to me.

MR. HUDDEL:  Object to form. Object on the grounds that it seeks legal conclusion.  Object on the ground that it misstates prior testimony.  Object on the ground that it's been asked and answered maybe a dozen times at this point.

MR. CRUSE:  Join the objections.

Page 259

THE DEPONENT:  You have my answer.

BY MR. NOLAN:

Q.    Okay.  So what we're looking at here in Exhibit 6, is this the final version of the statement that was published?

A.    I have no idea.

Q.    Here in this statement it still says, the Pennsylvania Commonwealth Court confirmed in a ruling today that video game machines manufactured and distributed by the company POM, under the name Pennsylvania Skill, are considered, quote, slot machines, unquote, under Pennsylvania law, right?

A.    Well, you're reading from the last paragraph.

Q.    First paragraph.

A.    I doubt this is the final that went out, because this last paragraph is the same.  That's what the sentence says, yes.

Q.    And you know that's inaccurate, because nowhere in the opinion that we just went through at length did the Court say that POM's games are, quote, slot machines, correct?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

Page 260

MR. HUDDEL:  Same objection.

Asked and answered.

THE DEPONENT:  I would have relied for every single word in this news release on the vice-president and the chief -- legal and chief counsel for Parks Casino.

BY MR. NOLAN:

Q.    That's not my question.

A.    If this was, in fact, the final version that went out, and I have no idea if it was, it would have been approved by the attorneys who I report to.  And I'm not getting paid to challenge the attorneys.

Q.    Wasn't my question.

A.    That's my answer.

Q.    Well, my question was, and please listen carefully, you would agree with me, having reviewed the opinion at length, nowhere did the Court hold that POM's games were, quote, slot machines, true?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection.

Asked and answered.

Page 261

THE DEPONENT:  I've answered the question.  You have my question -- you have my answer.

This document would have been approved, every single word of it, by Tom Bonner and/or probably Mark Stewart.

BY MR. NOLAN:

Q.    You would agree with me that this statement that we're looking at here where it says the Court ruled basically that Pennsylvania Skills games are considered, quote, slot machines under Pennsylvania law, you know that's inaccurate, right?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection --

MR. CRUSE:  Asked and answered.

MR. HUDDEL:  Same objections.

THE DEPONENT:  The answer is no, I do not know that.

BY MR. NOLAN:

Q.    Well, we went through the opinion at length and you told me that you couldn't find anywhere in that opinion where the Court held that POM's games were, quote, slot machines.

Page 262

Do you remember that?

MR. CRUSE:  Objection.  Misstates his prior testimony.  Compoundly soliciting legal opinions from a communications expert.  Asked and answered.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I've answered your question.

BY MR. NOLAN:

Q.    Do you remember what my question was?

A.    I'm fairly confident I remember what your question was.

Q.    Okay.  What was it?

MR. HUDDEL:  I'm gonna object to -- object to form.

MR. CRUSE:  Form.  Argumentative.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I answered your question.

If this was, in fact, the final news release that was issued from Parks Casino, from me on behalf of Parks Casino, this would have been approved by

Page 263

the attorneys on the case and I would always, always defer to the attorneys involved in the matter.

It never, ever changes.

BY MR. NOLAN:

Q.    That wasn't my question.

It's inaccurate, right?

MR. CRUSE:  Objection asked and answered.  Calls for a legal conclusion.

MR. NOLAN:  Same objections.

BY MR. NOLAN:

Q.    You understand that that's inaccurate?

MR. CRUSE:  Objection.  Calls for a legal conclusion.  Asked and answered.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Until the Parks attorney tells me that it's illegal or inaccurate, illegal, legal, they carry the day.

BY MR. NOLAN:

Q.    Wasn't my question.

I'm gonna ask you more time.

You have read through the opinion.

You admitted earlier that you're not aware of any

Page 264

language where the Court held that POM's games were, quote, slot machines.

Based on that, you understand that the statement in the first paragraph is inaccurate, yes?

MR. CRUSE:  Objection.  Asked and answered.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  And I want to give you the same answer.

BY MR. NOLAN:

Q.    All right.  Give it to me.

MR. HUDDEL:  Same objections.

MR. CRUSE:  Everything is transcribed.  You can stand by your former answer.

MR. NOLAN:  Please stop coaching the witness.

MR. CRUSE:  I'm not coaching the witness.

THE DEPONENT:  I've answered your question.  I can --

BY MR. NOLAN:

Q.    You're not gonna give me any other answer other than that?

Page 265

MR. CRUSE:  You said you weren't going to ask it again.

Now you did.

MR. HUDDEL:  Same objection asked and answered.  Seeks a legal conclusion.  Misstates prior testimony.

MR. CRUSE:  Same objections.

(Shelly Deposition Exhibit Number 7 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 7.

Do you recognize this document?

A.    I do not remember this document.

Q.    Do you see that it's an e-mail from Mark Stewart to a group of people, including you, on November 20th, 2019, at 6:09 p.m.?

A.    I do.

Q.    Do you see, attaches for your review and comment a one-pager?

A.    I do.

Q.    And do you see the attachment, one pager, entitled Commonwealth Court Decision Paves Way for Criminal Enforcement Against Illegal Skill Slot Machines?

Page 266

A.    I do.

Q.    Okay.  Do you see he states a recent Commonwealth Court decision is a major development in the eradication of illegal gambling in Pennsylvania, in POM, a Pennsylvania LLC, the Commonwealth of Pennsylvania, et al, Number 4018 M.D. 2018, the Court concluded that so-called, quote, skill games, unquote, manufactured by POM of Pennsylvania, LLC, are slot machines under the definition of that term used by the legislature in the Gaming Act and he cites to the opinion at 11.

Did I read that correctly?

A.    Yes, sir.

Q.    Okay.  Do you remember we looked at page 11 of the opinion and you agreed that nowhere on that page did the Court hold that POM's games are slot machines?

MR. CRUSE:  Objection.  Calls for a legal conclusion.  Misstates prior testimony.

MR. HUDDEL:  Same objections. Asked and answered.

THE DEPONENT:  So you're asking me to critique Mr. Stewart's analysis of the

Page 267

opinion?

Did I write this document?

BY MR. NOLAN:

Q.      I'm asking you.  Do you recall --

A.      I'm sorry.

Q.      -- that we looked at page 11 of the opinion and you agreed that there was nowhere in there that the Court held that POM's games were slot machines?

MR. CRUSE:  Objection to form. Calls for a legal conclusion.

MR. HUDDEL:  Same objections. Asked and answered.

THE DEPONENT:  I believe the reason I don't recognize this document is I don't believe I wrote it.

In fact, I have no idea what you want me to comment on in this document.

I do not believe I wrote this document.

BY MR. NOLAN:

Q.      Okay.  That wasn't my question.

A.      Well, that's why I'm asking.

What is your question?

Q.      All right.  Let's look back at Exhibit 3.  That is the opinion.

Page 268

Please turn to page 11 and direct me to anywhere that you read the words where the Court is saying that POM's games are, quote, slot machines?

MR. HUDDEL:  I object to the -- I object on the basis that this question directs the witness to perform a legal analysis extemporaneously.

MR. CRUSE:  Adding to that objection, which is wholly unqualified to do.

THE DEPONENT:  He calls POM -- I apologize.  I'll speak more clearly.

I'm reading this out loud, because -- I don't know why I'm doing this.

But on page 11, because POM alleges that its game requires --

MR. CRUSE:  As before, when he is asking you to look --

MR. NOLAN:  Please stop coaching the witness.

MR. CRUSE:  -- you're entitled to read the entirety of the document.

MR. NOLAN:  He already did.

Page 269

MR. CRUSE:  He is looking at the opinion at 11, you're entitled to read the entirety of the page 11, again out loud or to yourself, however you please.

MR. NOLAN:  Please stop coaching the witness.

MR. CRUSE:  There is no coaching of this witness.  There's no obstruction.

MR. NOLAN:  He already read it. Cover to cover.

MR. CRUSE:  You are playing games. You are playing so many games and it's absolutely obvious what you're doing.

Asking this communications expert over and over again about principles of Pennsylvania law.  None of this is admissible, even close to it.

You are playing games.

MR. NOLAN:  Please answer the question.

THE DEPONENT:  I can't answer the question.  I'm not an attorney, but --

BY MR. NOLAN:

Q.    Can you find anywhere on that page --

Page 270

A.      I'm sorry.  I'm gonna finish my sentence.

Q.      Go ahead.

A.      Thank you.  I'm sorry.  I'm speaking to myself.  I shouldn't do that today.

Whoever wrote this document -- I'm not gonna speculate.  I don't know how that Section 1103 to act in the enact paragraph could be interpreted.

But that must be where Mr. Stewart or somebody at Eckert decided that this ruling says that there's -- that they are slot machines.

That's all I got for you.

Q.      Did he ever tell you that?

MR. CRUSE:  No.  I am instructing him not to answer, because that directly asks for a communication made between privileged persons in confidence relating to the legal representation.

BY MR. NOLAN:

Q.      Are you going to follow your attorney's advice and refuse to answer my question?

A.      I'm gonna follow my attorney's advice and refuse to answer your question.

Page 271

Q.    You started to read  -- you started to read the sentence, because POM alleges and we spoke about that earlier.

Do you remember?

A.    Vaguely, but yes.

Q.    And in that sentence the Court uses the if then structure, yes?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

MR. HUDDEL:  Asked and answered.

MR. CRUSE:  Join that objection as well.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  And you would agree with me that the Court specifically ruled that POM's activities are not subject to the Gaming Act, correct?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection. Asked and answered.

THE DEPONENT:  I cannot help you with this, sir.

I have -- you are so far in the

Page 272

weeds in this stuff.  I have absolutely
nothing I can add to my answers.

I rely -- this document was
clearly written by an attorney, not by
Pete Shelly.

And if my attorney, Parks'
attorney says that's what the ruling
says, then that's what the ruling says as
far as the communications person is
concerned.

That's my answer.

BY MR. NOLAN:

Q.    Right.

You speak and read English,
correct?  You're a journalist, right?

MR. HUDDEL:  Objection.  Object to
the form.

MR. CRUSE:  Join.

BY MR. NOLAN:

Q.    Right?

A.    I'm sorry?

MR. CRUSE:  Objection.
Argumentative.

BY MR. NOLAN:

Q.    You speak and read English, you're

Page 273

a journalist, right?

MR. CRUSE:  Objection.

Argumentative.

MR. HUDDEL:  Same objection.

MR. CRUSE:  Most lay people who aren't able to offer legal conclusions speak English, Counselor.

BY MR. NOLAN:

Q.    Please answer my question.

A.    Yes.

Q.    And so when the Court states the Gaming Act doesn't apply to POM's games, you understand those words, right?

MR. HUDDEL:  Object to the extent this calls for a legal conclusion.

MR. CRUSE:  Join the objection.

THE DEPONENT:  I understand perfectly well what the attorneys working for Parks Casino said and that trumps anything that you think I can put on the table here today.

I have no expertise in gaming, in the Gaming Act.

BY MR. NOLAN:

Q.    Looking back at Mr. Stewart's

Page 274

one-pager --

A.    Would that be this one?

Q.    Yeah.

A.    So Mr. Stewart wrote this.  Okay. I just wanted to confirm.  Make sure.

Q.    In the third paragraph, Mr. Stewart wrote, the Commonwealth Court has now definitively concluded that POM's, quote, Skill games, unquote, are nothing more than slot machines.

Can you direct me to anywhere in the opinion where the Court states that?

MR. CRUSE:  Objection.  Calls for a legal conclusion.  Calls for speculation as to what Mark Stewart did if Mark Stewart wrote this.

MR. HUDDEL:  Same objections. Asked and answered.

THE DEPONENT:  You're gonna have to ask Mr. Stewart, whoever wrote this.

BY MR. NOLAN:

Q.    Well, I'm asking you.

MR. CRUSE:  Answer the question if you can.

THE DEPONENT:  I am not capable --

Page 275

I am not going to try and interpret a Commonwealth Court opinion and take on someone with Mark Stewart's experience and tell him he's wrong.  I'm not going to do that.  I wouldn't have done it at the time and I'm not doing it here today.

BY MR. NOLAN:

Q.    Well, would you agree with me if the Court did not hold that POM's games are slot machines, then every time you made that statement after November 20th, 2019, your statement was inaccurate?

MR. CRUSE:  Objection to form. Improper hypothetical to a fact witness. Calls for speculation.  Calls for a legal conclusion.  And argumentative.

MR. HUDDEL:  Same objections. Asked and answered as well.

THE DEPONENT:  Based on my experience and the way these documents are read and approved and vetted, I believe that Mr. Stewart -- I defer to Mr. Stewart.

BY MR. NOLAN:

Q.    That wasn't my question.

Page 276

A.      I don't know what your question was.

Q.      You would agree with me, if, in fact, the Court did not hold that POM's games were slot machines, then every time you said that after November 20th, 2019, your statement was inaccurate?

MR. CRUSE:  Madam court reporter, I'd like to interpose the exact same list of objections I did to the -- I think it was the third time he asked that same question.

MR. HUDDEL:  Object to form. Object on the ground that it seeks a legal conclusion.  Object, asked and answered.

Object, I think we're into badgering and harassing territory at this point.

THE DEPONENT:  I don't know how to answer that question.

My team's interpretation was that the Court said they were slot machines.

If the attorneys at Eckert Seamans were wrong and I repeated a mistake and

Page 277

they were wrong and I repeated a mistake.

It's not my responsibility to interpret a Commonwealth Court ruling.

BY MR. NOLAN:

Q.    All right.  Let's look at what he said in the e-mail that he sent to you all when he attached this statement.

A.    Do I have that?

Q.    Yeah.

A.    Oh, it's on the front.

Q.    Right.

In the second paragraph he says, the focus is 5513.

The gaming and criminal provisions, including 5518 (a) 9 through 10 and (f) ended up being too complicated.

Each of them are contingent on a finding that the device was made, used, sold, et cetera, quote, in violation of the part, unquote of, the Gaming Act.

Did I read that correctly?

A.    Yes.

Q.    And he goes on to admit that the Gaming Act doesn't apply to POM, right?

MR. CRUSE:  Objection to form.

Page 278

States what's in the document.

MR. HUDDEL:  Same objection.

THE DEPONENT:  He says that don't empower the PGCB to regulate POM.

Is that your question?  The answer is yes.

BY MR. NOLAN:

Q.    Well, he says the Gaming Act doesn't apply to POM, right?

MR. CRUSE:  Objection to form. States what's in the document.

MR. HUDDEL:  Same objections.

THE DEPONENT:  It says that the Gaming Act didn't apply to them, being POM.

BY MR. NOLAN:

Q.    Right.

So Mr. Stewart is admitting to the group that the Court opinion, the Court ruled that Gaming Act doesn't apply to POM, right?

MR. CRUSE:  Objection.  Calls for speculation.  Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  This is the

document that would have been issued.

I am deferring to Mr. Stewart's words in this document, not in an e-mail, and he says flat out in this document, Skill games manufactured by POM, LLC, are slot machines under the definition of that term used in the Legislature in the Gaming Act.

BY MR. NOLAN:

Q.    That's not my question.

Look here in this first paragraph.

A.    Which?

Q.    Excuse me, the second paragraph of the e-mail.

Do you see in the third line from the bottom, do you see where it says it repeatedly?

A.    What paragraph are you in?

Q.    The second paragraph.  Starts with the focus is 5513.  And look in the third line from the bottom, do you see where it says it repeatedly?

A.    And wrongly in some ways.

Q.    Right.

A.    Yes, sir.

Page 280

Q.    So Mr. Stewart, talking about the Court opinion, states to you and the group, quote, it repeatedly, end parens, and wrongly in some ways, out of parens, held that the Gaming Act didn't apply to them, which makes the, quote, in violation of the part, unquote, prerequisite hard to establish.  And at the very least, muddies it too much for our purposes.

Did I read that correctly?

A.    Yes.  Those are the words in Mr. Stewart's e-mail to the team.

Q.    So even Mr. Stewart is admitting that the Court ruled that the Gaming Act didn't apply to POM, yes?

MR. CRUSE:  Objection.  Calls for speculation as to Mr. Stewart's state of mind.

Calls for a legal conclusion.  And to the extent that the question is soliciting any communications outside of Mr. Stewart's writing here, which the Court ordered disclosed, to the extent your answer requires you to disclose any attorney/client communications, I repeatedly -- for probably the 80th time

Page 281

today, you are not to disclose or waive your attorney/client privilege.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I think I've answered this question as best I can.

BY MR. NOLAN:

Q.    He's admitting to you in an e-mail that the Court opinion held that the Gaming Act didn't apply to POM, yes?

MR. CRUSE:  Objection.  Calls for speculation as to Mr. Stewart's state of mind.  Calls for a legal conclusion.

And, Court Reporter, the other objections that I posed to the second time that Mr. Nolan asked that question.  This being the third.

MR. HUDDEL:  Same objections.  Seeks a legal conclusion.  Asked and answered.  Requires speculation.  Foundation.  Form.

THE DEPONENT:  I am going to repeat my answer.

As a communications consultant to Parks Casino, a recent Commonwealth Court decision is a major development in the

Page 282

eradication of illegal gambling and POM dot, dot, dot, Number 418, dot, dot, dot, the Court concluded that the so-called Skill games manufactured by POM of Pennsylvania, LLC, are slot machines under the definition of that term used by the legislature in the Gaming Act.

That is what I relied on for my communications on behalf of Parks Casino moving forward.

Not an e-mail.

BY MR. NOLAN:

Q.    I'm not talking to you about that.

My question to you was in the e-mail he admitted that the Court held that the Gaming Act doesn't apply to POM, yes?

MR. CRUSE:  Madam court reporter, because my throat is getting sore from repeating the same objections, that is now the fifth time that question has been asked, I interpose the same objections as to speculations, conclusions of law and so on.

MR. HUDDEL:  Same objections. Asked and answered.

THE DEPONENT:  I'm not -- I've given you my answer.

BY MR. NOLAN:

Q.    Did you, after receiving Mr. Stewart's e-mail at 6:09 on November 20th, did you ask him, why did you state in the e-mail that the Gaming Act doesn't apply to POM and that it makes the, quote, in violation part hard to establish?

MR. CRUSE:  That question expressly seeks to violate the privilege and seeks a communication made between privileged persons in confidence relating to a legal representation.

And I instruct you not to answer.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice?

A.    Yes, sir, I am going to follow my attorney's advice and not answer the question.

BY MR. NOLAN:

Q.    Down in the second paragraph from the last, starting with the second sentence, he states, quote, given that the Crimes Code is free of the cloud created by the Court over any Gaming

Page 284

Act enforcement provisions, it was more effective to focus on 5513.

Did I read that correctly?

A.      Yes, sir.

Q.      And what did you understand that to mean by the cloud created by the Court over any Gaming Act enforcement provisions?

MR. CRUSE:  Objection.  Calls for speculation as to what Mr. Stewart meant.

MR. HUDDEL:  Objection.  Calls for a legal conclusion.

MR. CRUSE:  Join the objection.

THE DEPONENT:  I have no idea what Mr. Stewart meant.

BY MR. NOLAN:

Q.      Did you ever ask Mr. Stewart, what do you mean by a cloud created by the Court over any Gaming Act enforcement provisions?

MR. CRUSE:  That question expressly seeks to pierce the attorney/client privileges.

It seeks information about a communication made in confidence for the purpose of a legal representation and I instruct you not to answer.

Page 285

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice?

A.    Yes, sir.

Q.    He goes on to state that we have also spoken with the AG's Unit handling the litigation.

Do you understand that to mean the Attorney General Unit?

MR. HUDDEL:  Objection. Speculation.

MR. CRUSE:  Join.

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.    He later states in that same paragraph, quote, despite our past efforts at giving them written arguments, et cetera, it was clear that they still had not grasped the 5513 point here and the significance of the Court's finding about the games being, quote, slot machines, unquote.

Did I read that correctly?

A.    You read it correctly, yes, sir.

Q.    Did Mr. Stewart ever talk to you about their past efforts at giving written

Page 286

arguments to the Attorney General?

MR. CRUSE:  That question seeks to pierce the attorney/client privilege and I instruct you not to answer.

BY MR. NOLAN:

Q.     Are you gonna follow your attorney's advice?

A.     Yes, sir, I am.

Q.     Earlier we talked about conflicts of interest.

Do you, in your mind, consider it to be a conflict of interest for Eckert attorneys, like Mr. Stewart, to be giving written arguments to an Attorney General who is in litigation against their firm's client, POM?

MR. CRUSE:  Objection.  Calls for a legal conclusion.  Calls for speculation as to what was in Mr. Stewart's mind.

MR. HUDDEL:  Same objections.

THE DEPONENT:  And I'm gonna need you to repeat the question.  I did not follow.

Do I believe it it's a conflict of interest if?

BY MR. NOLAN:

Q.    Given the fact that POM was a client of Eckert's at the same time Mr. Stewart was giving the Attorney General, who's litigating against POM, written arguments to use?

MR. CRUSE:  Objection.  And going back to a point we discussed earlier, Counsel.  I think the idea of relevance permeates all of discovery, including this deposition.

MR. NOLAN:  That is not a legitimate objection.

MR. CRUSE:  And what in the world does what Pete Shelly think about a conflict of interest have to do or have any relevance to this case?

MR. NOLAN:  Relevance is not a legitimate objection.

MR. CRUSE:  It's definitely a legitimate objection.  It governs all of discovery.  And this is part of discovery.

MR. NOLAN:  Please stop coaching and --

MR. CRUSE:  How is this coaching,

Page 288

asking about relevance?

            Calls for a legal conclusion.

        Calls for what's in Mr. Stewart's mind.

            Like it is astounding the limited

        amount of admissible evidence you have

        sought in this deposition, besides just

        games.

            (Shelly Deposition Exhibit Number 8

             marked.)

BY MR. NOLAN:

        Q.    I'm handing you what's been marked

Exhibit 8.

            Earlier you mentioned Karin

Ashford.  Who is she?

        A.    Karin's the new in-house counsel.

I believe her title might be chief legal officer

or something like that.  I'm not -- she is an

attorney at Parks Casino.

        Q.    Were you aware that prior to

working for Parks, she worked for Penn?

        A.    I am aware of that.

        Q.    As an attorney?

        A.    I assumed as an attorney.

        Q.    Do you see at the beginning of

this e-mail string is the -- I guess the press

release that you helped write?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes, that is the press release I believe I wrote.

I don't recall it specifically, but -- and it's clear that that's what they were -- your question was, what are they talking about?

BY MR. NOLAN:

Q.    No.

You see that that is the press release that you helped write, right?

A.    That appears to be the press release I helped write.  I don't recall it specifically.  It's a very long time ago, but yes.

Q.    And you see that the actual version that was published has the inaccurate statement that the Court held that POM's games are, quote, slot machines?

MR. CRUSE:  Objection to form.  Misstates prior testimony.  Calls for legal conclusions.

MR. HUDDEL:  Same objections.

MR. CRUSE:  Lack of foundation as

well.

THE DEPONENT:  The language hasn't changed from the previous draft.

BY MR. NOLAN:

Q.    Right.

So that's what went out to the public, right?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes.  PRNewswire is the source of the news release.  That's the distribution system.

BY MR. NOLAN:

Q.    Same with the inaccurate statements about illegality, yes, that made it into the public version?

MR. CRUSE:  Objection to form. Lack of foundation.  Calls for a legal conclusion.  Misstates his prior testimony.

MR. HUDDEL:  Same objections.

THE DEPONENT:  The language has not changed.

BY MR. NOLAN:

Q.    Okay.  Same with about a reference

to the Crimes Code and stating that these machines, POM's machines, are subject to forfeiture under the law.  That made it into the public statement as well?

MR. CRUSE:  Same objections to the prior question, court reporter.

MR. HUDDEL:  Object to form.  Objection to a legal conclusion.

THE DEPONENT:  That paragraph remains.

BY MR. NOLAN:

Q.    Okay.  So were you aware that Karin Ashford received a copy of that statement and forwarded it on to Mark Stewart and stated in an e-mail, did Tom read the same opinion I did?

Did you see that?

MR. HUDDEL:  Compound question.  Objection.

Did you see or was he aware?

BY MR. NOLAN:

Q.    Well, let me rephrase it.  Let's look at --

A.    Could you just give me a minute to read this?

Q.    Sure.

Page 292

A.      I want to read this from front to back one more time.

I'm not sure who MSJ is here, but, okay, I understand the e-mail string.

And your question is what again, sir?

Q.      Right.

A.      What's your question?  I'm sorry.

Q.      You understand that Ms. Ashford, who was then in-house counsel at Penn National, now is in-house counsel at Parks, is saying the Court said that they're not ruling on whether the POM game is an illegal gambling device.

You understand that, right?

MR. CRUSE:  Objection to form.
Calls for speculation as to what is in
Ms. Ashford's head.

MR. HUDDEL:  Same objections.
Seeks a legal conclusion.

THE DEPONENT:  There is a
difference of opinion obviously between
Mr. Stewart and -- I'm sorry, your first
question was I aware of this exchange and
the answer is no.

Page 293

BY MR. NOLAN:

Q.    Mr. Stewart never told you, hey, Karin Ashford at Penn National called and said we're wrong?

MR. CRUSE:  Again, this is another question directly trying to pierce the attorney/client privilege and instruct you not to answer.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice?

MR. HUDDEL:  In addition, asked and answered.

THE DEPONENT:  I'm gonna follow my attorney's advice.

BY MR. NOLAN:

Q.    At any point did anyone ever make you aware that Karin Ashford, who is now the general counsel at Parks, told Mr. Stewart that he's wrong, that's not what the opinion says?

MR. CRUSE:  Did you need the question repeated?

THE DEPONENT:  No, I can answer that question.

MR. HUDDEL:  I want to object.

Page 294

Asked and answered.  Seeks a legal conclusion.

THE DEPONENT:  Was I aware that Karin Ashford shared this opinion with Mark Stewart, is that your question?

BY MR. NOLAN:

Q.    Yes.

A.    The answer is no.

Q.    Is that something that you think Mark Stewart should have shared with you?

MR. CRUSE:  Objection.

BY MR. NOLAN:

Q.    The fact that another casino attorney is saying, no, that's not what the Court said?

MR. CRUSE:  Objection.  Calls for speculation as to what is in Mr. Stewart's head.

MR. HUDDEL:  Objection to form.

THE DEPONENT:  No, I do not.

BY MR. NOLAN:

Q.    Knowing now that another casino attorney said that's not what the Court held, given the fact that you relied on his direction as to what to state about that opinion, do you

Page 295

think that's something that he should have told you?

MR. CRUSE:  Objection compound. Objection, calls for what's in Mr. Stewart's head.  Objection, calls for legal conclusions.

MR. HUDDEL:  Objection, form. Asked and answered.

THE DEPONENT:  My answer is I'm not the least bit surprised that two attorneys might differ on interpretation of a Court ruling.

MR. CRUSE:  Certainly doing it today.

BY MR. NOLAN:

Q.    Let's look at her subsequent e-mail.  Let's turn to the first page.

Ms. Stewart [sic] states, after reading the opinion, I fear that the ruling rejects the argument that the Gaming Act's definition even applies to these unregulated games.

So if the State were to argue regular statutory construction principles and bring in the Gaming Act definition as evidence,

Page 296

the Court will say we already ruled that the Gaming Act's definition is irrelevant.

Do you see that?

MR. CRUSE:  Objection.  Misstates what's in the document.

There is no Ms. Stewart anywhere in this document.

BY MR. NOLAN:

Q.    Sorry.  Ms. Ashford.  Let me repeat that.

Do you see here where Ms. Ashford tells Mr. Stewart in an e-mail, quote, after reading the opinion, I fear that the ruling rejects the argument that the Gaming Act's definition even applies to these unregulated games.

So if the State were to argue regular statutory construction principles and bring the Gaming Act definition as evidence, the Court will say we already ruled that the Gaming Act's definition is irrelevant.

Did I read that correctly?

A.    Yes.

Q.    Okay.  Did anyone ever tell you that she had shared her opinion with Mr. Stewart

Page 297

stating that he's wrong?

MR. CRUSE:  If you can answer that question without violating the attorney/client privilege of which means disclosing communications of counsel, then answer it.

THE DEPONENT:  I had no idea whatsoever about these e-mail exchanges.

BY MR. NOLAN:

Q.    Do you think that's something Mr. Stewart should have told you about, given the fact that you were relying on his statements about the opinion?

MR. CRUSE:  Objection.  Calls for speculation as to what's in Mr. Stewart's head.  Calls for a legal opinion.

MR. HUDDEL:  Same objections. Asked and answered.

MR. CRUSE:  If you're able to answer the question, you can answer.

THE DEPONENT:  I am not able to answer that question without speculating.

I don't know -- lawyers disagree all the time.  I can't help you with this question.

Page 298

I have no idea which lawyer, that lawyer, this lawyer.  I relied on Mark Stewart's -- I was working for Parks.  Parks' attorney, Mark Stewart.  I have no idea if Karin Ashford's opinion would have changed anything at that time.  I just don't know.

I never dealt with Penn Gaming in any way, shape or form.

(Shelly Deposition Exhibit Number 9 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked as Exhibit 9.

You recognize this as an e-mail string that you were copied on, yes?

A.    Give me a second to open it up, if you don't mind.

Yes.  I remembered -- yes.

Q.    All right.  Let's go to the first e-mail on this string.  It's from Mark Stewart.  It's to Bob Green, Mr. Gmerek, Mr. Bonner and you, dated January 7, 2020.

Do you see that?

A.    Yes, sir.

Page 299

Q.    And he's discussing a council meeting in the Borough of Middletown, Pennsylvania.

Do you see that?

A.    I do.

Q.    Where they were talking about ordinances to declare Skill games a public nuisance?

A.    Yes, sir.

Q.    Okay.  Do you recall what this is discussing?  Do you recall this?

A.    I had no idea at the time, but now that you put it in front of me, yes, I do recall this conversation or this matter, yes.

Q.    Okay.  So was this part of the campaign that Mr. Stewart was involved in to drive POM out of business?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.

THE DEPONENT:  I have no idea.  I had nothing whatsoever to do with Middletown Borough or efforts to get municipal -- municipal attempt to get rid of skill games.

This was entirely new to me at the

Page 300

time and I had nothing to do with it.

So I loathe to speculate about what was in Mr. Stewart's mind.

BY MR. NOLAN:

Q.   Well, did he ever describe to you the efforts that they made to try to get ordinances passed that would declare Skill games a public nuisance?

MR. CRUSE:  That question directly solicits information about a communication made between privileged persons in confidence for the purpose of obtaining or providing legal advice and legal representation and I instruct you not to answer.

BY MR. NOLAN:

Q.   Are you going to follow your attorney's advice?

A.   Yes, sir.

Q.   In the second paragraph of this first e-mail, he states, a decision had already been made to table the ordinance and for me to come into their next executive session to provide more information and background.

This Borough has received hundreds

Page 301

of thousands of dollars in local share, which we will compare with the, quote, we gave six grand to the fire company, unquote, type of comment.

Did I read that correctly?

A.    Yes, sir.

Q.    What's your understanding of what the hundreds of thousands of dollars in local shares was referring to?

MR. CRUSE:  Objection to form. Calls for speculation to as to what is in Mr. Stewart's head.

THE DEPONENT:  Each casino provides a local share payment in their county and sometimes the other side of the county.  So it's contributions to fire companies, ambulance companies, non-profits.  That is what I believe he means by hundreds of thousands of dollars of local share.

BY MR. NOLAN:

Q.    Where does that money come from?

A.    It comes from the casinos.

Q.    Through the PGCD?

A.    I'm not sure.  I believe it might be the Department of Revenue.  I honestly don't

Page 302

know.

Q.    Okay.  Reading on, he states, my guess is we will need to make this ordinance part of the local share grant process for 2020 in order to get real traction, which I will work on, since we handled that process for Dauphin County.

Do you see that?

A.    Yes, sir, I see that.

Q.    What's your understanding of what role Mr. Stewart plays in handling that local share grant process for Dauphin County?

MR. CRUSE:  Objection.  Calls for speculation.

THE DEPONENT:  I have no understanding of it at all.  I don't know.

BY MR. NOLAN:

Q.    What did you take him to mean here where he is talking about trying to get the Borough to enact ordinances to declare Skill games as a public nuisance and he is saying to make this happen, we're gonna have to involve this grant process?

MR. CRUSE:  Objection.  Calls for speculation as to what's in Mr. Stewart's

Page 303

head.

MR. HUDDEL:  Objection, compound.
Objection, asked and answered.

THE DEPONENT:  Yeah, I have zero
knowledge of this part of the effort at
all.

I just -- I was not involved and
didn't -- yeah, I found out about the
Middletown Borough meeting when
someone -- when Mark, I think it was,
shared the link about the article.

BY MR. NOLAN:

Q.    Okay.  Well, you responded to this
e-mail at 11:35 and said, I'm pulling together a
plan for a grassroots push, because I really
don't think we can afford to wait for the other
guys to step up.

Do you see that?

A.    I do.

Q.    So what sort of grassroots push
did you plan for regarding this issue?

A.    It had nothing to do with local
ordinances.

Skill games cost the lottery
millions of dollars and it impacts seniors.

Page 304

Skill games, according to the Office of Attorney General, local District Attorneys and Pennsylvania State Police can attract crime to the communities.

So that affects communities. So identify community leaders who want to protect their community.

But the third one would have been possibly casinos, employees and business partners, although that's somewhat limited, because lawmakers tend to respond more to constituents in their district as opposed to in a district that has a casino.

That was what I anticipated -- anticipated pulling together for Mr. Green and the team.

Q.    Have you ever seen a formal study that showed the impact of Skill games on the Pennsylvania Lottery?

A.    I've seen a study. I'm not sure -- what do you mean by formal?

Q.    An actual legitimate study that analyzes what, if any, impact Skill games have on the Pennsylvania Lottery?

MR. CRUSE: Objection to form.

Page 305

MR. HUDDEL:  Objection to form.

THE DEPONENT:  I have seen a study produced by the Pennsylvania Lottery, which analyzed the impact of Skill games on revenue, store by store, machine by machine.

They've updated it once since I've been involved in this campaign.

BY MR. NOLAN:

Q.    Do you have a copy of it?

A.    I do not.  I have one.  It's on our website.

Q.    Who did you receive that from?

A.    I don't recall.  I didn't -- I wasn't -- I don't recall.

It might have been a legislator. It might have been someone in the capitol.

I believe it came up at a committee hearing.

I'm fairly confident it's a public document, but I don't recall who sent me the study, that formal study.

Q.    Is it on the PEG website?

A.    It's on the -- yes, it's on one of our websites, Pennsylvanians Against Illegal

Gaming or Pennsylvanians Against Gaming Expansion.

Q.    Okay.  Are you aware of any instance where anyone has been adjudicated for a criminal act which resulted from the presence of a Skill game being in the vicinity?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Yeah, objection to form.  Object to the extent that it requires the witness to perform a legal analysis or draw a legal conclusion.

MR. CRUSE:  Join.

THE DEPONENT:  I'm aware in Hazelton, Pennsylvania, a man was pushed into a broom closet and shot in the back of the head.  He stole the cash box.  He had been playing a Skill game in that store front all day.

And the District Attorney of Luzerne County, I believe it's Luzerne County, made it clear that it was the Skill game.

I'm aware that just a month -- three weeks ago, the Delaware County District Attorney testified that the

Page 307

businesses need these store -- these machines out where as many people as possible can see them and play them.

And the combination of access like that and cash can sometimes lead to deadly circumstances or something to that effect.

I am aware of numerous breaking and entering with crowbars. Some going into a convenience store wielding a gun, trying to get the cash from the machines. Thieves smashing Skill machines in a laundromat.

The Attorney General referenced, I believe, I might be wrong about that, a murder in Philadelphia that they attributed to the presence of Skill games.

Yes, I am aware of crimes directly linked to the presence of Skill games in commercial establishments.

BY MR. NOLAN:

Q.    Are you saying that the shooting in Luzerne County was caused by the Skill game?

MR. HUDDEL:  Objection.  Calls for

Page 308

speculation.

MR. CRUSE:  And objection to the extent it calls for a legal conclusion.

THE DEPONENT:  I'm saying there's a wrongful death suit in that matter. And I will go find the quote or the video from the Lackawanna -- Luzerne District Attorney who said that man played a Skill game all day, was intoxicated or high on narcotics and came back and robbed the machine.

It was because of the Skill game. It's not my opinion.  I believe that's almost -- that's not a direct quote, but that's an accurate reflection of what the District Attorney in Luzerne County said.

BY MR. NOLAN:

Q.    But are you saying -- are you personally saying that the machine caused him to shoot someone?

MR. CRUSE:  Objection to the extent that it calls for a legal conclusion.

MR. HUDDEL:  Objection, speculation.

Page 309

THE DEPONENT:  I'm saying that the authorities of Lackawanna -- I apologize, in Luzerne County attributed that crime to the presence of the Skill machine.

BY MR. NOLAN:

Q.    But are you saying that the game caused him to shoot the person?

MR. HUDDEL:  Same objection. Calls for speculation.

MR. CRUSE:  Please listen to his question.  He's saying, are you saying that it caused this event.

THE DEPONENT:  No.

BY MR. NOLAN:

Q.    Okay.  You're saying it was the presence of the game that led to this crime?

MR. CRUSE:  Objection.  Misstates his testimony.

MR. HUDDEL:  Objection, calls for speculation.

THE DEPONENT:  To clarify, the District Attorney said that, not Pete Shelly.

BY MR. NOLAN:

Q.    Okay.  Because we all can agree

Page 310

that a game doesn't control someone's mind and make them commit heinous criminal acts.

Fair?

MR. CRUSE:  Objection.  Calls for a legal conclusion.  Calls for speculation.

THE DEPONENT:  I don't believe that's what I said.

BY MR. NOLAN:

Q.    Right.  So you agree with me.

It doesn't control the person's mind and make them commit crimes, right?

MR. CRUSE:  Objection.  Calls for a legal conclusion.  Calls for speculation.

THE DEPONENT:  I have no idea how to answer that question.

BY MR. NOLAN:

Q.    Really?

MR. CRUSE:  Same objections.

Argumentative.

BY MR. NOLAN:

Q.    Do you think the game controls people's minds and makes them commit crimes?

MR. HUDDEL:  Object to form.

Page 311

Asked and answered.

MR. CRUSE:  Objection.  Calls for speculation.  Calls for a legal conclusion.  Calls for psychoanalysis.

THE DEPONENT:  Skill games can drive people to lose a lot of money and there are many news articles out there that make it plain that these crimes have been committed in these commercial establishments around Pennsylvania because of the presence of Skill games.

As opposed to controlling someone's mind, I can't help you with that.

BY MR. NOLAN:

Q.    Okay.  Because you're right, you would have no way to formulate an opinion that there was any type of mind control going on there, right?

A.    I don't believe I ever said that.

Q.    Okay.  So it's just the presence of the games is what you're saying is attracting people that then choose to commit crimes.

Fair?

MR. HUDDEL:  Object to form.

Page 312

Misstates the prior testimony.

THE DEPONENT:  I would rather cite Pennsylvania State Police and all these other people.

It is the lack of security measures, complete lack of security measures in some instances, the presence of a large amount of cash and nothing standing between the criminal and the clerk and that machine.

That's what law enforcement officials have said repeatedly around this state.

I don't recall anybody ever saying anything about Skill machine controlling somebody's mind.  I don't know where that came from.

BY MR. NOLAN:

Q.    Looking back at Exhibit 9.

MR. CRUSE:  We have been going over an hour and a half, so whenever you're ready for another five minute-break, that would be great.

THE DEPONENT:  Where are you? Exhibit 9, what page?

Page 313

BY MR. NOLAN:

Q.    Front page, second to last e-mail, from you to the group at 12:08 p.m.

Do you see that?

A.    From Pete Shelly to Dick January 7, 12:08.  Is that the one?

Q.    Yes.  You say at the first meeting I attended at Tony's office.  Who is Tony?

A.    I have no recollection who Tony is.  I just got to tell you I don't know.  I just don't remember.

Q.    Well, at that meeting you suggested 400,000 total, which does not include the media, but that Bob has already paid for.

What are you talking about there?

MR. CRUSE:  Okay.  To the extent -- the Court did what it did with ordering the disclosure of these documents, which is between the agency and counsel.

To the extent you're having to answer these questions requires you to disclose any further or any additional communications with counsel, I instruct you not to answer on the basis of

Page 314

attorney/client privilege.

But to the extent that you can answer based on what's on this document without disclosing communications with counsel, other than those that are expressly on the page of this sheet, I instruct you not to answer.

But with that, answer if you can.

THE DEPONENT: And your question again was what?

BY MR. NOLAN:

Q.    What are you talking about here when you suggested at Tony's office 400,000 total?

A.    So this would have been a budget -- proposed budget for a paid media campaign.

Q.    To do what?

A.    To make the public aware of the threat that the illegal Skill games posed in the Commonwealth and have them urge lawmakers to take action.

Q.    Okay. And who's gonna be paying -- or who did you propose would pay the 400,000?

Page 315

A.      There was a conversation -- my client.

MR. CRUSE:  That was between -- okay.  I -- to the extent that it doesn't involve counsel in the performance of their legal representation, you can answer.

THE DEPONENT:  Yes.

I don't recall who Tony is.  And that's a problem, because there could have been a marketing person at Parks Casino.  They've had some turnover there.

I deal with a gentleman named Mark Oppenheimer now, so I'm a little hamstrung here.

But generally speaking, the goal -- what was I talking about?  The goal was raising money for, as I mentioned earlier, some of the tactics we might use.  Could be radio, could be digital, billboards, television, patch-through calls, banner planes.

We've done all of the above with different clients.

That was the context for this

Page 316

e-mail.

BY MR. NOLAN:

Q.    Okay.  So who was -- who did you envision paying this?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  Frankly, I didn't envision anybody paying for it.  It wasn't my job.

Mr. Green and the team at Parks was going to go and ask the other casinos to contribute to the campaign.

BY MR. NOLAN:

Q.    Aha.

A.    Which was not something I anticipated at all upon engagement.  But that, I believe, is the context for this e-mail.

Q.    Well, you state in your first bullet point, we've received no help from the other casinos in helping turn up the noise.

I'm talking to a few people about helping on a contract basis with the grassroots and that will cost money.

What few people are you talking about and why would grassroots cost money?

A.     Well, you don't --

MR. HUDDEL:  Objection, compound.

MR. CRUSE:  Objection, compound.

THE DEPONENT:  Okay.  We've received no help from the other casinos in helping turn up the noise, so Parks Casino and I were making -- we are doing our jobs, raising awareness about the issue and the other casinos were not getting involved.  So that's number one.

I am talking to people about helping out on contract basis with the grassroots and that will cost money.

We do grassroots engagement; however, for a project this big, we would have brought in folks to help us.  And what that means is, you identify, as I said earlier, important people in the land who can get lawmakers' attention.

So senior citizens, casino employees.  I forget the other ones I mentioned.  So that's what grassroots means and that does not happen for free.

BY MR. NOLAN:

Q.     So what outreach was made to other

Page 318

casinos to kick in and pay for this campaign to prohibit Skill games?

MR. HUDDEL:  Objection.

MR. CRUSE:  Objection.

THE DEPONENT:  Sorry, guys.  I apologize.  I was not involved in that outreach.

BY MR. NOLAN:

Q.    Okay.  Who was?

MR. HUDDEL:  Objection, foundation.

THE DEPONENT:  There was one meeting -- there was a meeting where we -- we made a presentation to the industry leaders very early on, maybe -- I don't know if it was -- when was this?  It wouldn't have been January.  That's too soon.

We had a media pitch and then folks in the room, if memory serves -- Parks was driving the bus.  Okay?

So I was never asked to reach out to any casino.  And, in fact, I was never even made aware if any of the casinos contributed until after the campaign was

Page 319

virtually halfway done.

So it might have been -- I don't know.  I don't know.

BY MR. NOLAN:

Q.    So did any of the casinos ever contribute?

A.    I don't know.

Q.    Did you have any other discussions about that?

MR. CRUSE:  With the warning about discussions with counsel, you can answer.

THE DEPONENT:  It did come up periodically, because Mr. Green, Bob Green and Parks Casino, was investing a significant amount of money in the campaign and there was -- people talked about it.

But I don't know, as I sit here, if there were more calls made, more outreach made.  It was above my pay grade.

BY MR. NOLAN:

Q.    So this was a campaign to prohibit Skill games?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  It was a campaign to rid the state of illegal Skill games.

BY MR. NOLAN:

Q.    Are you aware of any Court opinion where the Court analyzed the Crime Code related to one of POM's games and determined POM's games are illegal under the Crimes Code?

MR. CRUSE:  Objection.  Directly solicits analysis and opinion from a layperson.

MR. HUDDEL:  Also, object -- same objection and object to form, vague.

THE DEPONENT:  I am not aware.  I never analyzed any of the court opinions. I don't know.

BY MR. NOLAN:

Q.    Mr. Stewart responds back, play it cheap, you weep.  We're in it to win.  So whatever needs to be done needs to be done.  600 still sounds low.

Did I read that correctly?

A.    Yes, sir.

Q.    So did you submit a proposal for 600,000?

A.    I don't remember.  I believe -- I know the total investment in the first go-around, the major battle we had was significantly less than six -- was less than -- I don't recall.  But I don't believe it was $600,000.

Q.    Okay.  So roughly how much was it?

A.    The initial proposal...oops.  Sorry.

MR. HUDDEL:  Objection.  Asked and answered.

MR. CRUSE:  Take your time.  You don't have to apologize.

THE DEPONENT:  The initial proposal did include TV.  And my firm, we decided we're not going to do that.  It was just too expensive and we didn't think it would be effective.

That was an internal discussion.  I might have raised it with Bob Green, but I doubt it.

I think the total in paid media in whatever time period this was referring to was probably closer to 350, maybe 400, 450, in that range.

I really don't recall the exact

Page 322

number, but I believe it was less than $600,000.

BY MR. NOLAN:

Q.   And where did that money come from?

MR. HUDDEL:  Objection, foundation.

THE DEPONENT:  Where did it come from?  It came from Parks.

BY MR. NOLAN:

Q.   Anyone else?

A.   No, I -- you asked if anybody else might have contributed, I believe at one point Mr. Gmerek said one of the casinos or Mark Stewart told me --

MR. CRUSE:  Hey, please don't disclose any communications with counsel.

THE DEPONENT:  I apologize.  It's been a long day.

MR. CRUSE:  Take your time.

THE DEPONENT:  Yeah.  It wasn't a counsel.  I believe somebody -- one of the other casinos might have contributed $25,000.  That was it.  I don't recall which one.  It was not significant.

Page 323

BY MR. NOLAN:

Q.    Is there anything untoward about this e-mail?  Are you guys discussing something that's bad or illegal?

MR. HUDDEL:  Objection to the form.

MR. CRUSE:  Object to form, lack of foundation.

THE DEPONENT:  You mean for raising money for a campaign?

MR. HUDDEL:  Same objections.  Object to form.

MR. CRUSE:  Answer if you can.

THE DEPONENT:  I have no idea what you mean.

BY MR. NOLAN:

Q.    In other words, is there any reason in your mind why this should be labeled confidential, subject to a protective order?

MR. HUDDEL:  Objection to form.  Objection, calls for legal conclusion.

MR. CRUSE:  Objection, lack of foundation.

MR. HUDDEL:  Yeah, foundation.

Page 324

BY MR. NOLAN:

Q.    In other words, would you be at all embarrassed, or, you know, feel bad if this was in the public domain?

MR. HUDDEL:  Objection, form.

MR. CRUSE:  Object to lack of foundation.

THE DEPONENT:  I'm totally agnostic on it.

MR. CRUSE:  Can we take a break?

MR. NOLAN:  Sure.

THE VIDEOGRAPHER:  Going off the record at 3:41 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 3:51 p.m.

(Shelly Deposition Exhibit Number 10 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 10.

Do you recognize that document?

MR. NOLAN:  Are we back?

THE VIDEOGRAPHER:  Yep, we're back

Page 325

on.

MR. NOLAN:  Sorry.  I had a brain freeze there.  I'm sorry.

BY MR. NOLAN:

Q.    Okay.  Mr. Shelly, do you recognize that document?

A.    I don't.  But I read it as I sit here.

Q.    Do you recognize this was a press release -- or excuse me, a statement sent by Matt Haverstick to the Pennsylvania legislature regarding the same Court opinion that we've talked about at length today?

MR. HUDDEL:  Object to the form.

MR. CRUSE:  Objection, lack of foundation.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  And he basically says the Court held that the Pennsylvania Skill games are not regulated by the Gaming Act as argued by the State, which is consistent with what we read in the opinion, correct?

MR. CRUSE:  Objection, calls for a legal conclusion.  Misstates prior

Page 326

testimony.

MR. HUDDEL:  Same objection.
Object to form.

THE DEPONENT:  That's what
Mr. Haverstick appears to be saying here.

BY MR. NOLAN:

Q.    Right.

And he's also making reference to
the Beaver county decision.

Do you see that in the fourth
paragraph?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  I do.

BY MR. NOLAN:

Q.    Are you familiar with the Beaver
County decision?

MR. HUDDEL:  Same objection.

THE DEPONENT:  Vaguely.

BY MR. NOLAN:

Q.    What's your understanding of what
the Court held in that case, which involved one
of the POM's games?

MR. HUDDEL:  Object to form.
Objection, seeks a legal conclusion.

Page 327

MR. CRUSE:  Objection, lack of
foundation.

THE DEPONENT:  My understanding of
that case is that's the Pace-O-Matic has
hung their hat on since the beginning of
the fight, that their machines are legal
in Pennsylvania.

Beyond that I know nothing about
it.

BY MR. NOLAN:

Q.    Were you aware that the court in
the Beaver case analyzed whether the POM game was
a gambling device under 5513 of the Crimes Code
by employing an analysis as to whether the game
was predominantly governed by chance or skill?

MR. CRUSE:  Objection, calls for a
legal conclusion.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I've already given
my answer.

What I know about that case is
that Pace-O-Matic used that case to
justify their contention that it was not
a game of chance, it was a game of skill.

Is that the question?

BY MR. NOLAN:

Q.     Yeah.

A.     Okay.  That's my understanding.

Q.     Okay.  And are you familiar with that analysis the courts have done historically in terms of determining whether an item is a gambling device?

MR. HUDDEL:  Objection.

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Same objection. Object to form.

THE DEPONENT:  Vaguely.

BY MR. NOLAN:

Q.     Okay.  So just generally speaking, you're aware that if a court determined that they were predominantly governed by skill, as opposed to chance, then they were not gambling devices and not illegal?

MR. CRUSE:  Objection, calls for a legal conclusion.

MR. HUDDEL:  Same objection. Object to form, vague.

THE DEPONENT:  I would defer to the attorneys.  I'm not sure how -- I

Page 329

don't know if that's an accurate statement or not.

I don't know.

BY MR. NOLAN:

Q.    Okay.  So who is Sean Schafer?

A.    Mr. Shaffer is a Government Relations professional and he works for Parks Casino.  He is a contracted lobbyist.

Q.    So Mr. Shaffer forwarded this to the group on November 21st, 2019, and also included Mr. Lyons on that, correct?

MR. HUDDEL:  Object to the form.

THE DEPONENT:  On the 21st at 11:35, Sean Schafer, yes, sir, that's what this appears.

BY MR. NOLAN:

Q.    Okay.  And then at 2:31 in the afternoon, Mr. Lyons' copying you, says -- he brings up the Beaver county ruling and the games of Skill distinction.

But didn't the Commonwealth Court ignore that distinction in ruling that PA Skill machines were slot machines or implicitly overruled Beaver County's decision?

Do you see that?

Page 330

A.      Yes.

Q.      Okay.  Did you all have any discussions about that?

MR. CRUSE:  Again, counsel to you, given that this involves communications involving counsel, Mr. Stewart, in the provision of legal services to Parks, you are not to disclose any communications involving Mr. Stewart and the provision of legal services to Parks Casino discovered by the privilege, which you are not entitled to waive.

BY MR. HUDDEL:

Q.      Are you gonna follow your attorney's advice and refuse to answer my question?

A.      I am, yes, sir.

Q.      Okay.  Well, Mr. Stewart responds back and says, I think the most we can say would be implicitly because of the slot machine finding, but the Court's finding was based on the slot definition in Title 4.

The Beaver case was about whether the machines are gambling devices under 5513. The two courts were addressing different

Page 331

statutes.

Did I read that correctly?

A.    That's what it says here, yes, sir.

Q.    And do you recall in the legal opinion how the Court specifically said it was not making a ruling on the legality of POM's machines under 5513?

MR. CRUSE:  Objection to form. Calls for a legal conclusion.

MR. HUDDEL:  Same objections. Asked and answered.

THE DEPONENT:  I don't recall that, but I assume that you're accurate.

BY MR. HUDDEL:

Q.    Do you remember the footnotes? There were two footnotes where they specifically said we're not ruling on this.

MR. HUDDEL:  Object to form.  It seeks a legal conclusion.  Asked and answered.

THE DEPONENT:  I don't as I sit here.

Do I have that?

Page 332

BY MR. HUDDEL:

Q.    Yeah.  Look at Exhibit 3, last page.

A.    Yes, I just read it.

Q.    Okay.  You would agree with me that consistent with what Mr. Stewart is saying in an e-mail to you all, that the Court didn't analyze whether or not POM's games were legal or illegal under the Crimes Code 5513.

Fair?

MR. CRUSE:  Objection to form.  Calls for a legal conclusion by a lay witness.

MR. HUDDEL:  Same objection.  Asked and answered.

THE DEPONENT:  I've answered the question.

BY MR. HUDDEL:

Q.    Yeah, you just read the footnotes.

A.    So I've answered the question.

MR. CRUSE:  Objection to form.  Calls for a legal conclusion by a lay witness.

MR. HUDDEL:  Same objections.  Asked and answered.

THE DEPONENT:  I've just read the footnote.  I've answered your question.

BY MR. HUDDEL:

Q.    And you would agree with me that that's what it says?

A.    I'll read the footnote for you.

MR. HUDDEL:  Objection.  Seeks a legal conclusion.  Asked and answered.

MR. CRUSE:  If you want to read the footnote, read the footnote into the record.

THE DEPONENT:  Our denial of the Department's application, however, does not decide the separate question raised POM's claim re POM -- whether POM game is an illegal gambling device under the Crimes Code, which both parties appear to acknowledge requires discovery in order to resolve.

So that was the Court's ruling.

BY MR. NOLAN:

Q.    Right.

So Mr. Stewart goes on to say, in truth, it's the next case/decision on our argument that will fully overrule the Beaver

Page 334

case.

Did I read that correctly?

A.    Yes.

Q.    So in other words, you would agree with me he's telling you there that the Beaver case is not overruled, correct?

MR. CRUSE:  Objection to form. Calls for speculation as to what is in Mark Stewart's head.  Calls for legal conclusions by a lay witness.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I have no idea what Mark Stewart meant by fully overruled.  I don't know.

BY MR. NOLAN:

Q.    Did you discuss it with him?

MR. CRUSE:  That expressly calls for invasion of the privilege and I instruct you not to answer.

BY MR. NOLAN:

Q.    Are you gonna take your attorney's advice and refuse to answer?

A.    Yes.

(Shelly Deposition Exhibit Number 11 marked.)

BY MR. NOLAN:

Q.    I'm handing you what's been marked Exhibit 11.

Do you recognize that document?

A.    Let me read it first, if I could, please.

I don't recognize -- I recognize this now.  I don't not recall it from the time it was being traded.

There was a lot of traffic here.  But I'm familiar with what these documents say.

Q.    Do you see it starts with the e-mail from Mr. Stewart to you all, the one-pager that we already discussed?

A.    Yes.

Q.    Okay.  And then he sent it to the group and Mr. Gmerek responded and he asks the question, quote, are we sort of saying that there's no need for legislation, so that if the police don't go get the machines, we're shit out of luck politically, question mark.

Do you see that?

A.    Yes, sir.

Q.    What did you understand Mr. Gmerek to be talking about there?

Page 336

MR. CRUSE:  Objection.  Calls for speculation as to what is in Mr. Gmerek's head.

THE DEPONENT:  I have no idea.

BY MR. NOLAN:

Q.    Okay.  Do you think maybe it's the whole notion that if you guys are claiming that the Court order means that POM's games are illegal, then why would you need any further legislation on it to ban that?

MR. CRUSE:  Objection.  Calls for speculation and calls for a legal conclusion and analysis by a layperson.

THE DEPONENT:  I have no idea.  I just don't know.

BY MR. NOLAN:

Q.    Well, Mr. Stewart responds regarding that question.  He says that could be a risk.

Did I read that correctly?

A.    Yes.

Q.    Okay.  And he goes on to say, the one-pager glosses over the fact that 5513 doesn't define slot machine, right?

MR. HUDDEL:  Object to form.

Page 337

THE DEPONENT:  That's what he says here.

BY MR. NOLAN:

Q.    Right.

And what he is suggesting is, down in subparagraph A, we use this one-pager and take on it to pressure PSP, DAs, et cetera, to act now.

Did I read that correct?

A.    That's what it says, yes, sir.

Q.    And that was part of your campaign to try to drive POM out of business, right?

MR. CRUSE:  Objection.  Lack of foundation.  Objection to form.

MR. HUDDEL:  Same objections.

THE WITNESS:  I don't believe that's correct.

BY MR. NOLAN:

Q.    What is he talking about there when he is talking about pressuring PSP, DAs, et cetera, to act now?

MR. CRUSE:  Objection.  Calls for speculation as to what is inside Mr. Stewart's head.

THE DEPONENT:  May I answer now?

Page 338

You asked that was part of your campaign, so I seem -- I assume -- you said your campaign, so I assume you mean the campaign that Pete Shelly pulled together for Parks.

BY MR. NOLAN:

Q.    Right.  Under the direction of Mark Stewart.

A.    I don't recall this being an element of the one-pager to put pressure on PSP, DAs, et cetera, to act now.  That appears to be what he is saying.

Q.    Okay. All right.  Reading on, he says, we capitalize on how people are upset about Mike and Todd and company.

Do you have an understanding of who Mike and Todd and company are?

A.    Yes, sir, I do.

Q.    Who?

A.    They are the principles in a firm called Long and Nyquist, Mike Long and Todd N-Y-Q-U-I-S-T.

They are quarterbacking my opinion, I believe, is accurate, the legislative and political campaign giving donations and all

Page 339

the various elements of Pace-O-Matic's campaign in Pennsylvania.

Q.   Let's turn to the page -- so moving towards the front of this document.

The Bates label ends in 1203.

MR. CRUSE:  Do you know what the Bates label is?

THE DEPONENT:  Yes.  Thank you. Yes, sir.  1203.

BY MR. NOLAN:

Q.   Okay.  Do you see there it's a continuation of this e-mail string from Richard Gmerek to a number of people, including Mark Stewart and you.

And he states, still under the subject line one-pager, we circulated the press release to about a hundred people on the Hill tonight so that when we get Mark's finished with his legal paper, we can just hit reply each, attach it and send it out.

Did I read that correctly?

A.   I believe that's what it says, yes, sir.

Q.   Okay.  So what press release is he referring to?

Page 340

Is the one that we discussed earlier that Karin Ashford responded to Mr. Stewart about?

A.    I don't know.  I assume that is -- I assume that's the one.

Q.    Because all this is still on November 20th, 2019, at 9:22 p.m.

At that point you would have only had time to send out one press release, right?

MR. CRUSE:  Objection.  Lack of foundation.

THE DEPONENT:  The issue is, frankly, the subject line is one-pager, and then he talks about a press release, so I'm not sure.

It could have been some other document -- some other document could have gone out.  I just don't know.

BY MR. NOLAN:

Q.    Okay.  Up above Mr. Stewart is saying, I think it's finished, unless Bob, Tom, Peter or Charlie have any comments, you can let it fly.

Do you recall getting back to him on his legal analysis with any comments?

MR. CRUSE:  Other than what's in this document that the Court forced to be disclosed, any communications that you had with Mr. Stewart outside of this document is covered by the attorney/client privilege and that privilege belongs to Parks Casino and I instruct you not to answer if your answer requires you to disclose attorney/client communications.

Otherwise, you can answer.

MR. HUDDEL:  Also, object to form.

THE DEPONENT:  So you want a response to I think it is finished, did I have -- your question is again?

BY MR. NOLAN:

Q.    Did you have any comments?  He's asking for your comments.

MR. HUDDEL:  Object to form.

THE DEPONENT:  I don't recall.

BY MR. NOLAN:

Q.    Okay.  Let's move forward to the page Bates labeled ending in 1201.

Do you see that?

A.    Yes, sir.

Page 342

Q.    Okay.  Actually go to the one page earlier, that's where your e-mail started.

A.    So 1202.

Q.    1200.

A.    I apologize.  The other way.

Q.    So this is an e-mail to you in the group, including Mark Stewart, on November 21, 2019, where you state, Dick and I just huddled.

Recommendation is that Mark's one-pager go up to Hill from Mark.  It makes sense for our attorney to respond to their attorney.

We also want to hit them hard for trying to pull a fast one like this with message in an e-mail.  The memo does not have to be changed.

Did I read that correctly?

A.    Yes, sir.

Q.    Who are you referring to hit them hard?

A.    I imagine it was Pace-O-Matic.

Q.    And what fast one do you think Pace-O-Matic pulled?

MR. HUDDEL:  Object to form.

THE DEPONENT:  The only -- I don't

Page 343

recall.  I just don't recall.  This feels like a hundred years ago.  It would have been -- I don't recall.

BY MR. NOLAN:

Q.    Okay.  Well, in any event, you draft a proposed e-mail to the legislators --

A.    Uh-huh.

Q.    -- in which you again use the statement, the Court confirmed in a ruling that video game machines manufactured and distributed by the company POM under Pennsylvania Skill are considered slot machines under Pennsylvania law, is that correct?

MR. CRUSE:  Can you take the witness to where you're reading from, please?

MR. NOLAN:  Well, it started at the bottom of page 1200 and now I'm reading the section of the proposed e-mail.

MR. CRUSE:  Pardon the confusion. I saw something else earlier or later.

BY MR. NOLAN:

Q.    Do you see that?

A.    I do.  I'm reading it.

Page 344

I am confused about the one-pager that Mark Stewart wrote in this Dear Legislators note here.

Which one do you want me to address?

Q.     Well, in other words, aren't you forwarding a proposed e-mail to the legislators that Mark Stewart then had some edits to?

MR. HUDDEL:  Object to form.

THE DEPONENT:  I am not sure about that, but I don't know.

The subject line is one-pager, it came from me, but then I refer to Mark's with a message in the e-mail.

I believe -- your question is what specifically?

BY MR. NOLAN:

Q.     In other words, at the top of page 1201 --

A.     Yes, sir.

Q.     -- that is a draft message that you're sending to the team that would be the cover e-mail that goes along to the legislators attaching Mark's one-pager?

A.     Correct.

Page 345

Q.    Okay.  And Mark had some edits?

A.    It appeared to, yes, sir.

Q.    So Mark, at 2:57 p.m., says, suggestions below.  I get wanting to say, quote, lose in court, unquote.

But I think it undermines credibility since technically the Court denied the AG's motion.

Did I read that sentence correctly?

A.    Yes, sir.

Q.    Okay.  So he's admitting to you that Pace-O-Matic did not lose in Court relative to that opinion.

Fair?

MR. CRUSE:  Objection to form.
Objection, calls for speculation as to
what is in Mark Stewart's mind.

MR. HUDDEL:  Same objections.
Calls for a legal foundation, legal
conclusion.

THE DEPONENT:  I don't agree that
that's necessarily fair.

BY MR. NOLAN:

Q.    What's inaccurate about my

Page 346

statement?

MR. HUDDEL:  Same objections.

BY MR. NOLAN:

Q.     My question --

MR. CRUSE:  Same objections.

THE DEPONENT:  I'm not a lawyer; however, the -- I'm not gonna speculate. I don't believe it's fair to assert, because we are not gonna say lose in court, that doesn't mean that we won or lost in court.

There might have been a minor issue.  There's language in that opinion that we could have found helpful. There's one paragraph over here.

There's a lot of reasons why a court opinion could be helpful even if you lose.

BY MR. NOLAN:

Q.     Okay.  And reading on up through the e-mail chain, it looks like it gets finalized and sent out, correct?

MR. HUDDEL:  Object to form.

THE DEPONENT:  I'm not sure where it says final ready to go here,

Page 347

respectfully.  Agreed to get it out.

BY MR. NOLAN:

Q.    You sent an e-mail --

A.    There it is.  November 21 at 3:36 p.m.

Q.    Yeah.

A.    It says, yes, done.

Q.    So you sent it out?

A.    Correct.

Q.    And now if we look at the very last e-mail on this chain from Mr. Skjoldal to the group, including you -- and this is on November 22nd, 2019, correct?

A.    At 11:58, is that the one?

Q.    Yeah.

A.    Yeah.  That's correct.

Q.    And he's referring to this opinion that we've talked so much about and which was the subject of your press release and the one-pager and cover e-mails and all that stuff, right?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  I believe that's correct.

Page 348

BY MR. NOLAN:

Q.    And would you look at the very last sentence that Mr. Skjoldal included in his e-mail where he is summarizing the opinion, do you see he states, quote, she also declined to be drawn on whether the machines constitute illegal gambling devices and you put illegal gambling devices in quotes.

Did I read that correctly?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection.

THE DEPONENT:  Yes, you read it correctly.

BY MR. NOLAN:

Q.    So Mr. Skjoldal, who is an attorney at Eckert, is advising you that the Court, in the opinion that we've already discussed, did not say POM's games were illegal gambling devices, right?

MR. CRUSE:  Objection to form. Lack of foundation.

And in responding to this question, if you have to disclose any additional communications with counsel that are outside of this document that

Page 349

was forced to be produced by the Court, I advise you that anything extraneous to this document itself is covered by the attorney/client privilege, which belongs to Park and you are not entitled to waive it.

MR. HUDDEL:  Objection to form, foundation.  Seeks a legal conclusion.

MR. CRUSE:  But to the extent you can answer otherwise, go ahead.

THE DEPONENT:  I do not recall this back and forth in any way, shape or form.

BY MR. NOLAN:

Q.    Would you agree with me that you're a recipient on Mr. Skjoldal's e-mail, correct?

A.    I am.

Q.    And you would agree with me that he advises the group that the Court in the opinion did not state whether the machines constituted illegal gambling devices?

MR. CRUSE:  Objection to form. Lack of foundation.

BY MR. NOLAN:

Q.    Right?

MR. HUDDEL:  Same objections.

THE DEPONENT:  That appears to be Mr. Skjoldal's opinion.

BY MR. NOLAN:

Q.    Do you have any reason to doubt what he is saying there?

A.    I am not an attorney.

Q.    Just asking you if you have reason to doubt it?

A.    I'm not going to answer the question.

MR. HUDDEL:  Object to form.

THE DEPONENT:  Mark Stewart was leading this effort.  Mark Stewart and Mr. Skjoldal had a difference of opinion or -- I can't recall that.

This was sent to me on November 22nd and I am not sure -- a lot of documents back and forth when this document -- the document at issue here went out on the 21st, is that correct?

That's correct.

So the document had already been

Page 351

gone based on advice from Mark Stewart.

As I sit here, I don't even know -- remember reading this e-mail.  I might have.  I might not have.

But this came after the one-pager we were discussing was approved by Mark Stewart, I believe Tom Bonner.

BY MR. NOLAN:

Q.    In other words, Mark Stewart's telling you that the opinion held that they were illegal, and his partner, Mr. Skjoldal, is saying the opinion didn't say they were illegal.

What, if anything, did you do to figure out who's right?

MR. CRUSE:  Objection.  Compound. Lack of foundation as to the first part of it.

And with respect to the first part of it, it assumes statements that -- strike that.

I will, though, give you the warning that I've given you before, that to the extent you have to disclose attorney/client communications to respond to the question, that would violate the

Page 352

attorney/client privilege that belongs to Park and you are not entitled to waive that privilege.

MR. HUDDEL:  Objection to form, foundation.  Objection, it seeks a legal conclusion.

THE DEPONENT:  I'm not going to answer the question.

BY MR. NOLAN:

Q.    You're not going to answer the question?

A.    Based on the advice of counsel, I don't believe I can answer that question.

Q.    Did you ever talk to Mr. Skjoldal or Mr. Stewart and say what's up, are they illegal or illegal?

MR. CRUSE:  That goes expressly approximately to your communications with counsel and I instruct you not to answer.

BY MR. NOLAN:

Q.    Are you going to follow your attorney's advice?

A.    Yes, sir, I am.

(Shelly Deposition Exhibit Number 12 marked.)

Page 353

BY MR. NOLAN:

Q.    I'm handing you what's been marked Exhibit 12.

Do you recognize that document?

A.    I do not.

Q.    Would you agree with me that it's an e-mail string -- excuse me.

It's an e-mail, yeah, string that was forwarded to you by Mark Stewart on November 22nd, 2019, regarding the POM opinion that we have been talking so much about?

A.    That's one e-mail from Mark to various folks there and I am copied on it.

Q.    Right.

You would agree with me that in the first e-mail, it's an e-mail from Mr. Skjoldal to Karen Romano copying Mark Stewart on November 22nd, 2019, under the subject line, POM opinion, next steps?

MR. HUDDEL:  Object to form to the extent that's a question.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  Do you know who Karen Romano is?

Page 354

A.    I believe Karen Romano was an official in the Office of Attorney General, but I can't swear to that under oath.

Q.    Okay.  Is it your understanding that she was involved in the litigation that is the subject of the opinion that we've been talking about?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Join.

THE DEPONENT:  Yes.  I do recall that.

She was, in fact, with the Office of Attorney General and very well might still be.

BY MR. NOLAN:

Q.    And in this e-mail, Mr. Skjoldal is outlining arguments that they are encouraging Ms. Romano to make in that very same case opposite POM, yes?

MR. CRUSE:  Objection to form.  Lack of foundation.  Calls for speculation as to what was in Mr. Skjoldal's head.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I believe he is

talking about next steps.  That's the
subject line.

BY MR. NOLAN:

Q.    In the litigation?

A.    POM opinion, next steps.

Q.    In the litigation, the same
litigation that we have been talking about that
was the subject of the order, right?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Objection to form,
foundation.  Calls for speculation.

THE DEPONENT:  Yeah, I don't know
if this is about the case or about this
opinion and what to do about it.  But it
is about the matter we have been
discussing.

BY MR. NOLAN:

Q.    Well, he says to you all, we sent
the e-mail below to the DAG.

What's your understanding of DAG?

A.    I have no idea what DAG is.

Q.    Okay.

A.    I believe that's a typo.

Q.    Or Deputy Attorney General?

A.    Okay.  Yes.  I apologize.  I'm

Page 356

used to OAG, Office of Attorney General.  That could be the Deputy Attorney General, correct.

Q.    So basically he is telling you that their e-mail to Ms. Romano summed up their view of the case law and suggested what Karin Romano should argue in that case against POM, right?

MR. CRUSE:  Objection to form.  Lack of foundation.

MR. HUDDEL:  Same objections.  Calls for speculation.

THE DEPONENT:  I am looking for someplace in here where he says here's what we think you should do in this case, so give me a minute to read it, please.

MR. CRUSE:  Mr. Shelly, I remind you again, based on what you just said, that you should always read the documents presented to you.

Mr. Nolan doesn't want you guessing what's in documents.  He wants you to read the ones he presents to you.

MR. NOLAN:  Please stop coaching the witness.

MR. CRUSE:  That's not coaching

Page 357

the witness.  That's asking him to read a document you put in front of him.

THE DEPONENT:  And your question is what?

BY MR. NOLAN:

Q.    Do you recognize the document?

A.    I don't recognize this document -- I don't believe -- I don't recall seeing this document prior to today, but I am copied on it, so I must have.  I don't recall it.

Q.    Whose e-mail is FCurran@ShellyLyons.com?

A.    F. Curran is Faith, F-A-I-T-H, C-U-R-R-A-N.  She is my colleague.

Q.    Okay.  Would you agree with me that this is the e-mail, the cover e-mail that we just recently discussed that was going to attach to Mr. Stewart's one-pager?

MR. HUDDEL:  Object to form.  Objection, foundation.  Objection, calls for speculation.

MR. NOLAN:  Oh, I'm sorry.  Are we on Exhibit 13?

MR. CRUSE:  No, we are on Exhibit 12.  You haven't given us Exhibit 13.

Page 358

MR. NOLAN:  Oh, sorry.

Can you look back at what my last question was?

(Reporter read back last question.)

MR. CRUSE:  I think you got lost in space and time, Mike.

(Shelly Deposition Exhibit Number 13 marked.)

BY MR. NOLAN:

Q.    You would agree with me --

A.    Can I interrupt you, sir?

What exhibit am I supposed to be looking at right now?

Q.    12.

A.    Where is F. Curran's e-mail address in here?

Q.    No, that's the next one.  Sorry. As you were reading, I started looking at the next exhibit.

A.    So I am looking at Exhibit 12. Thank you.

Q.    You would agree with me that this is an e-mail that they forwarded to you where they laid out their summary of the argument that

Page 359

they were recommending Karen Romano make in the case against POM.

Fair?

MR. HUDDEL:  Objection.
Foundation, form, calls for speculation.

MR. CRUSE:  Join.

THE DEPONENT:  I'm copied on this e-mail?

BY MR. NOLAN:

Q.    Yeah.  At the top --

A.    Yes.

Q.    -- they forwarded it to you?

MR. HUDDEL:  Same objections.

MR. CRUSE:  Join.

THE DEPONENT:  I have one e-mail.
Kevin Skjoldal, right?

BY MR. NOLAN:

Q.    Please tell me -- the e-mail below --

A.    Yes, it was forwarded to the team above, correct.

Q.    Right.

A.    I apologize.

Q.    So in other words, they're laying out the argument that they recommend Karen Romano

Page 360

should make against POM.

Fair?

MR. CRUSE:  Objection.  Calls --
objection, form, lack of foundation.
Calls for speculation as to what
Mr. Skjoldal intended in this e-mail.
And it calls for legal conclusions.

MR. HUDDEL:  Same objections.

THE DEPONENT:  And your question
is, is this -- this is a memo --

BY MR. NOLAN:

Q.    They forwarded you an e-mail where
they are outlining an argument that Romano should
make against POM, right?

A.    That's correct.

MR. HUDDEL:  Same objection.  Form
and speculation.

MR. CRUSE:  Same objection.

BY MR. NOLAN:

Q.    Now, I'm handing you Exhibit 13.
Would you agree that this e-mail
string starts with the cover e-mail which we
looked at recently that was going to attach Mark
Stewart's one-pager?

MR. CRUSE:  Objection to form.

Page 361

MR. HUDDEL:  And objection, foundation.

THE DEPONENT:  It appears to be the cover letter, yes, sir.

BY MR. NOLAN:

Q.     So that's the one that we looked at just a few minutes ago where you had responded, yes, done, it went out the door, right?

MR. HUDDEL:  Object to form.

THE DEPONENT:  I'm waiting for my counsel.  He looks like he --

MR. CRUSE:  No, I was just reading it.

THE DEPONENT:  Yes.  I apologize.

BY MR. NOLAN:

Q.     All right.  And then looking up -- working up the e-mail chain, you ask -- or I'm sorry, Representative Pamela Delissio asks you, good day, do you know if there's a hotline or such where suspected illegal machines can be reported?

Do you see that?

A.     I do.

Q.     And then you forward that to

Page 362

Stewart and some others and you state, maybe at the bottom of the ads we use new hotline number.

Did I read that correctly?

A.    Yes, you did.

Q.    Okay.  Had you already started up a hotline?

MR. HUDDEL:  Object to form.

THE DEPONENT:  I don't recall.  I don't believe it would have been that fast, but it could have been.

I don't recall when we started the 888 number.

BY MR. NOLAN:

Q.    Okay.

(Shelly Deposition Exhibit Number 14 marked.)

BY MR. NOLAN:

Q.    I'm handing you what's been marked Exhibit 14.

Do you recognize that to be an e-mail string that you received from Jim Mann and forwarded on to Mark Stewart and others?

A.    Yes.

Q.    And this is in response to your press release on POM?

Page 363

A.      It's either my press release on POM or Mark's memo on POM.  I'm not sure which -- it says your press release on POM.

Q.      Who is Jim Mann?

A.      I don't know.  I forget who he is. I believe he's a former legislative staffer, but I don't recall as I sit here.

Q.      He states to you, disappointing, you really should apologize to everyone you sent that nonsense to.  Shameful way to wind up a career, Pete.

        Did I read that correctly?

A.      Yes.

Q.      And you wrote in response, thanks for the note, but obviously don't see it that way.  Happy to wander over for a cup of coffee and kick around.

        Have a great Thanksgiving.

        Did you and Mr. Mann ever discuss this?

A.      We did not.

Q.      Did you know what he was talking about?

        MR. HUDDEL:  Object, foundation.

        THE DEPONENT:  Not specifically,

Page 364

no.

It could have been the one-pager.

It could have been the news release.  It

could have been anything.

BY MR. NOLAN:

Q.    Well, Mr. Mann responded to you

and said in the second paragraph, what

Commonwealth Court said was that these games fall

outside of the purview of the Control Gaming

Board and the gaming law.

Their regulations fall under the

provisions of the Crime code, in parens, Judge

McCullough, used the phrase preeminent law, end

quote, out of parenthesis.

Did I read that correctly?

A.    Yes, sir.

Q.    And you understood that, right?

You understood what he's talking about?

MR. HUDDEL:  Object to form.

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  Reading on, Mr. Mann states

to you, the Court stressed multiple times in the

body of the opinion and in the footnote that the

question of whether these particular machines

violated the criminal code was a separate question that they do not address.

Did I read that sentence correctly?

A.    You did.

Q.    Reading on he states, such a determination requires factual discovery to resolve and he even cites you to the page and footnote number.

True?

A.    True.

Q.    Did you bother to go read that at that time?

A.    I don't recall.

MR. HUDDEL:  Object to form.

BY MR. NOLAN:

Q.    Well, would you agree with me at this point multiple people have told you that the opinion did not state that POM's games were illegal?

MR. CRUSE:  Objection.  Lack of foundation.

MR. HUDDEL:  Objection, form.
Objection seeks a legal conclusion.

THE DEPONENT:  None of those

Page 366

people were the attorneys who I was working for on behalf of Parks Casino.

BY MR. NOLAN:

Q.    How about Skjoldal?

A.    Mark Stewart was the lead attorney.  If he had a difference of opinion with Mr. Skjoldal, that's on them.

Mark Stewart guided my work.  And that's what I included in everything I put out approved by the counsel, the lawyer for Parks Casino.

Q.    All right.  But at this point you've got an Eckert attorney, also on the team Kevin Skjoldal saying the Court didn't say that they were illegal.  And now you've got Mr. Mann advising you and even citing you to the page and footnote number saying the Court didn't say they were illegal.

Wouldn't you say that at that point that you were on notice that the opinion did not hold that the POM games were illegal?

MR. CRUSE:  Objection, lack of foundation.  Objection, calls for a legal conclusion.

MR. HUDDEL:  Objection, form,

compound, vague.

THE DEPONENT:  I'm just gonna read the note from Kevin Skjoldal to Karen Romano sent on November 22 of 2019.  Most significantly, the Court concluded that POM's games are slot machines.

BY MR. NOLAN:

Q.    Where are you reading from?

MR. CRUSE:  I believe that's Exhibit 12.

THE DEPONENT:  Yeah, it's 01214, as discussed the other day, while there's some flawed analysis in the Commonwealth Court's recent decision, the POM action, there are positive points as well.

Most significantly, the Court concluded that POM's games are slot machines.  That's -- that's what --

BY MR. NOLAN:

Q.    Mr. Shelly, I'm looking at Exhibit 14 here.

Mr. Mann is telling you, and citing you to the page and footnote where he is saying, the Court stressed multiple times the question of whether these particular machines

Page 368

violate the Crimes Code was a separate question that they do not address.

Such a determination requires factual discovery to resolve.

You were aware of that at that point, right?

MR. CRUSE:  Objection to form.

MR. HUDDEL:  Same objection. Seeks a legal conclusion.

THE DEPONENT:  You just said that Kevin Skjoldal didn't agree that the Court concluded they were slot machines.

Did I misunderstand that?

BY MR. NOLAN:

Q.    No.

Mr. Skjoldal told you that the opinion did not hold that POM machines were illegal.

MR. HUDDEL:  Objection to form. That doesn't sound like a question to me, but I'll object to the extent it is a question.

MR. CRUSE:  Join.

BY MR. NOLAN:

Q.    Right?

A.    I'm not going to get into an argument, into a battle between two lawyers.

Q.    Okay.  Well, how about --

A.    I don't work -- I did not work for Jim Mann.  I did not report to Jim Mann.  I reported and worked for Mark Stewart and the Eckert team.

Mark and Kevin might have had a difference of opinion about how far the ruling went, I don't really -- It's not my job.

But the Court concluded that POM's games are slot machines.

Q.    Well, let's look at what Mark Stewart says about Mr. Mann's e-mail.

Mr. Mann told you that the Court did not address the question of legality, because such a determination requires factual discovery to resolve.

You forwarded on to Mr. Stewart, and Mr. Stewart admitted to you, he is correct that the Court said it's a fact issue.

Do you see that?  Why are you looking at your attorney?

MR. CRUSE:  Objection to the predicate of the sentence, form, lack of

foundation and calls for a legal conclusion.

THE DEPONENT:  I was looking at my attorney because I wanted to make sure that he was reading the same document, if that's okay with you?

MR. CRUSE:  Admittedly there was some confusion a few minutes ago on documents.  I'm sorry.

THE DEPONENT:  I'm gonna answer your question.

BY MR. NOLAN:

Q.    Please do.

A.    He is correct.  The Court said it's a fact issue.  That's wrong, though, and was premised on the dot, dot, dot, dot, dot.

He says it's wrong in his opinion. Is that what that document says or not?

Q.    Yeah, it does.

A.    That's wrong.

Q.    He's submitting that the Court did not rule on the legality.  He might think it's wrong, but he admits that it's a fact issue that the Court didn't rule on, correct?

MR. HUDDEL:  Object to form.

Page 371

Misstating the e-mail.  Misstating the document.

THE DEPONENT:  I've answered your question.

BY MR. NOLAN:

Q.     What was that answer?

MR. HUDDEL:  Object to the form.

THE DEPONENT:  You can have it read back.  I answered your question.

BY MR. NOLAN:

Q.     You would agree with me --

A.     I would not agree with you. Period.

Q.     -- Mr. Stewart admitted it's a fact issue?

MR. HUDDEL:  Object to form. Misstates the document.

MR. CRUSE:  Join.

THE DEPONENT:  When my lawyer approves several one-pager documents, the Court said this.  You read this one way. I don't.  That's wrong.

Mr. Stewart is not saying -- the lawyer for Parks insists the Court ruled that they're slot machines, and that

Page 372

e-mail doesn't change that opinion --
that e-mail does not change that fact at
all.

(Shelly Deposition Exhibit Number 15
marked.)

BY MR. NOLAN:

Q.      Handing you what's been marked
Exhibit 15.

Do you recognize this to be an
e-mail chain started by you sent to Mark Stewart
and Mr. Gmerek under the subject, just
confirming, on November 25, 2019?

A.      This is a copy of an e-mail from
November 25, 2019.

Q.      Right.

A.      Correct.

Q.      Okay.  And you state to Mr.
Stewart and Mr. Gmerek, the e-mail blast below
went out awhile ago, just re-sending so you each
have a copy.

In addition, I also sent a note to
you and Andy Green regarding outreach to the
unions that Bob mentioned asking for support.

I'll keep you posted.

Who's Andy Green?

Page 373

A.      Andy Green works at Parks Casino.

Q.      And what did you and Mr. Green communicate about regarding outreach to unions?

MR. CRUSE:  To the extent you had communications with Mr. Green separate and apart and independent from communication that involved counsel, you can answer.

But if it involved counsel at Parks, that's covered by the privilege and I instruct you not to answer.

THE DEPONENT:  Mr. Green deals with Labor Relations at Parks Casino and I talked to him about engaging some organized labor workers, casino employees in the campaign to drive home the value of 25, 23,000 jobs the casinos provide.

That's the extent of my conversation with Mr. Green.

BY MR. NOLAN:

Q.      Okay.  All right.  So down below you copied the e-mail blast that went out to all lawmakers, correct?

A.      Yes, sir.

Q.      All right.  And you're, again,

Page 374

talking about this November of 2019 opinion which we've been discussing, right?

A.    Yes, sir.

Q.    And you even include a place for the lawmaker to click on and pull up the ruling.

Fair?

A.    That's what the document says, yes, sir.

Q.    Okay.  And, again, you repeat this statement, the Court confirmed that video game machines manufactured and distributed by the company POM under the name Pennsylvania Skill are considered, quote, slot machines, unquote, under Pennsylvania law.

Did I read that correctly?

A.    You did.

Q.    And you include down below that the sentence from page 11 of the opinion, the because sentence, right?

A.    Yes, sir.

Q.    Okay.  That if then sentence that we already have spoken about, correct?

A.    Correct.

Q.    Are you making a representation to the Pennsylvania lawmakers that that sentence

Page 375

which says if POM's activities are subject to the Gaming Act, then the POM game fits within the definition of slot machine under the Gaming Act, are you representing to the lawmakers that that is where the Court held that POM's games are slot machines?

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Objection.  The same objection and object to form.

THE DEPONENT:  That came from Mark Stewart and the attorneys at Eckert.

As I have said repeatedly, they told me, interpreted, translated, distilled down that ruling.  That's where that came from.

I would never, ever quote an opinion like that without -- it just didn't happen.

I was told that -- reassured that that was the case by Mark Stewart the team at Eckert.

BY MR. NOLAN:

Q.    Including Skjoldal?

MR. HUDDEL:  Object to form.

THE DEPONENT:  I assume.

Mr. Skjoldal was copied a lot of these e-mails.  I don't know.  Let's just say Mark Stewart to be clear.

BY MR. NOLAN:

Q.    Well, you would agree that this sentence which you included in your e-mail to lawmakers, it doesn't mean that the Court found that POM's games are slot machines?

MR. CRUSE:  Objection.

BY MR. NOLAN:

Q.    It's an if then type sentence and the Court found that POM's activities were not subject to the Gaming Act.

MR. CRUSE:  Objection.  Calls for a legal conclusion.

MR. HUDDEL:  Object to form. Calls for a legal conclusion:

THE DEPONENT:  I defer to my attorney at Eckert.

BY MR. NOLAN:

Q.    Yeah.

This is a statement --

A.    I refer to my attorney at Eckert.

Q.    This is a statement that you made

Page 377

to the lawmakers.

Are you saying that the sentence that you wrote means that the Court found that they're slot machines?

MR. CRUSE:  Objection.  Lack of foundation.  Objection, calls for legal conclusions.

THE DEPONENT:  I have no --

MR. HUDDEL:  Objection, calls for a legal conclusion.  Object to the form.  Object, asked and answered.  I think this is the fourth time you've asked this question.

THE DEPONENT:  I've -- you've asked, I answered.  I'm done.

BY MR. NOLAN:

Q.   Are you saying -- is that what it means?  That sentence that you included in your e-mail to lawmakers, that sentence means POM's games are slot machines?

MR. HUDDEL:  Objection, calls for a legal conclusion.  Object to form.  Asked and answered.  I think we're at five times now.

MR. CRUSE:  Yep.  Join the

Page 378

objection.

THE DEPONENT:  You've asked.  I've answered.  I can't do any about it.

BY MR. NOLAN:

Q.    This is your statement that we're talking about.

Is that what that means to you?

MR. CRUSE:  Objection to attempt number six.

MR. HUDDEL:  Objection.  Asked and answered again.  Again, objection, seeks legal conclusion again.

THE DEPONENT:  Asked and answered.  I'm not gonna -- I cannot provide any more information than I have already given.

BY MR. NOLAN:

Q.    This is the first time I'm asking you.

A.    It's the fourth time you've asked about this statement and I've told you.

Q.    Is that what it means to you?

MR. CRUSE:  Objection to attempt number seven actually.

MR. HUDDEL:  Objection, asked and

answered.  Objection, seeks a legal
conclusion.

THE DEPONENT:  I've answered your
question.

BY MR. NOLAN:

Q.    Please answer it.

A.    No, I have answered it.

MR. HUDDEL:  Same objection, asked
and answered again.  Seeks a legal
conclusion again.

MR. CRUSE:  Attempt number eight.

(Shelly Deposition Exhibit Number 16
marked.)

BY MR. NOLAN:

Q.    Showing you what's been marked as
Exhibit 16.

Do you recognize that document?

A.    I don't.

Q.    Do you recognize --

A.    It's okay if I can read it?

Q.    Sure.

A.    Thank you.

MR. CRUSE:  Can we take a
one-minute break to calm the temperatures
in here?

Page 380

THE VIDEOGRAPHER:  We're going off the record.  The time is 4:52 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 4:59 p.m.

BY MR. NOLAN:

Q.    I've handed you Exhibit 16.

Do you recognize that to be an e-mail string between you and Mark Stewart, you, Bob Green, Mr. Gmerek regarding a potential media call with Brad Bumstead?

A.    Yes, sir, I do recognize that.

Q.    Okay.  And you had suggested that you would speak with Mr. Bumstead with the thought of getting him to publish a piece about these issues that we've been discussing, right?

A.    That's correct.

Q.    Okay.  And Mr. Stewart attached, in his response to you, a letter that will be sent out on behalf of several -- a number of Pennsylvania casinos to lawmakers, is that correct?

A.    Yes, sir.

Q.    All right.  Did you then have

Page 381

those communications with Mr. Bumstead and did he publish a piece on these issues?

A.     I don't recall.

Q.     Let's look at the letter that Mr. Stewart sent to you.

In fact, let's look at -- it's the second page of the letter, last paragraph.

Do you see that?

A.     Setting aside?

Q.     Yeah.  Are you there?

A.     Yes.

Q.     Okay.  And actually let me direct your attention, this was sent May 2nd, 2019, correct?

A.     It's dated May 2nd, 2019.

Q.     Right.

Long before the e-mail that we recently looked at where Mr. Stewart said the Beaver case was not overruled.

Do you remember that?

A.     I don't.

Q.     Well, here on the second page, in the last paragraph, he is representing to -- in this letter, he has represented to the lawmakers, setting aside this highly questionable claim as

Page 382

to Skill and the non-precedential nature of the referenced trial court decision, the, quote, predominant factor test, unquote, was rendered invalid, as to these games when the General Assembly enacted Act 42, which specifically defines an SG as a slot machine.

Did I read that correctly?

A.      Yes, sir.

Q.      Okay.  Reading on it states, quote, there can be no dispute that the only legal place to operate a slot machine is in a licensed casino.

Did I read that correctly?

A.      You did.

Q.      Reading on it states, as a result of Act 42, the Beaver County trial court decision is no longer relevant or of any legal effect, just like any other court decision that is effectively reversed after the legislature changes a law.

Did I read that correctly?

A.      Yes, sir.

Q.      That's different than what he told Mr. Lyons in his response to Mr. Lyons' question Mark about the Beaver County decision.

Page 383

Do you remember that?

MR. HUDDEL:  Object to form.

MR. CRUSE:  Object to form.

MR. HUDDEL:  Calls for a legal conclusion.

THE DEPONENT:  I do not.

BY MR. NOLAN:

Q.    Would you look back at Exhibit 10?

A.    I have Exhibit 10.

Q.    Do you see in, I guess, the third line down, the first paragraph.  We're more than halfway through the line.

The sentence that starts in truth?

A.    Uh-huh.

Q.    Do you see Mr. Stewart says, quote, in truth, it's the next case/decision on our argument that will fully overrule the Beaver case.

Did I read that correctly?

A.    You did.

Q.    Reading on he states, if a court finds that the machines are slot machines under 5513, because the term has the same meaning in both laws and the Court found the games fit in, then the Beaver decision is completely toast.

Page 384

Did I read that correctly?

MR. HUDDEL:  Objection.  Yeah, you didn't, but --

THE DEPONENT:  Yes.

BY MR. NOLAN:

Q.    Okay.  But back here on May 9th, there's a letter to the lawmakers saying the Beaver County trial court decision is no longer relevant or of any legal effect.

How do you reconcile that?

MR. CRUSE:  Objection to form.  It calls for speculation as to what was in Mr. Stewart's head in a letter that he wrote in May of 2019.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I can't reconcile that.

BY MR. NOLAN:

Q.    Let's turn to the last page of the actual substantive text.

A.    This is back to 16?

Q.    Yes.  Thank you.

And do you see the conclusionary paragraph?

A.    Yes, sir, I do.

Page 385

Q.    Okay.  Fourth line from the bottom, do you see the sentence that starts, while there?

A.    I do.

Q.    Okay.  So in this letter to the lawmakers, it states, quote, while there's no question that SG's are illegal under present law, Pennsylvania law enforcement has indicated they desire a clearer mandate.

We, therefore, join in law enforcement's request that the General Assembly enact legislation expressly declaring that SG's are unlawful.

Did I read that correctly?

A.    Yes, sir.

Q.    Would you agree with me that that last statement necessarily means that at the time this letter was written, there was no legislation that expressly declared that Skill games are unlawful?

MR. CRUSE:  Objection.  Calls for speculation again as to what's in Mr. Stewart's mind on May 2nd, 2019.

And objection calls for legal conclusions from a lay witness.

Page 386

MR. HUDDEL:  Same objections.

THE DEPONENT:  I would just read, while there is no question that Skill games are illegal under present law. That's Mr. Stewart's words.

BY MR. NOLAN:

Q.   Okay.  Although he admits that there is no current legislation expressly declaring that Skill games are unlawful.

True?

MR. CRUSE:  Objection, lack of foundation.  Objection, calls for speculation as to what's in Mr. Stewart's head by in gentleman, Mr. Pete Shelly on May 2nd, 2019.  And objection, calls for legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I can't help you.

Mr. Stewart says while there's no question Skill games are illegal under present law, that's what the letter says.

BY MR. NOLAN:

Q.   Right.

But it also says Pennsylvania law enforcement has indicated they desire a clearer

Page 387

mandate.

Did you ever ask Mr. Stewart what that's all about?

MR. CRUSE:  I instruct you not to answer that question.  That directly seeks information between the attorney and you as another agent, part of the attorney/client privilege and instruct you not to answer.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice and refuse to answer my question?

A.    I'm going to refuse to answer your question, following -- based on my attorney's advice.

(Shelly Deposition Exhibit Number 17 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 17.

Do you recognize that document?

A.    I do now.  I wasn't -- I don't recall it from December 16th of 2019, but I recognize what this is.

Page 388

Q.    Okay.  And is this a full-page advertisement that you, on behalf of Parks, placed in some type of publication, the Sunday Patriot News?

A.    I don't know.  There it is.  Yes, Sunday Patriot News, yes, sir.

Q.    Okay.  Who drafted this?

A.    I did.

Q.    Would you turn to the -- turn to the third page of the advertisement, the dear neighbors?

MR. HUDDEL:  Is there a Bates number on the page you're talking about?

MR. NOLAN:  Ends in 9293.

THE DEPONENT:  Yes, sir.

BY MR. NOLAN:

Q.    So you wrote this paragraph, dear neighbors?

A.    To the best of my recollection, yes, sir.

Q.    Okay.  And in the second paragraph you write, the Pennsylvania Commonwealth Court recently ruled that the gaming devices in this photo are slot machines.

As such, these machines should be

Page 389

removed from every convenience store, bar, thrift shop and pizza parlor in the state.

Did I read that correctly?

A.    Yes.

Q.    When you say the Commonwealth recently ruled, are you talking about the opinion that we've been discussing here today which is Exhibit 3?

A.    Yes, sir.

Q.    And if, in fact, that opinion does not hold that POM's games are slot machines, you would agree that this statement that you made to the neighbors in this publication is inaccurate?

MR. CRUSE:  Objection to form.
Objection, calls for a legal conclusions.
Objection, expressly calls for speculation.

MR. HUDDEL:  Same objections.

THE DEPONENT:  Mr. Stewart told me, Parks and the lawmakers and anybody that would listen, that that Court said those machines are illegal and I followed his guidance direction.

(Shelly Deposition Exhibit Number 18 marked.)

Page 390

BY MR. NOLAN:

Q.    I'm handing you what I'm going to mark as Exhibit 18.

Do you recognize that document?

A.    I do not.

Q.    It's an e-mail from you to Mark Stewart and Mr. Gmerek on January 7, 2020, in which you attach a document titled Sponsorship Memo, 0107 draft, is that right?

A.    Yes.  I did not release something like this.  This is a draft.

Q.    So who wrote this draft?

A.    I don't know.  I don't know who wrote this draft.

Q.    Did you or Mr. Stewart or Mr. Gmerek ever discuss that document?

MR. CRUSE:  Don't answer that. That seeks to invade the privilege to the extent it involves communications with Mr. Stewart.

BY MR. NOLAN:

Q.    Are you gonna follow your attorney's advice?

A.    I am.

(Shelly Deposition Exhibit Number 19

Page 391

marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 19.

Do you recognize that document?

A.    This appears to be a one-pager I drafted for review by Mark Stewart and Dick Gmerek.

Q.    Okay.  And this is a document that you drafted relating to the Court order that we have already been discussing and including the same inaccurate statement about the Court determining that POM's games were slot machines, is that right?

MR. CRUSE:  Objection to form.

Objection to lack of foundation.

Objection to the legal conclusion within your question.

MR. HUDDEL:  Same objections.

THE DEPONENT:  This is based on that ruling.

BY MR. NOLAN:

Q.    Okay.  All right.  And it's specifically referencing POM's games, yes?

A.    Yes.

Page 392

Q.    Okay.  And down in the one, two, three, fourth paragraph you say, these machines should be removed from every convenience store, bar, thrift shop and pizza parlor in the state.

There is zero ambiguity it is illegal to operate a slot machine anywhere in Pennsylvania other than a licensed, regulated, supervised casino.

Did I read that correctly?

A.    You did.

Q.    Are you saying that it's illegal for POM to operate games or to have games in operation other than in a regulated, supervised casino?

MR. CRUSE:  Objection to form.  It states what's written in the document. Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I said what the document says.  It's pretty straightforward.

BY MR. NOLAN:

Q.    Right.

But are you representing here that POM's games are illegal?

Page 393

MR. CRUSE:  Objection to form.

Misstates what's written in the document.

Calls for a legal conclusion.

MR. HUDDEL:  Same objections.

THE DEPONENT:  That's what the

document says.  That I am -- yeah.

BY MR. NOLAN:

Q.     Who told you that POM's games are

illegal?

MR. CRUSE:  And, again, I would

instruct you to the sense that the Court

ordered certain documents ordered in this

case, but the attorney/client privilege

still exists.  And part it -- it's not

yours to waive.

To the extent that requires

disclosure of conversations with counsel

as part of the legal representation, I

instruct you not to answer.

BY MR. NOLAN:

Q.     Are you gonna follow your

attorney's advice?

A.     I am.  Yes, sir.

Q.     It attaches two photographs.

Do you recognize those

photographs?

A.    I do.

Q.    Who took those photographs?

A.    I don't recall.  I believe it was one of the other casino's lobbyist, but I'm not sure which one.

I did not take those photos.

Q.    Where was this taken?  What establishment?

MR. HUDDEL:  Objection, foundation.

MR. CRUSE:  I join those objections.

THE DEPONENT:  It was taken at a convenience store in Berks County.

BY MR. NOLAN:

Q.    Do you know the name of the convenience store?

A.    No, sir.

Q.    Do you know the name of the person that appears to be an adult sitting on the stool?

A.    No, sir.

Q.    Do you know a name of the individual in the coat standing in front of that person?

Page 395

A.      No, sir.

Q.      Do you know whether or not this whole photograph thing was staged?

MR. HUDDEL:  Object to the form.

THE DEPONENT:  That's -- I don't know how to answer that question.

MR. CRUSE:  Do you know?

THE DEPONENT:  It's ludicrous to think that.

BY MR. NOLAN:

Q.      Really?

A.      Yes, really.

Q.      Why do you say that if you don't know who these people are or what the circumstances were surrounding when this photo was taken?

A.      I believe those photos have been shared in other venues, including a recent state Senate Policy Committee Hearing.

I believe -- believed and believe now that those were photos taken at a convenience store in Berks County.

Q.      Have you ever spoken with the person who took those photographs?

A.      I would have to go back and find

out who actually sent them to me.  I believe it was one of the lobbyists for another casino, but I am not positive and I don't want to speculate.

(Shelly Deposition Exhibit Number 20 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 20.

Do you recognize that document?

A.    I do.

Q.    What is it?

A.    It is a column to the editor signed by Tom Polk Bonner, Chief Counsel, Parks Casino.

Q.    Who wrote that?

A.    I might have written it.  I don't recall.  So I don't know who wrote it.

Q.    At the very end, you or whoever, wrote these Skill games are illegal.

Is that something you think you would have written?

MR. HUDDEL:  Objection to form.

MR. CRUSE:  Objection to foundation of the question.  Misstates his prior testimony.

MR. HUDDEL: Same objections.

THE DEPONENT: Is your question is that something that I would have, could have maybe written?

MR. NOLAN: Right.

MR. CRUSE: Objection, calls for speculation.

MR. HUDDEL: Same objection.

THE DEPONENT: So I can answer that question, right?

Yes. I could have written that -- that sentence.

BY MR. NOLAN:

Q. If you did so, would it have been at the direction of Mark Stewart?

MR. CRUSE: Objection. Expressly calls for speculation. Objection, calls for a hypothetical to a fact witness. Objection, lack of foundation.

MR. HUDDEL: Same objection.

THE DEPONENT: It would have -- should I answer the question?

BY MR. NOLAN:

Q. Yeah.

A. It's signed by Tom Bonner, Chief

Page 398

Counsel Parks Casino.  So whoever wrote it, it was approved by the chief counsel at my client.

Q.    Right.

But the statement about them being illegal, would that have come from Mr. Stewart?

MR. CRUSE:  Objection, lack of foundation.  Objection, calls for speculation.

MR. HUDDEL:  Same objections.

THE DEPONENT:  I haven't the foggiest idea.  I don't recall writing this, but I very well could have.

(Shelly Deposition Exhibit Number 21 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 21.

Do you recognize this document?

A.    I do.

Q.    Does it start off with an e-mail from you to Bob Green in which you attach texts for a blast that would go to all lawmakers?

A.    Yes.

Q.    Do you also attach a proposal from Martin for, I guess, some public relations work

Page 399

involving a mobile billboard?

A.    It's a campaign, yes.

Q.    A campaign.

Okay.  And the third attachment is something that you had drafted for Dave Fillman of the FSCME, is that right?

A.    Yes.  AFSCME.

Q.    And you told Mr. Green that basically it was your anticipation that the Erie Times would publish that letter?

A.    Yes.

Q.    Okay.  Do you know if that letter was published?

A.    I don't recall.

Q.    Can you turn to the document that is the Fillman, I guess, op ed piece?

A.    Yes, sir.

Q.    Did you draft that?

A.    Yes.

MR. CRUSE:  Late objection to foundation to the question there.

BY MR. NOLAN:

Q.    At the very end of the letter you wrote for Dave Fillman, it's time lawmakers step up and enact legislation to shut these machines

Page 400

down once and for all.

Did I read that correctly?

A.    That's what the op ed says, yes, sir.

Q.    Okay.  Because when you wrote this, there was no legislation in place that, quote, shut the machines down, correct?

MR. CRUSE:  Objection, calls for a legal conclusion.

MR. HUDDEL:  Same objection. Also, asked and answered.

THE DEPONENT:  I don't agree with that assessment.

BY MR. NOLAN:

Q.    Why do you not agree with it?

MR. HUDDEL:  Objection, calls for a legal conclusion.  Objection, asked and answered.

We have been over this issue many times.

MR. CRUSE:  Join.

THE DEPONENT:  Legislation to shut these machines down once and for all would simply be a $25 million appropriation in the state budget.

(Shelly Deposition Exhibit Number 22 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 22.

Do you recognize that document?

A.    Yes, sir.

Q.    What is it?

A.    It's a statement I wrote on February 20th, 2020.

Q.    This was a statement, Pennsylvanians Against Illegal Gambling?

A.    Yes, sir.

Q.    Would you look down at the third paragraph?  And can you read the last line to me?

A.    It's time for lawmakers to ban these machines once and for all from our state.

Q.    Did you write that because when you wrote it there was no current law banning Skill games?

MR. CRUSE:  Objection, calls for a legal conclusion.  Objection, asked and answered more than 10 times today about this same point.

MR. HUDDEL:  Same objections.

Page 402

THE DEPONENT:  Same answer.

That's incorrect.

BY MR. NOLAN:

Q.    How is that incorrect?

MR. HUDDEL:  Again, same
objections.  Asked and answered.

MR. CRUSE:  Calls for a legal
conclusion.

BY MR. NOLAN:

Q.    Go ahead.

A.    Same answer I just gave.

Q.    Which is what?

MR. HUDDEL:  Same objections.

MR. CRUSE:  Same objections.

THE DEPONENT:  Lawmakers could
appropriate money for reinforcement.
Lawmakers could do a lot of things to
crack down on any illegal activity and
they do it every single session.

BY MR. NOLAN:

Q.    But you're asking for legislation
to ban the games.  That means necessarily that
there was no current legislation that banned the
games.

Fair?

Page 403

MR. CRUSE:  Objection, lack of foundation.  Objection, Mr. Nolan's speculation of what's within Mr. Shelly's mind.  And objection, calls for legal conclusion.

MR. HUDDEL:  Same objections.  Asked and answered.

THE DEPONENT:  I perhaps could have written it differently, but if that is what I said, then that's what I meant.  It's time to ban these machines once and for all.

I answered the question seven times.  I'm not answering it again.

(Shelly Deposition Exhibit Number 23 marked.)

BY MR. NOLAN:

Q.    I'm handing you what I have marked Exhibit 23.

Do you recognize that document?

A.    No.

Q.    Would you agree with me that if you look at the beginning of the e-mail string, it's an e-mail from Bryce Merket to all users@ggrgov.com regarding an appellate court

Page 404

opinion that refused to overturn seizure of gaming machines?

A.      That appears to be what it is.

Q.      Okay.  And could you look at the actual copy of the, I guess, press release at the end?

A.      This document?

Q.      Yeah.

A.      This is an update, not a press release.  But I'm looking at it, yes.

Q.      Okay.  And do you see down in the one, two, three, fourth paragraph, it discusses the fact that the Court analyzed whether that manufacturer's skill games were illegal or not under the predominant factor test?

MR. CRUSE:  Are you reading from this document somewhere?

BY MR. NOLAN:

Q.      Yeah, in the fourth paragraph.

MR. CRUSE:  Where are you reading from in the fourth paragraph?

MR. NOLAN:  Third line down.

There is no amount of skill a player can input into the machine that will change the outcome or the reward of

Page 405

the game.

MR. HUDDEL:  If this is a question, I object to the form.

MR. CRUSE:  Object to the form.

THE DEPONENT:  I have no idea what this document is.

BY MR. NOLAN:

Q.    Okay.  Do you see in the last sentence it says, because the outcome of game play is predetermined and there is nothing a player can do to overcome that result, the machines are illegal gambling devices, per se.

Did I read that correctly?

A.    You did.

Q.    Okay.  So you did receive this document, correct?

A.    I have no recollection of receiving this document and I'm not even sure if it would matter to me.  I have no idea who this is from.

Q.    Would you turn to the third page of that e-mail string?

Didn't Mr. Gmerek forward this on to you and Bob Green and Mark Stewart?

A.    He did.

Q.    And if you look at the second page, don't you see how -- where Mr. Gmerek asked Mr. Stewart, just asking, don't we have an obligation, quote -- or excuse me, in parens, to be viewed as a, quote, an honest broker, out of quote, out of parens, to put something in that says they looked at it as a Title 18 case, not as the definition in Title 4 makes them illegal?

MR. CRUSE:  Objection.  Lack of foundation, form.

MR. HUDDEL:  Same objections.

BY MR. NOLAN:

Q.    You can answer.

A.    Thank you.

I have no recollection of reading that document, seeing that document, knowing the first thing about it.

So I'm not going to comment on it.

THE VIDEOGRAPHER:  We are at 6:57.

(Shelly Deposition Exhibit Number 24 marked.)

BY MR. NOLAN:

Q.    Handing you what's been marked Exhibit 24.

Do you recognize that document?

A.      I don't recognize this document. It was copied on an e-mail from Bob Green to the team, but this does not ring a bell with me.

Q.      Well, would you look at the very last e-mail on this string from Mark Stewart to Bob Green and Mr. Gmerek and you and Eric Holder?

A.      I see -- yes, I do see that.

Q.      And do you see that Mr. Stewart is responding to several questions -- points that Mr. Gmerek made in the preceding e-mail?

A.      I thought you asked me to read the e-mail from Bob Green to Gmerek, Shelly and Stewart, is that correct?

Q.      No.  I was asking you about the very -- the most recent e-mail in the string.

A.      That would be the first one here?

Q.      On page 1801.

A.      I am looking at it right now.

Q.      Okay.  Do you recognize it being the e-mail you received?

A.      It is apparently an e-mail that I received, yes, sir.

Q.      And Mr. Stewart is responding to several points that Mr. Gmerek had made in the preceding e-mail, yes?

MR. HUDDEL:  Objection, speculation, foundation.

MR. CRUSE:  Join.

THE DEPONENT:  That appears to be the case.

BY MR. NOLAN:

Q.    Okay.  So in other words, Mr. Gmerek, at 8:31 in the morning, sent an e-mail.  And in the third point he made, he said, quote, third, what we really need is to draft our bill or amendment that kills Skill games.

Did I read that sentence correctly?

A.    Yes.

Q.    And that was point three, and in response Mr. Stewart is responding, quote, for point three what we really need to kill, we will do a Title 18 bill amendment and a Liquor Code amendment.

Did I read that sentence correctly?

A.    Yes.

Q.    Reading on he states, we have Tommy's bill and we have the liquor club stuff drafted.  With all that's changed since Tommy's

Page 409

bill was introduced, we are working on a new, simpler kill Title 18 amendment looking that includes provisions to help ease their removal.

Did I read that correctly?

MR. CRUSE:  That's time.  That's seven hours.

BY MR. NOLAN:

Q.    Did I read that correctly?

MR. CRUSE:  We're done.

MR. NOLAN:  Your alarm just went off.

MR. CRUSE:  Our timekeeper just said seven hours.

MR. NOLAN:  Well, we're not done, so we'll be filing a motion with the Court.

THE REPORTER:  Would you like a copy?

MR. CRUSE:  Okay.  I'll have it in rough on Monday and then I'll take standard delivery of the final.

THE VIDEOGRAPHER:  This marks the end of the deposition of Pete Shelly. We're going off the record at 5:34 p.m.

MR. HUDDEL:  Same for me, please.

Page 410

MR. NOLAN:  Monday final.

(Deposition concluded at 5:34 p.m.)

Page 411

COUNTY OF LANCASTER         :
                           : SS
COMMONWEALTH OF PENNSYLVANIA:

        I, Joyce A. Wise, RMR, Court Reporter
and Notary Public, do hereby certify that PETE
SHELLY, the witness, personally appeared before
me, being first duly sworn or affirmed to testify
to the truth, the whole truth, and nothing but
the truth, in answer to the oral questions
propounded to him by the attorneys for the
respective parties, testified as set forth in the
foregoing deposition.

        I further certify that before taking of
said deposition, the above witness was duly sworn
or affirmed, that the questions and answers were
taken down stenographically by the said Joyce A.
Wise, RMR, approved and agreed to, and afterwards
reduced to print by means of computer-aided
transcription under the direction of the
aforesaid Reporter.

        In testimony whereof, I have hereunto
subscribed my hand this 24th day of September
2023.

                    _____
                    Joyce A. Wise, RMR
                    Notary Public