# EXHIBIT 1

# (UNREPORTED OPINIONS)

856 Fed.Appx. 392 (Mem)
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

ARCELIK A.S.

v.

E.I. DUPONT DE NEMOURS AND COMPANY

TDK Electronics AG; TDK

India Private Ltd [*], Appellants

No. 20-1869
|
Argued: February 11, 2021
|
(Filed: May 20, 2021)

On Appeal from the United States District Court for the
District of Delaware (D.C. Civil No. 1-15-cv-00961), District
Judge: Honorable Leonard P. Stark

**Attorneys and Law Firms**

Benjamin Garrett Minegar, Jones Day, 500 Grant Street,
Suite 4500, Pittsburgh, PA 15219, Lawrence D. Rosenberg
[ARGUED], Jones Day, 51 Louisiana Avenue, N.W.,
Washington, DC 20001, Jason J. Rawnsley, Richards Layton
& Finger, 920 North King Street, One Rodney Square,
Wilmington, DE 19801, Counsel for Appellants

John A. Sensing [ARGUED], Potter Anderson & Corroon,
1313 North Market Street, Hercules Plaza, 6th Floor, P.O. Box
951, Wilmington, DE 19801, Counsel for Appellee

Before: CHAGARES, SCIRICA, and RENDELL, Circuit
Judges.

OPINION [*]

SCIRICA, Circuit Judge

This discovery dispute arises out of civil litigation between
a consumer appliance manufacturer and E.I. DuPont de
Nemours and Co. ("DuPont"). In preparing its defenses,

DuPont obtained the issuance of letters of request [1] to
Germany and India. These letters of request sought to obtain
testimony and documents from representatives of a non-
party company known as TDK. After the District Court
ordered the issuance of the letters of request, TDK sought to
vacate the order, arguing the issuance of the letters violated
international comity. The District Court referred the matter to
a Magistrate Judge, who denied TDK's motion to vacate. The
District **393** Court then overruled TDK's objections to the
Magistrate Judge's order and denied TDK's motion to vacate.
For the reasons discussed below, we will affirm the District
Court's order.

I

Arçelik, A.Ş. ("Arcelik"), a consumer appliance
manufacturer, alleged a faulty DuPont product caused fires
in clothing dryers made and sold by Arcelik. The specific
product is Zytel, "a plastic resin manufactured, marketed, and
sold by DuPont." J.A. 086. Zytel was intended to "operate
under conditions of high heat and humidity," but in late 2012,
Arcelik dryers began to catch fire. J.A. 086. Investigations
suggested the fires were caused by defective batches of Zytel.

Zytel made its way to Arcelik's dryers through a third-
party, German manufacturer TDK. [2] Specifically, TDK
bought Zytel from DuPont and used the product to mold
exterior components of capacitors. Arcelik then purchased the
capacitors from TDK for use in Arcelik's dryers.

Arcelik brought suit against DuPont and did not name TDK
as a defendant. DuPont filed a motion to dismiss, contending,
in part, that TDK was a necessary and indispensable party
under Federal Rule of Civil Procedure 19. DuPont asserted
TDK was indispensable because the complaint implicated
"the raw material/component part supplier defense." J.A. 119.
The District Court rejected this argument and concluded that
because the Complaint alleged Zytel itself was defective when
it left DuPont's possession and the Complaint focused on
DuPont's manufacture of Zytel, the raw material/component
part supplier defense was not implicated.

As the case moved forward, DuPont sought discovery from
TDK in order to examine "whether the design or manufacture
of the electric capacitors had a role in the alleged fires[,] and ...
the extent to which Arcelik relied on or even cared about the
use of Zytel ... in [TDK's] electric capacitors." J.A. 135. To
pursue this discovery, DuPont filed a motion for the issuance

of letters of request to authorities in Germany and India under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"). [3] The requested letters sought testimony from individuals associated with TDK about the design and manufacture of TDK capacitors, the contractual relationship between TDK and Arcelik, and any coordination between TDK and Arcelik in investigating the dryer fires. The letter to India also included a request for documents.

The District Court granted the motion for letters of request. TDK filed a motion to vacate the order and the District Court referred the motion to Magistrate Judge Jennifer L. Hall, who denied the motion to vacate. TDK objected to the Magistrate Judge's ruling, but the District Court overruled those objections. The District Court applied the clearly erroneous or contrary to law standard in reviewing the Magistrate Judge's ruling because the District Court concluded the motion was not dispositive. Following the order, the District Court entered a protective order to protect **\*394** any trade secrets produced during the execution of the letters of request.

This appeal followed. Arcelik is taking no position on the underlying order and is not participating in this appeal.

## II

As an initial matter, DuPont challenges our jurisdiction and contends the District Court's order denying the motion to vacate the letters of request was non-final because TDK can seek redress abroad in German and Indian courts. [4]

Federal courts of appeals have jurisdiction over "appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. "A final decision of a district court means, with limited exceptions, an order that ends the litigation on the merits and leaves nothing for the district court to do but execute the judgment.... Ordinarily, a pretrial discovery order such as this one is not considered final." *In re Madden*, 151 F.3d 125, 127 (3d Cir. 1998) (citations omitted).

TDK contends an exception should apply here because the order is either a final order not subject to any other appellate review or a non-final order appealable under the collateral order doctrine. TDK is a non-party in the underlying litigation and cannot appeal from the final judgment. And any enforceable orders to produce a witness or documents

issued as a result of the letters of request will come from courts in Germany and India. If TDK refused to comply with the foreign orders, it would face contempt proceedings under foreign law, not U.S. law. At that point, a U.S. appeals court could not review the letters of request order or any contempt order issued by a foreign court.

While there is no direct precedent on point, we have explained that, in circumstances involving non-party discovery, an order is final when the aggrieved entity has no "means, other than [the] immediate appeal before us, to obtain appellate review of the district court's decision." *In re Madden*, 151 F.3d at 127.

Here, the District Court's order denied the motion to vacate letters of request for judicial assistance to Germany and India. If those countries grant the letters of request, their courts will issue orders under their respective laws. While TDK could raise independent challenges to any orders issued by a German or Indian court, those challenges would not constitute appellate review of the District Court's order under U.S. law. DuPont contends the proper approach for TDK to seek review is for the witnesses to refuse to testify and be held in contempt. *See In re Flat Glass Antitrust Litigation*, 288 F.3d 83, 88 (3d Cir. 2002) ("[N]onparty witnesses must be held in contempt before seeking appellate review."). Yet, in that situation, the witnesses would not be defying an order to testify by the District Court or any U.S. court, and we do not have appellate jurisdiction over contempt orders in Germany and India. If we reject jurisdiction over TDK's appeal, federal appellate review of this order would appear to be impossible.

Accordingly, the District Court's order is final for purposes of our review and we have jurisdiction.

## III

TDK's challenge of the District Court's order rests on two grounds. First, TDK contends the District Court applied an incorrect standard of review. Second, TDK contends the District Court erred in its balancing of international comity factors **\*395** related to the issuance of the letters of request.

Whether the District Court applied the correct standard of review to the Magistrate Judge's order is subject to our plenary review. *See Rode v. Dellarciprete*, 892 F.2d 1177, 1182 (3d Cir. 1990); *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1246 (10th Cir. 2015). We review the District Court's balancing of the international comity factors for abuse of discretion. *See*

*Petrucelli v. Bohringer and Ratzinger*, 46 F.3d 1298, 1310 (3d Cir. 1995) ("We apply the abuse of discretion standard when reviewing orders regarding the scope and conduct of discovery."); *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 305 (3d Cir. 2004) (reviewing the balancing of international comity factors for abuse of discretion). "An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *NLRB v. Frazier*, 966 F.2d 812, 815 (3d Cir. 1992) (internal quotation marks omitted). For the reasons discussed below, we conclude the District Court did not err.

### A. The District Court Applied the Correct Standard of Review to the Magistrate Judge's Decision.

TDK contends the District Court erred by applying the clearly erroneous standard in its review of the Magistrate Judge's decision. It contends the District Court should have applied *de novo* review.

The Federal Magistrates Act allows district court judges to delegate certain matters to a Magistrate Judge. 28 U.S.C. § 636. Upon objection from a party, the district court must review the Magistrate Judge's decision under a "clearly erroneous or contrary to law" standard when the matter is non-dispositive, and under a *de novo* standard when the matter is dispositive. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a)–(b).

"[A] motion is dispositive if a decision on the motion would effectively determine a claim or defense of a party." *EEOC v. City of Long Branch*, 866 F.3d 93, 98 (3d Cir. 2017). Accordingly, discovery orders are not normally dispositive. *See id.* (using a discovery motion as an example of a non-dispositive motion).

TDK contends letters of request are an exception to the rule that discovery orders are non-dispositive because this discovery dispute is the only dispute between it and DuPont and the dispute "is over regardless of which way the court rules." Appellant Br. at 20 (quoting *EEOC*, 866 F.3d at 100). TDK analogizes to the 28 U.S.C. § 1782 [5] and administrative subpoena contexts. In both of those contexts, the order of the court—to enforce the foreign letter of request or the administrative subpoena—ends the controversy before the court. *See, e.g.*, *Frazier*, 966 F.2d at 817–18 (holding that proceeding for enforcement of an agency subpoena was a dispositive matter). TDK contends the circumstances here are

similar to those contexts because the only remaining actions will take place abroad, outside of the U.S. court system.

But TDK's position elides a key distinction between motions for letters of request and proceedings involving § 1782 or the enforcement of administrative subpoenas. [6] In those latter cases, the only role of the **\*396** federal judiciary in the matter is to resolve the discovery question. Before a federal court receives the § 1782 assistance request or motion to enforce an administrative subpoena, there is no case in federal court, no docket, no case number. And once the court rules, that is the end of the involvement of the federal court system. Here there is an underlying case. *Arcelik v. DuPont* will continue regardless of how this discovery dispute is resolved. Nothing we decide in this appeal will dispose of the lawsuit or any claim or defense in that litigation.

Moreover, TDK did not identify a circuit or district court case where a foreign third-party discovery request was considered dispositive. And there are several unreported cases involving letters of request treating a Magistrate Judge's decision on these matters as non-dispositive. [7]

While it is a close question, we conclude the Magistrate Judge's opinion in this matter is non-dispositive. [8] This judgment is based on the fact—recognized by a growing number of district courts holding that decisions regarding letters of request are non-dispositive—that, unlike in the § 1782 and administrative subpoena contexts, the underlying case will continue in U.S. courts after this discovery dispute is settled and a decision on the motion will not terminate a claim or defense. *See, e.g.*, *NIKE, Inc. v. Wu*, 349 F. Supp. 3d 346, 352–53 (S.D.N.Y. 2018) (holding that a foreign third party's motion to quash a subpoena was non-dispositive because, unlike in the administrative subpoena context, the underlying civil action will continue in U.S. courts after the subpoena motion is decided); *see also supra* note 8.

Since the Magistrate Judge's decision was non-dispositive, the District Court applied the correct standard when it evaluated the decision subject to the "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A).

### B. The District Court Did Not Abuse Its Discretion in Reviewing International Comity Factors.

The court reasonably balanced the comity factors in concluding that they tip in **\*397** favor of granting the letters of request. *Societe Nationale Industrielle Aerospatiale v. U.S.*

*District Court for Southern District of Iowa* is the guiding Supreme Court case for an international comity analysis. 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987). [9] In *Aerospatiale*, the Supreme Court identified five factors that are relevant to any comity analysis:

(1) the importance to the ... litigation of the documents or other information requested;

(2) the degree of specificity of the request;

(3) whether the information originated in the United States;

(4) the availability of alternative means of securing the information; and

(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

482 U.S. at 544 n.28, 107 S.Ct. 2542.

In reviewing the application of these factors, TDK is correct that we review questions of law *de novo* and questions of fact for clear error, but we review the District Court's conclusions as to the balancing of the factors "only for abuse of discretion." *In re Auto. Refinishing*, 358 F.3d at 305; *see In re Sealed Case*, 932 F.3d 915, 938 (D.C. Cir. 2019) ("We need not tarry over the Banks' remaining arguments that the district court abused its considerable discretion in balancing the comity factors."). The District Court applied the correct legal standard in reviewing the Magistrate Judge's opinion, *see supra* Part III.A, and applied the international comity framework TDK sought to have applied. We now review the District Court's determinations of fact and balancing of the factors and find no abuse of discretion.

### *1. Importance to the Litigation*
The District Court found the discovery sought here is important to the litigation because it is "highly relevant" to DuPont's defenses. J.A. 14 at 36:18–37:13. TDK objects on two grounds.

First, TDK contends DuPont's defenses based on TDK's alleged negligence or wrongdoing were already rejected by the District Court when it denied DuPont's **\*398** motion to dismiss, which sought dismissal of the underlying lawsuit brought by Arcelik for failure to join TDK as an indispensable party. But the court denied the motion to dismiss because the Complaint was limited to the manufacture of Zytel and did not implicate the "raw material/component part supplier defense." J.A. 119. That is, the court rejected this argument because the allegations in the Complaint were limited to the manufacture of Zytel itself and not any other component part. Approximately three months later, DuPont filed its answer to the Complaint.

The different procedural postures at play in the motion to dismiss and the motion to vacate the letters of request are crucial. At the motion to dismiss stage, the District Court had to limit itself to a review of the Complaint and the Complaint focused on Zytel as it left DuPont's control. In the motion to vacate, by contrast, the question was whether the discovery would be relevant to defenses DuPont pled in its Answer filed after the denial of the motion to dismiss. Accordingly, even though TDK was not a necessary party under Rule 19, the District Court correctly held discovery from TDK is highly relevant to DuPont's defenses.

TDK's second objection relates to the identification, in the letter of request to Germany, of a former TDK employee —who TDK argues cannot be compelled to speak on its behalf, or perhaps at all under German law. But, as the District Court noted, the former employee has "relevant personal knowledge." J.A. 14 at 37:11–13. While the District Court expressed concern about "put[ting] a retired consultant in an uncomfortable and maybe expensive position," it stated that "if TDK doesn't want to put forward some current employee, ... it will be [the former employee], failing TDK coming forward with someone else." J.A. 14 at 35:15–36:4. TDK has not put forward any other name. Oral Argument at 34:00–34:40, *Arcelik A.S. v. E.I. Dupont de Nemours and Co.*, (No. 20-1869), https://www2.ca3.uscourts.gov/oralargument/audio/20-1869_Arcelikv.EIDupont.mp3.

Article 3 of the Hague Convention requires the inclusion of "the names ... of the persons to be examined" when a deposition is sought. Hague Convention, *supra* note 3, art. 3. To the extent German law precludes the former employee's testimony, German courts applying German law can determine the consequences of that preclusion in their execution of the letters of request. Accordingly, it was proper for the District Court to include the former employee's name in the letter of request under the Hague Convention, designating a person with relevant information and deferring to German courts to resolve any disputes about that person's testimony under German law.

### 2. Specificity of the Requests

The District Court found DuPont's requests were sufficiently specific and noted TDK could raise additional objections in German and Indian courts. TDK contends the requests are overbroad, in part, because they involve trade secrets. However, the fact that discovery might risk the divulgement of trade secrets is by itself insufficient to preclude any discovery, especially, as in this case, where the court has entered a protective order to guard those trade secrets.

Alternatively, TDK contends that *Aerospatiale* counsels against granting discovery when open-ended requests are "too burdensome or too intrusive," and that the District Court improperly outsourced some of this specificity review to Germany and India in violation of the court's responsibilities, under *Aerospatiale* and *In re Auto. Refinishing*, to minimize the cost and inconvenience **\*399** of discovery and prevent discovery abuses.

But *Aerospatiale* was focused on whether the Federal Rules of Civil Procedure could be used instead of requiring first resort to the Hague Convention. *See supra* note 9. Accordingly, some of the international comity concerns noted by the Court are lessened when only use of the Hague Convention is at issue because all the relevant nations have consented to the treaty process. [10] This is reflected in the Court's discussion of the burdensome nature of a request. While some discovery may be more intrusive than others—for example, requesting the identity of pilots on a flight versus a request for all of the design specifications for the aircraft—the Court used these hypotheticals to envision a situation where a district court would rely on the Hague Convention, because the treaty process may be more suitable to burdensome requests than domestic discovery rules. *Aerospatiale*, 482 U.S. at 545–46, 107 S.Ct. 2542. We thus conclude that *Aerospatiale* does not counsel against granting discovery through letters of request simply because the discovery requested may be somewhat burdensome.

### 3. Country of Origination

There is no dispute that the information in question originated outside of the United States. Although the information originated abroad and the District Court suggested this weighed against issuing the letters of request, this was overcome by the fact that there were no alternative means for DuPont to obtain the information. We find no error in the District Court's conclusion.

### 4. Availability of Alternative Means

The District Court held there were "no alternative means for DuPont to secure the information it is seeking" because "they can't get it from TDK U.S.," as "much of what DuPont is seeking is internal information that is solely held at the foreign TDK entities." J.A. 15 at 38:5–11. Moreover, TDK's U.S. entity represented that it had no responsive documents to DuPont's subpoena. TDK objects on the grounds that DuPont is already in possession of the relevant information or can obtain it from Arcelik and that TDK has already provided "extensive information" to DuPont. Appellant Br. at 37–38. But, as DuPont notes, Arcelik witnesses and documents cannot "testify as to things like TDK's internal decision-making regarding the design of the capacitors and its decision to incorporate Zytel into the capacitors." Appellee Br. at 33. Additionally, the "extensive information" provided by TDK totals only between twenty to thirty pages. Appellee Br. at 34. Accordingly, the District Court appropriately concluded that there were no other means available for DuPont to obtain the information it seeks through the letters of request.

### 5. National Interests

The District Court held the U.S. has a "very important interest" in a defendant being able to exercise its "discovery rights and its right to prepare a defense." J.A. 15 at 38:20–24. With respect to German and Indian interests, the District Court highlighted that those countries "will ultimately decide about specific documents and specific questions and TDK's objections." J.A. 15 at 38:24–39:3. TDK objects that the issuance of the letters of request will harm German and Indian national interests in **\*400** protecting trade secrets. But when a court issues letters of request under the Hague Convention, "it commits the issue whether compliance with the request would undermine important interests of the state where the information is located to the courts or other authorities of that state." Restatement (Third) of Foreign Relations Law § 473 reporters' note 5 (1987). So, TDK's objection misses the mark. To the extent Germany and India's national interests in protecting trade secrets are implicated in this case, their courts will provide the relevant protection. Accordingly, the District Court properly held that this factor favored issuing the letters of request.

\* \* \*

In sum, the District Court concluded it was not clearly erroneous for the Magistrate Judge to deny TDK's motion to

vacate the letters of request. We conclude the District Court did not abuse its discretion in holding that the *Aerospatiale* factors weigh in favor of issuing the letters of request.

IV

For the foregoing reasons, we will affirm the District Court's order denying the motion to vacate the letters of request.

**All Citations**

856 Fed.Appx. 392 (Mem)

**Footnotes**

\*       (Pursuant to Rule 12(a), Fed. R. App. P.)

\*       This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1       Also known as letters rogatory.

2       "TDK" in this case refers to TDK Electronics AG and TDK India Private Ltd. When the lawsuit was initiated, TDK Electronics went by the name Epcos AG.

3       Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Aug. 8, 1972, 23 U.S.T. 2555, 847 U.N.T.S. 231. Each party to the Hague Convention designates a "Central Authority" to receive requests and forward them to the appropriate authorities within their country. *Id.* art. 2.

4       The District Court had jurisdiction under 28 U.S.C. § 1332.

5       Discovery proceedings under § 1782 occur when a U.S. district court receives a letter of request from a foreign court sent under the Hague Convention.

6       TDK fails to point to any cases affirmatively declaring § 1782 decisions are dispositive. Instead, they point to a Ninth Circuit concurrence advocating for that conclusion, a Tenth Circuit opinion questioning but not deciding whether such decisions are dispositive, and a treatise whose primary direct authority is the Ninth Circuit concurrence already mentioned. Meanwhile, the majority of district courts to consider this question have determined § 1782 orders are non-dispositive. *See In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 71 (S.D.N.Y. 2019) (collecting cases).

7       *See Bodyguard Prods., Inc. v. Musante*, Civ. No. 19-00139, 2020 WL 403720, at *2 (D. Haw. Jan. 24, 2020) (treating order denying motion for letters of request as non-dispositive); *Dyson, Inc. v. Sharkninja Operating LLC*, No. 14-cv-779, 2017 WL 446042, at *2 (N.D. Ill. Feb. 2, 2017) (treating order granting in part motion for letters of request as non-dispositive); *Tiffany (NJ) LLC v. Andrew*, No. 10 Civ. 9471, 2011 WL 11562419, at *1 (S.D.N.Y. Nov. 14, 2011) (treating order directing discovery through the Hague Convention as non-dispositive); *Richards v. Univ. Coll., Aberystwyth*, No. 04-cv-0073, 2005 WL 839100, at *1 (D. Minn. Apr. 12, 2005) (holding a motion for a letter of request "is not a dispositive motion in the sense that it is determinative of a cause of action, claim, or defense under the meaning of Fed. R. Civ. P. 72. Rather, the matter before the Court is properly categorized as a discovery request, which does not require the consent of parties to be decided before a magistrate judge").

8       In making this conclusion, we do not endorse all of DuPont's contentions. DuPont asks us to conclude this matter is non-dispositive because TDK can raise future objections in German and Indian courts. But it is

too much of a stretch to conclude that a discovery dispute is non-dispositive with respect to U.S. courts merely because it may continue elsewhere. In fact, the administrative subpoena context directly counters this argument because, despite the underlying disputes continuing outside of federal court, we have regularly held rulings on administrative subpoenas are dispositive. *See*, *e.g.*, *Frazier*, 966 F.2d at 817–18.

9 We need not decide two peripheral issues. First, while *Aerospatiale* directs district courts to "exercise special vigilance" in monitoring foreign discovery, it does not explicitly require a comity analysis prior to the issuance of a letter of request under the Hague Convention. 482 U.S. at 546, 107 S.Ct. 2542. Instead, the *Aerospatiale* court only addressed the question of whether the Federal Rules of Civil Procedure could be used as an alternative to the Hague Convention procedures. We need not decide here whether *Aerospatiale* implicitly requires the comity analysis because—as we conclude in this section—even with a review of comity factors, the District Court did not abuse its discretion in rejecting the motion to vacate. Second, some circuits require —as an initial step in the comity analysis—the identification of a true conflict between U.S. law and foreign law before addressing *Aerospatiale*'s comity factors. *See, e.g.*, *In re Sealed Case*, 932 F.3d 915, 931 (D.C. Cir. 2019); *In re Maxwell Comm. Corp.*, 93 F.3d 1036, 1049 (2d Cir. 1996). But we need not decide here whether finding a true conflict is required to perform the comity analysis because we would affirm either way. If there is no conflict, then the District Court properly issued the letters of request because the information is relevant to DuPont's defenses and the request is proportional to the needs of the case. *See In re Sealed Case*, 932 F.3d at 931 ("[a]bsent a clash of foreign and domestic law, American courts may press forward free from worry that their rulings will threaten" international comity). And if there is a conflict, then the District Court was right to analyze the comity factors, and—as discussed in this section—did not abuse its discretion in denying the motion to vacate.

10 Additionally, the parties do not contest that the Hague Convention procedures govern the discovery dispute.

---

**End of Document**                                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment

Distinguished by   In re Puig, Inc.,   Bankr.S.D.Fla.,   July 31, 2008

2008 WL 724627

Only the Westlaw citation is currently available.

United States District Court,

E.D. Pennsylvania.

BRO-TECH CORPORATION t/a the

Purolite Company, et al., Plaintiffs,

v.

THERMAX, INC. d/b/a Thermax

USA Ltd, et al., Defendants.

Civil No. 05-CV-2330.

|

March 17, 2008.

**Attorneys and Law Firms**

Aaron H. Marks, Jonathan E. Minsker, Joshua Greenblatt, Marc E. Kasowitz, Leonard A. Feiwus, Kasowitz Benson Torres & Friedman LLP, New York, NY, Clive Zietman, Keith Thomas, Manches LLP, London, UK, Joseph J. Centeno, Joseph J. McGovern, Peter J. Toren, Richard P. Limburg, Alexis P. Basilevsky, Mathieu Shapiro, Obermayer Redmann Maxwell & Hippel LLP, Philadelphia, PA, for Plaintiffs.

Daniel S. Bernheim, Silverman Bernheim & Vogel, Philadelphia, PA, Frank M. Gasparo, John A. Basinger, Grant Hanessian, Jacob Max Kaplan, Frank M. Gasparo, Baker & McKenzie LLP, New York, NY, for Defendants.

*MEMORANDUM OPINION & ORDER*

RUFE, District Judge.

**\*1** Defendants object to an Order of a Magistrate Judge requiring them to disclose forensically sound images of certain data storage devices to Plaintiffs' counsel without any limitation as to the scope of the disclosure or prior filtering for privileged or work-product materials that the images might hold. For the reasons that follow, Defendants' objections will be sustained, and the Order will be overruled and modified in part.

## I. BACKGROUND

The Order in dispute issued February 7, 2008 ("the February 7 Order"), and states, in relevant part:

> On or before February 20, 2008, Defendants' counsel shall produce to Plaintiffs' counsel forensically sound copies of the images of all electronic data storage devices in Michigan and India which Defendants' expert, Huron Consulting Group ("Huron"), copied in May and June 2007 and which were reviewed by Stephen Wolfe, Defendants' expert. These forensically sound copies are to be marked "CONFIDENTIAL-DESIGNATED COUNSEL ONLY." [1]

As explained in the Memorandum Opinion accompanying the Order ("the Memorandum Opinion"), this production was required to permit a determination of whether Defendants had violated the Stipulation and Order entered in this matter on May 23, 2005 ("The May 23 Order"). [2] The May 23 Order, in turn, imposed an ongoing obligation on Defendants to return to Plaintiffs any Purolite files in their possession, and then to purge said files from their possession, custody and/or control. [3] The February 7 Order makes no provision for the protection of any privileged materials that might be found on the India and Michigan data storage devices in question ("the India and Michigan servers"). By way of explanation, the Memorandum Opinion states, "[i]nasmuch as Mr. Wolfe testified that he considered [the India and Michigan servers] for purposes of [Federal Rule of Civil Procedure] 26(a)(2)(B), Defendants must provide copies to Plaintiffs, regardless of any claim of attorney-client privilege or work product doctrine." [4]

The February 7 Order issued in the context of a dispute around the deposition of Stephen Wolfe, an employee of Huron Consulting Group, a computer forensic services firm relied on by Defendants for both testifying and consultative expert work. Wolfe testified that, at Thermax's direction, he had performed two distinct tasks. The first was to produce

an expert report regarding whether an array of Purolite information identified by Purolite's expert witness Lawrence Golden ("the Golden Exhibits") was located on a discrete set of data storage devices ("the Thermax devices"), after performing all necessary searches of images of the devices. [5] This set of devices did not include the India or Michigan servers. [6] The second task was to conduct electronic searches of images of Thermax's India and Michigan servers for evidence of Purolite files therein (which, in accordance with the May 23 Order, already should have been disclosed to Plaintiffs and purged). [7] The two tasks were different in several ways. Of primary importance for present purposes, each task involved searches of different devices, with the searches involved in the former task providing the exclusive basis of Wolfe's expert report, and the searches of the India and Michigan servers not informing his report in any respect. [8] In other words, Wolfe performed the former task in his capacity as a testifying expert, and performed the latter task in his capacity as a consulting expert.

**\*2** The instant dispute stems from Wolfe's testimony that in December 2007, after completing the review of only 5% of the hits yielded by the search of the India and Michigan servers for evidence of Purolite files, he was instructed to stop the job by Thermax's counsel. [9] Following Wolfe's deposition, counsel for Plaintiffs and Defendants exchanged a series of letters, contesting whether Thermax was obligated to turn over copies of the India and Michigan servers to Purolite. Ultimately, counsel were unable to resolve the point, and they appealed to the Magistrate Judge for a Court-imposed resolution. To that end, after a hearing on the matter, the Magistrate Judge issued the February 7 Order.

Defendants raise two objections to the February 7 Order. They argue that before any disclosure of the contents of the India and Michigan servers to counsel for Purolite occurs, Thermax has the legal right to filter the information to be disclosed in order to remove any attorney-client communications or work product material therein. Defendants also argue that they should be required to disclose to Purolite (after a review for privileged materials) only files which yield hits during a targeted search of the India and Michigan servers for evidence of Purolite files, and not, as the February 7 Order requires, to disclose the entire content of the India and Michigan servers for Plaintiffs' counsel's review.

In opposing Defendants' objections, Plaintiffs assert that the February 7 Order should not be disturbed because inspection of Thermax's entire India and Michigan servers by Plaintiffs' counsel is the only way to ensure that no violation of the May 23 Order has occurred. Plaintiffs' further assert that Thermax waived any privilege it might have been able to claim in the information on the India and Michigan servers by disclosing the servers to Stephen Wolfe, who authored an expert report for Defendants, albeit one which did not in any way concern the content of the India or Michigan servers.

## II. DISCUSSION

The Court may overrule an order of a Magistrate Judge "involving a nondispositive discovery dispute only if the decision is clearly erroneous or contrary to law," or where the Magistrate Judge has committed an abuse of discretion. [10]

Here, in the February 7 Memorandum Opinion, it is explained that because "Mr. Wolfe testified that he considered the [servers], for purposes of Rule 26(a)(2)(B), Defendants must provide copies [of the servers] to Plaintiffs, regardless of any claim of attorney-client privilege or work product doctrine." [11] In making this legal ruling, the Court invoked Federal Rule of Civil Procedure 26(a)(2)(B), which requires a party to disclose all material considered by its expert in formulating an expert report to opposing parties regardless of any privilege claims around the material, and also cited to case law for that proposition.

As the plain terms of the Rule make clear, however, Rule 26(a)(2)(B) only applies to material disclosed to and considered by an expert witness for purposes of his or her expert report and testimony-that is, information the expert receives or considers in his or her capacity as a testifying expert witness. Commonly in litigation involving complex and specialized areas-such as computer forensics-a witness will perform dual roles, one as testifying expert, and one as consulting expert. [12] Information exclusively considered by such an expert in his or her capacity as consulting expert does not fall under Rule 26(a)(2)(B). [13] A court should only give force to this differentiation of roles if it is convinced that the information considered for consulting expert purposes was not also considered pursuant to the expert's testifying function. [14] The normal discovery and privilege rules govern when materials considered by an expert exclusively in that individual's capacity as a consulting specialist must be disclosed to an opposing party.

**\*3** In this instance, the Court must overrule as contrary to law that portion of the February 7 Order which compels Thermax to produce to Plaintiffs the entire India and Michigan servers for Plaintiffs' review, without regard for privilege, on Rule 26(a)(2)(B) grounds. Wolfe repeatedly stated under oath that the India and Michigan servers were outside the scope of his expert report, and that he did not consider them in his testifying expert role. [15] Instead, his expert report exclusively concerned the contents of other devices. Because the information on the India and Michigan servers was not disclosed to or considered by Wolfe for purposes of his expert report, Rule 26(a)(2)(B) does not apply to the materials on those servers, and does not provide a legal basis for requiring their disclosure to Purolite. However, the Court notes that Thermax's reasons for excluding the India and Michigan servers from the scope of Wolfe's expert report will be subjected to certain scrutiny during the immediate pretrial phase of this litigation, and will directly bear on the ultimate admissibility of Wolfe's testimony and report.

Notwithstanding the foregoing ruling, the Court wholly agrees with the Magistrate Judge that, in present circumstances, a significant measure of disclosure of the contents of the India and Michigan servers is necessary to ensure that Thermax has not retained Purolite information in violation of the May 23 Order. The fact that Wolfe's electronic search of the India and Michigan servers using search terms designed to find Purolite information yielded numerous hits suggests the strong possibility (if not providing conclusive proof) that Purolite information is improperly contained in those servers. Furthermore, the parties agree that some disclosure is now necessary, although they disagree on the proper scope of the disclosure. [16] Thus, disclosure of the images, to some extent, shall be required.

To determine the proper scope of the disclosure, the Court balances the relevant, contending interests. On one hand, Thermax argues any disclosure must be limited so as to involve only files in which there is some reason to believe that improperly possessed Purolite information may be found. Defendants concede that Purolite's counsel must be permitted to review such files, but contend there is no basis for disclosing the remainder of the India and Michigan server files, noting that these necessarily would include the files of, among others, persons in senior Thermax management positions. Thermax therefore proposes that Purolite's counsel be permitted to review files, after filtering for privilege, that generate hits in a targeted electronic search for Purolite

information in the India and Michigan server images, but nothing else.

Purolite counters that disclosure and review of the entire India and Michigan servers is necessary to ensure that no Purolite information is improperly in Thermax's possession. Plaintiffs point out that this Court previously ordered full and unfettered disclosure of images of individual defendant Narvinder Sachdev's various electronic devices after it was demonstrated, in part through his own admission, that Sachdev had intentionally violated the May 23 Order by retaining electronic files containing Purolite information. [17] Plaintiffs claim the present circumstance involves similar evidence of a violation by Defendants, and merits the same remedy of full disclosure.

**\*4** The Court finds that there is not, at present, evidence of an intentional violation of the May 23 Order by Defendants, as would warrant full disclosure. We know too little about the contents of the files that yielded hits during Wolfe's search of the India and Michigan servers to reach such a conclusion at this time. Wolfe's search may have yielded false hits, or may otherwise have signaled files that were properly in Thermax's possession; conversely, the hits may indicate a Thermax violation. Lacking clear evidence of an intentional violation, the Court will not impose the type of disclosure ordered previously in materially different circumstances involving Defendant Sachdev. Instead, a more measured, yet still significant, disclosure will be required.

Another factor shaping this Order is that of privilege. Thermax argues that filtering for privileged and work product materials should be permitted before any disclosure of Thermax information to Purolite's counsel occurs. Purolite counters that Thermax waived any privilege in the materials disclosed to Wolfe by operation of Rule 26(a)(2)(B), an argument that has already been considered and rejected by the Court, and also because the materials were disclosed to and searched by Wolfe. We assume for the present analysis that some files in Thermax's India and Michigan servers contain privileged or work product material. When privileged communications or work product materials are voluntarily disclosed to a third party, the privilege is waived. [18] An exception to this rule exists for disclosures to third parties which are necessary for the client to obtain adequately informed legal advice. [19] Under this exception, Thermax has not waived its privilege or work product protections in the India and Michigan server files disclosed to Wolfe. When searching these files, Wolfe was functioning in his capacity

as "a non-testifying expert, retained by the lawyer to assist the lawyer in preparing the clients's case." [20] Thermax did not waive any protections it might have in the India and Michigan servers by disclosing them to Wolfe for consultative expert assistance in this litigation. Accordingly, this Order must provide for a privilege and work product filter.

### III. CONCLUSION

In light of the foregoing analysis, the February 7 Order will be modified to require disclosure under a more limited protocol than was originally imposed. [21] An appropriate Order follows.

### *ORDER*

**AND NOW,** this 17th day of March 2008, upon consideration of the February 7, 2008 Order of the Magistrate Judge [Doc. No. 293], Defendants' Objections to the Order [Doc. No. 304], Plaintiffs' Response in Opposition [Doc. No. 308], Defendants' Reply Memorandum [Doc. No. 312], and Plaintiffs' Additional Memorandum in Opposition [Doc. No. 315], it is hereby **ORDERED** that Defendants' Objections are **SUSTAINED,** and that Paragraph 3 of the February 7, 2008 Order is amended as follows:

**\*5** (1) Within **three (3) days** of the date of this Order, Defendants' counsel shall produce to Plaintiffs' computer forensic expert forensically sound copies of the images of all electronic data storage devices in Michigan and India of which Huron Consulting Group ("Huron") made copies in May and June 2007. These forensically sound copies are to be marked "CONFIDENTIAL-DESIGNATED COUNSEL ONLY";

(2) Review of these forensically sound copies shall be limited to:

(a) MD5 hash value searches for Purolite documents identified as such in this litigation;

(b) File name searches for the Purolite documents; and

(c) Searches for documents containing any term identified by Stephen C. Wolfe in his November 28, 2007 expert report;

(3) All documents identified in these searches by Plaintiffs' computer forensic expert will be provided to Defendants' counsel in electronic format, who will review these documents for privilege;

(4) Within **seven (7) days** of receiving these documents from Plaintiffs' computer forensic expert, Defendants' counsel will provide all such documents which are not privileged, and a privilege log for any withheld or redacted documents, to Plaintiffs' counsel. Plaintiffs' counsel shall not have access to any other documents on these images;

(5) Each party shall bear its own costs;

(6) In all other respects, the February 7, 2008 Order shall remain in force.

It is so **ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2008 WL 724627

### Footnotes

| | |
|---|---|
| 1 | Order of Feb. 7, 2008, at ¶ 3, Doc. No. 293. |
| 2 | Mem. Op. of Feb. 7, 2008, at 5-6 ("Mem.Op."). |
| 3 | Doc. Nos. 13 and 14. |
| 4 | Mem. Op. at 5. |

5      Wolfe Dep. Tr. at 9:12-11:18, 84:17-85:24.

6      *Id.*

7      *Id.*

8      Wolfe Dep. Tr. at 81:1-24, 84:19-85:24. Numerous other factors differentiated Wolfe's two tasks. To take two further examples, the materials searched for and search terms used in each task overlapped somewhat, but were not identical. *Compare* Wolfe Dep. Tr. at 84:19-85:1 (for purposes of his expert report, Wolfe's searched the Thermax devices for matter drawn from the Golden Exhibits) *and* Wolfe Dep. Tr. at 78:13-81:19 (Wolfe searched India and Michigan servers for (1) the unique electronic "fingerprints" (or MD5 hash values) of all Purolite documents identified as such in this litigation; (2) the file names of the identified Purolite documents; and (3) certain search terms drawn from the Golden Exhibits). Although the transcript is not perfectly clear on this point, it appears that when confronted with a "hit," or a match between a search term and data in the device being searched, Wolfe's response was different in the former task than in the latter. In formulating his expert report, Wolfe opened electronically searched files that contained hits and evaluated their contents against the contents of the source of the search term(s) in question to determine the strength or accuracy of the match. Wolfe Dep. Tr. at 134:15-22. In contrast, with the exception of files related to the Golden Exhibits, *see* Wolfe Dep. Tr. at 144:4-146:1, hits in the India or Michigan servers apparently were not substantively evaluated by Wolfe, but were categorized and identified according to more superficial file characteristics, filtered for "false hits" by reference to external attributes, and submitted to Thermax's counsel for review of the actual content of the files. Wolfe Dep. Tr. at 18:23-20:17.

9      Wolfe Dep. Tr. at 144:4-146:8.

10     *Scott Paper Co. v. United States,* 943 F.Supp. 501, 502 (E.D.Pa.1996).

11     Mem. Op. at 5.

12     *See, e.g., U.S. Fidel. & Guar. Co. v. Braspetro Oil Servs. Co.,* No. 97 CIV. 6124JGKTHK, 2002 WL 15652, at *6, *8 (S.D.N.Y. Jan.7, 2002); *Messier v. Southbury Training Sch.,* No. 3:94CV1706, 1998 WL 422858, at * 1-2 (D.Conn. June 29, 1998); *B.C.F. Oil Ref., Inc. v. Consol. Edison Co. of N.Y., Inc.,* 171 F.R.D. 57, 60 (S.D.N.Y.1997).

13     *Id.* The extent to which Rule 26(a)(2)(B) affects materials considered by a dual-purpose expert who serves as both testifying expert and consulting expert has not been addressed in this Circuit. However, the Court is guided by the uniform rulings of district courts elsewhere that have decided the question. *See, e.g., S.E.C. v. Reyes,* No. C 06-04435, 2007 WL 963422, at *1 (N.D.Cal. Mar.30, 2007) ("A question thus arises about whether, and to what extent ... privilege applies when an expert alternately dons and doffs the "privileged hat" of a litigation consultant and the "non-privileged hat" of the testifying witness. In other words, does a litigant forfeit the privilege that would otherwise attach to a litigation consultant's work when he offers that expert as a testifying witness? Every court to address this "multiple hats" problem has concluded that an expert's proponent may still assert a privilege over such materials, but only over those materials generated or considered uniquely in the expert's role as consultant.") (citing cases). The law on this point is especially developed in the Second Circuit, and specifically, in a line of cases decided in the Southern District of New York. *See, e.g., Braspetro,* 2002 WL 15652, at *8; *B.C.F. Oil,* 171 F.R.D. at 60; *Detwiler v. Offenbecher,* 124 F.R.D. 545, 546 (S.D.N.Y.1989); *Beverage Mktg. v. Ogilvy & Mather Direct Response, Inc.,* 563 F.Supp. 1013, 1014 (S.D.N.Y.1983). While the latter two cases were decided prior to the advent of Rule 26(a)(2)(B), they serve as the basis for the principle established in *B.C.F. Oil* and reiterated in *Braspetro*-that an expert may "wear two hats," one as a testifying expert, and one as a consulting expert, and documents disclosed to the expert which have no relation to the testifying expert role need not be produced under Rule 26(a)(2)(B).

14    *See B.C.F. Oil,* 171 F.R.D. at 60.

15    *See, e.g.,* Wolfe Dep. Tr. at 81:14-19, 84:19-85:24.

16    Def.'s Sur-reply at 4.

17    Order of September 30, 2005, Doc. No. 42.

18    *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3d Cir.1991).

19    *Id.*

20    *In re Grand Jury Subpoenas,* 265 F.Supp.2d 321, 326 (S.D.N.Y.2003) (citing *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961) and 3 Joseph M. McLaughlin, Weinstein's Evidence § 503.01 (2d ed.2003)); *see also Westinghouse,* 951 F.2d at 1423-24 (citing 8 Wigmore, Evidence § 2301 at 583 (McNaughton rev.1961); McCormick, Evidence § 92 at 188); *HPD Labs. v. Clorox Co.,* 202 F.R.D. 410,414 (D.N.J.2001).

21    The changes and additions hereby made to the disclosure protocol in the Order are largely based upon the proposed form of order submitted by Defendants. The modifications Defendants propose appear to the Court to be reasonably calculated to provide for a well-tailored search of the India and Michigan servers for Purolite information and also to protect any privileged or work-product material yielded in the search. Through two rounds of briefing, Plaintiffs opted not to offer an alternative proposed order that would accomplish the same basic purpose of ensuring compliance with the May 23 Order while allowing for some limitation in scope and adequate privilege protection, instead arguing only for the complete disclosure of the India and Michigan servers notwithstanding any privilege claim, a position the Court has already determined to be unjustified under the applicable law.

---

**End of Document**                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW Document 367-1 Filed 01/12/24 Page 15 of 45

Pace-O-Matic, Inc. v. Eckert, Seamans Cherin & Mellott, LLC, Not Reported in Fed....

2023 WL 7491133

2023 WL 7491133
Only the Westlaw citation is currently available.
**NOT PRECEDENTIAL**
United States Court of Appeals, Third Circuit.

PACE-O-MATIC, INC.

v.

ECKERT, SEAMANS CHERIN & MELLOTT, LLC; Mark S. Stewart; Kevin M. Skjoldal, Appellants in No. 22-2958

*Hawke McKeon & Sniscak, LLP, Appellant in Nos. 22-2445 and 22-2902

*Greenwood Gaming and Entertainment, Inc., Appellant in Nos. 22-2446 and 22-2959

*(Pursuant to Rule 12(a), Fed. R. App. P.)

Nos. 22-2445, 22-2446, 22-2902, 22-2958, and 22-2959
|
Argued September 20, 2023
|
Filed November 13, 2023

On Appeal from the United States District Court for the Middle District of Pennsylvania (District Court No. 1-20-cv-00292), District Judge: Honorable Jennifer P. Wilson

**Attorneys and Law Firms**

Peter C. Buckley, Abraham C. Reich, Robert S. Tintner [ARGUED], Fox Rothschild, 2000 Market Street, 20th Floor, Philadelphia, PA 19103, Counsel for Appellants Eckert, Seamans Cherin & Mellott, LLC, Mark S. Stewart, and Kevin M. Skjoldal.

Melissa A. Chapaska, Dennis Whitaker [ARGUED], Hawke McKeon & Sniscak, 100 N Tenth Street, P.O. Box 1778, Harrisburg, PA 17101, Counsel for Appellant Hawke McKeon & Sniscak, LLP.

George A. Bibikos [ARGUED], #6330, 5901 Jonestown Road, Harrisburg, PA 17112, Counsel for Appellant Greenwood Gaming and Entertainment, Inc..

Michael Martinich-Sauter [ARGUED], Jeffrey B. Jensen, Michael Nolan, Spencer Tolson, Husch Blackwell, 8001 Forsyth Boulevard, Suite 1500, St. Louis, MO 63105, Counsel for Appellee Pace-O-Matic, Inc.

Before: RESTREPO, McKEE, RENDELL, Circuit Judges.

OPINION [*]

RENDELL, Circuit Judge.

**\*1** Eckert Seamans Cherin & Mellott, LLC ("Eckert"), Hawke McKeon & Sniscak, LLP ("HMS"), and Greenwood Gaming and Entertainment, Inc., d/b/a Parx Casino ("Parx") appeal from the District Court's order requiring disclosure of allegedly privileged material under the doctrine of judicial estoppel. Because the District Court erred in implementing the standard for application of judicial estoppel under our caselaw, we will vacate the order and remand.

I [1]

Pace-O-Matic, Inc. ("POM") develops, produces, and licenses electronic games sold, as relevant here, in Pennsylvania and Virginia. In 2016, Eckert began representing POM solely in Virginia regarding certain regulatory matters. At that time, Eckert also represented Parx, POM's market competitor, in Pennsylvania.

In 2018, POM, through other counsel, filed two lawsuits in the Commonwealth Court of Pennsylvania (the "Commonwealth Court Cases") against state agencies, challenging the seizure of some of its games in Pennsylvania. [2] Parx, represented by counsel of record HMS and Ballard Spahr, LLP, filed amicus briefs in opposition to POM's position and moved to intervene in the action.

In January 2020, POM learned that Eckert was involved in drafting Parx's filings in the Commonwealth Court Cases. POM requested that Eckert withdraw from representing Parx in the Commonwealth Court Cases, but Eckert instead withdrew from its representation of POM in Virginia.

In February 2020, POM brought the instant action against Eckert in federal court, alleging a breach of fiduciary duties. POM served interrogatories and requests for document production on Eckert and non-party subpoenas on Parx and HMS seeking communications that Eckert had with Parx and HMS in the Commonwealth Court Cases. Eckert, Parx, and HMS objected, asserting attorney–client and work-product privilege. POM moved to compel production; Eckert, Parx, and HMS moved for a protective order. The Magistrate Judge heard oral argument and conducted an *in camera*

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 16 of 45

Pace-O-Matic, Inc. v. Eckert, Seamans Cherin & Mellott, LLC, Not Reported in Fed....

2023 WL 7491133

review of the documents at issue. The Judge then issued a memorandum and order invoking the doctrine of judicial estoppel to preclude Eckert's assertion of an attorney–client relationship with Parx. The Magistrate Judge concluded that Eckert, HMS, and Parx had each, explicitly or implicitly, mischaracterized Eckert's role in the Commonwealth Court Cases by asserting that Eckert did not represent a party adverse to POM in the Commonwealth Court Cases.

Eckert, HMS, and Parx appealed to the District Court, which affirmed the Magistrate Judge's memorandum and order on July 5, 2022 (the "July 5 Order") and ordered the appellants to turn over the allegedly privileged documents and communications. Eckert, HMS, and Parx filed motions for reconsideration and permission to take an interlocutory appeal under § 1292(b). The District Court denied the motions for reconsideration but granted permission for the interlocutory appeal to decide whether judicial estoppel may be applied as an exception to or waiver of the attorney–client privilege of a non-party for interlocutory appeal.[3] The appellants timely filed petitions for interlocutory review of the July 5 Order under § 1292(b). A motions panel of this court granted the petition, and we consolidated the appeals.

## II[4]

**\*2** The appellants urge, first, that judicial estoppel cannot be applied as a waiver of, or exception to, attorney–client privilege held by a non-party and, second, that the District Court abused its discretion in applying the doctrine of judicial estoppel to the facts before it. Because we agree that the District Court misapplied the law, we need not address the first argument.[5] We review the District Court order invoking judicial estoppel "only for abuse of discretion," inquiring whether its "ruling is founded on an error of law or a misapplication of law to the facts." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 780 (3d Cir. 2001) (internal quotation marks omitted).

The concept of judicial estoppel stems from the courts' intrinsic authority to prevent parties from "playing fast and loose with the courts" by asserting inconsistent positions to gain an unfair advantage. *Scarano v. Cent. R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953). In order to apply judicial estoppel, a district court must satisfy itself that:

> (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted [previously]; (2) the party changed his or her position in bad faith ...; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity.

*Montrose*, 243 F.3d at 777–78. "[J]udicial estoppel is appropriately applied in a narrow category of cases because it 'is an extraordinary remedy that should be employed only when a party's inconsistent behavior would otherwise result in a miscarriage of justice.' " *Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548, 559–60 (3d Cir. 2002) (quoting *Montrose*, 243 F.3d at 784).

The District Court reasoned that judicial estoppel was appropriate because the appellants had presented fundamentally different positions in bad faith to obstruct discovery and no lesser sanction would address the resulting harm. We conclude that the requirements for applying judicial estoppel have not been met.

## A

The Magistrate Judge viewed Eckert's assertion that it did "not represent any party adverse to POM in [the Commonwealth Court] litigation" as irreconcilably inconsistent with its invocation of the attorney–client privilege to shield its communications with Parx. JA 13–14. But Eckert's counsel explained to the Magistrate Judge that Eckert has maintained that it has a longstanding attorney–client relationship with Parx but did not appear as *counsel of record* for Parx in the Commonwealth Court Cases. And Eckert did not view itself as representing a party adverse to POM when Parx was not a party in either Commonwealth Court Case but only had a motion to intervene pending. The Magistrate Judge did not appear to appreciate Eckert's nuanced view of its role. As we read the record, Eckert's position was perhaps "hyper-technical," *see In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 378 (3d Cir. 2007), but it was not wholly incompatible with its assertion of the attorney–client privilege. Eckert readily conceded that it represented

Case 1:20-cv-00292-JPW  Document 367-1  Filed 01/12/24  Page 17 of 45

Pace-O-Matic, Inc. v. Eckert, Seamans Cherin & Mellott, LLC, Not Reported in Fed....

2023 WL 7491133

Parx in connection with the Commonwealth Court Cases, but Parx was not a party and Eckert never entered an appearance in the case.

B

**\*3** Second, even if there were irreconcilable tension between Eckert's positions, the District Court abused its discretion in finding that Eckert, HMS, and Parx acted in bad faith. To satisfy the bad faith requirement, (1) a litigant must behave culpably (2) in a way that "assault[s] the dignity or authority of the court." *Montrose*, 243 F.3d at 781. In other words, "judicial estoppel may not be used to punish litigants for how they treat other litigants or third parties; its *only* legitimate purpose is to remedy an affront to the court's integrity." *Id.* at 785 (footnote omitted).

Our focus is on whether the appellants' conduct assaulted the District Court's authority. "[J]udicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position," *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009), because "[u]nlike the concept of equitable estoppel, which focuses on the relationship between the parties, judicial estoppel focuses on the relationship between the litigant and the judicial system." *Delgrosso v. Spang & Co.*, 903 F.2d 234, 241 (3d Cir. 1990). Here, no court accepted Eckert's, HMS's, or Parx's allegedly inconsistent positions that Eckert was not representing an entity adverse to POM in litigation. Absent that clear threat to judicial authority, the District Court lacked "an integral factor justifying the application of judicial estoppel." *United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005).

POM urges that judicial estoppel may apply even where no court accepted a litigant's prior position. *See G-I Holdings*, 586 F.3d at 262. But that exception was applied in a bankruptcy case, *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314 (3d Cir. 2003), and is quite limited. There, the Bankruptcy Court had not accepted representations in the debtor's disclosure statement, but the Court cited "the reliance placed upon the [debtor's] disclosure statement by the creditors and the court" as justifying the application of judicial estoppel to bar the taking of a later inconsistent position. *Id.* at 320–22 (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988)). Nondisclosure there harmed creditors, "undermining the bankruptcy process by

weakening their bargaining position." *G-I Holdings*, 586 F.3d at 262 (discussing *Krystal Cadillac*, 337 F.3d at 324–25). No such systemic threat lurks behind the appellants' positions, so "applying judicial estoppel here presents a greater threat to judicial integrity." *Id.*

Moreover, in routine litigation, defendants are permitted flexibility in asserting positions in early stages of litigation "because a defendant ought to have the opportunity to put up the best possible defense in light of all the claims against it." *Id.*; *see also* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically ...."). Here, there really was no "earlier position" that the District Court accepted or that was relied on. It was all part and parcel of the same discovery proceeding, so there was no assault on the court's authority.

C

Third, the remedy is not sufficiently tailored. Courts should not apply judicial estoppel unless (1) "no sanction established by the Federal Rules or a pertinent statute is 'up to the task' of remedying the damage done by a litigant's malfeasance," *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir. 1999) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)), and (2) "the sanction is 'tailored to address the harm identified,' " *Klein*, 185 F.3d at 108 (quoting *Republic of the Phil. v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 (3d Cir. 1994)).

**\*4** The Magistrate Judge concluded that only two alternative sanctions were available, both of which were "categorically determinative of the outcome on the merits of th[e] litigation": (1) entering default judgment against Eckert or (2) judicially estopping Eckert from denying its representation of a party adverse to POM in litigation. JA 18 (internal quotation marks omitted). Neither the Magistrate Judge nor the District Court appear to have contemplated the use of "Rule-or statute-based sanctions" more proportionate to the misconduct alleged, which alone was error. *Montrose*, 243 F.3d at 785. The sanction ultimately seized upon by the Magistrate Judge was fundamentally inappropriate because it goes to the very heart of the underlying suit—the nature of the relationships between Eckert and POM and Eckert and Parx. The novel application of judicial estoppel to effectively eviscerate a non-party's privilege after the fact was unwarranted when the Magistrate Judge might simply have ruled on the privilege

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 18 of 45

Pace-O-Matic, Inc. v. Eckert, Seamans Cherin & Mellott, LLC, Not Reported in Fed....

2023 WL 7491133

issue on the merits and used more temperate sanctions to deter counsel from any future gamesmanship. [6]

Finally, the District Court did not tailor the remedy because it focused its analysis on the alleged bad faith of Eckert, discussing minimally any malfeasance by HMS or Parx. But Parx, as holder of the attorney–client privilege, would suffer the brunt of the penalty imposed by the July 5 Order. *Cf. id.* at 786 (concluding remedy was not tailored where non-party plan participants, not plaintiff hospital and savings plan, were harmed when district court invoked judicial estoppel to dismiss case). In sum, the District Court sought to force a square peg into a round hole by selecting judicial estoppel as an appropriate sanction for appellants. That was an abuse of discretion.

III

On remand, the District Court should consider whether the appellants' perceived misconduct merits sanctions and, if so, whether sanctions available under the Federal Rules or pertinent statutes are appropriate. Accordingly, we will vacate the District Court's July 5 Order and remand for further proceedings consistent with this opinion.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 7491133

## Footnotes

*    This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1    Because we write only for the parties, we will recite only the facts necessary to our decision.

2    *See POM of Pa., LLC v. Pa. State Police, Bureau of Liquor Control Enforcement*, No. 503 MD 2018 (Pa. Commw. Ct.); *POM of Pa., LLC v. Commonwealth of Pa., Dep't of Revenue*, No. 418 MD 2018 (Pa. Commw. Ct.).

3    The District Court stayed the order requiring production of discovery materials pending this appeal.

4    The District Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), and we have appellate jurisdiction under 28 U.S.C. § 1292(b). The District Court determined that the July 5 Order "(1) involve[s] a 'controlling question of law,' (2) offer[s] 'substantial ground for difference of opinion' as to its correctness, and (3) if appealed immediately 'materially advance[s] the ultimate termination of the litigation.' " *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974) (quoting 28 U.S.C. § 1292(b)). We will exercise our discretion in permitting this appeal to be taken from the July 5 Order, 29 U.S.C. § 1292(b), and do not address the appellants' or appellee's arguments regarding the *Perlman* doctrine or the collateral order doctrine.

5    Although appellants' first argument aligns with the question certified by the District Court, when we exercise jurisdiction under § 1292(b), we "may address any issue fairly included within the certified order because 'it is the *order* that is appealable, and not the controlling question identified by the district court.' " *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (quoting 9 J. Moore & B. Ward, *Moore's Federal Practice* ¶ 110.25[1] (2d ed. 1995)).

6    Parties rely on the privilege as essential to open communications with counsel. To have it denied after the fact, and with little evidence of the role of Parx, the client, in the positions Eckert was taking, gives us serious pause.

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 20 of 45

In re Rutter's Data Security Breach Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 3733137
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

IN RE RUTTER'S DATA
SECURITY BREACH LITIGATION

CIVIL ACTION NO. 1:20-CV-382
|
Signed 07/22/2021

## ORDER

KAROLINE MEHALCHICK, United States Magistrate
Judge

**\*1** Now before the Court is a discovery dispute regarding the production of an investigative report which was created after Defendant was notified of a potential data breach. (Plaintiffs' Letter, June 15, 2021; Defendant's Letter, June 15, 2021). Plaintiffs request an order compelling the production of "an investigative report created in response to the data breach by a third-party cybersecurity consultant—Kroll Cyber Security, LLC ("Kroll")—and any related communications between Kroll and Defendant ..." (Plaintiffs' Letter, June 15, 2021) ("Plfs' 6/15 Letter"). Defendant asserts that this material is protected by both the work product doctrine and the attorney-client privilege. (Defendant's Letter, June 15, 2021) ("Def's 6/15 Letter").

In its June 15, 2021, letter, Defendant provides the facts which give rise to this motion. Rutter's received two Carbon Black Defense alerts on May 29, 2019, which "detail[ed] the execution of suspicious scripts and indications of the use of potentially compromised credentials." (Def's 6/15 Letter, at 1). On that same day, Defendant hired outside counsel, BakerHostetler, "to advise Rutter's on any potential notification obligations." (Def's 6/15 Letter, at 1). The next day, BakerHostetler hired Kroll "to conduct forensic analyses on Rutter's card environment and determine the character and scope of the incident." (Def's 6/15 Letter, at 1). Kroll gathered and analyzed "pertinent facts," including forensic images and "virtual machine snapshots of a sample of potentially affected in-store site controllers." (Def's 6/15 Letter, at 1-2). Defendant and BakerHostetler understood Kroll's work to be privileged. (Def's 6/15 Letter, at 2). Plaintiffs learned about this investigation during the Fed. R. Civ. P. 30(b)(6) deposition of Defendant's Vice President of Technology,

Bernard Frazer. (Plfs' 6/15 Letter). Plaintiffs note that numerous meetings took place between Kroll representatives and Defendant, and that Defendant paid Kroll directly. (Plfs' 6/15 Letter). Kroll's investigation took approximately two months, concluding in July 2019, with Kroll providing Defendant a written report of its findings at the end of the investigation. (Plfs' 6/15 Letter). Plaintiffs now seek production of this written report and related communications between Kroll and Defendant. (Plfs' 6/15 Letter, at 1)

### A. THE WORK PRODUCT DOCTRINE

Defendant asserts that the report prepared by Kroll after Defendant was alerted of possible fraudulent activity (the "Kroll Report") is protected from discovery by the work product doctrine. (Def's 6/15 Letter). The work product doctrine serves to "promote[ ] the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991). The work product doctrine directly promotes the adversary system, whereas the attorney-client privilege serves to directly promote the attorney-client relationship. *Westinghouse Elec. Corp*, 951 F.2d at 1428. The Supreme Court of the United States has said that the work product doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 & n. 11 (1975).

**\*2** The doctrine applies to "documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) ..." *In re Cendent Corp. Securities Litigation*, 343 F.3d 658, 662 (3d Cir. 2003) (quoting Fed. R. Civ. P. 26(b)(3)). Rule 26(b)(3) establishes two types of work product: first, general documents and tangible things that are prepared in anticipation of litigation, and second, work product that consists of "mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation." *Cendent Corp*, 343 F.3d at 663 (quoting Fed. R. Civ. P. 26(b)(3)). The party seeking the protection of the work product doctrine has the burden of proving that the doctrine applies. *Conoco, Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 730 (3d Cir. 1982).

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 21 of 45

In re Rutter's Data Security Breach Litigation, Not Reported in Fed. Supp. (2021)

For the work product doctrine to apply, the document must be prepared "in anticipation of litigation." Fed. R. Civ. P. 26(b)(3). A document is prepared in anticipation of litigation if "in light of the nature of the document and the factual situation of the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1258 (3d Cir. 1993) (quoting United States v. Rockwell Intern., 897 F.2d 1255, 1266 (3d Cir. 1990)). Aiding in "identifiable" or "impending" litigation must have been the "primary motivating purpose behind the creation of the document." United States v. Rockwell Intern., 897 F.2d 1255, 1266 (3d Cir. 1990); Leonen v. Johns-Manville, 135 F.R.D. 94, 97 (D.N.J. 1990). To determine whether "the prospect of litigation" is the purpose behind the document, the initial inquiry is into whether the party which ordered or prepared the document had a "unilateral belief" that litigation would result. Martin, 983 F.2d at 1260. Second, the anticipation of litigation must be objectively reasonable. Martin, 983 F.2d at 1260. [1]

It is clear from the contract between Kroll and Defendant that the primary motivating purpose behind the Kroll Report was not to prepare for the prospect of litigation. Included in the contract is a "statement of work" (SOW) which includes a description of services. (Def's 6/15 Letter, at 14). The following is included in the "Description of Services" section of the SOW: "The overall purpose of this investigation will be to determine whether unauthorized activity within the Rutter's systems environment resulted in the compromise of sensitive data, and to determine the scope of such a compromise if it occurred." (Def's 6/15 Letter, at 14). This language demonstrates that Defendant did not have a unilateral belief that litigation would result at the time it requested the Kroll Report. See Martin, 983 F.2d at 1260. The purpose of the investigation was to determine whether data was compromised, and the scope of such compromise if it occurred. (Def's 6/15 Letter, at 14). Without knowing whether or not a data breach had occurred, Defendant cannot be said to have unilaterally believed that litigation would result. (Def's 6/15 Letter, at 14); see Martin, 983 F.2d at 1260.

Furthermore, in its corporate deposition, Defendant stated that litigation was not contemplated at the time the Kroll Report was prepared. (Plfs' 6/15 Letter, at 17). Rutter's corporate designee, Bernard Frazer, is the individual who signed the agreement with Kroll to perform the investigation at issue and write the Kroll Report. (Def's 6/15 Letter, at

9-16; Plfs' 6/15 Letter, at 1). Frazer testified that he was not "contemplating" forthcoming lawsuits as a result of the data breach at the time Kroll was performing its work and that he was unaware of anyone else at Rutter's contemplating such lawsuits. (Plfs' 6/15 Letter, at 17). According to Defendant, "Kroll would have prepared – done this work and prepared its incident response investigation regardless of whether or not lawsuits were filed six months later[.]" (Plfs' 6/15 Letter, at 17-18). As such, it cannot be said that the "primary motivating factor" behind the creation of the Kroll Report was to aid in identifiable or impending litigation. See Rockwell Intern., 897 F.2d at 1266 (holding that for the work product doctrine to apply, litigation must have been the "primary motivating purpose behind the creation of the document"); Leonen, 135 F.R.D. at 97 (D.N.J. 1990) (holding that there must have ben an identifiable specific claim or impending litigation when the materials were prepared).

**\*3** Defendant cites In re Experian Data Breach Litig., No. SACV1501592AGDFMX, 2017 WL 4325583, at \*2 (C.D. Cal. May 18, 2017) in support of its position that the Kroll Report was prepared in anticipation of litigation. (Def's 6/15 Letter, at 3-4). In Experian, the investigative report was provided to Experian's outside litigation counsel, which then provided it to Experian's in-house counsel, and was not provided to Experian's Incident Response Team. Experian, 2017 WL 4325583, at \*2. Here, Kroll provided its report to Defendant when it was completed and there is no evidence that it was provided first to BakerHostetler. (Plfs' 6/15 Letter, at 14, 16) (Defendant testifying that Kroll's work concluded towards end of July 2019 and that the Kroll Report was delivered to Defendant around July of 2019). Kroll was to "work alongside Rutter's IT personnel to identify and remediate any potential vulnerabilities." (Def's 6/15 Letter, at 14) (emphasis added). In Experian, the report's legal nature was supported by declarations. Experian, 2017 WL 4325583, at \*2. Unlike the declarations in Experian, Rutter's corporate designee testified that he was unaware of anyone at Rutter's contemplating a lawsuit at the time the Kroll Report was compiled. (Plfs' 6/15 Letter, at 17). [2] Similarly, the report in In re Target Corp. Customer Data Sec. Breach Litig., MDL No. 14-2522, 2015 WL 6777384 (D. Minn. Oct. 23, 2015) was compiled after litigation was already pending and more was reasonably expected to follow. Target, 2015 WL 6777384, at \*3.

For the foregoing reasons, production of the Kroll Report and related communication between Kroll and Defendant are not precluded by the work-product doctrine.

Case 1:20-cv-00292-JPW Document 367-1 Filed 01/12/24 Page 22 of 45

In re Rutter's Data Security Breach Litigation, Not Reported in Fed. Supp. (2021)

## B. THE ATTORNEY-CLIENT PRIVILEGE

Defendant asserts that the Kroll Report and related communications between Kroll and Defendant are protected by the attorney-client privilege. (Def's 6/15 Letter, at 2). This privilege attaches to "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (internal quotation marks omitted), *as amended* (Oct. 12, 2007). " 'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *Teleglobe*, 493 F.3d at 359 (citing Restatement (3d) Lawyers § 70).

Because "the attorney-client privilege obstructs the truth-finding process, it is construed narrowly." *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991). "A communication is only privileged if it is made 'in confidence.' " *Teleglobe*, 493 F.3d at 361 (citing Restatement (3d) Lawyers § 68). Where "persons other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the privilege does not attach." *Teleglobe*, 493 F.3d at 361. However, "[a]s a general matter, the privilege is not destroyed when a person other than the lawyer is present at a conversation between an attorney and his or her client if that person is needed to make the conference possible or to assist the attorney in providing legal services." *Miller v. Haulmark Transp. Sys.*, 104 F.R.D. 442, 445 (E.D. Pa. 1984) (privilege not waived by presence of insurance agent who arranged coverage and aided in preparation of answer); *see also Quagliarello v. Dewees*, 802 F.Supp.2d 620, 632-33 (E.D. Pa. 2011) (finding no waiver of attorney-client privilege where 18-year-old student-plaintiff consulted with her lawyer in the presence of her parents and a neighbor who facilitated her obtaining legal counsel); *Harkobusic v. Gen. Am. Transp. Corp.*, 31 F.R.D. 264, 266 (W.D. Pa. 1962) (holding attorney-client privilege applied to communications between client's brother-in-law and various attorneys where brother-in-law was acting as client's agent in seeking legal advice). "These exceptions are consistent with the goal underlying the privilege because [this] type of disclosure is sometimes necessary for the client to obtain informed legal advice." *Westinghouse*, 951 F.2d at 1424.

**\*4** A communication may only be privileged if its primary purpose is to gain or provide legal assistance. *Kramer v. Raymond Corp.*, 1992 WL 122856, at \*1 (E.D. Pa. 1992).

The attorney or agent must be " 'acting as a lawyer' – giving advice with respect to the legal implications of a proposed course of conduct." *Hercules Inc. v. Exxon Corp.*, 434 F.Supp. 136, 147 (D. Del. 1977). For the assistance to be 'legal' in nature, the lawyer must guide future conduct by interpreting and applying legal principles to specific facts. PAUL R. RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES. § 7:10 (2019). The *primary* purpose of *each communication* deemed privileged must be to gain or provide legal assistance. *Kramer*, 1992 WL 122856, at \*1. "Merely because a legal issue can be identified that relates to on-going communications does not justify shielding them from discovery." *In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789, 798 (E.D. La. 2007). Importantly, the attorney-client privilege does not protect the communication of facts. *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) ("The client cannot be compelled to answer the question, 'what did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."); *U.S. Fidelity & Guar. Co. v. Barron Industries, Inc.*, 809 F.Supp. 355, 364 (M.D. Pa. 1992) ("The privilege simply does not attach to a discussion of the facts, no matter how extensive or involved the discussion may become.").

Here, Defendant does not establish that the Kroll Report and related communications involved "presenting opinions and setting forth ... tactics" rather than discussing facts. *See Fidelity & Guar. Co.*, 809 F.Supp. at 364. The SOW shows that Kroll was employed to collect data from Defendant's equipment, to monitor Defendant's equipment, to determine whether Defendant's equipment was compromised and to what extent, and to "work alongside Rutter's IT personnel to identify and remediate any potential vulnerabilities." (Def's 6/15 Letter, at 14). Only one portion of this description of services is not inherently factual: Kroll's role in working with Rutter's IT personnel to identify and remediate potential vulnerabilities. (Def's 6/15 Letter, at 14). However, this service cannot be deemed to be gaining or providing legal assistance, as neither Kroll nor Rutter's IT personnel are professionals in the field of law and this service involves those two entities working alongside each other with no mention of attorney involvement. (Def's 6/15 Letter, at 14); *see Kramer*, 1992 WL 122856, at \*1.

For the foregoing reasons, Defendant does not carry its burden of establishing that the Kroll Report and related communications between Kroll and Defendant had a primary

In re Rutter's Data Security Breach Litigation, Not Reported in Fed. Supp. (2021)

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 23 of 45

purpose of providing or obtaining legal assistance for Defendant. *See Teleglobe*, 493 F.3d at 359. The record shows that the report and communications were either factual in nature or, where advice and tactics were involved, did not include legal input. (Def's 6/15 Letter, at 14); *see Teleglobe*, 493 F.3d at 359. The attorney-client privilege does not apply to the Kroll Report and related communications between Kroll and Defendant.

C. CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel production of the Kroll report and related communications between Kroll and Defendant is granted, and Defendant is to produce the same to Plaintiffs within 14 days of the date of this Order.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3733137

## Footnotes

1    "A reasonable anticipation of litigation is not established by the mere fact litigation occurred, the party consulted or retained an attorney, undertook an investigation, or engaged in negotiations." *Faloney v. Wachovia Bank, N.A.*, 254 F.R.D. 204, 214 (E.D. Pa. 2008).

2    Frazer, Vice President of Technology at Rutter's, declares that the Kroll Report would have been prepared in a substantially different form, and may not have been necessary, had the threat of litigation or the legal obligation to notify anyone potentially affected by the incident not existed. (Def's 6/15 Letter, at 7). Litigation, alone, must form the basis of "work product," so this declaration – in which Frazer speaks to Rutter's' notification obligations as a potential basis for the report – does not establish the report as work product. (Def's 6/15 Letter, at 7); *see* Fed. R. Civ. P. 26(b)(3); *see also Litigation*, Black's Law Dictionary 11th ed. 2019) ("The process of carrying on a lawsuit.").

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

1989 WL 11068
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

In re U.S. HEALTHCARE, INC.
SECURITIES LITIGATION.

No. 88–0559.
|
Feb. 8, 1989.

**Attorneys and Law Firms**

David B. Zlotnick, Bala Cynwyd, Pa., Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, New York City, Robert M. Roseman, Philadelphia, Pa., for plaintiff.

H. Robert Fiebach, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for Horrocks, Berger Abramson; Berger; Longacre; Skillman; Weiner; and U.S. Healthcare, Inc.

Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa. and Patricia A. McGovern, Robert G. Cohen, Associate General Counsel, Arthur Young & Company, New York City, for Arthur Young.

*MEMORANDUM OF DECISION*

McGLYNN, District Judge.

**\*1** In this securities litigation, plaintiffs have filed a motion to compel the production of certain documents withheld by Wolf, Block, Schorr and Solis–Cohen ("Wolf, Block") on the ground of attorney-client privilege. Additionally, plaintiffs have requested that the court compel the continued deposition testimony of Alan Molod, Esquire and of representatives of U.S. Healthcare, Inc. ("USH"). For the following reasons, plaintiffs' motion is denied.

I. *BACKGROUND*

This is a securities fraud class action brought on behalf of all persons who purchased the common stock of USH from July 3, 1985 through August 21, 1987. Plaintiffs seek damages from USH, certain officers of USH, and Arthur Young and Company ("Arthur Young"), USH's auditors, for artificially inflating the trading price of USH during the class period by fraudulently portraying USH's earnings, financial condition and prospects to the investing public and by causing the

company to purchase its own stock on the market. This court certified this as a class action on September 28, 1988.

During the class period, Wolf, Block served as USH's outside general counsel. Wolf, Block worked on securities issuances and related filings for USH, reviewed or participated in the drafting of SEC filings, and gave legal advice from time to time regarding contractual and other matters. On September 30, 1988, plaintiffs served a Subpoena Duces Tecum upon Wolf, Block demanding the production of numerous documents relating to various aspects of Wolf, Block's representation of USH during the class period. In response to that subpoena, on November 3, 1988, Wolf, Block produced over three thousand documents. Thereafter, Wolf, Block gave plaintiffs' counsel a list of the documents that it would not produce on the grounds of privilege. The question before this court is whether the attorney-client privilege attaches to the documents requested by plaintiffs in this motion.

II. *DISCUSSION*

The purpose of the attorney-client privilege is to protect clients' freedom of expression thereby encouraging clients to make full disclosures to their attorneys. *Fisher v. United States,* 425 U.S. 391 (1976); *In re Grand Jury Investigation No. 83–2–35,* 723 F.2d 447 (6th Cir.1983). As a general rule, confidential information disclosed by a client to an attorney for purposes of obtaining legal advice is protected. The privilege also attaches to an attorney's communications to a client, as well as to inter-attorney communications, attorney's notes and memorandum, which include legal advice or confidential information received from the client. *Green v. I.R.S.,* 556 F.Supp. 79, 85 (N.D.Ind.1982).

In an attempt to establish that the attorney-client privilege did not attach to these documents, plaintiffs assert first that the documents identified in their motion, and the information contained in them, were never intended to be confidential. [1] Plaintiffs state that all of the requested documents report legal advice given by Wolf, Block in connection with USH's issuance of financial statements and SEC filings for the year ended September 30, 1987. Because the financial statements were eventually disclosed to third parties, plaintiffs claim that the information contained in the documents at issue is not protected by the attorney-client privilege. Alternatively, plaintiffs assert that some of the requested documents do not contain legal advice at all, but rather report business or accounting decisions. Plaintiffs also allege that USH

has relied on the advice of counsel defense and, hence, the attorney-client privilege is waived as to all oral or written underlying communications. This last argument is superfluous since defendants have not asserted such a defense.

**\*2** Wolf, Block alleges that the documents withheld involve "a broad range of issues for which legal, not business, assistance was sought and given." Furthermore, it is well settled that information shared with an attorney does not lose its confidential status simply because it was shared in the course of preparing a document which was to be disclosed to third persons. Specifically, as the court concluded in *Schenet v. Anderson,* 678 F.Supp. 1280 (E.D.Mich.1988):

[T]he attorney-client privilege applies to all information conveyed by clients to their attorneys for the purpose of drafting documents to be disclosed to third persons and all documents reflecting such information, to the extent that such information is not contained in the document published and is not otherwise disclosed to third persons.

*Id.* at 1283. *See also United States v. Schlegal,* 313 F.Supp. 177, 179 (D.Neb.1970). [2] Thus, the only discoverable information is that which is contained in the publicly filed documents. The attorney-client privilege still attaches to the withheld memoranda, which is comprised of confidential disclosures and legal advice. Given this standard, each of plaintiffs' requests must be evaluated individually.

First, plaintiffs request the production of Alan Molod's handwritten notes of a meeting held in December 1986 attended by several representatives of USH, as well as Mr. Raymond Kraft from Arthur Young. According to the depositions of Mr. Molod and Alan Letofsky, Esquire, General Counsel to USH, Mr. Molod was asked to be at the meeting in order to render legal advice regarding the recoverability of certain overpayments made by USH to it primary physicians. Alan Letofsky was also present to offer legal assistance. Moreover, Mr. Kraft was included because his presence was required for the rendition of Mr. Molod's legal advice, and, thus, his participation was not inconsistent with the intention to keep the meeting confidential. Furthermore, Mr. Kraft's presence and the attendance of other necessary participants did not cause a waiver of the privilege. *See, e.g., Miller v. Haulmark Transp. Sys.,* 104 F.R.D. 442, 445 (E.D.Pa.1984) ("As a general matter, the privilege is not destroyed when a person other than the lawyer is present at a conversation between an attorney

and his or her client if that person is needed to make the conference possible or to assist the attorney in providing legal services.").

After the meeting, Sheldon Pollack, Esquire, of Wolf, Block conducted research and prepared a memorandum dated December 22, 1986 regarding the legal advice requested of Mr. Molod. On January 13, 1987, Mr. Molod sent his opinion letter on the recoverability issue to Alan Letofsy, with a copy to Mr. Kraft. Plaintiffs have a copy of that letter. Now plaintiffs seek the production of Mr. Pollack's December 22, 1986 research memorandum. With respect to the handwritten meeting notes and the research memorandum, since they report confidential client communications and legal advice, they are privileged and not discoverable.

**\*3** Next, plaintiffs demand four documents pertaining to the Insurance Department hearing. Wolf, Block has produced the November 20, 1986 memorandum in its entirety, and the November 6, 1986 and November 19, 1986 memoranda in redacted form, removing from each only one paragraph which contained legal conclusions. Consequently, the motion with regard to those documents is denied. The fourth document, the December 4, 1986 file memorandum of Gerald Gornish, Esquire, was prepared some time after the hearing and it summarizes a confidential conversation between Mr. Garnish and Mr. Zamzow. As such, that document is privileged and, thus, not discoverable. *See Matter of Fischel,* 557 F.2d 209, 211 (9th Cir.1977) ("the privilege normally extends both to the substance of the client's communication as well as the attorney's advice in response thereto").

The September 29, 1986 file memorandum involving Lincoln National recites a confidential conversation between Steven Haas, Esquire and Alan Letofsky. A similar conversation between Mr. Haas and Ms. Karen Barr, who was employed by USH at the time, is set forth in the memorandum of March 4, 1987. The client contacted Mr. Haas in each case and requested his legal advice. The memoranda reports the nature of the legal assistance sought and the advice finally rendered. Only the information disclosed in the public filing is discoverable, *Green v. I.R.S., supra,* and accordingly the Haas–Letofsky memoranda is protected by the privilege. With respect to this category of documents, plaintiffs' motion will be denied.

In another category of documents, plaintiffs seek the production of the September and October 1987 memoranda and handwritten notes. Wolf, Block alleges that each of those

Case 1:20-cv-00292-JPW  Document 367-1  Filed 01/12/24  Page 26 of 45

In Re U.S. Healthcare, Inc. Securities Litigation, Not Reported in F.Supp. (1989)

documents contain or refer to confidential communications between USH and its attorneys, between Mr. Molod and USH's General Counsel involving requested legal assistance. Regardless of whether these documents relate to the "reserve issue," the confidential communications are protected by the privilege.

On August 21, 1987, the date the class period closes, USH issued a press release specifying that its reserves for medical claims was going to be increased in the third and fourth quarters of 1987. Thereafter, USH continued its investigation in an attempt to quantify the extent of the reserve increase and the reasons for it. USH sought legal advice from both its General Counsel and Mr. Molod. The documents reflect the legal services provided in connection with the ongoing investigation.

The October 22, 1987 "Privileged and Confidential Memorandum of Counsel" summarizes a legal study conducted by USH's General Counsel at the request of Mr. Abramson. Since the memorandum includes client confidences disclosed to in-house counsel for the purpose of attaining legal advice, they are protected. *See, e.g., In re LTV Securities Litigation,* 89 F.R.D. 595, 601 (N.D.Tex.1981) ("Information gathered in such a manner as to be privileged does not become discoverable solely because management makes other business use of the information."). Similarly, Mr. Molod's October 22, 1987 file memorandum in which he reports his conversation with Mr. Letofsky about the privileged memorandum is protected from disclosure. In connection with Wolf, Block's legal assistance, Mr. Molod had several conversations with Mr. Abramson, some of which he recounted in file memoranda. Mr. Molod also attended meetings with other representatives of USH, including Mr. Letofsky. Mr. Molod and Mr. Letofsky participated not as business consultants but as legal advisors. Additionally, Mr. Molod's handwritten and typewritten notes summarizing his conversations with Mr. Abramson and the discussions at the referenced meetings are privileged. Furthermore, since Mr. Kraft's and Mr. McParland's attendance at the September 9, 1987 and October 19, 1987 meetings was necessary to Wolf, Block's rendition of legal advice, their presence at the meetings did not constitute a waiver of the attorney-client privilege.

*4 Also, because Mr. Molod's October 22, 1987 file memorandum contains Mr. Molod's legal analysis of the confidences disclosed to him by his client, it is privileged.

*See Matter of Fischel,* 557 F.2d 209, 211 (9th Cir.1977). That memorandum, like the other internal file memoranda at issue here, were not disclosed by Mr. Molod to any other attorney at Wolf, Block nor to anyone at USH. It was the intention and expectation of Mr. Molod that each of these documents would remain confidential. The privilege has not been waived.

In this motion, plaintiffs also request that Wolf, Block produce any drafts retained by Wolf, Block of USH's 1985 and 1986 Annual Reports to Shareholders and Forms 10–K. However, these drafts contain information which was not later revealed to third parties. Thus, they are protected from discovery. *See Schenet, supra,* at 1283–84. The *Schenet* court concluded:

With regard to preliminary drafts of documents intended to be made public, the court holds that preliminary drafts may be protected by the attorney-client privilege. Preliminary drafts may reflect not only client confidences, but also the legal advice and opinions of attorneys, all of which is protected by the attorney-client privilege. The privilege is only waived as to those portions of the preliminary drafts ultimately revealed to third parties.

*Id.* (citations omitted). Similarly in this case, the preliminary drafts requested by plaintiffs contain the legal advice of the attorneys, as well as communications between Wolf, Block and the client. Consequently, these documents are protected also.

Finally, since the documents plaintiffs requested have properly been withheld on the grounds of privilege, plaintiffs' request to be permitted to resume Mr. Molod's deposition, as well as depositions of other representatives of USH, will be denied. Accordingly, plaintiffs' motion will be denied.

An appropriate order follows.

### ORDER

AND NOW, this 7th day of FEBRUARY, 1989, upon consideration of plaintiffs' motion to compel,it is hereby ORDERED that plaintiffs' motion is DENIED.

**All Citations**

Not Reported in F.Supp., 1989 WL 11068

## Footnotes

1    Plaintiffs cite *Wojdak v. First Western Government Securities, Inc., et al.,* Civil Action No. 83–1076 (E.D.Pa. January 30, 1985) (VanArtsdalen, J.) for the proposition that this court should have an in camera inspection of these documents. In *Wojdak,* Judge VanArtsdalen held that "[b]ecause the law firm was hired expressly to provide opinion letters to be disseminated to others, there is a serious question as to exactly what information the client intended to be confidential. Such a determination cannot unilaterally be decided by the party asserting the privilege." *Id.* at 7. In that case, there were approximately 3,200 documents relevant to plaintiffs' document requests, and it was unclear whether there was a legitimate ground for asserting the privilege 3,200 times. However, in the present case, it is evident that the documents requested herein were created with the intent that they would remain confidential.

2    The *Schlegal* court determined that only the information revealed to the government in the submitted document should fall outside of the protection of the attorney-client privilege. *Schlegal, supra,* at 179. *Cf. Leucadia, Inc. v. Reliance Ins. Co.,* 101 F.R.D. 674, 677 (S.D.N.Y.1983) ("Even if the report had been privileged, the privilege was waived by its use in prospectuses and other public documents."). The present case is distinguishable from *Leucadia* since plaintiffs here seek to discover documents containing confidential information which has not been placed in public documents.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vacco v. Harrah's Operating Co., Inc., Not Reported in F.Supp.2d (2008)

2008 WL 4793719

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Deutsche Bank Securities Inc. v. Kingate Global Fund Ltd.,   S.D.N.Y.,   August 24, 2022

2008 WL 4793719
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dennis C. VACCO, et al., Plaintiffs,

v.

HARRAH'S OPERATING CO., INC., et al., Defendants.

Civil Action No. 1:07–CV–0663 (TJM/DEP).
|
Oct. 29, 2008.

**Attorneys and Law Firms**

Orrick, Herrington Law Firm, Frederick D. Holden, Esq., Michael T. Stolper, Esq., Rachel P. Rangi, Esq., of Counsel, San Francisco, CA, Crane, Parente Law Firm, Thomas M. Kernan, Esq., of Counsel, Albany, NY, for Plaintiffs.

Boies, Schiller Law Firm, George Carpinello, Esq., of Counsel, Albany, NY, for Defendants.

*DECISION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** This action, though only relatively recently filed, represents an outgrowth of a longstanding conflict between two rival factions, both striving to gain acceptance as the duly recognized leadership of the St. Regis Mohawk Indian Tribe, and the Tribe's efforts to develop a casino gaming operation in Monticello, New York. The underlying dispute, which is predicated upon facts which on the surface are uncomplicated, has proven contentious and has generated several discovery disputes, with the latest round presenting the court with issues surrounding the scope and extent of attorney-client privilege and work product doctrine protection as well as the circumstances under which those protections can be waived.

Among the questions presented by the plaintiffs is whether documents prepared by the corporate defendant at the request of its independent auditor, reporting generally on pending litigation, and disclosed to that auditor are deserving of work

product protection. Also at issue is whether communications between the defendants and a Washington, D.C. law firm also authorized to engage in lobbying should be shielded from disclosure. Defendants' motion raises questions regarding the sufficiency of plaintiffs' objections to the production of requested documents on the grounds of attorney-client privilege and attorney work product.

Upon careful consideration of the governing legal principles, informed by an *in camera* review of the disputed documents, I make the following rulings, generally sustaining the parties' assertions of privilege and work product coverage and finding no basis to conclude that those protections have been waived.

*I. BACKGROUND*

This action has as it genesis a default judgment entered on March 20, 2001 by the Tribal Court of the St. Regis Mohawk Tribe (the "Tribe") in favor of the Marlene Arquette and twenty-five other Tribal members and against five defendants, including Park Place Entertainment Corporation ("Park Place"), whose liabilities were assumed by defendant Harrah's Operating Company, Inc. ("Harrah's") as a result of a 2005 merger; Clive Cummis an individual affiliated with Park Place; and three members of the Tribal Council, in that judgment, *inter alia,* the plaintiffs were awarded damages totalling $1.787 billion, plus interest and costs. Complaint (Dkt. No. 1) ¶¶ 4, 6, 22 and Exh. A. The litigation was preceded by two other suits filed with this court as an outgrowth of that same Tribal Court proceeding. In the first, *Park Place Entm't Corp., et al. v. Arquette, et al.,* Civil Action No. 00–CV–0863 (N.D.N.Y. filed June 2, 2000) (*"Arquette I"* ), Harrah's predecessor, Park Place, sought to enjoin the Tribal Court action. Complaint (Dkt. No. 1) ¶ 8(a); *see also* Civil Action No. 00–CV–863, Dkt. No. 1. In the second, certain representatives of the Tribe requested enforcement of the Tribal Court judgment. Complaint (Dkt. No. 1) ¶ 8(a); *see also Arquette, et al. v. Park Place Entm't Corp., et al.,* Civil Action No. 01–CV–1058 (N.D.N.Y. filed June 27, 2001) (*"Arquette II"* ). Both actions were dismissed by the court, without prejudice, on March 31, 2003, based upon a reported settlement reached among the various interested parties. Complaint (Dkt. No. 1) ¶ 8(a); *see also Arquette I,* Dkt No. 50; *Arquette II,* Dkt. No. 56.

**\*2** The two named plaintiffs in this action, Dennis C. Vacco and Joseph E. Bernstein, assert that they are trustees of the Catskill Litigation Trust (the "Trust"), an entity formed in January of 2004, and in that capacity are authorized to hold and manage the trust's assets, which include among them the

2008 WL 4793719

claims asserted in this action arising from the Tribal Court default judgment. Complaint (Dkt. No. 1) ¶ 1. The assignment of the Arquette parties' rights in connection with the Tribal Court judgment to the Trust appears to have been effectuated by the execution of a Joint Alliance Agreement, a document which has proven to be controversial and gives rise to one of the defenses at issue in connection with this motion.

## II. *PROCEDURAL HISTORY*

Plaintiffs commenced this action on June 22, 2007, invoking the court's subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1332, asserting that by its nature the action raises one or more federal questions, and that in any event there is complete diversity of citizenship between the parties. Complaint (Dkt. No. 1) ¶¶ 6, 7. Named as defendants in the action are Harrah's and Clive Cummis, a licensed attorney who practices in New York City. *Id.* ¶¶ 4, 5, 8(d).

In lieu of answering plaintiff's complaint, defendants instead sought its dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that 1) the plaintiffs improperly obtained their interest in the Tribal Court judgment pursuant to a champertous assignment prohibited under N.Y. Judiciary Law § 489(1), and 2) the issues raised in the action were previously settled in the context of a negotiated resolution of *Arquette I* and *Arquette II.* Dkt. No. 16. That motion resulted in the issuance of a decision and order by Senior District Judge Thomas J. McAvoy on December 4, 2007 in which, noting the need to consider materials outside of the record in order to inform his analysis of the two issues raised, he opted against conversion of the motion to one for summary judgment, given the procedural posture of the case, and referred the matter to me to oversee discovery with respect to the two issues presented in the motion. Dkt. No. 23.

The discovery dispute now before the court is not the first that has arisen since the issuance of Judge McAvoy's order. Questions raised by both parties concerning the sufficiency of their respective adversary's discovery responses led to the earlier filing of cross-motions to compel discovery. Dkt. Nos. 28, 29. Following oral argument regarding those motions, I issued a bench decision, followed by a written order dated April 4, 2008, requiring the production of certain additional documents by both sides. Dkt. No. 33.

After having been notified by the parties of the existence of lingering issues, I once again granted permission for the simultaneous filing of cross-motions to compel discovery.

In their motion, plaintiffs seek discovery of documents falling into two categories, one related to statements provided by representatives of Harrah's to its outside auditors regarding pending litigation, and the second concerning communications between Harrah's and Holland & Hart, LLP, a Washington, D.C. law firm retained to engage in activities which, defendants contend, were legal in nature but which, plaintiffs argue, in fact represented little more than lobbying efforts on Harrah's behalf, principally before the Bureau of Indian Affairs ("BIA"). Dkt. No. 37. Defendants' motion challenges the sufficiency of plaintiffs' responses to requests for additional documents relating to the drafting and execution of the Joint Alliance Agreement, the formation of the Catskill Litigation Trust, any financial support given by the Trust to tribal members, certain tribal resolutions related to the formation of the Tribal Court, and the tribal court judgment or other previous related actions. Dkt. No. 36. Oral argument was conducted regarding the parties' cross-motions during a digitally recorded telephone conference held on September 23, 2008, at which time decision was reserved and the parties were directed to produce the disputed, withheld materials for *in camera* review by the court. [1]

## III. *DISCUSSION*

### A. *Controlling Legal Principles*

**\*3** The parties' cross-motions implicate protections afforded under both the attorney-client privilege and the work product doctrine, the latter of which generally protects materials prepared in anticipation of litigation. Before turning to the specifics of the issues now presented, it is helpful to recount the general principles associated with both protections, the underlying policies supporting them, the contours of the protections afforded, and the circumstances under which a party may waive protection under either.

### 1. *Attorney–Client Privilege*

Since this court's jurisdiction is based principally upon diversity of citizenship, the attorney-client privilege analysis is informed by New York Law. [2] Fed.R.Evid. 501; *see also* Dixon v. 80 Pine Street Corp., 516 F.2d 1278, 1280 (2d Cir.1975); *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.,* 215 F.R.D. 466, 470 (S.D.N.Y.2003). By statute, New York gives protection to any "confidential communication made between the attorney or his or her employee and the client in the course of professional employment [.]" N.Y. C.P.L.R. 4503(a)(1). Under this provision, which has been characterized by the New York Court of Appeals as a "

'mere re-enactment of the common-law rule' ", *Spectrum Sys. Int'l Corp. v. Chem. Bank,* 78 N.Y.2d 371, 377, 581 N.E.2d 1055, 1060, 575 N.Y.S.2d 809, 814 (1991) (quoting *Hurlburt v. Hurlburt,* 128 N.Y. 420, 424, 28 N.E. 651, 652 (1891)), attorney-client protection "extends to both confidential information provided to the lawyer by the client and legal advice given by an attorney that discloses such information." *Nat'l Educ. Training Group, Inc. v. Skillsoft Corp.,* No. M8–85, 1999 U.S. Dist. LEXIS 8680, at *7–8 (S.D.N.Y. June 10, 1999) (citations omitted). The burden of establishing that the prerequisites for the attorney-client privilege have been met rests with the party seeking to invoke its protections. *In re F.T.C.,* No. M18–304, 2001 WL 396522, at *2 (S.D.N.Y. April 19, 2001); *In re Nassau County Grand Jury Subpoena Dated June 24, 2003,* 4 N.Y.3d 665, 678–79, 830 N.E.2d 1118, 1126, 797 N.Y.S.2d 790, 798 (2005).

In determining whether it should apply, a court should not lose sight of the strong policy considerations which form the underpinning of the attorney-client privilege—one which is deeply rooted in our country's jurisprudence, and finds its origins in English common law. *See Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682 (1981) (citing 8 J. Wigmore, Evidence § 2290 (McNaughten rev.1961)). In fulfilling its underlying policy considerations, the privilege seeks "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682; *see also In re County of Erie,* No. 07–5702, 2008 WL 4554920, at *5 (2d Cir. Oct. 14, 2008) (citing *Swidler & Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 2084 (1998)). It is generally thought that serious encroachment upon this privilege would vastly undermine the ability of an attorney to represent a client effectively, and would have a potentially chilling effect upon the candor in the flow of communications necessary for proper fulfillment of an attorney's role. *Upjohn,* 449 U.S. at 389; *see also* 24 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5472 (1986 & 2003).

**\*4** Despite the important and longstanding considerations supporting the privilege, it exists in obvious tension with the overarching belief that under our system of justice, all relevant information should be disclosed and considered when a dispute is resolved. *Spectrum Sys. Int'l Corp.,* 78 N.Y.2d at 376–77, 581 N.E.2d at 1059, 575 N.Y.S.2d at 813. Because it serves to shield otherwise potentially relevant information, and thus runs counter to the goal of promoting

full disclosure, the attorney-client privilege is narrowly construed to provide no greater protection than necessary to accomplish its desired purpose of fostering open dialogue between client and attorney. *Nat'l Educ. Training Group, Inc.,* 1999 U.S. Dist. LEXIS 8680, at *8–9. As the Second Circuit has observed,

> [t]he privilege itself is an exception to the critically important duty of citizens to disclose relevant evidence in legal proceedings. It does not shield communications which serve purposes other than those which led to judicial recognition of the privilege.

*In re John Doe Corp.,* 675 F.2d 482, 489 (2d Cir.1982) (citation omitted).

Despite its longstanding roots and strong policy underpinnings, the protections afforded by the attorney-client privilege may be waived. *Lugosch v. Congel,* No. 1:00–CV–0784, 2006 WL 931687, at *17 (N.D.N.Y. March 7, 2006) (Treece, M.J.). While by no means the sole basis for finding waiver, a party who voluntarily shares privileged information with another individual or entity whose legal interests are not mutually aligned is generally considered to have abandoned the protections of the privilege. *Id.* Because of the strong public policy considerations which support it, however, "rules which result in the waiver of [the] privilege and thus possess the potential to weaken attorney-client trust, should be formulated with caution." *In re County of Erie,* 2008 WL 4554920, at *5.

### 2. Work Product Doctrine

Materials prepared in anticipation of litigation are protected from disclosure under Rule 26(b)(3) of the Federal Rules of Civil Procedure, which memorializes a doctrine having its roots in the Supreme Court's decision in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385 (1947).[3] To warrant protection under this provision, a document must comprise 1) a document or tangible thing, 2) which was prepared in anticipation of litigation, and 3) was prepared by or for a party, or by or for its representative. *United States v. Adlman,* 68 F.3d 1495, 1501 (2d Cir.1995); *Tayler v. Travelers Ins. Co.,* 183 F.R.D. 67, 69 (N.D.N.Y.1998) (Hurd, M.J.) (citations omitted). As is the case with regard to other discovery

exemptions, the burden of establishing entitlement to work product protection rests squarely with the party seeking to avoid disclosure. *Tayler,* 183 F.R.D. at 69; *see also Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 470 (S.D.N.Y.1993) (citations omitted).

Although the rule itself is not so limited in its application, by its express terms Rule 26(b)(3) pays particular deference to the work product of an attorney. Attorney work product is best described as encompassing the mental impressions and legal opinions made by a lawyer, the governing rule in essence creating "a zone of privacy for an attorney's preparation to represent a client in anticipation of litigation." *In re Grand Jury Subpoena Dated Oct. 22, 2001,* 282 F.3d 156, 160 (2d Cir.2002) (citing *Hickman,* 329 U.S. at 510–11, 67 S.Ct. at 393 and *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir.1998)).

### B. *Plaintiffs' Motion*

#### 1. *Auditor Statements*

**\*5** In response to both document demands served upon the defendants and a subpoena issued pursuant to Rule 45 of the Federal Rules of Civil Procedure upon Deloitte & Touche, LLP ("D & T"), ten documents from Harrah's files and sixty-three within the possession of D & T have been held back from discovery. The limited privilege log provided with regard to the ten documents withheld by Harrah's reflects that they were generated between July 12, 2005 and October 29, 2007, and are all described generically as "General Counsel Report to Audit Committee".[4] Plaintiffs' Motion (Dkt. No. 37) at pp. 1–2 and Exh. D. The log does not specify the basis for withholding the documents. *Id.* There is no privilege log provided with regard to the documents withheld by the auditors. Since it is well established that documents exchanged between a company's in-house or outside counsel and its auditors are not protected by the attorney-client privilege, *see In re John Doe Corp.,* 675 F.2d at 488–89, and defendants do not contend otherwise, it appears that the documents in issue have been withheld under claim of work product protection.

In response to this claim, plaintiff initially argues that the documents do not qualify for work product protection since they were all generated after *Arquette I* and *Arquette II* were settled, and all but two came prior to commencement of this action. Plaintiffs' Motion (Dkt. No. 37) at p. 2. This argument is easily dispensed with. At the outset I note that communications do not necessarily lose work product

protection simply because they relate to the settlement of an action. *See Rumain v. Baruch College of City Univ. of New York,* No. 06 Civ. 8256, 2007 WL 4462178, at \*2 (S.D.N.Y. Dec. 14, 2007). Moreover, while it is true that the *Arquette* actions may have been considered by some to have been settled—a matter which is vigorously contested—the underlying dispute concerning tribal leadership and the rights to develop gaming operations under tribal auspices raged on, including administratively before the BIA, even after dismissal of *Arquette I* and *Arquette II.* The court doubts that anyone, and certainly least of all the plaintiffs in this action, had any expectation that the matter would not generate further litigation in one or more available fora.

Whether the disputed litigation summaries are deserving of work product protection at all presents a closer question. Characterizing the disputed reports as "by their very nature, made in the ordinary course of business [,]" plaintiffs argue that they do not qualify for work product protection particularly since they do not evince such matters as mental impressions of counsel and litigation strategy. *See* Plaintiffs' Motion (Dkt. No. 37) at p. 2. In support of their argument, plaintiff's cite *In re Bairnco Corp. Sec. Litig.,* 148 F.R.D. 91, 103 (S.D.N.Y.1993). *Id.* Defendants counter that the plaintiffs have taken an unduly restrictive view of the protection afforded by the work product doctrine, and that the litigation summaries at issue represent quintessential work product. Defendants' Opposition (Dkt. No. 38) at pp. 3–12.

**\*6** The Second Circuit Court of Appeals had occasion to explore the contours of the work product doctrine in settings such that now presented in *United States v. Adlman,* 134 F.3d 1194. In that case the court posited three hypotheticals to illustrate various potential circumstances under which work product protection could arise. *Adlman,* 134 F.3d at 1199–1200. The third of those hypotheticals included the following attributes:

> A business entity prepares financial statements to assist its executives, stockholders, prospective investors, business partners, and others in evaluating future courses of action. Financial statements include reserves for projected litigation. The company's independent auditor requests a memorandum prepared by the company's attorneys estimating the

likelihood of success in litigation and an accompanying analysis of the company's legal strategies and options to assist it in estimating what should be reserved for litigation losses.

*Id.* at 1200. After setting forth the three examples the appellate court noted that in each instance legal analysis of the type giving rise to the work product protection is involved. *Id.* The court went on to formulate a "because of litigation" test which would shield materials in situations where "the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *Id.* at 1202 (citing and quoting, *inter alia,* Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)) (*emphasis added* by Second Circuit in *Adlman* ). Attempting to clarify by contrasting other potential circumstances, the court continued that "it should be emphasized that the 'because of' formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." *Adlman,* 134 F.3d at 1202. Against this backdrop, I have reviewed the disputed communications *in camera,* and conclude at the outset that they are entitled to work product protection.

Placing heavy reliance upon the court's decision in *Medinol, Ltd. v. Boston Scientific Corp.,* 214 F.R.D. 113, 116 (S.D.N.Y.2002), plaintiffs argue that even if the litigation summaries at issue are deserving of work product protection, that protection was waived when they were disclosed to D & T in light of its position as an independent outside auditor and the potentially adversarial nature of that relationship. Plaintiffs' Motion (Dkt. No. 37) at p. 3. *Medinol,* however, has been almost uniformly rejected as adopting far too restrictive a view regarding the circumstances under which a waiver can occur. *See, e.g., Am. Steamship Owners Mut. Prot. and Indem. Ass'n v. Alcoa Steamship Co., Inc., et al.,* No. 04 Civ. 4309, 2006 WL 278131, at *2 (S.D.N.Y. Feb 2, 2006). While disclosure of materials covered by the attorney-client privilege to third parties with no common interest can and generally does result in a waiver of the privilege, *see e.g., Sokol v. Wyeth,* No. 07 Civ. 8442, 2008 WL 3166662, at *5 (S.D.N.Y. Aug 4, 2008); *Denney v. Jenkens & Gilchrist,* 362 F.Supp.2d 407, 412 (S .D.N.Y.2004), the law is not nearly so ungenerous when it comes to the sharing of materials subject to work product protection. *See, e.g.,*

*U.S. v. Stewart,* 287 F.Supp.2d 461, 468–69 (S.D.N.Y.2003). The policy underlying work product protection is " 'to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent.' " *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.,* 229 F.R.D. 441, 445 (S.D.N.Y.2004) (citing and quoting *United States v. Am. Tel. & Tel. Co.,* 642 F.2d 1285, 1299 (D.C.Cir.1980)). Accordingly, work product privilege is not automatically waived through disclosure to a third person absent a basis to conclude that " 'disclosure is inconsistent with maintaining secrecy from possible adversaries.' " *Merrill Lynch,* 229 F.R.D. at 445 (citing and quoting *Stix Prods. v. United Merchants and Mfrs.,* 47 F.R.D. 334, 338 (S.D.N.Y.1969)).

**\*7** For these reasons, most courts which have addressed the specific issue of whether the sharing of litigation related statements with outside auditors should result in a waiver have sided with the defendants in eschewing *Medinol. See, e.g., Securities and Exchange Commission v. Roberts,* No. C 07–04580, 2008 WL 3925451, at *10–11 (N.D.Cal. Aug. 22, 2008); *Am. Steamship Owners,* 2006 WL 2781341, at *2; *Lawrence E. Jaffee Pension Plan v. Household Int'l, Inc.,* 237 F.R.D. 176, 181(N.D.Ill.2006); *see also Tronitech, Inc. v. NCR Corp.,* 108 F.R.D. 655, 657 (S.D.Ind.1985) (similarly holding, although prior to the court's decision in *Medinol* ).

In sum, having concluded that defendants have established a basis to assert work product protection with regard to the disputed litigation summaries developed for D & T, and finding no waiver as a result of the disclosure of those documents, I will deny this portion of plaintiffs' motion to compel discovery.

### 2. *Communications with Holland & Hart, LLP*

The second issue raised in plaintiffs' motion, implicating a far greater number of withheld documents, relates to communications between representatives of the defendants, including between their counsel in this action and Thomas L. Sansonetti, Esq. and William G. Myers, Esq., two affiliates of the Washington, D.C. law firm of Holland & Hart, LLP. [5] Plaintiff maintains that because the efforts of those two individuals, though licensed attorneys, by their nature represented lobbying, any communications between them and representatives of the defendant are not privileged. Plaintiffs' Motion (Dkt. No. 37) at pp. 4–6. Characterizing the actions of the Holland & Hart attorneys at issue as legal in nature, rather than representing mere lobbying efforts, defendants

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 33 of 45
Vacco v. Harrah's Operating Co., Inc., Not Reported in F.Supp.2d (2008)
2008 WL 4793719

respond that the communications are entitled to attorney-client privilege protection. Defendants' Opposition (Dkt. No. 38) at pp. 12–16. As an alternative basis for withholding disclosure of those communications, Harrah's asserts that in any event they constitute work product, and their disclosure to Holland & Hart provides no basis for a waiver. *Id.* at pp. 16–18.

There are two immutable principles at play with respect to this issue. The first directs that communications between a lobbyist and his or her client are not entitled to attorney-client protection solely by virtue of that relationship, even though the lobbyist may also be a licensed attorney. *In re Grand Jury Subpoena Dated March 9, 2001,* 179 F.Supp.2d 270, 285 (S.D.N.Y.2001) (citation omitted). Conversely, it is equally true that the fact that an attorney also engages in lobbying does not automatically divest communications between that individual and his or her client of attorney-client protection. *Id.* The analysis as it relates to such documents, then, is entirely contextual and depends upon the nature of the services as illuminated by the contents of those communications and other relevant factors shedding light on the parties' relationship. *Id.; see also NXIVM Corp.,* 241 F.R.D. at 128–32.

 **\*8** I have reviewed the disputed communications *in camera* in order to assist in making a determination regarding those documents. The documents reviewed by the court confirm defendants' assertion that they relate to advice, given by Holland & Hart to Harrah's and/or their counsel in this action, Boise, Schiller & Flexner, relative to the prosecution of this action as well as pending administrative proceedings before the DOI. This is exemplified by the fact that based upon information and advice received from those attorneys at Holland & Hart, LLP, defendants' attorney, George F. Carpinello, Esq., sent a letter dated August 14, 2007 to the BIA setting forth the position of his clients concerning whether the Tribal Court which issued the original judgment in this case was properly constituted in March of 2001. *See* Defendants' Opposition (Dkt. No. 38) at Exh. B. The conclusion that the services rendered by Holland & Hart, LLP were predominately legal is reinforced by the retainer agreement entered into at the outset of the firm's engagement. Based upon these factors and my *in camera* review, I conclude that the disputed documents are attorney-client privileged materials subject to protection from disclosure.'

### C. *Defendants' Motion*

In their motion, defendants seek enforcement of five document discovery requests. *See generally* Defendants' Motion (Dkt. No. 36). Like plaintiffs' motion, the application filed by Harrah's and Cummis implicates matters involving the attorney-client privilege as well as whether the privilege extends to mutually aligned parties under a common interest theory. *Id.*

#### 1. *Joint Alliance Agreement*

Defendants' first disputed request seeks documents related to an agreement entered into between the Trust and the Tribe, designated as a "Joint Alliance Agreement." Defendants' Motion (Dkt. No. 36) at pp. 1–2. Drafts of that agreement have been withheld from discovery by the plaintiffs based upon the fact that they were prepared by attorneys for the Trust and shared only with the Tribe, a party with a common litigation interest. Plaintiff's Opposition (Dkt. No. 39) at p. 2.

When two or more parties share a common legal interest, legal advice provided with respect to that common interest is shielded by the attorney-client privilege, absent a basis to find a waiver. *U .S. v. Schwimmer,* 892 F.2d 237, 243–44 (2d Cir.1996); *In re Rivastigmine Patent Litig.,* No. 05 MD 1661, 2005 WL 2319005, at \*2 (S.D.N.Y. Sept. 22, 2005). Under this doctrine, which is distinct from the joint defense privilege, it is not required that an actual suit be pending at the time the privilege communications are disclosed. *Schwimmer,* 892 F.2d at 243–44. Similarly, despite defendants' argument to the contrary, it is not necessary that a formal written common interest agreement have been entered into in order to invoke the common interest privilege; it is enough that there is an oral understanding between the parties toward mutual cooperation. *In re Rivastigmine Patent Litig.,* 2005 WL 2319005, at \*4.

 **\*9** The court has reviewed the documents otherwise responsive to this request but withheld, and agrees that in light of the common interest privilege, there is no basis to find a waiver based upon the sharing of those documents with third parties. This portion of defendants' motion will therefore be denied.

#### 2. *Documents Relative to Formation of the Trust*

Defendants' fourth document demand requests the production of materials concerning formation of the Trust. Defendants' Motion (Dkt. No. 36) at p. 2. Plaintiffs have withheld documents, including drafts of the trust agreement, as

attorney-client privileged in light of the fact that they were prepared for the Trust and shared only with the Trust or those with a common interest. Plaintiffs' Opposition (Dkt. No. 39) at p. 2. Having reviewed the disputed, withheld documents *in camera,* I agree and will therefore deny this portion of defendants' motion as well.

### 3. *Sufficiency of Search for Documents*

Defendants' fifth document request seeks materials within the possession, custody, or control of a large number of individuals, quantified by the parties at thirty-three.[6] Defendant challenges the sufficiency of plaintiff's search for the requested materials, and specifically whether it was reasonably calculated to uncover all of the documents sought and located within the possession, custody, or control of those individuals. Defendants' Motion (Dkt. No. 36) at p. 2.

During the recent hearing representations were made to the court regarding the search conducted by plaintiffs' representatives in response to this request. Based upon the representations of counsel I find that the search was reasonable and sufficient to meet the obligations of the plaintiffs to provide discovery. This portion of defendants' motion to compel will therefore similarly be denied.

### 4. *Documents Reflecting Payments Made by the Trust*

Defendants' sixth document demand relates to payments made to the plaintiffs in *Arquette I* and *Arquette II* by third parties, a matter potentially bearing upon the champerty issue raised in the defendants' dismissal motion. Defendants' Motion (Dkt. No. 36) at p. 3. In response, plaintiffs assert that they have produced all documents within the possession custody or control of the Trust, which was only formed in January of 2004, noting that certain payments were made prior to that date by Catskill Development, LLC, an entity which has been dissolved and whose assets, including its files, were assigned to Empire Resorts, Inc. in January of 2004, plaintiffs adding they have no control over that entity. Plaintiffs' Opposition (Dkt. No. 39) at p. 3.

Defendants' document discovery requests are governed by Rule 34 of the Federal Rules of Civil Procedure, which allows a party to request, *inter alia,* production of documents which are in the "possession, custody, or control" of the party upon which the request is served. Fed.R.Civ.P. 34(a). The touchstone of control, which has been variously defined by the courts, is the ability, whether through exercise of a legal right or authority or through other means, to obtain

the requested documents. *Searock v. Stripling,* 736 F.2d 650, 653 (11th Cir.1984); *Camden Iron and Metal, Inc. v. Marubeni Am. Corp.,* 138 F.R.D. 438, 441 (D.N.J.1991); *M.L.C., Inc. v. North Am. Phillips Corp.,* 109 F.R.D. 134, 136 (S.D.N.Y.1986); *see also Playboy Entm't Group, Inc. v. United States,* No. CIV. A. 96–94, 1997 WL 873550, at *3 (D.Del. Dec. 11, 1997) (citing, *inter alia, Camden Iron,* 138 F.R.D. at 441). As utilized in Rule 34, the term "control" is broadly construed by the courts. *Camden Iron,* 138 F.R.D. at 441 (citing *Scott v. Arex, Inc.,* 124 F.R.D. 39, 41 (D.Conn.1989)). The burden of establishing a party's control over requested documents, however, rests with the party seeking to compel production. *Id.* (citing *United States v. Int'l Union of Petroleum & Indus. Workers,* 870 F.2d 1450, 1452 (9th Cir.1989)).

**\*10** The question of a party's control over documents possessed by a non-party is inherently fact specific. Addressing the issue, courts have examined various relevant factors, including the corporate structures and interrelationships of the entities involved; whether there is financial dependency or overlap among the relevant entities; the extent of any common ownership and management, including among directors and officers; the non-party's connection to the transaction at issue; and whether the non-party stands to benefit from a favorable litigation outcome. *Playboy Entm't Group, Inc.,* 1997 WL 873550, at *3; *Camden Iron,* 138 F.R.D. at 441–42; 7 James Wm. Moore et al., Moore's Federal Practice § 34.12 (3d. ed.1997). An important factor to be considered is the very practical consideration of the ability of the party from whom the documents are sought to obtain them on demand from the non-party in possession of them. *Playboy Entm't Group, Inc.,* 1997 WL 873550, at *3 (citing, *inter alia, Camden Iron,* 138 F.R.D. at 441).

At the present time the court has insufficient information from which it could conclude that the records of Empire are indeed within plaintiffs' possession, custody, or control. Under the circumstances, this portion of defendants' motion will therefore be denied, without prejudice to renewal after further discovery is conducted to flesh out the critical facts surrounding this issue.

### 5. *Tribal Council Resolutions*

Defendants' final issue concerns a request for documents relative to various tribal council resolutions specified in the request. Defendants' Motion (Dkt. No. 36) at p. 5. In response, plaintiffs note that documents otherwise responsive to this request are being withheld based upon a claim of

privilege, asserting that the resolutions were drafted by plaintiff Dennis Vacco, Esq., who at the time was acting as counsel to the Tribe. Plaintiffs' Opposition (Dkt. No. 39) at p. 3. Plaintiffs further assert that the documents were not shared with unrelated parties without a common litigation interest, such that the privilege could be considered to have been waived. *Id.* Under these circumstances, having reviewed the disputed documents *in camera,* I conclude that this portion of defendants' motion similarly should be denied.

### IV. *SUMMARY AND CONCLUSION*

The dispute now before the court presents issues which call upon the court to apply established rules to determine whether the documents in issue are worthy of attorney-client and/or work product protection, and whether any such protection has been lost by virtue of the fact that those documents were communicated to third parties. Having reviewed the documents and applied the controlling legal principles, I conclude that the materials provided by the defendants to D & T, their outside auditors, constitute work product, and that the resulting protection against disclosure was not waived. Similarly, I find that the disputed materials exchanged with defendants' outside attorneys at Holland & Hart are entitled to protection as attorney-client privileged documents. Turning to the issues raised by defendants' motion, I conclude based upon my *in camera* review that each of the documents withheld was protected from disclosure, and that based upon the record now before the court the plaintiffs have made a search reasonably calculated to uncover relevant, responsive documents. Accordingly, it is hereby

**\*11** ORDERED as follows:

1) Plaintiffs' motion to compel discovery (Dkt. No. 37) is DENIED.

2) Defendants' motion to compel discovery (Dkt. No. 36) is DENIED, without prejudice to renewal to seek disclosure of relevant, non-privileged documents held by Empire Resorts, Inc.

3) No costs or attorneys' fees are awarded to any party in connection with the pending cross-motions.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4793719

---

## Footnotes

1    Defendants have since been instructed by the court to furnish any retainer agreement entered into with Holland & Hart, LLP for *in camera* inspection, and have now complied with that directive.

2    As was previously noted, plaintiff's complaint also seeks to invoke federal question jurisdiction. *See* Complaint (Dkt. No. 1) ¶ 6. While enforcement of a judgment entered in a Native American court implicates certain broader federal considerations, the essence of plaintiffs' claim is an effort to enforce a foreign judgment, a matter which does not in and of itself present a federal question. *Stiller v. Hardman,* 324 F.2d 626, 628 (2d Cir.1963). In the end, as both parties agreed during oral argument, it does not appear that there is any material difference between New York and federal common law insofar as the attorney-client privilege principles applicable to this case are concerned. *Accord Tompkins v. R.J. Reynolds Tobacco Co.,* 92 F.Supp.2d 70, 75 (N.D.N.Y.2000) (Scullin, J.) ("New York law governing the attorney-client privilege ... is generally similar to accepted federal doctrine.") (quotations and citations omitted).

3    That rule provides, in pertinent part, that subject to subdivision (b)(4) (related to expert discovery), a party may obtain discovery of "documents and tangible things" otherwise discoverable under subdivision (b)(1) and "prepared in anticipation of litigation or for trial by or for another party or [that other party's] representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)" only upon a showing that the party seeking discovery "has substantial need of the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed.R.Civ.P. 26(b)(3). In ordering discovery of such materials when the required showing has been made, the court shall "protect against

2008 WL 4793719

disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative [of a party] concerning the litigation." *Id.*

4    My order dated April 4, 2008, compelling discovery, required, *inter alia,* "that any documents withheld from production but otherwise falling within the scope of [the] order must be listed on an appropriate privilege log served upon the withholding party's adversary." Dkt. No. 33 at p. 4. Notwithstanding this explicit directive, during a telephone conference held one week later the parties agreed between themselves not to require the production of privilege logs from each other. *See* Defendants' Opposition (Dkt. No. 38) at pp. 1–2. As plaintiffs now argue, under ordinary circumstances the failure to provide an appropriate privilege log can operate as a waiver of otherwise available protection against production of otherwise relevant and discoverable materials. *See U.S. v. Constr. Prod. Research, Inc.,* 73 F.3d 464 (2d Cir.1996); *NXIVM Corp. v. O'Hara,* 241 F.R.D. 109, 130 (N.D.N.Y.2007) (Treece, M.J.); *Johnson v. Bryco Arms,* No. 03 CV 2582, 2005 WL 469612, at *3– 4 (E.D.N.Y. March 01, 2005). In this instance, however, given the parties' apparent agreement to excuse this meaningful requirement, I conclude that plaintiffs are not well positioned to assert waiver under these circumstances.

5    According to information publically posted on the Holland & Hart website, Mr. Sansonetti served as the Solicitor of the Department of the Interior ("DOI"), the parent agency of the BIA, and as such was the number three ranked person within that department at the time. Holland & Hart, LLP, People: Attorneys/Professionals Profile, http:// www.hollandhart.com/peopleprofile.cfm?IDname=personID & ID=0861 (last visited Oct. 27, 2008). Sansonetti joined Holland & Hart in 1993 and has developed what is described as a "national practice in national resources and environmental law." *Id.* That same website indicates that Mr. Myers also served as the Solicitor of the DOI and has several years of prior federal governmental experience, particularly specializing in energy and natural resources issues. Holland & Hart, LLP, People: Attorneys/Professionals Profile, http:// www.hollandhart.com/peopleprofile.cfm?Idname=personID & ID=0998 (last visited Oct. 27, 2008). The website states that since joining Holland & Hart in 1997 Myers has "advised clients on utilization of federal lands, environmental compliance, legislative matters, and litigation." *Id.*

6    Plaintiffs' counsel represents that several of the individuals involved are deceased.

---

**End of Document**                                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 37 of 45

Van Every v. Ambrozyak, Not Reported in Atl. Rptr. (2018)

2018 WL 1886724

Only the Westlaw citation is currently available.

**NON-PRECEDENTIAL DECISION—**
**SEE SUPERIOR COURT I.O.P. 65.37**

Superior Court of Pennsylvania.

Leslie L. VAN EVERY, Individually,
and as the Personal Representative of the
Estate of David E. Van Every, Plaintiff

v.

Stepan AMBROZYAK, KLM Express, Inc.,
and Stephanie J. Kauffman, Defendants

v.

Cargo Transporters, Inc., ABF Freight Systems, Inc.,
David L. Perry, Patrick J. Anderson, FFE Transportation
Services, Inc. and John Doe, Additional Defendants

Appeal of: FFE Transportation Services, Inc.

No. 797 MDA 2017
|
Filed April 20, 2018

Appeal from the Order Entered April 12, 2017, In the Court
of Common Pleas of Cumberland County, Civil Division at
No(s): 2014–01630, 2015–06112, 2016–00398, 2016–00555,
2016–00577, 2016–00617

BEFORE: BOWES, OLSON, AND RANSOM, JJ.

MEMORANDUM BY BOWES, J.:

**\*1** FFE Transportation Services, Inc. ("FFE") appeals
from the discovery order compelling it to produce certain
documents requested by plaintiff Leslie L. Van Every ("Van
Every"), individually, and as the personal representative of
the Estate of David E. Van Every, which FFE claims are
privileged. [1], [2] We reverse and remand.

This consolidated action stems from the filing of several
lawsuits concerning a multi-vehicle accident which occurred
on February 4, 2014, on Interstate 76 (the Pennsylvania
Turnpike) in Cumberland County, Pennsylvania. Van Every's
husband, David E. Van Every, died as a result of injuries
sustained in the accident. Van Every filed her complaint
against FFE on November 5, 2015. FFE retained the law firm
of Pion, Nerone, Girman, Winslow & Smith, P.C. ("Pion") to
handle its defense in the matter.

In Van Every's amended complaint, she alleges that an
FFE tractor-trailer driven by an unidentified FFE employee
blocked lanes of traffic on Interstate 76, causing the multi-
vehicle accident. In its answer, FFE averred that one of its
drivers may have been operating a tractor-trailer on Interstate
76 near the location of the accident, but was unable to confirm
this fact.

During discovery, Van Every served FFE with written
discovery requests, including the following requests for the
production of documents:

> 53. Any and all documents pertaining to the investigation
> conducted by FFE ... to identify the driver of the subject
> FFE tractor and semi-trailer.

> 54. Any and all documents pertaining to the investigation
> conducted by FFE ... to identify the subject FFE tractor and
> semi-trailer.

Amended Complaint, ¶¶ 53, 54. In response, FFE objected
to the production of any privileged document, produced
a privilege log wherein it identified fifty-four withheld
documents, and asserted that each document was protected by
the attorney-client privilege and/or the attorney work product
doctrine.

Van Every filed a motion to compel FFE to produce the
withheld documents or, in the alternative, for the court to
conduct an *in camera* review. Following briefing on the
matter, the trial court ordered FFE to produce the withheld
documents for an *in camera* inspection. On April 12, 2017, the
trial court determined that thirteen of the fifty-four documents
were privileged, and ordered FFE to produce the remaining
forty-one documents, which it found to be non-privileged.
This timely appeal followed.

**\*2** Subsequent to the filing of its notice of appeal, FFE
produced thirty-four of the forty-one documents ordered for
production by the trial court. FFE continues to withhold from
production seven documents, Nos. 36–40 and 50–51. The
seven documents consist of emails between a representative
of FFE and members of the Pion law firm, regarding their joint
investigation of the identity of the driver and tractor-trailer
involved in the accident.

On appeal, FFE raises the following issue for our review:
"Whether the trial court committed an error of law in
compelling FFE to produce documents protected by the

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 38 of 45

Van Every v. Ambrozyak, Not Reported in Atl. Rptr. (2018)

attorney-client privilege and which are not subject to any of the limited exceptions to disclosure?"[3] Appellant's brief at 5.

Whether the attorney-client privilege protects a particular communication is a question of law. *See Clemens v. NCAA (In re Estate of Paterno)*, 168 A.3d 187, 194 (Pa.Super. 2017). Accordingly, our standard of review is *de novo* and our scope of review is plenary. *Id*.

The attorney-client privilege was derived from the common law, and later codified at 42 Pa.C.S. § 5928, which states: "In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." We also note that Pennsylvania law disfavors evidentiary privileges because they are in derogation of the truth. *See Red Vision Sys., Inc. v. Nat'l Real Estate Info. Servs., L.P.*, 108 A.3d 54, 61 (Pa.Super. 2015). Nonetheless, we "faithfully adhere to constitutional, statutory, or common law privileges." *McLaughlin v. Garden Spot Vill.*, 144 A.3d 950, 953 (Pa.Super. 2016). This court does not have the power to "order disclosure of materials that the legislature has explicitly directed be kept confidential." *Id*. (citation omitted).

"[I]n Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Gillard v. AIG Ins. Co.*, 15 A.3d 44, 59 (Pa. 2011). "The attorney-client privilege is intended to foster candid communications between counsel and client, so that counsel may provide legal advice based upon the most complete information from the client." *Yocabet*, *supra*, at 1027 (citation omitted). Since the purpose of the attorney-client privilege is to create an atmosphere that will encourage confidence and dialogue between attorney and client, the privilege is founded upon a policy extrinsic to the protection of the fact-finding process. *Id*.

The party asserting privilege bears the burden of producing facts establishing proper invocation of the privilege. *See Yocabet*, *supra*, at 1019. For a party to invoke the privilege, the following elements must be established:

1) The asserted holder of the privilege is or sought to become a client.

**\*3** 2) The person to whom the communication was made is a member of the bar of a court, or his subordinate.

3) The communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort.

4) The privilege has been claimed and is not waived by the client.

*Id*. at 1027 (citation omitted). When the client is a corporation, the privilege extends to communications between its attorneys and the agents or employees of the corporation authorized to act on its behalf. *See Brown v. Greyhound Lines, Inc.*, 142 A.3d 1, 9 (Pa.Super. 2016). In determining whether a communication by a client to someone other than his attorney is covered by the attorney-client privilege, courts have held that, as long as the recipient of the information is an agent of the attorney and the statement is made in confidence for the purpose of facilitating legal advice, it is privileged. *See Farrell v. Regola*, 150 A.3d 87, 100 (Pa.Super. 2016); *see also* Restatement (Third) of the Law Governing Lawyers § 70 (2000) (providing that "privileged persons" include the client, the attorneys, and any of their agents that help facilitate attorney-client communications or the legal representation.).

However, the protection of the privilege extends only to *communications* and not to facts. *See Upjohn Co. v. United States*, 449 U.S. 383, 395–96 (1981). As explained by the High Court,

A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, "What did you say or write to the attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Id*. (citing *Philadelphia v. Westinghouse Electric Corp.*, 205 F.Supp. 830, 831 (ED Pa. 1962) ).

The trial court determines whether the facts support the asserted privilege. *See Law Office of Douglas T. Harris v. Phila. Waterfront Partners, LP*, 957 A.2d 1223, 1231 (Pa.Super. 2008) (citing 8 Wigmore, Evidence, § 2322 (McNaughton rev. 1961) ). "Once the invoking party has made the appropriate proffer, then the burden shifts to the

Van Every v. Ambrozyak, Not Reported in Atl. Rptr. (2018)

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 39 of 45

party seeking disclosure to set forth facts showing that disclosure should be compelled either because the privilege has been waived or because an exception to the privilege applies." *Id.*

Turning to the communications at issue herein, FFE contends that, after it was named as a defendant in the action, its defense counsel, Pion, directed FFE to undertake an investigation as to the identity of the driver and the tractor-trailer involved in the accident. Pion also participated in the investigation. FFE claims that this investigation is the subject of the seven withheld documents, which consist of email communications between FFE and attorneys, paralegals and staff of Pion, or among attorneys and paralegals of Pion.

FFE contends that it has established that the attorney-client privilege applies to the emails because (1) FFE is the client of Pion; (2) the communications were made after the commencement of Van Every's litigation against FFE; (3) the communications are between representatives of FFE and attorneys, paralegals and staff of Pion, or among attorneys and paralegals of Pion; (4) the communications relate to the investigation being performed by FFE and Pion to identify the driver and tractor-trailer at the scene of the accident; and (4) there has been no waiver of the privilege because the emails were not shared with any third party.

 **\*4** Each of the seven documents that FFE has withheld from production consist of a printout from the email account of an attorney at Pion. Document Nos. 36–40 and 51 each consist of a string of emails. Document No. 50 consists of a single email. Several of the documents involve the same or substantially similar email chains. In its privilege log, FFE described the withheld documents as follows:

Document No. 36: "9/20/16. Email string between Mark Rhea (FFE), Sandee Starks (FFE), John Pion, Ashley Travis (Pion paralegal), Tina Paluti (Pion paralegal) and Pion admin. staff re: discussion of investigation into identity of driver." [4] Privilege log at 3.

Document No. 37: "9/20/16. Email from Ashley Travis (Pion paralegal) to John Pion and Tina Paluti (Pion paralegal) re: discussion of investigation into identity of driver (includes entire email string contained in Doc. # 36)." *Id.*

Document No. 38: "9/20/16. Email string between John Pion, Sandee Starks (FFE), Ashley Travis (Pion paralegal), Tina Paluti (Pion paralegal), and Pion admin. staff re: discussion

of investigation into identity of driver (includes entire email string contained in Doc. # 37)." *Id.*

Document No. 39: "9/22/16. Email string between John Pion, Sandee Starks (FFE), Mark Rhea (FFE), Ashley Travis (Pion paralegal), Tina Paluti (Pion paralegal), and Pion admin. staff re: discussion of investigation into identity of driver." [5] *Id.*

Document No. 40: "9/27/16. Email string between John Pion, Sandee Starks (FFE), and Ashley Travis (Pion paralegal) re: discussion of investigation into identity of driver (includes entire email string contained in Doc. # 39)." *Id.*

Document No. 50. "12/14/16. Email from Sandee Starks (FFE) to John Pion and Bradley Sprout: discussion of investigation into identity of driver. Includes as an attachment a spreadsheet compiled by FFE as part of investigation of identity of driver." [6] *Id.* at 4.

Document No. 51. "12/14/16. Email from John Pion to Sandee Starks (FFE), Bradley Sprout, and Pion admin. staff re: discussion of investigation into identity of driver (includes emails contained in Doc. # 50)." *Id.*

Based on our *in camera* review of the seven withheld documents, we conclude that the communications contained therein are protected by the attorney-client privilege, and therefore subject to non-disclosure. FFE is a client of the Pion law firm. Each of the email communications was exchanged between FFE employees and Pion attorneys, paralegals and administrative staff. The email communications relate to facts which the attorneys were informed of by FFE, without the presence of strangers, for the purpose of securing assistance in a pending legal matter, and not for the purpose of committing a crime or tort. Finally, the privilege was timely invoked, and not waived.

 **\*5** Bearing in mind that any "facts" pertaining to the accident included within those communications are not protected, and therefore subject to disclosure, we point out that FFE has produced to Van Every the email exchanges between Sandee Starks and Mark Rhea dated September 20, 2016 and September 21, 2016, which provided factual information pertaining to the investigation. Additionally, FFE produced to Van Every the list of FFE dispatchers included in Document Nos. 50 and 51, and the spreadsheet of tractor-trailers attached to document No. 50. No additional facts relative to the accident are contained in any of the remaining emails.

Van Every v. Ambrozyak, Not Reported in Atl. Rptr. (2018)

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 40 of 45

While Van Every claims that FFE must disclose *all* communications regarding such facts, this is simply not the law of Pennsylvania. The attorney-client privilege attaches to communications between an attorney and a client in preparation for litigation *even if the discussion in the interview concerns merely factual events*. *See Gould v. City of Aliquippa*, 750 A.2d 934, 938 (Pa.Cmwlth. 2000) (noting that the Pennsylvania Rules of Civil Procedure provide ample methods, such as depositions and interrogatories, by which litigants may properly discover available facts). [7] Thus, we are satisfied that FFE has fulfilled its factual disclosure obligations.

As FFE established that document Nos. 36–40 and 50–51 are protected by the attorney-client privilege, the burden shifted to Van Every to prove that FFE waived the privilege, or that an exception applies. In this regard, Van Every alternatively contends that, if the documents are deemed privileged, FFE waived the privilege by "voluntarily" producing thirty-four of the forty-one documents subject to the trial court's order compelling production. Van Every points to the privilege log, and argues that the subject matter description of the thirty-four produced documents is the same or similar to the description of document Nos. 36–40, and 50–51. Citing *United States v. Keystone Sanitation Co., Inc.*, 885 F.Supp 672 (M.D. Pa. 1994), [8] Van Every claims that disclosure of privileged information relating to a particular subject matter operates as a waiver of privilege as to other confidential communications relating to the same subject matter.

We are not persuaded by Van Every's argument, given the circumstances of FFE's production. FFE produced the thirty-four documents pursuant to a court order *compelling* the production of those documents. Thus, the production was not "voluntary," and did not operate as a waiver of the attorney-client privilege as to document Nos. 36–40 and 50–51.

For the foregoing reasons, we conclude that document Nos. 36–40 and 50–51 are protected from disclosure by the attorney-client privilege, and the trial court erred in compelling FFE to produce them.

Order reversed. Case remanded. Jurisdiction relinquished.

### All Citations

Not Reported in Atl. Rptr., 2018 WL 1886724

## Footnotes

1      The remaining captioned-defendants are not parties to this appeal.

2      When a discovery order requires the production of materials that the appealing party has asserted are privileged, Pa.R.A.P. 313 applies, and we will accept jurisdiction. *See Yocabet v. UPMC Presbyterian*, 119 A.3d 1012, 1016 n.1 (Pa.Super. 2015); *see also* Pa.R.A.P. 313 (providing that an appeal may be taken as of right from a collateral order "where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.").

3      In its privilege log, FFE asserted that documents Nos. 36–40 and 50–51 were protected by *both* the attorney-client privilege and the attorney work product doctrine. As FFE has abandoned its claim that the subject documents are protected by the work product doctrine, that argument is not before us. Nevertheless, Van Every devotes much of her brief to her argument that the subject documents are not protected by the attorney work product doctrine.

4      The first email in the string, sent by Mark Rhea (FFE) to Sandee Starks (FFE), is dated September 20, 2016. FFE claims that it produced this email to Van Every. *See* Appellant's brief at 18 n.6, 21.

5      The first email in this string, sent by Mark Rhea (FFE) to Sandee Starks (FFE), is dated September 21, 2016. FFE claims that it produced this email to Van Every. *See* Appellant's brief at 18 n.6, 22.

**Van Every v. Ambrozyak, Not Reported in Atl. Rptr. (2018)**

Case 1:20-cv-00292-JPW    Document 367-1    Filed 01/12/24    Page 41 of 45

6    Document No. 50 includes a list of the FFE dispatchers working on the date of the accident. FFE asserts that it provided this list to Van Every. *See* Appellant' brief at 20, 21, 22. The spreadsheet attached to Document No. 50 contains a list of the tractor-trailers that entered the Pennsylvania Turnpike on the date of the accident. FFE claims that it produced the spreadsheet to Van Every. *See* Appellant's brief at 18 n.6, 21, 22.

7    Although decisions by the Commonwealth Court are not binding on this Court, they may be persuasive. *See Estate of Brown*, 30 A.3d 1200, 1204 n.2 (Pa.Super. 2011).

8    The only relevant authority cited by Van Every is non-binding federal authority. *See Eckman v. Erie Ins. Exchange*, 21 A.3d 1203, 1207 (Pa.Super. 2011) (stating that we are not bound by federal court decisions, other than the United States Supreme Court).

---

**End of Document**                                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

1991 WL 160249
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Steven R. WOJDAK, et al.,

v.

FIRST WESTERN GOVERNMENT
SECURITIES, INC., et al.

Civ. A. No. 83–1076.
|
Aug. 16, 1991.

**Attorneys and Law Firms**

Ronald F. Kidd, Michael M. Mustokoff, Philadelphia, Pa., for Plaintiffs.

Arthur E. Newbold, IV, Philadelphia, Pa., Robert E. Leberman, Richard J. Sideman, San Francisco, Cal., for First Western Govt. Securities, Inc., Sidney P. Samuels, Samuels, Kramer & Co.

Arden J. Olson, Irving R. Segal, John E. McKeever, Philadelphia, Pa., for Arvey, Hodes, Costello & Burman.

*MEMORANDUM OPINION AND ORDER*

VANARTSDALEN, Senior District Judge.

**\*1** This action was commenced in 1983 as a class action on behalf of certain investors in securities that were marketed and/or sold to them by or through First Western Government Securities, Inc. (First Western), and the financial adviser firm of Samuels, Kramer and Co. Also named as defendants were Sidney P. Samuels, a principal in both of the corporate defendants, and the law firm of Arvey, Hodes, Costello and Burman (Arvey Hodes), who had been counsel to the corporate defendants and who had prepared and provided legal advice as to the various security documents including opinions as to the tax consequences upon the investors. The essence of the complaint is that the defendants violated federal securities laws by advising potential investors that the investments would produce certain tax benefits by way of allowing certain "losses" to be treated as ordinary losses for purposes of federal income tax liabilities. That advice proved to be incorrect.

The Internal Revenue Service challenged the returns of certain of the investors and sought to impose substantial additional taxes, penalties and interest on the claimed "losses." As a result, the present class action was filed on behalf of the investors. The parties agreed that the outcome of the Internal Revenue Service claims, which were then being litigated would have a substantial and possibly controlling effect on the investors' class action suit. Consequently, after a motion for summary judgment had been filed on behalf of the defendant law firm in this class action, by agreement of all parties, the case was placed in suspense pending final determination of the Internal Revenue Service tax claim litigation. That litigation was finally resolved by the United States Supreme Court. In *Freytag v. Commissioner of Internal Revenue,* 59 U.S.L.W. 4872 (U.S. June 27, 1991), the Supreme Court affirmed the decision of the lower courts that "petitioners' [the tax paying investors] tax shelter scheme consisted of sham transactions and that petitioners owed additional taxes." *Id.* at 4873. As the Supreme Court noted in footnote 1 of the opinion, counsel for the tax payer petitioners contended that the case had "implications for up to 3,000 taxpayers [investors] and a billion and a half in alleged tax deficiencies."

Because of the outcome of the tax litigation, plaintiffs intend to proceed with the class action contending primarily that they were fraudulently misled and misinformed by the defendants as to the tax consequences of the "losses" created by the investment programs.

In addition to the pending motion by the defendant law firm for summary judgment, there is an unanswered motion for class certification. A conference of counsel was held August 7, 1991, where it was decided that the parties should be permitted a period for discovery before answering the summary judgment and class certification motions. There was, however, an outstanding and unresolved discovery dispute as to production of documents by the defendants, First Western and Arvey Hodes. By a memorandum and order dated January 30, 1985, certain of these discovery issues were resolved, and defendants were directed to deliver to the court for an in camera inspection any documents to which defendants continued to claim attorney-client privilege that were otherwise called for in the motion to compel. In response, approximately 100 documents were delivered to me. I have examined each one individually, and the matter is ripe for decision.

Wojdak v. First Western Government Securities, Inc., Not Reported in F.Supp. (1991)

**\*2**  The first group of documents consists of ten documents from the files of First Western. The first document is a letter from First Western to Sideman and Bancroft, attorneys who were also representing First Western in these matters. Sideman and Bancroft is not a defendant in the present litigation. The letter contained a copy of a draft opinion prepared by the law firm of Arvey Hodes concerning tax consequences of the proposed investment programs. The draft opinion letter, as well as all or practically all draft opinion letters withheld by defendants, had stamped on it "Draft for Discussion Purposes Only." Also, at the end of the opinion letter, it is stated: "This letter is intended for your personal use only and is not to be distributed to customers of First Western." It is thus clear that the draft opinion letters were for the purpose of giving legal advice to a client, and were expressly treated by the sender and the recipient as confidential.

What I have said as to Document No. 1 applies also to all draft opinion letters prepared by Arvey Hodes that are claimed as privileged. They need not be produced. Plaintiffs' contentions that the privilege claims lacked specificity is irrelevant since I have viewed the documents in camera and the draft opinion letters clearly provide confidential legal advice to the client. Plaintiffs also claim that the drafts were used to prepare a letter to be eventually delivered to the potential investors. Of course, plaintiffs are entitled to obtain copies of the final opinion letter of Arvey Hodes. Plaintiffs are not, however, entitled to study the various drafts to determine the mental processes of the attorneys as disclosed by the confidential communications to the client in developing the final version.

Plaintiffs also claim application of the "crime fraud" exception. A review, individually and in combination of each and all of the documents in camera, fails to reveal even a scintilla of a suggestion of any fraud in the preparation of the opinion letter by any party.

Likewise, there is no evidence of any waiver of privilege. The fact that First Western may have forwarded copies to other of its attorneys for their advice does not constitute any waiver. As I stated in the memorandum of January 30, 1985, there remained the question of whether the client intended the documents to be confidential. After a full review, it is clear that both the law firms and the client not only intended, but in fact, did keep the draft opinion letters confidential. Hence, all are privileged.

Document No. 2 is a letter from First Western to Arvey Hodes providing information for the purpose of obtaining legal advice. It is privileged.

There are also a series of letters between the law firms of Sideman and Bancroft and Arvey Hodes concerning their mutual client, First Western. When separate law firms are jointly representing a client, it seems to me that confidential interoffice communications utilized to prepare appropriate advice to the client comes within the attorney-client privilege.

**\*3**  One document in the files of First Western should be turned over. Document No. 7, a letter from Sideman and Bancroft to Arvey Hodes, although privileged, contained a copy of a letter by an R.D. Schmidt, apparently an attorney representing one of the investors, that was "inadvertently" mailed to Sideman and Bancroft. Document No. 7, including the covering letter of August 29, 1983, from Sideman and Bancroft to Arvey Hodes, excluding the second paragraph which may be redacted, shall be turned over to plaintiffs.

Of the documents contained in the files of Arvey Hodes, which are claimed as privileged, all but a very few are clearly privileged and need not be turned over. Preliminary drafts of brochures which were delivered to Arvey Hodes or which Arvey Hodes prepared are privileged, the same as the Arvey Hodes draft opinion letters. Likewise, correspondence between First Western and Arvey Hodes is privileged.

There are a series of interoffice memoranda by Arvey Hodes, and memoranda "to file." In effect, these are recordings of the attorneys' mental thoughts and strategy. There is no evidence that they were prepared in anticipation of litigation, but it seems to me that conversations and written correspondence produced for the sole purpose of providing legal advice to a client, where, as here, it is clear that the memoranda were to be treated as confidential and contained within the law firm, should be entitled to the attorney-client privilege.

Document No. 23 contains a copy of a memorandum that had been circulated by a Michael Senft in 1979 that challenges some of the conclusions of the Arvey Hodes opinion letter that had been distributed by First Western to the investors. Although plaintiffs probably already have or may otherwise acquire a copy of this letter, and the different viewpoint of Mr. Senft has undoubtedly been thoroughly explored in the tax litigation, I fail to see how this is privileged. Therefore, it must be turned over, together with the interoffice memorandum, excluding by redaction, the last sentence of the memorandum.

Case 1:20-cv-00292-JPW   Document 367-1   Filed 01/12/24   Page 44 of 45

Wojdak v. First Western Government Securities, Inc., Not Reported in F.Supp. (1991)

Document No. 26 is simply an innocuous covering letter of certain draft copies of a brochure. The brochures were not attached. The covering letter, Document No. 26, shall be turned over, but no draft copy of any brochure need be turned over. This is also true as to Document No. 27.

Document No. 28 is a confidential attorney-client communication. Also Document No. 29 is pure legal advice from Arvey Hodes to First Western. Both are covered by the attorney-client privilege.

Documents Nos. 30 through 35 inclusive are various draft copies of the proposed brochure. Almost all of them have stamped "Rough Draft." Many have handwritten notes, apparently by one or more of the reviewing attorneys. Document No. 35 is only a covering letter without a draft copy enclosed. Document No. 35 shall be turned over, but the last phrase may be redacted. Documents Nos. 36 through 43 contain additional preliminary drafts of portions of the Brochure. They are all privileged. Document No. 44 is an interoffice memorandum in reference to the Brochure and is privileged. Documents Nos. 45, 46, 47, and 48 are additional draft copies of proposed documents and are privileged.

 **\*4**  Documents Nos. 49 through 57 are preliminary drafts of proposed Customer Agreements and proposed letters to customers and need not be disclosed. Document No. 53 appears to be a copy of an actual letter sent to a customer. However, with the in camera submission is a statement by counsel asserting that Document No. 53 along with other documents are preliminary drafts. I accept this representation by counsel and therefore hold that it is privileged.

Document Nos. 58 through 75 inclusive are all preliminary drafts of the proposed Arvey Hodes tax opinion letter, or portions thereof. They are privileged.

Documents 76 and 77, although being portions of the final tax opinion letter, contain handwritten notes apparently made by reviewing counsel. They were obviously prepared for the purpose of advising the client. They need not be turned over to plaintiffs. Documents No. 78, 79, and 80 are interoffice memoranda regarding advice to the client and are privileged.

Document No. 81, although an interoffice memorandum, simply discloses a factual situation in reference to an IRS "Project." The document is not privileged except as to the last phrase commencing with the word "however," which

may be redacted. Document No. 82, another interoffice memorandum, discloses confidential legal advice to the client. It is privileged and need not be disclosed. The same is applicable to Document No. 83. Documents Nos. 84 and 85, without copies attached, do not appear to be privileged. They shall be turned over.

Document Nos. 86, 87, 88, and 89 are interoffice memoranda discussing various legal issues of the client. They are privileged. Documents Nos. 90, 91, and 92 appear to be legal research conducted by Arvey Hodes and retained by them. They involve advice or potential advice to the client and are privileged.

Documents Nos. 93 through 101 inclusive are various handwritten notes, many of which are probably legible and understandable only by the scrivener. All appear to be legal research or notes of the thoughts of counsel. It seems to me that such recorded mental impressions of counsel that involve potential advice to a client and are retained confidentially in the law firm's files should remain privileged. These documents need not be turned over.

Documents Nos. 102 and 103 are additional interoffice memoranda referring to legal advice and/or communications with the client as well as the mental impressions of the drafting lawyers. They need not be turned over.

The last Document No. 104 is a copy of a letter to the client, or as represented by counsel, a draft of such a letter. It clearly refers to confidential advice and communications between the attorneys and the client and is therefore privileged.

An order follows.

*ORDER*

After carefully reviewing individually and collectively each and every document submitted for in camera inspection pursuant to the Memorandum and Order filed January 30, 1985, and considering the briefs of counsel heretofore submitted on the motion to produce documents in discovery, and for the reasons set forth in the accompanying memorandum, utilizing for identification purposes, the document numbers attached by defense counsel to the submitted documents, it is

**\*5** ORDERED that the following documents or designated portions thereof, or copies thereof, shall within fifteen (15) days from the date of this Order be produced by defense counsel to plaintiffs' counsel:

    *A.* Documents from the files of First Western Government Securities, Inc.

1. Document No. 7, redacting therefrom the second paragraph of the covering letter from Sideman and Bancroft.

    *B.* Documents from the files of Arvey, Hodes, Costello and Burman.

1. Document No. 23, redacting therefrom the last sentence of the attached interoffice memorandum.

2. Document Nos. 26 and 27. Draft copies of any attached or enclosed brochures or other documents need not be produced.

3. Document No. 35, redacting therefrom the last phrase. No draft copy of any attached or enclosed opinion or brochure or other document need be produced.

4. Document No. 81, redacting therefrom the final phrase commencing with the word "however."

5. Document Nos. 84 and 85, without producing any attachment of copies referred to in the memoranda.

It is further ORDERED that all other documents presented for an in camera inspection are privileged and need not be produced in response to the outstanding discovery requests and motion to compel.

It is further ORDERED that the Order of August 7, 1991, as to the scheduling of briefing on the pending motion for summary judgment and class certification, shall remain in full force and effect and that the parties shall have three (3) months from the date of filing of this Order to complete discovery on the pending motion for summary judgment; to wit, until November 15, 1991; the nonmoving parties shall have one month thereafter to file their answers together with appropriate briefs to the motion for summary judgment; to wit, until December 16, 1991; movants shall have two (2) weeks thereafter to file any response or responsive brief; to wit, until December 30, 1991. A briefing schedule on the class certification issue shall be entered subsequent to a ruling on the summary judgment motion.

**All Citations**

Not Reported in F.Supp., 1991 WL 160249

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.