# EXHIBIT A

# COMPILATION OF UNREPORTED CASES CITED IN PACE-O-MATIC, INC.'S BRIEF

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 3 of 87

Alabama Aircraft Industries, Inc. v. Boeing Company, Not Reported in Fed. Supp. (2016)

2016 WL 9781826

2016 WL 9781826
Only the Westlaw citation is currently available.
United States District Court, N.D. Alabama.

ALABAMA AIRCRAFT INDUSTRIES, INC.,
Alabama Aircraft Industries, Inc.—Birmingham, and
Pemco Aircraft Engineering Services, Inc., Plaintiff,
v.
The BOEING COMPANY, Boeing
Aerospace Operations, Inc. and Boeing
Aerospace Support Center, Defendant.

CIVIL ACTION NUMBER: 2:11-cv-03577-RDP
|
Filed 03/24/2016

**Attorneys and Law Firms**

J. Michael Rediker, Meredith Jowers Lees, Rebecca A. Beers, Peter Tepley, R. Scott Williams, Rumberger, Kirk & Caldwell, P.C., Reginald L. Jeter, Law Office of Celeste P. Armstrong, Roger A. Brown, Patricia C. Diak, Haskell Slaughter Young & Rediker LLC, Birmingham, AL, Joshua D. Lerner, Rumberg Kirk & Caldwell PC, Miami, FL, for Plaintiff.

Alexia R. Brancato, Craig S. Primis, Erin C. Johnston, John C. O'Quinn, Matthew E. Papez, Tia T. Trout-Perez, Kirkland & Ellis LLP, Washington, DC, John Thomas Richie, Kevin C. Newsom, Reed Thomas Warburton, Bradley Arant Boult Cummings, LLP, Birmingham, AL, for Defendant.

**REPORT AND RECOMMENDATION**

David J. Middlebrooks, Special Master

 **\*1** Before the Special Master is Boeing's "Motion to Compel Production of Lobbying and Public Relations Documents AAI Withheld for Privilege" ("the Motion" or "Boeing's Motion"), which was filed on January 27, 2016. [1] The Motion has since been fully briefed, with AAI submitting a Response ("AAI's Response") on February 10, 2016 and Boeing filing a Reply ("Boeing's Reply") on February 17, 2016. For the reasons explained below, it is the recommendation of the Special Master that Boeing's Motion be **GRANTED IN PART** and **DENIED IN PART.**

**I. FINDINGS OF FACT**

**A. Non-Party Entities**

1. Navigators Global LLC ("Navigators") [2] is a Washington, D.C.-based lobbying firm that was originally hired by AAI in 2008. Boeing's Motion at 1; AAI's Response at 2. Navigator's 2008 and 2009 Engagement Letters with AAI indicate that it was hired to provide "consulting services," but, according to AAI, it engaged Navigators to "lobby on behalf of AAI and its interests to the Department of Defense and to the United States Congress in conjunction with its bid protest efforts." Boeing's Motion, Exs. E & F; AAI's Response at 2.

2. The Abernathy MacGregor Group, Inc. ("Abernathy MacGregor") is a Los Angeles, CA-based public relations firm that was originally hired by AAI in 2011. Boeing's Motion at 1; AAI's Response at 2. Abernathy MacGregor's 2011 Engagement Letter with AAI indicates that it was hired to "provide strategic communications counsel and services," particularly in regard to the present litigation. Boeing's Motion, Ex. G at ¶ 1; AAI's Response at 2. More specifically, the Engagement Letter notes, "AMG shall perform services as Counsel shall direct that are customarily performed by corporation communications firms at the behest of lawyers. AMG's services under this engagement shall be for the purpose of facilitating the rendition of Counsel's legal services to Client and Counsel believes that AMG's services will be reasonably necessary for the accomplishment of purposes for which Counsel has been retained by Client." Boeing's Motion, Ex. G at ¶ 3.

**B. Underlying Discovery**

3. After "discover[ing] these entities' involvement in this matter by examining AAI's document production," Boeing subpoenaed both Navigators and Abernathy MacGregor in May 2015. Boeing's Motion at 1; Boeing's Motion, Exs. A & B.

4. Navigators did not withhold or redact any documents in responding to Boeing's subpoena. Boeing's Motion at 1. However, as part of its own production, AAI withheld certain communications with Navigators on the basis of privilege. Boeing's Motion, Ex. D.

5. Likewise, in responding to Boeing's subpoena, Abernathy MacGregor withheld and/or redacted certain responsive documents, producing a privilege log that articulated its privilege bases. Boeing's Motion, Ex. C.

**\*2** 6. By letter dated August 26, 2015, Boeing objected to a number of Abernathy MacGregor's privilege assertions. Boeing's Reply, Ex. V. Abernathy MacGregor responded by letter dated September 16, 2015, writing, "As to the privilege issue, both Abernathy and AAI continue to assert that the documents listed on the privilege log were properly withheld based on attorney-client privilege. That privilege, however, is owned by AAI, not Abernathy. Accordingly, please address all further communications challenging the assertion of privilege directly to AAI's counsel ..." Boeing's Motion, Ex. P. In a reply letter dated October 1, 2015, Boeing assented to Abernathy MacGregor's request, noting that it would "take these matters up with AAI and the Special Master as appropriate." Boeing's Reply, Ex. W.

7. On January 26, 2016, Boeing wrote to AAI, requesting the production of "all agreements, effective now or in the past, between Plaintiffs or counsel for Plaintiffs and any public relations or lobbying firm, including but not limited to Navigators Global, LLC or Abernathy MacGregor Group, related to Boeing or the KC-135 PDM Recompete Contract." AAI's Response, Ex. B.

#### C. Motion

8. The next day, Boeing filed its Motion, arguing that "[a]s a general matter, there is no lobbying privilege or public-relations privilege." Boeing's Motion at 1. AAI submitted its Response on February 10, 2016, and Boeing filed its Reply on February 17, 2016.

9. Having received and reviewed the parties' briefs, the undersigned proceeded to issue two Orders. The first, which was prompted by arguments advanced by AAI in its Response,[3] ordered Boeing to (a) notify the Special Master of any previous meet and confer efforts, and/or (b) meet and confer with AAI regarding the disputed lobbying and public relations documents. February 24, 2016 Order at 4. The second ordered AAI to submit for *in camera* review the twenty-seven (27) documents (as well as an expanded privilege log) that remained in dispute after the parties' March 4, 2016 meet and confer. March 11, 2016 Order at 2. AAI submitted the documents and privilege logs on March 18, 2016, and, after reviewing the same, the undersigned enters this Report and Recommendation.

## II. CONCLUSIONS OF LAW

For the reasons outlined below, it is the undersigned's legal conclusion that the vast majority of the twenty-seven (27) disputed documents ("the disputed documents") are not protected by either the attorney-client privilege or the work product doctrine.[4] The bases for this conclusion—as well as the rationale behind those rare exceptions—are detailed in the paragraphs below.

### A. Disclosure To Navigators And Abernathy MacGregor Results In Waiver Of The Attorney-Client Privilege As To All Of The Disputed Documents

**\*3** Although it spends relatively little time in its Response addressing the applicability of the attorney-client privilege in the present situation, AAI broadly, if half-heartedly, asserts the privilege as to the disputed documents.[5]

It is well established that "[t]he attorney-client privilege exists to protect *confidential* communications between client and lawyer made for the purpose of securing legal advice." *In re Grand Jury Proceedings 88-9, 899 F.2d 1039, 1042 (11th Cir. 1990)* (internal citation omitted) (emphasis added). As would be expected by use of the term "confidential," it is generally accepted that "a client's and his attorney's communications are not deemed confidential when made in the presence of a third party." *United States v. Gordon-Nikkar, 518 F.2d 972, 975 (5th Cir. 1975).*

That being said, there are a number of exceptions to this general rule, including "precedent for expanding the attorney-client privilege to those assisting a lawyer in representing a client." *Haugh v. Schroder Investment Management North America Inc., 2003 WL 21998674 at \*3 (S.D.N.Y. Aug. 25, 2003).* Indeed, "confidential communications to non-lawyers [are] protected by the privilege if the non-lawyer's services are *necessary* to the legal representation." *In re New York Renu with Moistureloc Product Liability Litigation, 2008 WL 2338552 at \*7* (citing *United States v. Kovel, 296 F.2d 918, 921 (2d Cir. 1961))* (emphasis added). In other words, where, as here, the attorney-client privilege would otherwise be waived by disclosure of the disputed documents to third parties, the privilege could be preserved by the above-referenced exception if it is demonstrated that the third parties' contributions were integral to counsel's provision of legal advice.[6]

**\*4** However, nothing in the disputed documents or the expanded privilege logs indicates that either Navigators or Abernathy MacGregor were providing AAI or its counsel

Case 1:20-cv-00292-JPW  Document 373-1  Filed 02/09/24  Page 5 of 87

Alabama Aircraft Industries, Inc. v. Boeing Company, Not Reported in Fed. Supp. (2016)

2016 WL 9781826

with anything other than standard lobbying and public relations services, neither of which provide a basis for invoking the exception described above. Absent evidence of a nexus between the work of these third parties and the formulation of legal advice by counsel for AAI, the undersigned is left to conclude that the attorney-client privilege is universally inapplicable to the disputed documents, as it is well established that lobbying and public relations communications do not come within the privilege on their own accord.

## B. The Work Product Doctrine Is Only Applicable To Those Disputed Documents That Were Prepared By Counsel For AAI

Perhaps acknowledging the uphill battle it faced in withholding documents on the basis of the narrow attorney-client privilege (and recognizing the friendlier confines of the broader, more waiver-averse work product doctrine),[7] AAI focused much of its briefing on the applicability of the latter, essentially arguing that all of the disputed documents fall within the ambit of the work product doctrine. AAI's Response at 8-14.[8] Although the scope of AAI's work product application is flawed in its overwhelming breadth, numerous disputed documents are, in fact, protected by the doctrine.

"The work-product doctrine 'protects from disclosure materials prepared by an attorney acting for his client in anticipation of litigation.' " *Hope For Families*, 2009 WL 1066525 at *8 (quoting *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979) (internal citations omitted)). "The core goal of the doctrine is 'to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy "with an eye towards litigation," free from unnecessary intrusion by his adversaries.' " *Haugh*, 2003 WL 21998674 at *4 (quoting *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (internal citations omitted)). Indeed, "[t]he doctrine protects a lawyer's ability to prepare his client's case, protects against the disclosure of the attorney's mental impressions, conclusions, strategies, or theories, and also avoids the unfairness that would occur if one party were allowed to appropriate the work of another." *Id.*

**\*5**  The doctrine also protects "material prepared by agents for the attorneys," as it has been recognized that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial."

*United States v. Nobles*, 422 U.S. 225, 238-39 (1975); *see also Costabile v. Westchester, New York*, 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (holding that work product doctrine protects work performed by persons "enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparation for litigation.").

However, "as a general matter [,] public relations advice, even if it bears on anticipated litigation, falls outside the ambit of protection of the so-called 'work product' doctrine ... That is because the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of litigation on the client's customers, the media, or on the public generally." *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) (citing *Nobles*, 422 U.S. at 238 & *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995)); *see also Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 78-79 (S.D.N.Y. 2010); *Chevron Corp. v. Salazar*, 2011 WL 3880896 at *1 (S.D.N.Y. Sept. 1, 2011); *In re Prograf Antitrust Litig.*, 2013 WL 1868227 at *3 (D. Mass. May 3, 2013); *A& R Body Specialty and Collision Works, Inc. v. Progressive Cas. Ins. Co.*, 2013 WL 6044342 at *4, n.2 (D. Conn. Nov. 14, 2013); *Doe v. Society of Missionaries of Sacred Heart*, 2014 WL 1715376 at *4 (N.D. Ill. May 1, 2014); *LifeVantage Corp. v. Domingo*, 2015 WL 5714426 at *2-3 (D. Utah Sept. 29, 2015). Likewise, the work product doctrine does not typically afford protection to pure lobbying work, even when it is conducted in parallel with ongoing or anticipated litigation. *See, e.g.*, *P. & B. Marina, Limited Partnership v. Logrande*, 136 F.R.D. 50, 59 (E.D.N.Y. 1991) (citing *North Carolina Electric Membership Corp. v. Carolina Power & Electric Co.*, 110 F.R.D. 511, 517 (M.D.N.C. 1986)) ("Summaries of legislative meetings, progress reports, and general updates on lobbying activities do not constitute legal advice and, therefore, are not protected by the work-product immunity."); *see also Id.* ("Seaview's use of a lobbyist appears to been intended to avert litigation by applying political pressure to federal agencies which could affect plaintiffs' marina operation. As such, the correspondence from Seaview's lobbyist was not directed towards anticipated litigation but rather toward non-litigation means that could achieve the same results in lieu of litigation. Such efforts are not equivalent to litigation nor subject to [ ] work-product immunity ...").

AAI has asserted repeatedly that the disputed documents are due to be protected by the work product doctrine because they were created "in anticipation of litigation,"[9] and, of

Alabama Aircraft Industries, Inc. v. Boeing Company, Not Reported in Fed. Supp. (2016)

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 6 of 87

2016 WL 9781826

course, in a literal, layman's sense, AAI is right: none of the documents would have been created were it not for the bid protest litigation and/or the current litigation. However, AAI's arguments in this regard fail to acknowledge the animating rationale behind *Nobles* (as well as the litany of aforecited cases that are specific to the public relations and lobbying contexts), *i.e.*, that work involving non-lawyers is only protected by the work product doctrine to the extent that it contributes or amounts to *legal* work. As noted above, the work of Navigators and Abernathy MacGregor (as evidenced in the disputed documents) cannot be construed to square with this rationale, and, as such, the undersigned concludes that AAI should not be permitted to withhold:

**\*6**  • documents created by Navigators; [10]

• documents inclusive of Navigators, but not reflecting protected attorney work product; [11] or

• documents created by Abernathy MacGregor. [12]

However, some of the disputed documents contain attorney work product, and the undersigned concludes that such documents are due to be withheld, in recognition of the accepted notion "that an otherwise valid assertion of work-product protection is [not] waived with respect to an attorney's own work-product simply because the attorney provides the work-product to a public relations [or lobbying] consultant whom he has hired and who maintains the attorney's work-product in confidence." *Calvin Klein*, 198 F.R.D. at 55. Such documents are identified and detailed below.

**C. Protected Documents**

"Attorney work product can [ ] conceptually be divided into two classes: that which recites factual matters and that which reflects the attorney's opinions, conclusions, mental impressions or legal theories." *Haugh*, 2003 WL 21998674 at *5 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 401 (1981)). Indeed, "[c]ourts distinguish between 'fact' (or 'ordinary') work product and 'opinion' work product: while fact work product includes raw factual information, opinion work product includes counsel's mental impressions, conclusions, opinions, or legal theories. Fact work product is subject to discovery when the party seeking discovery demonstrates a substantial need for the material and an inability to obtain the substantial equivalent of the information without undue hardship. On the other hand, 'immunity from discovery for opinion work product is absolute or nearly absolute.'" *Sacred Heart*, 2014 WL

1715376 at *3 (quoting *Caremark, Inc. v. Affiliated Computer Svcs., Inc.*, 195 F.R.D. 610, 616 (N.D. Ill. 2000)) (internal citations omitted). The attorney work product contained in the disputed documents consists solely of opinion work product, and, accordingly, the undersigned concludes that the withholding of such documents should be deemed final. [13]

**1. HS078295, HS078296-97, & HS078356**

**\*7**  All three documents reflect the "mental impressions, conclusions, strategies, or theories" of AAI's counsel regarding draft documents. As such, they constitute protected opinion work product.

**2. DG00000060 & DG00000069**

As described in AAI's expanded privilege log, these documents are "chart[s] of KC-135 contract modifications with commentary from counsel and other AAI personnel," rendering them protected opinion work product.

**3. DG00000065**

This document is a draft pleading prepared by counsel for AAI, and, as such, is a classic example of protected opinion work product.

**4. DG000000067**

This document is an email from AAI's in-house counsel, who provides analytical context to the aforementioned contract modification charts. As such, the document amounts to protected opinion work product.

**III. RECOMMENDATIONS** [14]

For the reasons outlined above, the undersigned recommends that Boeing's Motion be **GRANTED IN PART** and **DENIED IN PART** in the following manner:

• AAI should be compelled to produce HS078541-42, HS078588, HS079165, DG00000040, DG00000047, DG00000062,      DG00000063,      DG00000071, DG00000073,     DG00000081,     DG00000082, DG00000083,      DG00000084,      DG00000085,

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 7 of 87

**Alabama Aircraft Industries, Inc. v. Boeing Company, Not Reported in Fed. Supp. (2016)**

2016 WL 9781826

DG00000086, DG00000115, DG00000117, DG00000118, DG00000120, & DG00000122 in unredacted form. [15]

- HS078295, HS078296-97, HS078356, DG00000060, DG00000065, DG00000067, & DG00000069 should be permanently withheld as opinion work product.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 9781826

## Footnotes

1     In the interests of clarity and economy, the undersigned will herein use the singular designations of "Boeing" and "AAI" in reference to Defendants and Plaintiffs, respectively.

2     Evidently, Navigators was previously incorporated as "DC Navigators LLC." *See* Boeing's Motion, Ex. E.

3     AAI's Response at 3-6; *see, e.g.*, AAI's Response at 3 ("Boeing's Motion is facially defective and should be denied without further consideration because Boeing has utterly failed to comply with the clear and mandatory [meet and confer] requirements of Rule 37 ...").

4     In addition to its privilege assertions, AAI also attempts to resist production of the disputed documents by arguing that they lack relevance. AAI's Response at 6-8; *see, e.g.*, AAI's Response at 6 ("Boeing has not and cannot establish that the disputed documents are <u>relevant</u> to the instant litigation."). However, the undersigned is unpersuaded by AAI's relevance argument, concluding, in light of the documents' prior designations as relevant, that such arguments are "misplaced," as characterized by Boeing in its Reply. Boeing's Reply at 1-2 ("AAI's belated relevance objections are misplaced ... Abernathy MacGregor identified the documents as responsive to the subpoena, and AAI made no objection to its scope at the time. Now is too late ... ***AAI***, not Boeing, identified these [Navigators] documents as relevant and responsive by placing them on its privilege log.").

5     AAI's expanded privilege logs either (a) fail to identify the specific protection being claimed (*i.e.*, the attorney-client privilege or work product doctrine), or (b) reflexively invoke both, preventing the undersigned from identifying the specific documents to which the attorney-client privilege allegedly applies. However, given the undersigned's ultimate conclusion (*i.e.*, that none of the disputed documents are covered by the attorney-client privilege), AAI's shortcomings in specificity are irrelevant.

6     AAI attempts to invoke another exception—the so-called "independent consultant as client's representative" exception (addressed most notably in *In re Bieter Co.* 16 F.3d 929 (8th Cir. 1994))—but does so unpersuasively, failing to evince the sort of interconnectedness between AAI and Navigators/Abernathy MacGregor that would render either third party a "representative" for privilege purposes. AAI's Response at 13 ("Another federal district court in this state has held that the attorney-client privilege can attached to communications occurring amongst a client, the client's attorney, and a lobbyist who had been hired as a *representative* of the client.") (emphasis added). Likewise, in its expanded privilege log, AAI emphasizes that Chris Cox, the Navigators lobbyist who is copied on most of the withheld communications, is a licensed lawyer (*see, e.g.*, "Supplemental Response" to HS078588: "The fact that Chris Cox, a lawyer employed by Navigators, was copied on this email does not alter that the redacted comments are protected by the attorney-client doctrine."); however, nothing in the withheld communications indicates that Mr. Cox was providing legal —as opposed to lobbying—advice to AAI, and, as such, his legal background is of no moment in this privilege analysis. *In re County of Erie*, 473 F.3d 413, 421 (2d Cir. 2007) (citing *In re Lindsey*, 148 F.3d 1100, 1106 (D.C.

**Alabama Aircraft Industries, Inc. v. Boeing Company, Not Reported in Fed. Supp. (2016)**

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 8 of 87

2016 WL 9781826

Cir. 1998)) ("When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor, media expert, business consultant, banker, referee or friend, that consultation is not privileged.").

7    Because "the purpose of the work product rule is not to protect the evidence from disclosure to the outside world but rather to protect it only from the knowledge of opposing counsel and his client," Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, *8 Federal Practice & Procedure* § 2024 (2d ed. 1994) (internal citations omitted), the doctrine is "not automatically waived by the disclosure to a third party." *Hope For Families*, 2009 WL 1066525 at *9 (M.D. Ala. April 21, 2009) (quoting *In re Grand Jury Subpoena*, 220 F.3d 406, 409 (5th Cir. 2000)).

8    Boeing accurately asserts that AAI failed to initially claim the protection of the work product doctrine as to all of the Navigators documents, and, correspondingly, argues—with some force—that AAI should thus be foreclosed from withholding Navigators documents on such basis. Boeing's Reply at 3 ("Because AAI did not claim work product protection in its log as to many of these documents, any such protection is waived. The non-work product documents should be produced on that basis alone."). However, it is not the aim of the Special Master to serve as a gotcha!-style arbiter (as evidenced, in this specific instance, by the undersigned's provision of an additional opportunity for Boeing to satisfy its meet and confer obligation), and, as such, AAI's tardy invocation of the work product doctrine will not be viewed with any prejudice.

9    *See, e.g.*, AAI's Response at 12 ("For the AbMac documents, all documents and communications at issue were created by counsel or by AbMac, as an agent for counsel, and they were all created in conjunction with the instant litigation ... Regarding the Navigators documents, those documents were created or communications were made in conjunction with and because of the bid protest litigation.").

10   Per the undersigned's *in camera* review, these documents include: HS078541-42.

11   Per the undersigned's *in camera* review, these documents include: HS078588 & HS079165.

12   Per the undersigned's *in camera* review, these documents include: DG00000040, DG00000047, DG00000062, DG00000063, DG00000071, DG00000073, DG00000081, DG00000082, DG00000083, DG00000084, DG00000085, DG00000086, DG00000115, DG00000117, DG00000118, DG00000120, & DG00000122.

13   Boeing explicitly requested an opportunity to demonstrate its "substantial need" for the disputed work product, but any such demonstration would be futile in this instance, as "immunity from discovery for opinion work product is absolute or nearly absolute." *See, supra*, at 14; Boeing's Reply at 4 ("To the extent AAI is allowed to submit additional evidence to support its flawed and belated work-product privilege assertions, Boeing should likewise be allowed to respond, including to submit evidence to show substantial need for the documents at issue. As matters now stand, AAI's description of the documents at issue do not permit Boeing to make such a showing.").

14   A party wishing to object to the undersigned's privilege determinations should inform the undersigned of the disputed document(s) encompassed by such objection. The undersigned will then deliver the subject document(s) to the Court, preserving any outstanding privilege.

15   HS078386 is listed on AAI's expanded Navigators privilege log, but was not included in the documents that were submitted to the undersigned. If, in light of the foregoing, AAI wishes to continue withholding HS078386, it should submit the document to the Special Master within three (3) days of the issuance of this Report and Recommendation; otherwise, it should produce the document to Boeing along with those listed above.

---

**End of Document**                                                                 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1013566
United States District Court,
S.D. Indiana,
Evansville Division.

Danessa V. BLAIR, individually and on behalf of
similarly situated individuals, et al., Plaintiffs [1] ,
v.
PROFESSIONAL TRANSPORTATION, INC., and
Ronald D. Romain, individually and as chief executive
officer of Professional Transportation, Inc., Defendants.

No. 3:14–cv–18–RLY–WGH.
|
Signed March 9, 2015.

### ENTRY ON PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

WILLIAM G. HUSSMANN, JR., United States Magistrate Judge.

**\*1** This matter is before me, William G. Hussmann, Jr., United States Magistrate Judge, on Plaintiff Danessa Blair's Motion to Compel Production of Documents (*Filing No. 170*) and Chief Judge Young's order of reference. On January 29, 2015, I denied Blair's motion in part by finding certain requested documents irrelevant. (*Filing No. 187.*) I also granted the motion in part by ordering the Defendants to submit the remaining documents for *in camera* review. (*Id.*) Having reviewed the documents, and being duly advised, I **GRANT** the Motion in part and **DENY** it in part.

### I. Background
The Plaintiffs here are current and former employees of Defendant Professional Transportation, Inc. (PTI). As the basis for their suit, the Plaintiffs claim that PTI has paid them less than the minimum wage and denied them overtime pay to which they are entitled under the Fair Labor Standards Act. *See 29 U.S.C. §§ 206, 207*. The FLSA permits aggrieved employees to recover double damages: They may pursue their unpaid overtime wages and the difference between their actual receipts and the minimum wage to which they were entitled, and they also may recover an equal sum in the form of liquidated damages. *See 29 U.S.C. § 216*.

In their Answer, the Defendants claim that PTI has dealt with the Plaintiffs in good faith and on a reasonable belief that it has complied with the FLSA. (*Filing No. 36 at ¶¶ 21–23.*) This is important because the FLSA grants courts discretion to decrease or eliminate statutory liquidated damages awards where they are satisfied that the defendant acted "in good faith and that he had reasonable grounds for believing" he complied with the FLSA. *See 29 U.S.C. § 260*.

By their Motion, the Plaintiffs ask the Court to compel the Defendants to produce communications involving the Crew Hauler's Trade Association (CHTA). Specifically, they seek 97 e-mails the Defendants have withheld as privileged and unedited copies of documents the Defendants have produced in redacted form. These documents have been identified at Entries 60–157 of the Defendants' privilege log. (*SeeFiling No. 170 at ECF p. 2 n. 2; Filing No. 175–1.*)

The parties describe the CHTA as an association of companies (including PTI) engaged in the business of transporting rail crews to and from train stations throughout the country. According to the Defendants, the CHTA formed in May of 2008–a period when the FLSA was in flux-for the purpose of "advanc[ing] the common public policy and legislative positions of the Members." (*SeeFiling No. 170–6 at ECF p. 1; Filing No. 175 at ECF pp. 2, 5.*) The documents the Plaintiffs seek were exchanged among the CHTA, its members, and attorney David Coburn. Presumably, the Plaintiffs seek these documents to undermine the Defendants' good faith defense-that is, to demonstrate that the Defendants monitored developments in the FLSA and therefore knowingly violated the law.

### II. Legal Standard
**\*2** A party to litigation is entitled to discover from his adversary "any nonprivileged matter that is relevant to any party's claim or defense...." *Fed.R.Civ.P. 26(b)(1)*. Where federal law decides the case, federal common law also determines the existence and applicability of any evidentiary privilege. *Fed.R.Evid. 501;see also United States v. BDO Seidman, LLP, 492 F.3d 806, 814 (7th Cir.2007)*. The party asserting privilege bears the burden of persuading the Court that privilege applies. *United States v. Evans, 113 F.3d 1457, 1461 (7th Cir.1997)*.

### III. Discussion
The Defendants have asserted both relevance and the attorney-client privilege as bases for indiscoverability. I find

that some of the Defendants' submissions are irrelevant and that some are privileged. I find that others are relevant but are not privileged and therefore must be produced. And I find that others contain both discoverable and indiscoverable content that must be produced but may be produced in redacted form.

### A. Relevance

To be discoverable, evidence must be "relevant to any party's claim or defense...." *Fed.R.Civ.P. 26(b)(1)*. At trial, evidence is relevant if it has "any tendency" to make a material fact more or less probable. *Fed.R.Evid. 401*. But even inadmissible evidence is discoverable so long as it "appears reasonably calculated to lead to the discovery of admissible evidence." *Fed.R.Civ.P. 26(b)(1)*.

The Defendants need not produce Documents 91–93, 96, 111–13, 128–30, 136–43, and 148–49 because they are irrelevant. These documents deal exclusively with administrative matters like billing or scheduling and therefore are not likely to lead the plaintiffs to any evidence that bears on their claims or PTI's defenses.

The remaining documents include content relevant to this litigation.

### B. Attorney–Client Privilege

The attorney-client privilege "protects communications made in confidence by a client and client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice." *Sandra T.E. v. S. Berwyn Sch. Dist. 100, 600 F.3d 612, 618 (7th Cir.2010)* (citations omitted). To qualify for the privilege, the Court must find that (1) the client sought legal advice from his attorney in her capacity as an attorney, (2) attorney and client communicated for that purpose, and (3) they communicated confidentially. *Id.* (citing *Evans, 113 F.3d at 1461 (7th Cir.1997)*).

"The claim of privilege cannot be a blanket claim; it 'must be made and sustained on a question-by-question or document-by-document basis.' " *United States v. White, 950 F.2d 426, 430 (7th Cir.1991)* (quoting *United States v. Lawless, 709 F.2d 485, 487 (7th Cir.1983)*). "Further, because the privilege is in derogation of the search for the truth, it is construed narrowly." *Evans, 113 F.3d at 1461*.

The Defendants concede that, "when an attorney is communicating in the capacity of a lobbyist and not as an attorney, such communications are not privileged." (*Filing*

No. 175 at ECF p. 15 (citing *In re Grand Jury Subpoenas Dated March 9, 2001, 179 F.Supp.2d 270, 285 (S.D.N.Y.2001)*).) But the Plaintiffs have not objected to the Defendants' contention that communications made for the purpose of obtaining legal advice are privileged even when the attorney otherwise is engaged in lobbying on the client's behalf. (*See id. at ECF pp. 15–16.* [2] ) In other words, legal advice invokes privilege, even if it comes from a lobbyist.

#### 1. Privileged Documents

**\*3** Many of the documents the Defendants have withheld or redacted are not privileged because they do not include communications made for the purpose of giving or receiving legal advice. Communication between an attorney and her client is privileged only if the parties are communicating for the purpose of giving or receiving legal advice. *Sandra T.E, 600 F.3d at 618*. Documents 60–61, 64, 72–73, 75, 78–79, 84, 86–88, 90, 104–110, 114–27 [3] , 131–35, 144–47, 150–55, and 157 deal strictly with lobbying efforts: They either outline a lobbying strategy, solicit information to be used in lobbying, or relay the results of a lobbying effort. Therefore, the Defendants must produce these documents in unredacted form.

#### 2. Nonprivileged Documents

The remaining documents (76–77, 80–83, 85, 89, and 100) are protected by the attorney-client privilege. These documents consist of legal advice or information provided for the purpose of receiving legal advice. Further, they appear to be confidential communications: The addressees of these documents appear to include only counsel for the CHTA, representatives of the CHTA's member companies, and counsel for the individual member companies. The Plaintiffs acknowledge that David Coburn—the attorney whose communications are in question-represented the CHTA. (*See Filing No. 170 at ¶¶ 12, 19.*) The Plaintiffs also acknowledge that the CHTA was an association of corporations united for the same purpose: advancing their collective legislative and public policy positions. (*Id. at ¶¶ 1, 18.*) So there seems to be no argument that these documents were distributed to anyone but attorney or client.

To whatever extent the Plaintiffs argue that these documents exceed the bounds of an attorney-client relationship, I find that privilege applies through the common interest exception.

In federal proceedings, the common interest doctrine entitles a party to avail itself of an evidentiary privilege even after it has shared a document with a third party. *BDO Seidman, 492 F.3d at 814–15*. Generally, a party waives any claim that a document is privileged when she shares it with a third party. *E.g., Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum LLC, No. 1:04–CV–477, 2007 WL 465444 at *2 (N.D.Ind. Feb.7 2007)*. The common interest exception negates waiver and allows a party to invoke privilege where she has shared a document only in confidence and for the purpose of advancing a shared legal interest. *BDO Seidman, 492 F.3d at 815–16*.

The exception recognizes that parties with common objectives often benefit by working together and that those benefits can be secured only if the parties' collective communications are afforded the same protection as their communications with their individual attorneys. *See, e.g., id. at 816; United States v. Schwimmer, 892 F.2d 237, 243–44 (2d Cir.1989); United States v. McPartlin, 595 F.2d 1321, 1336 (7th Cir.1979)*. It also acknowledges that the public benefits from greater conformity to the law and less frequent litigation when parties can pool their efforts and resources to ensure compliance. *See BDO Seidman, 492 F.3d at 816*.

 **\*4** A party asserting the common interest exception therefore must articulate a qualifying legal interest shared by each party to the communication. The shared interest must be a *legal* interest. *E.g., BASF Aktiengesellschaft v. Reilly Indus., Inc., 224 F.R.D. 438, 442 (S.D.Ind.2004)*. An entirely commercial or financial interest does not qualify. *Id*. But, litigation need not be initiated or even anticipated for an entity to hold a qualifying legal interest. *BDO Seidman, 492 F.3d at 816*. Indeed, the Seventh Circuit has recognized that complying with the law and avoiding litigation are valid legal interests. *Id*.

Simply identifying a legal interest does not entitle a litigant to the protections of the common interest exception. She must demonstrate that each party's interest is identical. *Grochocinski v. Mayer Brown Rowe & Maw LLP, 251 F.R.D. 316, 327 (N.D.Ill.2008); Draus v. Healthtrust, Inc.— The Hosp. Co., 172 F.R.D. 384, 391 (S.D.Ind.1997)* (citing *Duplan Corp. v. Deering Milliken, Inc., 397 F.Supp. 1146, 1172 (D.S.C.1974))*. She also must demonstrate that the parties cooperated to advance their identical legal interest and that the document requested was shared in confidence and for the purpose of advancing their joint interest. *BDO Seidman, 492 F.3d at 815–16; Schwimmer, 892 F.2d at 244*.

Finally, because the common interest doctrine is an exception to the basic rule of waiver and not a freestanding privilege, the requestee also must show that the document was protected by another privilege *before* she shared it with the commonly interested parties. *Grochocinski, 251 F.F.D. at 327; Bitler, 2007 WL 465444, at *3*.

The documents I have identified as privileged qualify for protection under the common interest exception. Again, the Plaintiffs acknowledge that David Coburn represented the CHTA and that the CHTA was an association of corporations. As I explained above, these communications were made for the solicitation or dissemination of legal advice, and they were shared only between Coburn, the CHTA's members, and their individual attorneys.

The remaining question, then, is whether the CHTA's member institutions shared a common legal interest, and I find that they did.

Advancing their legislative positions was *a* common interest, but it was not their *only* common interest. The communications between Coburn and the CHTA's personnel indicates that they shared common *legal* interests, including:

• understanding their liabilities and obligations under proposed changes to the law (Documents 74, 76, 77, 80, 89, 99, 100, 103);

• understanding and complying with the law as it stood (Documents 80–83, 85, 103); and

• complying with the law in forming the corporation and conducting their lobbying efforts (Documents 62, 99, 100).

Each of the documents that I find would be privileged or redactable relates to one of those interests. Therefore, the common interest exception resolves any threat to these documents' protection.

### C. Redactable Documents
 **\*5** The Defendants have withheld many documents in which only segments of the communications relate to the dissemination or receipt of legal advice. The Defendants must produce the following documents but may redact privileged communications as follows:

• Document 62: The Defendants may redact:

○ all but the first two sentences of the first full paragraph on page 3; and

○ the final paragraph on page 3.

• Document 74: The Defendants may redact the second paragraph on page 1.

• Document 99: The Defendants may redact:

○ the first two bulleted paragraphs and the final paragraph of Bob Tevault's e-mail on page 1;

○ the entirety of David Coburn's e-mail beginning on page 1 and ending on page 2;

○ the five bulleted paragraphs in Bob Tevault's e-mail on page 2; and

○ the remainder of the document beginning with David Coburn's e-mail on page 3.

• Document 103: The Defendants may redact:

○ the first sentence of the first full paragraph beginning on page 2;

○ the entirety of the second full paragraph beginning on page 2; and

○ the remainder of the document beginning with David Coburn's June 14 e-mail beginning on page 2.

For the reasons I explained above, these redactable portions would be subject to the common interest exception.

### D. Documents with Multiple Messages

As a final point of clarification, I note that most of the Defendants' submissions include chains of several e-mails. Where a document includes only "new" material (material not presented in an earlier document), my analysis applies to the entire document unless I have specified otherwise. [4] Where a document contains both "new" and "old" material (material reproduced from an earlier document), my analysis applies only to the "new" material unless I have specified otherwise. To the extent any content I have deemed irrelevant or privileged reappears in a subsequent document, the Defendants may redact that content from reappearances. [5]

### IV. Conclusion

I **DENY** the Plaintiffs' Motion in that I find that the documents identified in the Defendants' privilege log as Documents 91–93, 96, 111–13, 128–30, 136–43, and 148–49 are irrelevant and need not be produced. I further **DENY** the Plaintiffs' Motion in that I find that Documents 76–77, 80–83, 85, 89, and 100 are protected by the attorney-client privilege and need not be produced.

I **GRANT** the Plaintiffs' Motion in that I compel the Defendants to produce Documents 60–61, 64, 72–73, 75, 78–79, 84, 86–88, 90, 104–110, 114–27, 131–35, 144–47, and 150–57, which are relevant but not protected by privilege. [6] I further **GRANT** the Plaintiffs' Motion in that I compel the Defendants to produce Documents 62, 74, 99, and 103, but I authorize the Defendants to redact those documents consistent with this Entry.

The Defendants will serve the required documents within 15 days of this Entry.

**\*6  SO ORDERED.**

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1013566, 2015 Wage & Hour Cas.2d (BNA) 177,793

---

### Footnotes

1    Whereas Judge Young has granted conditional class certification (*see* Filing No. 33), I use the term "Plaintiffs" throughout this Entry.

2    Citing *United States v. Ill. Power Co., No. 99–cv–0833–MJR, 2003 WL 25593221, at \*3 (N.D.Ill. Apr.24, 2003);Vacco v. Harrah's Operating Co., No. 1:07–CV–0663 (TJM/DEP), 2008 WL 4793719, at \*7–8 (N.D.N.Y.*

*Oct. 29, 2008);In re Brand Name Prescription Drugs Antitrust Litigation, No. 94 C 897, MDL No. 997, 1995 WL 557412 (N.D.Ill. Sept.19, 1995).*

3    I note that Document 127 states the holding of a judicial decision, but it does not present the holding as legal advice. Rather, it presents the holding to give context to a discussion about lobbying strategy.

4    For example, Document 61 includes two e-mails, neither of which appeared in Document 60. Therefore, my instruction to produce Document 61 applies to both e-mails.

5    For example, Document 84 includes a "new" e-mail (Fln Neve's message sent June 11 at 5:07 P.M.) but also reproduces several other messages-including Documents 77 and 80–82, which I have deemed privileged. My finding that Document 84 is relevant but not privileged applies to the first e-mail. The Defendants must produce that message in its entirety but may redact the reproduction of Documents 77 and 80–82 consistent with my instructions.

6    Remembering, of course, that the Defendants may redact the portions of these documents containing privileged segments of Documents 62, 74, 76–77, 80–83, 85, 89, 99–100, and 103.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Bolus v. Carnicella, Not Reported in Fed. Supp. (2020)

2020 WL 930329

2020 WL 930329
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Brian J. BOLUS, et al., Plaintiffs,

v.

Amy CARNICELLA, et al., Defendants.

No. 4:15-CV-01062
|
Filed 02/26/2020

**Attorneys and Law Firms**

Daniel D. Haggerty, Edward T. Kang, Kandis L. Kovalsky, Kang Haggerty & Fetbroyt, LLC, Jeremy S. Spiegel, Pro Hac Vice, Law Office of Jeremy Spiegel, Philadelphia, PA, Gilbert B. Abramson, Abramson & Abramson, LLC, Bala Cynwyd, PA, for Plaintiffs Brian J. Bolus, Karen Bolus, Preston Bolus.

Gilbert B. Abramson, Abramson & Abramson, LLC, Bala Cynwyd, PA, Daniel D. Haggerty, Kandis L. Kovalsky, Kang Haggerty & Fetbroyt LLC, Jeremy S. Spiegel, Law Office of Jeremy Spiegel, Philadelphia, PA, for Plaintiff Minuteman Spill Response, Inc.

Anthony R. Bowers, Keli M. Neary, Office of Attorney General, Harrisburg, PA, Nicole R. DiTomo, Pennsylvania Office of Attorney General, Norristown, PA, for Defendants.

**MEMORANDUM OPINION**

Matthew W. Brann, United States District Judge

**I. BACKGROUND**

**\*1** Plaintiffs Brian J. Bolus, Karen Bolus, Preston Bolus, and Minuteman Spill Response Inc. have served a subpoena on non-party Northridge Group, Inc., a firm that helps develop responses to environmental hazards. [1] Northridge has moved the Court to modify the subpoena's scope, which Northridge finds objectionable. [2]

**II. FACTS AND PROCEDURAL HISTORY** [3]

**A. Plaintiffs' Subpoena**
Plaintiffs directed their subpoena to Northridge on October 28, 2019. [4]

The subpoena defines "Communications" as follows. [5]

4. "Communications" shall mean all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, notes, telegrams, telexes, advertisements, facsimiles, e-mail, or other forms of verbal and/or communicative discourse.

The subpoena defines "Document" as follows. [6]

5. "Document" is used in the broadest sense possible and includes, without limitation, any and all written, printed, typed, electronically generated, electronically stored information ("ESI"), electronically recorded, graphic and/or photographic material of any kind now or at any time in your possession, custody, or control, including without limitation, drafts, drawings, diagrams, photographs, photocopies, charts, graphs, email attachments, email families, metadata where available, text messages, and messages from any social media platform or chat application (e.g. Skype, Microsoft Teams, WhatsApp, Facebook, LinkedIn, etc.).

The subpoena defines "All documents" as follows. [7]

6. "All documents" as used herein shall include copies or duplicates of documents contemporaneously or subsequently created that have any nonconforming notes or other markings, or were sent to different

Bolus v. Carnicella, Not Reported in Fed. Supp. (2020)

2020 WL 930329

individuals than were the originals, or where different for any other reason, and all drafts prepared in connection with any document. Documents should be produced in their entirety, including all attachments, appendices, exhibits, schedules or with any other affixtures.

The Court reproduces the offending subpoena instructions below. [8]

2. All documents shall be produced in word searchable form and in the manner in which they were maintained in the regular course of business.

3. Where possible, all documents and/or photographs, should be produced in native form and with their original metadata.

4. A document is deemed to be in your possession, custody or control if it is ... (b) in the physical custody of another person and you (i) own the requested document in whole or in part; (ii) have a right by contract, law, statute or otherwise to use, inspect, examine or copy the requested document on any terms; (iii) have an understanding, whether express or implied, that you may use, inspect, examine, or copy the requested document on any terms; (iv) have, as a practical matter, been able to use, inspect, examine, or copy the requested document when you have sought to do so; or (v) are able to lawfully use, inspect, examine or copy the requested document.

**\*2** Northridge has marshaled objections to a host of Plaintiffs' discovery requests. Only one of these requests is worth noting in particular; the Court reproduces it below. [9]

1. All documents, including communications, and attachments thereto, in your possession, custody or control mentioning, concerning, referencing or relating to the following: (a) Brian Bolus; (b) Bolus; (c) Karen Bolus; (d) Minuteman; (e) Minuteman Spill Response, Inc.; (f) Minuteman Environmental Services, Inc.; (g) Minuteman Towing, Inc.; (h) Degg H. Stark; (i) D.H. Stark

Investigations; (j) Glenn Parno; (k) Anthony J. Rosini; (l) Robert Crebs; (m) Julie Hagen; (n) Michelle Troup; (o) Paul Zimmerer; (p) I-80; (q) Exit 173; (r) Interstate 80; (s) Mifflinville; (t) New Columbia; (u) Harrisburg; (v) Loganton.

**B. The Events Preceding This Motion**

On November 11, 2019, Plaintiffs' counsel, Kandis Kovalsky, spoke with Northridge's counsel, Joseph Holko. [10] Holko informed Kovalsky that he was aware of Plaintiffs' subpoena. [11] The two agreed to give Northridge more time to make motions and to respond to the subpoena. [12] They also agreed to "continue further discussing limiting the scope of the" subpoena, with Kovalsky telling Holko that Plaintiffs would consider limiting sub-items (p) through (v) (above) "depending on Northridge's initial search results." [13] Holko also reports that during this November 11, 2019 conversation, he and Kovalsky agreed to limit the subpoena in some respects. [14]

On November 13, 2019, Northridge filed a Motion to Enlarge Time in Which to Move to Limit and Respond to Plaintiffs' Subpoena. [15] The Court then scheduled a telephone conference to discuss discovery disputes, including the subpoena and Northridge's November 13, 2019 motion. [16] On the day of the conference—November 25, 2019— Northridge wrote the Court and attached a copy of its objections to the subpoena. [17] Northridge hadn't provided Plaintiffs with these written objections beforehand. [18]

After the conference, the Court granted Northridge's November 13, 2019 motion and gave Northridge until December 2, 2019 to move to limit the subpoena and until January 17, 2020 to respond to the subpoena. [19]

On December 2, 2019, Northridge made the present motion. [20] Northridge never contacted Plaintiffs to discuss modifying their subpoena before filing the present motion. [21] Northridge did not request Plaintiffs' concurrence to the present motion before filing it. [22]

**Bolus v. Carnicella, Not Reported in Fed. Supp. (2020)**

2020 WL 930329

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 16 of 87

Northridge reports that it "has performed an ordinary, user, non-technical" search of its current email system" but would need to hire a vendor, KLDiscovery, "in order to more fully and completely respond to the Subpoena (including production of drafts, documents and photographs in native form and metadata)." [23] KLDiscovery estimates that such a response would cost between about $8,000 and $14,000. [24]

**\*3** Northridge now seeks the following specific changes to the subpoena, as well as a blanket request that "the Subpoena's Definitions, Instructions, and Requests should be limited by and comply with" Federal Rule of Civil Procedure 45. [25]

1. Eliminating ESI from the definitions of the terms "Documents" and "Communications";

2. Eliminating the request for ESI from Instructions 2 and 3;

3. Modifying Instruction 4 so that it does not "require Northridge to produce documents which Northridge has a right to use, inspect, examine or copy, but may never have used, inspected, examined, or copied" and does not "require Northridge to search documents in the possession of anyone or any entity where Northridge has the 'right' to examine the document;

4. Removing "any obligation on the part of Northridge to produce ESI, trade secret or other confidential research, development, or commercial information";

5. Removing "any obligation on the part of Northridge to produce" "any 'Documents' or 'Communications' 'relating to the Plaintiffs' and/or 'relating to' the persons, entities or locations identified in Request 1";

6. Eliminating any request for "drafts," "drafts in connection with any documents," "and multiple copies of the same document sent to different individuals";

7. Eliminating any "request for documents and photographs in their native format and for metadata for each";

8. Eliminating any "request seeking the production of documents in more than one format";

9. Eliminating any "request for computer searchable documents, insofar as [Northridge] seeks to produce the documents as paper copies."

## III. DISCUSSION

### A. Whether Northridge complied with the requirements of the Middle District of Pennsylvania's Local Rules

#### 1. Legal Standards

Middle District of Pennsylvania Local Rule 7.1 provides that any motion "shall contain a certification by counsel for the movant that he or she has sought concurrence in the motion from each party, and that it has been either given or denied." "A certificate of nonconcurrence does not eliminate the need for counsel to comply with Local Rule 26.3 relating to conferences between counsel in all discovery motions directed toward a resolution of the motion."

A related Middle District of Pennsylvania Local Rule, Local Rule 26.3 (which relates specifically to discovery motions such as Northfield's motion before the Court), provides that: "Counsel for movant in a discovery motion shall file as part of the motion a statement certifying that counsel has conferred with counsel for the opposing party in a good faith effort to resolve by agreement the issues raised by the motion without the intervention of the court, together with a detailed explanation why such agreement could not be reached. If part of the issues raised by the motion have been resolved by agreement, the statement shall specify the issues so resolved and the issues remaining unresolved."

"Local Rule 26.3 requires that the moving party certify that it made a good faith effort to resolve the discovery dispute before seeking court action." [26] Indeed, a party's failure to provide this certification before bringing a discovery motion provides the court with a freestanding reason to deny the motion. [27] As a court with a similar local rule explained, this kind of local court rule is "designed to encourage professionalism and collegiality among litigators and avoid unnecessary court intervention, protracted legal proceedings and needless expense and fees. Zealous advocacy does not excuse a 'belligerent and uncompromising approach to the discovery process.'" [28]

#### 2. Analysis

**\*4** I find that Northridge has not complied with Local Rule 7.1 or with Local Rule 26.3. The Court acknowledges

Bolus v. Carnicella, Not Reported in Fed. Supp. (2020)

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 17 of 87

2020 WL 930329

Plaintiffs' proffered authorities that provide precedent for dismissing a discovery motion without prejudice when a movant does not comply with the above procedural strictures. However, this District has shown some leniency with litigants' non-compliance on these and related measures. Such non-compliance is certainly disfavored by this District, but it has often failed to find this non-compliance dispositive. As a consequence, courts have often failed to deny a party's motion on the basis of such non-compliance.[29]

### 3. Conclusion

Though Northridge has not complied with Local Rule 7.1 or with Local Rule 26.3, the Court will not impose the drastic remedy of denying Northridge's motion on that basis.

### B. The merits of Northridge's motion

#### 1. Legal Standards

Federal Rule of Civil Procedure 45 ("Rule 45") governs the issuance of subpoenas, which a party can use to seek discovery from a non-party.[30] A party may use a subpoena to obtain "hard-copy" documents as well as ESI.[31]

Rule 45 gives certain protections to the target of a subpoena. "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."[32] "On timely motion"—i.e., the motion before the Court—"the court for the district where compliance is required must quash or modify a subpoena that" "requires disclosure of privileged or other protected matter, if no exception or waiver applies; or" "subjects a person to undue burden."[33]

#### a. Undue Burden

"When analyzing whether a subpoena places an undue burden on a non-party, the court considers issues such as relevance, the requesting party's need, the breadth of the request, and the burden imposed."[34] Other relevant issues are "the time period covered" and "the particularity with which the documents are described."[35] "The party seeking to quash a subpoena bears the heavy burden of demonstrating that

the requirements of Rule 45 are satisfied.... Specifically, the moving party must show a 'clearly defined and serious injury.' "[36]

### b. The Production of ESI, In Context of the Delineations of Discovery

**\*5** "The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C)."[37]

Rule 26(b)(2)(C) provides that a court "must limit the frequency or extent of discovery otherwise allowed" if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."

Rule 26(b)(1) states the general scope of discovery that is allowed in an action. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

### 2. Analysis

#### a. The information that Plaintiffs seek in their subpoena is relevant and not available from another source.

Plaintiffs argue that their subpoena targets information "not only relevant, but critical to Plaintiffs' claims" because it gets at the alleged illegal conduct that undergirds this dispute.[38]

Bolus v. Carnicella, Not Reported in Fed. Supp. (2020)

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 18 of 87

2020 WL 930329

The Court finds this argument convincing. Further, Plaintiffs have presented evidence—a letter from the target of a previous similar subpoena—that the information Plaintiffs seek in this current subpoena is not available from another source. [39] The Court finds that the information that Plaintiffs seek in their subpoena is relevant and is not available from another source.

### b. Plaintiffs' subpoena does not subject Northridge to an undue burden.

Northridge argues that the subpoena subjects it to an undue burden. The Court paraphrases Northridge's individual arguments below.

i. Plaintiffs seek the same ESI in more than one form. [40]

ii. The subpoena mandates that Northridge create responsive documents. [41]

iii. The subpoena seeks multiple copies of the same document or drafts. [42]

iv. The subpoena seeks drafts "in connection with any document"; the term "in connection with" is unclear and overly broad. [43]

v. The subpoena's request that Northridge search for files "relating to the Plaintiffs" is vague and ambiguous. [44]

vi. Producing ESI in native form with original metadata, and running certain searches, would require the retention of a computer data retrieval and forensic company, at significant expense. [45]

vii. Forcing Northridge to search documents from every entity from which it has a "right" to examine documents poses an undue burden. [46]

viii. Certain search terms are too broad and not connected to the litigation. [47]

ix. Plaintiffs seek trade secret or other confidential research, development, or commercial information. [48]

**\*6** None of these arguments are availing. With respect to (i)-(iii): as Plaintiffs explain, they do not seek the same ESI in more than one form, Northridge does not have a duty to create

responsive documents, and Plaintiffs do not seek multiple copies of the same document or drafts, but rather any different versions or recipients of a document. [49] With respect to (iv): Northridge takes a selective snippet of the relevant definition. The full segment is "drafts *prepared* in connection with any document." The Court finds that this is clear.

With respect to (v) and (viii), "the mere statement by a party that the discovery sought is overly broad, burdensome, oppressive, vague or irrelevant is not adequate to voice a successful objection." [50] Northridge has made only conclusory arguments about these two deficiencies, and as such, Northridge has not sustained its burden of presenting acceptable objections. My analysis for (ix) follows the same course. A party who claims privilege bears the burden of establishing that a privilege applies. [51] "[M]ere conclusory or ipse dixit assertions" do not suffice for a party to meet its burden. [52] Here, Northridge's cursory, conclusory assertions of privilege do not suffice. [53]

This leaves the above objections (vi) and (vii). For (vi): Northridge submits KLDiscovery's invoice reflecting an expense of about $8,000 to $14,000. Northridge argues that this represents an undue burden. But Northridge makes no substantive argument as to *why* this burden is inappropriate, other than stating, in a conclusory fashion, that the expense is "significant." [54] Northridge has not carried its burden to show that this ESI is not reasonably accessible because of undue burden or cost. [55]

Finally, objection (vii). Northridge argues that this instruction poses an undue burden because it requires "not only a search of documents in [Northridge's] actual possession or possession of its attorney, but also in the possession of anyone or any entity where [Northridge] has the 'right' to examine the document." [56] The instruction in question fleshes out the definition of the term "possession, custody, or control." "Control is defined as the legal right, authority or ability to obtain documents upon demand." [57] Therefore, Northridge having to search documents in a third-party's custody—when it has a right to do so—does not pose an undue burden. (If it did, that would contradict the settled definition of "control.")

### 3. Conclusion

Bolus v. Carnicella, Not Reported in Fed. Supp. (2020)
2020 WL 930329

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 19 of 87

**\*7** None of Northridge's objections are persuasive. Plaintiffs' subpoena does not impose an undue burden on Northridge.

## IV. CONCLUSION

The Court denies Northridge's motion. An accompanying Order reflects this denial and clarifies additional discovery obligations that lie in its wake.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 930329

## Footnotes

1       *See* ECF No. 114 Ex. A; Northridge Group Inc. Home Page, http://www.northridgehazmat.com (last visited Feb. 25, 2020).

2       ECF No. 114.

3       For background on the core dispute and its underlying facts, reference ECF Nos. 73 and 103. This discussion focuses on Northridge's motion.

4       ECF No. 114 Ex. A.

5       Subpoena at Definition 4.

6       Subpoena at Definition 5.

7       Subpoena at Definition 6.

8       Subpoena at Instructions 2-4.

9       Subpoena at Request 1.

10      ECF No. 122-4 at ¶ 2.

11      *Id.* at ¶ 3.

12      *Id.* at ¶ 4.

13      *Id.* at ¶ 5.

14      *See* ECF No. 133. Holko also reports that he sent Kovalsky an unspecified email on November 6, 2019, and that he sent her "a detailed follow up email" after the November 11, 2019 conversation, "without a response." *Id.*

15      ECF No. 108.

16      ECF No. 110.

17      ECF No. 111.

18      ECF No. 122-4 at ¶ 8.

19      ECF No. 113.

20    ECF No. 114.

21    ECF No. 122-4 at ¶ 11.

22    ECF No. 122-4 at ¶ 12.

23    ECF No. 114 at ¶ 12.

24    ECF No. 114 Ex. B.

25    ECF No. 114 at 1-2.

26    *Lofton v. Wetzel*, No. 12-cv-1133, 2015 WL 5761918, at *2 (M.D. Pa. Sept. 29, 2015).

27    *See Han Tak Lee v. Tennis*, No. 4:CV-08-1972, 2012 WL 2905384, at *3 (M.D. Pa. July 16, 2012).

28    *Hilton-Rorar v. Sate and Federal Communications, Inc.*, Case No. 5:09–CV–01004, slip. op. at 3 (N.D. Ohio, filed Jan. 7, 2010) (*cited by Bialko v. Quaker Oats*, No. 08-cv-0364, 2010 WL 11553253, at *1 (M.D. Pa. Mar. 2, 2010) (Vanaskie, J.)).

29    *See Indianapolis Life Ins. Co. v. Hentz*, No. CIV A 1:06CV2152, 2009 WL 36454, at *2 (M.D. Pa. Jan. 6, 2009) (holding that failure to seek concurrence is excusable though disfavored); *United States v. Sawyers*, No. 1:19-CR-00052, 2019 WL 6328091, at *3 (M.D. Pa. Nov. 26, 2019) (similar); *Daley v. Firetree, Ltd.*, No. 4:CV-04-2213, 2005 WL 3440486, at *1 (M.D. Pa. Dec. 14, 2005) (failing to file a Local Rule 7.1 certification was not dispositive); *Cmty. Ass'n Underwriters of Am., Inc. v. Queensboro Flooring Corp.*, No. 3:10-CV-1559, 2014 WL 1516152, at *3 (M.D. Pa. Apr. 15, 2014) ("significant technical deficiencies" in motion papers did not warrant summary dismissal); *Wallace ex rel. Wallace v. Novartis Pharm. Corp.*, 984 F. Supp. 2d 377, 388 (M.D. Pa. 2013) (court had granted party's motion "despite his repeated failure to comply with the Local Rules," including failure to follow Local Rule 7.1); *Moyer v. Berdanier*, No. 3:CV-11-1811, 2013 WL 704483, at *4 n.4 (M.D. Pa. Feb. 26, 2013) (court considering a motion despite failure to comply with Local Rule 26.3).

30    *See* Fed. R. Civ. P. 45.

31    Fed. R. Civ. P. 45(a)(1).

32    Fed. R. Civ. P. 45(d)(1).

33    Fed. R. Civ. P. 45(d)(3).

34    *Diodato v. Wells Fargo Ins. Servs. USA, Inc.*, No. 1:12-CV-02454, 2013 WL 6054824, at *1 (M.D. Pa. Nov. 15, 2013).

35    *Grider v. Keystone Health Plan Cent., Inc.*, No. CIV.A. 05-MC-40, 2005 WL 2030456, at *7 (M.D. Pa. July 28, 2005).

36    *Charter Oak Fire Ins. Co. v. Am. Capital, Ltd.*, No. MISC. 1:12-MC-00358, 2012 WL 5862735, at *3 (M.D. Pa. Nov. 19, 2012) (cleaned up).

37    Fed. R. Civ. P. 45(e)(1)(D).

38    ECF No. 122 at 10.

39    *See* ECF No. 122 Ex. B.

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 21 of 87

Bolus v. Carnicella, Not Reported in Fed. Supp. (2020)

2020 WL 930329

40    ECF No. 116 at 3-4.

41    ECF No. 116 at 4.

42    *Id.*

43    *Id.*

44    ECF No. 116 at 7-8.

45    ECF No. 116 at 5, 7.

46    ECF No. 116 at 5-6.

47    ECF No. 116 at 7.

48    *See* ECF No. 116 at 7.

49    ECF No. 122 at 12-13.

50    *Northern v. City of Philadelphia*, No. CIV. A. 98-6517, 2000 WL 355526, at *2 (E.D. Pa. Apr. 4, 2000) (*citing Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982)).

51    *Glenmede Tr. Co. v. Thompson*, 56 F.3d 476, 484-85 (3d Cir. 1995).

52    *Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.*, 202 F.R.D. 418, 423 (E.D. Pa. 2001) (internal citation and quotation omitted).

53    *Gould v. O'Neal*, No. CV 17-100 (JMV), 2019 WL 4686991, at *5–6 (D.N.J. Sept. 26, 2019) (holding that a cursory assertion of privilege by non-party subject to a subpoena was unpersuasive).

54    *See* ECF No. 116 at 5, ("To do so, will require the retention of a computer data retrieval and forensic company at significant expense to Northridge."); 8 ("the request for ESI ... subjects Northridge to undue burden and an expense of over $8,000").

55    *See* Fed. R. Civ. P. 26(b)(2)(B); *Equal Employment Opportunity Comm'n v. FedEx Ground Package Sys., Inc.*, No. 2:15-CV-256, 2018 WL 1441426, at *4 (W.D. Pa. Mar. 21, 2018).

56    ECF No. 116 at 6.

57    *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441 (D.N.J. 1991); *see also Frank Brunckhorst Co. v. Ihm*, No. MISC. 12-0217, 2012 WL 5250399, at *7 (E.D. Pa. Oct. 23, 2012); *Hussey v. Chase Manhattan Bank*, No. CIV.A. 02-7099, 2005 WL 1787458, at *1 (E.D. Pa. July 26, 2005).

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

In Re U.S. Healthcare, Inc. Securities Litigation, Not Reported in F.Supp. (1989)

1989 WL 11068

1989 WL 11068
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

In re U.S. HEALTHCARE, INC.
SECURITIES LITIGATION.

No. 88–0559.
|
Feb. 8, 1989.

**Attorneys and Law Firms**

David B. Zlotnick, Bala Cynwyd, Pa., Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, New York City, Robert M. Roseman, Philadelphia, Pa., for plaintiff.

H. Robert Fiebach, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for Horrocks, Berger Abramson; Berger; Longacre; Skillman; Weiner; and U.S. Healthcare, Inc.

Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa. and Patricia A. McGovern, Robert G. Cohen, Associate General Counsel, Arthur Young & Company, New York City, for Arthur Young.

*MEMORANDUM OF DECISION*

McGLYNN, District Judge.

**\*1** In this securities litigation, plaintiffs have filed a motion to compel the production of certain documents withheld by Wolf, Block, Schorr and Solis–Cohen ("Wolf, Block") on the ground of attorney-client privilege. Additionally, plaintiffs have requested that the court compel the continued deposition testimony of Alan Molod, Esquire and of representatives of U.S. Healthcare, Inc. ("USH"). For the following reasons, plaintiffs' motion is denied.

I. *BACKGROUND*

This is a securities fraud class action brought on behalf of all persons who purchased the common stock of USH from July 3, 1985 through August 21, 1987. Plaintiffs seek damages from USH, certain officers of USH, and Arthur Young and Company ("Arthur Young"), USH's auditors, for artificially inflating the trading price of USH during the class period by fraudulently portraying USH's earnings, financial condition and prospects to the investing public and by causing the

company to purchase its own stock on the market. This court certified this as a class action on September 28, 1988.

During the class period, Wolf, Block served as USH's outside general counsel. Wolf, Block worked on securities issuances and related filings for USH, reviewed or participated in the drafting of SEC filings, and gave legal advice from time to time regarding contractual and other matters. On September 30, 1988, plaintiffs served a Subpoena Duces Tecum upon Wolf, Block demanding the production of numerous documents relating to various aspects of Wolf, Block's representation of USH during the class period. In response to that subpoena, on November 3, 1988, Wolf, Block produced over three thousand documents. Thereafter, Wolf, Block gave plaintiffs' counsel a list of the documents that it would not produce on the grounds of privilege. The question before this court is whether the attorney-client privilege attaches to the documents requested by plaintiffs in this motion.

II. *DISCUSSION*

The purpose of the attorney-client privilege is to protect clients' freedom of expression thereby encouraging clients to make full disclosures to their attorneys. *Fisher v. United States,* 425 U.S. 391 (1976); *In re Grand Jury Investigation No. 83–2–35,* 723 F.2d 447 (6th Cir.1983). As a general rule, confidential information disclosed by a client to an attorney for purposes of obtaining legal advice is protected. The privilege also attaches to an attorney's communications to a client, as well as to inter-attorney communications, attorney's notes and memorandum, which include legal advice or confidential information received from the client. *Green v. I.R.S.,* 556 F.Supp. 79, 85 (N.D.Ind.1982).

In an attempt to establish that the attorney-client privilege did not attach to these documents, plaintiffs assert first that the documents identified in their motion, and the information contained in them, were never intended to be confidential. [1] Plaintiffs state that all of the requested documents report legal advice given by Wolf, Block in connection with USH's issuance of financial statements and SEC filings for the year ended September 30, 1987. Because the financial statements were eventually disclosed to third parties, plaintiffs claim that the information contained in the documents at issue is not protected by the attorney-client privilege. Alternatively, plaintiffs assert that some of the requested documents do not contain legal advice at all, but rather report business or accounting decisions. Plaintiffs also allege that USH

In Re U.S. Healthcare, Inc. Securities Litigation, Not Reported in F.Supp. (1989)

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 23 of 87

1989 WL 11068

has relied on the advice of counsel defense and, hence, the attorney-client privilege is waived as to all oral or written underlying communications. This last argument is superfluous since defendants have not asserted such a defense.

**\*2** Wolf, Block alleges that the documents withheld involve "a broad range of issues for which legal, not business, assistance was sought and given." Furthermore, it is well settled that information shared with an attorney does not lose its confidential status simply because it was shared in the course of preparing a document which was to be disclosed to third persons. Specifically, as the court concluded in *Schenet v. Anderson,* 678 F.Supp. 1280 (E.D.Mich.1988):

[T]he attorney-client privilege applies to all information conveyed by clients to their attorneys for the purpose of drafting documents to be disclosed to third persons and all documents reflecting such information, to the extent that such information is not contained in the document published and is not otherwise disclosed to third persons.

*Id.* at 1283. *See also United States v. Schlegal,* 313 F.Supp. 177, 179 (D.Neb.1970). [2] Thus, the only discoverable information is that which is contained in the publicly filed documents. The attorney-client privilege still attaches to the withheld memoranda, which is comprised of confidential disclosures and legal advice. Given this standard, each of plaintiffs' requests must be evaluated individually.

First, plaintiffs request the production of Alan Molod's handwritten notes of a meeting held in December 1986 attended by several representatives of USH, as well as Mr. Raymond Kraft from Arthur Young. According to the depositions of Mr. Molod and Alan Letofsky, Esquire, General Counsel to USH, Mr. Molod was asked to be at the meeting in order to render legal advice regarding the recoverability of certain overpayments made by USH to it primary physicians. Alan Letofsky was also present to offer legal assistance. Moreover, Mr. Kraft was included because his presence was required for the rendition of Mr. Molod's legal advice, and, thus, his participation was not inconsistent with the intention to keep the meeting confidential. Furthermore, Mr. Kraft's presence and the attendance of other necessary participants did not cause a waiver of the privilege. *See, e.g., Miller v. Haulmark Transp. Sys.,* 104 F.R.D. 442, 445 (E.D.Pa.1984) ("As a general matter, the privilege is not destroyed when a person other than the lawyer is present at a conversation between an attorney

and his or her client if that person is needed to make the conference possible or to assist the attorney in providing legal services.").

After the meeting, Sheldon Pollack, Esquire, of Wolf, Block conducted research and prepared a memorandum dated December 22, 1986 regarding the legal advice requested of Mr. Molod. On January 13, 1987, Mr. Molod sent his opinion letter on the recoverability issue to Alan Letofsy, with a copy to Mr. Kraft. Plaintiffs have a copy of that letter. Now plaintiffs seek the production of Mr. Pollack's December 22, 1986 research memorandum. With respect to the handwritten meeting notes and the research memorandum, since they report confidential client communications and legal advice, they are privileged and not discoverable.

**\*3** Next, plaintiffs demand four documents pertaining to the Insurance Department hearing. Wolf, Block has produced the November 20, 1986 memorandum in its entirety, and the November 6, 1986 and November 19, 1986 memoranda in redacted form, removing from each only one paragraph which contained legal conclusions. Consequently, the motion with regard to those documents is denied. The fourth document, the December 4, 1986 file memorandum of Gerald Gornish, Esquire, was prepared some time after the hearing and it summarizes a confidential conversation between Mr. Garnish and Mr. Zamzow. As such, that document is privileged and, thus, not discoverable. *See Matter of Fischel,* 557 F.2d 209, 211 (9th Cir.1977) ("the privilege normally extends both to the substance of the client's communication as well as the attorney's advice in response thereto").

The September 29, 1986 file memorandum involving Lincoln National recites a confidential conversation between Steven Haas, Esquire and Alan Letofsky. A similar conversation between Mr. Haas and Ms. Karen Barr, who was employed by USH at the time, is set forth in the memorandum of March 4, 1987. The client contacted Mr. Haas in each case and requested his legal advice. The memoranda reports the nature of the legal assistance sought and the advice finally rendered. Only the information disclosed in the public filing is discoverable, *Green v. I.R.S., supra,* and accordingly the Haas–Letofsky memoranda is protected by the privilege. With respect to this category of documents, plaintiffs' motion will be denied.

In another category of documents, plaintiffs seek the production of the September and October 1987 memoranda and handwritten notes. Wolf, Block alleges that each of those

1989 WL 11068

documents contain or refer to confidential communications between USH and its attorneys, between Mr. Molod and USH's General Counsel involving requested legal assistance. Regardless of whether these documents relate to the "reserve issue," the confidential communications are protected by the privilege.

On August 21, 1987, the date the class period closes, USH issued a press release specifying that its reserves for medical claims was going to be increased in the third and fourth quarters of 1987. Thereafter, USH continued its investigation in an attempt to quantify the extent of the reserve increase and the reasons for it. USH sought legal advice from both its General Counsel and Mr. Molod. The documents reflect the legal services provided in connection with the ongoing investigation.

The October 22, 1987 "Privileged and Confidential Memorandum of Counsel" summarizes a legal study conducted by USH's General Counsel at the request of Mr. Abramson. Since the memorandum includes client confidences disclosed to in-house counsel for the purpose of attaining legal advice, they are protected. *See, e.g., In re LTV Securities Litigation,* 89 F.R.D. 595, 601 (N.D.Tex.1981) ("Information gathered in such a manner as to be privileged does not become discoverable solely because management makes other business use of the information."). Similarly, Mr. Molod's October 22, 1987 file memorandum in which he reports his conversation with Mr. Letofsky about the privileged memorandum is protected from disclosure. In connection with Wolf, Block's legal assistance, Mr. Molod had several conversations with Mr. Abramson, some of which he recounted in file memoranda. Mr. Molod also attended meetings with other representatives of USH, including Mr. Letofsky. Mr. Molod and Mr. Letofsky participated not as business consultants but as legal advisors. Additionally, Mr. Molod's handwritten and typewritten notes summarizing his conversations with Mr. Abramson and the discussions at the referenced meetings are privileged. Furthermore, since Mr. Kraft's and Mr. McParland's attendance at the September 9, 1987 and October 19, 1987 meetings was necessary to Wolf, Block's rendition of legal advice, their presence at the meetings did not constitute a waiver of the attorney-client privilege.

**\*4** Also, because Mr. Molod's October 22, 1987 file memorandum contains Mr. Molod's legal analysis of the confidences disclosed to him by his client, it is privileged.

*See Matter of Fischel,* 557 F.2d 209, 211 (9th Cir.1977). That memorandum, like the other internal file memoranda at issue here, were not disclosed by Mr. Molod to any other attorney at Wolf, Block nor to anyone at USH. It was the intention and expectation of Mr. Molod that each of these documents would remain confidential. The privilege has not been waived.

In this motion, plaintiffs also request that Wolf, Block produce any drafts retained by Wolf, Block of USH's 1985 and 1986 Annual Reports to Shareholders and Forms 10–K. However, these drafts contain information which was not later revealed to third parties. Thus, they are protected from discovery. *See Schenet, supra,* at 1283–84. The *Schenet* court concluded:

With regard to preliminary drafts of documents intended to be made public, the court holds that preliminary drafts may be protected by the attorney-client privilege. Preliminary drafts may reflect not only client confidences, but also the legal advice and opinions of attorneys, all of which is protected by the attorney-client privilege. The privilege is only waived as to those portions of the preliminary drafts ultimately revealed to third parties.

*Id.* (citations omitted). Similarly in this case, the preliminary drafts requested by plaintiffs contain the legal advice of the attorneys, as well as communications between Wolf, Block and the client. Consequently, these documents are protected also.

Finally, since the documents plaintiffs requested have properly been withheld on the grounds of privilege, plaintiffs' request to be permitted to resume Mr. Molod's deposition, as well as depositions of other representatives of USH, will be denied. Accordingly, plaintiffs' motion will be denied.

An appropriate order follows.

*ORDER*

AND NOW, this 7th day of FEBRUARY, 1989, upon consideration of plaintiffs' motion to compel,it is hereby ORDERED that plaintiffs' motion is DENIED.

**All Citations**

Not Reported in F.Supp., 1989 WL 11068

1989 WL 11068

## Footnotes

1    Plaintiffs cite *Wojdak v. First Western Government Securities, Inc., et al.,* Civil Action No. 83–1076 (E.D.Pa.
     January 30, 1985) (VanArtsdalen, J.) for the proposition that this court should have an in camera inspection
     of these documents. In *Wojdak,* Judge VanArtsdalen held that "[b]ecause the law firm was hired expressly to
     provide opinion letters to be disseminated to others, there is a serious question as to exactly what information
     the client intended to be confidential. Such a determination cannot unilaterally be decided by the party
     asserting the privilege." *Id.* at 7. In that case, there were approximately 3,200 documents relevant to plaintiffs'
     document requests, and it was unclear whether there was a legitimate ground for asserting the privilege
     3,200 times. However, in the present case, it is evident that the documents requested herein were created
     with the intent that they would remain confidential.

2    The *Schlegal* court determined that only the information revealed to the government in the submitted
     document should fall outside of the protection of the attorney-client privilege. *Schlegal, supra,* at 179. *Cf.
     Leucadia, Inc. v. Reliance Ins. Co.,* 101 F.R.D. 674, 677 (S.D.N.Y.1983) ("Even if the report had been
     privileged, the privilege was waived by its use in prospectuses and other public documents."). The present
     case is distinguishable from *Leucadia* since plaintiffs here seek to discover documents containing confidential
     information which has not been placed in public documents.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2456616
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

LEFTA ASSOCIATES, Ulysses G. Auger
Trust, and Lulu H. Auger Trust, Plaintiffs,

v.

Jack F. HURLEY, Jr., Rhoads & Sinon, LLP,
and Paxton Land Company, Defendants.

Civil No. 1:09–CV–2487.
|
June 16, 2011.

**Attorneys and Law Firms**

Christopher E. Fisher, Kenneth W. Lee, Tucker Arensberg PC, Harrisburg, PA, Cyril V. Smith, William K. Meyer, Zuckerman Spaeder LLP, Baltimore, MD, for Plaintiffs.

Arthur W. Lefco, Gregory W. Fox, Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, for Defendants.

*MEMORANDUM OPINION*

MARTIN C. CARLSON, United States Magistrate Judge.

**I. INTRODUCTION**

 **\*1** Now pending in this action are two motions that relate to documents that Plaintiffs produced to Defendants during the course of discovery. Plaintiffs claim that the documents in question were produced inadvertently, are subject to the attorney-client privilege, and are, therefore, confidential. Plaintiffs further contend that, pursuant to a confidentiality agreement entered into in this case, Defendants were obligated either to return the documents or to destroy them, and to make no unauthorized use of the materials. Because Plaintiffs believe Defendants failed to adhere to the terms of the confidentiality agreement with respect to at least some of the documents that were produced, Plaintiffs have moved for enforcement of the confidentiality agreement, and the imposition of sanctions against Defendants and their attorneys. (Doc. 62.)

In response, and in marked contrast, Defendants have filed a motion seeking a judicial determination that the documents

that Plaintiffs produced were not privileged or confidential, and, therefore, that Defendants could not have been in violation of the confidentiality agreement or subject to sanctions. (Doc. 71.) Furthermore, Defendants argue that even if the documents in question were privileged or otherwise confidential, Defendants and their counsel have not violated the terms of the confidentiality agreement in this case because the documents were never used for any prohibited purpose. Defendants also argue that there is no factual or legal basis for the imposition of sanctions as a result of Defendants' conduct.

The motions are fully briefed, and have been supported by a number of affidavits and declarations from counsel in this case. Upon careful consideration of the documents in question, the briefs filed in support of and opposition to the parties' competing motions, and the evidentiary materials offered by the parties, we conclude that the documents at issue are not protected by the attorney-client privilege, and Defendants were not, and are not, obligated to return the documents or to refrain from using them in this litigation. [1] Moreover, assuming that Defendants were obligated to adhere to the terms of the confidentiality agreement in place in this litigation, we find insufficient evidence to show that Defendants violated the terms of this agreement by misusing the produced material. Instead, the evidence submitted suggests that Defendants adhered to the terms and conditions of the confidentiality agreement in handling the documents produced, and in seeking a judicial declaration that the materials were not protected, whereas Plaintiffs rely on nothing more than speculation that Defendants must have used the materials improperly and used them as a basis for filing additional affirmative defenses to the claims in this case. We find this bare speculation to be insufficient to support Plaintiffs' quite serious charges of attorney misconduct, and conclude that the evidence of record indicates that Defendants' counsel did not behave improperly.

 **\*2** Moreover, we reject Plaintiffs' argument that Defendants should be prohibited from arguing that the documents in question are not privileged on the basis that Defendants were dilatory in responding to Plaintiffs' claims of privilege, when Plaintiffs did not assert those claims of privilege for four months after the documents in question were produced. Not only do Plaintiffs provide no persuasive authority that such a sanction would be warranted, but we conclude that the sanction is particularly inappropriate in this case, where Plaintiffs seek the enforcement of a confidentiality agreement that itself provided that the privilege was to be maintained

as to inadvertently produced documents only when the producing party "promptly requests [their] return ...." (Doc. 20.) As Plaintiffs waited for four months before claiming that the documents in question were produced inadvertently, it would appear equally if not more reasonable to conclude that it was Plaintiffs who had failed to comply with the terms of the Confidentiality Order by asserting a claim of privilege and inadvertent production four months after making the documents available to Defendants. In any event, for these reasons and as more fully explained below, upon consideration of the parties' substantive arguments and evidentiary showings, Plaintiffs' motion will be denied and Defendants' motion will be granted.

## II. *BACKGROUND*

Plaintiffs are the owners of certain partnerships with interests in the Gateway Gettysburg development, one or more real estate projects in Adams County, Pennsylvania. Plaintiffs initiated this lawsuit against the Harrisburg law firm Rhoads & Sinon, one of its partners, and the law firm's title company, for legal malpractice and related claims arising out of the Gateway Gettysburg project. In the complaint, Plaintiffs allege that Defendants mishandled certain loan documents, and otherwise performed negligently, and that as a result of Defendants' negligence, certain guaranty documents that were executed in connection with the Gateway Gettysburg project imposed a 50% guaranty obligation on the Plaintiffs, as opposed to a 25% obligation that Plaintiffs had agreed to. Defendants vigorously dispute Plaintiffs' allegations.

Discovery in the case began in March 2010. Due to the large volume of documents that the parties were exchanging, and in order to control discovery-related costs in this case, the parties entered into a stipulated order regarding confidential material (the "Confidentiality Order"), which the Court entered on June 8, 2010. (Doc. 20.) The Confidentiality Order authorized the parties to identify documents produced as "confidential," which would provide that the documents could only be used in connection with this litigation, and could not be disclosed to anyone other than parties, counsel, and consultants. (*Id.,* ¶ 1(e).) In addition to authorizing the parties to designate discovery as confidential, the Confidentiality Order also served as

**\*3** a mechanism to avoid waiver of privilege or any other applicable protective evidentiary doctrine as a

result of the inadvertent disclosure of documents containing privileged communications.

(*Id.,* at 1.) In this regard, the Confidentiality Order provides three rules that govern the inadvertent production of privileged documents.

First, the Confidentiality Order provides that the inadvertent production of privileged documents "shall NOT waive any privilege ... if the producing party ... promptly requests its return" after taking reasonable care to avoid the inadvertent production. (*Id.,* ¶ 1(a).)

Second, the Confidentiality Order provides that if the producing party gives notice that it produced privileged documents by mistake, the other side is either to return the documents immediately or destroy them, and certify compliance within 30 days. (*Id.,* ¶ 1(b).)

Third, if the requesting party disputes the privilege claim, "a single set" of the documents "may be sequestered and retained by and under the control of the requesting party for the sole purpose of seeking court determination of the [privilege] issue." (*Id.,* ¶ 1(c).)

The Confidentiality Agreement is thus structured to achieve two goals: First, it allows the parties to prevent the requesting party from improperly using or benefitting from the unintentional disclosure of privileged documents during the course of a discovery process involving the exchange of a substantial amount of documents by both sides in this action. In addition, it permits parties receiving documents that are later claimed to be cloaked in privilege to challenge that assertion of privilege in court.

On September 30, 2010, several months after producing documents in the case, Plaintiffs notified Defendants that they had inadvertently produced a number of documents that they claimed were subject to the attorney-client privilege, or which otherwise constituted attorney work product. (Doc. 80, Ex. A, Letter Dated September 30, 2010.) Defendants responded to this letter several months later, on January 3, 2011, conceding that certain of the documents were privileged and indicating that the documents would be destroyed, but disputing Plaintiffs' remaining claims of privilege. (Doc. 80, Ex. B, Letter Dated January 3, 2011 (misdated 2010).) Plaintiffs, in turn, replied on January 10, 2011, further

agreeing that some documents were, in fact, not privileged, but maintaining their claims of privilege with respect to the remaining documents. (Doc. 80, Ex. C, Letter Dated January 10, 2011.) Defendants wrote to Plaintiffs on February 3, 2011, agreeing that one additional disputed document was privileged and would be destroyed, but indicating that the remaining documents remained in dispute, and that Defendants would seek court intervention to resolve the impasse. (Doc. 80, Ex. D, Letter Dated February 3, 2011.)

On February 7, 2011, Plaintiffs filed a motion to compel compliance with the Confidentiality Order, and requested that the Court impose sanctions as a result of what Plaintiffs contended were Defendants' violations of the Confidentiality Order with respect to the disputed documents. (Doc. 62.) Plaintiffs filed a brief in support of the motion on the same day, with a number of exhibits and supporting materials (Doc. 63), and Defendants responded with a brief in opposition and their own supporting materials on March 2, 2011 (Doc. 70). Plaintiffs filed a reply brief on March 16, 2011 (Doc. 79), and Defendants, after obtaining leave of court (Doc. 97), filed a sur-reply on April 7, 2011 (Doc. 98), to provide further support for their assertion that their counsel had made no improper use of the disputed discovery documents.

 **\*4** On March 2, 2011, after Plaintiffs' filed their motion seeking enforcement of the Confidentiality Order, Defendants took a different tack, moving for entry of an order declaring that the documents Plaintiffs' inadvertently produced were not privileged. (Doc. 71.) Defendants filed a brief in support of this motion on March 16, 2011, and attached a number of exhibits and supporting materials. [2] (Doc. 80.) Plaintiffs filed a brief in opposition to this motion on April 7, 2011 (Doc. 96), to which Defendants replied on April 28, 2011 (Doc. 101). The District Court then referred both motions to the undersigned for resolution. (Docs.64, 72.)

The documents that remain in dispute fall into three general categories, which have been compiled as Exhibits E, F, and G to Defendants' brief in opposition to Plaintiff's motion. (Doc. 70, Ex. E, F, and G.) The first category of documents consists of spread-sheet financial forecasts that relate to the Gateway Gettysburg project, and emails from Ulysses Auger, Jr., in which he forwards these forecasts to himself. (Doc. 70, Ex. E.) Plaintiffs claim that these documents are privileged because they were "prepared by Ulysses Auger, sometimes with the assistance of Lefta Associates' attorney Bruce Goldstein or its consultant Bill Johnson, for discussion purposes among Lefta Associates and its counsel." (Doc. 80, Ex. C, Letter Dated

January 10, 2011.) In keeping with the definitions used by the parties, the Court will refer to this category of documents as "The Financial Forecasts."

The second category of documents include Ulysses Auger's notes regarding "talking points" that were to be used or addressed during negotiations with lenders who were financing the Gateway Gettysburg project loans. (Doc. 70, Ex. F.) The Court will refer to this category of documents as "The Talking Points Notes." With one exception, this category of documents does not clearly appear to contain or indicate any communication between Plaintiffs and their attorneys. Nevertheless, Plaintiffs marked these documents as confidential attorney-client communications, and insist that they were prepared with counsel for use in negotiations with the banks financing the projects.

The final category of documents appear to consist principally of power-point presentations that contemplate restructuring scenarios that Plaintiffs were evaluating in connection with the Gateway Gettysburg project and its financing. (Doc. 70, Ex. G.) The Court will refer to this category of documents as "The Restructuring Scenarios." In addition to the power-point presentations, these documents also include certain emails transmitting the presentations from Auger to himself, and also to Pat Steckler, who is an employee of Plaintiffs. (*Id.*) On their face, none of the documents indicate that they include communications between Plaintiffs and their lawyers for the purpose of receiving legal advice. Plaintiffs insist that these documents are privileged either because they "were prepared by Ulysses Auger and sent to Left Associates' attorneys Bruce Goldstein and Larry Roscher for use in discussions among Lefta Associates and its attorneys," (Doc. 80, Ex. C, Letter Dated January 10, 2011), or because they were prepared by Mr. Auger and his counsel. (Doc. 96, Attach. Declaration of Bruce Goldstein, Esq., ¶ 13.)

 **\*5** In the competing motions that are now before the Court, Plaintiffs place great emphasis on the ***process*** that the parties agreed was to govern the inadvertent production of privileged or confidential documents, whereas Defendants focus instead on the ***substance*** of the documents actually produced in this case, and whether these documents are privileged. Upon review of the voluminous documents that are at issue in this dispute, we conclude that Plaintiffs have not demonstrated that the documents are covered by the attorney-client privilege, and thus find it unnecessary to consider further whether the parties faithfully complied with the terms and conditions set forth in the Confidentiality

Order. For the reasons explained below, we find that Plaintiffs have not demonstrated that the documents are subject to the attorney-client privilege, and, therefore, they are not subject to the clawback provisions of the Confidentiality Agreement. Having so found, we find it unnecessary to resolve Plaintiffs' ancillary arguments that Defendants violated one or more terms of the Confidentiality Order itself, and we thus decline Plaintiffs' invitation to consider the imposition of sanctions for Defendants' conduct during discovery. [3]

## III. *DISCUSSION*

### A. The Attorney–Client Privilege Under Pennsylvania Law.

Rule 501 of the Federal Rules of Evidence provides, in relevant part, as follows:

> [I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed.R.Civ.P. 501. Thus, in diversity actions, such as the instant litigation, the law governing evidentiary privileges is supplied by the courts of the state in which the federal court sits. *See, e.g., Rhone–Poulenc Rorer v. Home Indem. Co.,* 32 F.3d 851, 861 (3d Cir.1994); *Maertin v. Armstrong World Indus., Inc.,* 172 F.R.D. 143, 147 (D.N.J.1997); *McDowell Oil Serv., Inc. v. Interstate Fire & Cas. Co.,* 817 F.Supp. 538, 545 (M.D.Pa.1993) (in diversity action, party's assertion of attorney-client privilege governed by state law). In accordance with these settled principles, Plaintiffs' assertion that the disputed documents constitute attorney-client-privileged communications is governed by Pennsylvania law.

The Pennsylvania Supreme Court has recently had occasion to explain the scope of the attorney-client privilege in Pennsylvania, and specifically to "consider whether, and to what degree, the attorney-client privilege attaches to attorney-to-client communications." *Gillard v. AIG Ins. Co.,* 15 A.3d 44, 46 (Pa.2011). In *Gillard,* the Pennsylvania Supreme Court

was addressing the scope of the attorney-client privilege, and observed that "Pennsylvania courts have been inconsistent in expressing the scope of the attorney-client privilege." *Id.* at 56. In making this observation, the court offered one possible interpretation for the inconsistent judicial treatment of the privilege in Pennsylvania:

> **\*6** Presumably, the disharmony relates to the ongoing tension between the two strong, competing interests-of-justice factors in play—namely—the encouragement of trust and candid communication between lawyers and their clients, and the accessibility of material evidence to further the truth-determining process. In light of this conflict, very good arguments are made on both sides concerning the privilege's appropriate breadth.

*Id.* at 57. In *Gillard,* the court was addressing—and resolving—a particular dispute that had arisen under Pennsylvania law with respect to whether, and to what extent, the attorney-client privilege attached at all to communications made from a lawyer to his client. *Id.* at 46. Although the fact that this was something of an open question under Pennsylvania law is somewhat surprising, the confusion regarding the scope of the privilege appears to have resulted from the fact that, by statute, Pennsylvania provides only for the confidentiality of communications made by a client to a lawyer. *See* 42 Pa. Cons.Stat. Ann. § 5928. Because of this limited statutory scope, some Pennsylvania courts had construed the scope of the privilege especially narrowly, and concluded that the privilege operated as a "one-way street," *id.* at 48, by protecting only communication from a client to a lawyer.

In *Gillard,* the Pennsylvania Supreme Court rejected this narrow interpretation of the privilege's application in Pennsylvania and made clear that the privilege "does afford derivative protection," *id.* at 57, and thus applied to confidential communication from a lawyer to a client. Accordingly, the Pennsylvania Supreme Court held that "in Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice. *Id.* at 59. Accordingly, following *Gillard,* in order for the attorney-

client privilege to attach, the party asserting the privilege must demonstrate that: (1) the information for which protection is sought was a communication from a client to an attorney, or from an attorney to the client; (2) the communication was kept confidential; and (3) the communication was made for the purpose of obtaining or providing legal advice. *See Gillard, supra.* [4]

Significantly, not every communication involving a lawyer meets this test, and the communication must have been made for the express purpose of obtaining or providing legal advice, as "[o]rdinary business advice is not protected." *See Wise Investments, Inc. v. Bracy Contracting, Inc.,* No. 01–3458, 2002 U.S. Dist. LEXIS 22263, *3, 2002 WL 31955990 (E.D.Pa. Oct. 23, 2002); *see also Wachtel v. Health Net, Inc.,* 482 F.3d 225, 231 (3d Cir.2007) ("Where a lawyer provides non-legal business advice, the communication is not privileged."); *Teltron v. Alexander,* 132 F.R.D. 394, 396 (E.D.Pa.1990) ( "[T]he privilege is limited to confidential communications with an attorney acting in his professional legal capacity for the express purpose of obtaining legal advice."); *see generally Upjohn Co. v. United States,* 449 U.S. 383, 395–96, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (privilege does not extend to business advice or to protect clients from factual investigations).

**\*7** It is widely recognized that the attorney-client privilege serves a salutary purpose: "[T]o encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* at 389; *see also In re Search Warrant B–21778,* 513 Pa. 429, 521 A.2d 422, 428 (Pa.1987) ("Its necessity obtains in the objective of promoting the most open disclosure in order to enhance the attorney's effectiveness in protecting and advancing his client's interests."); Restatement (Third) of the Law Governing Lawyers § 68 cmt. c (2000) (observing that the privilege "enhances the value of client-lawyer communications and hence the efficacy of legal services").

At the same time, "because the privilege obstructs the search for the truth and because its benefits are, at best, 'indirect and speculative,' it must be 'strictly confined within the narrowest possible limits consistent with the logic of its [purpose].' " *In re Grand Jury Investigation,* 599, F.2d 1224, 1235 (3d Cir.1979) (citation omitted) (quoting 8 Wigmore on Evidence § 2291, at 545 (McNaughton rev.1961); *see also United States v. Nixon,* 418 U.S. 683, 709–10 1974, 94 S.Ct. 3090, 41 L.Ed.2d 1039) (privileges against compelled

disclosure, although intended to protect legitimate interests, interfere with the search for truth and must not be construed expansively). Yet, courts need to be careful that they do not construe the privilege so narrowly that they frustrate its purposes. *See Upjohn,* 449 U.S. at 390–96; *see also Delco Wire & Cable, Inc. v. Weinberger,* 109 F.R.D. 680, 687 (E.D.Pa.1986) ("Thus, the principles by which [the court] must be guided are countervailing: the privilege may neither be given undue breadth nor be unduly restricted.").

With these substantive requirements and policy considerations in mind, the party asserting the privilege bears the burden of proving that the privilege applies to a particular communication. *See Joe v. Prison Health Servs.,* 782 A.2d 24, 31 (Pa.Commw.Ct.2001); *see also In re Grand Jury,* 603 F.2d 469, 474 (3d Cir.1979); *SEPTA v. CaremarkPCS Health, L.P.,* 254 F.R.D. 253, 259 (E.D.Pa.2008) ("The party asserting the attorney-client privilege 'bears the burden of proving that it applies to the communication at issue.' ") (quoting *Sampson v. Sch. Dist. of Lancaster,* 2008 U.S. Dist. LEXIS 91421, 2008 WL 4822023, at *3 (E.D.Pa. Nov.5, 2008)). In this regard, "[t]he burden of establishing the elements of the privilege can be met only by an evidentiary showing based on competent evidence and cannot be discharged by mere conclusory or *ipsit dixit* assertions." *Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.,* 2002 F.R.D. 418, 423 (E.D.Pa.2001). "Rarely, if ever, will the submission of documents to the court for *in camera* inspection be adequate to prove the existence of the elements necessary to establish the applicability of the privilege." *Delco Wire & Cable, Inc. v. Weinberger,* 109 F.R.D. 680, 688 (E.D.Pa.1986). Instead, "a party claiming the privilege must present record evidence, such as affidavits, and sufficient facts to bring the communication at issue within the narrow scope of the privilege." *Wise Investments,* No. 01–3458, 2002 U.S. Dist. LEXIS 22263, at *5, 2002 WL 31955990 (citing *Delco Wire & Cable, Inc. .,* 109 F.R.D. at 688).

**\*8** Notably, for purposes of the instant discovery dispute, the "attorney-client 'privilege does not shield documents merely because they were transferred to or routed through an attorney.' " *Smithkline,* 232 F.R.D. at 478 (quoting *Resolution Trust Corp. v. Diamond,* 773 F.Supp. 597, 600 (S.D.N.Y.1991)). Thus, "[w]hat would otherwise be routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on correspondence or memoranda." *Smithkline,* 232 F.R.D. at 478 (quoting *Andritz Sprout–*

2011 WL 2456616

*Bauer v. Beazer East,* 174 F.R.D. 609, 633 (M.D.Pa.1997)). Accordingly, in order to invoke properly the attorney-client privilege, the party seeking to prevent disclosure "must clearly demonstrate that the communication in question was made for the express purpose of securing legal not business advice." *AAMCO Transmissions, Inc. v. Marino,* Nos. 88–5522, 88–6197, 1991 U.S. Dist. LEXIS 13326, *9, 1991 WL 193500 (E.D.Pa. Sept. 24, 1991).

**B.** *Application of the Privilege in this Case.*

With the foregoing principles in mind, we turn to the three categories of documents that Plaintiffs claim are protected by the attorney-client privilege in this case. We consider each of these categories of documents *seriatim.*

**1. The Financial Forecasts.**

The Financial Forecasts primarily consist of spread-sheet financial forecasts that relate to the Gateway Gettysburg project, and emails from Ulysses Auger, in which he forwards these forecasts to himself. (Doc. 70, Ex. E.) Plaintiffs claim that these documents are privileged because they were "prepared by Ulysses Auger, sometimes with the assistance of Lefta Associates' attorney Bruce Goldstein or its consultant Bill Johnson, for discussion purposes among Lefta Associates and its counsel." (Doc. 80, Ex. C, Letter Dated January 10, 2011.) However, upon review of these documents, we find essentially no indication that the documents represent confidential attorney-client communications, and other than the affidavit that Defendants' attorney, Bruce Goldstein, submitted in which he provided an overview of the legal services he provided to Ulysses Auger, we find that Defendants have provided nothing that would allow the Court to conclude that these materials constitute privileged, confidential communications between lawyer and client. Indeed, even Mr. Goldstein's affidavit fails to demonstrate that these documents themselves represent confidential communications:

> Among the materials Mr. Auger and I reviewed at these meetings were forecasts and projections which he had prepared to use as an analysis of the Gateway Gettysburg Properties in connection with our discussions of strategy and the development of restructuring proposals and proposals to Monahan. As we reviewed

each loan, forecast, and projection, Mr. Auger and I had candid discussions during which I provided my legal opinions concerning (a) the loan documents, (b) the legal posture of Lefta and the Trusts with regard to the loans, and (c) possible negotiating strategies for negotiating with Susquehanna Bank, other banks, and/or Mr. Monahan. Mr. Auger gave me his ideas about potential negotiating positions and their possible impact on the loans, forecasts, and projections. The forecasts and projections were important tools in our strategy discussions because they enabled us to combine the legal and business factors which are crucial in loan restructurings.

**\*9** (Doc. 96, Attach., Declaration of Bruce Goldstein, Esq., at ¶ 9) (hereafter "Goldstein Decl. ¶ ___.") Mr. Goldstein also attests, in general fashion, that the "forecasts and projections, [were] revised from time to time, which resulted from those meetings directly reflected both the legal opinions about the loans I furnished to Mr. Auger, and the confidential forecasts and projections he gave me." (*Id.,* ¶ 10.) For these reasons, Mr. Goldstein explains that Mr. Auger marked the documents as privileged because he believed they constituted attorney-client privileged material.

Following a review of these materials, which in large part appear to be spreadsheets with differing financial projections contained within them, we cannot find that these documents constitute communications, much less privileged communications that were exchanged for the purpose of obtaining or furnishing legal advice. Although Mr. Goldstein offers a general explanation that seems to suggest that it is impossible to untangle business advice from legal counsel owing to the type of financial transactions at issue, (*id.,* ¶ 4), neither Plaintiffs nor Mr. Goldstein provide any description or explanation as to the parties' "candid discussions," "legal opinions," or even the "ideas" that Ulysses Auger exchanged with his lawyer.

Upon consideration, we agree with Defendants that even assuming that the Financial Forecasts may have provided

the catalyst for confidential communications between Mr. Goldstein and Mr. Auger, it does not cause the Financial Forecasts themselves to become privileged communications. We further agree that the documents in question appear as nothing more than Mr. Auger's own financial and factual analyses regarding the real estate projects in Gettysburg. Because the privilege extends to cover legal communications between a lawyer and client, and not to facts themselves, we conclude that the Financial Forecasts are not protected from disclosure by the attorney-client privilege, and we find that Plaintiffs' have failed to discharge their burden of showing that the documents should be protected from disclosure.

### 2. The Talking Points Notes.

The second category of documents include Ulysses Auger's notes regarding "talking points" that were to be used or addressed during negotiations with lenders who were financing the Gateway Gettysburg project loans. (Doc. 70, Ex. F.) With one exception, this category of documents does not appear to contain or indicate any communication between Plaintiffs and their attorneys. Nevertheless, Plaintiffs marked these documents as confidential attorney-client communications, and insist that they were prepared with counsel for use in negotiations with the banks financing the projects.

In his declaration, attorney Bruce Goldstein attests that Mr. Auger "frequently discussed presentations to the banks, and strategized about the best way to achieve restructuring or workout[,]" and that these discussions were reduced to writing in the form of the Talking Points Notes. (Goldstein Decl. ¶ 11.) As with the Financial Forecasts, however, neither Mr. Goldstein nor Plaintiffs explain adequately, or persuasively, as to how the Taking Points Notes reflect or demonstrate any protected attorney-client communications. Plaintiffs represent that "[t]he need for legal advice in connection with the Talking Points documents is apparent." (Doc. 96, at 5.) Whether or not the need for legal advice in connection with preparing talking points is "apparent," what is not apparent is that the Talking Points Notes themselves represent confidential communications between a lawyer and client. Instead, they appear to consist of information that was conveyed to a third party, and they do not, in any event, reflect the discussions or communications between Mr. Auger and Mr. Goldstein that may have informed Mr. Auger's presentations or restructuring strategy. We thus agree with Defendants that although those conversations and communications may be privileged, the Talking Points themselves are not protected.

**\*10** We do pause to observe that one of the documents included with the Talking Points Notes is an email from Mr. Auger to Mr. Goldstein. (Doc. 70, Ex. F, LEFTA00015255.) Although this is a communication between Mr. Auger and Mr. Goldstein, review of the single email in question reveals that it does not contain any confidential information, or legal advice; to the contrary, it merely indicates that Mr. Auger had a phone conversation with a bank representative. Upon consideration, because this single email reveals no confidential attorney-client communications that we can discern, and because Plaintiffs have failed to carry their burden of showing that the Talking Points Notes are covered by the attorney-client privilege, we are unable to find that the privilege attaches to these documents.

### 3. The Restructuring Scenarios.

The final category of documents that Plaintiffs' contend are protected from disclosure by the attorney-client privilege are the Restructuring Scenarios, which Plaintiffs contend are "closely related" to the Financial Forecasts. (Doc. 96, at 5.) These documents consist largely of power-point presentations that reflect restructuring possibilities that Plaintiffs were exploring with respect to the Gateway Gettysburg project. According to Mr. Goldstein, he and Mr. Auger had numerous conversations about these various alternatives, and he attests that the Restructuring Scenarios "summarized the results" of these conversations. (Goldstein Decl. ¶ 13.) [5] In keeping with the generality of Mr. Goldstein's declaration, however, nothing in the declaration explains what aspects of the Restructuring Scenarios reveal confidential attorney-client communications, and the documents themselves are silent on this point. The absence of information is telling and compels us to decline Plaintiffs' invitation to find that these documents are protected from disclosure by the privilege. Although we can imagine that the conversations or other communications that Mr. Auger and Mr. Goldstein may have shared regarding the potential restructurings would themselves be protected from disclosure, the Restructuring Scenarios simply do not appear to constitute communications, and Plaintiffs have failed to demonstrate that the privilege should attach to these documents.

We also find persuasive Defendants' assertion that these particular documents have considerable evidentiary value to this case because they go some way towards suggesting that Plaintiffs were aware that their guaranty obligations may be 50%, as opposed to 25%, and because they reveal Plaintiffs'

motives for restructuring the loans and their assessment of the financial risks and upside in connection with the project. As we observed above, although the attorney-client privilege serves an especially important purpose in fostering uninhibited and frank communication between a lawyer and client, it also has the risk of interfering with the search for the truth, and for that reason care must be taken to ensure that it is applied carefully and in limited fashion. In this case, we not only find that Plaintiffs have failed to meet their burden of demonstrating that the Restructuring Scenarios are protected by the attorney-client privilege, but find further that to cloak them with protection from discovery in this case could very well obfuscate issues that are critically important to a fair resolution of the parties' dispute.

## IV. *CONCLUSION*

 **\*11** Upon consideration, therefore, we conclude that Plaintiffs have failed to demonstrate adequately that the documents being challenged in this case—the Financial Forecasts, the Talking Points Notes, and the Restructuring Scenarios—constitute privileged attorney-client communications. For that reason, we find that Plaintiffs' motion for sanctions for Defendants' alleged violation of the Confidentiality Order must be denied, and that Defendants' motion to determine that the disputed documents are not privileged and subject to clawback should be granted.

Having found that the documents in question are not privileged, we further decline Plaintiffs' invitation to consider whether Defendants complied faithfully with all aspects of the Confidentiality Order governing discovery, and the clawback

of inadvertently produced documents, in this case. In addition, upon reviewing the evidence submitted by the parties in support of and opposition to the competing motions for relief, we find that Defendants did not misuse the discovery that was produced, and later challenged. For this additional reason, we find that there is no basis for the imposition of sanctions against any party.

## V. *ORDER*

Accordingly, for the reasons set forth above, having concluded that the Financial Forecasts, the Talking Points Notes, and the Restructuring Scenarios are not protected from disclosure by the attorney-client privilege, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' Motion to Compel Compliance with Protective Order, for Sanctions Including Striking Certain of Defendants' Affirmative Defenses, and for Other Relief (Doc. 62) is DENIED.

2. Defendants' Motion to Determine That Disputed Documents Subject to Plaintiffs' "Clawback" Request are Not Protected is GRANTED. Defendants shall be permitted to retain and use the Financial Forecasts, the Talking Points Notes, and the Restructuring Scenarios in connection with this litigation.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2456616

---

## Footnotes

1    Plaintiffs subsequently withdrew their claim of privilege regarding two sets of documents, and further withdrew their claim that the documents produced constituted attorney work product. Accordingly, in this memorandum we consider only the three categories of documents that Plaintiffs contend are protected by the attorney-client privilege.

2    The parties filed a motion seeking leave of court to file Exhibits D, E, F, G, and I to Defendants' brief in opposition to Plaintiffs' motion under seal because the documents were marked "confidential" and, therefore, were to be governed by the terms of the Confidentiality Order entered in this case. (Doc. 74.) On March 11, 2011, the Court granted the motion and permitted Defendants to file these exhibits under seal with the Court for resolution of the competing motions. (Doc. 78.)

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

3    With that having been said, it bears mention that upon consideration of the parties' competing submissions, we do not agree with Plaintiffs that Defendants must be presumed to have made illicit use of the documents that were being challenged pursuant to the terms of the Confidentiality Order. Defendants have submitted sworn declarations from their lawyers who have attested that counsel did not make any prohibited or improper use of the materials produced pending a resolution of Plaintiffs' and Defendants' related motions. Against these sworn declarations made by officers of the court, Plaintiffs have offered only conjecture and speculation in support of their serious allegations that counsel engaged in inappropriate conduct. We find that the balance of evidence tilts decidedly in Defendants' favor on this point. However, it is not necessary for the Court to consider further or resolve the parties' arguments on this subject, because the documents that remain in dispute are not privileged, and therefore Plaintiffs' claims that the Confidentiality Agreement was violated is moot.

4    The Third Circuit has articulated the requirements applicable to the attorney-client privilege as follows:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with the communication is acting as a lawyer; (3) the communication relates to a fact which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily (I) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

> *Rhone–Poulenc Rorer, Inc., v. Home Indem. Co.,* 32 F.3d at 862 (citing *United States Shoe Mach. Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)).

5    As Defendants note, there seems initially to be some inconsistency between Mr. Goldstein's representation that the Restructuring Scenarios are summaries of attorney-client communications, on the one hand, and Plaintiffs' earlier representation to Defendants that the Restructuring Scenarios "were prepared by Ulysses Auger and sent to Lefta Associates' attorneys Bruce Goldstein and Larry Roscher for use in discussions among Lefta Associates and its attorneys." (Doc. 80, Ex. C, Letter Dated January 10, 2011.) However, we understand Plaintiffs explanation to be that some portion of the Restructuring Scenarios was prepared following discussions with counsel, whereas some portion reflected Mr. Auger's own analysis of the proposals. (Doc. 96, at 5.)

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 35 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

KeyCite Yellow Flag - Negative Treatment

Disagreed With by   Eason v. Roman Catholic Bishop of San Diego, S.D.Cal.,   October 7, 2019

2015 WL 4111448
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

William PHILIPS et al., Plaintiffs,
v.
FORD MOTOR COMPANY, Defendant.

Case No. 14–CV–02989–LHK
|
Signed 07/07/2015

**Attorneys and Law Firms**

Adam J. Levitt, John Ernst Tangren, Grant & Eisenhofer P.A., Chicago, IL, Mary Sikra Thomas, Justin S. Brooks, Grant & Eisenhofer, P.A., Wilmington, DE, Nathan Bowen Atkinson, Spilman Thomas and Battle, PLLC, Winston-Salem, NC, Niall A. Paul, Spilman Thomas and Battle, PLLC, Charleston, WV, Mark Philip Pifko, Roland K. Tellis, Baron & Budd, P.C., Encino, CA, for Plaintiffs.

Amir M. Nassihi, Andrew L. Chang, Michael Kevin Underhill, Shook, Hardy & Bacon L.L.P., San Francisco, CA, Dustin Alan Lane, Seipp Flick Hosley LLP, Coral Gables, FL, Todd Andrew Croftchik, Seipp, Flick, Hosley LLP, Lake Mary, FL, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

LUCY H. KOH, District Judge

*1 Plaintiffs William Philips ("Philips"), Jaime Goodman ("Goodman"), Allison Colburn and her son Ian Colburn (collectively, "California Plaintiffs") have brought a putative class action lawsuit against defendant Ford Motor Company ("Ford"), a Delaware corporation with its principal place of business in Dearborn, Michigan. ECF No. 55, Second Amended Complaint ("SAC") ¶¶ 1, 32–56. Before the Court is Ford's Motion to Dismiss the SAC's California claims.[1] ECF No. 58 ("Mot."). California Plaintiffs have opposed the motion, ECF No. 63 ("Opp."), and Ford has replied, ECF No. 67 ("Reply").

The Court finds this matter suitable for decision without oral argument under Civil Local Rule 7–1(b) and hereby VACATES the motion hearing set for July 9, 2015, at 1:30 p.m. The case management conference scheduled for that date and time remains as set. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court hereby GRANTS IN PART and DENIES IN PART Ford's Motion to Dismiss.

## I. BACKGROUND

### A. Factual Allegations

California Plaintiffs are individuals seeking to represent a class of statewide consumers who purchased or leased Ford Fusion vehicles, model years 2010 through 2014, or Ford Focus vehicles, model years 2012 through 2014 (the "Vehicles"),[2] which California Plaintiffs allege are equipped with a defective Electronic Power Assisted Steering ("EPAS") system. SAC ¶ 1. The following chart summarizes California Plaintiffs' alleged purchasing information:

| Plaintiff | Vehicle | Site of Purchase | Date of Purchase |
|---|---|---|---|
| Philips | 2011 Ford Fusion (used) | Salinas Valley Ford (California) | March 2012 |
| Goodman | 2011 Ford Fusion (new) | Future Ford of Clovis (California) | October 13, 2010 |
| Allison Colburn[3] | 2010 Ford Fusion (new) | Galpin Ford (California) | January 12, 2010 |

[Editor's Note: The preceding image contains the reference for footnote [3] ]

Id. ¶¶ 32–54.

Power steering systems supplement the torque that the driver applies to the steering wheel, thus making it easier for the driver to turn the wheel. SAC ¶ 76. Ford's EPAS system replaces the traditional hydraulic-assist power steering pump and is comprised of a power steering control motor, electronic control unit, torque sensor, and steering wheel position sensor. Id. ¶ 2. California Plaintiffs allege, however, that Ford's EPAS system suffers from a "systemic defect" that "renders the system prone to sudden and premature failure during ordinary and foreseeable driving situations." Id. This defect, California Plaintiffs claim, causes drivers of the Vehicles to "experience significantly increased steering effort and an increased risk of losing control of their vehicles when the EPAS system fails" and "defaults to manual steering." Id. ¶¶ 3, 101.

2015 WL 4111448

**\*2** In support of this claim, California Plaintiffs rely on three categories of evidence: (1) their own alleged experiences with EPAS failure, SAC ¶¶ 36, 43, 53; (2) the National Highway Traffic Safety Administration's ("NHTSA") investigation into the EPAS system of the Ford Explorer, a vehicle not at issue in this putative class action, *id.* ¶¶ 82–103; and (3) complaints to the NHTSA by Ford owners about power steering failures in the Vehicles, *id.* ¶¶ 104–32.

As to the first category, California Plaintiffs allege that the EPAS system in each of their Vehicles[4] has failed. None of them, however, alleges that any accident has taken place or that they have suffered any physical injury or any property damage as a result of an EPAS failure. Specifically, Philips says he "reviewed Ford's promotional materials and other information," and that he "would not have purchased his 2011 Ford Fusion, or would not have paid the purchase price charged," if he had known of "the EPAS system defects and failures." SAC ¶ 34. Philips also says he experienced "intermittent problems with the steering system in his Fusion," which caused "difficulty steering." *Id.* ¶ 36. After lodging multiple complaints with Ford, Philips alleges he "was told that it would cost approximately $2,000 to fix the problem." *Id.* According to Philips, "Ford offered to pay 50%." *Id.*

Goodman, on the other hand, claims that prior to "purchasing her 2011 Ford Fusion," she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase; and (d) received and reviewed a brochure concerning the Fusion." *Id.* ¶ 40. "The window sticker," Goodman says, "indicated that the vehicle she would purchase was equipped with power steering." *Id.* "Nowhere in these materials did Ford disclose the EPAS system defects and failures," and had Ford done so, Goodman alleges she "would not have purchased her 2011 Ford Fusion, or would not have paid the purchase price charged." *Id.* ¶¶ 40–41. In addition, Goodman claims that "in 2014" she "began having intermittent problems with the steering system in her 2011 Ford Fusion and experienced difficulty steering." *Id.* ¶ 43. "The problems first occurred at low speeds," Goodman says, "when the steering would lock up while she was attempting to park." *Id.* After one attempt at repair, Goodman alleges that she experienced steering difficulties "while she was driving on the road, not just parking." *Id.* Ultimately, Goodman "took the vehicle to a Ford dealership and was told that it would cost $1,800 to fix the problem with the steering system." *Id.*

Prior to "purchasing her 2010 Ford Fusion," Allison Colburn claims that, just like Goodman, she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase; and (d) received and reviewed a brochure concerning the Fusion," and that "[t]he window sticker indicated that the vehicle she would purchase was equipped with power steering." SAC ¶ 47. Unlike Goodman, however, Allison Colburn alleges that the brochure she read "contained the same 'Drive smart' heading featured in the 'Technology Fact Sheets' available on Ford's website." *Id.* "Nowhere in these materials did Ford disclose the EPAS system defects and failures," and had Ford done so, Allison Colburn alleges she "would not have purchased her 2010 Ford Fusion, or would not have paid the purchase price charged." *Id.* ¶¶ 47–48. Notably, Allison Colburn does not allege she experienced any power steering failures. Instead, her son Ian Colburn alleges that "in October 2014," after his mother had given him the car, "the power steering in the 2010 Ford Fusion failed." *Id.* ¶¶ 51, 53. The Ford dealership in San Diego where Ian Colburn took the car for repairs "initially quoted the repair price as $1,756.95, but reduced the price to $990.19." *Id.* ¶ 54. Allison Colburn says she paid the $990.19 to fix the power steering. *Id.*

**\*3** As to the second category of evidence, California Plaintiffs emphasize documents produced in connection with the NHTSA's Ford Explorer investigation, which began on June 19, 2012. SAC ¶ 83. In response to the NHTSA's request for information, Ford "produced a database containing 1,173 complaints" regarding loss of power steering, nine of which allegedly described "incidents that resulted in a crash." *Id.* ¶ 89. Ford also produced various internal e-mails, which California Plaintiffs allege, reveal that the Vehicles suffer from the same EPAS system defect as the Ford Explorer and that Ford knew about the defect yet never disclosed it to the public or otherwise took corrective action. *Id.* ¶¶ 90–98. According to California Plaintiffs, the NHTSA investigation found "fifteen accidents that were caused by a loss of power steering in the Explorer." *Id.* ¶ 99. However, the NHTSA's Office of Defects Investigation ("ODI"), which published a resume closing the Ford Explorer investigation, was more circumspect: "ODI identified 15 crashes with evidence indicating loss of power steering assist *may* have been a factor." ECF No. 22–4 ("ODI Resume") at 2 (emphasis added).[5] "All 15 crashes," the ODI Resume continued, "involved low-speed impacts ... resulting in minor vehicle damage or no damage," with only one reported incident of

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 37 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

"minor injuries to the driver that did not require medical treatment." *Id.*

As to the third category, California Plaintiffs provide a litany of testimonials by other Ford owners complaining to the NHTSA about alleged power steering failures in the Vehicles. SAC ¶¶ 104–32. The two dozen complaints California Plaintiffs detail in the SAC are, California Plaintiffs allege, a mere sampling of the hundreds of complaints the NHTSA has received regarding EPAS failures in the Vehicles. *See id.* ¶ 104. Only two of the examples cited by California Plaintiffs, however, involved accidents:

> On December 11, 2012, a vehicle owner reported a crash in a 2010 Ford Fusion. The Defective Vehicle lost power steering, traction control, and the ability to brake upon entering a freeway on ramp. To stop the vehicle and avoid endangering other drivers, the driver was "forced to crash into the concrete wall barrier on the driver's side of the ramp." The driver and one other individual were injured.

> ....

> On October 3, 2012, a vehicle owner reported a crash in a 2011 Ford Fusion. The steering wheel seized while the owner was driving at 35 MPH, causing her to crash into a curb. After the initial accident, the steering of the vehicle continued to fail. The vehicle was taken to a Ford dealer three times, and the dealer refused to help her because the failure could not be replicated. The vehicle owner notified Ford but Ford was unwilling to offer assistance.

*Id.* ¶¶ 110, 112. The most recent power steering failure cited by California Plaintiffs, mentioned for the first time in the SAC, took place on March 10, 2015, "very nearly" led to a collision, and left the driver "quite shaken." *Id.* ¶ 132.

Based on this evidence, California Plaintiffs allege that Ford fraudulently concealed [6] the claimed power steering defect: "Ford actively concealed, failed to disclose, and continues to fail to disclose to consumers of the Defective Vehicles that the uniformly designed EPAS system in the Defective Vehicles is prone to premature failure during ordinary and foreseeable driving situations." SAC ¶ 4. Despite press releases and web-based "promotional materials" touting "EPAS as a reliable and beneficial product," Ford, according to California Plaintiffs, knew "as early as 2010" that the EPAS system was "prone to sudden, premature failure," and yet took no remedial action. *Id.* ¶ 11. "Ford's omissions," California Plaintiffs say, "are material to consumers because

of the significant safety concerns presented as a result of the system's defects and premature failures." *Id.* ¶ 5. According to California Plaintiffs, "Ford's failure to disclose to consumers and the public at large the material fact that the EPAS system is prone to premature failure ... recklessly risked the safety of occupants of the Defective Vehicles and the public at large." *Id.* ¶ 6.

**\*4** In May 2011, and again in December 2012, Ford allegedly issued technical service bulletins indicating Ford's awareness of EPAS system failures in the Vehicles. SAC ¶¶ 13 (2012 Ford Focus), 19 (2013 Ford Fusion). California Plaintiffs claim that "Ford concealed the fact that the EPAS system is prone to sudden and premature failure from consumers so that the warranty period on the Defective Vehicles would expire before consumers become aware of the problem." *Id.* ¶ 24. [7] Had Ford disclosed the alleged defect, California Plaintiffs say they "would not have purchased ... those vehicles, or would have paid substantially less for the vehicles than they did." *Id.* ¶ 25.

### B. Procedural History

On June 27, 2014, Plaintiffs filed their initial Complaint in federal court. ECF No. 1. The Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), is the asserted basis for this Court's subject matter jurisdiction. SAC ¶ 28.

On September 8, 2014, Plaintiffs filed their FAC containing fifty-one causes of action, including forty-nine claims specific to the laws of six states (California, Ohio, Michigan, Georgia, Illinois, and Arizona) and two nationwide claims based on the laws of forty-four additional states. *See* FAC ¶¶ 145–645. On October 24, 2014, Ford moved to dismiss the FAC. ECF No. 22. Concurrently with that motion, Ford filed a Request for Judicial Notice, ECF No. 22–3, which the Court has granted, *see supra* note 5. Plaintiffs opposed the motion on December 16, 2014, ECF No. 35, and Ford replied on January 16, 2015, ECF No. 36. At a hearing held on February 12, 2015, the Court granted Ford's Motion to Dismiss with leave to amend. ECF Nos. 46, 48.

In light of the unwieldy nature of the FAC, the parties stipulated at a February 18, 2015 case management conference to proceed with the California claims only for Ford's second round Motion to Dismiss. ECF No. 51. If any of the California claims survived the second round Motion to Dismiss, the parties would continue to litigate those claims to resolution before this Court. ECF No. 54 at 9. If, however,

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

none of the California claims survived, then the Court would confer with the parties regarding how to proceed with the non-California claims, including possibly transferring the case to a more appropriate jurisdiction. *Id.*

With that understanding, California Plaintiffs filed the SAC on March 27, 2015. The SAC asserts four causes of action under California law: (1) violation of the unlawful and unfair prongs of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code § 17200 *et seq.*, SAC ¶¶ 141–49; (2) violation of the fraudulent prong of the UCL, *id.* ¶¶ 150–59; (3) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750 *et seq., id.* ¶¶ 160–71; and (4) common law fraudulent concealment, *id.* ¶¶ 172–85. Notably, California Plaintiffs have abandoned their claims under the False Advertising Law ("FAL"), Cal. Civil Code § 17500, *et seq.,* and Song–Beverly Consumer Warranty Act, Cal. Civ.Code § 1790 *et seq. See* FAC ¶¶ 181–220.

**\*5** In the SAC, California Plaintiffs seek to represent the following statewide class of consumers:

> All current and former owners and lessees of a Defective Vehicle (as defined herein) in California

SAC ¶ 133. Excluded from the class definitions are, inter alia, "any individuals who experienced physical injuries as a result of the defects at issue in this litigation." *Id.* ¶ 134.

On April 30, 2015, Ford filed the instant Motion to Dismiss. Mot. at 26. Pursuant to a stipulation approved by the Court, *see* ECF No. 60, California Plaintiffs opposed the motion on May 28, 2015, Opp. at 26. Ford replied on June 15, 2015. Reply at 16.

## II. LEGAL STANDARDS

### A. Rule 12(b)(6) Motion to Dismiss

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn,* 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn,* 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson,* 355 F.3d 1179, 1183 (9th Cir. 2004).

### B. Rule 9(b) Pleading Requirements

Claims sounding in fraud are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b); *see Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy the heightened standard under Rule 9(b), the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir. 2007) (per curiam) (internal quotation marks omitted); *see also Vess v. Ciba–Geigy Corp. USA,*

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 39 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." (internal quotation marks omitted)). The plaintiff must also set forth "what is false or misleading about a statement, and why it is false." *Ebeid ex rel. U.S. v. Lungwitz,* 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks omitted).

## III. DISCUSSION

**\*6** Ford offers several bases in support of its Motion to Dismiss. First, Ford argues that California Plaintiffs have waived or abandoned various claims. Mot. at 7–9. Second, Ford contends that California Plaintiffs' claims are barred by the applicable statutes of limitations. *Id.* at 9–10. Third, Ford says that California Plaintiffs have failed to adequately plead their fraud-based claims. *Id.* at 11–21. Fourth, Ford argues that California Plaintiffs' CLRA claims must fail because they have failed to allege a "transaction" under the meaning of the statute. *Id.* at 21–23. Fifth, Ford contends that California Plaintiffs' equitable claims–i.e., UCL claims and CLRA claims for injunctive relief–must be dismissed because California Plaintiffs have an adequate remedy at law. *Id.* at 23–24. Finally, Ford asks the Court to strike references to "nationwide" claims from the SAC. *Id.* at 25. For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Ford's Motion to Dismiss.

### A. Waived or Abandoned Claims

Ford first argues that California Plaintiffs have waived their warranty and FAL claims by failing to replead these claims in the SAC. Mot. at 7. The Court agrees. The warranty and FAL claims were dismissed with leave to amend, and California Plaintiffs have waived the claims by failing to replead them. *See Lacey v. Maricopa Cnty.,* 693 F.3d 896, 928 (9th Cir. 2012) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled."). Accordingly, California Plaintiffs are precluded from reasserting California warranty or FAL claims against Ford.

### B. Standing to Assert Claims for Vehicles Not Purchased

Ford argues that California Plaintiffs lack standing to assert claims based on Vehicles that California Plaintiffs did not purchase—i.e., the 2012–2014 Ford Fusion; 2010–2014 Ford Fusion Hybrid; 2013–2014 Ford Fusion Energi; 2012–2014 Ford Focus; and 2012–2014 Ford Focus Electric. Specifically, Ford argues that California Plaintiffs fail to adequately allege facts showing substantial similarity between the EPAS systems in the 2010–11 Ford Vehicles and those in the other Vehicles. Mot. at 7–8. For the reasons stated below, the Court finds that California Plaintiffs have adequately pleaded standing to assert claims against products they did not personally purchase.[8]

Article III of the U.S. Constitution requires that a plaintiff plead and prove he or she has suffered sufficient injury to satisfy the "case and controversy" requirement. *See Clapper v. Amnesty Int'l,* 133 S.Ct. 1138, 1146 (2013) ("One element of the case-or-controversy requirement is that plaintiffs 'must establish that they have standing to sue.' " (quoting *Raines v. Byrd,* 521 U.S. 811, 818 (1997))). The U.S. Supreme Court has further clarified that standing means a plaintiff must plead and prove (1) injury-in-fact that is concrete and particularized, as well as actual or imminent; (2) that this injury is fairly traceable to the challenged action of the defendant; and (3) that this injury is redressable by a favorable ruling from the court. *Monsanto Co. v. Geertson Seed Farms,* 130 S.Ct. 2743, 2752 (2010).

In food misbranding cases, courts in this district have held that "a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are *substantially similar.*" *E.g., Miller v. Ghirardelli Chocolate Co.,* 912 F.Supp.2d 861, 869 (N.D.Cal. 2012) (emphasis added). In this particular case, the Court finds that California Plaintiffs have adequately alleged that the supposedly defective EPAS system is substantially similar across the Vehicles. California Plaintiffs cite evidence in the form of internal communications between Ford employees where the power steering systems in different vehicles were commonly referred to as "the EPAS," without any indication that the EPAS system varied across vehicles. SAC ¶¶ 14–15. Specifically, a Product Development Engineer wrote that she "[t]alked to the tech below and this loss of assist [in the Explorer] would always occur in low speed parking lot maneuvers similar to the Focus issue." *Id.* ¶ 14. Later, an EPAS Steering Engineering employee wrote "Can you tell if the EPAS ribbon cable concern of the Fusion is linked to the Explorer[?] This concern I believe was resolved at the end of Nov. 2011 for the Fusion vehicle line." *Id.* ¶ 15. Plaintiffs contend that these emails show that Ford equated the Focus's EPAS system to the Ford Explorer EPAS system,

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 40 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

and the Fordʼs EPAS system to the Explorer EPAS system. At the motion to dismiss stage, the Court must "construe the pleadings in the light most favorable to the nonmoving party." *Manzarek,* 519 F.3d at 1031.

**\*7** Moreover, California Plaintiffs allege repeatedly that the EPAS systems in all the vehicles are "uniform," *id.* ¶¶ 1, 4, 21–22, 69, 186, and that the steering defect manifested in similar manners across different models of vehicles, *id.* ¶¶ 107–29. As the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party" when ruling on a motion to dismiss, the Court finds these allegations sufficient in this case. *Manzarek,* 519 F.3d at 1031. In addition, California Plaintiff have only limited technical information available in the pre-discovery stage. *See Armstrong v. Davis,* 275 F.3d 849, 867 (9th Cir. 2001) (holding that plaintiffs are not required to engage in hyper-technical inquiries during the pleading stage), *abrogated on other grounds as recognized by Nordstrom v. Ryan,* 762 F.3d 903 (9th Cir. 2014). The Court therefore finds that these allegations sufficiently establish substantial similarity between the purchased and unpurchased products. Accordingly, the Court DENIES Fordʼs Motion to Dismiss California Plaintiffsʼ claims as to the following models: 20122014 Ford Fusion; 2010–2014 Ford Fusion Hybrid; 2013–2014 Ford Fusion Energi; 2012–2014 Ford Focus; and 2012–2014 Ford Focus Electric.

### C. Statutes of Limitations

Ford next moves to dismiss California Plaintiffsʼ claims based on the applicable statutes of limitations. The UCL contains a statute of limitations that bars claims brought more than four years after the cause of action accrued. *See* Cal. Bus. & Prof.Code § 17208. The CLRAʼs limitations period is three years, *see* Cal. Civ.Code § 1783, as is common law fraudʼs, *see* Cal. Civ.Code § 338(d). Because this action was brought in June 2014, and the limitations periods began to run when the California Plaintiffs purchased their vehicles, all UCL, CLRA, and fraudulent concealment claims asserted by California Plaintiffs would be barred except for Philipsʼs claims and Goodmanʼs UCL claim. In the SAC, however, California Plaintiffs invoke the discovery rule, the doctrine of fraudulent concealment, and equitable estoppel in seeking to toll the limitations period for their claims. SAC ¶¶ 57–67. For the reasons stated below, the Court finds that California Plaintiffsʼ UCL, CLRA, and fraudulent concealment claims are not time-barred.

As an affirmative defense, the statute of limitations promotes diligent assertion of claims and ensures defendants "the opportunity to collect evidence while still fresh, and provide[s] repose and protection from dilatory suits once excess time has passed." *Aryeh v. Canon Bus. Solutions, Inc.,* 292 P.3d 871, 875 (Cal. 2013). Ordinarily, the statute of limitations runs from the occurrence of the last element essential to a plaintiffʼs claim—i.e., the "last element" accrual rule. *El Pollo Loco, Inc. v. Hashim,* 316 F.3d 1032 (9th Cir. 2003) (internal citation omitted). To align the policy goals of the limitations defense with its actual application, courts and legislatures have over time developed certain exceptions to the "last element" rule, including the discovery rule and the doctrine of fraudulent concealment. *Aryeh,* 292 P.3d at 875. The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* Meanwhile, the doctrine of fraudulent concealment "tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale." *Id.* The California Supreme Court has held that claims under the UCL are "governed by common law accrual rules," including the discovery rule. *Id.* at 878; *see Plumlee v. Pfizer, Inc.,* No. 13–CV–00414 LHK, 2014 WL 4275519, at \*6 n.5 (N.D.Cal. Aug. 29, 2014). The discovery rule also applies to CLRA claims. *See Yumul v. Smart Balance, Inc.,* 733 F.Supp.2d 1117, 1131 (C.D.Cal. 2010). The doctrine of fraudulent concealment applies to claims under the UCL and the CLRA. *Id.*

Under the discovery rule, a claim accrues and the limitations period begins to run when a plaintiff has information of "circumstances to put [him] on *inquiry* or if [he] ha[s] *the opportunity to obtain knowledge* from sources open to [his] supervision." *Fox v. Ethicon Endo–Surgery, Inc.,* 110 P.3d 914, 917 (Cal. 2005). At that point, a plaintiff must conduct a reasonable investigation about the cause of his injury and is subsequently charged with the presumptive knowledge of the information that would have been revealed by such an investigation. *Fox,* 110 P.3d at 920. In order to rebut this presumption and toll the statute of limitations through the discovery rule, a plaintiff must plead facts showing (1) the "time and manner of discovery" and (2) the "inability to have made earlier discovery despite reasonable diligence" in investigating. *Id.* at 921. The burden is on the plaintiff to show diligence, and conclusory allegations will not withstand a motion to dismiss. *Plumlee,* 2014 WL 4275519, at \*8. If the discovery rule is invoked, the statute of limitations will be tolled until a reasonable investigation would have revealed the factual basis for that cause of action. *Fox,* 110 P.3d at 917.

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

**\*8** Even though Ford is correct that UCL and CLRA claims in consumer cases generally accrue on the date of purchase, California Plaintiffs here were not charged with a duty to reasonably investigate until the alleged steering defect manifested in their vehicles. *See Plumlee,* 2014 WL 4275519, at *7; *Fox,* 110 P.3d at 920 (plaintiffs are not charged with knowledge under the discovery rule until "information of circumstances to put [them] on inquiry or if they have the opportunity to obtain knowledge from sources open to [their] investigation." (citation omitted)). Prior to that point, California Plaintiffs had no reason to suspect wrongdoing, and there was no fact or circumstance to prompt an investigation. Only when the defect manifested in their vehicles in 2013 and 2014, *see* SAC ¶ 36 (defect in Philips' 2011 Ford Fusion manifested in "fall of 2013"); ¶ 43 (defect in Goodman's 2011 Ford Fusion manifested "in 2014"); ¶ 53 (defect in Allison Colburn's 2010 Ford Fusion manifested "in October 2014"), were California Plaintiffs charged with a duty to investigate and presumptive knowledge of the defect. *Fox,* 110 P.3d at 920. The statute of limitations began to run at that point. *Id.* California Plaintiffs, thus, timely filed this action within the limitations periods.

Although Ford relies heavily on *Plumlee,* this reliance is misplaced because that case is distinguishable from the instant one. In *Plumlee,* the plaintiff bought a drug in 2005 and used it for three years. *Plumlee,* 2014 WL 4275519, at *7. She then stopped using the drug due to its failure to improve her condition. *Id.* at *7. At this point, the plaintiff was charged with a duty to investigate and the statute of limitations began to run, since the lack of improvement in her condition was the "circumstance[ ]" that should have caused a reasonable person to suspect wrongdoing. *Id.* at *6. The plaintiff, however, waited for more than four years—beyond the statute of limitations period under the UCL—before bringing her claim. *Id.* at *7. In attempting to invoke the discovery rule, the plaintiff in *Plumlee* failed to plead facts showing that she was unable to discover the cause of her injury despite her reasonable diligence within those four years. Therefore, the court held that Plumlee's UCL claim was time-barred. *Id.*

Here, in contrast to *Plumlee,* California Plaintiffs' vehicles performed as expected up until their cars' EPAS systems failed. "Plaintiffs are required to conduct a reasonable investigation *after* becoming aware of an injury," and not before. *Fox,* 110 P.3d at 920. Therefore, California Plaintiffs need not allege facts showing diligence prior to the manifestation of the defect, as there was no duty

to investigate prior to that point. Because the statutes of limitation did not begin to run until 2013 and 2014, when the defect manifested, the action was timely filed within the statutory periods provided for the UCL, CLRA, and fraudulent concealment claims. The Court therefore DENIES Ford's Motion to Dismiss California Plaintiffs' claims on statute of limitations grounds.

### D. Fraudulent Omission Claims

As California Plaintiffs have now abandoned their affirmative misrepresentation claims, the four claims in the SAC all concern fraudulent omissions regarding the EPAS system defect. *See* SAC ¶¶ 144–45 (UCL unfair or unlawful prong); ¶ 154 (UCL fraudulent prong); ¶¶ 162, 164 (CLRA); ¶ 174 (fraudulent concealment claim). Accordingly, the Court addresses the four claims together as the "fraudulent omission" claims.

To state a valid claim for a fraudulent omission, California Plaintiffs must allege the "omission of a fact the defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co.,* 144 Cal.App. 4th 824, 835 (2006). "California federal courts have generally interpreted *Daugherty* as holding that '[a] manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue.' " *Wilson v. Hewlett–Packard Co.,* 668 F.3d 1136, 1141 (9th Cir. 2012) (quoting *Oestreicher v. Alienware Corp.,* 322 Fed.Appx. 489, 493 (9th Cir. 2009)). In addition, "Plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss." *Id.* at 1145.

**\*9** Ford makes three arguments in support of its Motion to Dismiss the fraudulent omission 16 claims: (1) California Plaintiffs fail to adequately allege Ford's knowledge of the EPAS system defect at the time of purchase; (2) Ford had no duty to disclose the EPAS system defect because it is not an unreasonable safety hazard; and (3) California Plaintiffs fail to adequately allege an omission. Ford also argues (4) that Philips's claims "necessarily fail" because his allegations in the SAC are materially indistinguishable from his allegations in the FAC; and (5) that Plaintiff Ian Colburn's claims fail for lack of reliance or injury. The Court addresses each argument in turn, and finds California Plaintiffs' (except for Ian Colburn's) allegations of fraudulent omission sufficient to survive a motion to dismiss for failure to state a claim.

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

### 1. Ford's Knowledge

Ford's first argument is that California Plaintiffs fail to allege that Ford knew of the EPAS system defect when California Plaintiffs purchased their vehicles. Mot. at 11; *Wilson,* 668 F.3d at 1145 ("[P]laintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss."). The first named plaintiff to purchase one of the Vehicles was Allison Colburn, who purchased her new 2010 Ford Fusion on January 12, 2010. SAC ¶ 46. Goodman purchased her 2011 Ford Fusion on October 13, 2010. *Id.* ¶ 38. Philips purchased his 2011 Ford Fusion in March 2012. *Id.* ¶ 33. Accordingly, California Plaintiffs must allege Ford's knowledge prior to January 12, 2010.

California Plaintiffs cite several sources of information supporting their allegation that "Ford has outwardly maintained its commitment to the flawed EPAS system even though it has been aware that the EPAS system installed in the Defective Vehicles is prone to sudden, premature failure since *as early as 2010.*" *Id.* ¶¶ 11, 81 (emphasis added). Specifically, California Plaintiffs rely on a May 2011 technical service bulletin ("TSB") stating that "[s]ome 2012 Focus vehicles equipped with electric power assisted steering (EPAS) ... may exhibit a lack of power steering assist on vehicle start up." SAC ¶ 13. A second TSB was issued in December 2012, stating that "[s]ome 2013 Fusion vehicles built on or before 11/30/2012 may exhibit a loss of power steering assist." *Id.* ¶ 19. California Plaintiffs also cite internal communications among Ford employees, from June 6, 2011 and March 23, 2012. *Id.* ¶¶ 14–16; 91–94. California Plaintiffs further cite the June 2012 NHTSA investigation into the Ford Explorer vehicles as evidence of Ford's knowledge of EPAS system defects. *Id.* ¶ 83. Other internal Ford e-mails suggest Ford's awareness of the Explorer issues in January 2011. *Id.* ¶ 97. Next, California Plaintiffs cite "hundreds of complaints from owners and lessees about steering problems with the Fusion line." *Id.* ¶¶ 17, 104–32. Some of these complaints are dated from 2010, but most are dated from 2012–2014. *Id.*

Ford contends that these allegations are insufficient, especially to show Ford's knowledge in January 2010, the time of Allison Colburn's purchase. Mot. at 11–12. Although the Court agrees that California Plaintiffs have not proved Ford's knowledge, they need not do so at the pleading stage. Rather, California Plaintiffs need only have plausibly alleged that Ford knew about the EPAS system defects "since as early

as 2010." SAC ¶ 11. The Court finds that California Plaintiffs have done so.

The May 2011 TSB, newly alleged in the SAC, is especially relevant. As other courts have recognized, it is reasonable to infer that "the TSBs ... were proceeded by an accretion of knowledge by Ford." *In re MyFord Touch Consumer Litig.,* 46 F.Supp.3d 936, 958 (N.D.Cal. 2014); *see Falco v. Nissan N. Am., Inc.,* No. CV 13–00686 DDP (MANx), 2013 WL 5575065, at *6–7 (C.D.Cal. Oct. 10, 2013) (stating that, where defendant issued the first of several TSBs in July 2007 and further did a redesign in 2006 or 2007, that "permit[s] plausible inferences that [defendant] was aware of the defect at the time they sold the vehicles in 2005 and 2006"); *see also MacDonald v. Ford Motor Co.,* 37 F.Supp.3d 1087, 1093 (N.D.Cal. 2014) (identifying "a number of facts" that support plaintiffs' knowledge allegations, including internal data, NHTSA complaints, and TSBs); *Decker v. Mazda Motor of Am., Inc.,* No. SACV 11–0873 AG MLGX, 2011 WL 5101705, at *5 (C.D.Cal. Oct. 24, 2011) (finding allegations of internal data and TSBs issued within one of year of purchase sufficient to plead knowledge). Furthermore, "[o]ne could reasonably infer that the TSB was issued in response to consumer complaints that surfaced immediately after rollout. That there were such complaints is substantiated by the NHTSA complaints identified by Plaintiffs." *MyFord Touch,* 46 F.Supp.3d at 958. As the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," the Court finds these allegations sufficient at the motion to dismiss stage. *Manzarek,* 519 F.3d at 1031.

**\*10** The cases cited by Ford are distinguishable. For example, in *Wilson* the Ninth Circuit rejected allegations of the defendant's knowledge where the plaintiff relied solely on customer complaints, many of which were undated or post-dated the plaintiff's purchase. *See Wilson,* 668 F.3d at 1148 ("Plaintiffs have submitted fourteen customer complaints, but the second amended complaint does not indicate where or how the complaints were made (*e.g.,* via HP's website). Twelve of those complaints are undated. The two complaints that are dated were made over two years after Plaintiffs purchased the Laptops."); *see also Williams v. Yamaha Motor Corp., U.S.A.,* No. CV 13–05066 BRO, 2015 WL 2375906, at *10 (C.D.Cal. Apr. 29, 2015) (rejecting knowledge allegations in part because plaintiffs "failed to allege even a single complaint that predates the sale of any first-generation motor."); *Callaghan v. BMW of N. Am., LLC,* No. 13–CV–04794–JD, 2014 WL 6629254, at *4 (N.D.Cal. Nov. 21,

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 43 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

2014) (rejecting knowledge based on post-purchase customer complaints). Other cases cited by Ford rejected the plaintiffs' allegations of knowledge where the plaintiff did not allege knowledge that the defect caused a safety hazard. *See, e.g., Marchante v. Sony Corp. of Am.,* No. 10CV795 JLS RBB, 2011 WL 6027602, at *4 (S.D.Cal. Dec. 5, 2011) ("[A]ll of Plaintiffs allegations regarding Sony's knowledge of the alleged defect pertain to Sony's knowledge that the defect causes excess heat that results in the deterioration of the television display, not that the defect poses any safety hazard.").

Here, California Plaintiffs' allegations, which include internal testing, dated internal communications, dated customer complaints, and dated TSBs, are sufficient to plausibly allege that Ford had knowledge of the EPAS system defect at the time California Plaintiffs purchased their vehicles. Indeed, other courts have allowed plaintiffs to proceed past the motion to dismiss on much thinner allegations. *See, e.g., Mui Ho v. Toyota Motor Corp.,* 931 F.Supp.2d 987, 998 (N.D.Cal. 2013) ("Plaintiffs claim that Defendants had non-public, internal data about the Class Vehicles' headlamp problems, including 'pre-release testing data, early consumer complaints about the defect to Defendants' dealers who are their agents for vehicle repairs, dealership repair orders, testing conducted in response to those complaints, and other internal sources.' "). Accordingly, the Court will not dismiss the fraudulent omission claims for failure to adequately allege Ford's knowledge.

## 2. Ford's Duty to Disclose

Ford's next argument is that Ford did not have a duty to disclose the EPAS system defect, and therefore California Plaintiffs cannot state a fraudulent omission claim under *Daugherty. See* 144 Cal.App. 4th at 835 (plaintiffs must allege the "omission of a fact the defendant was obliged to disclose."). California Plaintiffs argue that Ford was required to disclose the EPAS system defect because the defect constituted a material safety hazard. *Wilson,* 668 F.3d at 1141; *Smith v. Ford Motor Co.,* 749 F.Supp.2d 980, 987–88 (N.D.Cal. 2010). Ford argues that California Plaintiffs' allegations fail because the risk of EPAS system failure is at most a "safety hazard" and not an "*unreasonable* safety hazard." Mot. at 19 (emphasis in original); Reply at 12. Ford's argument is unconvincing. Whether the alleged defects are an unreasonable safety hazard is a question of fact, and based on the allegations in the SAC, the Court cannot say that

California Plaintiffs' allegations in that regard are deficient as a matter of law.

In the SAC, California Plaintiffs allege that the EPAS system failure causes "increased risk of losing control of their vehicles when the EPAS system fails." SAC ¶ 3. California Plaintiffs also allege that "[w]hen the EPAS system fails while a Defective Vehicle is on the road and the driver's ability to turn the vehicle is greatly reduced, occupants of the Defective Vehicles, occupants of surrounding vehicles, and pedestrians are exposed to the risk of collisions and grave bodily harm." *Id.* ¶ 5. The SAC continues in this vein:

> 101. The marked increase in the difficulty of steering that arises when the EPAS system fails and the steering system in the Defective Vehicles defaults to manual steering creates an unreasonable safety risk (both in the Ford Explorer and in the Defective Vehicles).

> **\*11** 102. Although failure of the EPAS system always compromises safety, this is particularly true when a vehicle is traveling at high speeds or on unlevel terrain. The sudden shock of needing to immediately exert great effort to control the vehicle makes the Defective Vehicles extremely susceptible to accidents when the EPAS system fails.

> 103. The danger created by sudden and unexpected failure of the EPAS system is clear from complaints reported to NHTSA about loss of control as a result of failure of the EPAS system. Moreover, certain complaints made to NHTSA suggest that failure of the EPAS system also may disable the braking system. One West Virginia owner reported that she rolled down a hill into a wooded area after the EPAS of her vehicle failed. In addition to losing the ability to steer the vehicle, the braking system failed to engage and the owner "lost complete control of the vehicle."

SAC ¶¶ 101–03. As California Plaintiffs' allegations explain, even if the EPAS only failed "in low speed parking lot maneuvers," *id.* ¶ 14, such a failure could still amount to a material safety hazard.

California Plaintiffs also tie the steering incidents they experienced to the EPAS system's alleged defects. *See, e.g.,* SAC ¶ 80 (listing five alleged defects in the EPAS system and explaining how each could lead to failure). These allegations distinguish the instant case from *Wilson,* where the plaintiffs' claim was dismissed for failure to link the defect to the safety risk, and not, as Ford argues, *see* Mot. at 21, because a

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 44 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

burning laptop is not a safety hazard, *see Wilson* at 1144–45 ("As Plaintiffs do not plead any facts indicating how the alleged design defect, *i.e.,* the loss of the connection between the power jack and the motherboard, causes the Laptops to burst into flames, the District Court did not err in finding that Plaintiffs failed to plausibly allege the existence of an unreasonable safety defect.").

Ford's attempt to further parse this argument in its Reply is just as unconvincing. Ford argues:

> the risk of injury posed by any vehicle defect would (all else being equal) be greatest when driving at high speed. But at high speed, a driver rarely if ever *needs* power-assisted steering; in fact, dramatic steering motions at high speed would likely pose a risk of injury themselves. Power-assisted steering is very helpful at low speeds, by contrast, such as when trying to park, but the risk of injury is correspondingly low.

Reply at 12–13 (emphasis in original). Ford's argument is not persuasive at the motion to dismiss stage, as the materiality of Ford's alleged nondisclosure is a factual question for the jury to decide. *See, e.g., MyFord Touch,* 46 F.Supp.3d at 957 (materiality is generally a question of fact); *Blaue v. Kissinger,* 2006 WL 2092380, *9 n.6 (N.D.Ill. July 24, 2006) ("[T]he question of whether a defendant's product is unreasonably dangerous for failure to incorporate certain safety devices is a question to be decided by a jury."). At the very least, it is plausible that a total failure in a vehicle's power steering —at high or low speeds—constitutes an unreasonable safety hazard. *See* SAC ¶¶ 101–03. Accordingly, the Court finds that, for purposes of a motion to dismiss, California Plaintiffs have alleged a material safety defect that Ford had a duty to disclose.

### 3. Ford's Alleged Omissions

 **\*12** Ford argues that California Plaintiffs' fraudulent omissions claims do not meet Rule 9(b)'s pleading standard. In *Kearns,* the Ninth Circuit explained that "nondisclosure is a claim for misrepresentation in a cause of action for fraud, [which] (as any other fraud claim) must be pleaded with

particularity under Rule 9(b)." 567 F.3d at 1127. In *Kearns,* the nondisclosure claims failed because they "were couched in general pleadings alleging Ford's intent to conceal from customers that [certified pre-owned] vehicles were essentially the same as ordinary used vehicles. Such general pleadings do not satisfy the heightened pleading requirements of Rule 9(b)." *Id.* Ford argues here that California Plaintiffs' claims fail for similar reasons. Mot. at 1213.

Ford relies in part on *Marolda v. Symantec Corp.,* 672 F.Supp.2d 992, 1002 (N.D.Cal. 2009), which required the plaintiff to identify "where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." *Marolda* involved an alleged fraudulent omission within a particular advertisement produced by the defendant. The plaintiff there claimed to know about the advertisement but failed to produce or describe it to the court. *See id.* at 1001. As other courts have recognized, however, "the *Marolda* requirements are not necessarily appropriate for all cases alleging a fraudulent omission." *Velasco v. Chrysler Grp. LLC,* No. CV 13–08080 DDP VBKX, 2014 WL 4187796, at *4 (C.D.Cal. Aug. 22, 2014) (quoting *Overton v. Bird Brain, Inc.,* 2012 WL 909295 (C.D.Cal. Mar. 15, 2012)). In *MacDonald,* moreover, the court found that the plaintiffs satisfied Rule 9(b):

> Plaintiffs adequately allege the "who what when and how," given the inherent limitations of an omission claim. In short, the "who" is Ford, the "what" is its knowledge of a defect, the "when" is prior to the sale of Class Vehicles, and the "where" is the various channels of information through which Ford sold Class Vehicles.

*MacDonald,* 37 F.Supp.3d at 1096.

This Court finds *MacDonald* more on point than *Marolda.* California Plaintiffs allege that Ford's "television advertisements concerning the vehicles," "material concerning the Fusion on Ford's website," "window sticker[s]," and "brochure concerning the Fusion" did not include relevant information about the EPAS system and its

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 45 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

possible failures. SAC ¶ 40. Ford, not surprisingly, does not argue that it disclosed the EPAS system's alleged failures.

As Judge Pregerson recently explained, in applying the reasoning from *MacDonald* :

> Plaintiff has identified the "who" (Chrysler); the "what" (knowing about yet failing to disclose to customers, at the point of sale or otherwise, that the TIPM 7 installed in Plaintiffs' vehicles was defective and posed a safety hazard); the "when" (from the time of the sale of the first Class Vehicle until the present day); and the "where" (the various channels through which Chrysler sold the vehicles, including the authorized dealers where Plaintiffs'[sic] purchased their vehicles). The court therefore concludes that Plaintiffs' factual averments are sufficient to allow Chrysler to prepare an adequate answer from the allegations.

*Velasco,* 2014 WL 4187796, at *5 (citations omitted). The same analysis applies here: California Plaintiffs have identified the "who" (Ford); the "what" (knowing about yet failing to disclose to customers, at the point of sale or otherwise, that the EPAS system installed in California Plaintiffs vehicles was defective and posed a material safety hazard); the "when" (from the time of the sale of the first vehicle until the present day); and the "where" (the various channels through which Ford sold the vehicles, including the authorized dealers where California Plaintiffs' purchased their vehicles). Accordingly, the Court finds that California Plaintiffs have sufficiently alleged that Ford fraudulently omitted information about the EPAS system in the Vehicles.[9]

**\*13** For all these reasons, the Court finds that California Plaintiffs have alleged a fraudulent omission and will not dismiss the SAC on that basis.

### 4. Plaintiff Philips's Allegations

Ford also argues that Philips's claims "necessarily fail" because his allegations in the SAC are materially indistinguishable from his allegations in the FAC. Mot. at 8–9. The Court does not find this argument persuasive. The Court's prior ruling focused on the inadequacy of Plaintiffs' affirmative misrepresentation allegations, which California Plaintiffs do not replead. ECF No. 48 at 9:1–23 (explaining that Plaintiffs' affirmative misrepresentation allegations were vague and conclusory). Considering that the only theory put forth in the SAC is a fraudulent omission theory, the Court finds the allegations relating to Philips sufficient to survive a motion to dismiss. The SAC adds specificity with regard to Ford's allegedly misleading marketing tactics and presents new allegations related to Ford's alleged knowledge of the EPAS system defect. *See* SAC ¶¶ 9–10 (allegations relating to marketing materials); ¶¶ 81–132 (allegations relating to knowledge). Accordingly, the Court finds the allegations relating to Philips sufficient at this stage of the litigation.

### 5. Plaintiff Ian Colburn Fails to Allege Reliance or Injury

Ford moves to dismiss the fraudulent omission claims brought by Ian Colburn due to his failure to allege reliance and injury, which are required elements of his claims. For the reasons stated below, the Court finds that Ian Colburn fails to allege actual reliance or injury for all four of his claims and thus dismissed his claims with prejudice.

This Court held in *Bruton* that claims brought under the unlawful or unfair prong of the UCL, like claims brought under the UCL's fraud prong, must allege actual reliance and injury, especially if they are based on a defendant's misrepresentations. *See Bruton v. Berber Products Co.,* No. 12–CV–02412–LHK, 2014 WL 172111, at *6 (N.D.Cal. Jan. 15, 2014) (citing *in re Tobacco II Cases,* 46 Cal.4th 298, 326 (2009) (holding that Proposition 64 imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong)); *see also* In re *Actimmune Mktg. Litig.,* No. 08–CV–2376, 2010 WL 3463491, at *8 (N.D.Cal. Sept. 1, 2010) (holding "that a plaintiff must plead 'actual reliance,' even if their [sic] claim arises under the unlawful or unfair prongs, so long as the pleadings assert a cause of action grounded in misrepresentation or deception"), *aff'd,* 464 Fed.Appx.

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 46 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

651 (9th Cir. 2011). Similarly, the CLRA also requires that a plaintiff plead reliance and injury. *See Durell v. Sharp Healthcare,* 193 Cal.App. 4th 1350, 1367 (2010); *Aron v. UHaul Co.,* 143 Cal.App. 4th 796, 802 (2006). Finally, a claim for fraudulent concealment under California law requires allegations of (1) knowing concealment or nondisclosure by the defendant (2) with the intent to defraud, which induces (3) actual reliance and (4) causes injury to the plaintiff. *625 3rd St. Assocs., L.P. v. Alliant Credit Union,* 623 F.Supp.2d 1040, 1050 (N.D.Cal. 2009) (citing *Hoey v. Sony Elecs., Inc.,* 515 F.Supp.2d 1099, 1104 (N.D.Cal. 2007)). It is clear from these cases that all four of Ian Colburn's claims require allegations of actual reliance and injury.

**\*14**  In the SAC, Ian Colburn alleges that he was given a 2010 Ford Fusion by his mother, Allison Colburn. The steering wheel in his vehicle allegedly failed, causing him to take it to a Ford dealership for repairs. SAC ¶¶ 51–54. Nowhere in the SAC does Ian Colburn allege that he viewed any promotional material or received any representation from Ford with regards to his vehicle. As in *Bruton,* a plaintiff has no standing to assert claims based on statements he did not view. *Bruton,* 2014 WL 172111, at \*9 (citing *Kwikset v.Super. Ct.,* 51 Cal.4th 310, 326 (2011)). Because Ian Colburn does not allege that he viewed any statement from Ford before he came into possession of the vehicle, any fraudulent concealment that may have occurred could not have led to justifiable reliance on his part. What's more, Ian Colburn does not allege in the SAC that he suffered any injury. Because he fails to adequately plead actual reliance or injury with respect to each of his four claims, the Court GRANTS Ford's Motion to Dismiss all of Ian Colburn's claims.

The Court does so without leave to amend because the Court, in granting Ford's prior Motion to Dismiss, told Plaintiffs that they must identify "specific materials, like car window stickers and websites, that were reviewed by plaintiffs and contained material omissions" in order to survive a motion to dismiss. ECF No. 48 at 9:7–10:17. As Plaintiff Ian Colburn has made no such allegation despite being on notice, the Court finds that allowing further amendment would be futile. *See Chappel v. Lab. Corp. of Am.,* 232 F.3d 719, 725–26 (9th Cir. 2000) ("A district court acts within its discretion to deny leave to amend when amendment would be futile ...."); *see also Chodos v. West Publ'g Co.,* 292 F.3d 992, 1003 (9th Cir. 2002) ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is particularly broad." (internal quotation marks omitted)).

### E. CLRA Claim: Whether California Plaintiffs Allege a "Transaction"

The CLRA provides that a consumer who suffers damage "as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person." Cal. Civ.Code § 1780(a). Section 1770, in turn, lists certain methods, acts, or practices and declares that they are "unlawful" if "undertaken by any person in *a transaction* intended to result or which results in the sale or lease of goods or services to any consumer." *Id.* § 1770(a) (emphasis added). The statute defines "transaction" as "an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." *Id.* § 1761(e). Ford argues that although California Plaintiffs allege they purchased their vehicles, "they do not allege this occurred in any 'transaction' with Ford or one of its agents." Mot. at 22.

The Court is not convinced. California Plaintiffs all allege that they purchased their vehicles directly from Ford dealerships. *See* SAC ¶ 33 (Philips purchased 2011 Ford Fusion from Salinas Valley Ford); ¶ 38 (Goodman purchased 2011 Ford Fusion from Future Ford of Clovis); ¶ 45 (Allison Colburn purchased 2010 Ford Fusion from Galpin Ford in Granada Hills). Allegations that vehicles were purchased from an authorized dealership are typically sufficient to state a claim against the vehicle manufacturer under the CLRA. *See, e.g., Chamberlan v. Ford Motor Co.,* No. C 03–2628 CW, 2003 WL 25751413, at \*8 (N.D.Cal. Aug. 6, 2003) (finding allegations that vehicles were purchased from "authorized dealerships acting as [Ford's] agents" sufficient to state a claim against Ford under the CLRA). Indeed, a plain reading of the CLRA does not require a direct transaction between a consumer and a manufacturer. Rather, the statute broadly defines transaction as "an agreement between a consumer and *another person.*" Cal. Civ.Code § 1761(e) (emphasis added). This broad definition is in keeping with the CLRA's command that the statute be "liberally construed and applied to promote its underlying purposes." *Id.* § 1760.

**\*15**  It comes as no surprise, then, that the vast majority of courts to address the issue have rejected Ford's argument, holding instead that a plaintiff need not allege a direct transaction with the manufacturer. *See, e.g., Falco,* 2015 WL 1534800, at \*6 (finding that plaintiffs need not allege a "direct" transaction between a consumer and the manufacturer in order to properly plead a CLRA claim);

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 47 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

*Rossi v. Whirlpool Corp.,* No. 2:12–cv–00125, 2013 WL 5781673, at *10 (E.D.Cal. Oct. 25, 2013) (holding that plaintiffs adequately pled their CLRA claim because "where a manufacturer had exclusive knowledge of a defect and the consumer relied upon that defect, the CLRA's protection extends to the manufacturer as well, regardless of whether the consumer dealt directly with the manufacturer"); *Tietsworth v. Sears,* 720 F.Supp.2d 1123, 1140 (N.D.Cal. 2010) (rejecting defendants' argument that plaintiffs were required to allege a direct transaction to state a claim under the CLRA because "when a plaintiff can demonstrate that the manufacturer had exclusive knowledge of a defect and the consumer relied upon that defect, the CLRA's protection extends to the manufacturer as well, regardless of whether the consumer dealt directly with the manufacturer"); *Keilholtz v. Superior Fireplace Co.,* 2009 WL 839076, at *3–4 (rejecting defendants' argument that a direct transaction must be alleged to state a claim under the CLRA because defendants "fail to cite any authority to support the proposition that a CLRA claim can be asserted only against defendants who sell goods or services directly to consumers").

Ford's citations to the contrary are unpersuasive. In *Green v. Canidae Corp.,* No. CV 09–0486 GAF PLAX, 2009 WL 9421226, at *4 (C.D. Cal. June 9, 2009), the district court dismissed the plaintiffs' CLRA claim against a pet food manufacturer because "the legislation clearly contemplates consumer transactions between a consumer and a retail seller, and does not apply to commercial transactions between a retailer and its vendors to acquire a supply of goods for resale." Not only does the weight of the persuasive authority fall against *Green,* but *Green* 's analysis is itself cursory. *Green* concludes summarily that permitting consumers to directly sue the manufacturers would contradict the dual CLRA purposes of consumer protection and efficiency. But *Green* offers no reason for so concluding. On the contrary, it seems that preventing consumers from suing manufacturers under the CLRA would require them to resort to less consumer-friendly causes of action for breach of warranty or common law fraud. *See Gray v. BMW of N. Am., LLC,* No. 13–CV–3417–WJM–MF, 2014 WL 4723161, at *6 (D.N.J. Sept. 23, 2014) (rejecting *Green* for the same reasons). In addition, *Green* distinguished *Chamberlan* on grounds that, in *Chamberlan,* "the used car dealers were authorized dealerships acting as agents of Ford." 2009 WL 9421226, at *4. Here, as in *Chamberlan,* California Plaintiffs all allege that they purchased their vehicles from authorized Ford dealerships. *See* SAC ¶¶ 33, 38, 45

Ford's citations to *Cirulli v. Hyundai Motor Co.,* No. SACV 08–0854 AG, 2009 WL 4288367, at *4 (C.D.Cal. Nov. 9, 2009), and *Fulford v. Logitech, Inc.,* No. C–08–2041 MMC, 2008 WL 4914416, at *1 (N.D.Cal. Nov. 14, 2008), are even less persuasive. In *Cirulli,* the district court sustained the plaintiffs' CLRA claims against Hyundai Motor America ("HMA"), with whom plaintiffs had a warranty agreement, but dismissed their CLRA claims against Hyundai Motor Company ("HMC"), HMA's parent company, because there was "no comparable transaction" with HMC.2009 WL 4288367, at *4. Here, by contrast, there is no dispute that California Plaintiffs all had a warranty agreement with Ford. *See* ECF No. 22 at 7 (Ford's first round Motion to Dismiss acknowledging that "[e]ach of the plaintiffs' cars was covered by an express 'bumper-to-bumper' warranty for the first three years or 36,000 miles driven"). Finally, in *Fulford,* the district court held, without analysis, that the plaintiff had "failed to allege that Logitech engaged in such acts in the course of a transaction with him." 2008 WL 4914416, at *1. In *Fulford,* unlike here and in *Chamberlan,* the products purchased in *Fulford* were not from "authorized dealerships acting as agents" of the manufacturer defendants. *Id.* at *1 n.2 (ellipsis and internal quotation marks omitted). Because California Plaintiffs purchased their vehicles from authorized Ford dealers, the instant case is therefore far more like *Chamberlan* than it is like *Green* or *Fulford.*

*16 Accordingly, the Court DENIES Ford's Motion to Dismiss California Plaintiffs' CLRA claims for failure to allege a "transaction."

### F. Equitable Relief Claims: UCL Claims and CLRA Injunctive Relief

Ford next argues that the Court should dismiss California Plaintiffs' equitable claims—to wit, their UCL claims and CLRA claims for injunctive relief. Mot. at 23–24. The Court should do so, Ford says, because California Plaintiffs have an adequate remedy at law. *Id.* For the second time, the Court agrees. *See* ECF No. 48 at 10:22–11:17 (granting Ford's first round Motion to Dismiss Plaintiffs' equitable claims due to "an adequate remedy at law").

Apart from civil penalties, which are not at issue in this case, the UCL provides only the equitable remedies of restitution and injunctive relief. *See Kor. Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1144 (2003); *Madrid v. Perot Sys. Corp.,* 130 Cal.App. 4th 440, 452 (2005). A plaintiff seeking equitable relief in California must establish that there is no adequate remedy at law available.

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

See *Knox v. Phoenix Leasing, Inc.,* 29 Cal.App. 4th 1357, 1368 (1994). Statutory relief under the UCL "is subject to fundamental equitable principles, including inadequacy of the legal remedy." *Prudential Home Mortg. Co. v.Super. Ct.,* 66 Cal.App. 4th 1236, 1249 (1998).

As the UCL provides only equitable remedies, *see* SAC ¶¶ 149, 159 (seeking restitution), and California Plaintiffs have an adequate remedy at law in the form of their claim for fraudulent concealment, the Court dismisses California Plaintiffs' UCL claims. *See, e.g., Durkee v. Ford Motor Co.,* No. C 14–0617 PJH, 2014 WL 4352184, at *3 (N.D.Cal. Sept. 2, 2014) ("Because the UCL provides for only equitable remedies, and plaintiffs have an adequate remedy at law for the alleged Song–Beverly Act violation, plaintiff's UCL claim must be dismissed."); *Gardner v. Safeco Ins. Co. of Am.,* No. 14–CV–02024–JCS, 2014 WL 2568895, at *7 (N.D. Cal. June 6, 2014) (dismissing UCL claim where plaintiffs' "claims for breach of contract and breach of the implied covenant of good faith and fair dealing may provide an adequate remedy [at law]"); *Rhynes v. Stryker Corp.,* No. 10–5619 SC, 2011 WL 2149095, at *3–4 (N.D.Cal. May 31, 2011) (dismissing plaintiffs' UCL claims because their "products liability claims" afforded them "an adequate remedy at law to redress their alleged injuries"). California Plaintiffs do not attempt to distinguish any of these cases, nor do they argue that their claims for fraudulent concealment are an inadequate remedy at law. *See* Opp. at 21–22. Moreover, the cases cited by California Plaintiffs do not even address the issue. *See, e.g., MyFord Touch,* 46 F.Supp.3d at 952 (not addressing equitable relief). Although California Plaintiffs "must establish that there is no adequate remedy at law available," *Durkee,* 2014 WL 4352184, at *2, the SAC contains no allegation of inadequacy.

To the extent California Plaintiffs assert a claim for injunctive relief in addition to damages under the CLRA, *see* SAC ¶¶ 169–70 (discussing damages only), that too is dismissed for the same reasons, *see Durkee,* 2014 WL 4352184, at *3 (dismissing entire CLRA claim due to an adequate remedy at law where plaintiffs sought "only injunctive relief" under the CLRA). Again, California Plaintiffs provide no answer.

**\*17** As a result, the Court GRANTS Ford's Motion to Dismiss California Plaintiffs' UCL claims and CLRA claims for injunctive relief. The Court does so without leave to amend because the Court has previously dismissed Plaintiffs' equitable claims due to an adequate remedy at law. *See* ECF No. 48 at 10:22–11:17. The Court therefore finds that

allowing further amendment would be futile. *See Chappel,* 232 F.3d at 725–26 ("A district court acts within its discretion to deny leave to amend when amendment would be futile ...."); *see also Chodos,* 292 F.3d at 1003 ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is particularly broad." (internal quotation marks omitted)). However, as stated *supra* at Part III.D., California Plaintiffs may continue to assert their CLRA claims for damages.

### G. Request to Strike Nationwide Claims

Lastly, Ford argues that the Court should strike the "nationwide" class claims that are repled in the SAC. Mot. at 25 (citing SAC at 39 n.7). Although the Court explained that Plaintiffs would need to add individuals with standing under the laws of each state in order to reassert Plaintiffs' nationwide claims, *see* ECF No. 48 at 12:3–13:7, the Court accepts Plaintiffs' representation that they have repled these claims in order to preserve tolling and to avoid a possible finding of waiver by an appellate court down the road, *see* SAC at 39 n.7. In light of Plaintiffs' representation, the Court finds it unnecessary to strike the requested matter from the SAC at the pleading stage. *See* Fed.R.Civ.P. 12(f). Accordingly, the Court hereby DENIES Ford's request to strike the nationwide claims from the SAC.

### IV. CONCLUSION

For the foregoing reasons, the Court rules as follows:

- The Court GRANTS with prejudice Ford's Motion to Dismiss as to Plaintiff Ian Colburn;

- The Court DENIES Ford's Motion to Dismiss at to California Plaintiffs' claims for fraudulent concealment and CLRA claims for damages;

- The Court GRANTS with prejudice Ford's Motion to Dismiss as to California Plaintiffs' UCL claims and CLRA claims for injunctive relief; and

- The Court DENIES Ford's request to strike the nationwide claims from the SAC.

**IT IS SO ORDERED**.

### All Citations

Not Reported in Fed. Supp., 2015 WL 4111448

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 49 of 87

Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)

2015 WL 4111448

## Footnotes

1  In addition to California Plaintiffs, the SAC includes the same non-California Plaintiffs from the First Amended Complaint ("FAC"): Jason Wilkinson, Robert Morris, Victoria Jackson, Johnpaul Fournier, and Ryan and Rebecca Wolf (together, with California Plaintiffs, "Plaintiffs"). *See* SAC ¶¶ 189–219. In light of the fact that the 108–page FAC contained fifty-one causes of action, including nationwide class claims and class claims brought under the specific laws of six different states, the Court decided to proceed by addressing the California claims first. *See* ECF No. 46; ECF No. 54 at 6, 9, 11–12, 37. To that end, the parties stipulated that "[a]lthough the SAC may contain both California and non-California claims," Ford's second motion to dismiss "shall address only Plaintiffs' California claims." ECF No. 51. Accordingly, the Court's order is limited to the four causes of action brought by California Plaintiffs in the SAC.

2  The SAC specifies further that the "Vehicles include the following models: 2010–2014 Ford Fusion; 2010–2014 Ford Fusion Hybrid; 2013–2014 Ford Fusion Energi; 2012–2014 Ford Focus; and 2012–2014 Ford Focus Electric." SAC ¶ 69.

3  There is no allegation that Ian Colburn, Allison Colburn's son, purchased any of the Vehicles. *See* SAC ¶¶ 51–54. Rather, Ian Colburn was gifted the 2010 Ford Fusion by his mother. *Id.* ¶ 51.

4  California Plaintiffs do not allege that any of them purchased a Ford Focus.

5  The Court GRANTS Ford's Request for Judicial Notice of the ODI Resume closing the NHTSA's investigation into the Ford Explorer's EPAS system. ECF No. 22–3. Because the SAC "necessarily relies" on this document, and because California Plaintiffs do not contest the document's authenticity or relevance, the Court considers it an appropriate subject for judicial notice under "the doctrine of incorporation by reference." *Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1038 (9th Cir. 2010); *see also In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prods. Liab. Litig.,* 890 F.Supp.2d 1210, 1216 n.2 (C.D.Cal. 2011) (taking judicial notice of the "NHTSA's ODI resume closing its investigation into Model Year 2010 Prius braking performance").

6  California Plaintiffs no longer allege fraud based on a theory of misrepresentation. *See* ECF No. 15 ("FAC") ¶¶ 7–8. California Plaintiffs instead rely solely on a theory of fraud by "omission[ ]," which they also call "fraudulent concealment." SAC ¶¶ 5, 35.

7  The Vehicles were all covered by an express New Vehicle Limited Warranty ("NVLW"), which Ford has filed with the Court. *See* ECF No. 22–2 (containing Ford's NVLWs for 2010, 2011, 2012, and 2013). Because the SAC "necessarily relies" on these documents, and because California Plaintiffs do not contest the documents' authenticity or relevance, the Court considers them an appropriate subject for judicial notice under "the doctrine of incorporation by reference." *Coto Settlement,* 593 F.3d at 1038; *see Elias v. Hewlett–Packard Co.,* 903 F.Supp.2d 843, 850 n.1 (N.D.Cal. 2012). The NVLW covered the Vehicles for the first three years or 36,000 miles driven, whichever came first. *See, e.g.,* ECF No. 22–2 at 14.

8  The Court's ruling is without prejudice to Ford later moving to dismiss for lack of standing should a sufficient factual record be developed showing that the products are not substantially similar.

9  The Court's analysis applies to Allison Colburn, Goodman, and Philips. As explained in Part III.D.5 *infra,* Ian Colburn's claims fail for lack of reliance and lack of injury. Those omissions apply to all the named plaintiffs except, as explained below, Ian Colburn.

**Philips v. Ford Motor Company, Not Reported in Fed. Supp. (2015)**

2015 WL 4111448

---

**End of Document**                                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3077844
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

John STEVENS, Plaintiff

v.

Jessi SULLUM, et al., Defendants

CIVIL ACTION NO. 3:20-1911
|
Signed April 25, 2023

**Attorneys and Law Firms**

Joseph P. Guzzardo, Guzzardo & Associates, Philadelphia, PA, Jeffrey Tenthoff, Matthew Moroney, Goldberg, Miller & Rubin, P.C., Philadelphia, PA, for Plaintiff.

Stephen G. Bresset, Bresset & Santora, LLC, Honesdale, PA, for Defendant Jessi Sullum.

James J. Scanlon, Ridley, Chuff, Kosierowski & Scanlon, P.C., Milford, PA, for Defendants D.A. Mark Powell, A.D.A. Judy Price.

David E. Heisler, Cipriani & Werner, P.C., Scranton, PA, for Defendants Detective Michelle Mancuso, Detective Chris Kolcharno.

Daniel D. Stofko, Margolis Edelstein, Scranton, PA, for Amicus Dominic J. Mastri, III.

## MEMORANDUM

MALACHY E. MANNION, United States District Judge

**\*1** Before the court is an appeal filed by defendants District Attorney Mark Powell and Assistant District Attorney Judy Price ("DA Defendants") of Judge Mehalchick's discovery order granting Plaintiff's request for disclosure of a memorandum drafted by DA Powell (the "Powell Memo" or "Memo"). (Doc. 95). The appeal requires this court to determine whether Judge Mehalchick clearly erred in finding the work product doctrine inapplicable to the Powell Memo. A well-established exception to the work product doctrine provides that if the attorney's conduct is a central issue in the case, the work-product doctrine does not apply. The Powell Memo was drafted by DA Powell whose alleged conduct is a central issue in this case. Therefore, the work product

protection does not apply to the Powell Memo. The court will thus **AFFIRM** Judge Mehalchick's order and **DENY** the appeal.

## I. BACKGROUND [1]

At issue in DA Defendants' appeal is the applicability of the work product doctrine to a memorandum authored by Defendant Powell in the context of the criminal prosecution of Plaintiff underlying this civil rights action (the "Powell Memo"). (Doc. 96). The Powell Memo is responsive to Plaintiff's document subpoena served on third-party Paul Lyon of Lyon Strategic Communications, LLC ("Lyon"). While Judge Mehalchick's order also granted Plaintiff's request for production of an email containing a statute that was marked up by Defendant Powell, DA Defendants' only appeal the order with respect to the Powell Memo. (Docs. 95, 96). After conducting a discovery conference call and reviewing the documents *in camera*, Judge Mehalchick issued an order granting Plaintiff's request for production of the documents. (Docs. 92 & 93). DA Defendants appealed that order and filed a supporting brief. (Doc. 96). Plaintiff filed a brief in opposition, (Doc. 98), to which DA Defendants replied, (Doc. 103). This court held oral argument on the appeal, after which the court ordered supplemental briefing on the work product privilege and deliberative process privilege as applied to the Powell Memo. The parties filed their briefs shortly thereafter. (Docs. 123, 138, 145).

## II. STANDARD OF REVIEW

When a United States Magistrate Judge decides a non-dispositive motion, the district court sitting on appeal may only reverse the judge's decision if the ruling is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see* Fed. R. Civ. P. 72(a) (reiterating the statutory standard); M.D. Pa. L. R. 72.2 (same). A ruling is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *PA Prison Soc. v. Cortes*, 622 F.3d 215, 231 (3d Cir. 2010) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). This means the court must accept the judge's factual determination unless that determination "either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data[.]" *Haines*, 975 F.2d at 92 (citing *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972)). A finding is contrary to law if the magistrate judge misinterpreted or misapplied applicable law. *Alarmax Distributors, Inc. v. Honeywell Int'l Inc.*, No.

2:14CV1527, 2015 WL 12756857, at *1 (W.D. Pa. Nov. 24, 2015).

**\*2** Findings supported by the record are not clearly erroneous, even if the record could support a different conclusion. *Anderson*, 470 U.S. at 573–74 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Along the same lines, the court is not entitled to reverse Judge Mehalchick's Order simply because it would have decided the case differently. *PA Prison Soc.*, 622 F.3d at 231 (citing *Anderson*, 470 U.S. at 573). Judge Mehalchick's ruling, then, is accorded significant deference. Since DA Defendants filed this appeal, "[they] must clear a high hurdle to compel this court to overturn a magistrate judge's decision of a non-dispositive pretrial matter." *Nothstein v. USA Cycling*, 337 F.R.D. 375, 384 (E.D. Pa. 2020).

## III. DISCUSSION

### A. Work Product Doctrine

The work product doctrine derives from Rule 26(b)(3) of the Federal Rules of Civil Procedure and the Supreme Court's decision in *Hickman v. Taylor*, 329 U.S. 495, 508 (1947), and precludes disclosure of documents and other tangible items which were (1) created in reasonable anticipation of litigation by or for a party and (2) prepared primarily for the purpose of litigation. "Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991) (citing *Hickman*, 329 U.S. at 510–11). The doctrine protects materials "prepared for any litigation or trial as long as they were prepared by or for a party to the subsequent litigation." *FTC v. Grolier, Inc.*, 462 U.S. 19, 25 (1983).

Rule 26(b)(3) establishes two categories of protection: fact work product and opinion work product. "Fact work product is discoverable only upon a showing [of] 'substantial need' and by demonstrating that one cannot otherwise obtain the 'substantial equivalent' of such materials without 'undue hardship.' " *In re Linerboard Antitrust Litig.*, 237 F.R.D. 373, 381 (E.D. Pa. 2006) (quoting Fed. R. Civ. P. 26(b) (3)). Opinion work product, "which consists of 'mental impressions, conclusions, opinions, or legal theories of an attorney,' is afforded almost absolute protection" and it "is discoverable 'only upon a showing of rare and exceptional circumstances.' " *Linerboard*, 237 F.R.D. at 381 (quoting *In*

*re Cendant Corp. Securities Litigation*, 343 F.3d 658, 663 (3d Cir. 2003)).

The burden of demonstrating that a document is protected as work product rests with the party asserting the doctrine. *Conoco Inc. v. U.S. Dep't of Just.*, 687 F.2d 724, 730 (3d Cir. 1982). The burden is significant because privileges "are not lightly created nor expansively construed." *United States v. Nixon*, 418 U.S. 683, 710 (1974). Indeed, the work product doctrine "must be strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Grand Jury Proc.*, 604 F.2d 798, 802 (3d Cir. 1979) (internal quotation marks and citations omitted).

Here, Judge Mehalchick found, in relevant part, that DA Powell did not draft the Powell Memo in anticipation of litigation, and thus the Memo was not entitled to work product protection. Specifically, Judge Mehalchick found that, rather than drafting "in anticipation of litigation," DA Powell drafted the Powell Memo "in anticipation of *ceasing criminal prosecution* in the underlying criminal case." (Doc. 92 at 11) (emphasis in original). DA Defendants say this was clear error because the Powell Memo consists of DA Powell's mental impressions, conclusions, opinions and/or legal theories pertaining to a then-active criminal prosecution. (Doc. 96). DA Defendants argue further that DA Powell drafted the Powell Memo in anticipation of a potential malicious prosecution claim from Plaintiff and in anticipation of potential ancillary litigation before the Disciplinary Board related to alleged attorney misconduct discussed in the memorandum. (Doc. 96 & 123). Plaintiff says Judge Mehalchick was correct in declining work product protection because the Powell Memo was created in anticipation of terminating criminal prosecution.

**\*3** "The question whether a document was prepared in anticipation of litigation is often a difficult factual matter." *United States v. Rockwell Int'l*, 897 F.2d 1255, 1266 (3d Cir. 1990). The relevant inquiry is "whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir. 1993) (citing *Rockwell Int'l*, 897 F.2d at 1266). As the Third Circuit explained:

> Only by looking to the state of mind
> of the party preparing the document ...

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 53 of 87

can we determine whether this test has been satisfied. Thus, that person's "unilateral belief" that litigation will result is the initial focus of the inquiry into whether the report was prepared "in anticipation of litigation." The rule is limited, however, by the requirement that the preparer's anticipation of litigation be objectively reasonable.

*Id.* "Even where the reasonable anticipation of litigation is established, whether the document comes within the purview of the work-product [doctrine] still depends primarily on the reason or purpose for the document production." *In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 184 (D.N.J. 2003). For example, the doctrine does not apply to "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes" even if those materials are later useful in litigation. *Martin*, 983 F.2d at 1260.

As the reader can probably glean from the summary of the law and arguments thus far, the issue presented by this appeal is a difficult one. The question of the work product doctrine's application to the Powell Memo contains both a thorny factual issue—*i.e.*, DA Powell's state of mind when drafting the Memo—and what seems to be a novel legal issue—*i.e.*, whether drafting a memorandum in anticipation of ceasing criminal prosecution is synonymous with drafting "in anticipation of litigation." The novelty of the latter legal issue is demonstrated by the parties' fruitless—but no doubt tireless—search for analogous case law. (*See* Doc. 123, DA Defendants' Supplemental Brief) ("there is no case directly on point"); (Doc. 138, Plaintiff's Supplemental Brief) ("Plaintiff was unable to find a case directly on point").

All told, the obscurity that remains after multiple briefs, supplemental briefs, and over an hour of oral argument likely demonstrates DA Defendants, as appellants, have not shown clear error in Judge Mehalchick's thorough, well-reasoned opinion. Regardless, the court need not delve into the thorny factual issue regarding DA Powell's state of mind, nor the novel legal issue described above because, even if DA Powell drafted the Powell Memo in anticipation of litigation, a well-established exception to the work product doctrine applies on this record.

As important as the work product doctrine is to the proper functioning of the adversarial system, it is not without judicious exceptions. One such exception is when the work product concerns the activities of counsel that are directly in issue in the litigation. Indeed, "[m]any courts faced with the issue of the production of opinion work product have recognized an exception to Rule 26(b)(3) protection for work product which concerns the activities of counsel that are directly in issue." *Pace-O-Matic, Inc., v. Eckert Seamans Cherin & Mellott, LLC*, No. 1:20-CV-00292, 2021 WL 5330641, at *8 (M.D. Pa. Nov. 16, 2021) (collecting cases); *see also* 8 Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE § 2026 (3d ed. 2020) ("[C]ourts have found such disclosure justified principally where the material is directly at issue, particularly if the lawyer or law firm is a party to the litigation."). For example, the prosecutor and law-enforcement defendants in *Bolus v. Carnicella* could not shield their opinion work product from disclosure because their mental impressions and legal strategy in the underlying criminal prosecution "form[ed] the heart of Plaintiffs' case." [2]

**\*4** This exception makes sense when we remember the purpose of the work product doctrine: to "promote[ ] the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients," *Westinghouse*, 951 F.2d at 1428. This purpose is not implicated where, as here, the attorney's work product is directly at issue in this case and may be used against him rather than his clients.

Here, as DA Defendants articulate in their brief, a fair reading of the Powell Memo shows "he is engaged in an analysis of the criminal case by evaluating facts and witnesses in contemplation of the prosecution of the Plaintiff," and the Memo "was written during the pendency of a criminal action in which [DA Powell] was analyzing the viability of an active prosecution[.]" (Doc. 96 at 7). DA Powell's analysis of the evidence in and viability of the criminal prosecution of Plaintiff is directly at issue in this case. Plaintiff's remaining claims against DA Powell include malicious prosecution under 42 U.S.C. § 1983. A key element related to that claim is whether DA Powell "acted maliciously or for a purpose other than bringing the plaintiff to justice" in initiating prosecution and continuing to prosecute Plaintiff in the underlying criminal case. For example, Plaintiff alleges in his amended complaint that DA Powell manufactured a false narrative in regard to Plaintiff, generated false evidence against him, and pressured a subordinate to continue prosecuting Plaintiff.

(*See, e.g.*, Doc. 9 at 10). The Powell Memo sheds light on DA Powell's intent and motivations in continuing to pursue the criminal prosecution of Plaintiff. To be sure, DA Powell's mental impressions, conclusions, opinions, or legal theories contained in the Powell Memo go to the heart of Plaintiff's claims against him. Therefore, these facts warrant application of the narrow exception to the work product doctrine for the information for which protection is sought is directly at issue. [3]

### B. Deliberative Process Privilege

The deliberative process privilege permits the government to withhold documents containing "confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice." *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 853 (3d Cir. 1995) (citation omitted). "[T]he ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *Id.* "It recognizes 'that were agencies forced to operate in a fishbowl, the frank exchange of ideas and opinions would cease[,] and the quality of administrative decisions would consequently suffer.' " *Id.* Like most privileges, the deliberative process privilege can be waived. "Where an authorized disclosure is voluntarily made to a non-[governmental] party, the government waives any claim that the information is exempt from disclosure under the deliberative process privilege." *Shell Oil Co. v. I.R.S.*, 772 F.Supp. 202, 211 (D. Del. 1991); *see also Fla. House of Representatives v. U.S. Dep't of Com.*, 961 F.2d 941, 946 (11th Cir. 1992) (citing *Shell Oil*). However, the deliberative process privilege is not waived if

"the disclosure was inadvertent, and the [government] [takes] reasonable steps in preventing and rectifying the disclosure." *Bayliss v. New Jersey State Police*, 622 F. App'x 182, 186 (3d Cir. 2015) (citing Fed. R. Evid. 502(b)).

**\*5** Here, even if the deliberative process privilege were to apply, DA Powell waived the privilege by voluntarily disclosing the Powell Memo. It is undisputed that DA Powell voluntarily disclosed the Powell Memo to Paul Lyon, a non-governmental third-party, when he attached the memorandum to an email to Mr. Lyon seeking public relations advice. DA Defendants do not allege this disclosure was inadvertent, nor that they took reasonable steps in preventing and rectifying the disclosure. In fact, DA Defendants do not respond whatsoever to Plaintiff's argument that the deliberative process privilege was waived. Thus, the court finds the deliberative process privilege does not prevent disclosure of the Powell Memo because, even if applicable, it was waived by voluntary disclosure.

### IV. CONCLUSION

In light of the foregoing, the court will **AFFIRM** Judge Mehalchick's discovery order requiring disclosure of the Powell Memo and **DENY** DA Defendants appeal thereof. An appropriate order follows.

### All Citations

Slip Copy, 2023 WL 3077844

---

### Footnotes

1    Since Judge Mehalchick stated the procedural and factual background of this case in her Memorandum, it is not fully repeated herein. (*See* Doc. 92).

2    *Bolus v. Carnicella*, No. 4:15-CV-01062, 2020 WL 6531007, at \*8 (M.D. Pa. Nov. 5, 2020).

3    The court appreciates the parties' supplemental briefing on the issue of waiver of the work product doctrine but need not reach the issue since the court finds the above-articulated exception applies.

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 55 of 87

2022 WL 4473594
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Nathaniel WAHLIG, Plaintiff,

v.

Kilolo KIJAKAZI, Acting Commissioner
of Social Security, [1] Defendant.

CIVIL NO: 1:20-CV-02310
|
Filed September 26, 2022

**Attorneys and Law Firms**

Lori L. Mannicci, Mannicci & Associates, LLC, Bethlehem, PA, for Plaintiff.

George Michael Thiel, U.S. Attorney's Office, Scranton, PA, for Defendant Andrew Saul.

**MEMORANDUM OPINION**

Susan E. Schwab, United States Magistrate Judge

**I. Introduction.**

**\*1** This is a social security action brought under 42 U.S.C. § 405(g). The plaintiff, Nathaniel Wahlig, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for supplemental security income under Title XVI of the Social Security Act. We have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, the Commissioner's decision will be affirmed, and judgment will be entered in favor of the Commissioner.

**II. Background and Procedural History.**

We refer to the transcript provided by the Commissioner. *See docs. 16-1 to 15-17.* [2] On September 5, 2018, Wahlig's mother protectively filed [3] an application for supplemental security income on behalf of Wahlig. *Admin. Tr.* at 132–37. This application for benefits [4] was filed on September 5, 2018, nine days before Wahlig attained the age of 18 as defined by the applicable regulation. *See* 20 C.F.R. § 416.120(c)(4) ("An individual attains a given age on the first moment of the day preceding the anniversary of his birth corresponding to such age."). Thus, he was seeking benefits as a child for that brief nine days and as an adult thereafter. After the Commissioner denied his claim at the initial level of administrative review, Wahlig requested an administrative hearing. *Id.* at 103–112. And on August 7, 2019, Wahlig, who was not represented by counsel, testified at a hearing before Administrative Law Judge ("ALJ") Gerard Langan. *Id.* at 9–49. Wahlig's mother and a vocational expert also testified at the hearing. *Id.*

The ALJ determined that Wahlig was not disabled either during the nine-day period before he had attained age 18 or thereafter. *Id.* at 97–98. And so, he denied Wahlig benefits. *Id.* Wahlig appealed the ALJ's decision to the Appeals Council, which denied his request for review on October 20, 2020. *Id.* at 3–7. This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

**\*2** In December of 2020, Wahlig, by then represented by counsel, began this action by filing a complaint claiming that the Commissioner's decision is not supported by substantial evidence and is contrary to law and regulation. *Doc. 1* at ¶ 7. He requests that the court reverse and set aside the Commissioner's decision or, in the alternative, remand the case to the Commissioner for further proceedings. *Id.* at 2 (Wherefore Clause).

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 12.* The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 15, 16.* The parties filed briefs, *see docs.* 17–19, and this matter is ripe for decision.

**III. Legal Standards.**

**A. Substantial Evidence Review—the Role of This Court.**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Consol.*

Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)

2022 WL 4473594

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 56 of 87

*Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Wahlig was disabled, but whether substantial evidence supports the Commissioner's finding that he was not disabled and whether the Commissioner correctly applied the relevant law.

**B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ.**

To receive benefits under Title XVI of the Social Security Act, a claimant generally must demonstrate an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).[5] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a). Unlike with disability insurance benefits under Title II of the Social Security Act, "[i]nsured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits" under Title XVI of the Social Security Act. *Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar. 22, 2017). Supplemental Security Income "is a federal income supplement program funded by general tax revenues (not social security taxes)" "designed to help

aged, blind or other disabled individuals who have little or no income." *Id.*

*3 The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 416.920. Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. § 416.920(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019). The RFC is " 'that which an individual is still able to do despite the limitations caused by his or her impairment(s).' " *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 416.945(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 416.945(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). But at step five, "the burden of production shifts to the Commissioner, who must ... show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites. Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999). The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). Otherwise, " 'the reviewing court cannot

Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)

2022 WL 4473594

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 57 of 87

tell if significant probative evidence was not credited or simply ignored.' " *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV. The ALJ's Decision. [6]
On January 30, 2020, the ALJ denied Wahlig's claims for benefits. *Admin. Tr.* at 75–102. At step one of the sequential-evaluation process, the ALJ found that Wahlig had not engaged in substantial gainful activity since the date of his application for benefits. *Id.* at 83–84.

At step two of the sequential-evaluation process, the ALJ found that Wahlig had the following severe impairments: autism, Asperger's syndrome, and major depressive disorder. *Id.* at 91.

At step three of the sequential-evaluation process, the ALJ found that Wahlig did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 91–94.

The ALJ then determined that Wydra has the RFC to perform full range of work at all exertional levels with some nonexertional limitations. *Id.* at 94. The ALJ found that Wahlig "is able to understand, retain and carry out simple instructions with few work place changes[,]" and that he "is capable of occasional decision-making with respect to work-related activities." *Id.* But the ALJ determined that Wahlig "should not engage in any fast production rate work[,]" and he "should avoid interaction with the public, except for incidental contact." *Id.* Finally, the ALJ concluded that Wahlig "may maintain occasional interaction with co-workers and supervisors; however, he should avoid any group, team, or tandem work activity. *Id.* In making this RFC assessment, the ALJ reviewed Wahlig's assertions and testimony as well as the assertions and testimony of his mother. *Id.* at 95. He also considered Wahlig's educational and treatment records and daily activities. *Id.* at 94–95. And he considered the opinion evidence in the record. *Id.* at 96.

 **\*4**  At step four of the sequential-evaluation process, the ALJ found that Wahlig had no past relevant work. *Id.* at 96.

At step five of the sequential-evaluation process, considering Wahlig's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs—such as janitor/cleaner, hand packager, and order filler—that exist in significant numbers in the national economy that Wahlig could perform. *Id.* at 97.

In sum, the ALJ concluded that Wahlig was not disabled. *Id.* at 97–98. Thus, he denied Wahlig's claims for benefits. *Id.* at 98.

## V. Discussion.
Wahlig presents three claims. First, he claims that the ALJ failed in his duty to develop the record fully and fairly. Second, Wahlig claims that the ALJ's RFC is not supported by substantial evidence. And Third, Wahlig claims that the ALJ's decision is not supported by substantial evidence because the ALJ's hypothetical questions to the vocational expert did not reflect of all his credibly established functional limitations. For the reasons discussed below, we conclude that Wahlig's claims are without merit.

### A. The ALJ did not fail to develop the record.
After Wahlig requested a hearing before an ALJ, he was sent a letter acknowledging his request ("Request for Hearing Acknowledgement Letter"). *Admin. Tr.* at 113–27. Among other things, that letter explained that Wahlig had the right to representation. *Id.* at 114, 117–18. And attached to the Request for Hearing Acknowledgement Letter was a list of organizations that may be able to help a claimant obtain representation. *Id.* at 119–22.

Wahlig appeared at the hearing before the ALJ without counsel. At the outset of the hearing, the ALJ advised Wahlig that he may be represented—by an attorney or non-attorney representative—if he so chose. *Id.* at 11. After explaining to Wahlig that such representatives are typically paid based on a contingent-fee agreement, but there are some agencies that may assist him without charging a fee, the ALJ told Wahlig that it was his decision whether he wanted to seek representation or to represent himself. *Id.* at 11-13. And the ALJ explained that he would postpone the hearing to allow Wahlig time to find a representative. *Id.* at 13.

When the ALJ asked Wahlig how he wanted to proceed, Wahlig's mother responded that she called one attorney on the list provided, but that attorney did not return her call. *Id.* at 13–14. She continued that "we thought we would come here, because we do have a lot of different evidence already from the school district and stuff, so we thought we would just represent ourselves." *Id.* at 14. Turning to Wahlig, the ALJ stated: "Okay. I need all answers coming from you, because you're an adult. This is your claim. So, you can consult

Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)

2022 WL 4473594

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 58 of 87

with your mom and all, I understand that, but everything has to come from you." *Id.* Wahlig responded: "I guess I'm representing myself then." *Id.*

The ALJ then gave Wahlig the written "Right to Counsel" form, and told him that if he had any questions, he could ask them. *Id.* at 14–15. Other than asking the date, Wahlig had no questions about the form. *Id.* And he completed and signed the form. *Id.* at 128. On the form, he acknowledged that he had received the Request for Hearing Acknowledgement Letter prior to the hearing explaining his right to be represented, that he understood his right to be represented, and that he was willing to proceed without a representative. *Id.*

**\*5** After Wahlig completed the form, the ALJ explained the hearing process, including the role of the vocational expert, and he admitted the exhibits into the record. *Id.* at 15–17. The ALJ then acknowledged that it did not appear that the record was up to date, and he asked Wahlig some questions about his treatment providers, to try to determine what records he needed to obtain. *Id.* at 17–21. And after taking testimony from Wahlig, Wahlig's mother, and the vocational expert, the ALJ stated that he was going to hold the record open to further develop the file. *Id.* at 48. More specifically, he outlined what he was going to do:

> Okay, so here's what I've got to do. I have to update the file with some additional records. Those things that we talked about at the beginning of the hearing from Guthrie and from Concern Counseling and from Dr. Hudak and from Athens School District and from Penn-York Opportunities. I'm going to send for all of that information and when I get it, I'm going to send you copies of it, so that you'll have available to you all of the information that I have available to me, when I'm making my decision. Once I receive all of that information and have shared it with you, then I'll be in a position to be able to make a decision and when I do that, I'll send you a copy of that decision in the mail. Understand?

*Id.* Wahlig voiced his understanding. *Id.*

On September 11, 2019, the ALJ sent Wahlig a letter outlining the additional evidence that he obtained. *Id.* at 697–98. As relevant here, the letter also indicated that the ALJ was unsuccessful in obtaining records from Penn York Opportunities, Inc. *Id.* at 697. The letter also provided that Wahlig could submit, among other things, additional records. *Id.* The letter closed by informing Wahlig that if the ALJ does not receive a response from Wahlig withing ten days, he will assume that Wahlig does not wish to submit additional evidence. *Id.* at 698. Wahlig did not respond to this letter. Despite the ALJ's efforts to obtain additional evidence, Wahlig now contends that the ALJ's efforts fell short, and he failed to fully develop the record. [7]

"Although the Supreme Court has described [Social Security Administration] administrative proceedings as 'adjudicative,' they are not classically so because they are 'non-adversarial,' and at times 'inquisitorial.' " *Anderson v. Comm'r of Soc. Sec.*, No. 21-2009, 2022 WL 1635628, at \*2 (3d Cir. May 24, 2022) (footnotes omitted). "[T]he special nature of proceedings for disability benefits dictates extra care on the part of the agency in developing an administrative record and in explicitly weighing all evidence." *Dobrowolsky v. Califano*, 606 F.2d 403, 406–07 (3d Cir. 1979) (footnote omitted). The ALJ must play an "active role" in this regard. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). He or she has "a duty to develop a full and fair record[,]" and "must secure relevant information regarding a claimant's entitlement to social security benefits." *Id.* And when the claimant is unrepresented, the ALJ must "assume a more active role[.]" *Dobrowolsky*, 606 F.2d at 407. The "ALJ owes a duty to a pro se claimant to help him or her develop the administrative record." *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). " 'When a claimant appears at a hearing without counsel, the ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts.' " *Id.* (quoting *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985)).

**\*6** Where a claimant is unrepresented at the hearing before the ALJ, "the reviewing court must determine whether there was clear prejudice to the claimant or unfairness in the administrative hearing." *Jozefick v. Shalala*, 854 F. Supp. 342, 347 (M.D. Pa. 1994). "A hearing may be characterized as 'unfair' where the ALJ has failed to discharge his obligation to develop a complete record." *Id.* at 348. "The question is not 'whether every question was asked which might have been

Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 59 of 87

2022 WL 4473594

asked had [the claimant] been represented by an attorney, [but] whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Id.* (brackets in original) (quoting *Edwards v. Sullivan*, 937 F.2d 580, 585–86 (11th Cir. 1991)).

Wahlig contends that the ALJ failed to obtain all the relevant records from Concern Counseling Services, from Penn York Opportunities, and from Kayla Mapes. Addressing each of these three categories of records below, we conclude that the ALJ did not fail to develop the record.

### 1. Records from Concern Counseling Services.

Wahlig asserts that he began treatment with Concern Counseling Services ("Concern") in December of 2017. *See doc. 17* (citing *Admin. Tr.* at 1263 (record from May 22, 2019 medication-management visit that lists treatment history including a reference to December 14, 2017)). He contends that after the hearing, the ALJ instructed the state agency to request additional records from Concern, but the ALJ apparently did not know that he began treatment in 2017, because the state agency only requested records from Concern from April 11, 2019, forward. *Id.*

The Commissioner counters that this is simply incorrect. She points out that in April 2019, which was before the hearing, the agency requested records from Concern. *See Admin. Tr.* at 1229 (authorization to disclose with no specific date limitation on the records), 1233 (authorization to disclose asking for records from 1/1/19 to the present). In response, Concern sent some records dated April 3, 2019, and April 10, 2019. *Id.* at 1231–46, 1226–30. The ALJ had these records before the hearing. *See id.* at 102 (listing these records as HO B11F, HO B12F), 1231-32 (listing May 14, 2019, as the date records were faxed to the agency). After the hearing, the agency requested records from Concern from April 11, 2019, to the present. *See id.* at 1258 (authorization to disclose asking for records from April 11, 2019, to the present). In response, Concern sent records dated May 22, 2019, and July 10, 2019. *Id.* at 1256–66.

The Commissioner concedes that the Concern did not provide records from prior to 2019. *Doc. 18* at 16. But she notes that the records that Concern did provide summarized Wahlig's treatment prior to 2019. *Id.* And those "records indicate that [Wahlig] went to Concern for medication management in January and February 2018,[8] many months before

the start of the relevant period and then treated with his primary care practice (Guthrie) until 2019 when he returned to Concern." *Id.* (footnote and citations to the record omitted).

Here, the agency requested documents from Concern on multiple occasions. And given that the records that were received included summaries of prior encounters, there are no evidentiary gaps which resulted in unfairness or prejudice to Wahlig with respect to the Concern documents.[9] Thus, we cannot say that the ALJ failed to develop the record in this regard.

### 2. Records from Penn York Opportunities.

**\*7** Wahlig contends that he participated in a program involving Penn York Opportunities ("Penn York") in the summer of 2018, but, according to Wahlig, the ALJ failed to obtain those records because, the agency only requested records from Penn York from September 14, 2019, forward, and Penn York responded that it had no such records. *See doc. 17* at 15.

Once again, the Commissioner shows that Wahlig has mischaracterized the record. In November 2018, which was before the hearing before the ALJ, the agency requested records from Penn York. *See Admin. Tr.* at 1223–24 (letter and authorization to disclose records requesting records from 2017 to the present). In December 2018, after not receiving a response from Penn York, the agency sent another letter to Penn York requesting the records. *See id.* at 1225. Still not having received the records, on August 9, 2019, two days after the hearing before the ALJ, the agency again requested records from Penn York, this time asking for records from September 14, 2000 to the present. *See id.* at 1268–69. And Penn York responded: "We do not have documents that are being requested." *Id.* at 1268.

Given that Penn York asserts that it does not have records, and Wahlig has not present a basis for the court to reasonably conclude that there are missing records from Penn York regarding Wahlig, we cannot say that the ALJ failed to develop the record in this regard.[10]

### 3. Records from Kayla Mapes.

Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)

2022 WL 4473594

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 60 of 87

Prior to the hearing before the ALJ, Wahlig completed a form titled "Claimant's Recent Medical Treatment." *See Admin. Tr.* at 283. That form asked whether he had recently been treated or examined by a doctor and, if so, to list the doctor's name, address and telephone number, the dates of treatment or examination, and what the doctor told him about his condition. *Id.* On this form, under doctor's name(s), Wahlig listed, among others, Kayla Mapes. *Id.* He identified Mapes as with the Intellectual Disabilities Program with the Bradford County Human Services; he provided her address and telephone number; and in the date column, he wrote "5-21-19 to Review ISP." *Id.* In the section asking what this person told him about his condition, Wahlig stated: "Kayla's office has the testing on his Intellectual Disabilities and that he does have Autism." *Id.* In his brief, Wahlig contends that he listed Mapes "as a treatment source who was going to test 'his intellectual disabilities and that he does have autism' through the 'Intellectual Disabilities Program' at Bradford County Human Services." *Doc. 17* at 15–16 (quoting *Admin. Tr.* at 283). But, he asserts, "[t]here is no indication that those records were requested." *Id.* at 16.

**\*8** The Commissioner contends that Wahlig again mischaracterizes the record by suggesting that Mapes was going to test him. *Doc. 18* at 17–18. That seems a fair criticism as the document that Wahlig cites does not say that Mapes is going to test him; rather, it says that Mapes's office has the testing on his intellectual disabilities and it suggests that his Individual Support Plan ("ISP") is going to be reviewed. *Admin. Tr.* at 283.

The Commissioner also contends that the agency did obtain Wahlig's Bradford County ISP, which listed Mapes as the support coordinator. *Id.* at 18. In fact, the record contains two ISPs—a June 2019 ISP and a September 2018 ISP. [11], [12]

The June 2019 ISP lists Mapes as the "Supports Coordinator." *Id.* at 294. And it lists May 21, 2019, as the "Annual Review Meeting Date." *Id.* Given that Wahlig wrote "5-21-19 to Review ISP" on the form regarding recent medical treatment, *see id.* at 283, it appears that it may be the June 2019 ISP to which he was referring. And that ISP is in the record. Moreover, although Wahlig suggests on the form that Mapes's office will confirm that he has autism, *see id.*, the ALJ, in fact, found that Wahlig's autism was a severe impairment, *id.* at 84, 91. In sum, we cannot say that the ALJ failed to develop the record by not requesting records from Mapes given that the record already contains the June 2019 ISP, and Wahlig has not

shown that it is reasonable to think that there are additional records from Mapes that are not part of the record.

## B. The ALJ's RFC's assessment is supported by substantial evidence.

Wahlig contends that substantial evidence does not support the ALJ's RFC assessment regarding limitations concerning interacting with others. Before addressing Wahlig's specific arguments, [13] we set forth standards regarding the RFC assessment in general.

**\*9** "The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). The RFC is " 'that which an individual is still able to do despite the limitations caused by his or her impairment(s).' " *Burnett*, 220 F.3d at 121 (quoting *Hartranft*, 181 F.3d at 359 n.1). In assessing a claimant's RFC, the ALJ must consider all the evidence of record. *Burnett*, 220 F.3d at 121. "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason v.* 994 F.2d at 1066). The court's "review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Wilder v. Kijakazi*, 1:20-CV-492, 2021 WL 4145056, at \*6 (M.D. Pa. Sept. 9, 2021); *see also Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) ("We examine the ALJ's conclusions as to [the claimant's] residual functional capacity with the deference required of the substantial evidence standard of review.").

"Surveying the medical evidence to craft an RFC is part of the ALJ's duties." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). And "[i]n evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009).

Further, in setting the RFC, the ALJ must clearly articulate his or her reasoning. In other words, the ALJ must "set forth the reasons for his decision" to allow for meaningful judicial review. *Burnett*, 220 F.3d at 119 (citing *Cotter*, 642 F.2d at 704–05). Although an ALJ need not "use particular language or adhere to a particular format in conducting his analysis," the ALJ must ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).

Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)

2022 WL 4473594

The ALJ's decision must set out "a clear and satisfactory explication of the basis on which it rests." *Cotter*, 642 F.2d at 704. If an ALJ "has not sufficiently explained" how he or she considered all the evidence " 'to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " *Dantzler v. Saul*, No. 3:16-CV-2107, 2019 WL 5569466, at *1 (M.D. Pa. Oct. 28, 2019) (quoting *Dobrowolsky*, 606 F.2d at 407).

Applying the above standards to the present record, we conclude that the ALJ's RFC determination is supported by substantial evidence.

Here, Wahlig takes issue with the ALJ's characterization of Wahlig's course of treatment as " 'limited, routine, and conservative.' " *Doc. 17* at 17 (quoting *Admin. Tr.* at 95). But the ALJ adequately reviewed Wahlig's course of treatment for the relevant period:

> The claimant's education record reflects that he was involved in a combination of regular and special education classes, namely itinerant emotional support for twenty percent or less of the school day in March 2019. At a medication check in October 2018, it was noted that the school reported continued problems with impulsivity, increased motor activity, and classroom disruption; however, the claimant reported no school issues. Nevertheless, the record reflects that the claimant graduated high school, was involved in an internship at his high school, and was accepted into college. The claimant presented for a consultative examination in January 2019, where it was reported that the claimant was not currently involved in outpatient therapy. It was further reported at the consultative examination that the claimant's mood is stable with medication and he is somewhat unbothered by unexpected changes in routine; however, he has limited social

> interest and generally prefers to be alone. The consultative examination revealed poor eye contact, fair social skills, unkempt and malodorous appearance, poor eye contact, limited insight, fair judgment, and mildly impaired attention, concentration, and memory skills. However, it also describes cooperative attitude, clear sensorium, normal motor behavior, fluent speech, neutral mood, full range and appropriate affect, and coherent and goal directed thought process with no evidence of hallucinations, delusions, or paranoia. While the consultative examiner estimated the claimant's intellectual functioning to be high below average to low average range, intelligent testing in March 2010 revealed a full scale IQ of 101. Subsequent mental status examinations by the claimant's treating mental health professionals in April and May 2019 describe fair eye contact, fair motivation to change, and fair judgment and insight, but otherwise revealed alert and oriented behavior, appropriate affect, intact attention and concentration skills, logical thought form, intact memory skills, average intelligence, appropriate appearance, appropriate speech, and goal-directed thought processes without hallucinations, delusions, obsessions, compulsions, mania, phobias, impulsivity, or suicidal or homicidal ideations. The claimant's mother testified at the hearing that psychotropic medication had significantly helped with the claimant's anger and outbursts.

**\*10** *Id.* at 94–95 (citations to the record omitted).

In disagreeing with the ALJ's characterization of his course of treatment, Wahlig points out that he has been receiving therapy since he was eight years. But for the relevant time period, the ALJ's characterization of Wahlig's course of

Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 62 of 87

2022 WL 4473594

treatment of "limited, routine, and conservative," is supported by the ALJ's summary of that treatment.

Wahlig also contends that the evidence does not support the ALJ's contention that he " 'retained the ability to perform a wide range of daily activities" such as participating in an internship and that he understands that "there are social standards he must adhere to, such as bathing. *Admin. Tr.* at 95. In this regard, Wahlig asserts that the internship lasted only a month, and that "understanding that he *should* bathe is not the same as actually doing it, and the record very clearly shows that the plaintiff does not bathe, brush his teeth, or change his clothes unless his mother forces him to." *Doc. 17* at 18 (italics in original; citations to the record omitted). True. But given that Wahlig testified at the hearing before the ALJ, which was held on August 7, 2019, that he started his internship approximately two weeks before and that the internship would probably end around the first day of school, *see Admin. Tr.* at 25, there is no basis to think that the ALJ thought the internship was anything long term. And throughout his decision, the ALJ repeatedly acknowledged Wahlig's hygiene issues. *See id.* at 85 ("[T]he claimant's mother testified that the claimant will not bathe or care for his personal hygiene, unless made to."), 90 ("[I]t was reported that the claimant needed to be reminded to care for his personal hygiene."; "[T]he claimant's mother testified that the claimant will not bathe or care for his personal hygiene unless he is forced...."); 92 ("The record reflects that the claimant needs to be told to care for his personal hygiene; however, he acknowledged at the hearing that he is aware that he should adhere to social norms and does bathe when necessary if he is around people."; "The record reflects that the claimant will not care for his personal hygiene unless he believe [sic] it to be necessary."); 93 ("The claimant and his mother testified that the claimant would not bathe regularly; however, the claimant also testified that he is aware of social norms that he is expected to adhere to and that he does not feel that caring for his hygiene is important unless he will be seeing other people."). Moreover, that ALJ adequately went through the evidence and explained his RFC determination.

And while Wahlig points to evidence that he contends supports additional limitations and suggests that the court accept his analysis of the evidence over the analysis set forth by the ALJ, we cannot reweigh the evidence. *Chandler,* 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); *Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005) ("In the process of reviewing the record for substantial evidence,

we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.' " (citation omitted)). And "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.,* 306 F. App'x 761, 764 (3d Cir. 2009). In sum, the ALJ fulfilled his duty in evaluating Wahlig's contentions regarding his symptoms and limitations and weighed them against the entire record. In doing so, the ALJ provided an explanation for affording limited weight to Wahlig's contentions. Thus, we conclude that that ALJ's decision regarding Wahlig's RFC is supported by substantial evidence. [14]

### C. The ALJ appropriately relied on the vocational expert's testimony.

**\*11** Wahlig claims that the ALJ's decision is not supported by substantial evidence because the hypothetical questions that the ALJ asked the vocational expert did not reflect all his credibly established functional limitations. We disagree.

The ALJ concluded that Wahlig was moderately limited in "understanding, remembering, or applying information," in "interacting with others," and in "concentrating, persisting, or maintaining pace." *Admin. Tr.* at 92. Wahlig contends that the ALJ failed, however, to adequately address those limitations in his hypotheticals to the vocational expert or in his RFC. But the ALJ did include nonexertional limitations in his RFC to account for those limitations. He limited Wahlig to jobs that only require him to be "able to understand, retain and carry out simple instructions with few work place changes[,]" and to be "capable of occasional decision-making with respect to work-related activities" *Id.* at 94. The ALJ also determined that Wahlig "should not engage in any fast production rate work[,]" and he "should avoid interaction with the public, except for incidental contact." *Id.* The ALJ further concluded that Wahlig "may maintain occasional interaction with co-workers and supervisors; however, he should avoid any group, team, or tandem work activity. *Id.* And the ALJ included all these limitations in his second hypothetical to the vocational expert, to which the vocational expert testified that there were jobs that such a hypothetical individual could perform. *Id.* at 46–47.

While Wahlig suggests that there are additional limitations that the ALJ should have included in his RFC assessment and in his hypothetical questions to the vocational expert, except as to the one limitation (missing more than two days of

Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 63 of 87

2022 WL 4473594

work a month) addressed below, Wahlig does not specify what those additional limitations should have been. And the ALJ adequately explained his decision to include the limitations that he did. That is all that is required. *See Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 209–211 (3d Cir. 2019) (concluding that an ALJ is not required to use any particular language, but an ALJ must provide a valid explanation for the limitations he or she finds).

The ALJ asked the vocational expert a third hypothetical that in addition to containing the above limitations included the limitation that the hypothetical individual would likely miss more than two day of work per month. *Admin. Tr.* at 47. The vocational expert responded that that additional limitation "would eliminate all the positions provided in both [previous] hypotheticals," and that she could not identify any other jobs that such a hypothetical individual could perform. *Id.* Wahlig suggests that the third hypothetical is the one on which the ALJ should have relied, but he does not develop an argument for why the ALJ should have chosen the third hypothetical.

Wahlig also contends that the ALJ failed to explain why he did not rely on the third hypothetical. But is clear why the ALJ did not rely on the third hypothetical: because he did not find that Wahlig would likely miss more than two days of work a month. As recounted above, the ALJ's RFC assessment is supported by substantial evidence. "While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworney v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). But an ALJ is not required to accept a vocational expert's opinion or testimony if that opinion or testimony is premised on limitations that the ALJ did not accept. *See Craigie v. Bowen*, 835 F.2d 56, 57–58 (3d Cir. 1987).

**\*12** Based on the ALJ's comprehensive analysis and because he considered all the evidence of the record, the ALJ's RFC assessment is supported by substantial evidence. And because the RFC assessment is supported by substantial evidence, the ALJ did not err in failing to credit the vocational expert's response to a hypothetical question that presented the hypothetical individual to be more limited than the ALJ determined Wahlig to be.

**VI. Conclusion.**

For the foregoing reasons, we will affirm the decision of the Commissioner. An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4473594

---

**Footnotes**

1    Kilolo Kijakazi is now the Acting Commissioner of Social Security, and she is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

2    Because the facts of this case are well known to the parties, we do not repeat them here in detail. Instead, we recite only those facts that bear on Wahlig's claims.

3    "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017). "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id.* Here, Wahlig's mother filed his application for benefits on September 25, 2018. *See Admin. Tr.* at 132. But there are references in the record to the filing date as September 5, 2018.

**Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)**

2022 WL 4473594

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 64 of 87

*See id.* at 59, 74. And September 5, 2018, is the date identified by the ALJ as the date that the application for benefits was protectively filed. *Id.* at 78.

4  This is not the first application for benefits on behalf of Wahlig. In 2008, an Administrative Law Judge found that Wahlig, who at that time was a school-aged child, was disabled. *Admin. Tr.* 50–58. Wahlig notes in his brief, that those benefits were terminated in 2013 due to excess household income. *Doc. 17* at 1 n.1.

5  The ALJ analyzed Wahlig's claim under both the standards applicable to child claims and the standards applicable to adult claims. Wahlig contends that the ALJ failed to adequately develop the record given that he was proceeding pro se. He also contends that the ALJ erred in connection with his determination of the RFC and in connection with his questioning of the vocational expert. Although the first contention is applicable to both his claim for child benefits and his claim for adult benefits, the latter two contentions relate to his claim for benefits as an adult. Different standards apply to claims as child and claims as an adult. Here, we set forth only the standards applicable to an adult claim since Wahlig was only considered a child for nine days of the applicable period, and other than his contention that the ALJ failed to develop the record, he does not make a specific claim regarding that period.

6  The ALJ analyzed the claim using both the standards applicable to child claims and the standards applicable to adult claims. For reasons already noted, *see supra.* note 5, we set forth only the ALJ's decision regarding the adult claim.

7  Wahlig titles his first argument: "The ALJ erred by failing [to] obtain a knowing and intelligent waiver of representation and by failing to fully develop the record in the case of an unrepresented claimant." *Doc. 17* at 13. Except in passing in a footnote (and without supporting caselaw), *see doc. 17* at 14 n.10, Wahlig does not address whether his waiver of counsel was knowing and intelligent. The Commissioner asserts that Wahlig waived this issue. *See doc. 18* at 15. We agree. *See United States v. Yung*, 37 F.4th 70, 81 (3d Cir. 2022) (concluding that appellant forfeited argument that "he "tuck[ed] it into a single footnote, without supporting authority or analysis"); *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."); *Schmalz v. Sovereign Bancorp, Inc.*, 868 F. Supp. 2d 438, 457 n.14 (E.D. Pa. 2012) ("An argument made only in a footnote is not worthy of credence (other than to be rejected by footnote).").

8  The records also summarize an encounter in December 2017. *Admin. Tr.* at 1263.

9  The Commissioner suggests that Wahlig should have submitted the missing records from Concern to the court. *See doc. 18* at 16. Wahlig replies that he is not required to do so, and he cites some cases that he says support that assertion. *See doc. 19* at 5–6 (citing, *inter alia*, *Jozefick*, 854 F. Supp. at 349 (rejecting the Commissioner's argument that the claimant must show that the outcome of the case might reasonably have been different if she had been represented by an attorney, stating that "[n]o such requirement ... can be discerned from the pertinent case law[,]" and that "cases have been remanded in order to more fully develop the record without requiring the claimant to make a specific proffer of the evidence that would be presented to the ALJ on remand") and *Coulter v. Weinberger*, 527 F.2d 224, 230 (3d Cir. 1975) (remanding where the ALJ failed obtain, among others, records that "might be expected to yield some data helpful to determine [the claimant's] conditions" at a certain time). Other cases, however, conclude that the claimant must present the missing records to the court. *See e.g. Brown v. Colvin*, No. 4:15-CV-00992, 2016 WL 6652360, at *2 (M.D. Pa. Nov. 10, 2016) (rejecting plaintiff's argument that the ALJ failed to properly develop the record, reasoning that his argument "fails because while he asserts that the records regarding his psychiatric treatment would 'certainly shed much light' on [his] suspected suicide attempt, he has failed to bring these documents before the Court for review[,]" that "[b]ecause Plaintiff's counsel has neglected to substantiate this argument with copies of the records, I cannot identify any prejudice that has been caused by the omission of these documents[,]" and that "[a]s the magistrate judge correctly stated, the Court is not required to accept Plaintiff's

Case 1:20-cv-00292-JPW    Document 373-1    Filed 02/09/24    Page 65 of 87

**Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)**

2022 WL 4473594

bare assertions as to what these records would show"). We need not enter this fray because even assuming for the sake of argument that Wahlig is not required to present the specific missing documents at issue, his claim that the ALJ failed to develop the record regarding the Concern records fails because given that the records that have been submitted summarize the missing documents, Wahlig cannot show that there are any evidentiary gaps that resulted in unfairness or prejudice.

10    Again, the Commissioner asserts that Wahlig should have attached the records, and again Wahlig bristles at that assertion. *See doc. 18* at 17, *doc. 19* at 5–6. As noted above, however, *see supra* note 9, we need not determine whether Wahlig must submit the actual records at issue because, in this instance, as to the records of Penn York he has not even shown that such records exist. Wahlig does assert that "it is likely that these records could have been obtained via a request to OVR [Office of Vocational Rehabilitation], but no such attempt was made." *Doc. 17* at 15. But that is speculation. And the record does contain records from OVR that cover the summer of 2018, at least through August 31, 2018. *See Admin. Tr.* at 196–214. And Wahlig has not presented a basis for the court to think that there are additional missing OVR records.

11    We cannot ascertain the exact dates the ISPs were prepared. But within the one ISP, it states that the ISP was last updated on June 17, 2019. *Admin. Tr.* at 294. Thus, we will refer to this ISP as the June 2019 ISP. And within the other ISP, it states that it was last updated on September 18, 2018. *Id.* at 216. Thus, we will refer to this ISP as the September 2018 ISP.

12    The Commissioner contends that Dr. Cloutier had the ISP when she opined that Wahlig could perform simple work. *Doc. 18* at 18. As Dr. Cloutier gave her opinions on January 25, 2019, *see Admin. Tr.* at 65, 67, 70, 73, she could not have had the June 2019 ISP. But Dr. Cloutier refers to an August 21, 2018 ISP. *See id.* at 63. That appears to be the ISP that we have referred to as the September 2018 ISP given that that ISP lists August 21, 2018, as the beginning of the applicable fiscal year. *See id.* at 216. In any event, Wahlig does not suggest that the September 2018 and the June 2019 are materially different such that Dr. Cloutier's opinion would have been different had she had the June 2019 ISP as opposed to the September 2018 ISP.

13    We address Wahlig's specific arguments below. We also note that in the heading of his claim regarding the RFC, Wahlig asserts that the ALJ "failed to account of his 'moderate' limitations in understanding, remembering, or applying information, concentration, persistence, or pace, and adapting and managing oneself." *Doc. 17* at 16. But he fails to develop an argument in this regard in the body of his brief. Thus, he has forfeited or waived that argument. *See New Jersey Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 493 n.2 (3d Cir. 2020) ("As this argument was vaguely presented without factual or legal support, it is forfeited for lack of development."); *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (noting that "arguments raised in passing ... but not squarely argued, are considered waived").

14    In his reply brief, Wahlig raises a new argument. He argues for the first time that the ALJ failed to address limitations in a June 15, 2018 OVR report. *See doc. 19* at 8. Wahlig contends that this reports indicates that when he "participated in a work-based learning program in the summer of 2018, his job coach observed him shut down and refuse to interact with anyone who yelled at him or raised their voice, was easily distracted, was often fiddling with something in his hand or pacing, had difficulty making decisions without knowing every specific detail for fear that the variables may change, had a 'dark' sense of humor [and] would often joke about things that other people do not find funny, and struggle[d] with personal relationships, acknowledging other's feelings, and expressing his emotions." *Id.* But Wahlig mischaracterizes the record. Although there is a record that references these issues, it does not indicate that Wahlig's job coach observed these things. *See Admin. Tr.* at 221. Rather, it appears that many of these observations were based on reports from Wahlig or his mother, and not specifically related to the summer program. *Id.* The only thing this record says about the summer 2018 program is that Wahlig "participated in the WBLE program through OVR in the summer of 2018, though he enjoyed having an income he stated that none of the jobs interested him." *Id.* (allcaps removed to aid readability). And it says nothing about his job coach making any statements. *Id.* In addition

Case 1:20-cv-00292-JPW    Document 373-1    Filed 02/09/24    Page 66 of 87

**Wahlig v. Kijakazi, Not Reported in Fed. Supp. (2022)**

2022 WL 4473594

to mischaracterizing the record, Wahlig failed to raise this argument in his opening brief; rather, he raised it for the first time in his reply brief. Thus, we will not consider this argument further. *See Bell v. Lackawanna Cty.,* 892 F. Supp. 2d 647, 688 n.41 (M.D. Pa. 2012) ("A reply brief is not the appropriate forum in which to raise new issues and the court need not address issues raised for the first time therein.").

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

1986 WL 15669

KeyCite Yellow Flag - Negative Treatment

Distinguished by Madanes v. Madanes, S.D.N.Y., March 8, 2001

KeyCite Overruling Risk - Negative Treatment

Overruling Risk Jones v. R.R. Donnelley & Sons Co., U.S., May 3, 2004

1986 WL 15669

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

ALAN B. WEISSMAN and

VIVIEN K. WEISSMAN, Plaintiffs,

v.

IRWIN FRUCHTMAN, ROBERT ESNARD, IRVING
E. MINKIN, HERBERT STURZ, CORNELIUS F.
DENNIS, RONALD SILVER, MAURICE BEANE,
JOSEPH AGUIRRE, GEORGE C. SAKONA, JEROME
DE CANIO, BETSY HAGGARTY, JUDITH SPEKTOR,
WILLIAM VALLETTA, JEFFREY GLEN, LEO
WEINBERGER, LOUIS MUNOZ, MELVIN SOKAL,
JOSEPH THOMAS, CHARLES KAROLY, DANIEL
HASKELL, MICHAEL TSITIRIS, ALI MURTAZA,
LASCELLE WRIGHT, DUANE WOOD, DENNIS
NEVILLE, HERMAN GREENBERG, PATRICK
COONEY, MANUAL TENORIO, PETER KAZINS,
JOHN HIRSCHAUER, MATILDA DUGAN, WILLIE
SHEPARD, JOHN L. SOTOS, ANTONIO REYES,
OLGA SHANAHAN, ANTHONY CARPENTIER,
PAUL CHARLTON, JUDITH FINKELSTEIN,
COLISEUM VACUUM CLEANER & SERVICE
COMPANY, INC., DAMUS, INC., FRANK
HERNANDEZ and KATHY HERNANDEZ, Defendants.

No. 83 Civ. 8958 (PKL).

|

October 31, 1986.

**Attorneys and Law Firms**

Alan S. Liebman, Alan S. Liebman & Associates, P.C., New
York City, for plaintiffs.

Nora Freeman, Ass. Corp. Counsel, Law Dep., New York
City, Wayne Saitta, Brooklyn Legal Services Corp. 'A',
Brooklyn, N. Y., Deborah Rand, Rutgers School of Law,
Newark, N. J., for defendants.

MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, UNITED STATES
MAGISTRATE.

**\*1** The matter before this Court stems from a five year long
conflict between the City of New York and the plaintiffs,
Alan and Vivian Weissman. Until recently the Weissmans
were the owners, as tenants by the entirety, of a building or
buildings [1] located at 400–404, 406 West 57th Street, New
York, New York. In part, this building is used for Single
Room Occupancy ('SRO') housing. SRO housing is generally
availed of by lower income people. Often the use of property
as SRO housing does not maximize the economic return of
that property and thus there is an inherent conflict between the
City who seeks housing for the poor and the owners of SRO
Housing who seek to maximize their earnings. See New York
Times, August 13, 1982, at B2, col.1; Id., July 25, 1982, § 4
at 6, col.4. This conflict has created a long and bitter history
between the parties, which we briefly summarize here. [2]

Plaintiffs, having tried but failed to obtain certificates of
eviction in order to demolish or alter their building, filed
an application with the Department of Buildings ('DOB')
for a permit to perform alterations. The DOB approved the
application, issued the alteration permit on December 23,
1981, and plaintiffs began work on the alterations. After
gutting the building, plaintiffs discovered what they believed
to be substantial structural defects. By letter dated April 16,
1982, plaintiffs notified the DOB that it was their opinion that
the building was unsafe and in imminent danger of collapse,
and requested demolition of the building. In response, DOB
conducted an inspection on April 22, 1982. During that
inspection substantial violations of the Building Code were
discovered and three Notices of Violation were issued. The
Notices required plaintiffs to make extensive repairs after
obtaining the necessary permits and approvals.

On April 30, 1982, plaintiffs were notified that the alteration
permit which had been issued the previous December was
revoked. Defendant Sakona, Manhattan Superintendent of the
DOB, wrote and explained that the original approval had been
erroneously granted because the building was located in the
'Preservation Area of the Special Clinton District.' There was
no hearing held by the DOB either before or after the permit
was revoked.

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 68 of 87

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

Throughout the month of June, the DOB inspected the building and concluded that while immediate repair was needed, a vacate order was not warranted. Plaintiffs responded by initiating the first of several lawsuits in New York State Supreme Court.[3] In that proceeding, the Weissmans sought an order vacating the premises and staying the enforcement of the Notices of Violation. This order was granted by the trial court, but was later reversed by the Appellate Division for lack of jurisdiction over the subject matter of plaintiffs' claim since plaintiffs had failed to exhaust their administrative remedies by appealing the permit revocation to the New York Board of Standards and Appeals ('BSA').

Following the Appellate Division's order, the plaintiffs filed an appeal with the BSA which refused to hear the appeal from the revocation of the alteration permit as untimely. The State Supreme Court, in a separate action, upheld the determination of the BSA regarding the alteration permit and affirmed the decision, on the merits, of the DOB regarding the denial of the demolition permit. Moreover, the City sought sanctions for the safety violations, and criminal penalties for the plaintiffs' alleged harassment of tenants.

 **2** Believing themselves to be in an administrative 'Catch-22,' the plaintiffs sought relief in this Court by filing a Civil Rights action under to 42 U.S.C. § 1983 for the refusal on the part of the defendants, various administrative officials of the City of New York, to permit the demolition and/or vacation of their building.

The Original and Amended Complaint alleged, in relevant part, that the

> defendants made determinations not within their jurisdiction, and in violation of established and lawful standards and procedures and in an arbitrary and capricious manner, that have deprived plaintiffs of a property right in violation of due process of law as afforded under the Fifth and Fourteenth Amendments of the Constitution of the United States.

(Amended Complaint ¶23). The factual allegations supporting this claim recount the efforts of the plaintiffs

to obtain a demolition permit and the revocation of the previously issued alteration permit.

Judge Brieant, to whom this case was originally assigned, granted in part and denied in part defendants' motion for summary judgment. He found that the revocation of plaintiffs' alteration permit without a hearing stated a due process claim. But Judge Brieant further found that the doctrine of res judicata barred relitigation of the issues related to the denial of a demolition permit because the State Supreme Court had upheld the DOB determination on the merits.

After Judge Brieant's decisions of June 24, 1985 and October 31, 1985, familiarity with which is assumed, plaintiffs proceeded with discovery. But despite the opportunity and the issuance by this Court of an order, dated November 26, 1985, scheduling depositions, plaintiffs have taken only one deposition during the past sixteen months. Plaintiffs now seek to amend their complaint for a second time in order to allege a new theory of conspiracy and to add additional defendants.

The essential difference between plaintiffs' proposed Second Amended Complaint and the First Amended Complaint is that plaintiffs have added a conspiracy claim. That conspiracy claim is based on a formal public policy of the City of New York which attempts to prohibit a reduction in SRO housing. See New York Times, Oct. 1, 1986, at 26, col.1. The conspiracy alleged is the formulation of this official policy and the acts in furtherance thereof are the effectuation of this policy by City officials.

17. In or about the Summer of 1981 the City of New York, acting through the Mayor's SRO Office, DOB, DCP, HPD, and the Office of Corporation Counsel, including defendants and other municipal officials who make policies for the foregoing, established an unconstitutional official policy known as the 'tenant protection plan' to protect single room occupancy tenants.

18. To carry out this policy, the defendants and other municipal officials who make policies for the Mayor's SRO office, DOB, DCP, HPD and the Office of Corporation Counsel, conspired to prevent plaintiffs and other owners of property in the City of New York that contained single room occupancy ('SRO') housing from lawfully using or developing their property in any manner that would interfere with the possession of tenants or reduce the availability of such housing, and in furtherance of this conspiracy made other unconstitutional official policies as described herein.

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

**\*3** (Second Amended Complaint ¶¶17–18). The factual allegations supporting this cause of action detail City officials implementing this official policy by performing various acts within the scope of their responsibility, such as inspecting buildings, denying permits, and issuing orders.

Specifically, plaintiffs' motion before this court seeks to: (i) serve a second amended complaint:

(a) to allege the existence of a conspiracy by municipal officials and employees to deprive plaintiffs of their constitutional rights;

(b) to allege the formulation and implementation of unconstitutional official policies by municipal officials and employees to prevent plaintiffs from using or developing their property in order to protect single room occupancy tenants;

(c) to eliminate any request for injunctive relief compelling the City defendants to immediately vacate the buildings and permit demolition of same;

(ii) add as defendants the City of New York and two additional attorneys with the Office of Corporation Counsel;

(iii) drop the tenants as defendants and discontinue the action as to them;

(iv) correct the misspellings of two defendants' names from 'Silver' to 'Silvers' and 'Haggarty' to 'Haggerty', and

(v) disqualify Corporation Counsel from continuing its representation of the City defendants.

For the following reasons plaintiffs' motion is granted as to parts (i)(b) (which we treat as the taking claim) and (c), (ii) as to the City of New York only, (iii) and (iv). The motion is denied as to parts (i)(a), (ii) as to attorneys Taussig and Mohr only, and (v). A second separate motion involving discovery will be addressed in part IV of this opinion.

I.

PLAINTIFFS' MOTION FOR LEAVE TO AMEND

[1] Plaintiffs' motion for leave to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure which expressly provides that leave 'shall be freely given when justice so requires.' In this Circuit, 'if the plaintiff has at least colorable grounds for relief, justice does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party.' S.S. Silberblatt, Inc. v. East Harlem Pilot Block, 608 F.2d 28, 42 (2d Cir. 1979) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)).

Among the grounds upon which defendants oppose plaintiffs' motion to amend is that plaintiffs do not have 'colorable grounds' for relief. In interpreting the 'colorable grounds' requirement the courts have used an analysis comparable to that required by a Fed. R. Civ. P. 12(b)(6) motion to dismiss. CBS, Inc. v. Ahern, 108 F.R.D. 14, 18 (S.D.N.Y. 1985). See Silberblatt v. East Harlem Pilot Block, 608 F.2d at 42; Valdan Sportswear v. Montgomery Ward & Co., 591 F.Supp. 1188, 1190 (S.D.N.Y. 1984). In this Circuit to dismiss a complaint for failure to state a claim upon which relief can be granted a court must accept plaintiff's allegations at face value, Heit v. Weitzen, 402 F.2d 909, 913 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), must construe the allegations in the complaint in plaintiff's favor, Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and must dismiss the complaint only if 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). See generally Wade v. Johnson Controls, Inc., 693 F.2d 19 (2d Cir. 1982).

**\*4** Rapf v. Suffolk County of New York, 755 F.2d 282, 290 (2d Cir. 1985). Following this standard we have accepted, for the purposes of this motion, all of plaintiffs' allegations as true and have drawn all reasonable inferences in favor of the plaintiffs. We now apply the standards just discussed to each of the claims in plaintiffs' proposed amended complaint attacked by defendants as legally insufficient.

Count I: The Conspiracy Claim

[2–6] The case law with respect to pleading conspiracy charges under §§ 1983 and 1985 of Title 42 of the United States Code is well developed in this Circuit.[4] Those cases require that a civil rights complaint must contain more than conclusory, vague or general allegations. See, e.g., Angola v. Civiletti, 666 F.2d 1, 4 (2d Cir. 1981); Koch v. Yunich, 533 F.2d 80, 85 (2d Cir. 1976); Fine v. City of New York, 529 F.2d 70 (2d Cir. 1975). In order to prove the

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

element of combination the plaintiffs must show that the conspirators "had a meeting of the minds' and thus reached an understanding to achieve the conspiracy's objectives.' Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979), rev'd on other grounds, 446 U.S. 1301, 100 S.Ct. 1987, 64 L.Ed.2d 670, reh. den., 448 U.S. 913, 101 S.Ct. 33, 65 L.Ed.2d 1176 (1980) (citing Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The complaint, therefore, must allege facts which would lead to a reasonable inference that the parties in fact agreed to the illegal course of action. Morpurgo v. Board of Higher Education, 423 F.Supp. 704, 711 (S.D.N.Y. 1976). Although the plaintiffs need not provide direct evidence of conspiracy, they must allege that the 'acts [complained of] were reasonably related to the claimed conspiracy,' Seneca Constitutional Rights Organization v. George, 348 F.Supp. 51, 57 (W.D.N.Y. 1972), and that the actions of the defendant caused the unconstitutional deprivation. DiGiovanni v. City of Philadelphia, 531 F.Supp. 141 (E.D.Pa. 1982).

[7] Moreover, to survive a motion to dismiss, the complaint must also include some specific allegations of fact indicating a deprivation of civil rights. Plaintiffs may not merely allege an act which is not wrongful on its face and assert that the act was done in bad faith and for an ulterior motive. Landesman v. City of New York, 501 F.Supp. 837, 839 (E.D.N.Y. 1980). To illustrate, in Landesman, Mayor Koch was accused of conspiring to deprive plaintiff of his civil rights by causing plaintiff's false arrest. The complaint, however, alleged only that the mayor publicly denounced the underlying criminal event and initiated an investigation of the matter. Granting the motion to dismiss, the court there held that the complaint was based on pure surmise that the purpose of the mayor's action was for an ulterior motive. Id. at 841. Similarly, plaintiffs' complaint in the instant action merely alleges that defendants carried out their lawful duties with improper motives.

[8] As noted, the alleged conspiracy is the enactment of an official policy of the City of New York to maintain the current level of SRO housing and the acts alleged to be in furtherance of the conspiracy are those of City employees implementing this policy. For example, plaintiffs allege that defendants Silvers, Aguirre, DeCanio and Dennis, all employees of the DOB, inspected the building, issued housing code violations, refused in 1982 to issue a vacate order and then did so in 1983. (Proposed Second Amended Complaint ¶¶34, 35, 40, 41, 43 and 45). While plaintiffs quarrel with the substance of defendants' decisions, they do not allege that they acted outside the scope of their employment.

*5 [9] Plaintiffs' allegations against the supervisory level defendants are equally lacking: defendant Esnard, Commissioner of the DOB, is accused of attempting to enforce correction of the housing code violations (Id. at ¶¶ 54–58); [5] Fruchtman, former Commissioner of the DOB is accused of receiving a letter from plaintiffs explaining that 406 was unsafe (Id. at ¶33); Sturz, Director of City Planning, is accused of having made a determination that 406 was outside of the preservation area and then later reversing himself (Id. at ¶¶48–49); Sokal, Director of the Clinton Neighborhood Preservation District, is accused of advising the DOB of Sturz's determination (Id. at ¶59); Specktor [6] and Haggerty, Director and Assistant Director of the Mayor's SRO Office, are accused of informing the DOB that plaintiffs were convicted of criminal harassment and recommending revocation of the alteration permit (Id. at ¶¶60–61); and, Minkin, First Deputy Commissioner of the DOB, is accused of revoking that permit (Id. at ¶¶62–64). All of these allegations, taken as true, describe acts well within the scope of these officials' responsibilities.

The allegations against Glen, and proposed defendants Mohr and Taussig, all attorneys in the office of the Corporation Counsel, are limited to an assertion that each consulted with various municipal officials about revoking plaintiffs' alteration permit. (Id. at ¶65). No specific allegation is made that any of these attorneys suggested, counseled or advocated violation of plaintiffs' constitutional rights.

Similarly, defendant Valletta, counsel to the Board of Standards and Appeals, is alleged to have 'refused' to let plaintiffs file an application with the Board to review the revocation of their alteration permit (Id. at ¶73). Presumably it is Munoz' legal advice to the Board which is being challenged, but, in any event, the Board's decision was upheld in state court as not being arbitrary or capricious. And, likewise, defendant Weinberger, Records Access Officer of the DOB, and defendant Munoz, General Counsel to the DOB and Records Appeal Officer, are alleged to have arbitrarily and capriciously denied plaintiffs' Freedom of Information Act request. (Id. at ¶¶76–77). Once again, plaintiffs had a right, which they exercised, to challenge this administrative decision in court. Apparently, the case was settled. Memorandum and Order, dated June 24, 1985, at 10.

In sum, the allegations against all the defendants describe actions taken by them within the scope of their official duties. Plaintiffs' attempt to color those actions with conclusory ulterior motives is simply insufficient to convert them to an

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 71 of 87

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

actionable claim. The Second Circuit has specifically held that

> certain claims are so easily made and can precipitate such protracted proceedings with such disruption of governmental functions that, despite the general rule of Conley v. Gibson, 355 U.S. 41 [78 S.Ct. 99, 2 L.Ed.2d 80] (1957), detailed fact pleading is required to withstand a motion to dismiss. A claim of a conspiracy to violate civil rights is a clear example. Fine v. New York, 529 F.2d 70, 73 (2d Cir. 1975); Powell v. Workmen's Compensation Board, 327 F.2d 131, 133 (2d Cir. 1964). Nor have we permitted litigants to precipitate hearings into the motives of law enforcement agencies simply on an allegation that the motive was improper.

**\*6** Angola v. Civiletti, 666 F.2d at 4. See also Harlow v. Fitzgerald, 457 U.S. 800, 816–19, 102 S.Ct. 2727, 2737–39, 73 L.Ed.2d 396 (1982) ('bare allegations of malice should not suffice to subject government officials either to the costs of trial or the burdens of broad-reaching discovery.')

For the reasons just discussed, plaintiffs' motion for leave to amend to assert a conspiracy claim is denied. However, plaintiffs may plead as predicate facts the establishment by the City of official policies to deal with SRO housing.

As to the remaining named defendants not discussed in this section, we assume that these are the tenant defendants and find no cause of action stated against any of them. Finding no claim stated against them, and agreement among the parties that they should be dismissed, plaintiffs' motion to amend and drop the following tenants should be granted: Joseph Thomas, Charles Karoly, Daniel Haskell, Michael Tsitiris, Ali Murtaza, Lascelle Wright, Duane Wood, Dennis Neville, Herman Greenberg, Patrick Cooney, Manual Tenorio, Peter Kazins, John Hirschauer, Matilda Dugan, Willie Shepard, John L. Sotos, Antonio Reyes, Olga Shanahan, Anthony Carpentier, Paul Charlton, Judith Finkelstein, Colisuem Vacuum Cleaner & Service Company, Inc., Damus, Inc., Frank Hernandez and Kathy Hernandez.

Count II: The 'Taking' and Due Process Claim

Apart from the conspiracy claim just discussed, the remainder of plaintiffs' complaint alleges a combination of due process violations and a taking of plaintiffs' property without just compensation based upon the granting and subsequent revocation of the alteration permit and related actions by the City. Since the due process allegations in the Second Amended Complaint are similar to those sustained by Judge Brieant's earlier decisions, the City has only challenged plaintiffs' 'taking' claim.

**[10]** Plaintiffs assert that their property was taken without just compensation by actions of the defendants which 'prevented plaintiffs from using or developing their property in any manner that would interfere with the possession of tenants or reduce the availability of SRO Housing.' (Second Amended Complaint ¶47). The defendants object to this claim as not being ripe since plaintiffs failed to secure a final determination from the City as to what could be done with the property. [7] See Kohlasch v. New York State Thruway Authority, 460 F.Supp. 956, 960 (S.D.N.Y. 1978).

We are of the opinion that for the purpose of this motion plaintiffs have sufficiently exhausted all reasonable means of securing the necessary permits to repair their buildings. Judge Brieant's June 24, 1985 opinion and the complaint provide ample support for this conclusion. It will be recalled that plaintiffs brought an action in state court to compel the City to issue the alteration permit and that plaintiffs prevailed at the trial level. This order was later reversed by the Appellate Division for want of jurisdiction because plaintiffs had not exhausted their administrative remedies. Thereafter, upon applying to the proper administrative authorities plaintiffs' application for review was denied as untimely. While plaintiffs may well have been permitted to commence additional administrative and court proceedings, in the context of a motion for leave to amend, plaintiffs' taking claim is ripe for decision. We also find, based on Judge Brieant's earlier decisions, that the plaintiffs have alleged the three necessary elements of a 'taking' claim: '(1) a property interest (2) that has been taken under the color of state law (3) without due process or just compensation.' Port Chester Yacht Club, Inc. v. Iasillo, 614 F.Supp. 318, 321 (S.D.N.Y. 1985); Kohlasch, 460 F.Supp. at 960.

**\*7** **[11]** As noted earlier, Judge Brieant held that plaintiffs' demolition claim could not be relitigated in federal court. Thus, defendants object to the plaintiffs repleading a cause

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 72 of 87

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

of action for the rejection of a demolition permit for 400 and 404. The Weissmans assert a right to replead because Judge Brieant referred only to 406 in his dismissal of the demolition claim. We reject the contention that in referring to 406 Judge Brieant was limiting his decision. In this connection, we are counselled by Judge Friendly's opinion in Fogel v. Chestnutt, 668 F.2d 100, 108 (2d Cir. 1981), cert. denied, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982), that law of the case 'applies as well to everything decided by necessary implication.'

Thus, we read 406 as a shorthand for the entire structure especially since Judge Brieant noted that there was some question as to whether the structure was one building or three. See Opinion, dated June 24, 1985. Judge Brieant's October 31, 1985 opinion clearly holds that no relief, constitutional or otherwise, may be sought for failure to issue a demolition permit. Judge Brieant's opinion is the law of the case and should be followed. [8] Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); Zdanok v. Glidden Company, Dur kee Famous Foods Division, 327 F.2d 944, 953 (2d Cir. 1964), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964).

Additional Defendants

[12] We turn now to that aspect of plaintiffs' motion seeking to add as defendants Gabriel Taussig and Larraine Mohr, attorneys with the Corporation Counsel's office during the relevant time period, and the City of New York. If the complaint as amended fails to state a cause of action against the proposed defendants, leave to amend need not be given. State Teachers Retirement Board v. Fluor Corporation, 654 F.2d 843, 855 (2d Cir. 1981).

[13] In order to state a cause of action against Taussig or Mohr the plaintiffs 'must demonstrate some 'affirmative link' between the misconduct complained of' and the actions of the proposed defendants. DiGiovanni v. City of Philadelphia, 531 F.Supp. at 144–45; see Rizzo v. Goode, 423 U.S. 362, 375–77, 96 S.Ct. 598, 606–07, 46 L.Ed.2d 561 (1976). Plaintiffs have failed to do so.

The Second Amended Complaint only mentions defendants Taussig and Mohr twice: once to identify them in paragraphs 15(b) and (c), respectively, and again in paragraph 65, which we quote:

> In furtherance of the conspiracy herein, defendants Glen, Taussig and Mohr

consulted with defendants Sturz, Minkin, Fruchtman and the Mayor's SRO Office about revoking plaintiffs' alteration permit prior to its revocation.

Accepting the factual allegations as true, they amount to nothing more than city attorneys consulting with their statutorily authoritized clients about actions of those agencies within their statutory authority. See New York City Charter § 394(a) ('the corporation counsel shall be attorney and counsel for the city and every agency thereof and shall have charge and conduct of all the law business of the city and its agencies and in which the city is interested.') Thus, we find the allegations against Taussig and Mohr totally insufficient to support a claim and we, therefore, deny the motion to amend as to these proposed defendants.

*8 This Court does find, however, the allegations against the proposed defendant, City of New York, sufficient to state a cause of action. The complaint against the original defendants, all city officials, involves actions within the scope of their employment for the benefit of the City. The City does not seriously contest this point. Rather, the City asserts that its addition as a defendant is barred by the statute of limitations and that the plaintiffs' claim is not preserved by relation back to the original complaint. They further argue that if the one year statute of limitations applies [9] the plaintiffs' original claim is time barred and thus any claim relating back is likewise time barred.

The interrelationship between the statute of limitations and relation back issues may be structured analytically as follows:
—If the claim against the City does not relate back, the plaintiffs' claim is time barred under either the one year or three year statute of limitations.

—If the claim against the City does relate back and the applicable statute of limitations is three years the plaintiffs' claim is not time barred.

—If the claim against the City does relate back and the applicable statute of limitations is one year and is retroactively applied, the plaintiffs' claim is time barred.

—If the claim against the City does relate back and the applicable statute of limitations is one year and is not retroactively applied, the plaintiffs' claim is not time barred.

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 73 of 87

1986 WL 15669

Because of the pivotal significance of the relation back question, we discuss it first.

[14] The doctrine of relation back is governed by Fed. R. Civ. P. 15(c), which provides in relevant part:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

See Morrison v. LeFevre, 592 F.Supp. 1052, 1057 (S.D.N.Y. 1984); Sounds Express International Limited v. American Themes and Tapes, Inc., 101 F.R.D. 694, 696 (S.D.N.Y. 1984). Rule 15(c) covers both a change or addition in parties. State Teachers Retirement Board v. Fluor Corporation, 500 F.Supp. 278, 187 (S.D.N.Y. 1980), aff'd in relevant part, 654 F.2d 843 (2d Cir. 1981).

Without the conspiracy claims, which we have found insufficient, the plaintiffs' Second Amended Complaint is essentially the same as the First Amended Complaint and the original Complaint. The one exception is that it adds a new legal theory of a taking without just compensation, a theory which we have found legally sufficient and which does not expand the scope of the litigation. Thus, it is clear to this Court that 'the claim . . . asserted in the [second] amended pleading arose out of the conduct . . . set forth . . . in the original pleading.' Rule 15(c); Holdridge v. Heyer-Schulte Corporation of Santa Barbara, 440 F.Supp. 1088, 1093 (N.D.N.Y. 1977).

*9 Since the Second Amended Complaint arises from the same facts alleged in the First Amended Complaint, the plaintiffs must next show that the City received notice of the institution of the action so that it will not be prejudiced in maintaining its defense on the merits. Morrison, 592 F.Supp. at 1057; Holdridge, 440 F.Supp. at 1093 ('The major consideration in deciding whether an amendment relates back is whether adequate notice is given to the opposing party . . ..'). Given that the Corporation Counsel, which represents the City, its agencies and its officials, knew of this lawsuit since its commencement and continuously provided representation to the other defendants, there can be no doubt that the City has had adequate notice and will be put to no extra expense, discovery or loss of substantive rights if it is added as a defendant. Strauss v. Douglas Aircraft, 404 F.2d 1152 (2d Cir. 1968). Finding no prejudice or surprise caused by adding the City of New York as a defendant, we find that the claim relates back to the original filing. [10] See Middle Atlantic Utilities Co. v. S.M.W. Development Corp., 392 F.2d 380, 385 (2d Cir. 1968) ('if a meritorious claim is offered, and there will be little resultant prejudice to defendant, plaintiff is normally entitled to a hearing on the merits').

[15] The question of whether a three year statute of limitations, pursuant to C.P.L.R. § 214(5), or a one year statute of limitations, pursuant to C.P.L.R. § 215(3), is appropriate in a 42 U.S.C. § 1983 action is currently before the Second Circuit in Okure v. Owen, No. 86–7343 (2d Cir. filed May 6, 1986). Since the Second Circuit's decision will bind this court, it would not be appropriate or productive for us to decide this issue independently. Cf. United States of America v. Salerno and Cafaro, 794 F.2d 64 (2d Cir. 1986) (staying mandate until the Supreme Court decides a similar case previously appealed). If the Second Circuit determines that a three year statute of limitations is applicable, the plaintiffs' claim would not be time barred. Alternatively, if the Second Circuit chooses the one year limitations period, we would need to address the issue of whether it should be retroactively applied. We therefore assume for discussion a one year limitation, realizing that the Second Circuit's selection of a three year limitations period would moot the following discussion although it would not change our conclusion.

The Supreme Court has set forth factors which must be considered in determining whether a new rule of law should be applied retroactively.

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, e.g., Hanover Shoe v. United Shoe Machinery Corp., supra [392 U.S. 481], at 496 [88 S.Ct. 2224, at 2233, 20 L.Ed.2d 1231 (1968)], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, e.g., Allen v. State Board of Elections, supra [393 U.S. 544], at 572 [87 S.Ct. 817, at 835, 22 L.Ed.2d 1 (1969)]. Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Linkletter v. Walker, supra [381 U.S. 618], at 629 [85 S.Ct. 1731, at 1738, 14 L.Ed.2d 601 (1965)]. Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity.' Cipriano v. City of Houma, supra [395 U.S. 701], at 706 [89 S.Ct. 1897, at 1900, 23 L.Ed.2d 647 (1969).

**\*10** Chevron Oil Co. v. Huson, 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971).

The Court in Chevron Oil refused to apply retroactively a decision rendered after the plaintiff filed suit which, inter alia, changed the limitation period in which to bring suit from a laches doctrine to a fixed state statute of limitations. The Supreme Court reasoned:

> It would also produce the most 'substantial inequitable results,' to hold that the respondent 'slept on his rights' at a time when he could not have known the time limitation that the law imposed upon him.

Id. at 108, 92 S.Ct. at 356 (citation omitted).

In Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Supreme Court held that § 1983 actions are personal injury actions to which the appropriate state statute of limitations should apply. It is clear that prior to Wilson

the statute of limitations in New York for actions brought under 42 U.S.C. § 1983 was three years, the limitation period applicable to actions created by statute. Pauk v. Board of Trustees, 654 F.2d 856, 866 (2d Cir. 1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982). The plaintiff had no way of foreseeing a change in the law when he filed his complaint prior to the Wilson decision. Even after Wilson, if the district courts were a barometer of what could be foreseen as a result of Wilson, the three year period would still be appropriate. See, e.g., Saunders v. State of New York, 629 F.Supp. 1067 (N.D.N.Y. 1986); Testa v. Gallagher, 621 F.Supp. 476 (S.D.N.Y. 1985); Williams v. Allen, 616 F.Supp. 653 (E.D.N.Y. 1985); Ladson v. New York City Police Dept., 614 F.Supp. 878 (S.D.N.Y. 1985); Snell v. Suffolk County, 611 F.Supp. 521 (E.D.N.Y. 1985), aff'd, 782 F.2d 1094 (2d Cir. 1986). Therefore, applying the Chevron factors, any decision applying a one year statute of limitations would be a clear break in precedent. [11]

The Chevron factors lead us to conclude that a decision to utilize a one year statute should not be applied retroactively. Our decision not to apply retroactively a one year statute of limitations is supported by Nell v. Waring, Cv. 79–0177, slip op. at 9 (E.D.N.Y. June 11, 1986) (Sifton, J.). As one of the only courts to hold the one year statute of limitations applicable, Judge Sifton raised sua sponte the issue of retroactive application. Applying the Chevron Oil analysis he found that the purpose of Wilson would not be furthered by dismissing § 1983 actions which were 'brought by plaintiffs acting under the reasonable good faith understanding that the statute of limitations for § 1983 in New York is three years.' Nell, slip op. at 10.

Having previously concluded that the plaintiffs' claim relates back to the original date of filing, we find that whether a three year or a one year statute of limitations period is decided upon by the Second Circuit, the claim against the City should not be time barred. [12] Therefore, the motion for leave to amend the complaint to add the City as a defendant is granted.

## II.

## PLAINTIFFS' MOTION TO DISQUALIFY DEFENDANTS' COUNSEL

**\*11** Plaintiffs move to disqualify the Corporation Counsel pursuant to Disciplinary Rule ('DR') 5–102(A) and (B) of the Code of Professional Responsibility, which governs when a

Case 1:20-cv-00292-JPW  Document 373-1  Filed 02/09/24  Page 75 of 87

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

lawyer must withdraw as counsel because he will be a witness in the case. [13]

[16, 17] Both parties agree, and we concur, that Bottaro v. Hatton Associates, 680 F.2d 895 (2d Cir. 1982), requires a restrained approach in deciding this motion.

> This Court has adopted 'a restrained approach,' Armstrong v. McAlpin, 625 F.2d 433, 444 (2d Cir. 1980), which calls for disqualification only upon a finding that the presence of a particular counsel will taint the trial by affecting his or her presentation of a case. Board of Education v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979); McAlpin, 625 F.2d at 444–446.

Id. at 896. Indeed, DR 5–102 is not to be literally applied in each instance, rather its application depends on the attending facts of each case and lies within the sound discretion of the trial court. See Freschi v. Grand Coal Venture, 564 F.Supp. 414, 417 (S.D.N.Y. 1983); Ross v. Great Atlantic & Pacific Tea Co., 447 F.Supp. 406, 409 (S.D.N.Y. 1978); see also International Electronics Corp. v. Flanzer, 527 F.2d 1288, 1293 (2d Cir. 1975). Moreover, the moving party bears the heavy burden of showing that the continued representation would violate the Code of Professional Responsibility. Evans v. Artek Systems Corporation, 715 F.2d 788, 794 (2d Cir. 1983); MacArthur v. Bank of New York, 524 F.Supp. 1205, 1209 (S.D.N.Y. 1981).

[18] The threshold question is whether any member of the Office of the Corporation Counsel 'ought be called as a witness.' Whether that lawyer actually testifies is not controlling. J.P. Foley & Co., Inc. v. Vanderbilt, 523 F.2d 1357, 1359 (2d Cir. 1975); MacArthur, 524 F.Supp. at 1208. We note at the outset that one of the three attorneys mentioned in the plaintiffs' Second Amended Complaint has not been affiliated with the Corporation Counsel's office since September, 1983, and, thus, does not implicate the rule. Accordingly, we turn to the other named members of the Corporation Counsel, Glen and Taussig.

[19] Whether Glen or Taussig 'ought to be called as a witness' for their clients is governed by the following test: 'whether the attorney's testimony could be significantly useful to his client; if so, he ought to be called.' MacArthur v. Bank of New York, 524 F.Supp. 1205, 1208 (S.D.N.Y. 1981).

The allegations, which we have already found to be legally deficient, against Glen and Taussig involve consultations with various city officials. Therefore, defendants can obtain all the necessary testimony from those officials without having to call the attorneys as witnesses. While in some cases corroborative witnesses or cumulative testimony might be necessary, plaintiffs have not carried their burden of establishing that this is such a situation.

This rule, of course, requires a careful evaluation of the relevant issues in the case and of other available testimony. An additional corroborative witness would almost always be of some use to a party, but might nevertheless be essentially cumulative. At some point, the utility of additional corroboration is de minimus and does not require the attorney's disqualification. EC 5–10 ('It is not objectionable for a lawyer who is a potential witness to be an advocate if it is unlikely that he will be called as a witness because his testimony would be merely cumulative or if his testimony will relate only to an uncontested issue.')

**\*12** MacArthur, 524 F.Supp. 1208–09.

[20] Plaintiffs also seek disqualification of the Corporation Counsel under DR5–102(B) claiming that one or more of these attorneys will be called as witnesses for the plaintiffs. Motions made pursuant to DR 5–102(B) have been subjected to particularly strict judicial scrutiny to prevent an attorney from disqualifying his adversary merely by calling him to the witness stand. See Rice v. Baron, 456 F.Supp. 1361, 1370 (S.D.N.Y. 1978); see also Kroungold v. Triester, 521 F.2d 763, 766 (3d Cir. 1975). For testimony to be prejudicial within the meaning of the disciplinary rule, the 'projected testimony of a lawyer or firm member must be sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony.' Rice, 456 F.Supp. at 1371 (quoting Freeman v. Kulicke & Soffa Industries, Inc., 449 F.Supp. 974, 977 (E.D.Pa. 1978), aff'd, 591 F.2d 1334 (3d Cir. 1979)).

[21] In the instant case, plaintiffs have not met their burden of demonstrating prejudice. The only proffer made on this point is found on page 18 of plaintiffs' supporting brief.

> Since Corporation Counsel's staff members were intimately involved in

1986 WL 15669

> formulating and implementing the policy
> for which plaintiff seeks redress, they
> ought to be and will be called by plaintiffs
> as witnesses at trial, they either will
> be able to confirm or to disavow the
> existence of the conspiracy.

Because plaintiffs have failed to state a claim for conspiracy, any need 'to confirm or to disavow the existence of the conspiracy' is obviated. [14]

[22] Finally, plaintiffs have argued at great length that the Corporation Counsel's 'duplicitous behavior' demands disqualification. In deciding this point, we are not unaware of judicial perception of a trend of using motions to disqualify counsel as a litigation strategy. See Allegaert v. Perot, 565 F.2d 246, 251 (2d Cir. 1977); J.P. Foley & Co. v. Vanderbilt, 523 F.2d 1357, 1360 (2d Cir. 1975) (Gurfein, J. concurring). Judicial concern is particularly acute where counsel is employed by the government and disqualification would substantially increase the cost of litigation. See Rubino v. City of Mount Vernon, et al., No. 82 Civ. 3101, slip op. at 4–5 (S.D.N.Y. April 25, 1984) (Sweet, J.) [Available on WESTLAW, DCTU database], aff'd on rehearing, slip op. (S.D.N.Y. June 18, 1984). We are also mindful of this Circuit's refusal to disqualify an entire government law department on the ground of one attorney's potential conflict. [15] Matter of Grand Jury Subpoena of Jean Ford v. United States, 756 F.2d 249, 254 (2d Cir. 1985).

As factual support plaintiffs cite the Corporation Counsel's office taking a litigation position in a related state case in contrast to that which was advocated in a letter to State Senator Manfred Ohrenstein. We find this argument neither well-founded nor relevant. First, it is neither uncommon nor improper to have a public attorney assert contrasting views as to what the law is in a litigation context as opposed to what the law ought to be in a legislative context. Second, the relevant inquiry on a disqualification motion, is one of fairness, i.e., if these attorneys testify, will the trial be 'tainted,' W.T. Grant Company v. Haines, 531 F.2d 671, 677 (2d Cir. 1976); Rubino, slip op. at 5, and can the litigation be conducted in fairness to all with all parties properly represented. Freschi v. Grand Coal Venture, 564 F.Supp. 414, 417 (S.D.N.Y. 1983); Rubino, slip op. at 5; Wolk v. Wolk, 70 Misc. 2d 620, 333 N.Y.S.2d 942 (N.Y. Sup. Ct. 1972). On the facts presented, we have concluded that a fair untainted trial can be held

and, therefore, disqualification of the Corporation Counsel is not appropriate. See Committee on Ethics and Professional Responsibility of the American Bar Association, Formal Opinion No. 339 (Jan. 31, 1975); Ross v. Great Atlantic & Pacific Tea Co., Inc., 447 F.Supp. 406, 409 (S.D.N.Y. 1978). See also International Electronics Corp. v. Flanzer, 527 F.2d 1288, 1293 (2d Cir. 1975).

### III.

### PLAINTIFFS' MOTION TO DROP TENANT DEFENDANTS AND CLAIM FOR INJUNCTIVE RELIEF

**\*13** The remaining issues in the original motion are not in controversy and therefore will not be dealt with in depth. Plaintiffs' motion to drop the tenants as defendants and to eliminate any request for injunctive relief is granted. See Morgan v. McDonough, 726 F.2d 11, 14–15 (1st Cir. 1984). Likewise, plaintiffs' motion to correct the spelling of two of the defendants' names is granted: 'Silver' to 'Silvers' and 'Haggarty' to 'Haggerty.'

### IV.

### PLAINTIFFS' DISCOVERY MOTIONS

Plaintiffs have filed an additional motion with this court seeking to compel certain discovery, appoint a Special Master and assess the costs of this motion against defendants. [16] We address these issues seriatim.

#### Document Production

The plaintiffs seek to compel the production of 46 documents withheld or redacted by the defendants. The defendants assert governmental privilege as to 44 of these documents, attorney-client privilege as to 14 of the documents (including one not claimed to be within the governmental privilege), and privilege under Rule 408 of the Federal Rules of Evidence as to one document. The defendants have provided this Court with all 46 documents for in camera review. We discuss here the law applicable to defendants' privilege claims. In this connection, we note that defendants need only prevail on a single claim of privilege for each document.

#### Predecisional Privilege

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

[23] The predecisional privilege is a subcategory of the governmental privilege. Mobil Oil Corporation v. Department of Energy, 102 F.R.D. 1, 4–5 (N.D.N.Y. 1983). This privilege 'protects from disclosure those agency documents which reflect 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'' Id. at 5 (citations omitted).

The purpose of this privilege is to create an atmosphere in which governmental officials can hold frank and open discussions in reaching decisions without fearing public disclosure of the process.

> Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions. The quality of a particular agency decision will clearly be affected by the communications received by the decisionmaker on the subject of the decision prior to the time the decision is made. However, it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached; and therefore equally difficult to see how the quality of the decision will be affected by forced disclosure of such communications, as long as prior communications and the ingredients of the decisionmaking process are not disclosed. Accordingly, the lower courts have uniformly drawn a distinction between predecisional communications, which are privileged, and communications made after the decision and designed to explain it, which are not.

N.L.R.B. v. Sears, Roebuck & Co., 421 U.S. 132, 151–52, 95 S.Ct. 1504, 1516–17, 44 L.Ed.2d 29 (1975) [citations and footnotes omitted].

  *14 The most detailed discussion to date of the procedure to invoke the predecisional privilege is found in Mobil Oil Corp.

v. Department of Energy, 102 F.R.D. 1 (N.D.N.Y. 1983). That court held that

To support its privilege claim, an agency must establish that '1) the materials were part of a deliberative process by which policies or decisions are formulated . . ., and 2) that the materials were truly of a predecisional, or advisory or recommendatory nature, or expressed an opinion on a legal or policy matter, or otherwise were reflective of a deliberative process.'

Id. at 5 [citations omitted].

Moreover, the claim of privilege must be made in a very specific manner.

> First, the claim of the privilege must be lodged by the head of the agency which has control over the matter, after personal consideration of the allegedly privileged nature of the information. This power to claim the privilege may be delegated by the head of the agency, but only to a subordinate with high authority . . .. The second procedural requirement is that a claim of privilege must specifically designate and describe the information that is purportedly privileged. And third, the agency must provide 'precise and certain' reasons for preserving the confidentiality of the requested information.

Mobil Oil Corp. v. Department of Energy, 520 F.Supp. 414, 416 (N.D.N.Y. 1981), rev'd on other grounds, 659 F.2d 150 (TECA), cert. denied, 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981) [citations omitted].

[24] Despite plaintiffs' strong protest, we hold that the defendants have properly invoked this privilege. Affidavits were submitted by the head of each agency claiming the privilege. [17] While each of these affidavits is very similar in nature, that does not change the facts sworn to under oath, which include the affirmation of personal knowledge and familiarity with the withheld documents. We also reject plaintiffs' claim that these affidavits were filed untimely because they were not furnished before the motion to compel

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 78 of 87

was made. See Fed. R. Civ. P. 37(a). Finally, any arguable substantive deficiency is eliminated by the submission of the documents for in camera review. See Mobil Oil, 102 F.R.D. at 7.

In fact, our in camera inspection of each of the documents for which defendants have claimed deliberative privilege confirmed our initial determination, made without the benefit of such a review, that the protection of the deliberative privilege has been properly invoked. Indeed, the withheld documents fall well within the most traditional parameters of governmental privilege.

Attorney-Client Privilege

The rules governing attorney-client privilege are summed up in Judge Friendly's oft cited opinion in United States v. Kovel, 296 F.2d 918 (2d Cir. 1961). The privilege attaches:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived . . ..

 **\*15** Id. at 921; In re Grand Jury Subpoena Duces Tecum (Marc Rich), 731 F.2d 1032, 1036 (2d Cir. 1984); United States v. Bein, 728 F.2d 107, 112 (2d Cir. 1984),cert. denied, 469 U.S. 837, 105 S.Ct. 135, 83 L.Ed.2d 75 (1984).

[25] Applying these standards, we find the defendants have properly invoked the attorney-client privilege. The relationship between the Corporation Counsel and the City agencies is that of attorney-client. See New York City Charter § 394(a); Smith v. City of New York, 611 F.Supp. 1080, 1084 (S.D.N.Y. 1985). An in camera review of the documents in question reveals communications between City agencies and the Corporation Counsel's office seeking legal advice on pending legislation. The challenge that these communications were not made in confidence is pure surmise. In any event, communication of legal advice between City agencies would not waive the privilege. See Hodges, Grant & Kaufmann v. United States, 768 F.2d 719, 721 (5th Cir. 1985).

Having found that both the predecisional privilege and the attorney-client privilege have been properly raised, we now must decide whether defendants have waived those privileges or whether the documents come within any recognized exception to those privileges.

[26] First, plaintiffs assert that defendants have impliedly waived any applicable privilege by having pled the affirmative defense of good faith. In support of their implied waiver argument, plaintiff cites Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975), where the court held that the assertion of an affirmative defense of good faith immunity constituted an implied waiver of the attorney-client privilege. In arriving at that conclusion the Hearn court relied on the Supreme Court's definition of good faith in Wood v. Stickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The test of good faith enunciated in Wood v. Strickland included subjective and objective elements. Subsequently, however, the Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), reacting to the proliferation and burdens of suits against governmental officials, replaced the subjective/objective test of Wood v. Strickland with an essentially objective test.

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.

Id. at 818, 102 S.Ct. at 2738.

Thus, utilizing the Harlow v. Fitzgerald definition of good faith, subjective intent or knowledge is not relevant to the assertion of a good faith immunity defense. Therefore, its assertion does not constitute an implied waiver of the attorney-client privilege.[18]

[27] Plaintiffs also rely on the crime or fraud exception to the attorney-client privilege asserting that the exception extends to intentional torts as well.[19] Having decided that the plaintiffs failed to state a claim for civil conspiracy, we reject outright their claim that a prima facie criminal conspiracy has

1986 WL 15669

been established. And since fraud has not been alleged, we address the only possible exception, that of intentional tort.

**\*16** The genesis of the assertion that there is a tort exception to the attorney-client privilege for torts is the oft quoted case of United States v. United Shoe Machinery Corporation, 89 F.Supp. 357 (D.Mass. 1950). In setting out the elements of the attorney-client privilege the Court added 'and not (d) for the purpose of committing a crime or tort . . . .' Id. at 358. While courts in many jurisdictions have quoted this passage, most of those courts, as the United Shoe court itself, did not have before them an issue of a tort exception. In short, the references to a tort exception were dicta.

It is clear, however, that the Second Circuit has not added torts to the crime or fraud exception. Only recently the Second Circuit had the occasion to review the crime or fraud exception and formulated it as follows:

> It is well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct.

In re Grand Jury Subpoena (Marc Rich & Co.), 731 F.2d 1032, 1038 (2d Cir. 1984) and cases cited therein; United States v. Bob, 106 F.2d 37, 40 (2d Cir. 1939), cert. denied, 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493 (1939).

Further evidence of judicial unwillingness to extend the crime or fraud exception to torts may be found in the rejection, by the Advisory Committee to the Federal Rules of Evidence, of the Uniform Rule of Evidence 26(2)(a) which included 'tort' in the formulation of its crime or fraud exception to the attorney-client privilege. 2 J. Weinstein, Evidence ¶503(d) (1)[01] (1982). [20] The Advisory Committee's report only excludes from the ambit of the attorney-client privilege advice 'sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud . . . .' 56 F.R.D. at 236.

The plaintiffs find support in two opinions by Judge Sand specifically extending the privilege exception to intentional

torts. Diamond v. Stratton, 95 F.R.D. 503, 505 (S.D.N.Y. 1982) and Irving Trust Co. v. Gomez, 100 F.R.D. 273 (S.D.N.Y. 1983). It is clear from Judge Sand's opinions that he was extending existing law. See e.g., Diamond, 95 F.R.D. at 505. We express no opinion as to the propriety of extending the crime or fraud exception to torts as we are bound by the Second Circuit's decision in Marc Rich which post-dated Judge Sand's innovative analysis.

[28] Finally, even were this court to accept the proposition that intentional torts should be added to the crime or fraud exceptions to the attorney-client privilege, we would nonetheless find that plaintiffs have failed to meet their burdens in overcoming the privilege. Apart from showing probable cause to believe that a crime or fraud [or tort] had been committed, the party attempting to defeat the privilege must show that 'the communications were in furtherance thereof' and 'that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud. . . .' In re Grand Jury Subpoena (Marc Rich & Co.), 731 F.2d at 1039.

**\*17** The plaintiffs have not provided a proffer of how the documents relate to the alleged tort. While plaintiffs often mention that Judge Brieant's opinion denying, in part, defendants' motion for summary judgment establishes plaintiffs' prima facie case, a proposition with which we have no disagreement, what plaintiffs have failed to do is make a prima facie showing that the documents which they seek somehow furthered the alleged due process violations.

> The attorney-client privilege is withdrawn upon a prima facie showing that the lawyer's advice was designed to serve his client in commission of a fraud or crime. United State v. Bob, 106 F.2d 37, 40, 125 A.L.R. 502 (2d Cir. 1939), cert. denied 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493 (1939).

Union Camp Corporation v. Lewis, 385 F.2d 143, 144 (4th Cir. 1967).

As the Second Circuit noted in United States v. Bob, 106 F.2d at 40, 'There must, of course, be first established a prima facie case; the mere assertion of an intended crime or fraud is not enough to release the attorney.' See also

1986 WL 15669

Coleman v. American Broadcasting Companies, Inc., 106 F.R.D. 201, 203 (D.C.D.C. 1985) ('In order to defeat this important privilege, more is necessary than mere allegations of wrongdoing on the part of the attorney or naming the attorneys as defendants in the litigation.') More recently, in In re Grand Jury Subpoena (Marc Rich & Co.), 731 F.2d at 1038–39, the Second Circuit took care to distinguish between those documents giving legal advice used in the business and those giving legal advice used in the fraudulent activity. Only that advice which actually furthered the ongoing fraud was exempted from the protection of the attorney-client privilege. Finally, our in camera inspection of the documents confirms our conclusion, reached without the benefit of such a viewing, that there is no basis to overturn the assertion of the attorney-client privilege claim.

Although we find that the attorney-client and governmental privilege have been properly asserted, we address plaintiffs' assertion that the policy considerations behind 42 U.S.C. § 1983 override those privileges. While we agree with the plaintiffs that § 1983 has an important federal purpose, we cannot agree that it trumps all claims of privilege. See, e.g., Ghandi v. Police Department of City of Detroit, 747 F.2d 338 (6th Cir. 1984) (balancing informant's qualified privilege over civil rights claimant); Black v. Sheraton Corporation of America, 564 F.2d 550 (D.C. Cir. 1977) (same).

[29] We recognize that the governmental privilege is qualified, not absolute. Skibo v. City of New York, 109 F.R.D. 58, 63 (E.D.N.Y. 1985); Mobil Oil, 102 F.R.D. at 5. Thus, the Court must balance the competing interests of full disclosure with the rationale underlying the privilege. In re Franklin National Bank Securities Litigation, 478 F.Supp. 577, 582 (E.D.N.Y. 1979). Chief Judge Weinstein articulated a five part test.

> In this balancing of competing interests, some of the factors that assume significance are (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

**\*18** In re Franklin National Bank Securities Litigation, 478 F.Supp. at 583 [citations omitted].

Applying Judge Weinstein's balancing test we find parts three (the seriousness of the issues) and four (the role of the government) favor the plaintiffs.

> The Congressional policy in favor of broad enforcement of the civil rights laws supports complete discovery when their violation is alleged. Similarly, when the case involves colorable claims of official misconduct the Courts are reluctant to permit officials to withhold relevant material by claiming privilege.

Kinoy v. Mitchell, 67 F.R.D. 1, 12 (S.D.N.Y. 1975) [footnotes omitted]. In addition, the government body claiming the privilege is the very body accused of violating the plaintiffs' rights. See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318, 329 (D.D.C. 1966), aff'd on op. below, 384 F.2d 979 (D.C. Cir.), cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967).

Counterbalancing these factors is the fundamental rationale for the governmental privilege, which would clearly be served by upholding the privilege given the specific nature of the documents withheld, and parts one and two of the balancing test which strike decidedly against disclosure.

It is obvious that the more relevant the documents are to the issues in the case, the greater the reason for disclosure. In re Franklin National Bank, 478 F.Supp. at 586 ('The information in the reports is relevant to numerous issues in the litigation; the litigant's claim of need is concrete, not abstract'). Here, however, no proffer of relevancy has been made and an in camera inspection shows no specific relevancy to the matter at bar. See United States v. Harley, 682 F.2d 1018, 1020 (D.C.Cir. 1982). As previously explained, this case is very straight forward. The plaintiffs either received due process or not, and either there was a taking or not. The communications between the Corporation Counsel and the various City agencies do not change the process which plaintiffs were due or the process they received. Similarly, if there was a property interest taken without just compensation, the communications would remain irrelevant. Where the denial of access to

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

documents 'would not significantly deprive them of relevant evidence . . . the argument for disclosure is not compelling.' In re Franklin National Bank, 478 F.Supp. at 588.

Weighing equally against disclosure is the availability of other evidence. In each case where production has been ordered the evidence was not otherwise available. See, e.g., Kinoy, 67 F.R.D. at 12 ('In this case plaintiffs have made the strongest possible showing of need for the documents requested.'); In re Franklin National Bank, 478 F.Supp. at 586 ('This factor is powerful in a situation like that presented here, where no satisfactory alternative source of information exists.'). Plaintiffs have shown neither a need, nor an unavailability of alternative sources. Plaintiffs' showing on this prong might have been stronger had they conducted extensive discovery. However, despite urging from this Court, plaintiff has taken only one deposition. In these circumstances, we will not breach a recognized privilege in order to compensate for plaintiffs' lack of diligence in discovery.

**\*19** In sum, we find that the defendants have properly invoked the attorney-client and governmental privileges, and that these privileges have neither been waived nor is any exception been found applicable. We therefore deny plaintiffs' motion to compel production of the 45 documents as to which attorney-client and/or governmental privilege was asserted.

Settlement Document

[30] Plaintiffs have moved to compel production of a settlement agreement entered into between the City and the new owners of the property involved in this litigation. [21] Defendants have resisted production on the ground that this settlement document is privileged under Rule 408 of the Federal Rules of Evidence. [22]

In advancing their claim of privilege defendants rely on affidavits from the signatories to the settlement agreement which state that the maintenance of confidentiality was an integral part of their agreement. The intention of the parties to the agreement, even if reflected in a confidentiality clause (which was not included here), is not controlling. Magnaleasing, Inc. v. Staten Island Mall, 76 F.R.D. 559, 562 (S.D.N.Y. 1977). We note, moreover, that defendants' reliance on affidavits is compelled by the parties' failure to take the appropriate and surer measure of requesting the court to seal the settlement agreement. See Palmieri v. State of New York, 779 F.2d 861 (2d Cir. 1985).

In any event, defendants' reliance on Fed. R. Evid. 408 as a privilege to prevent disclosure is equally unavailing. This evidence rule limits a document's relevance at trial; not its disclosure during discovery. [23] NAACP Legal Defense and Educational Fund, Inc. v. Department of Justice, 612 F.Supp. 1143, 1146 (D.D.C. 1985); Center for Auto Safety v. Department of Justice, 576 F.Supp. 739, 749 (D.D.C. 1983).

Rule 408, which is designed to encourage frank and open discussions in order to encourage settlements rather than protracted litigation, accomplishes its purpose in a limited fashion.

> The protection afforded by Rule 408 is far less broad that the [defendant] asserts. While its intent is to foster settlement negotiations, the sole means chosen to effectuate that end is a limitation on the admission of evidence produced during settlement negotiations for the purpose of proving liability at trial, not the application of a broad discovery privilege. Otherwise parties would be unable to discover compromise offers which could be offered for a relevant purpose, i.e., proving bias or prejudice of a witness, opposing a claim of undue delay, proving an effort to obstruct a criminal investigation or prosecution, or enforcing a settlement agreement.

Center For Auto Safety, 576 F.Supp. at 749. See also Olin Corporation v. Insurance Company of North America, 603 F.Supp. 445, 449 (S.D.N.Y. 1985); J. Weinstein and M. Berger, 2 Weinstein's Evidence, ¶408[01] (1982).

[31] Nevertheless, our rejection of defendants' claim of privilege under Rule 408 does not end the inquiry. In order to compel production the plaintiffs must show that the material they seek to discover comes within the scope of discovery allowed by Rule 26(b) of the Federal Rules of Civil Procedure, i.e., plaintiffs must show that the settlement agreement sought will be admissible or lead to admissible evidence. Bottaro v. Hatton Associates, 96 F.R.D. 158, 159 (E.D.N.Y. 1982). Plaintiffs have failed to make such a showing.

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

**\*20** [32] Plaintiffs assert that they seek the settlement agreement 'to determine whether [plaintiffs] have been treated discriminatorily compared to the treatment afforded by [sic] the new owners of the property.' (Plaintiffs' brief at 40). With such a stated purpose, the settlement agreement would not be admissible at trial, since its introduction would violate Rule 408 as it would be utilized to prove liability. Nor have the plaintiffs articulated any reasonable connection between the settlement agreement entered into in 1986 and the events of 1982 which could lead to evidence admissible in this action. Finally, plaintiffs suggest in their reply brief that 'the Settlement Agreement can be used to impeach witnesses called to the stand by the defendants.' (Plaintiffs' Reply at 29). No further explanation is provided of how or to whom plaintiffs refer. Such broad, unsubstantiated allegations are not sufficient to enable plaintiffs to come within the permissible uses of settlement agreements accorded by Rule 408. See Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc., 486 F.Supp. 414, 423 n.10 (S.D.N.Y. 1980).

In sum, we believe that the policy considerations behind Fed. R. Evid. 408 require the type of relevance analysis we have just undertaken when settlement documents are sought in discovery. In this connection we find Judge Neaher's characterization of this process instructive.

> The question in this case, however, is whether an inquisitor should get discovery into the terms of the agreement itself based solely on the hope that it will somehow lead to admissible evidence on the question of damages. Given the strong public policy of favoring settlements and the congressional intent to further that policy by insulating the bargaining table from unnecessary intrusions, we think the better rule is to require some particularized showing of a likelihood that admissible evidence will be generated by the dissemination of the terms of a settlement agreement. Since the terms of settlement do not appear to be reasonably calculated to lead to discovery of admissible evidence and the defendants have not made any showing to the contrary, this justification for a Rule 37 order must fail.

Bottaro, 96 F.R.D. at 160.

Accordingly, having concluded that plaintiffs have made no showing that discovery of the settlement agreement is admissible or will lead to admissible evidence, we find that the settlement agreement is outside the scope of discovery and therefore deny the motion to compel.

Deposition Questions

Plaintiffs have moved to compel defendant Irving E. Minkin to answer questions that his counsel directed him not to answer during his deposition and for an order directing Minkin to answer questions regarding demolition. In response to a request from chambers, plaintiff's counsel selected certain examples of questions and answers and categorized them by the nature of the objection. We have read each question and objection submitted under cover of counsel's letter of October 23, 1986. Having done so, we make the following observations and rulings.

**\*21** First, while these transcripts do not necessarily represent the nadir of deposition decorum, they certainly do not approach the level of civilized, courteous professionalism which this and every court can properly expect from counsel. See Manual on Discovery, United States District Court, Eastern District of New York (including Standing Orders of the Court on Effective Discovery in Civil Cases), 1984. It is hoped that future depositions will be conducted in a cooperative and courteous spirit and that counsel will recognize, at a minimum, that it is in their and their client's self-interest to have meaningful and rapid discovery, which is not sidetracked by colloquy and improper questioning.

Second, plaintiffs have contended that the City's assertion of the attorney-client privilege was improper because there was no attorney-client relationship between Mr. Minkin and the Corporation Counsel. We reject that argument for the reasons stated in our discussion earlier on the attorney-client privilege. Supra at 4___–4___.

[33] Third, we have reviewed the other cited examples of directions to the witness not to answer and regretably find them well-founded. While as a general rule witnesses ought not to be directed not to answer questions on grounds other than privilege, see Order dated December 18, 1985, we cannot say that there are not some occasions when a defending attorney is left with no truly viable alternaive. Unfortunately, some of those occasions occurred here. We cite two examples:

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 83 of 87

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

1986 WL 15669

'Mr. Minkin, do you feel oppressed?' (p. 122) and 'What are you telling me, plan examiners are idiots; they approved the first one and made a mistake on the other one?' (p. 722).

Finally, plaintiffs' requested a direction that Minkin answer questions about the demolition issue. Try as they might, plaintiffs have not persuaded us that they seek to inquire about an issue other than the one which may not be relitigated in federal court because of the doctrine of res judicata.

Accordingly, plaintiffs' motion to compel is denied in its entirety.

Additional Depositions

[34] Plaintiffs seek an order compelling the depositions of certain 'senior official' defendants, Fruchtman, Esnard and Sturz, and members of the Corporation Counsel's office. The subject of the depositions of senior City officials has already been addressed in a Memorandum and Order, dated September 12, 1985, and on a motion for reconsideration, which was denied on November 13, 1985. In relevant part, the September 12, 1985 order read:

> The depositions of numerous City employees and officials which have not been objected to should commence. The conduct of this discovery may obviate the need for the objected to discovery of senior City officials and counsel as well as the need for tenant discovery. During the depositions of the City employees, plaintiffs should pose questions concerning the involvement of senior officials and the terms of tenant relocation. In addition to possibly reducing the need for additional depositions, those questions should create a record upon which the City's objections may be resolved more intelligently. Thus, a ruling on the objections posed by the City to the depositions of senior officials and counsel, except as otherwise noted below, is reserved at this time.

 **\*22**  While we find it somewhat unusual that plaintiffs should renew this request again after having taken only a single deposition, we nevertheless have reviewed plaintiffs' presentation, including the deposition transcript references, and have concluded that plaintiffs have adequately supported their request for the deposition of Sturz, since he was directly involved in the decision to revoke the alteration permit. With respect to all the other depositions sought, plaintiffs have failed to show at this stage the involvement of the desired deponent with a viable cause of action and/or the absence of an attorney-client privilege barrier.

Appointment of a Special Master

[35] For a second time plaintiffs have moved this Court to appoint a Special Master to supervise discovery. Plaintiffs complain that during the five days of Irving Minkin's deposition defense counsel made 116 speaking objections, 55 directions not to answer, had 15 discussions with the witness after the question and had 8 discussions with the witness before the answer. The inability of counsel to resolve routine discovery disputes amongst themselves has already required this Court to enter an order, dated December 18, 1985, establishing behavior rules to be followed at depositions in this case. [24] Nevertheless, as the discussion below sets out, the appointment of a special master is a most unusual remedy and wholly inappropriate here.

A court may appoint a Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure. This reference is limited by subsection (b). 'A reference to a master shall be the exception and not the rule . . .. [A] reference shall be made only upon the showing that some exceptional condition requires it.' See generally 5A Moore's Federal Practice ¶53.05.

The plaintiffs cite only one case in either their moving or reply brief to support their request. That case, In re Agent Orange Product Liability Litigation, 97 F.R.D. 427 (E.D.N.Y. 1983), is readily distinguishable from the one at bar. The Agent Orange litigation concerned some four million documents and thousands of claims of privilege. The instant action pales in comparison.

The Supreme Court has held that neither calendar considerations, complexity of issues, nor the possibility of long trials are exceptional conditions warranting a Special Master. LaBuy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957). The circuit courts have interpreted this rule as 'sharply limiting' the use of Special Masters. Liptak v. United States, 748 F.2d 1254, 1257 (8th Cir. 1984). See Jack Walters & Sons Corp. v. Morton

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

Case 1:20-cv-00292-JPW   Document 373-1   Filed 02/09/24   Page 84 of 87

1986 WL 15669

Building, Inc., 737 F.2d 698, 712 (7th Cir. 1984), cert. denied, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984). Indeed, only recently the Second Circuit admonished District Courts against using Special Masters to avoid performance of judicial duty. Madrigal Audio Laboratories, Inc. v. Cello, Ltd., 799 F.2d 814, 230 U.S.P.Q. 764, 766 n.2 (2d Cir. 1986).

 *23 Having found no special circumstances in this case, we therefore deny the plaintiffs request to appoint a Special Master.

Request For Attorney's Fees

[36] Having rejected plaintiffs' challenges to defendants' privilege assertions, their motion to compel Minkin to answer deposition questions, and only having partially granted their request for additional depositions, we find no basis for an award of attorney's fees. We therefore deny plaintiffs' request.

**All Citations**

Not Reported in F.Supp., 1986 WL 15669

## Footnotes

1   Whether this structure is one building or more than one building has been an issue in dispute throughout this proceeding. See Judge Brieant's June 24, 1985 opinion. In fact, plaintiffs allege that the three buildings were originally built as one. Amended Complaint, ¶24. We use the term building for the entire structure in dispute and discuss this issue in more depth infra.

2   For a more detailed discussion of the procedural history of this case see the two earlier opinions of Judge Brieant, dated June 24, 1985 and October 31, 1985.

3   Weissman v. City of New York, No. 14180/82 (N.Y. Sup.Ct.), rev'd, 96 A.D.2d 454, 464 N.Y.S. 2d 764 (1st Dep't), appeal dismissed, 60 N.Y.2d 815, 469 N.Y.S. 2d 700, 457 N.E. 2d 807 (1983) ('Weissman I').

4   A civil conspiracy is a combination of two or more persons to do an unlawful act by unlawful means or for an unlawful purpose.' Powell v. Kopman, 511 F.Supp. 700 (S.D.N.Y. 1981). Section 1985 explicitly requires that a conspiracy be between 'two or more persons.' This Court recognizes that a municipality is a person for purposes of 42 U.S.C. §§ 1983 and 1985, Owens v. Haas, 601 F.2d 1242, 1247 (2d Cir. 1979), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); Heimbach v. Village of Lyons, 597 F.2d 344, 346 (2d Cir. 1979), but we do question whether a second person has been alleged in this conspiracy. 'It is the law of this Circuit that that requirement is not met where a conspiracy is alleged to have occurred among a corporation and its directors, 'all of whom acted solely within their official capacities.'' Legal Aid Society v. Association of Legal Aid Attorneys of the City of New York, 554 F.Supp. 758, 766 (S.D.N.Y. 1982). The same rule has been applied when the conspiracy was alleged to have been perpetrated by a law school, its trustees and members of its faculty, Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978), cert. denied, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978), or a union and its officials. Gilliard v. New York Public Library, 597 F.Supp. 1069, 1075 (S.D.N.Y. 1984). Similarly, plaintiffs here have alleged only acts by city employees within their official capacity. While not deciding the matter on this basis, this court is hard pressed to find more than one 'person' involved in this alleged conspiracy.

5   Curiously, the allegations against Esnard include the following: 'On January 30, 1986, a corporation owned by the plaintiffs was sentenced in the Criminal Court of the City of New York to pay a fine of $20,000 because of the violations, and such fine has been paid.' (Proposed Amended Complaint, ¶49).

6   The allegations against Ms. Specktor appear in the Amended Complaint, but are absent from the proposed Second Amended Complaint.

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)

Case 1:20-cv-00292-JPW Document 373-1 Filed 02/09/24 Page 85 of 87
1986 WL 15669

7    As a separate ground for their opposition, defendants correctly point out that whether state and local governments must pay damages to a landowner who claims a temporary 'taking' by regulation is an open question. Given the open status of the legal issue raised, we decline to deny the motion to amend on this ground, since the defendants have not established that under no circumstances could relief be awarded. McLain v. Real Estate Board of New Orleans, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980); Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Nor do we find any prejudice to the defendants from plaintiffs pleading this new legal theory as it does not change the scope of discovery nor concern any additional facts.

8    We have been furnished with plaintiffs' motion before Judge Leisure seeking reconsideration of the dismissal of plaintiffs' claim for damages based upon the denial of the demolition permit. In their motion plaintiffs rely exclusively on Davidson v. Capuano, 792 F.2d 275 (2d Cir. 1986), a case which we believe to be readily distinguishable from the case at bar. In Davidson, the Second Circuit held that a successful plaintiff in a state Article 78 proceeding where damages are not available should not be barred from seeking damages in federal court in a § 1983 action. We find Finkelstein and its progeny to create three classes of potential federal plaintiffs. The first are those who were successful in their Article 78 proceeding and are entitled to bring a damage action in federal court. See, e.g., Giano v. Flood, 803 F.2d 769 (2d Cir. 1986); Davidson, 792 F.2d at 275; Catten v. Coughlin, 644 F.Supp. 1228 (S.D.N.Y. 1986) (Duffy, J.). The second category of potential plaintiffs are those who lost their Article 78 proceeding on procedural grounds. Having never had an opportunity to have their claim judged on the merits, under traditional res judicata principles, these plaintiffs still have a right to bring an action in federal court. J. Moore, 1B Moore's Federal Practice, ¶0.409 (2d ed. 1984). See, e.g., Fay v. South Colonie Central School District, 802 F.2d 21 (2d Cir. 1986); Leonardi v. Board of Fire Commissioners of Mastic Beach Fire District, 643 F.Supp. 610 (E.D.N.Y. 1986); Lundy v. Coughlin, No. 85 Civ. 5945, slip op. (S.D.N.Y. June 25, 1986) (Sand, J.) [Available on WESTLAW, DCTU database]. The third category of potential plaintiffs, and the one applicable to the instant matter, are those who have lost their Article 78 proceeding on the merits. Here the traditional policies of res judicata apply as well, see J. Moore, 1B Moore's Federal Practice ¶0.409 (2d ed. 1984), and remain unaffected by the Davidson doctrine. We see no suggestion in Davidson that having been unsuccessful on the merits in state court, a plaintiff is entitled to a second bite at the apple in federal court. Of course, should Judge Leisure disagree, we will adjust this opinion accordingly.

9    The issue of the statute of limitation for 42 U.S.C. § 1983 actions is now before the Second Circuit in Okure v. Owens, 625 F.Supp. 1568 (N.D.N.Y. 1986), appeal docketed, No. 86–7343 (2d Cir. May 6, 1986). We note plaintiffs' counsel's failure to include the pending appeal in their citation, contrary to the obligation imposed by ethical responsibility of giving all subsequent history of a cited case including a pending appeal. Model Code of Professional Responsibility EC 7–23 (1979). We also note that that there were numerous errors in citations (including case names, subsequent history, volume and page numbers and jurisdictions) in the memoranda of both parties which obviously imposed an unwarranted burden on the Court.

10   Query whether the City is not required to be joined as the real party in interest under Fed. R. Civ. P. 17(a) since any judgment under the 'taking' claim would be payable by the City? See Unilever (Raw Materials) Ltd. v. M/T Stolt Boel, 77 F.R.D. 384, 388 (S.D.N.Y. 1977).

11   The circuits are split as to whether the statute of limitations should be applied retroactively. Compare Gibson v. United States, 781 F.2d 1334 (9th Cir. 1986); Jackson v. City of Bloomfield, 731 F.2d 652 (10th Cir. 1984), applying Wilson prospectively only with Wycoff v. Menke, 773 F.2d 983, 986 (8th Cir. 1985), cert. denied, 3en U.S. 4en, 106 S.Ct. 1230, 89 L.Ed.2d 339 (1986); Fitzgerald v. Larson, 769 F.2d 160, 163 (3rd Cir. 1985); Smith v. City of Pittsburgh, 764 F.2d 188, 1985 (3d Cir.), cert. denied, 3en U.S. 4en, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985) applying Wilson retroactively.

1986 WL 15669

12    We realize that the Second Circuit, in Okure, may address the issue of retroactivity of the statute of limitations. Obviously, if the Second Circuit decides the retroactivity question differently than we have, a motion for reconsideration could be made.

13    13 DR 5–102 reads as follows:

Withdrawal as Counsel When a Lawyer Becomes a Witness

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

14    It is also possible that Taussig's or Mohr's testimony would be privileged. However, that possibility is not the basis of our decision.

15    The defendants assert that 'where it is not the trial counsel, but another attorney in a large government office whose testimony is allegedly likely to be necessary, the possibility that counsel will have to argue his own credibility to the jury, one of the traditional concerns underlying the rule, does not arise.' Defendants' Brief at 41. We agree, but remain perplexed by the listing of Gabriel Taussig, a proposed defendant and potential witness, as lead counsel for the defendants. See also Grand Jury Subpoena of Ford v. United States, 756 F.2d 249, 151–52 (2d Cir. 1985) (approving a 'Chinese Wall' to insulate counsel).

16    Plaintiffs' motion reads in full:

A. pursuant to Fed. R. Civ. P. 37(a):

(i) compelling the City defendants to produce documents requested by plaintiffs that the City defendants have withheld and redacted based on:

(a) the supposed applicability of the predecisional privilege and/or the attorney-client privilege;

(b) the supposed applicability of Rule 408 of the Federal Rules of Evidence;

(c) the requests supposedly being overly broad or vague;

(ii) compelling defendant Irving E. Minkin to answer questions posed during his deposition that Corporation Counsel directed him not to answer, and to answer questions regarding demolition;

(iii) compelling certain of the defendants who are 'senior officials' and attorneys to appear for deposition;

(iv) directing the City defendants to pay to plaintiffs the reasonable expenses, including attorneys fees, incurred by plaintiffs on this motion;

(v) granting plaintiffs such other, further or different relief as seems just and proper to the Court.

B. pursuant to Fed. R. Civ. P. 53(a) appointing a Special Master to supervise all examinations before trial and all other aspects of pre-trial discovery.

Weissman v. Fruchtman, Not Reported in F.Supp. (1986)
Case 1:20-cv-00292-JPW  Document 373-1  Filed 02/09/24  Page 87 of 87

1986 WL 15669

17    Specifically, affidavits were submitted by: Charles M. Smith, Commissioner of the Department of Buildings; Alan H. Kleinman, Acting Director of the Mayor's Office of Single Room Occupancy Housing; Paul A. Crotty, Commissioner of the Housing Preservation Department and Robert Esnard, Deputy Mayor for Physical Development.

18    We note that the few courts which have adopted the implied waiver of the attorney-client privilege doctrine have agreed that it is to be narrowly applied. Hearn v. Rhay, 68 F.R.D. at 582; Connell v. Bernstein-Macaulay, Inc., 407 F.Supp. 420, 423 (S.D.N.Y. 1976).

19    For a more complete discussion see Silbert, Crime Fraud Exception, 23 Am. Crim. L. Rev. 351, 354–55 (1986).

20    Uniform Rule of Evidence 26(a) provides:

the 'privilege shall not extend (a) to a communication if the judge finds that sufficient evidence, aside from the communication, has been introduced to warrant a finding that the legal service was sought or obtained in order to enable or aid the client to commit or plan to commit a crime or a tort.'

Reprinted in 2 J. Weinstein, Evidence ¶503(d)(1)[01] n.9 (1982).

21    On January 6 1986, the plaintiffs sold the property located at 400–404, 406 West 57th Street to a group headed by Toa Construction and Rikya Yamagata. As part of this sale, the plaintiffs assigned any and all rights in their pending litigation in Weissman v. City of New York, Index No. 08019/83. Thereafter, the City and the new owners entered into a written agreement settling the assigned action.

22    Rule 408 of the Federal Rules of Evidence provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

23    The legislative and judicial reluctance to extend the 'settlement privilege' doctrine of Rule 408 to the discovery phase of a litigation is understandable. First, since the 'settlement privilege' was not a privilege recognized at common law, the usual parallel between privilege law for discovery and evidentiary purposes is not controlling. Oliver v. Committee for Re-Election of the President, 66 F.R.D. 553 (D.D.C. 1975). Second, there would appear to be little need for such an extension. In most cases, statements made for, or in the course of, settlement negotiations have been communicated to the adversary and need not be 'discovered.' For non-communicated settlement statements or documents, the attorney-client and work product privileges would often supply sufficient protection.

24    We note that this motion has not been premised, as indeed it could not have been, on judicial unavailability.

---

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.