# APPENDIX OF
# UNPUBLISHED OPINIONS

Case 1:20-cv-00292-JPW   Document 393-1   Filed 05/24/24   Page 2 of 71

Electronic Frontier Foundation v. Office of Director of..., Not Reported in Fed....

2009 WL 10710750

2009 WL 10710750
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

ELECTRONIC FRONTIER
FOUNDATION, Plaintiff,
v.
OFFICE OF the DIRECTOR OF
NATIONAL INTELLIGENCE and
Department of Justice, Defendants.

No. C 08-01023 JSW, No. C 08-02997 JSW
|
Signed 10/07/2009

**Attorneys and Law Firms**

Marcia Clare Hofmann, Electronic Frontier Foundation, San Francisco, CA, David L. Sobel, Electronic Frontier Foundation, Washington, DC, for Plaintiff.

Adam Kirschner, Andrew Irwin Warden, Marcia Berman, U.S. Department of Justice, Washington, DC, for Defendants.

**ORDER DENYING MOTION FOR LIMITED STAY PENDING APPEAL DETERMINATION BY SOLICITOR GENERAL AND DENYING MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION**

JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE

**\*1** Now before the Court is the motion filed by Defendants for a 60-day stay pending a determination by the Solicitor General whether or not to appeal the decision by this Court granting Plaintiff's motion for summary judgment and denying Defendants' motion for summary judgment dated September 24, 2009 ("Order"). The Court finds the motion suitable for resolution without oral argument. Therefore, the hearing set for October 9, 2009 is HEREBY VACATED. *See* N.D. Civ. L.R. 7-1(b). Also before the Court is Defendants' motion for leave to file a motion for reconsideration.

Having considered the parties' pleadings and the relevant legal authority, the Court DENIES Defendants' motion for a limited stay. Although Federal Rule of Appellate Procedure

4(a)(1)(B) permits the Government up to 60 days to determine whether to file an appeal, the Court is not persuaded that it should exercise its discretion to stay its own order pending "necessary consultations and deliberations to determine whether to appeal" the Court's Order. (Reply at 2.) The disputed documents were the subject of an order granting preliminary injunction dated April 2008, a subsequent delay in order for Defendants to re-evaluate their position subject to the reformed regulations of the Obama Administration, and the matter has been submitted on the parties' cross-motions long enough for the Defendants to consider their options regarding a possible appeal in the event their motion was denied.

A motion for a stay pending appeal would be premature and is not properly before the Court. *See* Fed. R. Civ. P. 62(c). The Court makes no finding as to whether a stay pending appeal would be appropriate. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (holding that the factors regulating the issuance of a stay pending appeal are: "(1) whether the stay applicant has made a strong showing that he is likely to proceed on the merits; (1) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.") Should Defendants decide to appeal the Court's Order and to seek a stay from this Court, they will have to meet this high burden.

Defendants have also filed a motion for leave to file a motion for reconsideration of the Order. A motion for reconsideration may be made on one of three grounds: (1) a material difference in fact or law exists from that which was presented to the Court, which, in the exercise of reasonable diligence, the party applying for reconsideration did not know at the time of the order; (2) the emergence of new material facts or a change of law; or (3) a manifest failure by the Court to consider material facts or dispositive legal arguments presented before entry of the order. N.D. Civ. L.R. 7-9(b)(1)-(3). In addition, the moving party may not reargue any written or oral argument previously asserted to the Court. N.D. Civ. L.R. 7-9(c).

There is no material difference or emergence of new law or fact since issuance of the Order and the Court has considered the dispositive legal arguments advanced by Defendants in their original papers. The Court concludes that, upon review of the proffered motion for reconsideration, Defendants reargue points previously asserted to the Court and, in essence, merely express their disagreement with the Court's

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 3 of 71

Electronic Frontier Foundation v. Office of Director of..., Not Reported in Fed....
2009 WL 10710750

decision. For these reasons, Defendants' motion for leave to file a motion for reconsideration is DENIED.

**\*2  IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10710750

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1171166
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

In re GAMING LOTTERY
SECURITIES LITIGATION

Nos. 96 Civ. 5567(RPP), 96 Civ.
7527(RPP), 96 Civ. 7936(RPP).
|
Aug. 17, 2000.

**Attorneys and Law Firms**

Wolf Popper LLP, New York, NY, By: Robert C. Finkel, Millberg Weiss Bershad Hynes & Lerach LLP, New York, NY, By: Deborah Clark–Weintraub, for Plaintiffs.

Sheldon Eisenberger, New York, NY, GalaxiWorld.com Limited, c/o Jack Banks, President, Gibraltar, for Jack Banks and Larry Weltman.

OPINION AND ORDER

PATTERSON, J.

 **\*1** Pursuant to the Court's Order of April 18, 2000, Proskauer Rose LLP, the former attorneys for Gaming Lottery Corporation ("Gaming"), previously Laser Friendly Inc. (Laser), an Ontario corporation, produced for the Court's *in camera* inspection discovery documents referred to in plaintiffs' March 3, 2000 memorandum in support of their renewed motion to compel the production of documents withheld on Gaming's claim of attorney/client privilege, together with a copy of Defendants' Revised Privilege Log dated December 17, 1999.

*BACKGROUND*

The renewed motion to compel[1] arises in the context of a securities fraud litigation arising out of conduct after Laser and its newly formed subsidiary, Specialty Manufacturing Inc. ("SMI"), a State of Washington corporation, entered into a purchase agreement as of January 31, 1995 (the "Purchase Agreement") with Ace Novelty Co., Inc. ("Ace") and ANCI, Inc. ("ANCI") both State of Washington corporations,

pursuant to which the assets of Ace's Specialty Manufacturing division would be transferred to ANCI, and Laser and SMI would purchase all the shares of ANCI from Ace at the final closing. (Affidavit of Deborah Clark Weintraub dated February 23, 1999 ("Weintraub Aff."), Ex. 4.) The Purchase Agreement provided that in the event the Final Closing did not occur on or before March 31, 1995, the purchase price of $4,650,000 less adjustments would be paid to the vendor's attorney to be held in escrow. (*Id.,* Ex. 4 at 26.)

A. *Events Prior to and Execution of the Final Closing*
Prior to entering into the Purchase Agreement, defendant Jack Banks, Laser's president and chief executive officer, had received a letter dated January 19, 1995 from the State of Washington Gambling Commission ("Washington Gambling Commission") (i) notifying him that Ace's Washington license to manufacture and sell pull tabs in Washington was not transferrable and would become null and void upon conclusion of the announced forthcoming purchase of the Specialty Manufacturing division of Ace by Laser and SMI; (ii) expressing concern that Laser had taken no steps to obtain a Washington license; and (iii) requesting that the Commission be kept "informed as to the status of the acquisition" of the Specialty Manufacturing division. (Weintraub Aff., Ex. 3.) Eleesha Swartz, general counsel for Laser, who was placed in charge of Laser's and SMI's licensing applications, reviewed this letter. (Affirmation of Karen Clarke dated March 5, 1999 ("Clarke Affm."), Ex. 1 at 46.)[2]

On February 14, 1995, Eleesha Swartz, also general counsel of SMI, submitted SMI's application for a license to manufacture pull tabs in the State of Washington, stating that the completion of the transaction was "conditional upon obtaining the requisite gaming license for the State of Washington" and that the "Specialty Manufacturing division will not be transferred until the State of Washington has granted a license to the applicant." (Wientraub Aff., Ex. 5.)

 **\*2** By letter dated March 14, 1995, the Washington Gambling Commission notified Robert Wilkinson, President of SMI, that (1) SMI had to provide copies of the closing documents including the bill of sale, closing statement, UCC–1, security agreements, promissory notes, etc., and (2) Laser Friendly (U.S.A.), a newly formed State of Washington corporation holding all SMI's shares, had to provide "[a]greements of any and all subsidiaries to include exclusive, partnership, management, franchise, consulting,

lease or *any other agreements."* (Weintraub Aff., Ex. 1 at ¶ 11 (emphasis added).)

On March 31, 1995, Laser wire-transferred the purchase price funds (less adjustments) to Ace's attorneys to be held in escrow. (*Id.,* Ex. 6.)

By letter dated April 19, 1995, Eleesha Swartz, acting for SMI, forwarded information requested on March 14, 1995 to the Washington Gambling Commission relating to SMI and Laser Friendly (U.S.A.). (*Id.,* Ex. 7.)

On May 3, 1995, Laser, SMI, Ace and ANCI executed a final closing agreement effective as of April 30, 1995 ("Final Closing Agreement") which stated that (1) the "Vendor and Purchaser hereby acknowledge that all the conditions to Final Closing ... have been fully satisfied or waived by Vendor and Purchaser, except as otherwise expressly provided herein," (Weintraub Aff., Ex. 9, Final Closing Agreement ¶ 11); (2) Paragraphs 16(e)(i), 16(i), 16(j), 17(b) and 17(c) in the Purchase Agreement requiring that Laser or SMI obtain licenses from regulatory authorities were deleted (*id.* ¶ 1(e)); (3) Ace "shall operate the business of the Division for ACNI for the period of time specified in the Operating Agreement" attached as Exhibit A to the Final Closing Agreement (*id.* ¶ 6);[3] and (4) Laser and SMI indemnify Ace from liabilities of any nature arising from the business as defined in the Operating Agreement and guarantee ANCI's performance under the Operating Agreement (*Id.* ¶¶ 7, 8.)

Also attached to Exhibit A, the Operating Agreement, were "Operational Notes for Ace Novelty—Laser Friendly Transition April 25, 1995." On pages 7 and 8, that document states the following:

15. What to tell Inside/Outside contacts, etc. such as Customers, Regulators, Employees, Vendors:

a. Basically the plan is to say nothing. If asked, we say there is no change, this is just in further anticipation of the transition to Laser U.S.A. and it is just getting our ducks in a row and things in position to make those changes.

b. In regards to discussions with Regulators, Kenn (Ace) continues to be the point person and place that all inquiries from Regulators etc. goes as it relates to Ace's business and operating under Ace's licenses and that continues to happen until Specialty physically takes over and operates under its own name...."

19. In the event of a disagreement on the operation of the business between Ace and Robert Wilkinson on behalf of ANCI under Section 2.3 of the Operating Agreement, all strategic decisions, *i .e.* marketing and production, Robert Wilkinson shall make the final determination.

**\*3** (*Id.,* Ex. 11 at 7–8.)

As of April 30, 1995, the parties to the Purchase Agreement executed a letter of instructions to the Escrow Holder to pay the escrow funds for the benefit of Ace (after a price reduction of $130,000 to purchaser). (Weintraub Aff., Ex. 13.)[4]

B. *Defendants' Denial That Closing Had Occurred*
Neither Gaming nor SMI notified the Washington Gambling Commission that the closing had taken place or forwarded the closing documents. Instead, Gaming and SMI maintained that the closing had not taken place. Subsequent to the final closing, defendants affirmatively sought to conceal the SMI closing from licensing agencies in Nebraska and Illinois, the Washington Gambling Commission, and the Superior Court of the State of Washington.

In his interview on June 22, 1995 with the Nebraska Department of Revenue in connection with the licensing of SMI in that state, Weltman stated that Gaming was in the process of acquiring the Specialty Manufacturing division of Ace and that the closing of the deal was pending the acquisition of the requisite licenses. (Plaintiffs' Reply Memorandum dated June 4, 1999, Ex. Z at 9, 21, 38–40.) Furthermore, notes maintained by the Nebraska Commission of conversations with Swartz on August 11, 1995 indicate that Swartz informed the Commission that the closing was "still pending because we don't have all the licenses yet." (*Id.,* Ex. A.) Notes from a conversation on August 24, 1995 indicate that Swartz's response to the question, "Has the final sales agreement been signed" was "No, we are still waiting on Nebraska and Washington licensure." (*Id.,* Ex. Y.)

By letter dated August 14, 1995, Eleesha Swartz advised the Illinois Office of Bingo and Charitable Games on behalf of SMI that "Laser Friendly (U.S.A.), Inc. is in the process of purchasing the Special Manufacturing division of Ace. The transaction has not closed and will not close until such time as Special Manufacturing, Inc. is in receipt of all U.S. gaming licenses and we will advise you with respect thereto in due course." (Weintraub Aff., Ex. 2.)

By letter to Ms. Swartz dated August 17, 1995, Steven F. Troster, a single practitioner in Toronto, who acted for Laser in the Purchase Agreement with Ace and was a recipient of the Final Closing Agreement on May 3, 1995, the Operating Agreement with Operational Notes and the Instructions to Escrow Holder, confirmed that the purchase price funds were transferred by Laser to the solicitors for the Vendors of SMI and further "that the documentation executed by the parties provides that such funds are to be held by the solicitors for the vendors until the earlier of September 30, 1995 or until such time as agreed to by the parties." (Weintraub Aff., Ex. 15 at 2.) The Troster letter is false and misleading in that it omits to state material facts necessary to make the statements contained therein not misleading, namely, that, despite the documentation, the escrow funds had been transferred by the vendor's attorney to Ace and Ace's creditors, a fact the documents mailed to Troster in May 1995 reflect. On August 22, 1995, Eleesha Swartz forwarded Mr. Troster's letter of August 17, 1995 to the Washington Gambling Commission in response to its phone message for confirmation of the status of the escrow funds. (*Id.,* Ex. 15.) Thus, Laser (Gaming) used the Troster letter to mislead the Commission about the status of the escrow funds and closing.

**\*4** On December 18, 1995, Defendant Weltman submitted a declaration in a lawsuit by Laser (Gaming) filed in the Superior Court of the State of Washington, seeking to force the Washington Gambling Commission to issue a license to SMI stating:

> At all times, Gaming Lottery Corporation and its subsidiaries have provided the Washington State Gambling Commission with every document within their power to provide.... The [Commission's] failure to act and grant the license has caused great harm not only to our company but to the *prospective* sellers, Ace Novelty and Trade Products, Inc.

(Weintraub Aff., Ex. 19 at 9–10 (emphasis added).)[5]

This statement by Weltman was false and misleading because (1) the final closing documents had not been disclosed to the Commission; (2) Ace was no longer a "prospective seller," because it had received its full consideration under the Purchase Agreement as amended by the Final Closing Agreement; and (3) Ace had not been 'caused great harm' by any failure to act by the Commission.

C. *Defendants' Claim of Reliance on Advice of Counsel*

Defendants' answer in this action includes the defense that their failure to notify the Washington Gambling Commission that the closing had taken place was "taken in good faith reliance on the advice of their accountants and attorneys," (Weintraub Aff., Ex. 22 at ¶ 93), particularly on the advice of Ronald Meltzer, Esq., an attorney representing Ace. (Reply Affidavit of Robert C. Finkel dated March 11, 1999 ("Finkel Reply Aff."), Ex. 34 at 60–61.) Mr. Meltzer, however, testified he provided advice to Ace only in connection with the Operating Agreement,[6] (Affirmation of Karen E. Clarke, dated March 5, 1999, ("Clarke Affm."), Ex. 2 at 10–12, 56–57 ("[T]his is the only subject matter that I'm supposed to be involved in")), and that his advice "would not have been about the closing in general because those are subjects I know nothing about and would have nothing to add" (*id.* at 57).[7] Furthermore, he denies he provided legal advice to Laser, ANCI, Banks or Weltman at that time (Finkel Reply Aff, Ex. 34 at 39 ("Not directly. I provided advice to Ace. Ace may have passed that advice on.").) Meltzer denied representing anyone but Ace on the Operating Agreement. (*Id.* at 39–40[8]). After the closing, Meltzer did give advice to the defendants in licensing matters.[9] Meltzer billed Laser for later services rendered on May 30 and May 31, 1995. (Clarke Affm., Ex. 6.) He did not bill Laser or SMI for services rendered prior to those dates.

Saul Gamoran of Ace confirmed that Meltzer was not providing advice to Laser or its principals on the SMI closing. (Finkel Reply Aff., Ex. 35 at 27 ("No. No, I would never have permitted that or waived that. He was giving us advice.... He was our lawyer. He represented us, not both parties.").)

Nevertheless, the defendants maintain that Meltzer enunciated an opinion that it was legal under Washington law for Laser to enter into the Operating Agreement and Final Closing Agreement, and that they relied on his advice. (Defendants' Memorandum in Opposition to Plaintiffs' Motion to Compel, dated March 5, 1999, ("Def.Mem.") at 12–13.)

**\*5** Defendants' claim of reliance on Meltzer's oral advice when Meltzer represented a party with adverse interests to Laser and when Laser was indemnifying Ace for any liability arising out of the Operating Agreement is incredible.[10]

D. *Prima Facie Evidence of Fraud*

Two provisions of Washington State law apply to the defendants' conduct after May 3, 1995 in allowing Ace to operate SMI on behalf of SMI and Gaming.

Revised Code of Washington 9.46.310 provides, in pertinent part, that:

> No person shall manufacture, and no person shall sell, distribute, furnish or supply to any other person, any gambling device, including but not limited to punchboards and pull tabs, in this state, or for use within this state, without first obtaining a license to do so from the commission under the provisions of this chapter.

Revised Code of Washington 9.46.215 criminalizes ownership, manufacturing, possession, transport or transfer of gambling devices by persons who are not licensed by the Commission:

> Whoever knowingly owns, manufactures, possesses, buys, sells, rents, leases, finances, holds a security interest in, stores, repairs, or transports any gambling device or offers or solicits any interest therein, whether through an agent or employee or otherwise, is guilty of a felony and shall be fined not more than one hundred thousand dollars or imprisoned not more than five years or both.

In view of these regulations and the Washington Gambling Commission's January 19, 1995 notice to Banks and Laser that Ace's license to manufacture and sell pull tabs in the state of Washington would become null and void upon the final closing of the Purchase Agreement, defendants' false statements that the SMI transaction had not closed and defendants' failure to disclose the final closing as of April 30, 1995 or to furnish the closing documents to the Washington Gambling Commission at a time when SMI and Laser were pursuing licenses to conduct a gaming business in the State of Washington constitutes *prima facie* evidence of fraud during the period May 3 to December 1995.[11]

*DISCUSSION*

With these facts in mind, the Court has conducted its own *in camera* inspection of the documents requested in plaintiffs' motion dated March 3, 2000 in order to determine if each document is entitled to attorney/client or work product privilege. The applicable test for this analysis is:

> (1) [W]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal adviser, (8) except the protection be waived.

*In re Richard Roe, Inc.,* 68 F.3d 38, 39–40 (2nd Cir.1995) (quoting *United States v. Kovel,* 296 F.2d 918, 921 (2nd Cir.1961) (quoting 8 Wigmore, Evidence, § 2292)). In addition, the Court determined whether the crime/fraud exception is applicable by examining (i) whether "the client communication or attorney work product in question was itself in furtherance of the crime or fraud" and (ii) whether there is "probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal" or fraudulent activity. *In re Richard Roe, Inc.,* 168 F.3d 69, 71. (2nd Cir.1999) (quoting *In re Richard Roe, Inc.,* 68 F.3d at 40).[12]

A. *Plaintiffs' Request for Redacted Portion of Fielden Note*[13]

 **\*6** The Court's review of the redacted portion of the notes of Barbara Fielden, Esq., dated April 25, 1995, does not reveal any entries bearing on defendants' state of mind or on Mr. Meltzer's advice, nor do any entries bear as to which of the defendants assert they have "waived the privilege" with respect to the advisability of relying on the advice of a lawyer with whom defendants did not have a lawyer/client relationship in connection with the May 3, 1995 Final Closing Agreement, Operating Agreement, Operational Notes or Instructions to Escrow Holder.

The unredacted portion of those notes has already revealed that Mr. Meltzer advised that the legality of the Final Closing was a "judgment call" and that Ace and Gaming "must report any change in how doing business [within] 60 days." (Finkel Aff., dated March 3, 2000, Ex. D.)[14]

Accordingly, the Fielden notes need not be produced in unredacted form.[15]

B. *Communications with Principals and Counsel for Trade Products*

For the reasons stated in this Court's Opinion and Order dated March 30, 2000, the Court adheres to its determination that

defendants have not carried their burden of showing that a lawyer/client privilege exists as to communications between Trade Products' counsel, Mary Magnuson, or Trade Products' executives and Ms. Swartz, Mr. Weltman, Mr. Banks and Laser (Gaming).

Not all communications to an attorney are privileged. In order to make a valid claim of privilege, "it must be shown that the information sought to be protected from disclosure was a 'confidential communication' made to the attorney for the purpose of obtaining legal advice or services." *Priest v. Hennessy,* 51 N.Y.2d 62, 69, 431 N.Y.S.2d 511, 409 N.E.2d 983 (1980) (citing *Matter of Jacqueline F.,* 47 N.Y.2d 215, 219, 417 N.Y.S.2d 884, 391 N.E.2d 967 (1979)). Here, the communications of defendants were intended to be transmitted to licensing authorities or were transmissions of information from licensing authorities about licensing requirements and have not been shown to have been made to obtain legal advice.

Furthermore, neither the joint defense privilege nor the community of interest exception exists because Ms. Magnuson was retained solely by Trade Products, and neither Ms. Magnuson nor her principals believed that she was acting also as an attorney for Gaming Lottery. (Finkel Aff., dated March 3, 2000, Ex. H at 22, 30–31; Ex. K at 88.) *In camera* review of the documents confirms Magnuson's testimony that even though Trade Products attempted to assist Laser (Gaming) in obtaining the licenses for Trade Products and Laser U.S.A. necessary for closing, Ms. Magnuson's role in relationship to defendants was merely to obtain information from the state gaming authorities as to what additional information those agencies required in order to issue those licenses. There is no showing of Magnuson receiving any confidential information from the defendants or of Trade Products accepting the confidentiality prerequisite of a common interest representation. Since the disclosures made to Magnuson were made for transmission to licensing authorities, defendants have not demonstrated "that the disclosures would not have been made but for the sake of securing, advancing, or supplying legal representation." *In re Grand Jury Subpoena Duces Tecum,* 406 F.Supp. 381, 386 (S.D.N.Y.1975); *See In re Regents of the University of California,* 101 F.3d 1386, 1389 (Fed.Cir.1996). Accordingly, Defendants have not shown that the prerequisites of the common interests privilege exist. *See In re Regents of the University of California,* 101 F.3d at 1390.

**\*7** Moreover, evidence has been presented that defendants' claim that Ms. Magnuson was acting on their behalf is being made in retrospect. First, on August 11, 1995, Ms. Swartz did not acknowledge Ms. Magnuson was acting for SMI in discussions with the Nebraska Gaming officials and did not provide Ms. Magnuson with a power of attorney to act for SMI in Nebraska. (Plaintiffs' Reply Memorandum of Law, dated June 4, 1999, Ex. A at 2.) Second, Swartz's notes of a telephone call with Magnuson and Weltman on September 14, 1995, which were reviewed *in camera,* refers to a telephone call with Frank Miller of Washington Commission in which Miller required receipt of information directly from Gaming, not from Magnuson, showing Magnuson was not regarded as an attorney for Gaming. (*In camera* Document # 135.)

Review of the documents demonstrates that defendants actively misled Trade Products' executives and Ms. Magnuson as to the SMI closing. Indeed, Ron Rudy of Trade Products testified that if Trade Products had known that the SMI transaction had closed and Laser was operating SMI without a license, it would not have gone forward with its transaction. (Finkel Aff., dated March 3, 2000, Ex. K at 33–35.) Rather than make disclosures, the following *in camera* documents demonstrate defendants actively misled Ms. Magnuson and Trade Products as to the status of the SMI closing.

*Document # 124*[16]—Swartz's notes of August 14, 1995 telephone call with Magnuson.

*Document # 130*—Swartz's notes of a telephone call on August 24, 1995 with Ron Rudy of Trade Products and defendant Weltman.

*Document # 132*—Swartz's notes of telephone call with Rudy on September 8, 1995 [notes Rudy reporting "Earnings of SMI incld in our 1 st 1/4" and "stock fraud—claiming not bot SMI" and Swartz's response—"letter from auditors"] [Also "Ron Meltzer go to Frank Miller,"[17]—"go from Ace side,"—"legit," "looked at," "LFI not operating SMI until license clear," "Ace still controls SMI"]

*Document # 133*—Swartz's fax cover note to Mary Magnuson, dated September 12, 1995, four days after Document # 132. ["copy of letter from our accountant re earnings ..."]

Attached to Document # 133 is a letter dated September 11, 1995 addressed to Gaming from Lipton Wiseman Altbaum & Partners, Willowdale, Ontario, Canada, which reads as follows:

> "You have asked our firm, as auditors to explain why we recommended back in January 1995 an accounting treatment for the earnings of Specialty Manufacturing Inc.

*Facts:*

> "We are given to understand that the corporation acquired the assets of Special Manufacturing Inc. with an effective date of February 1, 1995.... Final closing of the transaction is to take place when a significant number of licenses have been transferred to the corporation.... The purchase price is fixed and is payable on the final closing. The funds were transferred and are being held by an escrow agent.

**\*8** *Issue:*

> Is it the appropriate accounting treatment for the corporation to account for revenues and expenses from the effective date of acquisition February 1, 1995, notwithstanding that the final closing has not taken place?

Document # 133 at 2.

The Canadian auditors answered the accounting issue affirmatively but at the same time, by transmission of a copy of the Canadian auditors' letter, Gaming advised Trade Products and Magnuson falsely that the funds were still held in escrow and the final closing had not taken place and was subject to Gaming obtaining a number of licenses when in fact (1) the funds had been paid out of escrow; (2) the closing had taken place; and (3) Laser (Gaming) had waived, or agreed to deletion of, the condition of licenses for the closing. Defendants' action is strikingly similar to its transmission of the Troster letter on August 22, 1995 to the Washington Gambling Commission to confirm that the escrow funds were being held.

In addition, review of the documents discloses that Swartz and Weltman were aware of Ronald Seale's and Park Wilshire Group, Inc.'s Nassau, Bahamas address, (Document # 106), but does not indicate Ms. Magnuson was advised of that address for Park Wilshire or Seale or Seale's Florida address, despite Magnuson's request on September 5, 1995, ["We need some info on Park Wilshire Group—i.e. who are they, where located—I think it would be helpful. Do you have anything?"] (Document # 131 at 1.) Instead, in October 1995, Swartz addressed the three offshore investors, Silva Run, Mariner Reserve Fund and Compania di Investimento, "c/o Coutts & Co. AG" in Switzerland to support Gaming's claim that investor information was prevented due to Swiss banking secrecy laws. (Documents153, 302.) It was Park Wilshire (Seale), however, that pursuant to a written agreement with Laser dated June 22, 1995 (Document # 131 at 2), obtained those three investors for Laser. The defendants' failure to impart this information to Magnuson further supports a finding that no confidential relationship existed between defendants and Magnuson and Trade Products and is contrary to defendants' claim and is consistent with the testimony of Magnuson and Rudy that no lawyer/client relationship existed between Magnuson and Laser, Gaming or the individual defendants.

For the foregoing reasons, the following documents must be produced to the plaintiffs: 105, 107, 113, 114, 115, 116, 117, 119, 123, 124, 125, 126, 127, 128, 131, 133, 135, 138, 139, 147, 150, 151, 152, 154, 155, 158, 160, 162, 169, 173, 302 (unredact only as to Mary Magnuson conversation), and documents M1–M20.

With respect to the documents submitted by Proskauer in response to the request by plaintiffs on pages 21 and 22 of Plaintiffs' Memorandum in Support of Motion to Compel dated March 3, 2000, a number of these documents consist of evidence that Laser was in fact making operational decisions for the Specialty Manufacturing division after May 2, 1995 when it was maintaining that Ace was still in control of the division. The rulings of the Court are as follows:

| Document # | Ruling |
|---|---|
| 64 | produce—notice of license application requirements not legal advice. No request for legal advice |
| 69 | produce—evidence of Troster's receipt of signed copies of closing agreements. No request for legal advice |

2000 WL 1171166

| | |
|---|---|
| 70 | produce—evidence of Wilkinson's management of SM when Laser maintained closing hadn't occurred and that Ace was managing SM—evidence of fraud |
| 77 | produce—communication of facts not legal advice |
| 79 | produce—evidence of Wilkinson's operation of SM when Laser maintained Ace controlled SM—evidence of fraud |
| 80 | produce—not legal advice. Notice of status of gaming license applications |
| 81 | produce—evidence of Laser operation of SM when Laser maintained to Commission that Ace controlled SM—evidence of fraud |
| 82 | produce—evidence of operation of SM when Laser maintained to Commission that Ace controlled SM—evidence of fraud |
| 86 | produce—evidence of operation of SM, etc.—evidence of fraud |
| 87 | produce—evidence of operation of SM, etc.—evidence of fraud |
| 94 | produce—evidence of Laser's control of SM, etc., when Laser claiming—evidence of fraud |
| 99 | produce—evidence of SM's control of business when Laser maintaining Ace in control—evidence of fraud |
| 106 | produce—no request for legal advice. Evidence of Laser's and Weltman's knowledge of Seale's and Park Wilshire Group, Inc.'s address in Bahamas, not c/o Coutts & Co. A.G., Switzerland |
| 118 | produce—evidence of Laser's control of SM operation—evidence of fraud |
| 134 | do not produce—request for legal advice |
| 141 | produce—communication from non-client |
| 142 | do not produce—attorney-client communication |
| 144 | do not produce—request for legal advice |
| 148 | do not produce—Swartz's notes; no evidence of communication to third party |
| 153 | produce—evidence of attempt to mislead Washington State Commission as to address of |

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 11 of 71
In re Gaming Lottery Securities Litigation, Not Reported in F.Supp.2d (2000)
2000 WL 1171166

| | | investors to obtain protection of Swiss bank secrecy laws—evidence of fraud |
|---|---|---|
| 157 | | produce—not legal advice |
| 165 | | do not produce—legal advice to client |
| 167 | | do not produce—legal advice not divulged to third party |
| 183 | | do not produce—legal advice from attorney |
| 188 | | produce—does not contain legal advice |
| 202 | | produce—does not contain legal advice |
| 204 | | produce—does not contain legal advice |
| 205 | | produce—does not contain legal advice |
| 206 | | produce as to t/c with Harry Poll; redact t/c with Larry Weltman |
| 216 | | produce—not legal advice. Not legal advice requested by client |

**\*9** IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1171166

Footnotes

1    In this opinion, the Court has considered the documents and deposition transcripts submitted by the parties on plaintiffs' original motion to compel dated February 24, 1999, as well as the renewed motion dated March 3, 2000. The Court denied the February 24, 1999 motion without prejudice on March 18, 1999.

2    In its public announcement of the Purchase Agreement for the Specialty Manufacturing Division, Laser stated that the Purchase Agreement was subject to Laser obtaining the requisite gaming license.

3    The Operating Agreement is attached to Exhibit 4 of the Clarke Affirmation.

4    On June 8, 1995, Laser issued an earnings report for the first quarter of its fiscal 1996 year ended April 30, 1995 which included consolidated earnings of SMI and did not mention that the necessary gaming license to operate in the State of Washington had not been received.

5    Thereafter, on April 12, 1996, the State of Washington brought suit against SMI, Gaming (U.S.A.) and Ace for conspiracy to manufacture and sell gambling devices without a license in violation of RCW 9.46.310 and RCW 9.46.215 (Weintraub Aff., Ex. 20). The fine for violation of RCW 9.46.215 is not more than $100,000. On January 2, 1997, the State of Washington and SMI, Gaming and Ace entered into a stipulation and agreed order that permitted sale under the supervision of the Washington State Gambling Commission of the assets of SMI and ANCI, including its existing stock of pull tabs and to pay the Commission one-third of the sales price, up to a maximum of $750,000, or $500,000, whichever was greater, and defendants agreed not to conduct any business requiring license in Washington for a period of 10 years in return for a dismissal without prejudice and an agreement not to pursue any civil or criminal proceedings related to the subject of plaintiff's complaint. (Weintraub Aff., Ex. 21.)

2000 WL 1171166

6      And the Operational Notes.

7      Meltzer was not asked whether the Final Closing Agreement or Operating Agreement should be furnished to the Washington State Gambiing Commission. (Finkel Reply Aff., Ex. 34 at 53 ("[T]he issue did not arise.").)

8      "Q. Did you provide any legal advice to ANCI or Laser Friendly or Mr. Banks or Ms. Swartz regarding the operating agreement?

   "A. I would give you the same answer which is I gave my advice to Ace. If Ace passed that on, they passed it on."

   (Finkel Reply Aff., Ex. 34 at 40.)

9      Meltzer was the attorney whose printed letterhead appears on every page of the declaration submitted by Weltman in the lawsuit by Laser (Gaming) filed in the Superior Court of the State of Washington, seeking to force the Washington Gambling Commission to issue a license to SMI, so it can be inferred that Meltzer reviewed Weltman's declaration. Since Meltzer was an attorney for Ace in the final closing of the SMI transaction (Weintraub Aff., Ex. 9 at 2), it appears that he was a party to this false and misleading statement to that Court.

10     Gaming's excuse that it had to rely on Meltzer because of the scarcity of lawyers with expertise in gaming licenses is rejected because it had previously consulted with Mary Magnuson, a lawyer with that expertise, on another matter. (Finkel Aff., dated May 26, 1999, Ex. C at 77–78.)

11     Furthermore, the defendants did not disclose in Laser's (Gaming's) June, September and December 1995 quarterly reports that the State of Washington gaming license had not been issued to SMI, even though quarterly earnings included SMI's earnings.

12     "[T]he probable cause necessary to sustain the exception is not an overly demanding standard." *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.,* 1999 WL 61442,[*]5 (S.D.N.Y. Feb. 3, 1999). Indeed, the Second Circuit has stated that there is little practical difference between describing the burden as requiring "probable cause" or a "prima facie" showing. *See In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1039 (2d Cir.1984). "Both require that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud." *Id.*

13     Plaintiffs' Memorandum of Law dated March 3, 2000 at 4–9.

14     Rather than report any changes in how it was doing business within 60 days, Laser embarked on the Trade Products acquisition.

15     The Court questions the practice of counsel for defendants subpoenaing documents of Fielden and Meltzer, redacting those documents for privilege and, during deposition, not having unredacted copies of those documents available for the witness' review to refresh the witness' recollection of the entire conversation. (Finkel Aff., dated March 3, 2000, Ex. G at 148–155; Finkel Reply Aff., dated March 11, 1999, Ex. 34 at 7, 15–16, 32.)

16     All document numbers refer to Defendants' Revised Privilege Log 12/17/99.

17     Miller was an official of the Washington State Gambling Commission.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 13 of 71

In re Pacific Forest Products Corp., Not Reported in Fed. Supp. (2006)
2006 WL 8433477

2006 WL 8433477
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

IN RE PACIFIC FOREST

PRODUCTS CORP., Debtor,

Colonial Bank, Appellant,

v.

Lewis B. Freeman, etc., Appellee.

SunTrust Bank, Appellant,

v.

Lewis B. Freeman, Appellee.

CASE NO: 05-23268-CIV-GOLD/TURNOFF
|
Signed 05/23/2006
|
Entered 05/24/2006

**Attorneys and Law Firms**

Mark Robert King, Jones Walker Law Firm, Miami, FL, for
Appellant.

Brett Michael Amron, Bast Amron LLP, David Charles Cimo,
John H. Genovese, Genovese Joblove & Battista, Miami, FL,
for Appellee.

**ORDER REVERSING BANKRUPTCY COURT'S
ORDER GRANTING PARTIAL SUMMARY
JUDGMENT**

THE HONORABLE ALAN S. GOLD, UNITED STATES
DISTRICT JUDGE

**\*1 THIS CAUSE** is before the Court upon the appeals
filed by SunTrust Bank ("SunTrust") and Colonial Bank
("Colonial") (SunTrust and Colonial may be referred to
collectively as "Appellants" or the "Banks") on January 23,
2006, which seek to reverse the Bankruptcy Court's Findings
of Fact and Conclusions of Law on Plaintiff's Motion for
Order Under Rule 56(d) on Counts I and III of the Amended
Adversary Complaint Granting Partial Summary Judgment
Regarding Debtor's Actual Intent to Hinder, Delay or Defraud
Creditors (the "Bankruptcy Court Order") **[DE 8 and 9].** On
March 14, 2006, Appellee Lewis B. Freeman ("Appellee" or

"Trustee") filed his answer brief **[DE 16].** On March 27, 2006,
Appellants filed reply briefs **[DE 18 and 19].** For the reasons
expressed below, I reverse the Bankruptcy Court Order.

**I. Factual and Procedural History**

This case involves an appeal from an adversary proceeding
arising in the bankruptcy case of Pacific Forest Products
Corp. ("Pacific Forest"). Pacific Forest was engaged in the
business of importing and exporting wood products, including
specialty hardwoods, moldings, and doors. As alleged in
elaborate detail, beginning in September or October of 1998,
Pacific Forest perpetrated a check kiting scheme by issuing
and depositing thousands of company checks made payable
to itself. Pacific Forest would cash checks against its account
at one bank to pay off uncollected balances at other banks.
For instance, Pacific Forest would deposit checks drawn from
its Colonial account into its SunTrust account. Pacific Forest
would then issue checks back from its SunTrust account to its
Colonial account, thereby completing the circle of financial
transactions. In this manner, Pacific Forest could use the
time during which the Banks processed its checks, commonly
known in the banking industry as "float time," as unsecured
loans. During the time of the alleged check kite, the Trustee
states that Pacific Forest issued very few checks to its vendors.
Pacific Forest's bank accounts were thus often overdrawn.

SunTrust became Pacific Forest's main depository for checks
drawn on its account with Colonial in December, 1998. The
Trustee alleges that over an eleven month period beginning in
January, 1999, SunTrust processed over 4,800 checks written
to Pacific Forest from Pacific Forest that were eventually
deposited in its Colonial account.

The Trustee alleges that on June 23, 1999, Pacific Forest
obtained a loan from Hamilton Bank, N.A. ("Hamilton
Bank") for the purpose of purchasing inventory and obtaining
working capital. Instead of pursuing these stated ends, Pacific
Forest used the proceeds of the loan from Hamilton Bank
to pay outstanding loans due and owing to the Banks.
In other words, according to the Trustee, Pacific Forest
used its Hamilton Bank account to check kites with its
accounts at SunTrust and Colonial. On November 3, 1999,
Pacific Forests's Colonial account was closed, but Pacific
Forest continued kiting checks between Hamilton Bank and
SunTrust.

In re Pacific Forest Products Corp., Not Reported in Fed. Supp. (2006)

2006 WL 8433477

**\*2** The scheme allegedly began to collapse in mid-December 1999.[1] On January 18, 2000, SunTrust stopped paying on Pacific Forest's checks, and it closed its Pacific Forest account on May 17, 2000.

In response to a request from Hamilton Bank for additional financial information, Pacific Forest retained an accounting firm to assess its records. In November, 2000, the accounting firm provided restated financials for fiscal years 1995 through three quarters of 2000. That information revealed Pacific Forest's financial problems, including significant operating losses. Hamilton Bank immediately notified Pacific Forest that it was in default of its loan agreement.

On February 14, 2001, three creditors of Pacific Forest filed an involuntary petition for bankruptcy relief under Chapter 7 against it. With Pacific Forest's consent, the petition was converted to a Chapter 11 reorganization on July 10, 2002. Appellee was appointed as the liquidating trustee for Pacific Forest.

On February 11, 2003, the Trustee filed an adversary complaint against the Banks, among others. On October 15, 2003, the Trustee amended the complaint, seeking to avoid alleged fraudulent transfers made in the course of an elaborate check kiting scheme in which the Banks supposedly participated (the "Amended Complaint").[2] At issue in this case are Counts I and III of the Amended Complaint, Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 548 and 544 and Florida Law against Colonial and SunTrust, respectively.

On June 23, 2004, the Trustee filed a Motion for Partial Summary Judgment Regarding Debtor's Actual Intent to Hinder, Delay, or Defraud Creditors (the "Motion for Summary Judgment"). Through the Motion for Summary Judgment, the Debtor sought judgment on the issue of the Debtor's actual intent to hinder, delay or defraud creditors, a fundamental element of both federal and Florida fraudulent transfer law. The Trustee's legal position was that because there was no dispute as to the existence of a massive check kiting scheme, all transfers in furtherance of that scheme were made with actual intent to defraud creditors. The Trustee's own words state it best:

> [i]n short, neither the Debtor, its former principals, nor any of the Defendants can offer any legitimate explanation of the Debtor's actions. Given the large volume and multi-millions of dollars of checks made payable to Pacific Forest

itself passing through the accounts of the Bank Defendants on a monthly basis, along with numerous multiple checks totaling even amounts and the creation of bogus invoices and other irregularities, it is beyond doubt that Pacific Forest was clearly engaged in a scheme to hinder, delay or defraud its creditors.

To further its position favoring a legal presumption of actual intent, the Trustee went on to craft a legal comparison between check kiting and Ponzi schemes. The comparison served the important bridge that would link the alleged check kite to a presumption of actual intent to defraud. Finally, the Trustee engaged in a badges of fraud analysis that purportedly supported its position of actual intent to defraud.

**\*3** The Banks responded that: (1) questions of fact remained as to the badges of fraud analysis; (2) the Trustee's conclusion of a check kite relied upon witness testimony that was contradicted; and (3) the Ponzi analogy did not apply to this case. The Banks also made the larger point that while Pacific Forest's transfers to them might have been fraudulent, the transfers could not be described as a fraud against creditors for purposes of avoidance. SunTrust also emphasized that Pacific Forest's agent stated that Pacific Forest paid nearly all of its creditors on a timely basis throughout the alleged check kiting time frame.

On April 13, 2005, the Bankruptcy Court held a hearing on the Trustee's Motion for Summary Judgment, and on May 3, 2005, the Bankruptcy Court entered its Bankruptcy Court Order, where it found that the Debtor acted with "actual intent to hinder, delay or defraud creditors" by engaging in an extensive check kiting scheme.

On May 16, 2005, Appellants each filed a motion for rehearing and reconsideration (the "Motions for Rehearing") of the Bankruptcy Court's Order, contesting a number of the Bankruptcy Court's findings of fact and conclusions of law, including the Bankruptcy Court's finding that the check kiting scheme at issue in this case demonstrated, *per se,* an intent to defraud. On May 25, 2005, the Bankruptcy Court denied Appellants' Motions for Rehearing.

In June 2005, Appellants filed motions for leave to appeal the Bankruptcy Court Order in this Court. On October 17, 2005, I granted Appellants' motions for leave to appeal ("Order Granting Leave to Appeal"). This appeal followed.

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 15 of 71

In re Pacific Forest Products Corp., Not Reported in Fed. Supp. (2006)
2006 WL 8433477

## II. Standard of Review

District courts sit as appellate courts over bankruptcy decisions. *Miner v. Bay Bank & Trust Co. (In re Miner),* 185 B.R. 362, 365 (N.D. Fla. 1995), aff'd, 83 F.3d 436 (11th Cir. 1996) (Table). A district court reviews a bankruptcy court's legal conclusions *de novo. In re Englander,* 95 F.3d 1028, 1030 (11th Cir. 1996). Further, district courts apply the *de novo* standard in reviewing a bankruptcy court's entry of summary judgment. *Gray v. Manklow (In re Optical Techs., Inc.),* 246 F.3d 1332, 1334 (11th Cir. 2001).

By contrast, a district court must accept a bankruptcy court's factual findings unless they are clearly erroneous, and it must also "give due regard to the bankruptcy court's opportunity to judge the credibility of the witnesses." *In re Englander,* 95 F.3d at 1030. "The bankruptcy court's findings of fact are not clearly erroneous unless, in light of all the evidence, [the appellate court is] left with the definite and firm conviction that a mistake has been made." *In re: Int'l Pharmacy & Discount II, Inc.,* 443 F.3d 767, 770 (11th Cir. 2005); *see also In re Scrap Metal Buyers of Tampa, Inc.,* 253 B.R. 103, 107 (M.D. Fla. 2000) ("[t]he 'clearly erroneous' standard means that the reviewing court must be left 'with the definite and firm conviction that a mistake has been made.' ") (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 375, 68 S.Ct. 525 (1948) ). Regarding mixed questions of law and fact, the district court must apply a clearly erroneous standard to the bankruptcy court's factual findings, and a *de novo* standard to its legal determinations. *Bakst v. Marks (In re Marks),* 131 B.R. 220, 222 (S.D. Fla. 1991), aff'd, 976 F.2d 743 (11th Cir. 1992) (Table).

The Bankruptcy Court entered partial summary judgment in favor of the Trustee. The issues that I have accepted for review, namely, whether a whether a Ponzi scheme is tantamount to a check kiting scheme, and whether a check kite establishes, *per se,* an intent to defraud, are purely legal issues. Therefore, I will review them under the *de novo* standard of review. As will be demonstrated below, the Bankruptcy Court committed reversible error in entering partial summary judgment for the Trustee.

## III. Analysis

**\*4** Through the Amended Complaint, the Trustee seeks to avoid transfers made to the Banks during the check kiting time frame. The Trustee pursues such relief under both federal and Florida law. 11 U.S.C. § 548 and Fla. Stat. § 726.105.[3] Transfers made with the "actual intent to hinder, delay, or defraud" creditors of the debtor may be recovered under both provisions. It is concerning this element of fraudulent transfer law that the Trustee sought from the Bankruptcy Court a partial declaration of judgment under Federal Rule of Civil Procedure 56(d).[4] Therefore, only this criterion supporting fraudulent transfer law is relevant to these proceedings.

A. Badges of Fraud

**\*5** Because of the difficulty in proving actual fraud, courts assessing fraudulent intent tend to look at "the totality of the circumstances and the badges of fraud surrounding the transfers." *Cuthill v. Greenmakr, LLC (In re World Vision Entertainment),* 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002). Although other factors may be considered, the following are common "badges of fraud" indicators:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*General Trading Inc. v. Yale Materials Handling Corp.,* 119 F.3d 1485, 1498 (11th Cir. 1997) (citing Fla. Stat. § 726.105(1) ). It is important for a court to consider the

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 16 of 71

In re Pacific Forest Products Corp., Not Reported in Fed. Supp. (2006)
2006 WL 8433477

badges in conjunction with the facts of the particular case. *Id.* at 1498. A court may infer fraud when several of the badges of fraud present themselves. *Id.*; *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1254 (1st Cir. 1991) (fraudulent intent is often inferred from the surrounding circumstances). However, given the subjective nature of intent, it is ordinarily inappropriate for a court to decide the issue on summary judgment. *Securities Investor Prot. Corp. v. Rossi (In re Cambridge Capital),* 331 B.R. 47, 58 (Bankr. E.D.N.Y. 2005).

To reiterate from my Order Granting Leave to Appeal, the Bankruptcy Court Order reached two legal conclusions: one, that a Ponzi scheme is equivalent to a check kiting scheme, and two, that a check kiting scheme evinces a *per se* intent to defraud by the debtor. The Bankruptcy Court did not weigh and evaluate the circumstances of Pacific Forest's banking transactions with an eye towards the badges of fraud before entering partial summary judgment. It would be inappropriate for me to conduct such a balancing act at this point. I will now address the soundness of the Bankruptcy Court's legal conclusions.

B. Ponzi Schemes

Ponzi is the name given to an investment strategy whereby initial investors are paid dividends from investment sums obtained from later investors. *Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.),* 309 F.3d 1325, 1327 n. 2 (11th Cir. 2002); *In re Taubman,* 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993).[5] The Eleventh Circuit defines a Ponzi scheme as:

> a pyramid-type investment scheme where investors are paid profits from newly attracted investors promised large returns on their principal investments. Typically it is not supported by any underlying business venture. An investor that does receive money is not receiving income on his or her investment, but merely a return of his or her own principal, or that of another investor. More and more investors are solicited in order that the investors at the top of the pyramd can be compensated. Usually the pyramid collapses, the majority of investors never receive any profits, losing their principal investment as well.

**\*6** *Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.),* 309 F.3d 1325, 1327 n. 2 (11th Cir. 2002). There is no underlying business venture in a Ponzi scheme; the scheme itself is a farce. *In re Taubman,* 160 B.R. at 978. As a result of its structure, a Ponzi scheme always ends in collapse, usually around the time when it can no longer attract new investors.

*Id.* at 983. The last investor to join the charade loses his money. *Id.*

Courts within this circuit have inferred fraudulent intent in cases involving Ponzi schemes. *See e.g., Cuthill v. Kime (In re Evergreen Sec.),* 319 B.R. 245, 253 (Bankr. M.D. Fla. 2003) ("[w]hen the existence of a Ponzi scheme is proven by the evidence a presumption of actual intent is applied.") (citations omitted). The rationale for inferring fraudulent intent derives from the structure of a Ponzi scheme, in that Ponzi schemers know from the beginning that future investors will not be paid. *In re Evergreen Sec.,* 319 B.R. at 253. Therefore, a Ponzi scheme is, by its nature, fraudulent. *In re World Vision Entm't,* 275 B.R. at 656; *Merrill,* 77 B.R. at 860 (inferring intent to defraud from the fact that the debtor ran a Ponzi scheme); *Liberatore v. 21st Century Satellite Commc'ns, Inc. (In re 21st Century Satellite Commc'ns, Inc.),* 28 B.R. 577, 584 (Bankr. M.D. Fla. 2002) (noting, in dicta, that Ponzi schemes are fraudulent *ab initio).* Every payment made to keep the scheme alive is made with fraudulent intent. *Id.* To summarize, a debtor's intent to "hinder, delay, defraud creditors is present when a transfer is made in furtherance of a Ponzi scheme." *In re Evergreen Sec.,* 319 B.R. at 253; *Terry v. June,* No. Civ.A. 3:03CV00052, 2006 WL 733965, at \*4 (W.D. Va. Mar. 17, 2006) ("a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them."). Where there is a Ponzi scheme unsupported by a legitimate business, the trustee gets the benefit of a presumption on the issue of actual intent to defraud. *Id.,* at \*5. In this way, Ponzi cases create an exception to the general rule that a debtor's intent presents a factual question. *Merrill,* 77 B.R. at 860 (stating, in the context of a proven Ponzi scheme, that although "the question of the debtors' intent would ordinarily present a factual question, we conclude that, from the undisputed evidence in the record, only one inference is possible-namely, that the debtors had the intent to hinder, delay or defraud creditors.").

**\*7** The Trustee analogizes Pacific Forest's questionable banking transactions to a Ponzi scheme. More specifically, the Trustee contends that Pacific Forest's operation of a check kite compels an inference that it intended to defraud creditors in the same way that an inference of intent to defraud arises in the Ponzi setting. The Trustee also argues that the underlying, undisputed facts in this case support a number of the badges of fraud and thereby demonstrate actual intent to defraud. Even if I decline to infer actual intent to defraud from Pacific Forest's check kiting activities, according to the Trustee, I may still affirm the Bankruptcy Court's entry of partial summary

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 17 of 71

In re Pacific Forest Products Corp., Not Reported in Fed. Supp. (2006)
2006 WL 8433477

judgment given the facts in the record. I reserve discussion on this latter point until the end of this opinion.

C. Check Kiting Cases

A check kiting scheme is somewhat more difficult to identify than a Ponzi scheme. The Sixth Circuit provides this succinct description of check kiting:

> [c]heck kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the kiter covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the "float" time, an artificial balance is created.

*U.S. v. Stone,* 954 F.2d 1187, 1188 n. 1 (6th Cir. 1992); *Howell v. Bank of Newman (In re Summit Fin. Servs., Inc.),* 240 B.R. 105, 109 (N.D. Ga. 1999) (citing *Stone).* Banks assume the risk of check kiting when they extend provisional credit to their customers on uncollected deposits. *Howell,* 240 B.R. at 109. They bear this risk in order to remain competitive in the market for deposits. *Id.*

The death knell for a check kiting scheme sounds when a bank discovers the kite and refuses to honor a check. As SunTrust acknowledges, when an entity orchestrating a check kite goes into bankruptcy and the automatic stay goes into effect, those with the largest overdrafts face the most dire situation. The bankruptcy trustee may try to recover the unauthorized loans created by the "float time" as fraudulent transfers.

The question for me to decide is whether the Bankruptcy Court erred in determining that a scheme to kite checks is equivalent to a Ponzi scheme. At least one court characterizes a check kite as a form of Ponzi scheme. *McLemore v. Third Nat'l Bank in Nashville* (In re Montgomery), 123 B.R. 801, 815 (Bankr. M.D. Tenn., 1991), aff'd, 136 B.R. 727 (M.D. Tenn. 1992), aff'd, 983 F.2d 1389 (6th Cir. 1993).[6] However, SunTrust points out a number of features that distinguish check kiting from a Ponzi scheme.

First, it is possible for a check kite to operate alongside a legitimate business. A Ponzi scheme, but its very definition, is an illicit operation from the outset. Its structure generates revenues through the untoward pillaging of new investors for the benefit of old ones. There is no foundation for future growth, and the only possible outcome is complete collapse.

Such fraudulent intent does not necessarily exist in the check kiter's mind. Instead, a check kiter may intend to repay money used to create "float" for its purposes. This is a fundamental distinction because the reasoning behind a presumption of fraudulent intent in the case of a Ponzi scheme rests in large part on the operator's knowledge of the scheme's inevitable demise. While a check kite's operator may very well harbor an intent to defraud, it is not necessarily a foregone conclusion that it bears such intent.

**\*8** If a check kite is unsupported by a legitimate interest, then it may in fact constitute a Ponzi scheme. That is not an issue that I will decide today. For one thing, whether Pacific Forest operated a legitimate business is a disputed issue of fact. More importantly, my review of the Bankruptcy Court Order is limited to the legal issues identified in my Order Granting Leave to Appeal.

Second, unlike in the Ponzi setting where the timing of transfers is irrelevant given the schemer's evil intent from the beginning, timing may play a significant role in a check kiting operation. In *Barber v. Union Nat'l Bank of Macomb (In re KZK Livestock, Inc.),* 190 B.R. 626, 627 (Bankr. C.D. Ill. 1996), the trustee brought an avoidance action against the defendant, who had loaned money to the debtor. The debtor's principal operated a check kiting scheme, and he eventually pled guilty to check kiting charges. *Id.* at 627-28. The trustee argued in a motion for summary judgment that the debtor's principal's plea established *prima facie* evidence of the debtor's intent to "hinder, delay or defraud the Debtor's creditors." *Id.* at 628. The bankruptcy court rejected the trustee's argument, and ultimately denied summary judgment because there was a fact dispute about whether the transfers at issue were made after the debtor could no longer cover the checks. *Id.* at 630. "While it may be true that check kiting is commonly found to be fraudulent conduct, such a determination was neither made nor was it essential to the finding of liability, and is an issue of fact which has yet to be determined." *Id.* at 631. As I established above, Ponzi schemes are run with actual intent to defraud because of the knowledge of inevitable failure from the outset. By contrast, an individual who kites checks may not act with the requisite intent to defraud if, for example, he remains financially able to promptly cover overdrafts. For purposes of this Order, I have no need to resolve the issue of whether Pacific Forest was capable of covering overdrafts when they arose. It is the mere possibility that a check kiter may not intend to defraud its creditors that threatens the validity of the Bankruptcy

2006 WL 8433477

Court's announced presumption of fraudulent intent in all cases involving check kites.

Third, while a check kite may operate as a fraud against a particular bank, it does not necessarily defraud the debtor's "creditors." *Id.* at 629. By contrast, a Ponzi scheme is a farce at its core, and therefore fraudulent vis-a-vis each and every one of the debtor's creditors, who happen to be the investors.[7] Because a check kite and a Ponzi scheme are not synonymous for all of the reasons given, I cannot import the presumption of fraudulent intent from the Ponzi context into this case. Nevertheless, I will independently consider whether it is appropriate to infer fraudulent intent where a check kite exists.

**\*9** A district court from Massachusetts addressed this precise question in *Marine Midland Bank v. Drayer (In re Drayer),* 29 B.R. 831, 834 (D. Mass. 1983).[8] A state court had entered judgment against the debtor for overdrafts in his account with the plaintiff. *Id.* In the debtor's bankruptcy case, the bank moved for summary judgment on grounds that the previous judgment against the debtor was nondischargeable under Section 523(a)(2) and (4) of the Bankruptcy Code, the sections touching on debts incurred through fraud or false pretenses. *Id.* at 832. Although the judge in the prior case stated that the debtor "was involved in a 'check kiting scheme,' " the bankruptcy court characterized that finding as merely "the action of the debtor in writing checks in very large amounts, depositing that check with another bank and then writing a check against that deposit before the first check has cleared; it is not a finding of fraudulent intent to deceive or the making of a false statement." *Id.* at 834.[9]

Assuming for purposes of this Order that a check kite exists in this case to the extent that it did in *Drayer,* I cannot conclude, *as a matter of law,* that Pacific Forest had the actual intent to defraud, hinder, or delay payment to its creditors. *Sailstad v. Hendrickson (In re Clemente),* 15 B.R. 937, 942 (N.D. Ohio 1981) (holding that the mere use of uncollected funds fails to demonstrate, *per se,* an intent to defraud because "a reasonable expectation of repayment would in many cases tend to negative the issue of intent."). That is because I accept the rationale in *Drayer,* that evidence of check kiting activities, such as writing checks against an account bearing insufficient funds, does not mandate a finding that the check writer acted with fraudulent intent.

Finally, I address the Trustee's contention that the factual record conclusively establishes that Pacific Forest actually intended to defraud its creditors. As the Trustee put it, I should affirm the Bankruptcy Court's ruling because even if "it is improper to invoke a 'per se' rule, the bankruptcy court made detailed and specific findings which mandate the conclusion that the use of a check kiting scheme in this case was clear and unrebutted indicia of actual intent to hinder, delay or defraud creditors." I disagree with the Trustee's characterization of the Bankruptcy Court's ruling.

Despite any possible grounds the Trustee may have brought to the Bankruptcy Court's attention in support of summary judgment, the Bankruptcy Court Order relied upon purely legal principles in entering partial summary judgment. Indeed, virtually all of the record material mentioned in the Trustee's response brief was specifically ignored by the Bankruptcy Court in its legal analysis. Further, the Bankruptcy Court specifically rejected the argument that "depending on the facts and circumstances, a check kiting scheme may not be fraudulent." The Trustee's earnest attempt to introduce this material to this Court is not well-taken. In fact, had the Bankruptcy Court granted summary judgment on those facts and circumstances, then I would have had no choice but to deny interlocutory review. *McFarlin v. Conseco Servs., LLC,* 381 F.3d 1251, 1258, 60-62 (11th Cir. 2004) (finding that because the district court denied summary judgment after applying the facts to the law, the movant could not prove a "controlling question of law") (quoting *Ahrenholz v. Bd. of Tr. of the Univ. of IL,* 219 F.3d 674, 677 (7th Cir. 2000) ); *California Pub. Employees' Ret. Sys. v. WorldCom, Inc.,* 368 F.3d 86, 96 (2d Cir. 2004), cert. denied, 122 S. Ct. 862 (2005) (declining to review a secondary issue not certified for appeal because even though an appellate court may consider any issue raised by the appealed-from order, the secondary question was fact-based and therefore did not raise a "controlling question").

**\*10** All of this is made plain in my Order Granting Leave to Appeal. Naturally, a controlling question of law cannot be one that depends upon issues of fact. The Trustee's wholesale reliance upon record facts, whether in dispute or not, is misplaced. The questions that I approved for interlocutory review were purely legal ones, and I will not entertain the Trustee's fact-based arguments at this juncture. That is a function reserved for the fact-finder in the Bankruptcy case.

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that:

Case 1:20-cv-00292-JPW   Document 393-1   Filed 05/24/24   Page 19 of 71

In re Pacific Forest Products Corp., Not Reported in Fed. Supp. (2006)
2006 WL 8433477

1. I REVERSE the Bankruptcy Court Order, and REMAND this case to the Bankruptcy Court to conduct a full trial on the merits of the Trustee's claims, and Appellants' affirmative defenses, relevant to the fraudulent transfer counts.

2. All pending motions are DENIED AS MOOT.

3. This case is CLOSED.

**DONE AND ORDERED, IN CHAMBERS** in Miami, Florida this 23rd day of May, 2006.

**All Citations**

Not Reported in Fed. Supp., 2006 WL 8433477

## Footnotes

1 The Trustee alleges that Pacific Forest engaged in a number of other questionable banking transactions, including money laundering. I will not devote any portion of this Order to those facts as they are irrelevant to this case.

2 The Amended Complaint alleges additional claims against individual and corporate defendants, including several other banking institutions. These additional claims are irrelevant to these proceedings.

3 Section 548 of Title 11 provides that:

[t]he trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

Section 726.105(1) of the Florida Statutes states in similar fashion that:

[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 20 of 71

In re Pacific Forest Products Corp., Not Reported in Fed. Supp. (2006)

2006 WL 8433477

2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

The federal and Florida avoidance provisions are very similar. *Cuthill v. Greenmark (In re World Vision Entm't),* 275 B.R. 641, 655 (Bankr. M.D. Fla. 2002). The primary difference between the two statutes is that the Florida version allows a longer period of time to reach back for avoidable transfers. *Id.* For purposes of this Order, it is important to note that the two statutes are analyzed under the same legal standards. *Venice-Oxford Assocs. Ltd. P'ship v. Multifamily Mortgage Trust 1996-1, (In re Venice-Oxford Assocs. Ltd. P'ship),* 236 B.R. 820, 834 (Bankr. M.D. Fla. 1999).

4   Rule 56(d), made applicable to adversary proceedings through operation of Federal Rule of Bankruptcy Procedure 7056(d), provides that:

[i]f on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

5   The actual moniker "Ponzi" derives from the surname of a charlatan who created a vast investment empire in the earlier part of the last century. *Merrill v. Abbott (In re Independent Clearing House Co.),* 41 B.R. 985, 994 n. 12 (Bankr. D. Utah 1984), aff'd in part and rev'd in part, 62 B.R. 118 (D. Utah 1986). Charles Ponzi represented to investors that he could take advantage of differences in currency rates by purchasing postal reply coupons in countries with weak currencies and redeeming them in countries with strong currencies. *Id.* Ponzi did not invest his contributors' money as described, and his own net worth grew solely from money he obtained from investors. *Id.* After an involuntary petition in bankruptcy was filed against him, an audit revealed that Charles Ponzi had never engaged in a legitimate business. *Id.*

6   The *McLemore* court held that a bank had no ordinary course of business defense to transfers made during a preference period because the transfers were part of a check kiting scheme. *Id.* The court was skeptical of the fact that the bank pushed the debtor out during the preference period in an attempt to avoid the kite, thereby leaving the bank in a more favorable position than other creditors. *Id.*

7   SunTrust also distinguishes check kites from Ponzi schemes on the grounds that, in the criminal context, a Supreme Court case holds that not every independent action that resembles a check kite carries the requisite fraudulent intent to warrant a criminal penalty. *Williams v. U. S.,* 458 U.S. 279, 286, 102 S. Ct. 3088 (1982). The Court in *Williams* reversed the defendant's conviction for check kiting, holding that even though the lower court's decision "addressed itself only to check kiting, its ruling has wider implications: it means that any check, knowingly supported by insufficient funds, deposited in a federally insured bank could give rise to criminal liability, whether or not the drawer had an intent to defraud." *Id.* Since *Williams,* Congress has passed a law prohibiting the specific act of engaging in a scheme or artifice designed to defraud a financial institution. 18 U.S.C. § 1344. The Courts of Appeals are divided over whether the new statute encompasses bare check kiting schemes. *U.S. v. Stone,* 954 F.2d 1187, 1190 (6th Cir. 1992). I do not weigh in the issue of whether check kiting is a criminal act, and I do not rely on *Williams* as providing additional grounds for distinguishing Ponzi schemes from check kites.

8   In my Order Granting Leave to Appeal, I declined to apply *Drayer* for reasons that are not relevant to its employment here. In his response brief, the Trustee unsuccessfully attempts to distinguish *Drayer.* First, the Trustee emphasizes that the bank in *Drayer* pursued a judgment of nondischargeability under § 523, while the Trustee seeks to avoid transfers under § 548. Second, the Trustee points out that there was evidence in *Drayer* tending to suggest that the debtor believed he could cover the overdrafts. These distinctions are meaningless to me because I rely upon *Drayer* only for the proposition that acts resembling check kiting do not always demonstrate fraudulent intent, and not that, as a matter of fact, Pacific Forest did not intend to hinder, delay, or defraud its creditors.

9   Further, the debtor attempted to avoid summary judgment by submitting an affidavit in which he claimed that he believed he could cover the overdrafts, and that the bank was aware of, and consented to, the overdrafts. *Id.* at 834. The bankruptcy

**In re Pacific Forest Products Corp., Not Reported in Fed. Supp. (2006)**

2006 WL 8433477

court construed the debtor's affidavit in the light most favorable to him, which it was required to do. *Id.* Unable to reconcile the difference in facts, the bankruptcy court denied the plaintiff's motion for summary judgment. *Id.* I will not engage in this sort of review of the record for factual disputes because, as explained below, my review of the Bankruptcy Court Order is limited to two distinct legal issues.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 22 of 71

2016 WL 69904
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Lisa KOSTIK, Plaintiff

v.

ARS NATIONAL
SERVICES, INC., Defendant.

CIVIL ACTION NO. 3:14-CV-2466
|
Singed 01/05/2016

**MEMORANDUM**

William J. Nealon, United States District Judge

**\*1** Presently before the Court is Defendant's "Motion to Certify For Interlocutory Review," which seeks an order certifying this Court's July 22, 2015 Order for interlocutory review pursuant to 28 U.S.C. § 1292(b). (Doc. 13). The motion has been fully briefed, and is ripe for disposition. For the reasons set forth below, Defendant's motion will be denied.

**I. BACKGROUND**

On December 1, 2014, Plaintiff, Lisa Kostik, sued Defendant, ARS National Services, Inc., under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA"). (Doc. 1). Plaintiff alleges that Defendant violated section 1692f(8) of the FDCPA when it disclosed a barcode, which when electronically scanned would reveal Plaintiffs account number, on a debt collection envelope. (Id.). On March 31, 2015, Defendant filed a motion for judgment on the pleadings. (Doc. 8). Defendant argued that Plaintiff's claim should be dismissed because a debt collector's disclosure of a barcode embedded with the plaintiff's account number could not constitute a violation under section 1692f(8) of the FDCPA. (Doc. 9, pp. 12-24). The Court disagreed and denied Defendant's motion on July 22, 2015. (Docs. 11, 12). Defendant now moves to certify the July 22, 2015 Order for interlocutory review pursuant to 28 U.S.C. § 1292(b). (Docs. 13, 14).

**II. DISCUSSION**

Pursuant to section 1292(b):

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b). Thus, for a district court to certify a question of law to the Court of Appeals, the case must (1) involve a controlling question of law; (2) as to which there is substantial ground for a difference of opinion; and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b); Tristani ex rel, Karnes v. Richman. 652 F.3d 360, 365 (3d Cir. 2011); (Sakalas v. Wilkes-Barre Host). Co. 2012 U.S. Dist. LEXIS 146723, at \*2-3, 2012 WL 4849721 (M.D. Pa. 2012) (Mariani, J.) (citations omitted). "The decision to certify for interlocutory appeal rests with the district court, and the burden to demonstrate that certification is appropriate lies with the moving party." Weitzner v. Sanofi Pasteur. Inc.2014 U.S. Dist. LEXIS 62039, at \*3-4, 2014 WL 1786500 (M.D. Pa. 2014) (Caputo, J.) (citing Orson v. Miramax Film Corp. 867 F. Supp. 319, 320 (E.D. Pa. 1994)). "Further, a court should exercise its discretion mindful of the strong policy against piecemeal appeals." Eisenbereer v. Chesapeake Appalachia. LLC. 2010 U.S. Dist. LEXIS 44017, at \*11 (M.D. Pa. 2010) (Caputo, J.) (citing Link v. Mercedes-Benz of N. Am. 550 F.2d 860, 863 (3d Cir. 1977), cert, denied. 431 U.S. 933 (1977)). "Moreover, Section 1292(b) certification is appropriate only in exceptional circumstances." Weitzner. 2014 U.S. Dist. LEXIS 62039, at \*5, 2014 WL 1786500 (citing U.S. v. Nixon. 418 U.S. 683, 690 (1974)); Ford v. Lehigh Rest. Grp. Inc. 2014 U.S. Dist. LEXIS 108041, at \*4, 2014 WL 3867970 (M.D. Pa. 2014) (Munley, J.) ("The Third Circuit has further explained that 'Congress intended that section 1292(b) should be sparingly applied ....'") (quoting Milbert v. Bison Lab. Inc. 260 F.2d 431, 433 (3d Cir. 1958); and citing Sporck v. Peil. 759 F.2d 312, 315 n.4 (3d Cir. 1985)). Additionally, even if the movant has made a strong showing "under all three elements required under § 1292(b),

Case 1:20-cv-00292-JPW   Document 393-1   Filed 05/24/24   Page 23 of 71

kostik v. ARS National Services, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 69904

a district court may nonetheless deny interlocutory appeal [footnote omitted]_" Principal Life Ins. Co. v. DeRose. 2012 U.S. Dist. LEXIS 65743, at *3 (M.D. Pa. 2012) (Conner, J.).[1] Furthermore, "the court should not certify questions of relatively clear law merely because the losing party disagrees with the court's analysis." Knopick v. Downey. 963 F. Supp. 2d 378, 398 (M.D. Pa. 2013) (Rambo, J.) (citing Elec. Mobility Corp. v. Bourns Sensors/Controls. 87 F. Supp. 2d 394, 398 (D.N.J. 2000)).

**\*2** Here, the second factor in section 1292(b) is determinative, specifically whether there is substantial ground for difference of opinion as to the correctness of the Court's July 22, 2015 Memorandum and Order. "A substantial ground for difference of opinion exists when there is genuine doubt or conflicting precedent as to the correct legal standard." Sakalas. 2012 U.S. Dist. LEXIS 146723, at *4, 2012 WL 4849721 (citing P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp. 161 F. Supp. 2d 355, 360 (D.N.J. 2001)). Said differently, "[a] substantial ground for difference of opinion exists when controlling authority fails to resolve a pivotal matter." In re Chocolate Confectionary Antitrust Litigation. 607 F. Supp. 2d 701, 705-06 (M.D. Pa. 2009) (Conner, J.) (citing Knipe v. SmithKline Beecham. 583 F. Supp. 2d 553, 599 (E.D. Pa. 2008); EBC. Inc. v. Clark Bldg. Svs. 2008 U.S. Dist LEXIS 21018, 2008 WL 4922107 (W.D. Pa. 2008)). "The clearest evidence of 'substantial grounds for difference of opinion' is where 'there are conflicting interpretations from numerous courts.'" Knopick. 963 F. Supp. 2d at 398 (quoting Beazer E. Inc. v. The Mead Corp. 2006 U.S. Dist. LEXIS 74743, at *7, 2006 WL 2927627 (W.D. Pa. 2006)): see Weitzner. 2014 U.S. Dist. LEXIS 62039, at *6, 2014 WL 1786500 (finding a substantial ground for difference of opinion because, inter alia. "'[t]he Circuits are split on the question_'"). But see Freedom Med. Inc. v. Gillespie. 2013 U.S. Dist. LEXIS 103301, at *15, 2013 WL 3819366 (E.D. Pa. 2013) ("A circuit split between our Court of Appeals and the courts of appeals for other circuits does not make Third Circuit precedent any less binding and cannot be said to create a 'substantial ground for difference of opinion' when it comes to issues of law before this Court.").

Defendant claims that there are substantial grounds for difference of opinion as to whether the disclosure of a barcode allegedly embedded with plaintiff's account number on a debt collection envelope can constitute a violation of section 1692f(8). (Doc. 14, pp. 2-7); (Doc. 18, pp. 6-9). In support of this argument, Defendant directs the Court's attention to a number of district court decisions that have considered

section 1692f under the same or similar circumstances present sub judice. but found that the FDCPA had not been violated. (Doc. 14, pp. 2-7).

Defendant first cites to two (2) decisions from the United States District Court for the Eastern District of Pennsylvania. (Id at pp. 2-3). Specifically, Defendant directs the Court's attention to Waldron v. Professional Medical Management, 2013 WL 978933, 2013 U.S. Dist. LEXIS 34402 (E.D. Pa. 2013), and Douglass v. Convergent Outsourcing. 2013 U.S. Dist. LEXIS 110708, 2013 WL 3993595 (E.D. Pa. 2013) ("Douglass). rev'd. 765 F.3d 299 (3d Cir. 2014)". In Waldron. the district court granted summary judgment in favor of the defendant after finding that the defendant's disclosure of a quick response code embedded with the plaintiff's account number on a debt collection envelope did not violate the FDCPA. Waldron, at ——, 2013 U.S. Dist. LEXIS 34402, at *15. In Douglass I. the district court granted summary judgment in favor of the defendant after finding that the defendant's disclosure of the plaintiff's account number and a quick response code, which was embedded with the plaintiff's account number, on a debt collection envelope did not violate the FDCPA. Douglass I. 2013 U.S. Dist. LEXIS 110708, a t * 18, 20, 2013 WL 3993595.

While Defendant acknowledges that the decision in Douglass I was overturned by the United States Court of Appeals for the Third Circuit in Douglass v. Convergent Outsourcing. 765 F.3d 299 ("Douglass II").[2] it contends that the "narrow Third Circuit ruling in Douglass pertained only to circumstances where the account number itself is printed on an envelope without the protection of being stored in a code." (Doc. 14, p. 4) (citing Douglass II. 765 F.3d at 302). Thus, according to Defendant, the portions of the decisions in Waldron and Douglass I finding that a quick response code embedded with the plaintiff's account number did not violate the FDCPA remain valid and therefore, support a finding that substantial grounds for a difference of opinion exist as to this Court's July 22, 2015 Order. (Id. at pp. 2-4, 7).

**\*3** Defendant also cites to a number of district court decisions from outside the Third Circuit: Perez v. Global Credit and Collection Corp.:[3] Gelinas v. Retrieval–Masters Creditors Bureau. Inc.:[4] Gonzalez v. FMS. Inc.:[5] Davis v. MRS BPO. LLC:[6] and Sampson v. MRS BPO, LLC.[7] (Doc. 14, pp. 4-7). In Perez and Sampson, the respective district courts found that the disclosure of an account number on a debt collection envelope does not constitute a violation

2016 WL 69904

under section 1692f(8) of the FDCPA. Perez, at ——, —— – ——, 2015 U.S. Dist. LEXIS 98692, at *2,12-13; Sampson, 117 F.Supp.3d at ——; see also Gelinas,at ——, —— – ——, 2015 U.S. Dist. LEXIS 100470, at *2, 8-9 (held that displaying an "invoice number" on a debt collection envelope was not a violation of section 1692f(8)). In Davis, the United States District Court for the Northern District of Illinois held that the disclosure of a "sequence of over 60 letters and numbers" which "appeared on the envelope above Plaintiff's name and address" was not a violation of the FDCPA. Davis, at —— – ——, —— – ——, 2015 U.S. Dist. LEXIS 91726, a t * 1–2, 9–15. In Gonzalez, the United States District Court for the Northern District of Illinois held that the disclosure of an "eight-digit account number representing [the plaintiffs] debt assigned by [the defendant]" embedded within a "fifteen-digit number" was benign and thus, did not violate the FDCPA. Gonzalez, at ——, 2015 U.S. Dist. LEXIS 87660, at *17. Notably, in Perez. Davis. Gonzalez, and Gelinas. the Third Circuit's decision in Douglass II was considered as persuasive authority, but was either distinguished or rejected. See Perez, at ——, 2015 U.S. Dist. LEXIS 98692, at *9; Gelinas, at ——, 2015 U.S. Dist LEXIS 100470, at *8; Davis, at ——, 2015 U.S. Dist. LEXIS 91726, at *13; Gonzalez, at ——, 2015 U.S. Dist. LEXIS 87660, at *15.

While the aforementioned district court decisions from outside of the Third Circuit clearly establish that courts have either disagreed with or declined to follow the Third Circuit's reasoning in Douglass II. those cases fail to demonstrate that there is a substantial ground for difference of opinion as to the application of Douglass II within the Third Circuit. See Freedom Med., Inc.2013 U.S. Dist. LEXIS 103301, at *15, 2013 WL 3819366.

In regards to Defendant's reliance on Douglass I and Waldron, although the these cases were decided within the jurisdiction of the Third Circuit, and contradict the conclusion reach by this Court in its July 22, 2015 Memorandum and Order, they also fail to establish that there is a substantial ground for difference of opinion as to the application of Douglass II within the Third Circuit. Importantly, both cases pre-date the Third Circuit's decision in Douglass II. the authority upon which this Court relied in reaching its decision to deny Defendant's underlying motion. Thus, clearly, both cases were decided without the benefit of the Third Circuit's analysis and reasoning regarding what constitutes a violation of section 1692f(8) of the FDCPA.[8] Consequently, Douglass I and Waldron fail to sufficiently establish substantial grounds for a difference of opinion as to whether a debt collector's

disclosure of a barcode embedded with the plaintiff's account number can constitute a violation of section 1692f(8) subsequent to the Third Circuit's decision in Douglass II.

**\*4** Notably, Defendant has not cited to a decision from the Third Circuit that has applied Douglass II in a manner that conflicts with this Court's July 22, 2015 Memorandum and Order presently at issue. Rather, there have been number of decisions from within the jurisdiction of the Third Circuit that have applied Douglass II to circumstances similar to those sub judice and reached decisions consistent with this Court's July 22, 2015 Memorandum and Order. For example, in Park v. ARS National Services. Inc.[9] the plaintiff alleged a violation of section 1692f(8) of the FDCPA due to, inter alia, the debt collector defendant's disclosure of a barcode containing the plaintiffs account number on a debt collection envelope. Park. 2015 U.S. Dist. LEXIS 147171, at *2-4, 2015 WL 6579686. The defendant moved for judgment on the pleadings by arguing that the plaintiff's amended complaint failed to sufficiently state a claim under the FDCPA. Id. a t * 3. The district court denied the defendant's motion as a result of its "analysis of the FDCPA and the Third Circuit's Douglass opinion ...." Id. at * 13. Thus, Park supports the Court's conclusion that, subsequent to Douglass II. there are not sufficient grounds for a difference of opinion within the jurisdiction of the United States Court of Appeals for the Third Circuit as to whether a debt collector's disclosure of a barcode embedded with the plaintiff's account number can constitute a violation of section 1692f(8) of the FDCPA. Id. at *7-13; see also Berry v. ARS Nat'l Servs. Inc. 2015 U.S. Dist LEXIS 171043, at *8-11, 2015 WL 9461404 (E.D. Pa. Dec. 23, 2015); Pirrone. 2015 U.S. Dist. LEXIS 163747, at *5 n.l, 2015 WL 7766393; Link, 2015 U.S. Dist. LEXIS 164938, at *7-14, 2015 WL 8488674. adopted by, 2015 U.S. Dist. LEXIS 164263, at *3, 2015 WL 8271651.

Defendant contends that Park and Link,[10] while reaching the conclusion that disclosure of a barcode embedded with an account number violates the FDCPA under Douglass II. actually support the granting of its instant motion. (Doc. 28). Defendant states that Park and Link "specifically discussed the importance of the Third Circuit ruling on this issue." (Id. at pp. 1-2). Thus, Defendant essentially argues that Park and Link provide further support for its earlier contention that "[t]he only appellate opinion touching this question (Douglass [II]) does not extend itself to the factual circumstances of this case and requires immediate, further exposition by the United States Court of Appeals for the Third Circuit." (Doc. 14, p. 7); see (Doc. 28, p. 1) (Park and Link

kostik v. ARS National Services, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 69904

"support [Defendant's] position that the Third Circuit should finally have the opportunity to clarify its holding in [Douglass II] and explain whether a barcode should be analyzed under a different standard than an account number."). However, merely because the Third Circuit has not addressed a factual scenario does not necessarily lead to the conclusion that there is an absence of controlling law. See United States ex rel. Nevyas v. Allergan. Inc. 2015 U.S. Dist. LEXIS 86243, at *7, 2015 WL 4064629 (E.D. Pa. July 2, 2015).

Even if it was determined that there was a lack of controlling law as to the issue presented, while the fact that the Third Circuit has yet to directly address an issue weighs in favor of certification, it is "far different from demonstrating that grounds for a substantial difference of opinion exists ...." Pappa v. Unum Life Ins. Co. of Am. 2008 U.S. Dist. LEXIS 39560, at *4, 2008 WL 2048664 (M.D. Pa. 2008) (Caputo, J.); see Smith v. Conseco Life Ins. Co. 2014 U.S. Dist. LEXIS 149323, at *4, 2014 WL 5361746 (D.N.J. 2014) ("not all matters of first impression produce genuine doubt as to the correct legal standard."); In re Chocolate Confectionary Antitrust Litigation. 607 F. Supp. 2d at 706 (lack of binding precedent supports certification) (citing Knipe. 583 F. Supp. 2d at 600; Morgan v. Ford Motor Co.2007 U.S. Dist. LEXIS 5455, at *23-34, 2007 WL 269806 (D.N.J. 2007); Chase Manhattan Bank v. Iridium Africa Corp. 324 F. Supp. 2d 540, 545 (D. Del. 2004)). "[T]he fact that this case may involve an issue of first impression does not warrant certification pursuant to § 1292(b)." Larsen v. Senate of Pa., 965 F. Supp. 607, 609 (M.D. Pa. 1997) (Rambo, J.). "If questions of first impression alone were sufficient to warrant certification for an immediate appeal, our Court of Appeals would be besieged with piecemeal interlocutory appeals." Shaup v. Frederickson. 1998 U.S. Dist LEXIS 18532, 1998 WL 800321 (E.D. Pa. 1998).

**\*5** Consequently, based on the foregoing, Defendant has not sufficiently demonstrated that there is a substantial ground for a difference of opinion within the Third Circuit as to the application of Douglass II to circumstances similar to those sub judice. As a result, the Court will deny Defendant's motion.

### III. CONCLUSION

Based on the foregoing, Defendant's "Motion to Certify For Interlocutory Review," which seeks an order certifying this Court's July 22, 2015 Order for interlocutory review pursuant to 28 U.S.C. § 1292(b), (Doc. 13), will be denied. A separate Order will be issued.

### All Citations

Not Reported in Fed. Supp., 2016 WL 69904

---

Footnotes

1    Plaintiff initially argues that Defendant's instant motion is untimely. (Doc. 16, pp. 3-5). However, that argument is unavailing because a district court may amend and certify an order for interlocutory appeal at any time. A.S. ex rel. Miller v. SmithKline Beecham Corp. 2013 U.S. Dist. LEXIS 173975, at *9-10 n.4, 2013 WL 6506570 (M.D. Pa. 2013) (Conner, J.) (citing Kenworthy v. Hargrove. 826 F. Supp. 138, 140 (E.D. Pa. 1993)).

2    The Third Circuit reversed the district court's grant of summary judgment in favor of the defendant as to the disclosure of the plaintiff's account number on a debt collection envelope. Douglass II. 765 F.3d at 306. The Third Circuit did not reach the district court's decision regarding the quick response code at issue. Id. at 301 n.4.

3    2015 WL 4557064, 2015 U.S. Dist. LEXIS 98692 (S.D.N.Y. July 27, 2015).

4    2015 WL 4639949, 2015 U.S. Dist. LEXIS 100470 (W.D.N.Y. July 22, 2015).

5    2015 WL 4100292, 2015 U.S. Dist. LEXIS 87660 (N.D. Ill. July 6, 2015).

6    2015 WL 4326900, 2015 U.S. Dist. LEXIS 91726 (N.D. Ill. July 15, 2015).

7    117 F.Supp.3d 1032 (N.D.Ill.2015).

8    Furthermore, the United States District Court for the Eastern District of Pennsylvania has recently addressed whether a violation of the FDCPA occurred when the defendant sent "debt collection letters in envelopes that display[ed] through a glassine window a 'quick response' ('QR') code that, when read or scanned, reveal[ed] the account number of the

2016 WL 69904

alleged debt that the Defendant assign[ed] to the consumer and his/her account." <u>Pirrone v. NCO Fin. Sys.,</u> 2015 U.S. Dist. LEXIS 163747, at *1 n.l, 2015 WL 7766393 (E.D. Pa. Nov. 30, 2015). The district court, in reaching its decision to deny the defendant's motion for judgment on the pleadings, stated that "even if the Court were to adopt a 'benign symbol' exception, a QR Code is not benign because it contains 'a core piece of information pertaining to the plaintiffs status as a debtor' and if disclosed to the public, 'could be used to expose [the plaintiff's] financial predicament.'" <u>Id.</u> at *5 n.l (emphasis and alterations in original) (quoting <u>Douglass II.</u> 765 F.3d at 303; citing <u>Park v. ARS Nat'l Servs. Inc.,</u> 2015 U.S. Dist. LEXIS 147171, 2015 WL 6579686 (D.N.J. Oct. 30, 2015); <u>Kostik v. ARS Nat'l Servs., Inc.,</u> 2015 U.S. Dist. LEXIS 2015 U.S. Dist. LEXIS 95230, 2015 WL 4478765; <u>Styer v. Prof 1 Med. Mgmt.</u>2015 U.S. Dist. LEXIS 92349, 2015 WL 4394032 (M.D. Pa. July 15, 2015) (Nealon, J.)). As a result, the district court concluded that "construing the facts alleged in the light most favorable to Plaintiff, the Court sees no principled basis to depart from the Third Circuit's decision in <u>Douglass [II]</u>." <u>Id.</u>

9   On November 2, 2015, Plaintiff filed a "Notice of Supplemental Authority Related to Defendant's Motion to Certify for Interlocutory Review." (Doc. 20). Plaintiff indicates that <u>Park</u> and <u>Link v. ARS National Services. Inc.</u> 2015 U.S. Dist. LEXIS 164938, 2015 WL 8488674 (W.D. Pa. Nov. 2, 2015), <u>adopted</u> by. 2015 U.S. Dist. LEXIS 164263, 2015 WL 8271651 (W.D. Pa. Dec. 8, 2015), "followed this Court's decision denying Defendant's motion for judgment on the pleadings." (Doc. 20, p. 1).

10  In <u>Link</u>. United States Magistrate Judge Robert C. Mitchell issued a report recommending that the defendant's motion for judgment on the pleadings, which argued that a barcode embedded with the plaintiff's account number did not violate the FDCPA, be denied. <u>Link,</u> 2015 U.S. Dist. LEXIS 164938, at *7-14, 2015 WL 8488674; see <u>Link v. ARS Nat'l Servs. Inc.</u> 2015 U.S. Dist. LEXIS 164263, at *1, 2015 WL 8271651 (W.D. Pa. Dec. 8, 2015). On December 8, 2015, Magistrate Judge Mitchell's report and recommendation was adopted by the United States District Court for the Western District of Pennsylvania and thus, the defendant's motion for judgment on the pleadings was denied. <u>Link,</u> 2015 U.S. Dist. LEXIS 164263, at *3, 2015 WL 8271651.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW   Document 393-1   Filed 05/24/24   Page 27 of 71

McCoy v. Favata, Not Reported in Fed. Supp. (2020)
2020 WL 5891898

2020 WL 5891898
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Isaiah W. MCCOY, Plaintiff,

v.

R. David FAVATA, et al., Defendants.

C.A. No. 17-1046 (MN)
|
Signed 10/05/2020

**Attorneys and Law Firms**

Herbert W. Mondros, Margolis Edelstein, Wilmington, DE – attorneys for Plaintiff.

Aaron R. Goldstein, Joseph C. Handlon, Stephen M. Ferguson, Deputy Attorneys General, State of Delaware Department of Justice, Wilmington, DE – attorneys for Defendants Matthew Denn, Gregory Babowal, Stephen Smith, and Deborah Weaver.

George T. Lees, III, Deputy Attorney General, State of Delaware Department of Justice, Wilmington, DE – attorney for Defendants Robert M. Coupe, Nathaniel McQueen, Jr., and Mark Ryde.

Shawn E. Martyniak, Deputy Attorney General, State of Delaware Department of Justice, Wilmington, DE – attorney for Robert M. Coupe, David Pierce, Marcello Rispoli, Todd Drace, and George Gill.

Scott G. Wilcox, Moore and Rutt, P.A., Wilmington, DE – Attorneys for Defendant Anthony DiGirolomo.

**MEMORANDUM OPINION**

NOREIKA, U.S. DISTRICT JUDGE:

**\*1** Before the Court is Plaintiff Isaiah McCoy's ("Plaintiff" or "McCoy") "Motion for Leave to Certify Order for Interlocutory Appeal." (D.I. 10). Defendants Matthew Denn, Gregory Babowal, Stephen Smith, and Deborah Weaver ("Prosecutor Defendants"), Defendants Robert Coupe, Nathaniel McQueen, Jr. and Mark Ryde ("DSP Defendants") and Defendant Anthony DiGirolomo opposed the motion (D.I. 107; D.I. 108; D.I. 110). Defendants,

Robert M. Coupe (in his capacity as Commissioner of the Department of Corrections) and David Pierce joined in the oppositions filed by the Prosecutor Defendants and the DSP Defendants. (D.I. 109). Defendants Todd Drace, George Gill, and Marcello Rispoli "take no position on the Plaintiff's Motion." (*Id.*). For the reasons stated below, Plaintiff's motion is DENIED.

**I. BACKGROUND**

As set out in the Court's earlier opinions, this case stems from the investigation, prosecution, conviction, and incarceration of Plaintiff for the May 4, 2010 murder of James Munford. (D.I. 66 ¶¶ 1-17). On July 6, 2010, Plaintiff was indicted for the murder of Munford. *See State v. McCoy*, No. 1005008059A, 2012 WL 5552033, at \*1 (Del. Super. Ct. Oct. 11, 2012). His first trial was prosecuted by former Defendant R. David Favata and Weaver. (D.I. 66 ¶¶ 38, 48). During that trial, Plaintiff represented himself *pro se* with the aid of stand-by counsel. (*See, e.g., id.* ¶¶ 199, 208). On June 29, 2012, the jury returned a guilty verdict against Plaintiff for the murder. (*Id.* ¶ 193). On October 11, 2012, the court sentenced Plaintiff to death. (*Id.* ¶ 196).

Thereafter, Plaintiff filed for post-conviction relief and, on January 20, 2015, the Delaware Supreme Court reversed his conviction and remanded the case for a new trial. (*Id.* ¶ 214). Explaining the reversal, the Delaware Supreme Court noted that the trial court had committed a "reverse-*Batson*" error and Favata had engaged in a number of improper actions during the prosecution. *See generally McCoy v. State*, 112 A.3d 239 (Del. 2015). The Delaware Supreme Court also found that, "[a]lthough there was no physical evidence linking McCoy to the crime, the record does not support McCoy's argument that the evidence was insufficient to convict him." *Id.* at 268.

Plaintiff's second trial began on January 9, 2017. (D.I. 66 ¶ 253). The second trial was prosecuted by Defendants Babowal and Smith. (*Id.* ¶¶ 53-59). McCoy was represented by counsel. (*Id.* ¶ 248). On January 19, 2017, he was found not guilty of the murder and released from prison. (*Id.* ¶¶ 255, 258).

On July 28, 2017, Plaintiff filed this lawsuit. (D.I. 1 ("Original Complaint")). The Original Complaint included seven counts raising theories of liability under federal and state law against twelve defendants. (*Id.*). On March 29, 2019, this Court granted motions to dismiss filed by the DSP Defendants, the DOC Defendants, and the Prosecutor Defendants, dismissing

**McCoy v. Favata, Not Reported in Fed. Supp. (2020)**

2020 WL 5891898

all claims against those parties without prejudice. (D.I. 64 ("First Opinion"); D.I. 65).

On April 22, 2019, Plaintiff filed an amended complaint. (D.I. 66 ("Amended Complaint")). The Amended Complaint included fourteen counts and added a defendant, Anthony DiGirolomo. (*Id.*). On April 21, 2020, the Court dismissed Plaintiff's claims against the DSP Defendants, the Prosecutor Defendants, Defendant DiGirolomo, and Defendants Coupe and Pierce. (D.I. 100; D.I. 101). The Court, however, allowed Plaintiff's claims against Defendants Rispoli, Drace, and Gill to proceed. Plaintiff's current motion seeks leave to appeal the Court's dismissal of his claims.

## II. LEGAL STANDARDS

**\*2**  "The decision of whether to grant leave to file an interlocutory appeal is 'informed by the criteria set forth in 28 U.S.C. § 1292(b).' " *Chase Bank USA, N.A. v. Hess*, No. 08-121 (LPS), 2011 WL 4459604, at \*1 (D. Del. Sept. 26, 2011) (quoting *In re Philadelphia Newspapers, LLC*, 418 B.R. 548, 556 (E.D. Pa. 2009)). Under § 1292(b), an interlocutory appeal is permitted only when the order at issue (1) involves a controlling question of law upon which there is (2) substantial grounds for a difference of opinion as to its correctness, and (3) if appealed immediately may materially advance the ultimate termination of the litigation. *Id. (citing* 28 U.S.C. § 1292(b) and *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974)). "[T]hese three criteria[, however,] do not limit the Court's discretion to grant or deny an interlocutory appeal." *In re SemCrude L.P.*, 407 B.R. 553, 557 (D. Del. 2009). Leave to file an interlocutory appeal may be denied for "entirely unrelated reasons such as the state of the appellate docket or the desire to have a full record before considering the disputed legal issue." *Katz*, 496 F.2d at 754.

An interlocutory appeal under § 1292(b) is appropriate only when the party seeking leave to appeal "establishes [that] exceptional circumstances justify a departure from the basic policy of postponing review until after the entry of final judgment." *In re Del. and Hudson Ry. Co.*, 96 B.R. 469, 472–73 (D. Del. 1989), *aff'd*, 884 F.2d 1383 (3d Cir. 1989). "In part, this stems from the fact that '[p]iecemeal litigation is generally disfavored by the Third Circuit.' " *Chase Bank*, 2011 WL 4459504 at \*1 (quoting *In re SemCrude*, Bank. No. 08–11525 (BLS), 2010 WL 4537921, at \*2 (D. Del. Oct. 26, 2010).

## III. DISCUSSION

### A. Controlling Question of Law

For the purpose of certifying an interlocutory appeal, a "controlling question of law" is "one which would result in a reversal of a judgment after final hearing." *Katz,* 496 F.2d at 47. "An order involves a 'controlling question of law' when it concerns a question of law, as opposed to one of fact or a mixed question of law and fact.' " *See In re Maxus Energy Corp.*, 611 B.R. 532, 540 (D. Del. Dec. 19, 2019) (quoting *Mata v. Eclipse Aerospace, Inc. (In re AE Liquidation, Inc.)*, 451 B.R. 343, 347-48 (D. Del. 2011)). In his motion, Plaintiff states in conclusory fashion that "[t]his case presents a controlling question of law both because the Court's Order dismissing the case against all defendants except Defendants Rispoli, Drace and Gill would constitute reversible error if presented on final appeal, and because the question is 'serious to the conduct of the litigation' practically, and legally." (D.I. 102 at 6). Plaintiff then goes on to point to six areas where Plaintiff suggests the Court erred.[1]

In doing so, however, Plaintiff does not identify which of the legal standard or standards the Court applied, based on precedent from the United States Supreme Court and the Third Circuit, Plaintiff contends is in doubt. Indeed, Plaintiff identifies no "genuine disagreement as to the correct legal standard" or how the Court's determination is not "consistent with well established Third Circuit law." *See Maxus Energy,* 611 B.R. at 546. Instead, his complaints appear to be directed to the Court's application of the facts of his case to the law. That, however, is not the standard for certification under § 1292(b). *See Premick v. Dick's Sporting Goods, Inc.*, No. 02:06-530, 2007 WL 588992, at \*2 (W.D. Pa. Feb. 20, 2007) ("questions about a court's application of the facts of the case to the established legal standards are not controlling questions of law for purposes of section 1292(b)"). Therefore, the Court is not persuaded that Plaintiff has raised a controlling question of law.

### B. Other Considerations

**\*3**  In light of the Court's conclusion that Plaintiff has not raised a controlling question of law, it is not necessary to determine whether there are substantial grounds for a difference of opinion and whether an immediate appeal would materially advance the termination of the litigation. The Court does note, however, that Plaintiff has failed to present exceptional circumstances justifying the need for immediate review. *See DeLalla v. Hanover Ins.,* No. 09–

Case 1:20-cv-00292-JPW   Document 393-1   Filed 05/24/24   Page 29 of 71

McCoy v. Favata, Not Reported in Fed. Supp. (2020)

2020 WL 5891898

2340 (RBK/JS), 2010 WL 3908597, at *3 (D.N.J. Sept. 30, 2010) ("Interlocutory appeal is meant to be used sparingly and only in exceptional cases where the interests cutting in favor of immediate appeal overcome the presumption against piecemeal litigation."). The Court does not find any "circumstance or reason that distinguishes the case from the procedural norm and establishes the need for immediate review." *In re Magic Rests., Inc.,* 202 B.R. 24, 26–27 (D. Del. 1996). Thus, the Court concludes that an interlocutory review of its April 21, 2020 Memorandum Opinion and Order (D.I. 100; D.I. 101) is not warranted.

**IV. CONCLUSION**

For the foregoing reasons, Plaintiff's motion for leave to certify the Court's order for interlocutory appeal (D.I. 102) is denied. An appropriate order will follow.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5891898

---

Footnotes

1    Specifically, Plaintiff states that "if the Third Circuit disagrees with this Court's holdings that i) there was probable cause to arrest Plaintiff notwithstanding the defects in the affidavit of probable cause; ii) the defendants are protected by absolute immunity; iii) Plaintiff has failed to plead an underlying constitutional violation by Defendant Ryde; iv) Plaintiff has failed to plead a claim of inadequate supervision and training against Defendants Coupe and McQueen, or a civil conspiracy claim against Defendants Coupe Ryde and McQueen; v) Plaintiff's claims against Defendant DiGirolamo are barred by the statute of limitations; and vi) Plaintiff has not stated a constitutional claim against Defendants Denn or Weaver, then the Order would be reversed." (D.I. 102 at 6).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 30 of 71
Rittenhouse Entertainment, Inc. v. City of Wilkes-Barre, Not Reported in Fed. Supp. (2021)
2021 WL 3511122

2021 WL 3511122
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

RITTENHOUSE ENTERTAINMENT,

INC., et al., Plaintiffs,

v.

CITY OF WILKES-

BARRE, et al., Defendants.

Civil No. 3:11-CV-00617
|
Signed 08/10/2021

**Attorneys and Law Firms**

Cletus P. Lyman, Michael S. Fettner, Lyman & Ash, Philadelphia, PA, Harry Kresky, Pro Hac Vice, New York, NY, Megan P. Maguire, Robert M. Cohen, Kingston, PA, for Plaintiffs Rittenhouse Entertainment, Inc., The Mines, Inc., G Net Comm. Co., Phoenix Estates, Thomas J. Greco.

Donald H. Brobst, Robert L. Gawlas, Thomas J. Campenni, Rosenn, Jenkins & Greenwald, LLP, Wilkes-Barre, PA, James C. Oschal, Rosenn, Jenkins & Greenwald, Wilkes Barre, PA, for Defendant City of Wilkes-Barre.

Donald H. Brobst, Thomas J. Campenni, Rosenn, Jenkins & Greenwald, LLP, Wilkes-Barre, PA, James C. Oschal, Rosenn, Jenkins & Greenwald, Wilkes Barre, PA, for Defendants Thomas Leighton, Gerald Dessoye, Tony Thomas, Jr., Kathy Kane, Willam Barrett, Rick Cronauer, Michael Merritt.

Deborah H. Simon, Elliott, Greenleaf & Siedzikowski, Blue Bell, PA, Joel M. Wolff, Wolff Law, PC, Dunmore, PA, John G. Dean, Elliott Greenleaf & Dean, Scranton, PA, for Defendants Luzerne County, Michael Savokinas.

David L. Schwalm, Thomas, Thomas & Hafer, LLP, Harrisburg, PA, Jillian M. Denicola, Ryan C. Blazure, Thomas, Thomas & Hafer, LLP, Wilkes-Barre, PA, for Defendants King's College, Robert McGonigle.

David L. Schwalm, Thomas, Thomas & Hafer, LLP, Harrisburg, PA, David J. Selingo, Law Offices of David J. Selingo, Kingston, PA, Jillian M. Denicola, Ryan C. Blazure, Thomas, Thomas & Hafer, LLP, Wilkes-Barre, PA, for Defendant Father Thomas J. O'Hara.

David L. Schwalm, Thomas, Thomas & Hafer, LLP, Harrisburg, PA, Jillian M. Denicola, Thomas, Thomas & Hafer, LLP, Wilkes-Barre, PA, for Defendants Paul Lindenmuth, John McAndrew.

**MEMORANDUM**

JENNIFER P. WILSON, United States District Court Judge

**\*1** This is a civil rights case that was recently remanded from the United States Court of Appeals with instructions to consider whether Defendants were entitled to summary judgment on the basis of qualified immunity and whether Defendants were entitled to summary judgment as to Plaintiffs' tortious interference with a contract claim. Following the remand, the court granted the Defendants summary judgment in part and denied it in part. All parties have moved for partial reconsideration of the court's order. (Docs. 240, 242, 244.) The motions for reconsideration are fully briefed and ripe for the court's review. For the reasons that follow, Defendants' motions for reconsideration are denied and Plaintiffs' motion for reconsideration is granted in part and denied in part.

**Background and Procedural History**[1]

Plaintiffs filed their amended complaint, which remains the operative pleading in this case, on April 6, 2012, raising several federal and state claims. (Doc. 36.) The court granted Defendants' motions to dismiss in part and denied them in part on June 4, 2012. (Docs. 59–60.) All three groups of Defendants moved for summary judgment following the close of fact discovery. (Docs. 135, 138, 141.) The court granted summary judgment as to all remaining federal claims on August 8, 2018, and declined to exercise supplemental jurisdiction over the remaining state law claims. (Docs. 201–02.) Plaintiffs appealed. (Doc. 203.)

On appeal, the Third Circuit vacated and remanded in part and affirmed in part. *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 782 F. App'x 148, 150 (3d Cir. 2019). The Third Circuit found that summary judgment was inappropriate as to the claims raised in Counts I, II, and III against the City and College Defendants and accordingly vacated and remanded for further proceedings on those claims. *Id.* at 153–54. The Third Circuit affirmed the grant of summary judgment as to

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 31 of 71

Rittenhouse Entertainment, Inc. v. City of Wilkes-Barre, Not Reported in Fed. Supp. (2021)

2021 WL 3511122

all claims raised against the County Defendants and all claims raised in Counts IV and VI. *Id.* at 155–56. Because the Third Circuit vacated and remanded as to some of Plaintiffs' federal claims, the court additionally vacated the court's decision to decline to exercise supplemental jurisdiction over the tortious interference claim and remanded for further proceedings on that claim. *Id.* at 156 n.6.

Following remand from the Third Circuit and court-ordered supplemental briefing on the issues of qualified immunity and tortious interference, the court issued a memorandum and order on May 7, 2021, granting summary judgment as to the remaining claims in part and denying summary judgment in part. (Docs. 238–39.) The court found that all individual defendants were entitled to qualified immunity as to the claims raised in Counts I, II, and III, and accordingly granted summary judgment to the individual defendants on that basis. (Doc. 238, pp. 21–28.) The court additionally granted summary judgment to Defendants Murphy, Thomas, Kane, Barrett, Cronauer, Merritt, and Frati on Plaintiffs' tortious interference with a contract claim, but denied summary judgment on that claim as to Defendants Leighton, Dessoye, O'Hara, and McGonigle. (Doc. 238, pp. 29–34.)

 **\*2**  All parties filed partial motions for reconsideration on May 21, 2021. (Docs. 240, 242, 244.) Defendants' motions seek reconsideration of the court's decision to deny summary judgment for the tortious interference claim as to Defendants Leighton, Dessoye, O'Hara, and McGonigle. (Docs. 240, 242.) Plaintiffs' motion seeks reconsideration of the court's decision to grant qualified immunity to the individual Defendants and additionally seeks reconsideration of the court's granting of summary judgment to Defendant Murphy as to the tortious interference claim. (Doc. 244.) Plaintiffs alternatively argue that if the court does not grant reconsideration, it should instead issue a certificate of appealability to allow Plaintiffs to immediately appeal to the Third Circuit. (Doc. 245, pp. 12–14.) Briefing on all three motions for reconsideration is complete, *see* Docs. 241, 243, 245, 249–54, and the motions are accordingly ripe for the court's disposition.

**Standard of Review**

A party seeking reconsideration of a district court's order must show either (1) "an intervening change in the controlling law"; (2) the availability of new evidence that was not available when the court issued its prior order; or (3) "the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). Motions for reconsideration "cannot be used to reargue issues that the court has already considered and disposed of." *McSparren v. Pennsylvania*, 289 F. Supp. 3d 616, 621 (M.D. Pa. 2018) (citing *Blanchard v. Gallick*, No. 1:09-CV-01875, 2011 WL 1878226 at \*1 (M.D. Pa. May 17, 2011)). Additionally, a motion for reconsideration "may not be used to present a new legal theory for the first time" or "to raise new arguments that could have been made in support of the original motion." *MMG Ins. Co. v. Guiro, Inc.*, 432 F. Supp. 3d 471, 474 (M.D. PA. 2020) (citing *Vaidya Xerox Corp.*, No. 97-CV-00547, 1997 WL 732464, \*2 (E.D. Pa. Nov. 25, 1997)). A "mere disagreement" with a court's legal conclusion is not a sufficient basis for reconsideration. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 73 F. Supp. 3d 488, 491 (M.D. Pa. 2014) (citing *Mpala v. Smith*, No. 3:06-CV-00841, 2007 WL 136750, at \*2 (M.D. Pa. Jan. 16, 2007)).

Although a court may reconsider a prior order based on a party's motion, motions for reconsideration "should be granted sparingly as federal courts have a strong interest in the finality of judgments." *Kitzmiller v. Dover Area Sch. Dist.*, 388 F. Supp. 2d 484, 488 (M.D. Pa. 2005). The decision of whether to grant a motion for reconsideration is left to the discretion of the district court. *Le v. Univ. of Pa.*, 321 F.3d 403, 405 (3d Cir. 2003).

**Discussion**

 **A.  Defendants' Motions for Reconsideration Are Denied**

The court will first consider Defendants' arguments that the court should reconsider the denial of summary judgment as to Plaintiffs' tortious interference with a contract claim. (Doc. 241, 243.) In denying summary judgment as to that claim, the court relied on persuasive authority from the Western District of Pennsylvania in *Cole v. Encapera*, No. 2:15-CV-00104, 2017 WL 3503121 (W.D. Pa. Aug. 16, 2017), reversed in nonrelevant part, 758 F. App'x 252 (3d Cir. 2018). *Cole*, like the present case, involved a tortious interference claim brought by the owner of a bar alleging that local police had tortiously interfered with the bar's business through increased police presence that allegedly caused individuals to stop

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 32 of 71

Rittenhouse Entertainment, Inc. v. City of Wilkes-Barre, Not Reported in Fed. Supp. (2021)

2021 WL 3511122

patronizing the bar. *Id.* at *4. This court summarized *Cole* as follows:

> In *Cole*, local police allegedly parked their cars outside of a plaintiff's bar and regularly accosted individuals as they entered and exited the bar, which allegedly caused customers to stop going to the bar. *Id.* at *4. The plaintiff brought a claim for tortious interference with a contract, and one of the defendant police officers moved for summary judgment, arguing that the tortious interference claim failed because the plaintiff could not specifically name any customers who had stopped going to the bar as a result of the police presence. *Id.* at *20. The court rejected this argument, finding it immaterial that the plaintiff could not name any specific customers who had stopped going to the bar, since there was evidence in the record from which it could be inferred that the police presence had caused people to stop going to the bar. *Id.*

**\*3** (Doc. 238.)

After summarizing the facts and holding of *Cole*, this court stated that it found *Cole* persuasive in deciding whether summary judgment was warranted in the present case. The court noted the undisputed evidence that there was increased police presence around The Mines during the relevant period and that business at The Mines "slowed considerably in the months following the increased police presence," and therefore concluded that "a reasonable finder of fact could infer that this slowdown in business was because of the increased police presence." (*Id.* at 32–33.) "Plaintiffs," the court continued, "have therefore presented sufficient evidence to establish the existence of a contract or a prospective contractual or economic relationship." (*Id.* at 33.)

All Defendants argue that the court's reliance on *Cole* is misplaced. The College Defendants note that the court found *Cole* "persuasive, and essentially controlling in this matter," which the College Defendants argue was a clear error of law because *Cole* runs contrary to Pennsylvania precedent on what is required for a plaintiff to succeed on a tortious interference claim. (Doc. 241, pp. 5–6.) The College Defendants further argue that even if *Cole* is relied upon by the court, they should still be granted summary judgment on the tortious interference claim because Plaintiffs "have not even reached *Cole's* newly established, low evidentiary standard." (*Id.* p. 7.) According to the College Defendants, the court's conclusion that a reasonable finder of fact could infer that the slowdown in The Mines' business was due to the increased police presence "is based on nothing more than speculation ... which draws a nexus without evidence, [and]

should never be allowed in the courtroom." (*Id.* at 12–13.) The City Defendants also argue that the court's reliance on *Cole* is misplaced because *Cole* "is not controlling precedent and its reasoning contradicts well-settled Pennsylvania law which is controlling and requires the specific identification of the contract or business relation with which the City Defendants allegedly interfered." (Doc. 243, p. 2.)

The court will deny Defendants' motions for reconsideration, as their arguments amount to nothing more than a disagreement with the court as to the persuasive value of *Cole*, which is not a sufficient basis for reconsideration. *See, e.g.*, *Fouad v. Milton Hershey Sch. & Sch. Tr.*, No. 1:19-CV-00253, 2020 WL 8225506, at *2 (M.D. Pa. Feb. 19, 2020) (noting that party's disagreement with court as to whether a prior case applied to factual scenario before the court was not a sufficient basis for reconsideration). As Plaintiffs aptly state in their opposition brief, "[t]o follow a persuasive authority with which defendants disagree, is not a clear error of law." (Doc. 251, p. 3.)

**B. Plaintiffs' Motion for Reconsideration Is Granted to the Extent that it Seeks Reconsideration of the Court's Decision to Grant Qualified Immunity to Defendants O'Hara and McGonigle**

**\*4** Turning to Plaintiffs' motion for reconsideration, the court will first consider the argument that the court erred in granting qualified immunity to individual College Defendants O'Hara and McGonigle. (*See* Doc. 245, p. 12.) Having reviewed the court's prior opinion in light of Plaintiffs' motion for reconsideration, the court finds that it committed a clear error of law in this ruling and will accordingly reconsider its decision and reinstate the claims in Counts I, II, and III against O'Hara and McGonigle.

When the issue of qualified immunity was previously before the court, O'Hara and McGonigle asserted that they were entitled to qualified immunity under *Filarsky v. Delia*, 566 U.S. 377 (2012), because Plaintiffs alleged in their complaint that O'Hara and McGonigle were working in concert with government officials. (*See* Doc. 221, pp. 8–10.) Plaintiffs responded that the question of whether a defendant is acting in concert with a government actor is a distinct question from whether that defendant is entitled to qualified immunity. (Doc. 225, pp. 25.) Plaintiffs therefore argued that O'Hara and McGonigle were not entitled to qualified immunity because they had not made any argument as to why they were entitled to qualified immunity beyond the fact that they were allegedly acting in concert with government actors. (*Id.* at 25–26.)

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 33 of 71
Rittenhouse Entertainment, Inc. v. City of Wilkes-Barre, Not Reported in Fed. Supp. (2021)
2021 WL 3511122

The court agreed with Plaintiffs that O'Hara and McGonigle had not sufficiently argued why they were entitled to qualified immunity, noting that although O'Hara and McGonigle had argued that the case was analogous to *Filarsky*, they had not taken "the extra and necessary step of arguing why they are entitled to qualified immunity if *Filarsky* does apply." (Doc. 238, p. 28.) The court nevertheless decided that O'Hara and McGonigle were entitled to qualified immunity because the right at issue in the case was not clearly established at the time the facts of the case had occurred. (*Id.*) "Accordingly," the court stated, "assuming without deciding that *Filarsky* applies to the present case, the individual College Defendants are granted summary judgment as to Counts I, II, and III on the basis of qualified immunity." (*Id.*)

The court committed a clear error of law in reaching this conclusion. By declining to decide whether *Filarsky* applied, the court allowed O'Hara and McGonigle to obtain the benefit of qualified immunity without first deciding the threshold issue of whether they could be entitled to qualified immunity in the first place. In effect, the court got the analysis backwards: the court decided that because the right at issue was not clearly established, it would not need to reach the issue of whether O'Hara and McGonigle could be considered state actors, whereas the correct analysis would be to decide whether O'Hara and McGonigle could be considered state actors, and, if they could not, the court would not need to determine whether the right at issue was clearly established.

With that error in reasoning identified, the court's remaining analysis is straightforward. As the court previously recognized, "the question of whether a defendant has acted in concert with a government actor is a distinct question from whether the defendant is entitled to qualified immunity." (Doc. 238.) O'Hara and McGonigle argued that they were entitled to qualified immunity because the Plaintiffs' complaint alleged that they were acting in concert with government actors, but a defendant acting in concert with a government actor is not by itself sufficient to establish that that defendant is entitled to qualified immunity. Accordingly, because defendants asserting that they are entitled to qualified immunity have the burden to prove that the doctrine applies, *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014), and O'Hara and McGonigle did not take "the extra and necessary step of arguing why they are entitled to qualified immunity," the court concludes that those Defendants are not entitled to qualified immunity. The court will therefore grant Plaintiffs' motion for reconsideration to the extent that it seeks reconsideration of the granting of qualified immunity to Defendants O'Hara and McGonigle and reinstate the claims in Counts I, II, and III against those Defendants.

## C. Plaintiffs' Other Qualified Immunity Arguments Are Denied

**\*5** Plaintiffs make several arguments as to why the court should reconsider its qualified immunity ruling with respect to the individual City Defendants, none of which have merit.

Plaintiffs' first argument is that the court committed a clear error of law because it "mixed" the separate issues of whether the right at issue was clearly established and whether the right was violated. (Doc. 245, p. 4–5.) Plaintiffs do not develop this argument beyond the conclusory and unsupported assertions that the court "disregarded" the Third Circuit's prior ruling in this case and that the court "provided [a] narrative of facts" that emphasized the "growing violence" outside of The Mines. (*Id.* at 5.) Because Plaintiffs fail to explain *how* the court disregarded the Third Circuit's opinion or otherwise committed a clear error of law, this argument is rejected.

Plaintiffs' second argument is that the court committed a clear error of law by "reinstating a one-sided and disputed narrative of the facts" and "implying the evidence did not support a violation of Plaintiffs' right to equal protection." (*Id.* at 5.) This argument is without merit because the court's ruling that the Defendants were entitled to qualified immunity was based on the conclusion that "the right at issue in this case was not clearly established at the time of the alleged violation." (Doc. 238, p. 25.) Thus, the court's statement of the material facts in the case was irrelevant to its conclusion with respect to qualified immunity.

Plaintiffs' third argument is that the court committed a clear error of law in determining that the right at issue was not clearly established at the time of the alleged violation. (Doc. 245, p. 9.) In the relevant portion of the court's opinion, the court noted that it could look to Supreme Court cases, controlling circuit precedent, or a robust consensus of persuasive authorities from other circuits to determine whether the right at issue was clearly established. (Doc. 238, p. 23.) Applying that standard, the court held that Plaintiffs had failed to show that the right at issue was clearly established because the only case Plaintiffs cited that was factually on point was *Desi's Pizza, Inc. City of Wilkes-Barre*, No. 01-CV-00480, 2006 WL 2460881 (M.D. Pa. Aug. 23, 2006), which could not establish a right because it was an

Rittenhouse Entertainment, Inc. v. City of Wilkes-Barre, Not Reported in Fed. Supp. (2021)
2021 WL 3511122

unpublished case. (Doc. 238, p. 24) (citing *El v. City of Pittsburgh*, 975 F.3d 327, 340 (3d Cir. 2020)).

Plaintiffs argue that this conclusion constitutes a clear error of law because it "misapprehend[s] the import of *Desi's Pizza*." (Doc. 245, p. 9.) *Desi's Pizza*, according to Plaintiffs, states that the right at issue was clearly established, it does not itself establish the right. (*Id.*) This argument is without merit. Controlling case law from the Third Circuit clearly states that unpublished cases cannot establish a right for purposes of qualified immunity. *See El*, 975 F.3d at 340–41. Plaintiffs do not cite any case law to support an exception to this rule where a case states that a right exists rather than establishing the right itself. Their contrary reading of *Desi's Pizza* is, therefore, a distinction without a difference.

Plaintiffs' fourth argument is that the court "overlooked that *Desi's Pizza* was brought against the City of Wilkes-Barre, the lead defendant in this action, such that the individual City Defendants would have known of the case regardless of whether it was published." (Doc. 245, p. 9.) This argument is also without merit, as the court's opinion clearly shows that it did not overlook the fact that Wilkes-Barre was the defendant in *Desi's Pizza*. (*See* Doc. 238, p. 24 (describing *Desi's Pizza* as "an unpublished case from this district in which the owners of a pizza shop in Wilkes-Barre alleged that *Wilkes-Barre* and various Wilkes-Barre employees had violated its constitutional rights by selectively enforcing local laws against the pizza shop based on the race of the pizza shop's customers" (emphasis added)).)

**\*6** Plaintiffs' fifth argument is that the court "erred in not recognizing that, by 2009, the wrongfulness of using State power to destroy a lawful business for racial reasons was obvious." (Doc. 245, p. 10.) The court disagrees that it made such an error. In defining the right at issue for purposes of a qualified immunity analysis, a court must not define the right at issue at a "high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011)). That is exactly what Plaintiffs invite the court to do here, and their argument is accordingly rejected.

**D. Plaintiffs' Motion for Reconsideration Is Denied to the Extent that it Seeks to Reinstate the Tortious Interference Claim Against Defendant Murphy**

Plaintiffs' final argument for reconsideration seeks to reinstate the tortious interference claim against Defendant Murphy. (Doc. 245, p. 14.) The court granted summary judgment to Murphy on the tortious interference claim

because there was "no evidence in the record from which a reasonable finder of fact could conclude that [he] exercised direct control over the Wilkes-Barre Police Department or caused the increased police presence outside of The Mines." (Doc. 238, p. 34.) Plaintiffs argue that this was error because Defendant Leighton testified in his deposition that Murphy oversaw the Wilkes-Barre Police Department. (Doc. 245, p. 14.)

Plaintiffs' argument is rejected because Plaintiffs did not introduce the evidence that Murphy oversaw the police department at any point before the court's decision, either before or after the appeal to the Third Circuit. (*See* Doc. 159, pp. 91–122; Doc. 226, pp. 1–24.) To the contrary, Plaintiffs' brief following the remand from the Third Circuit only mentioned Defendants Leighton, Dessoye, O'Hara, and McGonigle as Defendants who could be held liable for tortious interference. (*See* Doc. 226, p. 14 ("the excessive law enforcement near The Mines was created by City and College defendants, including the Mayor, Police Chief, College President O'Hara, and Dean McGonigle, working together.").) The court will therefore reject the argument because a motion for reconsideration cannot be used to introduce "evidence that could have been proffered prior to the issuance of the order in question." *Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 295–96 (M.D. Pa. 2016) (quoting *McDowell Oil Serv., Inc. v. Interstate Fire & Cas. Co.*, 817 F. Supp. 538, 541 (M.D. Pa. 1993)).

**E. Plaintiffs' Motion for Certificate of Appealability Is Denied**

Finally, the court will consider Plaintiffs' argument that if reconsideration is not granted, the court should issue a certificate of appealability to allow Plaintiffs to immediately appeal to the Third Circuit. (Doc. 245, pp. 12–14.)

A district court may certify an order for appeal if the court finds that it "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Thus, certification under § 1292(b) is only proper when "(1) the issue involve[s] a controlling question of law; (2) as to which there are substantial grounds for difference of opinion; and (3) an immediate appeal of the order may materially advance the ultimate termination of the litigation." *Simon v. United States*, 341 F.3d 193, 199 (3d Cir. 2003). The party seeking a certificate of appealability bears the burden of showing that the certificate should issue. *Consumer Fin.*

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 35 of 71
Rittenhouse Entertainment, Inc. v. City of Wilkes-Barre, Not Reported in Fed. Supp. (2021)
2021 WL 3511122

*Protection Bureau v. Navient Corp.*, —— F. Supp. 3d ——, No. 3:17-CV-00101, 2021 WL 772238, at *3 (M.D. Pa. Feb. 26, 2021) (citing *Orson Inc. v. Miramax Film Corp.*, 867 F. Supp. 319, 320 (E.D. Pa. 1994)).

**\*7** Plaintiffs have not met that burden in this case. The only argument Plaintiffs make as to why a certificate of appealability should issue is that the court's decision "differ[s] from the holding of *Desi's Pizza.*" (Doc. 245, p. 13.) Plaintiffs have not, however, shown that there are "substantial grounds for difference of opinion" on that issue, *Simon*, 341 F.3d at 199, which ordinarily requires a showing that the case raises "one or more difficult and pivotal questions of law not settled by controlling authority." *Knopick v. Downey*, 963 F. Supp. 2d 378, 398 (M.D. Pa. 2013) (quoting *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 599 (E.D. Pa. 2008)). Here, as noted above, the question of whether to follow *Desi's*

*Pizza* is settled by controlling precedent in *El* holding that unpublished cases cannot establish a right for purposes of qualified immunity. *See El*, 975 F.3d at 340–41. Plaintiffs' motion for certificate of appealability is accordingly denied.

**Conclusion**

For the foregoing reasons, Defendants' motions for reconsideration are denied and Plaintiffs' motion for reconsideration is granted in part and denied in part. An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3511122

---

Footnotes

1    Because the court writes primarily for the parties, this section only includes background and procedural history that is essential to understanding the motions for reconsideration. For a more complete background and procedural history, please see the court's May 7, 2021 summary judgment opinion. (Doc. 238.)

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1566583
Only the Westlaw citation is currently available.
United States District Court,
E.D. California.

Christopher SIMMONS, Plaintiff,

v.

Jonathan AKANNO, et al., Defendants.

No. 1:09–cv–00659–GBC (PC).
|
April 22, 2011.

**Attorneys and Law Firms**

Christopher Simmons, Coalinga, CA, pro se.

ORDER DENYING REQUEST FOR LEAVE TO APPEAL
SCREENING ORDERS

GERALD B. COHN, United States Magistrate Judge.

*ORDER*

**I. *PROCEDURAL HISTORY***

 **\*1** Plaintiff Christopher Simmons ("Plaintiff") is a state
prisoner proceeding pro se and in forma pauperis in this civil
rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed his
Complaint on April 14, 2009 and consented to Magistrate
Judge jurisdiction on June 8, 2009. (ECF Nos. 1 & 8.) Plaintiff
then filed a First Amended Complaint on April 8, 2010. (ECF
No. 10.) No other parties have appeared in this action.

Plaintiff's First Amended Complaint was dismissed with
leave to amend for failure to state a claim on December
8, 2010. (ECF No. 20.) Plaintiff filed his Second Amended
Complaint which was also dismissed for failure to state a
claim on February 18, 2011. (ECF Nos. 23 & 24.) Plaintiff
filed his Third Amended Complaint on March 28, 2011. (ECF
No. 28.) The Court has not yet screened Plaintiff's most recent
amended complaint.

Pending before the Court is Plaintiff's "Objections and
Motion/Request for Leave to Appeal Orders of December
8, 2010 and February 18, 2011". (ECF No. 25.) This Court
construes and analyzes Plaintiff's motion/request for leave as
a request for certification of an interlocutory appeal.

**III. *ARGUMENT***
Plaintiff objects to the Court's Screening Orders filed
December 8, 2010 and February 18, 2011 and asks for leave
to appeal those orders. Plaintiff states that he disagrees with
the Court's finding that he can not bring his claim under the
American's with Disabilities Act and his claim for inadequate
medical care in the same action. He also states that his
complaints must be liberally construed.

As to his request for leave to seek appellate review,
Plaintiff states that: "1) The Court's Order(s) a) conclusively
determines Plaintiff's right to bring multiple claims in a single
action; b) review is necessary to resolve an important issue
separate from the merits of the action; and c) the Court's Order
indicated that failure to comply with, in all due respect, the
pleading standard under Federal Rule of Civil Procedure 8(a)
will result in dismissal with prejudice, and that all causes of
action not alleged in the Amended Complaint is 'waived,' and
would not be reviewable, depriving Plaintiff of his substantive
right to relief." (ECF No. 24, p. 2.)

**IV. *Legal Standard and Analysis***
When an issue is unresolved and interlocutory resolution
could materially advance the termination of the litigation, 28
U.S.C. § 1292(b) permits a question to be certified for appeal,
when a district court certifies that an order not otherwise
appealable under section 1292(b) "involves a controlling
question of law as to which there is substantial ground for
difference of opinion and that an immediate appeal from the
order may materially advance the ultimate termination of
the litigation." *U.S. v. W.R. Grace,* 526 F.3d 499, 522 (9th
Cir.2008); 28 U.S.C. § 1292(b). "Section 1292(b) provides
for interlocutory appeals from otherwise not immediately
appealable orders, if conditions specified in the section are
met, the district court so certifies, and the court of appeals
exercises its discretion to take up the request for review."
*Caterpillar Inc. v. Lewis,* 519 U.S. 61, 74, n. 10, 117 S.Ct.
467, 136 L.Ed.2d 437 (1996). Thus, section 1292(b) requires
a two step application process.

 **\*2** Step one is at the district court level for certification of
the order—which is discretionary. S. Repr. 2434, 85th Cong.,
2d Sess., 1958, in 1958 U.S.Code Cong. & Admin. News
5255, 5257. Indeed, permissive interlocutory appeal is not
available absent written certification from the district court.
*Credit Suisse v. U.S. District Ct.,* 130 F.3d 1342, 1346 (9th
Cir.1997). A district court may amend its order to add findings

for an interlocutory appeal. Rule 5 of the Federal Rules of Appellate Procedure governs appeals by permission under section 1292(b):

(a) Petition for Permission to Appeal

...

(3) If a party cannot petition for appeal unless the district court first enters an order granting permission to do so or stating that the necessary conditions are met, the district court may amend its order, either on its own or in response to a party's motion, to include the required permission or statement.

If a district court certifies an order for interlocutory appeal because it involves a controlling question of law, after the order is initially entered, the proper procedure is to amend the order to contain the required certification. *Haas v. Pittsburgh Nat. Bank,* 627 F.2d 677, 679 n. 1 (3d Cir.1980). A certification order that is not directly framed as an amendment of the original order may nonetheless be treated as an amendment. *Id.* Though not stated as such, the practical application of the permission for leave to appeal sought by Plaintiff requests that this Court amend its orders dismissing the Complaints to permit him to pursue an appeal pursuant to section 1292(b).

Step two under section 1292(b) is before the court of appeals for permission to appeal. *U.S. v. W.R. Grace,* 526 F.3d at 522 ("once the district [court] opens the gate to this court, we exercise complete, undeferential review to determine whether the court properly found that § 1292(b)'s certification requirements were satisfied.") "[A] party must obtain certification from both the district court and the court of appeals to bring an interlocutory appeal." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper,* 254 F.3d 882, 885 (9th Cir.2001). Thus, this Court has the authority to entertain the petition for certification of an order for interlocutory order, because Plaintiff consented to Magistrate Judge jurisdiction[1] and certification by the district court is the first step in section 1292(b) procedure.

Section 1292(b) imposes three criteria that must be met before a district court may certify an interlocutory appeal: the order must state "(1) that there is a controlling question of law; (2) that there is substantial grounds for difference of opinion; and (3) that an immediate appeal may materially advance the ultimate termination of the litigation." *In re Cement Antitrust Litig. ( MDL No. 296),* 673 F.2d 1020, 1026 (9th Cir.1982),

aff'd, 459 U.S. 1190, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983); 28 U.S.C. § 1292(b).

"Section 1292(b) is meant to be used sparingly, and appeals under it are, accordingly, hen's-teeth rare." *Camacho v. Puerto Rico Ports Authority,* 369 F.3d 570, 573 (1st Cir.2004). "Because permitting piecemeal appeals is bad policy, permitting liberal use of § 1292(b) interlocutory appeals is bad policy." *McFarlin v. Conesco Services, LLC,* 381 F.3d 1251, 1259 (11th Cir.2004). "Congress did not intend 28 U.S.C. § 1292(b) to serve an error-correction function." *Weber v. U.S. Trustee,* 484 F.3d 154, 159, n. 3 (2nd Cir.2007). Only "exceptional circumstances justify departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).

1. *Controlling Question of Law*
**\*3** An issue is "controlling" if its resolution could materially affect the outcome of the litigation. *In re Cement Antitrust Litig. ( MDL No. 296),* 673 F.2d at 1026 (trial judge's recusal is a collateral issue). Section 1292(b) appeals should be reserved for "situations in which the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts," and requires that "resolution of a controlling legal question would serve to avoid a trial or otherwise substantially shorten trial." *McFarlin,* 381 F.3d at 1259. "The Supreme Court has recognized that 28 U.S.C. § 1292(b) acts as a safety valve for 'serious legal questions taking the case out of the ordinary run.' " *Estate of Kennedy v. Bell Helicopter Textron, Inc.,* 283 F.3d 1107, 1116 (9th Cir.2002) quoting *Digital Equipment Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 883, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994).

"The antithesis of a proper § 1292(b) appeal is one that turns on whether there is a genuine issue of fact, or whether the district court properly applied settled law to the facts ...." *Id.* "The legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law." *Id.* The term "question of law" does not mean the application of settled law to fact. *Ahrenholz v. Board of Trustees of the University of Illinois,* 219 F.3d 674, 676 (7th Cir.2000). Nor does it mean any question, the decision of which requires rooting through the record in search of the facts or of genuine issues of fact. *See id.* Instead, what the framers of § 1292(b) had in mind is

more of an abstract legal issue or what might be called one of "pure" law, matters the court of appeals "can decide quickly and cleanly without having to study the record." *Id.* at 677.

Plaintiff disagrees with, and apparently seeks appellate review of, this Court's screening orders and the Court's application of procedural law (specifically Federal Rule of Civil Procedure 8) to Plaintiff's factual allegations within his First Amended Complaint and Second Amended Complaint. Plaintiff seems to be arguing that this Court's determination that he cannot proceed on his ADA claims and his medical claims in the same action is improper and should be reviewed by the appellate court. Reviewing this issue would require extensive factual review, essentially a re-screening of Plaintiff's factual allegations in his First and Second Amended Complaints which is the "antithesis of a proper § 1292(b) appeal," *McFarlin,* 381 F.3d at 1259, and does not involve a controlling question of law so as to justify certification by this Court for appeal under section 1292(b).

### 2. *Difference of Opinion*

"In determining whether to grant review, we should ask if there is substantial dispute about the correctness of any of the pure law premises the district court actually applied in its reasoning leading to the order sought to be appealed." *McFarlin,* 381 F.3d at 1259. When an appellate court is in "complete and unequivocal" agreement with a district court, there is no "substantial ground for difference of opinion." *McFarlin,* 381 F.3d at 1258.

**\*4** Plaintiff does not show a difference of legal opinion as to the issues he challenges. Rather, the only difference of opinion raised by the present motion is Plaintiff's difference of opinion with this Court as to whether the factual allegations in the First and Second Amended Complaints stem from the same transaction, occurrence, or series of transactions and should be brought in the same action.

A district court has a duty "to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute." *Max Daetwyler Corp. v. Meyer,* 575 F.Supp. 280, 283 (E.D.Pa.1983). This Court analyzed the strength of Plaintiff's factual allegations to state any cognizable claims, and construed all inferences in the light most favorable to Plaintiff. Substantial ground for dispute did not exist at that time. A current review again reveals a lack of substantial ground for dispute, and Plaintiff presents none. Instead, Plaintiff relies on the difference

between his view (that he should be allowed to proceed with all claims presented in the Amended Complaints) and this Court's ruling dismissing his Amended Complaints with leave to amend for failure to state any cognizable claims. Plaintiff's arguments thus do not give rise to a substantial ground for dispute.

### 3. *Material Advancement*

A party seeking interlocutory certification must show that an immediate appeal may "materially advance," rather than impede or delay, ultimate termination of the litigation. *In re Cement Antitrust Litig. ( MDL No. 296),* 673 F.2d at 1026. "When litigation will be conducted in substantially the same manner regardless of our decision, the appeal cannot be said to materially advance the ultimate termination of the litigation." *White,* 43 F.3d at 378–379.

Plaintiff does not address whether a section 1292(b) appeal in his favor would materially advance this action. Rather, without arguing as much, Plaintiff appears to believe that this Court's decisions upon screening of the Amended Complaints were incorrect and that the Ninth Circuit will rule in Plaintiff's favor to correct the error and allow Plaintiff to proceed on all claims alleged.

Plaintiff fails to persuade this Court that a section 1292(b) appeal will materially advance this action; rather, it appears that a section 1292(b) appeal would increase chances of delay. Even if this case was certified for interlocutory appeal by this Court, the Ninth Circuit accepted it for appeal, and ruled in Plaintiff's favor, there would most likely be a remand to this Court to screen the Third Amended Complaint—which is the precise posture of the action on this very date. An orderly appeal can be taken from an entered judgment, if after screening, the Third Amended Complaint and any subsequent amended complaints which Plaintiff is granted leave to file are found not to state any cognizable claims so as to result in this action's ultimate dismissal.

**\*5** Thus, this Court declines to certify an interlocutory appeal for Plaintiff as he failed to present any issue that involves a controlling question of law which would not require the appellate court to delve beyond the surface of the record in order to determine the facts; he fails to show that there is substantial grounds for difference of opinion; and an immediate appeal will not materially advance the ultimate termination of the litigation.

#### IV. *Conclusion and Order*

Based on the foregoing, Plaintiffs "Objections and Motion/ Request for Leave to Appeal Orders of December 8, 2010 and February 18, 2011," filed on March 17, 2011, is DENIED as a request for certification of interlocutory appeal under 28 U.S.C. § 1292(b).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1566583

Footnotes

1    Plaintiff consented to magistrate judge jurisdiction for all proceedings in this case. (ECF No. 8.) Therefore, the Magistrate Judge has authority to conduct all proceedings in the district court in this action. *See* Rule 305 and Appendix A(k)(4) of the Local Rules of the Eastern District of California, Fed.R.Civ.P. 73(a).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 691360
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Richard SMALL, in his own right and as
Administrator of the Estate of Wally Small a/
k/a Wallace Clarence Small, Deceased, Plaintiff

v.

LOWER PAXTON TOWNSHIP, Defendant

No. 1:22-cv-01146
|
Filed February 20, 2024

**Attorneys and Law Firms**

Gary Brownstein, Gary Brownstein, Trial Attorney, Philadelphia, PA, for Plaintiff.

Rolf E. Kroll, Margolis Edelstein, Camp Hill, PA, for Defendant.

## MEMORANDUM

Yvette Kane, District Judge

**\*1** Before the Court are: (1) Defendant Lower Paxton Township ("Defendant" or the "Township")'s motion to dismiss the Third Amended Complaint (Doc. No. 41) filed by Plaintiff Richard Small ("Plaintiff"), in his own right and as Administrator of the Estate of Wally Small a/k/a Wallace Clarence Small, Deceased ("Decedent") (Doc. No. 45); and (2) Plaintiff's "Motion for Leave to File Interlocutory Appeal and Stay Proceedings" (Doc. No. 43). For the reasons that follow, the Court will deny Plaintiff's motion for leave to file an interlocutory appeal and grant Defendant's motion to dismiss.

## I. BACKGROUND

As noted in the Court's July 19, 2023 Memorandum and Order (Doc. Nos. 38–39) addressing Defendant's motion to dismiss Plaintiff's Second Amended Complaint, this case has an involved procedural history, which the Court sets forth below after detailing the factual background of Plaintiff's Third Amended Complaint.

### A. Factual Background[1]
Plaintiff avers that on July 23, 2020, at approximately 8:00 p.m., Decedent was "lawfully operating a vehicle" on the 1000 block of Avila Road in Lower Paxton Township, Pennsylvania. (Doc. No. 41 ¶ 6.) At that same time and place, Officer Michael Elezovic ("Officer Elezovic"), acting under color of law and within the scope of his employment, "allegedly observed [Decedent's] vehicle 'not utilizing his turn signal 100 feet prior to commencing a turn, and stopping for 4-6 seconds at a stop sign', and based on these alleged observations, decided to commence a high speed chase." (Id. ¶ 7.) Plaintiff alleges that Decedent "was understandably fearful when a white police officer would try to stop him without cause just a few weeks after the tragic murder of George Floyd at the hands of a white police officer[ ] in Minneapolis, MN, and therefore fled." (Id. ¶ 8.) Plaintiff avers that, after Officer Elezovic called in the chase to dispatch and "provided his justification, he was informed by his supervisor Corporal Pachalski to terminate the chase immediately." (Id. ¶ 9.) Plaintiff asserts that "[i]t is believed and therefore averred that since his justification for probable cause was insufficient, in violation of custom and practice, and likely in violation of internal policies and procedures of Lower Paxton Township concerning the initiation and continuation of high speed chases, the specifics of which [sic] have thus far concealed and yet to disclose." (Id.) Plaintiff alleges that "[t]his high speed chase continued for approximately one and one half miles, reaching speeds in excess of 80 miles per hour, through residential areas and a school zone, before leaving the jurisdiction of Lower Paxton Township, and continuing into Susquehanna Township, where, predictably, the chase terminated in a four (4) vehicle motor vehicle accident at the intersection of Union Deposit Road and South Progress Avenue, Susquehanna Township." (Id. ¶ 10.) "As a result of this occurrence, Plaintiff[']s[ ] [D]ecedent was caused to sustain severe injuries, including internal injuries, blunt impact trauma to his torso and other injuries, which ultimately led to the declaration of his death at Hershey Medical Center at approximately 8:42 p.m. on July 23, 2020." (Id. ¶ 11.)

### B. Procedural Background
**\*2** On July 25, 2022, the Township filed a Notice of Removal (Doc. No. 1) removing this case, which was originally filed by Plaintiff on July 1, 2022, in the Dauphin County Court of Common Pleas, to this Court and attaching the state court complaint (id.). Plaintiff's state court complaint asserted negligence allegations against the Township but also included the base assertion that the Township "also violated

the Constitutional Civil Rights of Plaintiff's decedent." (Id.) Accordingly, in reliance on that assertion, the Township removed the case to this Court, asserting federal question jurisdiction. (Id. at 1–2.)

On August 1, 2022, the Township filed a motion to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 3.) On August 15, 2022, the Township filed a brief in support of its motion to dismiss in accordance with Local Rule of Court 7.5. (Doc. No. 5.) Plaintiff subsequently filed a letter request for an extension of time—until October 1, 2022—to respond to the motion to dismiss (Doc. No. 6), which request the Court granted (Doc. No. 7). On September 27, 2022, Plaintiff filed a motion to compel discovery (Doc. No. 8), requesting that the Court enforce discovery obligations imposed in state court prior to removal of the case to this Court. The Court scheduled a status conference with the parties (Doc. No. 9), during which the Township's counsel volunteered to provide the requested discovery to Plaintiff's counsel, and Plaintiff's counsel requested an additional extension of time to respond to the pending motion to dismiss; accordingly, upon the conclusion of that conference, the Court issued an Order granting Plaintiff an extension of time until October 17, 2022, to respond to the Township's motion to dismiss and denying Plaintiff's motion to compel as moot (Doc. No. 11). Thereafter, on October 13, 2022, Plaintiff filed a concurred-in motion for an extension of time to respond to the Township's motion to dismiss (Doc. No. 12), which the Court granted (Doc. No. 13), making Plaintiff's response due November 1, 2022.

On November 1, 2022, Plaintiff filed a Reply to the Township's Motion to Dismiss and Cross Motion for Leave to File an Amended Complaint (Doc. No. 14), along with a brief in support (Doc. No. 14-2). In his motion, Plaintiff represented that "[o]n October 24, 2022, [the Township] finally provided answers to discovery and produced documents which provide the factual background for the initiation and continuation of this high-speed chase, which ultimately led to Plaintiff's decedent's untimely death" and, on that basis, "request[ed] leave of Court to file an Amended Complaint pursuant to FRCP 15(a)(2)." (Doc. No. 14 ¶¶ 7–8.) Plaintiff stated that he requested defense counsel's consent to his cross-motion but received no response. (Id. ¶ 8.) The Township did not file a brief in opposition to Plaintiff's Cross Motion for Leave to File an Amended Complaint within fourteen (14) days of the filing of Plaintiff's brief in support of his motion. Accordingly, the Court deemed the motion

unopposed in accordance with Local Rule of Court 7.6 and granted Plaintiff's Cross Motion by Order dated November 28, 2022, providing Plaintiff twenty (20) days within which to file an amended complaint. (Doc. No. 15.) That Order also denied the Township's motion to dismiss the complaint. (Id.)

Subsequently, on December 15, 2022, Plaintiff filed an amended complaint. (Doc. No. 16.) In addition to the claims asserted in the original complaint, the amended complaint explicitly asserted a 42 U.S.C. § 1983 ("Section 1983") municipal liability claim against the Township and added Officer Elezovic as a defendant, asserting Section 1983 and negligence claims against him. (Id.) On December 29, 2022, the date any response to Plaintiff's amended complaint was due, the Township filed two motions: (1) a Joint Motion for Leave to Amend (Doc. No. 18); and (2) a Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 19). In the Joint Motion for Leave to Amend the Township represented as follows:

*3 4. Counsel for Defendant Lower Paxton Township and Plaintiff Richard Small have discussed Defendant's request that Plaintiff agree to amend his Complaint to allege facts consistent with the undisputed facts of record, notably that an order to discontinue the pursuit was not provided until after the car crash at issue had occurred.

5. The date of this motion, December 29, 2022, is also the deadline for which a response to Plaintiff's Amended Complaint was to be filed. Counsel for Defendant apologizes for the short notice provided to the Court regarding the subject of this motion.

6. Counsel for both Plaintiff and Defendant have discussed this motion and submit it as a joint motion for enlargement to this Honorable Court to allow the pleadings to best represent the facts of record.

7. Defendant concurs to an amendment as proposed but in the event that the amendment is not made, Defendant respectfully requests an enlargement of time to respond to Plaintiff's Amended Complaint as currently filed.

WHEREFORE, the parties request that this Honorable Court provide leave for Plaintiff to file a Second Amended Complaint, or in the alternative enlarge the deadline to respond to Plaintiff's Amended Complaint.

(Doc. No. 18 at 3.)

Faced with these twin filings, the Court construed the first motion as representing the parties' joint desire that Plaintiff be

permitted the opportunity to file a second amended complaint, and given the first motion's filing on the same day that the Township's response to the operative amended complaint was due to be filed, the Court viewed the Township's filing of a motion to dismiss the amended complaint as protective of its rights in the event the Court declined to grant the parties' Joint Motion for Leave to Amend. Accordingly, on January 4, 2023, the Court granted the parties' Joint Motion for Leave to Amend, providing Plaintiff with a third opportunity to file a complaint in this matter and denied the Township's motion to dismiss. (Doc. No. 20.)

Plaintiff filed a Second Amended Complaint (Doc. No. 21) on January 23, 2023, again asserting negligence (Count III) and Section 1983 municipal liability (Count II) claims against the Township and Section 1983 (Count I) and negligence (Count III) claims against Officer Elezovic.[2] On the same day, the Court received a letter from Plaintiff's counsel detailing a dispute between Plaintiff and the Township. (Doc. No. 23.) Specifically, the letter represented that the Township objected to three requests for production of documents seeking the following information:

> 18. Lower Paxton Township Police Department complete policy and procedure manual for the operation of police vehicles including policies, procedures and directives for operation in a high speed chase or emergency situation.

> 19. Lower Paxton Township Police Department directives for police pursuit, and pursuit outside Lower Paxton Township jurisdiction.

> ....

> 24. A complete copy of the personnel file on Officer[ ] Michael Elezovic, as well as all investigative documents pertaining to any and all other high speed chases initiated or participated in by him, which culminated in a motor vehicle accident.

(Doc. No. 23-1 at 6–7.) Plaintiff's letter represented that "[t]hese documents are crucial discovery to investigate the nature and extent of the municipality's liability on this claim." (Doc. No. 23 at 1.)

**\*4** The Court directed the Township to respond to Plaintiff's letter (Doc. No. 22), and accordingly, on January 30, 2023, it filed a letter response (Doc. No. 26). In that letter, the Township's counsel represented as follows:

As the Court is aware, Defendants requested that this Honorable Court dismiss the Monell claim as asserted in the first and second iterations of Plaintiff's Complaint. We are now presented with Plaintiff's third attempt to assert such a claim in [his] Second Amended Complaint and in Defendants' view, the claim is still deficient, and Defendants anticipate filing a motion to dismiss the claim against the Township. Against this background, Defendants have objected to providing the Lower Paxton Township police policies and procedures on the basis that Plaintiff[ ] ha[s] consistently failed to state a claim that could make such procedures relevant. Defendants assert that its policies and procedures are proprietary and privileged absent a claim that warrants their production. Accordingly, Defendants submit there is a compelling reason to stay the discovery sought until such time as the Court determines that Plaintiff has asserted a viable claim.

....

As the Court is aware, Defendants have endeavored to supply Plaintiff[ ] with all relevant information based upon the facts alleged in the Complaints. To that end, Defendants have supplied Plaintiff[ ] with, inter alia, the mobile video recording ("MVR") footage from Officer Elezovic's vehicle. This discovery is particularly relevant to Plaintiff's current claim that he requires the Township's policies and procedures to plead a claim against the Township. The MVR footage and accompanying audio unequivocally demonstrates that the accident occurred less than two minutes after the pursuit was commenced and, contrary to the allegations in the Second Amended Complaint, moments before the order to discontinue was issued.

(Doc. No. 26 at 1–2.) The Township's counsel requested that the Court "assess the viability of Plaintiff's third effort to implicate the Township before ordering the production of the applicable policies and procedures." (Id. at 3.)

On February 6, 2023, Defendants filed a motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 30.) Also on February 6, 2023, Plaintiff's counsel filed a reply to the January 30, 2023 letter submitted by Defendants' counsel. (Doc. No. 29.) Plaintiff's counsel's letter did not respond to the Township's argument that Plaintiff's Second Amended Complaint pleaded facts contradicting the MVR footage produced by the Township to Plaintiff; instead, it argued that "in order to successfully prosecute a municipal

claim for liability under Monell, it is imperative that the municipality produce written and unwritten policies and procedures relevant to the facts of the case, as well as the personnel file for the Officer involved." (Id.) Further, Plaintiff's counsel stated that, "[c]onsistent with its prior practice, the Defendant is once again attempting to conceal discovery in order to support another Motion to Dismiss," and "requested that the Court not sanction such impropriety and enter an Order striking the aforementioned Objections to production, and compel Defendant to produce the necessary documentation for Plaintiff's review." (Id.) Plaintiff also requested that "the Court afford the Plaintiff ... an opportunity to file a Third Amended Complaint with greater specificity, once this discovery has been produced." (Id.)

**\*5**  After careful consideration of Plaintiff's request, the Court declined to order the Township to produce the documents requested by Plaintiff and instead ordered a stay of discovery in this matter pending the Court's resolution of Defendants' Rule 12(b)(6) motion to dismiss. (Doc. No. 31.) In so doing, the Court noted that the purpose of Rule 12(b)(6) is to "streamline [ ] litigation by dispensing with needless discovery and factfinding," see Neitzke v. Williams, 490 U.S. 319, 326–27 (1989), and that Plaintiff must file a complaint that states a plausible claim before he is entitled to discovery, see Mann v. Brenner, 375 F. App'x 232, 239 (3d Cir. 2010) (unpublished) (finding no abuse of discretion in district court's conclusion that plaintiff was not entitled to discovery prior to a Rule 12(b)(6) ruling because "[a] motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim, and therefore may be decided on its face without extensive factual development"). (Doc. No. 31 at 8.) The Court also noted that Plaintiff already had the opportunity to file three versions of a complaint in this case, two of them after receiving some discovery from the Township, and that the pending motion to dismiss argued that all the claims asserted in Plaintiff's Second Amended Complaint were subject to dismissal for failure to state a claim upon which relief can be granted. (Id.) Under such circumstances, the Court concluded that Plaintiff's outstanding discovery requests were not "proportional to the needs of the case." See Fed. R. Civ. P. 26(b)(1); (Doc. No. 31 at 8.)

Five days after the Court issued its February 16, 2023 Order, Defendants filed a brief in support of their motion to dismiss. (Doc. No. 32.) After the motion was fully briefed, on July 19, 2023, the Court issued a Memorandum and Order: (1) dismissing Plaintiff's Section 1983 claim against Officer Elezovic with prejudice as barred by the applicable statute

of limitations; (2) dismissing Plaintiff's Section 1983 claim against the Township without prejudice to Plaintiff's ability to file a Third Amended Complaint addressing the pleading deficiencies identified by the Court in its Memorandum; and (3) in the absence of a viable federal claim, declining to exercise supplemental jurisdiction over Plaintiff's state law claims and dismissing those claims without prejudice to Plaintiff's ability to reassert the claims in a Third Amended Complaint. (Doc. Nos. 38–39.)

More specifically, as to Plaintiff's Section 1983 claim against Officer Elezovic, the Court noted that:

> Plaintiff timely filed his initial complaint asserting claims against the Township on July 1, 2022, in the Dauphin County Court of Common Pleas, but did not file an amended complaint asserting claims against Officer Elezovic until December 15, 2022, well past the two-year statute of limitations. Therefore, as Plaintiff and Defendants acknowledge (Doc. Nos. 36 at 7–8; 33 at 8), Plaintiff's claims against Officer Elezovic are time-barred unless they relate back to Plaintiff's initial complaint.

(Doc. No. 38 at 12.) The Court then addressed the relation back requirements of Federal Rule of Civil Procedure 15(c)(1)(C) and Plaintiff's argument that the Township "prevented him from identifying Officer Elezovic as a defendant prior to the filing of the amended complaint on December 15, 2022, because '[t]he only investigative document produced by the Defendant pre-litigation is the heavily redacted incident report' " and "that 'a fair reading of the heavily redacted incident report is that Officer Michael Elezovic was the responding officer to the accident itself, and may not have been the officer who initiated this illegal chase' and so was 'not specifically named as a party in Plaintiff's [o]riginal [c]omplaint.' " (Id. at 14 (quoting Doc. No. 36 at 7–8).) Ultimately, the Court concluded that Plaintiff failed to demonstrate that the relation back requirements of Rule 15(c)(1)(C) were met in this case, stating as follows:

> [E]ven if this Court assumes arguendo that Plaintiff has shown that Officer Elezovic had notice of the action within the 120-day timeframe referenced by Rule 15 and so would not be prejudiced in defending this case (an issue Plaintiff fails to address in his briefing beyond stating that "[t]he reference to Officer Elezovic in the [o]riginal [c]omplaint ... put both Lower Paxton Township and Officer Elezovic on notice of his involvement"), the Court concludes that Plaintiff has failed to demonstrate the third requirement of relation back under Rule 15(c)(1)(C)—that Officer Elezovic "knew or should have known

that the action would have been brought against [him], but for a mistake concerning the proper party's identity." See Fed. R. Civ. P. 15(c)(1)(C). While Plaintiff argues that this "mistake" was "manufactured by the Defendant's concealment of the true facts" (Doc. No. 36 at 9), Plaintiff's naming of Officer Elezovic in his original complaint indicates that Plaintiff was aware that Officer Elezovic had a role of significance in the events underlying this case (and can even be fairly construed as reflecting that Officer Elezovic was the driver of the vehicle involved in the police pursuit). Under such circumstances, Plaintiff cannot demonstrate that he made a "mistake concerning the proper party's identity." See Garvin v. City of Philadelphia, 154 F.3d 215, 221–22 (3d Cir. 2003) (stating that "an amended complaint will not relate back if the plaintiff had been aware of the identity of the newly named party when she filed her original complaint and simply chose not to sue them at that time"). Whether Plaintiff's failure to name Officer Elezovic as a defendant in the original complaint was a "tactical" choice, as the Township describes it, or one of omission, Plaintiff's Section 1983 claim against Officer Elezovic, asserted for the first time in his amended complaint, filed December 15, 2022, is time-barred. Accordingly, the Court will grant Defendants' motion to dismiss this claim, and the Section 1983 claim against Officer Elezovic will be dismissed with prejudice because any attempt to re-assert it would be futile.

**\*6** (Doc. No. 38 at 17–18.) In accordance with the Court's conclusion, the July 19, 2023 Order dismissed Plaintiff's Section 1983 claim against Officer Elezovic with prejudice. (Doc. No. 39.)

As to Plaintiff's Section 1983 claim against the Township, the Court concluded that the Second Amended Complaint failed to plausibly allege such a claim, for the following reasons: (1) Plaintiff failed to allege facts showing an "intent to harm" on the part of a pursuing police officer as required to plausibly allege a violation of substantive due process in the police pursuit context; (2) even assuming the truth of Plaintiff's allegation that the pursuing officer continued the pursuit in violation of Township orders or policy, such an allegation did not suffice to meet the shocks-the-conscience test under the due process clause; and (3) Plaintiff's allegations regarding the existence of a municipal policy or custom or a failure to train were too vague and conclusory to plausibly allege a Section 1983 claim against the Township. (Id. at 21–27.) The Court's Order dismissed Plaintiff's Section 1983 claim against the Township without prejudice to Plaintiff's ability to file an amended complaint addressing the pleading deficiencies

identified in the Court's Memorandum, within twenty-one (21) days. (Doc. No. 39 at 1.)[3]

Thereafter, on August 3, 2023, Plaintiff filed a Notice of Appeal (Doc. No. 40) of the Court's July 19, 2023 Order. See (Doc. No. 40 (stating that "Plaintiff in the above case hereby appeals to the United States Court of Appeals for the Third Circuit, from the Order dismissing Count I of Plaintiff's Second Amended Complaint with prejudice")).[4] Six days later, on August 9, 2023, and in accordance with the timeframe set forth in the Court's July 19, 2023 Order, Plaintiff filed a Third Amended Complaint reasserting Section 1983 and negligence claims against the Township. (Doc. No. 41.) Five days after that, on August 14, 2023, Plaintiff, apparently recognizing the non-final nature of the Court's July 19, 2023 Order and his inability to appeal it absent permission from this Court pursuant to 28 U.S.C. § 1292(b), filed the pending "Motion for Leave to Appeal Interlocutory Order and Stay Proceedings."[5] (Doc. No. 43.) Plaintiff filed a brief in support of his motion the next day. (Doc. No. 44.)

**\*7** Meanwhile, in light of Plaintiff's filing of a Third Amended Complaint, Defendant filed the pending motion to dismiss the Third Amended Complaint (Doc. No. 45), on August 23, 2023, followed fourteen (14) days later by a brief in support of the motion (Doc. No. 46). On September 20, 2023, Plaintiff filed a response (Doc. No. 48), as well as a brief in opposition to Defendant's motion to dismiss (Doc. No. 47). Accordingly, both pending motions are ripe for disposition.

## II. LEGAL STANDARDS

### A. Motion for Certification of Interlocutory Appeal
28 U.S.C. § 1292(b) provides for the immediate appeal of an interlocutory order of a district court under the following circumstances:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order.

See 28 U.S.C. § 1292(b). Accordingly, the "three criteria for the district court's exercise of discretion to grant a § 1292(b) certificate" consist of the Court's determination that an order "(1) involve a 'controlling question of law,' (2) offer 'substantial ground for difference of opinion' as to its correctness, and (3) if appealed immediately 'materially advance the ultimate termination of the litigation.' " See Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3d Cir. 1974) (quoting 28 U.S.C. § 1292(b)). Even if the three statutory criteria are satisfied, a district court retains "discretion to deny certification of an [interlocutory] appeal." See In re Chocolate Confectionary Antitrust Litig., 607 F. Supp. 2d 701, 708 (M.D. Pa. 2009) (citing Bachowski v. Usery, 545 F.2d 363, 368 (3d Cir. 1976)). Certification under 28 U.S.C. § 1292(b) is appropriate only under "exceptional circumstances." See Knopick v. Downey, 963 F. Supp. 2d 378, 398 (M.D. Pa. 2013) (quoting Caterpillar Inc. v. Lewis, 519 U.S. 61, 74 (1996)).

The first requirement for certification is that an order involve a "controlling question of law." "A question of law is controlling if: (1) an incorrect disposition would constitute reversible error, or (2) it is serious to the litigation, either practically or legally." Sayles v. Allstate Ins. Co., No. 3:16-cv-01534, 2017 WL 2985402, at *2 (M.D. Pa. July 13, 2017) (citing Katz, 419 F.2d at 755). The Third Circuit has noted that "on the practical level, saving of time of the district court and of expense to the litigants ... [are] highly relevant factor[s]." See Katz, 496 F.2d at 755; see also 19 James Wm. Moore, et al., Moore's Federal Practice § 203.319[3] (3d ed. 2013) (stating that a controlling question of law is one that "has the potential of substantially accelerating disposition of the litigation").

As to the second requirement for certification, it is clear that a party's disagreement with the district court's ruling does not constitute a "substantial ground for difference of opinion" within the meaning of the statute. See In re Chocolate Confectionary Antitrust Litig., 607 F. Supp. 2d at 706. Rather, a "substantial ground for difference of opinion exists when there is a genuine doubt or conflicting precedent as to the correct legal standard" to be applied in the order at issue. See Juice Entm't, LLC v. Live Nation Entm't, Inc., 353 F. Supp. 3d 309, 313 (D.N.J. 2018) (quotation omitted); Knipe v. SmithKline Beecham, 583 F. Supp. 2d 553, 599 (E.D. Pa. 2008). The difference of opinion must involve "one or more difficult and pivotal questions of law not settled by controlling authority." See Sayles, 2017 WL 2985402, at *2 (quotations and citations omitted); Knipe, 583 F. Supp. 2d at

599. The moving party may meet its burden to demonstrate a "substantial ground for difference of opinion" by showing that "different courts have issued conflicting and contradictory opinions when interpreting a particular question of law," see Vares-Ebert v. Township of Hamilton, No. 15-cv-07331, 2020 WL 948774, at *2–3 (D.N.J. Feb. 27, 2020), or by demonstrating the absence of controlling law on a particular issue, see Sayles, 2017 Wl 2985402, at *2; Knipe, 583 F. Supp. 2d at 600.

**\*8** With regard to the third requirement, the statute requires the moving party to demonstrate that an interlocutory appeal may "materially advance the ultimate termination of the litigation." See 28 U.S.C. § 1292(b). "Several factors are pertinent in determining whether an immediate appeal would materially advance the ultimate termination of the litigation, including: (1) whether the need for trial would be eliminated; (2) whether the trial would be simplified by the elimination of complex issues; and (3) whether discovery could be conducted more expeditiously and at less expense to the parties." Patrick v. Dell Fin. Servs., 366 B.R. 378, 387 (M.D. Pa. 2007) (citing Interwave Tech., Inc. v. Rockwell Automation, Inc., No. 05-cv-00398, 2006 WL 401843, at *6 (E.D. Pa. Feb. 16, 2008)).

### B. Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. See Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 312 (3d Cir. 2010). The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC

Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible. See id. The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## III. DISCUSSION

 *9  The Court first addresses Plaintiff's motion for leave to file an interlocutory appeal before addressing Defendant's motion to dismiss Plaintiff's Third Amended Complaint.

### A. Plaintiff's Motion for Leave to File Interlocutory Appeal

In his motion, Plaintiff asserts that the Court's July 19, 2023 Order:

> involves a controlling question of law to which there is a substantial ground for difference of opinion regarding when Amendments should relate back to original pleadings, especially where, as here, there has been evidence of concealment preventing Plaintiff to

properly plead in the first instance, and no prejudice upon the Defendants. An immediate Appeal from that Order may materially advance the ultimate termination of the litigation.

(Doc. No. 43 at 3 ¶ 5.)

The Court will deny Plaintiff's motion seeking to certify the Court's July 19, 2023 Order for interlocutory appeal due to his complete failure to demonstrate an entitlement to such certification, a procedural vehicle appropriate only under "exceptional circumstances." See Knopick, 963 F. Supp. 2d at 398 (quotation omitted). Plaintiff's motion and supporting brief do not even mention 28 U.S.C. § 1292(b), much less persuasively demonstrate that its three criteria governing the Court's discretion to grant a Section 1292(b) certificate support the Court's certification of its July 19, 2023 Order for interlocutory appeal. For example, with regard to the second requirement for certification, and as noted above, a party's disagreement with the district court's ruling does not constitute a "substantial ground for difference of opinion" within the meaning of the statute. See In re Chocolate Confectionary Antitrust Litig., 607 F. Supp. 2d at 706. Plaintiff's arguments in favor of certification, as expressed in his brief in support of his motion, consist of nothing more than disagreement with this Court's determination that Federal Rule of Civil Procedure 15(c)'s relation back provision did not apply to the Second Amended Complaint's asserted Section 1983 claim against Officer Elezovic so as to render the claim timely. Plaintiff argues that:

> [w]here, as here, Plaintiff's failure to timely name Officer Michael Elezovic, as a party Defendant was based, in whole or in part on Defendant's active concealment of Officer Elezovic's role as it relates to this incident, it is respectfully submitted that the Court should have applied Rule 15(c)1(C) to allow Plaintiff's addition of Officer Elezovic as a party Defendant to relate back to the date of original filing.

(Doc. No. 44 at 1.) Plaintiff cites no relevant authority in his filings, much less authority demonstrating "a genuine doubt or conflicting precedent as to the correct legal standard" to be applied by the Court. See Juice Entm't, LLC, 353 F. Supp. 2d at 599. Because Plaintiff has failed to demonstrate that the three criteria governing interlocutory appeal pursuant to 28 U.S.C. § 1292(b) are met here, the Court will deny Plaintiff's motion for leave to file interlocutory appeal. The Court turns to Defendant's motion to dismiss Plaintiff's Third Amended Complaint.

**B. Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint**

**\*10** Plaintiff's Third Amended Complaint asserts four claims against the Township: (1) municipal liability pursuant to 42 U.S.C. § 1983 (Count I); (2) negligence (Count II); (3) wrongful death (Count III); and (4) survival (Count IV). As noted supra at note 2, while the Third Amended Complaint, like the Second Amended Complaint, seeks a remedy pursuant to Pennsylvania's wrongful death statute, 42 Pa. C.S.A. § 8301, and survival statute, id. § 8302, under Pennsylvania law, "wrongful death and survival actions are not substantive causes of action; rather they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." See Sullivan, 765 F. Supp. 2d at 707. Accordingly, Plaintiff's Third Amended Complaint asserts essentially two claims—a Section 1983 municipal liability claim against the Township (Count I) and a negligence claim against the Township (Count II). The Court first addresses Plaintiff's Section 1983 municipal liability claim.

**1. Plaintiff's Section 1983 Municipal Liability Claim**

Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. The statute provides, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

See id. Section 1983 "does not ... create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim for relief under § 1983, a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States" and "show that the alleged deprivation was committed by a person acting under color of state law." See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).

Municipalities such as the Township are considered "persons" under § 1983 and may be held liable for injuries caused by

violations of constitutional rights. See Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). They can only be held liable, however, "for their own illegal acts." See Pembaur v. Cincinnati, 475 U.S. 469, 481 (1986). It is only when a municipality's "execution of [a] policy or custom ... inflicts the injury" that the municipality "as an entity is responsible under § 1983." See Monell, 436 U.S. at 694. To plead a Section 1983 claim against a municipality, a plaintiff must allege (1) an underlying constitutional violation (2) caused by the municipality's execution of a municipal policy or custom. See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003).

A municipal policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." See City of Canton v. Harris, 489 U.S. 378, 385 (1989). A custom is "an act 'that has not been formally approved by an appropriate decision maker,' but is 'so widespread as to have the force of law.' " See Natale, 318 F.3d at 584 (quoting Bd. of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997)). In order to recover from a municipality under this theory of liability, a plaintiff must show "a direct causal link between the municipal policy or custom and the alleged constitutional deprivation." See City of Canton, 489 U.S. at 385. Complaints alleging municipal liability under Section 1983 are not subject to heightened pleading standards. See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993). However, a plaintiff attempting to establish a Monell claim must "identify a custom or policy, and specify what exactly that custom or policy was." See McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009).

**\*11** In the alternative, a municipality may be liable under Section 1983 for a failure to train, monitor, or supervise— however, the failure alleged in such a circumstance must amount to "deliberate indifference to the constitutional rights of persons with whom the police come in contact." See City of Canton, 489 U.S. at 388. To establish deliberate indifference in this context, a plaintiff must generally show the failure alleged "has caused a pattern of violations." See Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000). Where a failure to train claim is alleged based on a single incident, the complaint must contain allegations that policymakers "kn[e]w to a moral certainty" that the alleged constitutional deprivation would occur and the need for further training "must have been plainly obvious." See City of Canton, 489 U.S. at 390 n.10. Further, "[l]iability cannot rest only on a showing that the employees 'could have

been better trained or that additional training was available that would have reduced the overall risk of continued injury.' " See Thomas v. Cumberland County, 749 F.3d 217, 226 (3d Cir. 2014) (citing Colburn v. Upper Darby Township, 946 F.2d 1017, 1029–30 (3d Cir. 1991)).

In arguing that Plaintiff's Section 1983 claim against it is subject to dismissal, Defendant first contends that Plaintiff's Third Amended Complaint fails to plead sufficient facts to sustain a municipal liability claim under either a "municipal policy or custom" or "failure to train" theory of liability. (Doc. No. 46 at 8–11.) Defendant asserts that "[t]he death knell to Plaintiff's Monell claim based upon an unconstitutional policy lies in Plaintiff's concession that the Township, through Corporal Pachalski, directed the pursuit to be terminated immediately upon learning of the pursuit and its justification." (Id. at 11 (citing Doc. No. 41 at 2 ¶ 9).) Defendant argues that "[t]his allegation severs the causal link between the conduct of the Township and the [a]ccident at issue" because, according to the allegations of the Third Amended Complaint, "upon learning of the chase the Township ordered its termination." (Id. at 11–12.)

Further, Defendant argues that Plaintiff relies on an improper legal standard in connection with his municipal liability claim, noting that "Plaintiff pleads that a traffic violation and unusual driving behavior were 'insufficient' to warrant the initiation of the pursuit, and then alleges in a conclusory fashion that if the pursuing officer had been 'properly hired, trained, and supervised he would not have initiated a high-speed chase after Plaintiff's Decedent without justification or probable cause ...' " (Id. at 12.) Defendant maintains that "[i]n so pleading, Plaintiff ignores the decades of case law making Plaintiff's Decedent responsible for his unwarranted and illegal flight from the officer and instead focuses exclusively upon the existence of probable cause to arrest." (Id.) However, Defendant argues that "[t]his is not the standard for imposition of constitutional liability in the context of a police pursuit" and "[i]nstead, such claims are regularly assessed under a substantive Due Process analysis." (Id.) Pursuant to the relevant standard, Defendant asserts that Plaintiff "has failed to plead facts indicating the pursuit lacked a legitimate government interest much less that the pursuit reflected an intent to harm" and argues that "[t]he contrary is established by [Plaintiff's] pleading that acknowledges a traffic violation and Plaintiff's Decedent's decision to flee." (Id. at 14–15.)

In general, Defendant argues that Plaintiff's Third Amended Complaint contains conclusory allegations as opposed to facts

related to the existence of a specific governmental policy or how that policy caused Plaintiff's Decedent's injuries. (Id. at 15–16.) Defendant asserts that "Plaintiff has failed to cure the defects that this Court found fatal to his prior pleading," instead parroting the relevant legal standard but failing to "plead any facts to support a pattern of similar constitutional violations that could arguably place [Defendant] on notice of a practice that was giving rise to constitutional injuries" or to "demonstrate[s] proof of knowledge and acquiescence by the policymaker of a custom that occurs with sufficient frequency to have the force of law." (Id. at 16.) Defendant asserts that "[o]n the contrary, Plaintiff continues to plead in conclusory fashion that had Officer Elezovic been properly hired, trained and supervised, and if Lower Paxton Township has [sic] proper policies and procedures, in place that were enforce[d], a high speed chase ... would not have taken place ...." (Id. at 16 (quoting Doc. No. 41 at 4 ¶ 18).) Defendant maintains that because "it is the Plaintiff's fourth attempt to state such a claim, this claim should be dismissed with prejudice." (Id. at 17.)

*12 In response, Plaintiff asserts that his Third Amended Complaint sets forth a municipal liability claim "premised upon negligent hiring, training, supervision and discipline as it relates to Office Elezovic, and a failure to implement and enforce procedural policies to prevent foreseeable accidents as it relates to a high speed chases initiated without probable cause," and argues that "[w]hile it is believed and therefore averred that Defendant had policies in place relating to the circumstances under which a police officer in Lower Paxton Township should initiate a high speed chase, Plaintiff is simply unable to specifically set forth those policies until same are produced by Defendant." (Doc. No. 48 at 6.) Plaintiff further states that "[i]f the Court finds Plaintiff's Third Amended Complaint lacking in requisite specificity, it is respectfully requested that Defendant's Motion to Dismiss this Count be denied without prejudice, and Defendant be compelled to produce all relevant policies, procedures, customs and practices as it relates to the facts of this case, as well as the personnel file of Officer Elezovic." (Id. at 7.)

Upon careful consideration of the Third Amended Complaint, the parties' briefing, and relevant authority, the Court concludes that Plaintiff has failed to plausibly allege a Section 1983 municipal liability claim against the Township. As an initial matter, the Court notes, as it did in its July 19, 2023 Memorandum, that a deprivation of a constitutional right related to a vehicular police pursuit is analyzed pursuant to the Due Process Clause of the Fourteenth Amendment.

See County of Sacramento v. Lewis, 525 U.S. 833 (1998). In Lewis, the Supreme Court stated that "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.' " See id. at 847 (quoting Collins v. Harker Heights, 503 U.S. 115, 128 (1992)); see also Kneipp, 95 F.3d at 1207 ("The appropriate standard to be applied in police pursuit cases involving an alleged violation of substantive due process is the 'shocks the conscience' test"). In accordance with this standard, the Supreme Court held in Lewis that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment." See Lewis, 525 U.S. at 854. Under this standard, a plaintiff must allege facts showing an "intent to harm" on the part of a pursuing police officer to plausibly allege a constitutional violation.

In this regard, Plaintiff's Third Amended Complaint avers as follows:

> It is believed and therefore averred that the "justification" to engage in a high speed chase here was pretext, and not capable of being rationalized to serve any legitimate governmental interest. As a result, the initiation and continuation [of] this high speed chase under the circumstances evidenced an intent to harm or at least worsen the plight of Plaintiff's [D]ecedent.

(Doc. No. 41 at 3–4 ¶ 15.)

Having previously alleged that Decedent "was lawfully operating a vehicle" (Doc. No. 41 at 2 ¶ 6), and then that Officer Elezovic "allegedly observed [Decedent's] vehicle 'not utilizing his turn signal 100 feet prior to commencing a turn, and stopping for 4-6 seconds at a stop sign' " before beginning a "high speed chase" of Decedent, who "fled" from Officer Elezovic (id. at ¶¶ 7–8), the above allegations of the Third Amended Complaint fail to plead facts showing an "intent to harm" on the part of Officer Elezovic, as required to plausibly allege a substantive due process violation. In Lewis, the Supreme Court stated that "conduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." See Lewis, 523 U.S. at 834 (emphasis added). Here, as alleged by Plaintiff in the Third Amended Complaint, the high-speed chase that led to Decedent's death began when Officer Elezovic allegedly observed Decedent's vehicle in violation of traffic laws, and Plaintiff's Decedent fled from Officer Elezovic rather than stop his vehicle. Even taken as true, these facts do not reflect a deliberate intent to injure "unjustifiable by any government interest." See id. While Plaintiff asserts in a conclusory fashion that the pursuit was "not capable of being rationalized to serve any legitimate governmental interest" and therefore the pursuit "evidenced an intent to harm or at least worsen the plight of Plaintiff's [D]ecedent," that statement parrots the relevant legal standard instead of asserting facts showing an intent to harm on the part of the pursuing police officer, as required by Lewis.

**\*13** As in the Second Amended Complaint, Plaintiff in the Third Amended Complaint appears to suggest that Officer Elezovic should not have pursued Plaintiff's Decedent as an initial matter because Plaintiff was "lawfully operating [his] vehicle." (Doc. No. 41 at 2 ¶ 6.) As previously noted by the Court, this argument is unavailing because "[t]he Supreme Court has held on multiple occasions that the decision to engage in flight and to ignore police warnings to stop causing risk to innocent bystanders results, not from the pursuit by law enforcement, but from the fleeing suspect intentionally placing himself and others in danger by unlawfully engaging in reckless flight." See Koreny v. Smith, No. 17-cv-00371, 2018 WL 1141513, at *8 (W.D. Pa. Mar. 2, 2018).

As the Court previously held, Plaintiff's allegation that Officer Elezovic's "initiation and continuation of this high speed chase" potentially "in violation of yet to be disclosed policies and procedures, as confirmed by Corporal Pachalski's order to terminate the chase," see (Doc. No. 41 at 4 ¶¶ 15–16), does not change the analysis. Indeed, in Davis v. Township of Hillside, 190 F.3d 167 (1999), the Third Circuit addressed a similar substantive due process claim alleging that a police officer involved in a vehicular pursuit "willfully violated applicable police department regulations" in connection with the pursuit. See id. at 170. In so doing, the Third Circuit noted that Lewis "squarely refutes plaintiff's contention that the officers' violation of police department regulations, which might be probative of recklessness or conscious disregard of plaintiff's safety, suffices to meet the shocks-the-conscience test under the due process clause." See id. Accordingly, even assuming the truth of Plaintiff's allegation that Officer Elezovic continued the chase in violation of a superior's order (and potentially violated Township policies in doing so), the Third Amended Complaint fails to plausibly allege a substantive due process violation and therefore fails to allege a Section 1983 claim against Officer Elezovic.

Despite Plaintiff's failure to plausibly allege a substantive due process violation against Officer Elezovic, however, Third

Circuit precedent pertaining to police pursuit "requires the district court to review the plaintiff['s] municipal liability claim[ ] independently of the section 1983 claim[ ] against [an] individual police officer[ ], as the [Township's] liability for a substantive due process violation does not depend upon the liability of any police officer." See Kneipp, 95 F.3d at 1213. Under the Third Circuit's decision in Fagan v. City of Vineland, 22 F.3d 1283 (3d Cir. 1994), "a municipality can be liable under section 1983 and the Fourteenth Amendment for a failure to train its police officers with respect to high-speed automobile chases, even if no individual officer participating in the chase violated the Constitution." See id. at 1294; see also Grazier ex rel. White v. City of Philadelphia, 328 F.3d 120, 124 n.5 (3d Cir. 2003) (noting that the Third Circuit "carefully confined Fagan to its facts: a substantive due process claim resulting from a police pursuit").

The relevant allegations of Plaintiff's Third Amended Complaint are as follows:

13. It is believed and therefore averred that the Lower Paxton Township at all relevant times had maintained a policy, custom or practice of deliberate indifference to the hiring, training, supervision, and discipline of its police officers, despite knowing that those police officers would come into contact with citizens such as Plaintiff's decedent.

14. In accordance with this municipal policy of deliberate indifference, police officer Michael Elezovic was improperly hired, trained, supervised, and disciplined, and, if properly hired, trained and supervised, he would not have initiated a high speed chase after Plaintiff's decedent without justification or probable cause, and continue that chase outside of his jurisdiction, likely in violation of policies and procedures yet to be disclosed.

*14 15. It is believed and therefore averred that the "justification" to engage in a high speed chase here was pretext, and not capable of being rationalized to serve any legitimate governmental interest. As a result, the initiation and continuation [of] this high speed chase under the circumstances evidenced an intent to harm or at least worsen the plight of Plaintiff's decedent.

16. The initiation of this high speed chase was without probable cause, in violation of the constitution, and likely in violation of yet to be disclosed policies and procedures, as confirmed by Corporal Pachalski's order to terminate the chase.

17. It is believed and therefore averred, that there had been previous incidents of high speed chases initiated by police officers of Lower Paxton Township without probable cause leading to injuries and deaths, and therefore making it a morale certainty that greater supervision and training was necessary.

18. It is believed and therefore averred that if Officer Elezovic had been properly hired, trained and supervised, and if Lower Paxton Township has [sic] proper policies and procedures in place that were enforced, a high speed chase through two jurisdictions without probable cause would not have taken place, and this accident would not have occurred and Plaintiff's decedent would be alive today.

19. The aforesaid Lower Paxton policy, custom or practice of deliberate indifference to the hiring, training, supervision, or discipline of its police officers who would come into contact with citizens was the direct and proximate cause of the death of decedent.

20. It is believed and therefore averred that Lower Paxton Township, at all relevant times, had, or should have had, policies in place to ensure that high speed chases are only initiated in truly emergent circumstances not existing here, and only with sufficient probable cause, confirmed by Corporal Pachalski as not existing here, to prevent foreseeable accidents and injuries to members of the public, like that involving Plaintiff's decedent.

21. If policies restricting the initiation and continuation of high speed chases absent truly emergent circumstances and without probable cause were not in place at the time of this accident, Lower Paxton Township would be effectively condoning the violation of the decedent's constitutional rights of due process of law under the Fourteenth Amendment, and to be free from unreasonable search and seizure, by effectively encouraging their officers to engage in high speed chases for any reason or no reason at all, in violation of the constitution.

22. In accordance with a municipal policy or indifference, Lower Paxton Township failed to implement and/or enforce appropriate policies and procedures to limit high speed chases to only emergent circumstances, which, if properly implemented and/or enforced, would have prevented this accident from having occurred.

23. The aforementioned policy, custom or practice of Lower Paxton Township of deliberate indifference to the

2024 WL 691360

danger associated with their officers engaging in high speed chases without probable cause, and their failure to implement and/or enforce appropriate policies and procedures regulating high speed chases, "shocks the conscious" in this day and age, and was the direct and proximate cause of the injuries and death of the decedent. (Doc. No. 41 at 4–5, ¶¶ 13–23.)

Even accepting these sweeping allegations in the Third Amended Complaint as true, and drawing all inferences from them in Plaintiff's favor, Plaintiff's "allegations related to the claimed custom or policy" remain "too vague and conclusory to show evidence of an actionable custom or policy on the part of the [Township]." See Garcia v. Phila. Dist. Att'y's Off., No. 23-01224, 2023 WL 3750604, at *2 (3d Cir. June 1, 2023) (unpublished), petition for cert. pending, No. 23-6327 (filed Aug. 4, 2023) (citing Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997) and then citing McTernan, 564 F.3d at 659); see also id. at 658 (noting that to plead a Monell claim, a plaintiff "must identify a custom or policy, and specify what exactly that custom or policy was"). The Third Amended Complaint fails to allege any facts related to the existence of a municipal policy or custom or how the alleged policy or custom allowed the alleged constitutional violation to occur, or to identify a policymaker or decisionmaker responsible for a policy or custom. Not only do Plaintiff's allegations consist of conclusory assertions that parrot the relevant legal standard rather than pleading specific facts, but they are internally inconsistent—on the one hand asserting that Officer Elezovic initiated the pursuit "likely in violation of yet to be disclosed policies and procedures," (Doc. No. 41 ¶ 16), while also alleging that the Township "failed to implement and/or enforce appropriate policies and procedures to limit high speed chases" and that failure caused the fatal accident (id. ¶ 22).

 *15  Furthermore, with regard to a failure to train Monell claim, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." See Connick v. Thompson, 563 U.S. 51, 62 (2011). Given Plaintiff's reliance on this single incident to support his claim, and as previously stated by the Court, Plaintiff must allege that policymakers "knew to a moral certainty" that the alleged deprivation would occur and that the need for further training was accordingly "plainly obvious." See City of Canton, 489 U.S. at 390 n.10. Plaintiff attempts to bolster his generalized allegations with "factual" representations regarding other incidents that are completely without support in the Third

Amended Complaint. For example, while the Third Amended Complaint states in a conclusory manner that "[i]t is believed and therefore averred that there had been previous incidents of high speed chases initiated by police officers of Lower Paxton Township without probable cause leading to injuries and deaths, and therefore making it a morale [sic] certainty that greater supervision and training was necessary," see (Doc. No. 41 at 4 ¶ 17), Plaintiff's belief in this regard does not equate to an assertion of facts showing a plausible failure to train claim. Instead, Plaintiff's allegations in the Third Amended Complaint are consistent with an assertion that "the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of continued injury,' " which is insufficient to plausibly allege a failure to train Monell claim. See Thomas, 749 F.2d at 226 (citation omitted). In addition, Plaintiff has not identified a "failure to provide specific training that has a causal nexus with [his claim]" and has not pleaded facts indicating "that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivation[ ] occurred." See Reitz, 125 F.3d at 145 (citing Colburn, 946 F.2d at 1030); see also, e.g., Pahler v. City of Wilkes-Barre, 207 F. Supp. 2d 341, 353 (M.D. Pa. 2001) (dismissing failure to train claim where the plaintiff pleaded no facts to support the contention that his injuries were caused by a failure to train, failed to identify the specific training the city should have offered, and failed to plausibly allege that training was not provided). Claims of failures to supervise, discipline, and monitor cannot be pleaded in a conclusory manner. See, e.g., Moresi v. City of Philadelphia, No. 15-cv-00038, 2015 WL 4111724, at *4 (E.D. Pa. July 8, 2015) (dismissing Monell claims asserting "failure to investigate, supervise, or discipline [ ] police officers" where, "[a]part from the single incidence of alleged police misconduct against [the plaintiff], [the plaintiff] plead[ed] no other facts necessary to establish a municipal liability claim").

Accordingly, because Plaintiff's Third Amended Complaint fails to plead facts plausibly alleging a substantive due process violation caused by the Township's policy, custom, or failure to train, as required to state a claim for Section 1983 municipal liability under Monell, the Court will grant Defendant's motion to dismiss Plaintiff's Section 1983 municipal liability claim (Count I). Defendant requests that the Court dismiss Plaintiff's Section 1983 claim against it with prejudice and without further leave to amend. (Doc. No. 46 at 17.) Plaintiff, on the other hand, asks that any dismissal of this claim be without prejudice to his ability to file a fourth

amended complaint after Defendant is "compelled to produce all relevant policies, procedures, customs and practices as it relates to the facts of this case." (Doc. No. 48 at 7.) Plaintiff cites no authority in support of his request for additional discovery and another opportunity to plead his claims. The Court notes that Plaintiff had the opportunity to file two amended versions of his complaint after receiving some discovery from the Township and a third amended version of his complaint after receiving guidance from the Court as to the pleading requirements of a Section 1983 municipal liability claim. As previously stated by the Court, Plaintiff must first allege a plausible claim for relief before he is entitled to discovery. See Connelly v. Lane Const. Corp., 809 F.3d 780, 789 (3d Cir. 2016) (noting that, to survive a motion to dismiss (and proceed to discovery), a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims"); Tieman v. City of Newburgh, No. 13-cv-04178, 2015 WL 1379652, at *21–*23 (S.D.N.Y. Mar. 26, 2015) (stating that plaintiff asserting Section 1983 failure to train claim must meet Twombly and Iqbal pleading standard despite limited information available to plaintiff pre-discovery). Accordingly, at this point the Court concludes that granting Plaintiff further leave to amend would be futile, and therefore the Court will dismiss Plaintiff's Section 1983 claim against the Township (Count I) with prejudice.

**2. Plaintiff's Negligence/Wrongful Death/Survival Claims**

In light of the Court's resolution of Defendant's motion to dismiss Plaintiff's Section 1983 claim (Count I), there is currently no viable federal claim before the Court supporting the exercise of supplemental jurisdiction over Plaintiff's state law claims (Counts II, III, and IV). See Plasko v. City of Pottsville, 852 F. Supp. 1258, 1267 (E.D. Pa. 1994) (first citing United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); and then citing Weaver v. Marine Bank, 683 F.2d 744, 746 (3d Cir. 1982)) ("[c]ourts should ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed"). Accordingly, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and will remand those claims to the Dauphin County Court of Common Pleas.

## IV. CONCLUSION

**\*16** For all of the foregoing reasons, the Court will deny Plaintiff's motion for leave to file interlocutory appeal and grant in part Defendant's motion to dismiss, insofar as Plaintiff's Section 1983 claim against Defendant will be dismissed with prejudice. The Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and remand those claims to the Dauphin County Court of Common Pleas. An appropriate Order follows.

**All Citations**

Slip Copy, 2024 WL 691360

Footnotes

1   The factual background is drawn from Plaintiff's Third Amended Complaint, the allegations of which the Court accepts as true for purposes of the pending motion to dismiss. See Kedra v. Schroeter, 876 F.3d 424, 434 (3d Cir. 2017).

2   The Second Amended Complaint sought a remedy pursuant to Pennsylvania's wrongful death statute, 42 Pa. C.S.A. § 8301 (Count IV), and survival statute, id. § 8302 (Count V). (Doc. No. 21 at 7–9.) Under Pennsylvania law, "wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." See Sullivan v. Warminster Twp., 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011). Accordingly, Plaintiff's Second Amended Complaint asserted essentially three claims: (1) a Section 1983 claim against Officer Elezovic (Count I); (2) a Section 1983 municipal liability claim against the Township (Count II); and (3) a negligence claim against both defendants (Count III).

3   In the absence of a viable federal claim, the Court declined to exercise supplemental jurisdiction over Plaintiff's state law claims and therefore also dismissed those claims without prejudice to Plaintiff's ability to reassert them in a Third Amended Complaint. (Id.)

4   Plaintiff's appeal of this Court's July 19, 2023 Order permitting Plaintiff to file an amended complaint did not divest the Court of jurisdiction over this case. See Bensalem Township v. Intl. Surplus Lines Ins. Co., 38 F.3d 1303, 1314 (3d Cir. 1984) (quoting Mondrow v. Fountain House, 867 F.3d 798, 800 (3d Cir. 1989) (holding that a "premature notice of appeal does not divest the district court of jurisdiction")). Subject to limited exceptions not applicable here, an appeal can only

2024 WL 691360

be taken from a final order of a district court. <u>See</u> 28 U.S.C. § 1291. "Only if the plaintiff cannot amend or declares [his] intention to stand on [his] complaint does [an] order become final and appealable." <u>See</u> Borelli v. City of Reading, 532 F.2d 950, 951–52 (3d Cir. 1976) (per curiam). Accordingly, this Court retains jurisdiction over this action.

5    Upon review of the Third Circuit's docket relating to Plaintiff's appeal of this Court's July 19, 2023 Order, <u>see</u> <u>Small v. Township of Lower Paxton, et al.</u>, No. 23-2408 (3d Cir. <u>filed</u> August 10, 2023), the Court notes that, on the same date that Plaintiff's appeal was docketed by the Third Circuit, the clerk of that court issued an order advising that the case was listed for possible dismissal due to a jurisdictional defect, <u>see</u> <u>id.</u>, ECF No. 4. In response to the Third Circuit's order, Plaintiff filed a copy of his "Motion for Leave to File Interlocutory Appeal" filed in this Court. <u>See</u> <u>Small v. Township of Lower Paxton</u>, No. 23-2408 (3d Cir. Aug. 23, 2023), ECF No. 5.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2023 WL 1805211
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Ronald STOCKTON, Plaintiff,

v.

John WETZEL, et al., Defendants.

Civil No. 1:16-CV-00613
|
Signed February 7, 2023

**Attorneys and Law Firms**

Ronald Stockton, Marianville, PA, Pro Se.

Nicole R. DiTomo, Pennsylvania Office of Attorney General, Norristown, PA, Allison L. Deibert, PA Department of Treasury Litigation Section, Harrisburg, PA, Nicole J. Boland, Pennsylvania State Police, Harrisburg, PA, for Defendants Lt. Bard, Willinsky, C.O. Harpster, C.O. Wilson, C.O. Barndt, C.O. A. Parks.

Nicole R. DiTomo, Pennsylvania Office of Attorney General, Norristown, PA, Karen Mascio Romano, Pennsylvania Office of Attorney General, Harrisburg, PA, Nicole J. Boland, Pennsylvania State Police, Harrisburg, PA, for Defendant Melissa Houck.

**MEMORANDUM**

JENNIFER P. WILSON, United States District Court Judge

**\*1** Before the court are a series of motions filed by Plaintiff, a self-represented inmate currently housed at State Correctional Institution Forest in Marienville, Pennsylvania. Throughout the present litigation, there have been multiple discovery disputes resolved by this court. Discovery is now closed, and the case is currently scheduled for a jury trial on May 23, 2023. Despite this procedural status, Plaintiff now seeks to reopen discovery and reargue the same issues already resolved. To that end, Plaintiff has filed a motion to reconsider the courts' most recent order resolving discovery disputes, a motion for preliminary injunction, and a motion for recusal which, despite their titles, are all vehicles to relitigate issues already decided. These will all be denied. In addition, Plaintiff has filed two motions relevant to his upcoming trial which the court will resolve once they are ripe. Finally, Plaintiff has

filed a motion to appoint counsel, which fails to address the factors relevant to the appointment of counsel and instead focuses on the conduct of opposing counsel. Therefore, the court will deny this motion, but grant Plaintiff leave to renew his request.

**A. Plaintiff's Motion to Reconsider the Court's Order Denying his Motion to Compel, Motion for a Preliminary Injunction, and Motion For Recusal Will Be Denied.**

On September 6, 2022, the court entered an order denying Plaintiff's motion to compel and motion for sanctions. (Doc. 235.) This order addressed an unredacted copy of an investigative report and the court's three previous orders in October of 2019, July of 2020, and August of 2022, and found that Plaintiff presented no new grounds to reconsider the courts' previous order. (*Id.*) The order addressed the "blue print" of the Bosch camera system and refused to consider the matter because discovery was closed. (*Id.*) The order also addressed the production of videos:

> Defendants further agreed to conduct an additional search for any footage that may exist of officers proceeding through the area Plaintiff references in his motion to compel and produce it within thirty days of their brief in opposition. Therefore, Plaintiff's request to compel Defendants to produce such footage will be denied as moot.

(Doc. 235.) The order denied Plaintiff's motion for sanctions against Defendants. On November 1, 2022, Plaintiff filed a motion for reconsideration of this order. (Docs. 255, 256.)

A party seeking reconsideration of a district court's order must show either (1) "an intervening change in the controlling law"; (2) the availability of new evidence that was not available when the court issued its prior order; or (3) "the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). Motions for reconsideration "cannot be used to reargue issues that the court has already considered and disposed of." *McSparren v. Pennsylvania*, 289 F. Supp. 3d 616, 621 (M.S. Pa. 2018) (citing *Blanchard v. Gallick*, No. 1:09-cv-01875. 2011 WL 1878226, at \*1 (M.D. Pa. May 17, 2011)).

**\*2** Plaintiff fails to show a change in controlling law, new evidence, or a clear error of law. Instead, he attempts to reargue his assertions of bad faith on the part of Defendants.

He cites the submission of newly located video evidence as new evidence of their repeated alleged misconduct in discovery. However, the production of the videos is addressed in the court's order and is not new evidence that justifies its reconsideration. As to the other issues the motion raises, these are merely attempts to reargue past disputes that have been settled by the court. Plaintiff's motion will be denied with the limited instruction that Defendants resend the videos, if they have not already, as Plaintiff alleges they were damaged upon arrival and he could only view two of the four videos.

On December 9, 2022, Plaintiff filed a motion for a preliminary injunction, which appears to be a motion to compel disguised as a motion for preliminary injunction. (Doc. 268.) Plaintiff again attempts to reargue the issues of the camera "blue print" and asserts that Defendants are withholding evidence. Discovery is closed in this matter. The court will not allow a party to disguise an attempt to relitigate discovery issues as a motion for a preliminary injunction. Therefore, Plaintiff's motion will be denied.

On December 28, 2022, Plaintiff filed a motion for recusal of the Attorney General's Office based on the alleged misconduct of Defendants' counsel during discovery. (Doc. 272.) The court has repeatedly declined to issue sanctions against Defendants' counsel in this case. Plaintiff's motion appears to be another request for sanctions based on his repeated allegations of misconduct during discovery. Plaintiff's motion will be denied.

### B. Defendants Will Be Required To Respond Plaintiff's Remaining Outstanding Motions.

Plaintiff has also filed a motion to reconsider the conspiracy claim that includes the missing affidavit of Inmate Fennell. (Doc. 257.) He has also filed a motion in limine. (Doc. 261.) Defendants shall respond to these motions within fourteen days of the date of this order.

### C. Plaintiff's Motion For Appointment of Counsel Will Be Denied.

Plaintiff filed a motion for appointment of counsel on December 22, 2022. (Doc. 270.) Plaintiff requests appointment of counsel based on the premise that discovery was unfair, jurors will unfairly believe Defendants' counsel because they are public officials, and he again repeats the alleged misconduct against Defendants' counsel.

Although prisoners have no constitutional or statutory right to appointment of counsel in a civil case, the court has discretion to "request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1); *see Houser v. Folino*, 927 F.3d 693, 697 (3d Cir. 2019). The appointment of counsel is a privilege, not a statutory or constitutional right. *Brightwell v. Lehman*, 637 F.3d 187, 192 (3d Cir. 2011); *Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993). However, representation by counsel may be appropriate under certain circumstances after a finding that the plaintiff's case has arguable merit in fact and law. *Tabron*, 6 F.3d at 155. If the court finds that the plaintiff has crossed this threshold inquiry, the court should consider the following factors in deciding whether to request a lawyer to represent an indigent plaintiff:

(1) the plaintiff's ability to present his or her own case;

(2) the complexity of the legal issues;

(3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation;

(4) the plaintiff's ability to retain counsel on his or her own behalf;

(5) the extent to which a case is likely to turn on credibility determinations, and;

(6) whether the case will require the testimony of expert witnesses.

**\*3** *Tabron*, 6 F.3d at 155-57. This list of factors is non-exhaustive, and no single factor is determinative. *Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002) (citing *Parham v. Johnson*, 126 F.3d 454, 458 (3d Cir. 1997)). Instead, these factors serve as guideposts for the district courts to ensure that the precious commodity of volunteer attorney time is not "wasted on frivolous cases." (*Id.*)

Plaintiff's motion failed to address the factors the court is to consider when determining whether to appoint counsel. As written, the motion is merely another opportunity to air his grievances against Defendants' counsel. Therefore, the motion will be denied with leave to renew with a motion addressing the factors set forth above.

### Conclusion

For the foregoing reasons, Plaintiff's motion for reconsideration of the order denying the September 2022

motion to compel, motion for a preliminary injunction, and motion for recusal will be denied. If not done already, Defendants shall resend the videos initially mailed in July of 2022 since the disc was damaged on arrival. Defendants shall respond to Plaintiff's motion to reconsider the court's order granting summary judgment on the issue of conspiracy, Doc. 257, and motion in limine, Doc. 261. Plaintiff's motion for appointment of counsel will be denied with leave to renew.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 1805211

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

715 Fed.Appx. 179
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Joan Y. SUMMY-LONG, Appellant

v.

PENNSYLVANIA STATE UNIVERSITY;
Penn State College of Medicine, ("PSCM");
Graham B. Spanier, Ph.D., President of
Pennsylvania State University; Harold L. Paz,
M.D., Senior Vice President for Health Affairs,
Dean and Chief Executive Officer of PSCM;
Darrell G. Kirch, M.D., former Senior Vice
President for Health Affairs, Dean and Chief
Executive of PSCM; Kevin Grigsby, D.W.S.,
Vice Dean of Faculty and Administrative
Affairs at PSCM; C. McCollister Evarts,
M.D., former Senior Vice President for Health
Affairs, Dean and Chief Executive Officer
PSCM; Elliot S. Vesell, Sc.D., Former Chair
of the Department of Pharmacology of PSCM;
Wayne Zolko, Associate Vice President
for Finance and Business and Controller of
PSCM; Kent E. Vrana, Ph.D., current Chair
of the Department of Pharmacology PSCM;
Melvin Billingsley, former Acting Chair of
the Department of Pharmacology of PSCM

No. 17-1206
|
Submitted Under Third Circuit
LAR 34.1(a) September 27, 2017
|
(Opinion filed: November 6, 2017)

**Synopsis**
**Background:** Female professor sued her former employer state university, claiming violation of Title VII, Title IX, federal Equal Pay Act (EPA), and Pennsylvania Human Relations Act (PHRA), and asserting § 1983 and § 1985 claims, for allegedly discriminating against her based on sex by paying her less than her male peers and then retaliating against her when she attempted to redress her concerns. The United States District Court for the Middle District of Pennsylvania, (M.D. Pa. No. 1-06-cv-01117), Matthew W. Brann, J., 226 F.Supp.3d 371, granted university summary judgment. Professor appealed.

**Holdings:** The Court of Appeals, Ambro, Circuit Judge, held that:

[1] prima facie case was not established for Title VII, Title IX, and PHRA claims;

[2] professor's lower salary than her male peers did not violate federal EPA;

[3] prima facie case was not established for Title VII retaliation claim;

[4] professor's motion to compel discovery was untimely;

[5] scope of discovery was appropriately limited; and

[6] district court was not biased against professor.

Affirmed.

West Headnotes (9)

[1]     **Summary Judgment**  🔑 Relationship to
        pleadings

        Female professor was precluded from attempting
        for first time in her summary judgment brief
        to assert disparate impact theory of liability
        for her sex discrimination claims against state
        university, under Title VII, Title IX, and
        Pennsylvania Human Relations Act (PHRA),
        where professor styled and prosecuted her

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 58 of 71

Summy-Long v. Pennsylvania State University, 715 Fed.Appx. 179 (2017)
130 Fair Empl.Prac.Cas. (BNA) 911, 352 Ed. Law Rep. 1038

action as disparate treatment claim. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(i); 43 Pa. Stat. Ann. § 951 et seq.

5 Cases that cite this headnote

[2]  **Civil Rights**  Compensation; comparable worth

**Civil Rights**  Admissibility of evidence; statistical evidence

Female professor failed to demonstrate that her lower pay by state university compared to her male peers was caused by sex discrimination, as required to establish prima facie case of pay discrimination based on her sex in violation of Title VII, Title IX, and Pennsylvania Human Relations Act (PHRA), under disparate treatment theory; professor relied on statistical report of historical salary studies at university's medical college that did not establish causation for any salary disparities, analyze individualized circumstances, or explain qualitative aspects of faculty, and that contained only salary inputs from academic year outside of relevant time period. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(i); 43 Pa. Stat. Ann. § 951 et seq.

9 Cases that cite this headnote

[3]  **Civil Rights**  Compensation; comparable worth

Substandard academic performance compared to her male peers constituted legitimate, non-sex based reason, under Title VII, Title IX, and Pennsylvania Human Relations Act (PHRA), for female professor's lower pay by state university compared to her male comparators. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(i); 43 Pa. Stat. Ann. § 951 et seq.

1 Case that cites this headnote

[4]  **Civil Rights**  Compensation; comparable worth

State university's articulated reason for female professor's lower pay compared to her male peers, her substandard academic performance, was not pretext for sex discrimination in violation of Title VII, Title IX, and Pennsylvania Human Relations Act (PHRA). Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(i); 43 Pa. Stat. Ann. § 951 et seq.

6 Cases that cite this headnote

[5]  **Labor and Employment**  Merit system; job rating system

Female professor's difference in her salary compared to her male peers at state university did not violate federal Equal Pay Act (EPA), where university awarded salary based on merit system, and professor's lower salary than her male coworkers resulted from her lack of publications and failure to obtain external funding. Fair Labor Standards Act of 1938 § 6, 29 U.S.C.A. § 206(d)(1).

1 Case that cites this headnote

[6]  **Civil Rights**  Public Employment

**Education**  Exercise of rights; retaliation

**Public Employment**  Exercise of Rights; Retaliation

Female professor was not subjected to adverse employment actions by state university's reduction of her laboratory space and failure to list her name on department faculty website, medical misdiagnosis by third-party physicians, and negative working conditions in department, and thus, professor failed to establish prima facie case of retaliation by university in violation of Title VII; laboratory space was awarded on external grant funding that professor did not have, her name was missing from website simply because website had not been updated in years, physicians were never parties to her claim and their alleged misdiagnosis was not motivated

by her protected activity, and rudeness from department assistant and omission of professor's name in article were not sufficiently adverse. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(i).

2 Cases that cite this headnote

**[7]    Federal Civil Procedure** 👉 Failure to Comply; Sanctions

Female professor's motion to compel production of documents was untimely filed on very last day of discovery in her equal pay lawsuit against state university, where professor failed to show that she was unable to file motion to compel in diligent manner, rather than 20 months after second round of objections by university, and denial of her motion did not result in actual and substantial prejudice to professor and was not a gross abuse of discretion resulting in fundamental unfairness.

1 Case that cites this headnote

**[8]    Federal Civil Procedure** 👉 Scope

District court appropriately limited scope of discovery rather than expanding scope by approximately 25 years after female professor's equal pay lawsuit had already been pending for 9 years.

**[9]    Judges** 👉 Statements and expressions of opinion by judge

Although district court referred to its frustration related to female professor's frequent changes of counsel and requests for deadline extensions in her equal pay lawsuit against state university, court was not biased against professor, where court carefully reviewed and explored all pertinent factual and legal issues before granting university summary judgment, and court did not show deep-seated or high degree of favoritism or antagonism that made fair judgment impossible.

 **\*181**  Appeal from the United States District Court for the Middle District of Pennsylvania, (M.D. Pa. No. 1-06-cv-01117), District Judge: Honorable Matthew W. Brann

**Attorneys and Law Firms**

Norman Perlberger, Esq., Bala Cynwyd, PA, for Plaintiff-Appellant

Janine C. Gismondi, Esq., Chena L. Glenn-Hart, Esq., James M. Horne, Esq., McQuaide Blasko Inc, State College, PA, for Defendant-Appellee

Before: AMBRO, KRAUSE, Circuit Judges, and CONTI[*], Chief District Judge

OPINION[**]

AMBRO, Circuit Judge

Dr. Joan Summy-Long ("Summy-Long") brought claims against her former employer, Pennsylvania State University ("Penn State"), under Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, the Federal Equal Pay Act, 42 U.S.C. §§ 1983 & 1985, the Pennsylvania Human Relations Act, the Pennsylvania Equal Pay Act, and the Pennsylvania Equal Rights Amendment. The theme is that she suffered wage disparity on account of her gender. After Summy-Long abandoned her Pennsylvania Equal Pay Act and Pennsylvania Equal **\*182** Rights Amendment claims, the District Court granted summary judgment to Penn State, holding that she failed to establish a *prima facie* case of sex discrimination and otherwise could not show that Penn State's explanations were a pretext for discrimination. We agree and thus affirm.

The facts of this case are well known to the Court and the parties. *See Summy-Long v. Pennsylvania State Univ.*, 226 F.Supp.3d 371 (M.D. Pa. 2016); *Summy-Long v. Pennsylvania State Univ.*, No. 1:06-CV-1117, 2010 WL 4514312, at \*1 (M.D. Pa. Nov. 2, 2010).

We review determinations on summary judgment *de novo*. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010). It is appropriate when "the movant shows that there is no genuine dispute as to any material fact and ... is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The court must view the evidence in the light most favorable to the non-

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 60 of 71

Summy-Long v. Pennsylvania State University, 715 Fed.Appx. 179 (2017)
130 Fair Empl.Prac.Cas. (BNA) 911, 352 Ed. Law Rep. 1038

moving party. *Galena v. Leone,* 638 F.3d 186, 196 (3d Cir. 2011).

Despite a long and settled history to the contrary, Summy-Long asked the District Court to construe her sex discrimination claims as asserting a disparate impact theory of liability. Disparate impact occurs when policies, practices, rules or other systems that appear to be neutral result in a disproportionate effect on a protected group, as opposed to disparate treatment claims that involve discriminatory decisions regarding an individual. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); 42 (U.S.C. § 20003-2(k).

 **[1]**   The District Court refused Summy-Long's request; it reasoned that she styled and prosecuted her action as a disparate treatment claim and thus was precluded from attempting to include other theories of liability at the eleventh hour in her summary judgment brief. We agree. Our Court has upheld decisions made by district courts rejecting disparate impact claims that were raised for the first time in summary judgment, expressing concerns over potential prejudice, expansion of burdens, and delay. *See e.g., Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 641 (3d Cir. 1993).

We apply the same legal standard for all of Summy-Long's sex discrimination claims. Title VII and the PHRA prohibit an employer from discriminating against its employees on the basis of sex. 42 U.S.C. § 2000e-2(a)(i); 43 Pa. Cons. Stat. § 955(a). Title IX applies the same prohibition to recipients of federal funds. 20 U.S.C. § 1681(a). "Following the Supreme Court's lead in turning to Title VII jurisprudence for Title IX cases, lower courts have adopted the Title VII framework to analyze Title IX [ ] claims." *Atkinson v. Lafayette Coll.,* 653 F.Supp.2d 581, 594 (E.D. Pa. 2009). This means Summy-Long's claims are analyzed under burden-shifting framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To survive summary judgment, a plaintiff must establish a *prima facie* case by showing (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse action, and (4) this occurred under circumstances that raise an inference of discriminatory action. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003). If Summy-Long meets the *prima facie* test, the burden shifts to Penn State to offer a legitimate, non-discriminatory reason for its actions. *Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir. 2000). If it does so, Summy-Long must then point to

evidence from which a reasonable jury could find that the University's explanation is a pretext for discrimination **\*183** and not the real motivation for its actions. *Sarullo,* 352 F.3d at 797.

 **[2]**   Summy-Long fails at the *prima facie* stage. She relies on the history of salary studies at Penn State's Medical College that show she, as well as other female faculty, received lower salaries than their male comparators. However, our Court has previously instructed district courts to treat statistical evidence with caution in disparate treatment cases. *Healy v. N.Y. Life Ins. Co.,* 860 F.2d 1209, 1217 (3d Cir. 1988). The reason is that the inquiry involves decision-making related to the individual rather than the group. *Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867, 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984).

The Haignere Report relied on by Summy-Long did not establish causation for any salary disparities, analyze individualized circumstances, or explain the qualitative aspects of the faculty. Further, the only salary inputs were taken from the 2001-2002 academic year, which is outside of the relevant time period, here after June 2, 2003.

 **[3]**    **[4]**   Even had Summy-Long crossed the *prima facie* threshold, she failed to show that Penn State's legitimate, non-discriminatory explanation of substandard academic performance is mere pretext. Penn State has cited numerous items in the record that Summy-Long's salary reflected a lack of academic performance in comparison to her colleagues. She was urged to increase publications and to obtain external funding to support her research and a required portion of her salary. She was also offered a position as a committee chair by her boss but refused. Summy-Long failed to apply timely to renew her National Institute of Health grant even after being reminded repeatedly for three years by her superior. She also failed to respond with any affirmative evidence that Penn State's explanation regarding her salary is pretextual. We thus affirm the District Court's summary judgment in favor of Penn State regarding her sex discrimination claims.

Summy-Long also appeals the summary judgment against her as to her claim under the Federal Equal Pay Act. To establish a *prima facie* case here, a plaintiff must show that employees of the opposite sex were paid more for performing work under similar conditions that required substantially "equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1); *Stanziale,* 200 F.3d at 107. Substantial equality is not determined by job titles; it turns on "actual job content." *Brobst v. Columbus*

*Servs. Int'l*, 761 F.2d 148, 155 (3d Cir. 1985). If a plaintiff is able to demonstrate a *prima facie* Equal Pay Act case, the burden then shifts to the employer to show that the pay difference resulted from (1) a *bona fide* seniority system, (2) a merit system, (3) a system that measures earnings by quantity or quality of production, or (4) a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1).

 **[5]**   As with Summy-Long's sex discrimination claims, even if she were able to demonstrate a *prima facie* Equal Pay Act case, Penn State has shown an affirmative defense that she has not overcome. It awards salary based on a merit system. The difference in Summy-Long's salary compared to her male coworkers resulted from, among other things, her lack of publications and failure to obtain external funding. Hence we affirm here as well.

The District Court also properly granted summary judgment to Penn State on the merits of Summy-Long's retaliation claims. There were four asserted bases for retaliation: (1) reduction of lab space; (2) her name was not listed on the Neural Science and Behavior Department faculty website;  **\*184**   (3) medical misdiagnosis by doctors not parties to this claim; and (4) negative working conditions in the Pharmacology Department. At the *prima facie* stage Summy-Long must show: (1) protected employee activity; (2) adverse action by employer after or concurrent with the protected activity; and (3) a causal connection between the two. *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015).

 **[6]**   Reduction in lab space was not an adverse action, as lab space is awarded based on external grant funding that Summy-Long did not have. Her name was missing from the faculty web site simply because it had not been updated in years. She alleges that Penn State doctors misdiagnosed her skin tumor, classifying it as squamous cell carcinoma, and when they recommended a second excision it showed she was cancer-free. Not only have the doctors never been parties to this claim, but Summy-Long fails to show the alleged misdiagnosis was in any way motivated by her protected activity. Additionally, the negative working conditions in Pharmacology consisted of rudeness from an assistant and an omission of her name in an article, which are not sufficiently adverse. Moreover, Summy-Long failed to show any causal relation of the University's action to her protected activity. Yet again, a *prima facie* case for retaliation is not met.

 **[7]**   The remainder of Summy-Long's appeal relates to discovery. The District Court denied her last minute motion

to compel, and she appeals. We review that denial under an abuse-of-discretion standard. *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 916 (3d Cir. 1990). Summy-Long submitted a discovery request on January 3, 2014—regarding performance and salary information for multiple Penn State employees dating back to the 1970s—to which Penn State promptly objected and repeated its objection two months later. Yet she waited almost twenty months to challenge the objections and compel production of the documents, filing a motion to compel on the very last day of discovery. The District Court denied it as untimely.

Summy-Long has failed to show that she was unable to file the motion to compel discovery in a diligent manner, rather than months after the second round of objections by Penn State. Our Court has held that a district court's discovery ruling will not be reversed without determining that it resulted in actual and substantial prejudice and was a "gross abuse of discretion resulting in fundamental unfairness." *Marroquin-Manriquez v. I.N.S.*, 699 F.2d 129, 134 (3d Cir. 1983); *see also In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817-18 (3d Cir. 1982). We make no such determination here.

 **[8]**   The District Court also properly limited the scope of discovery to alleged discriminatory practices occurring on or after June 2, 2003. Summy-Long does not challenge that this is the law of the case relative to monetary relief, but claims that the Court erred in determining that the scope of the evidentiary time frame relevant to her case is also limited to after 2003. What this ignores is that the District Court's ruling took place in the context of deciding Summy-Long's motion to compel, which sought the production and performance of her comparators as far back as 1978. The Court relied on the fact that, since 2010, the parties had proceeded on the basis that this case involved salary-related issues only for the period during and after 2003. Based on this, it properly declined to expand the scope of the case by approximately twenty-five years after the case already had been pending for nine years.

 **[9]**   Finally, Summy-Long claims that the District Court was biased against her.  **\*185**   While the Court may have referred to its frustration related to Summy-Long's frequent changes of counsel and requests for deadline extensions, it carefully reviewed and explored all pertinent factual and legal issues before coming to a decision.

Critical comments by a judge in an opinion or during court proceedings do not by themselves make for bias or prejudice. *See Knoll v. City of Allentown*, 707 F.3d 406, 411 (3d Cir.

2013). What is needed is a "deep-seated" or "high degree" of "favoritism or antagonism that would make fair judgment impossible." *United States v. Wecht*, 484 F.3d 194, 213 (3d Cir. 2007), as amended (July 2, 2007) (citing *Liteky v. United States*, 510 U.S. 540, 555-56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). The record reveals none of that here.

We affirm in all respects.

**All Citations**

715 Fed.Appx. 179, 130 Fair Empl.Prac.Cas. (BNA) 911, 352 Ed. Law Rep. 1038

Footnotes

\*     Honorable Chief Judge Joy Flowers Conti, District Court Judge for the Western District of Pennsylvania, sitting by designation.

\*\*     This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5903915
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Tengiz T. SYDYKOV, Petitioner,

v.

IMMIGRATION AND CUSTOMS
ENFORCEMENT and Warden of Clinton
County Correctional Facility, Respondents.

Civil No. 1:21-CV-00575
|
Signed 08/10/2021

**Attorneys and Law Firms**

Tengiz T. Sydykov, Miami, FL, Pro Se.

Joseph J. Terz, Joanne M. Sanderson, U.S. Attorney's Office, Harrisburg, PA, for Respondents.

**ORDER**

JENNIFER P. WILSON, United States District Court Judge

 **\*1** This is a habeas corpus case under 28 U.S.C. § 2241 brought by an immigration detainee who asserts that his detention under 8 U.S.C. § 1226(c) has become unconstitutionally prolonged. The court denied the petition without prejudice on June 2, 2021 and closed the case. Petitioner has since filed a motion for reconsideration. For the reasons that follow, the motion for reconsideration is denied.

**Background and Procedural History**

Petitioner Tengiz T. Sydykov ("Sydykov") is a native and citizen of Kyrgyzstan who was admitted into the United States on January 19, 2010. (Doc. 4-1, p. 3.)[1] Sydykov's status was adjusted to lawful permanent resident on June 25, 2012. (Doc. 4-1, p. 7.) On January 11, 2019, Sydykov was convicted of weapons trafficking and smuggling in the United States District Court for the Eastern District of Virginia and sentenced to 36 months incarceration. (Id. at 10.) On July 27, 2020, the United States Department of Homeland Security ("DHS") served Sydykov with a notice to appear that charged

him as removable from the United States. (Id. at 7.) Sydykov was taken into custody by United States Immigration and Customs Enforcement ("ICE") and placed in Clinton County Correctional Facility ("CCCF") on August 24, 2020. (Doc. 4-1, p. 14.)

Sydykov requested custody redetermination under 8 C.F.R. § 1236, but his request was denied by an Immigration Judge ("IJ") on September 1, 2020. (Doc. 4-1, p. 15.) Sydykov moved to reconsider the IJ's decision on October 18, 2020, see Doc. 4-1, p. 18, but his motion was denied on November 2, 2020. (Id. at 21.)

An IJ ordered Sydykov to be removed to Kyrgyzstan on January 5, 2021. (Doc. 4-1, p. 22.) Sydykov appealed to the Board of Immigration Appeals ("BIA") on January 20, 2021, and his appeal was received by the BIA on January 25, 2021. (Doc. 4-1, p. 43.) As of the present date, Sydykov's appeal remains pending before the BIA, but he has since been transferred to the Krome North SPC in Miami, Florida.

Sydykov filed the petition that initiated this case on March 30, 2021, asserting that he is entitled to a writ of habeas corpus because his detention has become unreasonably prolonged, because his detention is unlikely to end soon, because the delays in his underlying removal case have largely been caused by the actions of the government, and because the nature of his detention is not meaningfully different from criminal incarceration. (Doc. 1.)

The court denied Sydykov's petition without prejudice on June 2, 2021, finding that habeas corpus relief was not warranted based on the standards set forth in *Santos v. Warden Pike Cty. Corr. Facility*, 965 F.3d 203 (3d Cir. 2020). (Docs. 6–7.) Sydykov filed the instant motion for reconsideration on June 15, 2021. (Doc. 8.) Respondents opposed the motion on June 29, 2021. (Doc. 9.) Sydykov has not filed a reply brief in support of the motion, and the deadline for doing so has expired. The motion is accordingly ripe for the court's disposition.

**Discussion**

 **\*2** A party seeking reconsideration of a district court's order must show either (1) "an intervening change in the controlling law"; (2) the availability of new evidence that was not available when the court issued its prior order; or (3) "the need to correct a clear error of law or fact or to

2021 WL 5903915

prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). Motions for reconsideration "cannot be used to reargue issues that the court has already considered and disposed of." *McSparren v. Pennsylvania*, 289 F. Supp. 3d 616, 621 (M.D. Pa. 2018) (citing *Blanchard v. Gallick*, No. 1:09-CV-01875, 2011 WL 1878226 at *1 (M.D. Pa. May 17, 2011)). Additionally, a motion for reconsideration "may not be used to present a new legal theory for the first time" or "to raise new arguments that could have been made in support of the original motion." *MMG Ins. Co. v. Guiro, Inc.*, 432 F. Supp. 3d 471, 474 (M.D. PA. 2020) (citing *Vaidya Xerox Corp.*, No. 97-CV-00547, 1997 WL 732464, *2 (E.D. Pa. Nov. 25, 1997)). A "mere disagreement" with a court's legal conclusion is not a sufficient basis for reconsideration. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 73 F. Supp. 3d 488, 491 (M.D. Pa. 2014) (citing *Mpala v. Smith*, No. 3:06-CV-00841, 2007 WL 136750, at *2 (M.D. Pa. Jan. 16, 2007)).

Although a court may reconsider a prior order based on a party's motion, motions for reconsideration "should be granted sparingly as federal courts have a strong interest in the finality of judgments." *Kitzmiller v. Dover Area Sch. Dist.*, 388 F. Supp. 2d 484, 488 (M.D. Pa. 2005). The decision of whether to grant a motion for reconsideration is left to the discretion of the district court. *Le v. Univ. of Pa.*, 321 F.3d 403, 405 (3d Cir. 2003).

In this case, Sydykov argues that reconsideration is appropriate because the court misunderstood his argument regarding the conditions of his confinement. (Doc. 8, pp. 2–3.) Sydykov "believes that due to his limited litigation skills, he did not draw sufficient attention of the Court to the facts of the conditions of his confinement and that, otherwise, the Court would have weighed said factor in favor of granting the sought after habeas corpus relief." (*Id.* at 2.) The court's misunderstanding is illustrated, Sydykov argues, by the fact that the court did not reference "any facts of Petitioner's *actual* criminal confinement that occurred just prior to his transfer into immigration detention and rather resorted to *hypothetical* conditions of criminal detention that he 'would likely face if he was criminally confined.' " (*Id.* at 2–3. (emphasis in original).) Sydykov also notes that the court "did not address the fact that [he] is currently held in confinement alongside criminal inmates and is subjected to the same conditions with those who are serving their sentences of criminal punishment." (*Id.* at 3.)

Sydykov argues that if his petition is properly understood, the court will find that the conditions of his confinement are not meaningfully different from criminal confinement. (*Id.* at 4.) To support this argument, Sydykov points to the affidavit that he previously attached to his traverse. (*See* Doc. 5-1, pp. 8–11.) Sydykov also attaches two more exhibits that were not previously filed to support his conditions of confinement argument. (*See* Doc. 8-1.) Finally, Sydykov argues that the court's decision violates his right to equal protection because another detainee housed in the same facility was previously granted habeas corpus relief by a different court in this district and the circumstances of his detention do not meaningfully differ from the circumstances of that detainee's detention. (*Id.* at 7.)

**\*3** The court will deny Sydykov's motion because none of his arguments present a proper basis for reconsideration. First, although Sydykov is correct that a court may reconsider its prior order when the court has patently misunderstood a party's argument, *see, e.g., Petruzzi's Inc. v. Darling-Delaware Co., Inc.*, 983 F. Supp. 595, 611–12 (M.D. Pa. 1996), the substance of Sydykov's motion for reconsideration shows that the court did not misunderstand his earlier argument. Sydykov argues that the conditions of his confinement do not meaningfully differ from criminal confinement, and the court squarely addressed this argument in its prior ruling. (*See* Doc. 6, pp. 7–10.) Thus, rather than seeking to correct a misunderstanding, Sydykov's motion actually asks the court to review the same argument and reach a different conclusion, which is not a proper basis for reconsideration. *See McSparren*, 289 F. Supp. 3d at 621 (noting that a motion for reconsideration "cannot be used to reargue issues that the court has already considered and disposed of").

Second, to the extent that Sydykov relies on exhibits that were not previously filed in support of his petition, his argument is rejected. A motion for reconsideration cannot be used to introduce "evidence that could have been proffered prior to the issuance of the order in question." *Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 295–96 (M.D. Pa. 2016) (quoting *McDowell Oil Serv., Inc. v. Interstate Fire & Cas. Co.*, 817 F. Supp. 538, 541 (M.D. Pa. 1993)).

Finally, Sydykov's equal protection argument is rejected because it was not raised in his original petition. *See MMG Ins. Co.*, 432 F. Supp. 3d at 474 ("A motion for

reconsideration may not be used to present a new legal theory for the first time....").

**Conclusion**

For the foregoing reasons, **IT IS ORDERED THAT** Sydykov's motion for reconsideration (Doc. 8) is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5903915

Footnotes

1        For ease of reference, the court utilizes the page numbers from the CM/ECF header.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

189 Fed.Appx. 576
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also Eighth Circuit Rules 28A, 32.1A.
(Find CTA8 Rule 28A and Find CTA8 Rule 32.1A)
United States Court of Appeals,
Eighth Circuit.

UNION PACIFIC RAILROAD COMPANY;

Missouri & Northern Arkansas Railroad

Company, Inc., Appellants/Cross–Appellees,

v.

CONAGRA POULTRY COMPANY,

Appellee/Cross–Appellant.

Nos. 05–2245, 05–2351.
|
Submitted March 16, 2006.
|
Decided June 29, 2006.

**Synopsis**
**Background:** After settling personal injury claims of
poultry company's employee, who was hit by boxcar on
company's premises, railroads filed third-party complaint
against company, seeking contractual indemnification. The
United States District Court for the Eastern District of
Arkansas, William R. Wilson, Jr., J., granted summary
judgment for railroads, reserving issue of whether settlement
was reasonable, and subsequently granted company's motion
to compel discovery responses related to reasonableness
and good faith of settlement. Company and railroads filed
interlocutory appeals.

**Holdings:** The Court of Appeals, Magnuson, District Judge,
held that:

[1] agreement required company to indemnify railroads for
employee's injuries;

[2] that portion of track upon which accident occurred was
outside fence surrounding company's facility did not take
accident outside indemnity provision; and

[3] exercise of jurisdiction over appeal from order compelling
discovery was not warranted.

Affirmed in part and appeal dismissed in part.

West Headnotes (3)

**[1]** **Indemnity** 🗝 Railroads

Indemnity provisions of agreement between
railroads and poultry company were
unambiguous and required company to
indemnify railroads for injuries sustained by
company employee hit by boxcar, pursuant
to provision requiring company to indemnify
railroads for losses incurred during "intraplant
switching," which was defined by agreement as
movement by company of rail cars on track, a
term defined as that portion of track identified
on attached map, given that accident occurred
during company's movement of rail cars on
portion of track covered by agreement.

1 Case that cites this headnote

**[2]** **Indemnity** 🗝 Railroads

That portion of railroad track upon which
poultry company's employee was struck by
boxcar during intraplant switching operation was
outside fence surrounding company's facility did
not take accident outside provision of agreement
requiring company to indemnify railroads for
losses incurred during "intraplant switching,"
given that such portion of track was covered by
agreement.

**[3]** **Federal Courts** 🗝 Preliminary proceedings;
depositions and discovery

Court of Appeals would not exercise jurisdiction
over interlocutory appeal from order compelling
discovery related to reasonableness and good

faith of railroads' settlement of personal injury claims of poultry company's employee in railroads' action against company for contractual indemnification, given that discovery dispute, which concerned disclosure of communications between railroads and their counsel and mental impressions of counsel, was ordinary and straightforward and involved legal questions that were settled issues of law, and review of discovery order would not resolve any substantive claims or eliminate need for trial. 28 U.S.C.A. § 1292(b).

3 Cases that cite this headnote

**\*577** Appeal from the United States District Court for the Eastern District of Arkansas.

**Attorneys and Law Firms**

David A. Littleton, Anderson & Murphy, Little Rock, AR, Michael B. Flynn, John E. Young, Flynn & Associates, Quincy, MA, for Appellants/Cross–Appellees.

Bill H. Walmsley, Walmsley & Weaver, Alfred F. Thompson, III, Murphy Law Firm, Batesville, AR, Robert D. Mullin, Jr., Aaron A. Clark, McGrath & North, Omaha, NE, for Appellee/Cross–Appellant.

Before ARNOLD and GRUENDER, Circuit Judges, and MAGNUSON,[1] District Judge.

[UNPUBLISHED]

MAGNUSON, District Judge.

**\*\*1** This case is before us on two interlocutory appeals. Union Pacific Railroad Company and Missouri & Northern Arkansas Railroad Company, Inc. (collectively "the Railroads") appeal an order granting a motion to compel discovery. ConAgra Poultry Company ("ConAgra") appeals an order granting summary judgment to the Railroads.

BACKGROUND

This case began as a personal injury lawsuit initiated by Kenneth and Priscilla Burress, who sought to recover from the Railroads for personal injuries sustained by Mr. Burress

when he was hit by a boxcar on the premises of his employer, ConAgra. Mr. Burress and another employee were moving two boxcars through the use of ConAgra's switch engine when the accident occurred. The Burresses settled with the Railroads for $5,000,000.

The Railroads filed a third-party complaint against ConAgra, seeking indemnification under the terms of an Industry Track Agreement ("Agreement"). The district court[2] granted summary judgment for the Railroads on the basis that the Burresses' losses were covered by the indemnity provisions of the Agreement, but the court reserved for trial the issue of whether the settlement was reasonable.

After the summary judgment order issued, ConAgra served discovery requests relating to the reasonableness and good faith of the settlement. Some of the requested information included communications between the Railroads and their counsel and mental impressions of counsel. The Railroads objected to the requests on the grounds of relevance, attorney-client privilege, and work-product protection. ConAgra moved to compel responses, and the district court granted the motion.

DISCUSSION

A. The Summary Judgment Order
ConAgra presents two general arguments for reversal of the summary judgment order: (1) that the Agreement's indemnity provisions are ambiguous, and (2) that the location of the accident creates a genuine issue of material fact. Neither of these arguments has merit.

1. *Whether the Allocation of Liability Under the Agreement Is Ambiguous*

ConAgra contends that the Agreement is ambiguous because it contains conflicting allocations of liability. The relevant part of the Agreement, section 4(c), provides:

(c) Except as otherwise specifically provided in this Agreement, all Loss related to the construction, operation, maintenance, **\*578** use, presence or removal of the Track shall be allocated as follows:

1. The Railroad shall pay the Loss when the Loss arises from or grows out of the acts or omissions of the Railroad whether or not a Third Person contributes to cause the Loss.

2. The Industry [ConAgra] shall pay the Loss when the Loss arises from or grows out of the acts or omissions of the Industry, or when the Loss arises from or grows out of ... (iv) *intraplant switching* .... This subsection applies regardless of ... whether or not the Railroad or a Third Person contributes to cause the Loss.

3. Except as otherwise more specifically provided in this Agreement, Railroad and Industry shall pay equal parts of the Loss that arises out of the joint or concurring negligence of the Railroad and the Industry, whether or not the acts or omissions of a Third Person contribute to cause the Loss....

**\*\*2** (Appellant App. at 47) (emphasis added). The district court concluded that ConAgra was obligated to indemnify the Railroads under section 4(c)(2)(iv) because the loss arose from intraplant switching.

A court must construe an indemnity clause according to the general rules of contract interpretation. *Pickens–Bond Constr. Co. v. N. Little Rock Elec. Co.,* 249 Ark. 389, 459 S.W.2d 549, 552 (Ark.1970). However, if a contract's language is clear and unambiguous, there is no need to rely on rules of construction. *Id.*

**[1]** ConAgra first contends that the term "intraplant switching" is ambiguous. Section 4(c)(2)(iv) of the Agreement indemnifies the Railroads, without regard to any negligence of the Railroads, for losses incurred during "intraplant switching." The Agreement defines this term as "the movement of rail cars on the Track by the Industry [ConAgra] by any method." (Appellant App. at 46.) The "Track" is defined as 1,905 feet of track as indicated on a map attached to the Agreement. (*Id.* at 41.) Neither the term "intraplant switching," nor any other term in section 4(c)(2)(iv) imposing the obligation to indemnify on ConAgra, is ambiguous. Mr. Burress's accident occurred during ConAgra's movement of rail cars on a track covered by the Agreement, and ConAgra's duty to indemnify the Railroads in this circumstance is expressed in such clear and unambiguous terms that no other meaning is possible.

ConAgra next argues that the subsections of section 4 cannot be reconciled with each other under the ruling of the district court. Under Arkansas law, a contract must be construed as a whole, *Fort Smith Light & Traction Co. v. Kelley,* 94 Ark. 461, 127 S.W. 975, 980 (1910), and a specific contract clause controls over a general one, *Pate v. Goyne,* 212 Ark. 51, 204 S.W.2d 900, 901 (1947). Here, the district court

implicitly determined that the specific subsection (c)(2)(iv) controls over the more general subsection (c)(1) because the loss arose out of ConAgra's movement of boxcars on the track, or in other words, during intraplant switching. Moreover, subsection (c)(1) does not apply because it requires the Railroads to pay for a loss arising from an act or omission of the Railroads, which did not occur in this case. Subsection (c)(3) does not apply because it is a "catch-all" provision applicable only when there is not a more specific provision covering the loss and when the Railroads and ConAgra are concurrently negligent. The subsections of section 4 do not create any ambiguity.

Finally, ConAgra claims that the word "contributes" in subsection (c)(2) is ambiguous because the term does not make ConAgra liable if a loss is caused by the sole **\*579** negligence of the Railroads. Although we believe the term does not create any ambiguity, the issue is irrelevant as the district court did not found its decision on this language.

In sum, the indemnity provisions of the Agreement are clear and unambiguous. The Agreement specifically details the circumstances under which either party or both parties will be responsible for a loss. Mr. Burress was injured during intraplant switching, and subsection (c)(2)(iv) clearly and unambiguously allocates this loss to ConAgra.

2. *Whether the Location of the Accident Creates an Issue of Material Fact*

**\*\*3** **[2]** ConAgra argues that the location of the accident raises a genuine issue of material fact regarding the scope of the term "intraplant switching." ConAgra does not dispute that the accident occurred during an intraplant switching operation. It contends, however, that the switching operation occurred outside the fence surrounding its facility, and thus, the switching was not "intraplant."

We reject ConAgra's argument. The Agreement defines "intraplant switching," and the definition is clear. The accident occurred while ConAgra was moving railcars on a track subject to the Agreement. This is the very definition of "intraplant switching." Whether or not the accident occurred inside the facility's fence is irrelevant. The Agreement defines the track covered by the Agreement as 1,905 feet of specific track at ConAgra's facility and does not mention a fence. It is undisputed that the accident occurred on the 1,905 feet of track covered by the Agreement. Consequently, the location of the accident does not create a genuine issue of material fact.

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 69 of 71

B. The Discovery Order

**[3]** Title 28 U.S.C. § 1292(b) provides for our jurisdiction over appeals of interlocutory decisions. *White v. Nix,* 43 F.3d 374, 376 (8th Cir.1994). Pretrial discovery orders are almost never immediately appealable. *Coleman v. Sherwood Med. Indus.,* 746 F.2d 445, 446 (8th Cir.1984). A party may immediately appeal a discovery order only if the order presents a controlling question of law or if an interlocutory appeal will materially advance the termination of the litigation. *See* 28 U.S.C. § 1292(b); *see also* 8 Charles Alan Wright, et al., *Federal Practice and Procedure* § 2006 (2d ed.1994). Neither circumstance is present here. The discovery dispute is ordinary and straightforward, and the legal questions are settled issues of law. A review of the discovery order will not resolve any of the substantive claims or eliminate the need for trial. Accordingly, we decline to exercise jurisdiction over the interlocutory appeal of the discovery order.

CONCLUSION

The grant of summary judgment is affirmed, and the appeal of the interlocutory discovery order is dismissed for lack of jurisdiction.

**All Citations**

189 Fed.Appx. 576, 2006 WL 1766717

Footnotes

1       The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota, sitting by designation.

2       The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 70 of 71

2012 WL 13012614
Only the Westlaw citation is currently available.
United States District Court, C.D. Illinois,
Springfield Division.

UNITED STATES of America, and
the States of California, Illinois,
North Carolina, and Ohio, Plaintiffs,
v.
DISH NETWORK, L.L.C., Defendant.

No. 09–cv–3073
|
Signed July 9, 2012

**Attorneys and Law Firms**

Albert N. Shelden, Jinsook Ohta, California Attorney General's Office, Jon F. Worm, California Department of Justice Office of the Attorney General, San Diego, CA, Daniel Kadane Crane–Hirsch, Patrick R. Runkle, Lisa K. Hsiao, Sang H. Lee, United States Department of Justice, Washington, DC, Elizabeth A. Blackston, Paul A. Isaac, Philip I. Heimlich, Illinois Attorney General, Gregory M. Gilmore, US Atty., Springfield, IL, Erin B. Leahy, Michael S. Ziegler, Ohio Attorney General's Office Consumer Protection Section, Jeffrey Robert Loeser, Office of the Ohio Attorney General, Columbus, OH, Kevin Anderson, North Carolina Department of Justice, David N. Kirkman, Teresa L. Townsend, North Carolina Attorney General's Office, Raleigh, NC, Adelina Rosa Viviana Acuna, California Department of Justice, San Francisco, CA, for Plaintiffs.

Catherine Emily James, Henry T. Kelly, Kelley Drye & Warren LLP, Chicago, IL, Damon William Suden, Kelley Drye & Warren, Elyse D. Echtman, John L. Ewald, Peter A. Bicks, Orrick Herrington & Sutcliffe LLP, New York, NY, Edward Ellis Weiman, Kelley Drye & Warren LLP, Los Angeles, CA, Geoffrey W. Castello, III, Joseph A. Boyle, Lauri A. Mazzuchetti, Kelley Drye & Warren LLP, Parsippany, NJ, for Defendant.

## OPINION

BYRON G. CUDMORE, UNITED STATES MAGISTRATE JUDGE

**\*1** This matter comes before the Court on Defendant's Motion for Reconsideration of the Court's June 12, 2012, Order Granting in Part and Denying in Part Plaintiff's Motion to Compel and Motion for Partial Stay of that Order (d/e 156) (Motion). For the reasons set forth below, the Motion is ALLOWED in part and DENIED in part.

The Court allowed in part the Plaintiffs' Motion to Compel Production of Documents Over Defendant's Privilege Assertions (d/e 95) (Motion to Compel). Opinion entered June 12, 2012 (d/e 151) (Opinion 151). The Court conducted an in camera review of several thousand documents and directed Defendant Dish Network L.L.C. (Dish) to produce some of the documents, but not others. The Court determined that the withheld documents were privileged under the attorney client or work product privileges. Opinion 151, at 10–15.

Dish now asks the Court to reconsider that ruling with respect to 108 documents that the Court ordered to be produced. Dish argues that the Court inadvertently omitted most of these documents from the list of documents that should have been designated as privileged. Dish also asks the Court to order the redaction of some documents that contain some privileged information unrelated to this case. Dish submits the declaration of one of its counsel, Lewis Rose, to support the Motion. Motion, attached Declaration of Lewis Rose (Rose Declaration).

Motions to reconsider serve the purpose to correct manifest errors of law or fact or to present newly discovered evidence. Caisse Nationale De Credit Agricole v. CBI Industries, Inc., 90 F.3d 1264, 1269 (7th Cir. 1996). The Rose Declaration does not contain newly discovered evidence, but only provides information that could have been submitted in response to the Motion to Compel. The Court, therefore, will not consider the Rose Declaration in resolving the Motion. Dish further should have asserted the redaction argument in the response to the Motion to Compel. That argument is, thus, waived.

The Court, however, has reviewed the documents identified by Dish to determine whether the face of some of the documents demonstrate that the Court made an inadvertent, but manifest error in finding that the documents were not protected by the attorney client or work product privileges.

The Court identified in Opinion 151 several types of documents at issue that were privileged,

Case 1:20-cv-00292-JPW    Document 393-1    Filed 05/24/24    Page 71 of 71

United States v. Dish Network, L.L.C., Not Reported in Fed. Supp. (2012)

2012 WL 13012614

Many documents were prepared in anticipation of litigation or for trial. Many relate to confidential legal advice related to litigation. Many reflect legal advice relating to matters unrelated to the Rule. Many involve communications with outside counsel who did not perform monitoring or compliance functions.

Opinion 151, at 10–11. Upon review of the 108 documents identified in the Motion, the Court finds that the face of several of the documents demonstrate that they are privileged for one or more of these reasons. In particular, several of the documents were prepared in anticipation of litigation or for trial and several involved communications with outside counsel who did not perform monitoring or compliance functions. The Court, therefore, reconsiders Opinion 151 to the extent that the following documents identified by the numbers assigned on the Plaintiffs' Challenge Log and Supplemental Challenge Log,[1] are privileged: 102–130, 44, 45, 46, 48, 50, 52, 53, 55, 56, 57, 61–68, 70, 965, 1371–1374,1672, 1681, 1721, 1724, 2155, 2411, 2724, 3175, 3302, 3532, 3678, 3702, 3912, 4270, 4346, 4348, 4491, 4492, and 4494.

**\*2** The Motion is denied with respect to the remaining documents listed in the Motion. The Court's review of these remaining documents does not demonstrate that the Court made a manifest error. The documents relate to compliance activities by in-house counsel or they are not privileged because they involved communications with third parties. See Opinion 151, at 7–9.

Dish's request for reconsideration and redaction of certain documents is denied because Dish waived the redaction argument by not raising the issue in its response to the Motion to Compel. If necessary, Dish may seek modification to the Protective Order Governing the Production of Discovery Material (d/e 35) to limit disclosure of this information.

WHEREFORE the Defendant's Motion for Reconsideration of the Court's June 12, 2012, Order Granting in Part and Denying in Part Plaintiff's Motion to Compel and Motion for Partial Stay of that Order (d/e 156) is ALLOWED in part and DENIED in part. The Court's Opinion entered June 12, 2012 (d/e 151) is reconsidered to the extent that the Defendant Dish Network, LLC, is not required to produce the following Documents listed on the Plaintiffs' Challenge Logs because these documents are privileged: 102–130, 44, 45, 46, 48, 50, 52, 53, 55, 56, 57, 61–68, 70, 965, 1371–1374,1672, 1681, 1721, 1724, 2155, 2411, 2724, 3175, 3302, 3532, 3678, 3702, 3912, 4270, 4346, 4348, 4491, 4492, and 4494. The Motion is otherwise denied. Opinion 151 otherwise remains in full force and effect. Defendant Dish Network, LLC, is directed to produce by July 22, 2012, the remaining unprivileged documents that have not yet been produced.

**All Citations**

Not Reported in Fed. Supp., 2012 WL 13012614

Footnotes

1    Motion to Compel, Exhibit 1, Challenge Log; and Supplemental Challenge Log (d/e 99).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.