Tab A - Unreported Cases

Case 1:20-cv-00292-JPW    Document 396-1    Filed 06/05/24    Page 2 of 17

Pace-O-Matic, Inc. v. Eckert, Seamans Cherin & Mellott, LLC, Not Reported in Fed....

2023 WL 7491133

2023 WL 7491133
Only the Westlaw citation is currently available.
**NOT PRECEDENTIAL**
United States Court of Appeals, Third Circuit.

PACE-O-MATIC, INC.

v.

ECKERT, SEAMANS CHERIN &
MELLOTT, LLC; Mark S. Stewart; Kevin
M. Skjoldal, Appellants in No. 22-2958
*Hawke McKeon & Sniscak, LLP,
Appellant in Nos. 22-2445 and 22-2902
*Greenwood Gaming and Entertainment,
Inc., Appellant in Nos. 22-2446 and 22-2959
*(Pursuant to Rule 12(a), Fed. R. App. P.)

Nos. 22-2445, 22-2446, 22-2902, 22-2958, and 22-2959
|
Argued September 20, 2023
|
Filed November 13, 2023

On Appeal from the United States District Court for the
Middle District of Pennsylvania (District Court No. 1-20-
cv-00292), District Judge: Honorable Jennifer P. Wilson

**Attorneys and Law Firms**

Peter C. Buckley, Abraham C. Reich, Robert S. Tintner
[ARGUED], Fox Rothschild, 2000 Market Street, 20th Floor,
Philadelphia, PA 19103, Counsel for Appellants Eckert,
Seamans Cherin & Mellott, LLC, Mark S. Stewart, and Kevin
M. Skjoldal.

Melissa A. Chapaska, Dennis Whitaker [ARGUED], Hawke
McKeon & Sniscak, 100 N Tenth Street, P.O. Box 1778,
Harrisburg, PA 17101, Counsel for Appellant Hawke
McKeon & Sniscak, LLP.

George A. Bibikos [ARGUED], #6330, 5901 Jonestown
Road, Harrisburg, PA 17112, Counsel for Appellant
Greenwood Gaming and Entertainment, Inc..

Michael Martinich-Sauter [ARGUED], Jeffrey B. Jensen,
Michael Nolan, Spencer Tolson, Husch Blackwell, 8001
Forsyth Boulevard, Suite 1500, St. Louis, MO 63105,
Counsel for Appellee Pace-O-Matic, Inc.

Before: RESTREPO, McKEE, RENDELL, Circuit Judges.

OPINION [*]

[*] This disposition is not an opinion of the full Court
and pursuant to I.O.P. 5.7 does not constitute
binding precedent.

RENDELL, Circuit Judge.

**\*1** Eckert Seamans Cherin & Mellott, LLC ("Eckert"),
Hawke McKeon & Sniscak, LLP ("HMS"), and Greenwood
Gaming and Entertainment, Inc., d/b/a Parx Casino ("Parx")
appeal from the District Court's order requiring disclosure of
allegedly privileged material under the doctrine of judicial
estoppel. Because the District Court erred in implementing
the standard for application of judicial estoppel under our
caselaw, we will vacate the order and remand.

I [1]

[1] Because we write only for the parties, we will recite
only the facts necessary to our decision.

Pace-O-Matic, Inc. ("POM") develops, produces, and
licenses electronic games sold, as relevant here, in
Pennsylvania and Virginia. In 2016, Eckert began
representing POM solely in Virginia regarding certain
regulatory matters. At that time, Eckert also represented Parx,
POM's market competitor, in Pennsylvania.

In 2018, POM, through other counsel, filed two lawsuits in the
Commonwealth Court of Pennsylvania (the "Commonwealth
Court Cases") against state agencies, challenging the seizure
of some of its games in Pennsylvania. [2] Parx, represented by
counsel of record HMS and Ballard Spahr, LLP, filed amicus
briefs in opposition to POM's position and moved to intervene
in the action.

[2] *See POM of Pa., LLC v. Pa. State Police, Bureau
of Liquor Control Enforcement*, No. 503 MD
2018 (Pa. Commw. Ct.); *POM of Pa., LLC v.
Commonwealth of Pa., Dep't of Revenue*, No. 418
MD 2018 (Pa. Commw. Ct.).

In January 2020, POM learned that Eckert was involved in
drafting Parx's filings in the Commonwealth Court Cases.
POM requested that Eckert withdraw from representing

Pace-O-Matic, Inc. v. Eckert, Seamans Cherin & Mellott, LLC, Not Reported in Fed....
2023 WL 7491133

Parx in the Commonwealth Court Cases, but Eckert instead withdrew from its representation of POM in Virginia.

In February 2020, POM brought the instant action against Eckert in federal court, alleging a breach of fiduciary duties. POM served interrogatories and requests for document production on Eckert and non-party subpoenas on Parx and HMS seeking communications that Eckert had with Parx and HMS in the Commonwealth Court Cases. Eckert, Parx, and HMS objected, asserting attorney–client and work-product privilege. POM moved to compel production; Eckert, Parx, and HMS moved for a protective order. The Magistrate Judge heard oral argument and conducted an *in camera* review of the documents at issue. The Judge then issued a memorandum and order invoking the doctrine of judicial estoppel to preclude Eckert's assertion of an attorney–client relationship with Parx. The Magistrate Judge concluded that Eckert, HMS, and Parx had each, explicitly or implicitly, mischaracterized Eckert's role in the Commonwealth Court Cases by asserting that Eckert did not represent a party adverse to POM in the Commonwealth Court Cases.

Eckert, HMS, and Parx appealed to the District Court, which affirmed the Magistrate Judge's memorandum and order on July 5, 2022 (the "July 5 Order") and ordered the appellants to turn over the allegedly privileged documents and communications. Eckert, HMS, and Parx filed motions for reconsideration and permission to take an interlocutory appeal under § 1292(b). The District Court denied the motions for reconsideration but granted permission for the interlocutory appeal to decide whether judicial estoppel may be applied as an exception to or waiver of the attorney–client privilege of a non-party for interlocutory appeal. [3] The appellants timely filed petitions for interlocutory review of the July 5 Order under § 1292(b). A motions panel of this court granted the petition, and we consolidated the appeals.

[3]     The District Court stayed the order requiring production of discovery materials pending this appeal.

II [4]

[4]     The District Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), and we have appellate jurisdiction under 28 U.S.C. § 1292(b). The District Court determined that the July 5

Order "(1) involve[s] a 'controlling question of law,' (2) offer[s] 'substantial ground for difference of opinion' as to its correctness, and (3) if appealed immediately 'materially advance[s] the ultimate termination of the litigation.' " *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974) (quoting 28 U.S.C. § 1292(b)). We will exercise our discretion in permitting this appeal to be taken from the July 5 Order, 29 U.S.C. § 1292(b), and do not address the appellants' or appellee's arguments regarding the *Perlman* doctrine or the collateral order doctrine.

**\*2**  The appellants urge, first, that judicial estoppel cannot be applied as a waiver of, or exception to, attorney–client privilege held by a non-party and, second, that the District Court abused its discretion in applying the doctrine of judicial estoppel to the facts before it. Because we agree that the District Court misapplied the law, we need not address the first argument. [5] We review the District Court order invoking judicial estoppel "only for abuse of discretion," inquiring whether its "ruling is founded on an error of law or a misapplication of law to the facts." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 780 (3d Cir. 2001) (internal quotation marks omitted).

[5]     Although appellants' first argument aligns with the question certified by the District Court, when we exercise jurisdiction under § 1292(b), we "may address any issue fairly included within the certified order because 'it is the *order* that is appealable, and not the controlling question identified by the district court.' " *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (quoting 9 J. Moore & B. Ward, *Moore's Federal Practice* ¶ 110.25[1] (2d ed. 1995)).

The concept of judicial estoppel stems from the courts' intrinsic authority to prevent parties from "playing fast and loose with the courts" by asserting inconsistent positions to gain an unfair advantage. *Scarano v. Cent. R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953). In order to apply judicial estoppel, a district court must satisfy itself that:

> (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted [previously]; (2) the party changed his or her position in bad

faith ...; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity.

*Montrose*, 243 F.3d at 777–78. "[J]udicial estoppel is appropriately applied in a narrow category of cases because it 'is an extraordinary remedy that should be employed only when a party's inconsistent behavior would otherwise result in a miscarriage of justice.' " *Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548, 559–60 (3d Cir. 2002) (quoting *Montrose*, 243 F.3d at 784).

The District Court reasoned that judicial estoppel was appropriate because the appellants had presented fundamentally different positions in bad faith to obstruct discovery and no lesser sanction would address the resulting harm. We conclude that the requirements for applying judicial estoppel have not been met.

### A

The Magistrate Judge viewed Eckert's assertion that it did "not represent any party adverse to POM in [the Commonwealth Court] litigation" as irreconcilably inconsistent with its invocation of the attorney–client privilege to shield its communications with Parx. JA 13–14. But Eckert's counsel explained to the Magistrate Judge that Eckert has maintained that it has a longstanding attorney–client relationship with Parx but did not appear as *counsel of record* for Parx in the Commonwealth Court Cases. And Eckert did not view itself as representing a party adverse to POM when Parx was not a party in either Commonwealth Court Case but only had a motion to intervene pending. The Magistrate Judge did not appear to appreciate Eckert's nuanced view of its role. As we read the record, Eckert's position was perhaps "hyper-technical," *see In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 378 (3d Cir. 2007), but it was not wholly incompatible with its assertion of the attorney–client privilege. Eckert readily conceded that it represented Parx in connection with the Commonwealth Court Cases, but Parx was not a party and Eckert never entered an appearance in the case.

### B

 **\*3** Second, even if there were irreconcilable tension between Eckert's positions, the District Court abused its discretion in finding that Eckert, HMS, and Parx acted in bad faith. To satisfy the bad faith requirement, (1) a litigant must behave culpably (2) in a way that "assault[s] the dignity or authority of the court." *Montrose*, 243 F.3d at 781. In other words, "judicial estoppel may not be used to punish litigants for how they treat other litigants or third parties; its *only* legitimate purpose is to remedy an affront to the court's integrity." *Id.* at 785 (footnote omitted).

Our focus is on whether the appellants' conduct assaulted the District Court's authority. "[J]udicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position," *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009), because "[u]nlike the concept of equitable estoppel, which focuses on the relationship between the parties, judicial estoppel focuses on the relationship between the litigant and the judicial system." *Delgrosso v. Spang & Co.*, 903 F.2d 234, 241 (3d Cir. 1990). Here, no court accepted Eckert's, HMS's, or Parx's allegedly inconsistent positions that Eckert was not representing an entity adverse to POM in litigation. Absent that clear threat to judicial authority, the District Court lacked "an integral factor justifying the application of judicial estoppel." *United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005).

POM urges that judicial estoppel may apply even where no court accepted a litigant's prior position. *See G-I Holdings*, 586 F.3d at 262. But that exception was applied in a bankruptcy case, *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314 (3d Cir. 2003), and is quite limited. There, the Bankruptcy Court had not accepted representations in the debtor's disclosure statement, but the Court cited "the reliance placed upon the [debtor's] disclosure statement by the creditors and the court" as justifying the application of judicial estoppel to bar the taking of a later inconsistent position. *Id.* at 320–22 (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988)). Nondisclosure there harmed creditors, "undermining the bankruptcy process by weakening their bargaining position." *G-I Holdings*, 586 F.3d at 262 (discussing *Krystal Cadillac*, 337 F.3d at 324–25). No such systemic threat lurks behind the appellants' positions, so "applying judicial estoppel here presents a greater threat to judicial integrity." *Id.*

Moreover, in routine litigation, defendants are permitted flexibility in asserting positions in early stages of litigation "because a defendant ought to have the opportunity to put up the best possible defense in light of all the claims against it." *Id.*; *see also* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically ...."). Here, there really was no "earlier position" that the District Court accepted or that was relied on. It was all part and parcel of the same discovery proceeding, so there was no assault on the court's authority.

C

Third, the remedy is not sufficiently tailored. Courts should not apply judicial estoppel unless (1) "no sanction established by the Federal Rules or a pertinent statute is 'up to the task' of remedying the damage done by a litigant's malfeasance," *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir. 1999) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)), and (2) "the sanction is 'tailored to address the harm identified,' " *Klein*, 185 F.3d at 108 (quoting *Republic of the Phil. v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 (3d Cir. 1994)).

**\*4** The Magistrate Judge concluded that only two alternative sanctions were available, both of which were "categorically determinative of the outcome on the merits of th[e] litigation": (1) entering default judgment against Eckert or (2) judicially estopping Eckert from denying its representation of a party adverse to POM in litigation. JA 18 (internal quotation marks omitted). Neither the Magistrate Judge nor the District Court appear to have contemplated the use of "Rule-or statute-based sanctions" more proportionate to the misconduct alleged, which alone was error. *Montrose*, 243 F.3d at 785. The sanction ultimately seized upon by the Magistrate Judge was fundamentally inappropriate because it goes to the very heart of the underlying suit—the nature of the relationships between Eckert and POM and Eckert and Parx. The novel application of judicial estoppel to effectively eviscerate a non-party's privilege after the fact was unwarranted when the Magistrate Judge might simply have ruled on the privilege issue on the merits and used more temperate sanctions to deter counsel from any future gamesmanship. [6]

[6]   Parties rely on the privilege as essential to open communications with counsel. To have it denied after the fact, and with little evidence of the role of Parx, the client, in the positions Eckert was taking, gives us serious pause.

Finally, the District Court did not tailor the remedy because it focused its analysis on the alleged bad faith of Eckert, discussing minimally any malfeasance by HMS or Parx. But Parx, as holder of the attorney–client privilege, would suffer the brunt of the penalty imposed by the July 5 Order. *Cf. id.* at 786 (concluding remedy was not tailored where non-party plan participants, not plaintiff hospital and savings plan, were harmed when district court invoked judicial estoppel to dismiss case). In sum, the District Court sought to force a square peg into a round hole by selecting judicial estoppel as an appropriate sanction for appellants. That was an abuse of discretion.

III

On remand, the District Court should consider whether the appellants' perceived misconduct merits sanctions and, if so, whether sanctions available under the Federal Rules or pertinent statutes are appropriate. Accordingly, we will vacate the District Court's July 5 Order and remand for further proceedings consistent with this opinion.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 7491133

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by   Director of Office of Thrift Supervision v. Vinson & Elkins, L.L.P.,   D.D.C.,   September 24, 1996

1995 WL 244522
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

UNITED STATES of America
v.
Jerry WEISSMAN, Defendant.

S1 94 Cr. 760 (CSH).
|
April 26, 1995.

*MEMORANDUM OPINION AND ORDER*

HAIGHT, District Judge:

**\*1** The superseding indictment in this case charges defendant Jerry Weissman with one count of obstruction of proceedings before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate ("PSI") in violation of 18 U.S.C. § 1505, and four counts of perjury in violation of 18 U.S.C. § 1621(1). The events from which the charges in the superseding indictment emanate allegedly occurred between January and June of 1993 during defendant's tenure as Chief Financial Officer ("CFO") of Empire Blue Cross and Blue Shield ("Empire").

In December of 1992, the PSI began investigating Empire in connection with the PSI's examination of the management and operation of the Blue Cross and Blue Shield insurance network, of which Empire was the largest provider. In connection with that investigation, the superseding indictment charges that defendant caused Empire to provide the PSI with false information concerning Empire's financial results by market segment. The information Weissman allegedly caused Empire to furnish the PSI correspond to the false results Weissman allegedly caused Empire to report in statements known as "Blanks" filed with the New York State Insurance Department ("NYSID") in the years ending 1989, 1990, and 1991, but differed from the actual results as reflected in the "Market Segment Reports" contained in Empire's internal financial reports. In addition to providing false information to the PSI, Weissman is alleged to have lied about the discrepancies between the Blanks and the Market Segment Reports under oath in depositions conducted by counsel to the PSI on June 11, 22, and 30, 1993.

Soon after the superseding indictment was filed in this case, counsel for Weissman expressed his intention to move to dismiss the superseding indictment against Weissman "on the ground that it is the product of the improper exploitation of Mr. Weissman's privileged attorney-client communications." Letter from Walter P. Loughlin, Esq. to the Court, dated October 31, 1994, at p. 1. It is defendant's belief that the evidence upon which the indictment is founded consists of statements allegedly made by Weissman at meetings held on June 16 and 17, 1993 attended by Weissman, his personal counsel at Simpson Thacher & Bartlett ("Simpson Thacher"), Empire's General Counsel Alan Drewsen, and attorneys from Willkie Farr & Gallagher ("Willkie Farr") in their capacity as outside counsel to Empire. Summaries of these allegedly self-inculpatory statements, with attribution to Weissman, were subsequently furnished to the government by Willkie Farr. Defendant intends to prove that because they were made in furtherance of a joint defense effort agreed upon by counsel, his communications were shielded by the attorney client privilege which was breached when Willkie Farr unilaterally supplied their contents to the government.

The Court has previously determined that litigation concerning the alleged existence and violation of defendant's attorney-client privilege will proceed in the following three phases:

**\*2** STAGE 1: A hearing will be held on the issue of whether statements made by defendant at meetings with attorneys on June 16 and June 17, 1993 were privileged.

STAGE 2: If it is determined in STAGE 1 that the statements made at the June 16 and June 17 meetings were privileged, a hearing will be held to determine if defendant waived the privilege.

STAGE 3: If it is determined in STAGE 1 and STAGE 2 that defendant's statements were privileged, and that the privilege was not waived, a hearing will be held to determine the extent, if any to which any information obtained by the government was the fruit of improper access to privileged information.

Order dated December 5, 1994 at p. 1. The Court has authorized defendant and the government to conduct third-

Case 1:20-cv-00292-JPW    Document 396-1    Filed 06/05/24    Page 7 of 17

U.S. v. Weissman, Not Reported in F.Supp. (1995)
1995 WL 244522

party discovery in preparation for these hearings, limited at present to only that information relevant to the first and second stages of the proceedings.

In connection with the discovery sanction, on December 6, 1994, defendant served identical subpoenas upon Empire and Willkie Farr seeking documents believed to be relevant to the first two stages of the dispute. Willkie Farr, which represents that it is in the sole possession of the documents sought, has produced certain documents responsive to the subpoenas while withholding others. In January of 1995, Willkie Farr presented to defendant a seventeen-page privilege log which lists 129 documents withheld on the basis of attorney-client and/or work product privileges. Defendant thereafter notified Willkie Farr that it sought 81 of the listed withheld documents, each withheld on the sole basis of the work product privilege. Willkie Farr subsequently provided defendant with a revised privilege log which, for the first time, added the attorney-client privilege as a basis for withholding eleven of the 81 identified documents. Willkie Farr and Weissman have been unable to resolve their differences over the production of the identified 81 documents. Under the circumstances, defendant filed the within motion to compel their production. Willkie Farr opposes the application.

In preparation for stages 1 and 2, the government correspondingly finds itself in need of Court intervention into a third-party discovery dispute. By letter application of January 30, 1995, the government seeks production of four documents from the Simpson Thacher firm withheld on the basis of the work product privilege. By letter dated February 10, 1995, Simpson Thacher informs the Court that it "has agreed to abide the outcome of the motion practice involving [Weissman] and Willkie Farr ... with respect to the production by third parties of attorney work product privileged documents." The government and Simpson Thacher have not independently briefed the work product issue.

Upon considering the arguments presented by both Weissman and Willkie Farr and having carefully reviewed all of the identified documents *in camera,* the Court orders disclosure of all of the Simpson Thacher documents and the bulk of the Willkie Farr documents, some in redacted form.

### BACKGROUND

**\*3** In January of 1993, the PSI served upon Empire a subpoena seeking the production of records and the testimony of high-ranking officers related to various aspects of Empire's management and operation, including its financial condition. As Empire endeavored to respond to the PSI requests, Weissman, Empire's CFO, met extensively with Willkie Farr. In particular, Weissman met several times with Willkie Farr partner Elizabeth Stong as Stong prepared Weissman for interviews by PSI staff on February 16, 1993, April 28, 1993 and June 2, 1993. At the June 2, 1993 PSI interview of Weissman, also attended by Stong and Empire General Counsel Drewsen, the inquiry of PSI staff members apparently delved into Weissman's personal activities. The scope of this inquiry prompted Weissman to retain John J. Kenney of Simpson Thacher to represent him on June 3, 1993.

The following day, June 4, 1993, Kenney met with Stong and Drewsen to discuss, among other things, the progress of the PSI investigation and to arrange for Kenny's access to Empire's business records pertinent to the investigation. *See* Memorandum in Opposition to Weissman's Motion to Compel ("Memorandum in Opposition") at p. 6. Weissman maintains that at this meeting counsel for Weissman and Empire agreed that the parties would undertake a joint effort to respond to PSI inquiries and to prepare Weissman for an upcoming PSI deposition. *See* Memorandum in Support of Weissman's Motion to Compel ("Weissman Memorandum") at p. 8. On June 10, 1993 a meeting was held at Willkie Farr offices attended by Weissman, Kenny, Stong and Melissa McAndrew, a Simpson Thacher associate, during which Stong assertedly prepared Weissman for the PSI deposition which had been adjourned to June 11, 1993. *See id.* at p. 8.

Meanwhile, without Weissman's knowledge, Maroa Velez, Empire's vice president in charge of internal auditing, commenced an internal investigation into possible discrepancies. In the course of this internal investigation, on June 16, 1993, Velez questioned Weissman about apparent discrepancies between the data reported in the Blanks and that contained in the Market Segment Reports. Following this interview, Weissman conferred with Kenney who arranged a meeting later that afternoon at Simpson Thacher offices, attended by Weissman, Kenney, Drewsen, and Louis A. Craco of Willkie Farr. Weissman contends that the meeting commenced with an affirmation by those in attendance that it was being conducted pursuant to the joint defense agreement established on June 4, 1993. *See* Weissman Memorandum at p. 11. Willkie Farr disputes that contention.

The following day, June 17, another meeting was held at the Simpson Thacher offices, this time attended by Weissman, Kenney, McAndrew, Stong and another attorney from Willkie Farr, Martin Klotz. Willkie Farr and the government maintain that during the June 16 and 17 meetings Weissman unburdened himself of his responsibility for creating the discrepancies. The parties agree that the June 17 meeting was held pursuant to an express oral agreement which allowed counsel for Empire to reveal Weissman's statements to the Empire Board of Directors and, without attribution of source, to appropriate regulatory authorities. *See* Memorandum in Opposition at p. 9. The parties disagree, however, as to the scope and significance of that express oral agreement.

**\*4** On June 22 and June 23, 1993, Weissman was deposed by PSI and the NYSID, respectively. Simpson Thacher attorneys who accompanied Weissman to those depositions thereafter conferred with counsel for Empire about their substance. On June 29, 1993 and July 13, 1993, Otto G. Obermaier of Weil, Gotshal & Manges, who had been retained by Empire to conduct an internal investigation of the discrepancies, interviewed Weissman in the presence of attorneys from Simpson Thacher and Willkie Farr. Empire dismissed Weissman on July 15, 1993.

### DISCUSSION

#### A. *Attorney-Client Privilege*

Weissman has not attempted to obtain discovery of any documents originally withheld on the basis of the attorney-client privilege. However, in light of Willkie Farr's revision of its privilege log to assert the attorney-client privilege as an additional basis for withholding eleven of the 81 documents sought by Weissman, Weissman asks the Court to review these eleven documents *in camera* to ensure that they are properly subject to the privilege and to ascertain whether attorney-client privileged portions are readily excisable.[1] Willkie Farr claims that four of the documents are protected in whole, and seven are protected in part, by the attorney client privilege. *See* Memorandum in Opposition at p. 3, n.3. I have followed Weissman's suggestion and reviewed the eleven documents.

As for five of the documents[2], the work product privilege has not been overcome for reasons discussed *infra.* Accordingly, because they are absolutely protected by the work product

privilege, the Court need not reach the issue of whether they are also protected by the attorney client privilege.

Three of the documents, 65, 66, and 79, are entirely shielded by the attorney client privilege because they constitute notes of the substance of communications made to Stong by employees of its client Empire.

Document 3 is an internal Willkie Farr memorandum which because it recites communications made by employees of Empire is almost entirely privileged. To the extent it is not privileged, it contains no information related to the cooperation or contacts between Weissman and Empire in responding to the PSI inquiry and is therefore irrelevant consistent with the discussion *infra* pp. 15-17.

Document 15 consists of Craco's diary notations related to the Empire PSI investigation. As discussed *infra* pp. 17-18, the entries for June 18-24 are not relevant and need not be disclosed. As for the remaining two entries, the attorney client privilege applies to protect only the first line on the June 16 entry. With that sole redaction, the remainder of those two entries must be disclosed.

The final document for which the attorney client privilege has been invoked is document 77 which contains a chronology of events addressing the PSI investigation, the disclosure of discrepancies, and Empire's response thereto. Having reviewed the document, I discern only four statements which conceivably constitute or reflect communications by the client for the purpose of seeking legal advice or assistance. In returning the original document to Willkie Farr, the Court will indicate on a copy what material is to be redacted before the document is given to Weissman. Upon redacting those four statements, Willkie Farr must disclose the document because the remainder of its contents are not protected by the attorney client privilege and because Weissman has demonstrated that the work product privilege protecting it should be overcome.

#### B. *Work Product Privilege*

##### 1. *General Principles*

**\*5** The discovery of attorney work product is governed by the provisions of [Fed. R. Civ. P. 26(b)(3)](#), which provides in substantial part:

Case 1:20-cv-00292-JPW    Document 396-1    Filed 06/05/24    Page 9 of 17

U.S. v. Weisman, Not Reported in F.Supp. (1995)
1995 WL 244522

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative ... only upon a showing that the party seeking discovery has *substantial need* of the materials in the preparation of the party's case and that the party is *unable without undue hardship to obtain the substantial equivalent of the materials by other means*. In ordering discovery of such materials when the required showing has been made, *the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories* of an attorney or other representative of a party concerning the litigation.

(emphasis added).

The privilege promotes two important interests. It is designed to prevent a party from taking advantage of his adversary's efforts to gather material for litigation, and to foster the adversary system by providing a safe harbor within which an attorney can analyze and prepare his client's case. *See In re Six Grand Jury Witnesses,* 979 F.2d 939, 944 (2d Cir. 1992), *cert. denied,* 113 S.Ct 2997 (1993); *Redvanly v. Nynex Corp.,* 152 F.R.D. 460, 463-64 (S.D.N.Y. 1993); *Resolution Trust Corp. v. Diamond,* 137 F.R.D. 634 (S.D.N.Y. 1991).

Designating material attorney work product does not carry it entirely outside the scope of discovery. Material falling within the general category of attorney work product has come to be divided into two classes: work which recites factual matters, and work which reflects an attorney's opinions, conclusions, mental impressions or legal theories. *See, e.g.,* 4 Jeremy C. Moore *et al.,* Moore's Federal Practice ¶ 26.15[3] at 26-304 (2d Ed. 1994). The work product privilege may be overcome as to the former type of work product if the party seeking production demonstrates a substantial need for the material in preparing his case and an inability without undue hardship to

obtain its substantial equivalent by other means. *See* Fed. R. Civ. P. 26(b)(3); *see also A. Michael's Piano, Inc. v. F.T.C.,* 18 F.3d 145 (2d Cir. 1994), *cert. denied,* 115 S.Ct. 574 (1994).

Even if the disclosure of factual work product is deemed appropriate, the rule admonishes courts to protect against discovery of the mental impressions, opinions, or legal theories contained in the documents. This second category, so-called "opinion" or "mental impression" work product, "includes such items as an attorney's legal strategy, his intended lines of proof, his evaluation of the strengths and weaknesses of his case and the inferences he draws from interviews of witnesses." *Sporck v. Peil,* 759 F.2d 312, 316 (3d Cir. 1985), *cert. denied,* 474 U.S. 903 (1985); *see also In re Steinhardt Partners, L.P.,* 9 F.3d 230, 234 (2d Cir. 1993) ("An attorney's protected thought processes include preparing legal theories, planning litigation strategies and trial tactics, and sifting through information."). This class of work product is entitled to at least heightened protection from discovery. *See Upjohn Company v. United States,* 449 U.S. 383, 401 (1981); *In re John Doe Corp.,* 675 F.2d 482, 493 (2d Cir. 1982); *Redvanly,* 152 F.R.D. at 464. However, "not every item which may reveal some inkling of a lawyer's mental impressions, conclusions, opinions or legal theories is protected as opinion work product.... Whatever heightened protection may be conferred upon opinion work product, that level of protection is not triggered unless disclosure creates a real, nonspeculative danger of revealing the lawyer's thoughts." *In re San Juan DuPont Plaza Hotel Fire Litigation,* 859 F.2d 1007, 1015 (1st Cir. 1988) (citing, *inter alia, Gould, Inc. v. Mitsui Mining & Smelting Co.,* 825 F.2d 676, 680 (2d Cir. 1987)).

**\*6** It remains unresolved, at least within this circuit, whether core mental impression/opinion work product is afforded absolute protection from disclosure. *Compare Redvanly,* 152 F.R.D. at 464 (privilege against disclosure of mental impression work product is not absolute) *with Bogan v. Northwestern Mutual Life Insurance Co.,* 144 F.R.D. 51, 53 (S.D.N.Y. 1992) (court considered mental impression work product "absolutely protected"); *see Santiago v. Miles,* 121 F.R.D. 636, 639 (W.D.N.Y. 1988) (observing that the Second Circuit has not determined whether mental impression work product is afforded absolute protection from disclosure). In *Upjohn,* the Supreme Court recognized a conflict existing between various circuits on this issue but expressly left the question open. 449 U.S. at 399.

Case 1:20-cv-00292-JPW    Document 396-1    Filed 06/05/24    Page 10 of 17

U.S. v. Weisman, Not Reported in F.Supp. (1995)
1995 WL 244522

The principles governing disclosure of work product in civil litigation have been applied in the criminal context as well. *See In re Six Grand Jury Witnesses,* 979 F.2d at 944; *United States v. Marcus Schloss & Company, Inc.,* No. 88 Cr. 796 (CSH), 1989 WL 62729, at \*2, (June 5, 1989). In striking a balance between a party's need for the information and the attorney's interest in preventing an invasion into his protected realm, the Court should consider the context in which the demand is made. Thus, "in a criminal case where the defendant's liberty is at stake ... 'substantial need' as originally contemplated by the civil discovery rules should be defined more flexibly." *Marcus Schloss,* 1989 WL 62729 at \*3. Bearing these standards in mind, I now turn to the present dispute.

2. *Scope of the Present Dispute*

The parties to this dispute have usefully divided the materials sought into the following five categories: (1) documents relating to the contacts between Weissman and Willkie Farr prior to the retention of Simpson Thacher on June 3, 1993; (2) documents relating to Weissman's statements on June 16 and/or June 17, 1993; (3) documents relating to the joint efforts of Empire and Weissman to respond to the PSI inquiries after the retention of Simpson Thacher; (4) documents relating to interviews of Weissman by Otto Obermaier on June 29 and July 13, 1993; and (5) documents relating to discussions between attorneys at Willkie Farr and Empire and the United States Attorney's Office. For the sake of simplicity, the Court will adopt the same grouping in assessing whether Weissman has satisfied his burden of demonstrating substantial need for the materials and the inability to obtain the substantial equivalent without undue hardship.

Weissman does not challenge Willkie Farr's assertion that the documents constitute work product. Instead, he argues that the work product privilege has been overcome by his demonstrated need for the documents to prepare to meet his burden of proving at stage 1 of the hearing that the statements made on June 16 and 17 were made in furtherance of a joint defense effort and under the protection of the attorney-client privilege, and to demonstrate at stage 2 that any such privilege was never waived. Specifically, defendant argues that the documents relating to his contacts with Empire and Willkie Farr in connection with the PSI investigation (category 1), and relating to the joint efforts of Weissman and Empire to respond to the PSI investigation after the retention of Simpson (category 3), are necessary to demonstrate that Weissman had an objectively reasonable belief that he and Empire shared a commonality of interest with respect to

the subject of the June 16 and 17 communications and that these communications would be confidential. Documents relating to the June 16 and 17 meetings (category 2), and documents related to the discussions between the United States Attorney's Office, Willkie Farr attorneys and Empire (category 5), are assertedly necessary to determine whether the June 16 and 17 meetings were actually conducted pursuant to a joint defense agreement. Finally, the documents related to the Otto Obermaier interviews (category 4) are necessary as relevant to the issue of whether, as the government contends, statements Weissman made at the interviews constituted waiver of the privilege.

**\*7** In response, Willkie contends that Weissman has failed to satisfy his burden of demonstrating sufficient need to lift the veil of work product protection. Willkie's opposition can be broken down into five principal arguments: (1) with a single exception (document #19), none of the documents in the first three categories are relevant to the issue of whether a joint defense effort existed with respect to the subject matter of the June 16 and 17 meetings; (2) the documents in categories four and five do not provide support for defendant's claims; (3) the bulk of the documents across all categories consist of attorney interview notes and other core opinion/mental impression work product immune from production; (4) the substantial equivalent of the documents in category four have already been obtained by defendant; (5) Empire will be prejudiced if documents relating to discussions and interviews with the United States Attorney's Office are released.

a. *Relevance of Documents*

Willkie Farr argues that even if the documents relating to the contacts between Weissman and Empire (both before and after Simpson Thacher's retention) were relevant to demonstrate that Empire and Weissman shared a common interest in responding to the PSI investigation, they shed no light on whether they shared a common interest with respect to Weissman's alleged responsibility for creating discrepancies between the Blanks and the Market Share Reports, which was the subject matter of the June 16 and 17, 1993 meetings. It is Willkie Farr's position that because Empire and Weissman could not possibly have shared any common interest in Weissman's misconduct, the relationship between Weissman and Empire in responding to *PSI inquiries* could not possibly bear on Weissman's reasonably objective belief that his June 16 and 17 communications concerning *his malfeasance* were privileged.

I cannot accept Willkie Farr's overly restrictive conception of relevance. As noted, defendant bears the burden of demonstrating that Weissman reasonably believed the statements he made during the June 16 and 17 meetings were made in furtherance of a common defense effort and were confidential. As this Court framed it, the factual issue to be determined at stage 1 is, "in the totality of the circumstances [at the June 16 and 17 meetings] did Mr. Weissman have an objectively reasonable understanding that what he [said at those meetings] would be held in confidence." Transcript of January 27, 1995 conference at p. 38. Weissman must establish that key threshold fact if his argument is to go anywhere. He must be allowed to develop the circumstances relevant to that proposition.

Defendant apparently intends to demonstrate that the substance of his contacts with Empire and Willkie Farr in connection with jointly responding to the PSI inquiry both before and after the retention of Simpson Thacher helped form the basis of his reasonable belief that they shared a common interest in the subject of the discrepancies. This is a legitimate argument for Weissman to make. I cannot so readily conclude, as Willkie Farr suggests, that no possibility of convergent interests could have existed between Empire and Weissman with respect to the allegations of his falsifying Empire's filed reports. The interests of Empire and Weissman are squarely at issue in stage 1 of the proceedings. It would be unfair to resolve that factual dispute before the parties have had a full opportunity to present relevant evidence at the stage 1 hearing. I therefore reject Willkie Farr's argument that no documents relating to any of these contacts conceivably bear upon the objective reasonableness of Weissman's belief that his communications were privileged.

**\*8** My review of the documents yields the conclusion that, consistent with the above discussion, the majority of the documents in the first and third categories are relevant. The exceptions are documents 6, 7, 11, 12, 42,[3] 55, 58, 64 and 69. Those portions of documents 6, 7, 11 and 12 which relate to interviews with employees other than Weissman, and which Weissman did not attend, are wholly irrelevant to the issue of whether Weissman's statements on June 16 and 17 were made in furtherance of a joint defense. Nor do the other enumerated documents shed any light on the issues. Accordingly, documents 42, 55, 58, 64, 69 and the portions of 6, 7, 11 and 12 relating to interviews with employees other than Weissman need not be produced. Because the remainder of the documents in the first and third categories are relevant

and necessary to Weissman in preparing to demonstrate that his statements were protected by privilege, Weissman has shown a substantial need to overcome the protection of the work product privilege.

Willkie Farr further asserts that three of the four withheld documents in category 2 related to Weissman's statements on June 16 and 17 have no bearing on the stage 1 or 2 issues.[4] Having inspected the documents, I agree that Craco's diary entries on June 18-24 (document 15) could not possibly have an influence on the matters in this proceeding. Those diary entries therefore need not be disclosed. Willkie Farr, however, entirely fails to explain how Craco's diary entries on June 16 and 17, and the entirety of Stong's handwritten and typed notes of the Weissman interview are irrelevant to the issue of whether the June 16 and 17 meetings were conducted pursuant to a joint defense agreement. To the contrary, Stong's notes of what transpired at those meetings and Craco's diary entries related to those significant days potentially bear upon the disputed issues. These documents are accordingly relevant and needed by Weissman in preparing to meet his burden. To the extent Willkie Farr implicitly asserts that the withheld portions of Stong's notes contain no evidence to support defendant's claims, that argument is addressed *infra.*

#### b. *Support for the Claims*

As for the remainder of the documents (categories four and five), Willkie Farr contends that Weissman cannot demonstrate any substantial need for them because, according to Willkie Farr, they contain no evidence which would aid Weissman in establishing his claims of privilege and non-waiver. This contention lacks merit.

As a preliminary point, it is not the proper function of Willkie Farr to determine whether documents would in fact be useful to establish defendant's case. It would be irresponsible for this Court to allow such a sweeping, unilateral and subjective conclusion to defeat a showing of substantial need. Conceptually, so long as the documents bear upon the disputed issues, defendant may find a beneficial use for them which escapes Willkie Farr.

More importantly, even if its evidentiary assertion were confirmed, Willkie Farr fails to offer any support for the proposition that substantial need does not exist unless the documents sought would be helpful to defendant in establishing his claims. The cases cited by Willkie Farr are

U.S. v. Weisman, Not Reported in F.Supp. (1995)
1995 WL 244522

Case 1:20-cv-00292-JPW    Document 396-1    Filed 06/05/24    Page 12 of 17

inapposite or distinguishable. In *Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir. 1989), the Second Circuit determined that plaintiff had not demonstrated any substantial need for attorney notes protected by the work product doctrine because the notes were prevented by the statute of frauds from being used at all in the analysis of whether a contract existed, the purpose for which the documents were sought. In the present case, the documents are not marked by any similar legal infirmities which would prevent the documents from having any bearing on the salient issues. In *Catino v. Travelers Ins. Co., Inc.,* 136 F.R.D. 534, 540 (D.Mass. 1991), the court found that plaintiffs failed to demonstrate substantial need to overcome the work product protection afforded various documents, observing simply that the documents did not "bear on" the unfair settlement practices at issue in the lawsuit. *Catino* therefore appears to stand for the obvious and distinct proposition that non-relevant documents need not be disclosed. Lastly, the court in *Heller v. United States Marshals Service,* 655 F. Supp. 1088, 1092 (D.D.C. 1987), merely concluded that plaintiffs could not demonstrate substantial need for attorney notes protected by the work product privilege "in light of the[ir] contents." The court did not elaborate on this conclusion. Nowhere does the court state whether the notes failed to support, as opposed to being irrelevant to, plaintiffs' claims, or whether such a finding would a showing of substantial need impossible. I do not derive from any of these cases the principle that to be worthy of substantial need a document must support defendant's claim.

**\*9** I conclude that because (with the noted exceptions) the challenged documents are clearly germane to the central issues of whether the statements were made pursuant to a privilege and whether any privilege was waived, and because they are of potential use to him in preparing to meet his burden, Weissman has demonstrated a substantial need for them notwithstanding their asserted inability to support his claim.

c. *Attorney Interview Notes/Core Opinion Work Product*

Approximately two thirds of the documents sought consist of notes and memoranda prepared by attorneys reflecting the contents of certain interviews and conversations.[5] Willkie Farr maintains that by their very nature, such notes and memoranda constitute core mental impression/opinion attorney work product which is either immune from production or requires a heightened showing of need

that cannot be met here. This argument derives support from the case law of other circuits. For example, in *In re Sealed Case,* 856 F.2d 268, 273 (D.C.Cir. 1988), the District of Columbia Circuit held that Securities and Exchange Commission attorneys could not be compelled to answer deposition questions calling for their recollection of the contents of witness interviews conducted in connection with the litigation. Appellant was required to make "a far stronger showing than" substantial need to overcome the privilege applying to such product based on oral statements from witnesses. *Id.*

The Supreme Court's decision in *Upjohn, supra,* 449 U.S. 383, also lends an element of support to Willkie Farr's argument. In *Upjohn,* the Court held that notes and memoranda of a corporation's attorneys reflecting oral statements of interviewed employees disclosed the attorneys' thought processes and could not therefore be produced over work product objections merely upon demonstration of substantial need and the inability to obtain the substantial equivalent thereof. *Id.* at 401. In so concluding, the Court observed that "[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." *Id.* at 399.

The difficulty with Willkie Farr's argument is that it fails to contend with Second Circuit precedent on point establishing the slightly different analysis this Court is required to follow. In *John Doe Corp., supra,* 675 F.2d 482, the government sought disclosure of attorney notes of interviews with corporate employees. Upon *in camera* examination of the notes, the court determined that their production would "not trench upon any substantial interest protected by the work-product immunity," as they merely "recite in paraphrased, abbreviated form, statements" made by the employee to the lawyer. *Id.* at 493. The court ordered production of these notes over the corporation's objection that they reflected the mental processes and legal theories of the interviewing attorneys, declaring:

**\*10** To the extent that the statements imply the attorney's questions from which inferences might be drawn as to his thinking, those inferences merely disclose the concerns a layman would have as well as a lawyer in these

particular circumstances, and in no way reveal anything worthy of the description "legal theory." [6]

*Id.*

It is clear from the court's discussion in *John Doe Corp.,* that in considering whether to require production of attorney interview notes in this circuit, a distinction must be drawn between summaries of the interviewee's statements on one hand and, explicit mental impressions, conclusions, opinions or legal theories of the attorney on the other. To the extent attorney interview notes comprise the former, they are producible upon a showing of substantial need. To the extent such notes are more than just summaries of statements and explicitly contain (as opposed to implicitly reflecting) the opinions, legal theories or mental impressions of the attorney, those portions are entitled to greater protection.

Another judicial officer in this district recently followed this analysis. In *Securities and Exchange Commission v. Thrasher,* No. 92 Civ. 6987 (JFK), 1995 WL 46681 (S.D.N.Y. February 7, 1995), plaintiff argued that attorney interview notes sought by defendant constituted core opinion work product and were not subject to disclosure. In a Report and Recommendation issued to Judge Keenan, Magistrate Judge Dolinger, relying upon *John Doe Corp.,* observed that "to the extent that the notes constitute summaries of what a party or witness has stated to the attorney or his representative, it [sic] is treated as factual work product and analyzed under the standards articulated in Rule 26(b)(3)." *Id.* at *6. Having reviewed the notes, Magistrate Judge Dolinger found they consisted of "abbreviated recapitulations of what a witness has said during his or her interview" and were subject to disclosure because of defendants' substantial need for them. *Id.* Plaintiff subsequently sought reconsideration of that decision on principally the same basis as Willkie Farr seeks to prevent disclosure here, arguing that *Upjohn* compels the conclusion that attorney notes of statements made during interviews or conversations are inherently opinion work product subject to a higher showing of need. The reasoning of Magistrate Judge Dolinger in rejecting that argument applies with equal force to the essentially identical one advanced by Willkie Farr:

> This argument ignores the fact that, whatever [plaintiff's] opinion of *Upjohn,* the year after *Upjohn*

was decided the Second Circuit addressed the issue of the status of attorney interview notes and provided the analytical framework that was followed in the [court's previous opinion issued February 7, 1995]. That approach continues to be followed in this circuit.

*Securities and Exchange Commission v. Thrasher,* No. 92 Civ. 6987, 1995 WL 92307, at *2 (March 7, 1995) (JFK) (citation omitted). [7]

**\*11** Without explicitly referencing *John Doe,* this Court employed the analysis that case endorsed in addressing a dispute analogous to the one at bar. In *United States v. Marcus Schloss, supra,* 1989 WL 62729, a criminal defendant charged with insider trading sought production of notes recorded by the attorney of a cooperating witness at interviews of that witness conducted by the United States Attorney's Office. After examining the notes *in camera,* the Court found them to be "typical lawyer's quasishorthand annotations of topics covered and statements made by the interviewee," *id.* at *3, and found that they did not reflect "counsel's views about what [the witness] said." *Id.* at *4. The Court held that the work product privilege had to yield in favor of defendant's substantial need to examine the documents for possible use in impeaching the cooperating witness at trial. The Court deemed it prudent, however, to excise any portions of the interview notes which reflected counsel's personal thoughts or beliefs. *Id.*

As discussed above, it remains unsettled whether core opinion/mental impression work product is absolutely immune from production or merely subject to a heightened showing of need. The *John Doe* court did not describe the manner in which courts were to afford this material "the greatest protection available." 675 F.2d at 493. Nonetheless, this Court has generally considered such work product absolutely protected from disclosure. *See Marcus Schloss,* 1989 WL 62729, at *4; *Herbert v. Lando,* 73 F.R.D. 387, 402-03 (S.D.N.Y. 1977). I remain of the view that preventing the disclosure of core opinion/mental impression work product is the proper practice. It follows that to the extent the documents identified by Willkie Farr as containing the attorney's mental impressions, opinions, thoughts or conclusions in fact contain such core work product, they shall not be disclosed.

I have reviewed *in camera* all of the documents considered attorney notes of conversations, testimony or interviews. The bulk of these documents are contemporaneous notes of interviews or meetings recounting the statements made by Weissman or others, generally in abbreviated fashion.[8] A few of the documents are straightforward memoranda prepared by attorneys present at the meeting or interview summarizing the substance of the testimony or conversation.[9] The reader of these notes and memoranda is able only to ascertain the content of the statements by the witness or the participants to the meeting. Nothing in the notes or memoranda conveys in any direct or explicit way the thought processes, theories, reflections, conclusions or opinions of the attorney. Since these documents do nothing more than merely relate statements or testimony in paraphrased form, their disclosure will not cause any improper probing of the mind of the attorney. Accordingly, aside from documents 55, 65, 66, 69 and 79 which the Court has already ruled privileged or irrelevant, the enumerated documents are discoverable under *John Doe Corp.* upon a showing of substantial need which has been made here.

**\*12** Document 72 is not included by Willkie Farr within the category of attorney notes, but is identified as containing core attorney work product. Upon reviewing the document, I conclude that, just like the documents described above, it reflects nothing more than counsel's notes of statements made at a meeting. As such, and because the attorney's opinions are not directly or implicitly revealed within the document, it falls under *John Doe* and must be disclosed for the same reasons as the above-described attorney notes.

Five of the documents within the category of attorney notes are specifically identified by Willkie Farr as containing explicit expressions of attorney thought processes or opinions: 19, 36,[10] 38, 41, 78 and 81. *See* Memorandum in Opposition at p. 15, n.9. Documents 19, 78 and 81 are notes prepared by Benito Romano of Willkie Farr summarizing relevant testimony of Weissman, explaining the chronology of events with respect to his disclosure of the discrepancies, analyzing the situation, and describing various actions taken by Empire. These papers are not analogous to the notes *John Doe* found to be permissibly disclosed upon a showing of mere substantial need. They do not simply reflect what was said at a particular interview or meeting. Instead, they involve the attorney's selection and distillation of the relevant and key testimony which unfolded over the period of several months. The notes reflect the attorney's evaluation and analysis of the important testimony and evidence, offering explicit insight into Romano's views and strategies concerning the evidence of the discrepancies and Empire's response to Weissman's revelations. Disclosure of these documents would clearly invade the privacy afforded to the attorney's mental processes. As classic opinion work product, they are absolutely protected from disclosure.

Documents 36 and 41 consist of an attorney's summary and analysis of testimony and evidence concerning the financial discrepancies, and document 38 consists of an attorney's summary and analysis of the findings of an actuarial investigation. It is obvious from their content that preparation of these documents entailed a process of careful sifting through and evaluating testimony and other materials, and drawing inferences therefrom. Disclosing these documents would present a real danger of revealing the attorneys' thought processes. As such, documents 38 and 41 fall within the category of core opinion work product.

Willkie Farr identifies twelve additional documents (none of which are characterized as attorney interview notes) as containing explicit core opinion work product.[11] The Court has previously determined document 42 to be irrelevant. Documents 22, 31, 32, 59, 60, 61, and 73 are memoranda and notes crystallizing the salient portions of Weissman's testimony and statements of various other individuals pertaining to identified subjects. Just as the Romano notes described above, these documents reflect the thought processes of the attorneys who culled through the material, selected the most telling statements, placed them in context, and drew inferences from them. As such, they constitute classic opinion work product entirely protected from disclosure.

**\*13** Documents 56, 74, and portions of 57, are reports of legal research on particular subjects conducted by attorneys. There can be no doubt that the description of the results of legal research necessarily discloses the thought processes, analyses, and strategy of the attorney through his or her selection of cases and interpretation of their significance. This is the very essence of what the privilege is meant to protect. Documents 56, 74 and the portions of 57 which contain legal research accordingly constitute protected opinion work product. To the extent document 57 does not consist of legal research, it contains a summary of the relevant and important facts as distilled and construed by counsel and, as such, is privileged in its entirety as core work product.

Case 1:20-cv-00292-JPW   Document 396-1   Filed 06/05/24   Page 15 of 17

U.S. v. Weisman, Not Reported in F.Supp. (1995)

1995 WL 244522

#### d. *Substantial Equivalent*

The withheld documents relating to the Obermaier interviews of Weissman consist almost entirely of notes of Stong and Benito Romano of what was said at those meetings. [12] Willkie Farr points out that Weissman has already obtained memoranda of both meetings prepared by Martin Klotz of Willkie Farr and a memorandum of the June 29 meeting prepared by Edward Feig of Weil, Gotshal & Manges. According to Willkie Farr, those documents afford Weissman the substantial equivalent of the Stong and Romano notes, thereby obviating any need for them.

In *Marcus Schloss,* this Court considered a similar objection to the disclosure of attorney interview notes when the government and the witness had previously provided defendant their notes of that interview. Noting that "[p]ossible inconsistencies or contradictions" between the different interview notes were of "obvious interest to the defendant" in challenging the witness' credibility, the Court held that defendant had demonstrated the requisite substantial need for the attorney notes notwithstanding his possession of other notes of the same interview. 1989 WL 62729 at *3.

In the present case, Weissman has a similar interest in comparing various attorney's notes of the interviews in which Weissman is alleged to have made statements constituting waiver of the alleged privilege attached to his June 16 and 17 statements. It is conceivable that either Stong or Romano could provide testimony as to their recollections of those interviews. These documents are of interest to Weissman in determining possible challenges to their credibility. But regardless of whether these attorneys testify, the notes provide a contemporaneous record of what transpired at those interviews which occurred nearly two years ago and whose participants may presently have a less-than-complete recollection. Weissman's possession of other memoranda of the interviews does not diminish his need for the notes of Romano and Strong which supply significant pieces to the puzzle of recreating his statements.

The cases cited by Willkie Farr are not to the contrary. In each case, the court found no substantial need for documents such as interview notes and reports where the litigant could obtain the same information through depositions or interrogatories of the attorneys who wrote the notes or the persons who prepared the reports. *See Horn & Hardart Co.,* 888 F.2d at 12; *Hohenwater v. Roberts Pharmaceutical Corp.,* 152 F.R.D.

513, 517 (D.S.C. 1994); *Hercules Inc. v. Exxon Corp.,* 434 F. Supp. 136, 153 (D. Del. 1977); *Miles v. Bell Helicopter Co.,* 385 F. Supp. 1029, 1032 (N.D. Ga. 1974). As Weissman fairly points out, deposing or issuing interrogatories to Benito and Stong would consume valuable time while Weissman is awaiting trial on criminal charges, a factor which conceivably rises to the level of undue hardship. In any event, I am not convinced that their responses to deposition questions or interrogatories concerning what transpired at those meetings would constitute the substantial equivalent of contemporaneous notes of Weissman's testimony.

#### e. *Prejudice*

**\*14** In *Marcus Schloss,* this Court noted that in the context of a criminal trial when urged to order disclosure of attorney notes reflecting prosecutors' interviews of a government witness, courts should factor into the analysis any "possible prejudice to the witness represented by the attorney in question ...." 1989 WL 62729, at *2 (emphasis added). No prejudice to the cooperating witness in *Marcus Schloss* was found to exist given that the government investigation of him had been completed, he had served his sentence, and no charges remained pending against him. *Id.* Willkie Farr argues, by way of contrast, that disclosure of the documents relating to interviews of Drewsen and Craco by the United States Attorney's Office, and discussions with the United States Attorney's Office, will prejudice Empire because Empire is currently defending related civil lawsuits and because "investigations by the United States Attorney's Office and the Manhattan District Attorney's Office are still ongoing." Memorandum in Opposition at p. 24.

Given that the United States Attorney's Office is necessarily familiar with the substance of the meetings, it is frivolous to suggest that the disclosure of notes of those meetings could be detrimental to Empire in the federal government's investigation, or by logical extension, to that of the District Attorney.

Even if the fear of other prejudice is legitimate, a proposition somewhat undercut by Willkie Farr's willingness to supply the government with other work product related to Weissman's alleged malfeasance, it must yield to Weissman's demonstrated need to determine whether these notes reveal facts concerning the existence of any joint defense agreement on June 16, 1993. However, there are sections in some interview notes or memoranda describing them which are

U.S. v. Weissman, Not Reported in F.Supp. (1995)
1995 WL 244522

of no conceivable assistance to Weissman, but arguably are prejudicial to Empire in the context of civil litigation. [13] Those portions as indicated by the Court on copies provided to Willkie Farr will be redacted.

3. *Simpson Thacher Documents*

The four documents withheld by Simpson Thacher are attorney notes of the June 29 and July 13, 1993 Obermaier interviews of Weissman (documents 10, 11, and 13 on Simpson Thacher's privilege log) and notes of a telephone call between Kenney and Drewsen on June 16, 1993 (document 6). I have reviewed these documents and find the interview notes to be methodical recapitulations of Weissman's statements and the telephone call notes to contain only shorthand annotations of topics covered during the conversation between Kenney and Drewsen. Core opinion/ mental impression work product is not contained in any of the documents. These documents must therefore be disclosed in light of the government's need to review them in preparation for challenging the defendant's claims at stages 1 and 2.

*CONCLUSION*

For the aforementioned reasons, defendant's motion to compel is granted in substantial part. Documents 1, 2, 4, 5, 8-10, 13, 14, 16-18, 20, 21, 23-30, 33-35, 37, 39, 40, 43, 45-52, 67, 68, 70-72, 75, 76, and 80 must be disclosed in their entirety. Documents 6, 7, 11, 12, 15, 44, 53, 54, 62, 63, and 77 must be disclosed in redacted form as indicated by the Court. Documents 3, 19, 22, 31, 32, 36, 38, 41, 42, 55-61, 64-66, 69, 73, 74, 78, 79, and 81 may be withheld in their entirety.

 **\*15**  The parties are directed to attend a conference on May 10, 1995 at 4:30 p.m. in Room 307 of the United States Courthouse.

Because the additional time to conference this case is necessary for counsel to disseminate and digest the discovery ordered by this Opinion, I prospectively exclude the time from today until the date of the next conference in calculating a speedy trial date under 18 U.S.C. §3161. I find that there is no private or public interest in a speedy trial that requires me to do otherwise.

It is SO ORDERED.

[1] These documents are numbered by the parties 3, 15, 19, 36, 38, 41, 42, 65, 66, 77 and 79.

[2] Document numbers 19, 36, 38, 41 and 42.

[3] This inter-Willkie Farr memorandum discusses a report from Empire's legislative counsel about Empire's New York state lobbying efforts in 1991-1993. While Empire contends that the document is privileged and core work product, *see* discussion *infra,* I need not reach those issues because the document is totally irrelevant to the existence *vel non* of a joint defense agreement or a waiver thereof.

[4] The exception is document 19 whose production Willkie opposes for other reasons.

[5] These are documents 1, 2, 6, 7, 9-12, 16, 17, 19-21, 23-26, 28-30, 33-36, 38-41, 43, 44, 46-55, 62, 63, 65-70, 78, 79 and 81.

[6] In this regard, *John Doe Corp.* is consistent with *Upjohn* decided the year before. In *Upjohn,* at least one attorney's notes of the interviews were described as containing, *inter alia,* his "beliefs as to the importance of [the responses and the questions], [his] beliefs as to how they related to the inquiry, [and his] thoughts as to how they related to other questions." 449 U.S. at 400 n.8. Thus, in contrast to *John Doe Corp.,* the notes in *Upjohn* appear to have contained both summaries of witness statements and explicit core opinion/mental impression work product reflecting on these statements.

[7] Objections to Magistrate Judge Dolinger's reports are currently pending before District Judge Keenan.

[8] These are documents 1, 2, 6, 7, 9-12, 16, 17, 20, 21, 23-26, 28-30, 33, 34, 39, 40, 43, 44, 47, 52, 53, 55, 62, 63, 65-70, and 79.

[9] Documents 35, 46, 48, 49, 50, 51 and 54.

[10] Document 41 is a revised version of document 36. The revisions are minor and do not change the substance of the document. Since 41 and 36 are virtually identical, I consider Willkie Farr's failure to include document 36 within the category of core opinion work product an oversight. My conclusion

as to document 41 applies with equal force to document 36.

11    22, 31, 32, 42, 56, 57, 59, 60, 61, 72, 73 and 74.

12    The two exceptions are document number 45 which is a draft letter to the Superintendent of Insurance reflecting Elizabeth Stong's comments regarding Weil Gotshal's investigation concerning the NYSID tri-annual audit, and document number 51, a memorandum by Stong relating the substance

of a conversation concerning disclosure of Klotz's memorandum of the June 17 meeting. As to these two documents Willkie Farr does not make any particularized objections.

13    These portions are contained in documents 44, 53, 54, 62 and 63.

**All Citations**

Not Reported in F.Supp., 1995 WL 244522

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.