Received 7/3/2024 5:18:36 PM Commonwealth Court of Pennsylvania

Filed 7/3/2024 5:18:00 PM Commonwealth Court of Pennsylvania
503 MD 2018

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| POM OF PENNSYLVANIA, LLC, | : | No. 503 MD 2018 |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA STATE POLICE, BUREAU OF LIQUOR CONTROL ENFORCEMENT, | : | |
| | : | |
| Respondent. | : | |

## ORDER

AND NOW, _____, 2024, upon consideration of POM of Pennsylvania, LLC's Application for Limited Relief from Stay and Clarification of the Court's May 25, 2023 Order, and any response thereto, it is hereby ORDERED that the Application is GRANTED as follows:

(1) The stay in this matter is lifted for the limited purpose of clarifying this Court's May 25, 2023 Order; and

(2) The May 25, 2023 Order of this Court is hereby clarified to apply only to these proceedings and is not a blanket prohibition on all discovery served on Respondent in any federal and/or state court proceedings.

_____
,J.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

POM OF PENNSYLVANIA, LLC,

    Petitioner,

v.

PENNSYLVANIA STATE POLICE,
BUREAU OF LIQUOR CONTROL
ENFORCEMENT,

    Respondent.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 503 MD 2018

## POM OF PENNSYLVANIA, LLC'S APPLICATION FOR LIMITED RELIEF FROM STAY AND CLARIFICATION OF THE COURT'S MAY 25, 2023 ORDER

## I. INTRODUCTION

1. Petitioner, POM of Pennsylvania, LLC (POM) brought the present original jurisdiction action against the Pennsylvania State Police, Bureau of Liquor Control Enforcement (BLCE), seeking a declaration that its skill amusement device (POM Game) is legal under 18 Pa.C.S. § 5513.

2. Through the course of litigation, POM and BLCE have engaged in discovery related to this claim and the Court has granted and denied relief on discovery disputes the parties brought to the Court.

3.    One year ago, this Court stayed the present case while the ultimate question—legality of the POM Game under the Crimes Code— was decided in a separate appellate matter.

4.    While this case remains stayed, BLCE sought to use one of the Court's orders on a discrete discovery issue to refuse third-party discovery in a federal case with a different party.

5.    POM now seeks limited relief from stay for the Court to clarify the scope of its order.

## II.    BACKGROUND

6.    On May 25, 2023, this court, entered an order on POM of Pennsylvania, LLC's (POM) motion to compel discovery responses. A copy of the May 25, 2023 Order is attached as Exhibit A.

7.    The May 25 Order granted POM's motion in part and denied the motion in part, requiring BLCE to produce investigative reports related to the POM Game devices if the underlying investigation has been concluded.

8.    Conversely, BLCE was not required to produce investigative information regarding POM Games if the investigation was ongoing.

9.    Ultimately, this matter was stayed "pending resolution of the related appellate matters of *In re: Three Pennsylvania Skill Amusement Devices, One Green Bank Bag Containign $525.00 in U.S. Currency, and Seven Receipts* (Pa. Cmwlth., No. 707 C.D. 2023), and *In re: Four Pennsylvania Skill Amusement Devices and One Ticket Recemption Terminal Containing $18,692.00 in U.S. Currency* (Pa. Cmwlth., No. 761 C.D. 2023)." 8/14/2023 Order.

10.    While this matter was stayed, litigation regarding the POM Game continued elsewhere. Importantly, this Court *en banc* unanimously affirmed an order from the Dauphin County Court of Common Pleas and held that the POM Games "are not slot machines under the Crimes Code" and "are not gambling devices *per se.*" *See In re: Three Pennsylvania Skill Amusement Devices, One Green Bag Containing $525.00 in U.S. Currency, and Seven Receipts*, 306 A.3d 432, 445 (Pa. Cmwlth. 2023), *petition for allowance of appeal granted*, 50 MAP 2024 (Pa.) (*Champions*).

11.    During this same time, in federal court, Pace-o-Matic, Inc., a corporate entity separate and distinct from POM, is engaged in protracted discovery in *Pace-o-Matic, Inc. v. Eckert Seamans, et al.*, No.

3

1:20-cv-292 (M.D. Pa.), an action alleging the law firm engaged in a conflict of interest by, *inter alia*, working to destroy POM's business by collaborating with POM's adversaries – notably, the Pennsylvania State Police.

12.    Discovery in that action, to date, has revealed high level and close contact between casinos, law firms and lobbyists, and BLCE, for the purpose of attacking POM.

13.    Since the May 25, 2023 Order, POM also has learned that BLCE's efforts regarding the POM Game in various instances have been laced with deception and abuse of power.

14.    For instance, BLCE's leadership trained BLCE officers to differentiate the POM Game from competitors' games, including training the officers on the colors and logos of the POM Game, so as to be able to pinpoint locations with only the POM Game for selective enforcement and prosecution. *See* Affidavit of Leann Needham, attached as Exhibit B.

15.    According to a former BLCE liquor control officer (LEO), BLCE officers "directed [the LEO] and other LEOs to find Pace-O-Matic games." *Id.* ¶ 10.

4

16. This same former LEO also stated that BLCE leadership "held a specific briefing with [the LEO] and others in this regard and provided [them] with paperwork … to utilize in identifying Pace-O-Matic games. Jones told [the LEOs] to look for the blue Pace-O-Matic logo to be sure [they] were seizing Pace-O-Matic Games." *Id.*

17. BLCE leadership also "provided [the LEOs] with a sheet of paper with directions on how to distinguish a Pace-O-Matic game from a Banilla game," a POM competitor, and then ordered the LEOs to find locations with POM Games only. *Id.*

18. The LEO's were further instructed to deliver messages to the owners to the effect that the POM Game was illegal, would be imminently seized, or otherwise would be legislated out of existence.

19. Along with instructing LEO's to seize POM Games, the BLCE encouraged local law enforcement in other ways.

20. For example, the Monroe County District Attorney's Office received training and technical support from BLCE as that DA's Office ramped up to seize skill games – with BLCE's active encouragement.

21. The assistance included BLCE's provision of a template search warrant for the POM Game.

22.    Thomas J. McMahon (a member of the Criminal Investigations Division of the Monroe County District Attorney's Office) adapted the BLCE search warrant, without making any material changes, for use in Monroe County. *See* Monroe County Search Warrant, attached as Exhibit C. The search warrant was defective in the following ways:

a. First, the search warrant misstates the relevant Pennsylvania law for determining if a machine is a gambling device *per se* by ignoring the "predominant factor" requirement. Instead, the affidavit again provides that the Commonwealth need only prove any element of chance.

b. Specifically, and contrary to the predominant factor test, the search warrant states that there are three elements of gambling:

CONSIDERATION: Anything of value required to initiate play on a device.

CHANCE: The randomness of some act, e.g. the spinning of slot machine reels.

REWARD: Something of value, worth more than the amount wagered, offered to a player for a winning outcome.

*See id.*

6

c. The search warrant further incorrectly provides in the affidavit that once the element of reward is proven, "the device is deemed a gambling device 'per se' and subject to seizure if the owner/operator of the device is not properly licensed." *Id.*

d. Second, the search warrant affidavit, by design, entirely disregards the Follow Me feature of the POM Game.

e. Specifically, McMahon indicates that on his first undercover visit on October 18, 2021, he played two of the four POM Games in the establishment, inserting money and playing the tic-tac-toe style game until he ran out of credits and/or got a ticket for a reward.

f. McMahon explains that on his second undercover visit on October 21, 2021, he again inserted money into a POM Game and played only the tic-tac-toe style game until he had no more credits.

g. None of these statements indicate that McMahon actually played Follow Me.

h. The only mention of Follow Me is McMahon's representation that he "verified that there is an alternative gameplay type called 'Follow Me'" that he did not see patrons play. *Id.*

23. In sum, the affidavit misrepresents the state of the law and portrays a version of gameplay on the POM Game that purposefully ignores key features of which BLCE and the Commonwealth are well aware.

24. Relying on this inaccurate and incomplete affidavit of probable cause, a state court judge issued the search warrant on October 26, 2021.

25. The Monroe DA's Office then seized POM Games at 2 locations in Monroe County. Those locations were identified by BLCE and BLCE provided support for the seizures.

26. The owner and operators of the POM Games filed motions for return of property, which were granted. In its Rule 1925 Opinion, the Monroe County Court of Common Pleas elaborated on the reasoning underlying its decision. A copy of the 1925 Opinion is attached as Exhibit D.

8

27.   With respect to the legality of the POM Game, the court found that, based on an analysis of its characteristics alone, the POM Game is predominantly a game of skill. *See id.*

28.   Further, the court found McMahon's testimony – *which was based on BLCE training and materials* - was "not relevant, trustworthy, or based upon any acceptable modicum of knowledge, observation of experience." *Id.* at 18.

29.   As for the Commonwealth's conduct in the proceedings that warranted suppression, the court found that the investigators knowingly and recklessly misstated the relevant law for search warrants and the assistant district attorneys approved and signed off on these errors. *See id.*

30.   The Monroe Court made the following specific misconduct findings:

    a. County Detective McMahon "knowingly or recklessly misstated in his affidavit in support of the search warrant the law defining games of chance," specifically the recitation of the chance element of gambling. *Id.*

9

b. This error was on behalf of not just the county detective but the Commonwealth because the warrant application was approved and signed for by an assistant district attorney. *Id.*

c. McMahon knew and withheld information from the affidavit, including that players utilizing the preview function but not ultimately playing had money refunded in full and that any credits left on a device after a player cashes out are not cleared but remain on the POM Game. *Id.*

d. McMahon "knew – or should have known – that players can – with skill earn 105% of their bet every time by using the [F]ollow [M]e function." *Id.* at 22. But at no time in the 18 months that the case was pending before the Court did the Commonwealth tell the Court of the function. *Id.*

e. In the Court's view, the Commonwealth's search warrant application "based upon inaccurate and incomplete facts, while also knowingly withholding critical facts, is reckless at best, intentional at worst, and warrants suppression." *Id.*

31. The Monroe County DA's Office now realizes that it was misled by BLCE's misstatements of gaming law, including those found

10

in the template search warrant BLCE developed for the Monroe DA's Office use. The Monroe DA's Office relied on BLCE's supposed expertise in gaming law and trusted that BLCE was acting in good faith. The Monroe DA's Office now acknowledges that it would not have seized the POM Game (which BLCE identified for seizure) had BLCE provided truthful legal and factual data about the POM Game.

32.    In the *Champions* case, when it was before the Dauphin County Court of Common Pleas, BLCE and the Office of Attorney General hired BMM Testlabs (BMM) to provide expert testimony.

33.    In preparation of its report, BMM intrusively searched and examined POM Games in BLCE's custody. The inspections involved BMM's imaging a POM Game hard drive, attempting to decompile the POM Game's source code, and attempting to decrypt encrypted POM Game hardware (which BLCE provided from a POM Game related to a different seizure).

34.    BLCE at no time had search warrants allowing it to search any POM Game in this manner. However, it knowingly allowed BMM to conduct these warrantless examinations with full knowledge that BMM was trying to reverse engineer a POM Game. Such action would have

11

grossly violated POM's intellectual property rights, along with amounting to an illegal search.

35.    BMM has revealed that had it known there was no search warrant authorizing these examinations and analyses, BMM would have stopped all work until BMM's legal department had evaluated whether BLCE and BMM had any lawful basis to move forward.

36.    Against this bad faith backdrop, BLCE (in the *Eckert* case) has now resisted a subpoena from POM's counsel by reliance on this Court's May 25 Order controlling discovery in this case.

37.    On November 3, 2022, Pace-o-Matic issued a subpoena to BLCE in the *Eckert* case seeking, *inter alia*, communications about the POM Game, documents related to targeting the POM Game, documents for training related to the POM Game, and documents and communications related to BLCE captains and employees instructing others to target POM Games. A copy of the subpoena is attached as Exhibit E.

38.    BLCE refused to comply and cited the May 25, 2023 Order as controlling and giving BLCE the blanket ability to resist all discovery efforts in the *Eckert* case.

## III.  ARGUMENT

### A.  This Court should lift the stay for the limited purpose of clarifying its May 25 Order.

39.    Although this matter is currently stayed, BLCE seeks to use the May 25 Order of this Court as a basis to refuse third-party discovery served on it in a pending federal case.

40.    Because BLCE relies on this Court's May 25 Order to refuse discovery in other courts, a limited lift of the stay for this Court to clarify its May 23 Order is necessary to resolve this issue before BLCE further improperly relies on this Order in any other separate litigation.

41.    POM's request to lift the stay is limited to this sole time-sensitive issue.

42.    Further, lifting the stay to address this discrete issue will not have any ramifications on the substantive issues in this case, including as they relate to *Champions* and its pending appeal.

43.    Accordingly, POM asks this Court to lift the stay in this case for the limited purpose of ruling on this Application alone.

13

**B.    This Court should clarify that its May 25 Order is limited in application and cannot be a basis for denying discovery in different jurisdictions.**

44.    BLCE's refusal to comply with third-party discovery by a different party in federal court is untenable for at least three reasons.

45.    **First**, and most fundamentally, the May 25 Order is in another legal proceeding, in a different court and with a different party – POM of Pennsylvania, LLC (which is represented by different counsel, the undersigned). Nothing in the order contemplates the notion that BLCE has an all-purpose shield to resist discovery in any and all separate legal matters, let alone one in federal court involving a different corporate litigant.

46.    **Second**, the gist of the above-captioned action was the legality of the POM Game, and BLCE (successfully) argued that its right to keep confidential investigative records of active investigations trumped POM's need for the records, especially in light that the records might not be relevant to the core issue in that case (*i.e.*, whether the POM game is, factually, a predominant skill game).

47.    Contrast the claim in this case with those in the *Eckert* case, in which Pace-o-Matic overall alleges the law firm acted improperly and

14

in concert with BLCE to destroy Pace-o-Matic's business. There, information about BLCE's investigations is highly relevant and probative of that allegation. Had that allegation been part of the above-captioned matter, it seems likely BLCE would've been unable to shield its internal documents.

48.   **Third**, BLCE's history of bad faith and misconduct underscores the need for this discovery. BLCE has a clear-cut history of being dishonest about the POM Game, and its conduct in citing to this Court's May 25 Order is more of the same. In addition to the patent relevance of the discovery, BLCE should have no active investigations of the POM Game *at all*, given this Court's *Champions* holding. The citation to the May 25 Order, in a federal court action, smacks of bad faith.

49.   This Court has the power to remedy BLCE's bad faith, by making clear the May 25 Order applies only in the above-captioned matter or, alternatively, even declaring the May 25 Order to be void.

50.   Finally, as required by Pa.R.A.P. 3707, before filing this Application with the Court, POM solicited concurrence from BLCE and the City of Philadelphia in the relief sought by email to counsel on July

3, 2024. BLCE does not concur in this requested relief at this time. The City of Philadelphia did not respond before the time of filing and, therefore, this Application is presently opposed.

WHEREFORE, POM respectfully requests that this Court grant its Application and enter an order lifting the stay for the limited purpose of deciding this Application and clarifying its May 25 Order.

Respectfully submitted,

Dated: July 3, 2024

/s/ Matthew H. Haverstick
Matthew H. Haverstick (No. 85072)
Edward T. Butkovitz (No. 309565)
Shohin H. Vance (No. 323551)
Miranda L. Dang (No. 330908)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml:mhaverstick@kleinbard.com
ebutkovitz@kleinbard.com
svance@kleinbard.com
mdang@kleinbard.com

*Attorneys for POM of Pennsylvania*

# EXHIBIT A

<u>IN THE COMMONWEALTH COURT OF PENNSYLVANIA</u>

POM of Pennsylvania, LLC,                    :
                          Petitioner    :
                                             :
          v.                             :    No. 503 M.D. 2018
                                             :
Pennsylvania State Police, Bureau of        :
Liquor Control Enforcement,                  :
                         Respondent    :

# **O R D E R**

AND NOW, this 25th day of May, 2023, upon consideration of POM of Pennsylvania, LLC's (POM) December 14, 2020 "Motion to Compel Full and Complete Responses to Petitioner's First and Second Sets of Requests for Production of Documents and First Set of Interrogatories Addressed to Pennsylvania State Police, Bureau of Liquor Control Enforcement" (PSP), and PSP's response thereto, and upon further consideration of PSP's January 14, 2021 "Motion for Protective Order" and POM's response thereto, it is hereby ORDERED as follows:

1.    POM's Motion to Compel is GRANTED IN PART and PSP's Motion for Protective Order is DENIED IN PART, as follows:

    a.    Per stipulation, PSP agrees to produce investigative reports related to unlawful gambling devices manufactured by POM, regardless of software version, for matters in which the investigation is concluded and the administrative process is completed (*i.e.*, an adjudication has been issued by an Administrative Law Judge on the pending administrative citation involving gambling, and no appeal has been filed). These documents will be redacted to protect any privileged

information, and a privilege log will be provided.  PSP will also provide an updated list of witnesses that it intends to call at the time of trial.

2.     POM's Motion to Compel is DENIED IN PART and PSP's Motion for Protective Order is GRANTED IN PART, as follows:

a.     PSP is not required to produce investigative information related to unlawful gambling devices manufactured by companies other than POM (whether contained in administrative investigative reports (AIRs), Gambling Device Inspection forms, third party complaints about such devices, property records of seizures, gambling inspection summaries, inspection log entries, questionnaires used by enforcement officers, sample questions asked about such devices, intelligence memos or communications with other law enforcement agencies regarding such devices, all of which is requested by POM in the above discovery requests).

b.     PSP is not required to produce investigative information related to unlawful gambling devices manufactured by POM (whether contained in administrative investigative reports (AIRs), Gambling Device Inspection forms, third party complaints about such devices, property records of seizures, gambling inspection summaries, inspection log entries, questionnaires used by enforcement officers, sample questions asked about such devices, intelligence memos or communications with other law enforcement agencies regarding such devices, all of which is requested by POM in the above discovery requests) for matters in which the investigation is ongoing or the administrative process is not completed.

     c.     PSP is not required to produce training materials.

     3.     In all other aspects not set forth in this Order, POM's Motion to Compel is DENIED and PSP's Motion for Protective Order is GRANTED.

     4.     All documents or information to be produced hereunder shall be produced on or before June 23, 2023, unless otherwise agreed by the parties or ordered by the Court.


*s/ Patricia A. McCullough*
PATRICIA A. McCULLOUGH, Judge

Order Exit
05/25/2023

# EXHIBIT B

**AFFIDAVIT**

I, Leann Needham (formerly Miles), am over the age of 18 and a resident of the Commonwealth of Pennsylvania. I have personal knowledge of the facts stated herein and if called as a witness could testify completely thereto. I suffer no legal disabilities and declare that, to the best of my knowledge and belief, the information herein is true, correct and complete.

1. I served with the Bureau of Liquor Control and Enforcement ("Bureau") for eight years. I commenced my employment on November 26, 2012 and resigned my position effective June 26, 2020. I spent almost my entire career with the Bureau of Liquor Control and Enforcement as an undercover Liquor Enforcement Officer ("LEO").

2. During my service with the Bureau, Captain James Jones was the primary statewide supervisor of the LEOs in the various field offices throughout Pennsylvania.

3. In 2020 I resigned my position with the Bureau due to the inappropriate manner in which work was assigned as result of Capt. Jones' abuse of his position. Specifically, the women who engaged in physical relationships with Jones were allowed to, essentially, do little to no work.

4. During much of my time with the Bureau, we were frequently shorthanded and the result was that a small number of workers, such as myself, were forced to do virtually all of the most difficult work. I was repeatedly directed to conduct numerous undercover activities on her own, without any backup or support, at locations that were less than ideal. I was required to conduct these activities despite any personal considerations, even the fact that, at one point, I was pregnant. Throughout my pregnancy I was directed to go into bars where there was drinking, smoking and numerous other risks, because other available Officers were given special treatment.

5. Other female LEOs, who had been specifically hired to do the same type of undercover work as myself - were never required to do this work, or even much of any work – as a result of their physical relationship with Captain Jones. I would, on more than one occasion, speak with my immediate supervisor EO 3 Earl Killion regarding the undercover work dispersed and why a certain female officer was never assigned that type of work. He went

to supervisor Sgt. Fischer and I specifically heard Sgt. Fischer state, "Tell Beeler and Miles to mind their own business and that they are assholes."

6. One of the female LEOs who was in a relationship with Jones had a cot in the women's locker room in the Punxsutawney Bureau office. This cot was purportedly for use by that LEO when she was working late doing undercover work. However, everyone understood this was a transparent falsehood. That LEO was never required to work undercover operations and was rarely in the position of returning to the office late at night after such an operation.

7. Capt. Jones was not above threatening people and "explaining" to them that he would not tolerate actions he viewed as disloyal. It was clear to many that anyone who attempted to interfere in his inappropriate personal arrangements would be penalized.

8. I was well acquainted with the various gambling investigations conducted by the Bureau in the Western regions where I was stationed. Jones designated himself as the direct contact for any and all questions regarding these gambling investigations. Jones maintained an unusual amount of control over these efforts during the last couple of years that I was with the Bureau. This was surprising to me because I had never been aware of any expertise or direct involvement by Jones in the examination or determination of alleged gambling devices.

9. I know of no occasion when Jones personally inspected any game of chance or of skill. Likewise, I never knew of a case where Jones had ever filled out any inspection forms in regard to alleged games of chance or skill. I know of no basis for any claim of expertise by Jones in the field of gambling or in the distinguishing of games of chance from games of skill.

10. In early 2020, Capt. Jones specifically directed me and other LEOs to find Pace-O-Matic games. Jones held a specific briefing with myself and others in this regard and provided us with paperwork we were directed to utilize in identifying Pace-O-Matic games. Jones told us to look for the blue Pace-O-Matic logo to be sure that we were seizing Pace-O-Matic games. Jones also provided us with a sheet of paper with directions on how to distinguish a Pace-O-Matic game from Banilla game. We were instructed to find a location with only Pace-O-Matic games. Jones also gave us guidelines on how to write our report on Pace-O-Matic games, before any seizure.

11. As part of the effort against skill games, I remember being told by Sgt. Fischer – a Bureau supervisor who answered to Capt. Jones, "Tell the licensee's they could potentially receive hefty fines and it would be in their best interest to remove the devices."

12. I was involved in the investigation and seizure and the Pace-O-Matic games from Country Garden Six-Pack in Clearfield County. That investigation and seizure were conducted at the direction of Capt. Jones. The initial report prepared was rejected by Jones and we were told to re-write it a certain way – as he directed. Capt. Jones told us that the Pace-O-Matic machines were illegal. However, I never saw or knew of any Court or other determination for this designation.

I declare under penalty of perjury or false statements that the above statements are true and correct. Executed this ___17th___ day of ___May___, 2022.

Leann M Needham
LEANN M NEEDHAM (Name)
628 Ferry St (Address)
East Brady PA 16028

# EXHIBIT C

| Commonwealth of Pennsylvania |  | APPLICATION FOR |
|---|---|---|
| | | **SEARCH WARRANT** |
| **COUNTY OF MONROE** | | AND AUTHORIZATION |

| Docket Number (Issuing Authority): | Police Incident Number: 2 0211.0 25 m 0 5 21 | Warrant Control Number: |
|---|---|---|
| Thomas J. McMahon | MCDA CID | (570) 517-3025 |
| *AFFIANT NAME* | *AGENCY* | *PHONE NUMBER*   *DATE OF APPLICATION* |

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED *(Be as specific as possible)*:

See Attachment "A" for items to be search for and seized.

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED *(Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.)*:
Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.

Smokin' Joe's Tobacco Shop Inc. - located at 15 N 3rd St, Stroudsburg, PA 18360 in Stroudsburg Borough, Monroe County.

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED *(If proper name is unknown, give alias and/or description)*:
Owner of Smokin' Joe's Tobacco Shop Inc. located at 15 N 3rd St, Stroudsburg, PA 18360

| VIOLATION OF *(Describe conduct or specify statute)*: | DATE(S) OF VIOLATION: |
|---|---|
| 18 PA C.S.A. § 5513. Gambling devices, gambling, etc. | 10/18/2021 to Present |

☐ *Warrant Application Approved by District Attorney – DA File No.* _____
*(If DA approval required per Pa.R.Crim.P. 202(A) with assigned File No. per Pa.R.Crim.P. 507)*
☐ *Additional Pages Attached (Other than Affidavit of Probable Cause)* Andrew J. Throckmorton  10/25/21

☐ *Probable Cause Affidavit(s) MUST be attached (unless sealed below)  Total number of pages:* _____

TOTAL NUMBER OF PAGES IS SUM OF ALL APPLICATION, PROBABLE CAUSE AND CONTINUATION PAGES EVEN IF ANY OF THE PAGES ARE SEALED

The below named Affiant, being duly sworn (or affirmed) before the Issuing Authority according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at the particular premises or in the possession of the particular person as described above.

| | MCDA CID | 302761 |
|---|---|---|
| *Signature of Affiant* | *Agency or Address if private Affiant* | *Badge Number* |

Sworn to and subscribed before me this **26th** day of **October**, **2021**. Mag. Dist. No. _____

Monroe County Courthouse                                    *(SEAL)*

*Signature of Issuing Authority*          *Office Address*

**SEARCH WARRANT** TO LAW ENFORCEMENT OFFICER: WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the premises or person described, and to seize, secure, inventory and make return according to the Pennsylvania Rules of Criminal Procedure.

☒ This Warrant shall be served as soon as practicable and shall be served only between the hours of 6AM to 10PM but in no event later than:*

☐ This Warrant shall be served as soon as practicable and may be served any time during the day or night but in no event later than: ** **4:30** PM, o'clock **October 28**, **2021**.

☒ This Warrant shall be returned to judicial officer **Jonathan Mark**.

* The issuing authority should specify a date not later than two (2) days after issuance. Pa.R.Crim.P. 205(4).
** If the issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit(s) and wishes to issue a nighttime warrant, then this block shall be checked. Pa.R.Crim.P. 206(7).

Issued under my hand this **26th** day of **October**, **2021** at **4:30** P M, o'clock.

*(SEAL)*

*Signature of Issuing Authority*      *Mag. Dist. or Judicial Dist. No.*      *Date Commission Expires*

Title of Issuing Authority: ☐ Magisterial District Judge  ☒ Common Pleas Judge ☐ _____

☒ *For good cause stated in the affidavit(s) the Search Warrant Affidavit(s) are sealed for* **60** *days by my certification and signature. (Pa.R.Crim.P. 211)*

10/26/2021  *(Date)*  *(SEAL)*

*Signature of Issuing Authority* (Judge of the Court of Common Pleas or Appellate Court Justice or Judge).

AOPC 410A-10

*TO BE COMPLETED BY THE ISSUING AUTHORITY*

Clerk of Courts
OCT 26 '21 PM5:00

| Commonwealth of Pennsylvania |  | AFFIDAVIT OF PROBABLE CAUSE |
|---|---|---|
| **COUNTY OF MONROE** | | |

| Docket Number | Police Incident | Warrant Control |
|---|---|---|
| (Issuing Authority): | Number: 2621-025 M0521 | Number: |

*PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*
Social security numbers and financial information (e.g. PINS) should not be listed.  If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.

Detective Thomas J. MCMAHON, being duly sworn according to law deposes and says:

I am a law enforcement officer of the Commonwealth of Pennsylvania within the meaning of section 5702 of Title 18 Pa. C.S.A. and as such am empowered to make arrests for criminal offenses enumerated in Title 18 Pa. C.S.A. I am a member of the Criminal Investigations Division (CID) of the Monroe County Office of the District Attorney (MCDA), a position I have held since January 2019. Prior to being hired as a detective, I worked for the MCDA CID office in a civilian capacity, which is a position that I held from April 2017 to January 2019, and at time assisted them during investigations. Your affiant attended Penn State University and graduated a Bachelor of Science degree in Administration of Justice and also attended the Lackawanna College Police Academy where I received extensive police training.

Your affiant also has experience doing surveillance in an undercover capacity while participating in drug and illegal narcotics investigations with the Monroe County Drug Task Force.

Your affiant has been personally involved in this investigation concerning the operation of illegal Video Gambling Devices (VGDs) located at Smokin' Joe's Tobacco Shop Inc. located at 15 N 3rd St, Stroudsburg, PA 18360.

This affidavit is based on conversations with other law enforcement agents, witnesses, observations, and my examination of reports and records. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

All dates and times within this affidavit should be considered to be in accordance with Eastern Standard Time.

### VIDEO GAMBLING

In various decisions, Pennsylvania Courts have ruled that gambling consist of three elements:

CONSIDERATION: Anything of value required to initiate play on a device.

CHANCE: The randomness of some act, e.g. the spinning of slot machine reels.

REWARD: Something of value, worth more than the amount wagered, offered to a player for a winning outcome.

All legal forms of gambling in Pennsylvania must be specifically authorized by law and operated in conformity with the relevant statutes and related regulations. Gambling is permitted at the Commonwealth's licensed casinos / horse racing tracks, by organizations licensed pursuant to the Small Games of Chance Act (Including

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| _Affiant Signature_ | 10/26/21 | | 10/26/2021 | (SEAL) |
|---|---|---|---|---|
| **Affiant Signature** | Date | **Issuing Authority Signature** | Date | |

Page **2** of 6

AOPC 410B-10

# Commonwealth of Pennsylvania

## COUNTY OF MONROE



# AFFIDAVIT OF PROBABLE CAUSE

| Docket Number | Police Incident | Warrant Control |
|---|---|---|
| (Issuing Authority): | Number: 20211025 M 0521 | Number: |

*PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*
*Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.*

Tavern Gaming), the Bingo Act, and by the Pennsylvania Lottery. Gambling activities outside those specifically authorized by statute are subject to criminal sanctions.

The Pennsylvania Supreme Court has instructed in "Commonwealth v. Two Electronic Poker Machines" that a video slot/poker machine is a "gambling device per se" if so intrinsically connected to gambling that it can have no legitimate amusement purpose.  Gambling devices "per se" are unlawful to maintain and/or operate unless an entity is properly licensed. In order to prove a machine a "per se" gambling device, the Commonwealth must demonstrate the three previously described elements of gambling exist in game play. If during an investigation the element of reward cannot be proven directly, the Pennsylvania Supreme Court has instructed that the presence of certain features is sufficient evidence to prove the element of "reward."  These features include a "knock-off" (a method to clear accumulated credits/points), "dip switches", a "power interrupt circuit", and an "accounting mode" which tracks points knocked off (payouts).  Once "reward" is proven, the device is deemed a gambling device "per se" and subject to seizure if the owner/operator of the device is not properly licensed.  Owners/operators of such devices are subject to criminal prosecution.

Further, the Pennsylvania Supreme Court has directed in "Commonwealth V. Dumont" that "probable cause" is to be determined using a flexible common-sense standard and that an officer does not need to prove all three elements of gambling prior to the seizure of a suspected video gambling device (VGD).  In order to seize a device for further inspection, officers must demonstrate the device is "set up" for play, accepts U.S. Currency, that game results are determined predominantly by chance and that, as articulated by the Court, the device incorporates a "knock-off " feature allowing accumulated points to be cleared.

## INVESTIGATION DETAILS

On 10/18/2021 at 11:34, I entered Smokin' Joe's Tobacco Shop Inc., located at 15 N 3rd St, Stroudsburg, PA 18360,  in an undercover capacity. Upon entering, I observed that there were four (4) Pennsylvania Skill Games Video Gambling Devices (VGDs), manufactured by MIELE/PACE-O-MATIC. All four (4) VGDs were turned on and ready for play. The VGDs were located along the wall on the left hand side of the store, if facing the back the store from the main entrance. In addition to the four (4) Pennsylvania Skill Games VGDs, there was a Pennsylvania Skill Games "Redemption Terminal" located on the same wall, alongside the VGDs.

I played on the Pennsylvania Skill Games VGD closest to the entrance. I inserted $20.00 cash, US Currency, into the machine and observed the credits increase by 2000. The machine accepted multiple bill denominations. I observed labels/signs on the VGDs which stated that Smokin' Joe's Tobacco Shop does not own the machines.

I played the Game, "Pirates" which is a nine (9) position video slot machine style game requiring two (2) like symbols and a "wildcard" symbol to be aligned vertically, horizontally, or diagonally to win. On a winning combination, the reels will display two (2) like symbols aligned vertically, horizontally, or diagonally and the

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| Affiant Signature | Date | Issuing Authority Signature | Date |
|---|---|---|---|
| | 10/26/21 | | 10/26/2021 (SEAL) |

Page 3 of 6

AOPC 410B-10

| **Commonwealth of Pennsylvania** |  | **AFFIDAVIT OF PROBABLE CAUSE** |
|---|---|---|
| **COUNTY OF MONROE** | | |

| **Docket Number** (Issuing Authority): | Police Incident Number: 2021\025m0521 | Warrant Control Number: |
|---|---|---|

*PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*
Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.

player has the ability to place a "wildcard" token in a slot to complete the pattern of three (3) symbols in a row going up, down, or diagonal. If there is not a winning combination, the player can continue to spin the wheels by pressing the "Play" button.

"Rapid Play" was enabled on the Pirates game theme. Rapid play allows the player to continuously push the play button until a winning combination appears on a spin and it allows the player to skip the spin animation that plays out on the screen, in order to show the combination results faster, which enables faster game play. When I got a winning combination, the game would no longer allow me to spin the wheels by pressing the "play" button.

I played the Pirates game theme until I ran out of credits.

I moved to the VGD directly to my right. There were 6 credits on the machine prior to inserting money into it. I inserted $10.00 cash, US Currency, into the machine and observed the credits increase by 1000. The machine accepted multiple bill denominations.

I played the game theme, "House of Voodoo" which is a nine (9) position video slot machine style game requiring two (2) like symbols and a "wildcard" symbol to be aligned vertically, horizontally, or diagonally to win. On a winning combination, the reels will display two (2) like symbols aligned vertically, horizontally, or diagonally and the player has the ability to place a "wildcard" token in a slot to complete the pattern of three (3) symbols in a row going up, down, or diagonal. If there is not a winning combination, the player can continue to spin the wheels by pressing the "Play" button.

While playing I accumulated 1366 credits and pressed the ticket button. A ticket printed worth $13.00 and I observed 1300 points get knocked off the total. I observed that there were 66 credits remaining after the knock-off.

I brought the ticket that printed from the Pennsylvania Skill Games VGD to the redemption terminal. I saw that there was a "Pennsylvania Skill Games" label on the redemption terminal. There were instructions on the video screen of the redemption terminal which instructed me to scan the QR Code on my payout slip/ticket at a scanner located on the redemption terminal. I observed that the scanner was located beneath the video screen on the terminal, held the payout slip/ticket's QR code up to the scanner. $13.00 cash, in US currency, was subsequently dispensed from the redemption terminal. I took the $13.00 and left the tobacco shop.I took photographs of all payout slips/tickets that were printed out of the machines, prior to exchanging them for cash money at the checkout counter. I placed identifying marks on all of the machines which I received payouts from. At no point during my investigation, did the store owner, or any employee check my ID or ask me about my age, to verify that I was over the age of 18.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| | | | | |
|---|---|---|---|---|
| _Thomas J. Phelan_ | 10/26/21 | | 10/26/2021 | (SEAL) |
| *Affiant Signature* | *Date* | *Issuing Authority Signature* | *Date* | |

Page **4** of 6



# Commonwealth of Pennsylvania

## COUNTY OF MONROE

# AFFIDAVIT OF PROBABLE CAUSE

| Docket Number | Police Incident | Warrant Control |
|---|---|---|
| (Issuing Authority): | Number:2021102SM0521 | Number: |

*PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*
*Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.*

On 10/21/2021 at 11:00, I entered Smokin' Joe's Tobacco Shop Inc., located at 15 N 3rd St, Stroudsburg, PA 18360, in an undercover capacity. Upon entering, I observed that there were four (4) Pennsylvania Skill Games Video Gambling Devices (VGDs), manufactured by MIELE/PACE-O-MATIC. All four (4) VGDs were turned on and ready for play. The VGDs were located along the wall on the left hand side of the store, if facing the back the store from the main entrance. In addition to the four (4) Pennsylvania Skill Games VGDs, there was a Pennsylvania Skill Games "Redemption Terminal" located on the same wall, alongside the VGDs.

I played on the Pennsylvania Skill Games VGD closest to the entrance. I inserted $10.00 cash, US Currency, into the machine and observed the credits increase by 1000. The machine accepted multiple bill denominations.

I played the game theme, "Graveyard Gold" which is a nine (9) position video slot machine style game requiring two (2) like symbols and a "wildcard" symbol to be aligned vertically, horizontally, or diagonally to win. On a winning combination, the reels will display two (2) like symbols aligned vertically, horizontally, or diagonally and the player has the ability to place a "wildcard" token in a slot to complete the pattern of three (3) symbols in a row going up, down, or diagonal. If there is not a winning combination, the player can continue to spin the wheels by pressing the "Play" button.

I played until I no longer had enough credits to continue playing and then verified that there is an alternative gameplay type called "Follow Me". It is accessed by pressing a button on the screen below the reels. I saw no other patrons playing this gameplay type.

I inserted an additional $20.00 into the VGD. While playing, I was awarded with bonus rounds/gameplay called "Golden Touch". I received free spins as a result of the bonus gameplay.

I accumulated 5046 credits and pressed the ticket button. A ticket printed worth $50.00 and I observed $50.00 points get knocked off the total. I observed that there were 46 credits remaining after the knock-off.

I continued playing Graveyard Gold and inserted $20.00 cash, US Currency, into the machine and observed the credits increase by 2000. I played until I no longer had enough credits to continue playing.

I inserted an additional $5.00 into the machine to continue playing. While playing, I accumulated 900 credits and pressed the ticket button. A ticket printed worth $9.00 and I observed 900 points get knocked off the total. I observed that there were zero (0) credits remaining after the knock-off.

I brought the two (2) tickets that printed from the Pennsylvania Skill Games VGD to the redemption terminal. I held the QR code on the payout slips/tickets up to the scanner. $59.00 cash, in US currency, was subsequently dispensed from the redemption terminal. I took the $59.00 and left the tobacco shop.

## CONCLUSION

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| | | | | |
|---|---|---|---|---|
| *Affiant Signature* | 10/26/21 | *Issuing Authority Signature* | 10/26/2021 | (SEAL) |
| | *Date* | | *Date* | |

Page 5 of 6

AOPC 410B-10

| **Commonwealth of Pennsylvania** |  | **AFFIDAVIT OF PROBABLE CAUSE** |
|---|---|---|
| **COUNTY OF MONROE** | | |

| **Docket Number** | Police Incident | Warrant Control |
|---|---|---|
| (Issuing Authority): | Number: | Number: |

*PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*
*Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.*

Based on the observations described above, your Affiant believes that all video gambling devices described in this affidavit are set-up, maintained and operated for the purpose of unlawful gambling. During the course of this investigation, law enforcement officers have personally received cash payouts on several of the video gambling devices maintained by the subject establishment. Your Affiant also believes that all devices, after seizure and subsequent inspection, will be found to possess characteristics unique to video gambling devices, and will prove to be gambling devices "per se" and therefore possessed and operated in violation of Pennsylvania Crimes Code / Title 18, Section 5513, Gambling Devices, gambling, etc.

Based upon the evidence gathered during this investigation it was determined that game play on these video gambling devices includes all three elements of gambling; consideration, chance and reward. Additionally, the devices are set up, maintained and being utilized for unlawful gambling purposes. Therefore, your Affiants respectfully request a warrant be issued to permit a search of the premises and the seizure and subsequent inspection of the video gambling devices described herein. Such inspection to include a detailed examination of the internal portion of the devices to identify and document the contents as well as to analyze any accounting/record-keeping data, and /or other indicia of unlawful gambling contained within. Refer to "Attachment A."

The facts contained in this Affidavit of Probable Cause are not the only facts known to your Affiant, but those facts that are necessary to establish probable cause.

Due to this investigation still being ongoing, and the sensitive nature of the information contain within this search warrant, I respectfully request that this search warrant be sealed for a period of 60 days.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| | 10/26/21 | | 10/26/2021 | (SEAL) |
|---|---|---|---|---|
| *Affiant Signature* | *Date* | *Issuing Authority Signature* | *Date* | |

Page 6 of 6

AOPC 410B-10

# ATTACHMENT "A"

1. Any and all electronic video gambling devices (VGDs) including but not limited to:
   a. VGDs manufactured by MIELE/PACE-O-MATIC and any other electronic video slot or poker devices.
   b. Any other VGDs manufactured by any other known or unknown manufacturers.
   c. Any and all electronic components related to video gambling devices, to include, circuit boards, bill acceptors, and monitors.

2. Remote devices which are used as a "knock off' device including but not limited to magnets, garage door openers, remote controls or other electronic, physical or mechanical device or object used to remove accumulated credits from video gambling devices. Any reference, service or maintenance manuals for electronic video gambling devices as described above.

3. Payout slips, papers, tickets, notes, receipts, schedules and any other items relating to or recording activity of illegal gambling in paper or electronic digital format. This would also include any containers wherein these items are found, passwords, or other instructions; and any and all computers, computer hard drives and portable storage devices that this information could be stored digitally.

4. Any and all locations that a "payout" was received from and any and all United States currency associated with the video gambling devices.

5. Any and all daily, weekly, and/or monthly collection receipt reports, cash disbursement journals, financial accounting ledger books, and or records reflecting the receipts of proceeds from electronic video gambling devices either electronic, digital, written or telephonic, or any other format including instructional manuals.

6. Address and/or telephone books, rolodexes or papers containing names, addresses, telephone numbers, pager numbers, fax numbers of taverns, clubs, fire companies, or other retail service entities, vendors, manufacturers, maintenance or other persons affiliated with the aforementioned video gambling devices or their proceeds. Regardless of whether or not such records are by themselves or mixed with legitimate sources.

7. General journals, cash receipt journals, cash disbursement journals, general ledgers, subsidiary journals, and any other records or writings which include notes receivable, accounts receivable, accounts payable, and closing ledgers.

8. An inspection of the machines to look for bookkeeping data, either stored digitally and accessed through an "accounting" or "administrative" mode, or stored mechanically on a device located inside the Video Gambling Devices, which tracks credits "knocked off" (payouts).

# EXHIBIT D

Monroe County Prothonotary Filed May 19, 2023 8:38 AM

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: FOUR PENNSYLANIA SKILL AMUSEMENT DEVICES AND ONE TICKET REDEMPTION TERMINAL CONTAINING $18,692 IN U.S. CURRENCY** | : : : : : : : : : : | **No. 6673 CV 2021** |
| | : | **APPEAL** |

**STATEMENT PURSUANT TO Pa.R.A.P. 1925(a)**

This matter comes before us on Commonwealth's appeal from our February 8, 2023 order granting L&M Music Company, Inc. and Smokin' Joe's Tobacco Shop, Inc.'s (Petitioners, collectively) Joint Omnibus Petition to Return Seized Property and to Suppress Evidence. For the reasons set forth below, we respectfully request that the Commonwealth's appeal be denied and our February 8, 2023 order affirmed.

**History**

This is the second appeal taken in this matter by the Commonwealth to the Pennsylvania Superior Court. On May 16, 2022, the Commonwealth filed a Notice of Appeal from our order filed May 17, 2022 denying the Commonwealth's Motion for Recusal. On July 11, 2022, we filed our Statement Pursuant to Pa.R.A.P. 1925(a) (First 1925(a) Statement) with respect to the Commonwealth's appeal. In our First 1925(a) Statement, we thoroughly recited the factual and procedural history of this case from its inception until May 16, 2022. We incorporate that history and will not reiterate it here.

1

Accordingly, we will begin with a review of the facts and procedural history relevant to the Commonwealth's current appeal that have transpired from May 16, 2022 to present.

On May 16, 2022, we proceeded to hearing on Petitioners' Joint Omnibus Petition to Return Seized Property and to Suppress Evidence. At the conclusion of the hearing, the Commonwealth requested 30 days to file a memorandum in support of its position. We gave the parties 21 days to file briefs. To date, the Commonwealth has not filed a brief in support of its position. Instead, the Commonwealth filed an application to stay the trial court proceedings in this Court while it litigated its appeal from our denial of its motion for recusal. The Superior Court stayed the matter before this court on May 20, 2022.

On January 24, 2023, the Superior Court, at docket number 1218 EDA 2022, quashed the Commonwealth's appeal. In its opinion, the Superior Court stated that "[a]s a preliminary matter, we must address whether we have jurisdiction to consider this interlocutory appeal." *In re Four Pennsylvania Skill Amusement Devices & One Ticket Redemption Terminal Containing $18,692 in U.S. Currency*, 1218 EDA 2022, 2023 WL 371788, at *7 (Pa. Super. Ct. Jan. 24, 2023), *reargument denied* (Apr. 5, 2023). Further, the Superior Court reasoned,

> [i]n this case, the Commonwealth is seeking to recuse the trial judge from considering whether to return the four gambling devices. If the trial judge orders that the devices be returned, double jeopardy principles would not be implicated and that decision could be appealed, including the trial judge's denial of the recusal motion.
> Accordingly, the appeal from the denial of the recusal motion is from an interlocutory order and is quashed.

*Id*. at 9.

2

On February 7, 2023, the Commonwealth filed an Application for Reargument with the Superior Court. On April 5, 2023, the Superior Court denied the Commonwealth's request. In the interim, on February 8, 2023, we issued an order granting the Petitioners' Joint Omnibus Petition to Return Seized Property and to Suppress Evidence. In our February 8th order, we wrote:

> 1. Petitioners' Petition to Suppress Evidence is **GRANTED**. The court finds that the Commonwealth improperly withheld and misrepresented material evidence relative to the issuance of the search warrant in this matter, and that such conduct warrants the suppression of the seized property.
>
> 2. Petitioners' Petition to Return Seized Property is **GRANTED**. The court finds that the devices at issue are legal games of skill, and that the Commonwealth has failed to establish that the devices, as designed, are games of chance.
>
> 3. The Commonwealth shall, within 48 hours of the issuance of this Order, **RETURN** the seized Skill Games and TRT to Petitioners. Petitioners shall retain the monies previously returned to them pursuant to prior order of court.

The next day, the Commonwealth filed a Motion to Strike our February 8th order on jurisdictional grounds. On February 13, 2023, Petitioners filed an answer to the Commonwealth's Motion to Strike.

We held a hearing on the Commonwealth's motion on February 17, 2023. At the conclusion of the hearing, we issued an order and denied the Commonwealth's Motion to Strike. In our order, we found "consistent with the Superior Court's decision entered in this matter on January 24, 2023 and Pa.R.A.P. 1701(b)(6), that we have jurisdiction to issue our February 8, 2023 final order in this matter." We further found "that Pa.R.A.P. 2572 is not dispositive of jurisdiction with respect to a quashed, interlocutory appeal."

3

On March 7, 2023, the Commonwealth filed a Notice of Appeal from our February 8th order.[1] On March 17, 2023, we directed the Commonwealth to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) within twenty-one days. The Commonwealth complied with our order by filing its concise statement on April 12, 2023 raising the following two alleged errors:

1. The Court made an error of law and abused its discretion in entering an order on February 8, 2023 returning property and suppressing evidence in a matter in which it has no jurisdiction, due to a pending appeal, and when the record had not been returned by the Superior Court, contrary to established case law, and the Pennsylvania Rules of Appellate Procedure.

2. Assuming, *arguendo*, that the Court had jurisdiction, which is not conceded, the Court made an error of law and abused its discretion in issuing its Order of February 8, 2023, returning property and suppressing evidence, without explaining its reasoning, by issuing an opinion, or a statement of findings of fact and conclusions of law, which is contrary to established case law and the Pennsylvania Rules of Criminal Procedure.[2] [3]

For the reasons that follow, we find no merit to the Commonwealth's claims. We will address each of the Commonwealth's claims in turn.

---

[1] At this time, the Commonwealth has yet to return the property to Petitioners. On February 17, 2023, Petitioners filed a Motion to Hold The Monroe County District Attorney in Contempt of this Court's Order of February 8, 2023. On February 24, 2023, we issued a Rule Returnable for Answer and Hearing upon Assistant District Attorney Andrew Throckmorton to show cause why the Petition or Motion should not be granted, and he should not be held in indirect contempt of court for failure to comply with our February 8, 2023 Order directing the return of the seized devices to Petitioners. A contempt hearing is scheduled for July 2, 2023.

[2] The Commonwealth has NOT alleged any substantive error of law and thus has waived any possible issue on those grounds. Pa.R.A.P. 1925(b)(4)(vii), *Com. v. Hill*, 609 Pa. 410, 427, 16 A.3d 484, 494 (2011) *citing Com. v. Lord*, 553 Pa. 415, 719 A.2d 306, 309 (1998).

[3] Petitioners filed a Motion to Vacate Automatic Supersedeas on April 27, 2023. We scheduled hearing on the motion for May 19, 2023. In the interim, the Commonwealth filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court from the Superior Court's quashing of its appeal concerning its recusal motion. The Petition is still pending before the Supreme Court.

4

## Discussion

### Jurisdiction

In its first statement of error, the Commonwealth contends that we lacked jurisdiction to enter our February 8, 2023 final order directing the Commonwealth to return the seized devices to Petitioners. We do not agree.

In its January 24, 2023 decision, the Superior Court explicitly stated, "[a]s a preliminary matter, we must address whether we have jurisdiction to consider this interlocutory appeal." *In re Four Pennsylvania Skill Amusement Devices & One Ticket Redemption Terminal Containing $18,692 in U.S. Currency*, 1218 EDA 2022, 2023 WL 371788, at *7 (Pa. Super. Ct. Jan. 24, 2023), *reargument denied* (Apr. 5, 2023). The Superior Court concluded that "the appeal from the denial of the recusal motion is from an interlocutory order" and quashed the Commonwealth's appeal. *Id.* at 9. Finding that it lacked jurisdiction, there was nothing to relinquish to this court.

Even if the Commonwealth's interlocutory appeal had not been quashed, the appeal would not prevent the entry of our February 8th final order. Pa.R.A.P. 1701(b)(6) states in relevant part:

> (b)　Authority of a trial court or other government unit after appeal.— After an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may:
>
> *　　*　　*　　*　　*　　*
>
> (6)　Proceed further in any matter in which a non-appealable interlocutory order has been entered, notwithstanding the filing of a notice of appeal or a petition for review of the order.

5

Pa.R.A.P. 1701(b)(6) specifically authorizes the trial court to proceed in matters where an appeal is pending. Furthermore, both the Pennsylvania Superior Court and Pennsylvania Commonwealth Court have consistently held that under Pa.R.A.P. 1701(b)(6), a trial court does not lose jurisdiction to proceed in a matter, despite the filing of an appeal from an interlocutory order. (*See Melani v. Nw. Eng'g, Inc.*, 2006 PA Super 281, 909 A.2d 404 (Pa. Super. Ct. 2006), PA.Super.2006) (Appeal from trial court's order and opinion, making findings on exact location of right-of-way and ordering that landowner who brought the action to quiet title pay legal costs, was an appeal from an interlocutory order and, thus, did not divest the trial court of jurisdiction to rule on landowner's post-trial motion; record showed that no judgment was ever entered in the case.); (*See also E.O.J., Inc. v. Tax Claim Bureau of Schuylkill Cnty.*, 721 A.2d 79 (Pa.Cmwlth. 1998), Cmwlth.1998) (Trial court had authority to adjudicate plaintiff's petition for relief from judgment of *non pros*, notwithstanding plaintiff's filing of notice of appeal in the case, since plaintiff's notice of appeal was an appeal from a nonappealable interlocutory order); (*Com. v. Tourscher*, 453 Pa.Super. 1, 682 A.2d 1275 (1996)) (Fact that defendant's appeal from order denying his petition to dismiss for double jeopardy was pending in Superior Court at start of trial did not preclude trial court from exercising jurisdiction to commence trial on criminal charges, where Superior Court subsequently quashed appeal as interlocutory); and (*Com. v. Cameron*, 445 Pa.Super. 165, 664 A.2d 1364 (1995)) (Trial court was not precluded from proceeding with trial pending appeal of ruling on defendant's motion to suppress and Commonwealth's motion to quash). Accordingly, we had jurisdiction to enter our February 8th order, and did not commit error in doing so.

6

Despite the clear language of Pa.R.A.P. 1701(b)(6) and the clear holdings of the appellate case law interpreting Pa.R.A.P. 1701(b)(6), the Commonwealth contends that we lacked jurisdiction to issue our February 8th order because the Superior Court had not "relinquished jurisdiction" and had not "remanded" the matter back to us. The Commonwealth cites Pa.R.A.P. 2572 in support of its position. Pa.R.A.P. 2572 states, in relevant part:

> (a) General rule. Except as provided in paragraphs (b) or (c), the record shall be   remanded after the entry of the judgment or other final order of the appellate court possessed of the record.
> (b) Effect of pending post-decision applications on remand. Remand is stayed until disposition of: (1) an application for reargument; (2) any other application affecting the order; or (3) a petition for allowance of appeal from the order. The court possessed of the record shall remand 30 days after either the entry of a final order or the disposition of all post-decision applications, whichever is later.
> *       *       *       *       *       *       *       *       *
> (e) Docket entry of remand. The prothonotary of the appellate court shall note on the docket the date on which the record is remanded and give written notice to all parties of the date of remand.

Pa.R.A.P. 2572(a), (b) and (e).

We find Pa.R.A.P. 2572 inapplicable to this case. By its own language, Pa.R.A.P. 2572 pertains only to the record and when it is to be remanded after the entry of a judgment or other final order of the appellate court possessed of the record. It does not pertain to or address a trial court's ability to proceed in matters in which an appeal has been filed from a non-appealable interlocutory order. Nor does it pertain to matters which the Superior Court quashes for lack of jurisdiction. If we were to follow the Commonwealth's reading of Pa.R.A.P. 2572, Pa.R.A.P. 1701(b), which specifically governs when a trial court may proceed further in any matter in which a non-appealable

7

interlocutory order has been entered, would be moot.  For these reasons, we find no merit to the Commonwealth's argument and ask to be affirmed.

### Failure to issue Opinion

In its second statement of alleged error, the Commonwealth contends that, even if we did have jurisdiction to enter our order, we erred by failing to issue an opinion or findings of fact and conclusions of law.  We find that this issue is both waived and meritless.

"Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).  It is well settled that issues not raised before the trial court cannot be raised for the first time on appeal or in a Pa.R.A.P. 1925(b) Concise Statement of Claims Raised on Appeal. *Orange Stones Co. v. City of Reading, Zoning Hearing Bd.*, 32 A.3d 287, 291 (Pa.Cmwlth. 2011) *citing Irwin Union Nat. Bank & Tr. Co. v. Famous*, 2010 PA Super 145, 4 A.3d 1099 (Pa. Super. Ct. 2010).

We issued our February 8, 2023 order granting Petitioners' Joint Omnibus Petition to Return Seized Property and to Suppress Evidence and directing the Commonwealth to return the seized devices to Petitioners within 48 hours.  The Commonwealth filed a Motion to Strike our February 8th order.  In its motion, the Commonwealth does not cite any legal authority but contends that we erred in entering our order because we did not have jurisdiction.  On February 14, 2023, we issued an order scheduling hearing on the Commonwealth's Motion to Strike for February 17, 2023 at 10: 30 am and directing the Commonwealth to cite to specific authority in support of its motion.  The Commonwealth filed its revised motion on February 17, 2023

8

at 10:49 am, claiming only that we lacked jurisdiction to enter our February 8th order, and citing to Pa.R.A.P. 2572 in support.  At the hearing on February 17th, the sole argument made by the Commonwealth in support of its motion was that we lacked jurisdiction under Pa.R.A.P. 2572 to issue our February 8th order.  At no time prior to the filing of its 1925(b) Statement has the Commonwealth ever raised the issue of an opinion, finding of facts, or conclusions of law.  The issue is waived.

Although the issue is waived and we need not address its merits, even on the merits, the Commonwealth's argument fails.  To begin, the Commonwealth cites none and we know of no law that requires us to issue an opinion, findings of fact, or conclusions of law in order to enter an order for return of property. *See* Pa.R.Crim.P. 588.

Regarding suppression of evidence, Pa.R.Crim.P. 581(I) states:

> (I)    At the conclusion of the hearing, the judge shall enter on the record a statement of findings of fact and conclusions of law as to whether the evidence was obtained in violation of the defendant's rights, or in violation of these rules or any statute, and shall make an order granting or denying the relief sought.

Pa.R.Crim.P. 581(I).  However, the Superior Court has found that when a trial judge provides adequate subsequent explanation for their ruling in their Pa.R.A.P. 1925(a) opinion as to not impeded their appellate review, remand is not necessary. *Commonwealth v. Cabbagestalk*, 1230 WDA 2017, 2018 WL 4496627, at *2 (Pa. Super. Ct. Sept. 20, 2018) *citing Com. v. Millner*, 585 Pa. 237, 888 A.2d 680, 688–89 (2005) (explaining the purpose of the Rule and "recogniz[ing] that, unfortunately, it is not uncommon for suppression judges to fail to comply with this directive[,]" but declining to

9

remand for compliance with Pa.R.Crim.P. 581(I) where review was not hampered, and for judicial economy).

Our February 8, 2023 order states that;

1. Petitioners' Petition to Suppress Evidence is **GRANTED**. The court finds that the Commonwealth improperly withheld and misrepresented material evidence relative to the issuance of the search warrant in this matter, and that such conduct warrants the suppression of the seized property.

2. Petitioners' Petition to Return Seized Property is **GRANTED**. The court finds that the devices at issue are legal games of skill, and that the Commonwealth has failed to establish that the devices, as designed, are games of chance.

3. The Commonwealth shall, within 48 hours of the issuance of this Order, **RETURN** the seized Skill Games and TRT to Petitioners. Petitioners shall retain the monies previously returned to them pursuant to prior order of court.

See February 8, 2023 Order. We believe our February 8th order satisfies the mandates of Pa.R.Crim.P. 581(I). To the extent it does not, we provide the following:

L & M Music Company, Inc. is lawfully incorporated and authorized to conduct business within the Commonwealth of Pennsylvania. Smokin' Joe's Tobacco Shop, Inc. is a lawful entity authorized to conduct business within the Commonwealth of Pennsylvania. On October 28, 2021, the Commonwealth of Pennsylvania, acting through the Monroe County District Attorney's Office, executed a search warrant and seized property belonging to Petitioners. Specifically, the Commonwealth conducted a search and seized video Pennsylvania skill amusement devices and one ticket redemption terminal (devices, collectively). L & M is the lawful owner of the devices,

10

and Smokin' Joe's has a lawful possessory interest in the devices through a business arrangement with L & M.  The devices were seized from Smokin' Joe's premises located at 15 N. 3rd St., Stroudsburg, PA 18360. The TRT contained $18,692 in US currency.

On November 24, 2021, Petitioners filed their Joint Omnibus Petition to Return Seized Property, to Suppress Evidence, and to Unseal Search Warrant.[4]  In their filing, Petitioners seek the return of the devices pursuant to Pa.R.Crim.P. 588 because 1) L & M is the owner of the devices and Smokin' Joe's has a possessory interest in the devices at the time they were seized; and 2) the devices are not contraband. Petitioners contend that the devices are not gambling devices as that term is defined in Pennsylvania law. Petitioners also seek suppression of the seized devices pursuant to Pa.R.Crim.P. 581. Petitioners contend the devices should be suppressed because they were unlawfully seized based on an invalid search warrant.  Specifically, Petitioners contend that the Commonwealth intentionally and or recklessly withheld or misrepresented information material to the search warrant application.

On May 16, 2022, we held a hearing on Petitioners' Joint Omnibus Petition.  At the conclusion of the hearing, the Commonwealth requested 30 days to file a memorandum in support of its position.  We gave the parties 21 days to file briefs.  To date, the Commonwealth has not filed a brief in support of its position.

A petition for the return of property is governed by Pa.R.Crim.P. 588 which states:

---

[4] For the reasons set forth in our First 1925(a) Statement, Petitioners' Petition to Unseal Search Warrant is now moot.

11

(A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B) The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

(C) A motion to suppress evidence under Rule 581 may be joined with a motion under this rule.

Pa.R.Crim.P. 588. Under this rule, the moving party must first establish that it is entitled to lawful possession of the property by a preponderance of the evidence. *Commonwealth v. Trainer*, 287 A.3d 960, 964 (Pa.Cmwlth. 2022)(citations omitted). Once that is established, the burden then shifts to the Commonwealth to show, by a preponderance of the evidence, that the property is either contraband per se, or derivative contraband, and should not be returned to the moving party. *Id.*(citations omitted). Contraband *per se* is property that is unlawful to possess, and derivative contraband is property that can be lawfully possessed, but is used in the perpetration of an unlawful act. *Commonwealth v. Irland*, 153 A.3d 469, 473 (Pa.Cmwlth. 2017), *aff'd,* 648 Pa. 380, 193 A.3d 370 (2018)(citations omitted).

The statute that makes gambling devices illegal, 18 Pa.C.S.A. § 5513, provides as follows:

Gambling devices, gambling, etc.

12

**(a) Offense defined.**--A person is guilty of a misdemeanor of the first degree if he:

(1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards;

(2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;

(3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or

(4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

*See* 18 Pa.C.S.A. § 5513(a).

Unlawful gambling is defined as "gambling not specifically authorized by the Commonwealth." *Com. v. Betres*, 237 Pa.Super. 361, 368, 352 A.2d 495, 498 (1975). It is undisputed that the devices at issue in the instant matter were not specifically authorized by the Commonwealth. However, the question remains as to whether the devices at issue are gambling devices.

A machine is a gambling device per se if it can be used for no purpose other than gambling. *Com. v. Irwin*, 535 Pa. 524, 527, 636 A.2d 1106, 1107 (1993) (citations omitted). The three elements of gambling are 1) consideration; 2) a result determined by chance rather than skill; and 3) reward. *Id.* (citations omitted). Where all three of these elements are present, the machine will be considered "so intrinsically connected with gambling" as to be a gambling device *per se*. *Id.* (citations omitted). The

13

Commonwealth has the burden of showing that the machines are per se gambling devices. *Id.* (citations omitted).

In determining whether a machine is a gambling device, the court must examine the characteristics of the machine itself and whether the three elements are present. *Com. v. Two Elec. Poker Game Machines*, 502 Pa. 186, 194, 465 A.2d 973, 977 (1983). With respect to the element of chance versus skill, Pennsylvania courts have employed the "predominant factor test" stating that "for a game to constitute gambling, it must be a game where chance predominates rather than skill." *Com. v. Dent*, 2010 PA Super 47, 992 A.2d 190, 193 (Pa. Super. Ct. 2010) (citations omitted). Simply because a machine involves a large element of chance, without more, is insufficient to find the machine to be a gambling device *per se*. *Two Electronic Poker Game Machines*, 502 Pa. at 195. Moreover, the outcome of a game does not need to be wholly determined by skill in order for the machine to fall out of the *per* se gambling device category. *Id.* Rather, courts must determine whether chance or skill predominates in any given machine.

At the outset of the May 16th hearing, the parties stipulated that Petitioners were the lawful owners of the devices. Accordingly, the burden shifted to the Commonwealth to establish that the devices were illegal gambling devices. For purposes of their petition, Petitioners do not dispute that the devices satisfy the elements of consideration and reward. Consequently, the only issue before us was whether the Commonwealth had established that the devices constitute games of chance and not games of skill.

14

The Commonwealth called two witnesses to testify: Detective Thomas McMahon as a fact witness and David Schoppe as an expert witness in the analysis of game play of the devices at issue.  Petitioners called Rick Goodling as an expert witness in the field of Pennsylvania law enforcement, gambling investigations, and operation of the devices at issue.  Petitioners also called Dr. Olaf VanCura as an expert witness in gaming technologies, design, and mathematics.

Based upon the evidence presented, we found each of the devices at issue is a video game machine that utilizes POM of Pennsylvania, LLC (POM), software.  The devices are puzzle based games consisting of three phases. The first phase consists of a preview feature.  In this phase, the player may preview the next game puzzle.  No payment or purchase is required for the player to exercise the ability to cause the electronic system to disclose the next game puzzle for the game theme and play level selected.  The player can then choose to play the puzzle displayed or exit the game.  The player also has the option to cycle through the dozens of other available game themes and play levels, preview the associated puzzles, and select which, if any, to play.

The second phase of the game is a "tic-tac-toe" style puzzle, featuring different graphical themes that a player can select.  While the graphics and some award amounts differ among the various themes, the gameplay is functionally equivalent in all themes.  When the tic-tac-toe phase of the game is initiated, nine reels arranged in a 3 x 3 grid are spun.  When the wheels stop spinning, nine symbols based on the player's chosen theme are displayed.  The pattern that is displayed is selected from a finite pool of puzzles. Once the reels are spun, the player has limited time to replace one of the

15

symbols with a "wild" symbol in order to complete one or more rows in the grid. Failure to place the "wild" symbol at all within the time limit will result in a loss because the devices do not generate automatic wins.

The third phase of the game - the "follow me" phase can be triggered under certain circumstances by successful completion of the tic-tac-toe phase of the game. If a player executes the necessary skill during the tic-tac-toe phase of the game and still fails to win at least 105% of the amount paid to play the game, the player is given the option of entering the "follow me" phase of play. The "follow me" third phase of gameplay begins with a 3 x 3 grid of colored dots. The dots flash in a random sequence that the player must repeat. The player needs to follow the sequences for multiple rounds of play, with each sequence adding another circle. If ultimately successful, the player is awarded with a combined total of 105% of the original amount spent to play.

Once gameplay is complete, a player has the option of redeeming any remaining credits by pressing the redeem button. Pressing this button will cause the machine to dispense a ticket, reflecting the dollar amount that is equivalent to the remaining credits. For instance, if a player has 1000 credits, pressing the redeem button, will result in a player getting a ticket for $10 which they can then exchange for cash. The devices only award whole dollar amounts. Thus, pressing the redeem button rounds the player's credits down to the nearest whole dollar and leaves any excess credits on the device. For instance, if a player has 1050 credits, pressing the redeem button will result in a player getting a ticket for $10. The excess 50 credits worth $.50

16

will remain on the machine and may be used by that player or another player on future gameplay.

Based upon the evidence that was presented at the hearing, we found that the devices at issue in this case are predominantly games of skill. Specifically, we find that the Commonwealth has failed to meet its burden of establishing that the devices are predominantly games of chance. Further, we find that the petitioners have established that the machines are predominantly games of skill.

With respect to the Petitioners' Petition for Return of Property, both of the Commonwealth's witnesses testified that the devices were games of chance based upon their own playing of the devices and their watching of others play the game. The Commonwealth did not present any testimony whatsoever as to how the devices or their software are designed, but rather focused its presentation solely on how various individuals chose to play the games. We do not find the Commonwealth's evidence compelling or even relevant as the central issue in this case is the design of the games, not how individuals may choose to play them. The manufacturer, owner, or possessor of the devices cannot control how an individual chooses to play the game. Admittedly, they can make certain aspects of the game more "tantalizing" to play, but ultimately have no control over how one chooses to play the devices. Thus, while we find the testimony of the Commonwealth's witness, David Schoppe, to be truthful, his analysis was based only on his observations, was not performed to any scientific or professional standard, and is not relevant to our analysis. In this regard, we adopt the reasoning of our brethren court, the Honorable Andrew H. Dowling of the Dauphin County Court of Common Pleas in *In re: Three Pennsylvania Skill Amusement Devices, One Green*

17

*Bank Bag Containing $525.00 in US Currency, and Seven Receipts*, 2022-CV-06333-MD.

Moreover, while we found Mr. Schoppe's testimony to be truthful and based upon hours of watching game play – however irrelevant we find it to be, we did not find the testimony of Detective Thomas McMahon's to be relevant, trustworthy, or based upon any acceptable modicum of knowledge, observation, or experience. Detective Mc Mahon testified that his training with respect to determining whether a gaming device is an illegal gambling machine consisted of one course lasting somewhere between four and six hours in length, and informal discussions with members of another law enforcement department. He testified that prior to submitting the search warrant in this case, he watched individuals play the POM devices for 1 to 2 hours and played the device himself for "like one hour." Detective McMahon based all of his opinions and testimony about the devices upon less than 2 hours of observation of others playing the game and less than 1 hour of his own play. Detective McMahon knew of, but never played to completion, the follow me phase of the game. Instead, he played it "for like a couple seconds" and opined that because he did not see people play the follow me feature in the short time that he observed others, the devices were games of chance.

He acknowledged that the Commonwealth did not have an expert analyze the devices' software to determine how the devices are designed. He admitted that he was not interested in determining how the devices were designed or determining if they could be played to win utilizing skill, as opposed to chance. He stated, "I mostly just

18

went in there and I just wanted to play the slot machine style game." May 16, 2022 Hearing N.T. page 64.

His testimony was also self-contradictory, at one-point testifying that the devices did not contain instructions on the follow me feature, but later acknowledging that the devices do in fact contain instructions on the feature. May 16, 2022 Hearing N.T. page 54, 58-9. He testified that the devices contain a "knock-off" feature which renders them a gambling device, but later conceded that the devices do not "knock-off" points, May 16, 2022 Hearing N.T. page 60-1. He also testified to knowing of the Beaver County Court of Common Pleas case which found POM devices to be legal, but testified that the Beaver County Case was not dispositive of this case because it involved a "different terminal and different software numbers" – only to acknowledge moments later that he did not know how the terminals differed. May 16, 2022 Hearing N.T. page 69.

It was clear from the outset of Detective McMahon's testimony that the Commonwealth did not understand the design of the game, its software, the available options to play the devices, or even how the devices physically operated. It was equally clear that counsel for the Commonwealth did not either. Probably most telling of the Commonwealth's lack of knowledge regarding the devices was when Detective McMahon demonstrated the device functions in open court. Upon questioning by the assistant district attorney, Detective McMahon inserted paper currency into the device multiple times in order to demonstrate its operation for the court, including how the preview feature worked. It was clear to us that neither he nor the assistant district attorney knew that the device allows one to preview the games to play without inserting

19

any money into the machine.  This fact did not become known to the court until Attorney Lovecchio's summation with respect to Petitioners' suppression motion when Attorney Lovecchio pointed out the functionality to the court.

Additionally, we found the opinion of Petitioners' expert, Dr. Olaf Vancura, to be compelling.  Dr. Vancura has worked as a designer, inventor, and consultant in the gaming industry since 1995.  He testified that a skillful player that plays the POM devices can win, which is defined as making a net profit, on each and every play of the game.  Additionally, he opined that there is no feature or functionality of the game that could prevent a skillful and patient player from achieving that result in every single play.  He gave this opinion with 100% mathematical certainty.

Adding to the persuasive opinion of Dr. Vancura is the fact that all of the witnesses who testified, including the Commonwealth's two witnesses, agreed that it is possible for a patient and skillful player to win 105% of their wager on each play utilizing the follow me feature.  While the determination of which puzzle will be displayed is predominantly chance, the playing of the tic-tac-toe game requires some skill – however slight it may be.  Even though the determination of the puzzle may be by chance, the preview feature allows a player to elect to play a different, winning game, or not play at all for a full refund, thus eliminating the element of chance.  Moreover, it is undisputable that the follow me feature can only be completed by a skillful player who plays with skill and is not dependent on chance.  Further, the follow me feature is available every time a player wins the same as or less than their wager.  This, too, eliminates the element of chance by giving a player the opportunity to win more than they wagered by utilizing skill each and every play of the device.

20

For all of these reasons, we found that the Commonwealth did not meet its burden of proof to establish that the devices at issue – as designed – are games of chance, and we ordered the devices returned to Petitioners.  We stand by our decision and ask to be affirmed.

With respect to Petitioners' Suppression Motion, we granted the motion because we found that the Commonwealth had improperly withheld and misrepresented material evidence relative to the issuance of the search warrant in this matter, and that such conduct warrants the suppression of the seized property.  We adopt the reasoning set forth by Attorney Lovecchio in his summation with regard to this issue.

Further, we find that Detective McMahon – and by extension the Commonwealth - either knowingly or recklessly misstated in his affidavit in support of the search warrant the law defining games of chance.  Specifically, Detective McMahon wrote that the chance element of gambling is defined as "[t]he randomness of some act, e.g. the spinning of slot machine reels."  This is not an accurate recitation of the law and is misleading to the issuing authority.  To the extent this error should not be held against the Commonwealth because Detective McMahon is not an attorney, this argument fails because the warrant application was approved and signed for by an attorney – ADA Andrew Throckmorton.

In addition to the various factors discussed above, Detective McMahon knew that the devices contained a preview function – even though he did not know it could be operated without inserting currency.  He did, however, know that if a player utilized the preview function but chose not to play the device at all, all currency that had

21

been inserted would be refunded in full.  The Commonwealth withheld all this information from the affidavit.

Detective McMahon also knew that any credits that are left on a device when one chooses to cash out are not cleared out or knocked off the device.  He testified that the credits remain on the device and may be played by the current player or the next player to use the device.  Again, the Commonwealth withheld all this information from the affidavit.

Moreover, Detective McMahon knew – or should have known – that players can – with skill - earn 105% of their bet every time by using the follow me function.  Once again, the Commonwealth withheld all this information from the affidavit.  Further, at no time during the 18 months that this case was pending before this court did counsel for the Commonwealth ever make the court aware of this function, yet the Commonwealth continued to insist it was entitled to retain possession of the Petitioners' property.

Finally, we incorporate our comments stated above regarding the Commonwealth's lack of knowledge concerning the design of the game, its software, the available options to play the devices, and how the devices physically operate.  We find that the Commonwealth's application for a search warrant based upon inaccurate and incomplete facts, while also knowingly withholding critical facts, is reckless at best, intentional at worst, and warrants suppression.  We also find that the seizure by the Commonwealth of the Petitioners' property without adequate and accurate knowledge of the devices, their design, and function is even worse, and also warrants suppression. Simply put, the Commonwealth did not have adequate knowledge to determine the

22

devices were illegal, and it withheld critical information that it should have disclosed in its search warrant application.  For all of the reasons stated above, we believe our suppression order was properly entered and does not constitute error.

We respectfully request the Superior Court affirm our order February 8, 2023 order granting the Petitioners' Joint Omnibus Petition to Return Seized Property and to Suppress Evidence.

BY THE COURT:

JENNIFER HARLACHER SIBUM, Judge

Dated: <u>May 18, 2023</u>

cc:    District Attorney (AT)
George Westervelt, Esq.
Matthew Haverstick, Esq.
Edward Butkovitz, Esq.
Marc Lovecchio, Esq.
James Gorman, III, Esq.
Court Administration

23

# EXHIBIT E

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Middle District of Pennsylvania

| | |
|---|---|
| PACE-O-MATIC, INC., | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   1:20-CV-292-JPW |
| | ) |
| ECKERT SEAMANS CHERIN & MELLOTT, LLC, et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   Colonel Robert Evanchick, Pennsylvania State Polic Commissioner, 1800 Elmerton Ave., Harriburg, PA 17110

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Attachment A

| Place: | Date and Time: |
|---|---|
| Via email to jeff.jensen@huschblackwell.com, or via an alternate mutually agreed to by the parties. | 11/30/2022 at 5:00 p.m. EST |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/3/2022

OR

_____          /s/ Jeff Jensen
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Pace-O-Matic, Inc. _____ , who issues or requests this subpoena, are:

Jeff Jensen, Husch Blackwell LLP, 190 Carondelet Plaza, Suite 600, St. Louis, MO 63105

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:20-CV-292-JPW

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

      I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

      ❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

      ❐ I returned the subpoena unexecuted because: _____

_____ .

      Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

      I declare under penalty of perjury that this information is true.

Date: _____

                                  _____
                                        *Server's signature*

                                  _____
                                      *Printed name and title*

                                  _____
                                      *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## DEFINITIONS

"**Communication**" includes every expression, statement, or dissemination of any words, thoughts, statements, ideas, or information, regardless of form, format, medium, or kind. "Communication" includes but is not limited to oral and written communications of any kind, including telephone conversations, discussions, meetings, notes, letters, agreements, emails and other electronic communications, facsimiles, and all other forms of written or oral exchange that are recorded in any way, including video recordings, audio recordings, written notes, or otherwise. Any communication that falls within the definition of "document" shall constitute both a document and a communication for purposes of this Subpoena. To the extent that any item constitutes a "Communication" under this definition, all attachments to that item also constitute "Communications," regardless of whether those items would independently constitute "Communications."

"**Document**" encompasses and includes every item, material, file, expression, document, and other thing that would constitute a "document" as that term is used in Federal Rule of Civil Procedure 34. "Document" includes every item, whether in electronic or tangible form, upon which any expression or communication has been recorded by any means, including but not limited to electronic documents, files, databases, and records, including but not limited to emails, voicemails, text messages, calendar entries, instant messages, MMS messages, SMS messages, iMessages, computer files, spreadsheets, and metadata. The term "document" includes every draft of any other material that falls within the definition of "document."

"**Eckert**" means Eckert, Seamans, Cherin & Mellott, LLC.

A person is "**party to**" a Communication if the person is involved in any way in the Communication, including but not limited to any speaker, listener, writer, drafter, reader, sender, or recipient (whether directly, via "cc," via "bcc," or via forward or similar mechanism).

"**Parx**" means Greenwood Gaming and Entertainment, Inc. d/b/a Parx Casino.

"**POM**" means Pace-O-Matic, Inc.

"**Pennsylvania State Police**" includes any employee, agent or representative of the Pennsylvania State Police as well as any component or subdivision thereof, including but not limited to the Bureau of Liquor Control Enforcement and the Bureau of Gaming Enforcement.

"**You**," and "**your(s)**" refers to the Pennsylvania State Police and includes every component and subdivision, including but not limited to Bureau of Liquor Control Enforcement and Bureau of Gaming Enforcement.

1

HB: 4865-4225-6698.1

**REQUESTS**

1.    All Communications relating to POM, "Pennsylvania Skill," "PA Skill," or "Queen of Virginia."

2.    All Communications relating to games of skill, skill games, "gray market" gaming, purportedly illegal gaming, or purportedly unregulated gaming to which any of the following persons was a party:

      a.    Mark Stewart;
      b.    Kevin Skjoldal;
      c.    David (a/k/a Neil) Hittinger;
      d.    Kristine Marsilio;
      e.    Any other employee, officer, or owner of Eckert, including but not limited to any individual whose email address includes the domain "@eckertseamans.com."
      f.    Robert ("Bob") Green;
      g.    Thomas Bonner;
      h.    Bryan Schroeder;
      i.    Any other employee, officer, or agent of Parx;
      k.    Richard Gmerek.

3.    All Communications relating to POM, "Pennsylvania Skill," "PA Skill," "Queen of Virginia," games of skill, skill games, "gray market" gaming, purportedly illegal gaming, or purportedly unregulated gaming that mention or discuss any of the following:

      a.    Mark Stewart;
      b.    Kevin Skjoldal;
      c.    David (a/k/a Neil) Hittinger;
      d.    Kristine Marsilio;
      e.    Any other employee, officer, or owner of Eckert;
      f.    Parx Casino and/or Greenwood Gaming;

4.    Documents reflecting all meetings, telephone calls, and videoconferences relating in any way to POM, "Pennsylvania Skill," "PA Skill," "Queen of Virginia," games of skill, skill games, "gray market" gaming, purportedly illegal gaming, or purportedly unregulated gaming that were attended by any of the following or to which any of the following were invited:

      a.    Mark Stewart;
      b.    Kevin Skjoldal;
      c.    David (a/k/a Neil) Hittinger;
      d.    Kristine Marsilio;
      e.    Any other employee, officer, or owner of Eckert;
      f.    Robert ("Bob") Green;

2

HB: 4865-4225-6698.1

g. Thomas Bonner;

h. Bryan Schroeder;

j. Any other employee, officer, or agent of Parx.

5. All Documents (including all Communications) relating to any actual or proposed joint or coordinated efforts with casinos or participants in the gaming industry relating to:

a. POM, "Pennsylvania Skill," "PA Skill," or "Queen of Virginia"; or

b. games of skill, skill games, "gray market" gaming, purportedly illegal gaming, or purportedly unregulated gaming in either Pennsylvania or Virginia.

6. All Documents (including all Communications) relating to any actual or proposed target or focus of Pennsylvania State Police related to:

a. POM, "Pennsylvania Skill," "PA Skill," or "Queen of Virginia"; or

b. games of skill, skill games, "gray market" gaming, purportedly illegal gaming, or purportedly unregulated gaming in either Pennsylvania or Virginia.

7. All Documents (including all Communications) relating to Captain James Jones and Pace-O-Matic, POM, "Pennsylvania Skill," "PA Skill," or "Queen of Virginia.

8. All Documents (including all Communications) relating to any investigation of Captain James Jones.

9. All Documents (including all Communications) related to Captain James Jones, Sergeant Fischer, or any of your employees, agents, or officers providing direction or instruction or suggestion to anyone to look for, find, or target Pace-O-Matic, POM, "Pennsylvania Skill," "PA Skill," or "Queen of Virginia games ("POM games") including but not limited calendar entries, notes, records, or minutes of meetings or briefings, descriptions or depictions of the POM games logo, descriptions regarding distinguishing POM games from Banilla games, instructions on writing reports related to seizure of POM games, instruction or descriptions characterizing the legality or illegality of the POM games, or instructions regarding communication with licensees of the POM games.

10. All Documents related to any training received by the Vice Unit or other specific Pennsylvania State Police Units related to games of skill, skill games, "gray market" gaming, purportedly illegal gaming, purportedly unregulated gaming, or POM games, including documents related to the cost of the training.

11. All Documents related to the seizure of POM games from Country Garden Six-Pack in Clearfield County including but not limited to any draft reports.

12. All Documents relating to any grant application submitted by the Monroe County District Attorney's Office to the Pennsylvania Gaming Control Board.

3

4

13.    All prepared remarks, slide decks, Powerpoint presentations, handouts, outlines, agendas, and other Documents reflecting or memorializing any aspect of the content of a training event delivered on or about September 28, 2021 by the Pennsylvania State Police's CAGE Unit.

HB: 4865-4225-6698.1