# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

POM OF PENNSYLVANIA, LLC,    :

    :

            Petitioner,    :   No._____

    :

       v.    :

    :

BUREAU OF LIQUOR CONTROL    :

ENFORCEMENT OF THE    :

PENNSYLVANIA STATE    :

POLICE; SCOTT MILLER;    :

JAMES JONES; and SCOTT    :

BERDINE,    :

    :

          Respondents.

## PETITION FOR REVIEW IN THE NATURE OF A COMPLAINT

Petitioner POM of Pennsylvania, LLC, by and through its undersigned counsel, submits this Petition for Review in the Nature of a Complaint, and in support alleges as follows:

## I. JURISDICTION

1. This Court has jurisdiction under Section 761(a)(1) of the Judicial Code, 42 Pa.C.S. § 761(a)(1). This petition for review is addressed to the Court's original jurisdiction and is in the nature of a complaint.

Received 4/11/2022 2:20:04 PM Commonwealth Court of Pennsylvania

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

POM OF PENNSYLVANIA, LLC,      :

            :

            Petitioner,    :    No._____

            :

       v.              :

            :

BUREAU OF LIQUOR CONTROL    :

ENFORCEMENT OF THE          :

PENNSYLVANIA STATE           :

POLICE; SCOTT MILLER;        :

JAMES JONES; and SCOTT      :

BERDINE,                  :

            :

          Respondents.    :

## <u>NOTICE TO PLEAD</u>

TO: RESPONDENTS

     You are hereby notified to file a written response to the enclosed petition for review within thirty (30) days from service hereof or a judgment may be entered against you.

Dated: April 11, 2022           /s/ Matthew H. Haverstick_____

                                    Matthew H. Haverstick (No. 85072)

                                    Joshua J. Voss (No. 306853)

                                    Shohin H. Vance (No. 323551)

                                    KLEINBARD LLC

                                    Three Logan Square

                                    1717 Arch Street, 5th Floor

                                    Philadelphia, PA 19103

                                    Ph: (215) 568-2000

                                    Fax: (215) 568-0140

                                    Eml: mhaverstick@kleinbard.com

                                    *Attorneys for Petitioner*

## II.     PARTY SEEKING RELIEF

2.     Petitioner POM of Pennsylvania, LLC ("POM") is a Wyoming limited liability company with a principal business address of 3870 Peachtree Industrial Blvd., Suite 340-194, Duluth GA 30096.

## III.    GOVERNMENT UNIT WHOSE ACTION IS IN ISSUE

3.     Respondent Bureau of Liquor Control Enforcement of the Pennsylvania State Police (the "Bureau") is a Commonwealth law enforcement agency that enforces the Liquor Code.

4.     Respondent Scott Miller is an adult individual with a principal address of 144 Leeds Road, Newville, PA 17241.

5.     Respondent James Jones is an adult individual with a principal address of 187 Ridgeway Heights Road, Punxsutawney, PA 15767.

6.     Respondent Scott Berdine is an adult individual with a principal address of 3781 Ben Franklin Highway, Belsano, PA 15922.

7.     At all times relevant, Respondents were acting under color of law and as agents of the Commonwealth of Pennsylvania.

## IV.  STATEMENT OF MATERIAL FACTS

8.  In Pennsylvania, POM distributes legal, electronic games of skill marketed with the trade name "Pennsylvania Skill" (the "Skill Game").

9.  The Skill Game offers the skillful player the ability to win, on every play, at least 105% of the player's consideration.

10.  Game play on the Skill Game commences when the player commits funds or credits to play a puzzle game resembling a tic-tac-toe board.

11.  Sometimes, the skillful player may correctly solve the puzzle and be awarded more than the amount of funds/points committed, or be directed to a bonus game that has the same outcome.

12.  However, and on *every* play, if the skillful player solves the puzzle correctly but does not win more than the funds/points committed for play, the player is offered the ability to play the "Follow Me" stage of the game. "Follow Me" requires the player to repeat a pattern of 20 multi-colored circles in the same order in which the circles are displayed on the screen.

3

13.    If the player completes the pattern correctly, the player wins 105% of the funds/points committed.

14.    Therefore, on every play of the Skill Game, the skillful player may win more than the funds/points committed for play — the "Follow Me" phase of the Skill Game ensures that outcome.

15.    The Skill Game also has a preview feature, which allows the player (before committing any funds/points for game play) to see the upcoming tic-tac-toe puzzle and decide whether to commit any funds/points to play).

16.    POM, through in-state operators, places the Skill Game in small, family-owned businesses like bar and restaurants and convenience stores, as well as in fraternal organizations. Many of these locations sell or serve alcohol.

17.    POM has spent significant time, money and energy in building a business in Pennsylvania. Key to this business model is POM's advocacy for legislation that more strictly regulates the Skill Game (and illegal competitors) and POM's vigorous efforts to market its legal game in the Commonwealth.

4

18.    The Bureau is part of the Pennsylvania State Police. It is staffed primarily by enforcement officers (who are not state troopers). These officers enforce, *inter alia*, the Liquor Code, and have the authority to issue citations to locations licensed to sell and/or serve alcohol. These citations can lead to the location's loss of its liquor license.

19.    The Bureau also regulates illegal gambling (via use of the Crimes Code) in venues other than casinos.

20.    Historically, the Bureau investigates and cites licensed locations that offer illegal gambling machines for play.

21.    Upon information and belief in 2020, Respondent Miller transferred from the Bureau to another position within the Pennsylvania State Police and with the rank of major. For several years prior to his transfer, Miller was the Director of the Bureau.

22.    In 2021, Respondent Jones retired from the Bureau with the rank of captain. For several years prior to his retirement, Jones was the Bureau's director of operations.

5

23. Until his arrest for child sexual assault in 2022, Respondent Berdine was an enforcement officer supervisor in the Bureau charged with managing gambling investigations.

**A. The Bureau's Harassment of POM**

24. The Bureau's relationship with POM was not always hostile.

25. In 2013, the Bureau and POM arranged for a "friendly" seizure of a Skill Game in Beaver County.

26. The purpose of the pre-arranged seizure was to test the legality of the Skill Game in court.

27. After an evidentiary hearing in the Beaver County Court of Common Pleas, the Skill Game was determined to be a legal game of skill. *See* Dec. 23, 2014 Opinion and Order, annexed hereto as Exh. A.

28. The Bureau and its command staff, agreeing that the Skill Game was legal, chose not to appeal the Beaver County decision.

29. Indeed, Bureau personnel subsequently, and publicly, referred to the Skill Game as legal in Pennsylvania. For instance, in 2015 Major Thomas Butler (then Director of the Bureau) testified before the Pennsylvania House of Representatives' Gaming Oversight Committee about the Beaver County decision, noted that the case

6

established that the Skill Game was not a "gambling device[]", and contrasted the Skill Game to the many illegal gambling devices that tried to mimic the Skill Game. *See* Sept. 29, 2015 Testimony of Major Thomas Butler, annexed hereto as Exh. B.

30.    More importantly, the Bureau – for several years after the Beaver County decision – did not seize the Skill Game in other counties.

31.    At some point, however, and for reasons not clear, the Bureau's view of POM and the Skill Game became negative.

32.    Upon information and belief, the Bureau's change in stance regarding the Skill Game was motivated by personal animus among the Bureau's command staff (and particularly Respondent Miller) towards POM employees, rather than any good-faith belief that the Skill Game had materially changed its software from the version adjudicated in the Beaver County case.

33.    Starting in 2018, Respondents began a program of targeted harassment towards POM and its business partners.

34.    The Bureau's leadership, including Respondents Miller, Jones and Berdine, instructed Bureau officers to visit licensed locations known to possess POM games. The officers were further instructed to

7

deliver messages to the owners to the effect that the POM games were illegal, would be imminently seized, or otherwise would be legislated out of existence.

35.    Bureau officers frequently would misstate gaming law or court decisions in an effort to cow or cajole locations from removing the Skill Game. When those efforts failed, officers threatened citations that would lead to a loss of the location's liquor license.

36.    Bureau attorneys also were involved in the efforts. In some instances, locations cited for maintaining the Skill Game would receive outreaches from Bureau lawyers, who would offer to reduce citation fines in exchange for assistance in building a case against POM and Pennsylvania Skill.

37.    Sometimes, this message would be delivered directly to leadership of fraternal organizations that operated only the Skill Game on their premises. For instance, Respondent Jones himself informed the leadership of one fraternal organization that all gaming devices, including the Skill Game, were illegal gambling devices and that the fraternal employees risked felony charges if they handled money from the Skill Game. When informed that only the Skill Game was present

8

on the property, Respondent Jones did not equivocate that the Skill Game was illegal. As a result of these types of misstatements, fraternal organizations have removed the Skill Game from many of their Pennsylvania locations.

38. Upon information and belief, the Bureau, its agents and lawyers all worked to single out the Skill Game for different, and harsher, treatment than any other machine (many of which actually have been adjudicated as illegal gambling devices, unlike the Skill Game).

39. Encounters like this – in which Bureau personnel deliberately and falsely represented the legal status of the Skill Game, and threatened the Skill Game's business partners – occurred all over the Commonwealth and continue to the present day.

40. Indeed, Bureau personnel earlier this year told the leadership of a statewide fraternal organization that the Skill Game and any game like it is per se illegal in Pennsylvania. This fraternal organization relies on the revenue generated from Skill Games to supplement its service and charitable projects.

41. More insidious is the Bureau's openly false statements in legal proceedings and documents.

42. For example, in 2020 Respondent Jones testified in a preliminary injunction hearing before this Court. *See* Jan. 15, 2020 Transcript of Proceedings, annexed hereto as Exh. C.

43. In that action, POM sought an injunction prohibiting the Bureau from seizing the Skill Game during the pendency of a declaratory judgment action brought by POM to determine the Skill Game's legality in a court of statewide jurisdiction.

44. Respondent Jones acknowledged in his testimony that the Commonwealth had not declared the Skill Game illegal, and that it was merely Jones's, and the Bureau's, opinion that the Skill Game was an illegal gambling device. *See* Exh. C at 16-17.

45. Jones also testified on the issue of whether the Bureau targeted POM and the Skill Game, falsely claiming the Bureau did not.

46. Specifically, Jones testified: "We – we look at every single machine in the Commonwealth. I mean, we really — as a Bureau, we don't have the resources, the manpower, or the interest in targeting any

10

particular vendor or anything like that. We've always … focused on every single manufacturer." *See* Exh. C at 14.

47.    Based on Jones's testimony, and notwithstanding the Court's holding that POM was likely to succeed on the merits of its claim, the Court denied POM's injunction request. *See* Jan. 21, 2020 Memorandum and Order, annexed hereto as Exh. D.

48.    But Respondent Jones's testimony was not true. The Respondents, and Jones specifically, explicitly instructed Bureau officers to seek out locations with only Skill Games and to target these locations for threats and seizures. Jones trained enforcement officers who worked underneath him to differentiate the Skill Game from competitors' games, including training the officers on the colors and logos of the Skill Game, so to be able to pinpoint locations with only the Skill Game for selective enforcement and prosecution. Indeed, Respondents, and Jones specifically, created and provided written training materials to teach officers how to identify the Skill Game and how they were different from competitors' games. Respondents provided this training so officers were certain to be locating and seizing the Skill Game, as opposed to the competitors' games.

11

49. The Bureau's efforts to malign the Skill Game were directed outwardly as well.

50. For years, the Bureau has contacted district attorneys throughout the Commonwealth in an effort to enlist prosecutors' help in seizing the Skill Game.

51. As part of its pitch, the Bureau falsely describes the physical and software characteristics of the Skill Game, misrepresents that the Skill Game is an illegal gambling device (notwithstanding the Beaver County decision) and misstates relevant Pennsylvania law on determining a gambling device.

52. For instance, upon information and belief the Bureau – in cooperation with casino lobbyists and public relations personnel, recruited the district attorney of Clearfield County to seize Skill Games.

53. The owners of the seized games filed a return of property motion and also asked for the unsealing of the search warrant's affidavit of probable cause that led to the seizures. The Clearfield county district attorney unsealed the affidavit of probable cause and provided it to counsel. *See* Sept. 27, 2021 Clearfield County Application

12

for Search Warrant and Affidavit of Probable Cause ("Clearfield Search Warrant"), annexed hereto as Exh. E.

54. The affidavit of probable cause is materially inaccurate in several respects.

55. First, the affidavit grossly misstates the relevant Pennsylvania law on the determination of a gambling device. Under *Com. v. Two Electronic Poker Game Machines*, 502 Pa. 186 (1983), the Commonwealth is required to prove that a suspected gambling device is one of predominant chance, i.e. chance can entirely determine the outcome of the game. *See id.* at 194-95; *see also Com. v. Dent*, 992 A.2d 190, 192-93 (Pa.Super. 2010)(discussing Supreme Court's articulation of "predominant-factor" test in *Two Electronic Poker Game Machines* and Court's holding "that for a game to constitute gambling, it must be a game where chance predominates rather than skill.")

56. The Clearfield Search Warrant, however, completely vitiates the "predominant-factor" requirement and maintains the Commonwealth only need prove the minuscule standard *any* element of chance in the game. *See generally* Exh. E.

13

57. Specifically, the Clearfield Search Warrant – sworn out to by a Bureau enforcement officer and a Bureau District Office commander – avers that

> VIDEO GAMBLING
> In various decisions, Pennsylvania Courts have ruled that gambling consist of three elements:
>
> CONSIDERATION: Anything of value required to initiate play on a device.
> CHANCE: The randomness of some act, e.g. the spinning of slot machine reels.
> REWARD: Something of value, worth more than the amount wagered, offered to a player for a winning outcome.

58. The Clearfield Search Warrant, while mentioning the Skill Game's preview feature and the "Follow Me" phase of the game, does not explain that both features ensure the player may always win more than the consideration spent on every play. Indeed, it appears none of the Bureau affiants chose to use the preview feature or play "Follow Me" at all. *See generally* Exh. E.

59. Respondent Berdine was directly involved in the seizure of the Skill Game in Clearfield County based on the deliberately inaccurate Clearfield Search Warrant.

60. Identical language appears, verbatim, in other, similar affidavits ostensibly authored by other law enforcement agencies, presumably because Respondents provided the defective language for broad use in their contacts with various district attorneys.

14

61.    For instance, the Monroe County District Attorney's Office seized Skill Games in October of 2021, upon information and belief at the direction of Respondents. The Application for Search Warrant and Affidavit of Probable Cause for the seizures contains, word for word, the same defective legal language describing Pennsylvania gambling law - including the same typographical errors – that appear in the Clearfield Search Warrant. *See* Oct. 26, 2021 Monroe County Application for Search Warrant and Affidavit of Probable Cause ("Monroe Search Warrant"), annexed hereto as Exh. F.

62.    Consistent with Bureau "investigative" techniques, a Monroe District Attorney's Office detective – acting upon Bureau instructions – also fails to mention the preview feature or meaningfully discuss the "Follow Me" phase of the Skill Game in the Monroe Search Warrant. Indeed, the detective appears not to have played "Follow Me" at all. *See generally* Exh. F.

63.    Upon information and belief, the Bureau has for years used the same incorrect description of Pennsylvania gambling law, and has ignored the import of the Skill Game's preview feature and "Follow Me" game, to deceive judges throughout the Commonwealth and secure

15

judicial sign off on defective search warrants, and does so consistently to the present day.

64.    After seizing the Skill Game with faulty search warrants, the Bureau then resists efforts to adjudicate return of property motions or similar filings. Among other efforts to stall adjudication of its seizures, the Bureau maintains that the search warrants must be sealed, but offers no valid legal justification for the sealings.

65.    Finally, Bureau personnel have been in contact with lawyers and lobbyists for casinos in a conspiracy to disparage POM and assist casino lobbyists in tortiously interfering in POM's business.

66.    As noted above, a casino public relations operative contacted the Clearfield County District Attorney regarding the Skill Games seizure there as part of a cooperative effort with the Bureau to harass POM. Upon information and belief, the Bureau has worked with casino lobbyists and public relations personnel throughout the Commonwealth to disparage the Skill Game, instigate its seizure and harass POM's business partners.

67.    Bureau personnel also directly communicated with casino lawyers in a conspiracy to harass and attack POM.

16

68.    For instance, a "Captain" (upon information and belief,

Respondent Jones) said the following:

From: King, Jr., Adrian R. <KingA@ballardspahr.com>
Sent: Sunday, March 8, 2020 8:24 PM
To: Pete Shelly <pshelly@shelly-lyons.com>
Cc: ████████████████████████████████████████████
Subject: RE: radio spot from PA Skills & Buy and PAIG response

On Friday I had a discussion with a State Police Liquor Control Enforcement Unit Captain about -- as he described -- the advertisements about how POM supports fire companies and local charitable organizations.

The Captain stated: "I can't say this, but you can . . . . . this is exactly like how organized crime operates in terms of garnering 'community support'." Noted that Al Capone ran soup kitchens in 1929 in an effort to insulate his illegal activity.

69.    This conduct is all the more remarkable, and wrongful,

because the Bureau has never articulated a factual or legal basis for

maintaining that the Skill Game is an illegal gambling device.

70.    The Bureau never appealed the Beaver County ruling in

POM's favor, has refused to cooperate in discovery in the separate

Commonwealth Court case (in which POM's discovery request to the

Bureau, for all documents and information regarding the Bureau's

opinion that the POM game is illegal, have been substantively ignored

*for years*), and in general cannot point to a single legal decision in the

Commonwealth that has ever found or held the Skill Game to be an

illegal gambling device.

17

71. Upon information and belief, Respondents actually believe and fear the Skill Game is *legal* in Pennsylvania, and will be so determined by a Court. Therefore, Respondents seek to destroy POM's business in Pennsylvania by stridently maintaining just the opposite through a campaign of harassment, misinformation and threats.

72. The goal of this unlawful conduct is the prevention of POM from establishing itself in the Commonwealth, and thus the maintenance of Respondents' (and their confederates') preferred narrative that any and all skill games are *per se* illegal.

## COUNT I – VIOLATION OF ARTICLE I, SECTION I OF THE PENNSYLVANIA CONSTITUTION

73. Article I, Section I of the Pennsylvania Constitution reads as follows: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, *possessing and protecting property and reputation*, and of pursuing their own happiness." (Emphasis added.)

74. Under the Pennsylvania Constitution, the right to reputation is "a fundamental interest which cannot be abridged without compliance with constitutional standards of due process and equal

18

protection." *R. v. Dep't of Pub. Welfare*, 636 A.2d 142, 149 (Pa. 1994); *see also* Pa. Const. art. I, § 11 ("All courts shall be open; and *every man for an injury done him in his ... reputation shall have remedy by due course of law ....*" (emphasis added)).

75.   The right is also self-executing, and POM may vindicate a violation of its right to reputation directly in this Court.

76.   Respondents' concerted and years-long repeated harassment and disparagement of POM and the Skill Game, detailed above, amounts to a violation of POM's Article I right to reputation.

77.   In continually violating POM's reputational rights, Respondents have interfered and violated POM's due process rights as well by, *inter alia*, targeting POM and the Skill Game for selective prosecution, interfering with the property rights of POM and its business partners, presenting false testimony in judicial proceedings and in deliberate misstatements of fact and law in court filings, and illegally conspiring with private parties to deprive POM of its constitutional rights.

78.   The only effective remedy for POM to combat this harassment campaign is for the Court to put a stop to it, by ordering the

19

Bureau to discontinue the harassment, misrepresentation and targeting/selective prosecution of POM and the Skill Game.

## V.    RELIEF SOUGHT

WHEREFORE, POM of Pennsylvania, LLC requests that the Court enter a judgment in its favor:  (a) declaring that Respondents have violated Plaintiffs' rights under Article I, Section I of the Pennsylvania State Constitution; (b) permanently enjoining Respondents from publicly and privately declaring the Skill Game to be *per se* illegal, unless the Skill Game is so determined judicially or by statute; and (c) permanently enjoining Respondents from targeting POM and the Skill Game for selective prosecution.

Respectfully submitted,

Dated: April 11, 2022

/s/ Matthew H. Haverstick
Matthew H. Haverstick (No. 85072)
Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
KLEINBARD LLC
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
Phone: (215) 568-2000
Fax: (215) 568-0140
Email: mhaverstick@kleinbard.com

*Attorneys for Petitioner*

## VERIFICATION

I, Paul Goldean, President and Chief Operating Officer of Hyper Sierra, LLC (manager of POM of Pennsylvania, LLC) verify that the statements made in the foregoing Petition for Review in the Nature of a Complaint are true and correct to the best of my knowledge, information, and belief. I make this verification subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.


Dated: 4-6-2022

Paul Goldean

# EXHIBIT B

# PENNSYLVANIA STATE POLICE

## STATEMENT TO THE HOUSE OF REPRESENTATIVES
## GAMING OVERSIGHT COMMITTEE

### September 29, 2015



**Presented by
Major Thomas P. Butler
Director, Bureau of Liquor Control Enforcement
Pennsylvania State Police**

Good morning, Chairman Payne, Chairman Kotik and distinguished members of the House Gaming Oversight Committee.  My name is Major Thomas Butler, and I serve as the Director, Bureau of Liquor Control Enforcement (BLCE), Pennsylvania State Police (PSP).  With me today is Major Marshall Martin, Director, Legislative Affairs Office.

I would like to extend my thanks for the opportunity to participate in this hearing. Prior to answering your questions, I have a short opening statement that provides an overview on the issue of illegal video gambling machines in Pennsylvania.

The BLCE estimates approximately 15,000 or more illegal video gambling machines are currently in operation throughout the state.  These devices generally consist of two types of machines, video poker and video slot, with slot machines being more popular statewide.  While video gambling machines can be found in all regions of the state, they are most prevalent in the southwest, southeast and northeast.  The vast majority of these illegal gambling machines are located inside liquor-licensed establishments.   Most of these illegal devices are owned by vending machines companies which, in addition to the illegal devices, also provide other legal machines such as cigarette machines, ATMs, juke boxes, and pool tables.  There are numerous vendors located throughout Pennsylvania engaged in this business.

The percentages of "winning combinations" or "payouts" on illegal video gambling machines generally range from 55-80%.  This percentage can be adjusted by the

2

vendor through settings on the motherboard located inside of the machine. While these machines are often labeled "For Amusement Only," the BLCE has never observed a video poker or video slot machine in a licensed establishment that was not used for illegal gambling purposes.

Once a player "wins" on an illegal video gambling machine, payouts are generally handled by the proprietor of the establishment (manager or bartender) who is responsible for paying the winnings to the player. The proprietor then prepares a "payout slip" reflecting the amount of winnings paid. An employee of the vendor usually visits the establishment on a weekly or bi-weekly basis to "empty" the machine, at which time the proprietor is reimbursed for the payouts. Most machines are equipped with internal accounting devices, which serve as a means for the vendor to verify the winnings. After payouts are reimbursed, the profits are usually split in half between the vendor and proprietor.

Conservatively, we estimate it is not uncommon for one machine to generate $500 or more in profits per week. In practice, a bar or club having four or five machines can make several thousand dollars per week. The vendor, depending on the size of his territory, can make well into the millions of dollars per year in untaxed revenue through this criminal enterprise.

Investigations are often initiated by a gambling complaint to the local BLCE District Enforcement Office. However, many times these machines are uncovered

3

during an investigation of a liquor-licensed establishment for an unrelated liquor code violation such as loudspeakers or visibly intoxicated persons, or during the course of a routine open inspection of the establishment. Investigations into illegal video gambling machines tend to be resource intensive. These investigations often include numerous undercover visits to the establishment, search warrants, transporting the machines to the District Enforcement Office, and inspecting the machine for "knock-offs" and internal accounting mechanisms. Interestingly, the BLCE statistics regarding arrests and seizures related to video gambling machines have remained relatively consistent over the last decade or more. In 2014, the BLCE initiated 26 criminal prosecutions, issued 270 administrative citations, and seized 694 illegal video gambling machines from liquor-licensed establishments. The BLCE is currently in possession of 1815 illegal video gambling machines which are being stored as evidence either in conjunction with active investigations or awaiting a court order authorizing destruction.

The BLCE's most recent vendor investigation was conducted from September 2014 through August 2015 in the Westmoreland and Fayette County area of Pennsylvania. This continuing investigation culminated in the service of 43 search warrants, resulting in the seizure of 177 video gambling devices and $679,000 in cash. Participating in this raid were 120 Liquor Enforcement Officers in addition to a host of Troopers from the BLCE, the Bureau of Criminal Investigation, and Troops A and B. This is an ongoing investigation in which charges have yet to be filed.

4

Illegal video gambling machines continue to flourish throughout Pennsylvania even though the BLCE devotes significant resources to investigating and prosecuting these offences.  Our experience has shown that they are usually replaced very quickly after they are seized.  The vast majority of enforcement actions taken by the BLCE are conducted through the Administrative Law Judge as opposed to criminal court; however, the BLCE does confer with the local District Attorney.  Because the penalties are relatively light, there may be little deterrent for the licensed establishment.

In two recent forfeiture cases*, the courts concluded that the video gaming devices seized by the BLCE were not gambling devices.  In both cases, it was acknowledged that two of the three elements of gambling were present, consideration and reward.  The cases turned on the key question of whether the games were predominantly resolved through the skill of the player or by chance.  The courts concluded that both machines were designed in a manner that the skill of the player was the 'predominant factor' in determining the outcome of the game.  Neither case established new law; rather, each was decided on the particular characteristics of the seized machines.

Based on these court decisions, the BLCE is seeing an expansion of devices in liquor-licensed establishments designed to mirror these "legal" machines by attempting to incorporate an element of skill into the game.  This is more complicated for the BLCE from the perspective that each new device we encounter during an investigation now

5

requires a more careful evaluation of the device's specific characteristics as well as discussion with our experts and attorneys before a seizure or charges can be initiated.

I hope this explanation has provided a clearer picture of issues surrounding enforcement of violations associated with illegal gambling devices and I will be happy to answer any questions you may have.

\* *Commonwealth v. One Jersey Hold'em Machine, 2014 Pa.Super. Unpub. LEXIS 465, 116 A.3d 698;* and *In Re: Pace-O-Matic, Inc. Equipment, No. M.D. 965-2013, Court of Common Pleas, Beaver County.*

6

# EXHIBIT B

# PENNSYLVANIA STATE POLICE

# STATEMENT TO THE HOUSE OF REPRESENTATIVES
# GAMING OVERSIGHT COMMITTEE

## September 29, 2015



**Presented by**
**Major Thomas P. Butler**
**Director, Bureau of Liquor Control Enforcement**
**Pennsylvania State Police**

Good morning, Chairman Payne, Chairman Kotik and distinguished members of the House Gaming Oversight Committee.  My name is Major Thomas Butler, and I serve as the Director, Bureau of Liquor Control Enforcement (BLCE), Pennsylvania State Police (PSP).  With me today is Major Marshall Martin, Director, Legislative Affairs Office.

I would like to extend my thanks for the opportunity to participate in this hearing. Prior to answering your questions, I have a short opening statement that provides an overview on the issue of illegal video gambling machines in Pennsylvania.

The BLCE estimates approximately 15,000 or more illegal video gambling machines are currently in operation throughout the state.  These devices generally consist of two types of machines, video poker and video slot, with slot machines being more popular statewide.  While video gambling machines can be found in all regions of the state, they are most prevalent in the southwest, southeast and northeast.  The vast majority of these illegal gambling machines are located inside liquor-licensed establishments.  Most of these illegal devices are owned by vending machines companies which, in addition to the illegal devices, also provide other legal machines such as cigarette machines, ATMs, juke boxes, and pool tables.  There are numerous vendors located throughout Pennsylvania engaged in this business.

The percentages of "winning combinations" or "payouts" on illegal video gambling machines generally range from 55-80%.  This percentage can be adjusted by the

2

vendor through settings on the motherboard located inside of the machine. While these machines are often labeled "For Amusement Only," the BLCE has never observed a video poker or video slot machine in a licensed establishment that was not used for illegal gambling purposes.

Once a player "wins" on an illegal video gambling machine, payouts are generally handled by the proprietor of the establishment (manager or bartender) who is responsible for paying the winnings to the player. The proprietor then prepares a "payout slip" reflecting the amount of winnings paid. An employee of the vendor usually visits the establishment on a weekly or bi-weekly basis to "empty" the machine, at which time the proprietor is reimbursed for the payouts. Most machines are equipped with internal accounting devices, which serve as a means for the vendor to verify the winnings. After payouts are reimbursed, the profits are usually split in half between the vendor and proprietor.

Conservatively, we estimate it is not uncommon for one machine to generate $500 or more in profits per week. In practice, a bar or club having four or five machines can make several thousand dollars per week. The vendor, depending on the size of his territory, can make well into the millions of dollars per year in untaxed revenue through this criminal enterprise.

Investigations are often initiated by a gambling complaint to the local BLCE District Enforcement Office. However, many times these machines are uncovered

3

during an investigation of a liquor-licensed establishment for an unrelated liquor code violation such as loudspeakers or visibly intoxicated persons, or during the course of a routine open inspection of the establishment. Investigations into illegal video gambling machines tend to be resource intensive. These investigations often include numerous undercover visits to the establishment, search warrants, transporting the machines to the District Enforcement Office, and inspecting the machine for "knock-offs" and internal accounting mechanisms. Interestingly, the BLCE statistics regarding arrests and seizures related to video gambling machines have remained relatively consistent over the last decade or more. In 2014, the BLCE initiated 26 criminal prosecutions, issued 270 administrative citations, and seized 694 illegal video gambling machines from liquor-licensed establishments. The BLCE is currently in possession of 1815 illegal video gambling machines which are being stored as evidence either in conjunction with active investigations or awaiting a court order authorizing destruction.

The BLCE's most recent vendor investigation was conducted from September 2014 through August 2015 in the Westmoreland and Fayette County area of Pennsylvania. This continuing investigation culminated in the service of 43 search warrants, resulting in the seizure of 177 video gambling devices and $679,000 in cash. Participating in this raid were 120 Liquor Enforcement Officers in addition to a host of Troopers from the BLCE, the Bureau of Criminal Investigation, and Troops A and B. This is an ongoing investigation in which charges have yet to be filed.

4

Illegal video gambling machines continue to flourish throughout Pennsylvania even though the BLCE devotes significant resources to investigating and prosecuting these offences. Our experience has shown that they are usually replaced very quickly after they are seized. The vast majority of enforcement actions taken by the BLCE are conducted through the Administrative Law Judge as opposed to criminal court; however, the BLCE does confer with the local District Attorney. Because the penalties are relatively light, there may be little deterrent for the licensed establishment.

In two recent forfeiture cases*, the courts concluded that the video gaming devices seized by the BLCE were not gambling devices. In both cases, it was acknowledged that two of the three elements of gambling were present, consideration and reward. The cases turned on the key question of whether the games were predominantly resolved through the skill of the player or by chance. The courts concluded that both machines were designed in a manner that the skill of the player was the 'predominant factor' in determining the outcome of the game. Neither case established new law; rather, each was decided on the particular characteristics of the seized machines.

Based on these court decisions, the BLCE is seeing an expansion of devices in liquor-licensed establishments designed to mirror these "legal" machines by attempting to incorporate an element of skill into the game. This is more complicated for the BLCE from the perspective that each new device we encounter during an investigation now

5

requires a more careful evaluation of the device's specific characteristics as well as discussion with our experts and attorneys before a seizure or charges can be initiated.

I hope this explanation has provided a clearer picture of issues surrounding enforcement of violations associated with illegal gambling devices and I will be happy to answer any questions you may have.

\* *Commonwealth v. One Jersey Hold'em Machine, 2014 Pa.Super. Unpub. LEXIS 465, 116 A.3d 698;* and *In Re: Pace-O-Matic, Inc. Equipment, No. M.D. 965-2013, Court of Common Pleas, Beaver County.*

6

# EXHIBIT C

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

POM of Pennsylvania, LLC,                    :
               Petitioner                  :
          v.                              :    No. 503 MD 2018
Pennsylvania State Police,                   :
Bureau of Liquor Control                     :
Enforcement,                                 :
               Respondent                  :


TRANSCRIPT OF PROCEEDINGS

Before:    THE HONORABLE ELLEN CEISLER, Judge

Date:      January 15, 2020, 9:43 a.m.

Place:     Commonwealth Court of Pennsylvania
           Pennsylvania Judicial Center
           601 Commonwealth Avenue, Courtroom No. 3001
           Harrisburg, Pennsylvania




APPEARANCES:

           Matthew H. Haverstick, Esquire
           Paul G. Gagne, Esquire
           Shohin H. Vance, Esquire
                For - Petitioner

           Karen M. Romano, Esquire
                For - Respondent

           Kevin J. McKeon, Esquire
           Adrian R. King, Jr., Esquire
                For - Greenwood Gaming and Entertainment, Inc.,
                Downs Racing, L.P., Mountainview Thoroughbred
                Racing Association, LLC and Washington Trotting
                Association, LLC, Amici Curiae

ALSO PRESENT:

           Michael C. Nickles, Esquire

**INDEX TO WITNESS**

| For Respondent | D | C | RD | RC |
|---|---|---|---|---|
| Captain James A. Jones, Jr. | 6 | 30 | 37 | -- |

THE COURT CRIER:  All rise.  Commonwealth Court is now in session.  The Honorable Ellen Ceisler presiding.

Please be seated.

MR. HAVERSTICK:  Good morning, Your Honor.

MS. ROMANO:  Good morning, Your Honor.

THE COURT:  Good morning, everyone.

Okay.  Why don't we start by having all counsel identify themselves for the record and who they're representing?

MR. HAVERSTICK:  Good morning, Your Honor.  For petitioner POM of Pennsylvania, I'm Matt Haverstick.  I'm here with my colleagues Shohin Vance and Paul Gagne.

THE COURT:  Do we know if amicus attorneys will be here today?

MR. McKEON:  Your Honor, Kevin McKeon on behalf of the amici.

THE COURT:  Okay.

MR. McKEON:  And with me, Adrian King.

THE COURT:  Okay.  Do you have any intention of trying -- of arguing or anything today?

MR. McKEON:  Your Honor, we would very much appreciate the opportunity to present argument if there's going to be argument.

THE COURT:  Okay.  Well, you can sit at the counsel table if you want then.

3

MR. McKEON:  Thank you, Your Honor.

THE COURT:  Okay.  And --

MS. ROMANO:  Good morning, Your Honor.  Chief Deputy Attorney General Karen Romano on behalf of the Pennsylvania State Police.  And I'm joined by Attorney Mike Nickles from the Pennsylvania State Police Bureau of Liquor Control Enforcement.

THE COURT:  Okay.  All right.  Well, welcome, everybody.  So we are here today to deal with a request for a preliminary injunction.  There was a temporary one that was placed in effect right before the holidays, I believe.  And the question has to do with the seizure of POM's -- I guess it's -- is the 402.49 PEN -- is this the only machine that we're talking about, the amusement skill -- the skill amusement device?  It's just that number machine, right?

MR. HAVERSTICK:  It's -- I think there are -- I think there are maybe three versions of -- they're essentially identical; I mean, functionally identical.  I think there may be three.  There was also a device called a ticket redemption terminal seized too that is not a game.

THE COURT:  Okay.  So basically our court has this case to handle on the merits.  The issue of whether these devices fall under the jurisdiction of the Gaming Act has already been decided by this Court in the decision -- I think the 2009 decision by Judge McCullough.  So we're not getting

4

into any of that today.  We're not going to get into whether or not the Gaming Act applies or whether the -- the Gaming Board has jurisdiction or anything like that.  We're just -- before our court now is only the issue of whether these devices are illegal gambling devices under the Crimes Code.

And I think what happened in December is some of these machines were confiscated by the Pennsylvania State Police in Dauphin County.  And you're trying to prevent -- the petitioners are trying to prevent more confiscations at least until the merits are decided on the Crimes Code.  Is that correct?

MR. HAVERSTICK:  Correct, Your Honor.

THE COURT:  So we're going to keep this argument very narrow and very focused on the preliminary injunction related to the confiscation of these.  I really don't want to get into any argument about whether these are slot machines under the Gaming Act.  That's already been determined.  All right.  So we need to hear this on the merits.  All right.

So I have a couple questions.  And you -- you both understand the -- the criteria for the preliminary injunction.  And I understand there's going to be one witness today for the state.

MS. ROMANO:  Correct, Your Honor.

THE COURT:  Okay.  So let's just start with that, and then we'll move on.

5

MS. ROMANO:  Thank you.

We call Captain James Jones to the stand.

(Whereupon, Captain James A. Jones, Jr., was sworn.)

## DIRECT EXAMINATION

BY MS. ROMANO:

Q    Good morning, Captain.

A    Good morning.

Q    Could you please introduce yourself to the Court?

A    I'm Captain James A. Jones, Jr., a captain in the Bureau of Liquor Control Enforcement with the Pennsylvania State Police.

Q    Captain, could you very briefly describe your background with the Pennsylvania State Police for the Court?

A    Yes, ma'am.  I've been a member of the State Police for over 30 years.  Initially --

THE COURT:  Captain, can you move over a little bit, because I can't really see your face.

THE WITNESS:  Okay.  I'm sorry.

THE COURT:  It's blocked by that.

THE WITNESS:  (Witness complied.)

THE COURT:  All right.  Thank you.

THE WITNESS:  For over 30 years.  Initially I started out as all troopers do, as a patrol trooper; progressed into crime as a criminal investigator, eventually

6

moving into vice narcotics investigation where I first began investigating unlawful gambling activity in the form of unlawful gambling devices and bookmaking; then progressed through the ranks as a sergeant, eventually ending up as a sergeant in Liquor Enforcement again as a district office commander where again I was intimately involved in the investigation of various types of gambling, primarily unlawful gambling devices.

I was eventually promoted to lieutenant as a section commander within the Bureau of Liquor Control Enforcement where I continued to be intimately involved with the investigation and also in -- in training individuals throughout the country on the detection and investigation of illegal gambling devices.

And most recently in April of this year, I was promoted to captain within the Bureau of Liquor Control Enforcement where I continue -- I oversee the operations of -- of the bureau and continue to be involved in gambling investigations.

BY MS. ROMANO:

Q    What does the Bureau of Liquor Control Enforcement do?

THE COURT:  I -- I know what they do.

MS. ROMANO:  You're familiar with them?  Okay.

THE COURT:  Let's just get down to the -- the

7

machines.  Okay.

So you go out, and you -- you confiscate or make sure there's not illegal gam- -- let's just talk about machines now, the -- the devices.

So in the pleadings, it indicated there were approximately 590 machines that had been confiscated in the last how many years, counsel?

MS. ROMANO:  Your Honor, that's about the average per year of how many machines --

THE COURT:  Okay.

MS. ROMANO:  -- are seized.

THE COURT:  And how many of them were POM machines?

THE WITNESS:  Total -- and I don't have the exact number -- I would say less than 30 that we've seized.  But I don't have that exact number, ma'am.  I'm sorry.

THE COURT:  So what are these other machines?  What do they do that would be different than the POM machines?

THE WITNESS:  As -- as the industry progresses, we see changes frequently in the types of machines that are -- that we encounter.  The -- the gambling devices marketed as skill machines include various features that require interactions by the players.

The -- what we would term in the bureau as traditional gam- -- video gambling devices don't have these mandatory interactions that operate a little bit more

similarly to conventional slot machines.

Most of the machines we encounter, skill machines included, the display is very similar to what we refer to as a -- a nine-window or eight-liner slot machine.  And they give -- that -- that's the -- the play that you observe on the machine.  It looks very similar to -- to those devices that we've dealt with for years with the added component of now instead of the machine -- the wheel -- the reel spinning and you getting a three symbol combination, the player must now interact and --

THE COURT:  Are you talking about --

THE WITNESS:  -- complete --

THE COURT:  -- tic-tac-toe now?

THE WITNESS:  Well, it is -- it is completing a -- it's completing a three character combination.  So you could say tic-tac-toe, or you could say just like, you know, when a slot machine comes up and gives you three sevens.

Here, you'd have a seven on the left, a seven on the right; and you have to choose one of the nine windows in which to place a wild card to then have the result of three symbols in a row.

THE COURT:  Have there been any other so-called skill machines that have been confiscated by other manufacturers or suppliers or -- that they haven't brought a suit?

9

THE WITNESS:  Yes, ma'am.  We have -- to my knowledge, we have --

THE COURT:  That have not, like -- they have not sought to have it stopped.

THE WITNESS:  Yes, ma'am.  We have -- we have seized, to my knowledge, all but one manufacturer.  We have five separate manufacturers we've identified.  And we have in our -- we have seized machines from every one of those manufacturers.

THE COURT:  That are skill machines?

THE WITNESS:  Yes.  That are gambling devices marketed as skill machines.  Yes.

THE COURT:  So I know what the Liquor Control Enforcement Board does, and I understand that they're required to go out and do these investigations and confiscate illegal machines and that.  So let's talk about how this would be of harm.  Okay.

MS. ROMANO:  Certainly, Your Honor.

BY MS. ROMANO:

Q    Captain Jones, an injunction to date has been issued currently.  Can you describe for the Court how the Pennsylvania State Police would be harmed if that injunction continues through this litigation?

A    Certainly.  And I would like to do that with a couple of very specific examples.

10

Just last week, I received a phone call from one of our district office commanders. And they were planning an operation to raid what we call a speakeasy. You know, here it is, you know, a hundred years later, and we still use that term speakeasy. But that's what we reference as an unlicensed liquor establishment, basically an unlicensed bar. But within that establishment is a -- a POM Pace-O-Matic machine.

Our concern is if we are to operate in our normal fashion -- the Liquor Code gives us full authority, and we -- we conduct ourselves in this manner. When we do a raid of these operations, we take everything involved in the operation of the basically illegal bar. We take the TVs off the wall. We take the barstools. We take all the liquor. We take the coolers. We take the -- the pool table. We take the cigarette machine, the dart machine.

Under this injunction, we're precluded from taking that machine. That would appear to give tacit approval to that machine which we feel is not legal. And it adds confusion to the public. We -- and that's a big -- of large concern to us because we have a duty to our licensees that they get the information and they understand what our position is because we're the enforcement branch.

And if we were to give them the impression or to do anything to lead them to believe that this was legal and then

eventually it -- it would come back to cause them any financial or -- or legal jeopardy, that's -- that's really of concern to us, because we have a --

THE COURT:  So last week at the speakeasy, whenever it was, was a POM machine there?

THE WITNESS:  Yes.

THE COURT:  Okay.  And how often has that occurred where you've gone in for other reasons, not just focusing in on the POM machines, where you had to remove them -- is that -- is that part of any of these confiscations -- do you know -- the ones they're referring to in Dauphin County --

THE WITNESS:  The --

THE COURT:  -- that led to this injunction --

THE WITNESS:  No.

THE COURT:  -- request?

THE WITNESS:  Ma'am, the three locations that had POM machines in this particular instance only had POM machines.  There were other locations as well that had other manufacturers' machines.  And we had an intermingling of machines at least at one location, but it didn't involve any of the POM machines.

THE COURT:  Did you remove all the machines from those locations where -- or just the POM machines?

THE WITNESS:  We relieved -- we removed all machines from every location, ma'am.

_12_

THE COURT:  Okay.

Sorry.

BY MS. ROMANO:

Q    Captain Jones, other than investigations into things like speakeasies, does this -- an injunction, would it hamper the State Police's ability to investigate other gambling operations?

A    Yes, ma'am.

Q    How so?

A    Another example:  we had a case; it was the Otter Street bar.  In that case, we seized --

THE COURT:  Where was that, Captain?

THE WITNESS:  That was in -- you're going to have to -- it was in Bucks County.

We seized several POM machines.  And during the course of that investigation, we also uncovered evidence of possible loan-sharking, where the vendor who owned the machines was loaning money to the licensed est- -- to the licensee, which is also a possible pecuniary interest violation.

We uncovered evidence of tax evasion where, one, the -- the licensee was not claiming the proceeds from those devices on his taxes, nor was the licensee obtaining any information from individuals who were receiving large payouts on those machines.

13

THE COURT:  But in all of these cases, you're telling me that the investigation was not targeting POM machines; it was part of a wider ranging investigation?

THE WITNESS:  Yes, ma'am.  We -- we look at every single machine in the Commonwealth.  I mean, we really -- as a bureau, we don't have the -- the resources, the manpower, or the interest in targeting any particular vendor or anything like that.  We've always looked at this as a wide-ranging issue and -- and focused on every single manufacturer.

Now that's not to say that if we have -- you know, if we're -- if -- like, on the 9th, we were trying to target as many manufacturers so -- as we could.  So maybe we -- we picked a place that had those machines as one of the many manufacturers so that we -- we could move against as many as we could.

THE COURT:  If you're -- if you could continue to do your investigations into illegal activities and not focus on POM but as part of those investigations you encounter some POM machines and could remove them, would you be harmed in continuing investigations?

THE WITNESS:  If we could continue to investigate POM machines regardless of where they are and remove them -- the -- the problem is, Your Honor --

THE COURT:  Just -- but if you're just

14

investigating POM machines --

THE WITNESS:  The problem is, Your Honor --

THE COURT:  Right now there's a question as to whether they're legal or illegal.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  I mean, that's still up for a legal -- that's a debate right now.  So if you're just targeting POM machines, of course that would hinder your investigations.  But everything you just told me indicates that you are -- these are broad-ranging investigations into all kinds of illegal conduct.

THE WITNESS:  Yes, ma'am.

THE COURT:  All right.  So if you could go and continue those investigations, not focusing on POM but they were there and you could take them, would that hinder your ability to continue investigations generally?

THE WITNESS:  It's hard to say specifically.  You know, every -- every investigation would be very specific.

The problem that we run into with an injunction like this is the -- the POM machine is the software.  It's not the device.  Every time the software changes, the machine changes.  And without the ability to investigate and examine those machines, we have no idea how they're operating. They're completely unregulated.  There's no certification. Their software updates are at the -- at the whim of the

15

manufacturer.

Those software updates -- anyone that's had a cell phone knows when you get an update on your cell phone can result in substantial changes to the appearance of -- of the device.

And without any regulation or inspection, one day, the capability exists for that device on one software version to be as it appears today.  In the next software version, it could be identical to a machine in a casino because there's no regulation or inspection.

So to say -- to preclude us from looking at these devices as -- we have -- we have seized at least five software versions.  And there are significant, in our opinion, differences in the game play of these software versions.  They're -- again, it's completely unregulated.  If we're precluded from even looking at them, we have no idea how the games are being played.

We have Pennsylvanians who are putting millions of dollars into these machines who deserve certain safeguards and assurances from -- from us.

THE COURT:  The state hasn't declared them illegal, though, yet.

THE WITNESS:  They have not, ma'am.

THE COURT:  So --

THE WITNESS:  But we still --

16

THE COURT:  -- that's the issue before this Court.

THE WITNESS:  Correct.

THE COURT:  Continue, counsel.

MS. ROMANO:  Thank you.

BY MS. ROMANO:

Q    Captain Jones, would an injunction with respect to the POM machines inhibit the Pennsylvania State Police's ability to investigate the other manufacturers of games marketed as skill games?

A    It does in the sense that we're -- we are -- we don't want to, again, focus on the other manufacturers, thereby giving the impression that we believe -- or that these games are legal.

We -- there are games out there that have -- that we found that have all the characteristics of the POM machines.  They've -- they've mimicked everything now. Originally it was just a portion of it.

And for us as an agency to -- you know, to say, okay, we're only going to investigate these machines and we're going to leave these alone, obviously the public impression is now that these are okay.

That encourages the proliferation of these devices that are, again, unregulated.  We find them in malls that -- with the redemption machines, where there's no oversight. Anyone can play, including children, including compulsive

17

gamblers who have no mechanism in which to self-exclude from play.

So it would just encourage that proliferation of these devices that we still feel strongly are gambling devices and are certainly being played as gambling devices by the patrons.

Q    Is there any other criminal activity that the Pennsylvania State Police will be prohibited from investigating if an injunction remains in place?

A    I can think of -- well, money laundering.

One of the things we also find, Your Honor, is that if we find one form of gambling at an establishment, we usually see that it appears in clusters.  So we don't -- a lot of times we don't just have, you know, the -- the gambling machines, traditional gambling machines marketed as skill machines.  We may have bookmaking.  We may have pool selling or various other forms of gambling.  A lot of times those moneys are intermingled between all of those devices.

And to do an effective investigation, we have to be able to examine all of those devices, look at the accounting and be able to do a full scope of an investigation on that establishment that's basically running a house of gambling.

And to exclude us from being able to seize and get into the operation of the accounting of any particular machine, whether it be a POM machine or a Banilla or a Blue

18

Sky or any of the other manufacturers, inhibits our ability to effectively conduct that investigation, because we'll be looking at all of the proceeds, the same way we look at taxes, reporting taxes.

The internals of -- of a lot of the machines that we look at -- we can glean a lot of information relative to the income of that establishment from the electronic accounting within the devices themselves.

THE COURT:  But how does an -- how has the injunction prevented you from going in and -- I mean, unless you're targeting POM, which is up in the air right now, what's to prevent you from going into any establishment at this point and seizing everything?

I mean, if this just happens to be caught in one of them -- how many machines -- how many POM machines have you confiscated; 30 in the last year?

THE WITNESS:  Again, that's an estimate.  I --

THE COURT:  Do you know how many?

THE WITNESS:  I don't know in the last year.

THE COURT:  How many?

MR. HAVERSTICK:  In the past year?

THE COURT:  Yes.

MR. HAVERSTICK:  One, I think.

THE COURT:  Okay.  In the --

MR. HAVERSTICK:  Before the -- before the -- well,

there was --

THE COURT:  How many --

MR. HAVERSTICK:  Perhaps two.

THE COURT:  -- since this petition for review was filed?

MR. HAVERSTICK:  Two at the most.

THE COURT:  Two.  So that's all?  Wait.  Wasn't there just three in December in Dauphin County?

MR. HAVERSTICK:  Well, not counting the December pickups.

THE COURT:  So four?

MR. HAVERSTICK:  Well, however many there were in December.  I think there was one in Bucks County and then there was one at a speakeasy which is --

THE COURT:  Okay.  So there's --

MR. HAVERSTICK:  -- we didn't challenge.

THE COURT:  -- four or five in the last --

MR. HAVERSTICK:  Yeah.

THE COURT:  -- couple years?

MR. HAVERSTICK:  Yeah.

THE COURT:  So how have your investigations been hindered then?

THE WITNESS:  There were more than that --

THE COURT:  You confiscated hundreds and hundreds and hundreds -- 600, from what I heard, in the course of a

20

year; and only -- in that time, only five or four or five have been the POM machines.  So how are your investigations hindered?

THE WITNESS:  There were more than that in the -- the past couple years, ma'am.

For -- for -- there was a time period when before these machines started to proliferate, as -- as a bureau, we have to -- we have to choose our priorities.  And we have to focus our efforts, because like every other limited law enforcement agency, we have to pick and choose where we allocate our manpower.

Most of the -- the officers that spearhead these type of investigations, there's only a handful of them.  They -- we have been focusing on -- on large-scale vendors of some of what we call traditional machines, and we have focused our efforts in those areas.

As these machines started to proliferate and become much, much more common -- and we -- we would receive complaints just as we would on the traditional machines of, Hey, you know, my husband goes and loses all his money on this machine, and we don't have money for food and clothing for the kids.

And we were seeing similar complaints that we did on the -- on the traditional -- what we call traditional machines.  And we saw this proliferation.  We saw them in

21

places where they were completely unsupervised.  And now they became a priority for us.

As I said, we have -- we have to -- as an agency, we have to allocate our resources effectively.  And there was --

THE COURT:  When you confiscated the machines in Dauphin County -- if I asked this question, I apologize -- were you just going in for the POM machines?

THE WITNESS:  No, ma'am.  We targeted, I think, five locations, and at least -- at least three manufacturers we seized on that raid.

THE COURT:  Okay.

MS. ROMANO:  Thank you, Your Honor.  And I'll wrap up here quickly.

BY MS. ROMANO:

Q    Captain Jones, it was pointed out that there were only two or three seizures since the petition for review was filed in this case.  Is there a reason that there was a drop in seizures during that time period since this litigation began?

A    Yes, ma'am.  As a bureau, again, we have to -- it's our job to effectively utilize our -- our resources.  We made the decision that -- that we would wait the decision on the Title 4 because that was the most efficient mechanism for us to deal with this problem.

It also afforded us -- afforded, what I would say, the opportunity to provide a lot more fairness to the licensees.  If we took -- if we proceed under Title 18, there's no way that we can keep the licensees from getting wrapped up in the investigation and in the crime.

If -- if the Title 4 argument had -- if we -- had gone our way, the licensees would have had an opportunity for --

THE COURT:  Is that the Gaming Act, you mean?

THE WITNESS:  Yes, ma'am.  I'm sorry.

THE COURT:  Okay.

THE WITNESS:  Would have had an opportunity to -- for voluntary compliance.  That would have obviously, you know, been in the news, and everyone would have heard it.  And everyone that wanted to voluntary comply would have had the opportunity.  And we feel that our licensees -- a lot of them have been misled by vendors.  And we thought that that was the -- the best course of action at the time, was to wait that outcome.

We never stopped investigating.  We did stop seizing, waiting that outcome.  The decision was made initially that regardless of that outcome, one way or another, we -- our cases that we had ongoing, we were going to be making seizures, whether it was under the Gaming Act or whether it was under Title 18.

23

THE COURT: Counsel -- I mean, I don't know if you can answer this question or if -- it will be up to your counsel. But do you know -- were you part of this unit when the Beaver County case, the Pace-O-Matic county CP case came out?

THE WITNESS: Ma'am, I was in the bureau at the time, but I really had -- I was a sergeant in one of the district offices.

THE COURT: So you really can't speak to that?

THE WITNESS: I -- I can't -- I mean, I'm very familiar with it, but I was not involved with it.

THE COURT: Would you be able to speak to why there wasn't an appeal on that?

MS. ROMANO: Your Honor, I'm not sure there's anyone at the -- we sort of talked about that. And I think that was a legal decision that was made at the time, and no one really knows the answer for why that was done.

THE COURT: Okay. So there is a decision that you could have appealed at that point that could have dealt with this a long time ago, and nobody appealed it.

And are you -- I mean, are you able to speak to how some of the district attorneys around the state have said that they're not illegal and kind of given permission to use them based on that Beaver County decision?

THE WITNESS: I am aware that a couple have, ma'am.

24

And -- but I can't really -- I can't speak to too much on it --

THE COURT: Okay. I didn't know --

THE WITNESS: -- other than the fact that it exists.

THE COURT: I didn't know if you were part of the decision-making.

Will you be able to speak to that?

MS. ROMANO: I can maybe speak a little bit, Your Honor. Perhaps I can ask Captain Jones a question that might --

THE COURT: Okay.

MS. ROMANO: -- sort of illuminate a little bit.

BY MS. ROMANO:

Q    Captain Jones, when was that Beaver County decision issued?

A    2014.

Q    What was the market for these machines like back in 2014 compared to now?

A    We saw very few of them.

Q    Was -- in the PS -- in the State Police's perspective, was it the same level of a problem as it is today?

A    No. It's grown exponentially.

Q    Okay. Has the State Police's interest in

25

enforcement against those machines grown as the market has grown?

A    It has.

THE COURT:  Do you know if you get money back when you play these games?  Or is it just you get to play more if you win?

THE WITNESS:  Ma'am, we've seen payouts in excess of $10,000 on a single play.

THE COURT:  For tic-tac-toe?

THE WITNESS:  For a simulated slot machine.

THE COURT:  Tic-tac-toe?

THE WITNESS:  Well, completing three characters; yes, ma'am.

THE COURT:  I'm talking tic-tac-toe.  I don't know what the characters mean.  Tic-tac-toe.  Oh, but the characters aren't Xs; they're -- they could be whatever.

MS. ROMANO:  Correct.

THE COURT:  $10,000?

THE WITNESS:  Yes, ma'am.  And tic-tac-toe sort of implies that you have a blank screen and you fill it in.

THE COURT:  Yeah.

THE WITNESS:  You're presented with -- with nine reels where -- where you have a character in every reel.  And then you get to place one character to complete a three -- three characters in a row.

26

THE COURT:  It's like tic-tac-toe but --

THE WITNESS:  It is --

THE COURT:  -- with characters.

THE WITNESS:  You complete three; yes, ma'am.

THE COURT:  So who gives you the $10,000?

THE WITNESS:  Well --

THE COURT:  The place?

THE WITNESS:  -- originally, it was always the -- the establishment that operated the game.  But now we have these ticket redemption terminals.  So now conceivably somebody can just scan their ticket and it spits out $10,000.

THE COURT:  Are these in convenience stores and -- you know, because I had thought that they were just in places where they were licensed to serve alcohol, like taverns and restaurants and hotels.  Are they in convenience stores and corner stores and that sort of thing as well at this point?

THE WITNESS:  Yes, ma'am.  The latest ones that I saw that were cause for concern for us were in the Logan Valley Mall in Altoona.

There was a kiosk, one of those little businesses out in the open area of the mall.  There was a machine at every corner of the kiosk on the outside of the kiosk; a redemption -- ticket redemption machine; and an ATM.

I wasn't working, but I was there with my family. And I observed for maybe 20 minutes.  And a large portion of

27

that time there was nobody even manning the kiosk.  These machines were completely open to whoever wanted to play them.

THE COURT:  And then if you get that ticket redemption -- I was wondering what that was -- where do you go with that?

THE WITNESS:  There's a -- there's a -- well, in this case, right next to one of the machines was a ticket redemption terminal.  So say you played; you got -- you were really lucky; you got a two thousand dollar payout or any -- any prize.  If you just went to that ticket redemption machine, scan your ticket, and it will dispense your money just like an ATM.

THE COURT:  Wow.

THE WITNESS:  It doesn't require you to provide any information relative to yourself, even though there's -- you know, for other -- you know, for other gaming, we know there's tax reporting requirements at certain thresholds.  Those can never be met because they have no idea -- the operator would have no idea who's receiving the payments.

BY MS. ROMANO:

Q    Captain, is there anything that prevents minors from playing these games at a location like the Logan Valley Mall?

A    Not at that location.  You know, in the licensed establishments, I think there's some level of protection

28

being that minors are not supposed to be in there unsupervised. So we have some level. But with convenience stores and some of these what we would call like mini stand-alone casinos that have up to 20 of these machines, the safeguards are -- are much less.

Q    To that point, is there harm to the public if this injunction remains in place?

A    Well, absolutely. It speaks to the -- the dangers of gambling that there are so many regulations on our casinos as far as who can be on the floor and who can play and regardless of -- obviously it's -- will be determined whether these are gambling devices.

Our position is they are. And they are played as gambling devices by the patrons. And there are no safeguards in place. So I think that the Commonwealth has asserted that there are dangers because they put these safeguards in place with legal slot machines and none of which exist here.

Nor are there safeguards to ensure any fairness to the players. You know, with slot machines, there are regulations on what the minimum payout is. And they are inspected; they are certified.

In theory, these machines could be changed in any way at any time by the manufacturer. I'm not accusing them of doing so, but the possibility exists. And we just don't know. We don't know what the return to player is on any

29

given software version.  We do know that that could be changed completely on an -- on an updated software version because the software is the game.

THE COURT:  I'm surprised that the Gaming Control Board hasn't intervened in this.  Do they care?

THE WITNESS:  I think they --

THE COURT:  They know this is out there.  So why wouldn't they become a party to this?  Maybe because they don't think they're illegal?

THE WITNESS:  I don't believe that's the case, ma'am.  I believe we had somebody from the Gaming Control Board actually testify in -- or we had -- in the 2014 case.  But that -- I wasn't there, so -- or 2013 case.  But I can't speak to that.

MS. ROMANO:  I have no further questions.

Thank you, Your Honor.

THE COURT:  Cross.

MR. HAVERSTICK:  Just a few, Your Honor.

Your Honor, mind if I do it from the table or the podium?

THE COURT:  Sure.  Whatever is -- just as long as you're at a microphone so we can hear you.

MR. HAVERSTICK:  I'll come up.

THE COURT:  All right.

CROSS-EXAMINATION

BY MR. HAVERSTICK:

Q    Captain Jones, good morning.

A    Good morning.

Q    Let me ask you a question about something you just said. Your testimony is you're unaware of the various software changes and what the impact on the game is with Pace-O-Matic, right?

A    I'm aware of the visual impacts of the -- game play impacts of the software changes. I don't know how they impact internal operations such as return to player and things like that. Correct.

Q    Have you ever attempted to ask Pace-O-Matic those questions?

A    It really wasn't relevant because what -- the game that exists at the time, they can tell us -- the relevancy of -- of my testimony is that what exists today could be totally different tomorrow.

Q    So the answer is no, you've never asked Pace-O-Matic what the different versions --

A    I have personally --

Q    Okay.

A    -- no, sir.

Q    Now, you know that there was a speakeasy pickup in Lancaster County within the past year, correct?

A    I -- I can't say I have specific knowledge of it.

31

Q    Would you -- would you -- would you have any reason to disbelieve me if I told you there was a speakeasy pickup of a POM machine in Lancaster County within the last year?

A    I wouldn't have.  No.

Q    Okay.  Are you aware of whether POM challenged the pickup of its game in the speakeasy investigation?

A    I don't believe they did.

Q    Okay.  So if I told you they didn't do it, you'd have no reason to believe me?

A    That's correct, sir.

THE COURT:  Not to believe you.

BY MR. HAVERSTICK:

Q    And if I told you further --

THE COURT:  Not to believe you.

MR. HAVERSTICK:  Not to believe --

THE COURT:  Not to --

MR. HAVERSTICK:  Yes.  There you go.  Thank you.

BY MR. HAVERSTICK:

Q    If I told you further that POM would be willing to stipulate that in a speakeasy investigation, if its game was picked up along with any other merchandise attendant to the speakeasy raid, that POM wouldn't seek to include that injunction, would that satisfy your concern about your enforcement efforts?

A    No, sir.  That's only one particular investigation.

32

And we -- we don't even know what we're going to encounter. We can't predict the types of investigations that we're going to encounter where these machines are also present.

Q    So -- so even though you have a concern that your investigation would be hampered if you couldn't pick up a POM game in a speakeasy investigation, even POM representing it wouldn't challenge that pickup still doesn't solve your concern about speakeasy pickups?

A    On that particular -- it depends on the -- the overall circumstances. Again, we -- we're speaking in generalities, and every single case is -- is different and unique.

Q    Oh, I get that. But you talked about speakeasies and -- and being prevented from doing speakeasy investigations. But it sounds like my solution doesn't solve your problem.

A    Not for the long term.

Q    All right.

A    Because we have several other types -- that's one type of investigation and under one set of circumstances.

Q    Well, that's a good point. And you -- you're aware that your counsel has acknowledged that the way to determine whether the POM game is a gambling device -- device is through extensive discovery?

A    Yes, sir.

33

Q    And expert testimony?

A    Yes, sir.

Q    And you know that's going to happen in this case, right?

A    Yes, sir.

Q    And, in fact, there's been discovery requests outstanding to PSP for over five months?

A    I'm aware they're outstanding.  I don't know when they -- how long they've been.

Q    You know we haven't gotten any responses yet?

A    I -- I have no idea.

Q    I assume one day PSP will give us responses.  In that case, don't you think the best way to determine the legality of the POM game or skill games in Pennsylvania is in this court so we can have the expert testimony and we can have the discovery and then have a judge decide?  Isn't that the best way to do it?

A    I think it is.

Q    More efficient than a hundred different pickups, from your standpoint, right?

A    But, again, from our standpoint, a -- a failure to act on our part is tacit approval that the machines are legal, which -- which gives -- it's confusing and sends mixed messages to the citizens of the Commonwealth.

Q    So about that, you've been with the -- you've been

34

with Liquor Control Enforcement for some years?

A    Yes.

Q    You're aware that after the Beaver County decision, there were seizures in a mixed game situation of all of the games other than the POM games; you know that happened, right?

A    Yes.

Q    Okay.  So it's not impossible for your investigations to be conducted and for seizures of mixed game situations to happen, leaving the POM game alone; that's -- that's very possible?

THE COURT:  When you say mixed, counsel, what do you mean?

MR. HAVERSTICK:  For instance, a situation where there is a POM game sitting beside a game of another manufacturer that we very well may believe, like PSP, is an illegal game.  I think it was responding to your question earlier, Can they investigate and do raids and leave the POM game alone; and his answer is they can and have.

THE WITNESS:  I don't know that we have.  I said we -- we -- obviously we can, but we -- we don't want to --

BY MR. HAVERSTICK:

Q    I get that.

A    -- because it sends -- it sends the wrong message, in our opinion.

35

Q    Now, when you were -- when you were delaying seizures pending the outcome of the Title 4 legal decision, did you stop your investigations statewide?

A    No, sir.

Q    You continued doing investigations?

A    Yes, sir.

Q    You just didn't do seizures?

A    Correct.

Q    So it's possible for you to do investigations in preparation of a seizure one day, depending on how the law comes out?

A    Yes, sir.

Q    Okay.  And then presumably you did that effectively during the Title 4 hiatus, right?

A    We did.

Q    Okay.  With respect to the population believing POM skill games are legal, the population in Beaver County would be justified in that belief, right?

A    Perhaps.  Again, if they -- if they did some research and realized that the game today is not exactly the game that was approved -- that -- or that was the subject of that case, they may have some questions.

Q    Sure.  I mean, like you do.

A    Like I do.

Q    But you've never asked POM about those questions?

36

A    I have not.

Q    Last question, and then I'll let you -- let you go. Quickly, on an unattended machine, lottery kiosks are in convenience stores, right?

A    Yes, sir.

Q    Are they attended?

A    Not -- I guess not always.

Q    So presumably a minor could go up to a lottery kiosk and buy a lottery ticket?

A    Yes, sir.

Q    Does that in your opinion make lottery kiosks illegal?

A    In my opinion, it makes it problematic, but --

Q    But not illegal?

A    Not illegal.

MR. HAVERSTICK:  All right.  Thank you, sir.

THE WITNESS:  Yes, sir.

THE COURT:  Any -- any follow-up questions, counsel?

MS. ROMANO:  Just one, Your Honor.

## REDIRECT EXAMINATION

BY MS. ROMANO:

Q    Captain Jones, is there harm in conducting a raid and seizing machines from other manufacturers and leaving a POM machine behind?  Can you speak to what that harm is?

A    Yes, ma'am.  Again, that appears to give our tacit approval to that device.  And we still feel strongly that that -- that those devices are, again, gambling devices.

THE COURT:  So, Captain, if you were continuing your investigations into illegal operations as it relates to liquor sales and illegal gambling but you're not focusing on POM at this point and the particular games that are at issue here and you could confiscate those -- the issue is targeting POM while the legal issues are outstanding -- would that hinder your investigation?  If we said as long as you're not targeting them, you could take them, would that -- would you have -- be harmed in your investigative abilities?

The issue here is they brought a -- you know, they brought a suit.  And the question of whether these are legal -- illegal gambling devices is up in the air at this point.  At this point, you know, there's a -- there's a county judge's opinion that's out there that hasn't been appealed.  There's been a couple district attorneys who've adopted that opinion.  You have the Pennsylvania State Police saying, Look at the opinion, and these are the three factors for illegal gambling.  And that middle issue has not been resolved.

So, you know, the fact -- the fact is you can still do your investigations, just not targeting their machines.  But you can remove them as long as they're not targeted in

38

that particular place.

I mean, we all know that this legal issue is going to have to get resolved very quickly. And that's really the goal here, to get -- to get the discovery complete and to come to a decision. That's really what I want to happen like very fast.

So if you could still take the machines as part of ongoing investigations, not targeting POM -- because from what I've heard, there's only been five or six in the last couple years, right?

MR. HAVERSTICK: Right.

THE COURT: So do you feel comfortable with that, Captain?

THE WITNESS: From the -- from a department standpoint --

THE COURT: They have to show there's irreparable harm. And the irreparable harm that they're presenting here is that you can't do your investigations. And I'm giving you these options. Can you do your investigations with this all in mind?

THE WITNESS: If in the course of our investigations we can treat POM machines just as we do any other machine in the Commonwealth, absolutely.

If we have to have special treatment for these machines, that's going to be evident in the way we conduct

39

our investigations.  And that's going to send a very confusing message to the citizens of the Commonwealth, and that's what we're concerned with.

THE COURT:  I agree.

Okay.

BY MS. ROMANO:

Q    Captain Jones, you mentioned that these other manufacturers -- you've seen them sort of mimic the POM machine?

A    Yes, ma'am.

Q    I think you said in all aspects to date?

A    The most current version of a certain manufacturer has adopted basically all the characteristics of the POM machines.

Q    To your knowledge, has POM taken a public stance with respect to the legality of their machines versus these other manufacturers' machines?

A    Yes.  They made a public statement saying theirs is the only legal machine in the Commonwealth.

MS. ROMANO:  Thank you.  I have nothing further.

THE COURT:  Any follow-up, counsel?

MR. HAVERSTICK:  None, Your Honor.

THE COURT:  All right.  Captain, thank you.

THE WITNESS:  Thank you, ma'am.

THE COURT:  So there's no other witnesses, right?

40

MR. HAVERSTICK:  No, Your Honor.

MS. ROMANO:  No, Your Honor.

THE COURT:  So let me just ask a couple questions before we get into some of the requirements for an injunction.

So these games -- are there cash rewards?

MR. HAVERSTICK:  There are.  The games are --

THE COURT:  I thought -- when I was reading, I thought they just got to play more games.

MR. HAVERSTICK:  No -- well, that happens too.  But the -- the game -- and, you know, we allege and we believe discovery and an evidentiary hearing will show permits winning more than you put into the game on every single play which is because the games are skill based.  I mean, we're not here to decide that issue today, but that is functionally how they work.

And -- and we think ultimately after discovery and expert testimony, the Court will be convinced that indeed they do pay out more than you put in if you're skilled enough to win the game.

THE COURT:  Counsel, do you know why there's been delays in discovery -- what are you asking for?  What was your -- one thing that kind of confused me in the discovery -- in one of your briefs, you stated that on May 6th, 2019, after the matter was fully briefed and

41

scheduled for argument, then you served your first set of inter- -- interrogatories and request for production.  I didn't get that.

MR. HAVERSTICK:  Well, Your Honor, I can go through it with the Court.

We were, frankly, surprised by the Gaming Act argument.  We thought it was a cipher argument, a red herring.  We always believed that the core issue that required discovery was -- was the issue in 5513.  And so we -- we propounded a discovery request, assuming, you know, maybe fingers crossed, that we get past the summary relief --

THE COURT:  What are you asking for?

MR. HAVERSTICK:  Well, the normal discovery I think one would ask in a case like this:  information from PSP and the Department of Revenue about their conclusions on the legality of game, enforcement issues, information about potential experts.

And allow me to -- and I want to let counsel off -- off the hook here a little bit on -- on the five-month time lag.  We agreed to stay the discovery responses pending the disposition of the Court.  And that just -- you know, in fairness --

THE COURT:  And that was November.

MR. HAVERSTICK:  That was November.

THE COURT:  Right.

MR. HAVERSTICK:  After November, I talked with counsel.  Counsel asked for a couple more weeks.

THE COURT:  And then Christmas --

MR. HAVERSTICK:  And we gave it --

THE COURT:  -- and all that.

MR. HAVERSTICK:  But what has been happening -- and I don't lay this at the feet of Ms. Romano or the Office of Attorney General; in our back-and-forth communications, it's become clear to me that Department of Revenue and PSP are dragging their feet responding our -- to our discovery request.

I don't think it's Ms. Romano, which makes these pickups, I think, especially problematic, because what -- these pickups are done as an administrative process.  That can take years.  We're trying to get this case moved along and get to a decision, and we think we need the discovery to do it.

THE COURT:  But you have no objections to the State Police and the -- the Bureau of Liquor Enforcement -- you have no objections to them continuing their general ongoing investigations and if your machines kind of --

MR. HAVERSTICK:  No.

THE COURT:  -- get caught up every now and then --

MR. HAVERSTICK:  No.

THE COURT:  All right.  So --

43

MR. HAVERSTICK:  No.  No.

THE COURT:  Okay.

MR. HAVERSTICK:  It --

THE COURT:  So let's -- when can we get this on the merits then?  That's what I need to know.  How long do both of you need to get this on the merits?

MS. ROMANO:  Your Honor, may I briefly address the discovery issue before we move on to timing?

THE COURT:  Okay.

MS. ROMANO:  Counsel is correct.  We did agree to a stay until the end of -- until the Court ruled on the gaming issue -- the Gaming Act issue.  And counsel has indulged me with some extensions after that due to the holidays; I took some time off over Christmas.

At this point, my clients have prepared and gathered documents.  Counsel asked for a lot of communication.  There's a lot of electronic discovery.  I think from the Department of Revenue I received 135 e-mails full of e-mails that need to be reviewed for privilege.  And that's --

THE COURT:  Wouldn't this --

MS. ROMANO:  -- where we are.

THE COURT:  Wouldn't this just be mostly expert testimony and then maybe some computer testimony about --

MR. HAVERSTICK:  It might be.  I don't know what

44

they have.

THE COURT:  To talk about the software -- I mean, honestly, the way the Captain described it, it's -- you don't know what's out there, what's changing; and so it's going to be hard to keep up with it.  I mean, that's the problem.  It feels like a legislative issue, really.

MR. HAVERSTICK:  I think perhaps it is.  But we certainly could -- well, we could resolve one way or the other whether the extant versions of the software are legal and probably in the process decide how much of a change is too far, how much of a change to the software -- because I think that's what we'll see in -- in especially the expert testimony, there's some changes that get so out there that all of a sudden they are chance games.  And we may be able to put some collars on an acceptable alteration to software to keep it skill versus --

THE COURT:  Because --

MR. HAVERSTICK:  -- chance.

THE COURT:  Because there could be experts say this particular software package, this particular machine is a straight chance or we get a predominant chance; but then the next iteration might not be.  So that's the problem, any -- if it's changing as much as the Captain indicates.

So I think -- I think the key to this case is getting it on the merits very quickly and -- you know,

45

because this could be in the court all the time, every time a new iteration comes out. There's got to be a better solution than --

MR. HAVERSTICK: Well, frankly -- begging your pardon, Your Honor; that -- that is one of the bases upon which an injunction in a case like this can be based. If there's a multiplicity of lawsuits on a -- on a novel issue, courts have recognized that even in a -- a criminal enforcement action, an injunction is the proper way to, you know, stop everything until we figure out what the answer is.

And then once we know the answer -- it may be that the Court determines that no matter what our software does, the game is an illegal gambling device, in which case it's kind of binary. I mean, if there's any game out there, including a POM game, they get picked up.

THE COURT: Okay. Let's see; what other questions did I have?

All right. So the counsel has made -- counsel for the State Police has made argument regarding irreparable harm. Is there any other -- I mean, look, the fact is these folks are having their machines confiscated under the rubric of them being illegal. So by that alone, you know, they're -- they're being stamped with the taint of criminal conduct. And I do believe that is -- it's very hard for them as well.

And then you have all of these tavern owners or --

46

these people that they're possibly going to lose their licenses and jobs. So a lot of people -- and they can't get any of their money back; if they're declared to be legal, they can't get their money back because of sovereign immunity. So I do believe that in terms of irreparable harm, after this discussion, that you prevail on the irreparable harm --

MR. HAVERSTICK: Thank you, Your Honor.

THE COURT: -- over -- over the State Police, because they can continue their investigations. They can continue to remove as long as it's not focused on you at this point.

You know, whether kids are out there gambling and -- you know, at this point, the only -- the only legal analysis is that they're legal. And -- and I'm just interested the Gaming Board hasn't intervened in this.

MR. HAVERSTICK: Well, if I may, Your Honor, the Gaming Board has taken a position publicly that it does not regulate these games. And I -- and I think after the Court's decision in November, it probably affirms the Gaming Board's view on it. If the Gaming Act doesn't apply to the games, the Gaming Board doesn't have jurisdiction to regulate them. So it's -- I assume it's satisfied with the result of November's decision.

THE COURT: Well, the -- that was a very thoughtful

47

decision. It was very well-thought-out.

Okay. So I'm -- I'm telling you my ruling on the irreparable harm at this point.

So what's the next -- the next issue? Restoration of the status quo? Well, clear right to relief; at this point, it's up in the air. There's -- it's not a clear right to relief at this point. I can't sit here and tell you that they're going to win or lose; I'm not an expert. So we need to have expert testimony. I think there is a substantial legal question at issue that needs to be fleshed out. And I think that under those circumstances, you would win on that prong as well.

So let's talk about the status quo. I mean, to me, the irreparable harm was the most important and the merits.

MS. ROMANO: Your Honor, under the test, petitioners have to meet every requirement of -- of the test to get a preliminary injunction.

THE COURT: Right. So we'll talk about those now.

MS. ROMANO: We don't think they meet the status quo requirement. The status quo has always been that the Pennsylvania State Police believed these machines are illegal. They've publicly said that. They testified to that. They market that out to their establishments; say, We believe these games are illegal.

They have continued to investigate these machines

all along and to conduct seizures where appropriate. So now to say you have to halt all of those investigations and halt all those seizures actually upends the status quo.

THE COURT: We haven't said that yet here today. When have we said that once?

MS. ROMANO: Well --

THE COURT: When have any of us -- they're continuing their investigations. They're confiscating five to six hundred machines a year, and they continue to do so. And they can confiscate the POM machines. So --

MS. ROMANO: We've looked at it from the lens of the injunction that's currently entered that says the State Police can essentially take no action with respect to a POM machine. And under that lens, it completely upends the status quo, that they now have to sort of treat the POM machines with kid gloves and they can focus on everyone else and everything else that's going on in the Commonwealth.

THE COURT: The current order does indicate that. Yes. Okay.

MS. ROMANO: And I think to the extent Your Honor is inclined to enter an injunction through the course of this litigation, we would respectfully ask that there be some more clarity in that order with respect to exactly what the Pennsylvania State Police can and cannot do moving forward.

THE COURT: Okay. All right. So status quo

then --

MR. HAVERSTICK:  May I be heard on that, Your Honor --

THE COURT:  Sure.

MR. HAVERSTICK:  -- because I have a slightly different take.

I think the status quo ante in this case is that the seizures weren't happening.  I mean, we -- we heard testimony today that in the past several years, there were what, four or five seizures of POM games.  And it sounds like at least several of them were attendant to investigations of crimes unrelated to whether the game was a gambling device.

And I think I've all but conceded -- and I'll do it on the record if the Courts wants me to -- we don't have a problem with that.  If -- if -- if -- just like any other potential item of contraband is picked up --

THE COURT:  You just said it on the record.

MR. HAVERSTICK:  Well, there you go.

THE COURT:  They heard you loud and clear.

Did you hear that?  You can seize them as long as you're not there targeting POM machines.

MR. HAVERSTICK:  We -- we did not object to the pickup of the speakeasy game because they had -- they weren't in there targeting the game; they were in there targeting the speakeasy.

50

I understand the state please -- State Police, rather, believes, I guess genuine, that these games are illegal. But -- but its belief doesn't make it so. These games have never been declared legal by the Legislature. They have never --

THE COURT: You just --

MR. HAVERSTICK: -- been declared --

THE COURT: Never declared illegal.

MR. HAVERSTICK: They've never been declared illegal -- sorry --

THE COURT: Right.

MR. HAVERSTICK: -- by the Legislature.

I think you corrected me, but I like --

THE COURT: Okay.

MR. HAVERSTICK: -- your corrections.

THE COURT: I just want to make sure I'm hearing you right.

MR. HAVERSTICK: They have indeed been declared legal by -- at least an iteration of them, by at least one common pleas judge in the Commonwealth.

And borrowing principles from the Rule of Lenity, we don't presume illegality of conduct that otherwise isn't statutorily prescribed as illegal. We presume conduct is legal.

The fact that the State Police thinks otherwise

51

doesn't mean that we're operating in an environment where these games are presumptively illegal. To the contrary, they should be deemed as presumptively legal until proven otherwise or legislated otherwise. And that's the status quo ante. And they -- they can't upend the status quo ante by doing what arguably are illegal seizures or --

THE COURT: It's the cart before the horse.

MR. HAVERSTICK: Yes. And -- and what --

THE COURT: That's what's happening here; it's the cart before the horse as it relates to these particular games right now. But we definitely need -- all of you need to have a clear understanding on -- on what these games mean and the impact --

MR. HAVERSTICK: It's why we brought the case, so we didn't have to have these arguments all over the state 67 times over and over again on what the game is. We wanted an authoritative decision up or down on the legality of the game.

Now we think we're going to do fine in that decision. But in the absence of a court telling me otherwise, the Commonwealth can't point to anything other than its belief that these games are illegal gambling devices. Therefore, I think the status quo ante has to presume that they are legal.

THE COURT: Okay. Did you want to respond to that?

MS. ROMANO: Yes. Briefly. Thank you, Your Honor.

As counsel says, the State Police just saying these games are illegal doesn't make it so. Well, POM just saying their games are legal doesn't make it so either.

THE COURT: That's true.

MS. ROMANO: Them just saying their games are games of skill doesn't make it so either, despite all the labelling they put on their machines.

THE COURT: And we're back to square one.

MS. ROMANO: Back to square one.

THE COURT: Right.

MS. ROMANO: That Beaver County case related to one machine, one iteration of software. You heard Captain Jones testify that he's seen at least five different versions since then.

THE COURT: The reason --

MS. ROMANO: It's not a blanket statement to be made.

THE COURT: The reason that -- that was not appealed was made clear to me today, because I was really confused. But I do understand now. But now it's reached a different level.

MS. ROMANO: Correct.

THE COURT: So -- okay.

MS. ROMANO: So I don't think that that Beaver

53

County opinion can be taken and made a blanket decision to apply to all of these games when there's five, six years' worth of advancements in the technology and the game play.

THE COURT: How come when they asked for legal determinations from the PSP as to their position, all the PSP responded was, Look at what the Beaver County decision was?

How many times did you ask or not get anything?

MR. HAVERSTICK: I think three or four opinions were requested from PLCB. And we always got the same response, a citation to the standard. But no -- certainly no invitation to say, Come show us your software so we can decide. It's: Here's the standard; you figure it out. And we did.

THE COURT: So you never responded to them either. You know, you've never given them the -- the Liquor Control Board -- you just said you have to meet these three criteria, which is consideration and chance and reward.

MS. ROMANO: Correct.

THE COURT: So you could have given them -- said, We think it's illegal. But they never -- you never responded except to point to those three issues. And then they have one judge and a couple DAs saying it's fine. So it's really gray. It's really gray.

MR. McKEON: Your Honor, if I may be heard?

THE COURT: Ah. There you are.

54

MR. McKEON:  And I apologize for butting in if I did.  But I'll -- I'll start, if I -- if I may, with the status quo argument because I think we're still on that.  But I want to make a slight detour for a moment.

Our position, if you've read our amicus brief --

THE COURT:  I did.

MR. McKEON:  -- is that the skill versus chance argument or factual issue is really not at issue here because these games are slot machines, and slot machines are per se illegal under the statute.

THE COURT:  That was -- the -- the Gaming Act defines slot machines.  And that would be skill, partial skill, and whatnot.  But it specifically said that any section of 5513 which is contrary to this is not -- it's re- -- it's -- it's not in effect.

So while these are slot machines under the Gaming Act, it's not -- it's not an illegal gambling device.  So that's a little bit -- that's the issue.  Whether it's a slot machine or not, fine; but is it illegal?

MR. McKEON:  Well, Your Honor, I think that the statute itself makes slot machines per se illegal.

THE COURT:  But --

MR. McKEON:  And what we now have is a decision of this Court saying that the POM machine is a slot machine.  And so --

55

THE COURT: But not under the gaming authority. It's under the -- we haven't decided -- it's -- so it's -- I read your brief, but it -- the -- the POM decision does away with that. It is a -- it is a slot machine under the Gaming Act, but it's not regulated or under the jurisdiction of the Gaming Act.

MR. McKEON: Your Honor --

THE COURT: So just because it's says slot machine doesn't mean that it becomes an illegal gambling device or else we wouldn't have the second point on the merits. It would be done.

MR. HAVERSTICK: And, Your Honor, the -- the Pennsylvania Code is chock-full of examples of the same word defined different ways in different -- sometimes even in the same -- same title, but certainly in -- the same: teacher, children, racketeering --

THE COURT: I know. I understand. I --

MR. HAVERSTICK: Yeah. They --

THE COURT: Very careful to consider that. It was very creatively written too. But --

MR. McKEON: Thank you, Your Honor.

THE COURT: But I don't think that the -- it doesn't decide whether it's an illegal gambling device under the Crimes Code. It just doesn't.

MR. McKEON: Well, if -- and I -- I don't want to

56

-- I mean, you've -- you've read the brief.  So if I could just recap that point --

THE COURT:  Okay.

MR. McKEON:  -- for -- quickly for a moment.

The statute itself -- and we're talking about 5513(a) -- makes any slot machine illegal.  Any.

THE COURT:  If it's an illegal gambling device.

MR. McKEON:  No.  Any slot machine is per se illegal.  The word you're focused on is or in the statute.  What it says is maintains, sells, lends, leases any slot machine or any device to be used for gambling purposes.

The or is disjunctive, and the or means either one or the other, not both.  And so that means that a slot machine is per se illegal under this statute.  That's our argument.

THE COURT:  Section 1903(a)(2) of the Gaming Act states that provisions of 5513 are repealed insofar as they are inconsistent with the act.

MR. McKEON:  Precisely.  And that is also part of our argument, Your Honor.  In fact, that proves our argument because what happened was this statute, 5513, was in existence at the time the gaming law was enacted in 2004.  And the statute says any slot machine is per se illegal.

The gaming law came along in 1903 Section 2 and directly -- addressing that direct point said with the

exception of legal slot machines under the Gaming Act.

So the statute 5513 applies very specifically to any slot machine, and it per se makes any slot machine illegal unless there's an exemption.  The only exemption is under originally two -- in the 2004 Gaming Act, 1903 Section 2; and in -- when -- when 5513 was again amended in 2012, (e.1) was added.  And (e.1) expressly exempts legal slot machines under the Gaming Act.  However, there's no exemption for any other slot machine.

THE COURT:  Under the Crimes Code --

MR. McKEON:  And this Court --

THE COURT:  Under the Crimes Code, to be per se -- a gambling machine per se, you have to prove the three points.  And we're still stuck in the middle point --

MR. McKEON:  Well, Your Honor --

THE COURT:  -- of whether it's a game of predominantly chance or not.

MR. McKEON:  I would direct your attention to the Bretz case decided by the Superior Court in 1981.  Its cite is 433 A.2d 55.

THE COURT:  Is that in your brief, counsel?

MR. McKEON:  It is not in our brief, Your Honor.  That's why I'm reading the cite.  It's 433 A.2d 55.  Judge Van der Voort of the Superior Court did exactly the analysis that I just went through, the disjunctive or in 5513, and

reaches the conclusion that I reached.

THE COURT: Was it a slot machine?

MR. McKEON: In that case, it was a slot machine, Your Honor.

THE COURT: What kind of slot machine was it? Do you know?

MR. McKEON: The -- the facts of the case didn't reveal, as -- as far as I remember. And -- however, the point is it's a slot machine. There is no -- to -- there is no definition of slot machine, the term slot machine anywhere in the Pennsylvania statutes except, except in the gaming law.

And so the Court under normal principles of statutory construction would look to that definition. These are same subjects, same people, same activity. You should look to the gaming law.

What the Court has already said in this case is that the POM machine, if it were evaluated under the definition used in the gaming law, is a slot machine. There's no other definition that Pennsylvania has.

MR. HAVERSTICK: Well, Your Honor --

MR. McKEON: And so --

THE COURT: Let him finish.

MR. McKEON: -- the whole debate on whether the thing is skilled versus chance -- it's an interesting debate;

59

it's an intense factual issue. I'd like to get to the issue in a moment of the -- of the status quo. But the debate about skill versus chance is not necessary to decide this case because this case can be decided on the law on the issue that I just discussed. And it's outlined in more detail in our brief.

If you look -- if --

THE COURT: So the amicus is taking a totally different view from the parties, even the Pennsylvania State Police, that it's a highly factual determination.

MR. McKEON: Well, I wouldn't say it's a totally different view, Your Honor. I'd say it's a -- it's a -- an alternative theory that is dispositive of this case.

So I think it's completely consistent. It's -- we just -- we just wouldn't need to get to the skill versus chance determination. The skill versus chance determination applies to all those other gambling devices that aren't per se mentioned in the statute.

THE COURT: Well, why didn't the -- why didn't the judges in that POM I and II -- why didn't they -- they left it separate: Hey, we're not deciding whether it's an illegal gambling device under the Crimes Code; we're going to leave that to be decided.

MR. McKEON: Well, with respect, Your Honor, that -- the reason they didn't do that is because the PSP

60

filed a motion for summary disposition on its counterclaim. Its counterclaim is totally different from the argument that I'm making. Its counterclaim is that the gaming law --

THE COURT: It was the Gaming Act.

MR. McKEON: Exactly; that the Gaming Act regulates all of these machines. The Court has already decided it doesn't buy that argument. And so I'm not certainly making that argument. All I'm saying is that the -- the statute itself, 5513 -- I'm not talking about the Gaming Act. I'm talking about 5513. 5513 --

THE COURT: So the definition of the Gaming Act for the slot machine. That's what you're saying; apply the definition of slot machine from the Gaming Act to the -- to the Crimes Code.

MR. McKEON: That would be a normal thing to do if you needed to do statutory construction. I don't think that you need to do statutory construction using all the presumptions, et cetera, because I think it's clear on the face of 5513, both 5513(a) which per se makes all or any slot machine illegal and 5513(e.1) which exempts -- in other words, it -- you know, 5513(a) captures every single slot machine in the state, including the legal ones. And then 5513(e.1) releases the legal ones. So the legal ones aren't covered by 55- -- well, they're covered by 5513(a) and then exempted under 5513(e.1). That's our argument.

And if you need to go beyond that -- and I think that's clear on the face of the statute. If you need to go beyond that, then you go to principles of statutory construction. You look at the definition in the Gaming Act. It's the only one in the Pennsylvania law of a slot machine.

What POM is doing and the Court has so found already in the decision from November 20th -- what POM is doing qualifies as a slot machine. Therefore, it is illegal under the statute. End of story. No need for further discussion. So as a legal issue, this case can be completely disposed of on that point.

But if you go to the skill versus chance argument -- and this is my argument on status quo -- what you've heard today in testimony and from argument is that the software on a POM machine can change virtually overnight, you know, within a minute. And so that software once changed alters the balance or could alter the balance between skill and chance.

And the determination you have to make in the number two issue that you're talking about is whether skill or chance predominates. If skill predominates under that old test that we would say doesn't apply to slot machines but applies to all those other gambling devices on the right side of the O-R in the statute, the -- the skill versus chance determination is fact-intensive and as you have already said

62

several times is a moving target.  You could decide today; and tomorrow, it's a different slot machine.  So it's a different determination on the balance between skill versus chance.

My point on status quo is that POM came to Pennsylvania and started marketing these machines, knowing that that was the state of the law, so -- understanding that every machine they put out there is subject to inquiry because nobody knows the balance between skill and chance until you determine it.  And so the State Police naturally want to look at every one of those machines because what they're looking for is the balance between skill and chance.

This is POM's business model.  They moved to this nuisance.  This is their problem.  So the status quo is that.  And now they have, I would say, the gall to ask this Court for an injunction, a preliminary injunction, a mandatory preliminary injunction to stop the State Police from doing what they've always done.  I -- I personally find it outrageous that they would do it.

So, to me, that is the status quo.  The status quo is they -- they made their bed; they should be made to lie in it.  It's -- they're in a gray area.  They know they're in a gray area.  We would say it's black.  They would say it's white.  But the reality is on the ground, the State Police are forced to deal with a gray area every day.  And that's

what POM decided to build its business model around. And so the status quo is that. It's not that they should have an injunction.

THE COURT: When was the new Gaming Act put into effect?

MR. McKEON: 2004.

THE COURT: Okay. So that was -- all right. So that was in effect at the time they started?

MR. HAVERSTICK: That's right, Your Honor.

THE COURT: All right. So -- would you -- are you finished, counsel?

MR. McKEON: I would say one other thing. Your Honor -- and -- and this may have just been the way I was hearing it. But the State Police put on testimony concerning harm. But they don't have to prove harm. POM has to prove harm. POM has to prove immediate and irreparable harm. I don't see that they've done that. I'm -- I know that I'm challenging a ruling that you said you already made, but --

THE COURT: They're being -- they're being tainted with, you know, being engaged in criminal activities. They're -- they're getting into all kinds of contractual issues. They're losing money, and they're never going to get it back because the state has immunity. So I think that they've met the irreparable harm at this point.

And I'm satisfied by what I heard today that the

State Police can continue to do their investigations, which was the only irreparable harm that I heard. I mean, look, the whole issue of gambling in society and unregulated, I -- I think it should be regulated. I'm mean, I'm not here -- I'm not the Legislature, though. So --

MR. McKEON: Right. But, Your Honor -- I -- I understand that. But the -- the Court -- getting a preliminary injunction is difficult under any circumstances. Getting a mandatory preliminary injunction is almost impossible. You have to prove the four elements.

I don't see that they've come close on making a -- a case on likelihood of success on the merits. They -- but putting that aside --

THE COURT: If I --

MR. McKEON: -- the irreparable --

THE COURT: If I -- if your argument is accurate, you're right. But I don't necessarily agree with that argument right now.

MR. McKEON: I -- I understand.

Let me just say one other thing about irreparable harm. They have a complete remedy under Chapter 58 of the Judicial Code. There -- there are forfeiture provisions.

So these machines have been seized. They're in Dauphin County. They're in some other county. They can go in to that Court of Common Pleas, like the statute allows

65

them, and -- and ask it to get the machines back and put on all the evidence they need to do to do that.

There's a preliminary -- there's a provision in Chapter 58 of the Judicial Code, 5803(f), I think it is, that allows for an immediate release or a preliminary release of the property once seized if they can prove certain things.

They can put on the case that they want to put on here there and show that that particular machine shouldn't -- you know, it's -- skill predominates over chance on that particular machine if that's the case they want to make and try to get their machine back.

They shouldn't be bothering this Court and trying to get a preemptive statewide injunction for their machines only when we already know that the software on the machines could change tomorrow. That's -- it's -- it's -- it's a -- I just think it's an outrageous ask.

And insofar as balancing the equities, which is the fourth element that we haven't really talked about --

THE COURT: Well, can I let them -- them respond to your argument about status quo?

MR. McKEON: I'm sorry, Your Honor?

THE COURT: I'd like them to respond before --

MR. McKEON: Okay.

THE COURT: -- we move to the next one.

MR. HAVERSTICK: Thanks, Your Honor.

66

Let me work backwards.

In theory, the idea that you can contest forfeitures sounds good. In practice, we've tried it. We've been working on some of those for years. It is not an effective remedy.

And furthermore, it's not an effective remedy for the harm suffered to POM of PA which suffers harm not just because of the seizure of the machine; it suffers harm to its business. It suffers harm to its reputation. It suffers harm to its property rights.

So even if we could actually, actually in the real world go and effect these arguments in front of courts of common pleas to get the games back after they are seized -- and I can tell you we've tried and it just doesn't work that way; it doesn't move that fast -- that's not a -- a complete remedy.

Your Honor, I -- I'll say this about POM making its bed and lying in it. When POM came -- came to Pennsylvania, one of the first things it did was arrange for the friendly pickup of its game in Beaver County with the agreement of the Pennsylvania State Police precisely to do what we're trying to do again today which is we want to know whether our game is -- this game is legal in Pennsylvania. Tell us yes or no. We want to be good corporate citizens. If we're not, we'll change it or leave. They got the okay.

67

We did it again when we filed in this court.  We're trying to do it in -- in this court.  You know, it's gone, frankly, slower than we would like because of some acts by the other side.  But that's where we're heading --

THE COURT:  You've asked for a legal determination four or five times, right, from --

MR. HAVERSTICK:  Yeah.  And we've asked several times from -- we've asked several times from DAs, from the Liquor Control Board.  We've met with various county DAs to have these conversations.

Certainly if PSP had ever wanted to -- there's been an open invitation -- they're aware of it -- to come talk and ask about our software, test it, do whatever they want.  We're -- we're not hiding what we're doing.  We're here, and we want to cooperate.  We want to be lawful citizens.  Again, that's why we're spending the money to be here.

THE COURT:  What about the argument, though, about the definition of slot machines applying to the Crimes Code?

MR. HAVERSTICK:  So a couple things about that, Your Honor.  It's an inventive argument, but this Court rejected it en banc.  The fal- -- the main fal- --

THE COURT:  No; they -- they said it was a slot machine.

MR. HAVERSTICK:  Well, in -- in dicta, there's a reference to the game being a slot machine, but there's no

definition of what that is.

THE COURT:  It's definitely a slot machine under the definition.  It's definitely a slot machine under the definition of -- it doesn't matter whether it's skill, partial skill, anything.  It's just --

MR. HAVERSTICK:  Here's -- here's the fallacy of the Gaming Act argument, though.  Commonwealth Court en banc held the Gaming Act does not apply to these games at all, period, end of story.  That formulation of the argument would accept that en banc holding except for the definition of slot machine.  That would be the one and only part of the Gaming Act that would apply.

Now, as we know and as I said before, different areas of the Pennsylvania Code have definitions of the same term that are different.  What this Court recognized in the POM case that was decided in November is that we don't care what the Gaming Act says about slot machines.  The analysis that needs to be done is the 5513 skill versus chance analysis.  I mean, that was -- that was the holding of that case.  Not that because somebody might give the game a name, that that name has talismanic or other legal meaning otherwise not subscribed to in the Crimes Code.

The purpose of the Crimes Code provision is to outlaw illegal gambling devices.  That's determined by Commonwealth v. Irwin, which we all in turn know is the skill

versus chance. I mean, that's -- that's -- that's the area that's up for dispute.

THE COURT: Isn't that what you've been getting back from the State Police: Look at that -- look at these three parts?

MR. HAVERSTICK: Yes.

THE COURT: All right. That's --

MR. HAVERSTICK: For years and years.

THE COURT: That's what they've been providing with them --

MR. HAVERSTICK: Years.

THE COURT: -- to use as guidance, so --

MR. HAVERSTICK: Years.

THE COURT: -- again, we're back to square one.

MR. McKEON: Well, Your Honor, the law calls -- calls itself. I mean, this is a theory that is supported but -- first of all, it -- this is not a Gaming Act argument, as Mr. Haverstick is saying. This is a 5513 argument, pure and simple.

THE COURT: He's citing case law that interprets 5513 as it relates to these slot machines. Intentionally or knowingly makes, assembles, leases, lends, et cetera, et cetera, et cetera, any punchboard, drawing card, slot machine, or any device to be used for gambling purposes.

What is gambling? Well, there's a three-part test.

The second part has -- is up in the air. That's the thing. It's up in the area. So, yes, it is a slot machine. Is it used for gambling? I don't -- I'm not an expert on -- on these things. I can't make a determination on that.

MR. McKEON: Your Honor, I -- I refer again to the Bretz case.

THE COURT: Okay.

MR. McKEON: Judge Van der Voort from --

THE COURT: Okay. I'm going --

MR. McKEON: -- 1981.

THE COURT: I will read that.

MR. McKEON: And it -- it makes it fairly clear that -- in that case, a seizure was allowed even though there was no criminal activity under 5513(a) because there -- because of the statutory construction that I went through.

The -- the key issue for construction purposes is the word or. And the -- the words -- the term slot machine is -- is -- is a specifically identified gambling device on the left side of the word or. And the way that the words read and the way that the Superior Court interpreted them -- you know, this is the case that is most directly on point -- is in the way that I'm doing it. And -- and or in this context means one or the other but not both. And so slot machine is per se -- a slot machine is per se --

THE COURT: Gambling --

MR. McKEON:  -- illegal under 5513 --

THE COURT:  Gambling device comes after or.  So gambling device has a three-part test.  So, yes, it's in there, but the or comes after that.  Is -- is this a gambling device?  Is it an illegal gambling device?  That's the -- and then that's a three-part test.  We haven't met the second part, at least in my -- and I can't --

MR. McKEON:  Your Honor, our position would be that the three-part test applies to any other gambling device.  It doesn't have to apply to punchboard, drawing card, or slot machine because they are specifically named and they're on the left side of the or.

THE COURT:  The left side of the -- the right side of the or --

MR. HAVERSTICK:  Yeah --

THE COURT:  -- says or any device.  They're just -- it's the catchall phrase right there.  It's -- well, we --

MR. McKEON:  Again, I commend to you --

THE COURT:  -- just don't agree on that.  Okay.

MR. McKEON:  -- the Bretz -- the Bretz case.  And --

THE COURT:  So did you have any more responses to the status quo --

MR. HAVERSTICK:  I think -- not to the stat- -- look, I'll back -- I'll be back to what I made -- the point I

72

made before because I think it is an important point.

This conduct is presumptively legal. People don't like it. The ca- -- I understand why the casinos don't like it. I understand why, I think, PSP and the Lottery don't like it. But the fact that they don't like it or that it competes with them or makes their jobs harder doesn't mean it's illegal.

It may well end up being illegal after we go through the hearing that we asked for and want in -- in front of this Court. That may be the result. We're willing to accept that.

But right now you don't presume conduct is illegal in this country and in this Commonwealth. It's presumptively legal. And in the absence of anything else to the contrary, that's the status quo.

THE COURT: Okay.

MR. McKEON: Your Honor, if I just may respond?

THE COURT: Briefly.

MR. McKEON: In this -- I will.

In this context, getting your machine seized is a cost of doing business. That's the status quo.

THE COURT: Okay. Well, they've had their machines seized. They -- they are having them seized. As long as they're not being targeted, that's all I care about at this very moment.

73

So -- so we have the final -- the final -- whether the public would be -- whether the injunction would not adversely affect the public interest.

So did you want to -- did you want to make argument on that?

MR. HAVERSTICK:  Yes.  Look, I think -- Your Honor, the -- and it somewhat ties into the idea of the status quo.

THE COURT:  Yeah.

MR. HAVERSTICK:  These machines -- Pace-O-Matic machines anyway were not being rampantly picked up in -- in the past couple of years.  It's not as if there's some sort of -- I mean, look, there may be a debate about whether -- but there's not -- it's not so attendant to other crimes that they were being scooped up in speakeasies or other, you know, tax -- tax investigations, things like that.  So you can't really dwell on the merits of the game itself.

What I think is in the interest of the public is being protected from overzealous seizure of private property that is, again, presumptively legal.  I mean, we're -- the people who have these places ceased are oftentimes tavern owners who are -- who are just managing to get by.

They are fraternal organizations who are using the proceeds of these games to pay for baseball teams or baseball uniforms.  They're, you know, organizations that are benefitting from the charitable contributions of

74

Pace-O-Matic.

But they're -- they're not -- they're not wealthy institutions. They're people who can ill afford potentially unfair and maybe even illegal seizures by the Pennsylvania State Police and law enforcement which is, we all know, a coercive and intimidating act.

Balance that against the interest that the public has and the lack, frankly, of interest that the Pennsylvania State Police has in -- in picking up games that are presumptively legal. I mean, they -- it doesn't have an interest in seizing legal contraband unless that legal contraband is attendant to some other -- commission of some other crime. And we've already said we're not contesting those seizures.

I just -- I feel that the public benefits when law enforcement, well-intentioned as it is, is required to follow the rules and the consumer -- consumer public and -- and, you know, the vendor public in this case can rely on the idea that until a game or an action is declared illegal, it's presumed legal. I just -- I don't see --

THE COURT: So you're essentially arguing that while it's legal, they shouldn't be using their police powers to confiscate property and --

MR. HAVERSTICK: Well --

THE COURT: -- taint individuals with --

MR. HAVERSTICK:  Correct.

THE COURT:  -- criminal -- is that -- is that what you're saying?

MR. HAVERSTICK:  Yes.  And we --

THE COURT:  Because I'm not really here to support, you know, tavern owners or --

MR. HAVERSTICK:  I get it.

THE COURT:  Yeah.  That's --

MR. HAVERSTICK:  And we -- to -- to that point --

THE COURT:  Not that I don't, but it's just that that's not my role here.

MR. HAVERSTICK:  We -- we've -- we've often publicly and in our papers said we support law enforcement efforts against illegal gambling devices.  We're not -- by no means are we saying the Pennsylvania State Police should be prevented from investigating, seizing, prosecuting illegal gambling devices.  We're as against those as everybody else.

We're talking about something that until it's called by a court an illegal gambling device should be presumed to be lawful private property.

THE COURT:  Okay.

MS. ROMANO:  Your Honor, if I may respond?

THE COURT:  Yes, ma'am.

MS. ROMANO:  Thank you.

I haven't heard counsel really say anything here

76

that a -- the standard is that an injunction would not adversely affect the public. Captain Jones has clearly established quite the opposite. An injunction absolutely would adversely affect the public.

There are problems with underage gambling here. There are problems with tax evasion here. There are problems with the State Police being hampered from enforcing any sort of criminal activity because they can't enforce against these machines.

For counsel to sit here and say that his -- the establishments that have their machines are of low income is a bit laughable when you consider they get a cut of what's paid into these machines. We're talking millions of dollars. They're not sitting here rubbing pennies together. They want these machines because they're getting a cut of the money that's being paid into them, illegal gambling money that's being paid into their establishments.

THE COURT: Okay. But --

MS. ROMANO: Counsel doesn't have a problem with --

THE COURT: -- this is -- this is not really addressing the issue. Whether they're making money or not is not an adverse effect to the public interest, whether they're making money or not.

MS. ROMANO: It's contributing --

THE COURT: How --

77

MS. ROMANO: It contributes to money laundering. It contributes to tax evasion. It contributes to underage gambling. It contributes to compulsive gambling. These are all massive harms in our public society, and this just proliferates it and allows it to continue to fester throughout our environment.

You know, Your Honor, we would submit that the standard for a preliminary injunction is to meet all six prongs of the test. Your Honor has said yourself the issue of whether they're likely to succeed on the merits is still up in the air. If they're not likely to succeed on the merits, they're not entitled to an injunction.

THE COURT: It's also whether there's a substantial legal issue that needs to be resolved. And at this point, it seems to favor them in a way --

MR. HAVERSTICK: I direct --

THE COURT: -- because the legal precedent is on their side and when you look at the discovery and you look at the State Police not responding to their inquiries. At this point -- at this point, it's kind of on their side. So, I mean, I'm not going to make a ruling from the bench on the injunction. I think we've dealt with all the prongs.

I want to know when this will be ready for a decision on -- a discussion on the merits. How long will it take? Everybody wants resolution on this. How long will it

take?  Do you folks need to take a little bit of time and then come back to me and give me some kind of time frame?

MR. HAVERSTICK:  I -- I think we could agree mutually on a --

THE COURT:  Because no matter what the outcome is, we still have to --

MR. HAVERSTICK:  Yeah.

THE COURT:  -- make this decision.

MR. HAVERSTICK:  We could agree on a -- I think without too much trouble.  I mean, assuming we're getting cooperation from PSP and Revenue, we can agree on a -- on a reasonable timetable for --

THE COURT:  Were their interrogatories complex?  Do you -- do you know, counsel?

MS. ROMANO:  Your Honor, it's not that the interrogatories were complex.  It was the volume of documents that are responsive to the document requests.  As I said, they're being reviewed for privilege now.  That's where we are.  The documents have all been identified.  It's a matter of getting through them for privilege.

THE COURT:  And do both of you --

MS. ROMANO:  And unfortunately --

THE COURT:  -- have experts at this point?

MS. ROMANO:  I'm sorry, Your Honor?

THE COURT:  Do both of you have experts?

79

MS. ROMANO: At this point because this issue has sort of been on hold, we hadn't moved toward that realm of whether we're getting an external expert or -- Captain Jones has been qualified as an expert in the past -- whether we're going to rely on him. So that's an issue we need to resolve and would need time to work through --

THE COURT: Right. Because whether the injunction is granted or denied, we still have to get to this. And everybody is up in the air. And I'm absolutely willing to shepherd this through as quickly as possible. Whatever the Court can do to assist, I'm willing for -- you know, to help. So --

MS. ROMANO: Your Honor, I -- I agree. I think if counsel and I talk and look at our calendars, we can come up with a reasonable proposal for timelines.

THE COURT: So is there any other argument that people -- either side feel they haven't been able to make as it relates to the injunction?

And I have to read that case.

MR. McKEON: Thank you, Your Honor. Just a few words on the balance of the equities and the -- and the public interest.

You know, the Lottery has put out figures indicating that these games are siphoning off about a hundred and fifty million dollars a year out of the Lottery. The

Lottery benefits senior citizens. The casinos are --

THE COURT: Excuse me. Why isn't the Legislature doing anything? I mean, don't you think they'd want to --

MR. McKEON: Well, Your Honor, there are bills in the Legislature.

THE COURT: Are there?

MR. McKEON: Yeah. But the battle right now is in the courts. And the issue obviously in front of you is whether to enjoin PSP from doing its job.

And on the specific issue of balancing the equities, you know, the fact is balanced against whatever sort of nebulous harm I'm hearing from POM about their troubles as a result of seizures of their machines -- you know, the fact is, again, they -- they moved into this space, knowing that this is a gray area. It's a -- it's a cost of doing business.

And they have a remedy in the forfeiture act. So they -- they already have a remedy. They don't have to be here. And the idea that -- the idea that their machines are presumptively legal, it's just not true.

THE COURT: And you base that primarily on your argument that the gaming code -- the Gaming Act defines slot machine; and, therefore, it's presumptively a gambling device under the Crimes Code.

MR. McKEON: Well, that argument, Your Honor, but

really -- I mean, that's -- that's one of the arguments. That's, I guess, one string to the bow. But the other one is the one that we've been talking about, the skill versus chance.

The moment you put yourself in business in an industry where the only determinant as to whether you're legal or not is whether your game is skill versus chance and you change your game every day, you've -- you've bought into an environment in which the State Police are going to look at you very, very carefully and seize your machines when they're in doubt because they're not presumptively legal.

You know, this is -- gambling is illegal unless it's made legal under the Gaming Act. And you're in an industry, as POM, conducting a business, knowing full well that everything you do, every time you put a machine on the street, they're going to -- the State Police are going to have to look at it, need to look at it. And they're going to make a determination of whether it's predominating skill versus chance. Well, you bought into the whole analysis. And that puts you at risk. And that's the cost of doing business.

THE COURT: I think that they feel at risk.

Do you feel at risk?

MR. HAVERSTICK: Very much so.

THE COURT: I'm sure you do.

MR. HAVERSTICK:  Quick -- quick couple of points, Your Honor.

MR. McKEON:  But that was their decision, Your Honor.

THE COURT:  I know.  I don't feel sorry for them.

(Laughter.)

MR. HAVERSTICK:  Quick couple of points, and then I'll --

THE COURT:  I say that in jest.  Okay, folks?  Please.

MR. HAVERSTICK:  We appreciate the Court's recognition that -- on -- on likelihood of success on the merits.  It really -- the question is whether there's a substantial legal question.  And the Marcellus Shale Coalition case in 2018 said that pretty clear.  And it's especially appropriate to --

THE COURT:  Wait.  Is that a case cited by --

MR. HAVERSTICK:  It's not in any of the briefs.  It's -- it's 646 PA --

THE COURT:  Let me write this down.

MR. HAVERSTICK:  Okay.

THE COURT:  Six -- 646 PA.

MR. HAVERSTICK:  482.

THE COURT:  And what was the name of the case?

MR. HAVERSTICK:  It's Marcellus Shale Coalition --

83

THE COURT:  Oh, okay.

MR. HAVERSTICK:  -- versus DEP.

In that -- in that case, the Chief reiterated that in a preliminary injunction, you use the substantial legal question test, especially when you've already -- especially when there is a -- a concrete demonstration of irreparable harm, it's the appropriate test.  And we're glad that the Court is looking at it.

There is legislation pending.  And interestingly enough, Your Honor, SB710 adds into the definition of 5513 skill game as a version of an illegal device.  Presumably --

THE COURT:  Oh, is that so?  Skill game is an illegal device?

MR. HAVERSTICK:  Well, as an -- in a -- in a proposed amendment to 5513.  Presumably that amendment would be unnecessary if counsel's understanding of the Gaming Act argument or the definition of slot machine is what it is.  The General Assembly wouldn't have to amend 5513 to specifically say a skill game is illegal.  It wouldn't need to do anything because skill -- because slot machine is already in there.

The point of 5513, as the Court recognizes, is it's not what you call the thing.  It's what it does.  It's whether it's an illegal gambling device.  And we all know the test for that.  The Commonwealth Court has already decided

84

the test for that.  It's already set up the evidentiary structure for us having --

THE COURT:  Can a 12-year-old get $10,000 from playing tic-tac-toe in a -- in a -- in a mall?

MR. HAVERSTICK:  No.  I mean, they're not -- they're not permitted to play those games.

THE COURT:  Or $200 or --

MR. HAVERSTICK:  And they can't get the payout.  They -- you know, look, I can't -- there's no -- none of us in this courtroom, whether we're talking about a casino or a lottery or skill games, can tell you with 100 percent certainty in no case are there ever minors playing the games.  It's just not possible.

I mean, we already -- the State Police already acknowledged that minors can just as easily go up to -- to a lottery kiosk and play it.  What we have in place are rules and contracts and structures to try to prevent that from happening.  And one of the things that skill games does is prevent redemption for people who are minors.  So I would say no at least aspirationally and I think --

THE COURT:  So even if they win and they're entitled, they don't get any -- any money back?

MR. HAVERSTICK:  They're not supposed to be playing the game.

THE COURT:  Wow.  That's interesting.

MS. ROMANO:  Your Honor, the problem with that is --

THE COURT:  I know.  I --

MS. ROMANO:  But the Lottery -- I mean, the reality --

THE COURT:  You can't regulate this.

MS. ROMANO:  The problem is if a -- if a child, an underage person played a lottery machine, to get a payout, they have to go to a human being and hand them their ticket who ideally is going to ask for ID to card them to make sure they're of legal age.

These machines, if a child or an underage person plays them and wins a payout and there's a ticket redemption machine right there, all they have to do is scan it and they get their money.  There's no human being making sure that they're of age.

I can tell you I went to play one of these games at Arooga's out of curiosity.  My then three-year-old walked up with me, before I could do anything, hit the machine; and he won $10.  So, yes; can a child win money?  Absolutely.

THE COURT:  A future gambling --

MS. ROMANO:  Right.  Right.  He now talks about the lottery tickets as well, so we're in trouble.  But --

MR. HAVERSTICK:  Here's --

MS. ROMANO:  -- with a ticket redemption terminal,

86

there's no -- no controls in place to make sure underage people aren't gambling.

THE COURT:  All right.  We're getting a little off --

MR. HAVERSTICK:  Yeah.  Yeah.  Your Honor, the third point is, to close out, lots of argument from that table about facts that aren't of record.  We've heard this -- this canard about Lottery losing money.

I don't -- I'm fascinated to know that my client changes its software every day.  I mean, that's -- that's news to me.  It's certainly not of record.  It's certainly nothing I've ever heard.  Now, before we --

THE COURT:  These are all the factual issues that need to be fleshed out.

MR. HAVERSTICK:  Which is why we --

THE COURT:  Right.

MR. HAVERSTICK:  Which is why we should put the whole thing on pause, including the seizures; have the factual hearing, get to the bottom of it.  And then whoever wins, wins and whoever loses, loses.

THE COURT:  I agree -- I agree that there's a lot of factual issues.

MR. HAVERSTICK:  Thank you, Your Honor.

THE COURT:  All right.  So do you folks want to -- we're going to adjourn as it relates to this hearing.  But if

87

you want to meet with me or discuss a timeline or you want to just do it on your own and then get back to the Court. But I -- whatever the Court can do to help you move this along in terms of being available for hearings or whatever, I'll make sure we do it.

MR. HAVERSTICK: Why don't counsel and I attempt to get a reasonable but aggressive schedule together? We'll present it to the Court. And if you're okay with it, then we'll -- we'll go with it.

THE COURT: All right. I mean, I don't get to make the decision, but I can assure you they're going to want to resolve this. Everyone wants to resolve it.

MR. HAVERSTICK: All right.

THE COURT: All right. Well, thank you all for your --

MR. HAVERSTICK: Thank you, Your Honor.

THE COURT: Counsel?

MR. McKEON: Your Honor?

THE COURT: Sure.

MR. McKEON: One last thing. I think you will -- we will be filing a petition to intervene in the case, just to apprise the Court.

THE COURT: All right. That would be good.

MR. McKEON: Thank you, Your Honor.

THE COURT: So you just filed this as amicus at

88

this point, so -- all right.  And we should coordinate the other case too.  I know there's outstanding motions with the other case --

MR. HAVERSTICK:  I think they -- they're treated --

THE COURT:  -- to make that interloc- -- you know, to get it appealed.  I'd like to keep this all together --

MR. HAVERSTICK:  I --

THE COURT:  -- if all the parties --

MR. HAVERSTICK:  All right.

THE COURT:  -- could agree to that, you know.

MR. HAVERSTICK:  I think the two -- the two Commonwealth Court cases have been coordinated at least.  I don't think they've been consolidated.  But they're treated on the same track.

THE COURT:  There's an outstanding motion to grant --

MR. HAVERSTICK:  Oh, yeah.  Right.

THE COURT:  -- to let the other matter be heard on appeal even though it's interlocutory.

MR. HAVERSTICK:  Interlocutory.  Yeah.

THE COURT:  So, you know, I think it's best to keep this all together and move quickly.

MR. HAVERSTICK:  Okay.

THE COURT:  That's what I think.

MS. ROMANO:  Your Honor, we have no problem

handling them together. And we've been treating them --

MR. HAVERSTICK: Yeah.

MS. ROMANO: -- essentially --

THE COURT: Okay.

MS. ROMANO: -- unofficially as one case.

But to Your Honor's point, that petition pending is pending in both actions, both this State Police action and the Revenue action, asking for that language to certify it for appeal.

THE COURT: Okay. You're asking for the appeal then.

MS. ROMANO: Correct.

THE COURT: Okay. All right. Well, let's try to keep this together and move quickly.

MR. HAVERSTICK: All right.

THE COURT: All right. Counsel, thank you very much.

MR. HAVERSTICK: Thank you, Your Honor.

MS. ROMANO: Thank you.

MR. McKEON: Thank you, Your Honor.

THE COURT CRIER: Commonwealth Court is now adjourned.

(Whereupon, the proceedings adjourned at 11:18 a.m.)

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the proceedings of the above cause and that this copy is a correct transcript of the same.

DATED:   February 3, 2020

_____
Rebecca Toner, RPR

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

91

# EXHIBIT D

LM

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

POM of Pennsylvania, LLC,    :
                  Petitioner    :
                               :

      v.    :    No. 503 M.D. 2018
                               :

Pennsylvania State Police,    :    Heard: January 15, 2020
Bureau of Liquor Control    :
Enforcement,    :
                Respondent    :

## MEMORANDUM AND O R D E R

        Before the Court is the Emergency Application of POM of Pennsylvania, LLC (POM) for a Preliminary Injunction (Application) seeking to prohibit the Pennsylvania State Police, Bureau of Liquor Control Enforcement (PSP) from seizing any Pennsylvania POM Amusement Device 402.49 PEN video game machines (POM Game) and directing PSP to return all seized POM Games and all currency found therein.

        This matter began on July 20, 2018, when POM filed a petition for review in our original jurisdiction seeking declaratory and injunctive relief against PSP at docket number 503 M.D. 2018.[1] More specifically, POM sought a declaration that the POM Game was a legal device under Pennsylvania law and that PSP lacked the power and authority to seize the POM Game and/or to initiate administrative or criminal proceedings with regard to the same. POM further sought to permanently enjoin PSP from seizing or threatening to seize POM Games and/or

---

[1] POM filed a petition for review in a related matter on June 8, 2018, against the Commonwealth, Department of Revenue, and the City of Philadelphia (City). *POM of Pennsylvania, LLC v. Department of Revenue and City of Philadelphia (POM I)* (Pa. Cmwlth., No. 418 M.D. 2018).

initiating administrative enforcement or criminal proceedings with regard to the same.

According to POM's petition for review, POM distributes software for the POM Games, which are located in taverns, restaurants, and social clubs throughout Pennsylvania where alcohol is served under license from the Pennsylvania Liquor Control Board. The POM Games are also distributed in other commercial establishments that do not serve alcohol. The POM Game is a coin-operated video machine that offers several games, including a tic-tac-toe style puzzle, a potentially unlockable bonus session, and a "Follow Me™ colored dot-matching second phase of game play." (Petition ¶¶12-13.) If a player is ultimately successful, he or she is awarded with a combined total of 105% of the original amount spent to play. (Petition ¶27.) Cash rewards are also available.

POM maintained that the POM Game is not an illegal game of chance under section 5513 of the Crimes Code, 18 Pa.C.S. §5513, which governs illegal gambling devices. (Petition ¶¶35-36.) POM noted that in *In re Pace-O-Matic, Inc. Equipment, Terminal I.D. No. 142613* (C.P. Beaver, No. M.D. 965-2013, filed December 23, 2014),[2] the Court of Common Pleas of Beaver County determined that a similar game was a game in which skill predominated and, thus, it was not a gambling device per se under Pennsylvania law. (Petition ¶45.)

---

[2] In Pace-O-Matic, agents of the Pennsylvania Bureau of Liquor Control Enforcement seized coin -operated video devices from a social club. *Id.*, slip op. at 1-2. Like the POM Game at issue, the devices contained tic-tac-toe style puzzles that were played for money and offered rewards and dot-matching bonus games. *Id.*, slip op. at 2-4. The court of common pleas concluded that a machine is a gambling device per se where three elements are present: (1) consideration; (2) a result determined by chance, instead of skill; and (3) a reward. *Id.*, slip op. at 5. Because the court of common pleas determined that the outcome of both the tic-tac-toe and bonus games was determined predominantly by skill, rather than chance, it held that the Commonwealth failed to prove that the seized devices were gambling devices per se. *Id.*, slip op. at 10-12.

2

PSP filed an answer, new matter, and counterclaim in response to POM's petition for review. In its counterclaim, the PSP alleged that the POM Game was considered a slot machine under section 1103 of the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. §1103. (Counterclaim ¶18.) PSP also averred that the POM Game had not been inspected or certified by the Pennsylvania Gaming Control Board (Gaming Control Board) and that POM had been acting in violation of the Gaming Act.[3] (Counterclaim ¶¶20-21.) PSP also maintained that POM was a manufacturer of slot machines under section 1103 of the Gaming Act, and that it had violated the Gaming Act by manufacturing slot machines without a manufacturer's license. (Counterclaim ¶¶25-27, 29-30.) Similarly, PSP contended that POM is a supplier of slot machines under the Gaming Act and that POM violated the Gaming Act by distributing slot machines without a supplier license. (Counterclaim ¶¶37-40, 42.)

POM filed a reply to PSP's new matter and counterclaim, after which PSP filed an application for summary relief in the nature of a motion for partial judgment on the pleadings with respect to its counterclaim. By opinion and order filed November 20, 2019, this Court denied PSP's application, concluding that because the plain language of the Gaming Act indicates that the General Assembly did not intend for the Gaming Act to regulate unlicensed slot machines and/or supplant the Crimes Code's regulation of the same, the POM Game is not subject to the Gaming Act. In so concluding, we relied on our simultaneous decision in *POM I*. However, we specifically noted that our denial of PSP's application did not decide the separate question of whether the POM Game was an illegal gambling device

---

[3] 4 Pa.C.S. §§1101-1904.

3

under the Crimes Code, which both parties appear to acknowledge requires discovery in order to resolve.

On December 9, 2019, PSP seized several POM Games from at least three locations in Dauphin County.[4] (Application at 9-10.) These actions by PSP prompted POM to file the current Application on December 12, 2019. POM sought an order specifically prohibiting PSP from "seizing any [POM Game], including related POM equipment and all currency found therein, under the auspices of Section 5513 of the Crimes Code . . . or any provision of the Gaming Act . . . or otherwise commencing, continuing, instituting, and/or maintaining any adverse actions or proceedings against the [POM Game]." (POM's Proposed Preliminary Injunction Order.) PSP filed an answer on December 18, 2019. Additionally, Greenwood Gaming and Entertainment, Inc., Downs Racing, L.P., Mountainview Thoroughbred Racing Association, LLC, and Washington Trotting Association, LLC (collectively, Amici), all slot machine licensees, filed a brief in opposition to POM's Application asserting that the POM Games are illegal slot machines under section 5513 of the Crimes Code.

## Preliminary Injunction

It is well established that a party seeking a preliminary injunction bears a heavy burden of proof, as the applicant must meet all of the following criteria:

> (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the

---

[4] Additionally, PSP seized a Ticket Redemption Terminal (TRT), a POM device that does not involve any game play, as well as currency contained in the POM Games and the TRT.

4

preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and, (6) the preliminary injunction will not adversely affect the public interest.

*SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 502 (Pa. 2014); *see also Summit Towne Centre, Inc. v. Shoe Show of Rocky Mt., Inc.*, 828 A.2d 995, 1001 (Pa. 2003). "Because the grant of a preliminary injunction is a harsh and extraordinary remedy, it is to be granted only when and if **each** [factor] has been fully and completely established." *Pa. AFL-CIO by George v. Commonwealth*, 683 A.2d 691, 694 (Pa. Cmwlth. 1996) (emphasis in original). Petitioners "must show the need for immediate relief, and the preliminary injunction, if issued, should be no broader than is necessary for the petitioner's interim protection." *Three Cty. Servs., Inc. v. Philadelphia Inquirer*, 486 A.2d 997, 1000 (Pa. Super. 1985); *see also Credit Alliance Corp. v. Philadelphia Minit-Man Car Wash Corp.*, 301 A.2d 816, 818 (Pa. 1973) (denial of a preliminary injunction affirmed where no showing of urgent necessity to avoid immediate and irreparable harm that could not be compensated); *Herman v. Dixon*, 141 A.2d 576, 578 (Pa. 1958) (preliminary injunction dissolved where no showing of urgent necessity to prevent irreparable harm); *Adler v. Bristol*, 475 A.2d 1361, 1363 (Pa. Cmwlth. 1984) (denial of a preliminary injunction affirmed where evidence failed to establish that an injunction would maintain the status quo and that denial of the injunction would result in greater injury).

After careful consideration, this Court finds that POM has not met its burden of proving that the injunction is necessary to preserve the status quo, that the injunction is reasonably suited to abate the offending activity, or that the injunction will not adversely affect the public interest.

5

At the injunction hearing, counsel for PSP presented the testimony of Pennsylvania State Police Captain James A. Jones, Jr., from the Bureau of Liquor Control Enforcement. Captain Jones testified that during the normal course of various ongoing statewide PSP investigations into illegal liquor and gambling operations over the past several years, PSP has confiscated an average of 590 gaming/gambling devices *annually*. Of these several thousand devices confiscated, approximately five to eight POM Games were actually confiscated. Captain Jones noted that the December 2019 seizures that precipitated the current Application for injunctive relief were not limited to machines supplied by POM. POM did *not* dispute these facts.

Captain Jones also testified that the POM Games have never been the direct target or focus of these investigations or seizures, but were in fact confiscated from various establishments as part of ongoing and in-depth investigations into illegal gambling operations involving a wide range of slot machines and other gaming devices from at least five different manufacturers and suppliers. Additionally, Captain Jones discussed the difficulty PSP would encounter if it were precluded from confiscating just the POM Games in the course of a seizure. Captain Jones expressed concern that the public would regard this as PSP's tacit approval of the POM Games. Further, he noted the great proliferation of these types of machines not just in licensed establishments serving alcohol, but also in establishments open to all members of the public, including minors. This Court finds the testimony of Captain James credible.

During argument, POM agreed that the PSP was clearly acting within its duties in investigating and seizing what it believes to illegal gambling machines. *See* Section 211 of the Liquor Code, 47 P.S. §2-211 (creating the Bureau of Liquor

6

Control Enforcement within the PSP and authorizing it to enforce various sections of the Crimes Code, including section 5513). POM recognized that it would be inappropriate, and harmful to the public, to enjoin PSP from performing these essential duties. POM also recognized that some POM Games could likely be confiscated in larger seizures which occur as a result of ongoing and long-term illegal gambling operations. POM clearly asserted that they do not intend to challenge these isolated seizures of the at-issue POM Games *as long as* the POM Games are not the direct target or focus of the PSP investigations, raids, or seizures.

This Court recognizes that unless, or until, POM Games are considered to be illegal gambling devices under the Crimes Code, POM may suffer harms to its reputation and property interests as a result of the seizures. However, given the credible testimony of Captain Jones, POM's acceptance of the PSP's important public function in identifying and curtailing illegal gambling operations with its attendant harms, the tiny fraction of POM machines that have actually been confiscated as part of larger investigations and confiscations into illegal gambling operations, and the fact that POM does not intend to challenge these isolated seizures as long as POM is not specifically targeted, this Court finds no improper conduct by the PSP that warrants the imposition of an injunction at this time.

As it stands now, granting the relief requested by POM[5] would negatively disrupt the status quo by inhibiting the PSP from performing its important functions, would not be reasonably suited to abate the offending activity, and thus may adversely affect the public interest.

---

[5] As noted above, POM sought very broad relief in the nature of an order specifically prohibiting PSP from seizing any POM Game, including related POM equipment and all currency found therein, or from commencing, continuing, instituting, and/or maintaining any adverse actions or proceedings against the POM Game.

7

Accordingly, the Court enters the following order:

NOW, this 21st day of January, 2020, upon consideration of the Emergency Application of POM of Pennsylvania, LLC, for a Preliminary Injunction, the responses thereto submitted by the Pennsylvania State Police, Bureau of Liquor Control Enforcement and Amici Curiae Greenwood Gaming and Entertainment, Inc., Downs Racing, L.P., Mountainview Thoroughbred Racing Association, LLC, and Washington Trotting Association, LLC, and following a hearing on January 15, 2020, POM's Application is hereby **DENIED**.

*Ellen Ceisler*

_____
Ellen Ceisler, Judge

8

Certified from the Record

JAN 21 2020

And Order Exit

# EXHIBIT E

CP-17-MD-214-2021

**Commonwealth of Pennsylvania**

**COUNTY OF** CLEARFIELD

**APPLICATION FOR**
**SEARCH WARRANT**
**AND AUTHORIZATION**

| Docket Number (Issuing Authority): | Police Incident Number: PA 2019-1738687 | Warrant Control Number: |
|---|---|---|

| Ofc. Lora A. Lion/Sgt Shawn P. Fischer    PSP - BLCE | 814-938-0565 | 09/27/2021 |
|---|---|---|
| **AFFIANT NAME** | **AGENCY** | **PHONE NUMBER** | **DATE OF APPLICATION** |

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible):
See Attachment A for items to be searched for and seized.

FILED 2:05
3 cert. PSP
SEP 27 2021 amm

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.):
Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits.
Pa.Code §§ 213.1 - 213.7.
Nittany Oil Company Inc. is located at 12120 Bennetts Valley Highway. It is a one-story business with gas pumps on either side.
It is at an intersection in Penfield with no other businesses immediately adjacent. There are nearby residences and a Fire
Department. The building is located within Huston Township, Clearfield County.

A TRUE ATTEST COPY

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown, give alias and/or description):

NITTANY OIL COMPANY INC.

| VIOLATION OF (Describe conduct or specify statute,): CC 5513(a)(1) Gambling Devices, Gambling, etc. | DATE(S) OF OCCURRENCE 02/02/20 - 05/26/21 |
|---|---|

☑ **Warrant Application Approved by District Attorney — DA File No.** SW-156-2021 RPS
(If DA approval required per Pa.R.Crim.P. 202(A) with assigned File No. per Pa.R.Crim.P. 507)
☑ **Additional Pages Attached (Other than Affidavit of Probable Cause)**

☐ **Probable Cause Affidavit(s) MUST be attached (unless sealed below)    Total number of pages** 6

TOTAL NUMBER OF PAGES IS SUM OF ALL APPLICATION, PROBABLE CAUSE AND CONTINUATION PAGES EVEN IF ANY OF THE PAGES ARE SEALED
The below named Affiant, being duly sworn (or affirmed) before the Issuing Authority according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at the particular premises or in the possession of the particular person as described above.

| | PSP - BLCE | 9361/7258 |
|---|---|---|
| **Signature of Affiant** | **Agency or Address if private Affiant** | **Badge Number** |

Sworn to and subscribed before me this 27 day of Sept, 2021. Mag. Dist. No. _____

Courthouse, CIfld PA (SEAL)

| **Signature of Issuing Authority** | **Office Address** |
|---|---|

**SEARCH WARRANT**
**TO LAW ENFORCEMENT**
**OFFICER:**

WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the premises or person described, and to seize, secure, inventory and make return according to the Pennsylvania Rules of Criminal Procedure.

☑ This Warrant shall be served as soon as practicable and shall be served only between the hours of 6AM to 10PM but in no event later than:*

☐ This Warrant shall be served as soon as practicable and may be served any time during the day or night but in no event later than: **
_____ M, o'clock _____

☒ This Warrant shall be returned to judicial officer   Clerk of Courts _____.
* The issuing authority should specify a date not later than two (2) days after issuance. Pa.R.Crim.P. 205(4).
** If the issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit(s) and wishes to issue a nighttime warrant, then this block shall be checked. Pa.R.Crim.P. 206(7).
Issued under my hand this 27 day of Sept, 2021 at 11:48 PM, o'clock.

| | 46 Judicial Dist. | 12-31-21 (SEAL) |
|---|---|---|
| **Signature of Issuing Authority** | **Mag. Dist. or Judicial Dist. No.** | **Date Commission Expires** |

Title of Issuing Authority: ☐ Magisterial District Judge ☒ Common Pleas Judge ☐ _____

☒ **For good cause stated in the affidavit(s) the Search Warrant Affidavit(s) are sealed for**
60 **days by my certification and signature. (Pa.R.Crim.P. 211)**

9-27-21 (Date) (SEAL)

**Signature of Issuing Authority** (Judge of the Court of Common Pleas or Appellate Court Justice or Judge).

AOPC 410A-16

TO BE COMPLETED BY THE ISSUING AUTHORITY

**Commonwealth of Pennsylvania**

**COUNTY OF** CLEARFIELD



**AFFIDAVIT OF PROBABLE CAUSE**

| Docket Number (Issuing Authority): | Police Incident Number: PA 2019-1738687 | Warrant Control Number: |
|---|---|---|

*PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*

**AFFIANT**

Your Affiants are, Liquor Enforcement Officer Lora A. Lion, who has been employed with the Pennsylvania State Police, Bureau of Liquor Control Enforcement since 2006, and Sergeant Shawn P. Fischer, Punxsutawney District Office Commander for the Bureau of Liquor Control Enforcement who enlisted with the Pennsylvania State Police in 1993.

**TRAINING AND EXPERIENCE**

Officer Lion has personally conducted investigations into illegal video gambling devices, including video slots, and video poker devices. Officer Lion has taken part in, and personally seized approximately 75 illegal video gambling devices, including video slots and video poker devices. Officer Lion has received multiple trainings on the investigation, seizure, characteristics, and workings of illegal video gambling devices, to include video poker and video slot devices. Officer Lion has been educated on the internal and external workings and characteristics of illegal video gambling devices, including video poker and video slot devices.

**VIDEO GAMBLING**

In various decisions, Pennsylvania Courts have ruled that gambling consist of three elements:

CONSIDERATION: Anything of value required to initiate play on a device.
CHANCE: The randomness of some act, e.g. the spinning of slot machine reels.
REWARD: Something of value, worth more than the amount wagered, offered to a player for a winning outcome.

All legal forms of gambling in Pennsylvania must be specifically authorized by law and operated in conformity with the relevant statutes and related regulations. Gambling is permitted at the Commonwealth's licensed casinos / horse racing tracks, by organizations licensed pursuant to the Small Games of Chance Act (including Tavern Gaming), the Bingo Act, and by the Pennsylvania Lottery. Gambling activities outside those specifically authorized by statute are subject to criminal sanctions.

The Pennsylvania Supreme Court has instructed in "Commonwealth v. Two Electronic Poker Machines" that a video slot/poker machine is a "gambling device per se" if so intrinsically connected to gambling that it can have no legitimate amusement purpose. Gambling devices "per se" are unlawful to maintain and/or operate unless an entity is properly licensed. In order to prove a machine a "per se" gambling device, the Commonwealth must demonstrate the three previously described elements of gambling exist in game play. If during an investigation the element of reward cannot be proven directly, the Pennsylvania Supreme Court has instructed that the presence of certain features is sufficient evidence to prove the element of "reward." These features include a "knock-off" (a method to clear accumulated credits/points), "dip switches", a "power interrupt circuit", and an "accounting mode" which tracks points knocked off (payouts). Once "reward" is proven, the device is deemed a gambling device "per se" and subject to seizure if the owner/operator of the device is not properly licensed. Owners/operators of such devices are subject to criminal prosecution.

Further, the Pennsylvania Supreme Court has directed in "Commonwealth V. Dumont" that "probable cause" is to be determined using a flexible common-sense standard and that an officer does not need to prove all three elements of gambling prior to the seizure of a suspected video gambling device (VGD). In order to seize a device for further inspection, officers must demonstrate the device is "set up" for play, accepts U.S. Currency, that game results are determined predominantly by chance and that, as articulated by the Court, the device incorporates a "knock-off" feature allowing accumulated points to be cleared.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF. I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

| Affiant Signature | Date 09/27/21 | Issuing Authority Signature | 9-27-21 (SEAL) Date |
|---|---|---|---|

AOPC 410B    9/27/21    2

| Commonwealth of Pennsylvania |  | AFFIDAVIT OF PROBABLE CAUSE CONTINUATION PAGE |
|---|---|---|

**COUNTY OF** CLEARFIELD

| Docket Number (Issuing Authority): | Police Incident Number: PA2019-1738687 | Warrant Control Number: |
|---|---|---|

### AFFIDAVIT OF PROBABLE CAUSE CONTINUATION

## LOCATION DESCRIPTION

NITTANY OIL COMPANY INC., T/A NITTANY MINIT MART, AKA PENFIELD MINIT MART, 12120 BENNETTS VALLEY HWY, HUSTON TOWNSHIP, PENFIELD, CLEARFIELD COUNTY, PA 15849

The Nittany Oil Company Inc. is located at 12120 Bennetts Valley Highway. It is a one-story business with gas pumps on either side. It is at an intersection in Penfield with no other businesses immediately adjacent. There are nearby residences and a Fire Department. The building is located within Huston Township, Clearfield County.

## DETAILS OF INVESTIGATION

This gambling investigation involving the possession and operation of illegal VGDs was initiated by the Pennsylvania State Police (PSP) based upon a request of the Bureau Command Staff to conduct a gambling investigation of licensed liquor establishments who possess Pennsylvania Skill video gambling devices.

This investigation involves Pace-O-Matic video games devices which are manufactured and distributed in PA by Miele Manufacturing. Each device contains multiple themed games. The devices in used in this investigation displayed games labeled Fishy Loot, Cocktail Grove, Amigos Locos, Living Large, Wild Beasts, Big Cheeses, Lucky Fruit, Bombs and Bombshells, Lucky Liberty, Graveyard Gold, Pirates, Bandito Brothers, Hi-Ways 50's and Reapers Wilde. Each game operates in similar fashion but are distinct by a theme such as "Wild Beasts" which display wild animals, "Reaper's Wild" which displays Halloween/horror images, "Hi-Way 50's" which displays iconic images of the 1950s, etc.

Account of visit on 02/02/20

On 02/02/20, Officer Earl Killion of the BLCE arrived at the Nittany Oil Company Inc., T/A Nittany Minit Mart in an undercover capacity. He observed four (4) Pennsylvania Skill video gambling devices (VGD) which were operational and set up for play in front of the building, near the main entrance doors. The first two (2) machines (# 1 and # 2) were to the left and positioned back to back. The remaining two (2) machines (# 3 and # 4) were to the center between the entrance doors and positioned back to back. Officer Killion selected a machine # 4 and viewed "Miele Industries" on the lower left panel with a blue logo identifying this machine as being Pace-O-Matic was observed on the screen. He then placed one (1) $20.00 U S Currency (Consideration) in the machine's bill oscillator and received 2000 credits making the value of each credit equal to one cent. The minimum bet was 40 credits and the maximum bet was 400 credits. He selected the game Fishy Loot. This game is essentially a video slot machine with a tic-tac-toe type grid containing 9 grid squares. Each grid box contained a picture such as a fish, octopus, squid, fishhook, etc. He then pressed the play button on the machine's cabinet. The symbols in the grid squares spun randomly until a symbol appeared in each grid square. There was no skill involved in playing the game and the average spin lasted 3 seconds. If a player was able to match identical symbols vertically, horizontally, or diagonally the player could tap over the third image in the row to have the image change to say "Wild" to win the number of credits for matching the 2 items (Chance). As the game was played, occasionally a message would appear stating "Follow Me" which was an option to leave the game being played and play another game. This game provided the opportunity to gain additional credits. Officer Killion was able to earn 2552 credits. He cashed out and received a ticket with number 1923 on it and confirmed a $25 payout (Reward) The ticket also confirmed gaming Software Version of 402.54 pen 1850 on the screen. Officer Killion went to the sales counter near machine #4 and provided his payout ticket to the store clerk. The clerk took the ticket and $25.00 payout (Reward) was given to him. It appeared the clerk placed the ticket under the register. On this same date, the currency was entered into the Punxsutawney property room as evidence.

9-27-21

**Affiant Signature**

AOPC 410B - Probable Cause Continuation

Page 3 of ___

**Commonwealth of Pennsylvania**

**COUNTY OF** CLEARFIELD



**AFFIDAVIT OF PROBABLE CAUSE CONTINUATION PAGE**

| Docket Number (Issuing Authority): | Police Incident Number: PA2019-1738687 | Warrant Control Number: |
|---|---|---|

### AFFIDAVIT OF PROBABLE CAUSE CONTINUATION

It should be noted that the machine does have a "follow me" feature which allows the player to win additional credits. This feature plays similar to the Milton Bradley/ Hasbro electronic game, "Simon". The machine displays 9 circles of various colors and plays through a sequence of circles that the player has to mimic in order to win. The sequence of buttons starts out simple but increases in complexity. It appears that the player must remember the sequence of 42 circles determined by the machine in order to win this game feature. It is not necessary to play the follow me feature in order to play and win the slot machine type games.

Account of visit on 07/24/20

On 07/24/20, Officer Lion entered the subject premises in an undercover capacity. Officer Lion observed four (4) Pennsylvania Skill Video Gambling Devices (VGD) that were operational and set up for play near the entrance of the premises and one labeled a Redemption Center. Officer Lion sat at a VGD that was on the left, which will be called Machine #1, and observed the software for the machine was SKL 402.57 PEN 1902 and 192.168.0.128:165895. There was also a sticker indicating Jack Houser Amusements". Officer Lion inserted four (4) $1.00 US Currency (Consideration) into the machine to play the "Graveyard Gold"(Chance) game. There were 2 credits remaining from a previous player and Officer Lion now had a total of 402 credits making each credit a value of one cent. The minimum level of 40 credits ($.40) with the maximum bet 400 credits. The VGD is a video slot game with 9 squares in a tick-tac-toe grid with approximately 3 seconds play time and no skill involved. Officer Lion played the "Graveyard Gold" game (Chance) by betting 40 credits for each spin. Officer Lion accumulated 560 credits on a crystal ball bonus spin and then won 2000 credits by having 3 identical skeletons appear. Officer Lion pressed the redeem button and the machine asked to confirm a $21.00 payout (Reward). Officer Lion touched "Yes" and received a printed ticket that displayed a prize value of $21.00. Officer Lion had to scan a driver's license prior to scanning the ticket at the Redemption Center and received one (1) $20.00 and one (1) $1.00 in US Currency, totaling $21 US Currency (Reward). Officer Lion had 42 credits left and played the "Wild Beast" game. This game is the same as the above description of gambling. Officer Lion put a distinguishing mark on the machine for future identification. She left 2 points on the device. On this same date, the currency and ticket were entered into the Punxsutawney property room as evidence.

Account of visit on 08/22/20

On 08/22/20, Officer Lion entered the subject premises in an undercover capacity. Four (4) Pennsylvania Skill video gambling devices were observed operational and set up for play in the front area along with a Redemption Center. Officer Lion selected a VGD to the far left that she had played before, Machine #1, and had the mark she made on a previous visit. Officer Lion inserted four (4) $1.00 US Currency (Consideration) into the machine to play the "Graveyard Gold" (Chance) game. There were 4 credits from a previous player, so she had 404 credits, making each credit a value of one cent. There is no skill involved in playing this game and each spin lasts approximately 3 seconds. See description above of game play. The minimum bet was 40 credits with a maximum bet of 400 credits. Officer Lion played 40 credits at a time and was able to randomly win 1258 credits. Officer Lion went to the main screen that had a blue swirl pattern that she recognized as the "O" in Pace-O-Matic. Officer Lion touched the redeem button and it asked her to confirm the 1200 prize value worth a $12.00 payout (Reward). Officer Lion then received a printed ticket with the prize value of $12.00 with a scan code. Officer Lion had to scan a driver's license prior to scanning the ticket in the Redemption Center which dispensed two (2) $5.00 and two (2) $1.00 bills for a total of $12.00 (Reward). This left 58 credits on the machine and Officer Lion played the "Wild Beast" (Chance) game. This is also a slot machine type game with no skill involved to play. The play time is approximately 3 seconds. The minimum bet is 8 credits and the maximum bet is 400 credits. Officer Lion was unable to obtain enough credits for another payout. On this same date, the currency and ticket were entered into the Punxsutawney property room as evidence.

**Affiant Signature**



**Commonwealth of Pennsylvania**

**COUNTY OF** CLEARFIELD

**AFFIDAVIT OF PROBABLE CAUSE CONTINUATION PAGE**

| Docket Number (Issuing Authority): | Police Incident Number: PA2019-1738687 | Warrant Control Number: |
|---|---|---|

**AFFIDAVIT OF PROBABLE CAUSE CONTINUATION**

Account of visit on 10/03/20

On 10/03/20, Officer Lion entered the subject premises in an undercover capacity. Officer Lion observed four (4) Pennsylvania Skill video gambling devices operational and set up for play in the front area of the entrance. Also observed was the Redemption Center. Officer Lion then approached the Pennsylvania Skill VGD located on the left, Machine #1, and observed the mark she had placed on it on a prior visit. Officer Lion observed on the screen that the video software was SKL 402.55 PEN 1989 and 192.168.0.70:165895. There were 7 credits from a prior player on the machine. Officer Lion inserted one (1) $5.00 US Currency (Consideration) into the machine and received 500 credits making the value of each credit as one .01 cent for a total of 507 credits to play. The minimum bet is 40 credits and the maximum bet was 400 credits. Officer Lion selected the "Gem Masters" (Chance) game which is a video slot game with 9 squares in a tic-tac-toe grid and each game lasts approximately 3 seconds and no skill was involved in play. Officer Lion played 40 credits at a time and was able to win 1967 credits. Officer Lion went to the main screen that had a blue swirl pattern that is recognized as the Pace-O-Matic logo. Officer Lion pressed a redemption button on the cabinet asking to confirm if she wanted to redeem 1900 prize value and she touched the "Yes" icon and a ticket dispensed from the machine's cabinet. The ticket indicated Officer Lion had an $19.00 prize value (Reward). Officer Lion had 67 credits remaining for play, so she selected the game " Wild Beasts" game, which has been described prior in this Affidavit. Officer Lion then had to scan a driver's license and then the ticket at the Pennsylvania Skill Redemption Center. The redemption center dispensed three (3) $5.00 bills and four (4) $1.00 bills for a total of $19.00 US Currency (Reward). The redemption ticket and the $19.00 payout were placed into the Punxsutawney Property Room as evidence.

Account of visit on 05/25/21

On 05/25/21, Officer Marcus J. Angello of the BLCE entered the subject premises in an undercover capacity. He observed four (4) Pennsylvania Skill Video Gambling Devices (VGD), which were all operational and ready for play, and a Redemption Center. He then took a seat at the machine that Officer Lion previoṡly received at payout on 10/03/20, Machine #1. He also observed the identifying marking that Officer Lion had placed on the machine. He observed this machine to have twelve (12), slot style games available for play. The games being offered for play were Under the Mountain, Lady Periwinkle, Pirates Rapid, Living Large Rapid, House of Voodoo, Gem Master, Graveyard Gold Rapid, Wild Beasts Rapid, Amigos Locos Rapid, Lucky Fruit Rapid, Reapers Wild Rapid, and Bombs and Bombshells Rapid. At this time, there were 0 credits on this machine. All games being offered for play were observed to be three (3) column, three (3) row, slot style games, which require a player to match three (3) like symbols, on a nine (9) square grid, to win a predetermined amount of credits. All games were observed to have a pre-reveal feature, which allows the patron to observe what the outcome of the next spin, per betting level, will be. This pre-reveal feature shows how many credits the player will win on the next spin of that game and betting level. The left side of the touch screen showed various symbols with point values attached. The right side of the screen showed additional information like; credits, lines played, betting level/ credits being played per spin and how much a player wins in credits. These machines are manufactured by Pace-O-Matic due to having the hurricane symbol in the top right corner of the screen. Officer Angello inserted $20.00 (Consideration) in US Currency into the machine and selected Under the Mountain (Chance). The gaming software displayed on the bottom right of the screen was SKL 402.59 PEN 1990. For his $20.00 in consideration, he received a total of 2,000 credits of play. which equals $0.01 cent per credit. The minimum betting level observed was 40 credits, or $0.40 cents and the maximum betting level observed was 400 credits, or $4.00. He began play by betting 40 credits per spin, which resulted in several smaller "hits" for minimal to moderate credits. The three (3) spinning reels turned like a slot machine and the time of play is approximately 3-5 seconds. It should be noted, the machine has a "follow me" feature, which allows the player to win additional credits. This feature plays like the Milton Bradley/ Hasbro electronic game, "Simon". The machine displays 9 circles of various colors and plays through a sequence of circles that the player must mimic to win. The sequence of buttons starts out simple but increase in complexity. It appears that the player must remember the sequence of 42 circles determined by the machine to win this game feature. It is not necessary to play the Follow Me feature to win the slot machine type games. After a period of play, Officer Angello won a bonus spin. The bonus spin gave him ten (10) free spins that did not require any interaction with the game. As the bonus spin was playing, if you continued to match three like symbols, you won that predetermined amount.

**Affiant Signature**

AOPC 410B - Probable Cause Continuation

9-27-21        Page 5 of __

| Commonwealth of Pennsylvania <br>COUNTY OF CLEARFIELD |  | AFFIDAVIT OF<br>PROBABLE CAUSE<br>CONTINUATION PAGE |
|---|---|---|

| Docket Number<br>(Issuing Authority): | Police Incident<br>Number: PA2019-1738687 | Warrant Control<br>Number: |

### AFFIDAVIT OF PROBABLE CAUSE CONTINUATION

After the bonus spins ended, he had accumulated 4,040 credits, giving him a total of 4,640 credits. He then pressed the "Ticket" button on the machine, at which time a box appeared on the screen, asking him if he wanted to redeem his total amount won of $46.00 (Reward). He pressed "Yes" at which time his ticket was printed out. The receipt showed a "Prize Value" of "$46.00". All remaining credits were played down until he could no longer make the minimum bet of 40 credits. He then went to the Redemption Center and scanned the code. The Redemption Center then dispensed two (2) $20.00 bill, one (1) $5.00 bill, and one (1) $1.00 bill, all in US CURRENCY. On this same date, $46.00 and the ticket were placed into DEO #7- Punxsutawney Property room.

Account of visit on 06/26/21

On 06/26/21, Officer Lion entered the subject premises in an undercover capacity. There were four Pennsylvania Skill labeled video gambling devices along the front area of the premises and one Pennsylvania Skill labeled Redemption Center. All four were turned on and ready for play and Officer Lion sat at Machine #1 on the far left, nearest the Redemption Center. Officer Lion previosly received a payout on that machine and she saw the same identifying mark that she had previously made on the cabinet. The software displayed on the screen was SKL 402.59 PEN 1990 and 192.168.0.25:185895 and there was a Pace-O-Matic blue swirl on the top right. The machine appeared to accept all denomination of US currency bills, but not coins. There were 7 points displayed on the screen. Officer Lion inserted one $10.00 bill (Consideration) into the video gambling device bill accepter which then displayed 1007 points. Each point had a value of one cent. The games available for play on this machine were Under the Mountain, Pirates Rapid, House of Voodoo, Lady Periwinkle, Living Large, Gem Master, Graveyard Gold, Amigos Locos, Reapers Wild, Lucky Fruit, and Bombs and Bombshells. All of these games have a minimum bet of 40 points and a maximum bet of 400 points. The last game, Wild Beasts, is the only game that has a minimum bet of 8 points. There was a Next Puzzle button that she pressed occasionally which showed the outcome of the next spin at each betting level. To win more points, there needed to be a match of three of the same symbols, either horizontally, vertically, or diagonally, after the slot reels stopped turning. The matching of three symbols awarded points based on the value assigned to each symbol. There was a Follow Me skill game offered after each spin containing a winning combination. Officer Lion knew this game to be similar to the Simon repeating sequence memory game. Officer Lion did not attempt to play this game and she did not see anyone else playing this game. Not playing the Follow Me game did not cause her to lose credits and Officer Lion only played the video gambling slot games. Officer Lion chose the game Gem Masters (Chance) which had a minimum bet of 40 points and a maximum bet of 400 points. After pressing play, each spin lasted approximately 3 seconds and there was minimal interaction required by Officer Lion. The screen showed a casino style video gambling slot game with 3 vertical wheels/reels that spun and displayed 3 lines horizontally. Officer Lion played 40 credits at a time and was able to randomly win 3,847 credits. Officer Lion touched the redeem button and it asked her to confirm the redeemable prize amount valued at 3800, worth a $38.00 payout (Reward). Officer Lion touched yes and received a printed ticket that displayed a prize value of $38.00 with a scan code. Officer Lion continued to play the VGD until there were 3 points remaining. Officer Lion scanned the ticket and received one $20.00 bill, three $5.00 bills, and tree $1.00 bills, all in US Currency. The redemption ticket and the $38.00 payout were placed into the Punxsutawney Property Room.

On 09/13/21, verification was completed with Mr. Paul Mauro, Director of the Bureau of Investigations and Enforcement for the PA Gaming Control Board that there are no entities licensed by the Board to operate at this location.
On 09/26/21, at 1133 hours, Officer Sommers made verification at the subject premises that the same four (4) video gambling devices and one (1) redemption center from previous visits were observed to be operational and setup for play. Verification was also made that the unique mark was present and the layout of the interior of the premises remains the same as previously described.

Throughout this investigation, all machines observed to be at the premises were verified to have the same software version number. The characteristics of gameplay and operation described from interactions with the specific machines that payouts were obtained from are identical to those other machines displaying the same version number.

9-27-21

**Affiant Signature**

**Commonwealth of Pennsylvania**

**COUNTY OF** CLEARFIELD



**AFFIDAVIT OF PROBABLE CAUSE CONTINUATION PAGE**

| Docket Number (Issuing Authority): | Police Incident Number: PA2019-1738687 | Warrant Control Number: |

**AFFIDAVIT OF PROBABLE CAUSE CONTINUATION**

CONCLUSION

Through our training and experience, your Affiants believe that all video gambling devices described in this affidavit are set-up, maintained and operated for the purpose of unlawful gambling. During the course of this investigation, law enforcement officers have personally received cash payouts on several of the video gambling devices maintained by the subject establishment.   Your Affiants also believe that all devices, after seizure and subsequent inspection, will be found to possess characteristics unique to video gambling devices, and will prove to be gambling devices "per se" and therefore possessed and operated in violation of Pennsylvania Crimes Code / Title 18, Section 5513, Gambling Devices, gambling, etc.

All officers listed in this Affidavit as having participated in this investigation are known to your Affiant. Each is known to have provided reliable information in numerous investigations resulting in the successful prosecution of both criminal and administrative charges.

Based upon the evidence gathered during this investigation and your Affiant's extensive knowledge of unlawful gambling devices, it was determined that game play on these video gambling devices includes all three elements of gambling; consideration, chance and reward. Additionally, the devices are set up, maintained and being utilized for unlawful gambling purposes. Therefore, your Affiants respectfully request a warrant be issued to permit a search of the premises and the seizure and subsequent inspection of the video gambling devices described herein. Such inspection to include a detailed examination of the internal portion of the devices to identify and document the contents as well as to analyze any accounting/record-keeping data, and /or other indicia of unlawful gambling contained within. Refer to "Attachment A."

The Attorney for the Commonwealth, Ryan P. Sayers asks that this search warrant affidavit be sealed. This affidavit contains sensitive information about the illegal gambling, as well as other key facts. The release of said information in the news media and/or access to said information by any suspects or perpetrators would seriously compromise the investigation.

9-27-21

**Affiant Signature**

**Commonwealth of Pennsylvania**

**COUNTY OF** CLEARFIELD

**APPLICATION FOR SEARCH WARRANT CONTINUATION PAGES**

| Docket Number (Issuing Authority): | Police Incident Number: PA 2019-1738687 | Warrant Control Number: |
|---|---|---|

**Continuation of:**

[X] Items to be searched and seized  [ ] Description of premises/person(s) to be searched  [ ] Owner/ Occupant  [ ] Violations

ATTACHMENT "A":

1. Any and all electronic video gambling devices (VGDs) including but not limited to: Video gambling devices manufactured by Pac-O-Matic and any other video gambling devices from unknown manufactures. Any and all electronic components related to video gambling devices, to include, circuit boards, bill acceptors, and monitors.

2. Remote devices which are used as "knock off" devices including but not limited to magnets, garage door openers, remote controls or other electronic, physical, or mechanical device or object used to remove accumulated credits from the above listed machines. Any reference, service or maintenance manuals for electronic video gambling devices described above.

3. Papers, tickets, notes, receipts, schedules, and any other items relating to or recording activity of illegal gambling in paper or electronic digital format. This would also include containers wherein these items are found, passwords, or other instructions.

4. United States coin and/or currency and/or other financial instruments.

5. Any and all computers, computer hard drives and portable storage devices.

6. Address and/or telephone books, rolodexes or papers containing names, addresses, telephone number, pager numbers, fax numbers of taverns, clubs, fire companies, or other retail service entities, vendors, manufacturers, maintenance or other person affiliated with the aforementioned video gambling devices or their proceeds. Regardless of whether or not such records are by themselves or mixed with legitimate sources.

7. Any and all daily, weekly, and/or monthly collection receipts reports, cash disbursement journals, financial accounting ledger books, and or records reflecting the receipts or proceeds from electronic video gambling devices either electronic, digital, written or telephonic, or any other format including instructional manuals.

8. General Journals, cash receipts journals, cash disbursement journals, general ledgers, subsidiary journals, and any other records or writings which include notes receivable, accounts receivable, accounts payable, and closing ledgers.

9. Bank account records, receipts, disbursements, ledgers, or other writings which document checking, savings, certificates of deposit, safe deposit box, signature cards, or other bank account activity.

10. Any statements, correspondence, records of deposit, records of disbursement, or other writings from brokerage firms, accounting firms, insurance companies, investment companies, banks, or other financial institutions which document transactions of holdings of stock, bonds, mutual funds, insurance policies, real estate, or other assets of pecuniary value.

11. All federal and or state income tax returns, forms 1040, 1065, 1099, 1120, filed or unfiled, and supporting work papers, financial statements, supporting documents and any other items used in the preparation of those returns.

9-27-21

Page 1 of 1 Pages

AOPC 410C





# EXHIBIT F

| **Commonwealth of Pennsylvania**  | **APPLICATION FOR** |
|---|---|
| | **SEARCH WARRANT** |
| **COUNTY OF MONROE** | **AND AUTHORIZATION** |

| Docket Number (Issuing Authority): | Police Incident Number: 2 0211025 M852 | Warrant Control Number: |
|---|---|---|

| Thomas J. McMahon | MCDA CID | (570) 517-3025 | |
|---|---|---|---|
| AFFIANT NAME | AGENCY | PHONE NUMBER | DATE OF APPLICATION |

**IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible):**

See Attachment "A" for items to be search for and seized.

**SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.):**
Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.

Smokin' Joe's Tobacco Shop Inc. - located at 15 N 3rd St, Stroudsburg, PA 18360 in Stroudsburg Borough, Monroe County.

**NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown, give alias and/or description):**

Owner of Smokin' Joe's Tobacco Shop Inc. located at 15 N 3rd St, Stroudsburg, PA 18360

| VIOLATION OF (Describe conduct or specify statute): | DATE(S) OF VIOLATION: |
|---|---|
| 18 PA C.S.A. § 5513. Gambling devices, gambling, etc. | 10/18/2021 to Present |

☐ **Warrant Application Approved by District Attorney – DA File No.** _____
(If DA approval required per Pa.R.Crim.P. 202(A) with assigned File No. per Pa.R.Crim.P. 507)

☐ **Additional Pages Attached (Other than Affidavit of Probable Cause)** *Andrew J. Thodemofin*    10/25/21

☐ **Probable Cause Affidavit(s) MUST be attached (unless sealed below)   Total number of pages:** _____

**TOTAL NUMBER OF PAGES IS SUM OF ALL APPLICATION, PROBABLE CAUSE AND CONTINUATION PAGES EVEN IF ANY OF THE PAGES ARE SEALED.**

The below named Affiant, being duly sworn (or affirmed) before the Issuing Authority according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at the particular premises or in the possession of the particular person as described above.

| | MCDA CID | 302761 |
|---|---|---|
| Signature of Affiant | Agency or Address if private Affiant | Badge Number |

Sworn to and subscribed before me this **26th** day of **October**, **2021**. Mag. Dist. No. _____

Monroe County Courthouse    **(SEAL)**

| Signature of Issuing Authority | Office Address |
|---|---|

**SEARCH WARRANT TO LAW ENFORCEMENT OFFICER:**
WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the premises or person described, and to seize, secure, inventory and make return according to the Pennsylvania Rules of Criminal Procedure.

☒ This Warrant shall be served as soon as practicable and shall be served only between the hours of 6AM to 10PM but in no event later than:*

☐ This Warrant shall be served as soon as practicable and may be served any time during the day or night but in no event later than: **
**4:30** PM, o'clock **October 28**, **2021**.

☒ This Warrant shall be returned to judicial officer **Jonathan Mark**

* The issuing authority should specify a date not later than two (2) days after issuance. Pa.R.Crim.P. 205(4).
** If the issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit(s) and wishes to issue a nighttime warrant, then this block shall be checked. Pa.R.Crim.P. 205(7).

Issued under my hand this **26th** day of **October**, **2021** at **4:30** P M, o'clock.

**(SEAL)**

| Signature of Issuing Authority | Mag. Dist. or Judicial Dist. No. | Date Commission Expires |
|---|---|---|

Title of Issuing Authority: ☐ Magisterial District Judge ☒ Common Pleas Judge ☐ _____

☒ For good cause stated in the affidavit(s) the Search Warrant Affidavit(s) are sealed for **60** days by my certification and signature. (Pa.R.Crim.P. 211)

10/26/2021    (Date)    **(SEAL)**

**Signature of Issuing Authority** (Judge of the Court of Common Pleas or Appellate Court Justice or Judge).

AOPC 410A-10

Clerk of Courts

OCT 26 '21 PM5:00

*(right margin, vertical:)* TO BE COMPLETED BY THE ISSUING AUTHORITY

| Commonwealth of Pennsylvania |  | AFFIDAVIT OF PROBABLE CAUSE |
|---|---|---|

## COUNTY OF MONROE

| Docket Number | Police Incident | Warrant Control |
|---|---|---|
| (Issuing Authority): | Number: 2621-025 M0521 | Number: |

PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:
Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.

Detective Thomas J. MCMAHON, being duly sworn according to law deposes and says:

I am a law enforcement officer of the Commonwealth of Pennsylvania within the meaning of section 5702 of Title 18 Pa. C.S.A. and as such am empowered to make arrests for criminal offenses enumerated in Title 18 Pa. C.S.A. I am a member of the Criminal Investigations Division (CID) of the Monroe County Office of the District Attorney (MCDA), a position I have held since January 2019. Prior to being hired as a detective, I worked for the MCDA CID office in a civilian capacity, which is a position that I held from April 2017 to January 2019, and at time assisted them during investigations. Your affiant attended Penn State University and graduated a Bachelor of Science degree in Administration of Justice and also attended the Lackawanna College Police Academy where I received extensive police training.

Your affiant also has experience doing surveillance in an undercover capacity while participating in drug and illegal narcotics investigations with the Monroe County Drug Task Force.

Your affiant has been personally involved in this investigation concerning the operation of Illegal Video Gambling Devices (VGDs) located at Smokin' Joe's Tobacco Shop Inc. located at 15 N 3rd St, Stroudsburg, PA 18360.

This affidavit is based on conversations with other law enforcement agents, witnesses, observations, and my examination of reports and records. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

All dates and times within this affidavit should be considered to be in accordance with Eastern Standard Time.

### VIDEO GAMBLING

In various decisions, Pennsylvania Courts have ruled that gambling consist of three elements:

CONSIDERATION: Anything of value required to initiate play on a device.

CHANCE: The randomness of some act, e.g. the spinning of slot machine reels.

REWARD: Something of value, worth more than the amount wagered, offered to a player for a winning outcome.

All legal forms of gambling in Pennsylvania must be specifically authorized by law and operated in conformity with the relevant statutes and related regulations. Gambling is permitted at the Commonwealth's licensed casinos / horse racing tracks, by organizations licensed pursuant to the Small Games of Chance Act (Including

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| Affiant Signature | 10/26/21 | Issuing Authority Signature | 10/26/2021 | (SEAL) |
|---|---|---|---|---|
| | Date | | Date | |

Page 2 of 6

AOPC 410B-10

| Commonwealth of Pennsylvania |  | AFFIDAVIT OF PROBABLE CAUSE |
|---|---|---|
| **COUNTY OF MONROE** | | |

| Docket Number | Police Incident | Warrant Control |
|---|---|---|
| (Issuing Authority): | Number: 20211025M0521 | Number: |

*PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*
*Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.*

Tavern Gaming), the Bingo Act, and by the Pennsylvania Lottery. Gambling activities outside those specifically authorized by statute are subject to criminal sanctions.

The Pennsylvania Supreme Court has instructed in "Commonwealth v. Two Electronic Poker Machines" that a video slot/poker machine is a "gambling device per se" if so intrinsically connected to gambling that it can have no legitimate amusement purpose. Gambling devices "per se" are unlawful to maintain and/or operate unless an entity is properly licensed. In order to prove a machine a "per se" gambling device, the Commonwealth must demonstrate the three previously described elements of gambling exist in game play. If during an investigation the element of reward cannot be proven directly, the Pennsylvania Supreme Court has instructed that the presence of certain features is sufficient evidence to prove the element of "reward." These features include a "knock-off" (a method to clear accumulated credits/points), "dip switches", a "power interrupt circuit", and an "accounting mode" which tracks points knocked off (payouts). Once "reward" is proven, the device is deemed a gambling device "per se" and subject to seizure if the owner/operator of the device is not properly licensed. Owners/operators of such devices are subject to criminal prosecution.

Further, the Pennsylvania Supreme Court has directed in "Commonwealth V. Dumont" that "probable cause" is to be determined using a flexible common-sense standard and that an officer does not need to prove all three elements of gambling prior to the seizure of a suspected video gambling device (VGD). In order to seize a device for further inspection, officers must demonstrate the device is "set up" for play, accepts U.S. Currency, that game results are determined predominantly by chance and that, as articulated by the Court, the device incorporates a "knock-off " feature allowing accumulated points to be cleared.

### INVESTIGATION DETAILS

On 10/18/2021 at 11:34, I entered Smokin' Joe's Tobacco Shop Inc., located at 15 N 3rd St, Stroudsburg, PA 18360, in an undercover capacity. Upon entering, I observed that there were four (4) Pennsylvania Skill Games Video Gambling Devices (VGDs), manufactured by MIELE/PACE-O-MATIC. All four (4) VGDs were turned on and ready for play. The VGDs were located along the wall on the left hand side of the store, if facing the back the store from the main entrance. In addition to the four (4) Pennsylvania Skill Games VGDs, there was a Pennsylvania Skill Games "Redemption Terminal" located on the same wall, alongside the VGDs.

I played on the Pennsylvania Skill Games VGD closest to the entrance. I inserted $20.00 cash, US Currency, into the machine and observed the credits increase by 2000. The machine accepted multiple bill denominations. I observed labels/signs on the VGDs which stated that Smokin' Joe's Tobacco Shop does not own the machines.

I played the Game, "Pirates" which is a nine (9) position video slot machine style game requiring two (2) like symbols and a "wildcard" symbol to be aligned vertically, horizontally, or diagonally to win. On a winning combination, the reels will display two (2) like symbols aligned vertically, horizontally, or diagonally and the

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| | 10/26/21 | | 10/26/2021 | (SEAL) |
|---|---|---|---|---|
| Affiant Signature | Date | Issuing Authority Signature | Date | |

Page 3 of 6

AOPC 410B-10

## Commonwealth of Pennsylvania

## COUNTY OF MONROE



## AFFIDAVIT OF PROBABLE CAUSE

| **Docket Number** (Issuing Authority): | Police Incident Number: 2021′′82 25′′785 21 | Warrant Control Number: |
| --- | --- | --- |

*PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*
*Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits, 204 Pa.Code §§ 213.1 - 213.7.*

player has the ability to place a "wildcard" token in a slot to complete the pattern of three (3) symbols in a row going up, down, or diagonal. If there is not a winning combination, the player can continue to spin the wheels by pressing the "Play" button.

"Rapid Play" was enabled on the Pirates game theme. Rapid play allows the player to continuously push the play button until a winning combination appears on a spin and it allows the player to skip the spin animation that plays out on the screen, in order to show the combination results faster, which enables faster game play. When I got a winning combination, the game would no longer allow me to spin the wheels by pressing the "play" button.

I played the Pirates game theme until I ran out of credits.

I moved to the VGD directly to my right. There were 6 credits on the machine prior to inserting money into it. I inserted $10.00 cash, US Currency, into the machine and observed the credits increase by 1000. The machine accepted multiple bill denominations.

I played the game theme, "House of Voodoo" which is a nine (9) position video slot machine style game requiring two (2) like symbols and a "wildcard" symbol to be aligned vertically, horizontally, or diagonally to win. On a winning combination, the reels will display two (2) like symbols aligned vertically, horizontally, or diagonally and the player has the ability to place a "wildcard" token in a slot to complete the pattern of three (3) symbols in a row going up, down, or diagonal. If there is not a winning combination, the player can continue to spin the wheels by pressing the "Play" button.

While playing I accumulated 1366 credits and pressed the ticket button. A ticket printed worth $13.00 and I observed 1300 points get knocked off the total. I observed that there were 66 credits remaining after the knock-off.

I brought the ticket that printed from the Pennsylvania Skill Games VGD to the redemption terminal. I saw that there was a "Pennsylvania Skill Games" label on the redemption terminal. There were instructions on the video screen of the redemption terminal which instructed me to scan the QR Code on my payout slip/ticket at a scanner located on the redemption terminal. I observed that the scanner was located beneath the video screen on the terminal, held the payout slip/ticket's QR code up to the scanner. $13.00 cash, in US currency, was subsequently dispensed from the redemption terminal. I took the $13.00 and left the tobacco shop.I took photographs of all payout slips/tickets that were printed out of the machines, prior to exchanging them for cash money at the checkout counter. I placed identifying marks on all of the machines which I received payouts from. At no point during my investigation, did the store owner, or any employee check my ID or ask me about my age, to verify that I was over the age of 18.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| Affiant Signature | 10/26/21 | Issuing Authority Signature | 10/26/2021 | (SEAL) |
| --- | --- | --- | --- | --- |
| | Date | | Date | |

Page 4 of 6

AOPC 410B-10

| Commonwealth of Pennsylvania |  | AFFIDAVIT OF PROBABLE CAUSE |
|---|---|---|
| **COUNTY OF MONROE** | | |

| Docket Number (Issuing Authority): | Police Incident Number: 202)10∩800052) | Warrant Control Number: |
|---|---|---|

***PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:***
*Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits. 204 Pa.Code §§ 213.1 - 213.7.*

On 10/21/2021 at 11:00, I entered Smokin' Joe's Tobacco Shop Inc., located at 15 N 3rd St, Stroudsburg, PA 18360, in an undercover capacity. Upon entering, I observed that there were four (4) Pennsylvania Skill Games Video Gambling Devices (VGDs), manufactured by MIELE/PACE-O-MATIC. All four (4) VGDs were turned on and ready for play. The VGDs were located along the wall on the left hand side of the store, if facing the back the store from the main entrance. In addition to the four (4) Pennsylvania Skill Games VGDs, there was a Pennsylvania Skill Games "Redemption Terminal" located on the same wall, alongside the VGDs.

I played on the Pennsylvania Skill Games VGD closest to the entrance. I inserted $10.00 cash, US Currency, into the machine and observed the credits increase by 1000. The machine accepted multiple bill denominations.

I played the game theme, "Graveyard Gold" which is a nine (9) position video slot machine style game requiring two (2) like symbols and a "wildcard" symbol to be aligned vertically, horizontally, or diagonally to win. On a winning combination, the reels will display two (2) like symbols aligned vertically, horizontally, or diagonally and the player has the ability to place a "wildcard" token in a slot to complete the pattern of three (3) symbols in a row going up, down, or diagonal. If there is not a winning combination, the player can continue to spin the wheels by pressing the "Play" button.

I played until I no longer had enough credits to continue playing and then verified that there is an alternative gameplay type called "Follow Me". It is accessed by pressing a button on the screen below the reels. I saw no other patrons playing this gameplay type.

I inserted an additional $20.00 into the VGD. While playing, I was awarded with bonus rounds/gameplay called "Golden Touch". I received free spins as a result of the bonus gameplay.

I accumulated 5046 credits and pressed the ticket button. A ticket printed worth $50.00 and I observed $50.00 points get knocked off the total. I observed that there were 46 credits remaining after the knock-off.

I continued playing Graveyard Gold and inserted $20.00 cash, US Currency, into the machine and observed the credits increase by 2000. I played until I no longer had enough credits to continue playing.

I inserted an additional $5.00 into the machine to continue playing. While playing, I accumulated 900 credits and pressed the ticket button. A ticket printed worth $9.00 and I observed 900 points get knocked off the total. I observed that there were zero (0) credits remaining after the knock-off.

I brought the two (2) tickets that printed from the Pennsylvania Skill Games VGD to the redemption terminal. I held the QR code on the payout slips/tickets up to the scanner. $59.00 cash, in US currency, was subsequently dispensed from the redemption terminal. I took the $59.00 and left the tobacco shop.

### CONCLUSION

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY, THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| Affiant Signature | Date 10/26/21 | Issuing Authority Signature | Date 10/26/2021 | (SEAL) |
|---|---|---|---|---|

Page 5 of 6

AOPC 410B-10

**Commonwealth of Pennsylvania**

**COUNTY OF MONROE**



## AFFIDAVIT OF PROBABLE CAUSE

| Docket Number | Police Incident | Warrant Control |
|---|---|---|
| (Issuing Authority): | Number: | Number: |

*PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*
*Social security numbers and financial information (e.g. PINS) should not be listed. If the identity of an account number must be established, list only the last four digits, 204 Pa.Code §§ 213.1 - 213.7.*

Based on the observations described above, your Affiant believes that all video gambling devices described in this affidavit are set-up, maintained and operated for the purpose of unlawful gambling. During the course of this investigation, law enforcement officers have personally received cash payouts on several of the video gambling devices maintained by the subject establishment. Your Affiant also believes that all devices, after seizure and subsequent inspection, will be found to possess characteristics unique to video gambling devices, and will prove to be gambling devices "per se" and therefore possessed and operated in violation of Pennsylvania Crimes Code / Title 18, Section 5513, Gambling Devices, gambling, etc.

Based upon the evidence gathered during this investigation it was determined that game play on these video gambling devices includes all three elements of gambling; consideration, chance and reward. Additionally, the devices are set up, maintained and being utilized for unlawful gambling purposes. Therefore, your Affiants respectfully request a warrant be issued to permit a search of the premises and the seizure and subsequent inspection of the video gambling devices described herein. Such inspection to include a detailed examination of the internal portion of the devices to identify and document the contents as well as to analyze any accounting/record-keeping data, and /or other indicia of unlawful gambling contained within. Refer to "Attachment A."

The facts contained in this Affidavit of Probable Cause are not the only facts known to your Affiant, but those facts that are necessary to establish probable cause.

Due to this investigation still being ongoing, and the sensitive nature of the information contain within this search warrant, I respectfully request that this search warrant be sealed for a period of 60 days.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE OF SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

| Affiant Signature | 10/26/21 | / Issuing Authority Signature | 10/26/2021 | (SEAL) |
|---|---|---|---|---|
| | Date | | Date | |

Page 6 of 6

AOPC 410B-10

# ATTACHMENT "A"

1.  Any and all electronic video gambling devices (VGDs) including but not limited to:
    a.  VGDs manufactured by MIELE/PACE-O-MATIC and any other electronic video slot or poker devices.
    b.  Any other VGDs manufactured by any other known or unknown manufacturers.
    c.  Any and all electronic components related to video gambling devices, to include, circuit boards, bill acceptors, and monitors.

2.  Remote devices which are used as a "knock off" device including but not limited to magnets, garage door openers, remote controls or other electronic, physical or mechanical device or object used to remove accumulated credits from video gambling devices. Any reference, service or maintenance manuals for electronic video gambling devices as described above.

3.  Payout slips, papers, tickets, notes, receipts, schedules and any other items relating to or recording activity of illegal gambling in paper or electronic digital format. This would also include any containers wherein these items are found, passwords, or other instructions; and any and all computers, computer hard drives and portable storage devices that this information could be stored digitally.

4.  Any and all locations that a "payout" was received from and any and all United States currency associated with the video gambling devices.

5.  Any and all daily, weekly, and/or monthly collection receipt reports, cash disbursement journals, financial accounting ledger books, and or records reflecting the receipts of proceeds from electronic video gambling devices either electronic, digital, written or telephonic, or any other format including instructional manuals.

6.  Address and/or telephone books, rolodexes or papers containing names, addresses, telephone numbers, pager numbers, fax numbers of taverns, clubs, fire companies, or other retail service entities, vendors, manufacturers, maintenance or other persons affiliated with the aforementioned video gambling devices or their proceeds. Regardless of whether or not such records are by themselves or mixed with legitimate sources.

7.  General journals, cash receipt journals, cash disbursement journals, general ledgers, subsidiary journals, and any other records or writings which include notes receivable, accounts receivable, accounts payable, and closing ledgers.

8.  An inspection of the machines to look for bookkeeping data, either stored digitally and accessed through an "accounting" or "administrative" mode, or stored mechanically on a device located inside the Video Gambling Devices, which tracks credits "knocked off" (payouts).