# HUSCH BLACKWELL

Michael P. Nolan          8001 Forsyth Boulevard, Suite 1500          Direct: 314.480.1770
Partner                   St. Louis, MO 63105                        Fax: 314.480.1505

michael.nolan@huschblackwell.com

October 1, 2024

Hon. Jennifer P. Wilson
U.S. District Court for the Middle District of Pennsylvania

> **Re:** ***Pace-O-Matic, Inc. v. Eckert Seamans Cherin & Mellott, LLC,* No. 1:20-cv-00292-JPW (M.D. Pa.) – Reply Regarding Confidentiality Dispute**

Dear Judge Wilson:

Plaintiff Pace-O-Matic, Inc. ("POM") respectfully submits this letter pursuant to the Court's September 19, 2024 Order. A party seeking protection under a protective order must "show[] that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (quotation omitted). The Third Circuit has identified several factors that can inform this inquiry. *Glenmede Tr. Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995). Contrary to Gmerek and Parx's arguments, the *Pansy* factors do not support maintaining the confidentiality of Exhibit 1 to POM's August 30, 2024 discovery letter (the "Anti-Skill List").

**First**, *Pansy* considers "whether disclosure will violate any privacy interests." *Glenmede*, 56 F.3d at 483. Relying on the decision in *Brand Energy*, Gmerek cites a purported "privacy interest in his proprietary business information." ECF 441 at 2 (quoting *Brand Energy & Infra. Servs., Inc. v. Irex Corp.*, No. 16-cv-2499, 2017 WL 9512135, at *4 (E.D. Pa. May 4, 2017)).[1] As an initial matter, Gmerek and Parx are both exceedingly vague about how disclosure of the Anti-Skill List would harm any legitimate interests. Gmerek insists that the anti-POM strategies reflected in the List "remain in place and ongoing to this day." *Id.* But the specific tasks in the document appear time-limited, and many relate to interactions with particular government officials who no longer hold their office. Thus, it is unclear which tasks, if any, reflected in the document remain "ongoing." Gmerek seemingly means that the broader anti-POM efforts—led by Stewart and Gmerek, at the behest of their casino clients—remain "ongoing."[2] That broader effort provides no basis for maintaining secrecy of the particular five-year-old tasks in the Anti-Skill List.

In addition, *Brand Energy* is inapplicable here for several reasons. That case involved a trade-secret dispute, and the specific information at issue was apparently "proprietary." 2017 WL 9512135, at *4 . The Anti-Skill List is not "proprietary": Gmerek has no *property* interest in it, as he might with a trade secret or other intellectual property. Thus, the Anti-Skill List receives less protection than the information in *Brand Energy*. *See Littlejohn v. BIC Corp.*, 851 F.2d 673, 685 (3d Cir. 1988) ("[N]on-trade secret but confidential business information is not entitled to the same

---

[1] Gmerek also cites, in passing, *BTG International Ltd. v. Amneal Pharmaceuticals LLC*, No. 15-cv-5909, 2018 WL 11355042 (D.N.J. May 31, 2018). That order appears to have been an unopposed joint request by the parties, and thus it provides little guidance here. *See id.* at *1.

[2] This position is at least in tension with Eckert's insistence that it ended its anti-POM efforts in early 2021. *See, e.g.*, ECF No. 112-3.

1

level of protection from disclosure as trade secret information."). More importantly, in *Brand Energy*, the protective order would have kept proprietary information out of the hands of the senior leadership of a direct competitor, who could have used that information to commercialize a competing product. *See Brand Energy*, 2017 WL 9512135, at *3. Here, Gmerek and Parx contend that POM's interests are contrary to theirs, and POM is presumably the only party who could make adverse use of the information. But the confidentiality order here does not prevent *POM* from accessing the Anti-Skill List. Thus, the rationale of *Brand Energy*—preventing information from falling into the hands of a perceived competitor, who might be able to commercialize that information—has no application here.

Moreover, "privacy interests are diminished when the party seeking protection is a public person subject to legitimate public scrutiny." *Pansy*, 23 F.3d at 787. A lobbyist generally constitutes a public figure, at least with respect to his lobbying. *See, e.g.*, *Campbell v. Pa. Sch. Bds. Ass'n*, 336 F. Supp. 3d 482, 497-98 (E.D. Pa. 2018). Thus, Gmerek has minimal "privacy" interests in his lobbying activities. *See id.* [3]

**Second**, *Pansy* considers "whether the information is being sought for a legitimate purpose or for an improper purpose." *Glenmede*, 56 F.3d at 483. Gmerek and Parx claim that POM seeks to de-designate the Anti-Skill List for the allegedly improper purpose of use in state-court litigation against Gmerek and others. This argument misses the mark for several reasons. De-designation directly advances POM's interests in litigating *this case*. For example, the improper designation of the Anti-Skill List prevents POM from discussing the document's contents with potential witnesses, unless that discussion occurs during a deposition. This hampers POM's ability to assess the scope of certain individuals' relevant knowledge, whether POM should call those individuals as witnesses at trial, or whether POM should depose those individuals. These normal—indeed, essential—litigation tasks are hindered by the improper designation of the Anti-Skill List. As another example, improper confidentiality over-designation has resulted in the need to submit many filings in this case under seal. Repeated, unnecessary sealing increases the inconvenience and expense of litigation. It also deprives the public of visibility into important aspects of this proceeding, an effect that is contrary to the public interest. *See id.* at 484 ("In *Pansy*, we emphasized the strong public interest in open proceedings.").

Moreover, Gmerek and Parx's argument lacks merit even on its own terms. "[I]t is well established that the Federal Rules of Civil Procedure create no automatic prohibition against using discovery obtained in one litigation in another litigation. In fact, such use across proceedings promotes efficiency and avoids waste." *Duling v. Gristede's Op. Corp.*, 266 F.R.D. 66, 75-76 (S.D.N.Y. 2010) (footnote and internal citations omitted). For this reason, federal courts generally refuse to limit a litigant's use of otherwise discoverable documents in collateral litigation. *See, e.g.*, *Cipollone v. Liggett Grp., Inc.*, 113 F.R.D. 86, 90-91 (D.N.J. 1986). In addition, if POM wanted to use the Anti-Skill list in parallel state-court litigation, it could simply obtain the document through discovery in those cases. The scope of civil discovery under Pennsylvania law is substantially the same as under the Federal Rules. *Compare* Pa. R. Civ. P. 4003.1(a) *with* Fed. R. Civ. P. 26(b). There simply would be no need for POM to pretextually pursue discovery in this case for the purpose of use in state-court cases.

**Third**, *Pansy* considers "whether disclosure of the information will cause a party embarrassment." *Glenmede*, 56 F.3d at 483. "[B]ecause release of information not intended by the

---

[3] A business entity—like Gmerek's lobbying firm or Parx—lacks privacy interests cognizable under this factor. *See Arnold v. Pa. Dep't of Transp.*, 477 F.3d 105, 111 (3d Cir. 2007).

writer to be for public consumption will almost always have some tendency to embarrass, an applicant for a protective order whose chief concern is embarrassment must demonstrate that the embarrassment will be particularly serious." *Cipollone v. Liggett Grp.*, 785 F.2d 1108, 1121 (3d Cir. 1986). Gmerek's conclusory argument provides no basis to conclude that any alleged embarrassment "will be particularly serious." His vague assertions do not establish good cause for a protective order.  *See id.*; *see also Glenmede*, 56 F.3d at 484 (rejecting "generalized allegations of injury to reputation and to relationships with clients").

In addition, Gmerek asserts that the Anti-Skill List is a document belonging to his lobbying firm, not a personal document. Gmerek Declaration, ECF 427-1, ¶¶ 22, 26, 34. This is consistent with his testimony that he did not draft the document.[4] And any alleged "embarrassment" would relate to Gmerek in his professional capacity, not in his personal life. In the context of a protective order, "embarrassment" refers to "non-pecuniary harm to individuals" rather than "pecuniary" harms to a business. *Glenmede*, 56 F.3d at 484. Thus, any alleged "embarrassment" here—either to Gmerek's business interests or to Parx's—carries little weight under *Pansy*. *Id.*

**Fourth**, *Pansy* also considers "whether the case involves issues important to the public." *Glenmede*, 56 F.3d at 483. Here, both this case and the particular document at issue involve matters of significant public interest. At the heart of this case is a wide-ranging effort by powerful special interests to manipulate the levers of government—including law-enforcement and regulatory agencies—to run a perceived competitor out of business. The Anti-Skill List details the status of that plot in late 2019, at a time when Eckert had successfully turned much of Pennsylvania's government against its then-client, POM. The document identifies specific public officials and agencies who—whether knowingly or unknowingly—enabled that plot. For this reason, even though no public official is party to this confidentiality dispute, multiple "public entit[ies] or official[s]" would be shielded from scrutiny by keeping the document confidential. *Id.* at 483; *see also Pansy*, 23 F.3d at 791. In addition, the Anti-Skill List relates almost entirely to lobbying activities. Pennsylvania law requires extensive disclosure regarding lobbying activities. *See generally, e.g.*, 65 Pa. C.S. Chap. 13A; 51 Pa. Code Part III. These stringent disclosure obligations further demonstrate that the Anti-Skill List involves issues important to the public.

Moreover, even accepting Gmerek and Parx's characterization of the case as a "private" dispute, this case still involves issues important to the public. For example, in *Glenmede*, the Third Circuit suggested that a dispute involving alleged misconduct by a law firm, as well as a fiduciary's preferencing of one client's interests over another's, implicated "the strong public interest in open proceedings." 56 F.3d at 484-85. The Third Circuit has also found that allegations of misconduct "by a major United States corporation" constitute "a matter of public interest." *Republic of the Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 664 (3d Cir. 1991). While perhaps less nationally famous than Westinghouse, Eckert holds a prominent place in the Pennsylvania business and legal communities. For this reason, allegations of substantial misconduct by Eckert constitute matters of public interest, particularly when that misconduct involves manipulation of government actors. The public-interest factor of *Pansy* strongly cuts against confidentiality.

For the reasons stated above, Gmerek and Parx have failed to carry their burden of showing good cause to maintain the confidentiality of the Anti-Skill List.

---

[4] In neither his deposition nor his declaration did Gmerek actually identify *who*, if not him, drafted the Anti-Skill List. Gmerek simply claims that the document was "*evidently* prepared by staff members." Gmerek Decl., ¶ 33 (emphasis added).

Very truly yours,

HUSCH BLACKWELL LLP

*/s/ Michael P. Nolan*

Michael P. Nolan