IN THE COURT OF COMMON PLEAS
MONTGOMERY COUNTY, PENNSYLVANIA

| | |
|---|---|
| IN RE: | : SUPREME COURT OF PENNSYLVANIA |
| | : 115 M.D. MISC. DKT. 2022 |
| THE FIFTIETH STATEWIDE | : |
| | : MONTGOMERY COUNTY COMMON PLEAS |
| INVESTIGATING GRAND JURY | : CP-46-MD-110-2023 |
| | : |
| | : NOTICE NO. 6 |

TO THE HONORABLE LILLIAN HARRIS RANSOM, SUPERVISING JUDGE:

### AMENDED RESENTMENT NO. 15

We, the Fiftieth Statewide Investigating Grand Jury, duly charged to inquire into offenses against the criminal laws of the Commonwealth, have obtained knowledge of such matters from witnesses sworn by the Court and testifying before us. We find reasonable grounds to believe that various violations of the criminal laws have occurred. So finding with no fewer than twelve concurring, we do hereby make this Amended Presentment to the Court.

_____
Foreperson
The Fiftieth Statewide Investigating Grand Jury

DATED: November 7, 2024

## INTRODUCTION

We, the members of the Fiftieth Statewide Investigating Grand Jury, having received and reviewed evidence pertaining to violations of the Pennsylvania Crimes Code in Schuylkill County and in multiple other counties across Pennsylvania pursuant to Notice of Submission of Investigation Number 6, hereby make the following findings of fact and recommendation of charges:

## FINDINGS OF FACT

The Grand Jury conducted an investigation into illegal video gambling devices (VGDs) installed and operated in multiple establishments across Pennsylvania. The investigation initially focused on the Deibler Brothers Novelty Company (Deibler Brothers), which was led by its principal owner, Arthur Deibler, Arthur's brother, Donald Deibler, their sister, Miranda Sandler, and Joel Ney. Deibler Brothers operated out of a headquarters located in Hegins Township, Schuylkill County. In addition to providing hundreds of local establishments with ATMs, juke boxes, dart boards, bar top games and pool tables, Deibler Brothers supplied thousands of illegal gambling devices. The devices were installed in locations throughout Schuylkill, Northumberland, Dauphin, Lycoming, Luzerne, Cumberland, Berks, Northampton, Lehigh, Carbon, Lackawanna, Monroe, Chester, Lancaster and Perry counties. The Deibler Brothers derived substantial profits from the distribution and operation of these illegal VGDs, with the company receiving in excess of $1 million per month during the time frame of this investigation.

In addition to the Deibler organization, the Grand Jury also heard evidence concerning another illegal gambling enterprise. That particular organization was led by John F. Conley and his son, John D. Conley. They distributed illegal VGDs throughout at least 18 counties in western Pennsylvania, as well as Delaware County. The Conley organization also received millions of

2

dollars annually from the operation of illegal VGDs.

The Grand Jury heard testimony about the legality of VGDs. The determining factor as to whether a device is illegal is whether the outcome of the game is determined predominantly by the skill of the player, or, by chance. One company -- Pace-O-Matic -- has been operating VGDs in Pennsylvania for several years. The company's games are marketed as involving "skill" and they have, as part of their software program, a secondary element (a memory test) which can sometimes be played upon losing a wager. With this secondary component being added to the "chance" part of the initial game, an intermediate Pennsylvania appellate court has determined that the company's games were predominantly games of skill and therefore not illegal under the Pennsylvania Crimes Code.[1] In contrast, the vast majority of VGDs distributed by the Deibler Brothers and Conley organizations had no such secondary element associated with them. The Grand Jury learned that the wins and losses in those games were determined predominantly by chance and therefore all of those games were illegal.

The Grand Jury heard testimony from an undercover Pennsylvania State Police Trooper (U/C trooper) that the Deibler Brothers and Conley organizations were desirous of having some of Pace-O-Matic's skill games co-mingled with illegal VGDs at multiple locations for several reasons. One reason was to try to dupe law enforcement officers and store owners into thinking that all of the machines that were located in the establishments were legal. Due to ongoing litigation concerning the status of Pace-O-Matic machines, the members of these organizations were hopeful that with the installation of Pace-O-Matic machines, the officers assigned to the Pennsylvania State Police Bureau of Liquor Control Enforcement (PSP-BLCE) would not investigate those locations. Secondly, by co-mingling the machines, these gambling machine

---

[1] The Pennsylvania Supreme Court has granted review of the intermediate appellate court's ruling, but for the moment that ruling remains in effect.

distributors sought to give the establishment owners and players the impression that all games being offered were legal. Deibler Brothers went so far as to place a banner on one illegal VGD which stated that the game included a secondary element when it did not.

This Grand Jury heard testimony from the U/C trooper that in early 2019, the Federal Bureau of Investigation (FBI) and PSP received complaints about various types of criminal conduct occurring in connection with the VGD industry. It was also relayed that retired PSP troopers were working on behalf of VGD manufacturers and operators. This U/C trooper testified that in response to these complaints, he assumed an undercover role but, in doing so, maintained his actual identity. He testified that PSP "faked" his retirement with the paperwork indicating that he retired in October 2019. Following his "retirement" he started working for Pace-O-Matic. He secured that job through an acquaintance, Ricky Goodling, who was a retired PSP corporal and had then gone on to work for Pace-O-Matic. The U/C trooper testified that over the next several years, he worked closely with Goodling on Pace-O-Matic's compliance team. During the course of their employment together, the U/C trooper learned that Goodling had orchestrated an illegal scam to obtain large sums of money that were derived from the illegal gambling activities of the Deibler Brothers and Conley organizations, as well as several authorized Pace-O-Matic operators.

The Grand Jury heard testimony that Goodling enlisted as a trooper in October 1991 and transferred to the PSP-BLCE Compliance Auditing and Gambling Enforcement (CAGE) unit in December 2002. In March 2005, Goodling was promoted to the rank of corporal and supervised the CAGE unit from May 2005 until his retirement in March 2018. The Grand Jury heard testimony that, as the CAGE supervisor, Goodling's main responsibility was to investigate potential violations of Pennsylvania's gambling laws. Goodling became a recognized expert in this area and even taught several training classes pertaining to VGDs throughout the state. Shortly

after his retirement from PSP, Goodling took a job with Pace-O-Matic, one of the companies he had previously monitored for compliance with Pennsylvania law.

Goodling began his employment with Pace-O-Matic as a compliance officer and was responsible for handling contract issues involving equipment manufacturers, distributors, and operators. Goodling would go on to become the Director of Compliance for the company and then, ultimately, the National Director of Compliance, where he was responsible for overseeing the day-to-day operations of compliance teams in each market where Pace-O-Matic had executed contracts with operators and locations where VGDs were placed.

According to his own sworn testimony during a legal proceeding, one of Goodling's main responsibilities was to ensure that Pace-O-Matic machines were not being co-mingled with competing gaming devices and/or illegal gaming devices. Any such co-mingling of illegal machines would constitute a violation of a contract between the operator and Pace-O-Matic. Another one of Goodling's responsibilities was to make sure that no more than five Pace-O-Matic VGDs were in operation at any one location. A third requirement was that no Pace-O-Matic operator was permitted to sell or transfer Pace-O-Matic game terminals or software to any unapproved third party.

On June 10, 2019, Goodling provided testimony to the Pennsylvania House Gaming Oversight Committee. During his testimony, he stated:

> As a former state trooper, I have seen the bad actors and how they utilize illegal machines to take advantage of the system, avoid taxes and hurt the entire industry. That is one of the many reasons I believe in the Pennsylvania skill product. We have a model that is transparent and really benefits the entire commonwealth.

The Grand Jury learned that sustained violations of contracts with Pace-O-Matic could be enforced by Pace-O-Matic's Compliance Team through punitive measures, such as increased

software license fees, and could ultimately end with operators or locations having their rights to operate Pace-O-Matic equipment terminated. With respect to Deibler Brothers, the company had been banned by Pace-O-Matic from operating their games due to such contractual violations. The U/C trooper was approached by Goodling, who informed him that, despite the ban, Deibler Brothers still possessed Pace-O-Matic games. Goodling advised that Deibler Brothers wished to obtain more of the company's games. Goodling then worked with the U/C trooper to allow Pace-O-Matic operators[2] to continue to provide Pace-O-Matic games to Deibler Brothers. This led to complaints by other Pace-O-Matic operators, complaints that would then be handled by the very compliance team that Goodling led. Goodling would thus have been made aware of all complaints about Pace-O-Matic games that were operated in the same location as illegal VGDs. He proceeded to quash those complaints by failing to take action to have the games removed. Goodling informed the U/C trooper that the Deibler Brothers and the Conley organizations were desirous of having more Pace-O-Matic Skill games interspersed throughout many of their locations. As stated above, one of the principal motivations was because they believed that it might reduce the number of PSP-BLCE investigations. Goodling directed the U/C trooper to assist him in obtaining large covert kickbacks from Arthur Deibler and John D. Conley in exchange for Goodling allowing them to violate Pace-O-Matic's contracts.

One of the steps that Goodling directed the U/C trooper to take was to create a limited liability company (LLC) with him in order to establish a bank account for depositing the large sums of money which he anticipated receiving from the Deibler Brothers and Conley criminal enterprises. The U/C trooper testified that he and Goodling created the fictitious entity of Rest and

---

[2] Pace-O-Matic deals primarily with operators who distribute Pace-O-Matic games to various establishments. At the time of the investigation, Pace-O-Matic did not require operators to report on the exact location or the placement of Pace-O-Matic machines.

Relaxation, LLC, with its headquarters listed as being located at the U/C trooper's former residence in Tioga County. After the entity was created, a bank account was established in the name of the LLC which would go on to ultimately receive tens of thousands of dollars between February 2021 and October 2023. The U/C trooper testified that beginning in February 2022, Arthur Deibler began delivering regular $10,000 payments in cash to Goodling to continue enjoying the benefit of Goodling running interference on any potential complaints made against Deibler Brothers which may have limited their ability to co-mingle Pace-O-Matic games with illegal VGDs at various locations. The U/C trooper also testified that Goodling directed him to set up a similar arrangement with John D. Conley. In this case, however, Goodling had the U/C trooper collect the money directly from the Conleys. The U/C trooper testified that the money he received from the Conleys was sporadic and was never an exactly even amount. The U/C trooper testified that the amount received on each occasion would either be slightly more or less than $10,000. Monies collected by Goodling and the U/C trooper from both organizations were distributed between them at the direction of Goodling. The U/C trooper testified that all of the cash he received during his undercover role was counted, documented and placed into evidence after being turned over to case agents by the U/C trooper. All told, the U/C trooper and Goodling received close to $100,000 in cash from the Conley organization and over $150,000 in cash from the Deibler Brothers organization. The Grand Jury also heard testimony that a review of Rest and Relaxation LLC's bank account showed that between February 2021 and November 2023, the account received over $300,000 in deposits from two of the Pace-O-Matic operators, who were independent contractors and providing Deibler Brothers and the Conley organization with the Pace-O-Matic games. Those two operators were Jason Manculich of M&R Amusements and James Fratto of Rock and Roll, LLC. Of the deposited amounts, Goodling withdrew close to

$100,000 and the remaining amount was seized pursuant to search warrants executed during the investigation. Over $152,000 in cash was also seized from Goodling's residence in November 2023. The U/C trooper testified that he had conversations with Goodling wherein he reminded Goodling that the money received from the Deibler Brothers' organization was generated by hundreds of illegal VGDs that the company had been operating throughout eastern Pennsylvania. The U/C trooper testified that Goodling's response was that he did not care where the money came from and that the worst that could happen was that he could be charged with a misdemeanor offense for illegal gambling. The U/C trooper also testified that he and Goodling had numerous conversations concerning the fact that Goodling was aware that nearly all of the Conley organization's profits came from the operation of illegal VGDs. In spite of this, Goodling instructed the U/C trooper to continue to request and accept payments from them.

      The U/C trooper explained how the Rest & Relation, LLC account was manipulated to evade federal reporting requirements, and how there were violations of both federal and state law. The Grand Jury was provided a history of deposits into the Rest & Relation, LLC account, which revealed 42 deposits being made between February 2021 and October 2023. A majority of these deposits were proceeds from Rock and Roll, LLC that were, at times, invoiced as "management consultation" fees and paid by check with a notation that read "consult." In reality, these payments were made to insure that Goodling would not report, or take any action, against Rock and Roll, LLC for violating Pace-O-Matic rules and policies. Further, the bank records showed that the deposits ranged from $1,000 to $9,000 but never exceeded $10,000. In fact, there were several instances of successive deposits of $9,000. The U/C trooper explained that the manner of structuring these deposits was discussed, and agreed to, between James Fratto of Rock and Roll, LLC, Goodling, and the U/C trooper at a meeting prior to the payments beginning in March 2021.

During this meeting, the parties discussed the importance of avoiding any Suspicious Activity Report or Currency Transaction Report for any monies paid by check as may be required under federal law for financial transactions exceeding $10,000. This Grand Jury was advised of the federal statute requiring such reporting and the Pennsylvania counterpart which incorporates any violation of federal reporting requirements into a state offense.

This Grand Jury also heard testimony that outside counsel for Pace-O-Matic indicated that at no time during Goodling's employment did anyone at the company consent to Goodling actively concealing violations of their contracts/policies or receiving anything of consideration for doing so. Outside counsel further represented that Pace-O-Matic had no knowledge of, nor did they consent to, allowing locations to operate Pace-O-Matic VGDs along with competing VGDs.

## RECOMMENDATION OF CHARGES

Based on the evidence we have obtained and considered, which establishes a *prima facie* case, we, the members of the Fiftieth Statewide Investigating Grand Jury, recommend that the Attorney General, or her designee, institute criminal proceedings against the following individual and charge him with the listed offenses:

### Ricky Goodling

| | |
|---|---|
| 18 Pa.C.S. § 911(b)(3), (4) | Corrupt Organizations; |
| 18 Pa.C.S. § 5111(a)(1),(3) | Dealing in Proceeds of Unlawful Activities; |
| 18 Pa.C.S. § 4108 (a) | Commercial Bribery; and |
| 18 Pa.C.S. §903(a)(1) – 18 Pa.C.S. §5513(a) | Conspiracy to Commit Gambling |