# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PACE-O-MATIC, INC.,     :
            :  **No. 1:20-cv-00292-JPW**
   **Plaintiff,**     :
            :  **Judge Wilson**
  **v.**          :
            :
**EXKERT SEAMANS CHERIN &** :
**MELLOTT, LLC, et al.,**   :
            :
   **Defendants.**    :

### DECLARATION OF MATTHEW HAVERSTICK

I, Matthew Haverstick, state the following under oath based on my personal knowledge and belief:

1. Since 2017, I have been Pace-O-Matic's ("POM's") lead counsel in Pennsylvania.

2. POM first became aware of an undercover Pennsylvania State Police ("PSP") trooper working inside POM when, in 2024, the Office of Attorney General ("OAG") released two grand jury presentments identifying that PSP had placed a trooper undercover inside the company. POM was not charged in those presentments, was described as a victim, and was identified as operating a legal business.

1

3.      POM quickly deduced the identity of the undercover: Ryan Kelley, a former POM legal compliance officer and, as of the date of this Declaration, apparently still a PSP employee.

4.      Kelley began his employment at POM in late 2019. He tendered his resignation in late 2021, but continued working for POM, and being paid, through 2022.

5.      POM then investigated on what authority Kelley was placed inside POM, and particularly whether he had any legal authority to participate in attorney-client privileged communications (which he had done on multiple occasions, in person and by email).

6.      POM determined that Kelley was used as an undercover operative for both the PSP and the FBI, although the FBI terminated his use because it determined POM was not engaging in any criminal conduct. PSP continued to use Kelley as an undercover operative, however.

7.      PSP also confirmed, in writing and under oath, that Kelley's undercover operation was initiated by PSP.

8.      As part of a separate investigation in which the OAG charged former POM employee Rick Goodling for defrauding POM (via one of the presentments mentioned in paragraph 2 *supra*), the OAG sought and obtained a hardwire intercept

2

of Goodling's phone. The intercept recorded innocent conversations between Goodling's and POM lawyers and executives.

9.    As is POM's right under Pennsylvania law, POM obtained access to the October 16, 2023 Affidavit in Support of the Application for an Order Authorizing the Interception of Wire and Electronic Communications.

10.    The Affidavit, sworn to by two PSP troopers, gave the history of Kelley's undercover operation. Although I was not allowed to keep a copy of the Affidavit, I was permitted to review it thoroughly and take verbatim notes of its contents.

11.    The Affidavit identified that Kelly's undercover operation started when PSP's Bureau of Liquor Control Enforcement made a complaint to Kelley (at that time a trooper working at the PSP academy) that POM operated illegal gambling devices. This PSP report, *to itself*, served as the purported predicate for the institution of Kelley's undercover operation. Although the FBI *later* joined the operation, the Affidavit makes clear that the undercover operation was commenced by PSP.

12.    The affidavit described how PSP faked Kelley's retirement from PSP so that he could join POM as an employee (working as a legal compliance officer).

13.    Similarly, PSP determined when Kelley's undercover operation ended. As sworn to in the Affidavit, PSP terminated the operation because it "became

3

concerned" with Kelley's "deep involvement" in POM, and particularly in POM's legal defense efforts.

14. At no point does the Affidavit aver or even suggest that the Kelley undercover operation was managed by federal authorities.

15. POM engaged in litigation to obtain whatever legal authority existed to allow Kelley to obtain and review attorney-client privileged emails, among other confidential records Kelley accessed.

16. POM also sought information from PSP and OAG, including but not limited to court orders justifying Kelley's espionage and Brady material OAG and PSP never provided in other litigation over the legality of the POM Game.

17. To obtain this information, POM brought a motion before the grand jury judge of the 50th Statewide Investigating Grand Jury, which investigated Goodling and before which Kelley testified.

18. OAG opposed the motion, and argued that because Kelley's insertion into POM predated the Notice Six investigation his conduct during that time (and any documents and information related to it) was outside the grand jury and that POM would have to pursue PSP outside of the grand jury judge's jurisdiction to obtain those documents.

19. On that basis, the grand jury judge rejected POM's requests.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  July 2, 2025                          .

_____
Matthew Haverstick

5