# HUSCH BLACKWELL

Michael P. Nolan8001 Forsyth Boulevard, Suite 1500Direct: 314.480.1770
PartnerSt. Louis, MO 63105Fax: 314.480.1505

michael.nolan@huschblackwell.com

September 19, 2025

Hon. Jennifer P. Wilson
U.S. District Court for the Middle District of Pennsylvania

Re:*Pace-O-Matic, Inc. v. Eckert Seamans Cherin & Mellott, LLC,* No. 1:20-cv-00292-JPW (M.D. Pa.) – Motion to Appoint Special Master

Dear Judge Wilson:

In November 2023, POM served a third-party document subpoena on Richard Gmerek ("Mr. Gmerek"), a lobbyist who helped Eckert implement its strategy to turn state governmental actors against POM. Mr. Gmerek and POM agreed on stipulated email search parameters to identify materials responsive to the subpoena. *See* ECF No. 411-1. Those agreed search terms—such as "POM" and "Pace-O-Matic"—were narrowly tailored to identify materials relevant to this litigation. *See id.* To minimize the burden on Mr. Gmerek, POM agreed that Mr. Gmerek could identify responsive emails where Eckert personnel were senders or recipients on a log rather than producing them because these documents were in the possession of Defendants and should have been produced by Defendants. Consistent with that agreement, Mr. Gmerek produced a 1,016-page log (the "Gmerek Log") of responsive emails involving Eckert personnel that were identified by the agreed search parameters.

POM compared the Gmerek Log to Eckert's prior productions and privilege logs. Based on that comparison, POM identified approximately 1,800 emails responsive to the agreed search parameters that Eckert had neither produced nor identified on a privilege log. Some of the omitted emails raised serious questions about the searches previously performed by Eckert. For example, a number of the omitted emails have a subject line related to "POM." Despite the obvious relevance of these emails, Eckert had neither produced nor logged them.

On August 22, 2024, POM sent correspondence to Eckert raising the discrepancies between the Gmerek Log and Eckert's prior productions and privilege logs. *See* Exhibit 1. Contemporaneously with that letter, POM also sent a version of the Gmerek Log that highlighted emails that appeared to be missing from Eckert's productions and privilege logs. POM's letter stated that, "[f]or each email highlighted on the log, we respectfully request that Eckert either produce the document or include it on a privilege log." *Id.* at 1.

On August 30, 2024, after a telephonic meet and confer, Eckert agreed to run the same search parameters as Gmerek in order to locate the missing materials identified in the Gmerek log, as well as any other materials identified by these search parameters.[1] Over the course of nearly nine months, Eckert made a series of piecemeal productions involving documents identified by the

---

[1] For example, the Gmerek search terms would also capture internal Eckert emails that would not have been included on the Gmerek Log.

Gmerek search parameters.[2] The bulk of these newly revealed materials were internal Eckert emails that did not appear on the Gmerek Log. On May 16, 2024, Eckert made its "final" production in response to the August 2024 letter, and it also served a supplemental privilege log.

POM carefully reviewed Eckert's supplemental productions and logs, and POM also conducted a further review of Eckert's prior productions and privilege logs. Based on that review, POM determined that there were still **more than 1,600 relevant emails** reflected on the Gmerek Log that Eckert has neither produced nor logged. On August 1, 2025, POM sent correspondence to Eckert noting these ongoing deficiencies and requested that Eckert remedy them immediately. *See* Exhibit 2. POM contemporaneously provided Eckert with an updated version of the Gmerek Log highlighting emails still missing from Eckert's productions and privilege logs. *See* Exhibit 3.

Many of the missing emails are of core and clear relevance to this case. For example, Eckert still has not produced or logged many emails that expressly mention POM and/or POM's "Pennsylvania Skill" trade name in the email subject line, including but not limited to the following:

| Control # (Gmerek Log) | Subject |
| --- | --- |
| #210634.1 | FW: POM PARX statement |
| #348890.1 | Re: Parx; POM actions – skill games |
| #60858.1 | Re: [External] Re: Your press release on POM |
| #262325.1 | Re: [External] Fwd: POM Skill Games – Update |
| #275823.1 | POM – PSP's Answer |
| #30194.1 | Re: [External] Fwd: Pace O Matic Lawsuit |
| #243637.1 | Re: POM letter |
| #63562.1 | RE: New POM Game in DC |
| #500290.1 | Paceomatic |
| #352351.1 | Meeting Updates and New Pace-O-Matic Lobbyist |
| #400871.1 | RE: FRPOM Pace-O-Matic to senators: FW: Vote NO on VGT Bill |
| #48338.1 | FW: PA skill website update |
| #603903.1 | Re: [External] FW: Pennsylvania Skill statement on casino industry comments about skill games during Feb. 24 state House Gaming Oversight Committee hearing |
| #532618.1 | RE: PA Lawmakers Say Regulating Pace-O-Matic Skill Games Would Benefit the State |

In subsequent meet and confer conversations, it became clear that Defendants had not made any effort to compare its productions and privilege logs with the list of missing documents from the Gmerek log which was provided by Plaintiff in *August 2024, nearly one year prior to Plaintiff's updated letter*. Alarmingly, Defendants' counsel reported that once they finally began comparing the Gmerek log to the documents they had collected according to the agreed search parameters— a comparison they began only after they received Plaintiff's August 2025 letter expressing intent

---

[2] The parties met and conferred several times regarding the pace of Eckert's production. These conferences followed Eckert's repeated failures to meet its commitments to resolve the issue. For example, on November 27, 2024, Eckert projected that it would complete its production within 30 days. In reality, it took 170 days to receive the next limited production. Similarly, on February 25, 2025, Eckert projected that it would complete its production within 20 days. In reality, it took 80 days to receive a limited production. Even after the long delays, the majority of the productions contained mass emails and news clips. In addition to the dates describe above, the parties met and conferred telephonically, by videoconference, or in writing regarding the issues discussed in the August 22, 2024, letter on August 30, 2024, December 13, 2024, April 22, 2025, May 6, 2025, August 1, 2025, August 7, 2025, August 12, 2025, August 22, 2025, and September 3, 2025.

to go to the Court for resolution—they realized their document collections from Eckert did not even contain the missing documents. Most recently, counsel for Eckert suggested that at least 2,800 emails had been erroneously omitted from prior document collections from Eckert. However, Eckert has been unable to provide any explanation for how this could have occurred. Given that some of the missing emails are parts of email chains that were partially produced, it is difficult to conceive a scenario in which those documents collected with search terms omitted only portions of emails chains containing those terms.

Defendants have repeatedly stated they are now trying to be sure they have collected the universe of relevant documents but have failed to provide any explanation for the egregious discrepancies. Further, they have stated that they require an additional "seven weeks" to determine the reasons they failed to collect and produce these documents, even after Plaintiff provided an itemized list.

The Court should appoint a special master to supervise the collection of materials identified by the Gmerek search terms and to oversee any privilege disputes that may arise with respect to those materials. Federal Rule of Civil Procedure 53(a)(1)(C) authorizes the Court to appoint a special master to "address pretrial. . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). Applying Rule 53, courts in the Third Circuit have embraced the use of special masters to ease the burden on district courts and to streamline proceedings in cases involving complex legal and factual issues. Such appointments have been particularly useful in overseeing the discovery process. For example, in *In re Orthopedic Bone Screw Products Liability Litigation*, the court appointed a Special Master to address and resolve all discovery disputes which arose in that multidistrict litigation. No. MDL 1014, 1995 WL 925665, *2 (E.D. Pa., Sept. 14, 1995) (ordering the appointment of a Special Master to review the parties' discovery disputes, conduct hearings to resolve the disputes, and prepare and file reports on the progress of the Special Master's duties). Further, in *In re Diet Drugs Products Liability Litigation*, the court appointed a Special Master "for the purpose of administering a discovery schedule, mediating discovery disputes and, if necessary, rendering reports and recommendations to the court as to any disputed discovery-related matter." No. MDL 1203, 2001 WL 497313, *3 (E.D. Pa., May 9, 2001). In *In re Chambers Development Securities Litigation*, the court appointed a Special Master to oversee all aspects of discovery. 912 F. Supp. 822, 826 (W.D. Pa. 1995). In summary, courts in the Third Circuit have routinely utilized special masters to provide extra efficiency and organization to the discovery process in complex cases.

Due to the procedural history of the failure to properly collect and produce documents uncovered by the Gmerek log discrepancy and additional documents identified by the Gmerek search terms, the review requires significant oversight by a special master to ensure proper procedures are followed without burdening the court and disrupting judicial efficiency. Moreover, based on the history of this case, POM anticipates that the parties may disagree over whether the attorney-client privilege applies to many of the documents captured by the Gmerek search terms. Based on the Gmerek Log alone, this could involve more than 1,000 documents. And it is unclear how many other documents might be captured by those terms. To mitigate the burden on the Court of any discovery disputes relating to the Gmerek search term documents, the special master should also oversee any privilege disputes relating to those documents.

For the reasons described above, POM respectfully requests that the Court appoint a special master to supervise the production of materials captured by the Gmerek search terms and to oversee any discovery disputes relating to those documents.

Very truly yours,

HUSCH BLACKWELL LLP

Michael P. Nolan